IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORDELL WILLIAMS,                        )
                                         )
        Plaintiff,                       )        No. 23 CV 14905
                                         )
v.                                       )        JURY TRIAL DEMANDED
                                         )
JAMES O'BRIEN, THE PERSONAL              )
REPRESENTATIVE OF THE ESTATE             )
OF WILLIAM FOLEY, THE CITY               )
OF CHICAGO, a municipality, and          )
UNKNOWN EMPLOYEES OF THE                 )
CITY OF CHICAGO,                         )
                                         )
        Defendants.                      )

**COMPLAINT**

NOW COMES Plaintiff, CORDELL WILLIAMS, by his undersigned counsel, the Law

Office of Steven W. Becker LLC, and complains against JAMES O'BRIEN, THE PERSONAL

REPRESENTATIVE OF THE ESTATE OF WILLIAM FOLEY, THE CITY OF CHICAGO, a

municipality, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, as follows:

**PRELIMINARY STATEMENT**

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. §

1988, and Illinois state law to address deprivations under color of state law of the Plaintiff's

rights as secured by the Constitution of the United States and the laws of the State of Illinois.

2.      The claims arise from a series of occurrences in 1994 when the State charged 19-

year-old Cordell Williams with the first-degree murder of Myron Cochran and Billy Johnson,

based upon a tortured and coerced confession procured by Defendants O'Brien and Foley,

detectives who worked under the direction of former Commander Jon Burge.

3. Mr. Williams was found guilty solely under an accountability theory by a jury and was sentenced to natural life imprisonment. The only evidence used to convict Williams under the accountability theory came from a statement that was extracted by torture and coercion, and was dictated by Defendants O'Brien and Foley.

4. On October 17, 2022, Judge Vincent M. Gaughan granted Mr. Williams' successive petition for post-conviction relief, vacated Mr. Williams' first-degree murder convictions, vacated the natural life sentences imposed in connection therewith, and then granted the State's motion of *nolle prosequi* with respect to such counts.

5. Mr. Williams, who is innocent of these crimes, was finally released on October 21, 2022. Mr. Williams was wrongfully incarcerated for twenty-eight (28) years and four (4) months.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1). All events occurred within the Northern District of Illinois. Upon information and belief, all parties to the case reside or resided in the Northern District of Illinois.

## PARTIES

8. Plaintiff CORDELL WILLIAMS ("Williams") is a citizen of the United States who resides in Chicago, Illinois.

9. At all times relevant, Defendants JAMES O'BRIEN ("O'Brien"), THE PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM FOLEY ("Foley"), and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO (collectively "Defendant Officers")

2

were employees of the City of Chicago Police Department and acting within the scope of their employment as duly appointed police officers of the City of Chicago and under color of state law.

10. Defendant CITY OF CHICAGO ("City") is a municipal corporation organized under the laws of the State of Illinois. The City is responsible for the various policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injuries occasioned thereby. The City was the employer of the other Defendants.

## STATEMENT OF FACTS

11. In May 1994, Cordell Williams was 19 years old, had a High School diploma, a job at the Board of Education, and no prior criminal convictions.

12. On May 25, 1994, Cordell Williams, David Evans, and two others, Veno and Chris, all went to the hospital to visit a friend, Paris McMoore, who had been shot.

13. After visiting their friend at Northwestern Hospital, the group went to a party at Veno's house.

14. Mr. Williams, who was driving his mother's car, was providing rides home from the party for those going his way, including David Evans.

15. In the early morning of May 26, 1994, Mr. Williams was driving, Londell Harper was seated on the front passenger side, David Evans was in the back seat on the driver's side, and Andre Rudik was in the back passenger seat.

16. On the way home to drop Evans off, and within just several blocks from Evan's house, David Evans demanded that Mr. Williams pull over the car.

17. Evans thought he saw two individuals who had previously tried to shoot him

3

sitting in a restaurant located at Halsted and 74th Street.

18.     David Evans then went into the restaurant, shot and killed the two individuals, Myron Cochran and Billy Johnson, and ran back to the car.

19.     Evans was later identified by two eyewitnesses, including an off-duty police officer, who was across the street from the restaurant at the time of the incident.

20.     The off-duty police officer, Stan Sanders, testified that Mr. Williams started the car and began pulling away as Evans ran towards the car.

21.     Evans stumbled on his way to the car but eventually was able to get into the back seat of the car.

22.     The off-duty police officer chased the car and reported the license plate number but lost the vehicle.  After a short distance, Mr. Williams demanded that David Evans get out of the car, dropped off the other passengers, and went home.

23.     Based on the license plate registration number, the police arrested Mr. Williams at approximately 1:30 a.m. in the early morning hours of May 26, 1994, after which he was transported to Chicago's Area One Police Headquarters.

