**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CORDELL WILLIAMS, | ) | |
| | ) | Case No. 23-cv-14905 |
| Plaintiff, | ) | |
| | ) | Honorable Lindsay C. Jenkins |
| v. | ) | |
| | ) | Mag. Judge Young B. Kim |
| JAMES O'BRIEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**THE OFFICER DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

SUMMARY OF THE FACTS ........ 2

The Execution Style Murders of Myron Cochran and Billy Johnson ........ 2

Williams' Activities Earlier in the Evening Leading Up to the Murders ........ 3

Williams Is Arrested At His Home And Brought to Area 1 ........ 4

Williams Is Questioned at Area 1 ........ 4

Defendant Detective O'Brien Interviews Williams ........ 4

Williams Alleges An Unknown Detective Beat Him ........ 5

Williams Gives A Court-Reported Statement ........ 6

Criminal Pretrial and Trial Proceedings ........ 8

The Affidavit of David Evans ........ 8

The CCSAO Forms the Working Group and Lawyers Committee ........ 9

The Working Group Investigates Williams' Convictions ........ 10

November 30, 2021: The Working Group Interviews Williams ........ 10

The Working Group Interviews David Evans ........ 11

May 10, 2022: The Working Group Submits its Recommendation ........ 11

The Convictions Are Vacated, Criminal Case Is *Nolle'd* And The COI Is Granted ........ 12

ARGUMENT ........ 13

I. Detective Foley Is Entitled To Summary Judgment On All Counts. ........ 13

II. O'Brien Is Entitled To Summary Judgment On Count I. ........ 14

III. Williams' Due Process Fabrication Claims in Count II Fail As A Matter Of Law. ........ 17

a. The Criminal Complaint was not used at trial and therefore cannot form the basis of a due process fabrication claim. ........ 17

b. Williams' allegation that O'Brien's gave false trial testimony fails. ........ 17

c. Williams' fabrication claim based on his own court-reported statement fails. ........ 18

IV. Williams' *Brady* Claim In Count III Fails As A Matter Of Law. ........ 21

V. Defendants Are Entitled To Summary Judgment On Count IV Because Probable Cause Existed To Arrest And Prosecute Williams Even Without His Court-Reported Statement. ........ 21

VI. Defendants Are Entitled To Summary Judgment On Williams State Law Malicious Prosecution Claim In Count VII. ........ 23

a. Williams cannot establish the favorable termination element of this claim. ........ 23

b. Williams cannot establish a lack of probable cause. ........ 26

VII. Defendants Are Entitled To Summary Judgment On Counts V, VI And IX. ........ 26

a. O'Brien and Foley are entitled to summary judgment on Williams' federal and state law claims for conspiracy in Counts V and IX. .......... 26

b. The failure to intervene claim in Count VI fails. .......... 28

VII. Williams' IIED Claim In Count X Fails As A Matter Of Law. .......... 29

# CASES


*AccordOdogba v. Wisconsin Dept. of Justice*, 22 F. Supp. 3d 895 (E.D. Wis. 2014) .................. 13

*Beaman v. Freesmeyer*, 2021 IL 125617 .................. 24

*Beck v. Ohio*, 379 U.S. 89 (1964). .................. 22

*Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007) .................. 26, 27

*Braun v. Vill. of Palatine*, 56 F.4th 542 (7th Cir. 2022) .................. 22

*Briscoe v. LaHue*, 460 U.S. 325 (1983) .................. 18

*Brown v. City of Chicago*, 2025 WL 2785426, 2025 U.S. Dist. LEXIS 193122 .................. 20

*Brown v. City of Chicago*, 709 F. Supp. Ed 558 (N.D.Ill. 2023) .................. 23

*Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009) .................. 13

*Canen v. Chapman*, 847 F.3d at 407 (7th Cir. 2017) .................. 18

*Carmody v. Bd. Of Trs. of Univ. of Ill.*, 893 F.3d 397 (7th Cir. 2018) .................. 13

*Chiaverini v. City of Napoleon*, 602 U.S. 556 (2024) .................. 26

*Chicago United Industries, Ltd. v. City of Chicago*, 669 F.3d 847 (7th Cir. 2012) .................. 15

*Coghlan v. Beck*, 2013 IL App (1st) 120891 .................. 26

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019) .................. 21

*Coleman/Fulton v. City of Chicago*, 2025 WL 2410325, 2025 U.S. Dist. LEXIS 161623 .................. 22

*Colorado v. Connelly*, 479 U.S. 157 (1986) .................. 15

*Dassey v. Dittman*, 877 F.3d 297 (7th Cir. 2017) .................. 14, 15, 17

*de Lima Silva v. Wisconsin Department of Corrections*,917 F.3d 546 (7th Cir. 2019) .................. 13

*Dick v. Conseco, Inc.*, 458 F.3d 573 (7th Cir. 2006 .................. 15

*Doxtator v. O'Brien*, 39 F. 4th 852 (7th Cir. 2022) .................. 28

*Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971 (N.D. Ill. 2013) .................. 28

*Fare v. Michael C.*, 442 U.S. 707 (1979) .................. 15

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) .................. 18

*Garcia v. City of Chicago*, 2012 WL 601844 (N.D. Ill. Feb. 23, 2012) .................. 15

*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003) .................. 21

*Haliw v. City of South Elgin*, 2020 WL 1304697 (N.D. Ill. March 3, 2020) .................. 27

*Harper v. Albert,* 400 F.3d 1052 (7th Cir. 2005) .................. 28, 29

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015) .................. 22

*Hobbs v. Cappelluti*, 899 F. Supp. 2d 738 (N.D. Ill. 2012) .................. 29

*Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007) .................. 22

*Howard v. Firmand*, 378 Ill. App. 3d 147 (2007)........................................................................ 26
*Illinois v. Gates*, 462 U.S. 213 (1983) ................................................................................... 22
*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)........................................................ 27
*Jackson v. Curry*, 888 F.3d 259 (7th Cir. 2018) ........................................................................ 14
*Jones v. York*, 34 F.4th 550 (7th Cir. 2022)................................................................................ 18
*Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009) ..................................................................... 13
*Koh v. Ustich*, 933 F.3d 836 (7th Cir. 2019)................................................................................ 14
*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) ............................................................. 21
*Lundy v. City of Calumet City,* 209 Ill. App. 3d 790 (1991)......................................................... 29
*March v. Cacioppo*, 37 Ill. App. 2d 235 (1962) ........................................................................... 29
*McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102 (1999) ............................................ 27
*McCoy v. Harrison*, 341 F.3d 600 (7th Cir. 2003) ....................................................................... 14
*Miller v. Fenton*, 474 U.S. 104 (1985)........................................................................................ 15
*MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651 (7th Cir. 2011).................. 14
*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ........................................................... 17, 21
*Mwangangi v. Nielsen*, 48 F. 4th 816 (7th Cir. 2022) ................................................................. 28
*Padilla v. City of Chicago*, 932 F. Supp. 2d 907 (N.D. Ill. 2013) ................................................ 24
*Patrick v. City of Chicago,* , 974 F.3d 824 (2020)......................................................................... 17
*People v. Williams*, 2016 IL App (1st) 133459 ............................................................... 19, 24, 25
*Pepper v. Vill. of OakPark*, 430 F.3d 805 (7th Cir. 2005)........................................... 13, 14, 17
*Phillips v. City of Chicago*, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018) .................................. 18
*Robinson v. Econ-O-Corp., Inc.,* 62 Ill. App. 3d 958 (1978) ..................................................... 29
*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)................................................................. 14, 15
*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................................... 15
*Smith v. Gomez*, 550 F.3d 613 (7th Cir. 2009) ............................................................................ 26
*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006)............................................ 21
*Starks v. City of Waukegan*, 123 F. Supp. 3d 1036 (N.D. Ill. 2015)............................................ 29
*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015)......................................................................... 18
*Swick v. Liautaud*, 169 Ill. 2d 504 (1996)................................................................................... 23
*Thompson v. Clark*, 596 U.S. 36, 142 S. Ct. 1332 (2022) ..................................................... 21, 22
*Turner v. Hirschbach MotorLines*, 854 F.3d 926 (7th Cir. 2017) .......................................... 26, 27
*Vinning-El v. Evans*, 657 F.3d 591 (7th Cir. 2011) ..................................................................... 13
*Wade v. Collier*, 783 F.3d 1081 (7th Cir. 2015............................................................................ 26

