**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CORDELL WILLIAMS, | ) | |
| | ) | Case No. 23-cv-14905 |
| Plaintiff, | ) | |
| | ) | Honorable Lindsay C. Jenkins |
| v. | ) | |
| | ) | Mag. Judge Young B. Kim |
| JAMES O'BRIEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

**Jurisdiction and Venue**

1. This Court has subject matter and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, respectively, and venue is proper as the actions that are the subject of Plaintiff's complaint occurred within this judicial district. (Dkt. 1., ¶¶ 6-7).

**Parties**

2. Plaintiff, Cordell Williams ("Williams"), was 19 years old when he was arrested in 1994 for the murder of Myron Cochran and attempted murder of Billy Johnson. (Dkt. 1., ¶¶ 18-22). Williams had been arrested numerous times between 1992 and May of 1994, for, among other things, possession of burglary tools, unlawful use of a weapon without a FOID card, and mob action. (Ex. 1, Williams Dep., 254:18-256:8).

3. Williams joined a gang known as the Black P. Stones in 1988. (Ex. 1, Williams Dep., 75:15-16). He was still affiliated with the gang and participated in gang activities in 1994. (Ex. 1, Williams Dep., 75:15-76:11, 78:16-79:9). Williams was the lookout for drug sales, carried a gun, and was tasked with looking out for other rival gang members and protecting members of his gang from getting shot at, beaten up, or possibly killed. (Ex. 1, Williams Dep., 81:2-82:9).

4. Williams grew up in an area that was primarily controlled by rival gangs, so he was

familiar with the borders of gang territories. (Ex. 1, Williams Dep., 85:1-86:17). Williams knew that one of the Black P. Stones' rival gangs in 1994 was the Gangster Disciples ("GDs"). (Ex. 1, Williams Dep., 184:2-7).

5. Defendants, Detective James O'Brien and Detective William Foley[1] were both employed by Defendant City of Chicago as police officers during the investigation into the homicides of Cochran and Johnson. (Dkt. 1., ¶ 9).

**<u>The Execution Style Murders of Myron Cochran and Billy Johnson</u>**

6. On May 26, 1994, at around midnight at the Honeybee Sub Shop at Halsted and 74th, David Evans ("Evans") shot 18-year-old Cochran and 19-year-old Johnson in the back of the head at point blank range and then shot each of them again in the abdomen or back. (Ex. 2, Pratt's Trial Testimony, F29:21-F30:11; Ex. 3, Rose's Trial Testimony, F128:24-F129:3; Ex. 1, Williams Dep., 159:1-12). Cochran was pronounced dead at the scene. (Ex. 4, Sanders' Trial Testimony, F55:23-F56:6). Johnson was transported to the hospital by paramedics and died from his wounds hours after he was shot. (Ex. 5, O'Brien's Trial Testimony, G14:20-24).

7. At the time of the shooting, off-duty Chicago Police Officer Stan Sanders happened to be in his car near the restaurant and heard the gunshots. He saw a Black male (whom he identified as Evans) running out and away from the sub shop. (Ex. 4, Sanders' Trial Testimony, F47:16-F48:14). Officer Sanders turned his car around to follow the individual and witnessed the individual stumble and fall. (Ex. 4, Sanders' Trial Testimony, F49:4-F50:1). Officer Sanders then exited his car, drew his revolver and told the individual "Police, stop," and the individual turned and looked at Officer Sanders. (Ex. 4, Sanders' Trial Testimony, F50:2-17).

8. The individual continued running towards the vehicle and stumbled again. (Ex. 4,

[1] William Foley is deceased. Plaintiff sued the Independent Administrator of the Estate of William Foley.

Sanders' Trial Testimony, F50:18-21). Officer Sanders saw the vehicle gradually pull away from the curb and saw that the driver's side back door was open. (Ex. 4, Sanders' Trial Testimony, F32: 3-20). The individual got into the car and Officer Sanders got back into his car and began chasing the car north on Halsted but eventually lost it because the driver was going through stop signs, had turned off the headlights, and was going very fast. (Ex. 4, Sanders' Trial Testimony, F52:20-F55:4).

9. Before Officer Sanders lost the car, however, he managed to get the license plate number and informed fellow officers when he returned to the scene of the shooting. (Ex. 4, Sanders' Trial Testimony, F56:10-19). The license plate number show the car was a Ford Tempo registered to Williams' mother at 7622 South Carpenter. (Ex. 6, Mangan's Trial Testimony, F93:9-19).

**Evening of May 25, 1994**

10. Earlier in evening of May 25, 1994, Williams was at a get-together at his friend Veno's house and offered to give Evans and others a ride home. (Ex. 1, Williams Dep., 146:1-6). In May 1994, Williams only knew Evans by the nickname "Day-Day." (Ex. 1, Williams Dep., 214:21-215:5).

11. In May 1994, Williams knew Evans was a "young general" of the Black P. Stones and was the nephew of the general of the gang. (Ex. 1, Williams Dep., 217:15-20; 308:20-309:3). Evans was a gang enforcer and part of the gang's hierarchy. (Ex. 1, Williams Dep., 137:5-13). Williams also knew Evans had a reputation for being a bad guy who had been locked up and shot at, and who had also shot at other people. (Ex. 1, Williams Dep., 90:17-90:11; 92:2-12). Williams believed Evans always carried a gun, was a loose cannon, and was someone you would not want to make angry. (Ex. 1, Williams Dep., 88:8-89:9; 92:2-12; 89:14-90:16).

12. Before getting in the car, Williams informed Evans that if he was riding with heat (*i.e.*, if he had a gun), he had to put it in the trunk. (Ex. 1, Williams Dep., 148:10-11). Williams "popped" open the trunk of his mother's Ford Tempo and witnessed Evans place a gun in the trunk. (Ex. 1, Williams Dep., 151:19-152:6).

13. At or around midnight on May 26, 1994, Williams was driving westbound on 83rd Street with Evans, Londell Harper ("Harper") and another passenger. (Ex. 1, Williams Dep., 145:13-19, 152:24-153:9, 147:4-6). Like Williams, all the passengers were Blackstones. (Ex. 7, Evans Dep., 42:1-5, 106: 11-24). Williams claims he was "intoxicated" at the time, though he was able to drive in a straight line without swerving or hitting other cars and made it all the way to the intersection of 74th and Halsted without a problem. (Ex. 1, Williams Dep., 153:8-22, 162:21-24).

