# Exhibit 1

## Deposition Transcript of Plaintiff, 4/23/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORDELL WILLIAMS, )
)
Plaintiff, )
)
v. ) No. 23 CV 14905
)
JAMES O'BRIEN, THE PERSONAL )
REPRESENTATIVE OF THE ESTATE )
OF WILLIAM FOLEY, THE CITY OF )
CHICAGO, a municipality, and )
UNKNOWN EMPLOYEES OF THE CITY )
OF CHICAGO, )
)
Defendants. )

The videorecorded deposition of CORDELL WILLIAMS, taken before Holly A. Koch, RPR, IL CSR 084-004925, commencing at 10:12 AM on the 23rd day of April 2025, at 333 West Wacker Drive, 19th Floor, Chicago, Illinois 60606.

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:

LAW OFFICE OF STEVEN W. BECKER LLC
BY: MR. STEVEN W. BECKER
205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
312.396.4116 | swbeckerlaw@gmail.com

ON BEHALF OF THE DEFENDANT CITY OF CHICAGO:

THE SOTOS LAW FIRM, P.C.
BY: MS. LISA M. MEADOR
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300 | lmeador@jsotoslaw.com

ON BEHALF OF THE DEFENDANT OFFICERS:

ROCK FUSCO & CONNELLY, LLC
BY: MR. PATRICK R. MORAN
333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000 | pmoran@rfclaw.com

Also Present: Nick Trotta, Certified Legal Video Specialist, Urlaub Bowen & Associates



INDEX


| Witness | PAGE |
|---|---|
| CORDELL WILLIAMS | |
| By Mr. Moran | 5 |


*CONFIDENTIAL*
pages 52-53

EXHIBITS

| Number | Description | Referenced/Marked |
|---|---|---|
| Exhibit 1 | Response | 246 |
| Exhibit 2 | Statement | 299 |
| Exhibit 4 | Photograph | 349 |
| Exhibit 3 | Affidavit | 351 |



THE VIDEOGRAPHER: Good morning. This is the beginning of Media Unit 1. We are now on the video record at 10:12 AM. This is the videotaped discovery deposition of Cordell Williams, being taken on April 22nd, 2025. We are located at 333 West Wacker Drive, 19th Floor, Chicago, Illinois.
This deposition is being taken on behalf of the defendant in the matter of Cordell Williams vs. James O'Brien, et al. The Case Number is 23 CV 14905, filed in the United States District Court for the Northern District of Illinois, Eastern Division.
My name is Nick Trotta, Certified Legal Videographer, represented Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois. The court reporter today is Holly Koch, also of Urlaub Bowen & Associates.
Counsel, please identify yourselves for the video record and the parties which you represent, starting with the questioning attorney.
MR. MORAN: This is Pat Moran. I represent Detective O'Brien and the estate of



Detective Foley.
MS. MEADOR: This is Lisa Meador, M-e-a-d-o-r, on behalf of the City of Chicago.
MR. BECKER: And Steven Becker, B-e-c-k-e-r, on behalf of Mr. Williams.
And one other minor thing. I think you mentioned it was the 22nd; I think it's the 23rd today.
THE VIDEOGRAPHER: Oh, I did say that. I'm sorry. It is the 23rd. I'm sorry.
MR. BECKER: No problem. I just wanted to make sure we got it right.
THE VIDEOGRAPHER: Please swear in the witness.
(Witness sworn.)
CORDELL WILLIAMS,
called as a witness herein, having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. MORAN:
Q. Okay. Mr. Williams, can you state your full name and spell it for the record, please.
A. Including my middle name?
Q. Yes, please.

A. Cordell Richard Williams. Cordell is C-o-r-d-e-l-l; Richard, R-i-c-h -- excuse me -- R-i-c-h-a-r-d; and Williams, commonly spelled, W-i-l-l-i-a-m-s.
Q. Okay. Very good. Thank you. I introduced myself earlier. As I said, my name is Pat Moran. I'm going to take your deposition today about the allegations in your lawsuit.
Have you ever given a deposition before?
A. I have.
Q. Okay. How many times?
A. I believe three times, if I'm not mistaken.
Q. Okay. I just want to go over some of the ground rules that you may remember.
If you don't understand one of my questions, will you please tell me?
A. Yes, sir.
Q. Okay. If you do answer one of my questions, we're going to assume that you understood the question; is that fair?
A. Absolutely.
Q. Okay. You can see, a court reporter is taking down everything we're going to say today. You



may be able to anticipate my questions. And I may be able to guess at some of your answers. But let's do each other a favor, and mostly her, and not talk over each other, so she can take down everything we say accurately; is that fair?
A. Yes, sir.
Q. Okay. If you need to take a break at any time, that's okay. You just need to answer the pending question first. Okay?
A. Yes, sir.
Q. Okay. And the last thing is, if you hear an objection from your lawyer, just stop talking and let him say whatever it is he has to say. And then, most of the time, you'll be allowed to answer the question. Although, he may tell you not to answer the question; so you'll have to listen carefully to whatever he tells you, obviously. But just let him say his piece, and then we can move forward. Okay?
A. Yes, sir.
Q. Okay. Great. You had mentioned that you gave three prior depositions.
Were those depositions in cases in which you were a party?
A. Those were cases of medical civil suits --



Q. Okay.
A. -- in the penitentiary.
Q. And were those civil suits filed by you, in that you were the plaintiff?
A. In most instances, yes.
Q. Okay.
A. But in, I believe, two of them for sure.
Q. Okay. So you think there might have been one of those depositions you were just a witness in that case?
A. That is what I believe to be, yes.
Q. Okay. What was the name of the case in which you were just a witness where you gave a deposition?
A. That's been a while. As I said, it was when I was in the penitentiary. But there is a new pending possible deposition from the penitentiary as well that I may be called as a witness to.
Q. Okay. And who -- who filed that lawsuit?
A. I believe it's Thompson. I'm not certain.
Q. Do you know, is that the last name?
A. I believe so, yes.
Q. Do you know Thompson's first name?
A. Trenton or Travis or something to that



nature. I was -- I was -- I was not personally even made aware of it. I was only made aware of it through their attorney or his attorney reaching out to mine.
Q. Got it. And who is your attorney in that case?
A. I don't have an attorney in that case.
Q. Oh, I see. I thought when you said "out to mine," I thought you meant you had an attorney.
So an attorney has reached out to you to give a deposition?
A. To my knowledge, yes.
Q. Okay. Do you have the name of the attorney?
A. No, I do not.
Q. Do you have it somewhere in your own files or on your phone or something like that?
A. No, sir.
Q. So is there any way you could find out the name of the lawyer who contacted you about giving a deposition?
A. The name of the lawyer that contacted my attorney, I'm certain my attorney would know.
Q. Mr. Becker would know then?
A. I believe so. Yes, sir.
Q. Are you -- is this deposition being

scheduled through Mr. Becker?
A. I'm not certain as to what it is. I was just reached out to as a possible witness and/or a deposition. I'm not familiar with the legalities of that --
Q. Okay.
A. -- entirely.
Q. Got it. And has a deposition been scheduled for you in that case?
A. To my knowledge, no.
Q. Okay. And then you said two of the three depositions you gave were your own cases?
A. Well, I had two cases. And I said approximately. I'm not certain. It's been over the course of 30-some odd years, and I've had several cases and instances of which there has been civil suits filed against and within the penal institutions of which I was at.
Q. I understand. I just wanted to make sure that I understand that you believe you gave two depositions in which --
A. I'm --
Q. -- you were the plaintiff; right?
A. Yes, sir. Because I filed two actual



lawsuits of my knowledge. So I'm fairly confident as well as almost certain that --
Q. Got it.
A. -- I did --
Q. All right.
A. -- I was deposed.
Q. Very good. Okay. And were you represented by a lawyer in those depositions?
A. I was. Harden [phonetic], if I may, if I recall correctly in one. And then the other one, I believe I was a pro se litigant.
Q. All right. And --
A. My apologies. And I believe -- I don't know if this would count as a deposition, but I did go before the Conviction Integrity Unit or the TIRC unit or one those natures of -- well, sort of why we're here, for the brutality issue --
Q. Oh, okay.
A. -- for the torture issue.
Q. And that would be in -- related to the same allegations that are at issue in this lawsuit?
A. That would be, sir.
Q. Okay. And when you went before either the Torture Inquiry Review Commission or the Conviction



Integrity Unit, did you sit in a room kind of like this where you were asked questions and you gave answers?
A. That is correct. Not sort of like this, though. This is much more spacious than the room in prison, so.
Q. Okay. And was there a court reporter present?
A. To my knowledge, there was, if I recall correctly. I was represented by Vince Field of Loevy & Loevy in that matter.
Q. Okay. How long were you represented by Loevy & Loevy?
A. I couldn't say to any definite permanence, but I would guess for whatever duration of time that they had allotted me because they were -- or didn't have funding, is what I was told -- lacked funding to proceed at one point or another.
Q. Okay. So to the best of your knowledge -- and I know you can't be specific -- tell me the approximate year or years you were represented by Loevy & Loevy.
A. I would say approximately maybe '15 to '17 approximately, if not possibly later, '17 to '19.



Q. Okay.
A. But them two -- I'm leaning more towards the '15 to '17, though.
Q. I see.
A. Years. 2015 to 2017.
Q. Understood. And did you ever get a copy of the transcript from --
A. No. My apologies.
Q. No, that's okay. Just let me get that question out real quick.
Did you get a copy of the transcript from the Q and A session you had before either the Conviction Integrity Unit or the Torture Inquiry Review Commission in which you were represented by Loevy & Loevy?
A. I did not receive anything of any nature regarding the resolution of that action from Loevy & Loevy or Vince Field, for that matter. So to my knowledge, I don't know specifically how that did or has wound up, other than my freedom here today.
Q. To your knowledge, was there an overlap in the time in which you were represented by Loevy & Loevy and Mr. Becker?
A. I don't believe so, no.

Q. Okay. So at some point, Loevy & Loevy stopped representing you, for whatever reason --
A. Yeah.
Q. -- and there's a gap in time. And then your next attorney would have been Mr. Becker?
A. Yes.
Q. Okay. The -- let's just change gears a little bit.
Oh, by the way, the depositions you gave in connection with your civil lawsuits, did you ever get a transcript of those depositions?
A. I believe I did in one, if I'm not mistaken. I don't recall where or if I would have them or other -- the other transcripts.
Q. Did you ever check your things in connection with this lawsuit to see if you still had any of those old transcripts?
A. I did not check extensively for them because I was definitely having my transcripts as well as my knowledge of this also.
Q. Is it -- do you know for sure whether you still have any of these transcripts?
A. From what portion?
Q. Any prior lawsuit in which you gave



testimony?
A. I know I do have some paperwork of it. However, it would not be to any extensive degree because over the years, over the course of time --
Q. Sure.
A. -- the case and what happened.
Q. So what is your current address?
A. 7622 South Carpenter Street, Chicago, Illinois 60620.
Q. And is that the house you grew up in?
A. That is my childhood home.
Q. And is that where you'd keep any of the documents you still have from your prior lawsuits?
A. If -- I would say so, yes.
Q. Okay.
A. Probably in the basement. As a matter of fact, I'm fairly certain they would be in the basement.
Q. Okay. Very good. So one of the things I'm going to ask, Mr. Williams, is that, if you could, please, double check. And don't throw anything out. We're going to make a request of your lawyer for some of these documents. He may tell us we're not entitled to it or object, and that will be between us. I just



want to make sure you know that you should make an effort to preserve those, just in case your lawyer does ask for you to produce them to us.
A. Yes. I was thinking of the same word. "Preservation."
Q. There you go. Preservation. All right.
What's your date of birth?
A. 08/01/1974.
Q. Okay. And today, that makes you what? 49; right? Or no. 51?
A. 51-ish. Not quite yet, though.
Q. All right. Okay. Let's talk a little bit about getting ready for today. Okay?
I would like to know what you did to prepare for this deposition?
A. Breathed. And just came to speak my piece and tell the truth.
Q. Okay. Did you have any meetings with your attorney in preparation for this deposition?
A. I had one meeting with my attorney.
Q. How long was that meeting?
A. I believe just over an hour, approximately.
Q. And was that face-to-face or on the phone, or?



A. That was face-to-face.
Q. During this meeting with your attorney to prepare for today, did you review any documents?
A. We reviewed, I believe, your -- the depositions and what have you, the things that you-all went over, as far as my coming to this, as well as -- the regular course of documents, I'm guessing.
Q. Okay. Let me see if I can jog your memory a little bit.
Did you review any police reports?
A. Yes.
Q. Did you review any trial testimony? Transcripts from the trial?
A. None that I recall.
Q. Did you review any handwritten police notes?
A. No.
Q. Did you review any of the correspondence that you wrote while you were incarcerated?
A. No.
Q. Did you review the complaint that your attorney filed for you in this case?
A. On this case?
Q. Yeah.
A. As far as -- that would have been part of

the record of -- I'm guessing that's what you're speaking of, the case, actually?
Q. Uh-huh.
A. Yeah.
Q. So in preparation for today, you looked at that complaint?
A. I had knowledge of it. But I've seen it. And --
Q. Sure.
A. -- I've lived it. That's where I'm going with it. I've lived it.
Q. No, I understand. And we're going to go over a lot of your lived experiences today. Just so you understand, what I'm trying to find out right now is what you did to prepare for testifying today.
Do you understand?
A. Okay. I went over the case, as what you all spoke to my witnesses about I guess and ...
Q. Excuse me. Did you review any affidavits in preparation for today?
A. We did.
Q. Which affidavits?
A. I believe that was my dad's affidavit, David Evans' affidavit. Possibly -- I don't remember if we



went over my dad's affidavits or not. And I was told about how --
Q. Well, hold on. Are you going to tell me what he told you?
A. Yes.
MR. BECKER: He just asked you about documents, Cordell.
THE WITNESS: Oh, well --
BY MR. MORAN:
Q. So here is the deal. And just so you're aware. Everything that you talked about with your lawyer is privileged.
A. Okay.
Q. You have an attorney-client privilege. So you don't have to tell me any of that.
A. Okay.
Q. All right. So instead of thinking about what your lawyer told you, just focus on the things you looked at or read, even in the meeting with him.
A. Okay.
Q. So you said you thought you might have looked at Londell Harper's affidavit?
A. No. We did -- I didn't look at Londell Harper's affidavit.



Q. Okay. Let me ask you this: Do you know if Londell Harper created an affidavit?
A. I don't.
Q. Okay. Did you look at -- in preparation for today, did you look at the court-reported statement that you gave to the detective?
A. I did.
Q. Did you look at a court-reported statement that anybody else gave?
A. May I retract that? Because it wasn't a court-reported statement. It was an affidavit regarding what was stated. The court-reported statement was not -- I have not looked at that.
Q. Okay. Have you ever looked at the court-reported statement that has been attributed to you?
A. I have, when we went over it in trial.
Q. Okay. And since the filing of this lawsuit, the one we're here for today, have you looked at that court-reported statement?
A. No, I have not.
Q. In the years that you were in prison and you were making efforts to appeal your case and writing to the Cook County State's Attorney's Office or anywhere



else for assistance, did you look at your court-reported statements?
A. I had to.
Q. Okay.
A. Yes.
Q. When is the last time you think you looked at your court-reported statements?
A. It's been some time. Quite possibly, years. Definitely not since I have been free.
Q. Okay. So now I want to ask you about -- are you aware of whether anybody else gave a court-reported statement related to the same incident in which those two individuals were shot by David Evans?
A. I am aware of the court-reported statements regarding that matter.
Q. Who do you think gave a court-reported statement?
A. To my knowledge, Londell Harper gave a court-reported statement, as well as Stanley, who -- I don't recall him -- Pratt, I believe his name was.
Q. Stanley Pratt.
A. And that's about all, to my knowledge.
Q. Okay. Have you ever read the court-reported

statement that Londell Harper gave?
A. I have.
Q. When is the last time you think you read it?
A. Quite possibly, that was even further. I know that's been over 12, 15, possibly 20 years.
Q. Okay. Do you remember what's in that court-reported statement?
A. Vaguely.
Q. Stanley Pratt, did you read the court-reported statement that he gave?
A. No.
Q. Who is Stanley Pratt, to your knowledge?
A. To my knowledge, he's the off-duty police officer that chased us.
Q. Okay. He's the off-duty police officer who chased you after David Evans had shot the two individuals?
A. Yes.
Q. Okay. All right. So we're going to move on to other things that you may have done to prepare for today. Okay?
MS. MEADOR: Just a second. Counsel, I'm absolutely sure you're not aware, but you're nodding your head in affirmation to a lot of what



the witness is testifying to. If you could just pay better attention so that it doesn't give the appearance that you're actually affirming his testimony --
MR. BECKER: Oh, sure.
MS. MEADOR: -- for him. I'm sure it's subconscious.
MR. BECKER: Sure.
MS. MEADOR: I'm sure it is.
THE WITNESS: I hadn't even noticed.
MS. MEADOR: You're focusing on him. And he's in my sightline. So thank you.
BY MR. MORAN:
Q. Okay. Did you speak with anyone besides your attorney about today's deposition?
A. No.
Q. Do you live with your mother currently?
A. I do.
Q. Is she -- I heard that she's currently in New Orleans caring for a family member?
A. She is. My -- I affectionately called her my grandmother. My biological grandmother is her sister. But my -- affectionately refer to aunt as my grandmother, is ailing with dementia.



Q. Okay. Do you currently live -- well, even though your -- so I want to see if you live with anyone else besides your mother in that house?
A. No.
Q. Okay. So currently, while your mother is down in New Orleans taking care of your grandmother, you're living alone?
A. For the most part. She just recently left, though, with the anticipation of being here for your deposition.
Q. Oh, she's coming here?
A. My -- understood -- she was here, at one point, for your deposition, I thought.
Q. Okay.
A. So I'm just here to work security for her when she comes.
Q. Okay.
A. So she came in. She flew out though.
Q. Okay. Well, I don't know if you're aware, but we're supposed to take her deposition by Zoom on, I think, Friday. So hopefully she can stay in New Orleans and not be bothered with a trip up here if she doesn't have to.
Okay. I've heard you have a girlfriend



right now?
A. I do.
Q. Can you tell me what her name is?
A. Her name is Charlene Powell.
Q. How long have you been seeing Charlene Powell?
A. Since I've been released.
Q. Give me approximately when you met, to the best of your knowledge.
A. Well, we met as kids, and she came back into my life at approximately -- maybe a year before I left prison. And she met -- she came to visit a couple of times. But as far as seeing her regularly and trying to build on a relationship, that, I definitely missed out on. I mean, it was kind of hard to have and not have -- well -- relationships.
Q. Okay. As it stands right now, you're -- she's your girlfriend; you're exclusive with each other?
A. Yes.
Q. Okay. And does she live with you?
A. No.
Q. Where does she live?
A. 93 -- at 93rd and Loomis. I often get the

address mixed up. It's 40-something, though.
Q. Okay. Give me an idea of how much time you spend together.
A. It's kind of hard for people to spend time with me, honestly. It's maybe four days a week.
Q. Okay. Does she ever spend the night?
A. Some nights.
Q. About how often does she spend the night? Like, weekly? Multiple times a week? Monthly?
A. Weekly, maybe.
Q. Do you ever spend the night at her place?
A. Sometimes.
Q. How often do you spend the night there?
A. Maybe weekly.
Q. Okay. Did you have any conversations with Ms. Powell about your deposition today?
A. No.
Q. Have you ever had conversations with Ms. Powell about the events that led to your incarceration?
A. Not at all.
Q. Have you ever had conversations with Ms. Powell about your life in prison?
A. My life in prison reflects on how I live



with her. And that's oftentimes why she can't be around, because of the trauma that was induced on me and that I oftentimes display out because I'm on psychotropics medications, supposed to be, for PTSD and other situations.
Q. We're going to get into that in a little bit. The question I have right now, though, is -- I guess, do you have -- have you had conversations with Ms. Powell either about life in prison or how it affected you?
A. Yes, life in prison. And she can see how it affected me, how it has affected me. I don't have a beautiful relationship with her. But it's male-female bonding, I guess.
Q. Do you have plans to get married?
A. No, I don't.
Q. Has she ever brought up the subject of marriage with you?
A. Yes, she has.
Q. And what does she say? What does she say about it?
A. What -- she would like to.
Q. And what's holding you back about getting married to Ms. Powell?



A. Life has held me back. So I don't have the same outlook on life that I once had.
Q. Do you think you can explain that a little more and how it relates to your decision or your reluctance to get married to her?
A. My reluctance is about oftentimes living life out here in society because of what I was forced to endure, having been out at one point, to try and become a productive part of society. When I was 19, working for the Board of Ed, and was kidnapped, as I believe it to have been, that should -- definitely uprooted out of my community. And simply because I feel I was young.
Q. Do you ever get into arguments with Ms. Powell about her desire to get married?
A. Entirely. Oftentimes. Because she wants to, and I don't want to. I would not like to. There's too many other things in life that I can't do because I have been sawed in half as well. Physically, I can't swim in a swimming pool. I can't sit in a bathtub. I can't do a lot of things in life that most people take for granted in life, simply because I was neglected in life while in prison and forced to endure the harmful, harmful situations of



prison. Now, I have an ostomy bag, amongst other health ailments, amongst the prazosin and the PTSD and anxiety and depression all wrapped up into one nice little ball. But I can't be married to the feminine portions of what I believe to be the yin and the yang experience.
Q. Okay. Does Ms. Powell provide you with a sense of peacefulness or relief?
A. No.
Q. What do you get out of the relationship with her?
A. Semblance of life. Because I don't want kids. I don't want anything really in life but to breathe. And oftentimes, when we have those types of intimate relationships of recourse about how life should be, I'm reminded that my life ain't been what it could be.
Q. Okay. So when you say she gives you semblance of life, explain how -- well, let me ask you this: Is that the only benefit you see of your relationship with Ms. Powell, that she gives you a semblance of life?
A. Absolutely. Because I don't believe she can grant me a child or children to begin life over again

with.
Q. When you say she can't grant you a child, can you explain what you mean by that?
A. I'm speaking about my own understanding about the physical makeup and her being elderly as far as not in the prime of her fertilization years, when we were kids and able to have built. But now she has other kids and has another life that I don't fit into and don't want to because of my psychosis and what have you. I don't view them as being -- what they have, I didn't have. And I'm not jealous of that because what I had was what I did have but was ripped away from.
Q. Right.
A. Excuse me.
Q. Have you told Ms. Powell -- or it sounds like what you're saying to me is that you don't see a future with Ms. Powell?
A. I'm saying I can only see day by day, minute by minute, and hour by hour, as I was in the belly of what proverbially could have been the beast or was the beast.
Q. Sure. Do you ever look ahead and think what life could offer you now that you're free and you can



do whatever you want?
A. And I'm scared to because I don't feel free in Chicago, where the CPD still rules the streets. There's a big wall that we understood it to be back then and even now that I have come through what I have came through.
Q. Have you ever thought about leaving Chicago?
A. I have. But I couldn't because of the illnesses I have attached to me after being exonerated. I couldn't fly. I still can't fly because of the real idea -- associated mindset of how to work a phone. And I got the brand new phone.
Q. Okay. So there's nothing legally holding you back right now from leaving Chicago; is that right?
A. Legally, nothing.
Q. Okay. Is there anything else holding you back from leaving Chicago?
A. Yes. My mindset, my spirituality, and my other things that have been, I believe, caged in as well because of my fear of the police in Chicago, my fear of the society that I have been dropped back into without any inclination of just kicked through the doors of Stateville.



Q. Have you told Ms. Powell the things you've told us today about the limitations you see in your relationship with her?
A. I have. I brutally have been honest because my understanding about the brutalities of the world has been just that, brutally and honest. No health care, no -- no life at one point.
Q. Okay. Now, I'm going to ask you -- we're going to come back to the effects and things like that later on in the deposition. I want to move on to other people you may have spoken to.
But before I do, can you tell me -- do you have Ms. Powell's phone number?
A. Absolutely.
Q. Can you tell us what it is?
A. I can't.
Q. Obviously, it's not in your memory; right?
A. Exactly. Because I wasn't raised with technology.
Q. Is it on your phone?
A. It is.
Q. Do you think you could show -- look it up and tell us what it is?
A. I probably could. I'm fairly certain that's



a portion of the phone itself. Would you like me to?
Q. Yeah, please. If you can, that would be great.
A. I just talked about how I could easily go to it. There's just so many ways to do everything, but too many ways to do one thing. (773) 243-9333.
Q. Okay. Thank you. And do you know if Ms. Powell works?
A. She does.
Q. What does she do for a living?
A. A CPS teacher.
Q. Do you know what grade level?
A. I believe it's the fifth grade this year.
Q. What school does she work at, if you know?
A. Randolph. It's on the South Side. I'm not familiar with the full name of it, but it's Randolph.
Q. What -- do you know what street it's on or what intersection?
A. Right off of Damen. In between Damen and Western. 73rd-ish. 72nd-ish.
Q. Okay. Thank you. Have you spoken to your mother about this deposition?
A. Well, naturally, we have spoken but not in-depthly about it.

Q. Have you spoken to Londell Harper recently?
A. No.
Q. How about David Evans?
A. No.
Q. When is the last time you spoke with David Evans?
A. I don't have a reason to want to speak to David Evans; so I haven't spoken to David Evans.
Q. All right. Did you know we took his deposition in this case?
A. I was aware of that.
Q. Okay. He testified that you requested an affidavit from him?
A. In the penitentiary?
Q. Yes.
A. I did.
Q. Okay. Is that the last time you spoke with Mr. Evans?
A. Not at -- I would believe that to have been right around the last time because he had been around me in Stateville at one point as well. I believe that was 20 -- I don't even know -- maybe '14 or something.
Q. When you and Evans were in Stateville, did you talk to each other about the incident that led to



your incarceration?
A. No, not entirely. Because I just asked him for an affidavit. And then to actually go back and forth with him is -- I didn't want to speak to him. My family felt like he stole my life. And my mother can't stand him.
Q. Do you feel like Mr. Evans stole your life?
A. I feel like we were all dumb entirely as youth. And the path in which we went down was wayward, to say the least.
Q. So choices that were made -- you regret some of the choices that were made when you were young?
A. Absolutely.
Q. I'm going to come back to Mr. Evans, though.
Do you blame Mr. Evans at all for what happened to you?
A. I believe I'm at a more peaceful mindset now nowadays than to point blame or push blame because it's been a long -- I was supposed to have been -- I became myself for not taking full advantage of that supervisory order, to follow the law and learn the law and get myself out of that situation, entirely upholding the law.
Q. What supervisory order are you talking



about?
A. The 1998 supervisory order that would have given me possibly some semblance of life prior to my youth being completely ripped entirely away from my life.
Q. Do you blame the detectives for what happened to you?
A. Entirely. In large part. The most largest of the parts.
Q. Tell me why you blame the detectives, but you don't have any blame for David Evans.
A. I didn't say I didn't have any blame for David Evans. I said, in large part, I blame the detectives. Because had the detectives followed the so-called breadcrumbs all the way through, we may have -- well, I may have -- wouldn't have wound up here today and possibly eaten alive. Who knows. God willing. But I would have been -- I better believe -- I've got to believe in a better situation right here today, rather than my mindset or my physical ailments, rather than all of what I've been through.
Q. Do you -- David Evans was convicted of the same crime; right?
A. He was convicted of the same crime that I



was convicted of?
Q. Yes.
A. Yes.
Q. Okay.
A. Except for I was under accountability.
Q. Right. David Evans is the one who pulled the trigger?
A. Yes.
Q. And you agree that David Evans is the one who pulled the trigger?
A. Yeah, I do.
Q. Okay. Have you spoken with Andre Rudik?
A. No.
Q. When is the last time you spoke with Andre Rudik?
A. I haven't. To my understanding, he's in the reentry circle. And I do see his work with returning citizens in. He's been on Springfield -- down in Springfield doing some things. And he had that whole -- I guess I don't know what he had, but he got enough of it.
Q. Was Andre Rudik in the car with you the night that David Evans shot those two individuals?
A. No.

Q. Have -- so I asked you, when is the last time you spoke with Andre Rudik. Have you ever spoken with him?
A. I have spoken with him before. And after some time, hopefully give him some hope. Because I was at a point in the prison system where I just didn't believe in it, you know. And I didn't believe in the justice or the so-called justice of it.
And there was an advocate. And I seen -- I had heard of him going through the prison systems because he was in Stateville prior to me getting there. And he was a worker in the prison system at one point that I heard of.
But I couldn't work. I couldn't do anything.
Q. So, to your knowledge, is Andre Rudik still in prison?
A. He's still in prison?
Q. No. I'm asking you if you know?
A. Oh, no. He's out, from my understanding. He's a returning citizen counselor or something to that degree. He works in the field of reentry.
Q. Got it. So he helps former inmates get back into society and adapt to society?



A. He does. He does.
Q. Okay. Have you ever tried to talk to him about whether he could offer you any help or assistance?
A. I don't personally want to speak to him in those regards. I know of several people whom he has spoken to and helped, you know, that have -- like I said, he speaks to people coming from prison. I did come from prison. So, I mean, in those terms of reentry, I've seen his work, and I hear often of him, fondly of him. But I don't -- I mean, I'm trying to move forward; I don't want to go backwards.
Q. Isn't that part of what he does, though; he helps people move forward?
A. He helps people reenter.
Q. Isn't that part of moving forward?
A. I don't believe it's part of moving forward. I believe it's part of those who want to reenter the system as to how it's been portrayed for them. Because reentering their system for them, as uneducated, is a blocker. And he has to navigate that for them. I don't have to navigate that for me. I can't navigate that for me because I can't work. I can't do anything really for myself. So he can't help



me.
Q. Okay. By the way, have you held a job at all since you've been released from prison?
A. I had a job at Ford Motor Company on Torrence. But I couldn't keep the job because of my ailment, my physical ailment of severe Crohn's disease that has left me decapitated in certain types of ways of surgical.
MR. MORAN: Yeah. Why don't we -- hold on a second. Do you want to take a quick break? She's got to come by, so we have to stop the video anyway. We can go off the record.
THE VIDEOGRAPHER: Going off the record at 10:56 AM.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Media Unit 2. We're going back on the record at 11:02 AM.
BY MR. MORAN:
Q. Okay. You ready to get started again, Mr. Williams?
A. Yes, sir.
Q. Okay. Can you tell me what kind of phone you have in front of you?



A. An iPhone 16.
Q. And where did you get the iPhone 16?
A. My mother bought it for me.
Q. All right. Did you have any of the prior versions of the iPhone?
A. No. I -- excuse me?
Q. Did you have any of the prior versions of the iPhone?
A. I did.
Q. What other versions of iPhone did you have?
A. The most recent two versions. No. As a matter of fact, come to find out, my mom had tricked me with that 13 Pro Max, and she got the new phone. But then I got the 15, I believe. That was new. And then now, the 16.
Q. So you had the iPhone 13 Pro Max at one point, which your mother gave you?
A. Yes.
Q. And then you had the iPhone 15?
A. Uh-huh.
Q. Okay. Do you have a computer at home?
A. I do, but I don't know how to work it.
Q. What kind of computer is it?
A. I believe it's an HP. It has HP on it.

Q. Do you ever use the internet?
A. Not -- I don't know how. I don't do -- what that -- the Wi-Fi is the internet; right?
Q. Well -- so, I mean, have you ever looked at the internet on your phone?
A. Well, yeah, I guess. I don't know how that works, actually. I'm computer illiterate.
Q. Have you -- do you know how to text people -- text message people?
A. Well, yeah. Yeah.
Q. Do you know how to send emails?
A. Vaguely, I do.
Q. Okay. Can you -- do you know there's an app on your phone, your iPhone, to look at the internet?
A. Like Facebook or something?
Q. Well, you have a Facebook account; right?
A. Yeah. Everyone does. I've been hacked several times too.
Q. Nothing we can do about that.
A. Yeah, ways of the world.
Q. Tell me the email address you used to create your Facebook account.
A. I'm actually not certain. I believe I had Cordell Williams on one. But I'm actually not



certain. There's three Facebook accounts attributed to me. And they're not all me.
Q. Okay. There could be someone else in the world with the name Cordell Williams?
A. No doubt. And -- yeah.
Q. All right. So I just want to focus on the ones that are your Facebook accounts. How many Facebook accounts do you have?
A. I only have one.
Q. Okay. And how many email addresses do you have?
A. That's -- again, I don't know actually because I've seen several with my name attached to them.
Q. Okay. Well, have you ever received an email?
A. I have.
Q. And what email address did you receive the email at?
A. CordellWilliams74@yahoo.com.
Q. Okay. I want to make sure I got it right. CordellWilliams74@yahoo.com?
A. Uh-huh.
Q. You have to say yes or no.



A. Yes, sir.
Q. Okay. And is CordellWilliams74 all one word?
A. That is.
Q. All right.
A. @yahoo.
Q. Do you have any other email addresses?
A. I do.
Q. What's the other one you have?
A. Coolie142@gmail.
Q. All right. Coolie142, can you spell "Coolie"?
A. C-o-o-l-i-e.
Q. Does Coolie have any special meaning for you, or?
A. Well, that's what they called me throughout the penitentiary.
Q. Oh, was that your nickname in prison? Coolie?
A. Yes. Because I just stayed cool and stayed out the way.
Q. Got it. Do you go by "Coolie" now?
A. No.
Q. Was your nickname Coolie -- I mean, there's



a number attached to it. Were you called Coolie142 or just Coolie?
A. Well, I don't know. That's how they put it together.
Q. Oh, I see. I see. Okay. Got it. Do you have any other email addresses?
A. Yeah. Several email addresses attached to me. But I don't -- I don't even -- like I said, I don't know how to use technology. So --
Q. I understand what you're saying. I'm just focusing on emails that you take ownership of.
A. Well, those two are the ones I take ownership of.
Q. Okay.
A. For the most part.
Q. And do you communicate -- without telling me what you actually say, do you communicate with Mr. Becker using either one of these email addresses?
A. Yes.
Q. Okay. Do you communicate -- by the way, are you represented by any other lawyers right now besides Mr. Becker?
A. Yes.
Q. Who else is representing you?

