# Exhibit 5

## Trial Testimony of J. O'Brien (Defendant Officer)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS - CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS )
)
vs. ) 94 CR 15518
)
CORDELL WILLIAMS )

REPORT OF PROCEEDINGS had in the above-entitled cause before the Honorable VINCENT GAUGHN, Judge of said court, on the 27th day of June, A.D., 1995.

APPEARANCES:

HONORABLE JACK O'MALLEY,
State's Attorney, by
MR. MIKE SMITH &
MS. LAURA NORASK,
Assistant State's Attorneys,
appeared on behalf of the People;

MS. RITA FRY,
Public Defender of Cook County, by
MR. DEBRA GROHS,
Assistant Public Defender;
appeared on behalf of Londell Harper;

MR. DAVID WEINER,
appeared on behalf of Cordell Williams.

Patricia M. Kovats, C.S.R.
Official Court Reporter
License # 084-003455
Criminal Division

# I N D E X

WITNESS - JAMES O'BRIEN

Direct Examination..........................3
Cross Examination..........................30
Redirect Examination.......................50
Recross Examination........................52

WITNESS - ERNEST WARNER

Direct Examination.........................55

WITNESS - DAVID BERRY LIFSCHULTZ

Direct Examination.........................73

WITNESS - GREGORY VACI

Direct Examination.........................90

Reporter's Certificate....................114

THE COURT: Bring the jury out, please.

(Jury entered courtroom.)

THE COURT: Good morning, ladies and gentlemen. Thank you again for coming on time and everybody being here.

State, proceed. Call your next witness.

Proceed, Mr. Smith.

(Witness sworn.)

JAMES O'BRIEN,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q Sir, would you state your full name and spell your last name?

A Detective James O'Brien, O'B-r-i-e-n. Star number 20466.

Q How long have you been a Chicago police officer?

A Approximately, eight and a half years.

Q How long have you been a detective?

A Five years.

Q Do you work out of Area 1?
A Yes, I do.
Q How long have you worked out of Area 1?
A Since October of 1992.
Q Calling your attention to May 26, 1994, were you working out of Area 1 at that time?
A Yes, sir, I was.
Q Did you become involved in an investigation at that time of the murder of a Myron Cochran (phonetic spellings) and the attempted murder shooting of Billy Johnson?
A Yes, I did.
Q At that time, Mr. Johnson was still alive, is that correct?
A Yes.
Q What time did you start work on that day on the 26th of May?
A At that time that day I started work at 4:30 in the afternoon. I was working what we call third watch which is the afternoon shift.
Q Were you working with a partner?
A Yes, sir, I was.
Q What's your partner's name?
A Detective Jerry Caroll.

Q When you started your shift that day what was the first thing you did after receiving this assignment?

A At that time I had a conversation with the detectives from the day watch, Detective Stalik (phonetic spelling) and Gehrke who was assigned to the investigation prior to us.

Q Did you do anything else?

A At that time we also reviewed any of the reports or notes that had been taken or written up until that point.

Q Now, did you learn that there had been a suspect that had previously been arrested and was in custody at that time?

A Yes, sir, I did.

Q What was that individual's name?

A Cordell Williams.

Q Did you subsequently meet with him?

A Yes, I did.

Q Do you see that person in court?

A Yes, I do.

Q Please point to him and indicate something he is wearing?

A Defendant seated in the white shirt with

the tie with the glasses.

MR. SMITH: Indicating for the record he identified the defendant Cordell Williams.

BY MR. SMITH:

Q Now, detective, when you first spoke with Cordell Williams where was he at?

A He was in an interview room at Area 1 violent crimes.

Q When you met with him who else was with you?

A My partner Detective Jerry Caroll.

Q Do you know about what time this was?

A Approximately, 6:30 in the evening.

Q When you spoke to him what was the first thing that was said?

A Detective Caroll advised him of his rights.

Q What did he do that from?

A He did it from an FOP book.

MR. SMITH: There would be a stipulation at this time. Stipulation would be that if Detective O'Brien were to review an FOP book he would previously recite the rights that were read by Detectives Rose and Detectives Gehrke to the defendant.

MR. WEINER: We would so stipulate.

THE COURT: That stipulation would be moved into evidence.

BY MR. SMITH:

Q After he was advised of his rights, did he agree to talk with you?

A Yes, he did.

Q At that time, detective, what did you and your partner do?

A We had an interview with Cordell Williams concerning this incident.

Q What was said at that time?

A At that time we spoke to Cordell Williams. We initially -- Actually we confronted him with the statements he had made to the other detectives at about how inconsistent they were, about his first statement he had with two guys, Chris and Veno, that he dropped them off. He told the detectives he dropped them off and he was home by 1:03. When in fact we knew this wasn't true because when the police got to his house the engine was still warm on his car. That was after midnight well after the engine would have cooled off.

Second time he talked to the detectives he stated he was with Chris and Veno again.

That he dropped them off and then he added -- he picked some other guys up and that he wasn't responsible for what they did if they did anything while he was with them. And that the third time the detectives talked to him when Detective (inaudible) and Gehrke talked to him he stated the person we were looking for was Dave or a Day and that he took those detectives out and he led them around and they weren't able to come up with any solid information on this Dave or Day, that we didn't believe he was telling us the truth and we wanted him to be truthful with us.

