# Exhibit 6

## Trial Testimony of R. Mangan (Arresting Officer)

MS. MORASK: Judge, People call Officer Mangan.

THE SHERIFF: Please step up in the witness box and face the clerk, Officer.

OFFICER ROBERT MANGAN,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MORASK:

THE CLERK: Please be seated.

THE COURT: All right. Proceed, State.

MS. MORASK: Thank you.

Q Sir, could you please tell the ladies and gentlemen of the jury your name, star number and unit of assignment.

A Robert J. Mangan, M A N G A N, star Number 4688. I now work in the 10th District, Chicago Police Department.

Q How long have you been a Chicago police officer?

A Seven and-a-half years.

Q Back on May 26th of 1994 what district were you working?

A I was assigned to the 7th District.

Q Okay. And when you were assigned to the 7th District, what was your partner's name?

A Michael Kane.

Q And on May 26th of 1994 in the early morning hours, were you on duty?



SOTOS-WILLIAMS 11449

A Yes, I was.
Q All right. And at approximately 1:30 in the morning, did you receive or monitor a call over the radio?
A Yes, we did.
Q What was the nature of that call?
A There was a flash message sent on a vehicle wanted for a homicide. It was a 1990 or '89 Ford four door with a license plate of BN 9244.
Q All right. And was there a location where the car was supposed to be at when you were monitoring the message?
A Yes. The address the car was registered to was 7622 South Carpenter.
Q And did you proceed to that location?
A Yes, we did.
Q What's located there, Officer?
A A single family residence.
Q Did you notice anything in front of the house?
A Yes. The vehicle was parked there directly in front of the house.
Q And what did you do at that time when you saw the vehicle parked in front of the house?
A My partner and I exited our vehicle and proceeded to ring the door bell of the residence.
Q Okay. And were you met by anybody at the door?

A Yes, we were.

Q Did that person introduce themselves?

A Yes.

Q What was that person's name?

A Brenda Williams.

Q And did you learn from her the person who had driven the car last?

A Yes.

Q And who was that?

A Her son, Cordell Williams.

Q And did that person eventually come to the door?

A Yes.

Q Did you see the person at that time?

A Yes.

Q Do you see that person today in court?

A Yes, I do.

Q Could you please point to him and describe something he's wearing for the ladies and gentlemen.

A He's all the way on the end to the right table next to the female attorney with the black shirt.

Q I want you to --

MR. WEINER: Let the record reflect that the officer has identified Mr. Harper.

MS. MORASK: Judge, may I rephrase my question?

THE COURT: The record is going to reflect that.

MR. WEINER: I want the record to reflect that.

THE COURT: It is going to reflect. So go on.

MS. MORASK: Q When you saw Mr. Williams at that time -- first of all, Officer, I want you to look around the courtroom and look at the counsel --

MR. WEINER: We'll stipulate now that he can identify the Defendant.

MS. MORASK: That's not my question.

THE COURT: Don't be offering stipulations, Counselor.

MS. MORASK: Q Did the person who came to the door back on May 26, 1994 look like this person sitting here right now?

A No, he did not.

Q Did he look different from that?

A Yes, he did.

Q Okay. Now, the person who came to the door, did he introduce himself as Cordell Williams or did his brother introduce him as such?

A His mother did.

Q Did you have a conversation with him?

A The extent of the conversation I had with him was if he was driving the vehicle to which he replied yes. I asked him what time did he get home. He said he got home at 10:30. I asked if he had loaned his car to anybody else. He stated no,

that he was the last person driving the vehicle.
Q All right. And where did that conversation take place?
A In the front room of the mother's residence.
Q And do you know what vehicle he was referring to?
A Yes.
Q And what vehicle was that?
A The 1990 Ford Tempo, four door.
Q And at that time were other detectives or officers arriving on the scene?
A Yes, they were.
Q And did you turn -- did you turn Cordell Williams over to Detective Dwyer or did he arrive on the scene?
A Yes, I did. Well, he went out to the vehicle on his own. I followed him out.
Q Mr. Williams or Detective Dwyer?
A Yes. No. Detective Dwyer was outside.
Q All right. And then once Mr. Williams was outside, was he placed under arrest by Detective Dwyer?
A Yes, he was.
Q And was he transported by yourself?
A Yes, he was.
Q Where did you transport him to?
A Area one, 51st and Wentworth.
Q And when you transported him to area one, was that the

end of your duties in relation to this case?

A Yes, it was.

MS. MORASK: All right. May I have a moment, Judge?

THE COURT: Sure.

(Brief pause)

MS. MORASK: Q I'm going to show you what's already been marked and shown to counsel as People's Exhibit 9, 10 and 11. Can you tell us what People's Exhibit 9 shows.

A This was the vehicle that was parked in front of 7622 South Carpenter with the license of BN 9244.

Q And is that the vehicle that Mr. Williams told you he had just driven?

A Yes, it is.

Q All right. And is People's Exhibit 10 and 11 two different views showing the license plate that you've just described to the ladies and gentlemen of the jury?

A Yes, it is.

Q And do all three of those truly and accurately show the vehicle as it appeared when you saw it in front of Mr. William's house?

A Yes, it does.

MS. MORASK: Thank you, Officer. I have nothing further.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Officer.
A Good afternoon, sir.
Q How different did Mr. Williams look that day than he does today?
A Well, his hair was shorter and he wasn't wearing glasses.
Q Okay. What was he wearing?
A Pair of shorts and I believe a T-shirt.
Q Was he wearing a hooded sweatshirt that day?
A When we met him at his home, no.
Q Was he wearing a baseball cap?
A No.
Q Did you observe any tatoos on his body?
A No, sir.
Q You had a conversation with him, is that correct?
A Yes, I did.
Q Was he polite with you?
A Yes, he was.
Q Detective Dwyer then came to the location?
A Yes. He was outside by the vehicle.
Q And Mr. Williams went out and talked to Detective Dwyer?
A Yes, he walked out.
Q Did you see Mr. Williams being placed under arrest by Detective Dwyer?

A Yes, I did.

Q And after you transported Mr. Williams to the police department, you didn't process him in terms of asking him questions about himself at the time that you -- that he was arrested, is that correct?

A No, sir.

Q Somebody else did that, is that true?

A Yes.

MR. WEINER: Thank you very much. I have no other questions of the officer.

THE COURT: Thank you.

MS. GROHS: No questions.

THE COURT: Thank you.

MS. MORASK: We have nothing further.

THE COURT: Thank you. You can step down, Officer.

THE CLERK: Please raise your right hand.

DETECTIVE DENNIS DWYER,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE CLERK: Please be seated.

THE COURT: Proceed, Mr. Smith.

MR. SMITH: Q Detective, would you please state your full