# Exhibit 7

## Deposition Transcript of D. Evans

## (Shooter of Myron Cochran, Billy Johnson)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORDELL WILLIAMS, Plaintiff, | ) | |
| vs. | ) | No. 23 CV 14905 |
| JAMES O'BRIEN, THE PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM FOLEY, THE CITY OF CHICAGO, a municipality, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, | ) | Hon. Lindsay C. Jenkins<br>Mag. Judge Young B. Kim |
| Defendant. | ) | |

The video-recorded deposition of DAVID E. EVANS, taken pursuant to the Federal Rules of Civil Procedure, before Cynthia Cancel Sobolewski, Certified Shorthand Reporter No. 084-003543, at 333 West Wacker Drive, 19th Floor, Chicago, Illinois, on Friday, April 4, 2025, commencing at 10:26 a.m. pursuant to subpoena.

APPEARANCES:

LAW OFFICE OF STEVEN W. BECKER, LLC, by
MR. STEVEN W. BECKER
(205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
312.396.4116
swbeckerlaw@gmail.com)
appeared on behalf of the plaintiff;

APPEARANCES: (Cont'd)

ROCK FUSCO & CONNELLY, LLC, by
MR. PATRICK R. MORAN
(333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000
pmoran@rfclaw.com)
appeared on behalf of the defendants James O'Brien, the personal representative of the Estate of William Foley;

THE SOTOS LAW FIRM, PC, by
MS. CLAUDIA C. FANTAUZZO
(141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300
cfantauzzo@jsotoslaw.com)
appeared on behalf of the defendant The City of Chicago, a municipality;

ALSO PRESENT:

Scot Ziarko, Legal Videographer

* * * * * * *



INDEX


| Witness: | Page |
|---|---|
| DAVID E. EVANS | |
| Examination by: | |
| Mr. Moran.................... | 5 |


EXHIBITS


| No. | Description | Marked/Referenced |
|---|---|---|
| 1 | 8/13/17 handwritten affidavit of David Evans............................ | 93 |
| 2 | 4/22/92 Booking Photographs CB9104003, 1004716..................... | 189 |
| 3 | 2/27/94 Booking photographs CB9597454............................. | 191 |
| 4 | 5/27/94 Booking photographs CB9645401, IR1004716.................. | 191 |


(Exhibits attached/scanned.)

\- - -



VIDEO TECHNICIAN: Good morning. This is the start of media No. 1 in the videotaped deposition of David Evans in the matter of Cordell Williams versus James O'Brien, et al., case 23 CV 14905.

This deposition is being held at 333 West Wacker Drive, Chicago, Illinois, as well as via Zoom meetings. Today's date is April 4th, 2025. The time is approximately 10:26 a.m.

My name is Scot Ziarko. I'm the videographer for Urlaub Bowen & Associates, Inc., located at 20 North Clark Street, Suite 600, Chicago, Illinois 60602.

The court reporter is Cindy Sobolewski.

Will counsel please identify yourselves for the record, and will the court reporter please swear in the witness.

MR. MORAN: Pat Moran on behalf of the defendants, O'Brien and Foley.

MR. BECKER: And Steven Becker, B-e-c-k-e-r, on behalf of the plaintiff, Cordell Williams.

MS. FANTAUZZO: Claudia Fantauzzo on behalf of the City of Chicago.

COURT REPORTER: Raise your right hand, please.



(Witness sworn.)

VIDEO TECHNICIAN: You may begin.

DAVID E. EVANS

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MORAN:

Q. All right. Great.

Sir, can you state your full name and spell it for the record, please?

A. My name is David Evans, D-a-v-i-d, E-v-a-n-s.

Q. All right. Do you have a middle name?

A. E, Earl.

Q. E-a-r-l?

A. Yes.

Q. Okay. Great.

Have you ever given a deposition before?

A. Yes.

Q. How many times?

A. Once. It was probably about -- probably about 10, 15 years ago.

Q. Okay. There's a couple ground rules

to make things go a little smoother that I'm going to let you know about. You may remember, maybe not.
But I'm going to ask you a series of questions today about some events that occurred a while ago that you were a participant in.
And if you do not understand one of my questions, will you please tell me?
A. Definitely.
Q. Okay. Great.
If you do answer one of my questions, we're going to assume that you understood the question. Is that fair?
A. It is.
Q. Okay. Great.
You can see our court reporter is taking down everything you and I are going to say and anything anyone else is going to say.
You may be able to anticipate my questions, but please let me finish, and I'll do the same for you, and that's so she can get down everything we say accurately. Is that fair?
A. Definitely.
Q. Okay. If you want to take a break at any time, that's okay; you just have to answer the



pending question first. Is that fair?
A. I think so.
Q. Okay. Perfect. I think that's good.
You said you gave a deposition 10 to 15 years ago. Were you a party or a witness in that case?
A. I think I was a party.
Q. And what was the nature of the case?
A. It was an excessive force case in prison.
Q. And were you represented?
A. Yes.
Q. Who was your lawyer?
A. Martin P. Head.
Q. Martin P. Healy?
A. Head.
Q. Head?
A. H-e-a-d.
Q. Martin Head, okay.
And do you remember what year that lawsuit was filed?
A. Probably -- I'll say about 2012, somewhere around there.
Q. And what was the outcome of the case?
A. It was a -- the jury found -- found in



my favor and -- but we later -- we later settled after the -- after the verdict.
Q. Okay. What was the verdict?
A. They was found to be excessive.
Q. Right.
How much did they award -- did the jury award?
A. It was minimum, like three to five. I think 3,000, something like that.
Q. 3,000?
A. Yeah.
Q. Okay. And you said you settled?
A. Yeah.
Q. How much did you settle for?
A. I think it was an additional thousand to set aside the convictions or whatever.
Q. Okay. So a total of 4,000?
A. Yeah.
Q. Okay. Any other depositions besides that one in your excessive force case?
A. No. Not that I could recall, no.
Q. Do you remember where that excessive force case was -- the trial was?
A. It was Dirksen Building.



Q. Okay. Were you the only plaintiff?
A. Yes.
Q. All right. How about testifying in court, have you ever testified in court?
A. Yeah.
Q. How many times?
A. I can't -- I can't recall. Like -- I'm trying to think. I testified for my postconviction hearing.
Q. Okay. Now, obviously I'm going to have to ask about your convictions. You understand that, right?
A. Yeah.
Q. Okay. And I'm not trying to --
A. No, I get it.
Q. -- bring up bad memories or harass you. I gotta ask --
A. Comes with the territory of this, yeah.
Q. Okay. So you were convicted on two counts of first-degree murder, right?
A. Um-hmm.
Q. You have to say yes or no.
A. Yes.
Q. That's one of the rules I forgot. You

have to answer out loud.
A. Okay.
Q. Do you have any other convictions on your record besides those two murder convictions?
A. No. No, I don't believe.
Q. Okay. So when you say you testified in your postconviction, you're talking about the post-conviction related to those two murder convictions?
A. Yeah, postconviction hearing leading up to it.
Q. Okay. Did you ever testify in anyone else's cases in court?
A. I did. Another postconviction.
Q. And who was that?
A. For Andre Ruddock.
Q. Andre.
A. In that case.
Q. Do you remember when that was?
A. It was about ten years ago, something about in there.
Q. Do you remember the outcome of Mr. Ruddock's case?
A. I don't -- I don't -- I don't -- I don't know if it got continued or -- I don't



remember the outcome.
Q. Do you know where Mr. Ruddock is today?
A. He's free.
Q. He -- the case he was -- that you testified in for him, had he been convicted of murder?
A. Yes.
Q. In a different -- but that was a different -- different murder conviction than the one you were convicted of, right?
A. Yes.
Q. Okay. And I think what you mentioned is he's free now, meaning he served his sentence?
A. I believe so.
Q. Okay. Do you know if his conviction was overturned or vacated?
A. No, I don't know.
Q. Okay. Do you know, is -- do you stay in contact with Mr. Ruddock?
A. No.
Q. Do you have any idea where he lives now?
A. I think he's in Chicago.
Q. You wouldn't happen to have his cell phone number, would you?



A. I may.
Q. Is it on your phone?
A. I may.
Q. Do you mind checking real quick?
A. Let's see.
No, I ain't -- I ain't save it under there.
Q. You don't have it on there?
A. No, I don't have it on there.
Q. Okay. So other than your postconviction hearing and Mr. Ruddock's postconviction hearing, have you ever testified in court in any other case?
A. No. I don't -- no.
Q. Okay. Did you testify in your own excessive force trial?
A. I don't think so.
Q. Okay. So I'm going to talk -- I'm going to change the subject to -- I want to talk about what you might have done to prepare for today.
A. Okay.
Q. Okay? Did you do anything to prepare for your testimony in this deposition?
A. No.
Q. Okay. Did you review any documents?



A. No -- I did look at the affidavit actually on my way -- on my way here.
Q. The affidavit you completed?
A. Yeah.
Q. Okay. And I'll show you -- that to you in a little bit.
Do you have a copy of that affidavit?
A. Not with me.
Q. You said you looked at it on the way here?
A. Yeah.
Q. Was it saved on your phone?
A. No, I got it in my -- I got a hard copy of it.
Q. Okay. Is it in your car?
A. Yeah.
Q. Okay. Got it.
And how did you get that hard copy? Is it a copy you've always had --
A. Yeah.
Q. -- or did somebody give it to you?
A. It's a copy I always had.
Q. Is it the original?
A. Yeah. Or a copy of it or whatever.

Q. Got it.
All right. Apart from your affidavit, did you look at any other documents for today?
A. No.
Q. Have you talked to anybody about your deposition today?
A. No.
Q. You see the gentleman across from me?
A. (Nodding.)
Q. Do you know this gentleman?
A. Mr. Becker?
Q. Yes.
A. Yeah.
Q. Have you met him before?
A. Over the phone just today.
Q. All right. Have you spoken to Mr. Becker prior to today?
A. Yes.
Q. And how many times have you spoken to Mr. Becker?
A. I believe once and just now right before I came up here, trying to find the way here.
Q. Okay. Let me ask you, that affidavit you created, did somebody ask you to make it?



A. I made that -- man, like 10, 15 years ago.
Q. I believe it's dated 2017.
A. 2017, okay. I'm trying to think. I think I did.
Yeah, I think Cordell reached out to me to make it.
Q. Have you ever spoken to any attorneys that represent Cordell Williams?
A. No.
Q. Okay. Do you know who Mr. Becker represents?
A. Cordell.
Q. Okay. That time you spoke to Mr. Becker before today?
A. Um-hmm.
Q. How long ago was that?
A. Three days, two days.
Q. And prior to two to three days ago, had you ever spoken to Mr. Becker before?
A. No.
Q. Okay. Was that conversation two to three days ago on the phone?
A. Yes.



Q. How long did that call last?
A. I'd say about five minutes or so.
Q. Can you tell me what you two discussed?
A. Discussed today's hearing or whatever is it.
Q. A deposition.
A. Deposition, yeah.
Q. Okay. What did you discuss about it?
A. Just basically stuff what you -- what you spoke to me about, what to expect, you know, and what else. It was short.
Q. Got it. Understood.
Okay. Now, you and I have never met before, right?
A. No.
Q. And we've never spoken before today, correct?
A. Correct.
Q. Okay. You did -- I just want to make sure, you're here pursuant to a subpoena, right?
A. Right.
Q. Okay. A process server came out to give you a subpoena, and you accepted it and agreed to be here today?



A. I mean, it was left in my mailbox. I ain't say I accepted it, but yeah.
Q. Okay.
A. I agreed.
Q. Very good. Thank you.
Okay. So the only people you've spoken to -- or strike that.
Have you spoken to Cordell Williams recently?
A. No.
Q. Do you know his whereabouts, like where he lives?
A. No, I don't -- no, not exactly.
Q. Do you have his phone number saved in your phone?
A. No.
Q. When is the last time you spoke to Cordell?
A. I think -- I think I saw him at a -- probably a couple months ago I'll say I saw him.
Q. Where did you see him at?
A. At RT whatever -- CTJ, Chicago Torture Justice Center. They have events there, and I bumped into him there.

Q. And where is the Chicago Torture Justice Center?
A. I don't know exactly. Over east.
Q. On?
A. Just put it in GPS, and that's how I get to everywhere.
Q. Right.
Do you know if it's on like the South Side or the --
A. East side.
Q. East side, okay.
And did you talk to Mr. Williams about his case that day?
A. No, we weren't talking about that.
Q. Okay. What did you talk about?
A. Just some hi's and bye's and what's up, what's up. And the event that was going on there.
Q. What was the event you were at?
A. Like an art show or something.
Q. How did you become aware of the event?
A. The people at CTJ, I'm on their little call list or whatever, and they send out fliers every time it's something going on there.
Q. Got it.



And it's called CT -- for short it's called CTJ?
A. Yeah. Yep.
Q. Just CTJ?
A. Chicago Torture Justice Center.
Q. CTJC then.
A. It's, I think, CTJ, though, but they might not use the C.
Q. Fair enough.
All right. What is -- well, let me ask you another question. Did you review -- not necessarily for today, but have you ever reviewed any of the documents that were created in connection with the crime for which you were convicted, like police reports, statements by any witnesses?
A. You saying have I ever?
Q. Yeah.
A. I mean, in the course of my case, that's -- you know, yeah.
Q. And after your case was resolved and your appellate process was resolved, have you looked at any of those documents since?
A. When my case was resolved in 2019 or somewhere like that, everything went in the garbage



when that was over with. I was happy to get rid of the legal box and be -- have that behind me, so no.
Q. So the only thing you saved is the affidavit that you created for Cordell Williams?
A. As far as legal, you know, I had an envelope that I brought from prison, like with my mail in it, and that was in there. Yeah.
Q. Okay. But as far as the legal documents --
A. Transcripts and all that, none of that.
Q. None of that, okay.
Have you ever seen the court-reported statement that Cordell Williams gave to the police?
A. Many years ago.
Q. Do you remember what's in it?
A. Not at all.
Q. Do you remember, for example -- well, you don't remember a single thing that's in statement?
A. I mean, if you can jog my memory. But no, I don't, not off top.
Q. As you sit here today, can you say whether anything in that statement is true or false?
A. I mean, from -- from my recall, I mean, dealing with the case, I know that it was a bunch



of false -- falsehoods in it. But specifically line for line, I ain't -- no, I ain't that clear on it.
Q. Okay. So generally you think there's some falsehoods in it?
A. Oh, absolutely.
Q. But you can't tell us what specifically those would be?
A. Not specific like -- like, you know --
Q. Okay.
A. -- line for line. Let me see it now, and I can go through it and point some things out.
Q. Okay. Can you tell me your current address?
A. 143 -- I mean, I'm sorry. 1463 Sibley Boulevard.
Q. Is it apartment or ...
A. Yes.
Q. Which unit?
A. Front.
Q. And do you live with anyone?
A. No.
Q. All right. And how long have you lived at this address?
A. A little bit over a year.

Q. Okay. And you currently -- obviously you have a cell phone. Can you tell me your cell phone number?
A. 708-539-2929.
Q. All right. Do you have an e-mail address?
A. Yes.
Q. Can you tell me what that is, please?
A. Deboevans, D-e-b-o, Evans1978@gmail.com.
Q. I'm just going to read it back to make sure I got it right. D-, as in David, B-, as in boy, O- --
A. No. D-e-b-o, Debo.
Q. Oh, D-e- -- see, good thing I read it back to you.
A. Absolutely.
Q. DeboEvans1978@gmail.com?
A. Correct.
Q. Perfect. Thank you.
Do you use any social media?
A. Not really. I got -- I got what you call, a Facebook, but I don't -- I don't use it.
Q. You have a Facebook account?
A. Yeah.



Q. Okay. Is the e-mail that you just gave me how you set up the Facebook account?
A. No. I don't even know how I set up the Facebook account.
Q. Do you know what e-mail you have associated with that Facebook account?
A. No. I'm saying an e-mail has to be associated with the Facebook?
Q. I'm no expert, but I think that's generally how it works.
A. Oh, I didn't know.
Q. Okay. What's your name on the Facebook account? Just David Evans?
A. Yeah.
Q. All right. When is the last time you put any information on Facebook?
A. Year or two. I mean, let me see how long I had it. I probably been made literally one post in the -- in the whole two years or year and a half I had it.
Q. Okay. Have you ever heard of Instagram?
A. Yes.
Q. Do you have an Instagram --
A. Yeah, I got Instagram too. And same --



same with that.
Q. You just don't use it that much?
A. I just don't use it at all. Like literally.
Q. Do you have any other e-mail addresses other than the deboevans1978?
A. Yes. Yeah.
Q. Can you tell me the other ones you have?
A. David@DavidDA2nd.com.
Q. So David@David the second?
A. Um-hmm.
Q. Is David the second spelled out?
A. Actually, D-a-v-i-d. David@David, D-A-2-n-d.
Q. D-A-2-n-d.
A. David@, then -- then it's DavidDA2nd.
Q. Okay. So just to make sure I got this right.
A. Um-hmm.
Q. David@DA2nd?
A. Uhn-uhn. David@DavidDA2nd.
Q. So David the, t-h- --
A. Uhn-uhn. David, then at symbol, and then it's DavidD-A-2-n-d. David@DavidDa2nd.



Q. Got it. Okay.
David@DavidDA2nd.com?
A. Uhn-uhn. You -- you gotta walk with me. David@ then my whole name.
Q. David, right?
A. David@.
Q. Yeah.
A. Then David@DavidD-A-2-n-d. I could write it out for you, make it easy.
Q. Yeah, I guess you could if you want. I think we have it. So wait, David -- I'm just going to focus on what comes after the at sign.
A. Okay. Start there. Good job.
Q. David?
A. Yeah.
Q. D-A-2-n-d?
A. That's it.
Q. .com?
A. Yeah.
Q. Okay. I think we got it.
All right. Perfect.
Do you have any other e-mail addresses?
A. No, I think -- my school e-mail, yeah.

Q. Oh, what's your school e-mail?
A. Evans -- yeah, the one I use for school. Evans. EvansDavid4@iCloud. Evans David, the number 4, at iCloud.
Q. Got it.
And is Evans David all one continuous --
A. Yes.
Q. Perfect.
All right. Do you use either one of the e-mail addresses you just gave me for any social media?
A. No.
Q. Okay.
A. I mean, like you said that it must be connected with it to get a social media account, but I wouldn't know because I'm not a -- you know.
But definitely not -- definitely not them two, the last two. So if the Debo, it may be how that get set up. But I don't remember.
Q. All right. So we have three e-mail addresses?
A. Yes.
Q. Do you have any more?



