# Exhibit 8

## Trial Testimony of D. Dwyer (Arresting Detective)

A Yes, I did.

Q And after you transported Mr. Williams to the police department, you didn't process him in terms of asking him questions about himself at the time that you -- that he was arrested, is that correct?

A No, sir.

Q Somebody else did that, is that true?

A Yes.

MR. WEINER: Thank you very much. I have no other questions of the officer.

THE COURT: Thank you.

MS. GROHS: No questions.

THE COURT: Thank you.

MS. MORASK: We have nothing further.

THE COURT: Thank you. You can step down, Officer.

THE CLERK: Please raise your right hand.

DETECTIVE DENNIS DWYER,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE CLERK: Please be seated.

THE COURT: Proceed, Mr. Smith.

MR. SMITH: Q Detective, would you please state your full

name and spell your last name.

A Detective Dennis T. Dwyer, D W Y E R, star Number 20211.

Q How long have you been a Chicago police officer?

A 24 years.

Q And how long have you been a detective?

A 18 years next month.

Q Where are you assigned?

A Area one.

Q Could you tell us the general boundaries that encompass area one?

A Currently the area one is bounded by the lake on the east, approximately the Stevenson Expressway on the north, in someplaces 75th Street on the south, other places 87th Street out on the south all the way to Harlem Avenue.

Q Now, on May 26th of 1994, were you working in area one?

A Yes, sir, I was.

Q And do you remember on May 26th what shift you were working?

A I was working the first watch.

Q What time does that go from?

A I start at 12:30 a.m., 00:30 hours.

Q And were you working with a partner on that day?

A Yes, sir, I was.

Q And what was your partner's name?

A Detective Ron Armata, A R M A T A, star Number 20202.
Q And did you receive an assignment shortly after coming to work there?
A Yes, sir, I did.
Q And what was the nature of your assignment?
A Two people shot, one dead, one on the way to the hospital from the submarine sandwich shop at 7403 South Halsted.
Q What did you do at that time?
A At that time responded to the scene.
Q Now, the scene located there is a small submarine shop?
A Yes, sir.
Q The -- how many victims are present when you got there?
A There was one subject dead on the floor. The other subject had been removed by paramedics.
Q The person that was there dead on the scene, did you learn later on his name to be Myron Cochran?
A Yes, sir, I did.
Q Now, after that, Detective, did you remain at the scene to continue your investigation?
A Yes, sir, I did.
Q And did Crime Lab personnel arrive and take various photographs of that scene?
A Yes, sir, they did.
Q Now, while you were there conducting your investigation

at the sub shop, did you receive any information regarding the vehicle used in this double shooting?
A Yes, sir, I did.
Q And what information did you learn at that time?
A At that time learned from the beat officers that the car that had been followed from the scene by an off duty police officer had been located at 7622 South Carpenter.
Q What did you do at that time?
A At that time we went to that location.
Q And when you arrived there, did you see the car that had previously been described by the Chicago Police Officer Sanders?
A Yes, sir.
Q And do you recall the license plate on that vehicle?
A Bravo, Nori, 9244.
Q And what did you do when you saw this -- saw this car?
A At that time I approached the front of the vehicle and noted a large amount of heat coming off the radiator of the automobile.
Q Now, about what time would this have been, Detective?
A This had to be approximately 1:15, 1:20 in the morning.
Q And while you were out there, did anyone else come out to the area where the car was located?
A Yes, sir.
Q And who was that?



SOTOS-WILLIAMS 11459

A Cordell Williams.
Q And did that person identify himself?
A Yes, sir.
Q Do you see that person in court?
A Yes, sir, I do.
Q Could you please describe something he's wearing.
A He's wearing a white shirt and a dark tie. He's seated at the defense table over there.
MR. SMITH: Indicating for the record he's identified the Defendant.
THE COURT: The record so reflects.
MR. SMITH: Q Now, at this time when he came out was there any conversation?
A Yes, sir.
Q All right. And who spoke first?
A He spoke first.
Q And what did he say?
A He asked what was happening, what was up.
Q And what, if anything, did you say to him at that point?
A I asked whose car this was.
Q And what did he say?
A At that time he said it was his mother's car. I asked who was driving it last. And he said he had been driving it but he had arrived home at 10:30 p.m.

Q And this was approximately 1:15 in the morning?
A Yes, sir.
Q And you previously stated you had put your hand by the -- where at at the car?
A Near the front radiator. You could feel the heat emanating out from the grille from the radiator.
Q What did that lead you to believe?
A That the car had just recently been driven.
Q After that did Officer Sanders arrive on the scene at 7622?
A Yes, sir, he did.
Q Did he identify that being the car that he had chased?
A Yes, sir, he did.
Q Was the Defendant, Cordell Williams who you've identified here in court placed under arrest?
A Yes, sir, he was.
Q Was he subsequently transported back to area one?
A Yes, sir, he was.
Q Now, where is area one located at?
A It's located at 5101 South Wentworth on the second floor.
Q And at the time -- backing up a second, Detective. At the time that you arrested Cordell Williams, did you advise him of anything?