24.     Upon arrival at Area One, Mr. Williams was placed in an interrogation room and handcuffed to a ring.

25.     Following initial questioning by Detective James O'Brien, the detective told Mr. Williams that he would be leaving the room and, upon his return, Williams would be begging to tell him something.

26.     Thereafter, Detective William Foley entered the room with a phone book.  Upon instruction, Mr. Williams stood up, after which Detective Foley struck him in the rib area with the phone book, knocking the wind out of Mr. Williams.

4

27.     Detective Foley then slapped Mr. Williams in the face.  At that point, Detective Foley left the room.

28.     Detective O'Brien re-entered the room and informed Mr. Williams that he would soon be speaking with Assistant State's Attorney Gregory Vaci and that he had better cooperate.

29.     Detective O'Brien then informed Mr. Williams that his father was at the station.

30.     Detective O'Brien informed Cordell Williams' father, Odell Williams, that if Cordell would cooperate, he could walk out of the station with his father.

31.     Detective O'Brien also asked Odell Williams about his dialysis treatments, when he last saw Cordell, and if he knew who Cordell was with.

32.     After that, Detective O'Brien accompanied Odell Williams to an interrogation room.

33.     Cordell Williams was then brought into the room with his father.  When Detective O'Brien left the room, Cordell broke down crying and told his father that he did not kill anyone.

34.     Odell Williams begged his son to tell the detectives whatever they wanted to know.  Cordell Williams, however, cut off his father and told him that he had been beaten up in custody and that his face was putty.

35.     Detective O'Brien then came into the room and told Odell Williams that his son had to go talk with the state's attorney.

36.     Detective O'Brien rehearsed the alleged statement with Cordell Williams and corrected certain details.  Mr. Williams was deprived of food, water, and restroom breaks during this period.

37.     At approximately 12:30 a.m. on May 27, 1994, ASA Vaci and Detective O'Brien interviewed Mr. Williams.

38. A court-reported statement was taken at around 2:30 a.m.

39. Mr. Williams was in the custody of the police for approximately 25 hours between 1:30 a.m. on May 26, 1994, and 2:30 a.m. on May 27, 1994, when a statement was taken. Mr. Williams' coerced statement was used against him at trial.

40. On October 25, 1994, Cordell Williams' trial attorney filed a motion to suppress statements.

41. The motion documented that Mr. Williams was held in custody for approximately 24 hours, was not allowed to use the bathroom despite repeated requests to do so, was struck in the face by a police officer while in custody, and, "as a result of the physical and psychological abuse by the officers," finally agreed to give a statement.

42. On or about March 22, 1995, Williams' trial counsel withdrew the motion to suppress statements. Mr. Williams' trial counsel threatened that he would cease his representation of Cordell Williams, thereby resulting in the loss of Williams' family's savings already invested into the case, if Mr. Williams did not agree to the withdrawal of the motion to suppress statements.

43. Mr. Williams' trial counsel has since been suspended from the practice of law by the Illinois Supreme Court for mismanagement of multiple criminal cases.

44. The only evidence that Mr. Williams was aware that David Evans had a gun came from Williams' coerced statement.

45. Absent Mr. Williams' coerced statement, there was no evidence to convict him under an accountability theory at trial.

46. On June 28, 1995, Detective O'Brien testified at Mr. Williams' trial and provided false testimony concerning statements allegedly made by Mr. Williams.

47.	On June 28, 1995, ASA Vaci testified at Mr. Williams' trial and published the coerced statement to the jury.

48.	In the State's closing trial rebuttal argument, it specifically alleged to the jury that "it's his [Cordell Williams'] words that have him here today . . . ."

49.	Londell Harper, one of the other passengers in the car at the time of the Evans shooting incident, was found not guilty in a bench trial.

50.	There is no evidence that, on May 26, 1994, Mr. Williams ever handled a gun, was aware of any plan to commit criminal activity, or knowingly aided David Evans before or during Evans' unanticipated shooting of Myron Cochran and Billy Johnson.

51.	At trial, the only evidence introduced against Mr. Williams to demonstrate his accountability for David Evans' actions came from a tortured and coerced statement extracted from Mr. Williams by Defendants O'Brien and Foley.

52.	On June 29, 1995, Cordell Williams was found guilty under an accountability theory of the felony offenses of first-degree murder of Myron Cochran and Billy Johnson following a jury trial conducted before the Honorable Vincent M. Gaughan under Case No. 94 CR 15518(01) in the Circuit Court of Cook County.