*Wallace v. City of Chicago*, 440 F. 3d 421 (7th Cir. 2006) .......................................................... 21

*Washington v. Summerville*, 127 F.3d 552 (7th Cir. 1997)............................................................ 23

*Yang v. Hardin,* 37 F.3d 282 (7th Cir. 1994)..................................................................................... 29

## INTRODUCTION

In this unusual case, Plaintiff Cordell Williams alleges he was wrongfully convicted of murder for his role as an accomplice in the 1994 execution-style killings of 18-year-old Myron Cochran and 19-year-old Billy Johnson. (Dkt. 1, ¶2). The undisputed record establishes that Williams drove the shooter, David Evans, to the crime scene, stopped at Evans' direction when Evans spotted rival gang members, gave Evans access to a gun in the trunk, and fled with Evans after the shooting. This case is unusual because the State knew all these facts in October 2022, when it agreed not to oppose Williams' petition to vacate his convictions and *nolle'd* the charges. State's Attorney ("SA") Kim Foxx personally made this decision based on a recommendation she received from the "Working Group." Formed in 2021, the Working Group consisted of three law professors/criminal defense attorneys — Marc Kadish, Maria Hawilo, and Vincent Southerland — sworn in as special assistant state's attorneys to investigate convictions involving certain detectives, including Defendant William Foley, and make recommendations.

The Working Group submitted a 22-page, single spaced "Recommendation" to SA Foxx, formally recommending that Williams' convictions be vacated "in the interest of justice" based largely on unproven pattern of abuse allegations against Detectives Foley and O'Brien in other cases, not on any new evidence of abuse or Williams' innocence. In its Recommendation, the Working Group also expressed doubts about the truthfulness of Williams' confession because [redacted] (DOSF ¶79). This assertion misrepresents inculpatory evidence the Working Group had in its possession and falsely suggests that Plaintiff was unaware of the gun.

That inculpatory evidence is Evans's handwritten affidavit — which Evans and Williams

confirmed is true — establishing that Williams drove Evans to the crime scene, knew Evans had placed a gun in the trunk, stopped at Evans' direction, popped the trunk for Evans to retrieve the gun, and fled the scene with Evans. The only mention of Evans' affidavit in the Recommendation is this single sentence: [redacted]." (DSOF ¶81). All three Working Group members, who were supposed to be independent and impartial, acted instead as advocates for Williams and misled SA Foxx into believing Williams was unaware of the gun. The result is a miscarriage of justice; Williams was "exonerated" and got an unopposed Certificate of Innocence ("COI"), but the undisputed evidence in this case establishes that he is guilty as an accomplice in the senseless and tragic murders of two young men.

This lawsuit followed. Williams sued former detectives James O'Brien ("Det. O'Brien") and William Foley ("Det. Foley").[1] Williams brings §1983 claims for coerced false confession under the Fifth and Fourteenth Amendments (Counts I), fabrication of evidence (Count II), *Brady* violations (Count III), prolonged pretrial detention under the Fourth and Fourteenth Amendment (Count IV), § 1983 conspiracy and failure to intervene (Counts V and VI), and state law claims for malicious prosecution, intentional infliction of emotional distress ("IIED") and civil conspiracy (Counts VIII, IX and X). (*See* Dkt. 1). Defendants now move for summary judgment on all of Williams' claims.

## SUMMARY OF THE FACTS

### The Execution Style Murders of Myron Cochran and Billy Johnson

Just after midnight on May 26, 1994, Cochran and Johnson were shot and killed at point-blank range. (DSOF ¶6). Chicago Police Officer Stan Sanders, nearby in his car, heard the shots

[1] Det. Foley passed away in 2006. This motion and memo of law will refer to Foley instead of his estate.

and witnessed a Black male — whom he later identified as Evans — flee the sub shop to a nearby car pulling away from the curb with its rear door open. (DSOF ¶7). Sanders pursued the car but lost it because it was going too fast with the headlights off. (DSOF ¶8). However, Sanders managed to get the car's license plate number, which showed it was registered to Williams' mother. (DSOF ¶9).

**<u>Williams' Activities Earlier in the Evening Leading Up to the Murders</u>**

Earlier in the evening of May 25, 1994, Williams was at his friend Veno's home and offered Evans and others a ride home. (DSOF ¶10). Evans was a "young general" and enforcer for the Black P. Stones with a violent reputation; Williams, who knew Evans only as "Day Day," believed Evans always carried a gun. (DSOF ¶¶10-11). Williams, then 19, was also affiliated with the Black P. Stones street gang and knew their rivals included the Gangster Disciples ("GDs"). (DSOF ¶¶3-4).

Before departing, Williams told Evans that any "heat" (i.e., gun), had to go in the trunk of the car. (DSOF ¶12). Williams popped the trunk and watched Evans place a gun inside. (DSOF ¶12). While driving northbound on Halsted toward 74th, Williams heard Evans yell "pull over pull over" because he saw "some bricks," which Williams knew was a reference to GDs. (DSOF ¶14). In 1994, this area was controlled by GDs. (DSOF ¶14). Williams stopped just north of 74th on Halsted and Evans told him to "pop the trunk." (DSOF ¶15). Williams complied and knew Evans was getting the gun. (DSOF ¶15). Williams claims he was falling asleep when shots rang out. He saw Evans running back and began pulling away, and Evans jumped in and yelled "get the fuck out of here." (DSOF ¶16). Williams saw a car chasing them, which he knew was either police or a rival gang, and drove away at 70-90 miles per hour. (DSOF ¶17). Williams dropped off Evans and the other passengers and then went home. (DSOF ¶18).

**Williams Is Arrested At His Home And Brought to Area 1**

About an hour after the shooting, police arrived at Williams's parents' home. (DSOF ¶19). Williams admitted to police he was the last to drive the car but claimed he got home at 10:30 p.m., nearly three hours earlier. (DSOF ¶19). Detective Dwyer observed that the radiator was still warm, indicating recent use. (DSOF ¶20). Williams was arrested and transported to Area 1. (DSOF ¶20).

**Williams Is Questioned at Area 1**

Williams does not recall being Mirandized but does not deny that he may have been. (DSOF ¶21). Williams also admits he knew he had the right to remain silent and ask for a lawyer. (DSOF ¶21). Detectives Rose and O'Brien and ASA Vaci all testified that Williams was Mirandized before any questioning. (DSOF ¶21). At Area 1, Williams voluntarily spoke with either Detective Dwyer or Gehrke for approximately 20–30 minutes, was given breaks, and was left alone in the room at times. (DSOF ¶22). These detectives were not abusive and made no threats or promises. (DSOF ¶22). Williams recounted the night's events without mentioning Evans because naming Evans could have gotten him killed. (DSOF ¶23).