14. Near Halsted and 74th, Williams heard Evans yell, "pull over pull over" and that he had spotted "some bricks," which Williams knew was a reference to the GDs. (Ex. 1, Williams Dep., 155:11-15, 311:10-313:2). Williams knew in 1994 that the GDs controlled the area at 74th and Halsted. (Ex. 1, Williams Dep., 136:22-137:2).

15. Williams drove northbound on Halsted through the intersection of 74th and Halsted and pulled over. (Ex. 1, Williams Dep., 157:12-16). At that point, Evans told him to "pop the trunk" and Williams opened the trunk of the car. (Ex. 1, Williams Dep., 157:23-158:3). Williams knew that Evans was getting the gun from the trunk. (Ex. 1, Williams Dep., 314: 11-15, 316:9-13).

16. Williams leaned back in his seat and was falling asleep when he suddenly heard gunshots. (Ex. 1, Williams Dep., 317:21-318:14). He saw Evans running in the street back to the car and started to drive away while Evans jumped into the car. (Ex. 1, Williams Dep., 318:15-19). When Evans got into the car, he yelled "get the fuck out of here." (Ex. 1, Williams Dep., 173:4-6).

17. As he drove away, Williams realized a car was behind them. (Ex. 1, Williams Dep., 169:6-10). Williams knew that the car behind them was either the police or a rival gang. (Ex. 1, Williams Dep., 176:14-23). Williams does not remember if Evans ever told him that the police were chasing them, but he does not deny that Evans may have said that. (Ex. 1, Williams Dep., 170:17-171:14). Williams drove away at about 70 to 90 miles per hour and turned left onto 73rd Street headed toward Aberdeen. (Ex. 1, Williams Dep., 171:24-172:10).

18. Once Williams got to the area of 74th and Aberdeen, he stopped the car and told Evans to "get the fuck out." (Ex. 1, Williams Dep., 173:10-16). Both Evans and the other passenger got out of the car. (Ex. 1, Williams Dep., 174:4-8). Williams then dropped Harper off at his home near 88th and Ashland. (Ex. 1, Williams Dep., 173: 17-23). After dropping Harper off, Evans went home. (Ex. 1, Williams Dep., 176:5-7). Once home, Williams fell asleep. (Ex. 1, Williams Dep., 182:13-16).

**<u>Williams Is Arrested At His Home And Brought to Area 1</u>**

19. Roughly an hour and a half after the murders, at approximately 1:30 a.m. on May 26, 1994, police officers arrived at Williams' parents' home. (Ex. 6, Mangan's Trial Testimony, F93:2-F94:5). Officer Mangan asked Williams if he had been driving the car parked directly in front of the home. (Ex. 6, Mangan's Trial Testimony, F93:18-19, F95:21-22). Williams stated that he was the last one to drive the car but claimed that he got home at 10:30 p.m., almost three hours earlier. (Ex. 6, Mangan's Trial Testimony, F95:22-F96:1).

20. Detective Dennis Dwyer, who was also present at Williams' parents' home, noticed a lot of heat coming from the radiator of the car, leading him to believe that the car had just recently been driven. (Ex. 8, Dwyer's Trial Testimony, F104:1-8). Police arrested Williams at his parents' home, and he was transported to Area 1. (Ex. 8, Dwyer's Trial Testimony, F96:15-24).

21. Williams does not recall whether he was Mirandized before he was taken to Area 1, or whether he was Mirandized by detectives before any of his interviews at Area 1. However, he does not deny being Mirandized and agrees that it is possible he was. (Ex. 1, Williams Dep., 293:21-24). Detectives Rose and O'Brien, and the felony review Assistant State's Attorney, Greg Vaci, all testified that Williams was Mirandized before he was questioned. (Ex. 3, Rose's Trial Testimony, F131:8-15; Ex. 5, O'Brien's Trial Testimony, G6:14-18; Ex. 9, Vaci's Trial Testimony, G95:1-G96:5). At the time of his arrest, Williams knew he had a right to remain silent and the right to ask for an attorney. (Ex. 1, Williams Dep., 294:4-296:13).

22. Upon arriving at Area 1, Williams almost immediately started talking with a detective about what happened. (Ex. 1, Williams Dep., 195:12-24). Williams identified the first detective who interviewed him as either Detective Dwyer or Detective Gehrke and believed the interview lasted between 20-30 minutes. (Ex. 1, Williams Dep., 202:23-203:4). Throughout this interview, Williams was given breaks and was left alone in the room. (Ex. 1, Williams Dep., 203:10-18). The detectives who interviewed Williams when he first arrived at Area 1 were not abusive toward him, nor did they make any threats or promises to Williams. (Ex. 1, Williams Dep., 206:2-20).

23. Williams told the detectives what happened on the night of May 25, 1994, and the early morning hours of May 26, 1994. (Ex. 1, Williams Dep., 207: 3-5). Williams told them he pulled the car over near 74th and Halsted because they saw a "brick" or GD; however, Williams did not mention Evans or any of his actions to them. (Ex. 1, Williams Dep., 207:6-208:22, 213:9-23). Williams admitted that he could have been killed if he had told the detectives that it was Evans who had gotten out of the car and told him to pop the trunk. (Ex. 1, Wiliams Dep., 216:3-9).

24. Based on the information Williams shared in his initial interview, the detectives took Williams out driving in the community for approximately two hours to look for Londell Harper. (Ex. 1, Williams Dep., 218:6-14). It was daylight when Williams went out looking for Harper, and it was around midday when he returned to Area 1. (Ex. 1, Williams Dep., 223:24, 226:1-5). At no point in the questioning and canvassing for Harper was Williams abused or threatened or promised anything by detectives. (Ex. 1, Williams Dep., 226:9-227:9).