A. Disparti Law.
Q. And what is Disparti Law representing you for?
A. Well, I can't work; so -- and I have an ailment, a health ailment, Crohn's disease, with the ADA that I do qualify, the Americans with Disabilities Act. And because of that, I sought Social Security income -- or Social Security Disability, in which they said I was qualified. But I haven't had a dime given to me since being so-called released from prison to going to the system of health care and what have you. But I can't --
Q. So --
A. Yeah.
Q. -- you have Disparti Law representing you in an effort to get you Social Security Disability benefits?
A. Indeed. Yes, sir.
Q. Okay. Have you given a deposition in connection with that case?
A. Not as of yet.
Q. Have you ever had to testify in that case?
A. In what regards, though? I mean, paper testimony or down at the --



Q. Either one.
A. -- Social Security Office?
Q. Either one.
A. I went into the Social Security Office and stated what I had to state.
Q. And what did you say when you went to the Social Security Office?
A. Well, they just asked me the questions, and I just answered them.
Q. Were they questions about what happened to you, how you ended up in prison, and what happened in prison?
A. Well, not directly, no.
Q. What were the questions about?
A. Well, they were questions about Crohn's disease. And I did -- I was diagnosed with that in prison. And I did have several surgeries that did extend from prison. But as for me being out of prison right now, I have been still going to the doctor because of the natural situation of the total colectomy and what have you.
Q. Okay. When you went to talk at the Social Security Office, was your lawyer from Disparti Law with you?



A. No, sir.
Q. Were you put under oath?
A. No, I don't recall being put under oath.
Q. All right.
A. I was made to sign contracts, though, binding contracts.
Q. You know what a verification is, like if you verify information in a pleading or document, you sign your name and say everything in this document is true to the best of my knowledge? You're aware of those things?
A. That's under oath?
Q. Yes, a verification is under oath.
A. Yes.
Q. Okay. Did you do -- did you verify any information like that, swearing it to be true under oath for the Social Security case that you have?
A. I did.
Q. And what was it? What was the document, if you remember?
A. Well, the verification of getting my medical records and consent and pretty much everything to deal with representation.
Q. By the way, did any of your lawsuits that



you filed while you were in prison settle?
A. Yes.
Q. Did you receive any money?
A. That's on the NDA. But I would guess. I don't know how to answer that. Is that the NDA?
Q. Well, before we get to what it was, the first question is: Did you receive any money?
A. Yes, I guess.
Q. Okay. The second question is: How much did you get?
A. Under the NDA? Is that -- I don't know the legal parameters of it.
Q. Well, your lawyer is free to pipe in right now, and he hasn't.
A. Oh, okay.
MR. BECKER: Well, if you had -- did you have an NDA from the court?
THE WITNESS: I do.
MR. BECKER: Okay.
BY MR. MORAN:
Q. Do you know what an NDA is?
A. A nondisclosure agreement.
Q. Okay.
A. To my knowledge.

Q. So we're going to ask that you tell us what that settlement amount was, even though there's an NDA. And we have a protective order in place in this case. We can put that information under seal in this deposition, pursuant to the protective order. It may come out later, but it would only come out by approval of a judge.
A. Okay.
(Whereupon, pages 51-52 are deemed confidential and bound separately pursuant to agreement.)



Q. So this part is -- now we're going to go out of the under-seal portion.
You told us that you had settled a case -- other cases and gotten money. And you're not sure -- you don't -- you're not sure if there's an NDA; is that right?
A. The case, yes.
Q. Okay. How many cases did you settle for money?
A. There was the Wexford case, and there is the Medin case on the Stateville Correctional Officer. I believe those two are the only ones that settled for money, actually.
Q. Okay. How much did the case against Stateville settle for?
A. 3,500, if I recall correctly.
Q. Okay. Other than those two settlements that we just discussed, the one against Wexford and the one against Stateville, do you have any other lawsuits that settled for money?
A. No.
Q. Okay. In the case against Wexford, that was also a case to get medical treatment for Crohn's disease; right?



A. Yes, sir.
Q. Did you get the required medical treatment?
A. Yes. After going to federal court for it, yes. Under the 1983 claim. Yes, sir.
Q. Okay. And that was actually part of the settlement with Wexford; right? That you would get the treatment that you needed?
A. Absolutely.
Q. Did you file any other lawsuits during your time in prison to get medical treatment, other than the case that you settled against Wexford?
A. It didn't reach it to the situation of actually going through. However, I did file another claim regarding medical treatment against the Joliet Correctional Center about the water and the well water there, and how that was not -- I believe that was dismissed without prejudice.
And I also filed another one against Joliet Correctional Medical Center as well, whereas there, they misdiagnosed my Crohn's disease as having overactive bowels.
Q. Do you know Crohn's disease to be under the broad, known condition called irritable bowel syndrome?



A. Now it is. However, then, it wasn't.
Q. Okay. Do you know what the cause of Crohn's disease is?
A. To my knowledge, genetics.
Q. Okay. Was part of the reason you accepted the monetary settlement from Wexford, to compensate you for the aggravation you experienced -- the pain and aggravation from not being timely treated?
A. Yes. Entirely, deliberate -- their deliberate indifference under collegiate review and what have you, but that didn't get too further -- or too far.
Q. Okay. So we were talking about email addresses and phones and computers.
You mentioned that you have an HP computer at your home; right?
A. I do.
Q. Is that a laptop?
A. I believe, yes.
Q. Okay. And have you ever used it?
A. Really, no. Because I never learned how to work it, honestly.
Q. Have you ever looked into ways you can learn how to use a computer?

A. I have. But I don't have that technical savvy gene of having not grown -- or better yet, of having grown up in the age of technology. And I don't want to be a part of technology, willingly. I mean, but I understand it's the way of the world now.
Q. Okay. So are you unable to use the computer because of your reluctance to be part of technology, or because you just don't know how?
A. I just don't really know how.
Q. Okay.
A. I mean, I can answer the phone, according to technology, but when you're going to the laptop and the actual network of Wi-Fi and how to -- online approach to offline, I don't want to be in line with that.
Q. Does your -- do you ever get emails -- do you get emails on your phone? You can get access to your emails from your phone?
A. I can.
Q. Have you done that recently?
A. Recently?
Q. Yeah.
A. Yes.
Q. Has your attorney ever sent you documents to



review via email that you were able to open on your phone?
A. And some I haven't been able to open as well.
Q. You can't open a document that's attached to an email on your phone?
A. Some emails I can't, honestly. I can't.
Q. All right. Tell me the steps you go through when you get an email that has an attachment, how you try and open the attachment.
A. I try and touch the screen.
Q. And then what happens?
A. It don't do nothing.
Q. Okay. Sometimes, does the document open?
A. Sometimes, it does.
Q. Okay. And when the document does open, are you able to read it?
A. That's when it -- it -- sometimes, I can.
Q. Okay.
A. When it does open. Sometimes.
Q. Have you ever looked into going to any classes at any local colleges, or anywhere really, where they teach basic computer skills?
A. I have looked into it. I even tried looking



online for it.
Q. Okay. And how did that work out?
A. It didn't.
Q. Tell me what you did to look online for classes that teach basic computer skills.
A. Well, on my phone, I asked Siri, because that Siri does everything for me, for the most part. But online, I couldn't. I just opened up the computer and tried something, but it didn't work. I don't have any computer technology. I was in the prison system of corrections that had nothing regarding corrections or rehabilitation.
Q. Do you know what Google is?
A. I do.
Q. Have you ever used Google?
A. I have.
Q. How did you use Google?
A. "Hey Siri, Google this."
Q. Okay. What do you know Google to be?
A. Part of Siri.
Q. Right. But when you ask Siri to "Google this," where does Siri take you to?
A. I guess, Google.
Q. Okay. So Google, to your knowledge, then,



would be a website; right?
A. I thought it was the internet.
Q. Same thing. It's on the internet. It's a website on the internet.
A. I didn't know that. You're teaching me.
Q. All right. So you got a free -- free advice here.
So when you asked Siri where you can find basic computer classes, what was the result?
A. They said Kennedy-King College, all types of spots right next to me that I definitely don't want to go to again -- ever again, to tell you the truth because I didn't want to be in the neighborhood that I was in. I tried to get away from the neighborhood. But again, I was given all of this all after being exonerated and placed on a sex offender registry, of all things.
Q. Let me back up a second before we talk about that.
A. Okay.
Q. I just want to focus on you asking Siri about where you can go get basic computer skills. Because, as I understand it, you did get results, but you don't want to go to the schools that Siri offered?

A. Because it would induce trauma --
Q. Okay.
A. -- in the neighborhood.
Q. You don't have to explain why. It's just, you don't want to go to those schools; right?
A. Right, I don't.
Q. Okay. Did you ask Siri to recommend -- or identify schools for you in other areas that you could go to?
A. I have.
Q. Okay. And what was the results?
A. Google sent me a whole list of the world, for the most part.
Q. Okay. How did you get here today?
A. By my vehicle that my mother bought.
Q. What kind of car is that?
A. That's a 2024 Expedition.
Q. How did you find this office?
A. On the map.
Q. Where was the map?
A. Actually, it was on the -- Maps.
Q. The app in the phone?
A. Yeah.
Q. Or on the car?



A. Both.
Q. Okay. How are you able to identify the address for either the phone or the car to get here today?
A. Ironically, I couldn't even see it on the map today. I don't know what happened with my Ford Expedition. The little thing -- what's the name? I swear before God, my most humble right, I couldn't even get directions here this morning without having it on my phone on a black screen, just angles. So just the arrows. As far as the map itself, it did not show up this morning. I swear before God.
Q. No, I'm not arguing with you.
But if you didn't have directions, how did you find this place?
A. With the -- it's a -- on the black phone. On my phone.
Q. Oh, just on your phone?
A. Just on my phone.
Q. Okay.
A. Because it wouldn't translate to the speakers -- I mean, to the actual Siri or the Google in the vehicle. I swear before God.
Q. Has it ever done that before, where you --



A. It has never done that before.
Q. Well, hold on a second. Have you ever gone somewhere in your car before, where you pulled up a map on your phone, and it appeared on the screen in the car?
A. That is exactly what I expected to happen. Last night, I punched in the address to this office, 333 West Wacker. Last night, prior to going to sleep.
Q. Okay.
A. It said 18 minutes at night. But yet, this morning, on the phone, it said 39 minutes, prior to leaving out of my back door to come here. When I got in the vehicle and plugged it into the phone, the screen literally would not work. I swear before God.
Q. Okay. No, I believe you.
Now, had you ever done this before, where you tried to go somewhere, put it in your phone, plugged it into the car, and it actually worked?
A. Oh, absolutely. That's what the routine was to be here.
Q. Okay.
A. I thought.
Q. Let me ask you this: Is there an area in the Chicago area or the suburbs where you would feel



comfortable going to learn basic computer skills?
A. No.
Q. Is there an area in the United States you would feel comfortable going to learn basic computer skills?
A. Possibly.
Q. And where is that area?
A. California.
Q. Okay.
A. Atlanta.
Q. How about New Orleans?
A. Possibly -- possibly New Orleans.
Q. You have family down there; right?
A. I do.
Q. You have family in D.C.?
A. I do. One.
Q. Your cousin, Lemuel Walker?
A. Yes, sir.
Q. Have you ever looked into going to any of these places to learn basic computer skills?
A. Ironically, I wanted to go to Washington D.C. But again, because of the family -- or because of the trauma of me, no one wanted to be around me for no real duration of time, let alone a couple of days

or a couple of months.
Q. So when you take your car out and you go to places, you plug in the address and you go to places, where do you go?
A. Rarely do I go out because I don't like to be around people anymore. When I was free and living, I was too free and living.
Q. Well, I don't want to get back into your -- we'll talk about your life before prison in a little bit. Okay?
A. No, I'm talking about after prison. When I was just recently released, as of 2022, I had this time frame from, what, two and a half years ago, so I was able to live to some degree. And that's what really got crazy out here for me, trying to live and catch up on something that's long gone from 30 years ago.
Q. All right. So I guess the question -- I want to focus on where you -- you told me that you do go places. And the directions worked before where you put it in your phone, and then it showed up on the car.
A. Yeah.
Q. Where do you go?



A. I actually went to the lakefront and had solace.
Q. Have you ever driven to see any friends?
A. My friends -- I don't have friends no more.
Q. Well, you have your girlfriend; right?
A. That's my lady.
Q. But she's got to be a friend; right? That's part of the word. Girlfriend.
A. Intimate relations. See, I don't think you really understand the disconnect that has went on from prison and for me, as far as for my life that I was definitely taken from. And I can't get to those actual things of what's -- what people do regularly. I don't do those regular things.
Q. So, Mr. Williams, I just want to make sure you understand. We're going to go one question at a time here. Okay?
A. I do.
Q. I know you have got a lot to say about that.
A. I do.
Q. But I want to focus on one question at a time; otherwise, we're going to be here forever. Okay?
A. Yes.



Q. You, obviously, drive to see your girlfriend when you go to her place; right?
A. Yes, sir.
Q. Okay. And do you have any other friends or acquaintances that you've gone to drive to -- that you had to drive to to see since you've been out of prison?
A. I don't have friends, sir.
Q. Okay. Do you ever go anywhere with your car besides the lakefront for solitude or to your girlfriend's?
A. I have gone places.
Q. Have you ever taken a road trip in your car outside of the Chicago area where you had to travel for more than an hour?
A. To New Orleans.
Q. All right. And were you alone when you made that trip?
A. I have been before.
Q. Okay. Since you've been out of prison, have you gone back to visit anyone?
A. In New Orleans.
Q. No. No. I mean back to a prison to visit anyone who you became acquainted with in prison?



A. I haven't been able to go into a prison.
Q. So do you understand what I'm asking? Just whether you, as a free person, visited someone who is incarcerated?
A. I haven't been able to go into a prison. I haven't been able to go into a prison.
Q. Okay. Let me ask you this: Do you believe, based on your -- what you've done to prepare for this case and, obviously, your lived experience, that you're prepared to testify about the events that led to your incarceration?
A. I lived them; so I've got to be ready to talk about them because that's the therapy of it. But I don't make no therapy of it lightly, though.
Q. No. No. No, I know.
Would you agree with me that these are life-changing events for you?
A. They have definitely been.
Q. Okay. And they're sort of burned into your memory?
A. I would say life and death.
Q. All right. Do you think you're prepared enough to testify then about today -- about the events that led up to your incarceration today?

A. I hope so.
Q. Okay. Are you currently receiving mental health care anywhere?
A. I am.
Q. Who are you getting the mental health care from?
A. I am getting health care from Heartland Alliance. I receive mental, like, sessions; so talks -- not necessarily talk sessions, but they are talk sessions. They're therapy.
Q. Therapy. You see a therapist?
A. Yes. Precisely.
Q. Okay. Who is the -- what's the name of the therapist?
A. I call -- we call him Brother Nate at the Chicago Justice -- Chicago Torture Justice Center, amongst -- I have a psychotropic doctor -- or it's my psych doctor at Heartland Alliance. I forget his name, but he was recently moved around.
Q. Is that HeartLine Alliance or Heartland Alliance?
A. Heartland, l-a-n-d.
Q. Got it. And it's spelled H-e-a-r-t?
A. Yes.



Q. Okay.
A. Alliance.
Q. How often do you see a therapist?
A. Well, we -- we were doing weekly chats or Zoom -- Zoom situations within a group setting.
Q. Oh, so you had group therapy sessions?
A. We had group therapy sessions, yes. At Chicago Torture Justice Center. And --
Q. Did you ever have a -- I'm sorry. Go ahead.
A. And the personal care, if you will, that had previously been done with the Heartland Alliance out -- I forget the West Side location, but there's also another location to where I first went when I first got out, out in Harvey, I believe, on 159th or so.
Q. Have you ever had one-on-one therapy sessions with a therapist since your release from prison?
A. I have.
Q. And is it -- who do you have the one-on-one therapy with?
A. Heartland Alliance. I don't recall the doctor's name. As I stated, one such doctor has moved on.



Q. How many times do you think you've had one-on-one therapy sessions?
A. Quite a number of times. Several.
Q. And how often have you seen a medical doctor for the purpose of getting psychotropic medications?
A. How often?
Q. Yeah.
A. At the refills.
Q. Are they automatic refills, or are they the kind where you have to go back in to the doctor and --
A. Every, I believe, six months or so, go back in to see the doctor.
Q. Are you currently on any medications right now?
A. I was prescribed escital, prazosin, Lexapro, BuSpar. And I believe that's it.
Q. Okay. Are you -- as you sit here right now today, are you on any medications?
A. I am.
Q. What medications are you on right now?
A. Well, right now, I'm on -- well, I was prescribed the omeprazole. They won't fulfill that -- or fill that prescription. But right now, I'm on ENTYVIO and escital. The other medications do not --



I feel too much of a brain fog. I'm sure you've heard that before from several people who have been on medications or whatever.
Q. Okay. So we're going to give you a little spelling quiz.
Can you spell the two medications you just mentioned? The ENTYVIO and escital?
A. ENTYVIO, E-N-T-I-V-Y-O [sic].
Q. Okay.
A. And escital, I think that's the generic for it. But it's e-s-c-i-t -- and some more.
Q. And then you mentioned one that was prescribed for you but is not being filled?
A. The omeprazole, but that's more for my Crohn's disease treatment or the acid reflux that creates inflammation -- or soothes inflammation in the system.
Q. Have you been diagnosed with any mental health conditions?
A. I have.
Q. Who diagnosed you?
A. A Dr. Lingam. And the doctor on the sheet -- I forget whom that is -- with Heartland Alliance.

Q. And what were you diagnosed with? What mental health condition were you diagnosed with?
A. PTSD, as well as depression and anxiety.
Q. Did you see -- or did you get any mental health care at all before you went to prison?
A. Prior to, no.
Q. Did you ever go to the University of Illinois for mental health care prior to going to prison?
A. No, sir.
Q. How about the University of Illinois at Chicago?
A. In regards to what?
Q. Mental health care.
A. No, sir. Not prior to prison, no.
Q. Did you ever go to anyone at the University of Chicago for mental health care?
A. Prior to prison, no. Not that I recall. Never.
Q. Okay. Okay. The medications that you read out, which ones are you taking for mental health care? Like, due to your PTSD or anxiety or depression?
A. Prazosin, p-r-o-s-i-n, I believe. No. P-r-o-s-o-i-n, if I'm not mistaken. But that's for



the PTSD. And the Lexapro is for the depression. And the BuSpar -- no. Excuse me. The Lexapro is for the anxiety. The BuSpar is for the depression.
Q. Okay. Do any of the medications you're taking right now, as you sit here today, affect your memory?
A. My memory?
Q. Yep.
A. I would not say so. No, sir.
Q. Do any of the medications you're taking right now affect your ability to understand the questions?
A. I would not say so. No, sir.
Q. Okay. Do any of the medications you're taking right now cause you to experience fatigue or tiredness?
A. My Crohn's disease causes me fatigue and tiredness --
Q. Okay.
A. -- when inflamed.
Q. Setting Crohn's disease aside -- we'll come to that in a second -- are any of the medications causing fatigue or making you tired?
A. No.



Q. Okay. The reason I'm asking is I just want to see if there's anything you're taking right now that's going to interfere with your ability to give a deposition today?
A. No, sir.
Q. Okay. So, in other words, down the road, if we end up at a trial, you're not going to argue at trial that you didn't understand the questions or you were too tired when you gave this deposition?
A. What I will say, sir, is that suffering from PTSD is just that mental illness that was induced by the time I did suffer. However, I do not have -- I am coherent for this deposition. I am.
Q. So the question I had asked, though, is whether if we end up at a trial, do you agree that you're not going to argue to the judge that your deposition should be disregarded or the answers you gave should be disregarded because you didn't understand or were too tired as a result of the medication you were taking?
A. There will be no objection to the judge on my behalf regarding this deposition.
Q. Okay. Thank you.
The -- do you know a person by the name



of Bernard Furgeson?
A. No, that name does not sound familiar to me. I do not know him.
Q. Do you know a person by the name of Robert Jones or Robert Johnson?
A. That name sounds familiar to me. It's possibly Robert Johnson.
Q. In what sense?
A. I know several Johnsons but not quite as many Roberts. But I do know of a Robert Johnson who was recently released from prison.
Q. Was this Robert Johnson a friend of David Evans, to your knowledge?
A. I have no knowledge.
Q. Okay. I believe you were in a gang when you were younger?
A. Yes.
Q. What was the name of the gang?
A. Blackstone Rangers or Black P. Stones.
Q. I've heard it referred to a couple of different ways. The Black Stones. The Black Peace Stones. Black P. Stones. Are those -- those are all different names for the same gang?
A. The dynamics of it is so crazy that I would

say yes, you are correct. But each name that you just mentioned basically took on a whole different understanding, conceptual-wise.
Q. So when you were -- when did you first join -- so the gang you were in, you called it the Black P. Stones?
A. The Black Stones.
Q. Or the Black Stones. Okay. So we'll call it the Black Stones. Okay.
Did you join the gang in 1988?
A. Around that time. In my youth, yes.
Q. All right. And were you ever in a gang called the Vice Lords?
A. No. They were affiliates of what they called the "finball" or "Five Point Nation." But I'm very aware of who the Vice Lords were and are.
Q. Five Point Nation, was that, like, a collection of five different gangs?
A. No, sir. Those were what they call "finball" and "six points." Folks and Peoples.
Q. Got it. Were the Vice Lords friendly with the Black Stones?
A. In my area and time, they were friends.
Q. Okay. How long did you stay a member of the



Black Stones?
A. Excuse me. A member? We was just, what you say, "blessed in." But you usually just stopped when you stopped, for the most part. Until someone came to you and asked you are you with this type of situation they were going to do, and if you said "No," you either risked a violation or -- you absolutely were kicked out. And the word got out.
Q. So you started off as a Black Stone in around 1988. When would you say you were officially not a Black Stone?
A. I would say probably '92. Because right then, my dad -- I was supposed to have been going to -- I was supposed to have graduated high school with expectations. But I wound up having to do an extra year of high school because my grades were poor. I went to a good school, but in a gang-infested area. And rather than fight to get into a school to get educated -- because my parents had to work and what have you -- my dad attempted to do everything he could do, but he was sick too.
Q. Okay. So were you a member of the Black Stones when the events that led to your incarceration occurred?



A. By my accounts, no.
Q. Okay. Tell me what -- what are the activity -- what -- when you were a member of the gang the Black Stones, what did you have to do as part of the gang?
A. Well, so-called being "active" was hanging around, partaking in all of the things that the gang partook in. And in our neighborhood and community or communities of color, the Black community, the ghetto that I grew up in that was Auburn Gresham and Englewood, it absolutely was gang-infested prior to my getting there, going back to the '60s with the Vice Lords and Black Stones and what have you.
What I got out of it was, I guess, some protection in high school.
Q. Did you have to participate in any of the gang activities?
A. Well, we were wayward youth. The gang activities of my day was just drinking, smoking, and boyhood things.
Q. Let's take it step by step. So the first question is: Did you participate in any gang activities?
A. The gang activities ranged so far, sir. And



I do not --
Q. Well, whatever they were. It's either yes or no.
A. Well, yeah. In the community, yes.
Q. Okay. And so now tell me what the gang activities were that you participated in.
A. Living in the community, protecting the community from outsiders, those whom we thought to be outsiders, those who weren't doing what we were doing.
Q. Were outsiders rival gang members?
A. Oftentimes. More often than not.
Q. Okay. What are some of the -- give me specific examples of activities as being part of the Black Stones back in the early '90s.
A. The early '90s, we had come out of fistfighting and people started dying; people started shooting; people started doing everything that was bad, according to what bad was.
Q. Okay. Did you participate in any of this?
A. Some gang fights, for sure. Because you had to be with your community or your like mindset. But when you weren't with your like mindset, which is what I was not of -- I was supposed to have been in school. I went to Lindblom. I was smart. I had actually

grown up.
Q. So I think what you're trying to say -- and you tell me if I'm wrong -- is that you were at a good school; you had good opportunities; but you made some poor choices in being a member of the gang and participating in some of those activities?
A. I would say that that is almost as accurate as you could be. However, in our communities or ghettos, that was the lifestyle of 85 percent -- dare I say more.
Q. Because the reason I ask is that you have expressed regret for some of the decisions that you made as a youth.
A. Definitely.
Q. Okay. And those are some of the decisions that you would express regret for, like being part of the gang and doing some of this gang stuff?
A. Entirely. Being wayward in my youth. I didn't -- I was not -- I had two parents. And that's a lot. Coming from where I came from, and I was a member of -- a junior classman as well. I was not really of that ilk.
Q. So let me ask you some specific questions about the gang activities. Okay?



A. Yes, sir.
Q. Did you ever sell drugs?
A. On the street corner, I was the lookout at one point for the drug operation.
Q. And what did you have to do as a lookout?
A. "Holler" -- "holler scwaller" when the police come or "Shante."
Q. Okay. And how often did the police come by where you had to yell out and give that warning?
A. Regularly and often, sir.
Q. Okay.
A. We had to know the gangways to run through that didn't have the dogs.
Q. Did you -- as a lookout for the drug operation, did you also have to look out for rival gang members?
A. Yes. Absolutely.
Q. What was the concern about rival gang members when you were acting as the lookout for the drug operation?
A. That shooting, gang banging, beating up, or -- and possible death could be happening.
Q. Okay. When you were a lookout, did you ever have to -- did that ever occur, where the rival gang



members showed up, and an altercation or a conflict occurred?
A. Often.
Q. And when you were a lookout, did a conflict ever occur that involved shooting?
A. It did.
Q. Did you ever carry a gun with you when you were younger?
A. I did.
Q. How often -- well, tell me the time frame you carried a gun.
A. In my youth. Teenage years.
Q. How about, you said you left the gang around 1992. Were you carrying a gun after 1992?
A. I doubt it. I don't recall carrying -- or as we would say, "toting a roscoe" during that time because I was definitely -- I was working then. So yeah. I would -- I didn't have no expectations because -- of being involved in any gang activities. For the most part, we wore our hats to the left or the right or had some distinctive tattoo or another. Or there is the color of a rag, red or blue.
Q. David Evans testified that the Black Stones would keep guns in certain locations for members to



use when needed; is that true?
A. Yes, I would say so. For sure.
Q. Did you ever go to one of those locations to get a gun when you felt the need for it?
A. I have before. However, that was a brandishing moment at one point, if anything.
Q. When you say "brandishing," you mean to, like, make it known you had a gun, so --
A. Yeah, just to make it known. Maybe alluding to show the handle or something.
Q. Right.
A. Yeah.
Q. When you carried a gun, what kind of gun did you carry?
A. Actually, a .38. A snub-nosed .38. It was my father's house protection gun.
Q. Do you know what ever became of that gun?
A. Yes. It was actually stolen from me, I thought.
Q. Was stolen from you or was stolen from your parents' house?
A. Well, it was actually stolen from me.
Q. Do you -- was this, like, someone stole it from you with your knowledge, like, took it from you

by force? Or was this you didn't even realize it, but someone swiped it?
A. I didn't even realize it, but someone had swiped it out of the trunk, albeit.
Q. And why did you keep the gun in the trunk?
A. Because, at that time, you couldn't -- well, I didn't -- I was still a square kid, by all accounts. I had access to the gun, but I didn't have the heart at that time to be running around with it on me and actually doing things, just riding around in the car. So naturally -- well, at least, in my mind -- I put it in the trunk for safe so-called keeping, out of the way of things.
Q. Was that also something you did to -- in case you got pulled over by the police?
A. Exactly.
Q. Did you ever shoot at anybody?
A. No.
Q. Do you know of any of the -- any gang members, your fellow gang members, who shot at people?
A. I know several people that have shot at people, as well as been shot at. I was shot at several times, which made it simple for me to get away from that activity.



Q. When is the first time you were shot at?
A. Man, I was in, I believe, sixth grade. It could have been fifth grade. At Stagg school. Right there on the corner from the house. 74th. Well, coming down towards us, because on my side, Vice Lords actually stayed -- it's called Rock Island -- actually stayed on my side of the tracks.
Q. Let me stop you right there. So 74th and what?
A. Lawrence.
Q. 74th and --
A. Where I lived?
Q. You said you were at -- oh, okay. Let me back up.
Where were you -- you said you were at 74th when this happened. And then you were going to draw a distinction between the different gang-controlled areas.
A. Yes.
Q. Okay. And so was Stagg on -- were you coming out of school when this shooting happened?
A. Yes.
Q. And Stagg was on 74th Street?
A. Stagg is right on the corner of 74th and



Morgan.
Q. 74th and Morgan. Okay.
And in that area, 74th and Morgan, which gang controlled that area?
A. Well, the GDs controlled the area.
Q. Were there any pockets or islands that -- in that area that the Black Stones controlled?
A. There was a pocket of that area on 73rd and May-ish. As a matter of fact, 73rd and May. That was the actual pocket or block that was in the heart of GD's land, Gangster Disciples' land, from approximately Lowe, all the way back to -- at that point, Damen.
Q. Okay. So why was that little pocket not controlled by the GDs?
A. You had pockets of everything that's not controlled by some bigger faction.
Q. Okay. Well, how about this: David Evans testified that where he lived, that was the pocket that was not controlled by the GDs.
A. Yes, sir.
Q. And he lived near 74th -- or 73rd and, I believe, Aberdeen?
A. Yes, sir.



Q. Is that right next to 73rd and May?
A. Yes, it is. The next block over.
Q. Is that the reason -- is David Evans the reason that the Black Stones were able to control that small area?
A. I wouldn't say "control," but damn sure was able to breathe or live there as a Black Stone gang set for sure.
Q. And was David Evans -- to your knowledge, did he hold rank in the gang?
A. Absolutely. However, his uncle -- his family bloodline was something different there. But David Evans was definitely the, as we would say, "young general."
Q. David Evans testified at his deposition that he was considered a general in 1994.
Do you have any reason to disagree with that?
A. No reason to disagree.
Q. And David Evans testified that his uncle held higher rank in the gang.
A. He did.
Q. Okay. Did you ever -- besides the night that David Evans was in your car that led to the

events of your incarceration, had you ever been with David Evans anywhere before that?
A. David was younger than me, I believe two years younger than me. So no. He -- we didn't oftentimes hang out, no. But he would be with his uncle, for certain. And everyone did know especially who he was. He was a knucklehead in the neighborhood.
Q. All right. Is he someone that you wouldn't want to make angry?
A. Definitely not.
Q. Definitely don't make him angry?
A. Definitely don't make him angry.
Q. Because there could be consequences?
A. There has been sequences throughout -- I mean, he is who he is -- who he is.
Q. He is who he is.
A. Or was.
Q. So you sound like you know specific examples of when David Evans got angry, and there were consequences.
A. I do know of specific examples, particularly in the penitentiary.
Q. Let's talk about before the penitentiary.
Do you know of any times when David



Evans got angry, and then something happened to somebody?
A. Well, from my understanding, he -- he was always a loose cannon. But as I stated, I didn't hang around him. I was actually from the other side of the tracks, the Vice Lords' side of the tracks. So as far as the Black Stones went, that was more about peer pressure to be around or to be protected.
Q. So in 19 -- in the early '90s, you obviously knew who David Evans was; right?
A. In the early '90s, yeah. I had graduated and went to high school. But I knew of him. I knew who his uncle was.
Q. Right. And you knew in the early '90s that you didn't want to cross David Evans because of who David was and who his uncle was?
A. Uh-huh.
Q. You have to say yes or no.
A. Oh, yes, sir.
Q. Okay. And that's because if either one of them got angry, you could end up getting beaten; right?
A. To say the least.
Q. Okay. Why do you say "to say the least"?



A. Because I was of the understanding that things could go different. We had a broad history in Chicago as so-called Black Stone members, if you understand the gang culture of Chicago. And it was happening in the ghettos of Chicago. There was no misconception about what went on in Chicago, induced or otherwise, or what have you. But it did happen as far as murders in Chicago. In the '90s, murders were at a high rate in Chicago.
Q. So let's -- let's bring it back to David Evans.
Did you have any concerns back in the early '90s that, if you crossed David Evans, you could end up getting killed?
A. Yeah. He was an up-and-comer, that you knew what he was coming up for.
Q. Did you ever witness David Evans commit any violent acts?
A. Witness, no.
Q. You've heard of it, though?
A. Yes.
Q. Did you hear -- prior to 1994, the events -- we're going to talk about from the -- everything before the day that David Evans got out of your car to



shoot those two individuals. Okay?
A. Uh-huh.
Q. Did you hear -- did you know or have any knowledge, whether you heard about it or whatever, of David Evans committing acts of violence in that time frame?
A. Yes, I had heard of him. Yes.
Q. Like, what did you hear?
A. That he was locked up at one point, had been shot at at another point, and was definitely shooting at people to some degrees of other points.
Q. Prior to the events that led -- you know, we're talking about that time frame. You know, early '90s up to that night in May of 1994, did you know David Evans to carry a gun with him?
A. I didn't really know David Evans. As I stated, we were not close friends of that type. I was on one side of the tracks, and he was on the other. Vice Lords at one point in time got into it with Black Stone members. I had no reason to be in that community. And I was working and going to work.
Q. Right. And my question is a little bit different in that, you knew David Evans -- you knew what you heard about him?