Q At that time did you have -- Did he agree to talk to you -- talk with you more about what happened that night?

A Yes.

Q What did he tell you at that time?

A At this time Williams stated that the previous night he had been down at Northwestern Hospital visiting a person by the name of Parish McMoore who is a friend of his that had been shot and that he was coming back from the hospital and that a person by the name of -- he was now calling him Dayday or Dave was in his vehicle and that they were northbound on Halsted in the 7400 block approaching

74th Street when this Dayday said, "There's some bricks. Stop the car. There's some bricks." He stated he shouted it out in the sub shop.

Q Did he tell you what bricks meant?

A He stated bricks are street names that the Blackstones use for Gangster Disciples or Disciples which are rival gang members of the Blackstones.

Q Did he indicate if he was a Blackstone?

A Yes, he did. He stated he was a Blackstone.

Q The others that were with him?

A They were Blackstones also.

Q How many people was he able to give you a name for that were with him at that time?

A At this time he was only able to name Dave or Dayday. At this time he stated the other two people in the car he didn't know their name.

Q After he heard this term bricks which means Disciples, what was the next thing?

A He stated that Dayday told him to pull over and he stated that he pulled the car over to the curb and that he popped the trunk so that Dayday could get a gun out which was in the trunk. He stated that he had seen Dayday place a gun in the trunk earlier in

the evening.

Q Did he say he knew what Dayday was going to do with the gun?

A Yes, he did. He stated he knew Dayday was going to go in and shoot the disciples.

Q Did he say where he was going to shoot them at?

A In the sub shop.

Q What else did he tell you at that time?

A He stated that after Dayday retrieved the gun from the trunk he walked off towards the sub shop. A few moments later he heard a series of shots. I believe he stated four or five shots and he saw Dayday or Dave now running out of the sub shop running back towards his vehicle.

Q Did he indicate what the next thing that happened with regards to this Dayday?

A He stated that as Dayday was running towards his vehicle he started to pull off and that Dayday stumbled and fell, but was able to get up and get in the car and that he then sped from the scene and he also stated that while they were fleeing the scene he believed that an off-duty police officer chased him and was flashing lights behind him.

Q You indicate he was able to lose or elude this police officer?

A He indicated that he was able to elude the police officer by numerous traffic maneuvers and that he then let the other subjects off in the neighborhood and that he then went home.

Q Did he say he let all of them off at that time?

A Yes, he did.

Q At that time, detective, after speaking to him -- First of all, about how long was that conversation?

A The entire conversation lasted approximately an hour and a half.

Q After you spoke to him what was the next thing that happened?

A During the conversation when he named the person we were looking for, the shooter as Dayday. I was familiar with Dayday as a David Evans from another homicide investigation which I had been involved in two years prior to that. During the conversation with Williams we were able to obtain this other murder file. We in fact verified that Dayday or Dave was David Evans of 7306 South May and that Detective

Stalik and Gehrke were still at Area 1. I requested them to go downtown and obtain a Chicago police department records photograph of David Evans.

Q Did they bring that photo back?

A Yes.

Q Was it shown to Cordell William?

A Yes.

Q He identified that as the person being identified as Dayday?

A Yes, he did.

Q What was the next thing you did at that time?

A At that time after the interview we asked Williams if he was hungry. He indicated he was. We went and got him some hamburgers. I believe we got them from Checker's. We then allowed him to use the washroom. We placed him back in the interview room. We made sure the seargent knew he was still in the interview room and myself and my partner, Detective Caroll and Detective Stalik and Gehrke, we left Area 1 and went on the street and attempted to locate David Evans.

Q When you placed the defendant in the interview room was he handcuffed at all?

A No, the door was locked. He didn't have to be handcuffed.

Q Did you give him any instructions?

A I told him if he needed anything just to knock on the door. Other detectives or a supervisor will come to the door.

Q Is that a common procedure?

A Yes, it is done with every prisoner that's left in the interview room.

Q Now, did you go out at that time with other detectives and try to locate David Evans?

A Yes, I did.

Q Were you successful?

A No, we were not.

Q What did you do after your attempt to locate David Evans failed?

A After that failed we returned to Area 1 violent crimes and we contacted the state's attorney's office, the felony review unit.

Q Did you contact anybody else?

A We also contacted Officer Stanley Sanders from the 12th District to come in and try to identify -- see if he was able to identify the suspect shooter David Evans.

Q Did he identify a photo of David Evans?
A He identified a photograph of David Evans as the person he chased from the sub shop. Yes.
Q Detective, did a state's attorney arrive there?
A Yes.
Q About what time?
A Approximately midnight I would say.
Q Do you recall that state's attorney's name?
A I believe ASA Vaci.
Q V-a-c-i?
A Yes, sir.
Q When he arrived, do you remember was that about midnight?
A Approximately midnight, yes, sir.
Q What was the first thing you did when the state's attorney arrived?
A First thing we did with the state's attorney was we advised him of what the circumstances of the case was. By that time we had been informed by the hospital that the second victim had also expired from his wounds, that he had been pronounced dead approximately 8:30 that evening. We advised him of that fact. He was provided with any reports that had

been prepared or notes that had been written up to that point. He reviewed those notes and then he had a short conversation with Officer Sanders.