A. That's it.
Q. Okay. How about -- let's see, Instagram, Facebook. Snapchat?
A. No.
Q. Have you ever heard of WhatsApp?
A. Um-hmm.
Q. Do you use that?
A. No.
Q. How about Signal, do you use that?
A. No.
Q. Okay. Do you use any texting application other than the text app on your iPhone?
A. No.
Q. All right. Have you ever heard of LinkedIn?
A. I think I -- yeah, heard of it.
Q. Are you on that?
A. No.
Q. You mentioned you're going to school. Where are you going to school?
A. Prairie State.
Q. What are you studying?
A. H-VAC.
Q. Is that a certificate program?



A. Certificate.
Q. How long do you have to go to complete the studies for H-VAC?
A. I believe two years. I'll have a bachelor's in it.
Q. Okay. And that's to --
A. Science.
Q. -- learn how to install heating and air conditioning?
A. Install or service tech.
Q. Yeah. And how long -- how much have you completed of those studies?
A. About -- probably three, three-quarters through.
Q. All right. So you're on track to graduate?
A. Yes.
Q. Okay. Let's see, you know you're here about a lawsuit that was filed by Cordell Williams, right?
A. Okay. Yeah.
Q. You understand that?
A. Yes.
Q. Okay. What do you believe the lawsuit



to be about?
A. What do I believe it to be about?
Q. Yeah.
A. Him being wrongfully convicted.
Q. Of what crime?
A. Of the murders that I did.
Q. Okay. Now, as you sit here today, you admit that you committed these murders?
A. I do.
Q. Okay. What do you understand as to how Mr. Williams was wrongfully convicted?
A. He -- he was forced to claim some things that wasn't true or whatever.
Q. Okay. And do you know who, your understanding of the case, is responsible for making him claim things that were untrue?
A. The people that interrogate him.
Q. Do you know the names of those people?
A. I know O'Brien is one of them, and I don't know the other ones right off the top.
Q. Did Detective O'Brien interrogate you for the -- these two murders?
A. Yes, he did.
Q. Okay. And as I understand it, you did

not give a statement; is that correct?
A. I didn't.
Q. In other words, you didn't confess?
A. I -- I didn't. I was on the verge, but I didn't.
Q. Okay. When you say you were on the verge, what does that mean?
A. That mean some of the tactics that they was using almost -- almost made me.
Q. Okay. How long were you in custody from the point of your arrest when you were picked up on the street to the point you were charged with murder?
A. A couple days, few days.
Q. As I understand it, you were found in Aurora, somewhere in Aurora?
A. Um-hmm.
Q. And after you were found in Aurora, you were taken back to Chicago?
A. Yeah.
Q. Which police station were you taken to?
A. Eventually I was taken to 51st and Wentworth.
Q. All right. And at 51st and Wentworth, that's where you were questioned?



A. I believe so, yeah.
Q. Okay. Were you taken to any other Chicago police stations?
A. I don't think so, no.
Q. Okay. Did any other detectives question you while you were at 51st and Wentworth besides Detective O'Brien?
A. It was a couple of them that came in and out, so I don't know all their names.
Q. Okay. And were you questioned continuously, or was it like questioned for a little bit, a break, and then questioned again?
A. Yeah, it was like that.
Q. A little bit, a break, and then questioned again?
A. Yeah, yeah.
Q. Okay. In total, how many detectives do you think questioned you?
A. I'll say two to three.
Q. Okay. Do you remember the names of the other individuals besides O'Brien?
A. Not off top.
Q. All right. And you had been questioned by Detective O'Brien on a prior occasion; is that



right?
A. Yes.
Q. Okay. When was that?
A. In -- in Andre Ruddock case.
Q. Okay. About what year?
A. About two years prior, I'll say.
Q. So it would be about 1992?
A. Yeah.
Q. Okay. And were you arrested in that Andre Ruddock case?
A. Not arrested, but detained.
Q. You were brought somewhere for questioning?
A. Yeah.
Q. Okay. Did you -- where were you brought for questioning in that 1992 case?
A. I believe the same -- same station.
Q. Okay. Tell me something, prior to you being arrested for those two murders, had you ever been arrested by the Chicago police before?
A. Prior to me being arrested for that, for the current -- this case? Yes.
Q. How many times?
A. I ain't -- I'm not certain.



Q. Is it more than ten times?
A. No, no.
Q. More than five?
A. Somewhere around that area.
Q. Between five and ten times?
A. No. I'll say about five.
Q. Five times?
A. A couple -- I think one in high school, high school brawl and a stolen car, trespass to a car and -- yeah, so about three to five, I'll say.
Q. All right. Let me ask you if you know a couple of people.
Well, let me ask you this actually before I get into that.
The events that took place where you ended up being convicted of murder occurred in May of 1994; is that right?
A. Um-hmm.
Q. You have to answer out loud.
A. Yes.
Q. Okay. Would you agree with me that those were life-changing events for you?
A. Absolutely.
Q. Okay. One of the reasons it's

life-changing is that you end up -- ended up having to go to prison for a long time, right?
A. Absolutely.
Q. Okay. Another reason it's life-changing is that you had never killed anyone before, right?
A. Absolutely.
Q. Okay. And that's -- I would imagine that's a big thing, right?
A. You're correct.
Q. Okay. Would it be fair to say that the events that took place in connection with that crime and having to go through the system, the legal system -- or the criminal justice system, you have a good memory of those because they were such big events in your life?
A. Fair to say.
Q. Okay. In anticipation of today, did you go over in your mind the things that happened so you'd be ready to talk about the stuff?
A. Actually, I didn't because it's -- like you say, it's such a monumental thing, that I really stay away from it. It ain't nothing that I'm looking to -- you know.
Q. Right.



Would it be fair to say that you're prepared to talk about those events today?
A. I'm prepared.
Q. Okay. And you have a good-enough memory to talk about those events?
A. I mean, I think so.
Q. Okay. And, you know, I'm going to give you your affidavit, but if you need to look at that beforehand, you just let me know.
A. Okay.
Q. And if there's anything else that would help you refresh your memory, just let me know.
A. All right. No problem.
Q. So -- oh, I forgot to ask you. Are you currently on parole?
A. Yes.
Q. Okay. What's the status of your parole?
A. I should be coming off within a month or two.
Q. And after you come off parole, your sentence will have been completely satisfied?
A. Yeah. Yeah.
Q. Okay. How often do you have to check in with your parole officer?



A. It's monthly.
Q. Are there any restrictions or requirements connected to your parole?
A. Yeah. Yes.
Q. And can you tell me what those are?
A. You can't like leave the state without prior consent, you know. Can't use drugs and can't -- things like that. I don't really -- off the top, that's about it, the major ones.
Q. Okay.
A. You know, no guns and stuff like that is obvious --
Q. Right.
A. -- you know.
Q. All right. Okay. Are you currently employed?
A. No.
Q. Have you had a job since you've been out of prison?
A. Yes.
Q. What were you -- what was your last job?
A. Last one was Target warehouse.
Q. Target warehouse?
A. Yes.



Q. Mr. Evans, I just want to make sure that -- I know you're holding your hand over your mouth because it's comfortable, but I just want to ask our court reporter and videographer if you're getting everything --
A. Yeah.
Q. -- because sometimes it's hard to hear.
A. Yeah.
Q. It's okay?
A. No, I ain't holding my hand over my mouth; it's just on my chin.
Q. I know, I know. I do the same thing.
A. Yeah.
Q. But sometimes I get told the same thing. You know, move your hand.
Okay. What was -- which Target were you working at?
A. It's on -- I think that's 38th and -- somewhere over there on -- is that Western? Back towards Cicero, somewhere that way. I can't remember. Didn't last long.
I was, I think, at West Liberty Foods before that. I think.
Q. Okay. How long did you work at Target?

A. It was like a week.
Q. What was the reason you left?
A. I can't -- I couldn't stand on my feet 12 straight hours in one spot.
Q. Got it.
Okay. How about West Liberty Foods, how long did you work there?
A. Several months. I'll say about a good five -- four or five months, somewhere in there.
Q. And what year was that?
A. Last year.
Q. Last year, okay.
And what was the reason you left West Liberty Foods?
A. The cold. You know, I was working in the freezer.
Q. Ah.
A. And in and out of that, getting sick.
Q. What was your job title at West Liberty Foods?
A. I was just ...
Q. I'm sorry?
A. I'm trying to think of the title. I don't -- I don't think it's, you know, a title



really.
Q. Or the best description you can give it.
A. I was putting stuff on the conveyor belt, like I don't know what type of title you give for that one --
Q. Okay.
A. -- but what they have.
But like I worked at Amazon also and I think they -- you know.
Q. When did you work at Amazon?
A. Either last year or -- yeah, it was -- I think from '23 into '24, like -- like around that time. And then four or five months as well. It was seasonal.
Q. What's your -- given that you're not working, what's your source of income now?
A. I find some odd jobs here and there.
Q. What kind of odd jobs do you do?
A. Sometimes one of my friends, he'll -- he's hooked up with a lady who be needing work, and sometimes it be consistent and sometime it's sparingly.
Q. What kind of work is it?
A. It be -- I wouldn't call it security,



but sort of like that, you could say. Just po- -- like sitting in my car, watching some equipment.
Q. Got it.
Prior to being arrested in 1994 for those two murders, did you have a job?
A. No.
Q. Okay. And I imagine during the prison -- your time in prison, you worked at various locations in the prison?
A. Um-hmm.
Q. What kind of jobs did you have in the prison?
A. In -- I was a porter, like a janitor.
Q. Um-hmm.
A. And in the kitchen. Food service. That was -- that was it.
Q. Okay.
A. Aside from going to school.
Q. What -- during the time you were incarcerated, what -- what prisons did you stay at?
A. Menard, Stateville, Pontiac was primarily the most.
Q. Any others?
A. Yeah. I ended it with Centralia and



Robinson.
Q. Did you have any infractions in prison where you were, you know, accused of something by the staff or whatever?
A. A lot of them.
Q. I'm sorry?
A. A lot of them.
Q. A lot of them?
A. Thousands of them.
Q. Thousands of them, okay.
What were the -- tell me what the more serious ones were.
A. Assault. I'll say I got a few staff assaults, a few inmate assaults and some -- and the other was miscellaneous, I guess, tickets.
Q. Um-hmm.
For the staff assaults or the inmate assaults, did you actually do those things or were you --
A. Yeah, I did them.
Q. Okay. What were you -- did any criminal charges arise out of it?
A. No.
Q. Now, as I understand it, prior to

being arrested in May of 1994, you were a member of a gang?
A. I was.
Q. The Black P. Stones?
A. Yes.
Q. All right. Were you -- did you maintain your membership with the Black P. Stones when you were in prison?
A. Full-time.
Q. How long did you stay with the P. Stones in prison?
A. I'll say until early 2000s, I'll say.
Q. Okay. Did you ever -- were you and Cordell Williams ever housed in the same facility?
A. For a little time I think we was, yeah.
Q. Which one?
A. I think we was briefly in Stateville together. And my -- my memory, yeah.
Q. And when you were at Stateville together, were you -- did you ever encounter each other and talk to each other?
A. Yeah, I saw him a few times.
Q. Okay.
A. You know, it was -- Stateville is



pretty clamped down, you know, so it was -- it wasn't open like the old -- the good ole days as far as prison goes. You know, so it was a lot of segregation.
Q. So this would have been -- well, tell me about what time frame, what year or range of years you would have seen Cordell Williams at Stateville.
A. What year was that? I can't recall the exact year. 2000s though. Something like that.
Q. In the 2000s?
A. Yeah.
Q. Okay. Did you ever talk to Cordell Williams when you were both incarcerated about the case you were both convicted of -- or the crime, I should say.
A. I believe -- I believe we have, but, you know, just generally.
Q. When you were incarcerated, were you ever housed with Andre Ruddock or in the same facility, I should say?
A. Yeah.
Q. Which one?
A. Stateville as well.
Q. Stateville.



Did you ever talk to Andre Ruddock about your experiences with the Chicago police while you were at Stateville?
A. I don't -- I don't think so. Like not the -- not off -- how you putting it, like experience with the ...
Q. How would you put it?
A. No, I'm just saying, like I don't -- that don't stand out like we had a discussion about that when I saw him.
Q. Well, where it came up in any way.
A. Okay.
Q. Maybe you didn't intend to talk about it, but somehow it came up.
A. No, not that I can recall.
Q. Okay. Do you remember a person by the name of Londell Harper?
A. Yes.
Q. Do you know if he was ever incarcerated with you at the same time?
A. No.
Q. Okay.
A. In fact, County Jail.
Q. You were in the County Jail?



A. We were in the County Jail, yeah.
Q. Okay.
A. But he didn't -- he didn't go to the penitentiary, so ...
Q. Got it.
A. He left '94, '95.
Q. And when you -- have you seen him since?
A. I saw him, I think, one time. Yeah.
Q. Where did you see him at?
A. In Chicago when I got out, not too long after.
Q. By the way, I forgot to ask. When did you -- when were you released?
A. April 25th of '23.
Q. Okay. Do you happen to know Mr. Harper's address?
A. No.
Q. Or cell phone number?
A. No.
Q. All right. But you do know -- or at least you think he lives in Chicago?
A. I don't -- I don't know where he live. I'm saying that's where I saw him at when I got out.
Q. Where did you see him, by the way?

A. We was at a club or something. I think that was -- what that is, not S2. A club on Stony, Stony Island.
Q. What's the name of the club?
A. What is the ... The Family -- The Family Den, that's it.
Q. Was Mr. Harper a P. Stone?
A. He -- he was considered, yeah.
Q. How about Cordell Williams, was he a P. Stone?
A. He was considered a Stone, yeah.
Q. When you say considered, he was a P. Stone, but it seems like you're -- you're kind of hedging a little bit.
A. It's just -- you know, the school of thought we come from is -- you know, it's -- it's different. So it's like, you know -- but I guess anything can be broken down and put in a baby bottle, right, to make you understand it.
Like let's say like you got those who we consider -- just say these are the Folks, but then you got those who are the Gangsters. So they, you know, just loosely affiliated as far as you know, but they ain't -- you know, but they



was -- the guys, by virtue of -- you know, but they weren't really the guys. They weren't the Gangsters, they was associates more so.
Q. So I think I understand what you're saying. I think what you're trying to say is that there was a hierarchy?
A. Yeah.
Q. Okay.
A. It was -- it was a hierarchy, but also like you had those just like -- we call them like high school Stones. Let's say there's some that's like they don't go to the meetings, they ain't attend, they just -- you know, when they come out the house -- and we was kids, too, a lot of us.
So just say you got, you know, 13-, 14-year-olds, 15- and 16-year-olds, and some of them still under their mothers' grips and parents' grips, so they ain't really out there like that. So that's what I mean.
Q. Okay. So they say they're -- these are people -- when you say that they're, like you said, there were Gangsters and then Folks.
A. Yeah.
Q. Folks would be people go who out and



say they're part of the gang, but they haven't really done much yet?
A. Haven't done or they don't like -- you know, you see them random or rarely I'm saying like.
Q. Got it.
A. They -- you know.
Q. Would you consider Cordell Williams, Londell Harper, and Andre Ruddock to be in that Folk category back in 19- -- May of 1994?
A. Yeah, safe to say. You could say that.
Q. And for yourself, were you considered more of a Gangster back in 1994?
A. I was.
Q. Okay. The --
A. By then.
Q. Go ahead.
A. By then, yeah.
Q. By then.
A. For sure.
Q. What -- what does one have to do to go from being a Folk to a Gangster?
A. Some of it is rights of inheritance, I'll say. Like, you know, you just -- some people got family ties that bring them -- that they grow



up -- they grow up within the inner circles of what's going on. And then some get brought closer and get closer and closer as they grow into it. But they not -- you know, just frequent participation in -- in meetings and hanging around and stuff like that, you know. Some people do it or did it 24/7 and some people did it an hour or a week or two, you know, on the weekend they come around.
Q. Got it. We'll get more into the gang stuff in a little bit. The -- I don't remember what I was asking you.
Oh, are the P. Stones still around?
A. Yeah.
Q. Do they go by the same name?
A. Um-hmm. I mean, all of it -- you know, as I imagine you know, that a lot of that stuff is over with and splintered into remnants of -- it's a new thing. It's -- you know, I ain't -- I ain't in tune with it.
Q. No, I understand. I understand things change and, you know --
A. Definitely.
Q. -- things don't exist exactly as they did back in 1994.

A. Um-hmm.
Q. I just want to know is are the P. Stones still a thing?
A. I mean, they still -- it's still -- I guess so, yeah.
Q. Would you say the P. Stones are still a force?
A. I don't know what's a force now. Honestly, I'm totally disconnected from it, so ...
Q. Completely removed?
A. I'm completely removed.
Q. Okay.
A. Them days are over with.
Q. Now, when you were in prison, you said you were a P. Stone for a bit?
A. Yeah.
Q. Okay.
A. And still disconnected in it while I was there, though, you know. Spiritually and mentally I had grew up out of that.
Q. Did you receive protection from the P. Stones in prison?
A. I mean, I guess, you know, we was -- I was a part of it so, you know, our unity in that,



you know, is the protection, not -- you know, so ...
Q. Did you know anyone, when you were incarcerated, by the name of Wayne Washington?
A. That don't ring a bell.
Q. Okay.
A. Wayne Washington. Not off top.
Q. How about Tyrone Hood?
A. No, not off top.
Q. Hang on a second.
Marcus Wiggins, does that name ring a bell?
A. Not at all.
Q. Nevest Coleman?
A. Not at all.
Q. Derrell Fulton?
A. (Shaking head.)
Q. You have to answer out loud.
A. No, never heard of none of them actually.
Q. Sean Tyler?
A. I heard that name.
Q. What did you hear about that name?
A. No, I'm saying I heard that name, but ...
Q. I know. Just tell me what you know about that name.



A. He got released or something, right? He got --
Q. That's what you know?
A. Yeah, that's what I know from.
Q. How about --
A. He got released before me, I believe.
Q. How about Marcellous Pittman?
A. No.
Q. Arnold Day?
A. No.
Q. Jerry Gillespie?
A. No.
Q. Tyrone Reyna?
A. No.
Q. Reginald Henderson?
A. No.
Q. Kilroy Watkins?
A. I know that name.
Q. How do you know that name?
A. He was -- I was locked up in Stateville with him before.
Q. Okay.
A. Yeah.
Q. Did you ever talk to him?