A Yes, sir, I did.
Q And what did you advise him of?
A His constitutional rights.
Q What did you do that from?
A From memory.
Q Please recite the same rights that you gave him when you placed him under arrest that early morning hours.
MR. WEINER: If the State would accept the stipulation, I would stipulate that he gave him his rights.
MR. SMITH: Judge, I would like the officer --
THE COURT: That's your prerogative.
MR. SMITH: I appreciate that.
MR. WEINER: You're quite welcome.
MR. SMITH: Q Would you please state the rights you gave the Defendant.
A You have the right to remain silent. If you choose not to remain silent, anything you say or write can and will be used as evidence against you in court.
You have the right to have an attorney. You have the right to have that attorney present with you during any questioning. If you cannot afford an attorney, one will be appointed to you at no charge.
And I asked him if he understands those rights. He answered in the affirmative to all the questions.

Q Did you question him out there at that time?
A No, sir.
Q About what time was it, do you know, Detective, that you placed him formally under arrest?
A About 1:30 a.m.
Q Now, later on you said you went back to area one, is that correct?
A Yes, sir.
Q At that time did you interview other witnesses to this shooting?
A Yes, sir, I did.
Q When you were done talking to those witnesses, did you have a chance to have a conversation with the Defendant, Cordell Williams?
A Yes, sir, I did.
Q And about what time would that have been?
A That was at 03:55 a.m.
Q And where would it have been at that you spoke to the Defendant Williams at?
A We took him into the sergeant's room and sat down, advised him of his rights again.
Q And that first time you advised him you didn't ask him any questions basically, is that correct?
A That's right.

Q At this time who -- who else was present with you when you interviewed him?
A My partner, Detective Ron Armata.
Q Now, at that time did you have a conversation with him about where he was at that evening?
A Yes, sir, I did.
Q And what did Cordell Williams tell you regarding that?
A As to his movements that evening, he said he had gone over to 83rd and Exchange and he had picked up two friends known as Veno and Chris and that they had gone to Northwestern Hospital to visit a friend who was in the hospital, victim of a gunshot. And after they left the hospital, they returned to the vicinity of 83rd and Saginaw where they did some drinking. And then he dropped off Veno and Chris and returned home at 10:30 p.m.
Q Now, about how long was this interview you had with the Defendant?
A 25 minutes, a half an hour.
Q Did he admit that he had any knowledge of this shooting over on -- in the sub shop on 74th and Halsted?
A He denied any knowledge of the shooting.
Q Now, after this, Detective, did you prepare a report with regard to the information that you had learned with regards to the shooting including what the witnesses said and the

Defendant?

A Yes, sir.

Q And did you turn that investigation over the following morning to other detectives for follow up?

A Yes, sir, I did.

MR. SMITH: May I have a moment, Judge?

THE COURT: Sure.

(Brief pause)

MR. SMITH: I've nothing further.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Detective.

A Good afternoon.

Q Detective, on May 26th of 1994 when Mr. Williams came to your car, do you remember how he was dressed, sir?

A No, sir, not offhand I don't.

Q Okay. After arresting the Defendant, you brought him down to area one and you processed him, is that correct?

A I had the -- one of the uniformed cars transport him into the area. We did not transport him ourselves.

Q Once he got to the area one, you asked him questions with respect to areas of identification and background which would commonly be known as processing a Defendant, isn't that

true?

A Yes, sir.

Q And when you asked him how old he was, what did Cordell Williams tell you how old he was, if you remember?

A I don't -- I don't recall his birthday or his age.

Q Well, would there be anything that would refresh your recollection, Officer?

A Probably my report.

Q Would that be your arrest report, sir?

A The arrest report or the -- our supplemental report.

Q I'm going to mark this as Defendant's Exhibit Number 1.

MR. WEINER: May I approach the witness?

THE COURT: Sure.

MR. WEINER: Q Sir, do you recognize what's been marked as Defendant's Exhibit Number 1 for identification?

A Yes, sir. It's a copy of an arrest report.

Q And does your name appear on that report?

A Yes, sir, it does.

MR. WEINER: And may the witness have that report up there, Judge? I am going to ask him a few questions if the State doesn't object rather than continuing to withdraw with regard to the processing information.

THE COURT: All right. I'll let him have it right now but if there's any objection by the State we'll consider that at the

proper time. All right. Go ahead.

MR. WEINER: Q When you asked him his age, how old did he tell you he was?

A 19 years old, sir.

Q Did you ask him if he was employed?

A Yes, sir, I did.

Q Did he tell you if he was in fact employed?

A Yes, sir.

Q Where did he say he was working?

MR. SMITH: Objection.

MR. WEINER: Judge, the State went into conversations. I think I have a right to secure information from the officer about other things that the Defendant said.

MR. SMITH: Relevance.

THE COURT: Overruled.

MR. WEINER: Q Where did he say he was working?

A Board of Education.