53.	On August 10, 1995, Williams was sentenced to natural life imprisonment in the Illinois Department of Corrections.

54.	On direct appeal, Mr. Williams raised the following issues: (1) the trial court erred in telling the jury that it should decide the meaning of the phrase "during the commission of the offense" in the accountability instructions; and (2) the court erred in failing to admonish the jury before sequestering them for the night.

55.	On March 26, 1999, Mr. Williams' convictions and sentence were affirmed on

7

appeal.

56.     On March 16, 2000, Mr. Williams filed a post-conviction petition alleging that counsel on direct appeal was ineffective for (1) failing to argue that the State failed to prove him guilty beyond a reasonable doubt; and (2) failing to argue that the sentence was unconstitutional.

57.     On March 27, 2000, the trial court summarily dismissed Mr. Williams' petition.

58.     On appeal, Mr. Williams argued that the statute under which he was sentenced was unconstitutional under the single-subject clause of the Illinois Constitution.

59.     On September 6, 2002, the appellate court found that the statute was not unconstitutional and affirmed the judgment of the trial court.

60.     On September 20, 2002, Mr. Williams filed a successive post-conviction petition raising a claim of actual innocence.

61.     On September 30, 2002, the trial court dismissed the petition.

62.     On appeal, after the Office of the Public Defender filed a motion to withdraw, the reviewing court granted the motion and affirmed the judgment of the trial court.

63.     On April 22, 2008, Mr. Williams filed a petition for writ of habeas corpus alleging (1) that the charging instrument gave him insufficient notice of the State's accountability theory; (2) that the first-degree murder statute was unconstitutional as applied to him; and (3) that his sentence was unconstitutional.

64.     On June 18, 2008, the trial court dismissed the habeas petition.

65.     On December 15, 2009, after the Office of the Public Defender filed a motion to withdraw, the appellate court granted the motion and affirmed the judgment of the trial court.

66.     On October 27, 2011, Mr. Williams filed a petition for relief from judgment asserting, *inter alia*, that his natural-life sentence was void because the sentencing statute was

declared unconstitutional under the single-subject clause.

67.     On January 27, 2012, the trial court dismissed the petition, finding that it was untimely and barred by *res judicata*.

68.     On appeal, Mr. Williams argued that his mandatory sentence of natural life without parole was unconstitutional as applied to him under the federal and state constitutions and that he was entitled to additional sentence credit.

69.     On July 14, 2014, the appellate court affirmed the trial court judgment.

70.     As to his sentencing challenges based on the United States Supreme Court's intervening decision in *Miller v. Alabama*, 567 U.S. 460 (2012), the appellate court found that Mr. Williams "used the wrong procedural vehicle to assert constitutional challenges to his sentence" and that the "appropriate method" for raising such a claim would be a new post-conviction petition.

71.     On December 19, 2014, Mr. Williams filed a motion for leave to file a successive post-conviction petition in which he alleged that his mandatory sentence of natural life without parole was unconstitutional as applied to him, that he satisfied the "cause" and "prejudice" test, and that he was entitled to proper sentencing credit upon resentencing.

72.     On March 25, 2015, the trial court denied Mr. Williams leave to file his successive post-conviction petition.  The trial court held that Mr. Williams may have been able to demonstrate cause but could not demonstrate prejudice.

73.     On May 11, 2018, the appellate court issued a published opinion reversing the trial court, vacating Mr. Williams' sentence, remanding the case for a new sentencing hearing, and instructing the circuit court to issue a corrected mittimus reflecting a sentencing credit of 441 days.  *People v. Williams*, 2018 IL App (1st) 151373, ¶¶ 25, 30.

74. On November 28, 2018, the Illinois Supreme Court, under its supervisory power, vacated the appellate court's opinion and returned the case for reconsideration in light of *People v. Harris*, 2018 IL 121932, on the issue of whether Mr. Williams' sentence violated the proportionate penalties clause. *People v. Williams*, 2018 IL LEXIS 1153 (Nov. 28, 2018).

75. On March 27, 2019, the appellate court issued an order allowing Mr. Williams' agreed motion for summary disposition and remanding the case to the circuit court with instructions to allow Mr. Williams leave to file a successive post-conviction petition and to appoint counsel for second-stage proceedings.

76. On July 8, 2020, Mr. Williams filed a successive post-conviction petition.

77. On July 18, 2022, Mr. Williams filed supplemental claims to his successive post-conviction petition, including claims that his due process rights were violated where the police, who had engaged in a pattern and practice of misconduct, used torture and coercion to extract a statement from him, which was introduced against him at his criminal trial, and that his trial counsel was ineffective for withdrawing Mr. Williams' motion to suppress statements alleging torture.