Based on Williams's account, Dwyer and Gehrke took him to canvass for one of his passengers, Londell Harper, for approximately two hours. (DSOF ¶24). At no point was Williams abused, threatened, or promised anything. (DSOF ¶24). Back at Area 1, Williams was moved to a different room and given a burger, crispy fries, and an orange soda. He was not denied access to the bathroom. (DSOF ¶25).

**Defendant Detective O'Brien Interviews Williams**

O'Brien and his partner Carroll were assigned to the investigation.[2] (DSOF ¶26). O'Brien met with Williams around 6:30 p.m. on May 26. (DSOF ¶27). Williams knew his rights and agreed

---

[2] Williams has no memory of Carroll. (DSOF ¶26).

to speak with O'Brien. (DSOF ¶27). He admits that O'Brien never raised his voice with him. (DSOF ¶33). When Williams mentioned Evans by the nickname "Day," O'Brien seemed to have a "lightbulb moment" and produced a photo of Evans, which Williams identified as his passenger. (DSOF ¶28).

Williams contends that during this interview, O'Brien threatened him in ways that were "subtle" or implied. (DSOF ¶31). For example, Williams claims that O'Brien threatened to charge Williams' father with a gun crime because O'Brien knew that Williams' father owned a gun. (DSOF ¶31). Williams' father never told Williams that O'Brien had threatened to charge him with a crime. (DSOF ¶31). At this deposition, Williams called the wording of the alleged threat "semantics" and admitted that O'Brien did not expressly threaten to charge his father with a gun crime. (DSOF ¶31). Williams also believes that O'Brien threatened him by asking about the day his father was accosted by Evergreen Park police one week earlier, while his father was on the way home from dialysis treatment. (DSOF ¶32). But Williams admits he does not have any proof that O'Brien was involved in the incident with the Evergreen Park police. (DSOF ¶32). Finally, Williams alleges that, shortly before O'Brien left the room for lunch, he told Williams that Williams would want to talk to him later. (DSOF ¶35). Williams admits, however, that he told O'Brien all the same information in the court-reported statement before O'Brien went to lunch – that is, before an unknown detective allegedly beat Williams. (DSOF ¶45).

**Williams Alleges An Unknown Detective Beat Him**

About 10 minutes after O'Brien left the interview room for lunch, another detective came in and allegedly beat Williams for about two minutes. (DSOF ¶36). No one else was in the room. (DSOF ¶36). This detective allegedly slapped Williams in the face with an open fist, kicked him in the buttocks and struck him in the ribs with a phone book. (DSOF ¶36). Williams did not know

the name of the detective who physically abused him at the time, but he came to believe it was Foley based on a conversation he had in prison years later with another inmate, Arnold Day. (DSOF ¶37). In this conversation, Williams described the unknown detective a "little stocky dude," and Day responded that it was Foley. (DSOF ¶37). According to Foley's Sworn Time and Attendance Record for 1994 (the "Attendance Record"), he took vacation days on May 26 and 27, 1994, the same days Williams was at Area 1. (DSOF ¶38). Foley's name does not appear in any police reports, and he did not testify at Williams' criminal trial. (DSOF ¶38).

At some point after the unknown detective left the room, O'Brien returned and brought Williams to speak with his father. (DSOF ¶39). According to Williams, his father said he should tell the police what they wanted to hear, and Williams would be able to go home. (DSOF ¶39). Williams' father passed away in 2019. (DSOF ¶39).

## Williams Gives A Court-Reported Statement

After Williams spoke with his father, O'Brien brought Williams to an office with a desk to speak with ASA Vaci between midnight and 12:30 a.m. on May 27, 1994. (DSOF ¶40). There was a newspaper on the desk that had "popped" when O'Brien placed it down. (DSOF ¶41). Williams did not pay attention to it because it did not stand out to him at that point. (DSOF ¶41). But after Williams began giving his court-reported statement, he thought there must be a gun under the newspaper because of "loud thud" he heard when it was placed on the table. (DSOF ¶41). Williams admits he never saw the alleged gun. (DSOF ¶41).

Williams gave a court-reported statement at 2:30 a.m. on May 27, 1994. (DSOF ¶42). Booking photos of Williams taken after his court-reported statement do not show any visible injury to Williams' face or head, or damage to Williams' wire-rimmed glasses. (DSOF ¶43). At his deposition, Williams confirmed that the following parts of his court-reported statement are true:

a. Williams was with Evans but only knew him by the nickname "Day-Day."
b. Evans is a member of the Black P. Stones.
c. He had popped the trunk for Evans to put the gun in the car.
d. Evans put the gun in the trunk of the car.
e. As they were traveling down Halsted, Williams heard Evans say "Pull over. Pull over" and that Evans saw some "bricks."
f. Williams knew at the time the word "bricks" was a slang reference for the Gangster Disciples (GDs), a rival gang.
g. Williams pulled over and Evans told him to pop the trunk because he was trying to get the gun.
h. Williams popped the trunk.
i. After Evans went to the trunk and got the gun, Evans proceeded to walk to the submarine shop.
j. Williams leaned back and was about to fall asleep when he heard four or five shots and freaked out.
k. Williams saw Evans running out of the shop as he tried to pull away as quickly as possible.
l. Evans ran to catch up to the car, snatched the door open, slipped, and jumped into the car.
m. In the car, Williams said "what the fuck had gone on."
n. Evans yelled "Pull the fuck off. Go go go" and that is when Williams observed an off-duty police officer behind the car.
o. Williams was going between 75-90 miles an hour.

(DSOF ¶44).

Williams also alleges that he was told by O'Brien to include the following false information in his court-reported statement: (a) that Andre Rudnick was a passenger in the car; (b) that the gun was a .45 Ruger; (c) that Williams was in the car when he popped the trunk for Evans to put the gun there; (d) that Williams was led to believe Evans was going to shoot somebody when Evans got the gun from the trunk; (e) that Williams saw Evans running out of the sub shop after hearing the shots; (f) that the police treated Williams well while at Area and that no promises or threats were made in return for his statement. (DSOF ¶46).

Notably, Williams himself identified Rudnick, not Peterman, as a passenger in both his Complaint and in a sworn interrogatory response. (DSOF ¶47). Neither Rudnick nor Peterman gave statements or testified at trial. (DSOF ¶47). After ASA Vaci approved murder charges,

O'Brien signed a Criminal Complaint on May 27, 1994, alleging Williams shot Cochran and Johnson. (DSOF ¶48).

**Criminal Pretrial and Trial Proceedings**

A grand jury indicted Williams on June 6, 1994. (DSOF ¶49). Williams' counsel moved to suppress the court-reported statement based on alleged physical abuse by the unknown detective, described in the motion as a "white male, around 40 years old, stocky and balding." (DSOF ¶50). The motion did not mention kicking or a phone book. (DSOF ¶50). After Detectives Dwyer, Rose, and Gehrke testified at the suppression hearing, Williams' attorney withdrew the motion, which was a surprise to Williams. (DSOF ¶51).

Williams' court-reported statement was admitted into evidence at trial. (DSOF ¶52). In addition, the State called O'Brien, Officer Sanders, Detective Dwyer and Officer Mangan to establish that the car seen fleeing the crime scene with the shooter was registered to Williams' mother, that Williams admitted that he last drove the car and that car's radiator was still warm when police arrested Williams at his home. (DSOF ¶52). Williams was convicted and sentenced to life in prison without parole. (DSOF ¶53).