25. Upon returning to Area 1, Williams was given a burger from Checkers, crispy fries, and an orange pop. (Ex. 1, Williams Dep., 228:15-229:5). Williams does not recall if he was given multiple burgers but does not deny that he may have been. (Ex. 1, Williams Dep., 325:1-8, 333:3-12). Williams does not recall whether he was allowed to use the bathroom or even if he had to go. (Ex. 1, Williams Dep., 229:6-7). However, he does not deny being able to use the bathroom. (Ex. 1, Williams Dep., 325:21-3264).

**<u>Defendant Detective O'Brien Interviews Williams</u>**

26. Detective James O'Brien and his partner Detective Jerry Carroll were assigned to the investigation upon starting their shift at 4:30 p.m. on May 26, 1994. (Ex. 5, O'Brien's Trial Testimony, G4:16-24). Williams does not remember Carroll. (Ex. 1, Williams Dep., 232:6-15).

27. O'Brien met with Williams to interview him around 6:30 p.m. that night. (Ex. 5, O'Brien's Trial Testimony, G6: 9-13). Before he spoke with O'Brien, Williams knew he had the right to remain silent and could have told O'Brien he did not want to talk, and that he wanted a lawyer. (Ex. 1, Williams Dep., 299:11-16). However, Williams agreed to speak with O'Brien. (Ex. 1, Williams Dep., 299:7-10). Williams also agreed that he had been given an opportunity to eat prior to meeting with O'Brien. (Ex. 1, Williams Dep., 229:18-19, 333:3-11).

28. At some point during his conversation with O'Brien, Williams mentioned Evans by

the name "Day" or "Daybreak." (Ex. 1, Williams Dep., 113:12-114:2, 243:19-23, 337:5-7). Williams perceived O'Brien to have a "lightbulb moment," as if O'Brien recognized the name. (Ex. 1, Williams Dep., 288:15-289:5, 337:8-12). O'Brien then brought Williams a photograph of Evans, which Williams identified as the individual he had referred to as Day or Daybreak in the car with him. (Ex. 1, Williams Dep., 115:1-116:12, 337:11-338:13).

29. Williams testified that O'Brien interviewed Williams for 20 to 45 minutes; O'Brien testified that he interviewed Williams for an hour and a half. (Ex. 1, Williams Dep., 333:12-17; Ex. 5, O'Brien's Trial Testimony, G11:10-14).

30. O'Brien knew Evans and his nicknames because he was involved in a previous homicide investigation involving Evans. (Ex. 5, O'Brien's Trial Testimony, G38:4-8; Ex. 1, Williams Dep., 115:20-116:2). O'Brien knew Evans was a member of the Black P. Stones and knew where he hung out. (Ex. 5, O'Brien's Trial Testimony, G9:8-17; Ex. 9, Vaci's Trial Testimony, H34:24-H35:5).

31. Williams believes that during this interview, O'Brien threatened him in ways that were "so subtle." (Ex. 1, Williams Dep., 259:20-260:4). For example, Williams claims that O'Brien threatened to charge Williams' father with a gun charge because O'Brien knew that Williams' father owned a gun. (Ex. 1, Williams Dep., 260:12-261:24, 348:11-349:22). Williams' father never told Williams that O'Brien had threatened to charge him with a gun crime. (Ex. 1, Williams Dep., 348:11-22). At his deposition, Williams called the wording of the threat "semantics" and admitted that O'Brien did not expressly threaten to charge his father with a gun charge. (Ex. 1, Williams Dep., 349:18-21).

32. Williams also believes that O'Brien threatened him by asking about the day Williams' father was accosted by Evergreen Park police one week earlier, while his father was on

the way home from dialysis treatment. (Ex. 1, Williams Dep., 259:20-260:4). Williams did not realize his father had been at Area 1 since early morning on May 26, 1994, and had likely spoken to O'Brien. (Ex. 1, Williams Dep., 340:5–343:23, 347:5-19). Williams does not have any proof that O'Brien was involved in the incident with the Evergreen Park police. (Ex. 1, Williams Dep., 342:12-343:11).

33. Williams does not claim O'Brien made any express threats; rather, the perceived threats were alluded to and implied. (Ex. 1, Williams Dep., 259:21, 266:23, 267:18-23, 268:19-269:3, 328:6-15). Williams also admits that O'Brien never raised his voice or yelled at him at any point. (Ex. 1, Williams Dep., 264:22-265:2).

34. Though Williams initially testified that O'Brien did not make any promises to him, Williams changed his mind and claimed that O'Brien told him he would probably get to go home if he cooperated. (Ex. 1, Williams Dep., 264:14-16; 267:3-23).

35. Before O'Brien left for lunch, he allegedly told Williams that Williams was going to want to talk to him later. (Ex. 1, Williams Dep., 262:13-18).

**<u>Williams Is Allegedly Beaten By An Unknown Detective</u>**

36. About 10 minutes after O'Brien left the interview room, Williams claims that another detective came in by himself and beat him for about two minutes. (Ex. 1, Williams Dep., 272:17-23, 333:18-23). Williams alleges that this detective slapped him in the face with an open fist, causing Williams to fall over. (Ex. 1, Williams Dep., 274:5-9). He also alleges that this detective kicked him in the buttocks and struck him in the ribs with a phone book. (Ex. 1, Williams Dep., 277:13-283:3). This detective did not say anything or speak to Williams. (Ex. 1, Williams Dep., 272:24-273:1).

37. Williams did not know the name of the detective who physically abused him. (Ex.

1, Williams Dep., 235:21-236:6). Williams believes it was Foley based on a conversation he had with another inmate while incarcerated, Arnold Day, in the same year as the 9/11 attacks. (Ex. 1, Williams Dep., 252:11-253:24). Williams told Day that the person who struck him was a "little stocky dude" and Day told him it was Foley. (Ex. 1, Williams Dep., 252:11-253:24).

38. According to Foley's Sworn Time and Attendance Record for 1994, he took vacation days on May 26 and 27, 1994, and was not working the days Williams was questioned at Area 1. (Ex. 10, Declaration of Yasmine Ali-Kelley and corresponding attachment, William Foley's 1994 Sworn Time and Attendance Record). None of the general progress reports or supplemental reports mention Foley as one of the investigating or arresting detectives. (*see* Ex. 11, Compiled Police Reports). Foley did not testify at any point during Williams' trial, nor was he mentioned during the proceedings. (*see* Ex. 12, Criminal Trial Transcript of Proceedings).