A. Yes.
Q. And you knew his reputation. Was it known that David Evans carried a gun with him?
A. It was known that he was a bad guy.
Q. He was a bad guy?
A. I would expect him to have a gun with him. Yes. I would expect him to have a gun with him at all times. I had no reason to believe he wouldn't have a gun with him.
Q. Okay. And that was true back in the early '90s?
A. Yes.
Q. David Evans talked a little bit about -- at his deposition, about violations.
A. Uh-huh.
Q. Had you ever witnessed a violation?
A. I had.
Q. Have you ever been the target of a violation?
A. I had been at one point.
Q. Only one time?
A. That I recall was significant, yeah. To a violation, yes.
Q. What happened to you when you were a target



of violations -- of a violation?
A. Well, I had messed up the money. I -- I -- well, that was going to be -- you say "mess up the church's money." But I had messed up the money working security and got a pager lost. And I had to pay that money back. But I didn't have the money to pay that money back. And at this time, it was early, when pagers had just started becoming popular amongst the local drug sets and what have you. A pager costed, I believe, $95 at that time. $95. And I was finna get my head beat to the white meat about $95, that I allowed a pager to be lost when the police came, and dropped the pager to run.
Q. Okay. So if I understand correctly, you're working for security -- you're working security. Does that mean you're providing security for, like, being a lookout for a drug transaction?
A. Yes, sir.
Q. Okay. And the police came?
A. Yes.
Q. And in the attempt to get away and avoid the police, you dropped the pager by accident?
A. Yes.
Q. Okay. And what about the money? Did you



lose any money as well or just the pager?
A. Well, I actually lost the work because the work was tied to -- well, not tied to, but it was in the clip of the pager at the time.
Q. Oh, so the money was attached to the pager?
A. The work.
Q. When you say -- oh, the drugs?
A. The drugs.
Q. Got you.
A. Yes.
Q. Okay. How much -- what was the value of the drugs?
A. Maybe -- as a matter of fact, we had what we called "pony packs" then. There was 12. And you get 90 off the 12. 12 Baggies or 12 rocks, and you could get 90 off the 12.
Q. And when you say "rocks," was this crack?
A. Cocaine. Crack cocaine, I guess, yes.
Q. Okay. So the gang became angry that you lost the pager and the drugs?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes. Oh, excuse me. Yes.
Q. I probably forgot to tell you, but you've



got to answer out loud for all of the questions.
A. I've been told this before, but yes, I understand. Thank you. My apologies.
Q. No, it's okay. You're not -- everybody -- everybody ends up in this boat.
Okay. So the -- were you violated then?
A. I actually -- I went to my dad and my mom and got, I believe, $50. And I gave up a leather football, a Wilson leather football, and a basketball to try and just buy some time. Because I was getting an allowance. I was still getting an allowance at that time.
Q. From your parents?
A. Yeah, I think $10 a week or something to that degree.
Q. Okay. Did you give the $50 and the football and the basketball to the gang?
A. Absolutely. And then, you know, I had to work it off. But that's how the gang made you do what you do, pressure you, you know.
Q. So were you beaten up?
A. I wasn't beaten up, but I was under the threat of being beaten, you know? And the general had

the gun and what have you. And he would -- he would brandish, to let it be known that that gun could go off.
Q. So, in other words, he threatened you with the gun?
A. Yes.
Q. Who was the general at that time?
A. Well, we're talking Dice. But that's the uncle at that time.
Q. Evans' uncle?
A. Yeah.
Q. What year did this happen?
A. This would have been, like, maybe '89, approximately. Possibly '90-ish.
Q. So did you end up paying the gang back what you -- what they said you owed?
A. Oh, absolutely.
Q. How much in total do you think you paid the gang?
A. I had to pay every bit of that $120 back, or at least until they got that back. But they probably worked it off for me probably twice of that -- worked it off of me.
Q. Had you ever been violated where you had to



suffer a beating from the gang?
A. No, sir.
Q. Had you ever participated in a violation where you were a part of the group?
A. I had participated in a violation that left a brother -- a member, at that time, blood splattered on the wall from being hit in the head with a pistol.
Q. Okay. Approximately what year did that happen?
A. I want to say that was like '92-ish. Excuse me. '92, maybe '93.
Q. So what did the member do that led to the violation?
A. Well, I heard, supposedly, he was to go out and pick up some money. And at that time, brung him back to a location -- a spot over east. And Dice had had to come to bring -- or bring him -- for the most part, bring us all together. And when this particular one -- we used to call him -- we called him Fly. We had nicknames, like Coolie, and what have you. But called him Fly Guy. And Fly Guy got hit in the head with a pistol because he didn't have his money. And he was pistol-whipped.
Q. How many times was he hit with a pistol?



A. Well, after that first time, when you see that blood splatter on that wall -- I know that one time was pretty good.
Q. All right. Did other gang members participate in hitting or beating this individual?
A. Yes.
Q. Were you part of that group?
A. I was part of that group.
Q. And what were you doing?
A. Kicking.
Q. And was this -- David Evans testified that certain violations would result in something called a "head to toe."
A. Absolutely.
Q. Okay. And that was when a gang member was beaten from head to toe?
A. Yes, sir.
Q. Okay. And those -- the beating could be punches? Kicks? Didn't matter?
A. Or weapon.
Q. Or weapons. Was this situation, where the individual was pistol-whipped, and you helped beat him --
A. Yes.



Q. -- was that a head-to-toe?
A. Yes, it was. Excuse me.
Q. Had you ever participated in a head-to-toe violation any other time?
A. I had before, yes.
Q. How many times did you participate? And when I say "participate," meaning that you're part of the group doing the beating and kicking and whatever; right?
A. Yeah. It was a couple of times that day. Because we used to all -- as a gang, we would also go up to school -- high schools as well as other gang's sets at one point in time, at least when I was active, as was -- that would happen because -- go ahead. That would happen.
Q. No. I -- okay -- so give me the rough -- approximate number of times you think you participated in inflicting a head-to-toe beating as part of a violation.
A. Well, on specific individuals, that would be when calls -- maybe three, four times, probably -- whenever the gang -- whenever the chief or the general called it, that's when you had to go get it -- or go get it done, rather.

Q. So if Dice said, "You're getting a head-to-toe beating because of whatever you did," everybody there had to participate?
A. And did, yes.
Q. Okay. Did you ever participate in a violation -- well, let me back up a second.
David Evans testified at his deposition that there were some violations where there were less than a head-to-toe, where the member was pushed up against the wall and punched everywhere, except for the face or the head --
A. Yes, sir.
Q. -- and there was no kicking?
A. That was a grace period, for certain. But it did happen.
Q. Okay. Did that ever happen to you, where you were put up against the wall and given one of these types of violations?
A. I don't recall. But I'm almost confident it would have happened because those were, like, "light workouts," we used to call them. In the penitentiaries, they were called 360s under the light workout side. But on the streets, it was a -- what did they call that? "Get on the wall." That's what



they said: "Get on the wall."
Q. And if you were told to get on the wall, you just had to stand there and take it?
A. Yes, sir.
Q. And --
A. Or -- that's what -- get on the wall or no cover up. That's what was the call. You either get on the wall for two minutes or whatever the allotted situation was or no cover up. And that's what happened. No cover up. Everybody just took off on him.
Q. How often did you participate in one of these light workouts or get-on-the-wall-type beatings?
A. When I went to a meeting or a --
Q. Whenever you went to a meeting?
A. Almost. But a lot of times, it didn't happen like that. But there were issues when times had called for someone to get on the wall for two minutes. Or the workout. It's exercise, calisthenics-type stuff.
Q. Right. I know. Calling it "calisthenics" sort of diminishes what's really going on; right?
A. And that was a common quote: "Beat the body, make the mind strong."



Q. Okay. David Evans testified that these get-on-the-wall-type beatings would occur all the time, like weekly, whenever the weekly meetings occurred.
Was that your understanding?
A. I would say so, yes.
Q. How about with respect to gang recruitment? Did you ever participate in that?
A. No.
Q. Are you aware of what the tactics were to recruit new gang members?
A. Actually, I'm not.
Q. How did -- how did -- how did you end up joining the Black Stones, given that you're living in the Vice Lord territory?
A. I actually wound up -- I grew up out in the 100s, on 100 -- and I think that was -13th and Forest, with family friends of my parents. And they were Vice Lords out there, Conservative Vice Lords. On my side of the tracks was Conservative Vice Lords of Rock Island. So growing up -- and mind you, the gang activity and culture comes from the '50s and the '60s. So this was embedded in our communities of color, to be protective against the police and the other outside



entities beyond the community.
So when -- how I got to be a Black Stone member, I grew up when Black Stones were from State to the lake and crossed over State Street into the Auburn Gresham areas and that west of State Street. And I also seen that firsthand knowledge transition of how Black Gangster Disciple Nation went to Black Gangsters, Gangster Disciples, and Black Disciples. So I'm very familiar with how I live in the culture of Chicago street gang life because it was a life that we lived in.
Q. You couldn't avoid it?
A. You couldn't avoid it.
Q. Understood. So did you make a -- like, a conscious decision to say -- where you said, "I'm going to join the Black Stones instead of the Vice Lords"?
A. Well, actually, the Vice Lords, I knew their whole model and creed. So I just didn't really like the Vice Lords.
Q. Yeah.
A. I didn't like GDs because they were associated with being dirty. And I didn't like no other gang, to tell you the truth, except for the

Black Stones because they were considered to be clean, from what I had remembered. Because again, by '86, when they locked Jeff Fort up, there was factions of gang members and what have you, and factions of gangs. But I didn't like Vice Lords or Gangster Disciples.
Q. Jeff Fort was El Rukn; right?
A. Well, yes. That's what they locked him up as, an El Rukn, yes.
Q. And did the El Rukns kind of morph into or turn into the Black Stones?
A. I think that may have been the other way around or something.
Q. Black Stones turned into El Rukns?
A. I believe so.
Q. Okay.
A. Well, according to the Angel of Fear that's on Channel 5.
Q. The Angel of Fear?
A. Yes.
Q. What's that?
A. That's WMAQ, Carol Marin -- Carol Maureen.
Q. Yeah. A news segment on the gangs?
A. Exactly.
Q. Yeah. Okay. So let me ask you this: You



had -- you drew a distinction between the Black Stones and, really, every other gang, in that the Black Stones were clean, and the other ones were not clean?
A. I guess that's how I looked at it then, yes.
Q. What does it mean to be clean?
A. "Wash your clothes" type situation. At that time --
Q. So the literal meaning of being clean?
A. Yes.
Q. And from -- your experience is, the Black Stones tended to have better habits of being clean?
A. They did.
Q. Is that the only reason you preferred the Black Stones over the other gangs?
A. If I think back to it, if I recall, yes.
MR. MORAN: Okay. Give me one second. We are at 12:15. We're probably going to go most of the day. Do you have a preference on when you want to stop for lunch? Whenever is good for you and our court reporter.
THE WITNESS: Whatever is good for her.
MR. MORAN: All right. So whatever you guys want to do is fine with me. I just want to make sure you know you have the option to stop and get



a bite to eat if you want to.
THE COURT REPORTER: Do you want to go off the record and talk about it?
MR. MORAN: Yeah. Sure. Let's do that.
THE VIDEOGRAPHER: All right. Going off the record at 12:17 PM.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Media Unit 3. We're going back on the record at 1:10 PM.
BY MR. MORAN:
Q. Okay. Mr. Williams, we just took a break so you guys could grab some lunch. Are you ready to go again?
A. Yes, sir.
Q. All right. Great. I'm going to come back to some of the things we were talking about and ask a couple of follow-up questions.
You had mentioned that when you had that -- when you were the subject of a gang violation for losing the pager, that you went to your parents to get the $50.
Did you explain to your parents why you needed the $50?



A. No, sir.
Q. Did your parents have any knowledge that you were a part of a gang?
A. No, not at that point. No.
Q. Did -- when did your first parents -- when did your parents first become aware that you were a member of a gang?
A. Actually, not until I had been locked up.
Q. Okay.
A. Incarcerated.
Q. So your various activities, where you were acting as a lookout or going to gang meetings and whatnot, they had no idea?
A. No, they didn't.
Q. Okay. Did your parents ever have discussions with you about avoiding gangs?
A. Technically, no. That was done by the school system, CPS.
Q. Yeah. Set the school system aside. I just want to focus on your parents. When you were growing up, did they ever talk to you about avoiding different gangs?
A. No, sir. Not specifically gangs. They had no knowledge of gangs in Chicago. They were actually

from the south.
Q. Got it. So your mother and father had no idea what the Black Stones were?
A. I can't say they did or didn't. I just knew that the gang culture of Chicago is what it was.
Q. Right. And your parents -- as far as you know, your parents had no understanding about that culture?
A. No. None, to my knowledge.
Q. Okay. When you mentioned that you had to work off part of the debt you owed to the gang --
A. Yes, sir.
Q. -- in general, when you were working for the gang, did you get paid?
A. I did.
Q. How much were you making from the gang back in the early '90s, late '80s?
A. That would have been about a hundred dollars a week.
Q. Okay. Was that -- when you eventually -- you said you got a job sometime after 1992?
A. Right around '92. Right after -- after -- actually, after I had -- well, after the realization of me not being able to attend college as I had



expected to upon graduating, which I did graduate in '92.
Q. Were you -- whatever job you had, were you making as much as you had made with the gang?
A. No, sir. Not near about.
Q. Okay. Did you have a nickname with the gang?
A. At that point, no.
Q. At any point?
A. Upon -- right upon being locked up, yes. I had an adopted name. I did not go by my given name.
Q. What were you going by when you got locked up?
A. Cordell.
Q. Oh, okay. When you were working for the gang you mentioned, that occasion where you dropped the pager and there were drugs attached to it --
A. Yes.
Q. -- was your role more than a lookout for that occasion?
A. Technically, no.
Q. Was your job ever to collect the money and bring it to the general?
A. No. Not specifically, no.



Q. Did you ever have responsibilities for gang money?
A. In some regards. However -- but the security aspect of it, I was holding the drugs at that point. So when I did work in the security, when I did run off with -- from the police and lost the pager, that was the security measure of which, you know, to -- and I did have 13 or 12 bags on me. I had a pony pack. I was holding a pony pack.
Q. So I guess what I'm trying to find out, if it was ever your job to hold money too?
A. Rarely, if at all -- often.
Q. In terms of -- as security, you would hold drugs?
A. Well, most of the time, I would be the lookout. But that did happen at times, yes.
Q. What's the most, in terms of value, monetary value of drugs you held when you were working security?
A. The most at one point was a pack.
Q. How much was that worth?
A. $120. 12 -- 12 a box.
Q. Got it. How often did you interact with Dice?



A. Dice was the general of the land. So when I was out and about, yeah, I would have to see Dice. You know, everybody would have to see Dice on a daily basis at some point or another. Outside of that, as far as interactions, rarely. Maybe -- definitely weekly. Definitely, weekly when I was active with the gang. However, outside or beyond that, when I was around.
Q. Did you ever socialize with Dice?
A. Not very heavy because I started working. I started working for the Board of Ed. And I had a job at that time for the post office. In '92, I was working for the post office on the midnight -- over the midnight shift.
Q. Let's talk a little bit about the -- when you were in prison. Like, the gang experience.
You had mentioned witnessing gang violations in prison?
A. Indeed.
Q. Did you participate in any gang violations in prison?
A. No. Not directly because I was sick, and I was outcasted as being weak.
Q. How -- explain what you mean by "outcast for

being weak."
A. I was outcast for being weak because, in my mind at least, I believe that someone knew of what I had been accused of saying or telling on the general's nephew or the young general.
Q. So you were -- essentially, you thought you were outcast for telling police that David Evans was involved?
A. That's what I thought, yes. I just stopped short of going to protective custody because no one had actually just came outright and said -- at that point at least, when I was coming into the penitentiary, no one had actually just outright said they are going to do me some bodily harm for telling on the general -- on the general's nephew. Excuse me.
Q. David Evans, was his nickname Day-Day?
A. Yes.
Q. Did you talk to the police about Day-Day?
A. I had actually -- I spoke -- this is in reference to that evening; right?
Q. Yes.
A. The police -- I spoke to the police about where I was that evening because I had went to see Paris Maclemore at the hospital. And I did take



Londell with me. And over there -- while over there -- well, I was a young kid that liked to drink and smoke and be with women or girls. And we had a party just like that as far as getting -- we're talking get-togethers.
Q. And we're going to get to that in one second. Okay? I assume you're talking about going to Vino's or Vito's or whatever it was?
A. Yeah. That's where -- yeah. We wound up there, yes.
Q. Okay. The only question I want to ask you right now is: Did you ever mention Day-Day's name or David Evans' name to the police when you were questioned about the murder?
A. I said "Day." Yes.
Q. Just "Day"?
A. Just Day. Well, actually, Daybreak is what they looked for or asked about.
Q. How do you think -- and Day-Day, who is David Evans, was actually in the car with you; right?
A. That evening, yes.
Q. How do you think the police ever figured out it was David Evans, if you only gave the name Daybreak?



A. Because when they showed me the pictures, O'Brien actually showed me the pictures. And actually, I think it was a Garkey [phonetic] or Gerkey [phonetic] that I was with prior to O'Brien, he -- he came and asked me what happened, and I told him what happened. And we went out canvassing the community for Londell, I believe, at that time. And he was not found at his house. So they took -- I think they took me back to the station, if I'm not mistaken.
Q. Yeah. And we're going to -- we'll talk about that as well. I assume you gave the name Daybreak because you didn't want to give David Evans' name or Day-Day to the police?
A. Well, I was actually intoxicated, but that's what I -- I did say Daybreak. I recall saying Day and -- yeah.
Q. Okay.
A. Yeah.
Q. Somehow, either Detective O'Brien or the other one -- I think his name is Detective Garkey. Does that sound right, or?
A. I remember -- it might have even been Dwyer [phonetic]. But I'm uncertain as to which one, but it was a --



Q. Okay.
A. -- gentleman --
Q. Just a detective showed you a picture. How is that?
A. Okay.
Q. Is that fair? I'm not going to hold you to who it was, but somebody showed you a picture of David Evans?
A. Well, that was O'Brien.
Q. Oh, that was O'Brien. Okay.
A. Yeah.
Q. So my question to you then is this: The only information you gave the detectives was Daybreak --
A. Yeah.
Q. -- in the car. And somehow Detective O'Brien shows you a picture of David Evans, who actually was in the car with you.
A. Yes.
Q. How do you think Detective O'Brien ended up giving you the picture of the exact person who was in the car with you?
A. I know how he did. He showed it to me, stating that he was involved in a murder from my

neighborhood or from the neighborhood of Englewood, a previous murder that had happened.
Q. Did you know that to be true?
A. I didn't.
Q. Do you know whether anyone else -- anyone else you knew -- or strike that.
So he showed you this picture of David Evans?
A. Amongst others.
Q. Amongst others. Did you identify David Evans as the person that was in the car with you?
A. I did.
Q. Okay. Let's come back to the discussion about gang violations in prison. Okay?
So you were not the target of any violations in prison; true?
A. Not immediately at first, no.
Q. How about ever?
A. I had heard that there had been a so-called hit put out on me at one point or another in Menard.
Q. Okay. But that never happened?
A. It didn't. To my knowledge, it didn't happen.
Q. Well, you would know if you had been



violated; right?
A. That is correct. But I wouldn't know if the conspiracy had been given the green light to go on or not.
Q. Is that the kind of thing that the gang leaders would have to approve?
A. Yes, most often than not. But by present day accounts of when that was, approximately I guess '15 or '16, the gang had been split and fractioned and --
Q. Yeah, no, I know. Okay. You observed gang violations while you were in prison?
A. Absolutely.
Q. Okay. Did you observe violations involving the Black Stones, like discipline among Black Stones?
A. Emphatically. Yes, sir, I did.
Q. Okay. And what did you see?
A. I saw in some instances -- or an instance or not, a death of an individual.
Q. Of people getting killed?
A. Absolutely.
Q. Okay. By the way, were you ever physically attacked in prison?
A. Yes, sir. And by the police, I might add.



Q. In prison?
A. In prison. Yes, sir.
Q. You mean --
A. The security guards.
Q. You mean the jail guards -- or the prison guards?
A. Yeah, the prison officers. Yes.
Q. Okay. Okay. Let's set aside the prison officers for a minute.
Other inmates attacked you?
A. I was attacked by another inmate before, yes.
Q. Okay. What year was this?
A. I don't recall which year it was. It was over a 28-and-a-half-year span, sir.
Q. Okay. Was it early on or later?
A. It was at the County. And in prison too. But that was more so about my cellies at that time.
Q. Okay.
A. I had cellmates that was angry about whatever or another. But, by the end, I was standing as my own man. And that's just it beyond that.
Q. Okay. So --
A. When it came to my cell.



Q. -- let's talk about the time in Cook County Jail when you were assaulted.
Were you, at that time, under the protection of the Black Stones?
A. At that time, I thought, yes.
Q. All right. Did you -- were you attacked by one person or multiple people?
A. One at -- it started off as one, but gang members don't move by themselves.
Q. Right. So then was it multiple people against you, or multiple people against multiple people, and you were part of the group of one?
A. It started as me and one, but the -- multiple people turned into multiple people.
Q. Got it. So the Black Stones came to your defense?
A. Right.
Q. And then others came to the defense of the other guy?
A. Right.
Q. Got it. Did you suffer any injuries?
A. I did at that point.
Q. What was your injury?
A. Well, at that point, I suffered just

beating -- beating -- just beaten up.
Q. Yeah.
A. But when I got into it with one particular guy and the police was involved, I had a broken leg that stemmed from the personal interaction.
Q. Would that be a broken leg from something that a jail officer did?
A. Yes.
Q. Okay.
A. That is -- yes.
Q. Does this incident you're talking about involve your conviction for aggravated battery against a jail officer?
A. No. It directly -- it started over my being found guilty because of one guy in a different gang trying to say something that brung up -- because I was on the deck for the Blackstone Rangers at that time. We were 15 Stones and nine other affiliated branches of Vice Lords and the Cobra Stones. But the 15 Stones all had been called to that deck -- A3 or A4 in the A-well of Division 1. And at that time, the mental pressure that I was under -- because that is where the violation -- or a violation did take place because I was called up there on the A-well of Division 1.



Q. You were called up there for a violation?
A. I was called up to A1 -- A-well, A3 or A4, in '95, when I was preparing to come to the penitentiary after having been found guilty of the two bodies that someone else had done.
Q. Okay. And were you called up to that deck for the purpose of being violated?
A. I was called up to that deck for hearing charges of a violation.
Q. Oh, so they were going to give you sort of the gang version of due process?
A. I guess -- that would be it, yes.
Q. You were going to be brought up on charges with the gang?
A. Uh-huh.
Q. And you were going to be given an opportunity to defend yourself against the charges?
A. Presumably.
Q. And then if the gang found that you had committed whatever violation you were accused of, that's when the violation would have happened?
A. Yes. Probably at that service, on what would have been designated as a Friday at 7:00 PM.
Q. Okay. Were you violated at that time?



A. At that time -- actually, the fight started with the police. And it wasn't because of me at that time; it was actually stemming from another guy whom I was into it with regarding his situation. But because there were more Black Stones on the deck and he felt like he knew my situation, we would get into it, and then he would want to leave, but he would get into it with Lieutenant -- excuse me -- Superintendent Edwards.
Q. All right. And this is -- this is the event that led to you being convicted of aggravated battery?
A. Yes, sir, it is.
Q. Okay. That conviction still stands; is that right?
A. To my knowledge, it does.
Q. All right. The -- and it was a felony conviction?
A. I'm uncertain, but I believe so.
Q. All right. Were you sentenced to a period of time? Like, four years?
A. I was. Four years. Yes.
Q. Okay.
A. So I don't know if it was a Class 2 or how it may have portrayed itself out in the legal sense.



Q. And the sentence, was it to run concurrently with the sentence you received for the murder conviction?
A. I don't recall.
Q. Okay. Has that conviction ever been vacated? And by "that conviction," I mean the aggravated battery against the jail officer?
A. To my knowledge, it has not.
Q. Okay.
A. Because I suffered from it.
Q. Now, you had mentioned that there was a violation -- or you got into a fight or -- at jail. And the injury was you just being beaten up, which it sounds like that you were -- you were not seriously hurt?
A. Well, I was just beaten up to physical harm.
Q. Right.
A. Albeit of my psyche, understanding now where it's coming from --
Q. Okay.
A. -- specifically. But --
Q. So later on, you felt the emotional or mental health impact of that violence?
A. I did. And went through our prison system

with it to be here today with you.
Q. Okay. Let me ask you something: Do you carry around -- would you say you carry around -- for a lack of a better way to put it -- emotional baggage from an incident like that?
A. You can't help but bring -- no one goes through prison life that I went through and that others have gone through unscathed, sir.
Q. How about -- I want to compare that now to your gang life outside of prison. You participated in violations; you were violated; you witnessed violent acts. Did any of that have an emotional impact on you?
A. It would have to, I believe. And I would say so, it did.
Q. Do you discuss those events with your therapist?
A. I try to unpack those events with my therapist. Yes.
Q. Okay. So would it be fair to say that your therapist is treating you for trauma that occurred before -- in part, before you went to prison?
A. Not entirely.
Q. What do you mean?



A. In small parts, I would say.
Q. So what I'm trying to say is that part of what the therapist is treating you for involves events that occurred before you went to prison?
A. And I would say a small part, yes.
Q. A small part?
A. Because most of my trauma induced came from being wrongfully convicted and going through prison.
Q. Okay.
A. When I was away from the gang mentality and aspects of it, attempting to become productively a part of citizenship with a job and what have you, as well as to try and go to school that following semester because of Grambling -- I wanted to go and attend Grambling. I even went down south at that time with my grandma and teacher and all to the Trump -- right there on the Gulf.
Q. This is after you got out of prison?
A. No, sir. This is before. Prior to it. And I was going to go to college at Grambling. And I was staying at the Trump -- he had a casino there.
Q. Right. A Trump hotel or a Trump casino?
A. It was the Trump -- The Grand Casino. I went there. It was red, blue lights. All neon



lights. I had a great time that summer.
Q. Let me ask you something. Did you get accepted to Grambling?
A. I was an alumni of my grandmother, affectionately, who did get to go to Grambling. And I knew that, obviously, I had -- I should --
Q. You're going down the legacy road. I know what you're saying. But --
A. Thank you, sir.
Q. -- my question is: Did you actually apply and get accepted?
A. I did apply.
Q. Were you accepted?
A. At that time, I do not know if I had been accepted.
Q. Wouldn't you need to graduate from high school to be accepted into a college or university?
A. Absolutely. That's why I didn't go.
Q. Okay. So would it be fair to say, then, that you did not get accepted because you had not yet graduated from high school?
A. I had not graduated from Lindblom Technical High School that I went to for four years and then had to go an extra year so -- to an alternative school, in



which I did actually get a high school diploma and was scheduled to go back to college after graduating from -- at Martin Luther King High School.
Q. As of the date you were arrested on May 26, 1994, had you received an acceptance letter from Grambling?
A. No, sir.
Q. Okay. Had you reapplied?
A. I had reapplied. Yes, sir.
Q. Okay. I want to ask you another question real quick on a little bit different topic.
You had indicated that if detectives had followed the breadcrumbs -- do you remember saying that?
A. I do recall saying that.
Q. What breadcrumbs were the detectives to follow -- should they have followed?
A. According to what I understood it to be, they should have followed the breadcrumbs of David Evans -- which they did wind up following. But also, just merely according to the law, I don't think I should have been beaten for -- for what happened. And I don't think I should have been made to go with what they say I went with. Because the court-reported

statement states that what was led and all of this and what have you regarding the coercion, I gave my portion of what happened and then, yet, I was created or made to do some other things.
Q. Okay. I'm going to switch gears a little bit.
A. Yeah.
Q. You said you had worked at Ford for a brief period after you got out of prison?
A. I did.
Q. How long did you work there?
A. Maybe 30 days because I couldn't handle the stress and the precursors -- not precursors -- stressors. That's what they call it. Stressors of inflammatory situations.
Q. What was your job title?
A. I don't recall. But I worked on a line. See, it was assembly. We was assembly -- ironically, we were assembling the parts for the Expeditions and the -- I think it was the Navigator. Did parts for the Expedition and the Navigators, the mechanical arms and wheels.
Q. You might have put together a part of your own car. You don't know; right?



A. Who knows.
Q. What was your hourly rate of pay?
A. I believe that was 22.50 or maybe 21.50 at that time. Two years ago.
Q. Okay. And were you terminated by Ford?
A. I was. Because I had gotten sick as a side effect of the inflammation of Crohn's disease, trying to keep up with the pressures of life as well as just living, to try and work and earn a living. Because I hadn't been allowed to get my job to take care of my mother as a home health care. I can't do that.
Q. Let me ask you this question about Crohn's. Now, I read somewhere that -- and I think you mentioned -- you alluded to it earlier, that, at some point, you had a colostomy bag?
A. I do.
Q. You do currently?
A. Yes, sir.
Q. Okay. Is that going to be a permanent thing, or is it scheduled to stop at some point?
A. My expectation is that that is permanent. Because with the inflammation and the bowel resection and what have you, the multiple surgeries, and including the lifelong situation of ENTYVIO treatments



that I can't escape, I would rather live with a bag than have to deal without because of the -- the -- there's no health benefit in what has been cut out of me. I've been sawed in half literally, for the most part.
Q. So let me ask you this: Have you been given a choice by your doctor to have the bag removed and go on in life without this colostomy bag or to keep the colostomy bag?
A. Only as recent as one month ago have I been given or granted that opportunity because of the new discoveries, if you will, of the medical professional.
Q. And is it your intention now that you have this choice to stay with the colostomy bag?
A. Only because the alternatives I have dealt with before.
Q. No, I understand. I'm not asking you to tell me why yet. I just want to make sure I understand.
Your intention at this point is to stay with the colostomy bag?
A. All intents and purpose, yes, sir.
Q. Okay. I'm going to switch gears again a little bit. Okay?



I'm curious. You had mentioned that your mother bought you a Ford Expedition.
She used her own money to buy that car?
A. I would have to say yes because whatever I have gotten, I have given to my mother willingly by ways of settlement or any other means of recourse. I have nothing to give. So monetary, that is hers by right.
Q. Do you have a Certificate of Innocence?
A. I do.
Q. Did you receive a payment from the State of Illinois?
A. I did.
Q. How much did you get?
A. 277 and some odd dollars and cents.
Q. $277?
A. And some odd cents.
Q. You didn't receive a payment in the six figures, as in over a hundred thousand?
A. 277,000. That's what I believe I said. If I said dollars, my -- my --
Q. Okay. That's what I --
A. -- my apologies. I meant $277,000 --
Q. Okay. So you were paid by --

A. -- and some odd cents.
Q. -- the State of Illinois as a result of your Certificate of Innocence. You were granted a Certificate of Innocence; the state of Illinois gave you $277,000?
A. Yes, sir. That is right. And, of course, some odd cents.
Q. And did you use that money to help buy this car?
A. I gave it all -- I signed and endorsed it over to my mother, so ...
Q. So your mother is in control of all of that money?
A. Yes. Well, I did split some of it regarding attorney's fees.
Q. I see.
A. To my knowledge. Or to the -- well, not to my knowledge. But, you know ...
Q. Some of it went to Mr. Becker?
A. Well, it was -- yes.
Q. And that's okay.
A. Designated. It was designated.
Q. It's okay.
A. It was already taken out.



Q. That's generally how it works.
A. Yes, sir. Yes, sir.
Q. You know, I'm not passing judgment at all. I just want to make sure I understand.
So, obviously, some of it went to your attorney?
A. Yes.
Q. And then you signed over the rest of the money --
A. Yes, sir.
Q. -- to your mother?
A. Entirely.
Q. Okay. And did your mother buy you the car after you had signed over the money?
A. That is correct. Yes, sir.
Q. To your knowledge, did your mother use the Certificate of Innocence money that you assigned to her or signed over to her to purchase this car for you?
A. I can't say that specifically, because my dad did leave her, to some degree, well off with the insurance policy, as well as we do have a -- my father worked for Ford. So we would have gotten it at a discount, which I'm fairly certain we did. But for



all intents and purposes, she took care of and has taken care of me.
Q. Okay. Who pays for the upkeep on the car?
A. We have insurance. And she pays everything.
Q. Got it. All right. I'm going to switch gears again. Okay?
You had mentioned -- we were talking about -- I think you got into a little bit about, like, which way to wear your hat if you're part of the gang, or colors, tattoos, and things of that nature.
Did the Black Stones wear certain colors?
A. Predominantly, yes.
Q. What were the Black Stones' colors?
A. Predominately red, black. Red and black. They wore that green for the Afrocentric point of view, if you will.
Q. And what kind of hats -- they're baseball hats, essentially, right, that gangs would wear?
A. Yes.
Q. What kind of hats did the Black Stones wear?
A. Well, it's not the kind, actually. By the time we -- by the time I came about, it was which way did you wear it, to the left or to the right.



Q. And which way did the Black Stones wear theirs?
A. To the left.
Q. Did you wear Black Stone colors when you were part of the gang?
A. Yes. Every -- well, yes. Everyone, for the most part, did.
Q. And did you wear your hat -- did you wear hats to the left when you were part of the Black Stones?
A. Sometimes, yes.
Q. How about tattoos? Were there specific tattoos that members of the Black Stones got?
A. Yes, there was.
Q. What kind -- what did they look like? Or describe the tattoos.
A. Pyramids, usually, or crescent moons and five-point stars with usually BPS over the top or some type of situation to that degree.
Q. Did you ever get a Black Stone tattoo?
A. No, sir. I refused to be a walking billboard for gangs.
Q. Have you ever gotten a tattoo?
A. No, sir.

Q. Okay. I want to talk a little bit about -- well, let me ask you this: Did you have concerns when you were a part of the gang, when you were -- well, let me back up.

Would it be fair to say that, at one point, you were active in gang business?

A. Oh, yes.

Q. Okay. And when you were active in gang business, did you have concerns whenever you went into territory controlled by another gang?

A. Emphatically so. However, knowing the activity of which gang business was going on at that time, you didn't wander off into other gangs' activities, certainly not. But -- and you didn't wander off into gang territories like that as well.

Q. How about, would you ever walk by yourself? Even when you were not conducting any gang business, would you ever just walk by yourself into GD territory?

A. No, not actively. No. Not understanding. No.

Q. Okay. In 1994, who controlled the area at 74th and Halsted?

A. The GDs.



Q. GDs. That was GD territory?

A. Yes.

Q. Okay. I'm probably going to switch gears a little bit again here. Excuse me.

I want to ask you whether -- did you ever consider David Evans to be a gang enforcer, someone who was enforcing rules, holding people accountable for rules?