Q After that were you present for another interview with defendant Williams?

A Yes, I was.

Q About what time was that?

A That was approximately 12:30 in the morning.

Q Where was this interview at?

A Also in Area 1 violent crimes in the same interview room.

Q Who else was present besides yourself?

A Cordell Williams was present and ASA Vaci.

Q At that time did anyone advise him of anything?

A He was again advised of his rights. The state's attorney did it.

Q They are substantially the same Miranda rights that you previously stipulated to?

A Yes, they are.

Q Did the defendant at that time Cordell Williams speak with the state's attorney?

A Yes, he did.

Q At this time did you learn any new information?

A Yes, we did.

Q What else did he tell you at this time?

A During this conversation he gave basically the same account of the incident as he had to us in our first conversation with him. However, at this time William was able to name the other two people that were in the car as Londell and André and he was also able to name the type of gun that was used as a .45 caliber Ruger and he also was specific about where he dropped the individuals off at. He stated that he had dropped Londell off at 87th and Ashland after the shooting and that he had dropped David Evans and Andre off at 75th and Aberdeen after the shooting. Then he went home.

Q Prior to this he had said he dropped them all off in the neighbor at one time, is that correct?

A That's correct.

Q Prior to this he told you he didn't know the name of these other two individuals, is that right?

A That is correct.

Q Now, after this conversation with the

state's attorney, did the defendant agree to give a court-reported statement?

A Yes, he did.

Q Was a court reporter summonsed to Area 1 violent crimes?

A Yes, sir.

Q Were you present for the taking of the court-reported statement at approximately 2:30 in the morning?

A Yes, sir, I was.

Q And at the end of that court-reported statement was it typed up and reviewed by the defendant and the state's attorney along with yourself?

A Yes, it was.

Q Was it signed by the defendant, State's Attorney Vaci and yourself?

A Yes, it was, after it was checked for accuracy.

Q Was a photo also taken of Cordell Williams shortly after that?

A After the statement was signed, yes, sir.

Q Now, detective, after that, did you begin to search for these other people: Andre Roderick,

Rondell Harper and David Evans?

A Yes, we did.

Q Jumping back a second, Detective, when the defendant spoke to you regarding his whereabouts the night before, he stated they had first had gone to a hospital, is that correct?

A Yes.

Q To see whom?

A They had gone to Northwestern Memorial Hospital to visit a Parish McMoore.

Q Were you familiar with a Parish McMoore?

A Yes, sir, I was.

Q Do you know him to be in a gang?

A Yes.

MR. WEINER: Objection -- Withdraw it.

THE COURT: Okay.

BY MR. SMITH:

Q What gang do you know him to belong to?

A He is a Blackstone.

Q On this day you began to look for Harper and Evans?

A Yes, sir, it is.

Q Sometime after that was defendant Londell Harper arrested and charged in this case?

A Yes, he was.
Q And did you continue to look for the others?
A Yes, I did.
Q Now, subsequent to that, did you eventually get a warrant?
A For David Evans, yes, sir, I did.
Q After you received that warrant did you continue to frequent places that David Evans may have been at?
A As time permitted in between our other murder investigation we would frequently check the neighborhood that David Evans lived in but we were unable to locate him.
Q Calling your attention to August 15, 1994, were you contacted by any officers?
A Yes, I was.
Q Who contacted you?
A Officer Theo Boldt from the 7th police district.
Q Was information given to you regarding the location of David Evans?
A Yes, it was, sir.
Q Where did you proceed at that time?

A We proceeded to the area of Aurora, Illinois.

Q Specifically in Aurora, where did you go?

A We had received information from Officer Theo Boldt that David Evans who was the wanted shooter in this offense was hiding at an apartment building which was located behind a McDonald's on Farnsworth Avenue in Aurora.

Q Did you receive any other information?

A And that he was staying with an individual whose street name was Womack and Womack drove a green Jeep Grand Cherokee, sport utility vehicle.

Q When you went out to Aurora, did you find this location that matched the description?

A We exited I88 and Farnsworth. We went southbound into Aurora. We came across a McDonald's and sure enough behind the McDonald's there was a large apartment complex located directly behind it.

Q Did you locate anything else?

A We had to drive down a couple blocks further south to get into the parking apartment complex. We were in an unmarked vehicle. We drove in there, and the building closest to McDonald's, there was a green Jeep parked out by the building.

Q What did yourself and the team of detectives that you were with do?

A At that time we left the area. We went to a parking lot further down Farnsworth and we contacted the Aurora police gang unit to come and meet with us.

Q Did they meet with you and did you explain basically what your purpose in being there?

A Several officers from their gang unit met with us as well as one of the parole officers. We explained we were looking for a subject for a double homicide. That we had a warrant for him. We gave them all information I just gave to you and we then went to that location.

Q When you arrived at that location, did you basically set up a perimeter and move in?

A Yes, we did.

Q Which apartment did you focus your attention on?

A The apartment that the Grand Cherokee -- the green Grand Cherokee was parked outside of.

Q Before you had a chance to go up to that apartment, did anything happen?

A Yes, sir.

Q What happened?