A. Not -- he was -- he was a clown considered in there. He wasn't no -- nobody like that.
Q. What does it mean to be a clown?
A. I mean, you know, he just was a different type of -- a gossiper, you know, someone that -- like, you know, he wasn't my -- he wasn't my -- my crowd.
Q. Who was your crowd?
A. I'm just saying, you know, the way I -- the way I functioned in there, that wasn't what I was -- that wasn't what I was on.
Q. No, I understand. But like when you say he wasn't my crowd, I want to get an idea of what kind of crowd you're talking about.
A. I ain't -- I don't -- I don't indulge in like, let's just say, horseplay or gossip and getting into -- you know, because in there you can find yourself into a lot of the same chaos you can out here. So I'm just saying I'm to myself working out and, you know --
Q. Sure.
A. -- playing chess and, you know, I'm --
Q. A way to stay out of trouble?

A. -- studious. We reading books and I'm in the crowd of, you know, people studying, you know, religion and things of that nature.
Q. How about Shawn Tavis or Travis?
A. Yeah, I know him.
Q. Is it Travis?
A. Travis, yeah.
Q. Yeah.
How do you know Shawn Travis?
A. Grew up -- grew up around him.
He was my -- I was gonna say my big brother's friend.
Q. Was he ever housed in the same facility as you?
A. No.
Q. No.
He -- did you guys ever talk to each other about your experiences with the Chicago police?
A. Not -- no, not that I recall.
Q. Did Mr. Travis ever ask you for any help with any cases?
A. Not that I can recall.
Q. Did he ever ask you to fill out an



affidavit for any cases?
A. Not that I can recall, no.
Q. Did Mr. Travis ever help you complete an affidavit?
A. Did he ever help me complete an affidavit? Not that I can recall, no.
Q. Okay. I'm going to ask you whether you know certain lawyers. I'm going to give you a list of names again. Okay?
A. Okay.
Q. Marc Kadish.
A. Never heard of him.
Q. How about Maria Hawilo?
A. Never heard of her.
Q. Vincent Southerland.
A. No.
Q. Peter Neufeld.
A. No.
Q. Russell Ainsworth.
A. No.
Q. Josh Tepfer.
A. No.
Q. Joey Mogul.
A. No.



Q. Craig Futterman.
A. No.
Q. Julie Koehler.
A. No.
Can I ask a question? Where -- where this -- where this come from?
Q. Where did this come from? Yeah, I -- I can't really tell you why I'm asking you questions.
A. Oh, okay. Okay. I'm sorry.
Q. Sorry.
A. 'Cause I'm like, I ain't never ...
Q. You know, you just have to --
A. Okay. Gotcha.
Q. -- do your best to answer the questions.
How about Steve Drizin, do you know that name?
A. No.
Q. Okay. Has anyone ever called you out of -- who claims to be representing Cordell Williams asked you what happened?
A. No, not -- no.
Q. Okay. When you had that conversation with Mr. Williams about completing the affidavit, did he tell you anything he needed in the affidavit?



A. Not that I can recall. Not that I recall it going like that, like what he needed and what -- but just thinking. Something like would I do -- fill out a -- complete an affidavit, you know, telling the truth on it.
Q. Okay.
A. Basically -- basically that -- I think I was asked that before.
Q. So tell me how this conversation came up between you and Mr. Williams where he asked you for that affidavit.
A. I couldn't. I couldn't. I don't know how that -- you know, at what point. I'm just giving you the best I can now hot to -- but I don't even remember the conversation really, really like that.
Q. Okay.
A. But I know that from reading it, I had to like, okay, yeah.
Q. When you created that affidavit --
A. Um-hmm.
Q. Well, just -- I guess start from the very basics in the beginning.
Obviously that affidavit you created is the truth, right?

A. Yes.
Q. Okay. Everything in it is truthful?
A. Yes.
Q. Okay. Did you have to consult any of your own records when you created that affidavit?
A. No. I don't believe so, no.
Q. Okay. Did you go to the law library for help with that affidavit?
A. No.
Q. All right. Did you review any of the -- did you ever do any legal research related to the crimes for which you were convicted?
A. Yes.
Q. Okay. And in what context? What were you trying to look up?
A. I mean, filing my postconviction. That was one of the things that -- you know, trying to get a new trial.
Q. Okay.
A. Yeah. Based off of technical -- technicalities.
Q. You personally believe that Mr. Williams should not have been convicted of that crime -- or the crime --



A. Yeah.
Q. -- you were convicted of?
A. I do.
Q. Okay. And prior to Mr. Williams asking you to create that affidavit, did you ever make it known to anybody that you didn't think he should be part of it, he shouldn't be convicted?
A. To him?
Q. No, to anybody. Anybody else, not --
A. Anybody else? I think I did. I'm sure I did. Let me see who else I would -- I'm trying -- you know, other than like a girl, you know, who I corresponded with type of thing.
Q. A girl that you were writing letters back and forth with?
A. Yeah.
Q. And you wrote in one of the letters that you didn't think Cordell should have been convicted?
A. Yeah, yeah. You know, because I had someone who -- several times who I was pen pals with, you know.
Q. Got it.
A. That type of thing. So I opened up.
Q. What's the girl's name?



A. Renee. Renee Gates.
Q. Gates?
A. Yeah.
Q. Do you still stay in touch with Ms. Gates?
A. No.
Q. Do you have her phone number?
A. No.
Q. Do you know where she lives?
A. No.
Q. Like what city?
A. Chicago. If she's still in Chicago, actually.
Q. How did you end up corresponding with Ms. Gates?
A. She -- she saw my sister and -- you know, she was an old girlfriend. And she saw my sister and asked about me. And she end up, you know, getting my name and -- well, looking me up on the IDOC website and writing me.
Q. Got it.
Did you keep copies of your letters?
A. No.
Q. Did you keep any of the letters she



sent you?
A. No, I don't think I brought them home with me.
Q. You don't -- so you don't have them in your possession today?
A. No.
Q. All right. Did she ever encourage you to come forward and say that Cordell wasn't involved?
A. No. She -- she just listened to me.
Q. I want to come back to something. Youhad mentioned that -- you were telling me how one goes from being a Folk to a Gangster in the P. Stones.
A. Um-hmm.
Q. How did you become a Gangster in the P. Stones?
A. I'll say, you know, growing -- growing up, I -- my uncle was -- my uncles, actually. I had some generations of uncles who were Stones. So my uncle right now, Kim Evans, he's in -- he's in -- doing 30 -- 32 years in the feds. He --
Q. The feds?
A. Yeah. So he's a high -- you know, a high-ranking, well-known Stone. And so he's six

years older than me. And that's who -- whose footsteps I was following in.
Q. So were you one of the -- were you in the category of people who basically inherited --
A. Yeah. It was -- yeah, that. So I was next. And so I did things as far as like facilitate meetings, teach literature, violate people, con- -- you know, just make stances against the rivals. I led a lot in that -- in that capacity.
Q. Sure.
A. And shot -- you know, I started shooting, I'll say. But, you know, that was the first time I killed someone. But I'm saying prior to that it was -- I was shooting. And so started -- went from fighting to shooting by '92, I'll say, and shot a couple people.
Q. Okay. How many prior -- prior to May of 1994, how many times do you think you shot somebody?
A. I think probably -- probably two or three. Some leg shots. I know one, yes.
Q. Were you -- in those situations was it -- were you in a confrontation with a rival gang member?
A. The one -- one particular situation, and I can really show you the difference like what



I mean. Like so it was -- you know, we -- we -- we -- where I grew up at, it was predominantly a Gangster Disciples area.
Q. Um-hmm.
A. So we were a small force, and so we was just starting to blossom. And so it was -- it was -- my -- our little crowd, we was on this side of the street, and it was their crowd. So they was walking through. It's probably like 15 of them, and it was like five of us. But we was -- we was going somewhere else. And so we saw the crowd and hollered out, Hey, who is that?
And they -- they hollered at -- hollered back, Nigga -- Nigga, woo woo. And -- and we had a gun with us. And one of the -- and it's -- you know, looking back, it's crazy. But the little guy who was carrying our -- our gun, he was only like 12, 13. So I was like 16, so I'm three years older than him or something like that.
And when they hollered out, I'm like, Man, and I told him to blow them down, you know. So -- and he didn't do it. He was like, No, uh-uh. And he didn't want to do it. So I took the gun, and I did it. And I -- I'm saying, just shot



at the crowd of them. And one guy got hit in the leg unfortunately. It was -- it was crazy like that that I knew 'cause it turned out that that whole crowd, again the Folks and the Gangster concept, all them wasn't even about that. And the guy who got hit was this guy's son who I know the father, Broham, who is Broham's son.
And now come a couple days later, we find out, man, that was woo-woo-woo. And -- and it was -- it was crazy because I had to see the father, and he questioned me because I'm a little bad boy in the neighborhood, so -- and he -- he -- he kind of got word. He like, Day Day, man, I heard -- man, that -- man -- man, tell me that wasn't you. And I'm, Naw. Hell, naw. And I'm -- you know.
And -- but as karma would have it, though, I end up getting shot in the leg not long after. I'll just say within a year or so, I got shot in the leg, you know. So -- but that was a scene of like what I'm meaning like.
Q. Okay. So just so I understand, you know, you're with a group walking one way.
A. Yeah.
Q. The other group is in the other



direction, and someone yells out.
A. Yeah.
Q. And I don't care what they yelled --
A. Yes.
Q. -- but somehow that instigates a confrontation. You end up taking the gun from the 12-year-old --
A. Yeah.
Q. -- and fired a shot or two --
A. Yeah.
Q. -- into the crowd. This kid gets hit in the leg.
A. Yeah.
Q. And that's essentially how it went down, right?
A. Essentially, yes.
Q. Okay. Now, the -- you said there was another one where you shot somebody. Was it a similar situation where you --
A. Yeah, it was -- it was similar. Something similar.
Q. Can you describe that one for us?
A. It was -- what that was, we had -- we was in somebody else neighborhood actually on

that -- on that time. And so it was a confrontation happening and -- you know, yeah. But that was that. I don't -- I don't want to go no further, but ...
Q. No, I understand. I'm not going to belabor the point. But I just want to make sure that this was a -- that second one or the other one, I should say --
A. Yeah.
Q. You're in somebody's else neighborhood, there's a crowd, words are exchanged.
A. Yeah.
Q. Were you carrying with you?
A. Yeah, I -- I was carrying.
Q. Okay. So -- and you ended up using your gun --
A. Yeah.
Q. -- when things got escalated?
A. Yeah.
Q. And were you shooting into a crowd or at a specific person?
A. It was a specific person this time.
Q. Do you remember the person's name or --
A. No, no. I'm saying he was just -- that was just dude. I'm saying, you know, who had



to go. Like that's that nigga. That's just the terminology that, you know, I knew him to be from who I was with.
Q. Sure.
A. They point him out type.
Q. So the time you were shot in the leg --
A. Um-hmm.
Q. -- can you explain how that happened?
A. Yeah. It was July 2nd, I'll never forget it. So we was -- I was just walking from one -- one corner to the next, and it was fireworks was going off. And just felt something zip through my leg and pain and crippled me almost. And -- and that was that.
Q. Do you know why or was somebody targeting you or --
A. It was -- we was all targeted. I'm saying as far as the -- you know, the area go. It's -- it's us versus them, and so it didn't matter who it was.
Q. And this is what year? You said July 2nd of?
A. '92. Was it '92? No, '93. Sorry, '93.
Q. Okay. At some point did you start



carrying a gun with you all the time?
A. Yeah, I definitely did.
Q. What year did you start doing that?
A. I'll say by '93. Definitely after I got shot. I definitely -- yeah, I don't think I -- yeah, rarely ever not have a gun after that.
Q. And did you always have the same gun?
A. No.
Q. Change it around?
A. Yeah. I mean, you know, we come up on -- come up on guns.
Q. Sure, sure. What kind of gun did you use for those two murders, do you remember?
A. Yeah. It was a .45.
Q. Okay. Can you describe that gun, like what it looked like or if you remember?
A. Chrome .45.
Q. Chrome.
So kind of flash -- if there was light on it, you could see a flash on it or something?
A. A chrome .45.
Q. Yeah.
Okay. I was going to ask you another question about your experiences with the



police prior to 1994.
A. Um-hmm.
Q. Did you trust the police?
A. Never -- never -- I wouldn't say that that was a consideration, like a thought, like do I trust the police. I ain't thinking about that.
Q. So if a cop stops you on the street back in the day when you're carrying a gun and starts asking you questions, do you have any -- would you trust that that police officer is going to keep any promises or anything like that?
A. I don't know what that mean.
Q. Well, so how many times have you been questioned by police in your life? Well, when I say "in your life" I mean before May of 1994.
A. I ain't certain.
Q. A lot?
A. No. I wouldn't say a lot. I mean, when you say "questioned," you talking about formally questions or just on the street, just random -- 'cause I'm saying, you know, in our -- in our neighborhood they pull up on us all the time and, you know --
Q. Right.

A. And so if you talking about that part, yeah, the police -- it's a different -- it's a different interaction. I'm saying from today and then, I'mma just example, like we can -- I remember, you know -- and I wasn't always -- though I had some streaks of, you know, being -- doing some bad stuff, I'll say, but it wasn't always like that. So I can just say we sitting out in front of my grandmother house on the porch or on the car and they'll pull up, woo, and I -- we had just came from -- the previous day we was playing basketball at Stagg. You know, we still had a little hooping dreams and stuff like that, so -- and I twist my ankle. So we was just sitting on the car just sitting there just, you know, chilling.

And so Murphy and T-Bod, these are two officers who, let's say, that's their beat, they worked that area, and they just pulled up -- and we just sitting there, and they just pulled up in broad daylight, probably 2:00, 3:00 o'clock in the afternoon, and someone just like, Hey, everybody, get on your knees. Everybody get, nah-nah, and I'm like, man, my ankle twist, I can't get down there. And they took that as me being



defiant, but I really had a broken -- damn near my ankle was broken. And you know, so -- and he went in on me. But I say that like looking at today's thing, the police are so polite, it was a different attitude from then and now.

And I -- so I had a lot of those type interactions. When you say trust and things like that, it wasn't no pleasantries that I experienced or witnessed with the police.

Q. Sure. I guess when I say "trust," I mean -- what I mean is do you believe what the police are telling you?

A. That's --

Q. Back in the day.

A. That's subject to circumstances like.

Q. Okay. That's fair.

Let me come back to the -- your status in the gang. You were considered a leader --

A. Yeah.

Q. -- in the P. Stones, right?

A. Yes.

Q. Okay. Did you have a specific rank?

A. I eventually -- I held a G title, general.



Q. When did you become a general?

A. Actually at 17 when I was -- it was around '93 sometime.

Q. Got it.

So when you were -- when you were in the car with Cordell Williams that night before those two murders --

A. Um-hmm.

Q. -- you were a known ranked member of the P. Stones?

A. Yeah.

Q. Okay. And when I say "known," do you think those guys in the car with you knew, like Cordell and the other two guys?

A. Yeah, they knew I was a Young G, as I was called at times.

Q. Because you were a young general?

A. Yeah.

Q. Okay. And your nickname at that time was Day Day?

A. (Nodding.)

Q. Right?

A. Yeah.

Q. Do you still go by Day Day?



A. Not particularly.

Q. Do you prefer not to go by Day Day?

A. Yeah, I do. I'm David. David the Second.

Q. Right.

How did you end up being called Day Day?

A. That's from birth almost type, my name, my family.

Q. Got it.

Okay. When did you first meet Cordell Williams?

A. I don't even -- I can't recall. I just -- I don't know. Probably in -- I don't know. Like seeing him, like you know, like '90 -- basketball. I just remember Cordell being -- he could dunk back in the day. This is -- he got a little popularity, I'm just saying far as the courts go. It's only a few of us young people that can actually dunk, and he was a dunker. He was able to dunk. So I met him at the basketball courts in the early '90s.

Q. How about you, could you dunk?

A. I could never dunk like -- like that.

I could -- somebody throw the ball up, I barely can put it down. I never was a springer like that.
Q. Right.
Okay. I want to ask you about a couple things you mentioned related to the gang. You talked about violations.
A. Um-hmm.
Q. Tell me what a violation is.
A. A violation is, you know, when somebody violating the policies and laws.
Q. And what happens with a violation?
A. You could be subject to -- you can get fined or you will get put on a wall where you will get two minutes, get -- get your body beat. Or if it's -- depending on the severity of, you know, the infraction, you can get a head-to-toe.
Q. What's a head-to-toe?
A. Well, I'm saying where you -- where your face is getting touched, your head is getting touched.
Q. Ah, so when you're up against the wall for your two minutes, your face --
A. Yeah, that's just a -- that's just a body violation, you know.



Q. Ah. And so those violations, those beatings, kicks, punches?
A. Not kicks. You know, we ain't put our feet on the brothers but you, you know -- you got somebody -- one guy might do a minute, and then another -- another guy do a minute.
Q. Is it just nonstop punching?
A. Yeah.
Q. Okay. And what happens if the guy up against the wall can't take it anymore?
A. That happens a lot. I mean, he -- he balled up and he just -- you know, it will be -- it will be subject to, you know, somebody -- it ain't cruel, cruel. But depending on what it is, you know, they'll stop if you, you know, out of breath and you collapsing or something. But for the most part, it's just send a message to you, I think.
Q. And how often did the violations include the two-minute beatings?
A. Probably every Friday somebody was getting a violation back then. This was, you know, growing up. For being late, for being late for service. If it wasn't two minutes, one minute. You would get a violation for being late, not paying



your dues, a lot of little stuff that was -- that was -- somebody made up and we just furthered it.
Q. Got it.
So in order to pay dues, how did the members get the money to pay the dues?
A. It wasn't no like forced -- you know, it wasn't a forced thing at one point even though they did with have what we call nation packs, nation work, and you had to -- but that wasn't always -- it was here and there. But pretty much you just -- you came -- it wasn't much, it wasn't much. $5 we're talking.
Q. Had you ever seen Cordell Williams at any meetings where a violation occurred?
A. Not that I can recall, no.
Q. All right. Can you say he was never at one of those meetings?
A. I can't say he -- 'cause I'm saying he could have been there when I wasn't present.
Q. Yeah, I know. I'm just -- this is only what you know.
A. Okay.
Q. So if you know he was or if you know he wasn't or just can't say.