Q You arrested him at his -- at a single family home, is that true, Officer?

A Out in front of the house, yes, sir.

Q Did you determine whether or not he lived there with his parents when you arrested him?

A Yes, sir, we did.

Q At the First District, sir, you said -- when Mr. Smith

asked you, you said you also had occasion to interview other witnesses, isn't that true?

A Yes, sir.

Q One of those witnesses would be Officer Stanley Sanders, the off duty officer that in fact reported the license plate of the car to the beat officers, isn't that true?

A Yes, sir.

Q When you interviewed Officer Sanders, where in fact did you interview Officer Sanders?

A In area one.

Q And would that be in your office on the second floor?

A Yes, sir.

Q And for how long had you interviewed Officer Sanders?

A 20 -- 20 minutes to a half an hour.

Q Did Officer Sanders tell you about the seeing the man run from the submarine shop and get into the car?

A Yes, sir.

Q Did Officer Sanders ever tell you that he got out of his car and pulled his weapon and announced his office?

A I believe he did mention that.

Q Did you include that in your report, sir?

A I don't recall if it's in the sup or not.

MR. SMITH: May I mark this Defendant's Exhibit Number 2 for identification. May I approach?

THE COURT: Yes.

MR. WEINER: Q I show you what's been marked as Defendant's Exhibit Number 2 for identification. Do you recognize that report?

A Yes, sir.

Q Is that the supplemental report that you prepared with regard to your investigation in the morning hours of May 26th of 1994 with regard to the deaths of Mr. Cochran and Mr. Johnson?

A Yes, sir. That's the report that my partner and I prepared. I actually typed it.

Q In that report, does it indicate that Officer Sanders stated that he had gotten out of his car, pulled his weapon and announced his office?

A No, sir, it doesn't mention it in the report.

Q Thank you. Officer, do you recall when Officer Sanders talked to you did he tell you that in fact the person with the gun fell down or tripped twice while running from the store?

A Yes, sir.

Q Did he tell you whether or not the car which the person got into was moving or was parked when the person tripped twice?

A I -- as I recall it, he said the guy fell once and the car started to pull away and he got up and he fell again as the car was pulling away.

Q Officer, isn't it a fact that in your report which has

been marked Defendant's Exhibit Number 2 for identification that Mr. Sanders told you that the vehicle was pulling away and that the gun man fell twice trying to enter the car?

A That's the way I remembered it, sir.

Q May I approach the witness? I'm asking you again to look at the report that you identified as People's Exhibit Number 2 for identification. Do you see in the body of that report what Officer Sanders told you which Detective Armata typed up with respect to what -- whether in fact the person had tripped?

A Yes, sir.

Q What is in fact -- what does the report say, sir?

A It says that he fell twice trying to enter said vehicle.

Q And what does it say about the car, was it moving or stationary, sir?

A Vehicle was pulling away.

Q So does that refresh your recollection, sir?

A That's the way it is in the report but I seem to remember that he fell once and fell once while the car was pulling away.

Q This report, sir, was made on May 26th of 1994.

A Yes, sir.

Q The day that you interviewed Mr. Sanders, is that true?

A Yes.

Q Also by the way one other question for you: When you interviewed Mr. Williams and did the processing, did you ask Mr. Williams if he was a member of a gang?

A Yes, sir, I believe we did.

Q And what did he say to you?

A I don't recall at this time.

Q Isn't it a fact that -- that he did tell you he was a member of a gang?

A I don't recall right offhand.

MR. WEINER: I have no other questions of the officer. Thank you very much.

THE COURT: State, redirect? I am sorry. Miss Grohs.

MS. GROHS: No questions.

THE COURT: Okay. Thank you.

REDIRECT EXAMINATION

BY MR. SMITH:

Q Detective, the report that you prepared is a supplemental report, is that correct?

A Yes, sir, it is.

Q Do you put down everything that you're told by a witness?

A No, sir.

Q Is it a summary of what you're told?

A Yes, sir. On its face it's a summarization of the facts

we compile during the course of the investigation.

MR. SMITH: May I have a moment, Judge?

THE COURT: Um-hm.

(Brief pause)

MR. SMITH: I have nothing further.

MR. WEINER: Judge, I have no other questions.

THE COURT: Okay. Thank you, Detective.

We're supposed to have some refreshments up here about 4:00 o'clock so that's where Barry went. Let me find out. State and Defense, can you come up here. Okay.

(Whereupon a discussion was had off the record in the courtroom out of the hearing of the jury.)

THE COURT: All right. Ladies and gentlemen, what we're going to do is take a break right now. And, Barry, could you take everybody back to the jury room. Again don't discuss this matter among yourselves. Thank you.

(Whereupon the following proceedings were had in court outside the presence of the jury.)

THE COURT: Mr. Sheriff, I'm going to order you to get potato chips. The accused have said they haven't had anything to eat so I'm going to allow their families to get them something to eat. They can have those too.

THE SHERIFF: Right now, your Honor?

THE COURT: Sure.