78. On October 17, 2022, Judge Vincent M. Gaughan granted Mr. Williams' successive petition for post-conviction relief, which alleged, *inter alia*, that Mr. Williams was tortured and coerced by detectives working under the direction of former Commander Jon Burge, vacated Mr. Williams' first-degree murder convictions, vacated the natural life sentences imposed in connection therewith, reinstated and redocketed the original counts, and then granted the State's motion of *nolle prosequi* with respect to such counts.

79. As a result of the charges, Mr. Williams was incarcerated for more than twenty-eight (28) years and four (4) months. Mr. Williams was in custody from on or about May 26,

1994, the date of his arrest, until October 21, 2022, the date he was released from the Illinois Department of Corrections following the grant of the State's motion of *nolle prosequi*.

## DEFENDANTS' PATTERN OF MISCONDUCT

80. The shootings at issue herein are far from the only time Defendants O'Brien and Foley, often joined by others, have worked together to "close" a case quickly, regardless of the evidence. Nor is it the first time in which these detectives used physical and psychological torture, to do so. Rather, these detectives had engaged in a longstanding pattern of such misconduct.

81. As a result, numerous men have had their convictions overturned, notwithstanding confessions taken by Defendants O'Brien and Foley.

82. Examples of misconduct committed by O'Brien and Foley, or both, include, but are not limited to:

    a. In 1987, Frank Bounds was interrogated by Foley and two other officers. During his interrogation, Bounds alleged that the officers kicked him in the forehead and attempted to kick him in the groin. The officers told him that if he would agree to sign a statement, they would not release his girlfriend's name to the media. As a result, Bounds agreed to sign a statement implicating himself in a brutal rape-murder that he alleges he had nothing to do with.

    b. Anthony Robinson was arrested in 1987 for murder. Robinson asserted that he was repeatedly kicked and slapped by Foley and two other detectives during his interrogation. Three days later, Robinson sought medical treatment for his left ear; he was diagnosed with a perforated eardrum. According to Robinson's sister, she observed her brother in the interrogation room handcuffed to the wall

and bleeding from his nose and mouth; he later complained to her that he had been kicked in the groin. Robinson was released, but six months later, he was arrested on the same charge. After Detective Kill slapped him again a few times, Robinson became extremely frightened that what had happened to him before could happen again (and worse) and signed a false confession.

c. In 1990, Cortez Brown was tortured by O'Brien into confessing to two murders with which he had absolutely nothing to do. O'Brien, along with Detectives John Paladino and Anthony Maslanka, beat Brown about his head and body, including with a flashlight. Brown was denied food and his right to an attorney. During post-conviction proceedings, the court vacated Brown's conviction, finding the evidence of the officers' pattern of misconduct "staggering" and "damning."

d. Marcus Wiggins brought a lawsuit against O'Brien, Boudreau, and others alleging that he was handcuffed to a wall, beaten and electroshocked while being questioned with a group of youngsters in a 1991 murder case. The detectives denied Wiggins' mother access to her son, who was a 13-year-old eighth grader at the time of the coerced confession. The other young suspects also gave confessions, many of them after being physically beaten as well. For example, Jesse Clemon and Iamari Clemon alleged that they were struck about their bodies, including with fists and flashlights. Two of these confessions were later thrown out on the basis of the "periodic screaming [at the police station] throughout the night," screaming that O'Brien and Boudreau testified that they did not hear. All of the defendants were either acquitted or had their cases *nolle*

*prosequied* by the State.  In civil depositions in an unrelated lawsuit, O'Brien and Halloran took the Fifth Amendment when asked questions about the torture of Marcus Wiggins and his co-defendants.

e.  In August 1991, 15-year-old Johnny Plummer was interrogated for 36 hours by Detectives Clancy, Foley, Boudreau, and Halloran.  Plummer alleged that he was hit in the face, stomach and side, including with a flashlight, by the detectives.  Halloran has taken the Fifth Amendment regarding Plummer's allegations.

f.  In August 1991, Javan Deloney was arrested for murder.  When he resisted Foley's and Kill's threats, the detectives became angry and repeatedly punched him in the chest and slapped him in the face.  Foley also threatened to throw Deloney out the window if he did not confess.  Deloney was denied the right to an attorney.  As a result, Deloney signed a false statement implicating himself in murder because he was afraid of being beaten or worse.

g.  In August 1991, Curtis Milsap was slapped in the face while handcuffed and kicked in the testicles by O'Brien until he confessed to a double murder about which he had no knowledge.  Notwithstanding his confession, Milsap was ultimately acquitted of the murders.

h.  Also in August 1991, George Anderson was arrested for two separate homicides. Anderson alleged that he was tortured into giving false and fabricated confessions over the course of 30 hours of police custody by Detectives Boudreau, Halloran, O'Brien, Kill, and Stehlick.  Following proceedings before the TIRC and an evidentiary hearing, an Illinois appellate