**The Affidavit of David Evans**

Police eventually arrested Evans and he was convicted of both murders at a separate trial. (DSOF ¶58). In 2017, Williams obtained a handwritten affidavit from Evans, which makes the following assertions:

a. On May 26, 1994, Plaintiff gave him and others a ride home from a party.
b. While at the party, Evans brandished a gun, which led Plaintiff to tell him to put the gun in the trunk of the car before leaving.
c. Plaintiff "popped the trunk" of his car and Evans put his gun in the trunk.
d. As they were blocks away from Evans' home, Evans saw what he thought were rival members in a restaurant who had been trying to shoot him.
e. Evans demanded that Plaintiff "pull over, pull over," which Plaintiff did.
f. Evans told Plaintiff to "pop the trunk and wait right here I wanna see if that's these

n-----".

g. Evans grabbed the gun from the trunk, walked to the individuals he saw and "in an awful case of mistaken identity," shot and killed Cochran and Johnson.

h. Evans ran back into Plaintiff's car and yelled "drive drive that's the police."

(DSOF ¶59). At their depositions, Williams and Evans each reviewed the affidavit and confirmed it is true. (DSOF ¶60).

**The CCSAO Forms the Working Group and Lawyers Committee**

In 2021, SA Foxx formed the "Lawyers Committee" and Working Group to review convictions involving seven former detectives, including Foley. (DSOF ¶61). The Working Group members — Kadish, Hawilo and Southerland — were sworn in as special assistants and paid $185 per hour to investigate the cases and submit their recommendations to First Assistant Lanier, who forwarded them to SA Foxx. (DSOF ¶¶62-63). The Lawyers Committee, composed largely of plaintiffs' civil rights attorneys, helped identify cases for review and received quarterly reports on the Working Group's cases. (DSOF ¶64).

SA Foxx approved of the Working Group's Procedures & Guidelines (the "Guidelines") and reviewed its recommendations. (DSOF ¶66). SA Foxx alone decided whether to accept, reject or modify the Working Group's recommendations. (DSOF ¶70). The Guidelines required the Working Group to submit quarterly status reports regarding their cases both to the First Assistant State's Attorney and/or the Chief Deputy and to the Lawyers Committee. (DSOF ¶67). Section D of the Guidelines allows the Working Group to recommend: (1) vacating based on innocence, if new evidence suggests a substantial probability that the defendant did not commit the offense; or (2) vacating based on the interests of justice if "credible information causes a loss of confidence in the integrity of the conviction"; or (3) no action only "if neither recommendation 1 nor 2 are satisfied." (DSOF ¶70). Recommending a retrial was not an option; however, SA Foxx had the option of modifying any recommendation. (DSOF ¶70).

In 2021, the Working Group members attended a presentation at the offices of Loevy & Loevy about specific detectives and received documents compiled from other lawsuits. (DSOF ¶71). The Working Group members did not meet with the detectives they were investigating. (DSOF ¶71). The Working Group members admit that there were potential conflicts of interest based on the Lawyers Committee's composition. (DSOF ¶72). Special Prosecutor Bob Milan concluded that the structure was unethical because members of the Lawyers Committee included plaintiffs' civil rights attorneys who would benefit financially from the dismissed cases by using them to establish pattern and practice evidence in future civil suits. (DSOF ¶72).

**The Working Group Investigates Williams' Convictions**

On November 22, 2021, Williams' counsel Steven Becker emailed several documents to Working Group members Kadish, Hawilo and Southerland, including the affidavit of David Evans. (DSOF ¶73). Hawilo forwarded the email to her colleagues to make sure they saw it. (DSOF ¶73). Kadish responded via email to say he had not seen "Evans statement" before and Hawilo replied that she wanted to discuss it. (DSOF ¶73). None of the Working Group members remember the affidavit. (DSOF ¶73).

**November 30, 2021: The Working Group Interviews Williams**

On November 30, 2021, Hawilo interviewed Williams. (DSOF ¶74). Before the interview, Southerland emailed Hawilo a list of questions/topics to cover, none of which referenced Evans's affidavit. (DSOF ¶74). According to the Recommendation, Williams said at his interview that he gave his car keys to Evans and that he "[redacted]." (DSOF ¶75). This assertion directly contradicts Evans's affidavit and Williams's own deposition testimony. (DSOF ¶¶12,59).

**The Working Group Interviews David Evans**

On December 9, 2021, all three Working Group members interviewed Evans. (DSOF ¶76). The Recommendation's summary of this interview does not mention Evans's affidavit or its contents. None of the Working Group members recalled Evans' affidavit or if he was even asked about it. (DSOF ¶76). During the interview, Evans admitted: [redacted]. (DSOF ¶77). None of these admissions are included in the Recommendation. (DSOF ¶77).

**May 10, 2022: The Working Group Submits its Recommendation**

On May 10, 2022, the Working Group submitted its Recommendation that Williams's convictions should be vacated "in the interest of justice," relying largely on unproven abuse allegations against Foley and O'Brien from other cases. (DSOF ¶78). It also expressed doubts about the confession because "[redacted]." (DSOF ¶79). In addition, Kadish submitted a "Concurring Opinion," lobbying for Williams' release because of his age. (DSOF ¶80). At his deposition, Kadish admitted that he did not believe the "pattern and practice" evidence was admissible or reliable and he did not rely on it. (DSOF ¶80). Moreover, though the initial draft of Kadish's concurring opinion recommended that Williams should not be awarded a COI, this recommendation was deleted from the final draft because, according to Kadish, the COI was beyond the Working Group's project. (DSOF ¶80).

The only mention of Evans' affidavit in the Recommendation and Concurring Opinion is

this single sentence: "[redacted]." (DSOF ¶81). The Recommendation does not mention the parts of Evans' affidavit establishing Williams' culpability. (DSOF ¶81). None of the Working Group members knew why information from Evans' affidavit was not included in the Recommendation. (DSOF ¶82). However, they all agree that it would have been important to include a full description of Evans' affidavit in the Recommendation. (DSOF ¶82). Kadish also agreed that the State could retry Williams without his confession, relying instead on Evans as a witness along with testimony from Officer Sanders that he saw Williams' car fleeing from the crime scene with Evans, Williams' misleading statement to police that he was home by 10:30 p.m. on May 25 and Det. Dwyer's observation that car's radiator was still warm at 1:00 a.m. on May 26, indicating it was recently driven. (DSOF ¶83).

On June 22, 2022, Lanier forwarded the Recommendation to SA Foxx. (DSOF ¶84). At her deposition, Lanier declined to answer questions about her conversations with SA Foxx concerning Williams. (DSOF ¶84). In a July 8, 2022, email, Lanier told the Working Group that SA Foxx agreed with the Recommendation. (DSOF ¶85).

**The Convictions Are Vacated, Criminal Case Is *Nolle'd* And The COI Is Granted**

On July 18, 2022, Williams supplemented his pending post-conviction petition to seek vacatur based on alleged "pattern and practice" abuse — a theory not raised in his original petition, which only sought a sentence reduction. (DSOF ¶86). On October 17, 2022, the Circuit Court granted the unopposed petition, vacated the murder convictions, and *nolle'd* all counts. (DSOF ¶87). Williams was released on October 21, 2022. (DSOF ¶87). On January 24, 2024, the Circuit Court awarded an unopposed COI. (DSOF ¶88).