39. At some point after the unknown detective left the room, O'Brien returned and brought Williams to speak with his father. (Ex. 1, Williams Dep., 270:1-19). According to Williams, his father allegedly told him to just tell the police what they wanted to hear, and he would be able to go home. (Ex. 1, Williams Dep., 271:2-8). Williams' father passed away in 2019. (Ex. 13, Brenda Williams Dep., 12:1-3).

**<u>Williams Gives A Court Reported Statement</u>**

40. After Williams spoke with his father, O'Brien brought Williams to an office with a desk to speak with Assistant States Attorney Greg Vaci ("ASA Vaci") between midnight and 12:30am on May 27, 1994. (Ex. 5, O'Brien's Trial Testimony, G15:4-18; Ex. 9, Vaci's Trial Testimony, G92:12-G93:24). O'Brien was present. (Ex. 1, Williams Dep., 234:18-23, 287:1-8).

41. Once in the room with ASA Vaci, Williams claims he was threatened again by what he perceived to be a gun on the table concealed under a newspaper. (Ex. 1, Williams Dep., 291:1-

8). Williams was sitting at the desk facing Vaci when O'Brien walked around the desk and sat down, at which point Williams noticed a newspaper on the desk. (Ex. 1, Williams Dep., 291:9-292:3). O'Brien picked up the paper and "popped it" but Williams did not pay attention to it because it did not stand out to him at that point. (Ex. 1, Williams Dep., 291:9-24). After Williams began giving his court-reported statement, he thought there must be a gun under the newspaper because of "loud thud" he heard when it was placed on the table. (Ex. 1, Williams Dep., 292:4-19). Williams did not see a gun. (Ex. 1, Williams Dep., 292:11-13).

42. ASA Vaci advised Williams of his Miranda rights prior to giving a court reported statement. (Ex. 1, Williams Dep., 303:18-304:9). Williams gave a court-reported statement at 2:30 a.m. on May 27, 1994, in the presence of ASA Vaci, Defendant Detective O'Brien, and a court reporter (Ex. 1, Williams Dep., 299:17-24; *see* Ex. 14, Court-Reported Statement of C. Williams, 5/27/1994).

43. Booking photos taken of Williams after he gave his court-reported statement do not show any visible injury to Williams' face and head, or damage to Williams' wire-rimmed glasses. (Ex. 15, Williams' Booking Photographs; Ex. 1, Williams Dep., 349:22-352:3)

44. At his deposition, Williams admitted that the following parts of his statement are all true (Ex. 1, Williams Dep., 301:6-329:24):

a. Williams was with Evans but only knew him by the nickname "Day-Day" (Ex. 1, Williams Dep., 306:4-7).
b. Evans was sitting behind the driver seat (Ex. 1, Williams Dep., 308:1-5).
c. Evans is a member of the Black P. Stones (Ex. 1, Williams Dep., 308:20-309:3).
d. Williams had popped the trunk for Evans to put the gun in the car (Ex. 1, Williams Dep., 310:24-311:7).
e. Evans put the gun in the trunk of the car (Ex. 1, Williams Dep., 310:6-10).
f. As they were traveling down Halsted, Williams heard Evans say "Pull over. Pull over" because Evans saw some "bricks" from the back seat (Ex. 1, Williams Dep., 311:8-17).
g. Williams knew at the time the word "bricks" was a slang reference for the

Gangster Disciples (GDs), a rival gang (Ex. 1, Williams Dep., 311: 24-312:15).

h. Williams pulled over and Evans asked him to pop the trunk because he was trying to get the gun (Ex. 1, Williams Dep., 313:3-15).

i. Williams popped the trunk (Ex. 1, Williams Dep., 313:3-15).

j. After Evans went to the trunk and got the gun, Evans proceeded to walk to the submarine shop (Ex. 1, Williams Dep., 317:14-20).

k. Williams leaned back and was about to fall asleep when he heard four or five shots and freaked out (Ex. 1, Williams Dep., 317:24-318:9).

l. Williams saw Evans running out of the shop as he cranked up his car and tried to pull away as quickly as possible (Ex. 1, Williams Dep., 320:4-10).

m. Evans ran to catch up to the car, snatched the door open, slipped, and jumped into the car (Ex. 1, Williams Dep., 320:11-22).

n. In the car, Williams said "what the fuck had gone on." (Ex. 1, Williams Dep., 321:2-14).

o. Evans yelled "Pull the fuck off. Go go go" and that is when Williams observed an off-duty police officer behind the car (Ex. 1, Williams Dep., 321:2-8).

p. Williams was going between 75-90 miles an hour (Ex. 1, Williams Dep., 322:11-16).

45. Williams also admitted at his deposition that he was given a couple of burgers from Checkers to eat and water and pop to drink before he spoke to O'Brien, and that he had told O'Brien all of the information included in the statement during their first interview, before Williams was allegedly attacked by the detective he now thinks was Foley. (Ex. 1, Williams Dep., 228: 15-229:5, 230:15-231:6, 271:19-22, 325:5-15, 330:17-331:11, 333:6-7).

46. Williams alleges that he was told by O'Brien to include the following false information in his court-reported statement:

a. Andre Rudnick was a passenger in the car (Ex. 1, Williams Dep., 304:14-305:20).

b. The gun was a .45 Ruger (Ex. 1, Williams Dep., 309:15-310:5).

c. He was in the car when he popped the trunk for Evans to put the gun there (Ex. 1, Willaims Dep., 310:11-311:7).

d. He was led to believe Evans was going to shoot somebody when he got the gun from the trunk (Ex. 1, Williams Dep., 313:16-314:4).

e. He saw Evans running out of the sub shop after hearing the shots (Williams claims he saw Evans running behind the car) (Ex. 1, Williams Dep., 318:2-24).

f. The police treated him well while at Area 1 (Ex. 1, Williams Dep., 326:5-

18).

g. No promises or threats were made in return for his statement (Ex. 1, Williams Dep., 327:18-24).