A. I definitely thought of him to be part of the hierarchy, without a doubt.

Q. And part of that role was enforcing gang rules?

A. Yes. It would have been for sure.

Q. Okay. I want to ask you if you know certain people you might have met in person.

Does the name Marcus Wiggins ring a bell?

A. I've heard of him. But I don't recall his face or -- I know that he was -- yeah. I've heard of him. But I don't recall seeing him face to face or can tell you if I actually met him or not.

Q. Tyrone Hood?

A. I've heard the name. But again, I don't -- I can't say I know him personally.



Q. Wayne Washington?

A. No.

Q. Nevest Coleman?

A. I've heard that name.

Q. What do you know about that name?

A. If I'm not mistaken, he was a Burge victim, a Jon Burge victim.

Q. Meaning that he was interrogated and tortured by Jon Burge?

A. Yes.

Q. Okay. Do you know anything about that?

A. No. It's before my time.

Q. How about Darrell Fulton?

A. No.

Q. Sean Tyler?

A. Yes. I've heard of him.

Q. What do you know about him?

A. From my understanding, he -- we had the same judge at the certificate of innocence.

Q. Oh, okay. So what do you know about Sean Tyler, other than the fact that you had the same judge?

A. Nothing.

Q. How about Reginald Henderson?



A. That's his brother.

Q. Do you know him personally, or?

A. I know him through his brother. Both of us had the same judge.

Q. Did you ever meet anybody by the name of Marc Kadish, an attorney by the name of Marc Kadish?

A. Don't sound familiar to me.

Q. Did you ever meet any -- an attorney by the name of Maria Hawilo, H-a-w-i-l-o?

A. No, that don't sound familiar.

Q. Did you ever meet an attorney by the name of Vincent Southerland?

A. That name sounds familiar, but I can't tell you where or how.

Q. Have you ever met with any attorneys who identified themselves as special assistant state's attorneys who were members of something called a "working group"?

A. Not offhand. No, sir.

Q. Or attorneys who identified themselves as, like, a special group of assistant state's attorneys who were investigating the integrity of convictions involving certain detectives?

A. Not offhand. That wouldn't stand out to me.

Not by name. No, sir.
Q. Okay. Let's see. So I want to talk a little bit about the night of the -- the night you went to Northwestern Hospital to go visit your friend, Paris Macklemore [phonetic]?
A. Macklemore. Yes.
Q. Okay. You drove there with a couple of people to visit Paris because Paris had been hospitalized as a result of being shot?
A. Correct.
Q. Okay. Where -- where was he shot at?
A. I'm not familiar exactly where.
Q. Okay. Is it just that you don't remember, or you never knew?
A. I don't believe I ever knew, to tell you the truth.
Q. All right. Did the people you went with, was it -- was Vino one of them?
A. I believe he was. I was -- I was working at the time. And if I ain't mistaken, we -- I was -- when I found out, I believe he was with -- when I found out, I went east to, I believe, pick him up, and we went to Northwestern, if I'm not mistaken.
Q. Okay. There was a person named Chris with



you?
A. If I ain't mistaken, yes. I believe there was four of us that evening that went to go see Paris. I know -- I believe it was me, Londell, Chris, and Vino.
Q. All right. How did you know Vino?
A. I had known Vino from having grown up over -- no. Not grown up over east -- but my mother had a childhood friend that used to keep me or babysit me. And I grew up on -- well, I was. Her name was Minnie something. But I remember growing up over east on 70 -- no. 80th and Manistee at one point. And she had a son named Fonzie. And he -- Alphonse.
But he -- that's how I knew of Vino. Vino was an elder from the East Side.
Q. How long had you known Vino as of May 1994?
A. Years.
Q. All right.
A. I don't even think he actually knew or remembered me, but I had known Vino for years.
Q. Was Vino a Black Stone?
A. To my knowledge, yes.
Q. Okay. Did you ever --
A. As a matter of fact, I believe they were



Apache Stones or something different. They worked for different branches or something over that way.
Q. A different branch of the Black Stones?
A. Yes.
Q. Okay. Was Chris a Black Stone?
A. He would have been, I guess, the same as Vino at that time.
Q. All right. How long did you stay at the hospital visiting Paris?
A. A few hours.
Q. Was Paris a Black Stone?
A. Yes.
Q. Okay. And where had Paris been shot? What part of his body?
A. That, I don't know. I believe it was his stomach area, but I don't know, actually.
Q. And would --
A. I don't recall, actually.
Q. To your knowledge, was the prognosis at least -- that night for Paris, that he was going to survive?
A. To my knowledge, yes, he was going to survive.
Q. Did Paris actually survive that gunshot



wound?
A. He did. I honestly don't remember all of what happened that evening because -- but I do -- I do remember going to visit him for sure. And he absolutely is still alive today, to my knowledge.
Q. Did Paris, to your knowledge, ever end up in the -- in prison?
A. He did, for unrelated charges, I'm guessing. But --
Q. Do you know what he was -- what he was convicted of?
A. To my understanding, it was a fed charge.
Q. A federal charge?
A. Yeah, a federal charge. Excuse me.
Q. Okay. The gunshot wound that Paris suffered, was he slot by a GD?
A. I honestly don't recall that time.
Q. All right.
A. He had been shot multiple times. But that time, I don't recall.
Q. Okay. Had he ever been shot by a GD?
A. He was, I believe, at -- the first time. A couple years or a year earlier.
Q. All right. What time of night do you think

you left the hospital?
A. I can't say, actually. I don't recall what time, actually. I know it was dark out.
Q. How does 8:00 o'clock sound? 8:00 o'clock at night?
A. I can't say you would be wrong or would have been wrong.
Q. And after you left the hospital, did you drive to Vino's?
A. Yes.
Q. You went to Vino's to drink?
A. Uh-huh.
Q. You have to say yes or no.
A. Oh, yes. That is part of why we done it, yes.
Q. And smoke some marijuana?
A. Yes. And we was with several females as well.
Q. Sure. Did you attend a party at Vino's that night?
A. We called it a "get-together."
Q. Got it.
A. That's what it was called, a "get-together."
Q. Would you call that get-together a party?



A. For all intents and purposes, yes, sir.
Q. Okay. And how long did you stay at Vino's little party or get-together, drinking and smoking marijuana?
A. I couldn't say. But I know, at the resolution of it, that's when I left.
Q. At some point in that day?
A. Yeah. At some point in that day. Yes, sir.
Q. Okay. Did it end when you ran out of beer and marijuana?
A. That would be a good summation, I would guess.
Q. Okay. So you're getting ready to leave. And was it your intention to drive anybody home that night?
A. Londell. Because Londell had came with me.
Q. Okay. And, at some point, David Evans ended up going with you?
A. That is correct. Yes.
Q. Tell me how David Evans ended up going with you in your car back towards your area.
A. Actually, I don't even recall how he got over there, to tell you the truth. But I do remember when we came back from Vino -- I mean, came back from



visiting Paris to Vino's, I was -- we was there, just doing what we do. And he wound up being there.
Q. Okay. Did David ask you for a ride?
A. Well, when I said I was getting ready to go, and was anybody going my way, yeah, he popped up. Yeah.
Q. Okay. Did anybody else pop up and ask for a ride?
A. Ask? No.
Q. So when you left Vino's, who was in the car with you?
A. When I left Vino's, it was me, Londell, David, and someone he said was going with us. Now, at the time, I didn't know who all was there. So I did recognize Day-Day as being who he was. And after he said so, for sure. "You going back that way" type of situation.
Q. You're talking about the fourth person?
A. Well, no. I'm actually talking about Day-Day. "We're going back that way" type situation.
Q. Got it. And when you said there was a fourth guy coming with, did you recognize who that person was?
A. He had on a hoodie, but I didn't -- I



didn't -- I knew of him. But I didn't know expressly who he was. I had seen his face around, for sure.
Q. Do you know his name?
A. Well, we called him -- I called him Big Frank. But he was known as Peteman [phonetic] throughout the neighborhood.
Q. Peter Man?
A. Well, Pete --
MS. MEADOR: Like, P-i-t-a, Pita?
THE WITNESS: Like, P-e-t-e. But it comes from --
BY MR. MORAN:
Q. It's one word; right?
A. Yes.
Q. Got it.
A. It -- well, yes, sir.
Q. Fair enough. Before you got in the car, did you ask Day-Day if he was carrying a gun?
A. Well, I figured he was. Because when I had seen him, you know, I was kind of thrown aback, like I didn't even know you was here.
Q. Right.
A. So when I seen him, I'm like -- as I stated, I was -- it was time to go. "Come on. Whoever is

going back my way, let's ride." That's the actual words. "Let's ride."
Q. All right. Did you ask Day-Day to put his gun in the trunk?
A. I didn't know he had one on him, but I suspected he did. If you're riding with heat, you got to put it in the trunk.
Q. Okay. So you told him to put it in the trunk?
A. I said, "If you're riding with heat, you've got to put it in the trunk." We're not -- I'm not -- my mindset was, "I'm not finna get caught with no gun in the vehicle."
Q. Got ya. Okay. Did he comply with your request?
A. To my knowledge, he did, yes.
Q. How did he get it in the truck?
A. I popped the trunk.
Q. Now, when you popped the trunk, did you have to go into the driver's seat to pop it?
A. No. I could have went into the driver seat or the passenger seat, but I went out of the car and popped the trunk from the glove compartment. But at the time, and much like now, you can work the remote.



Q. So you could -- is that what you did that night, you pushed a button on the remote, and the trunk opened?
A. I believe so. That's what I would have done. I would have -- it was 30 years ago, but that's what I believe I would have done, for certain.
Q. So just to be clear, when you popped the trunk for David to put his gun into the trunk, you had hit a button on your remote?
A. Yes, I would have did that. Yes.
Q. Okay. Were you standing outside of the car when that happened?
A. I wouldn't have went out to the car. I believe I would have been in the doorway.
Q. How far back?
A. It's a 60 feet range on it. But I popped the trunk, though.
Q. Okay. How far away from the car were you standing when you popped the trunk?
A. Just the distance to the house. Because we were in a two-flat house. But I'm guessing that may have been like 20 feet, approximately.
Q. Where was Londell Harper at this point in time?



A. I believe Londell was still in there. Yeah. He had to be still in there.
Q. Londell Harper testified that when he was with you at this -- whatever you want to call it -- gathering, he was on whatever the top floor is on the back porch with a group of people.
A. Okay.
Q. Do you have any reason to disagree with that?
A. No, I don't.
Q. Okay. And where was this -- was this a two-flat or a three-flat?
A. It was a two-flat.
Q. Okay. And was it located on the corner? Middle of the block?
A. Possibly the middle of the block, I'm guessing. I know it wasn't on the corner.
Q. Okay. And where was your car parked?
A. My car was right out front. Directly in front.
Q. Directly in front?
A. Yes.
Q. Okay. And was there, like -- were you -- was it one of those two-flats where you've got to walk



up some stairs to get to the front door, or were the stairs --
A. Yes.
Q. -- at ground level?
A. The way it was built on the east side, you could walk in -- it was slightly on the front premises of the yard. You walk up, and you can walk up the stairs to -- not necessarily the main floor, but, like, 1A-type floor. And you had, like, almost a basement apartment that would have been -- well, as a matter of fact, that would have been, like, basement 2 or 1A or however you would view that.
Q. Okay.
A. But there isn't nothing actually on the main level. You had to walk up a little -- couple stairs in order to get into the house that would have been the main level, but it wasn't directly on the main level.
Q. Got it. Did you see David Evans put the gun in the trunk?
A. I did see him go to the trunk.
Q. Did you know at that time what kind of gun David was carrying with him?
A. No, sir.

Q. Did you ever see the gun itself?
A. As I told -- I can't actually state that I actually saw the entire gun, no.
Q. Or any part of it?
A. I believe I did see the bell -- not the bell -- the handle of it.
Q. Can you describe what you saw?
A. Well, him grabbing it to put it into the trunk.
Q. David Evans testified that he had a chrome .45.
A. Okay.
Q. Do you have any reason to disagree with that?
A. No reason to disagree with that.
Q. Okay. You were somewhere in the neighborhood of 83rd and Houston?
A. Approximately. It's not that exact spot. Block, rather.
Q. And you were intending to travel west, back towards your neighborhood?
A. Correct.
Q. What route did you take to go west?
A. I would normally take 83rd down -- it had



been some time at that time -- but 83rd down west -- going westbound towards -- to Racine or Harlem.
Q. Were you too intoxicated to drive?
A. I probably was.
Q. Now, when you say "probably," are you saying that "I might have been over the legal limit, but, otherwise, I was okay"?
A. I would say I was definitely over the legal limit.
Q. Okay. But you were able to drive in a straight line?
A. I believe so. I would say so. I had done that before previously, so ...
Q. All right. Not your first time --
A. My memory or whatever, I don't know. But I was --
Q. Fair to say, it wasn't your first time driving --
A. Intoxicated.
Q. -- after you had been drinking and smoking weed?
A. That is correct.
Q. Okay.
A. Yes, sir.



Q. And did you have any problems driving west on 83rd?
A. No, I didn't.
Q. Okay. At some point, did you get to Halsted?
A. At some point. Yes, sir.
Q. And you turned right on Halsted?
A. Yes, sir.
Q. Okay. Was there any conversation in the car up to this point?
A. I don't recall any. It was a rather somber moment, if I recall correctly. Because I was just really trying to get home and trying to go to work in the morning. I worked for the Board of Ed.
Q. Well, obviously, you didn't mind being out that late; right?
A. Well, technically, I did. But I knew I had to be up.
Q. Yeah. But you were young; you were out having fun; you were okay with being out late that night; right?
A. I was okay with responsibilities.
Q. Okay. So you knew that you could handle staying out, going to this little gathering or party



with your friends and some people that you were just acquaintances with and then having to get up early the next morning and go to work. That was okay; right?
A. That was okay with me. Yes, sir.
Q. All right. So, at some point, you turned right on Halsted and go north on Halsted; true?
A. Yes.
Q. All right. And as you're driving along north on Halsted, did anybody say anything at any point?
A. I don't recall up until we got to 74th. I remember sliding up to the light and hearing, "Pull over. Some Bricks."
Q. "Pull over. Some Bricks"?
A. Yeah.
Q. Okay. Who said that?
A. It came from the back. I was intoxicated; so I just -- I was almost to my destination.
Q. Now, "Brick" is slang for a GD?
A. At that time, yes.
Q. All right. Did you know when someone says -- whoever said it, "Pull over. Some Bricks," you know someone had spotted some GDs?
A. Well, we actually call them Copricks. So

when you said "Bricks," that was a new terminology, to some degree. But Ebonics. But I guess it was different.
Q. Well, let's put it this way: At that moment, you knew a Brick was a reference to a GD; right?
A. I knew it wasn't a reference to Black Stones. So yes.
Q. Okay. And you knew you were in GD territory; right?
A. I was in my area. Yes.
Q. No. GD territory?
A. That was their area.
Q. Yeah. Okay. All right. David Evans testified in his deposition that he's the one who yelled out, "Pull over." And he testified that he used a loud voice that one could construe as him shouting it.
A. Okay.
Q. Do you have any reason to disagree with that?
A. No reason to disagree.
Q. Okay. Did you pull over?
A. I did.



Q. Where did you -- did you go through the intersection on the north side of 74th on Halsted to pull over?
A. When the light changed to green, I did cross the light.
Q. Okay. How far down did you get before you pulled over?
A. I would guess the bus stop, if there was a bus stop there.
Q. Okay.
A. Maybe two car lengths.
Q. All right. David Evans testified that you drove about a third of the way down the block and pulled over.
Does that sound right to you?
A. About. Just about right. Yes.
Q. Okay. Did anyone say anything in the car at that point?
A. I don't recall anyone saying anything, no.
Q. Did anyone get out of the car when you pulled over?
A. David did.
Q. All right. Did David tell you to do anything?



A. Pop the trunk.
Q. Did you pop the trunk?
A. I did.
Q. When you popped the trunk, were you sitting in the car?
A. Yes, I was sitting with my -- I was actually beginning to lean my head back.
Q. Because you were tired?
A. Yes.
Q. Now, knowing that someone had identified Bricks, GDs, you pulled over in gang -- in rival gang territory, and you know there's a couple of GDs down the street -- or at least one.
Did you have any questions for David, like, "Why are we pulling over here?"
A. I had no questions. I wasn't even thinking in those regards.
Q. David Evans testified that he recalls you questioning why you were pulling over at that point.
Do you have any reason to disagree with what he testified to?
A. No reason to disagree, sir.
Q. Okay. What happened after you popped the trunk?



A. After I popped the trunk, I leaned back and relaxed. I wasn't thinking about anything. And I should have been thinking, probably. However, I wasn't thinking about anything.
Q. Okay. Did you observe where David went?
A. No.
Q. Do you know whether he walked or ran?
A. I'm guessing he walked. I don't -- I have no clue what he did.
Q. What's the next thing you remember happening?
A. The next thing I remember was shots.
Q. Gunshots?
A. Yes.
Q. How many gunshots did you hear?
A. I can't recall.
Q. More than three?
A. Possibly. I don't recall.
Q. Okay. When you heard the gunshots, did you look back?
A. When I heard the shots, I was startled.
Q. Right.
A. Because I hadn't known how close they were or the proximity of them. But when I heard the shots,

I startled and woke up. I'm like wide awoke now.
Q. Did you look to see where the shots were coming from?
A. I looked around, but I didn't pay any attention to -- I just heard the shots. That was a -- I just heard the shots.
Q. Did you see David behind the car, coming back to the car?
A. No. I don't recall seeing him behind the car. What I do recall is, after hearing the shots, I jumped up, and I remember, like, what the -- everything is becoming crystal clear to me now as far as what's going on. And --
Q. Well, let's stop right there. What became crystal clear as to what was going on in that moment in time?
A. My high was blown.
Q. That's it?
A. Absolutely. Because I woke up, like, what is happening?
Q. Now, in that neighborhood, at that time, in 1994, you hear gunshots. Somebody is shooting at somebody; right?
A. Yes.



Q. You knew that. As soon as you hear those gunshots, you know somebody is shooting at somebody?
A. Yes.
Q. Okay. Did you have any concerns if David Evans was part of that at that moment?
A. I am concerned that he's a part of a shooting. However, I'm concerned also that I'm not being shot.
Q. Of course.
A. Or shot at, to my knowledge. That's why I didn't know what was happening.
Q. And one of the things you would want to do, in terms of self-preservation and self -- and safety, is to determine where these shots are coming from and if you're in the line of fire; right?
A. No.
Q. No?
A. What I want to do is get away from the gunshots of what I hear and know to be dangerous.
Q. Okay. Were the -- did you know from where you were sitting where the gunshots were coming from, where you heard the sounds coming from?
A. Well, I knew they wasn't in front of me because, when I opened my eyes, nothing was in front



of me.
Q. Okay.
A. And I was glad to open my eyes for all intents and purposes. However, I did not know exactly where the gunshots came from.
Q. Now, when David got out of the car and said, "Pop the trunk" --
A. Uh-huh.
Q. -- did you know what he was going to get out of the trunk?
A. It didn't dawn on me at that time. I was not -- I had no understanding of where I was at, technically speaking.
Q. So you were -- you were incoherent?
A. In large part, yes. I was -- I was intoxicated.
Q. But somehow, you made it from 83rd and Houston, down 83rd, turning right onto Halsted without any problems?
A. As I had done several times before.
Q. Okay. So you weren't too incoherent to know your directions or to avoid other cars and not crash; right?
A. Yes. The way home. Yes.



Q. Okay. And you were awake the whole time; right?
A. I was operating the vehicle. Yes, sir.
Q. Of course. Right?
A. Yes.
Q. So when David says "Stop" in rival gang territory -- or somebody said, "I saw Bricks," you stop in rival gang territory, and David tells you to open the trunk, where you know his gun is located, don't you know that he's getting the gun at that point?
A. I was not thinking in those regards.
Q. Okay.
A. I was -- I didn't even know where he had went to, let alone what he had went in to do. I just didn't regard him as doing anything outside of possibly going to get on a bus stop.
Q. Did you -- how long did you sit there coming to terms with what you just heard before you started the car?
A. With the shots? With the gunshots?
Q. Yes.
A. As soon as I heard the gunshots and my eyes was open, and I'm more coherent to what's going on,

I'm looking around.
Q. So you were looking around?
A. Yeah. When I heard the gunshots, yes. I woke up, and I looked around, trying to figure out what's going on and making sure that I wasn't hit.
Q. Sure.
A. In gang territory.
Q. Now --
A. So -- oh.
Q. -- did you look back behind you, where you heard the shots?
A. I didn't know where the shots came from, other than from in -- well, I knew they wasn't in front of me.
Q. Sure.
A. I didn't know if they was immediately to the left, how far back were they to the left or the right or any of that nature.
Q. Let me ask you something: What would happen -- what would Dice do if he found out that you had left David in GD territory after you heard gunshots?
A. Oh, I would -- I could guess what he would do, and that is, from my understanding, physicality



speaking, I would probably -- whatever David would have gotten, I would have gotten twice that.
Q. Because that would have been a major violation; right?
A. It would have, yes.
Q. You knew that at the time?
A. Well, I was -- I understood it to be what it would be, yes.
Q. Did you wait for David?
A. No.
Q. Did you look back to see if he was headed back towards your car?
A. Not to see where he was at headed towards or nothing. I looked back to see what was going on.
Q. When you looked back, did you see David at all?
A. Actually, I didn't. When I pulled off, trying to watch or look into the window -- or the -- what's that called? The little rearview -- not the rearview mirror. The mirror on the side.
Q. Okay. The side mirror?
A. Yeah, the side mirror. Excuse me. But the side mirror, when I looked in there, I see a shadow running. And then it dawned on me: Day-Day had



gotten out of the car. So in the course of me pulling off and trying to get out of that parking space -- I was in a parking space.
Q. Was there a car directly in front of you?
A. There had to be. Yes, sir.
Q. Was there a car directly behind you?
A. That, I don't remember.
Q. Did you have to parallel park the car before David got out?
A. I don't recall.
Q. Did you have to turn the wheel all the way to the left to sort of cut around a car and get back on to Halsted before driving away?
A. I do recall doing that. Yes, sir.
Q. All right. And when you looked back -- and you knew David had gotten out of the car before all of this went down; right?
A. Well, I was intoxicated. But --
Q. I know. But you already agreed that you knew he got out of the car, and he told you to pop the trunk, and you agreed to pop the trunk.
A. Well, I agreed that he definitely told me to pop the trunk.
Q. Okay. And when he told you to pop the



trunk, where was he?
A. He was in the back seat behind me, right directly behind me at that point.
Q. And then, at that point, he got out of the car?
A. I would guess so, yes. Yes.
Q. Okay.
A. I would have to say that, yes.
Q. Because it doesn't make sense to pop the trunk and then just sit there in the car; right?
A. No, it doesn't.
Q. And you knew that back then?
A. Intoxicatedly enough, I guess.
Q. Okay. So then you see this figure running back towards the car as you're trying to start the car and get away; right?
A. Trying to leave, yes.
Q. Okay. And did David try and get back in the car?
A. He did at some point.
Q. Did you slow down so he can get in?
A. No, sir.
Q. Did you -- you just kept trying to get away?
A. I kept trying to leave that location, for

sure.
Q. Okay. Why were you in such a hurry to get away, when you knew David was trying to get into the car?
A. For one, I didn't care what David was trying to do. I was startled, and I was trying to get away from there. I hadn't known David actually shot someone. I hadn't known what the case was, but I did know shots had rung out -- rang out. And I know that whatever was on the other side of them shots was receiving what came from them shots.
Q. David made his way back into the car?
A. He did.
Q. Did he fall getting back in the car?
A. I believe he did.
Q. Or did he just slip? I mean, was it a full on fall, or did he just kind of slip a little bit?
A. I honestly don't know. I was --
Q. All right.
A. -- trying to get up out of that situation and leave.
Q. And when he got into the car, did you ask him anything, like, you know, "What happened?"
A. I did.



Q. What did he say?
A. Honestly, I don't recall because I was in a hysterical state. "What the fuck did you do? What the fuck went on? What the fuck?" I'm constantly hitting him with all types of "what the fucks?"
Q. Now, as you're driving away, did you notice a police car behind you? Or no -- strike that.
You were being chased by a car?
A. Well, I knew a car had gotten on behind me, yes.
Q. At some point, did you recognize that car to be a police car?
A. Never.
Q. Did you recognize -- or did you at some point realize that a police officer was driving that car?
A. When I was incarcerated, yes.
Q. Okay. So the whole time you're being chased by this car, did you know whether it was a police -- a police officer behind the wheel of that car?
A. The whole time was maybe a blink of an eye, but I did not know who or what was behind me. All I seen was lights get up close in my rear view. So I'm, "Whoa."



Q. Were those lights -- were the -- they were headlights; right?
A. Absolutely.
Q. Were they flashing brights on and off?
A. I don't recall no flashing lights of no sorts.
Q. Londell Harper testified at his deposition yesterday that he was asleep, and when he realized what was going on, the car was moving fast and jerking forward, that you said, "We're being followed by the police."
A. That is new to me.
Q. Do you have any reason to disagree with what he testified to?
A. I do have reason to disagree with that, because I don't recall that.
Q. David Evans testified at his deposition that he told you the police were behind you.
A. I don't recall that.
Q. Okay. Do you have any reason to disagree with David Evans' testimony?
A. I do have reason to disagree with that portion of his testimony because I do not recall that.
Q. Now, when you say you don't recall, are you



in a position to tell me you didn't say that, or is it just that, "I can't remember him saying that"?
A. I can't remember him saying that or having ever heard him say that.
Q. So what I'm trying to find out, just so you understand --
A. Okay.
Q. -- there's a difference between saying "I don't remember" and saying "that never happened."
Which is it for you?
A. I don't recall him ever saying anything of that nature regarding that.
Q. Okay. But he could have said it?
A. He could have.
Q. Okay. And in your intoxicated state at that time, were you still incoherent?
A. I would have had to have been if he did, in fact, say that.
Q. Okay. But you knew enough to get away?
A. I knew enough where I didn't want to be for certain.
Q. Okay. You drove north on Halsted?
A. I did.
Q. Turned left on 73rd?

A. Yes. That would -- yes.
Q. Would you say you were going like 70, 80, 90 miles an hour?
A. In a Ford Tempo, if it did get there, I probably did do it.
Q. Okay. And you sped down 73rd?
A. I was -- yes.
Q. Did you turn left on to Aberdeen or May at some point?
A. Yes.
Q. Did you drop David off near his home?
A. Near his home, no.
Q. Where did you drop him off?
A. I didn't drop him off. I told him to "get the fuck out."
Q. Well, okay. You told him to get out?
A. Yes.
Q. Where was that at?
A. At approximately 74th and Aberdeen.
Q. 74th --
A. 75th because I -- well, 74th. Because I wasn't on 75th. Possibly by the viaduct. There's a viaduct that runs parallel to 74th, 75th Street. So that would have been possibly 74th-ish and Aberdeen.



Q. When David got in the car and you were asking him questions, did he say things like, "Pull the fuck off" or "Get the fuck out of here"?
A. If I recall correctly, he did say "Get the fuck out of here." But I'm like, "What the fuck did you do?"
Q. Right.
A. Because that's what caused me to go into all of the "what the fucks" and what have you.
Q. Okay. The -- okay. So I think what you were just saying is you let David out somewhere in the area of Aberdeen and 75th?
A. More 74th.
Q. Okay. And you told him to get out?
A. I just stopped and -- yeah. "Get the fuck out."
Q. Okay. The -- where did you go after David got out?
A. I took Londell home.
Q. Okay. And where did Londell live?
A. At that time, I believe it was -- it was on Ashland. I want to say 87th. Possibly 88th and Ashland.
Q. Okay. Was there anybody else in the car



that you had -- that you let out that night?
A. No. Londell was -- oh, and --
Q. Peteman?
A. Yeah. The guy that -- yeah. Told him, he -- told Day-Day to "Get the fuck out."
Q. Did Peteman get out at the same time as David?
A. Yes.
Q. All right. Prior to pulling over, did David say anything to the effect of, "I want to see if these are the guys who shot at me"?
A. No.
Q. Did David say anything to the effect of -- or did anybody say anything to the effect of, "These are the Bricks who shot at us"?
A. I don't recall anyone saying anything on that ride home. Other than "Bricks" and "Pull over," I don't recall anyone saying anything ever.
Q. Londell Harper testified at his deposition yesterday that when you pulled over, David got out of the car, and you got out of the car with him. Is that true?
A. I don't recall no such thing like that. And I don't -- damn sure don't recall getting out of no



vehicle.
Q. Okay. Do you have reason to believe that -- or do you disagree with Londell, his version?
A. I strongly disagree with that.
Q. Okay. What did you do after you dropped off Londell?
A. I went home.
Q. Okay. At some point before you went home, did David tell you what happened?
A. No.
Q. Do you have any idea what happened?
A. No.
Q. Okay. The car that was chasing you, David testified that there was only two choices to believe when you're being chased in that neighborhood at that time of night: It's either rival gang members or the police. Do you agree with that?
A. I would -- yeah. I would be inclined to agree with that, for certain.
Q. And when you were being chased that night, was that in your mind, that this was either GDs or police chasing you?
A. Well, honestly, it wasn't in my mind that anything was going to happen that night. But when I

seen lights, just big lights in my rearview mirror, I had no other recourse to think that it was nobody nice.
Q. Well, I'm talking about something a little more specific. So in the moment, you realize you're being chased; there's headlights up against your car in the back, which causes you to speed down 73rd, going up to 70 to 90 miles an hour, if your car can go that fast; right?
A. Yeah.
Q. Well, obviously, you were afraid of something; right?
A. Definitely.
Q. Well, what is it about that car chasing you that you were afraid of?
A. Those big lights in my rearview mirror.
Q. Which meant one of two things; right?
A. As you have stated, it would either have been the police -- and I was damn sure hoping it wasn't no gang members.
Q. Right. Because that would have been worse than the police?
A. At that time, for certain.
Q. Okay. Did you tell your parents what



happened when you got home?
A. No.
Q. Prior to detectives showing up at your house -- or police came to your house. Not detectives, but uniformed police officers; right?
A. Yes, sir.
Q. Okay. At any point in time between the police showing up at your home and the moment you got home, did you tell your parents any of what happened?
A. No, sir.
Q. Okay. What did you think happened?
A. I honestly didn't want to know if -- if that could be a -- I had no want to know what had happened. Because in our community of color, the less you knew, the better off you were.
Q. Now --
A. And I didn't know nothing.
Q. -- as you sit here today, do you see how one could look at the events you've described and say, "Cordell Williams helped David Evans"?
MR. BECKER: I'm going to object to that. Speculation.
MR. MORAN: No, it isn't.



BY MR. MORAN:
Q. You can answer the question, though.
A. Can you repeat the question?
Q. Sure. Actually, she's going to read it back to you.
(Record read.)
THE WITNESS: To answer that honestly, I could see how one could. But only one, as I could see.
BY MR. MORAN:
Q. But what you've explained to me is that you were too intoxicated to appreciate what was going on; right?
A. That's a real cold-blooded word, to "appreciate." I don't know --
Q. Well, did you appreciate what was happening?
A. I did not.
Q. Why was that?
A. Because, at that particular time, I had no clue what was happening.
Q. Well, I think you told me -- every time I asked you if you knew what was going on, you answered that you were intoxicated; right?
A. Right.



Q. Okay. So is it your position that you were too intoxicated to understand that David had asked you to get -- open the trunk so he could get a gun and go confront some Bricks?
A. By his mere statement of what was stated to me, I was following an instruction that was given to me. So a block of wood can point away, but I followed what Day-Day told me to do.
Q. Okay. And by following what he told you to do, one way to look at that is that you assisted him with whatever it is he was doing?
A. That is one way to look at it, I guess, from your point of view.
Q. Well, let's take out the intoxication. Let's say you're not intoxicated at all. You're in your right frame of mind. Everything happens exactly the way it did.
A. Hyperbole.
Q. Not hyperbole. You mean a "hypothetical"; right?
A. Hypothetical. That's what I would mean.
Q. Okay. Yeah. It is a hypothetical. We're going to take your explanation of intoxication out of the picture and just say: You're driving a car;

someone tells you to pull over, "There's a Brick." David says, "Pop the trunk" and gets out of the car. And you do it.
In your mind -- and let's say it's somebody else. It's not you -- in your mind, is the person who popped the trunk assisting David in what David is planning to do?
MR. BECKER: I'm going to object to speculation.
BY MR. MORAN:
Q. Are you able to answer that question?
A. In hindsight, I'm not.
Q. Well, all of it's hindsight.
A. Well, it is. But at that moment, I had no knowledge of anything.
Q. No. No. No, I know. This is -- I'm giving you now the opportunity to step outside of what happened and be an observer. And we're going to say: It wasn't Cordell Williams driving the car. It was somebody else. But everything happens exactly the way you described. The person driving the car pulls over, is told to pop the trunk; the person driving the car knows there's a gun in the trunk; they know that person knows David Evans is a high-ranking gang member



and that David Evans gets out of the car.
Is that person, in your mind -- or did that person, in your mind, assist David Evans in any way, shape, or form?
MR. BECKER: Again, I'm going to object. Speculation. It calls for a legal conclusion.
THE WITNESS: It does. And I --
BY MR. MORAN:
Q. Are you able to answer the question?
A. In what mind frame do you ask that I answer that question?
Q. Your current mind frame.
A. Well, my current mind frame would say that I'm legally educated to understand the legalities of that. So therefore, having been given the legalities of it from the point of view of accountability, I wouldn't say so, because I understand the accountability aspects of having been through what I did go through. And that trauma induced -- it -- it's a lot to try and process now.
Q. Before you get into all of that, just tell me yes or no. Is it a question you can answer?
A. I could.
Q. Okay. And what's the answer? Yes or no,



did that person help David Evans?
MR. BECKER: Again, same objections.
THE WITNESS: I was just going to say, again, to the legalities of it, I understand the accountability theory.
BY MR. MORAN:
Q. Well, that's not what I'm asking. I'm asking a different question.
A. I do get that, sir.
Q. Can you answer the question I've asked?
A. I guess not to you as being one, no.
Q. Okay. That's fine.
Okay. So you're -- how long were you at home before the police showed up?
A. I can't say. I would guess maybe an hour. I had drifted off to sleep.
Q. Okay. Now, I would think after an experience like that, having to speed away after hearing gunshots and being concerned that you're being chased by somebody, you were kind of amped up; right?
A. No.
Q. No? You were able to go right in and fall asleep?
A. I did.