A The grand Cherokee, two people came out of the apartment and entered the Grand Cherokee and left.
Q What if anything did you or your fellow officers do?
A A couple officers from the Aurora gang unit and two of the detectives, Detectives Beaudrow and Halloran that were from Area 1 violent crimes went after the Grand Cherokee and initiated a field stop on that vehicle.
Q Had you gone up to the apartment at this point?
A No.
Q Did they relay any information to you?
A After curbing the vehicle and had a conversation with the occupants they relayed information back to us that David Evans, Dayday, was inside the apartment.
Q What did you do when the other detectives and gang members from Aurora do?
A We approached the apartment. The Aurora detectives covered -- the Aurors gang officers covered a sliding glass door on the side of the apartment. Myself and my partner went to the front door.
Q What did you observe when you got to the

front door?

A I was able to look in and through the window in the door I was able to observe David Evans seated on a sofa inside that apartment.

Q What if anything did you do at that time?

A At that time I knocked. Evans asked who was it. I stated police. At that time I was able to observe him get up off the couch and run which would have been towards where the sliding glass doors were. I then, for the safety of the other officers, I kicked the door in and myself and Detective Caroll went in and arrested David Evans.

Q Was he subsequently transported back to Area 1?

A Yes, sir, he was.

Q Did you contact any witnesses regarding viewing a lineup?

A Yes, sir, I did.

Q Who did you contact?

A Officer Sanders and Mr. Pratt who was the civilian witness to this incident.

Q Now, did officer Sanders first view the lineup at approximately 8:00 p.m. on August 15, 1994?

A Yes, sir, he did.

Q Did he identify anyone?
A He immediately identified David Evans as the person he chased out of the sub shop, chased from the sub shop.
Q Same day about 11:30 in the evening, did Mr. Alexander Pratt view a lineup?
A Yes, he did.
Q Did he identify anybody?
A Yes, he did.
Q Who did he identify?
A He identified David Evans as the person he saw shoot and kill both the victims.
Q Detective, I'd ask you if you recognize what has been marked People's Exhibit Number 29 for identification?
A Yes, sir, I do.
Q What do you recognize that to be?
A This is the typed court-reported statement of Cordell Williams concerning this double homicide.
THE COURT: Mr. Smith, People's Number 29 is the same as Defense's 2. It is a supplemental report made out by Dwyer.
MR. SMITH: Judge, then this would be marked as -- If I could change the marking on this,

your Honor?

THE COURT: Sure. Thank you.

MR. SMITH: Marked as People's Exhibit number 34, Judge.

BY MR. SMITH:

Q Detective, People's Exhibit number 34, do you recognize what that is?

A Yes, sir, I do.

Q What do you recognize that to be?

A It's the typed court-reported statement of Cordell Williams taken at Area 1 on that evening concerning the double homicide.

Q Is that the original?

A I believe so, yes.

Q Is that in substantially the same condition as it was when the statement was taken by the state's attorney?

A Exactly.

Q I show you what's been marked as People's Group Exhibit 30A and 30B. 30A is an evidence envelope, is that correct?

A Yes, sir.

Q I show you what's marked as 30B. Do you recognize what People's 30B is?



SOTOS-WILLIAMS 11544

A 30B is the photograph of Cordell Williams taken by the court reporter after the statement was taken from him at Area 1 violent crimes.

Q Showing you what's marked People's Exhibit Number 31 for identification. Do you recognize who that is a photograph of?

A This is also a photograph of Cordell Williams. It's a Cook County jail intake photo.

Q Does that truly and accurately depict how he appeared shortly after giving that statement?

A Yes, sir, it does.

Q Does the court -- Does the photo taken by the court reporter truly and accurately represent how Cordell Williams looked when he was there at the area?

A Yes, sir, it does.

Q I'll show you what's previously been marked People's Exhibit Number 12 for identification. Do you recognize what that is a photograph of?

A Yes, sir, I do.

Q What is that a photo of?

A This is a photograph of the lineup which was conducted with Officer Sanders with suspect David Evans.

Q Where is he located?

A Evans is seated in the fifth position. He is the subject on the end here.
Q I'll show you -- Does he have a red letter "S" over his head?
A Yes, he does.
Q Showing you People's Exhibit Number 1 for identification. Do you recognize what that is a photograph of?
A Yes, I do.
Q What is that a photo of?
A This is a photograph of the lineup which was viewed by Alexander Pratt later in the evening. It also contains one of the participants as suspect David Evans.
Q Is that the person who was identified?
A Yes, it is.
Q Is there any mark on that?
A There is an X over the number 4 subject in this lineup who is David Evans.
Q Showing you what's previously marked -- what is marked People's Exhibit Number 32 for identification. Do you recognize People's Exhibit 32 as a photograph?
A Yes, I do.

Q Who is that a photo of?
A Identification photograph of David Evans taken after a lineup.
Q Finally, showing you what's marked People's Exhibit Number 33 for identification. What is that a photograph of?
A This is also a photograph of David Evans. It is a photograph of his left arm, tattoos that are present on that arm.
Q Does that accurately, these photographs, represent the lineup and defendant David Evans after you had taken him into custody and after he was identified in those lineups?
A Yes, sir, they do.
Q Now, detective, did you determine in the course of your investigation the respective ages of David Evans, Londell Harper, Andre Roderick and Cordell Williams?
A Yes, I did.
Q What was their ages?
A Andre Roderick, David Evans and Londell Harper were all 17 at the time of this incident. Cordell William was 19 at this time of this incident.
Q With regards to the area where they live,



SOTOS-WILLIAMS 11547

are you familiar with their addresses?