A. Yeah, I can't say.
Q. Okay. The head-to-toe -- how often did that happen, the head-to-toe beatings?
A. That was -- that was rare.
Q. Okay. That had to be a pretty serious infraction?
A. Yeah.
Q. What kind of infraction led to a head-to-toe?
A. It could have been stealing. That was a major, you know.
Q. Stealing from anyone or just the gang?
A. Yes. Yeah, from -- from the members, yeah more so. And even sometime, you know, depending on -- you could do something outside of that -- outside of the members I'm saying. Old lady, you know old -- different things on the block because you bringing that heat on, you know -- and a bad image. So it was little stuff like that that if somebody was a repeat offender of it, then they'll be like, man, he gotta get -- he gotta get that.
Q. So when you say "heat," you mean bringing the police?
A. No -- yeah, I'm saying bringing heat as

far as -- not just heat, not just the police, but also making the neighbors feel unsafe and like -- you know, like having an issue with us being present.
Q. Sure.
Did you ever participate in inflicting a head-to-toe violation?
A. Yeah, I did.
Q. How many times?
A. Actually I only did it once.
Q. Had you ever observed without participating a head-to-toe violation?
A. Yeah.
Q. How many times?
A. Probably several times, a few times.
Q. These head-to-toe violations that you saw, did you ever see anyone suffer any permanent injuries?
A. No, I can't -- not that I can recall, 'cause I don't even know if I even continued to be around the individuals who was --
Q. Oh.
A. -- you know what I mean, like that.
But one guy, he -- he got it because he stole the nation pistols. Like we had guns, you



know, that was for everybody stashed here or there, and he ran off with them and stuff like that, you know.
Q. Sure, sure.
How about the two-minute beatings, did you participate in those?
A. Yeah. I participated, received some myself.
Q. Yeah. That -- well, that was going to be my next question. Did you ever receive a head-to-toe or a two-minute beating?
A. Yeah, yeah, yeah.
Q. How about --
A. Not a head-to-toe, but a couple of those, yeah.
Q. And the things that -- I think you mentioned the things that would lead to a two-minute beating would be like showing up late for a meeting?
A. Yeah.
Q. Or not paying a dues?
A. Paying dues, yeah.
Q. Okay. So would you say those are relatively minor infractions?
A. Yeah, they minor in that -- but I'm



saying it would be after warnings, you know.
Q. Yeah.
A. You don't just get it immediately. But it's, you know, after --
Q. After some warnings.
A. Yeah, after some warnings.
Q. It's progressive?
A. Yeah, it's progressive.
Q. Okay. Did you have a reputation of being -- well, let me -- yeah, an enforcer in the gang?
A. Yeah, that's part of the title. You have to, you know, be a lawman, and that's the rhetoric that the Stones use is law govern all events and one got to stand on law and, you know, so I -- you can go by the title the lawman.
Q. Tell me what an enforcer does.
A. I ain't -- I'm not necessarily saying the title enforcer exists, but --
Q. Someone with a reputation of being an enforcer --
A. Right.
Q. -- that's what you're talking about, right?



A. Yeah. You can term it like that, but ...
Q. Well, how would you term it?
A. Yeah, they enforce the law. That's what I mean, like that.
Q. How would you do that?
A. By bringing a brother up on charges like -- that's the way we did it. Like one's out of order, he done did A, B, or C and we done -- we done went through the steps and giving him the -- you know, the -- the law.
Q. Give him the law, okay.
How about one of the things you mentioned, I think, was -- you had a word for it but it was -- oh, stances against rivals.
A. Um-hmm.
Q. What does a stance against rivals mean?
A. It could just be as little as, let's say, like that crowd walking through here, let's say I remember, you know, when I was coming up and my uncle and them, and he was on us while we was just the peewees, the shorties, whatever.
And a guy came through the block with his hat turned to the right. Let's say we wear our hat this way, they wear their hat that way

back in the day. And so he came through and I wasn't -- you know, I knew him so as far as school or something like that. It wasn't no rivalry to me, but you know -- so it was like, man, y'all let them niggas walk through here? And, you know, so it was put the pressure on you that -- so that's a parts of a stance. Like this the territory, so you make -- you make niggas go the other way or straighten their hat up or they get -- they get crushed coming through here.

Q. So those are the -- okay. So you're protecting your turf?

A. Yeah.

Q. Okay. And there's three ways to protect your turf. You tell them you got to not put your hat like that.

A. Just challenge it.

Q. Yeah.

A. However you challenge it.

Q. Tell them to get lost. Or if they refuse, then you get violent with them?

A. Yeah. Or I'm saying you ain't even got to ask no -- give them no warnings or nothing. You know -- and you know, it's times where there ain't



no -- ain't no -- you know.

Q. Yeah. Sometimes you don't give them a warning.

A. No.

Q. You just go after them.

A. Yeah. You frozen over, you at. So it's -- you go -- back then it was certain areas you go through, you ain't -- they not -- you know, you -- you not getting a memorandum.

Q. Was there -- what were the borders for the P. Stones back in 1994?

A. It was -- it was shaping in the area that I'm from still, so ...

Q. So I thought -- well, you didn't say it, but were you living -- I think I read somewhere that you were living at 74th and Aberdeen?

A. 73rd and May.

Q. 73rd and May, okay.

A. Yeah.

Q. Is that close to 74th and Halsted?

A. Yes. I mean, about a mile.

Q. Okay. Was there a time when the GDs were all south of Garfield Boulevard and the P. Stones were all north of Garfield Boulevard?



A. Probably before my time, yeah.

Q. Okay.

A. Yeah, before my time, the majority, yeah.

Q. And now with you being a general, the P. Stones now have a presence in that 74th --

A. Yeah.

Q. 73rd and May area?

A. Um-hmm.

Q. Okay. You have to say yes or no.

A. Yes.

Q. Okay. And that day where these murders happened, you guys saw two guys in the restaurant who you thought were GDs.

A. I did, yeah.

Q. Okay. And the GDs had been shooting at you, right?

A. Yeah, yeah.

Q. How many times had you been shot at by a GD prior to 1994 where you knew you were being shot at, but they missed?

A. Numerous, num- -- numerous times.

Q. Was it your understanding that you, as a general, were sort of a marked person by the GDs and that you were targeted by GDs?



A. Yeah, I was one of them.

Q. Okay. Do you think that was well known among the P. Stones that you were a target of the -- when I stay GDs, it's Gangster Disciples, right?

A. Um-hmm.

Q. You have to say yes or no.

A. You saying it was --

Q. What -- I'm sorry. Let me ask it again.
I've been saying GDs.

A. Yeah.

Q. For the record, GD is Gangster Disciple?

A. Yeah.

Q. Okay. Was it your understanding that among the P. Stones it was common knowledge that you were a target of the GDs?

A. I think -- I think we -- we -- we all were targets, though, I don't -- I don't -- I don't -- we didn't see it like that because it was --

Q. Well, let me ask you this.

A. Yeah.

Q. Guys who were like the Folks, like Cordell Williams --

A. Yeah.

Q. -- was he a target too?

A. Yeah. If he was -- if he was in the area and, you know -- the way it's -- it goes where it went was like that's one of them niggas. That's just -- I'm just saying, like it wasn't -- but I'm just saying my name might be more -- ring more, but still it's like you one of them.
Q. Do you know if Cordell Williams was ever violated?
A. No, not -- not that I know of, no.
Q. Okay. You don't know one way or the other?
A. I'm saying I don't think he was.
Q. Oh, you don't think he was?
A. No, because I would -- you know, I would --
Q. You're a general, you would know these things?
A. Yeah, I would know certain, you know --
Q. Yeah.
A. Because it had been rare for him.
Q. For a Folk?
A. For him. I'm saying he wasn't the --
Q. Why for him?
A. I'm saying he was -- you know, we got --



just say you got some -- some brothers who were like smooth, let's say. You got -- you know, we give them people names and stuff like that. Fluid. He flow. He just flow. He's super smooth, you know.
Q. So he knew how to stay out of trouble?
A. Yeah. He -- he was just smooth. He wasn't no -- yeah, he -- he knew -- he was out the way. He wasn't on that.
Q. Had Cordell -- was Cordell Williams ever with you when you had to do a stance against a rival gang member? And I'm not including the nature of the murders.
A. Right. I can't say a particular time, but probably throughout -- you know, throughout the time I known him, he probably seen me. He probably seen me --
Q. Yeah.
A. -- chasing some guys or doing -- I was, you know, active a lot, so ...
Q. Okay. I'm going to --
A. You'd have to ask him.
Q. Go ahead. I'm sorry.
A. No, I'm saying you have to ask him. He probably could remember a time more than me. People



tell me about stuff that I done seen. Man, remember you had did this, and I don't even remember it.
Q. Now, among the P. Stones how many carry guns? You carry a gun all the time, so how many others carried a gun all the time?
A. I couldn't say.
Q. Okay. Did you know of others who were worried, like yourself, enough to carry a gun all the time?
A. My uncle. I'm saying but it wasn't -- I'm ain't gonna say we're worried, it was just mandatory. Like, you know, it was -- security is a must.
Q. Did you feel that you needed a gun for self-protection or as part of your job to go after opposing gang members too?
A. It was more -- I'll say more protection.
Q. Okay.
A. Defense. But offense as well when -- when necessary.
Q. Right, right. So part of the -- part of carrying a gun was for offense?
A. Absolutely.
Q. Yeah.



Okay. Do you want to take a quick break?
A. No, I'm okay. I want to get it over with. I'm ready to --
Q. I know. I gotta -- I gotta use the restroom.
A. Oh, you need a break?
Q. Yeah.
A. All right. No problem.
MR. MORAN: Why don't we go off the record.
If you're going to get up, make sure you take off your microphone, Mr. Evans.
THE WITNESS: Okay.
VIDEO TECHNICIAN: The time is 11:53 a.m. This is the end of Media 1. We're off the record.
(Recess taken.)
VIDEO TECHNICIAN: The time is 12:03 p.m. This is the beginning of Media 2. We're back on the record.
MR. MORAN: Okay. I was going to ask the court reporter to read back the last question and answer so I can get reoriented.
(Record read.)
MR. MORAN: All right. Perfect. Thank you.

BY MR. MORAN:
Q. Mr. Evans, can you tell me what were the colors of the P. Stones back in 1994?
A. Red and black.
Q. And what were the colors of the GDs?
A. Blue and black.
Q. And what -- what direction did P. Stones wear their hats, like a baseball hat?
A. To the left.
Q. And for the GDs, what direction did they wear their hat?
A. To the right.
Q. Were the -- in May of 1994 were the Blackstone -- or the P. Stones and the GDs at war?
A. Yes.
Q. Okay. The -- if you saw -- how -- how did you recognize the two individuals that you thought were rival gang members on the night of the murders? What made you think that they were rivals?
A. Their -- their -- their hats.
Q. The way they were wearing their hats?
A. Yeah, their hats were ...
Q. And were they wearing the --
A. Signaling --



Q. I'm sorry. Go ahead.
A. Just, yeah, their hats was signaling affiliations.
Q. Okay. And I think they were in a place -- they were walking into a restaurant called the Honey Sub restaurant. Does that sound familiar?
A. Okay, yeah.
Q. Was that restaurant at 74th and Halsted?
A. Oh, you saying was it, yes.
Q. Yeah. Okay.
A. Yeah, that's where is I was at.
Q. And that intersection, 74th and Halsted, was that inside of P. Stone territory?
A. No.
Q. Whose territory was it?
A. It was Folks territory.
Q. Folks territory?
A. Yeah.
Q. And tell me, who are the Folks?
A. GDs, BDs.
Q. So you guys were in the wrong territory?
A. You could say that.
Q. Yeah.
Were you out looking for rival gang



members, or were you just headed somewhere?
A. Actually we just heading -- heading home.
Q. Heading home, okay.
These two individuals who ended up -- you ended up shooting, did you -- besides their hats --
A. Um-hmm.
Q. -- did you see anything else about them that made you think they were GDs, like colors of their clothes?
A. No.
Q. Just the hats?
A. No, that's it.
Q. Okay. Did you recognize them as individuals, setting aside their hats, like by face or how they were walking?
A. No.
Q. Okay. So I'm going to give you your affidavit to take a look at real quick, okay, because then I'm going to ask you some questions about the night in question.
A. Um-hmm.
MR. MORAN: We'll mark this as Exhibit No. 1.



(Deposition Exhibit No. 1, Witness Evans, was marked for identification 04/04/2025.)
BY MR. MORAN:
Q. Okay. Mr. Evans, I'm handing you what's been marked as Exhibit No. 1. And this is a copy of the affidavit that you wrote; is that correct?
A. Oh, yes.
Q. Okay. Can you turn to the last page for me, please. Now, it's a two-page affidavit, right?
A. Yes.
Q. Okay. Do you want to take a moment and read through it?
A. No, I'm just -- as you -- I was reading as you were talking. I'm sorry.
Q. No, no, no. It's a fair thing to do. You go ahead and take a moment and read through it and let me know after you've had a chance to do that.
A. (Reviewing document.)
Yeah, yeah. All right.
Q. Okay. This is the handwritten affidavit that you completed at the request of Cordell Williams?
A. Yes.

Q. Okay. On the second page your signature appears at the bottom?
A. Okay.
Q. Is that your signature?
A. Yes.
Q. Okay. And it's below a little paragraph that says, Pursuant to -- and I'm not going to read the whole thing, but essentially you're declaring under penalty of perjury that everything in the affidavit is true and accurate to the best of your knowledge and belief, correct?
A. Yes.
Q. Okay. Did you -- do you know the statutes you were citing?
A. I'm familiar with them in terms of I didn't -- dealing with my prior civil case that I told you about.
Q. Yeah.
A. So yeah.
Q. Okay. So you know that those statutes are for verifying documents?
A. Yes.
Q. Truthfulness of documents?
A. Yeah.



Q. Okay. And if you're invoking those statutes, you're verifying the truthfulness of the document under penalty of perjury, right?
A. Yeah. To the best of my knowledge, yes.
Q. Okay. Very good.
And I think you mentioned earlier, but I'm just going to ask you again real quick, everything in this affidavit -- you had a chance to look at it just now. Everything in it is true and accurate to the best of your knowledge and belief?
A. Yes.
Q. Okay. How long did it take you to write the affidavit?
A. This was done in August of '17? I honestly can't say. You know what I mean, like --
Q. Okay.
A. -- like -- I remember the night and the day and all that, you know what I'm saying. But I see it's lengthy, so I took my time with it.
Q. Okay. Maybe a couple of hours?
A. I don't know if it was some I did --
Q. Over time?
A. -- over time. Now and later, you know.
Q. Okay. Do you think you had sufficient



time to complete the affidavit?
A. I guess so.
Q. Yeah. Well, I mean, as opposed to being rushed.
A. Yeah, yeah. Yeah, I wasn't rushed.
Q. Okay.
A. Wasn't rushed.
Q. Okay. And if you needed extra paper and pen or pencil, whatever you wrote it with --
A. Yeah.
Q. -- you had success to that stuff?
A. Yeah. But I mean at the same time, I'm just thinking back like, you know, I wanted to do it and be done with it.
Q. Oh, I understand.
A. Like --
Q. Here's what I want to make sure. You had all the resources you needed --
A. Okay.
Q. -- to complete this affidavit; is that true?
A. I believe so. Pen and paper you talking about?
Q. Yeah.



A. Yeah.
Q. And you had all the time you needed to do the affidavit?
A. Okay.
Q. Is that true?
A. Yes.
Q. Okay. And if you needed to refer to anything in your own case file that you still had, because you hadn't gotten rid of it yet, you could do that, look into your own file and look at police reports or whatever?
A. I didn't -- I didn't have police reports and stuff from my case at the time during this, though.
Q. Oh, I thought you testified earlier that you got rid of that stuff in 2019.
A. No, I got rid of transcripts, you know. So over time -- this -- this like '94-type stuff. I been gone 20 -- over 20 years at the time, so I got habeas corpus, this petition --
Q. Sure.
A. -- this civil -- you know, case law, all type of -- the whole box.
Q. Well, let me ask you this: Do you --

did you have trouble remembering anything when you wrote this affidavit?
A. I don't -- I don't think so. I can't say I did, but I just sit back and zone out on this.
Q. All right. Did you have to guess at anything in this affidavit?
A. Not -- not that -- not that I can recall off top, no.
Q. Okay. Fair enough.
I want to direct your attention to the middle of the second page.
A. Okay.
Q. There's a word scratched out and then the word "wouldn't" is written in above it. Do you see that?
A. Okay.
Q. And that's on page 11, right?
A. Okay.
Q. Okay. Did you scratch out -- did you make that change, scratch it out and write in "wouldn't"?
A. Yeah. That's mine.
Q. What is the word that was scratched out?
A. (Gesturing.)



Q. If you remember.
A. Ab- -- no, I mean, no, it's a scratch-out. It ain't --
Q. I know, but you wrote it, so maybe you remember.
A. No. No, not at all.
Q. You can't tell.
A. But I'm saying I know this is all me. I don't know what it was. It's a misspelling or something like that probably.
Q. Okay. So the last line of paragraph 11 should read, I believe he thought I wouldn't go as far as I did; is that right?
A. Yeah, yeah.
Q. Okay. All right. So you can set that aside for a second.
A. Okay.
Q. And if you need to look a back at it --
A. Cool.
Q. -- that's okay.
A. All right.
Q. So what I'm going to do now is ask you some questions about the night of the murder, okay -- or the murders.



If you want to stop at any time, it's okay, take a break, I get it. It's fine.
Good to go?
A. Yeah.
Q. Okay. How did you end up in the car with Cordell Williams that night?
A. Getting a ride home.
Q. And where were you getting a ride home from?
A. From over east. From one of the -- one of the -- one of the brother's house.
Q. Whose house were you at?
A. This was Vino. I was at Vino house.
Q. Beano?
A. Vino, yeah.
Q. Can you spell that?
A. Brother named Vino, V-i-n-o.
Q. Okay. Was Vino a fellow P. Stone?
A. Yeah.
Q. Okay. And who was all at P. Stone -- or Vino's house?
A. It was a lot of different people there. It was a -- it was a, you know, kind of little party slash -- you know, a smooth place to be.



Q. Okay.
A. Over east outside away from our area. You know, our area was Englewood and it -- it was hectic our area, so that's the -- the paradise over there, so --
Q. Out east?
A. Yeah.
Q. When you say out east, give me an idea of like the streets.
A. That was on 83rd and Buffalo.
Q. How many miles away from your neighborhood was 83rd and Buffalo?
A. Probably like 20, 30.
Q. 30 miles?
A. I mean, coming from Halsted or May, Racine, all the way to the lake? I don't know how to estimate it, but what --
Q. Okay.
A. -- would you call from -- to the lake.
Q. Was it close to the Indiana border?
A. It's that -- it's that way.
Q. Okay. That's all right.
Okay. So had Cordell Williams been at that party with you?