13

court vacated Anderson's convictions and remanded for retrials at which the State will be precluded from introducing his involuntary confessions.

i. Gregory Logan was interrogated regarding a murder in 1991 by O'Brien, Foley, and other police officers. When Logan professed his innocence, the detectives beat him with a bat, pushed his head against the wall, and pointed a gun to his head. He was denied the right to an attorney.

j. In February 1992, Arnold Day was interrogated in connection with the murder investigation of Rafael Garcia. After isolating Day in an interrogation room for hours, Foley and Boudreau forcefully grabbed Day by the neck and choked him. The detectives also threatened to throw Day out the window. Day ultimately confessed, but was nonetheless acquitted of the Garcia murder after presenting compelling allegations of police torture.

k. In October 1992, Clayborn Smith was smacked on the face and head, and punched in the ribs by Boudreau, Halloran, and Foley. The detectives also grabbed Smith's neck, pulled his hair and yanked his finger back. After 37 hours of interrogation and physical torture, Smith confessed to a murder that he did not commit. In pending post-conviction proceedings, the Court barred the State from denying that Boudreau and Halloran engaged in a pattern of abuse between 1990 and 2001.

l. In November 1992, Harold Hill, Dan Young, and Peter Williams falsely confessed to rape and murder after Boudreau, O'Brien, Moser, and Halloran physically assaulted and psychologically coerced them. Hill was only 16 years old at the time and could not withstand the detectives' physical violence.

14

Similarly, after being kicked and struck about his body, Dan Young, whose IQ was 56, also falsely confessed to a crime with which he had absolutely nothing to do. Indeed, even Peter Williams (who, it turned out, was incarcerated on an unrelated charge at the time of the rape-murder), falsely confessed after being chained to a radiator, hit with a blackjack, and forced to urinate on himself. Williams was never charged; twelve years after their convictions, Hill and Young were exonerated when DNA evidence proved that they could not have been the offenders.

m. In May 1993, Terry King and Tyrone Hood were arrested for the murder of Marshall Morgan, Jr. Detectives Foley and Lenihan tried to get King to confess by beating him about his face and body – exactly as occurred to Williams here. King was left with a black eye, bumps on his head, and lacerations inside his jaw. King was ultimately released without being charged when his alibi cleared.

n. Tyrone Hood was beaten about the body by Boudreau, Ryan, Lenihan, and Foley while he was held at the lockup at 51st and Wentworth. Hood was also interrogated by Boudreau and Halloran. So too for the witnesses in Hood's case, a number of whom alleged the Defendants physically or psychologically coerced them. Hood has been granted a Certificate of Innocence, and his civil lawsuit against Defendants Ryan, Lenihan, Boudreau, and Halloran recently settled.

o. In 1993, Emmett White was arrested by Clancy, O'Brien, and Halloran. In an effort to secure his confession, O'Brien, Clancy, and Halloran slapped White on his face and struck White on his body. When White told the officers that he did

15

not have anything to say to them and was exercising his right to remain silent, the detectives became infuriated. The detectives again struck White about the face and body, threw him on the ground, and one of the officers stepped on his face. Although the police alleged that White confessed to the crime, when asked about White's allegations that he was beaten about the face and body, O'Brien and Halloran pled the Fifth Amendment.

p.  Jerry Gillespie confessed to murder after he was kicked and slapped about the face and body and choked during 30 hours of interrogation by Foley, Boudreau, O'Brien, and Halloran. Gillespie was denied the right to an attorney and threatened with further beating, including being burned with a cigarette, if he did not sign the statement that was prepared for him. Both O'Brien and Halloran have taken the Fifth Amendment on questions relating to Gillespie's allegations.

q.  In 1993, the day after Tyrone Reyna's sixteenth birthday, he was beaten during an interrogation by O'Brien, Boudreau, and Halloran, who refused to let him contact his family and intimidated him into confessing to a murder that he did not commit. Reyna's co-defendants, Nicholas Escamilla and Miguel Morales, were arrested by the same detectives despite the lack of any physical evidence or eyewitnesses linking them to the crime. Boudreau, O'Brien, and Halloran tortured Escamilla by beating him and threatening to send his pregnant wife to jail if he did not confess. After hours of abuse, Escamilla eventually confessed. Although Morales was also beaten during his interrogation, he refused to confess.

r.  Therefore, to secure Morales' conviction, O'Brien, Halloran. and Boudreau

16

coerced John Willer and Raphael Robinson into identifying Morales as the offender. For example, O'Brien used a very-suggestive lineup: He grabbed Robinson by the neck while Robinson was viewing a lineup and asked him "how many fingers am I holding up." When Robinson answered "three," O'Brien used this to say that Robinson had identified person number three. In addition, O'Brien spoke with Robinson prior to his trial testimony to explain who committed the murder and where in the courtroom they would be sitting.