## ARGUMENT

### I. Detective Foley Is Entitled To Summary Judgment On All Counts.

Every claim against Foley rests the allegation that he is the unknown detective who silently entered the interrogation room, alone, and physically assaulted Williams. (Dkt. 1, ¶¶125-127, 141-142). But Williams has never been able to identify Foley on his own. Instead, he is relying solely on speculation by Arnold Day, a fellow inmate who was not present during the alleged assault and who concluded it was Foley based on a generic description Williams gave him years later. That is not enough to defeat summary judgment.

Personal involvement in an alleged constitutional deprivation is a predicate requirement for § 1983 liability. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (the individual defendant must have caused or participated in a constitutional deprivation); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). To be held liable under §1983 the individual defendant must have caused or participated in the alleged constitutional deprivation. *Pepper*, 430 F.3d at 810. There must be a causal connection between the sued officials and the alleged misconduct. *Carmody v. Bd. Of Trs. of Univ. of Ill.*, 893 F.3d 397, 401-02 (7th Cir. 2018). Participation in an investigation alone is not enough to establish personal involvement in a constitutional deprivation. *See, e.g.*, *de Lima Silva v. Wisconsin Dep't of Corrections*, 917 F.3d 546, 564 (7th Cir. 2019) (finding no personal involvement of two named Defendants in employment discrimination suit where there was no evidence that they were involved in the decision to discharge plaintiff despite their participation in the personnel investigation) *see also Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); *accord Odogba v. Wisconsin Dept. of Justice*, 22 F. Supp. 3d 895, 911 (E.D. Wis. 2014); *See Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (stating that an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye").

Here, Williams cannot rely on Day's speculative claim that it was Foley because it is inadmissible hearsay and is based on a generic and limited description of the unknown detective as a "little stocky dude." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) (inadmissible hearsay cannot be relied upon to avoid summary judgment); *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (the court is not required to draw every conceivable inference from the record and "mere speculation or conjecture will not defeat a summary judgment motion"). The only admissible evidence of Foley's whereabouts is the Attendance Record showing he was on vacation when Williams was at Area 1. His name is not in any police reports, and he did not testify at trial. (DSOF ¶38). On this record, Foley is entitled to summary judgment on all counts.

## II. O'Brien Is Entitled To Summary Judgment On Count I.

Williams cannot show that O'Brien was personally involved in coercing his confession. *See Pepper*, 430 F.3d at 810. Though Williams alleges that he was physically abused by an unknown detective, there is no evidence that O'Brien knew about it, condoned it, or participated in it. Further, the undisputed facts demonstrate that O'Brien's interactions with Williams were not coercive.

A confession is involuntary if the "totality of the circumstances . . . reveal that the interrogated person's will was overborne." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018)). The relevant circumstances include "both the characteristics of the accused and the details of the interrogation." *Dassey v. Dittman*, 877 F.3d 297, 303 (7th Cir. 2017) *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (collecting factors). The purpose of this test is to determine whether the defendant's will was overborne. *Id.* (citation omitted). A person arguing his confession was involuntary must show

that the police engaged in coercive practices. *Id*. *citing Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986). The Supreme Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff. *Dassey*, 877 F.3d 304. The Supreme Court also allows police interrogators to tell a suspect that "a cooperative attitude" would be to his benefit. *Dassey*, 877 F.3d at 304. *Fare v. Michael C.*, 442 U.S. 707, 727 (1979) (reversing finding that confession was involuntary). In assessing voluntariness, courts must weigh the tactics and setting of the interrogation alongside vulnerabilities of the suspect. *Dassey*, 877 F.3d at 304. *Bustamonte*, 412 U.S. at 226. Relevant factors include the suspect's age, intelligence, and education, as well as his familiarity with the criminal justice system. *Dassey*, 877 F.3d at 304. A court may determine voluntariness at summary judgment. *See Dick v. Conseco, Inc.*, 458 F.3d 573, 580 (7th Cir. 2006). However, "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony." *Miller*, 474 U.S. at 117.

In this case, though Williams alleges he was abused by one unknown detective, he cannot show that O'Brien was aware of it or condoned it, or that O'Brien knew of or engaged in any other coercive conduct. Williams admits that he volunteered to talk to detectives almost from the moment he was brought to Area 1. He does not deny (or claims he cannot recall) that he was given his *Miranda* rights each time he was questioned, including by O'Brien. *See Chicago United Industries, Ltd. V. City of Chicago*, 669 F.3d 847, 853 (7th Cir. 2012) (witness' inability not recall something not enough to raise a triable issue of fact at the summary judgment stage); *see also Garcia v. City of Chicago*, 2012 WL 601844, *4 (N.D. Ill. Feb. 23, 2012) (citing *Chicago United Industries*) (a witness's testimony that he did not remember a conversation is evidence only of his

failure to remember, not of a denial). Williams also admits that he could have stopped talking and asked for a lawyer at any point with O'Brien, and that he nonetheless agreed to speak with O'Brien. No one was abusive or coercive toward him before he spoke with O'Brien, and Williams admits that O'Brien did not raise his voice, yell or physically abuse him. He also admits he was given burger(s), fries and orange soda before he spoke with O'Brien and that O'Brien allowed him to speak with his father before giving his court reported statement. (DSOF ¶39). There is nothing coercive about these circumstances.

Though Williams now alleges that O'Brien threatened him in "subtle" ways, none of these alleged threats were included in the motion to suppress Williams filed in his criminal case and none are even remotely threatening or coercive. (DSOF ¶50). For example, Williams admits he never heard from his father that O'Brien threatened to charge him with a gun crime and admits that O'Brien never expressed such a threat to Williams. He called the wording of the threat "semantics." It is not unreasonable or threatening for O'Brien, a detective investigating a shooting homicide, to ask Williams' father about Williams' access to guns. Similarly, Williams somehow got the notion that O'Brien threatened him or his father when O'Brien asked Williams about the incident between Williams' father and Evergreen Park police. But Williams cannot say what the threat was and admits he has no proof that O'Brien had any involvement in this incident. Williams also alleges that he felt threatened midway through giving his court-reported statement because he thought there might be a gun under the newspaper next to O'Brien. But Williams admits he never saw the gun and did not even initially perceive this as a threat. The timing of this alleged threat also makes no sense because Williams had already told O'Brien everything in his court-reported statement hours earlier, before the encounter with the unknown detective.

Moreover, even at 19, Williams was not unfamiliar with the criminal justice system. *See Dassey*, 877 F.3d at 304 ("Relevant factors include the suspect's familiarity with the criminal justice system"). As an active gang member, Williams knew his gang activities were unlawful. He had been arrested multiple times before 1994 and knew his rights. (DSOF ¶2).

**III. Williams' Due Process Fabrication Claims in Count II Fail As A Matter Of Law.**

To prevail on a fabrication claim, Williams must show that: (1) O'Brien deliberately falsified evidence in bad faith; (2) the evidence was used at trial; (3) the evidence was material; and (4) Williams was damaged. *Zambrano v. City of Joliet*, 141 F.4th 828, 831 (7th Cir. 2025). Williams identifies only three alleged fabrications: (1) the Criminal Complaint; (2) O'Brien's trial testimony; and (3) the court-reported statement. (DSOF ¶¶46, 54). In each instance, Williams alleges only O'Brien, not Foley, is responsible. Foley is therefore entitled to summary judgment on Count II. *Pepper*, 430 F.3d at 810.