47. Although Williams claims that O'Brien told him to say Andrew Rudnick was a passenger in the car, in his answer to Interrogatory No. 2, Williams answered under oath that Rudnick, not Peterman, was one of the passengers. (Ex. 16, Answer to Irog No. 2, p. 3). Williams' Complaint also alleges that Rudnick, not Peterman, was one of the passengers. (Dkt. 1, ¶15). Police did not interview Rudnick or Peterman and neither of them testified at Williams' criminal trial. (*See* Ex. 11, Compiled Police Reports; *see* Ex. 12, Criminal Trial Transcript of Proceedings).

48. On May 27, 1994, after ASA Vaci approved murder charges against Williams following his court–reported statement, O'Brien signed a "Complaint for Preliminary Examination" ("Criminal Complaint") for two counts of first-degree murder against Williams, alleging that Williams shot and killed Cochran and Johnson on May 26, 1994. (*See* Ex. 17, Complaint for Preliminary Examination, *See* Ex. 11, Compiled Police Report, p. 25).

**<u>Criminal Pretrial and Trial Proceedings</u>**

49. On June 6, 1994, a grand jury returned an indictment against Williams for two counts of first-degree murder. (*See* Ex. 18, Grand Jury Indictment).

50. Prior to his criminal trial, Williams' attorney filed a motion to suppress Williams' court reported statement, and there was a subsequent hearing on the motion. (Ex. 12, Criminal Trial Record of Proceedings at B3). The motion alleges that an unknown officer hit Williams in his forehead several times with an open hand. (Ex. 19, Williams' Motion to Suppress Statements ¶9). The motion includes a handwritten note that read, "white male, around 40 years old, stocky, occurring approximately 10 to 12 hours after being held in custody." (Ex. 19, Williams' Motion to Suppress Statements). The motion does not allege that Williams was kicked, knocked over, or

struck with a phone book. (Ex. 19, Williams' Motion to Suppress Statements).

51. After Detectives Dwyer, Rose, and Gehrke testified at the motion to suppress hearing, Williams' attorney withdrew the motion. (Ex. 12, Criminal Trial Record of Proceedings, B42:12-15). At his deposition, Williams testified that he did not know his attorney would withdraw the motion and was surprised that he did. (Ex. 1, Williams Dep., 239:17-21).

52. During Williams' trial in June 1995, his court-reported statement was admitted into evidence after O'Brien authenticated it. (Ex. 12, Criminal Trial Record of Proceedings, H63:17-19; Ex. 5, Obrien's Trial Testimony, G25:6-18). In addition to Williams' court-reported statement and O'Brien's testimony, the State called Officer Sanders, Detective Dwyer and Officer Mangan to establish that the car seen fleeing the crime scene with the shooter was registered to Williams' mother, that Williams admitted that he last drove the car, and that heat was still emanating from car's radiator when police arrested Williams at his home. (Ex. 4, Sander's Trial Testimony, F52:13-F53:19; Ex. 8, Dwyer's Trial Testimony, F102:9-104:8 ; Ex. 6, Mangan's Trial Testimony, F93:2-F95:1).

53. After a jury trial in June 1995, Williams was convicted on two counts of first-degree murder on an accountability theory for the shooting deaths of Myron Cochran and Billy Johnson and sentenced to life in prison without parole. (Ex. 12, Criminal Trial Record of Proceedings, I4: 6-11, J30:5-6).

**The Allegedly Fabricated Evidence and *Brady* Evidence**

54. In his answers to Defendant O'Brien's First Set of Interrogatories, Williams was asked to identify the allegedly fabricated evidence at issue in this lawsuit. (Ex. 16, Answer to Irog., p.14). He identified: (1) the Criminal Complaint issued by O'Brien against him on May 27, 1994; and (2) O'Brien's June 28,1995, criminal trial testimony concerning statements allegedly made by

Williams. (Ex. 16, Answer to Irog., p.14).

55. The Criminal Complaint states that Williams "knowingly and without lawful justification, shot Billy Johnson with a handgun, knowing that said act was likely to cause death or great bodily harm to Billy Johnson, which in fact did cause the death of Billy Johnson, and that Williams "knowingly and without lawful justification, shot Myron Cochran in the head with a handgun, knowing that said act was likely to cause death or great bodily harm to Myron Cochran, which in fact did cause the death of Myron Cochran." (Ex. 17, Complaint for Preliminary Examination). The Criminal Complaint was not referred to at trial or admitted into evidence as an exhibit at trial. (Ex. 20, May 13, 1996, Impounding Order; Ex. 12, Criminal Trial Record of Proceedings).

56. In his answer to O'Brien's Interrogatory No. 20, Williams was asked to identify any claims that Defendants withheld exculpatory evidence. (Ex. 16, Answer to Irog., p. 12-13). Williams identified only his mistreatment by detectives, answering: "The Defendant detectives withheld exculpatory evidence that the Plaintiff was physically tortured, coerced, and intimidated into providing a false confession." (Ex. 16, Answer to Irog., p. 12-13).

**The Affidavit of David Evans**

57. Evans shot and killed Cochran and Johnson because he thought they were rival gang members. (Ex. 7, Evans Dep., 108:3-16). Evans shot them in the back of the head so they would not know it was coming. (Ex. 7, Evans Dep., 130:4-14). Evans then shot them again two or three times. (Ex. 7, Evans Dep., 130:15-19). Evans characterized his conduct as a case of mistaken identity. (Ex. 7, Evans Dep., 154:4-155:4).

58. Evans was arrested, tried before a jury, convicted of both murders, and sentenced to life in prison, though his sentence ultimately was reduced to 60 years because he was only 17

years old when he committed the crime. (Ex. 7, Evans Dep., 30:10-15, 33:15-20, 42:24-43:3, 45:12-14).