Q. Okay. I'm curious why that is?
A. Because I was, I guess, still possibly intoxicated. But I had no knowledge of murders being committed at that time.
Q. No, I know. I didn't say anything about murders, just that you heard gunshots; you had to speed away; you panicked and freaked out; and you were being chased. Right after an event like that, aren't you agitated or stressed out?
A. Well, even in my psychosis at that time, I was still in the so-called hood, proverbially. And I didn't know of any murder -- shootings happened a lot, but not in close proximity of what I heard them to be. So when I left, I was getting away from harm by all the -- for all intents and purposes, in my mind. So going home was comfort for me.
Q. Relaxing?
A. Absolutely.
Q. Would it be fair to say, though, that you were so upset you yelled at David to "Get the fuck out of the car"?
A. Yeah. Because I know something had happened. And if a gang warfare had gone on, why would I want to be around that? And I wasn't around

that for however long I wasn't with him.
Q. David Evans testified at his deposition that the GDs and the Black Stones were at war in May 1994.
A. Okay.
Q. Do you have any reason to disagree with that?
A. None to disagree with that.
Q. And you, I believe, just said that it was not unusual to hear gunshots?
A. It was not in the hood.
Q. Okay. Was it unusual to hear gunshots in the vicinity of 74th and Halsted?
A. It was unusual to hear gunshots in my vicinity, of close proximity to me.
Q. Because you tried to avoid that?
A. I was absolutely trying to avoid that. Who would like that?
Q. But you had been in the vicinity of gunshots before; right?
A. And didn't like it.
Q. Yeah, I understand. But my question is: Had you been in the vicinity of gunshots before?
A. Yes. And didn't like it.
Q. Many times; right?



A. Enough times to know I didn't like it.
Q. Got it. Okay. I'm curious -- once you realized -- you said it was like five to ten seconds before the chase -- the car stopped chasing you?
A. I would guess so.
Q. How long did it take to get to Aberdeen and 75th?
A. I couldn't tell you.
Q. Five minutes?
A. Five minutes? To get four or five blocks?
Q. A minute? Two minutes?
A. That would still be -- based on the one individual, I guess, seconds. Like five or ten seconds. Is that what you said?
Q. How long had the car stopped chasing you before you dropped off David?
A. Well, I recall the car chasing me down Halsted for approximately the end of that block. I honestly don't even recall if they turned left with me or not. And then I honestly don't recall where I was going to. I just knew I didn't want to be there.
Q. Right. But you just testified that you dropped David somewhere in the area of Aberdeen and 75th.



A. Right. I knew where I didn't want to be. I didn't want to be over there in that area with GDs or -- Halsted or nowhere over there. That was not a conducive area to -- proximity-wise of harm or --
Q. Once you --
A. -- not being harmed.
Q. Once you got away and realized that you had gotten out of that area and you weren't being chased, why be upset with David?
A. Why not? I mean, he had just been the cause of shooting that I heard.
Q. But you knew that David carried a gun and was frequently the cause of shootings; right?
A. I did know that he was frequently to be known to be involved in this. However, he was getting out. And I was merely relaxing, what I thought to be relaxing. Because I had closed my eyes.
Q. Were you relaxing at the moment you told David to "Get the fuck out of your car"?
A. Not at all.
Q. At that time --
A. There was no relaxing in the moment about that.
Q. You were agitated; right?



A. I was perturbed, to say the least.
Q. Okay. And after you got out of the car, is that when you started to relax?
A. By that time, I was trying to get home.
Q. Right.
A. If I could have, I would have went straight home.
Q. Okay. So do you know why the police showed up at your home?
A. I did not know why at the time when they did.
Q. Eventually, did you learn?
A. I did learn, eventually.
Q. And what did you learn was the reason the police came to your home?
A. They said that -- at some point, I was made aware that a body or a murder had happened and that another was on life support.
Q. Right. Let's -- I'm going to be even more basic than that.
How did the police who responded to this crime know to go to your house? Did you ever learn that?
A. No, I didn't. But I can only guess that --

188

the license plates, I'm guessing.
Q. That's right. The person following you, the police officer who was chasing you, took down the license plate.
A. Uh-huh.
Q. You have to say yes or no.
A. Oh, yes. Excuse me. Excuse me.
Q. All right. That's a reasonable thing for a police officer to do: Observe the crime, take down the license plate of the car getting away?
A. Yes.
Q. Okay. And it's reasonable for the police to go to your house, where the car is registered?
A. That is correct. Excuse me.
Q. I'm sorry. And it's reasonable for the police to ask you to come in for questioning?
A. To ask.
Q. Or to arrest you even; right?
A. Yes. Because I was arrested. Yes.
Q. You were driving the car that got away from the murder?
A. I was driving the car, yes.
Q. And when the police came to your house, don't you agree that that would have been enough

189

information for police to take you -- to arrest you and take you down to the station?
MR. BECKER: I'm going to object. That's calling for a legal conclusion.
THE WITNESS: I believe that was cause to be taken into custody.
BY MR. MORAN:
Q. Okay. Right. You're the driver of the getaway car.
A. Okay.
Q. Before the police know anything else, and they know that you were the one driving the car, don't you think it's reasonable for the police to take you in for questioning?
A. Before they know anything else, yes.
Q. Okay. And at the time that you were taken from your home to the police station, did you explain that you didn't know David was going to get out and shoot anybody?
A. Oh, I didn't know that was the end of the question.
Q. Yeah. Did you explain that when the uniformed police officers were at your house, ready to take you to the police station?

190

A. No, sir.
Q. Okay.
A. I wasn't asked to explain that.
Q. Okay. You didn't say anything; right?
A. No, sir. Well, yes. I didn't say anything. Yes, I didn't say anything.
Q. Did the police inform you when they came to your home that morning that somebody had been killed?
A. They did not inform me of that, no.
Q. All right. At what point did you first learn that somebody had been killed?
A. I learned that in the back seat of the car out front of my house.
Q. In the back seat of the -- a police car?
A. Yes.
Q. Got it. So did a police officer tell you at that point that somebody had been killed?
A. Yes. In the back seat of the car out front of the house. Yes, sir.
Q. At that moment in time, did it dawn on you David had shot somebody?
A. No. Because I still hadn't known what had happened. I -- I -- just simply hadn't known expressly what had happened. I never asked.

191

Q. I'm not asking that question.
At the point you learned that somebody had been killed, you also knew that you had pulled over at David's instruction -- or somebody's instruction -- that there was a Brick who had been spotted, a GD, and David had told you to pop the trunk where he put the gun; right?
A. Uh-huh.
Q. You have to say yes or no.
A. Oh, yes. Excuse me.
Q. That's okay. And you knew all of that at the moment the police officer told you that somebody had been killed over there; right?
A. Yes.
Q. Did it dawn on you that David had shot somebody at that moment in time?
A. No.
Q. When did you first realize that Day-Day must have shot somebody?
A. When I realized that I was being charged with the murder and that I didn't do the murder.
Q. Okay. Let's talk a little bit -- okay. So let me just break that down a little bit.
A. Okay.

Q. You had been -- you were taken to Area 1; right?
A. Yes.
Q. You know what Area 1 is?
A. I believe that to be 51st and Wentworth.
Q. Correct. Okay. And you were questioned at Area 1?
A. Began questioning, yes.
Q. Okay. And, eventually, when you were informed that you were being charged with murder, that was also at Area 1?
A. Yes.
Q. All right. And I think I've read in your complaint that you were at Area 1 for a long period of time?
A. I was.
Q. All right. And the first time you realized that it was David who shot somebody was after you had been charged with murder?
A. I would say yes. Yes.
Q. And during the time you were being questioned for that, it didn't dawn on you at all that David had gotten a car -- a gun out of your trunk and shot somebody?



MR. BECKER: That's asked and answered already. You've asked the question about two or three times.
MR. MORAN: No, I have not.
THE WITNESS: Could you repeat the question?
MR. MORAN: She'll repeat it for you.
(Record read.)
THE WITNESS: It had not dawned on me David had shot someone.
BY MR. MORAN:
Q. Okay. Okay. So I want to talk about what happened at the police station, at Area -- 51st and Wentworth, Area 1. If I say it's Area -- if I call it "Area 1," you'll know what I'm talking about; right?
A. Okay. Yes, sir.
Q. Okay. The -- the uniformed police officers talked -- brought you to that police station. In the time that the officers took you from your home to the police station, did anyone -- any police officer, any uniformed police officer do anything abusive to you?
A. From the time they took me from my home --
Q. To the point they dropped you off at the -- at Area 1?
A. No, no one had did anything to me at that



point. No.
Q. Okay. And where were you brought when you were first brought to Area 1?
A. I honestly don't recall. I know at some point I wound up in a holding cell.
Q. Okay. When you were taken from your home to the police station, were you handcuffed?
A. Yes.
Q. Behind your back?
A. Yes.
Q. Okay. And you were placed in the back of a squad car?
A. Yes.
Q. Okay. Did your mother or father come to the police station where you were at?
A. I was told that my father and someone else did. I don't know if that was my mother or what. I hadn't known that that was my mother or what at that time.
Q. From the moment you first arrived at Area 1 to the moment you were taken to Cook County Jail, did you have a chance to see your father at all while you were at Area 1?
A. I did.



Q. Okay. And you had a chance to speak with him?
A. I did.
Q. Okay. Did you have an opportunity to meet with your father more than once?
A. No.
Q. Okay. How long was the meeting between you and your father?
A. Brief.
Q. And was it just you two alone in a room?
A. Yes.
Q. Okay. When did you first meet a detective who started asking questions about what happened?
A. I would say almost immediately --
Q. All right.
A. -- upon arriving at the station.
Q. So I think you mentioned that you were brought to a lockup when you got there.
A. I said I found myself in the lockup at some point -- or holding cell.
Q. Okay. Sorry. I misunderstood. So let's go to when you first got there.
At that time, was there a second floor to this building at Area 1?

A. I believe so. But I honestly can't recall. As a matter of fact, I believe there was. There had to be. Because if I recall correctly, I went upstairs from a holding cell at some point.
Q. Okay.
A. So I am guessing that yes, that would have to be the situation.
Q. And is that where -- on that -- in that upstairs area, is that where the questioning took place?
A. I would say yes.
Q. Okay. The -- were you brought into a room, like a little room for questioning?
A. I was.
Q. That's where you -- and this room where you were first questioned, can you describe it for me?
A. The room I was first questioned in was -- if I recall correctly, it was, like, a -- it was a mediocre little room.
Q. Tell me what "mediocre" means.
A. Relatively small, by accounts. I would say maybe 6-by-10, possibly.
Q. Bigger than a jail cell? Or I'm sorry. Like, the cells when you were at Stateville or Menard, how big were they?



A. I would think about that size. Either 6-by-10 or 6-by-12.
Q. Roughly the same size?
A. Roughly, yes, sir.
Q. Okay. Was any furniture --
MS. MEADOR: One second. Counsel, the nodding.
MR. BECKER: Pardon?
MS. MEADOR: The nodding.
MR. MORAN: You're nodding. When he answers, you nod, as if you're affirming, like coaching him. She's worried you're coaching him.
MR. BECKER: Oh, I'll try to keep my head straight.
MR. MORAN: It's all right. We've got to make sure there's no improprieties.
BY MR. MORAN:
Q. Okay. So was there any furniture in this room?
A. Not in the first room, that I recall, no.
Q. Okay. How many rooms were you questioned in?
A. I believe two.



Q. All right. Now, let's just focus on the first room. Was there a table in it?
A. I don't recall there being a table in one of the rooms, and I believe that to have been the first room.
Q. Was there a chair?
A. I believe so.
Q. Was there a bench?
A. Definitely a bench.
Q. Were you handcuffed the entire time you were in this first room?
A. I honestly don't recall if I was handcuffed behind my back or to the bench at that point. Or possibly handcuffed to -- or sitting behind my back on the chair. I honestly don't recall.
Q. Okay. Was there -- did you see, like, a giant ring or a big ring on the wall?
A. A ring?
Q. Yeah.
A. No. Not if you're speaking about a ring bench or a ring to the bench.
Q. No. Just, like, a big circle attached to the wall?
A. I don't recall that.



Q. How about the second room? Did you ever see one of those in the second room?
A. Not no big ring attached to no wall. I recall a ring attached to the bench.
Q. To the bench?
A. Yeah. That's what they handcuffed us in.
Q. Did you get handcuffed to that ring attached to the bench?
A. I did. Yes, I did.
Q. Were you handcuffed to the ring to the bench during the entire time you were being questioned?
A. Yes.
Q. So, in other words, there was never a moment in which your hand -- one of your hands was not cuffed?
A. Well, in the first instance, I was -- well, in the first room, I was cuffed behind my back. But in the second instance, I believe I was cuffed to the ring on the vents on the wall. Well, not the -- it didn't connect to the actual wall; it connected to the bench.
Q. So, in other words, your hand was down by your side?
A. Precisely.

Q. And one hand was cuffed and the other cuff was around that ring?
A. Precisely.
Q. Okay. Was that uncomfortable, to have your hand cuffed to the ring?
A. Absolutely it was.
Q. Was it painful?
A. Not at the time that -- not at the beginning. No. If you weren't resisting or nothing, no.
Q. Okay. And, by the way, someone who is being questioned for a murder, the police don't know whether they have done it or not, is it reasonable, in your mind, for that person to be -- have one hand cuffed to a ring during the questioning?
A. I hadn't been questioned before for a murder before; so I wouldn't know.
Q. Well, as you sit here today?
A. Well, after years of understanding, I would think not. Or I would think that to be the norm, after years of understanding.
Q. Okay. Is that a reasonable thing for police to do, to handcuff a suspect to a ring while -- in an interrogation room or a questioning room when they



talk to the person about what happened?
MR. BECKER: I'm going to object on speculation again.
BY MR. MORAN:
Q. Go ahead.
A. It is now, having knowledge of what has been done -- reported.
Q. So when is the -- you said questioning began almost right away when you were put in the first room?
A. Yes.
Q. But I want you to tell me if you know who the person was that was asking you questions?
A. I honestly can't say if it was Dwyer or Garkey, with a "G." But I believe that, detective-wise, it was Dwyer.
Q. Okay. Did you ever hear of a name Stellick [phonetic]?
A. I saw that name in my transcript, if I ain't mistaken.
Q. Do you remember a person by that name?
A. If I recall correctly, it's a police name.
Q. Right.
A. A CPD name.
Q. Well, I know you know the name from reading



it. But do you remember a person --
A. No.
Q. -- called Stellick?
Can you describe Dwyer for me?
A. I actually don't know the difference between him or Garkey. But the guy that actually -- he was an elderly gentleman -- aging gentleman, approximately late 40s to early 50s, had glasses, liked to wear a suit and tie -- excuse me. Not suit and tie, but suit jacket like. And he had on blue that day with a tie, a long tie. And he had his hair kind of cuffed over but not fluffed out.
Q. You just described almost all of the detectives.
A. I know it was the one that had on the blue jacket.
Q. All right. So other than the description -- is there anything distinctive about the first detective who questioned you that you could tell me?
A. Well, I wouldn't know that. I'm just seeing that first distinctive detective as either Dwyer or Garkey, with a "G."
Q. How long were you questioned in the first room?



A. I would say maybe 20 minutes approximately or so. It could have been longer.
Q. Say, 20 to 30 minutes?
A. Possibly.
Q. Okay. And how many times overall did you have a session where you were questioned in Area 1?
A. I can't actually say. Just questioning?
Q. Yeah. So let me just ask you this. Give you a little context.
Was it a situation in which you were just asked questions straight through for the entire time, or was it you were asked questions for a brief period, then there was a break, you were left alone, and then somebody came back in and asked questions, and then a break, and left alone?
A. I was questioned, then a break, and left alone for a minute. And that happened a few times, I believe.
Q. So I'm going to try and jog your memory. We'll call them "questioning sessions"; is that fair?
A. No.
Q. What do you want to call them?
A. Well, I'm saying it's not fair because much of the question didn't happen -- or there was some

questions that did not happen in those two rooms.
Q. Okay. There was another room, a third room?
A. No. They were just outright open questioning.
Q. Where were you when that happened?
A. I was out amongst the desk of the officers, Garkey and what have you.
Q. And was that early, middle, or late in your time at Area 1?
A. It was throughout.
Q. Okay. So --
A. Not quite as frequent or nothing, but it was throughout.
Q. Let's just focus for a moment on the times that you were in a room and questioned.
A. Okay.
Q. So there was -- people would come in, and a person would come in and question you, then there would be a break, you'd be left alone, and then somebody would come back in?
A. Well, specifically for the two questioning rooms or the two interrogation rooms, there was questioning, then taken out. Then, at some point, I was brung back for questioning in the -- well, no --



for holding in the interrogation room, where Foley came in, and, as I say, "tenderized" me. I use that to try and associate what he'd done to me.
Q. All right. Did the first detective who spoke to you -- I think you said it was Dwyer and Garkey and -- was it just those two?
A. Just those two, or possibly one and the same. But I'm just -- I couldn't remember which was which, as far as name-wise.
Q. Okay. We're just going to start from the beginning and work through it. And do your best to tell me who is who and what's what.
A. Yes, sir.
Q. All right. We're talking about this first moment that you're in this room with Dwyer and Stellick and the room is roughly the same size as a prison cell or a jail cell?
A. I don't recall a Stellick.
Q. Okay. I'm sorry.
A. I don't know who that is.
Q. I said Stellick. I meant Garkey.
A. It could have been Garkey.
Q. Okay. And you said it lasted 20 to 30 minutes?



A. Yes.
Q. Did they ask you questions?
A. They did. But I don't recall that portion of the interrogation, to tell you the truth. There was nothing rugal out of the way of what, you know --
Q. Okay. Well, you kind of jumped to my next question.
Did either one of these detectives do anything abusive to you?
A. No. They actually took me out to search for Londell.
Q. All right. We'll get to that in a second.
Did either one of these detectives threaten you in the first questioning -- the first session of questioning?
A. No, sir.
Q. Did either one of these detectives make any promises to you in the first questioning -- session of questioning?
A. No, sir.
Q. Did either one of these detectives -- or strike that.
Did you bring up the name "Daybreak" or "Day-Day" to either one of these detectives in the



first session?
A. I don't recall that.
Q. Okay. Did you tell these detectives everything you knew about what happened that night?
A. Yes.
Q. So you told them that you were driving home from a party, that Day-Day was in the car, that someone said there were some Bricks, and Day-Day told you to pull over, and Day-Day told you to pop the trunk?
A. No, I didn't tell them that.
Q. Why not?
A. Because they didn't ask that. What they asked me was where I was at and those types of questions. And when I told them about what had happened that day and how it wound up, we went out to look for Londell Harper.
Q. So you gave them Londell Harper's name?
A. I was with Londell Harper, yes.
Q. You were also with Day-Day; right?
A. But Day-Day came about that evening, later that evening. Yes.
Q. Did the detectives ask you where you were at roughly midnight or 12:30 in the morning on May 26,

1994?
A. They got around to that. However, they didn't lead with that. They asked me how did my -- how did the day go, for the most part.
Q. Understood. So what I'm asking now is, in that 20 to 30-minute session with the first group of detectives, were you asked where you were on May 26, 1994, at roughly 12:30 in the morning?
A. It came up. Yes, it did. Yes, sir.
Q. Did you tell them that you had been with Day-Day?
A. No, I didn't.
Q. Did you tell them that you were told to pull over after someone had spotted Bricks?
A. I did state that, if I -- yes, I did.
Q. And did you tell them that Day-Day told you to pop the trunk?
A. I did not tell them Day-Day told me to pop the trunk at that time.
Q. Did you tell them that Day-Day had put his gun in the trunk before you left Vino's?
A. No, I didn't.
Q. Why didn't you tell these detectives those facts?



A. Again, I hadn't been asked for that level of detail.
Q. Of course, they wouldn't know to ask you that specific type of question; right?
A. I guess not.
Q. They just asked you what happened; right?
A. Yes, sir.
Q. Isn't that part of what happened?
A. As far as what?
Q. Isn't Day-Day putting a gun in the trunk and Day-Day telling you to pop the trunk just before you hear the gunshots, isn't that part of what happened?
A. Well, yes, it is. Yes, sir.
MR. MORAN: Okay. Let's stop right here. She's got to take a break.
THE VIDEOGRAPHER: We're going off the record at 3:02 PM.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Media Unit 4. We are going back on the record at 3:12 PM.
BY MR. MORAN:
Q. All right. You ready to get going again, Mr. Williams?



A. I am.
Q. All right. You know, I forgot to ask you a quick question. When you were leaving the -- you know, you're driving back from the scene, you sped away, and you drop off David Evans. And I think you mentioned that you were tired, and you just wanted to go home; right?
A. I did.
Q. Didn't Londell Harper live in the area of 88th and Ashland?
A. I think I made mention of that. Yes.
Q. Okay. Why not just ask him if he wants to crash at your house?
A. That was no -- no. That was not an option.
Q. Why not?
A. I wouldn't -- I was going to my house. There was no option for him to go to my house at no point. For what?
Q. Isn't he one of your friends?
A. Again, he was not a near-and-dear friend. He was a youngster as well at one point. But I knew him to not be involved with much of anything.
Q. So he's not someone you would have allowed to stay over at your house?



A. You said he's not someone that?
Q. You would have allowed to stay at your house?
A. Well, my parents would never allow no one outside of anyone they knew --
Q. Okay.
A. -- to stay at their house.
Q. Okay. Now -- all right. So when we were talking about your interview with the first set of detectives and the -- that lasted 20 or 30 minutes. And we -- before the break, I was asking you about what, you know, you may have told them about Day-Day. And you did not tell them anything about Day-Day's involvement at that point in time?
A. You said tell who?
Q. The two detectives who first questioned you?
A. No. Well, they asked me what had happened. And I think -- I did mention Day at that point or David at that point -- or Day or David at that point.
Q. In the first interview with these two detectives?
A. I believe so, if I'm not mistaken, yes.
Q. Okay. Because you told me before that you didn't.

A. No. What I stated before was that they asked me about what was the -- what went on with me that day.
Q. And what did you --
A. And I told them what I had did that day.
Q. And you agreed that they also asked: What happened at 12:30 in the morning on May 26, 1994; right?
A. Well, actually, that's what you agreed. But I did state that that was part of what happened, yes.
Q. Okay. Well, I don't want to split hairs with you, but that's what happened; right?
A. Well, yeah. I said what had happened that day --
Q. All right.
A. -- in the course of that. But yes. Yes.
Q. So did you tell them that -- I think you just told us that you did not mention to these first sets of detectives that Day-Day had put his gun in the trunk of your car?
A. Well, it was 30 years ago, but I did state what had happened that day. I mean --
Q. Did you tell these first two detectives that Day-Day had put the gun -- a gun in the trunk of your



car before you left --
A. I honestly don't recall what I stated outside of what I did state that evening. If it is part of that record, I had --
Q. Listen, you're going too far afield. It's just a yes-or-no question. Okay? I don't want to be here forever. You either did or you didn't.
Did you tell these two detectives that Day-Day had put a gun in the trunk of your car before you left Vino's?
A. I honestly don't recall.
Q. Did you tell these two detectives that somebody in the car told you to pull over near 74th and Halsted because they saw a Brick?
A. I believe I did.
Q. Okay. And did you tell these two detectives that Day-Day got out of your car and told you to pop the trunk?
A. I don't believe I said "Day-Day" at that time, but --
Q. Did you tell them that anybody got out of the car and said "pop the trunk"?
A. I believe I did. Yes.
Q. Okay. And why didn't you say "Day-Day"



then? Why didn't you tell the detectives it was Day-Day who got out of the car -- or who said "pop the trunk" and got out of the car?
A. Well, I honestly don't know if I did or didn't say that at that time. It was 30 years ago, sir. And --
Q. So here is my question for you: Let's assume for a minute that you did tell these detectives, these first two detectives, that Day-Day, who you knew to be David Evans, had done these things -- put the gun in the trunk and then later on told you to pop the trunk so he could -- and then got out of the car -- if you did tell these detectives that, why were you looking for Londell Harper?
MR. BECKER: Objection. Speculation.
THE WITNESS: Well, I've got to go --
MR. BECKER: You can go ahead and answer.
THE WITNESS: Okay. Well, Londell Harper, I knew his name.
BY MR. MORAN:
Q. Well, hold on a second. Did you know Day-Day's name on May 26, 1994?
A. I knew him as Dice's nephew. I didn't --
Q. Did you know he was David Evans?



A. No, I didn't.
Q. You did not know his name at all?
A. I did not know David Evans' name. No, sir.
Q. You just knew him as Day-Day?
A. I just knew him as Day-Day. Yes, sir.
Q. Okay. And you told these detectives that -- you used the name Day-Day with the detectives?
A. Yes. I used the name Day, not even Day-Day.
Q. Well, that's what I -- I'm asking --
MS. MEADOR: Counsel, your headshaking, please stop.
BY MR. MORAN:
Q. I'm asking if you used the name Day-Day with the first set of detectives?
A. I know I didn't use Day-Day with the first set of detectives.
Q. Because that's a unique nickname, isn't it?
A. Well, not really in the hood. You have a Day-Day in several different locations.
Q. Did you tell these detectives that the person who got out of your car who told you to pop the trunk was the nephew of Dice?
A. I couldn't have said that. No, sir.
Q. Why not?

A. Because, at that time, I -- I'm trying to go back to that frame of mind of exactly at that time.
Q. Okay. Well, let me ask you this: If you had told the detectives that it was Dice's nephew who got out of the car and said "pop the trunk," would you have been putting yourself in harm's way?
A. I would have.
Q. Would you have been killed?
A. I could have.
Q. Okay. At this point in time, when you're being questioned by detectives, you still didn't know that Day-Day was the one who had shot somebody; right?
A. I hadn't known to what degree or to the extent that things had transpired in that. I didn't --
Q. Well, that's not what you testified to. Remember, I asked you when it first dawned on you that Day-Day is the one who pulled the trigger, and you said, "It wasn't until I had been charged." That's hours and hours later, isn't it?
A. To my knowledge, I would guess so.
Q. So what's the harm in giving up Day-Day's name and giving some help to the detectives to identify who Day-Day is when you were first talking to



the detectives?
A. As I said, when I first talked to the detectives, they asked me what had happened. So, at that time, I was not asked for Day-Day's name; I was asked what had happened.
Q. Did the detectives ask you for Londell Harper's name?
A. They did.
Q. They said, "Do you know Londell Harper"?
A. They said, who was I with?
Q. Okay. Did you give them all the names?
A. I did.
Q. Including Day-Day?
A. What I knew of Day-Day, yes.
Q. Except that you knew Day-Day to be a general or the son -- the nephew of a general, and Day-Day to be an enforcer, and Day-Day to be a ranking member in the gang; right?
A. Yes. I knew him as the general's nephew or the young general. Yes.
Q. Did you tell these detective that information?
A. I told them that I was with Day and Londell Harper.



Q. I want you to answer that question.
Did you tell these detectives that Day-Day was the young general, the nephew of the general, named Dice, of the Black Stones?
A. No, I did not say that.
Q. When -- what led to the detectives asking you -- no. First, let me ask you this: At what point were you asked to go out and find Londell Harper? Was that after this first session, or was it after a different one?
A. After the first session.
Q. Okay. And how long were you out looking for Londell Harper?
A. Approximately two hours or so.
Q. Where did you take the detectives to find Londell Harper?
A. Well, I took them straight to where I knew I dropped him off at.
Q. Where is that at?
A. 88th and Ashland.
Q. Before you dropped off Londell Harper, did the two of you talk about what happened?
A. The two of who?
Q. You and Londell?



A. No.
Q. Because you had to drive from 75th and Aberdeen to 85th -- or 88th and Ashland; right?
A. Right.
Q. That's at least a mile; right?
A. At least.
Q. During that time frame, did you talk to Londell Harper at all about what happened?
A. I don't recall talking to him because I was, for one, trying to figure out what happened. I'm guessing he's possibly still intoxicated because I know I was heavily intoxicated. But it did kind of, like, blow my high.
Q. Well, your high has been blown; you heard gunshots; you're agitated because David started something that could have gotten you in trouble or gotten you hurt. And there's no conversation between you and Londell Harper as you drive him home that night?
A. No, not that I recall. None.
Q. Did you talk to each other about what might happen if the police --
A. I don't recall talking to him, period.
Q. I know. I'm just trying to jog your memory.

A. I'm just trying to say what I remember.
Q. I know. You're telling me you don't remember, so I'm going to throw some things out there to see if you do remember.
A. Okay.
Q. Did you talk to Londell Harper at all about what the two of you might say if the police come calling?
MR. BECKER: Objection. Asked and answered already. He said he didn't have a conversation.
MR. MORAN: Okay. Do you want to help him with any other answers?
MR. BECKER: Pardon me?
MR. MORAN: Because that's coaching. So I would appreciate it if you're not coaching him.
MR. BECKER: I have a right to make an objection.
MR. MORAN: Then make it. That's not -- saying what he's been asked or not is not a proper objection.
BY MR. MORAN:
Q. Did you have a conversation with Londell Harper on the way home about what you had talked about if the police -- what you would say if the police came



calling?
A. No, I had no conversation with Londell.
Q. Did you have any conversations with Londell Harper on the way to dropping him off about the fact that Day-Day, who you know to be a loose cannon, had done something again that you would consider part of being a loose cannon?
A. I had no conversation. None.
Q. Now, you're sure you had none?
A. I'm positive I had no conversation or recollection of a conversation that I had with Londell Harper.
Q. Okay. During the time -- how long after the first session of questioning were you taken out with the detectives to look for Londell Harper?
A. That was -- we -- after I was interrogated that first time, we immediately went out and canvassed the area or the neighborhood.
Q. All right.
A. But we went over east first, prior to getting to Londell's house, which is the sequence of events that I'm guessing you're trying to get to.
Q. Well, no. I'm not trying to get anywhere. But --



A. Okay. Excuse me.
Q. -- thanks for sharing that.
So, to be clear, when you went out with the detectives to find Londell Harper, you started off going east. By that, do you mean you went over to the vicinity of where Vino's party or gathering was?
A. That is correct.
Q. Okay. And then you worked your way back west?
A. That is correct.
Q. Did you follow the same route that you had taken?
A. We did.
Q. Now, if I'm not mistaken, you would have gotten to Area 1 at roughly 1:30 in the morning?
A. I don't know the time.
Q. I believe you said you got home, were asleep for about an hour, and then the police came; right?
A. Roundabout. Yes. That's what happened. Yes.
Q. Okay. And did the police talk to your parents first, the uniformed police?
A. I have no clue.
Q. All right. Did you get to the police



station roughly around 2:00 o'clock in the morning then?
A. I can't say what time it was.
Q. All right.
A. I don't know.
Q. How long were you in Area 1 before the questioning began in that little room with the two detectives?
A. I honestly can't remember that far back. I know it wasn't that long, but I can't say what time it was --
Q. Sure.
A. -- or wasn't.
Q. That's okay. So if you were brought in around 2:00 in the morning, questioning starts, maybe, like, 2:15. 20 to 30 minutes go by, it's 2:45. Right after the questioning, you were taken out on the road with the detectives to find Londell Harper. So you're on the road for two hours with the detectives. Now it's 4:45 in the morning.
A. No, sir.
Q. Okay. What part of that is wrong?
A. I know it was daylight when we went out or left out. So that was after 7:00 AM.

Q. Do you know when the sun comes up and daylight occurs in late May?
A. No clue in that portion of late May.
Q. Okay. Would you be surprised to learn that it comes up as early as 6:00 o'clock?
A. In that day and time, I'm fairly certain Google could find that out.
Q. Okay. So you would defer to whatever Google says about the sunrise on May 26, 1994?
A. About the past, yes.
Q. Okay. That's fair. You knew you had dropped off Londell Harper at 88th and Ashland?
A. Uh-huh.
Q. The detectives started looking at 83rd and Houston; right?
A. Yes.
Q. Did you tell the detectives, "Don't go there. I dropped him off over at 88th and Ashland. There's no reason for him to come all the way back in the few hours that I've been here"? Did you tell the detectives something like that?
A. No. I had no need to. Because the detectives were not over on 83rd and Houston looking for Londell. They already knew where Londell was.



Q. I thought you said they took you to 83rd and Houston to look for Londell Harper?
A. No. I said they took me out to 83rd and Houston. And then we went -- we did go out looking for Londell, as you stated.
Q. Well, that's actually what you stated.
A. Okay. But it actually was you who brung up regarding the Londell --
Q. Okay.
A. -- finding. But I'm getting where you're going.
Q. So why did you go to 83rd and Houston?
A. That's where Vino stayed.
Q. Okay. Were they looking for Vino too?
A. They -- those group of detectives had asked me what had happened that evening.
Q. Okay.
A. I was on 83rd and Houston with Vino at Vino's house, Vino and Chris prior to going to see Paris Macklemore. And when we came back to 83rd and Houston, where I was drinking and smoking and partying with the females who were there --
Q. So they just took you wherever you had been?
A. Precisely.



Q. Okay. What time of day did you get back from being out looking for Londell Harper?
A. I definitely wasn't able to look at my watch. I was handcuffed. I can't say. Midday-ish. I don't know.
Q. It was morning?
A. It could have been still morning.
Q. Okay. You're brought back.
Now, during the time you're in the car with these detectives, did they do anything abusive towards you?
A. No. Not -- not -- not Garkey or whomever I was with. No, sir.
Q. So up to the point where you're questioned for the first time, taken out with the detectives to look for Londell Harper, to the point you were brought back to Area 1, had any police officer or detective done anything abusive towards you?
A. No, sir.
Q. Had any police officer or detective raised a voice with you?
A. No, sir.
Q. Had any police officer or detective threatened you?