A Yes, I am.

Q Where did they live at?

A Cordell Williams live 7622 South Carpenter. Andre Roderick lived at 7570 South Carpenter. David Evans lived at 7306 South May. Londell Harper lived at 8822 south on Ashland.

Q Detective, when you first spoke to the defendant Cordell Williams, can you describe his demeanor?

A Initially when we went in the room his demeanor was, I would say, cocky.

Q Through the course of this investigation, did you subsequently learn that Billy Johnson had died of gunshot wound to his head, correct?

A That's correct.

Q Did you ever inform defendant Cordell William that the second victim had now died?

A Yes, we did.

Q What was his reaction to that?

A As a matter of fact, actually no response.

Q During any of the times when he spoke of this double murder, did he ever show any type of remorse or regret whatsoever?

A None at all.

MR. SMITH: May I have a moment, your Honor?

THE COURT: Yes.

(Brief pause.)

MR. SMITH: We have nothing further, Judge.

THE COURT: Cross-examination.

CROSS EXAMINATION

BY MR. WEINER:

Q Detective O'Brien, good morning.

A Good morning, sir.

Q When you first saw Cordell Williams on the morning of May 26th of 19 -- afternoon of May 26, 1994, was he wearing glasses?

A I believe so, yes, sir.

Q He was wearing glasses the first time you saw him and he was wearing glasses the entire evening, wasn't he?

A I believe so, yes, sir.

Q He was wearing -- What else was he wearing that you remember?

A I believe he was wearing some type of T-shirt and maybe a black shirt with a design and maybe red shorts. I don't specifically recall what

kind of pants he had on.

Q You didn't notice any tattoos on Cordell Williams?

A At that time, no, sir.

Q Did you ever during the time you were interviewing him?

A None on his lower arms, but I never had him take his shirt off to check further.

Q Was the exhibit 30B that you identified which was the court reporter's picture of Cordell Williams after his court-reported statement at 2:30 in the morning, is that correct?

A Yes, it is.

Q Officer, -- Detective, you took this interview of Cordell Williams on May 26th of 1994, is that right?

A Yes, sir.

Q You devoted approximately a five-page report to the interview, your going out and looking for David Evans and then coming back and meeting with the assistant state's attorney, isn't that true?

A We did a report. I'm not sure exactly how long. Yes, sir.

Q You filed that report on June 7th, 1994

some 13 days later, isn't that true?

A That would have been when the report was submitted, yes, sir.

Q Could you tell the ladies and gentlemen of the jury why you waited 13 days to file that report?

A This murder and the other 275 murders that we had in Area 1 aren't the only cases we're involved in. We come to work. What happens, we get assigned jobs. We always can't sit down and do our typing as soon as we'd like to. That's why we take notes. May is the beginning of the summer. The summer is when the majority of our murders and shootings happen. That was the first available moment we were able to get to that report.

Q So then you had plenty of opportunity. I mean at various times you and your partner, I believe Detective Caroll, to prepare a report which you discussed today with regard to the interview that you had with Cordell William, isn't that true?

A We had plenty of time, ample opportunity, sir?

Q What I'm saying, when you submitted this report on June 7th you had reviewed your notes?

A Yes, sir.

Q You had talked to Detective Caroll about his notes at the interview, isn't that correct?

A Yes, sir.

Q And as far as you're concerned, the report that you submitted basically in fact tells the statement that Cordell Williams gave to you and Detective Caroll that day, isn't that true?

A It is a summary of the statement, yes, sir.

Q Well, now, detective, you said that when you first talked to Cordell Williams you confronted him with the conflicting statements that he had made, isn't that true?

A Yes, sir.

Q One of those statement was that he had went to visit Parish McMoore at Northwestern?

A Yes.

Q You determined that to be the truth, isn't that also true?

A Yes, sir.

Q One of those statements was that he had been driving his mother's 1990 Ford Tempo, is that true?

A Yes.

Q You determined that that was the truth,

isn't that right?

A Yes, sir.

Q The first thing that the defendant said to you after you had confronted him was the statements was that after the defendant and the three other individuals visited Mr. McMoore they returned to the neighbor, isn't that true?

A Yes, sir.

Q He never told you, did he, that they were returning to the neighborhood to commit a murder, did he?

A No, sir.

Q He never told you that there was a plan by either he or Dayday or any of the other individuals in the car to come back and commit a crime, isn't that true?

A Not specifically planned, no, sir.

Q Did he tell you that there was any other kind of a plan?

A He stated that he had knowledge that Evans was going to shoot those individuals when they went into the sub shop.

Q I want to talk to you about the time you said this that they said he said when he came back to

the neighborhood.

MR. SMITH: Objection.

THE COURT: If you understand it.

BY MR. WEINER:

Q I am talking about your first few pieces of conversation with him.

A Yes, sir.

Q When he said he was coming back to the neighborhood.

A Yes, sir.

Q Did he tell you that they were coming back to commit a crime?