A. Yeah, he -- he was there.
Q. Do you know who he came with, if anyone?
A. No, I don't know who he came with.
Q. How long were you all at that party before you left in his car?
A. I'm not -- I'm not certain. Like --
Q. Like an hour?
A. I'm not certain. I'm not certain how long he was there.
Q. About how long were you at this party?
A. That night, I don't -- probably a couple hours, an hour, something like that. An hour or two.
Q. By the way, back in 1994, May of 1994, did you have a cell phone?
A. Absolutely not.
Q. When you say absolutely not, why -- why so certain? Why --
A. Cell phones, they did exist in '94, but on our block I think you can say nobody had one.
Q. Okay.
A. So you know, that was something that only the -- the top-flight dope dealers I seen have the brick phone or -- then by the summer of '94 I think



I'd seen a flip phone. But never -- never nobody in the circle that I ran with had a cell phone.
Q. By the way, was drug dealing one of the businesses of the P. Stones?
A. I mean, every individual had their own whatever, indulgences. But that wasn't something that -- you know.
Q. I don't -- I don't mean using drugs. I mean was it part of the way for the P. Stones to raise money was to go out and sell drugs in the neighborhood?
A. I mean, I guess when you -- when you paint it with a broad brush like, because -- because I'm a Stone and I do that, but it wasn't like that was a requirement type of thing.
Q. Sure.
Were you selling drugs?
A. Off and on.
Q. Not as a regular --
A. No, I wasn't -- I wasn't a dedicated hustler.
Q. Got it.
Is that what the drug dealers were called, hustlers?



A. What's that?
Q. Hustler, I mean, was that something you called the people who primarily sold drugs?
A. Yeah, he -- he hustled. I'm saying he -- he get money.
Q. Yeah.
A. So when you got those that get money, those who -- gangbangers who, you know, into -- you know, and then you got those that do a little bit of both.
Q. Sure.
Okay. So you're at this party and somehow Cordell Williams ends up giving you a ride home?
A. Yeah.
Q. Okay. How many people were in the car when you left the party?
A. I know it was -- it was like a car full of us.
Q. I'm sorry?
A. A car full of us, it was a full car.
Q. Okay.
A. Probably three or four.
Q. Three or four, okay.



A. Yeah. In the car.
Q. Do you remember the names of the people in the car with you when you left the party?
A. No. I mean, me -- yeah, me, Cordell, Londell, and I think Peterman was in there with us.
Q. Was there a person named Andre Ruddock in the car with you at all?
A. No.
Q. He wasn't in the car at all that night?
A. No.
Q. What was his -- did he have a nickname?
A. Pudge.
Q. That was his nickname?
A. Yeah, that's his nickname.
Q. Okay. You're sure he was not in the car?
A. Yeah. He wasn't.
Q. Okay. Who do you think the fourth person was?
A. Peterman.
Q. Peter Man?
A. Yeah.
Q. P-e-t-e-r?
A. You can -- you spell it like that, man. Peterman.

Q. Oh, is that -- I mean, was that two words or one word?
A. One word.
Q. Peterman, okay. Kind of like the truck or whatever. Peterman.
All right. And everyone in the car was a P. Stone?
A. Yeah.
Q. Okay. Where did you go after you left the party?
A. We was going home. We was -- it was over with. It was -- he was just dropping us off home. That's -- you know, Cordell was like one of the few who had a car, so it ain't -- it's -- it's not uncommon for, you know, he'll give brothers a ride home.
Q. Sure.
A. So one of them.
Q. Was he a reliable source for a ride?
A. Yeah, you could say that.
Q. Did he primarily give P. Stones rides?
A. I mean, that's -- you know, that's the only people that I accompanied at that time, you know what I'm saying.



Q. Right.
A. So ain't no -- I don't know about what he did in his times away from me or when I didn't see him or nothing. But I'm talking about if I seen him and I needed a ride, you know. But like I say, it wasn't -- we wasn't everyday kick it partners like that, but on occasion.
Q. Was your relationship with Cordell Williams in 1994 the kind of situation where you could go to him and say, Look, I need a ride, you gotta give me a ride?
A. No.
Q. All right. So you wouldn't like use your rank as a gang member to get him to give you a ride?
A. No.
Q. You just asked him for a ride?
A. Yeah. I mean, if I'm -- if I'm -- if we around each other, it ain't -- it ain't as -- it ain't like that.
Q. Okay. The -- okay. Tell me, if you can remember, the route you took from 83rd and Buffalo back towards where you lived at 73rd and May.
A. Um-hmm. I remember. It's -- you know, coming from the east, we -- 'cause you got to kind



of travel. You got to kind of be careful how you travel back then.
Q. Let me stop you right there. Why do you have to be careful how you travel?
A. For the same reason that that happened to the -- unfortunately the boys who I --
Q. Who you shot?
A. Who I killed, yeah.
Q. Okay. So you have to be careful how you travel to avoid a rival gang spotting you and trying to shoot at you?
A. Yeah, yeah.
Q. Okay.
A. This is -- yeah. You know, so certain blocks you don't -- you don't drive down. Certain -- you know, you got -- you got to be careful.
Q. Understood. Okay.
A. And so -- but one of the ways I -- we go is 76, I remember.
Q. Okay. So you take 76th Street?
A. Um-hmm.
Q. And that's an east-west street?
A. Yeah.
Q. Okay. And did you take 76th Street



most of the way back towards your neighborhood?
A. Yeah.
Q. All right. At some point did you turn off onto --
A. Halsted.
Q. -- Halsted? Yeah.
A. Yeah.
Q. All right. So you would have been going northbound on Halsted?
A. Yeah.
Q. Okay.
A. To go to 73rd to where I live.
Q. Right. Okay.
At the time when you're driving along the way, were you guys talking in the car?
A. No.
Q. Nobody was saying a word?
A. No.
Q. There was no talk, for example, of the fact that you had been shot at?
A. No.
Q. Or that -- to be careful in certain areas 'cause --
A. No. It's already understood like to

be ...
Q. Okay.
A. But I'm just remembering like -- you know, like you say, that was a big moment that I had reflected on, and -- but it was just a silent drive kind of like. And this ain't -- this happened before where everybody in their own head and -- or listening to music and just rolling and wasn't no going back and forth. It was just ...
Q. You know, I want to follow up on something that you mentioned. You -- I think you've said a couple times already that you've had opportunities to reflect on your past and become a different person and you've grown spiritually and things of that nature, right?
A. Yeah. For sure.
Q. Okay. And I imagine one of the ways you developed that growth is by thinking about the events that happened that night where those two boys got shot.
A. Yeah. Absolutely.
Q. Okay. Tell me what you think about when you go over those thoughts in your head that helped you grow as a person.



A. What I think about?
Q. Yeah.
A. The mistake that -- that it was to be a part of that lifestyle and being programmed in that way to see my people in that way and -- because, you know, like you say, based solely on the signaling of a hat and it's -- and it's -- but we conditioned in that way that it's sort of -- we call it flagging.
And so it's like -- like you asked me a question did I know their names, did I know them by face, did I know them by this. But it's like the American flag. It's like if you got an American flag on you, you -- you identify it as who you are. So if it was Al-Qaeda or whoever that saw you, you -- you that.
And so in our culture back then, anybody who wear their hats, it is -- it is a clear declaration, it's not like this era now where it's hip hop now. But, you know, you -- you making a statement and if you -- you know, and so that's the deep regrets, though, to be so controlled by that.
Q. Okay. So back in 1994 in that neighborhood where you're driving through, anyone who wore a hat off to the right --



A. Yeah.
Q. -- would have been making a clear statement, I'm a GD?
A. GD, BD.
Q. Yeah.
And it's a clear declaration?
A. It is.
Q. Okay. Now, as you're driving in that area going north on Halsted, as you're approaching 74th Street, you're going 75th, 74th.
A. Um-hmm.
Q. You knew you were in hostile territory, right?
A. Um-hmm.
Q. You have to say yes or no.
A. Yes. I'm sorry.
Q. Did everybody in the car know this, that it was hostile territory?
A. Yeah.
Q. What makes you think that Cordell Williams knew it was hostile territory?
A. He grew up in the community.
Q. So it's common knowledge?
A. Yeah.



Q. Okay. And being in hostile territory, you guys would have known then that if you stopped for too long, you potentially could be targeted by the Gangster Disciples?
A. Yeah, it's a possibility.
Q. Okay. Were you guys wearing hats that night?
A. I don't remember.
Q. Were you wearing colors?
A. I don't remember.
Q. Okay. Is that something you normally would have been doing, wearing the colors of the gang and you go --
A. No. Colors ain't that big like that, you know. This ain't like the West Coast where Crip and Blood where, you know, they got a culture they -- that seriously, where they wear blue or wear red and can't do it and you -- it's -- it's serious over there with that.
But our culture, it was never that serious on colors. More the hats than the colors in our -- in our culture.
Q. Got it. Okay.
Do you remember as you sit here now

whether anybody in the car had a hat on?
A. No, I don't remember.
Q. Okay. Back in May of 1994 do you think you were a well-known enough leader that rival gangs would know you by face?
A. Not all -- not all of them, but I'm sure quite -- quite a few knew me.
Q. Okay. Was there anything about the car you or guys that night that would have alerted a rival gang that you were P. Stones?
A. No, not that I can think of.
Q. Did you have a concern at all that night that you could have been identified as P. Stones?
A. No, no. In what way? I don't -- you say in front of car or from what?
Q. Well, if you come to like a stoplight, okay --
A. Okay.
Q. -- and it takes a long time and you see a crew or a group --
A. Yeah, right.
Q. -- on the -- on the street corner, do you get a little anxiety or concern?
A. Yeah. Yeah, we do, because I'm saying



in our -- in our culture this is how it goes. On that car before you even approach a mile or a block away, I'm saying all -- you know, all eyes going to be on that.
So yeah. So you know, you got to -- that's what I mean, be mindful. Four guys pulling up in a car.
Q. Okay. There were definitely four guys in the car?
A. Yeah. It was four, full car.
Q. Okay. So you were approaching -- going northbound on Halsted?
A. Um-hmm.
Q. 74th Street is in front of you?
A. Yeah.
Q. What side of the street is the Honey Sub restaurant on, left or right?
A. It's on the east side.
Q. East side. So it's going to be on your right side?
A. On the right, yeah.
Q. Okay. And what side -- where were you sitting in the car?
A. That's where I was sitting, on that side.



Q. Were you behind the driver or were you behind the --
A. Behind the passenger.
Q. Behind the passenger?
A. Yeah.
Q. Okay. Are you sure?
A. Yeah. I was -- I remember like yesterday. I was leaning on the window and look and saw what I saw.
Q. Okay. Were you -- are you sure you didn't come down -- were you guys headed southbound on Halsted at that time? In other words, were you coming from the opposite direction southbound --
A. I don't --
Q. -- towards 73rd --
A. I don't understand. We going towards 73rd. We're going north.
Q. All right. Okay. Describe what you saw. Or what happened next? You saw some -- two people?
A. I saw -- and I'm like, Hold on. Hey. I thought I saw what I saw. Saw what I saw.
Q. What was it that you saw?
A. Two guys with their hats swung off.
Q. Okay. In the wrong direction?



A. Yeah.
Q. All right. Was there a gun in the car?
A. Yeah.
Q. Where was the gun?
A. It was in the -- it was in the trunk by then.
Q. Okay. How did the gun -- obviously you put the gun in the trunk, right?
A. Yeah.
Q. Okay. Tell me why you put it in the trunk.
A. It was -- yeah, Cordell didn't want to ride in case we get pulled over type.
Q. Okay. He didn't want any out in the car itself?
A. Yeah.
Q. He wanted to keep it in the trunk?
A. Yeah.
Q. So at what point did you put the trunk -- or the gun in the trunk?
A. When I was on the way going home.
Q. So before when you were leaving Vino's?
A. Yeah, when we was leaving the party.
Q. Okay. Leaving the party before you get

in the car --
A. Or the gathering. I don't want to call it a party, but yeah, whatever.
Q. Okay. Well, so what should we call it? I don't want to put words in your mouth.
A. Not --
Q. It's not --
A. Just Vino -- just leaving Vino house. Little chill-out spot.
Q. Okay. Was it a gathering?
A. Little chill-out spot. Just chilling. Not a party, though, I'm saying.
Q. How many people do you think were at Vino's?
A. Probably about 12 people, something like that. Eight something like that.
Q. All right. You guys were drinking?
A. Yeah. Drinking, smoking, just, you know, chilling out.
Q. Smoking the weed -- a little weed?
A. Yeah. It was -- you know, 'cause it was some Latinos, you know, Latin Kings. That's their block, their area. So it was a mixture of us with them, and it was that, you know.



Q. And the P. Stones got along with the Kings?
A. Yeah.
Q. Okay.
A. Some of them was there, I'm just saying.
Q. Yeah, yeah, yeah. I get it, I get it. We'll just call it a gathering.
A. Yeah. A little gathering.
Q. All right. So you leave the gathering at Vino's, and before you get in the car Cordell asks you to put the gun in the trunk?
A. Yeah.
Q. All right.
A. When I -- when asked him for a ride, yeah, I was like, man, let me -- and he was like, yeah -- like you -- I know -- you dirty? Uh-uh, don't -- like, no, put that up.
Q. Okay. What does it mean to be dirty?
A. You know, was I carrying a gun.
Q. Carrying a gun, okay.
All right. So you see these two guys. Where did you first spot the two individuals with their hats in the wrong direction?
A. I don't know what you mean. Like



where? What you say, driving by them?
Q. So you're driving down the street, you're leaning out --
A. Driving past the restaurant.
Q. Right past it. And where were they inside the restaurants or were they walking in?
A. Yeah, they was inside.
Q. Okay. And the way the restaurant -- do you know if that restaurant is currently there?
A. I don't -- I don't think so.
Q. Okay. Do you know if there's anything there?
A. Not that -- I don't know.
Q. All right. The way the restaurant looked back in May of 1994 as you're driving by, was it all windows that faced the street?
A. Yeah, yeah.
Q. So you could look right in and see whoever is in there?
A. Yeah.
Q. Okay. Were these two individuals sitting down or standing?
A. Standing.
Q. Where were they standing, like --



A. It ain't much room in there. It's about -- it's about this big (gesturing), so ...
Q. Okay. Are there any table? Was there any seating?
A. No.
Q. You just had to stand. Okay.
A. Lights like this or fluorescents lights in it. It's a little heavy illuminated.
Q. Got it.
Okay. At this point when you spotted these two individuals, had there been any conversation in the car?
A. No. None.
Q. All right. About what time of night was it?
A. Midnight.
Q. And what did you do next? You see these two guys with their hats in the wrong directions. You think they're GDs. What did you do next?
A. I asked him to pull over for a minute.
Q. Okay. Did you demand that he pull over?
A. Yeah, I did. Pull over. Hey, pull over.
Q. Did you raise your voice?
A. Yeah, I did.

Q. Did you shout it?
A. I -- I expressed it forcefully.
Q. Well, I mean, does it sound like a shout? One could perceive you as shouting pull over.
A. You can. I'm saying, yeah, it was forcefully stated.
Q. All right. What did Cordell do?
A. He pulled over.
Q. Okay. What did you say next?
A. I was like, Hold on. Hey, give me a second. Hold on. And I -- and I immediately popped out.
Q. Did you tell him to pop the trunk?
A. I did.
Q. Okay. Did he pop it?
A. Yeah.
Q. Was there any discussion at that time?
A. No. It was just -- it went -- it was -- it wasn't no talking, no.
Q. I want to go back to when you were at Vino's.
A. Okay.
Q. When you put the gun in the trunk. Was



there anything else in the trunk?
A. No, not that I know of. No. I don't know.
Q. So the only thing in the trunk when you jumped out in front of the Honey Sub restaurant was that gun?
A. I don't know.
Q. I mean, to the best of your memory.
A. I'm saying like I don't -- I don't -- I don't remember like if it was a tire or a crowbar, some clu- -- you know, that's what I'm saying. Like I don't -- I'm just remembering the main parts about when I -- you know, that's what I recall that far, you know.
Q. Well, did anyone in the car say what are you doing?
A. No, I don't recall -- no, I don't recall nothing.
Q. Was there any hesitance or resistance to stopping the car in front -- in front of the restaurant in a hostile gang territory?
A. I think it might have been what's up, what's wrong type, you know what I'm saying. Hold on, hold on, and that type of -- ain't much



discussion. I wasn't going back and forth or nothing. It was, Hey, hold on. And you know, it was just, Hold on. Give me a second.
Q. Okay. Do you remember who was saying something?
A. I don't. But I'm just like -- not exactly like that, but I'm just knowing that -- just recalling fragments of, you know.
Q. Okay. Somebody said like, hey, what's going on, or whatever?
A. Yeah, I think Coolie might have said, Hey, oh, and I'm, Hold on. You know, type -- Cordell, rather.
Q. All right. I mean, given that you're stopping the car now to --
A. Right.
Q. -- jump out in hostile gang territory --
A. Right.
Q. -- there must have been some concern, right?
A. Yeah, yeah.
Q. Okay. You were the leader in the car?
A. Yeah.
Q. All right. So if you made a demand,



your expectation was they're going to follow what you say?
A. Um-hmm.
Q. Is that true?
A. For the most part, yeah.
Q. Okay. Well, what would happen if Cordell didn't pull over?
A. I mean, it may not -- it may not -- nothing maybe not happen. I'm saying it may just be a -- you know, I'm trying to -- not been out in relationship, let's say. You know how like you got a wife and you don't want to hear her mouth or you don't want to deal with that attitude or vice versa, she don't want to rub you the wrong way and have to -- you know, you got to -- it don't have to be something happens to you, but ...
Q. Look, I'm not saying that -- I think you're misunderstanding the question.
A. Okay. Maybe I am.
Q. You demand that Cordell pulls over. If Cordell had not pulled over and said, No way, I'm not pulling over, would that have been something that you can violate him for, especially if he does it in front of two other people?

A. You know, it's a thing we call, like the catch-up gang, like -- or try to -- I have to try to twerk it in a way that make him -- make him to get -- you know, make him fit a violation. But it had been -- I don't -- I don't think that I would have did that.
Q. Okay. So let's go back. You're about to jump out of the car, you told him to pop the trunk, he pops the trunk.
A. Yeah.
Q. Okay. You go get the gun, right?
A. Um-hmm.
Q. What happens -- and then what happens next?
A. No, I was finna say like the rest history, but I gotta explain it?
Q. You know, do your best.
A. Okay. I get the gun and I go down there and --
Q. And let me just make it a little easier for you. How far did the car stop from the restaurant?
A. It -- it didn't stop -- it was like a good -- I'mma say half a block. But I'll say a



third of a block down.
Q. A third of a --
A. Yeah, 'cause it wasn't an immediate stop. He was like, Man, what's up, man? Now that you making me -- what's going on?
Q. Okay. So he was questioning?
A. Yeah, yeah. Like what's up, man? And I'm like, Hold on. And you know, so he eventually pulled over.
Q. Okay.
A. So it wasn't right by the restaurant.
Q. All right. So let me just make sure I understand. You're coming up towards 74th?
A. Yeah.
Q. You tell him to stop. He stops about a third of the block after you tell him?
A. Yeah.
Q. Did he go through the intersection of 74th and Halsted?
A. Um-hmm.
Q. He did?
A. Yeah.
Q. Okay. So --
A. On the 73rd side.