s. When asked about their interrogation and coercion of Escamilla, Morales, Willer, and Robinson during a deposition in a civil suit, O'Brien and Halloran refused to answer any questions for fear of subjecting themselves to criminal liability.

t. In December 1993, Boudreau, O'Brien, and Halloran "closed" two separate murders by coercing confessions from two intellectually disabled individuals, Fred Ewing and Darnell Stokes. One expert concluded that Ewing was "unable to comprehend the substance of the confession which he allegedly made." Absent any other evidence connecting them to the crime, both were acquitted notwithstanding the "confessions" obtained by Boudreau and O'Brien. O'Brien and Halloran both refused to answer questions about Ewing's and Stoke's allegations that they were beaten by O'Brien, Halloran, and Boudreau when in a deposition in an unrelated civil suit.

u. In 1994, Nevest Coleman, an educated man with no criminal record, was arrested for a rape and murder he did not commit. Given that the body was buried in the basement of Coleman's apartment building, Boudreau, Halloran,

17

Foley, and Clancy set their sights on Coleman. Coleman repeatedly denied his involvement in the rape and murder, which was met with punches to Coleman's face. Eventually, the officers fed Coleman details about the crime, and Coleman falsely confessed to being a lookout. In 2016, DNA evidence exculpated Coleman and his co-defendant. In 2017, Coleman was exonerated, and the State dismissed all charges.

v. In 1995, Boudreau and Halloran interrogated and coerced a confession from Oscar Gomez. The detectives held Gomez for 30 hours, repeatedly beat him while he was shackled to the wall, and prevented him from communicating with an attorney or with his family. Despite his "confession," Gomez was found not guilty. O'Brien and Halloran both took the Fifth Amendment when asked questions about their coercive interrogation of Gomez.

w. Kylin Little was a witness to a 1996 murder. When O'Brien, Halloran, and Boudreau interrogated him, they physically and psychologically coerced him until he lied and implicated Eric Gibson, a man who had absolutely nothing to do with the crime. Since his interrogation, Little has fully recanted the statement he gave to the police.

x. In 1996, Jeremy Allen was wrongfully charged with murder after O'Brien coerced two witnesses into falsely identifying Allen. Allen was ultimately acquitted at trial.

y. In February 1997, Robert Wilson falsely confessed to slashing a woman with a knife after being slapped and threatened by O'Brien. O'Brien withheld evidence from the victim that another man, one who exactly fit her description

18

of the perpetrator, had slashed several persons in the same area at about the same time. The victim ultimately recanted her identification of Wilson, but not before Wilson had spent almost 10 years in jail. In a deposition in an unrelated civil suit, O'Brien and Halloran both took the Fifth Amendment when questioned about Wilson's allegations of abuse.

z. After police officer Michael Ceriale was shot to death in 1998, Boudreau, O'Brien, and Halloran arrested then-16-year-old Jonathon Tolliver at 4:00 a.m. and interrogated him for a 24-hour period, resulting in allegedly incriminating oral statements. To ensure Tolliver's conviction, Boudreau, O'Brien, and Halloran also coerced incriminating statements from other witnesses by holding them in custody for extended periods of time, physically abusing and threatening to lodge charges against them, withholding food, and denying access to a parent or attorney.

aa. In 1998, 17-year-old Antoine Anderson was interrogated by O'Brien and Halloran about a recent murder. The detectives hit Anderson in the face and chest, and threatened to take away his children. As a result of this abuse, and after being held for two days at the police station, Anderson falsely confessed to a crime he did not commit.

bb. In October 2001, Marcellous Pittman was arrested for a murder that he did not commit. During his interrogation by Halloran and O'Brien, Pittman was beaten about his body and coerced into making a false confession. In 2022, a court suppressed Pittman's confession after finding his allegations credible and questioning Halloran's and O'Brien's credibility and version of events. The

19

State then dismissed all charges against Pittman.

## THE CITY OF CHICAGO'S POLICIES AND PRACTICES CAUSED PLAINTIFF'S WRONGFUL CONVICTION

83.     As a result of its policies and practices, the Chicago Police Department is responsible for scores of miscarriages of justice like those the Defendant Officers inflicted on Plaintiff and the others described above.

84.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people of serious crimes they did not commit—numerous of which involve the named Defendant Officers.

85.     The pattern of misconduct identified in the paragraphs above involving Defendants O'Brien and Foley are but a fraction of this widespread practice, which extended throughout the City.

86.     These cases include many in which Chicago police officers employed the same tactics the Defendant Officers employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary, false, and fabricated confessions; and (2) concealing exculpatory evidence.