**a. The Criminal Complaint was not used at trial and therefore cannot form the basis of a due process fabrication claim.**

The Criminal Complaint is not listed in the Impounding Order identifying all trial exhibits, and the allegation in it – that Williams shot Cochran and Johnson – was not even the theory the State presented at trial. As a result, Williams' due process claim based on the alleged fabrication of the Criminal Complaint fails. *Zambrano*, 141 F.4th at 831 ("to succeed" on a due process fabrication claim the plaintiff must show the evidence was used at trial); *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022) (allegedly fabricated evidence could not have influenced the jury's verdict if it was not used at trial) *citing Patrick v. City of Chicago,* , 974 F.3d 824 at 834-35 (2020).

**b. Williams' allegation that O'Brien's gave false trial testimony fails.**

Williams' due process fabrication claim based on O'Brien's trial testimony also fails as a matter of law because police officers have absolute immunity from suit under §1983 for giving

allegedly false testimony at trial proceedings, even when that testimony deprives a party of his right to a fair trial. *Briscoe v. LaHue*, 460 U.S. 325 (1983). This is true regardless of whether the testimony itself is false or implies something false. *See Jones v. York*, 34 F.4th 550, 553 (7th Cir. 2022) *citing Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2015) (en banc) ("Witnesses in a § 1983 trial have absolute immunity from liability based on their testimony at trial."). "[T]his protection covers the preparation of testimony as well as its actual delivery in court." *Canen v. Chapman*, 847 F.3d at 407, 415 (7th Cir. 2017). Williams also cannot rely on *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017), to avoid testimonial immunity under *Briscoe* by alleging that O'Brien authenticated Williams' court-reported confession at trial because, as set forth below, that confession is either substantially true or the alleged fabrications are immaterial. *Id*. at 441.

**c. Williams' fabrication claim based on his own court-reported statement fails.**

The Seventh Circuit has "repeatedly emphasized that fabricated evidence is testimony that is invariably false, and that is known to be untrue by the fabricator, as opposed, for instance, to coerced testimony that is forced by improper means but may be true or false." *Zambrano*, 114 F.4th at 422 *citing Petty*, 754 F.3d at 422 and *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). A plaintiff must show the evidence was falsified and the falsification was done in bad faith. *Id*. at 831. The defendant must have known the fabricated evidence was false. *See Phillips v. City of Chicago*, 2018 WL 1309881, at *25–26 (N.D. Ill. Mar. 13, 2018) *citing Petty*, 754 F.3d at 422 ("[A] prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'") *quoting Fields*, 740 F.3d at 1112

In *Zambrano*, the plaintiff alleged that a detective fabricated statements in a police report attributed to the plaintiff. The accuracy of the allegedly fabricated facts was not disputed; the dispute was merely whether the plaintiff provided the information to the detective. *Id*. at 831-32.

The Seventh Circuit found that the plaintiff's word alone, that the statements attributed to him were fabricated, was insufficient to establish bad faith. *Id*. at 831. Critical to the Seventh Circuit's holding was the fact that the accuracy of the fabricated evidence was not contested. *Id*. ("Given the lack of any dispute as to the identity of those friends or the location of the apartment, the circumstances do not even allow an inference that Schumacher knowingly misrepresented Zambrano's statement").

The same is true here – Williams cannot show that O'Brien knew parts of Williams' court-reported statement were false. First, Williams does not deny that most of his court reported statement is true, including that Williams drove the shooter, David Evans, to the crime scene, stopped the car at Evans' direction because Evans saw opposing gang members, gave Evans access to a gun in the trunk of the car and then, after Evans had shot Cochran and Johnson, fled the scene with Evans. (DOSF, ¶49). This is more than enough to establish Williams' guilt as an accomplice to murder. 720 ILCS 5/5-2(c) *see also People v. Williams*, 2016 IL App (1st) 133459, ¶38.[3]

Second, none of the alleged falsehoods are significant enough to have made O'Brien aware they are false. Though Williams claims that the passenger in the car was Peterman instead of Rudnick, neither Rudnick nor Peterman gave a statement to police or testified at trial and Williams does not dispute that there were three passengers with him. Moreover, Williams previously agreed in his Complaint and in a sworn interrogatory response that Rudnick was the other passenger, not Peterman. (DSOF ¶47). Similarly, though Williams quibbles with where he was when he popped the trunk for Evans to put his gun in it, he admits that he *did* pop the trunk for that purpose. Williams also claims he did not know the caliber of the gun Evans used to commit the crime, but he admits that Evans retrieved the gun from the trunk of his car before the shooting. (DSOF ¶16).

[3] Despite the coincidental same last name, Defendants are not aware of any connection between the defendant in *People v. Williams* and Plaintiff.

And though Williams claims that he did not see Evans run out from the sub shop after the shooting, he admits that he saw Evans running into the street behind his car after the shooting. (DSOF ¶¶52).

Though Williams claims he was "coerced somewhat" into saying he was "led to believe Evans was going to shoot somebody when he got the gun from the trunk," he does not dispute the accuracy or truth of the facts leading to that belief.[4] (DSOF ¶¶52). With such minor discrepancies, Williams cannot show that O'Brien knew these details were false. *See Brown v. City of Chicago*, 2025 WL 2785426, 2025 U.S. Dist. LEXIS 193122, *37 (granting Rule 50 motion for the City because the jury could not have possibly found statements attributed to the plaintiff false where the plaintiff admitted he said each of them in verbatim or in substance).

Finally, Williams' description of his interactions with O'Brien does not change the outcome. In *Petty*, the plaintiff alleged that police coerced a witness into giving false evidence, holding him against his will in a locked room without food or water, badgering him, and pressuring him to identify the plaintiff as one of the assailants. 754 F.3d at 423. The Seventh Circuit still affirmed dismissal of the plaintiff's fabrication claim because there was no allegation that the defendants "created evidence that they knew to be false, which is the hallmark of a fabrication case." *Id*.

Here, as in *Petty*, the fact that Williams was detained, subjected to vague and subtle threats, or struck by an unidentified officer outside O'Brien's presence does not establish that O'Brien knew any part of the confession was false. 754 F.3d at 423. Unlike the plaintiff in *Petty*, Williams admits he was given food and drink, was not yelled at, knew he did not have to talk and could have asked for a lawyer, and was permitted to speak with his father.

---

[4] Whether the statement was coerced is irrelevant to whether it was fabricated. *Zambrano*, 141 F.4th at 831; *Petty*, 754 F.3d at 422 (coerced testimony that is forced by improper means but may be true or false).

## IV. Williams' *Brady* Claim In Count III Fails As A Matter Of Law.

A §1983 *Brady* claim requires proof that the defendant concealed exculpatory evidence, resulting in prejudice. *Moran*, 54 F.4th at 492. Evidence is not suppressed if the defendant already knew of it before trial. *Avery*, 847 F.3d at 443. The only *Brady* evidence Williams identified is O'Brien's and Foley's failure to disclose their alleged unlawful interrogation methods. The Seventh Circuit has squarely foreclosed this type of *Brady* theory. Setting aside that there is no evidence that O'Brien or Foley engaged in any unlawful methods, Williams has no *Brady* claim based on the alleged suppression of this type of misconduct because Williams knew how he was treated long before trial. As a result, the Seventh Circuit has squarely foreclosed this type of *Brady* claim. *See Avery*, 847 F. 3d at 443 (evidence is not suppressed if it is known to the criminal defendant) *citing Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).; *see also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1028 (7th Cir. 2006); *Wallace v. City of Chicago*, 440 F.3d 421, 429-30 (7th Cir. 2006) ("A section 1983 plaintiff cannot base his *Brady* claim on a defendant's failure to disclose plaintiff's own false confession.").