59. In 2017, Williams obtained a handwritten affidavit from David Evans to help establish his innocence. (Ex. 7, Evans Dep., 353:6-354:23; Ex. 21, Evans' 2017 Affidavit; Ex. 1, Williams Dep., 34:12-16). Evans' affidavit makes the following assertions:

a. On May 26, 1994, Williams gave him and others a ride home from a party (¶1).
b. While at the party, Evans brandished a gun, which led Williams to tell him to put the gun in the trunk of the car before leaving (¶2).
c. Williams "popped the trunk" of his car and Evans put his gun in the trunk (¶2).
d. As they were blocks away from Evans' home, Evans saw what he thought were rival members in a restaurant who had been trying to shoot him (¶3).
e. Evans demanded that Williams "pull over, pull over," which Williams did (¶4).
f. Evans told Williams to "pop the trunk and wait right here I wanna see if that's these n-----" (¶5).
g. Evans grabbed the gun from the trunk, walked to the individuals he saw and "in an awful case of mistaken identity," shot and killed Cochran and Johnson (¶¶6-7).
h. Evans ran back into Williams's car and yelled "drive drive that's the police" (¶8).

(Ex. 21, Evans' 2017 Affidavit, ¶¶1-8).

60. At his deposition, Evans reviewed the affidavit and confirmed it is true. (Ex. 7, Evans Dep., 57:9-58:3, 93:5-95:4, 148:17-155:16). Williams also reviewed Evans' affidavit at his deposition and confirmed it is true. (Ex. 1, Williams Dep., 354:6-355:12).

**<u>The CCSAO Forms the Working Group and Lawyers Committee</u>**

61. In 2021, SA Foxx formed the "Lawyers Committee" and the "Working Group" in collaboration with civil rights attorney Peter Neufeld. (*See* Ex. 22, Guidelines). The Working Group and the Lawyers Committee were created to identify and review the integrity of convictions involving Detectives Kenneth Boudreau, William Foley, Richard Paladino, James Cassidy

Thomas Coughlin, Frank Valdez, and Patrick McCafferty. (Ex. 22, Guidelines, at 1; Ex. 23, Hawilo Dep., 71:16-24; Ex. 24, Lanier Dep., 59:13-18, 60:5-20).

62. The Working Group, which conducted the investigations, was made up of three law professors/criminal defense attorneys – Marc Kadish, Maria Hawilo and Vincent Southerland – sworn in as special assistant state's attorneys and paid $185 per hour to investigate convictions and make recommendations. (Ex. 22, Guidelines, at 1; Ex. 23, Hawilo Dep., 8:6-18; Ex. 25, Southerland Dep., 9:1-8; Ex. 26, Kadish Dep., 8-9).

63. Risa Lanier, the First Assistant under SA Foxx, oversaw the Working Group's activities and reviewed their recommendations prior to passing them along to SA Foxx for her ultimate decision. She testified that the Working Group was the product of discussions between SA Foxx and members of the Lawyers Committee. (Ex. 24, Lanier Dep., 76:16-23, 108:24, 109:1-13). The Working Group was created in the wake of the settlement of the lawsuits brought by the "Englewood 4." (Ex. 24, Lanier Dep., 76:14-23).

64. The Lawyers Committee helped to create the Working Group and helped to identify a list of cases to be reviewed by the Working Group. (Ex. 25, Southerland Dep., 140:9-24-141:1-19; Ex. 23, Hawilo Dep., 112:23-24, 113:1-2). The Lawyers Committee was comprised of mostly plaintiff's civil rights lawyers, some of whom regularly sue the city, such as Peter Neufeld, Russell Ainsworth, Josh Tepfer, Steve Drizin, Craig Futterman, Mary Katherine McCarthy, and Joey Mogul. (Ex. 23, Hawilo Dep., 111:11-20; Ex. 22, Guidelines, at 1 n.1).

65. Although SA Foxx had the ultimate authority to decide who would be on the Working Group, one was recommended by the Lawyers Committee, one was recommended by the CCSAO's Conviction Integrity Unit ("CIU"), and the third member was to be jointly recommended by the CIU and Lawyers Committee. (Ex. 22, Guidelines, Sec. III).

66. SA Foxx approved of the Working Group's Procedures & Guidelines (the "Guidelines"), received regular reports on the hand-selected cases the Lawyers Committee made for the Working Group, and reviewed recommendations by the Working Group. (Ex. 22, Guidelines, at 1-6; Ex. 24, Lanier Dep., 161:2-8, 253:14-19; Ex. 27, July 8, 2022, Email – Lanier to Hawilo, Kadish, and Southerland). All final determinations on cases reviewed by the Working Group were reserved to SA Foxx. (Ex. 22, Guidelines, Sec. V).

67. The Guidelines required the Working Group to submit quarterly status reports regarding their cases both to the First Assistant State's Attorney and/or the Chief Deputy, in consultation with the State's Attorney, and to the Lawyers Committee. (Ex. 22, Guidelines, Sec. V). Though the Lawyers Committee was not supposed to be involved in the Working Group's investigations or decisions, the Working Group's members and Lanier were unable to explain why it was necessary to provide quarterly status reports to the members of the Lawyers Committee. (Ex. 24, Lanier Dep., 120:9-121:4; Ex. 23, Hawilo Dep., 118:5-14;Ex. 25, Southerland Dep., 182:1-4).

68. The Working Group was also required by the Guidelines to consider "the past allegations" of misconduct against the seven listed detectives as part of its assessment in all cases it reviewed. (Ex. 22, Guidelines, at 1, at Sec. VIII(C); Ex. 24, Lanier Dep., 181:21–182:1). The Working Group created its own internal protocols ("Protocols") to guide its work, which SA Foxx reviewed and approved. (Ex. 22, Guidelines, Sec. VIII; Ex. 24, Lanier Dep., 161:2-8).

69. According to the protocols it created, the Working Group was required to apply "heightened scrutiny" to any cases it concluded were impacted by patterns of misconduct and was further required in any such cases to recommend vacatur in the interests of justice *unless* "substantial evidence" existed to overcome the impact of a detective's involvement. (Ex. 28,

Protocols, at 6; Ex. 24, Lanier Dep., 179:12-18). Neither the Working Group nor First Assistant Lanier could recall what, if any, research had been done to develop this standard. (Ex. 24, Lanier Dep., 179:12-180:1-7; Ex. 23, Hawilo Dep., 100:4-101:24).