A. No, sir.
Q. Had any police officer or detective promised you anything?
A. No, sir.
Q. Okay. So now we're back at Area 1. What happens next? They take you out of the car. Where do they bring you?
A. Again, it's 30 years ago. But I'm somewhere in that police station at Area 1.
Q. Okay.
A. And then, at some point, I found myself in the interrogation room. And this interrogation room, there was a desk to the -- when you entered, to the left. And this is where I had seen my dad at, at some point. But in this interrogation room, there was a desk to the left and the ring with the -- with the stool -- with the -- not the stool.
Q. The bench?
A. The bench.
Q. Okay.
A. And --
Q. Were you left alone in this interrogation room?
A. I believe I was, if I'm recalling correctly.

I was left alone briefly, if I'm not mistaken.
Q. How long do you think you were left in this interrogation room?
A. I can't say for exactly how long it was.
Q. Okay.
A. Not for very long, though.
Q. And when you -- what's the next thing that happened -- you remember happening?
A. Honestly, I believe I was given something to eat at one point or another. Excuse me.
Q. And what -- this would have been at some point between you being dropped off from looking for Londell Harper and the point when the next questioning occurred?
A. Yes. I believe I was given a Champ Burger. I recall that for certain.
Q. A what?
A. A Champ Burger -- Checkers.
Q. All right. How about anything to drink?
A. Yes. An orange pop and Champ's fries. The fries with -- the crispy fries.
Q. Did you request Champ's or was that just given do you? I mean Checkers.
Did you request Checkers, or was that



given to you?
A. Yes. Because, at that point, there was a Checkers across the street. And I had seen that coming back in. And I believe they asked me did I want something to eat, if I'm not mistaken about that.
Q. Okay. And were you allowed to use the restroom too?
A. I don't actually recall.
Q. Did you -- up to this point in time where you got the food, had you asked for time to use the restroom?
A. I honestly don't recall. I know I wasn't in that holding tank much after that or the holding cell much after that.
Q. That's the first one you were in?
A. Yes. When I first got there, I was in a holding cell.
Q. So were you given a chance to eat your food?
A. I was.
Q. All right. What happened next?
A. Vaguely, the sequence of events escapes me. But I do recall going -- at some point, my dad came. Or they told me at some point my dad was there. And, at some point, I recall them -- I don't know where



they came and got me from, though. I don't know if I was out being -- if I was out in the --
Q. The main area with all of the desks?
A. Right. And I don't recall if I was there or where exactly I was at that point. But at some point, they did come and get me and bring me to my father.
Q. Now, when you were brought to your father, were you brought to him in a different room?
A. Yes. I had went to the room with the desk in it. And where I was -- where I seen my dad.
Q. Now, as of the moment you saw your father, when you first laid eyes on him, had you been questioned by any other detectives besides the first two that you told us about?
A. Yes. Because, as a matter of fact, after -- after being brung back and after eating, I think O'Brien had went -- or no. O'Brien was either on his way in there -- as a matter of fact, it had to be after -- it was definitely after 12:00 o'clock because I had definitely gotten lunch. That was the purpose or the premise of why we had gotten the lunch. And I was being, I'm thinking, turned over or something to that degree. But I don't recall seeing Garkey or the other one -- Dwyer, whomever that was. I don't recall



seeing them again.
Q. All right. So you're given lunch. And then at some point after that, you speak to Detective O'Brien?
A. Yeah. At some point after that. He was the next police officer or detective that I did see.
Q. Okay. Now, how many detectives did you speak with during your time there at Area 1?
A. I distinctively remember Garkey or the -- Garkey. As a matter of fact, I believe Dwyer was his partner, if I'm not mistaken. But I think that was Garkey with the glasses and the close-like haircut to his head. But definitely wearing the blazer and the glasses. So after -- after we got back with that --
Q. So those two detectives. Now I'm trying to figure out how many more you spoke with.
We know you spoke with O'Brien; right?
A. Yes.
Q. And I think you said you talked to Foley; right?
A. Foley came in.
Q. Right. But he's one of the people you talked to; right?
A. I didn't talk to Foley. Foley -- well,

Foley didn't talk to me. Foley came in and slapped me and -- yeah. Foley didn't talk to me.
Q. Okay. We'll come back to him in a second. We're going to set Foley aside.
A. Okay.
Q. So Garkey, Dwyer, O'Brien.
A. Yes.
Q. Any other detectives that you spoke with?
A. I don't recall speaking to any other detectives.
Q. Okay. Do you remember a Detective Carroll?
A. He doesn't stand out to me. Now, if he was of those detectives that was there, then so be it. However, I spoke to Garkey and possibly his partner or --
Q. Okay.
A. I can describe him slightly. But I know his name was Garkey and/or Dwyer. But the one guy that I specifically descriptively made mention of.
Q. Okay. So you spoke with Dwyer, Garkey, and O'Brien?
A. Yes.
Q. Okay. Those are the only three you remember actually talking to?



A. Yes.
Q. All right. And as far as Foley goes, there was no talking --
A. Garkey was the perpetrator of that beating.
Q. He's the one who struck you and beat you and things like that?
A. Physically, yes.
Q. Okay. So the next detective after you've had your lunch you speak with is Detective O'Brien?
A. Yes. I believe Detective O'Brien was coming in freshly to that time slot or whatever.
Q. Okay. Can you describe him for me?
A. About 6-4 maybe. Possibly even slightly taller. But definitely a big guy, wide build to some degree. He wasn't old again. He was about maybe early 40s. Early to mid-40s possibly.
Q. And where were you when you first met Detective O'Brien?
A. He came and got me. I want to say I was already out and about, possibly. I don't recall exactly how he came -- or how I came to him. But we definitely crossed paths. And that's when he became or got to be the lead detective.
Q. Okay. And did eventually -- when you first



met him, did you eventually end up in an interrogation room, or --
A. Yes.
Q. -- some small room where you were questioned by him?
A. Yes. And as a matter of fact, I see myself out at his desk and then winding up in that interrogation room with the desk.
Q. When you were questioned by Detective O'Brien at any moment at Area 1, okay?
A. Uh-huh.
Q. Was any other detective present?
A. When questioned by O'Brien?
Q. Yes.
A. No, sir.
Q. Okay. He was always alone or by himself?
A. As far as I recollect, yes, sir.
Q. All right. Do you remember talking to an assistant state's attorney by the name of Greg Vaci?
A. Yes.
Q. Did you talk to Greg Vaci in the presence of Detective O'Brien?
A. I did.
Q. Okay. And did you also talk to Greg Vaci



alone?
A. I don't recall, sir.
Q. Did Greg Vaci ever sit with you alone outside the presence of the detectives and ask you how you've been treated by police?
A. No.
Q. That never happened?
A. No.
Q. Okay. You said Detective Foley is the one who struck you?
A. He is.
Q. All right. Was Detective O'Brien ever present when Foley was with you?
A. No, he was not.
Q. All right. To your knowledge, where was Detective O'Brien when Foley was in a room with you?
A. Well, I found out where he was because he stated as such. He stated that he went to lunch himself and turned the keys -- or went out somewhere. It was in the motion to suppress. He went out somewhere and left the keys with a sergeant. Now, at the time, I didn't even know who Foley was. He may have been sergeant, Detective Foley at that time. I don't know. But, at the time, I identified a man who

was stocky built with a mustache and balding up top with salt and pepper gray on the side. And his mustache reminded me of a Hitler-ish mustache. And when he came in and slapped the shit out of me for sure with the open hand, and the knee-jerk reaction, I'm trying to -- I just was knee-jerked goofy.

Q. Let me ask you something. You described his mustache as -- you compared it to Hitler.

A. I did.

Q. Was that one of these really narrow mustaches that are only just below the nose, just like Hitler's?

A. It was very Hitler-ish. And I recall -- it was. It was thick, though.

Q. Okay.

A. Rather thick as far as black-wise.

Q. And I'm going to ask you about what happened with Foley in a second. But I have a different question for you right now.

A. Uh-huh.

Q. Did you testify at the motion to suppress hearing?

A. No. My lawyer was citing trial -- or citing strategy. He refused to put me on the stand.



Q. Did you testify at your trial?

A. No, I didn't.

Q. Were you -- did the judge tell you during the trial that you had a right to testify?

A. Judge Gaughan absolutely did. But yet again, citing trial strategy of a drunk, I might add, David Wiener. I didn't even know he was a drunk at that time.

Q. Well, I know. But what I'm asking right now is: Did you know you had the right to testify?

A. Yes. But I was a wayward youth and had no knowledge -- no.

MS. MEADOR: I'm so sorry. Can you read back his answer? I missed it.

THE COURT REPORTER: Can you just repeat it, please?

THE WITNESS: In regards to the question of --

MS. MEADOR: Can you just read back his answer, please?

THE COURT REPORTER: I didn't get all of the answer; so I was also asking him to repeat.

MS. MEADOR: Fair enough. Fair enough.

THE WITNESS: What's the question?



BY MR. MORAN:

Q. So I'll ask the question -- you know what?

MS. MEADOR: Sorry. I thought it was easier.

BY MR. MORAN:

Q. Did you know you had a right to testify at your own trial back when the trial occurred?

A. I was advised of my rights by the judge. Yes. But as far as knowing, I didn't know anything of the legal process.

Q. All right. Well, when the judge told you what your rights were, did you understand the -- what the judge told you?

A. I did understand what the judge had spoken of. Yes.

Q. Okay. And if you didn't understand, would you have said, "Judge, can you repeat that. I don't understand"?

A. Not at that time.

Q. So you know you also have the right under the Fifth Amendment to remain silent and not testify at all? Did you know that?

A. I do now and in hindsight of that. But yet, at my wayward youth, I was trying to stick to some



believable code of not being involved.

Q. Well, I mean, it's your own trial.

A. I mean, I do get that in hindsight, sir.

Q. So -- and you were active in trying to help your lawyer defend you; right?

A. I was. However, my lawyer was not active in the legal process. He was an alcoholic and was disbarred, to my knowledge.

Q. Yeah, but that was way after your trial.

A. Way after. But he lied to my parents about coming to see me.

Q. Okay. Early on in your trial -- or strike that.

At the motion to suppress hearing, your lawyer wouldn't let you testify; is that right?

A. Citing trial strategy, yes.

Q. Okay. And then your lawyer withdrew the motion altogether?

A. Yes.

Q. All right. You were upset with that?

A. I was bewildered by that, for certain.

Q. All right. I guess my question is: Did you take advantage of your right to remain silent at your own trial?

A. I did.
Q. Okay. Did you have a good faith basis to believe that, if you had testified, your testimony would incriminate you?
A. Would incriminate me? No.
Q. Okay. So why not talk?
A. Citing trial strategy of David Wiener.
Q. Just following your lawyer's advice?
A. Just following my attorney's advice.
Q. That seems reasonable; right?
A. Absolutely reasonable.
Q. Anyone who takes the Fifth, they're doing it pursuant to a lawyer's advice, you would agree with me, that's reasonable?
A. I would agree with you.
Q. All right. And that shouldn't be held against them?
A. It shouldn't be.
Q. Okay. The -- so let's go back to your conversation with Detective O'Brien. Okay?
A. Yeah.
Q. I think you've just confirmed with us that Detective O'Brien was out to lunch when Foley came in and assaulted you?



A. I like the way you put that, "out to lunch." But yes, that is what happened.
Q. Well, I mean, that's what you said. He was off eating somewhere; right?
A. That is correct. That is what he stated, he was out to lunch.
Q. All right. You don't have any reason to disagree with that; right?
A. I do have reason to disagree with that. But again, that would be biased reasons on my portions of it.
Q. Well, I mean, do you have any objective evidence you could point to and say that he wasn't really at lunch?
A. Nothing besides conjecture.
Q. Okay. So the conversation with Detective O'Brien, how does it start off?
A. That's kind of hard to answer because I'm uncertain as to where are you speaking of starting off at with?
Q. Okay. Well, did --
A. The interrogation? Or what process are you speaking of?
Q. Did Detective O'Brien, at some point,



introduce himself to you?
A. Indeed.
Q. Okay. And where did that happen?
A. My apologies. The cord had got stuck.
Q. That's all right.
A. You said where did it happen?
Q. Yes.
A. I'm uncertain. But actually, I believe I was brung to his desk or a desk on that -- well, the second floor, it had to be.
Q. Okay. And so he introduces himself?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes, sir. Yes, sir. Excuse me.
Q. And does he tell you what he's going to do? Like, what his role is, what he's going to do in terms of --
A. What I recollect is that he stated who he was, James O'Brien, and he was a detective. And that he was now investigating -- excuse me -- the murders of Myron Cochran and Billy Johnson, because both of them had -- I was just made aware that both of them had both passed away or passed on.
Q. Okay.



A. And that is when Detective O'Brien officially, I guess, was installed or came on board to do what -- what he was doing.
Q. Okay. Did Detective O'Brien ask you -- hang on a second -- any questions about your involvement in that crime?
A. He did. However, he stated more so, in a more emphatic way of, dare I say, knowing what he figured happened, so to speak.
Q. So he told you what he thought happened?
A. Well, he actually stated -- well, he let me say again what had happened. And I guess, upon hearing Day or David or Daybreak or whatever, he -- he never really -- he was one of those stoic-type dudes, much like Foley in that regard.
Q. Okay. But let's -- I want to stick with the question.
A. Okay.
Q. He -- did you use the name Day-Day with Detective O'Brien?
A. No.
Q. You only used the name Daybreak?
A. I used Day, yeah. Or Daybreak, yes.
Q. Day or Daybreak?

A. Yes.
Q. Okay. I think you testified earlier that you had used the name Day-Day with the first two detectives?
A. I don't recall using the actual word "Day-Day."
Q. Okay.
A. But Day or --
Q. Did you use --
A. -- Daybreak.
Q. Did you use any name at all for Day-Day or David Evans when you spoke to the first two detectives?
A. I know I probably said "Day" for sure. Because I was --
Q. Okay.
A. -- getting away from -- you know, I hadn't known him; so I was -- by Day.
Q. Prior to meeting Detective O'Brien, had you ever spoken to him before?
A. No.
Q. Prior to meeting Detective O'Brien, had you ever heard of him before?
A. No.



Q. Prior to meeting Detective O'Brien, did you know whether he had investigated any of your fellow Black Stones before?
A. No.
Q. Okay. As you sit here today, do you know whether Detective O'Brien had investigated any of your fellow Black Stones before you met him?
A. Yes. As of today, yes.
Q. And what do you know?
A. I know that he's been involved in several instances of people that I've known. Because he was the lead detective in the -- I guess, the guy of the Midnight -- CPD Midnight Crew.
Q. That's what you heard?
A. Well, that's by today's standards.
Q. Well -- and I know. But that's what you heard; right?
A. By today's standards, yes.
Q. What does that mean, "by today's standards"?
A. Back then, I had no interaction with the police. This was my first offense; so I had no interaction with the police.
Q. Really?
A. Yeah, really.



Q. You had never been arrested before May 26, 1994?
A. No. Not by detectives, no. And not questioned on any murders, no.
Q. But you had been arrested before; right?
A. By CPD regular police, yes.
Q. And you had been questioned by CPD before; right?
A. No.
Q. So when you were arrested by the Chicago police prior to May of 1994, not one single police officer asked you a single question?
A. If you're going to use those types of semantics, of course, the police --
MR. BECKER: I'm going to object. That was not his testimony.
MR. MORAN: Well, okay.
MR. BECKER: He said "officers."
MR. MORAN: That's what I said too.
THE WITNESS: I was distinctive between detectives and CPD, though.
BY MR. MORAN:
Q. Yeah, I know. I understand that.
But has a Chicago police officer,



whether they're wearing a blue uniform or a white uniform or a suit, had anyone in the Chicago Police Department ever questioned you about your involvement in a crime prior to May of 1994?
A. In a crime, yes.
Q. Okay. How about questioned you in connection with being a witness? Had any Chicago police officer ever questioned you as a witness prior to May of 1994?
A. A witness to what, though?
Q. Anything.
A. I would guess so, yes.
Q. I mean, it would be hard to be doing what you do at that time and not have some encounters with the police; right?
A. Well, what I was doing at that time was working.
Q. No. I mean, in the early '90s, when you were -- in your history, I guess. You went over earlier, like, being a lookout or, you know, like, the moment you lost the pager, and you were being chased by the police.
A. Okay.
Q. Remember those?

A. Yes, sir.
Q. Okay. I'm going to give you an exhibit to look at, since we're on the subject. This will be Exhibit Number 1.
(Exhibit 1 was marked for identification.)
BY MR. MORAN:
Q. And these are going to be Response to Defendant James O'Brien's First Set of Interrogatories to Plaintiff. And let me get you a set.
Okay. You're looking at Exhibit Number 1. I'm just going to call these your "answers to interrogatories."
A. Okay.
Q. Have you ever seen this document before?
A. "Lindsay Jenkins." I can't say that I have. But I do know what it is. It's a United States District Court for the Northern District.
Q. Okay. In your prior -- from your prior lawsuits, you know what interrogatories are; right?
A. I do.
Q. Okay. Why don't you take a look at the very last page for me.
A. Like, on the end?



Q. Yep. It's a verification; right?
A. Okay.
Q. Well, is that what it says, "verification"?
A. Yes, sir.
Q. All right. Is that your signature?
A. It is.
Q. And the date is July 26, 2024?
A. That is correct.
Q. And the verification says, "I, Cordell Williams, pursuant to 28 U.S.C. 1746 declare under penalty of perjury that the responses to Defendant James O'Brien's First Set of Interrogatories to Plaintiff are true and correct to the best of my knowledge and belief"; is that correct?
A. Yes, sir.
Q. All right. And did you have a chance to review all the answers that were given in this document?
A. Review?
Q. Yes. Before you signed it.
A. Yes, sir. I believe so.
Q. Okay. I want to ask you about a specific one. Give me one second. Look on Number 23, which starts on page 14. It's at the bottom of page 14.



Are you there?
A. 14. Yes.
Q. Okay. Do you see the Question Number 23?
A. Yes. "Have you ever been a member?"
Q. Yes. It's asking whether you've ever been a member of or affiliated with a street gang. And I'm going to pop down to your answer at the top of the next page.
It says you were a Vice Lord and considered a Little Lord, a Little Vice Lord from the ages of 7 to 12.
A. Yes.
Q. Is that true?
A. Yes.
Q. Okay. So prior to being with the Black Stones, you were with the Vice Lords?
A. No. I was considered to be.
Q. Considered to be?
A. That's when I was on 113th, -14th.
Q. Got it.
A. That's -- well, go ahead.
Q. Why didn't you indicate in this answer that you were also a member of the Black Stones?
A. Because they asked about me prior to, or I



took it as being. That's 7 years old. I was 7.
Q. But the question was: Have you ever been a member of or affiliated with any street gangs?
A. Affiliated. By affiliation, I was a Peewee Lord, a Little Vice Lord. But I had not been blessed in.
Q. I'm not disputing that you were a Peewee Vice Lord. Okay? What I'm asking is: You told us today that you were a Black Stone.
A. Yeah.
Q. But your answer to this interrogatory doesn't include that you were a Black Stone. I'm just curious why you left that out?
A. We didn't get any further, I guess.
Q. All right.
A. From 7 to 12.
Q. All right. I'm going to ask you another question real quick. Look at the question to Number -- in Question Number 16.
A. 16.
Q. And it's on page 9, the bottom of 9. And I'm not going to -- the question doesn't matter as much, but there's a list of people who are identified numbers 1 through 6. It's at the bottom of 9, going

on to page 10.
A. Oh, okay. Yes, sir.
Q. Those people are George Anderson, Marcellous Pittman, Anthony Robinson, Arnold Day, Marcus Wiggins, and Jerry Gillespie.
Do you see those names?
A. Yes, sir.
Q. You told us you met -- you heard of Marcus Wiggins?
A. I did.
Q. How about the other names, George Anderson, Marcellous Pittman, Anthony Robinson, Arnold Day, or Jerry Gillespie, do you know any of those individuals?
A. I met them in prison.
Q. You met all of them?
A. No, not all of them.
Q. Who did you meet in prison?
A. In prison, I met Arnold Day. And I think I know who Jerry Gillespie is. I'm not certain. I believe I was on the medical rig with him.
Q. Is Arnold Day a Black Stone?
A. He is.
Q. He has rank --
A. Well, excuse me. He's an Apache Stone.



Q. They're a variation of the Black Stones?
A. Yes.
Q. Okay. Does he have rank with the gang?
A. I would think so. I don't know, actually.
Q. Okay. Did you ever talk about Detective Foley with any of these individuals?
A. Me and Arnold Day did speak about Detective Foley.
Q. What did you talk about?
A. Well, Detective Foley, I talked about how -- I didn't even know who Detective Foley was, but I talked about being beat up by a little stocky dude named -- I didn't know his name at that time. I just described him.
Q. When did you have the conversation with Arnold Day about Detective Foley?
A. When?
Q. Yeah. Roughly. Give me an approximate year.
A. I couldn't say actually what year. That was when I was in Menard. So it was in the time I was in Menard.
Q. What year did you first go to Menard?
A. The year of the towers.



Q. You have to -- what do you mean by "the year of the towers"?
A. I don't know what year the towers fell.
Q. Oh, you mean the Twin Towers in New York?
A. Yes.
Q. 9/11. September 11, 2001.
A. Okay. Well, that's when I got -- I got there in April of that year, I believe.
Q. Okay.
A. Yeah. If I'm not mistaken. April.
Q. I'm going to come back to conversations you may have had with him about Detective Foley. And I'm going to turn your attention to Question Number 6 on page 3.
A. You said on page 3?
Q. Yeah, the bottom of page 3.
A. Okay.
Q. Okay. The question is: "Have you ever been arrested, detained, or held in custody by any law enforcement official for any reason prior to May 26, 1994?" And your answer on the next page identifies a handful of instances in which you were arrested.
Do you see that?
A. Yes, sir.



Q. Okay. So it looks like you were arrested in 1992 for possession of burglary tools?
A. Yes. That's what it says.
Q. Is that true?
A. Yes, I believe so. Well, yes.
Q. Did you actually have burglary tools with you?
A. I don't even recall what that is, but --
Q. All right.
A. -- but I would -- yes.
Q. In June of 1993, you were arrested for unlawful use of a weapon and no FOID card.
Do you see that?
A. '93. I do see it. Yes, sir. Yes, sir. Excuse me. Yes, I do see it.
Q. Were you in possession of a weapon in that instance?
A. Yes.
Q. What kind of weapon?
A. I could not recall. I don't know.
Q. Was it a gun?
A. Oh, I would guess it to be a gun. Yes.
Q. Because a FOID card is the card you have to have if you're going to have a gun?

A. Right.
Q. All right. You were arrested for mob action in February of 1994.
Do you see that?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes. Yes. My apologies. My apologies. Yes.
Q. Okay. What is mob action, to your knowledge?
A. Actually, I remember this, if I may tell you what happened.
Q. Sure.
A. I did go up to Ogilvie to pick up my friend Green -- Reginald Green's little sister, Tamika Green, from Ogilvie School, directly on the next block over from Morgan, 76th and Morgan. Well, as a matter of fact, it was two blocks over on Peoria. Sangamon and Peoria -- Morgan, Sangamon, and Peoria. And I walked up there with them -- with him to pick her up from Ogilvie Grammar School. And because I was not a student there, I was arrested by two female officers for what they said was loitering, writing on the side of a building. And they -- that's what they told me I



was being arrested for. But it was more about the attitude that I had. And so they gave me mob action as well because I was from the other side of Morgan Street, where the Vice Lords ran Rock Island at. And actually, on that side of Morgan Street, from 79th down to 74th, down to Damen, and all of that, is where the GDs had officially been named --
Q. Okay.
A. -- governors of that area.
Q. Well, did you do anything that would constitute mob action, to your knowledge?
A. Not at all.
Q. All right. In these instances that are listed here, were you questioned by police officers?
A. Questioned? No.
Q. They didn't ask you any questions?
A. That ain't how we did things in that area and time.
Q. Okay.
A. By the -- that ain't how police did things in that area and time in the ghetto.
Q. All right. And had you ever -- it says -- at the very end, it says, "Police" -- "Plaintiff believes there may have been several additional mob



action arrests; however, the cases were all non-suited."
Do you know, as you sit here today, of other arrests?
A. I couldn't tell you how many there were, because that was juvenile. But, as I did state, in my wayward youth, it was several. That's just what --
Q. Did you ever have to spend time in a juvenile detention facility?
A. No, sir.
Q. Did you ever have to go to juvenile court for a crime in which you were charged as a juvenile?
A. No, sir. Because again, most of these were SOL'd. The case was SOL'd.
Q. No, I understand. But your -- the last sentence of your answer indicates there may be others. So I'm asking if you had ever been detained as a juvenile?
A. I've been detained several, several times --
Q. Okay.
A. -- in my community of color.
Q. Have you --
A. Well, yeah.
Q. Have you been detained at a juvenile



facility for any length of time?
A. No, sir.
Q. All right. So I want to come back to Detective O'Brien.
A. Uh-huh.
Q. He's questioning you. And as you indicated -- I think you indicated earlier that Detective O'Brien started out by telling you what he thought happened?
A. He did.
Q. All right. Did Detective O'Brien ask you any questions?
A. He did.
Q. What did he ask you?
A. My name and things that he already should have known, mostly. And yeah, where I went to school and things of that nature, mediocre questions.
Q. Did Detective O'Brien threaten you?
A. He did.
Q. What did he -- how did he threaten you?
A. Well, it was so subtle. He asked me about my dad, and after having spoken to my dad. I didn't even know my dad was there. But after having spoken to my dad, he began to tell me about how my dad went

to dialysis and was pulled over and accosted by the police, and how was I going to protect him? And started saying a bunch of random stuff about protecting my dad and the likes.
Q. Can you tell me anything specifically Detective O'Brien said to you about your father?
A. Specifically, he asked about the gun. My dad said that I -- that he had given -- that he had stated was missing or stolen.
Q. Is this the .38?
A. That is.
Q. Okay. What did you tell Detective O'Brien when he asked about the gun?
A. When he asked about that gun, I asked him, "What do you mean?" And because I was shocked that my dad would say something about a gun. In particularly, at the time -- at this opportune time. It was making no sense to me.
Q. Now, was this .38, was this your gun or your dad's gun?
A. It was my dad's gun that he had in the house.
Q. And you took it from time to time?
A. I did.



Q. Did you tell your father you had been taking it?
A. Never.
Q. Okay. Did Detective O'Brien threaten you in any other way?
A. He threatened me with a case for my father.
Q. Can you explain what you mean by that?
A. A gun case on my father, as if this gun had been used or was used in a homicide or something to that degree.
Q. Now, did you tell Detective O'Brien that the gun -- or did you have a discussion with him at all that this gun was a .38 caliber pistol?
A. No, I hadn't had any discussion with him regarding that gun.
Q. Did you tell him -- did you give him a description of the gun?
A. No.
Q. Did you tell him the gun had been stolen?
A. I told him nothing of that gun.
Q. Where do you think Detective O'Brien had any knowledge about this gun?
A. I can only conclude that my dad had told him.



Q. Did you talk to your father about that?
A. No.
Q. So -- and I know your father has passed -- but in all of the years since you were arrested, did you ever have a conversation with him in which you asked your father: Did you talk to this police officer about the gun?
A. I wanted to, but I never did.
Q. Did Detective O'Brien tell you that it was a .38 caliber gun?
A. No, he didn't. I don't recall him ever mentioning what caliber that gun was, no.
Q. Okay. Other than the two threats you just told us about, did Detective O'Brien threaten you in any other way?
A. Well, he told me when he brung me to that interrogation room that I would be wanting to talk to him when he came back.
Q. Okay. What happened after he said that to you?
A. I walked in to the -- to that interrogation room, where I was in handcuffs to the rings.
Q. You walked -- sorry. Say that again. You walked --



A. I walked into the room where I was handcuffed -- I mean -- yeah. To the room where I was handcuffed to that ring on the bench.
Q. Okay. And were you handcuffed again to the bench?
A. Yes, I was.
Q. Okay. When you were handcuffed to the bench, were you able to stand up?
A. I was.
Q. Stand up all the way straight?
A. I was able to stand up all the way straight, but I -- not entirely straight because I was still cuffed to the ring.
Q. Right.
A. But I was able to stand up with a slight lean to the cuffs.
Q. Okay. And what happened after Detective O'Brien brought you to this room and told you that you want to talk to him again?
A. I was -- I actually sat down on the ring.
Q. Okay. What happened next?
A. After a few moments, Foley came in. I didn't recognize him and didn't know his name at that time.

Q. Now, had Detective O'Brien already left?
A. He had left.
Q. How much time went by between the moment O'Brien left and the moment Foley came in the room?
A. I'm uncertain, but I would say maybe ten minutes, tops.
Q. Okay. Now, we're going to come back to what happened with Detective Foley. I want to go to the next moment you spoke to Detective O'Brien.
Did he say anything else to threaten you at any point in time after your experience with Detective Foley?
A. He didn't say nothing else, no.
Q. Did Detective O'Brien, at any point in time you spoke to him, make any promises to you?
A. Not to me, no. Not that I recall.
Q. At any point in time, did Detective O'Brien raise his voice with you?
A. There was no need to by then.
Q. Well --
A. But no.
Q. -- from this moment you met Detective O'Brien to the moment you left Area 1, did he ever raise his voice with you?



A. He wasn't that type. I would say no, he did not.
Q. Okay. Did Detective O'Brien provide you with any details of the crime that you did not know?
A. Yes.
Q. Okay. At what point did he do that?
A. With the caliber of the gun. He did that prior to going in to that room or leaving me in that room -- taking me to that room, actually.
Q. So before you were left in the room, in which Foley came in, Detective O'Brien had told you that the gun used was a .45 caliber pistol?
A. Yes. He told me specific -- that's when -- actually, when we found out that the second boy had died. And I -- it was some time that had passed between that. But O'Brien had told me the caliber of that gun then and that it was execution-style. And right after that, or in the following sequences of that, that's when he brung them pictures in there and spoke to me about what had -- or Day-Day. That's when he brung in the pictures of Day-Day, Paris Macklemore, Andre Rudik, Johnson -- Robert Johnson. His name was Robert Johnson, I believe. Little Rob. Yeah. Robert Johnson.



Q. Okay. Did Detective O'Brien give you any other details of the crime other than what you've already described?
A. Of the time it took place?
Q. Yeah.
A. No.
Q. So the only details that you were given by Detective O'Brien about the crime that took place was the caliber of the gun and the fact that it was execution-style?
A. Yes.
Q. Okay. At any point in time -- you said Detective O'Brien did not promise you anything. But you sort of said it in a way that makes it seem like somebody else had made a promise -- or O'Brien had made a promise to somebody else.
Do you know if Detective O'Brien made a promise to anybody about you?
A. To my knowledge, no. However, he had said to cooperate.
Q. Okay. Did he say that you would get anything in return for cooperating?
A. No. But it was implied that it would go better if I cooperate.



Q. Okay. So let's just focus on one thing at a time.
Did Detective O'Brien tell you that you would get anything in return for cooperating?
A. Get to go home.
Q. He told you that?
A. He said that my dad was here, and that's -- I would probably get to go home if I cooperated. He said "cooperated." I should cooperate.
Q. Okay. So I want to be clear about what you're saying.
A. Yes, sir.
Q. Because it's a little unclear right now.
A. Yes, sir.
Q. I understand Detective O'Brien asked you to cooperate.
A. He did.
Q. Okay. Did Detective O'Brien say that, by cooperating, you would get something?
A. No, he did not state that. No, sir.
Q. Did Detective O'Brien ever tell you, "If you tell us what we want to hear, we'll let you go home"?
A. It was implied that I could speak to my dad.
Q. Okay. That's a little different.

A. It is.
Q. So I want you to just answer the question I'm asking.
Did Detective O'Brien tell you that you could go home if you cooperated?
A. Yes.
Q. He did tell you this?
A. He did say that I could go home if I would cooperate.
Q. Okay. Then why do you keep --
A. It would go better for me.
Q. Then why did you --
A. He added that it would go better for me --
Q. Okay.
A. -- to cooperate.
Q. So I'm not -- I want to make sure you understand where I'm coming from.
A. I do.
Q. All right. You keep saying "implied"; right?
A. Yes, sir.
Q. Okay. And I think, by that, you mean it'll go better for you if you cooperate?
A. Yes.



Q. Okay. Did Detective O'Brien tell you how it would go better for you?
A. No, sir, he didn't.
Q. Okay. Did he use the words "go home" with you?
A. He specifically stated that I could go home.
Q. Okay.
A. And then that I could talk to my dad. Those were stated in the same breath as being able to go home and talking with my dad.
Q. Okay. At what point in time when you were talking to Detective O'Brien did he make these statements to you?
A. Just prior to seeing my dad. I'm -- I can only guess at this point.
Q. No, I know. So we're going to use landmarks in the timeline. I know you don't know exactly the time.
There's the moment you were with Foley. So we'll use that as a main landmark.
A. Okay.
Q. Did Detective O'Brien make these statements to you before or after your time with Detective Foley?
A. Before.