A No, sir.

Q Did he tell you they had any discussion whatsoever about committing a crime?

A No, sir.

Q When he told you that Mr. Evans had put a gun in the trunk, where did he tell you he was at that time?

A When he had put the gun in the trunk?

Q Where was Mr. Williams?

A I don't recall where he said he was at that time.

Q Did he tell you -- not tell you he was in

the car and had popped the trunk?

A He said he popped the trunk to allow Evans access to the weapon at the time they stopped.

Q Didn't you say in your report that Mr. Williams knew that there was a gun in the car earlier in the evening because he had popped the trunk?

A I don't recall if we put those words in there. I know he stated he knew the gun was in the trunk because he seen Evans place it in there earlier.

Q Did he ever say he saw that gun before may 26, 1994?

A No, sir.

Q Did he ever say that David Evans or anybody else had shown him any gun before May 26th of 1994?

A Not at that time, no, sir.

Q At any time during the interview with yourself or the state's attorney, did he ever say that he had seen David Evans with that gun before May 26th of 1994?

A During the court-reported statement he was able to name the type of gun that Evans had.

Q I asked you if he had ever said he had ever seen that gun before?

A Specifically, no, sir, he did not.

Q So, when you were questioning Mr. Williams about his coming back to the neighborhood before the shooting, at no time did Mr. Williams tell you that he or anybody else in the car had told him that they were intending to use that weapon that night, did he?

A He didn't say that, no, sir.

Q Now, you said that he told you that when he was driving down Halsted a person behind him that he knew as Dayday -- By the way, he had told other police officers that the person's name was Dave or Day, didn't he?

A Yes, sir, he did.

Q That in fact is consistent with the term Dave and Dayday, isn't it?

A It's partial, yes, sir.

Q I mean I know it caused you to recollect that a person named Dayday was involved in another shooting?

A Yes, sir.

Q But he had told several other officers in fact had led some officers -- had been in a car with other officers looking for a person named Dave or Day earlier in the day, isn't that true?

A Right, but not in the right locations.

Q Well, isn't that a conclusion on your part? Did you know he was trying to take them to area store fronts where Mr. Evans hung out?
A I know David Evans. I know him from the other homicide investigation. I know where he lives. I know where he hangs out. I dealt with him, and where he took those other officers is not where David Evans hangs out. It's not where David Evans lives.
Q Of course, maybe Mr. Williams knew other areas where he hung out and they were different from where you knew he hung out as well, isn't that true?
A That's possible.
Q Were you with him during the time that he was in that car?
A No, sir, I was not.
Q Were you with him when he was going around with Officer Burke or any other officer trying to find an area?
A No, I was not.
Q So now, as they were driving in this car -- By the way, Mr. Williams never said he put the gun in the trunk, did he?
A No, sir, he did not.
Q Mr. Williams never said he handled that gun

in any way, did he?

A No, sir.

Q In fact, during the entire conversation that you had with Mr. Williams or the conversation that the state's attorney had with Mr. Williams, Mr. Williams never said that he had touched that gun at any time, did he?

A No, sir.

Q Now, you said that he said as they were driving along, Dayday said stop the car because he had seen some bricks in the sandwich shop, is that right?

A Yes, sir.

Q Did he ever tell you that Dayday said stop the car, keep it running, I'm going to go in there and shoot these guys and then come out and we're going to get away?

A In those words, no, sir.

Q In fact, what he said to you was Dayday yelled bricks, stop the car and he stopped the car, isn't that right.

A Yes, sir.

Q In fact, he told you he pulled the car over into a parking space, didn't he?

A He said he pulled the vehicle to the curb.

Q He told you he turned the vehicle off, didn't he?
A I don't recall if he said he turned the car off, sir.
Q Well, you said he told you that he then popped the trunk when -- I believe in your testimony when he pulled over the car, but isn't it a fact that Dayday tells Mr. Williams to pop the trunk?
A Yes, sir.
Q Mr. Williams didn't, as you testified, popped the trunk before Dayday told him to pop the trunk, did he?
A He popped the trunk for Evans, yes, sir.
Q He popped the trunk after Evans said pop the trunk, didn't he?
A If that's what the report says then that's what he said that night.
Q Do you know where he told you that he popped the trunk from?
A He was never specific whether it was an alarm or if it was a button in the glove box. He said pop the trunk.
Q Did he tell you he was in the car at the time he popped the trunk?

A Yes, sir.
Q He didn't go out to the back of car with Mr. Evans, did he?
A That's what he stated. No.
Q Now, you then said that he told you that he knew Mr. Evans was going to go in there and shoot those people?
A Yes, sir.
Q Did he ever tell you Mr. Evans told him he was going to do that?
A That Evans told him? No, sir, he didn't say that.
Q Didn't he tell you that after he popped the trunk that a member -- that another person in the car said shit, Evans is going in there or Dayday is going in there to shoot?
A No, sir, he never told us that.
Q Didn't he tell you that he only thought David Evans might shoot someone?
A No. He told us he knew he was going to shoot em.
Q Were you present at the court-reported statement?
A Yes, sir, I was.