Q. So he's on -- he's on the north side of 74th?
A. Yes.
Q. Pulls over on Halsted. You gotta get out, get the gun, run back across the intersection or across the street --
A. Um-hmm.
Q. -- the Honey Sub restaurant?
A. Right.
Q. Okay. And from the moment you first told him you wanted him to pull over to the moment he pulled over, tell me what was said to the best of your ability. I mean, we know he said something, right?
A. To the best of my ability, that's what I'm -- everything I done said. Like he -- man, what's up? Hold on, pull over, pull over. And I'm just remembering it's like, man, what you on? Hey look, pull over. One second. Let me out. I pop out and, hey, hit that trunk and ...
Q. Before you got out of the car --
A. Yeah. I'm telling you, it was so quick. Wasn't no --
Q. I believe -- believe me, I do believe



you on -- I definitely believe you on that.
A. -- debating, long discussions. Wasn't none of that.
Q. Did you say there were a couple of bricks?
A. I don't -- I don't recall if I said that. I may have.
Q. Okay. Bricks --
A. Yeah.
Q. -- is a slang for Gangster Disciples?
A. Yeah.
Q. So if you said there's a couple of bricks, everybody in the car would know that you spotted a couple of Gangster Disciples?
A. Indeed. If they was paying attention, yeah.
Q. Okay. Cordell pulls over.
A. Um-hmm.
Q. Now you jumped out -- you told him to pop the trunk, you jump out, you get the gun. What happens next?
A. I go down there to the restaurant and I fire on some guys and I step back after that, step back towards the car. And then I started trotting

a little bit.
Q. Okay. Let me ask you a couple questions about this. Okay?
Did you shoot them in the back of the head?
A. Yes.
Q. Okay. So they didn't even know it was coming?
A. No.
Q. What I said is true; they didn't know it was -- it was coming, right?
A. Say it again.
Q. Did they know it was coming?
A. No.
Q. And after they fell to the ground did you shoot any of them again?
A. Yes.
Q. How many times?
A. Two or three.
Q. In the chest?
A. I don't recall. You know, from the trial, you know all this come up, you know what I mean, so it stuck in the head. But when it happened, as it was happening, it was not a pinpoint like I



was -- like I can see that. It was just -- I was just shooting down. And I don't -- you know, I was blacked out, so I didn't actually literally see the -- anything after the first shot I don't -- I don't even see nothing.
Q. Okay. Now, when you -- after the -- you fired the shots, did you think you had killed them?
A. Yeah.
Q. That was -- that was the plan, right?
A. Well, not a plan. That's what happened.
Q. Right. But if you shoot somebody in the head, I mean --
A. Yeah.
Q. -- the most likely outcome is that person's going to die?
A. Yeah. Absolutely.
Q. Okay. And you knew that before you pulled the trigger, right?
A. I knew what?
Q. That if you shoot someone in the head --
A. Oh, yeah, yeah.
Q. -- that person is probably going to die?
A. Yeah.
Q. Okay. So now at this moment you've



just killed two people for the first time in your life -- at least that's what you think might have happened, right?
A. I ain't even thinking about it, but yeah. You know what, as I'm -- you making me think about it. When I left out of there, as I was leaving, yeah, that --
Q. Okay.
A. Yeah.
Q. And you know you're in rival gang territory, right?
A. Um-hmm.
Q. You have to say yes or no.
A. Yes.
Q. Okay. And the people you just killed you think, at least at that time, are Gangster Disciples, right?
A. Um-hmm.
Q. You have to say yes or no.
A. Yes.
Q. Okay. Did you run back to the car?
A. I eventually did, yeah.
Q. I mean, in light of all these facts, you'd want to get out of there fast, right?



A. Well, I wouldn't have ran actually. I wouldn't have ran.
Q. Okay.
A. Because it's like -- kind of make you more obvious or whatever. So I ran because of the car that got behind me.
Q. What car was it?
A. The off-duty police officer who was on the spot.
Q. How could you tell that the person -- well, first of all, was it a police car?
A. Yeah, it was a -- what we called a police car.
Q. Okay. Describe it.
A. Like one of them Fords. You know how like --
Q. It looks like a police car, but it's not?
A. Right. I mean, I think -- but it's like -- you know, certain cars are police cars.
Q. Okay.
A. It just --
Q. You could tell right away it was a police car?
A. Yeah.

Q. Okay. And the person inside, was that person in a uniform?
A. I ain't -- I wasn't paying -- you know what I mean, I couldn't see none of that. I just knew that it was a police car and he was trailing me.
Q. And then you started running?
A. Yeah.
Q. Okay. And you ran back to the car that Cordell was in?
A. Yeah.
Q. Okay. And you tried to get into Cordell's car?
A. Yeah.
Q. All right. Cordell had started pulling away?
A. Yeah.
Q. All right. Did you have any trouble getting in that car?
A. Thinking back. Did I?
Q. I mean, the car is pulling away and you're running up to it.
A. Yeah, yeah. I'm chasing it.
Q. Yeah.
A. Yeah. So yeah, a little bit.



Q. Okay.
A. But not like that guy -- come to think of it, you making me think about it. He -- that's the police manipulating. He -- he did what he did. He said that I slipped and fell in front of -- and when he got to trial, he changed the testimony. This is -- you know, in order for them to try to get the conviction.
But he said that I fell in front -- I fell in front of the car -- in front of his car, and he then got out of his police car, ran around to the car and said, Freeze, police. I looked up at him, then I got off the ground and then ran and jumped in Cordell car. That's what he changed his testimony to in the -- in the court.
But the truth of the matter is that ain't -- ain't nothing close to that happening.
Q. Okay. You're talking about the off-duty cop?
A. Yeah.
Q. Okay.
A. He made a good -- yeah, they had to drum that up to make it a positive identification 'cause he -- he couldn't see me like I couldn't see him.



Q. Okay. Did --
A. In real life.
Q. Tell me what really happened. I mean, obviously you couldn't have smoothly gotten in the car. It must have been some difficulty.
A. But it wasn't a difficulty like --
Q. I know.
A. -- he created. But I'm saying though that it was just --
Q. You tell me what happened.
A. The car was moving and I was running to the car, and I'm trying to get in the car and slip a little bit and, you know, I'm talking about it's -- I just -- I'm running away from something that's --
Q. Sure.
A. -- as serious as that, and I'm trying to get away. And trust me, ain't no -- just nothing close to what he talking about. My instincts is life or death. I'm popping -- I ain't even slipped and did none of that what he described. But you making me think -- you know, it was just the trial. I remember that. Like they played, they doing what they doing to try to, you know, secure a conviction.
But the truth, I did what I did but --



Q. Okay.
A. -- that didn't happen.
Q. Let's set aside what the cop said at trial.
A. Right.
Q. I don't care about that right now?
A. Okay.
Q. I just want to hear what you say happened. Okay?
A. Okay.
Q. So you're running after the car.
A. Yeah.
Q. You try and get in, you slip a little?
A. Um-hmm.
Q. Is that true?
A. Yeah.
Q. Okay. You have to keep running?
A. Yeah.
Q. And then eventually you get into the car?
A. Eventually I get in, yeah.
Q. Okay. And was Cordell, as he was pulling away, speeding up, or was he trying to let you get in?
A. I think he was -- I think he was trying

to let me get in --
Q. Okay.
A. -- at the same time, you know.
Q. Sure.
A. I think -- yeah, so that's it.
Q. Okay. When you -- when you went from the car to the sub shop, did you walk or run?
A. I walked.
Q. Okay. The .45 -- you shot a .45 before that day, right?
A. Um-hmm.
Q. You have to say yes or no.
A. Yes. I'm sorry.
Q. That's all right.
Those are loud shots, aren't they?
A. Pretty much.
Q. Yeah. I mean, if you fire enough of them at once, they can kind of ring your ears, right?
A. Yeah.
Q. That happened to you that night, that your ears were ringing a little?
A. No, not that I could recall.
Q. All right. Let's see, when you got in the car, did you say anything?



A. Yeah. I did.
Q. Did you say something to the effect of like, Pull the fuck off, go, go, go?
A. I said, Drive this motherfucker.
Q. Okay. Did you say, Go, go, go?
A. I said, I remember -- I don't remember if go, go, go was attached to it or something, but I'm just saying, you know ...
Q. You were insisting that obviously --
A. Drive this motherfucker.
Q. Did you say something to the effect could -- I mean, did you say anything like, Pull the fuck off?
A. Same thing. If I did, I don't -- but I'm saying, Drive this motherfucker, is what I recall. By probably, you know, some of that.
Q. Cordell was driving fast at some point to get away from the cop?
A. He drove fast.
Q. Did you say that there was a police car behind you?
A. I don't -- I don't recall if I said it. I don't recall.
Q. Did the cop flash any lights?



A. He didn't have no police lights. He didn't have no siren or none of that.
Q. Okay. So if he's flashing some kind of lights, I mean why -- why -- let me ask you this: Was that car so obviously a cop that even Cordell driving and looking at it in the rearview mirror would have known?
MR. BECKER: I'm going to object on speculation now.
THE WITNESS: I wouldn't -- I wouldn't -- I wouldn't know what he -- you know, I can't say that. But -- I can't say that --
BY MR. MORAN:
Q. Well, let me ask you this: Did you make it known when you got in that car one way or another that you were being now chased by a police car?
A. I'm not certain. I probably did, but I'm just -- I'm -- to answer your question, I'm just thinking like the way I ran to that car and with some somebody on my tail, I mean ...
Q. They would have known something is wrong?
A. It's either some Folks or the police.
Q. Right.
A. The way they was driving.



Q. Only two choices, right?
A. Right. It's only two choices.
Q. It's either the GDs or the police chasing you.
A. Yeah. That's coming like that.
Q. Okay.
A. And the way I'm panicking, like I'm in a -- you know, I'm just yeah, yeah, yeah. I was turnt to -- I don't want to act it out, but ...
Q. No, I get it. I get it.
Okay. Was Cordell going like 80 miles an hour to try and get away?
A. He was going fast. I can't say exact, but he was going fast.
Q. He was speeding?
A. He was speeding.
Q. Yeah. What direction did he go?
A. 73rd.
Q. Okay. Did he let you out somewhere near 75th and Aberdeen?
A. Somewhere near there. Somewhere -- where was it? I know I was telling him, Hey, turn, turn, all right. Let me out. And I'm just like -- I was, you know ...

Q. So you're telling him where to go?
A. Yeah. I'm telling him where to go because the police, he -- he -- he -- now that we know it's the police or whatever, he didn't -- he didn't follow us like that. He lied about that. He was -- I guess he did a good job in getting the license plates, right, and he fell back like immediately. So after --
Q. So in other words you lost him right away?
A. At the left turn -- I'm saying after that left turn on 73rd, he didn't -- he didn't chase us.
Q. Okay. So he turned left on 73rd?
A. Yeah.
Q. Cordell did?
A. Yeah.
Q. And then he goes down to Aberdeen?
A. Somewhere. I don't -- swear, but I'm just --
Q. Did he take another left on Aberdeen?
A. Yeah, he went somewhere.
Q. But somehow you got dropped off around 75th and Aberdeen?



A. I think so. I'm saying I got -- I got outta there somewhere.
Q. And you were telling -- you were giving directions to Cordell, turn here, go this way, stuff like that?
A. Yeah.
Q. Okay. And then you demanded to stop and get out?
A. Yeah, because, you know, honestly I'm saying that area is -- it's my area even though like the territory is like -- that's considered GDs, Folks or whatever, but I grew up all over there. I'm saying I went to -- I went to twelve different grammar schools. I graduated -- I went to high school. From seventh grade I failed twice. Them people sent me to high school. From seventh grade I been in all types of -- so from Racine to Halsted, I could go through gangways, like a tunnel. And so I'm telling him -- this my area. And I'm saying that I -- I frequent this -- this is like the back of my hand. Even though I -- I have to choose the side, my family is Stone, so I ain't have no choice in what I was. But all the little guys I went to school, every different school I



went, so I knew all these people, so -- but before I really, really turned into that, I -- I know that neighborhood. So I was telling him where to go, let me out right here. I know I'm straight.
Q. Okay. So you know exactly where to go even though you're in rival gang territory?
A. Yeah.
Q. And you were giving directions to Cordell --
A. Yeah.
Q. -- to help get away.
And at some point it's your belief that everybody in the car must have known that that was a cop behind you, right?
MR. BECKER: Again, I'm going to object on speculation.
BY MR. MORAN:
Q. Is that true?
A. I can only speculate and say --
Q. Well --
A. -- they thought it was either them or the police.
Q. Okay. I understand that.
At some point when you're giving



directions from the ride, from the shooting to where you get dropped off --
A. Okay.
Q. -- did you say at any point, That's a cop behind us, or something to that effect?
A. I don't -- I can't recall if I say said that right, but I'm --
MR. BECKER: I object, asked and answered. I think he already answered that question.
THE WITNESS: I can't -- I can't recall if I said that.
MR. MORAN: I don't think that's been asked yet.
THE WITNESS: But yeah.
BY MR. MORAN:
Q. You can't recall if you said it?
A. No.
Q. All right. Let's look at your affidavit. Okay? Let's go over some parts of it.
Okay. So you wrote at the very top, Affidavit?
A. The front?
Q. Yeah. We're going to look at the very first page.

A. Excuse me.
Q. And you've got the case number, 94 CR 22253?
A. Okay.
Q. Was that the case number just for Cordell or was that a case number that applied to all three of you?
A. That's -- that's -- that's my case.
Q. Okay. And the judge was Vincent Gaughan, right?
A. Um-hmm.
Q. That was your judge as well, right?
A. Yes.
Q. All right. By the way, did you have a jury trial?
A. Yes. Yes.
Q. Let me ask you about the trial real quick. We'll come back to the affidavit.
Did you testify in your own defense?
A. No.
Q. All right. Did you -- was your trial going on at the same time as Cordell's?
A. No.
Q. All right. So you had a separate trial



altogether?
A. Yeah.
Q. Do you know the -- have you ever heard the phrase simultaneous juries?
A. I heard of that before, something like that.
Q. Okay. I'll tell you what it means and you tell me if this happened with you.
A. Okay.
Q. It's when two criminal defendants are tried together with two separate juries. And when evidence comes in as to one defendant but not the other --
A. Okay.
Q. -- one jury will leave the courtroom.
A. Okay.
Q. Okay?
A. Yeah, I think I seen on TV or something.
Q. Possibly.
Did something like that happen with you?
A. No.
Q. All right. Do you know if something like that happened with Cordell, where he had a



bench trial, not a jury trial, alongside you or Londell Harper with a jury trial?
A. No, not that I know of.
Q. Okay. So you've entitled -- and by the way, you didn't have any help writing this affidavit?
A. No.
Q. Okay. You didn't like ask anyone with knowledge at the prison or do legal research on how to write these things?
A. You know, by this time I'm --
Q. You know what to do?
A. I'm -- I'd been, you know, researching for a minute and I've been writing for 30 years. I'm saying I write books.
Q. Understood.
A. So I can narrate.
Q. Okay. So let's look at the first paragraph.
A. Okay.
Q. About 12:00 a.m. May 26, 1994 after a night of partying -- and then there's some, you know, description of what you guys were smoking and drinking.
A. Um-hmm.



Q. Mutual friend's house, Cordell Williams was providing a ride home for those going his way.
That's a truthful statement?
A. It is.
Q. Okay. Number 2. While at the party I brandished my gun so prior to letting me into his car Cordell popped the trunk and told me I had to put the gun in the trunk, and I did.
That's a truthful statement, right?
A. It is, yes.
Q. Okay. I think you described that before, right?
A. Okay.
Q. Okay. Number 3, as we were blocks away from my house I thought I saw rival gang -- or rival members in a restaurant who had been trying to shoot me.
Is that a truthful statement?
A. It is.
Q. Okay. Now, when we talked about this earlier, I asked you if you had recognized them outside of their hats, and you said no. But this says you recognized them as individuals who had tried to shoot you.

A. The rivals.
Q. What do you mean, the rivals?
A. Like, for instance, GDs are one and the same. Like --
Q. Oh, one GD is all GDs?
A. Yeah.
Q. Okay. So you were -- is paragraph Number 3 specifically referring to individuals who actually tried to shoot you, or they're just part of the gang that tried to shoot you?
A. Yeah, part of the gang that was trying to shoot me.
Q. Okay. Number 4, I demanded Cordell to pull over and he did.
Is that a truthful statement?
A. Yeah.
Q. All right. Now, I noticed here you put pull over in quotation marks.
A. Yeah.
Q. What is the significance of quotation marks?
A. It was just emphasizing the demand.
Q. Okay.
A. Like what, you know, words can't ...



Q. Well, let me ask you this --
A. Okay.
Q. -- do quotation marks indicate what you think were the actual words used?
A. I think it was more the emphasis on pull over, hey, pull over. Hey, hey, hold on. Pull over. Yeah, it was -- it was, I think, the actual words as well, but more to the spirit of it.
Q. Okay. And the demand, I think you said earlier, one could construe as you shouting pull over?
A. Okay. Yeah.
Q. Okay. I told Cordell -- and this is in quotations again -- pop the trunk and wait right here I want to see if that's these niggas.
That's a truthful statement?
A. Yeah. Truthful in spirit. I could see that, yeah.
Q. That's what you told Cordell?
A. Yeah.
Q. Okay. Now, I would imagine that in all the years that you've been writing stuff for the courts and whatever --
A. Yeah.