87.     At all times relevant hereto, members of the Chicago Police Department, including the Defendant Officers in this action, routinely manufactured evidence against innocent people by physically torturing, coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

88.     As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendant Officers in this action, contrived false narratives

20

that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

89. In 2019, the Federal Bureau of Investigation and Department of Justice confirmed that Chicago Police Department supervisor, Jon Burge—who had supervised Defendants O'Brien and Foley—was aware that on numerous occasions, detectives he was supervising participated in the torture and physical abuse of persons being questioned.

90. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a suspect or witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

91. The municipal policy and practice set out in the paragraphs above was described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements and physically abused witnesses.

92. Before and during the period in which Plaintiff was falsely charged with these shootings and convicted, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards ("OPS") almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

93. As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence with the Chicago Police

Department.  In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

94.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant Officers here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes.  As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

95.     The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a. The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b. The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c. The risks of engaging in tunnel vision during investigation.

d. The need for full disclosure, candor, and openness on the part of all officers

22

who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

96.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

97.     The City's failure to train, supervise, and discipline its officers, including the Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case.  Constitutional violations like those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

98.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

99.     The City of Chicago's policymakers also approved the policies and practices described in the foregoing paragraphs and were deliberately indifferent to the violations of constitutional rights described herein.

## **PLAINTIFF'S DAMAGES**

100.     Plaintiff has suffered and continues to suffer enormous physical and psychological injury as a direct and proximate result of the Defendants' misconduct.  Plaintiff spent more than 28 years of his life imprisoned for crimes that he did not commit.  He woke up

each day with this reality, not knowing whether he would see his family again outside prison walls or ever successfully prove the wrongfulness of his conviction and incarceration.

101. Over the course of his 28 years of imprisonment, Plaintiff's beloved father, his godmother, and his childhood caretaker all passed away, and Plaintiff was deprived of the opportunity to properly grieve with his family or to attend their memorial services.

102. As a result of Defendants' actions, Plaintiff continues to experience chronic physical and psychological pain and suffering, humiliation, constant fear and anxiety, deep depression, despair, rage, and other physical and psychological effects from his years of wrongful conviction.

**COUNT I**
**42 U.S.C. § 1983 – Due Process: Coerced False Confession**

103. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

104. As more fully described above, the individual Police Officer Defendants acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by using physical violence, threats of violence, trickery, manipulation, and deceit to compel Plaintiff against his will to make statements that were later used to convict him.

105. In the manner described more fully above, Defendants coerced Plaintiff to make statements that were introduced as inculpatory evidence for crimes they knew he did not commit. Defendants falsified police reports and Defendant O'Brien gave false testimony about the misconduct they used in securing this false evidence. They failed to correct the fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

24

106.     The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

107.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murders of Myron Cochran and Billy Johnson.  Thus, the Defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful convictions.

108.     Notwithstanding its effect on the outcome of the trial or even the truth or falsity of the statements, the mere use of Plaintiff's physically coerced statements at his trial violates his Fifth and Fourteenth Amendment rights against compelled self-incrimination.

109.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

110.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, chronic physical conditions, and other grievous and continuing injuries and damages.

111.     The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT II
### 42 U.S.C. § 1983 – Due Process:  Fabrication of Evidence

112.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

113.     As more fully described above, the individual Police Officer Defendants

25

acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by fabricating Plaintiff's inculpatory statements and by testifying at Plaintiff's trial about those statements.

114.     Defendant O'Brien testified falsely at Plaintiff's trial as described above, claiming that Plaintiff confessed to his knowledge and involvement in a plan to shoot Cochran and Johnson.  O'Brien knew that his testimony was false and that Plaintiff had not confessed to his involvement in the crime.

115.     The Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

116.     Absent this misconduct, Plaintiff would not have been wrongfully convicted of the murders of Cochran and Johnson.  Thus, the Defendants' misconduct deprived Plaintiff of his constitutional right to a fair trial and directly resulted in Plaintiff's wrongful conviction.

117.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

118.     As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, chronic physical conditions, and other grievous and continuing injuries and damages.

119.     The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

26

**COUNT III**
**42 U.S.C. § 1983 –** *Brady* **Violations**

120.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

121.    As described in detail above, all of the individual Police Officer Defendants, acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial, in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecutors who tried the case.

122.    The Police Officer Defendants continued to suppress exculpatory evidence after Plaintiff's conviction.  Had this exculpatory evidence been disclosed, Plaintiff would not have spent 28 years in prison for a crime he did not commit.

123.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's innocence.

124.    As a direct and proximate result of this deprivation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, chronic physical conditions, and other grievous and continuing injuries and damages.