## V. Defendants Are Entitled To Summary Judgment On Count IV Because Probable Cause Existed To Arrest And Prosecute Williams Even Without His Court-Reported Statement.

Though Williams brings his "Prolonged Pre-trial Detention" claim under the Fourth and Fourteenth Amendment, this type of claim is not cognizable under the Fourteenth Amendment and can only arise under the Fourth Amendment *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019). Even under the Fourth Amendment, the claim fails because probable cause defeats a Fourth Amendment pretrial detention claim (also known as a federal malicious prosecution claim). *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019); *see also Thompson v. Clark*, 596 U.S. 36, 42, 142 S. Ct. 1332 (2022) (recognizing malicious prosecution as sometimes referred to

claim for unreasonable seizure under the Fourth Amendment). Probable cause exists where the police officer is aware of facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id. citing Beck v. Ohio*, 379 U.S. 89, 91 (1964). It exists whenever "the facts and circumstances that are known to" an official "reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (quoting *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007)). A finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

The numerous admittedly truthful parts of Williams' court-reported statement are sufficient alone to establish probable cause. Even without Williams' court-reported statement, however, the undisputed facts then known to O'Brien also establish probable cause for charging and prosecuting Williams. *Coleman/Fulton v. City of Chicago*, 2025 WL 2410325, 2025 U.S. Dist. LEXIS 161623, *155 ("*Fulton*")[5] *citing Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015) (evidence that was the product of coercion cannot supply probable cause). In *Fulton*, the district court found there was probable cause to believe the plaintiff was involved in the murder because he was the last person seen with the victim before she disappeared, and her mutilated body was found in the basement of the plaintiff's building. 2025 WL 2410325, 2025 U.S. Dist. LEXIS 161623, *157. "By linking [the plaintiff] to both the victim and the time and place of the murder, the facts known to [the defendant ASA] amply demonstrated such a probability" that the plaintiff was involved in the crime.

[5] To distinguish this case from *Coleman v. Peoria*, it will be referred to by the name of the co-plaintiff, *Fulton*.

Similarly, in *Brown v. City of Chicago*, 709 F. Supp. Ed 558 (N.D.Ill. 2023), the Court found there was probable cause to support a first degree murder charge even without the disputed confession, where eyewitness testimony "would lead a reasonably cautious person to believe, or entertain an honest strong suspicion" that the shooter came to the park and began shooting, killed the victim, and that the plaintiff, who drove the getaway car, was involved in that plan. *Id*. at 571.

The same reasoning applies here. Officer Sanders' observations, Williams' admission at his mother's home that he drove the car last, and the heat from the car's radiator indicating it was recently driven are sufficient to link Williams to the victims and the time and place of the murders and lead a reasonably cautious person to suspect him. These facts alone establish probable cause; and combined with Williams' truthful admissions from the court reported statement, which Williams admits he told O'Brien before any alleged abuse occurred, Williams cannot show probable cause was lacking.

**VI. Defendants Are Entitled To Summary Judgment On Williams State Law Malicious Prosecution Claim In Count VII.**

**a. Williams cannot establish the favorable termination element of this claim.**

To prevail on a claim for malicious prosecution under Illinois law, Williams ultimately must prove that a *nolle prosequi* was entered for reasons indicative of innocence. *Swick v. Liautaud*, 169 Ill. 2d 504, 513 (1996). A "bare nolle prosse without more is not indicative of innocence." *Washington v. Summerville*, 127 F.3d 552, 557-558 (7th Cir. 1997). "Lack of a recorded reason for the nolle prosequi offers no insight as" to whether it is indicative of innocence. *Id.* at 558. Rather, the circumstances must compel an inference that there were no reasonable grounds to pursue the case; "otherwise, every time criminal charges are nol-prossed a civil malicious prosecution action could result." *Swick*, 169 Ill. 2d at 513-14. What controls is whether the State lacked any credible evidence to support the criminal charge, and the State's

inability to carry its burden is indicative of innocence. *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 928 (N.D. Ill. 2013). One of the circumstances courts look at is the post-conviction proceedings that precede a decision to *nolle* the charges. *See Beaman v. Freesmeyer*, 2021 IL 125617, ¶10 (Illinois Supreme Court citing its previous decision examining the plaintiff's post-conviction proceedings to find that the State's abandonment of the criminal proceedings supports an inference that there was a lack of reasonable grounds to pursue the criminal prosecution).

Here, it is undisputed that SA Foxx alone decided that Plaintiff's convictions should be vacated based on the Working Group's Recommendation and that the Working Group was in possession of Evans' affidavit when submitted the Recommendation. Evans' affidavit is powerful and credible evidence of Plaintiff's guilt under an accountability theory. Under Illinois law, a person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, or agrees or attempts to aid such other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 1998). *See Williams*, 2016 IL App (1st) 133459, ¶38. The State is not required to prove that a defendant and co-defendants shared the same intent regarding the charged offense (*i.e.*, first degree murder); rather, it need only to prove that defendant had the intent to promote or facilitate a crime. *Williams*, 2016 IL App (1st), ¶46. Proof of the common design need not be supported by words of agreement but may be drawn from the circumstances surrounding the commission of the act. *Id.*, ¶39.

*Williams* is factually analogous. In that case, the defendant was driving a group of fellow gang members, when a passenger saw rival gang members on the elevated train platform and told the defendant to pull over. *Williams*, 2016 IL App (1st) 133459 at ¶¶10, 40. The group confronted the rival gang members and a fight ensued. One of the rival gang members was pushed or fell

onto the tracks where he was electrocuted and died. *Id*. The appellate court held that this evidence was sufficient to find the defendant guilty beyond a reasonable doubt of first-degree murder under an accountability theory. *Id*. The appellate court rejected the defendant's argument that he did not intend to kill anyone because even without the intent to kill, the defendant's group "went to the train platform to confront rival gang members," which led to a confrontation culminating in the victim being electrocuted. *Id*. ¶45. The Court noted that the common design rule can impose liability for murder even where a misdemeanor was originally intended. *Id*. (citation omitted).

Here, the affidavit by itself establishes that Williams knew Evans' gun was in the trunk of the car, stopped the car at Evans' direction because Evans had seen "rivals" who had been trying to shoot him, opened the trunk for Evans to get the gun, and helped Evans escape from the crime scene. The State could have retried Williams without the disputed confession and called Evans to testify consistent with his affidavit.[6] This by itself is enough to establish "reasonable grounds to pursue the criminal prosecution" under an accountability theory. Combined with the testimony of Officer Sanders, who saw Evans run from the sub shop to Williams' *waiting* car, Williams' initial claim to police that he last drove that car hours earlier at 10:30 p.m., and Det. Dwyer's observation of heat coming from the car's radiator, indicating it was recently driven, the State had more than enough to prosecute and convict Williams as an accomplice, without using Williams' disputed confession. Yet the Working Group, agents of the CCSAO, misrepresented the affidavit, concealed its inculpatory portions, and presented SA Foxx with a distorted picture suggesting Williams was unaware of the gun. As a result, the State walked away from a prosecution supported by ample evidence of Williams' guilt.

---

[6] And there is no reason to believe Evans would have refused to testify given that he handwrote the affidavit, admitted in the affidavit that he shot Cochran and Johnson, and agreed to speak with the Working Group members.