70. Section D of the Guidelines allows the Working Group to recommend: (1) vacating based on innocence, if new evidence suggests a substantial probability that the defendant did not commit the offense; or (2) vacating based on the interests of justice if "credible information causes a loss of confidence in the integrity of the conviction"; or (3) no action only "if neither recommendation 1 nor 2 are satisfied." (Ex. 22, Guidelines Sec. VIII). Recommending a retrial was not an option; however, SA Foxx alone made all final determinations and had the option of modifying any recommendation. (Ex. 22, Guidelines Sec. V; Ex. 24, Lanier Dep., 264: 16–265:3).

71. In 2021, all three Working Group members attended a presentation at the offices of Loevy & Loevy about specific detectives. (Ex. 23, Hawilo Dep., 125:5-15). Attorneys from Loevy & Loevy also provided the Working Group with documents they had compiled from other lawsuits regarding allegations of abuse against the Detectives. (Ex. 23, Hawilo Dep., 243:18-244:4; Ex. 29, January 20, 2022, Email String between Russell Ainsworth, David Owens and Working Group members). The Working Group members did not meet with the detectives they were investigating or with the attorneys who have represented the same detectives over the years. (Ex. 23, Hawilo Dep., 160:17-20, 161:14-17; Ex. 26, Kadish Dep., 62:11-20; Ex. 25, Southerland Dep., 128:17-24, 129:3).

72. The Working Group members admit that there were potential conflicts of interest based on the composition of the Lawyers Committee. (Ex. 24, Lanier Dep., 140:15-24-141:12; Ex. 26, Kadish Dep., 101:2-9, 104:8-17; Ex. 23, Hawilo Dep., 122:7-24-123:1; Ex. 25, Southerland Dep., 175:6-24, 176:14-15). Special Prosecutor Bob Milan concluded that the structure of the

Working Group was unethical because members of the Lawyers Committee included plaintiff's civil rights attorneys that had pending civil suits against the City of Chicago and could benefit financially by using cases dismissed pursuant to Working Group reviews as pattern and practice evidence in future civil suits. (Ex. 30, Defendants' December 29, 2025, Rule 26(a)(2) Disclosures, with February 3, 2022, Memorandum of Bob Milan as an exhibit).

**<u>The Working Group Investigates Williams' Convictions</u>**

73. On November 22, 2021, Williams' counsel Steven Becker emailed several documents to Working Group members Kadish, Hawilo and Southerland, including the affidavit of David Evans. (Ex. 31, November 22, 2021, Email Chain between Steve Becker and Working Group Members). Hawilo forwarded the email to her colleagues to make sure they saw it. (Ex. 31, November 22, 2021, Email Chain between Steve Becker and Working Group Members). Kadish responded via email to say he had not seen "Evans statement" before and Hawilo replied that she wanted to discuss it. (Ex. 26, Kadish Dep., 148:17-153:15). None of the Working Group members remember the affidavit. (Ex. 26, Kadish Dep, 151:22-153:9; Ex. 23, Hawilo Dep., 254: 12-21; Ex. 25, Southerland Dep., 280:2-282:2).

74. On November 30, 2021, Hawilo interviewed Williams. (Ex. 23, Hawilo Dep., 291:20-292:4; Ex. 32, Working Group Memorandum Finding and Recommendation (the "Recommendation,") at 11-16). Before this interview, Southerland emailed Hawilo a list of question or topics for her interview of Williams. Evans' affidavit is not included in the questions Southerland emailed to Hawilo, nor are the contents of the affidavit identified. (Ex. 23, Hawilo Dep., 312: 10 – 316: 2; *see also* Ex. 44, November 30, 2021, Email – Southerland to Hawilo).

75. The Recommendation contains a summary of Hawilo's interview with Williams. (Ex. 32, Recommendation, p. 11-13). There is no indication in this summary that Williams was

asked about Evans' affidavit or its contents. (Ex. 32, Recommendation, p. 11-13). Instead, the Recommendation notes that Williams said he gave his car keys to Evans, and that Williams "[redacted]." (Ex. 32, Recommendation, at 11, Ex. 23, Hawilo's Dep. 294:21-296:24).

76. On December 9, 2021, all three members of the Working Group interviewed David Evans via Zoom. (Ex. 23, Hawilo's Dep. 369:15-19; Ex. 33, Hawilo's Notes Regarding Interview of David Evans, at 1; Ex. 34, December 9, 2021, Email – Kadish to IDOC employee). The Recommendation also contains a summary of the interview with Evans. (Ex. 32, Recommendation, p. 10-11). This summary does not mention Evans' affidavit or indicate whether Evans was even asked about his 2017 affidavit. (Ex. 32, Recommendation, at 10-11). The Recommendation also does not mention the statements Evans made in his affidavit. (Ex. 32, Recommendation, p. 10-11). Hawilo, Kadish and Southerland could not recall Evans' affidavit or whether the Working Group asked Evans about it. (Ex. 32, Recommandation, p. 10-11; Ex. 23, Hawilo Dep., 289:20-24-290:1-6; Ex. 25, Southerland Dep., 288, 290:14-19; Ex. 26, Kadish Dep., 165:15-20).

77. During his interview with the Working Group, Evans made the following additional admissions that: [redacted] (Ex. 33, Hawilo's Notes Regarding Interview of David Evans, at 1-3). None of the above information Evans provided to the Working Group was included in the Recommendation. (*See* Ex. 32, Recommendation).

**May 10, 2022: The Working Group Submits its Final Recommendation**

78. On May 10, 2022, the Working Group submitted its 22-page, single-spaced Recommendation to First Assistant Risa Lanier, formally recommending that Williams's convictions be vacated "in the interest of justice" based largely on the facts learned during the Working Group investigation and the unproven "pattern of abuse" allegations against Detectives Foley and O'Brien. (Ex. 32, Recommendation, 1; Ex. 26, Kadish Dep., 219:14-22). Hawilo was primarily responsible for drafting the Recommendation, which Southerland and Kadish helped to edit. (Ex. 23, Hawilo Dep., 263:5-15; Ex. 26, Kadish Dep., 170:8-9; Ex. 35, May 10, 2022, Email – Southerland to Lanier). Kadish also prepared a concurring opinion. (Ex. 23, Hawilo Dep,, 357:20-21; Ex. 26, Kadish Dep., 12:15-17, 212:21-24).