Q. Okay. And Detective O'Brien -- did you see your father before or after you saw Foley?
A. I saw my father after seeing Foley.
Q. Okay. And between the time that you were with Detective Foley and the time you saw your father, did you speak with Detective O'Brien at all?
A. You said in the time before I saw Foley?
Q. Between seeing Foley and seeing your father, did you speak with O'Brien at all?
A. Speak with, no.
Q. But you saw him?
A. I did see him.
Q. When you saw him, what happened?
A. Well, he brung me from one interrogation room to the -- to where -- I did not come from the interrogation room. I don't know where he brung me from. If I'm -- if I recall correct, he -- he brung me to my dad. And then I asked my dad, why was he there?
Q. You asked your dad why he was at the police station?
A. Yeah. Because I didn't think my -- I didn't know what -- how long I had been there or nothing. And I asked my dad, "What you here for? Why are you



here?"
Q. And what did he say?
A. And he was just sitting there, like, "Boy, tell them people what you want" -- "tell them people what they want to know. They say you'll go home. They said you can go home."
Q. Okay. That's what your dad said?
A. That is what my dad said.
Q. Okay. So let's focus on this time between when you -- when Foley left the room and the moment you saw your dad. How much time do you think went by?
A. Maybe ten minutes.
Q. Okay. In that ten-minute period, you obviously saw O'Brien, because he brought you to your dad?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes, sir. My apologies. My apologies.
Q. That's all right. And in the time between leaving the room where Foley was and the time you saw your dad, did Detective O'Brien say one word to you?
A. No.
Q. Okay. So you -- you spoke with your dad for how long?

A. Maybe five minutes.
Q. And what happened after that?
A. After that, Foley came back and got me. And I just remember going to the doggone -- to see Vaci.
Q. To see Greg Vaci?
A. Yes.
Q. Was it Foley or O'Brien who came to get you and bring you to Greg Vaci?
A. No. O'Brien came to get me.
Q. Okay. You said -- because you said Foley just a minute ago.
A. Oh, my apologies. I misspoke. Foley did not say nothing or came and got me. Foley came and whooped me. That's it.
Q. All right.
A. And left.
Q. Now, in the moment -- let's talk about the time you were with Foley. Okay?
How much time were you with Foley?
A. Physically with Foley long enough for him to do his business, maybe one to two minutes.
Q. One to two minutes?
A. Yes.
Q. Did Foley say anything to you?



A. No words.
Q. Did Foley -- what happened as soon as you saw Foley and you were in the room alone with him?
A. As soon as Foley stepped through the door, he stepped in slow and methodically with a shit-eating grin on his face, is what I like to say. And as he came in slow and methodically, I'm looking directly at him, and I'm saying to myself, "Why" -- "Why" -- "Who is this? Why are they here?" So I'm guessing he's another detective. I didn't know him to be a sarge or anything of that nature.
Q. Uh-huh.
A. Had on gray -- gray pants. They looked like they're beaded thread or some type of -- you know, just, like, gray slack pants.
Q. Okay. Did he --
A. With a white shirt, tie, and exactly how I say he looked. Stocky built-wise.
Q. Did he look chubby?
A. Yes, like he had been a football player but was stocky built for some time.
Q. How tall do you think he was?
A. Maybe 5-10 at the tallest.
Q. And what kind of build? Just medium build?



A. Well, stocky. He was, like, a thumb, for the most part.
Q. Did he look muscular?
A. Like he may have been at one point.
Q. All right. Did he strike you?
A. He did.
Q. Where did he strike you?
A. He struck me in my face so hard that he knocked me down, actually. I didn't know if he had stole -- or punched me or what.
Q. Where were you? Were you sitting or standing when Foley first punched you?
A. Well, as he walked towards me slow and methodically, I was getting up because he was coming close towards me. And I don't know what made me stand up, but I'm asking him, "What?" And I just stood up instinctively -- not sprang up or nothing. But he was walking slowly on me. And then he just took off on me.
Q. Did you try and confront him?
A. No, sir. Why would I do that in the police station? I was handcuffed.
Q. All right. So you stood up. You tried to stand up, and he struck you?



A. Yes.
Q. What side of -- what side of your face did he strike?
A. Right on this left side because he came in with the right.
Q. And did he punch you with a full, closed fist?
A. It -- no, sir. Pardon me. That's my phone that's going off.
Q. You can take a break if you need to.
A. I don't need a break.
Q. All right. Do you want to -- why don't you do this -- why don't you silence your phone?
A. Yes, sir. It's going to silence itself now.
Oh, my God. And speaking of, that's the girlfriend.
Q. You're welcome to go have a conversation.
A. No, I'm not.
Q. All right. Okay. So -- by the way, is that an iPhone?
A. No, sir.
Q. What kind of phone is that?
A. That's an Android, that my girl gave me to keep tabs on me.

Q. So you've got an Android and an iPhone?
A. This is actually her phone. But yes, I do have both.
Q. Do you have -- can you text her on that phone?
A. This is her phone. I can text her.
Q. Okay. Because I know she bought it for you, but, I mean, she can reach you on it; right?
A. Absolutely.
Q. And you can text her back and --
A. Indeed.
Q. -- things like that?
A. Indeed.
Q. Which phone is easier to use?
A. Neither, to tell you the truth, because I don't know nothing about this Android phone.
Q. Can you use text messaging on that Android?
A. To text her, yes.
Q. How about anybody else?
A. I'm guessing so, yes. Yes.
Q. Do you use any other texting apps, like Signal or?
A. Signal?
Q. Yeah. Have you ever heard of that? Or



WhatsApp? Have you ever heard of that?
A. You know way more about this than I do.
Q. Do you use email on that Android?
A. No.
Q. Can you get -- connect to the internet on that Android?
A. I would -- yes, I would say so. Absolutely, I would say so.
Q. Do you ever go shopping on Amazon?
A. No.
Q. Never?
A. No.
Q. All right. So I'm going to come back to now -- to Foley. Okay?
Did he use a closed fist when he struck you in the face?
A. No, I believe it was an open hand.
Q. Okay.
A. Or something to this degree. But I know it was hard up in here.
Q. And where on your face did he strike you?
A. Like, right here.
Q. Right on the cheek?
A. Yeah, right on the side of the mouth type



thing.
Q. Okay.
A. Right here. Because it took me around and, I'm like, "Whoa."
Q. Did he cause any bleeding?
A. No. No. No.
Q. Did you ever have a noticeable injury from that strike?
A. I don't actually know. I didn't have a -- I wasn't privy to a mirror.
Q. Okay. For you -- like, when you went to -- you did go to Cook County Jail; right?
A. I did.
Q. Did you eventually bond out?
A. No.
Q. You were in Cook County Jail the whole time?
A. Yes.
Q. Okay. I thought I saw a transcript where a judge gave you conditions of a bond?
A. You would know better than me. I'm guessing that could happen. I don't know.
Q. Well, I mean, you would know if you were -- if you'd gotten out of Cook County Jail pending trial; right?



A. Well, I know I didn't get out of Cook County Jail.
Q. Okay. All right. Okay. So did you ever see a doctor at Cook County Jail?
A. For this incident?
Q. Well, I mean, more than just this; right? He -- it did something else to you; right?
A. I'm not understanding that question.
Q. Well, okay. We'll come back to whether you saw a doctor.
Did Detective Foley do anything else to you besides striking you on your cheek with his right hand?
A. Well, when he struck me, in a knee-jerk-type of reaction, I jumped. Or I was -- I was angry.
Q. So you lurched at him?
A. No, sir. I couldn't lurch. I wanted to, but I couldn't because I was -- I'm right-handed. And at the time, I was handcuffed to the ring. So when I went to lurch up, as you say it, I was pulled back down.
Q. All right. So what's --
A. And --
Q. -- what's the next thing that Detective

Foley did to you?
A. Well, he took the book and hit me. Or -- yeah. He had took that -- he took that book and hit me. Because when he hit me, I came back down. Already -- I was already being pulled back down from the knee-jerk reaction.
Q. Okay.
A. So I hit the ring.
Q. So were you -- when he put the book up against you and hit you, were you on the bench?
A. Well, when I -- when I was pulled back down and the book came, he actually -- it was, like, one fell swoop. Because when I'm pulled back down and hit the bench, then I'm feeling it immediately. "Ow."
Q. So he hit -- so you're sort of laying on the bench at that point; right?
A. Yes. In large part, yes.
Q. And he put the book down over your left side?
A. Well, he comes with the book --
Q. Yeah.
A. -- and he hits me.
Q. But where? Like, right over your left ribs?
A. Yes, right up in here.



Q. Okay. And then how did he hit the book?
A. Well, the book came with him and hit me.
Q. Oh, I see. Okay. So he used the book -- the impact of the book --
A. Yeah.
Q. -- is what hit you?
A. I believe. Yes, the way he --
Q. All right.
A. -- because, like I said, I was off balance and on my side. So when he came down with the book, that just put more pressure on me, if you know what I mean.
Q. So he struck you with the book, essentially?
A. Yes.
Q. All right. Did he do anything else?
A. He -- I want to say he put his foot on me. But he, like, kicked me in my ass, so to speak.
Q. In your -- like, in your actual buttocks?
A. Yeah. Sort of, like, kicked me straight in the ass, so to speak.
Q. All right.
A. Well, excuse my language.
Q. That's okay. You're allowed to say whatever it is you want to say.



Did Detective Foley physically abuse you in any other way than what you've just described?
A. No.
Q. Okay. So the physical abuse was an open-hand strike to the cheek?
A. As light as you would like --
Q. Well, that's what you described; right? He used an open hand and --
A. Yes.
Q. -- struck your cheek; right?
A. Yes. Struck me off my feet, yes.
Q. And it was hard enough that it forced you down --
A. Yes.
Q. -- on impact --
A. On impact, yes.
Q. And then he hit you in your ribs --
A. Yes.
Q. -- with the phone book?
A. Yes.
Q. And then he kicked you in the butt?
A. Yes, sir. Kicked me in -- yes, sir. Yes, sir.
Q. Did he leave after that?



A. He did.
Q. He didn't say anything at all?
A. Not a word.
Q. Okay. Did you suffer any injuries from any of this?
A. Yes, I did. I was in pain. Hitting that steel bench that don't move, but cut into you.
Q. Okay. What injuries did you suffer?
A. Well, bruising --
Q. Yeah. I mean, like, where was the bruising?
A. About my body, for certain. And, well, I've had -- my face was seemingly swollen.
Q. Seemingly swollen?
A. I couldn't see myself, but I felt my skin tight on my face.
Q. At some point, did you look in a mirror, either in the lockup at Area 1 or Cook County Jail, to see if you had any injuries?
A. I don't know if you have been there. Presumably, you haven't, though. There is no mirrors of sorts that you could tell if your face is swollen. As a matter of fact, there are no mirrors, to my knowledge, in any portion of where you just stated, Cook County or anywhere of that nature. There's

aluminum --
Q. Fair enough. Okay. At any point in time after Foley left the room, were you physically beaten or assaulted by any police officer?
A. Not physically, no.
Q. When you say "not physically," what do you mean?
A. I mean that's when the psychological actually took part.
Q. Okay.
A. Or took place, rather.
Q. Now, up to the point after you left from Foley, right, you go into another room, and you were taken to see your father; right?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes. Yes. Excuse me.
Q. And up to the point you see your father, nobody says a word to you; right?
A. No.
Q. I'm right, though; right?
A. Yes, you are right. No one else says a word to me.
Q. And after you see your father, you are



brought by Detective O'Brien to see Greg Vaci?
A. Yes.
Q. Did Greg Vaci say anything to you at all?
A. Vaci looked at me then and looked down and began to -- well, O'Brien brung me in while Vaci looked at me and looked down. Immediately, the stenographer was to my left as well. But Vaci had stood in front of her. And she didn't -- I don't recall her ever looking back at me or looking at me, period, whoever that was. And O'Brien, he preceded me in. The desk was right to my right. Yeah. The desk was right to my right. Vaci was to my left. The stenographer. And I stepped in through and passed him and was seated in front of the desk off to the -- to the left -- no. To the right. And I was facing Vaci.
Q. Okay.
A. And the stenographer was turned. She wouldn't -- she could have had a view of me on the side of me, but she never looked at me that I recall.
Q. Okay. Were you looking at her the whole time?
A. I began looking at Vaci and her, yes. Because I'm facing them.
Q. Okay. Now, you're in this room. Was this



the same kind of room where -- where the questioning took place?
A. As far as the interrogation?
Q. Yeah.
A. No. This was, like -- could have been a sergeant's office off to the side or a commander's office -- or whatever office was off to the side by the detective's desk.
Q. All right. Did you have any conversations at all -- now, at some point, this is where the court-reported statement took place; is that correct?
A. That is correct.
Q. All right. Before you started giving this court-reported statement, did you talk to anybody?
A. No. I did have a phone call. But that was prior to even, I believe -- as a matter of fact, that was just prior to the interrogation, if I'm not mistaken.
Q. Which interrogation?
A. The second interrogation.
Q. That's with O'Brien?
A. Right.
Q. Who did you talk to?
A. A Stovall, I believe. Donnie Stovall



[phonetic].
Q. Who is Donnie Stovall?
A. We had went to his house in -- in search of Londell at one point, if I'm not mistaken. Well, I'm not mistaken. We were out searching for Londell. And in the course of coming back, west from over east, we stopped at Donnie Stovall's because I was -- I think I was over there earlier that day.
Q. Okay. But I have to ask because -- I appreciate that --
A. Yeah, I understand.
Q. Why were you talking to Donnie Stovall from the police station?
A. Well, we had went there -- we went to Donnie Stovall's house, based on what I had said happened during the course of the day.
Q. Right.
A. I started out leaving from my own house at 76th and Carpenter and went to -- well, went down to Donnie Stovall's house on 75th and Carpenter --
Q. Okay.
A. -- prior to going over east -- or better yet, prior to picking up Londell, then going over east to go see Paris Macklemore. So the course of that

entire day, they went through.
Q. Okay. So let me ask you something. Obviously, this shooting took place around 12:30 in the morning on May 26th, 1994; right?
A. Yes, sir.
Q. Was it your belief or understanding that the police were interested in everything you did on May 25th?
A. Yes.
Q. Okay. Did the police ever come around asking you, "Hey, what happened at 12:30 in the morning on May 26th"?
A. O'Brien did.
Q. And what did you tell him?
A. I told him that I was over east, as I had told the other detectives. And then, in the course of that questioning, I guess the lightbulb went off in his head.
Q. His head or yours?
A. His.
Q. Okay. Well, instead of trying to climb into his head, you tell me what information -- what questions were asked and what answers were given about what happened at 12:30 AM on May 26, 1994.



A. After the -- well, after seeing my dad and the pictures that he had already shown me and everything, he -- as I stated, then he hit the lightbulb moment. And I just began to -- that's where all of the coercion began, for the most part.
Q. All right. So after you had seen the picture of Day-Day --
A. Yes.
Q. -- you knew that O'Brien knew somehow Day-Day was involved?
A. I knew David Evans' name. Yes.
Q. Oh, you knew David Evans' name?
A. Yeah. He told me David Evans' name.
Q. Okay. Did he ask you, "Who is this?"
A. He did.
Q. And did you say, "That's Day-Day"?
A. Yes.
Q. All right. And did he say, "Is that the same guy that was in the car with you, who you've been calling Day or Daybreak?"
A. He did.
Q. And did you answer, "Yes"?
A. I said, "Yes." He said, "That's David Evans."



Q. Okay. All right. At that point in time, did you understand or believe that Detective O'Brien had figured out who Daybreak is?
A. I would say so, yes.
Q. Okay. And at that point in time, did you tell Detective O'Brien that it was Day-Day, David Evans who got out of the car and had told you to pop the trunk and all that?
A. Well, he more so told me what happened then. But I did say that he did -- well, I did say he told me to pop the trunk, yes.
Q. All right. Okay. So now you've gone from seeing your father to this room with Greg Vaci and the court reporter and Detective O'Brien.
Is there any conversation with anyone before the court-reported statement starts?
A. No. Not anyone outside of O'Brien. No.
Q. Okay. And during the court-reported statement, did anyone ask you questions besides Greg Vaci?
A. No.
Q. Did anyone -- did Detective O'Brien ever threaten you again after that second interview -- that interview with him ended?



A. No, I was never threatened again after that. Not verbally, no.
Q. Okay. How about in any way, shape, or form, were you threatened again after that second conversation with Detective O'Brien?
A. Yes, in a room with Vaci.
Q. Okay. That's what I'm talking about.
A. Oh, okay.
Q. How were you threatened in that room?
A. Well, when I came in the room and was sat down on the desk on the other side of the desk, facing Vaci and the stenographer, O'Brien went back around to the table -- back around on the desk and sat down. And at that point, I noticed the newspaper when he sat down. But I didn't pay real attention to it because it didn't stand out to me at that point. But I was looking at Vaci. And when he picked up the paper and popped it -- and I found that to be odd that he popped that paper like that -- then he just sat -- or felt something -- sat down, like, on the desk. And naturally, I'm thinking, it was too heavy -- there wasn't no cell phones at that time. So I'm thinking it's too heavy to be anything other than his gun. So I associated it with being his gun.

Q. So at the time -- now, you said you didn't think about it at the time.
A. Yeah.
Q. Is this something you thought about after you gave the court-reported statement and then thought to yourself, "That must have been a gun"?
A. I thought about it as I was giving the court-reported statement.
Q. As you were giving it?
A. Yes.
Q. Okay. Did you actually see a gun?
A. See his -- no. I didn't actually see the gun. No.
Q. And the sound you heard, can you describe it?
A. A loud thump. I know what guns sound like. I had been caught with guns before; so I knew what the gun sounds like either falling or being placed, albeit on the table.
Q. Did you say, "Hey, is that a gun under that newspaper?"
A. I dared not say that.
Q. All right. So now I want to ask you another question.



A. Yes, sir.
Q. We're going to go back in time to when the police officers arrived at your home in the early morning hours of May 26, 1994.
A. Uh-huh.
Q. And you are -- did you have any conversation with your parents before you were taken to the police station?
A. None.
Q. Did your parents say something like, "Hey, we're going to get you a lawyer. Don't say anything"?
A. None.
Q. Did they say, "Cooperate"?
A. They said nothing. I don't even recall speaking to my parents prior to being -- or getting extracted from their house.
Q. All right. When you were taken out of your home, were you -- you were handcuffed, you said; right?
A. Yes.
Q. Were you given your Miranda rights?
A. I don't recall being read my Miranda rights.
Q. All right.
A. That's not to say they didn't do it. I



don't know.
Q. Sure.
A. I don't recall.
Q. Understood. As of that time, when you were taken into the police car, did you know what Miranda rights were?
A. I had no interaction with the police. So at that time, I did not know expressly --
Q. Okay.
A. -- what Miranda rights were.
Q. Well, number one --
THE COURT REPORTER: One at a time, please.
MR. MORAN: Okay. Sorry.
BY MR. MORAN:
Q. Okay. So first, that's not really my question. Okay?
A. Mm-hm. Yes.
Q. Did you know what Miranda rights were when you were taken by the police from your home on May 26, 1994, in the early morning hours and placed into that squad car?
A. I knew of the Miranda rights, yes.
Q. Okay. In your prior encounters with police, which we went over in your answers to interrogatories,



in which you were arrested for various things, were you given Miranda warnings?
A. I would guess so. But I don't actually recall.
Q. Do you know what -- so as of the moment you were placed in the police car, did you know you had a right to remain silent?
A. I would say yes.
Q. Okay. Did you know you had a right to ask for an attorney to represent you?
A. Yes.
Q. Now, being in a gang, and doing the business that you were doing as a lookout or security, were there any discussions among the gang members, the leadership of the gang, as to what to do when taken by the police?
A. I would say it swiftly and easily: Yes, there was.
Q. Okay. Did the gang members tell you: "Don't talk"?
A. They didn't say it in those terms. They said, "Shut the fuck up if you get caught by the police."
Q. Okay. And what did you understand that to

mean?
A. Keep your mouth closed.
Q. All right. And you knew all of this in the moments that the police officers were taking you from your home to Area 1 on May 26, 1994?
A. I knew about consequences and repercussions. I did.
Q. So you knew that you had the right to remain silent; right?
A. I don't recall being read my Miranda rights.
Q. I know you don't recall at that moment, but you know you had that right; true?
A. As an emerging adult, yes.
Q. All right. And you knew from the gang that you shouldn't talk anyway; right?
A. They told me to shut the fuck up.
Q. Right. And, well, obviously, we all know what that means; true?
A. Only if one does.
Q. Well, I mean, you keep -- I mean, these are yes-or-no questions.
Did you understand what that meant, when the gang told you not to talk?
A. I know what the gang meant, yes.



Q. When you got to Area 1, when you first met with Detective Dwyer and I think you said Garkey or?
A. Yes, I did say Garkey.
Q. Did either one of those detectives give you your Miranda rights?
A. I don't recall either of them ever reading my -- reading me my Miranda rights.
Q. When you say "reading," do you mean reading from, like, a piece of paper?
A. Yes.
Q. All right. Did they tell you, though, that you have the right to remain silent?
A. I don't believe -- I don't recall them saying that. But again, I'm not saying that they didn't.
Q. Sure. And did you agree to talk to them?
A. Yes, I did talk with them.
Q. Right. But you agreed -- it wasn't just that you talked to them. You made the choice to talk to those detectives in that moment in time?
A. I did make the choice to talk to those detectives, yes.
Q. With full knowledge that you could say, "I'm not talking"?



A. I would have to say yes, with full knowledge that I could have said "I am not talking."
Q. When you first started talking to Detective O'Brien, you had the same knowledge; right?
A. Albeit, yes.
Q. Did Detective O'Brien ever give you Miranda rights or warnings?
A. I do not recall him ever reading me my Miranda rights.
Q. Okay. Did you make the choice to talk to Detective O'Brien?
A. I did.
Q. And that was your choice?
A. No, that was based on what I believe to be coercion.
Q. All right. Did the coercion occur when you talked to Detective O'Brien in the interview or when you spoke with Greg Vaci?
A. I believe it occurred when I was -- I believe I was being prepared to speak with Greg Vaci.
Q. Okay.
A. Almost in like terms as prepared to speak with you here today, to some degree.
Q. Okay. Except you're free to go and you can



take breaks whenever you want, and you can get lunch, and you can have coffee and water.
A. A much better situation. But they did offer me lunch there too.
Q. Okay.
A. And paid for it.
Q. Fair enough. Point taken. Okay. So my point is, though, that: Did you make a choice to talk to Detective O'Brien?
A. I did.
Q. Okay. And you agree, you could have told Detective O'Brien, "You know what? I want a lawyer. I'm not talking to you"?
A. That was a constitutional right. Yes, sir.
Q. You knew that?
A. I was told that. Yes, sir. I knew that.
Q. Okay. So let's go now to the moment you speak to Greg Vaci in front of the court reporter for your court-reported statement.
Before you gave that court-reported statement, had anybody prepared you as to what you were going to say?
A. Outside of Detective O'Brien, no, sir, no one had prepared me for anything.

Q. And what did Detective O'Brien -- how did he prepare you?
A. Gave me certain, dare I say, thoughts or whatever regarding -- I had no knowledge of the actual caliber of the pistol. I had no knowledge of what had happened. And by then, having been -- or was going to be charged, I was made aware of certain things, albeit during the course of the -- or the sequence of events, that the young brother had died and other things that happened --
Q. Sure.
A. -- in regards to those particulars.
Q. So what we're -- and what I'm going to do now is, I'm going to give you your court-reported statement, and we'll go over it. Okay?
A. Yes, sir.
Q. Tell me -- let's see where it is.
And this is going to be Exhibit Number 2, Mr. Williams.
(Exhibit 2 was marked for identification.)
MR. MORAN: There you go. There you go.
MR. BECKER: Thank you.
MR. MORAN: Wait a minute. Is that



Williams?
MR. BECKER: Yes, it is.
MR. MORAN: Okay. Good. There you are.
MS. MEADOR: Oh, thank you.
BY MR. MORAN:
Q. Okay. Mr. Williams, you're looking at Exhibit Number 2. And this is entitled, "Statement of Cordell Williams, taken in an interview room, 2nd Floor at Area 1 Headquarters, 51st and Wentworth, Chicago, Cook County, Illinois, on Friday, May 27, 1994, at 2:30 AM."
Okay. Is this the document you've seen before as your court-reported statement?
A. It appears to be, yes.
Q. Okay. If you want to take a moment and page through it, you're welcome to, to ensure that it's what you remember it to be.
A. Yes, sir.
Q. Okay. So I want to go through some of it with you. Okay? And let's look at the very first page where it says "Mr. Vaci." And it says, "Let the record reflect that we are in Interview Room Number 1."
Do you see where I'm at?



A. Yes, sir.
Q. Okay. We're going to scroll down to the next page. And actually, at the very bottom, I just want to ask you, do you see a signature?
A. At the very bottom of which page?
Q. The first page?
A. Yes, sir. See my signature?
Q. Yes.
A. Yes, sir.
Q. Is that your signature in the middle?
A. It is.
Q. Okay. And I want to -- actually, let's look at the very last page.
Is that your signature on that page as well?
A. It is.
Q. Okay. And as you page through, is your signature on every single one of these pages?
A. As far as I can tell, it is.
Q. Okay. Did you have a chance to read through this statement before you signed it?
A. I don't recall if I did, but I would think that -- I would have to say that I did.
Q. Okay. The second page, at the very top, it



says, "We're here to take the statement of Cordell Williams concerning the investigation of the fatal shooting of Myron Cochran and Billy Johnson."
That was your understanding of what the purpose of the court-reported statement was?
A. Yes.
Q. Okay. Let's look at the first question. It says, "Cordell, I talked to you earlier and explained that I'm an assistant state's attorney, a lawyer, and prosecutor and not your lawyer; is that correct?"
And that was -- your answer is, "Yes."
My question for you is: Did you understand that Mr. Vaci was not your attorney and was working for the government as a prosecutor at this time?
A. I did understand him to be working -- or was not my attorney.
Q. Okay. And the next question, he says, "Before we spoke, I advised you of your constitutional rights; is that correct?" And you answered, "Yes."
Is that true?
A. That is what's stated on the -- yes.
Q. Did Mr. Vaci advise you of your constitutional rights?

A. Reading this, I believe he did.
Q. Okay. And he indicates in the next line that he's going to read the rights again. I'm not going to go over all of them. But he's going to read your rights again. And he goes through those rights, and you answer "yes," that you understood all of these rights.
Did that actually happen?
A. Yes.
Q. Okay. The next question is, "Calling your attention to May 26, 1994" -- and this is on page --
MS. MEADOR: 3.
BY MR. MORAN:
Q. 3. I can't see the page numbers. "Calling your attention to May 26, 1994, at around 12:20 in the morning, who were you with at that time?"
And your answer: "I was with Londell, Day-Day, and Andre."
Do you see that?
A. I do.
Q. Is that true? You were with Londell, Day-Day, and Andre?
A. No.
Q. What part is untrue?



A. Andre.
Q. Okay. Why did you answer you were with Andre?
A. Because that's what I had been prescreened, if you will, prepared to say.
Q. Someone told you to say that?
A. Yes.
Q. Who told you to say that?
A. O'Brien.
Q. Okay. And did you tell Detective O'Brien that you were with Peteman?
A. I told Detective O'Brien where I was at during the course of May 26 or 25, that is.
Q. I understand. But did you tell Detective O'Brien that you had -- Peteman was in the car, not Andre?
A. I don't recall saying Peteman was in the car. And it's Peteman. Like, there was a song called Pete Rose we used to sing back in the day. But that's what it --
Q. Peteman?
A. Yes. Petey Rose is Peteman, Peteman, Peteman.
Q. Okay. I got you.



A. Excuse me.
Q. No. That's a good -- that's a good clarification.
All right. So would you agree with me, though, that the part of your answer that refers to Londell and Day-Day is true?
A. I would say yes.
Q. Okay. Next question: "Where were you?"
Answer: "We were coming from westbound on 83rd, and we took South Chicago over to 76th, 76th over to Halsted."
Is that true?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes. My apologies. My apologies. I was trying to read along with you. Yes.
Q. And I'm going to jump down where they ask: "Whose car were you in?"
And your answer, "My mother's car."
Is that true?
A. Yes.
Q. Question: "What type of car was it?"
And the answer is: "A '94 Tempo."
Is that true?



A. Yes, it is.
Q. That was a new car that year then?
A. Yes. I believe so. Yes.
Q. Okay. Question -- next question: "And you said you were with Day-Day?"
And you answer, "Yes."
That's true; right?
A. Yes.
Q. Question: "Do you know him by any other name?"
And your answer is, "No."
That's a truthful statement; right?
A. Yes.
Q. Okay. So the next question, "Showing you what we have marked as Exhibit A, where the statement is a photograph. Do you recognize this?"
And further down, you answer that "The photo is Day-Day."
Do you see that?
A. Yes, I do.
Q. Did you, in fact, identify a photo of Day-Day for your court-reported statements?
A. That is correct. Yes.
Q. Okay. Question -- let's jump down. "Where

was Day-Day sitting in the car?"
Answer: "Behind the driver, which is me."
Is that a truthful answer?
A. That is.
Q. The --
A. Yes. That is, to my knowledge. Yes.
Q. The next question: "Where was Londell sitting?"
Answer: "In the passenger seat."
A. Yes.
Q. Is that a truthful answer?
A. It's absolutely truthful.
Q. Okay. Now, we know Andre -- you said Andre was not in the car?
A. Yes.
Q. Would -- the person sitting behind the passenger, who was that?
A. That would have been Peteman. Yes.
Q. Okay. Next question: "Is Day-Day a member of a gang?"
Your answer: "Yes."
That's a truthful answer; right?
A. Correct.



Q. And then you identify the gang as the Black P. Stones. That's also a truthful answer; right?
A. Correct.
Q. "While the four of you were in the car, was there a gun in the car?"
And you answer, "Yes."
That's a truthful answer; right?
A. In the entirety of the car, yes. But it was in the trunk, no doubt.
Q. Sure. Next question: "Where was the gun?"
Your answer, "In the trunk."
A. Yes.
Q. That's a truthful answer; right?
A. Yes.
Q. "What type of gun was it?"
"I believe it was a .45 Ruger."
Is that a truthful answer?
A. That's what I was told.
Q. So that's not something that you knew independently?
A. Well, I did not know that independently. I believe -- I was led to believe it was.
Q. Who led you to believe it was a .45?
A. That's what I was told was murdered -- or



the victims was murdered with, by O'Brien.
Q. Okay. But it's your testimony that Detective O'Brien gave you the information that it was a .45 caliber gun?
A. He did.
Q. Okay. Question -- next question: "Who put the gun in the trunk?"
Answer: "Day-Day."
That's a truthful statement; right?
A. He did put a gun in the trunk. Yes, sir.
Q. Okay. Question: "Where were you when Day-Day put the gun in the trunk?"
Answer: "I was in the car. I had popped the trunk."
Now, is that a truthful answer?
A. I don't believe it to be.
Q. Okay. Because I think you said earlier that you were standing in the doorway when you popped the trunk with the remote?
A. That is correct. I would not have been in the car --
Q. Okay.
A. -- with the pistol in the vehicle.
Q. Understood. Now, that part of the answer,



where you say, "I had popped the trunk," that is true, isn't it?
A. I did pop the trunk at some point, for certain.
Q. Yeah. For Day-Day to put his gun in the trunk?
A. Absolutely.
Q. Okay. Question: "Where did you go when the four of you were in the car?"
Answer: "We were traveling down Halsted. And as we traveled down Halsted, he said, 'Pull over. Pull over'."
"Who said that?"
Answer: "Day-Day."
I'm going to stop there. Are those answers truthful?
A. Yes, sir.
Q. Okay. As you sit here today, is it true that Day-Day is the person who said, "Pull over. Pull over"?
A. Yes, sir. I would say so. Yes.
Q. Next question: "Why did he tell you to pull over?"
Answer: "He said he saw some Bricks,

which was believed to be Disciples."
Is that a truthful answer?
A. I did hear that he said "Bricks" from the back seat. Yes.
Q. Okay. And you knew, at that time, Bricks were -- was a way to refer to the Disciples?
A. They were called Pricks by -- Ebonics. Yeah.
Q. Okay. "Did you know" -- next question: "Did you know at the time that Bricks were Disciples?"
Answer: "Yes. I know what they called them. That is the name they had called them by."
Is that a truthful answer?
A. Yes. Ebonics was changing constantly. But yes. Yes.
Q. Okay. Question: "Are the Black Stones and Disciples at war?"
And you answered: "They are rivals. Yes."
Is that a truthful answer?
A. Yes.
Q. The next question: "Did you know at the time?"
And you answer: "Yes."



Is that truthful?
A. Yes. That they were rivals, yes.
Q. Okay. Question: "What did you do next?"
"I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk, and I popped the trunk."
That's a truthful answer; right?
A. Yes, sir.
Q. Okay. Question: "Why did he ask you to pop the trunk?"
Answer: "He was trying to get the gun."
Is that a truthful answer?
A. I would guess that's what he was trying to do. Yes, I believe so. Yes.
Q. All right. Question: "What did you think Day-Day was going to do?"
Answer: "I was led to believe that he was going to shoot somebody."
Is that a truthful answer?
A. That was coerced, to some degree.
Q. What do you mean by "to some degree"?
A. Because I knew he got out to get out. I know he did that, for certain. But I didn't know



specifically what he was going in there to do. I didn't know if he was going to order food. I didn't even know if he was going to get on the bus stop. When I did sit back -- I didn't even look back.
Q. Now, you knew just before that, he said, "Pull over. Pull over. There's some Bricks"; right?
A. Yes.
Q. And you knew that he told you to pop the trunk?
A. Yes.
Q. You must have known that, whatever he's going to do, he's getting the gun out of the trunk; right?
A. I must have known. I was tired and wanting to go home.
Q. Well, did you know he was going to get the gun out of the trunk?
A. He told me to pull over, so --
MR. BECKER: I'm going to object. That was asked and answered.
BY MR. MORAN:
Q. We're talking about at this point in time when you're giving the statement.
Did you actually know that Day-Day was



going to get the gun from the trunk that you had popped for him?
A. He just told me to pull over and pop the trunk.
Q. Okay.
A. However, I had no second thoughts about it. No, sir. I had --
Q. All right.
A. -- no second thoughts about it.
Q. Question: "What did you see next?"
Answer: "I didn't see anything. I heard the shots. I heard about four or five shots."
Is that a truthful answer?
A. I would have to say so. I did hear shots. Yes, sir.
Q. Next question: "What happened after you heard the shots?"
MR. MORAN: Oh, I did? Hang on a second. Yeah. Yeah. Yeah. All right.
BY MR. MORAN:
Q. Let me -- let me -- did I ask a question or did I stop in the middle?
THE COURT REPORTER: You stopped in the middle.