Q Were you present when the state's attorney asked him what he thought David Evans was going to do?
A Yes, sir.
Q And didn't he answer that he had reason to believe that Evans was going to go in there and shoot?
A That's what he stated during the court reported -- That's not what he stated during our oral interview.
Q At the court-reported statement there was a court reporter there, wasn't there?
A Yes, sir.
Q He or she was taking down each and every word that this defendant said, isn't is that true?
A Yes, sir.
Q And at the court-reported statement the only notes that were taken by the court reporter were on a machine such as the court reporter sitting in front of you today, isn't that also true?
A Yes, sir, it is.
Q Now, the state's attorney had an interview with the defendant Cordell Williams before he made the court-reported statement, didn't he?
A Yes, sir, he did.
Q Did it surprise you at the reported

statement that the state's attorney asked Cordell Williams, Mr. Williams, what did you think that David Evans was going to do?

MR. SMITH: Objection to the form of the question.

THE COURT: Overruled. The detective can answer.

THE WITNESS: You asked me if I was surprised by what the state's attorney --

BY MR. WEINER:

Q Yes, sir.

A I can't say I was surprised by what the state's attorney did.

Q Did you ever hear David -- Cordell Williams tell the state's attorney that he knew there was a plan to kill those two individuals?

A Told the states attorney, no, sir.

Q Did he ever tell you he knew there was a plan to kill those two individuals?

A A plan?

Q Yes.

A No, he never said plan.

Q Did he ever tell you that he was, before that car stopped, there was some sort of an agreement

between anybody in that car and him that they were going to take that gun out and kill anybody?

A No, sir.

Q So when he said to you that he knew Evans was going to shoot those two people, why didn't you expand on that? Why didn't you say to him, well, how did you know?

A We continued on with the interview. We were trying to proceed in an orderly manner with the interview.

Q You have been a homicide -- violent crime detective for five years, right?

A Yes, sir.

Q You know that in an accountability case, don't you, that if there had been a prior plan, a prior agreement, it would clearly submit the state's case against the difficulty if in fact he were to be held accountable, isn't that true?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: Would you repeat that, sir?

BY MR. WEINER:

Q You know in an accountability case when someone is to be held accountable for the shooting by

another individual that it is very helpful to your case and to the state's case that you determine whether or not there had been a previous plan or an agreement by the participants, isn't that true?

A A plan or an agreement for accountability? I don't think it has to be specifically a plan or agreement. I think he has to aid or abet prior or during the commission of an offense. That's my definition of accountability. When he stated that he knew that Evans was going to do the shooting and when he popped the trunk, he made himself accountable.

Q Well, Detective O'Brien, you then were so satisfied that when he said I knew he was going to go in there and kill those two people that you just went on with the interview? You never asked another question about how he knew, is that your testimony?

A You asked me --

Q I'm asking you now.

A When he stated he knew, he made himself accountable.

Q You didn't have to ask him anything about how he knew, isn't that right?

A As far as his knowledge?

Q Yes.

A I am assuming he surmised from the circumstances.

Q Did you assume he surmised before or after he popped the trunk?

A I am assuming when Evans told him to pull over that he knew what was going to happen.

Q You assumed that but never asked him that, isn't that right, officer?

A I can't recall if I specifically asked him that or not.

Q You never asked him when he knew?

A He stated he knew when he pulled over.

Q He didn't state -- He stated he knew when he pullled over. I want to show you --

MR. SMITH: Objection. If there is a question I ask that the detective be allowed to answer the question.

THE COURT: Sure.

BY MR. WEINER:

Q Showing you what I marked as Defendant's Exhibit Number 3 for identification. I'll ask you if you recognize this document?

A Yes, sir, I do.

Q Is that the report that you made and

submitted on June 7th of 1994 with regard to the statement that Cordell Williams made to you?

A Yes, sir.

Q Can you tell the ladies and gentlemen of the jury where it says in that statement that he knew that Evans was going to kill the two individuals when he was told to stop the car?

A Do you want me to read it verbatim?

Q Read what you wrote.

A Sure. That they drove through the neighbor down Halsted northbound to 74th Street. Dayday who was seated behind the driver Williams shouted to Williams stop the car as Dayday had observed some bricks in the sub sandwich shop at 74th and Halsted. Williams explained the term bricks is street for disciples, a rival street gang. Dayday then tells Williams to pop the trunk. Williams knows there to be a handgun in the trunk as he observed Dayday place it in the trunk earlier in the evening. Williams does pop the trunk and Dayday retrieves the handgun and proceeds in the sandwich shop. Williams relates that he knows Dayday's intentions are to shoot at the individuals, parenthesis, bricks inside the store.

Q So my question is again: where does it say

in that report that he knew that Dayday was going to shoot the individuals when Dayday told him to stop the car?

A In the report it states that he popped the trunk and saw Evans heading towards the door of the sub shop. Again, this is a summary of his statement.

Q You are a pretty careful guy, aren't you, in terms of being a police detective, I would say, and would you not agree you are probably one of the most carefully prepared police detectives on the force, would you not agree, sir?

A Judging against what standards, sir?

Q Judging against the fine police officers that serve our city?

A I do my job.

Q In that report it says that he knew that Dayday was going to shoot after he popped the trunk and observed Evans going into the sub shop, isn't that true?

A You're turning the terms around. He never said after he popped the trunk. That sentence is after those other sentences.