Q. -- you've come to learn what the purpose of quotation marks are.
A. Okay.
Q. Is that true?
A. You could say that, yeah.
Q. Okay. And so you would know then that quotation marks are usually used to indicate what was actually said; is that true?
A. Yeah.
Q. Okay. So that's -- the phrase pop the trunk and wait right here I want to see if that's these niggas, that's the phrase you actually used in the car --
A. Um-hmm.
Q. -- when you had Cordell pull over?
A. Yes.
Q. Okay. Number 6, I immediately jumped out, grabbed my gun from the trunk and proceeded walking towards those individuals that I saw.
Is that a truthful statement?
A. It is.
Q. Okay. Number 7, I immediately -- or no. Sorry.
In an awful case of mistaken



identity I shot and killed two individuals, Myron Cochran and Billy Johnson, at that restaurant, and ran back to Cordell's car, with an unmarked police car behind me giving chase.
Is that a truthful statement?
A. I believe it is, yes.
Q. Okay. I want to ask you a couple things about that paragraph.
A. Okay.
Q. How do you know it was mistaken identity?
A. Actually I can only base it off of testimony.
Q. What testimony?
A. Trial testimony.
Q. Right. But, I mean, so whose? What was said?
A. And, you know, I heard from somebody else that that may not have been -- that may have not been the truth. But how it was presented with their family and different people saying that they was not involved, they didn't do this and this and ...
Q. Well, let's back up a second. Okay. Earlier -- and the way this affidavit reads, you

had identified individuals as people who tried to shoot you.
A. Yeah.
Q. And then later on in the affidavit you're saying it's a case of mistaken identity.
A. Yeah.
Q. Now, I read that and I think you've come to realize that these are not the individuals who tried to shoot you.
A. Yeah.
Q. Is that the mistake?
A. The only way -- I'm sharing with you the only way that I come to that realization is that from information that came out during trial or a sentencing hearing, not no -- you know, so I didn't know them personally. And that's like that -- it's disconnected like that where --
Q. So having gone through the trial and listened -- listened to the mitigation/aggravation phase of the trial --
A. Um-hmm.
Q. -- okay, you heard the family testify --
A. Um-hmm.
Q. -- and you formed a belief that these



guys are not the ones who ever tried to shoot me.
A. Yeah.
Q. And that was the mistake?
A. Yeah. That was it.
Q. Okay. Okay. Let's go to the next page. Number 8, I jumped into Cordell's car and I was in panic yelling drive, drive, that's the police.
A. Okay.
Q. Is that a truthful statement?
A. I believe it is.
Q. Okay. Number 9, The look on Cordell's face was shock and fear as he drove away. After about a mile we lost the police. I then leaped out of the car with my gun and ran away.
Is that a truthful statement?
A. It is.
Q. Okay. Let me ask you something: You formed a belief, you have an opinion here about the look on Cordell's face.
A. Um-hmm.
Q. What about the other two individuals in the car, what was the look on their faces?
A. It was -- it was the same. Everybody was a state of, you know, shock.



Q. Okay.
A. And 'cause, you know -- you know, yeah.
Q. Let me ask you something: I remember you telling me that story about how you shot at a group that exchanged words. There were two groups --
A. Yeah.
Q. -- sort of little bit of a distance away --
A. Yeah.
Q. -- and you just shot into a group --
A. Yeah.
Q. -- right?
Were stories told among the gang, to your knowledge, about the -- you know, Hey, man, Day Day -- I saw Day Day shoot at this group. You know, he doesn't take any -- you know, he'll stand up for the gang, you know, things like that.
Had you developed a reputation as someone welling to stand up for the gang and take shots at the rivals?
A. I have, I have. But some things -- I actually didn't -- I actually didn't tell that story or some things, you know, you keep concealed, right, because, like I say, we -- we on top of each



other. So I shot a guy who was your son, for instance, let's just say, for example, and I ain't want that to be known.
Q. All right. Well, I appreciate that you may not --
A. Yeah.
Q. -- retell the story, but you were with a group.
A. So I can't say what particular stories was told on me.
Q. Okay.
A. But I'm just saying like some things -- everything didn't get exposed and -- depending on which circles you traveled in. But I think it's fair to say that everybody around me knew that I would stand up.
Q. Right.
So when -- they knew when you were going to go confront a rival gang, you were going to stand up for the P. Stones.
A. Possibly, yeah. Good possibility.
Q. Okay. Okay. Let's look at Number 10. I never killed anyone before. I also had never partnered in any type of shooting with Cordell

158

before.
A. That's true.
Q. We did not plan to do this shooting.
Is that a truthful statement?
A. It is.
Q. Okay. I want to ask you a couple questions about that too. Had you ever partnered in a shooting with anyone else prior to May 26th, 1994?
A. I can't say. Like -- like the incident I told you about, that was like partnering, but it wasn't a -- it was just spontaneous as well --
Q. Okay.
A. -- where we encountered somebody, and I was like -- and they -- they barked a few things and we barked a few things back. And so would you consider that partnering?
Q. Well, I guess I'm going to use the word you used. Okay?
A. Okay.
Q. You wrote had never partnered in any type of shooting with Cordell before.
A. Yeah.
Q. Okay.
A. True. Definitely.

159

Q. Prior to May 26th, 1994.
A. Definitely never partnered with him on anything. Like we didn't hang together like that.
Q. I understand. I just want to make sure I read this correctly.
A. Okay.
Q. That prior to May 26th, 1994 --
A. Yes.
Q. -- you had never partnered in a shooting with Cordell before.
A. With Cordell before. That's true.
Q. Okay. And you didn't plan to do the shooting?
A. No.
Q. Okay. Now, when you say plan to do the shooting, you're drawing a distinction between something spontaneous that comes up in the moment versus driving around all night looking for two specific people so you can shoot them; is that true?
A. No. I'm just saying like it was no conversation at all with him --
Q. I understand.
A. -- about that.
Q. You didn't have a discussion about

160

shooting someone with Cordell?
A. Yeah, I didn't.
Q. Okay. Let's look at Number 11.
A. Um-hmm.
Q. I believe Cordell pulled over, let me get my gun, and waited on me because I had never done this before, and I believe he thought I wouldn't go as far as I did.
Is that a truthful statement?
A. I think it is, yes.
Q. Okay. Now, when you say I'd never done this before, what do you mean?
A. Meaning that I had never been on a mission with him before or --
Q. Okay.
A. -- or -- or never killed anybody before.
Q. Now, you had shot people before, right?
A. Um-hmm, yeah, you know.
Q. Well, just yes or no.
A. You could -- you could say that. But it wasn't --
Q. Okay. What --
A. I wasn't known as a killer. It's a difference.

161

Q. Okay.
A. I'm just giving you the truth.
Q. I'm not debating that with you at all. Okay?
A. Um-hmm.
Q. But I just want you to answer a couple questions for me.
A. Okay.
Q. I think you testified earlier that you had shot people before.
A. Yeah.
Q. That's right?
A. Yeah.
Q. Okay. And --
A. One outside the neighborhood -- and I'm just telling you the -- so what you -- like --
Q. I'm going to give you a chance to explain.
A. All right.
Q. I just want to get through a couple things right quick. Okay?
A. Okay.
Q. We know that you've shot people. In other words, you fired a gun at someone and the

bullet went into that person's body.
A. True.
Q. Okay. We know you fired a gun at people before and missed.
A. Um-hmm.
Q. Is that true?
A. True.
Q. Okay. Do you need to take a break?
A. Yes. Give me like ten seconds.
MR. MORAN: Why don't you go and step in the hall, and you can take as long as you want.
THE WITNESS: Okay.
VIDEO TECHNICIAN: Go off?
MR. MORAN: Yeah, go off.
VIDEO TECHNICIAN: The time is 1:13. This is the end of Media 2.
THE WITNESS: Okay.
VIDEO TECHNICIAN: We're off the record.
(Recess taken.)
VIDEO TECHNICIAN: The time is now 1:15 p.m. This is the beginning of Media Unit 3. We're back on the record.
BY MR. MORAN:
Q. Okay. You -- Mr. Evans?



A. Yes.
Q. So just to rehash real quick, get you back on -- reoriented where we were at, I had asked you if you'd shot people before. You agreed.
A. Um-hmm.
Q. You shot people and missed as well. You agreed with that.
So now I'm going to ask you is it true you also shot into a crowd before?
A. Yes.
Q. Okay. Now, you shoot into a crowd, you don't know if you're going to hit someone in the leg or the head, right?
A. Right.
Q. So you could have killed somebody; you just kind of got lucky in that you didn't.
A. Absolutely.
Q. Okay. And this is all before the night of May 26th, 1994.
A. Yes.
Q. Okay. I want to look at something that you wrote here as part of paragraph 11. Okay? So we're not done with paragraph 11 yet.
A. Okay.



Q. In addition, my uncle was a high ranking member in our gang and I was of some rank also. Let's just stop there.
A. Okay.
Q. You were a general, right?
A. Yeah.
Q. Okay. So that's more than some rank. That's like the highest.
A. It ain't the highest, but it's ...
Q. It's up there?
A. It's -- it's significant.
Q. What's the highest?
A. You had different titles like akbah [phonetic], Ka'bah. And it's a range of different names how their structure is.
Q. Okay. Cordell was not. In other words, Cordell did not have rank in the gang?
A. True.
Q. You mentioned that earlier.
A. Yeah.
Q. Okay. I'm going to start reading again. I believe Cordell was reluctant to resist me because I was well known to get members violated for showing cowardice against our rivals.



That's a true statement?
A. Yeah, I believe so.
Q. What does it mean to show cowardice against a rival?
A. What does it mean to show cowardice? You know, being -- being -- being in the way.
Q. I'm sorry, being in the way?
A. Yeah. Being in the way. You know, like get out the way, slow down. You ain't got to interfere. Get out the way.
Q. Well, would -- tell me -- define coward, cowardly. Define it for me. What does it mean to be a coward?
A. I mean, in that time in that -- you know, I'm going -- I'm keeping it there. I don't define it that way now.
Q. Okay.
A. I look at it as foolishness.
Q. Fair point. Fair point. So I'm going to change the question for you.
Back in 1994 how did you define what it is to be a coward?
A. It could have been simple as like somebody like having an attitude 'cause -- you know,

everybody don't have the same attitude in the gang, let's say. Like -- like some people in the gang be like, dude a hothead, man. I ain't -- I ain't -- I ain't fucking with dude, man. I ain't -- you know.
Q. Let me ask you if this is what you're trying to say. People who showed cowardice against a rival --
A. Um-hmm.
Q. -- is someone who's afraid to confront a rival or afraid to take a stand against a rival.
A. Um-hmm.
Q. Is that true?
A. That could be true, yeah, absolutely. You know, I was trying to think of a more fit example, but that'll do.
Q. Okay. And in those situations the reason someone might get violated for showing cowardice to a rival is that as a member of the P. Stones, it's your job to stand up to the rivals, right?
A. In some respects, yeah.
Q. Well, what do you mean in some respects?
A. It depends.
Q. On what?



A. On the situation, you know.
Q. Okay. So you yourself have confronted rivals. You've given us several examples of situations --
A. Yeah.
Q. -- in which you've confronted rivals.
A. Yeah.
Q. Okay. Are those situations when you would expect fellow gang members to stand with you?
A. At that time, yeah.
Q. Okay. By the way, when you wrote this in 2017, obviously with all your reading and writing --
A. Yeah.
Q. -- you would have had a better understanding of what all the words mean and everything like that, right?
A. Right.
Q. You've become more educated in life.
A. Absolutely.
Q. Okay. And you're using words in 2017 to describe events in 1994 --
A. Yeah.
Q. -- right?
A. I'm reflecting on, yeah, the spirit of



things.
Q. And you're using words that obviously you think are useful in describing these events based on your education and experiences and, you know, trying to write your own stuff for your legal case and doing your own legal research and your spiritual journey and all the books you're reading. Is that true?
A. Yeah.
Q. Okay.
A. Yeah.
Q. So you would understand that the definition of cowardly is to be afraid, right?
A. Yeah, yeah.
Q. Okay. And that's what that means here is that a gang member who's not willing to challenge a rival and is going to back down out of cowardice --
A. Yeah.
Q. -- that -- that person gets violated.
A. Yeah.
Q. Okay.
A. That can happen.
Q. Did you get the sense that Cordell was afraid to resist you?



A. Yeah. Well, afraid, that's my -- my -- afraid or -- let me see, or just like ...
Q. Well, how about this, did you get the sense that he didn't want to be viewed as a coward?
A. He was -- I'mma just say like I'm reflecting on that -- on everything. But it was more like not just afraid. That may be an element of it, but more like not wanting to wrestle with me, not wanting to like --
Q. Argue with you?
A. All right, all right, whatever, man. You know what I mean, he want to just -- go ahead. I'm just --
Q. I'm going to come back --
A. -- gonna give in.
Q. Let's come back to the words you used in this affidavit.
A. Back to that, yeah.
Q. Okay. You think that Cordell was reluctant to resist you --
A. Yeah.
Q. -- because you're well known for getting members violated for showing cowardice?
A. Yeah.

Q. Okay. So also that must mean that you --
A. Absolutely.
Q. -- think Cordell had concerns about being viewed as a coward.
A. Absolutely, absolutely. I said that that definitely was an element.
Q. All right. Would it have been cowardly to refuse to stop the car when you demand that he stops?
A. In my estimation, yeah.
Q. Okay. Would it have been cowardly to refuse to pop the trunk when you told him to pop the trunk?
A. In my estimation, yes. At that time, absolutely.
Q. And would it have been cowardly for him to not wait for you to come back to the car after you were done?
A. It would have been more than cowardly.
Q. What's more than cowardly?
A. Abandoning me.
Q. Yeah.
A. Yeah, I mean ...



Q. That's a violation, isn't it?
A. That's more than a violation --
Q. That's a head-to-toe.
A. -- at that time. Just think about that. Like, come on.
Q. No, I get it.
A. No, no. I ain't saying like for you to actually think about it, but I'm saying that's cowardly and a little bit more because you just deserted me.
Q. Okay. So we've read through your affidavit --
A. Um-hmm.
Q. -- so far. And this is what we know so far from your affidavit. Okay?
A. Yeah.
Q. There was a gun in the trunk that belonged to you.
A. Yes.
Q. True?
A. True.
Q. Cordell told you to put it in the trunk. True?
A. True.



MR. BECKER: Again, I would object to asked and answered.
MR. MORAN: Well, I'm not done. I'm making sure that these things are true.
BY MR. MORAN:
Q. Cordell -- you told Cordell to pull over. You demanded it, right?
A. I did.
Q. You used the word bricks.
A. Don't -- don't recall if I did use that -- use that word.
MR. BECKER: I object. That's a misstatement of the testimony.
BY MR. MORAN:
Q. And you got out to get the gun, right?
A. I did.
Q. Okay. Now, none of us can climb into Cordell Williams' head, right, and say what he knew. But you told him to pull over, you told him to pop the trunk, you ran out and got something out of the trunk, right?
A. (Nodding.)
MR. BECKER: Again, I object. Asked and answered already.



BY MR. MORAN:
Q. That's true, right?
A. True.
Q. Okay. And you were going to confront two rival gang members. True?
A. (Nodding.) True.
Q. And did you know what you were going to do at the time you walked down to that restaurant? Did you know you were going to shoot them the way you did?
A. I didn't.
Q. All right. So maybe you were just going to confront them with the gun and threaten them, right?
A. I didn't -- I was -- I didn't -- building up to it as I got there.
Q. Okay. And you ran back to the car afterwards?
A. Yeah.
Q. Cordell was pulling away, right?
A. Right.
Q. But he was also, in the course of pulling away, giving you a chance to jump back in the car, right?

A. Right.
Q. After five shots had rung out.
A. Yeah.
Q. Okay. I want to come back to your affidavit. Number 12.
A. Okay.
Q. I did not come forward to express this previously as I maintained my right to plead not guilty, and preserve my right to appeal. But in light of Miller versus Alabama I have been advised by my lawyer upon representing -- or resentencing, I'm sorry -- to just be honest about everything at this point, so I have.
Is that a truthful statement?
A. Yeah.
Q. Tell me what about your resentencing motivated you to be honest.
A. My case, it was final. I was -- it was behind me.
Q. Okay.
A. Honest.
Q. No, I understand.
Up until that point --
A. I was still trying to come home, find a



way home.
Q. Find to way to get out of jail or prison.
A. Yeah.
Q. Okay. Which meant that you could not tell this truth about what happened that night.
A. Yeah.
Q. Okay. But you've been honest about everything else since?
A. Yeah.
Q. Okay. I mean, obviously -- and I don't mean to be rude or anything, but you do know the difference between telling a truth and a lie, right?
A. Say it again.
Q. You do know the difference between the truth and a lie, right?
A. I think so.
Q. Well, tell me what you think it is.
A. Yeah. I mean, yeah.
Q. What's the difference?
A. What's the difference?
Q. Yeah.
A. What's the difference between a truth and a lie?
Q. Yes.



A. A lie is a lie and the truth is the truth.
Q. Right. I understand. You just repeated it. But, I mean, tell me -- explain to me the difference.
A. One is a -- one is the truth and one is fabricated. One is something made up.
Q. Okay. Okay.
A. I mean, I don't know how to ...
Q. No, that's good enough.
I want to come back to a phrase you used.
A. Okay.
MR. MORAN: You know what, give me -- I need to take a quick break. Give me five minutes.
THE WITNESS: All right. Cool. I'll use the bathroom.
VIDEO TECHNICIAN: The time is 1:28 p.m. This is the end of Media Unit 3. We're off the record.
(Recess taken.)
VIDEO TECHNICIAN: The time is now 1:36 p.m. This is the beginning of Media 4. We're back on the record.



BY MR. MORAN:
Q. Okay. Are you ready to get started again, Mr. Evans?
A. Yes, I am.
Q. Okay. A couple of questions I forgot to ask.
How did -- when the car -- when you had Cordell pulled over in the car and asked him to pop the trunk, how did he pop the trunk?
A. Umm ...
Q. Did he have to get out of the car, or did he have some way of doing it inside the car?
A. I think he had some way of doing it inside, I believe.
Q. Okay. So did Cordell get out of the car at all?
A. Not -- not that I recall, no.
Q. Okay. All right. And I can't remember if I asked this, but did Cordell have a nickname back then?
A. Coolie.
Q. Coolie.
How about the other guys in the car?
A. Londell and Peterman.

Q. Did Londell have a nickname?
A. Milky, but he rarely was called that.
Q. And the other person in the car?
A. Um-hmm.
Q. Did he have a nickname?
A. That is what I knew him by, Peterman.
Q. Oh, Peterman.
What was his first name? His real name?
A. Frank.
Q. And what was Frank's last name?
A. Armour [phonetic].
Q. Okay. All right. Do you have any current plans to move from your address where you live now?
A. Current plans to move?
Q. Yeah. Like in the near future.
A. No.
Q. Or in the next few years.
A. No.
Q. Okay.
A. I ain't think about that.
Q. All right. And how -- how did you end up getting that apartment? Did you like somehow --



like one of the services through parole help you get it?
A. Yes.
Q. Is it a halfway house?
A. No.
Q. How did parole help you get the apartment?
A. It's a program. What it's called, Housing Choice Partners.
Q. Housing Choice Partners.
After you are discharged from parole, are you going to be able to stay in that apartment?
A. I believe it may -- it may be conditioned on certain things.
Q. Like what?
A. Income, job, and being able to contribute somewhat.
Q. Are you currently paying for that apartment?
A. Not currently.
Q. And are you -- I take it you're actively looking for a job?
A. Yeah.
Q. The I want to come back to something --



we're almost done, but I want to come back to something that you talked about -- a little bit about earlier. And you had -- you said you've been questioned on two occasions by Detective O'Brien.
A. Two occasions? This one that's in my case and --
Q. Andre Ruddock.
A. Yeah.
Q. All right. Had you ever been questioned by Detective Foley before?
A. I don't -- I don't know off the top.
Q. You have accused Detective O'Brien of using excessive force with you or using force with you during questioning?
A. He -- yeah.
Q. Is that true?
A. Yeah. Definitely.
Q. I --
A. I said definitely. Yeah, it's true. I'm sorry.
Q. Are there any other detectives who did that?
A. Not to me. Not that I recall.
Q. I'm only talking about you.