125.    The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT IV**
**42 U.S.C. § 1983 – Prolonged Pre-Trial Detention**

126.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

127.    In a manner more fully described above, the Defendant officers acting individually, jointly, and in conspiracy, as well under color of law and within the scope of their employment, deprived Plaintiff of his Fourth and Fourteenth Amendment constitutional rights.

128.    The Defendant officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

129.    In so doing, the Defendant officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and in all such proceedings were ultimately terminated in Plaintiff's favor indicative of his innocence.

130.    The Defendant officers subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was innocent, through the Defendants' procurement of a physically coerced confession, fabrication of evidence, and suppression, and withholding of evidence.

131.    The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Plaintiff's constitutional rights and in total disregard of the truth and Plaintiff's innocence.

28

132.    As a direct and proximate result of this deprivation of his constitutional right, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, chronic physical conditions, and other grievous and continuing injuries and damages.

133.    The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy**

134.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

135.    All of the individual Police Officer Defendants reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of confessions and testimony for the purpose of framing Plaintiff for a crime he did not commit.

136.    All of the individual Police Officer Defendants reached an agreement amongst themselves to deprive Plaintiff of material exculpatory evidence and information to which he was lawfully entitled and to conceal their misconduct from Plaintiff, all in violation of Plaintiff's constitutional rights, as described above.

137.    In this manner, the Police Officer Defendants conspired to accomplish an unlawful purpose by an unlawful means.

138.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

139.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

140.     As a direct and proximate result of this illicit agreement referenced above, Plaintiff suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, chronic physical conditions, and other grievous and continuing injuries and damages.

141.     The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT VI**
**42 U.S.C. § 1983 – Failure to Intervene**

142.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

143.     In the manner described above, one or more of the individual Police Officer Defendants, and other unknown individuals, stood by without intervening to prevent the alleged constitutional violations, despite having an opportunity to do so.

144.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with willful indifference to Plaintiff's constitutional rights, and in total disregard of the truth and Plaintiff's innocence.

145.     As a direct and proximate result of this failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including, but not limited to, loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, chronic physical conditions, and other grievous and continuing injuries and damages.

146.     The misconduct described above in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII
### 42 U.S.C. § 1983 – *Monell* Policy Claim

147. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

148. The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included, but were not limited to, the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above. These policies and practices also included a practice of coercing false confessions and fabricating evidence to close cases as described more fully above.

149. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

150. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

151. The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

## COUNT VIII
### State Law Claim – Malicious Prosecution

152. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

153. All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were

31

instituted and continued with malice and resulted in the injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor and in a manner indicative of innocence.

154. The Defendants accused Plaintiff of murdering Myron Cochran and Billy Johnson, knowing that he was innocent of the crimes. All of the individual Defendants fabricated evidence, manipulated witness testimony, and withheld exculpatory evidence. The individual Defendant Officers knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

155. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

156. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress and chronic physical conditions, as is more fully alleged above.

## COUNT IX
## State Law Claim – Civil Conspiracy

157. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

158. As described more fully in the preceding paragraphs, the individual Defendant officers acting in concert with one another conspired to accomplish an unlawful purpose by unlawful means.

159. In furtherance of the conspiracy, the Defendants committed overt acts and were otherwise willing participants in joint activity.

160. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

161. As a direct and proximate result of this misconduct, Plaintiff suffered injuries,

including, but not limited to, emotional distress and chronic physical conditions, as is more fully alleged above.

## COUNT X
### State Law Claim – Intentional Infliction of Emotional Distress

162.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

163.    The acts and conduct of the individual Defendants as set forth above were extreme and outrageous.

164.    The Defendants intended to cause or were in reckless disregard of the probability that their conduct would cause severe, emotional distress to Plaintiff.

165.    The individual Defendants' actions and conduct directly and proximately caused severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

166.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

167.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

## COUNT XI
### State Law Claim – *Respondeat Superior*

168.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

169.    When they committed the acts alleged in this Complaint, the individual Defendant Officers were members and agents of the Chicago Police Department, an agency of

33

the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

170. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
## State Law Claim – Indemnification

171. Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

172. Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based on the employees' misconduct committed within the scope of their employment activities.

173. The individual Defendant Officers are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff CORDELL WILLIAMS prays this Court enter judgment in his favor and against Defendants JAMES O'BRIEN, THE PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM FOLEY, THE CITY OF CHICAGO, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual Defendants in their individual capacities; and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.


Respectfully submitted,


/s/ Steven W. Becker
Steven W. Becker
Law Office of Steven W. Becker LLC
205 N. Michigan Avenue, Suite 810
Chicago, IL 60601
(312) 396-4116