**b. Williams cannot establish a lack of probable cause.**

"It is well established that the existence of probable cause forms a complete defense to a malicious prosecution claim." *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015); *accord Howard v. Firmand*, 378 Ill. App. 3d 147, 149, (2007) ("Probable cause is a complete defense to an action for malicious prosecution."); *see also Chiaverini v. City of Napoleon*, 602 U.S. 556, 558, (2024). For the same reasons set forth above in Section V related to the federal claim of prolonged pretrial detention, Williams cannot establish a lack of probable cause to arrest and prosecute him for the murders of Cochran and Johnson. As a result, his malicious prosecution claim fails.

## VII. Defendants Are Entitled To Summary Judgment On Counts V, VI And IX.

**a. O'Brien and Foley are entitled to summary judgment on Williams' federal and state law claims for conspiracy in Counts V and IX.**

Conspiracy is not an independent basis of liability under §1983 or state law. *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2009); *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶59. A civil conspiracy requires an agreement between two or more persons to accomplish an unlawful purpose, plus at least one tortious act in furtherance. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007). An agreement is indispensable; a defendant who innocently performs an act that happens to further another's tortious purpose is not liable. *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017); *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶59 ("conspiracy is not an independent tort: the conspiracy claim fails if the independent cause of action underlying the conspiracy allegation fails") (citations omitted). Under Illinois law, a civil conspiracy requires, "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused the injury to

the plaintiff. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (citing *McClure v. Owens Corning Fiberglas Corp*., 188 Ill.2d 102, 133 (1999)). An agreement is a "necessary and important" element of this cause of action, and "[a] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017).

Here, Williams' federal and state law conspiracy claims against O'Brien and Foley fail because there is no evidence to suggest that either caused or contributed to any constitutional deprivation or other tort. The only allegations against O'Brien are that he falsified a small and immaterial portion of an otherwise truthful inculpatory confession, made vague, subtle or implied threats that in one case Williams did not even perceive as threats at first, and may or may not have said Williams "could probably" go home if he cooperated. There is no evidence to suggest Foley had any involvement in this case and no evidence to suggest anyone else was part of the alleged conspiracy.

Finally, Defendants are also entitled to qualified immunity on Williams' § 1983 conspiracy claims because "it cannot be said that the law [was] clearly established on this point. . . [t]hat is, reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake)." *Haliw v. City of South Elgin*, 2020 WL 1304697, *4 (N.D. Ill. March 3, 2020) (finding liability is not clearly established for conspiracies amongst police officers of a single municipality because the law was unsettled on whether the intra-corporate conspiracy doctrine applies to § 1983 claims) (*comparing Jackson v. City of Cleveland*, 925 F.3d 793, 819-20 (6th Cir. 2019) (the intra-corporate conspiracy doctrine applies to § 1983 just as it does to § 1985 claims because both create

"cause[s] of action against any 'person' who deprives a plaintiff of his rights[.]"), *with Drager v. Vill. of Bellwood*, 969 F. Supp. 2d 971, 985 (N.D. Ill. 2013) ("The Seventh Circuit has yet to decide whether the doctrine applies to § 1983 conspiracy claims, and district courts in this Circuit are split on whether it does.").

**b. The failure to intervene claim in Count VI fails.**

Williams generally alleges that O'Brien and Foley failed to intervene to prevent constitutional misconduct. But Judge Easterbrook has questioned whether failure to intervene is cognizable under §1983. '"Failure to intervene' sounds like vicarious liability.'" *Mwangangi v. Nielsen*, 48 F. 4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring). "The Supreme Court has held many times that §1983 supports only direct, and not vicarious, liability." *Id.* Seventh Circuit decisions allowing failure-to-intervene claims do not explain "why this theory of liability is consistent with *Iqbal*, *Vance*, and similar decisions." *Id*. at 834 (citing *Doxtator v. O'Brien*, 39 F. 4th 852, 865 (7th Cir. 2022)). Judge Easterbrook concluded that *Doxtator* relied only on cases which predate *Iqbal* and *Vance. Id.* As such, judgment should be granted in their favor.[7]

Turning to the merits, O'Brien and Foley are each entitled to summary judge because Williams cannot establish that either had any knowledge of any alleged misconduct committed by the other or by another officer. "[I]n order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *See Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005). A plaintiff may state a claim for failure to intervene by showing that "any constitutional violation has been committed by a law enforcement official; and the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin,* 37 F.3d

[7] Defendants recognize current precedent allows for a failure to intervene claim but, respectfully, contend that this theory is incongruent with *Iqbal* and *Vance* and runs afoul of the personal involvement requirement of §1983 by placing vicarious liability on a police officer for failing to stop another's conduct. As such, Defendant Officers raise this argument to preserve in the event of an appeal

282, 285 (7th Cir. 1994) (emphasis omitted); *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 754 (N.D. Ill. 2012). There is no proof that O'Brien was aware of any misconduct by Foley or anyone else and no facts to suggest he could have reasonably intervened to stop this alleged behavior. The same goes for Foley, who was not even working the day Williams was at Area 1. Accordingly, the failure to intervene claim fails. *See Celafu v. Village of Oak Grove*, 211 F.3d 416, 423 (7th Cir. 2000); *Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005) (Plaintiff's failure to establish an underlying constitutional violation warrants dismissal of their dependent failure to intervene claim).

**VII. Williams' IIED Claim In Count X Fails As A Matter Of Law.**

Before turning to the merits, Defendants note that plaintiff cannot move forward on her IIED claim because she failed to establish a cause of action for malicious prosecution. Under Illinois law, the hurdle for an IIED claim is higher than the hurdle for a malicious prosecution claim, at least where the same offending conduct forms the basis of both claims. *See Lundy v. City of Calumet City,* 209 Ill. App. 3d 790, (1991) ("It is not enough that *** [the defendant's] conduct can be characterized by malice."); *Robinson v. Econ-O-Corp., Inc.,* 62 Ill. App. 3d 958 (1978) (reversing summary judgment for the defendant as to the malicious prosecution claim but affirming as to the IIED claim); *March v. Cacioppo*, 37 Ill. App. 2d 235, 241-249 (1962) (same, on a motion to dismiss); *Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1063-64 (N.D. Ill. 2015) ("Because Starks has failed to identify evidence sufficient to maintain his malicious prosecution claim against the dentist and Thomas-Boyd, it follows that he cannot maintain his IIED claim against those defendants."). Given that Williams' IIED claim stems from the same offending conduct that formed the basis of his malicious prosecution claim, it too fails.

On the merits, the claim also fails. A claim for IIED requires conduct so extreme and outrageous it goes beyond all possible bounds of decency. *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 90 (1976). Williams's IIED claim rests on the same alleged misconduct as his conspiracy claim. (Dkt. 1, ¶¶162-167). Because there is no viable evidence that O'Brien or Foley caused a constitutional deprivation, the IIED claim fails for the same reason. It must be dismissed.

Respectfully submitted,

JAMES O'BRIEN and GERI LYNN YANOW, as Independent Administrator of the Estate of WILLIAM FOLEY

__*s/ Patrick R. Moran*_____
One of their attorneys

Eileen E. Rosen
Patrick R. Moran
Collin Smith
Erin Shiel
ROCK FUSCO & CONNELLY LLC
333 W Wacker, 19th Floor
Chicago, Illinois 60606
312-494-1000
erosen@rfclaw.com
pmoran@rfclaw.com
csmith@rfclaw.com
eshiel@rfclaw.com