79. The Working Group was unable to conclude that Williams was factually innocent but expressed doubts about the truthfulness of Williams' confession because "[redacted]." (Ex. 32, Recommendation, at 21).

80. Kadish's "Concurring Opinion," lobbied for Williams' release because of Williams' age when he was convicted. (Ex. 32, Recommendation, at 23-24; Ex. 26, Kadish Dep., 12:15-17). At his deposition, Kadish admitted that he did not believe the "pattern and practice" evidence was admissible or reliable and he did not rely on it. (Ex. 26, Kadish Dep., 122:9-16, 200:21-201:3). Kadish also admitted that the initial draft of his concurring opinion recommended that Williams should not be awarded a COI, but that recommendation was deleted from the final draft submitted to SA Foxx. (Ex. 26, Kadish Dep., 212:12-15, 213:1-6). When asked why that recommendation was deleted, Kadish testified that the question of whether the State's Attorney's

Office would decide whether to contest or agree with the COI was beyond the Working Group's project. (Ex. 26, Kadish Dep., 213: 7-13).

81. The only mention of Evans' affidavit in the Recommendation is this single sentence: "[redacted]." (Ex. 32, Recommendation at 14; Ex. 24, Lanier Dep., 227:22-228:2). The Recommendation did not mention the inconsistencies between Evans' affidavit and the statements Williams made to the Working Group. (*See* Ex. 32, Recommendation). The Recommendation also did not explain that Williams told Evans "[redacted]" before Evans headed toward the restaurant where the murders occurred. (*See* Ex. 32, Recommendation).

82. None of the Working Group members recall Evans' affidavit or why it was not included in the Recommendation. (Ex. 23, Hawilo Dep., 312:3-6; Ex. 26, Kadish Dep., 152:8-20, 160:13-161:3; Ex. 25, Southerland Dep., 281:22-282:1-2). However, they all agree that it would have been important to include a full description of Evans' affidavit in their Recommendation to the State's Attorney. (Ex. 23, Hawilo Dep., 300:6-8; Ex. 26, Kadish Dep., 160:5-12, 163:7-10; Ex. 25, Southerland Dep., 286:10-18). Hawilo agreed that it would have been "better" to discuss Evans' affidavit in detail in the Recommendation. (Ex. 23, Hawilo Dep., 300:6-8).

83. Kadish agreed that the information in Evans' affidavit could have been used by the State to build a case against Williams. (Ex. 26, Kadish Dep., 162:3-163:19). Kadish also agreed that the State could retry Williams without the confession, relying instead on Evans as a witness along with the other evidence that does not lack integrity, such as testimony from Officer Sanders that he saw Williams' car fleeing from the crime scene, Williams' misleading statement to police that he was home by 10:30 that night, and the heat of the radiator on the car when police arrived

at Williams' home at 1:00 a.m., suggesting that the car was recently driven. (Ex. 26, Kadish Dep., 163:20-164:1, 177:12-182: 5).

84. On June 22, 2022, First Assistant Lanier forwarded the recommendation to SA Foxx for the two to discuss at a meeting scheduled for the next day. (Ex. 24, Lanier Dep., 262: 20-264:14). Lanier refused to answer questions at her deposition regarding conversations with SA Foxx about Williams or the Recommendation. (Ex. 24, Lanier Dep., 271:7-272:21).

85. In a July 8, 2022, email, Lanier told the Working Group members that SA Foxx agreed with the Working Group's recommendation and would be providing relief at the next court date. (Ex. 24, Lanier Dep., 252: 17- 259: 6).

86. On July 18, 2022, Williams filed a supplement to his pending successive post-conviction petition, seeking for the first time to have his conviction vacated based on alleged "pattern and practice" evidence of abuse. (Ex. 36, Williams' July 18, 2022, Suppl. Claims to Successive Post-Conviction Petition, at 1, 13). His then-pending petition, filed on July 8, 2020, only sought a sentence reduction. (Ex. 37, Williams' July 8, 2020, Petit. for Post-Conviction Relief in *People v. Cordell Williams*, Cir. Ct. Cook Co. Case No. 94-CR-15518-01).

**October 17, 2022: The Circuit Court Vacates Williams' Convictions**
**and Grants the State's Motion to Nolle Prosequi All Counts**

87. On October 17, 2022, the Circuit Court granted Williams' unopposed post-conviction petition and vacated Williams' convictions and sentences. (Ex. 38, October 17, 2022, Order in *People v. Cordell Williams*, Cir. Ct. Cook Co. Case No. 94-CR-15518-01; Ex. 39, Transcript of October 17, 2022, hearing in *People v. Cordell Williams*, Cir. Ct. Cook Co. Case No. 94-CR-15518-01, 2:23-24-3:1-10). The Circuit Court also granted the State's motion to *nolle prosequi* all counts against Williams. (Ex. 39, Transcript of October 17, 2022, hearing in *People v. Cordell Williams*, 4:1-6; Ex. 40, October 17, 2022, Email – Steve Becker to Working Group

members). Williams was released from prison on October 21, 2022. (Dkt. 1., ¶5).

88. On August 7, 2023, Williams filed a petition for a Certificate of Innocence. (Ex. 41, Williams' August 6, 2023, Petition for COI). The State took no position on Williams' petition. (Ex. 42, October 10, 2023, Criminal Disposition Sheet). On January 24, 2024, the Circuit Court of Cook County granted the petition and awarded Williams a Certificate of Innocence. (Ex. 43, January 24, 2024, Order in *People v. Cordell Williams*, Cir. Ct. Cook Co. Case No. 94-CR-15518-01).

Respectfully submitted,

JAMES O'BRIEN and GERI LYNN YANOW, as Independent Administrator of the Estate of WILLIAM FOLEY

*s/ Patrick R. Moran*
One of their attorneys

Eileen E. Rosen
Patrick R. Moran
Collin Smith
Erin Shiel
ROCK FUSCO & CONNELLY LLC
333 W Wacker, 19th Floor
Chicago, Illinois 60606
T: 312-494-1000
erosen@rfclaw.com
pmoran@rfclaw.com
csmith@rfclaw.com
eshiel@rfclaw.com