MR. MORAN: All right.
BY MR. MORAN:
Q. All right. Mr. Williams, I'm going to start over. Okay?
A. Yes, sir.
Q. All right. And I want to direct your attention to the question at the top -- higher up on the page on page 6.
"Why did he ask you to pop the trunk?"
Answer: "He was trying to get the gun."
Is that a truthful answer?
A. That's an answer. But again, that's -- I had no second thought of that, sir.
Q. Okay. Question: "How did you pop the trunk?"
Answer: "With my alarm."
Is that a truthful answer?
A. Yes.
Q. What do you mean by "my alarm"?
A. That was -- I believe you would hold the "disarm" button. And holding it for two or three seconds, and the trunk would automatically pop.
Q. Where is the "disarm" button?



A. On the alarm.
Q. On your remote or inside the car?
A. On the remote key tag.
Q. And you still used your remote to pop the trunk?
A. Yes, sir.
Q. Were you outside of the car or in the car when you popped the trunk?
A. I was -- excuse me -- I was inside the car.
Q. Okay. "What did you see Day-Day do next?"
A. I saw Day-Day do nothing.
Q. Hold on a second. I'm going to direct your attention to the question on the transcript.
"What did you see Day-Day do next?"
And the answer is, "He went to the trunk, and I believe, I guess, he got the gun. And then he proceeded to walk to the submarine shop."
Is that a truthful answer?
A. I believe that yes, it is, sir, as part of the -- well, yes, sir.
Q. Question: "What did you see next?"
Answer: "I didn't see anything. I heard the shots. I heard about four or five shots."
We already went over that one. I'm



going to skip to the next one.
"What happened" -- question: "What happened after you heard the shots?"
Answer: "After hearing the shots, we all turned around, frantic, and we seen Day-Day running out of the shop."
Is that a truthful answer?
A. I can't say that it is, sir. That is an answer that was given. I just remember being woken up with those shots.
Q. Were you frantic when you heard the shots?
A. Absolutely. I was nodding off and away. I mean, albeit ignorant or whatever, however, intoxicated.
Q. Well, did you see Day-Day running out of the shop?
A. I did not see anything until I went to pull off and pull into the street. And I noticed -- albeit, a shadowy figure.
Q. Okay. Where did you get Day-Day running out of the shop?
A. Because that's what I was told.
Q. Who told you to say that?
A. O'Brien.



Q. Now, when I asked you earlier what information O'Brien had given you, you told me the caliber of the gun?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes. Yes. Excuse me. You were still talking, though.
Q. And David Evans' name, his real name.
A. Yes.
Q. Remember? And I asked you: Did he give you any other information? And you said: No.
A. That is correct.
Q. Okay. So if that's true, where did the information about Day-Day running out of the shop come from?
A. Well, I was told where the situation happened at. So as I stated, when I pulled out, I seen him running into the streets.
Q. Okay.
A. That's a -- well, yeah. I just seen him running into the streets, sir.
Q. Fair enough. So this is, in part, true then, that you did see him running?
A. I would guess, in part, yes.

Q. All right. "When you saw" -- we're going to look at the next question. Okay?
A. Yes, sir.
Q. "When you saw Day-Day running out of the shop, what did you do?"
"I cranked up my car in trying to pull off as quick as possible."
Is that a truthful answer?
A. That is. And that would comport otherwise with how I did see him.
Q. Okay. The next question -- this is at the top of page 7. Question: "What did you see Day-Day do?"
Answer: "He was trying to run to catch up to the car. He snatched the door open."
"What happened next?"
Answer: "As he snatched the door open and tried to get in, I was already pulling off; so he slipped, and he got back up and ran. The door was still open, and he jumped in."
Are those truthful answers?
A. To my knowledge, yes.
Q. Okay. So we're going to go to the next question. Question: "What did you do after Day-Day



got in?"
Answer: "I was in a paranoid. I was paranoid. I said, What the fuck had gone on, you know? And he just said, Pull the fuck off. Pull the fuck off. Go. Go. Go. That is when I observed the off-duty officer behind us."
Is that a truthful answer?
A. Technically speaking, yes.
Q. Okay. Why do you say "technically"?
A. Because I didn't know who was behind me at the time.
Q. Okay. You learned later on that an off-duty officer had spotted you?
A. Yes.
Q. And that's the one who was chasing you?
A. Yes. Because if I'm not mistaken, he did show up at the police station, to my knowledge.
Q. Okay. And everything else that you say about being paranoid and asking what the fuck had gone on and Day-Day saying "pull the fuck off, pull the fuck off," that's all true?
A. Yes.
Q. Okay. Next question: "What was the officer doing behind you?"



Answer: "He had flashed his lights."
"And what did you do?" Next question: "What did you do?"
Answer: "I had proceeded to make a left on 73rd."
Are those truthful answers?
A. I don't recall any flashing lights. I just recall seeing a bright light in my rearview mirror.
Q. Did you make a left onto 73rd?
A. I did.
Q. Okay. Question: "How fast were you going?"
Answer: "About between 75 and 90 miles an hour."
Is that a truthful answer?
A. I did state that, I guess, but I didn't know a Tempo could go that fast.
Q. Well, it's a brand new Tempo?
A. At that time, yes.
Q. Okay. So it is -- do you have any reason to disagree with that statement, or that answer you gave about going 75 to 90 miles an hour?
A. I guess not. No, sir.
Q. Okay. Question: "Why were you going that fast?"



Answer: "I was paranoid and scared."
Is that a truthful answer?
A. I would say yes.
Q. Next question -- and this is at the bottom of page 7 -- "Where did you go?"
Answer: "I went down to Aberdeen, made a left, and went down to 75th and put Day-Day out."
Is that a truthful answer?
A. I would say so. But 75th is actually on the other side of the train tracks. So I know I didn't make it to the other side of that train track because that's not the Englewood area. But -- and yeah. But I would have to say that was 74th, prior to 75th. That's just a minute detail, though.
Q. Okay. You put Day-Day out in that area?
A. Absolutely.
Q. And by "put out," it means you kicked him out of your car?
A. Get the fuck out.
Q. Got it. And the top of page 8, the very next question: "What do you mean by 'put him out'?"
Answer: "Just put him out. Told him to get out."
That is a truthful answer?

A. Indeed.
Q. Okay.
A. Without the wording.
Q. Understood. Question: "What happened next?"
Answer: "After that, I don't know where he ran to or what he did, but I left and took Londell home."
That's a truthful answer; right?
A. Indeed.
Q. Question: "What did you do after that?"
Answer: "I went home myself."
That's a truthful answer; right?
A. Yes, sir.
Q. Next question -- he asked where you lived, and you say, "7622 South Carpenter."
Is that your address?
A. It is.
Q. And that was your address back in 1994?
A. It was.
Q. Okay. Question: "While you have been here, have you" -- "while you have been here, have you had anything to eat?"
Answer: "Yes."



Question: "What did you have to eat?"
Answer: "A couple of sandwiches and a couple of burgers from Checkers."
Is that a truthful answer?
A. I don't know about a couple, but I did eat a Champ's burger.
Q. All right.
A. I did.
Q. Question: "Did you have anything to drink?"
Answer: "Yes."
Question: "What did you have to drink?"
"Pop and water," is your answer.
Is that a truthful answer?
A. I would say so.
Q. Okay. Next question: "Cordell, are you able to read and write English well?"
And your answer was: "Yes."
Is that a truthful answer?
A. Yes.
Q. Next question: "Were you able to use the bathroom while you have been here?"
Answer: "Yes."
Is that a truthful answer?



A. I would say so, but I don't recall ever using a bathroom.
Q. Okay. You just don't remember?
A. I just don't remember.
Q. Okay. Next question: "Have the police treated you well while you have been here?" This is at the top of page 9.
And you answered, "Yes."
Is that a truthful answer?
A. No.
Q. Okay. And I think that's what you described earlier for us; right?
A. It is.
Q. Okay. Have you given us the full explanation earlier in this deposition as to how the police did not treat you well?
A. I did, in regards to the physical and mental abuse.
Q. Okay. And that would be specifically what you described with Detective Foley, as far as physical abuse and Detective O'Brien as far as mental abuse?
A. In part. I didn't go in depth into what all O'Brien did do to me mentally.
Q. Okay.



A. As well as with my father and -- well, it was somewhat alluded to.
Q. We'll come back to it.
A. Okay.
Q. I'll give you a chance to explain it as soon as we're done with this.
A. Yes, sir.
Q. Question -- next question: "Have I, the assistant state's attorney, treated you well?"
And you answered, "Yes."
Is that a truthful answer?
A. He'd done nothing to harm me, other than taking the statement.
Q. Right. He didn't do anything -- he treated you fine; right?
A. Yeah. He did no physical or psychological abuse to me. No.
Q. Okay. Next question: "Have any promises or threats been made to you in return for your statement here today?"
And your answer is: "No."
And I'm going to guess that you're going to say that's not true?
A. That is not true.

Q. Okay. And you described earlier already what the threats were?
A. Yes, I did.
Q. And what the promises were?
A. Yes, I did.
Q. Okay. Is there anything else you haven't described that would fall into the category of a threat or a promise?
A. Outside of the threats to my father and further physical harm, no.
Q. When you say "further physical harm," you mean threaten -- threats of further physical harm?
A. Well, I was in -- what I mean, implied threats of going further possibly with anything that I didn't give --
Q. Okay.
A. -- an answer to.
Q. And we'll come back to that too.
A. Yes, sir.
Q. Question -- next question: "Are you under the influence of any drugs or alcohol while you have given" -- "been giving this statement?"
Answer: "No."
That's a truthful answer?



A. No, I was not under any alcohol or anything.
Q. No drugs; no alcohol?
A. Not at that time. No.
Q. And you were not intoxicated; true?
A. I would think that probably had wored out.
Q. Okay. Question: "Have you been able to see and speak to your father while you were here?"
Answer: "Yes."
That is a truthful answer; right?
A. I did see and speak with him.
Q. Okay. Question -- the next question -- we're almost at the end of this thing.
"The court reporter will now type up your statement. We will then read over the entire statement together, and you will be allowed to make any additions or corrections you wish. Do you understand that?"
And you answered: "Yes."
A. Yes, sir.
Q. Did you have an opportunity to review this and make corrections or changes that you felt were necessary?
A. I had a slight review. But I went and signed it immediately almost.



Q. Okay. Okay. Now, you can set that aside for a second.
THE COURT REPORTER: I'm going to request another break. We've been going over two hours again.
MR. MORAN: Yep. Yep. For sure.
THE VIDEOGRAPHER: Going off -- going off the record at 5:18 PM.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Media Unit 5. We are going back on the record at 5:32 PM.
BY MR. MORAN:
Q. Okay. So we're back on the record. You're ready to get going again?
A. Yes, sir.
Q. All right. So, Mr. Williams, I want to ask you -- the information we just went over in the court-reported statement, are these the things that are in the court-reported statement that you discussed with Detective O'Brien when you had that first meeting with him in the interview room?
A. Yes, sir. I believe so, in large part.
Q. Okay.



A. Yes, sir.
Q. So when we went over the court-reported statement, you told us everything that was true and that -- the things that you felt were not true.
Do you remember?
A. Yes, sir. I do.
Q. Okay. And all of the things that are true in the court-reported statement, that's what you discussed with Detective O'Brien in your first interview with him?
A. Yes, sir.
Q. Okay. And did you also -- when you -- the things that are not true, that you say came from Detective O'Brien, are those the things that were also discussed in that first interview with him?
A. They were.
Q. Okay. Now, I just want to make sure -- I'm going to go back to the interviews between you and the various detectives. And I want to make sure I understand the timeline. Okay?
And we'll start with the first interview with Dwyer and Garkey. Remember, we talked about that, that lasted about 20 to 30 minutes?
A. Yes, sir.

Q. All right. And then you went on -- out with them in their car to look for Londell Harper?
A. Uh-huh.
Q. You have to say yes or no.
A. Yes, sir. Yes, sir.
Q. Okay. So you came back to the police station?
A. Yes, sir.
Q. Okay. And you were -- were you left alone for a period of time?
A. I had to be because there are certain guys that I don't recall being with -- a detective at all or a police officer.
Q. Okay. In those moments that you were left alone, were you in -- were you in a room by yourself?
A. I was either in a holding cell or -- I know once I got there, I was in the holding cell for some time. I don't know how long.
Q. Right.
A. I had no understanding of time.
Q. Sure.
A. You know ...
Q. Now, you knew that you came back to Area 1 with the two detectives after looking for Londell



Harper at some point in the daylight hours?
A. Correct.
Q. Okay. And after you had been at the Area 1 station after they dropped you off, at some point, you were brought food to eat?
A. Shortly thereafter, I was brung -- albeit, multiple Checkers burgers, I guess.
Q. Okay. All right. And then, at some point after you ate, that's when you talked to Detective O'Brien?
A. Yes.
Q. And how long did that interview with Detective O'Brien last?
A. I honestly couldn't say exactly how long that interview last. But I would have to believe it to have taken anywhere from 20 to -- 20 minutes to possibly 45 minutes.
Q. Okay. And then, after that interview with Detective O'Brien, he left; ten minutes later, Detective Foley comes into the room?
A. Yes. Yes.
Q. Okay. And that's when Detective Foley struck you three times?
A. Yes.



Q. Okay. And then Detective Foley leaves, and you're in the room for a period of time before Detective O'Brien comes back?
A. Yes.
Q. Were you in that room alone for that period of time?
A. Yes. I felt -- in hindsight, I felt like I was in there stewing or something because I didn't know what was coming next.
Q. All right.
A. I do remember that question circling in my mind, like, "What's next?"
Q. Now, earlier today, you had said that Detective O'Brien talked to you out by the desks?
A. I was out there. Yes.
Q. Okay. At what point between your first arrival at Area 1 and the point where you gave the court-reported statement were you out among the desks talking to Detective O'Brien?
A. With specifically Detective O'Brien?
Q. Yes.
A. Oh, man. That's so jumbled up in my mind. It's been so long ago. I can't specifically state how long or what -- I know I didn't speak to O'Brien until



after coming back from looking for Londell.
Q. Sure. It was after lunch; right? Or whenever you --
A. It was definitely after lunch.
Q. Yeah. Did you speak with any other detectives out among the desks?
A. I don't recall speaking to any other detectives outside of Garkey and maybe his partner.
Q. Right.
A. And -- and O'Brien.
Q. Now, Detective Dwyer and Garkey and maybe one of their partners, did you speak to any of those guys at the desks?
A. I don't recall speaking to anyone directly at the desk --
Q. Okay.
A. -- outside of those three other names.
Q. And when you spoke to Detective O'Brien out by the desks, what did you talk about?
A. It had to have been small talk by -- by range of discussion. We hadn't gotten actually in-depthly into that after 12:00 o'clock moment at the desk side. But that is where I do definitely recall the lightbulb incident, if I'm to equate that with

that of what I believed him to have that moment of, there go the case with Day-Day, that Daybreak is David Evans. That's what I'm gathering. Because right after that, that's when he took off, so to speak.

Q. Did you mention Day-Day to Detective O'Brien out by the desks?

A. That's where it first happened at. As far as him gaining -- mentioning or gaining the thought process of a David Evans or a Day-Day, Daybreak-type situation, that did happen out amongst or by the desk area, yes.

Q. Okay. When you were out by the desks with Detective O'Brien, did he threaten you at all?

A. Not initially at that time. Not when he first came onto that shift or whatever.

Q. So I'm drawing a distinction between talking to Detective O'Brien in the interview room or the interrogation room --

A. Right.

Q. -- and talking to Detective O'Brien out by the desks.

A. Okay.

Q. So what I understood you to say earlier was that your conversation with O'Brien out by the desks



was mostly small talk?

A. That is correct.

Q. Okay.

A. For the most part. Yes, sir.

Q. But at some point you mentioned Day-Day?

A. At some point, Day-Day -- or Day-Day's name did come up at some point.

Q. Okay. And, to you, your impression of Detective O'Brien is that, when he heard the name Day-Day, the lightbulb must have gone off in his head?

A. Yes. As I stated, the watershed moment or the lightbulb moment. Yes, sir.

Q. Okay. And after that moment, you were brought to an interrogation room?

A. Uh-huh.

Q. You have to say yes or no.

A. Yes, sir.

Q. That's -- in that interrogation room, Detective O'Brien brought in a photograph of Day-Day?

A. He brung in several photographs of not only David Evans, known as Day-Day, known to me as Day-Day, but brung in the photograph, told me who he was, David Evans, and then also made mention of his uncle and went into all types of other things with pictures of



Paris Macklemore, whom had on a purple shirt at the time -- a purple shirt, short sleeved shirt, handcuffs behind his back, looked beat up, as well as Andre Rudik, as well as Robert Johnson. And I don't recall that there was anyone else. But David Evans, Paris Macklemore, Robert Johnson, and Andre Rudik were all shown to me --

Q. Okay.

A. -- as part of pictures.

Q. And when those photos were shown to you, did you reveal then to Detective O'Brien that that's the Day-Day that was in the car with you?

A. I did.

Q. Okay. And I suppose, as far as the other photos go, you told them, "Those guys weren't part of this"?

A. I told them no, those guys were not part of any -- anything that happened murder-wise or --

Q. All right.

A. -- that evening, outside of David Evans.

Q. Other than the small talk chitchat you had with Detective O'Brien out by the desks and your conversation with Detective O'Brien during that one session in the interview room, did you speak to



Detective O'Brien at any other time?

A. Outside of out by the desk and in the interview room, no, except for coming back to the -- with the Vaci, being brought back in there.

Q. When he brought you to Greg Vaci?

A. Yes. Yes.

Q. Okay. And what was that -- what did he say to you during -- in that moment?

A. It was -- it -- I don't recall anything distinctively standing out then, but I know he walked me into that room. And he had a grip on me, I remember, pushing me into that room, not forcibly pushing me, but holding on to me and guiding me into there as if to steer me into there.

Q. Were you handcuffed at the time?

A. I believe -- I don't even think I was at that time.

Q. Okay.

A. I don't recall.

Q. Now, you had -- when we were going over your court-reported statement, you said that there were some other things about mental coercion involving Detective O'Brien that you hadn't explained yet.

Do you remember that?

A. You said that I hadn't explained yet?
Q. Yes.
A. Yes, sir. And speaking -- yes, sir. I remember that, yes.
Q. All right. What other types of mental coercion were you talking about that you had not yet explained in this deposition related to Detective O'Brien?
A. Well, actually, what I'm speaking of -- or was speaking about was the actual part of my father being accosted and talking about -- because, like I said, I didn't even know my father was there. And then when he told me about my father being pulled over and the seat, I know what my dad had told me about that. My dad was an elderly gentleman coming from the dialysis at the Concord Building at the Evergreen Plaza. And he was maliciously, in his elder state, pulled out of his car by Evergreen Police detectives, seat torn out of his car of a blue Thunderbird, and ransacked. How can you not see that this is an elderly man? At that time, I believe, 50-ish himself.
Q. All right. Let me stop you real quick because I want to make sure I understand when in the sequence of events this happened. Okay?



A. That evening that -- oh, go ahead.
Q. Are you saying O'Brien had -- was involved in pulling your father over in Evergreen Park?
A. I'm saying that O'Brien told me about the incident that I knew about. But I hadn't known my dad was there at that time.
Q. So O'Brien told you about an incident in which the Evergreen Park police pulled your dad over and pulled him out of a car?
A. Yes. And in hindsight, he had to have spoken to my dad. Well, I figured he had spoken to my dad, in hindsight. Well, knowing that now.
Q. Okay. Did you ever talk to your dad about an incident in which he was pulled out of the car by police in Evergreen Park?
A. Absolutely. When it happened.
Q. When did it happen?
A. Not even a full week prior to that.
Q. Okay. Let me back up a second.
One week prior to you --
A. Or less. My apologies.
Q. -- giving a court-reported statement -- so one week prior, basically, to this murder -- or these two murders, your father was pulled out of a car by



Evergreen Park police?
A. Yes, sir.
Q. And you think Detective O'Brien somehow is involved in making that happen?
A. By that time, I had known what Detective O'Brien or the CPD was capable of. So yes, I did, in fact, believe he either had something to do with that -- and albeit, I don't know why, at that time, other than him being a CPD or a detective of that sort. I had no knowledge that he had knowledge of that at that time.
Q. Do you have any proof that Detective O'Brien was actually involved in an incident between your father and the Evergreen Park police?
A. Oh, no. I'm not saying that he directly did. I'm saying, at that point in time, I didn't know where he had got that information from.
Q. Well, so let me back up a second.
A. Yes, sir.
Q. Do you think Detective O'Brien -- do you have any proof that Detective O'Brien was involved in this incident with the Evergreen Park police?
A. None.
Q. None whatsoever?



A. None whatsoever.
Q. Okay.
A. None whatsoever.
Q. Did you ask your father any questions about how Detective O'Brien knew about this incident with the Evergreen Park police?
A. No.
Q. Never discussed it once?
A. Never discussed it once. It was never a thought in my mind because I'm just thinking, "How the hell do he know about that?"
Q. All right. Is it -- do you know whether Detective O'Brien learned of the incident with the Evergreen Park police from speaking with your father at some point at Area 1?
A. I did figure that out later.
Q. Okay.
A. I did.
Q. Is that something you figured out on your own, or did you get it confirmed by somebody?
A. No, I figured that out on my own, after learning down the line that my dad had actually been there and, from my understanding, was there a while.
Q. Did Detective O'Brien -- do you have any

knowledge of Detective O'Brien actually threatening your father?
A. I do, yes.
Q. And what is that knowledge?
A. He threatened my father with a gun charge.
Q. He threatened to charge your dad with a gun or a gun charge?
A. Yes. And I was thinking that he was going to give him the gun charges of the murders that they had placed on me.
Q. Now, did you know before you gave your court-reported statement that Detective O'Brien had any conversations with your father about a gun charge?
A. No.
Q. Okay. Did you know before you gave your court-reported statement that Detective O'Brien had had any conversations with your father?
A. No.
Q. Did you know that -- you mentioned something about Detective O'Brien asking you about dialysis with respect to your father?
A. No, sir.
Q. True? Okay. Did that happen? Did Detective O'Brien ever mention to you or ask you



questions about your dad's health condition?
A. Well, he told me -- and again, this is speaking about -- I had no knowledge that he had spoke to my dad.
Q. Right. I understand.
A. So I'm just hearing him say "your dad went to dialysis and" -- so all of this, again, I'm not knowing this. But this is what happened to my father. I know this is what happened to my father. I just knew -- I just didn't know he had spoken to my father about it. So when he brung it up --
Q. So let me ask you -- when you say "I know this happened to my father," what is the "this" you're working -- or you're talking about? What happened?
A. The -- him being accosted by the police department, albeit Evergreen police department.
Q. Okay.
A. Detectives, though, I'm told. I was told by my father these were detectives, not clothed police.
Q. Understood. This is the incident with the Evergreen Park police?
A. Yes, sir. It happened on Western. Yes, sir. 95th and Western.
Q. Did it happen a week before these murders



occurred?
A. Almost a week. Yes, sir.
Q. Okay.
A. Possibly three to four days. And --
Q. All right. So did Detective O'Brien, to your knowledge -- before you gave a court-reported statement, did you have any knowledge that Detective O'Brien had made any promises to your dad?
A. Well, my dad said that someone, not Detective O'Brien, but he did say the police said they -- "they said they're going to let you go, Boy." That's what his exact words to me were.
Q. Okay. But he didn't say how he knew that?
A. Well, no, he didn't.
Q. All right. And did he say when he heard that? Did your father say when he heard that information?
A. Yes. He said he -- the police had told him that.
Q. No, I know that. But before you gave your court-reported statement, did you know how long your dad had been waiting at Area 1?
A. No.
Q. Do you know if your dad went to Area 1,



like, right after the police took you there?
A. I have no clue when he got there.
Q. Okay. Did you ever ask him?
A. No, I did not.
Q. Did you ever ask your mother when your father got to Area 1?
A. I was told by my mom that -- and that's how I did find out that my dad had been there, from that morning, from the time she went to work --
Q. Okay.
A. -- was my understanding.
Q. What time did she go to work?
A. She just said the time she left. But I know she usually left around 6:30-ish, 6:45.
Q. So was it -- when your mother left at 6:40 or 6:30 in the morning, your dad was already gone? Or is he walking out the door at the same time?
A. I'm guessing he's walking out at the same -- I'm guessing.
Q. Okay.
A. And then I was told that he was there with a childhood friend, a Derek Burnett [phonetic].
Q. Uh-huh.
A. So, like I said, I don't have no clue at no

point in time what time my dad left or came or -- I was only told what had happened.
Q. Okay. Is there anything else about Detective O'Brien and coercion -- mental or psychological coercion that you haven't told us yet?
A. Well, in regards to the gun charge and me being asked how do I feel I'm going to protect him and whether I think it's going to happen, those types of alluding or implied situations, no. That was -- everything else has been talked about.
Q. Did you know whether Detective O'Brien threatened your father with a gun charge?
A. My dad did not say he threatened him physically with a gun charge. But O'Brien did tell me specifically, "The gun that he got caught with" -- or the gun -- he did not say "caught with" -- "the gun that you had, your dad said he had a gun. Now, he said that it was a .38." That's what I understood it to be. But I know he had said that the people were killed to be -- the people were killed with a .45 caliber weapon, which is why I stated in the court-reported -- I was led to believe it was a .45.
Q. So was it your understanding when Detective O'Brien was talking to you -- first of all, was this



in the interview room when Detective O'Brien brought up a possible gun charge against your father?
A. Yes.
Q. Okay. And when he brought it up, was Detective O'Brien telling you that it is a possibility that your father could get charged in some way if the gun used was the gun that came from your house?
A. Well, now, the semantics of the wording is where we're going into this. And I can't specifically say that he said "this gun was used." No. I don't recall him saying that like that. Now, a gun charge -- I knew that the gun was a .38. I knew what I had been told. And ...
Q. So did you know at that point in time that the .38 caliber gun that you had had already been stolen?
A. I did.
Q. All right. Did Detective O'Brien say to you, "If you don't give a statement, I'm charging your father with a gun charge"?
A. He didn't outright say that. No, sir.
Q. Okay. At some point after you gave your court-reported statement, were you taken for a photograph, like, a booking photo?



A. I believe so. But that would have -- I don't remember taking that picture at Area 1.
Q. Where do you think you took it?
A. I believe I took it at the County. But I don't know that to be certain or not.
Q. You know what? I'm going to show you the photo and just ask you if you recognize it and give you a chance to tell us where you think it was taken. That way ...
We'll mark this as Exhibit Number 3. Oh, wait. This is going to be Exhibit Number 4. I already marked Number 3.
MS. MEADOR: No, you didn't use this yet.
MR. MORAN: Yeah, I didn't use this yet.
MR. BECKER: Do you want this back, Pat?
MR. MORAN: No. No. No. We'll go out of order. We're going to mark this as Number 4.
(Exhibit 4 was marked for identification.)
MR. MORAN: I'm going to use 3 later. Sometimes that happens. We go out of order. It is what it is.
BY MR. MORAN:
Q. Okay. Sir, you're looking now at Exhibit



Number 4, which is a photograph of you taken on May 27, 1994.
Do you recognize the photograph?
A. I kind of do.
Q. Is this the photograph you're referring to that was taken after you gave your court-reported statement?
A. I would guess so, yes.
Q. Okay. Was this the shirt you were wearing when you were brought to Area 1 in the early morning hours of 8/26/1994?
A. Honestly, I don't recall that shirt. And I'm looking at that shirt like that's an actual shirt that I -- I would wear that shirt now.
Q. The -- the -- you wore glasses back in 1994; is that right?
A. I did.
Q. Are these the -- the picture of you on the right-hand side of the page, showing glasses, are those the glasses that you regularly wore back in 1994?
A. I would guess so.
Q. And were you wearing those glasses during your entire time at Area 1?

A. I would have to -- I needed them, for sure.
Q. Yeah. So you had to be wearing them; right?
A. I was more than likely wearing them.
Q. Okay. And what was your -- I know things may have changed since then. But back in 1994, what was the vision problem that you required glasses for?
A. Nearsighted.
Q. You were nearsighted?
A. I think. I don't know exactly how that was. I couldn't see far away.
Q. You couldn't see far away. But you could see up close, but not far away?
A. Right.
Q. Okay. So if you had to read something, that was no problem; but if you had to see, like, a street sign or someone across the room, that could be a problem?
A. Well, across the room and kind of up close. My glasses were thick then.
Q. I did notice they look a little thick.
A. They were thick, yes.
Q. Okay. All right. I'm going to give you Exhibit Number 3. We went out of order. And ask you to take a quick look at it.



Exhibit Number 3 is the affidavit of David Evans.
(Exhibit 3 was marked for identification.)
BY MR. MORAN:
Q. Is this the affidavit that you -- I want you to take a quick look at it and tell me if that is a fair and accurate version of the affidavit that you obtained from David Evans?
A. I would say yes, sir. Yes, it is.
Q. Okay. I'm going to ask you a question about it. Not too many. Just real quick.
MR. BECKER: Do you have an extra copy?
MR. MORAN: Oh, God. I'm sorry, Steve.
MR. BECKER: That's all right.
MR. MORAN: Here it is. We got a copy for him. I just hadn't pulled it out yet.
You get one too.
MS. MEADOR: Oh, thanks.
BY MR. MORAN:
Q. Okay. Did you read -- by the way, you're familiar with this affidavit; right?
A. Yes.
Q. And this is the affidavit you asked David



Evans to provide you; true?
A. Well, this is what he was given -- was given to me, yes.
Q. All right. And what was the reason you asked David Evans to get you this affidavit?
A. Well, I've been trying to get my innocence proven.
Q. Right.
A. I mean, because I had nothing to do with this. So I mean, it's simple. Keep it simple.
Q. Okay. And did you have a chance -- you've seen it before, obviously; right?
A. Yes. I have seen it. Yes.
Q. Okay. Did you think that this affidavit is helpful in proving your innocence?
A. I would say so. Yes, sir.
Q. Okay. When Mr. Evans gave you this affidavit, or any point in time when you read it, was there anything in the affidavit that you would say is not true?
A. I would not say that -- well, this is his affidavit, for certain. But yeah, I would say this is accurate.
Q. Okay. Do you want to take a moment to read



through it, just to be sure?
A. Well, yes.
Q. All right.
A. Since I have it.
Q. Take your time. And let me know when you're done.
A. Yes, sir.
Q. Okay. You've had a chance to read through it? And do you agree -- or is it -- do you agree with what Mr. Evans has written in his court-reported statement is true?
A. Yes, sir.
Q. Okay. Very good. That was quick.
The next question -- I just want to make sure -- I want to go back to the timeline of your time at Area 1.
After you went from the interview room to see your dad, you went from your dad then to the room with Greg Vaci to give that court-reported statement?
A. Yes, sir.
Q. Okay. And then after you gave that court-reported statement, were you informed that you were being charged with murder?

A. That is correct.
Q. And that's when you had -- these photographs were taken after that?
A. Yes, sir.
Q. And when I say "these photographs," I'm referring to Exhibit Number 4, those -- or what appear to be booking photos.
A. Yes, sir.
MR. MORAN: Okay. Give us a couple -- give us 30 seconds. We'll just step out real quick.
MR. BECKER: Sure. Take your time.
MR. MORAN: We're at the end of the road here.
THE VIDEOGRAPHER: Do you want to go off the record?
MR. MORAN: Yes, please.
THE VIDEOGRAPHER: Going off the record at 6:01 PM.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of Media Unit 6. We are going back on the record at 6:09 PM.
MR. MORAN: Okay. I think that's all the questions I have. You don't have any questions?



MS. MEADOR: I have no questions.
MR. BECKER: No questions for the plaintiff.
MR. MORAN: All right. Very good. Do you guys -- have you decided whether you want to reserve or waive signature?
MR. BECKER: No. Go ahead and explain it to him.
MR. MORAN: Mr. Williams, you have the right to review the transcript of this deposition to make sure the court reporter took everything down accurately. You can make, like, changes to -- like, typographical-type changes, but you can't change the substance of your answers, which means you can't change a "Yes" to a "No," things like that.
Or you could agree the court reporter has taken everything down correctly. That's called waiving signature. If you want to review it, that's called reserving signature. It's a choice that's entirely up to you, and you're free, if you want to ask your lawyer questions about what to do.
THE WITNESS: I was actually going to say I reserve the right to check with my lawyer.



MR. MORAN: So do you want to just reserve signature, and then you guys can sort that out?
THE WITNESS: His call.
MR. BECKER: We'll waive.
MR. MORAN: You're going to waive. All right. Signature is waived.
THE VIDEOGRAPHER: This concludes Media Unit 6 of today's video deposition of Cordell Williams. We're going off the record at 6:10 PM.
MR. MORAN: I will order.
MR. BECKER: I will take a copy.

(Whereupon, the deposition of CORDELL WILLIAMS concluded at 6:10 PM.)



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORDELL WILLIAMS, )
)
Plaintiff, )
)
v. )No. 23 CV 14905
)
JAMES O'BRIEN, THE PERSONAL )
REPRESENTATIVE OF THE ESTATE )
OF WILLIAM FOLEY, THE CITY OF )
CHICAGO, a municipality, and )
UNKNOWN EMPLOYEES OF THE CITY )
OF CHICAGO, )
)
Defendants. )

CERTIFIED SHORTHAND REPORTER
REPORTER CERTIFICATE

I, Holly A. Koch, CSR, RPR, do certify that I am a licensed Certified Shorthand Reporter, duly qualified and certified by the State of Illinois;

That prior to being examined, the witness named in the foregoing proceeding was sworn to testify the truth;

That the said proceeding was recorded by me stenographically at the time and place herein mentioned, and the foregoing pages constitute a full, true, complete, and correct record of the testimony given by said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action nor connected with nor related to any of the parties in said action or to their respective counsel, in any manner whatsoever.

Dated: May 28, 2025

Holly Koch
Illinois CSR No. 084004925