Q I thought that's what you said. He never said -- You never said in that report, that summary,

that he ever said to you, Mr. Williams, that is that he knew what Evans was going to do at the time Evans said stop the car, did you?

THE COURT: Do you understand the question, detective?

THE WITNESS: I understand what he is getting at.

Again, that is a summary of what he told us. The order that his knowledge is placed in this is just in the summary fashion.

BY MR. WEINER:

Q You're saying that in a double homicide that you had 13 days to prepare a report in which it doesn't say anything about when he had knowledge, and you're saying that you understand accountability to be aiding and abetting either before or during the time of the commission of the offense that you summarized something that could be interpreted as being before, during or after Mr. Evans left the car with the gun. Is that what you're saying?

A Yes, sir.

MR. WEINER: Thank you, your Honor. I have no other questions of the detective.

THE COURT: Thank you.

MS. GROSS: Nothing.

THE COURT: State, redirect?

REDIRECT EXAMINATION

BY MR. SMITH:

Q Detective, defense counsel asked you about accountability. We also know there not need be an agreement in order to --

MR. WEINER: Objection.

THE COURT: Overruled at this time.

BY MR. SMITH:

Q You also know for accountability that there not need be an express plan or agreement to be accountable for a murder?

A That's correct.

Q As a matter of fact, many murders are done without a group sitting down and writing out their plans, aren't they?

A Most of them.

Q A lot of them are done on spare of the moment?

A That's correct.

Q Especially in the form of a driveby?

A Yes, sir.

Q Everybody has a part to play?

A Yes, sir.

Q In this instance after being told to pull over, the defendant did pull that car over, didn't he?

A Yes, sir, he did.

Q At that time he knew that Dave Evans was getting out of the car, correct?

A Yes, sir.

Q He popped the trunk so David Evans could get that gun?

A That's correct.

Q He knew that gun was in the trunk?

A Yes, sir.

Q He knew that Dave Evans was probably going to shoot those kids?

A Yes, sir.

Q He sat there and waited while David Evans went down to the sub shop, didn't he?

A Yes, sir, he did.

Q After the shooting he sat there and waited while David Evans made good his excape?

A He helped him. He made sure he made good his escape.

MR. WEINER: Objection; conclusion.

THE COURT: I will allow you latitude on

recross.

BY MR. SMITH:

Q Then he took off and then it led the police officer on a high speed car chase going up to anywhere from 60 to 90 miles an hour through side streets of the city?

A Yes, sir.

Q Dangering other people's lives to get his partner off?

A Yes.

Q And get rid of the murder

A Yes, sir.

Q -- get rid of that murder weapon?

A Yes, sir.

MR. SMITH: I have nothing further.

THE COURT: Thank you. Mr. Weiner

RECROSS EXAMINATION

BY MR. WEINER:

Q Detective, did Mr. Williams ever tell you he helped get rid of the murder weapon?

A Specifically, no, sir, he did not.

Q How about nonspecifically?

A No, he never said anything about what happened to the murder weapon. I'm sorry.

Q So when counsel asked you, that was an incorrect answer, is that true, he asked you if he was helping to get rid of the murder weapon. That was incorrect?

A No.

Q Didn't Mr. Williams tell you that when he heard the shots he pulled away from the curb and Evans almost didn't make it into the car?

A He stated Evans fell, yes, sir.

Q He stated that Evans fell twice trying to get into the car, didn't he?

A I don't know if Williams stated he fell twice.

Q How many times did he say that he fell?

A I remember he said he fell; so I don't remember if he said he fell twice.

Q He said he fell while the car was pulling away?

A As he began to pull away.

Q He told you, did he not, that if Evans hadn't gotten to the car he was going to go any way, didn't he?

A No, he never stated that, sir.

Q Well, did he not tell you that he was in a

panic when he heard the shots?

THE COURT: Sorry. There is several conversations. Could you be more specific as to foundation?

BY MR. WEINER:

Q Let me say this. Were you present during the court-reported statement where a court reporter had a machine and was taking down his statement word for word at 2:30 in the morning along with Gregory Vaci, the assistnat state's attorney?

A Yes, sir, I was.

Q Were you present when Mr. Williams said that when he heard the shots he was in a panic and in fact, he said he cranked up the car and tried to pull off as fast as possible?

A If that's in the court reported statement. I was present.

Q Isn't that what he told you when you sat with him in the interview room at Area 1 before you let him use the bathroom and fed him the Checker's hamburgers?

A No, sir.

Q Didn't he tell you, sir, at Area 1 that he was shocked and surprised when he heard those gunshots

and tried -- he had the car off and he tried to get out of there as quickly as possible?

A I don't recall him saying that at all.

MR. WEINER: No other questions of the detective.

MR. SMITH: Nothing further, Judge.

THE COURT: You can step down.

(Witness excused.)

MR. SMITH: We have one brief witness.

THE COURT: Fine.

(Witness sworn.)

(Witness sworn.)

ERNEST WARNER,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. NORASK:

Q Sir, could you tell us your full name and spell your last name for the court reporter?

A My name is Ernest Warner, W-a-r-n-e-r.

Q Sir, what is your occupation and by whom are you employed?

A I'm a firearms examiner for the Chicago