A. Okay.
Q. Not what you may have heard.
Has any other detective besides O'Brien ever used any kind of physical force with you during questioning?
A. No.
Q. Has any detective other than Detective O'Brien ever used any kind of mental tricks or coercion with you during questioning?
A. Whoever his partner is. I'm saying I don't know -- I don't know his name off the top, but I'm saying, you know, they both was taking turns. He was just the good cop/bad cop type of --
Q. So somebody was in the room when O'Brien was hitting you?
A. Yeah.
Q. Something like that?
A. Yeah.
Q. Had Detective O'Brien ever promised you anything in exchange for a statement or a confession?
A. Other than going home.
Q. He told you you could go home?
A. Yeah.
Q. Okay. Did Detective O'Brien ever

threaten you with anything to get you to give a statement or confession?
A. Threaten me with -- I'm sorry. Can you repeat that?
Q. Did he ever threaten you to get you to say something?
A. Yeah.
Q. What did he say to -- what was the threat?
A. I can't put my finger on it, but I'm saying it was either I'm gonna go down or -- for, you know.
Q. So he threatened you with a crime?
A. Yeah.
Q. Okay. Now, let's go over to 1992, the one with Andre Ruddock. You were questioned in Area 1 in connection with that murder, right?
A. Yep.
Q. Okay. How long was your -- did Detective O'Brien question you? Just give me a ballpark?
A. Some hours.
Q. Some hours?
A. Yeah.
Q. How long were you at Area 1?



A. I can't -- I can't -- I can't say exactly like a day or, you know, a half a day or something. But it was -- it was some hours --
Q. When did you first --
A. -- that I recall.
Q. -- publicly reveal that Detective O'Brien had abused you in connection with that 1992 questioning?
A. I don't -- I don't recall.
Q. Was the first time you ever revealed that Detective O'Brien had physically abused you during cross-examination of your testimony in the postconviction hearing for Andre Ruddock?
A. Publically? I guess in that forum, yeah.
Q. Okay. Is that the first time you revealed it to anyone?
A. No. No, I don't think so.
Q. Well, when -- when did you reveal that Detective O'Brien had abused you in 1992 before your cross-examination in the Andre Ruddock postconviction hearing?
A. I can't -- I can't pinpoint when I -- when I spoke on that the first time or shared that with somebody. I don't recall.



Q. Did you share it with Andre Ruddock's lawyers?
A. I believe I did.
Q. Did you share it with Andre Ruddock's -- strike that.
Did you share it with Andre Ruddock?
A. Probably did.
Q. Okay.
A. But ...
Q. When you were called to testify in the postconviction hearing for Andre Ruddock, had you spoken to Andre Ruddock's lawyers before that testimony?
A. Probably -- probably prior to testifying testimony, you know, like Mr. Becker called me or I called him or whatever. Just how it look.
Q. Okay.
A. But not ...
Q. Prior to -- strike that.
Did you include in the affidavit you wrote for Andre Ruddock that Detective O'Brien had abused you?
A. I don't recall.
Q. Do you have that affidavit still?



A. No.
Q. Why don't you have that? You have the one for Cordell, so I'm just curious why you don't have that one.
A. Yeah. A lot of stuff didn't make the cut, you know, when I left -- left prison. That's one of them that didn't.
Q. Okay.
A. I don't -- I don't -- I don't know. I don't know though. No particular reason.
Q. Okay. So you were unable to explain why that affidavit would not contain any allegations against Detective O'Brien for physical abuse; is that true?
A. Yeah. I don't remember the affidavit. Honestly, I don't -- I'm lost.
Q. All right. How about in the case --
(Brief interruption.)
BY MR. MORAN:
Q. All right. Let me ask you this, the 1994 questioning with Detective O'Brien, all right, did he threaten you?
A. Yeah.
Q. Did he promise that you could go home

if you confessed?
A. No, he didn't actually on that one. He didn't promise me to go home. He just wanted me to confess.
Q. Did he beat you up?
A. Absolutely.
Q. Did he punch you in the face?
A. Yeah. He didn't punch, he -- it sound crazy, but he just slapped me like eight, nine -- seven, eight, nine times repeatedly like when I -- I defied him on something.
Q. I mean -- okay. Apart from those seven or eight, nine slaps that you mentioned --
A. Yeah.
Q. -- did he do anything else to physically abuse you?
A. That was -- that was -- that was it. That was enough. You know, I mean, you say apart from that.
Q. When you were with Detective O'Brien for that questioning, did you provide him with any information?
A. I don't know.
Q. In other words, did you give him a



story, like an alibi or whatever?
A. I don't know if I did, him or the other one who was talking to me or -- what I -- what I gave them, but ...
Q. Okay.
A. I'm saying him particularly, but ...
Q. So did you tell, for example, that you were with a friend named John Brown or John Brown's house?
MR. BECKER: I'm going to object. I think he's already asked and answered. He said he didn't recall.
MR. MORAN: I did not ask that question, but that's okay.
BY MR. MORAN:
Q. Did you tell Detective O'Brien you were at John Brown's house?
A. I don't know.
Q. Okay. Is that something that you deny saying?
A. I'm not certain.
Q. Who is John Brown?
A. He's a friend of mine.
Q. Is he a P. Stone?



A. Yeah. He was.
Q. Did he live in an apartment building near 63rd and California?
A. Yeah.
Q. Let's see -- okay. I think you said earlier that you did not give any kind of confession during the questioning with Detective O'Brien?
A. Yeah.
MR. MORAN: Okay. I'm going to show you another exhibit. We'll call this Exhibit 2.
(Deposition Exhibit No. 2, Witness Evans, was marked for identification 04/04/2025.)
BY MR. MORAN:
Q. Before we jump into Exhibit No. 2, Mr. Evans, I want to ask you a different question.
A. Okay.
Q. So I don't want you to be distracted by that exhibit. I'll come back to it.
A. Okay.
Q. Can you tell me Vino's real name?
A. Who?
Q. Vino.
A. No.



Q. You don't know his name?
A. No.
Q. Okay. Do you know his like first name? Just --
A. Vino is -- Vino is his name.
Q. Vino is his name?
A. Yeah.
Q. Oh. It's not a nickname?
A. I mean, you know what, I can't even say that. I don't even know. All I know is Vino.
Q. All right. That's fine.
A. I know him by Vino. And he's not from my neighborhood, so he's from over east. And, you know, we meet brothers. And all I know him -- I just know him by Vino.
Q. Okay. So let's take a look at this exhibit. It's Exhibit No. 2.
A. Okay.
Q. It's a booking photograph of an individual taken on April 22nd, 1992, with the number -- I guess the letters CB and then numbers 9104003 and then handwritten 1004716.
A. Okay.
Q. Do you recognize this individual?

A. Sorta kinda. Is this me?
Q. It could be, I guess. Is this a picture of you?
A. Or is this Cordell?
Q. If you know, you know; if you don't, you don't.
A. This -- okay. No, I see my name. I was a little confused because I had a haircut like this and -- but I see. It's my name on it, though.
COURT REPORTER: I just put that sticker on there.
THE WITNESS: Oh, okay.
BY MR. MORAN:
Q. Oh, yeah. So just so we're clear, there's an exhibit sticker on there that has your name. It's Evans Exhibit No. 2.
A. Okay. I'm sorry.
Q. Ignore that.
A. Okay.
Q. Just look at the photo.
A. Okay. This Cordell.
Q. You sure?
A. Yeah.
MR. MORAN: Okay. I'm going to give you another exhibit. And we'll call this Exhibit No. 3.



(Deposition Exhibit No. 3, Witness Evans, was marked for identification 04/04/2025.)
BY MR. MORAN:
Q. Okay. You're looking at Exhibit No. 3. And this is a photograph -- another booking photo of an individual taken on February 27, 1994. And it's got the CB9597454, and underneath the handwritten IR100471, and then the rest of the numbers are not present.
Do you see that photograph, sir?
A. Okay.
Q. Do you know who that individual is or do you recognize the person in that photograph?
A. Yeah. This -- this Cordell also. Cordell Williams.
MR. MORAN: Okay. I'll show you a third picture.
(Deposition Exhibit No. 4, Witness Evans, was marked for identification 04/04/2025.)
BY MR. MORAN:
Q. Okay. Exhibit No. 4 is a photograph of an individual, a booking photo. One has the individual wearing glasses, CB9645401 and IR 1004716. The photograph was taken on May 27, 1994.



Do you see that?
A. Yes.
Q. Is that a picture of Cordell Williams?
A. Yes, it is.
Q. Okay. And you recognize all three of these pictures to be photographs --
A. I didn't -- the first -- yeah, but I do.
Q. Okay. So all three photographs are Cordell Williams?
A. Yeah.
Q. Okay. In any of the photographs do you see any injuries to Mr. Williams' face?
A. If the lip look a little swoll' on one of them, but it's my view.
Q. Which one?
A. The last one you said.
Q. Exhibit No. --
A. Yeah.
Q. -- 4?
A. Yeah, yeah, 4.
Q. Which side --



A. The one with the glasses on.
Q. The one with the glasses.
Okay. And let's compare that to the other photographs.
A. These years apart, right?
Q. They are years apart, yes. Well, not years apart. One is a few months after --
A. It's 1992. These two are '94.
Q. We have '92, we have May of '94 and February of '94. Exhibit 3 is February of '94, Exhibit 2 is April of 1992, and Exhibit 4 is May of '94.
And do you see a difference in these three photos that indicates there's an injury to injury to Mr. Williams in the photographs depicted in Exhibit No. 4?
A. Slight.
Q. Okay.
A. Lip.
Q. Which -- here's what I want you to do.
A. I was talking about this picture (indicating).
Q. I know. Here's what I'm going to ask you to do. Okay?

A. Yeah.
Q. Ready?
A. Yeah.
Q. I want you to take this pen, and then on that exhibit draw a small circle where you think there's an injury.
A. (Complying.)
Q. All right. Can I see the exhibit, please.
Okay. And is it fair to say you do not see that injury -- okay. So hold on a second. I'm going to -- I gotta ask you a different question.
A. Okay.
Q. You ready?
You've just drawn a circle on Exhibit 4 around the one side of Mr. Williams' mouth, the photograph wearing glasses -- in which he's wearing glasses, right?
A. Yes.
Q. Okay. Am I correct to say that you do not recognize that injury in the photograph on the opposite side of the page in which he is not wearing glasses?
A. Yeah. You can kind of see it there too.



Q. Okay.
A. Yeah.
Q. And --
A. You want me to circle it?
Q. Sure.
A. (Complying.)
Q. And what makes you think that there's an injury to his -- okay. So you've actually drawn a smaller circle on the bottom portion of his lip --
A. Um-hmm.
Q. -- on the left side of his face in the photograph in which he's not wearing glasses, right?
A. Okay.
Q. You've drawn a larger circle over the left side of Mr. Williams' lips in the photograph in which he is wearing glasses, right?
A. Um-hmm.
Q. Is that true?
A. Okay.
Q. Well, not okay. You tell me.
A. I just -- I just drew a circle. I ain't -- you know, one bigger than the other, that wasn't intentional.
Q. Okay. Here's my question.



A. Oh, yeah, it wasn't intentional like did I -- I meant the bottom.
Q. The bottom?
A. On this -- both on here. My bad.
Q. Oh, so -- on both photographs --
A. The circle was too big.
Q. The bottom lip, okay.
Tell me what about -- what characteristic about the bottom lip indicates to you that that is an injury as opposed to anything else.
A. Okay. No, you said if -- the question you asked was like did it look --
Q. Appear, yeah.
A. Yeah, appear. I'm saying it appeared swollen and scabbed up like.
Q. Where's the scab?
A. Where I circled.
Q. You see a scab within those circles?
A. Yeah.
Q. Okay.
A. Well, like something there.
Q. Tell me what about the picture of these -- or Mr. Williams' lips in these photographs tells you -- what description can you give me that



tells you that these are injuries to his mouth as opposed to something else?
A. It just what -- how it appear to me. Like it's -- it's not normal, I'm saying.
Q. Okay. Why isn't it normal?
A. It looks swollen and, like I say, scabbed off like.
Q. Is that how he looked that night?
A. I -- I ain't -- I don't know.
Q. Well, I mean, you were with him.
A. I mean, I could say I don't recall.
Q. Okay. Did he --
A. I don't recall.
Q. Do you see any injuries to any other part of his face?
A. Actually, let me see.
Q. Yeah.
A. I don't -- no, not that I could pinpoint. No.
Q. Do you see any injuries to any part of his visible body, his arms, his neck?
A. No, I can't.
Q. Forehead?
A. You know, he covered up. I can't see

him.
Q. You can see his arms and his neck and his forehead, right?
A. Barely though. I'm saying like you can't -- you can't see his chest. I can't see this part of his arm (indicating).
Q. Okay.
A. Can't see -- you know.
VIDEO TECHNICIAN: (Indiscernible) microphone.
THE WITNESS: Oh. Oh, my bad.
Yeah. I can't -- yeah.
But it don't -- you know, what I just see, though.
BY MR. MORAN:
Q. I want you to take a look at Exhibit Number 2.
A. Okay.
Q. Tell me how Mr. Williams' lips are different in Exhibit No. 2. And I think you can only do that with the left side photo.
A. Well, it just -- it just look a little more inflated right there, kinda look like sore like.
Q. Okay.
A. Does to me, though. That's just ...



Q. Did you get punched in the face at all? No, you didn't.
A. Slapped.
Q. You said you were slapped. Slapped.
A. Numerous times. And yeah, you -- I like to see the photo of me to see if it -- if it showed.
Q. I -- I would like to see that as well.
A. Okay.
Q. By the way, when you went to the County Jail --
A. Um-hmm.
Q. -- after you were arrested in May of 1994, did you seek any medical attention?
A. No.
Q. Why not?
A. Because, you know, it ain't -- it ain't something that you do.
Q. What do you mean, it's not something you do?
A. I mean, under the -- trying to be a tough guy and survive that, you know, I wasn't -- wasn't nothing broke on me or nothing. You know, I was --
Q. Were you bleeding at all?



A. I wasn't bleeding, no. It was just more my pride was hurt.
Q. Did you have any swollen marks or --
A. I'm not certain. I'm not certain. I probably was because, like I say, you know, I was cuffed up and he just was -- he just went -- went doing -- you know what I'm saying, and repeatedly (gesturing) and --
Q. Can you do me a favor?
A. Yeah.
Q. Can you describe Detective O'Brien for me.
A. Sure. He about six, four, kind of a bit country style, you know, and clean-shaven at the time, I remember. You know.
Q. What color hair?
A. I don't remember the color of his hair.
Q. Glasses?
A. I don't -- I don't remember.
Q. What was his build?
A. He was, like I say, a country build. He was -- you know, he pretty big guy. More -- I'll say build of -- I'm trying to think of a football player that I was thinking of, you know,



back then. O'Brien --
Q. He looked like a football player?
A. Yeah.
Q. Okay. Did you -- tell me something -- I want to change the subject.
A. He looked like the fullback for the Bears. I'm trying to think -- Muster or -- that's who he resembled to me.
Q. Okay. Did the individuals that you stayed with in Aurora, do you remember their names?
A. Yeah. Individual?
Q. Yeah.
A. Yeah.
Q. What were their names?
A. One person, Robert Jones.
Q. Did you stay with a person by the name of Ples Ferguson Jones?
A. Okay. No, he was -- he was there. That wasn't his house, though. I thought you meant like that.
Q. Was he staying there too?
A. He was over there. He was there.
Q. Did you tell these -- Robert and Ples what had happened with you shooting these two

individuals?
A. No.
Q. You didn't say a word to them?
A. No, I didn't tell them that.
Q. Did you tell them that -- why you needed to stay in Aurora?
A. No.
Q. You didn't tell them, for example, that the police were after you for a murder?
A. No.
Q. Okay. Did -- do you know if either of these individuals testified at your trial, Robert Jones or Ples Ferguson?
A. I think they both did.
Q. Do you know what they said?
A. Not off -- no, I don't recall everything they said.
Q. Okay. Well, I'm just asking if you know whether they said that you admitted to killing these individuals?
A. Okay. Yeah.
Q. They did?
A. One of them did.
Q. Okay. Did you tell that person --



which one?
A. The other one, not -- not Robert Jones.
Q. Ples Ferguson?
A. Yeah.
Q. All right. Do you know where Robert Jones lives today?
A. I just know him as CB, that's why I don't know his name.
Q. Do you know where Robert Jones lives today?
A. No. Not a clue, not a clue.
Q. Do you have his cell phone?
A. No.
Q. How about Ples Ferguson?
A. No, not a clue.
Q. When is the last time you spoke to either one?
A. I haven't.
Q. Well, you must have spoken to them in 1994, right?
A. I mean, you talking about since then. I'm saying I haven't since then.
Q. Oh, okay. All right. Very good.
I think -- I think I'm done for now.



I'll see if Claudia has questions and then ...
MR. BECKER: Sure.
MR. MORAN: Claudia, do you want to ask anything?
MS. FANTAUZZO: I don't have anything right now. Thank you.
MR. MORAN: Okay. So do you have any questions?
MR. BECKER: I do not.
MR. MORAN: All right. Well, that's the end of it. Your across the finish line. The deposition is over.
So I have to tell you that you have an option to review the transcript if you want to review it to make sure that the court reporter took down everything okay.
You can't change the substance of your testimony. So you can't change a yes to a no, but if you find typos and things of that nature, you can fix them.
THE WITNESS: Okay.
MR. MORAN: Alternatively, you can do something called waiving signature, which means you trust that the court reporter took everything down



and you do not need to review the transcript.
THE WITNESS: Okay.
MR. MORAN: Do you have a preference?
THE WITNESS: I can trust her. Yeah.
MR. MORAN: So you're choosing to waive signature?
THE WITNESS: I'm choosing to waive, yeah.
MR. MORAN: Okay. Signature is waived.
All right. We're all done.
VIDEO TECHNICIAN: The time is now 2:04 p.m. This is the end of Media 4. This concludes the deposition. We're off the record.
(The proceedings were adjourned at 2:04 p.m.)

REPORTER'S CERTIFICATE

I, Cynthia Cancel Sobolewski, do hereby certify that DAVID E. EVANS was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was waived by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 15th day of April 2025.

Cynthia C. Sobolewski
Illinois CSR No. 084-003543