# Exhibit 9

## Trial Testimony of G. Vaci (ASA that took Plaintiff's statement)

MR. WEINER: I don't have any questions from Dr. Lifschultz.

MS. GROSS: No questions.

THE COURT: Doctor, can you step down.

(Witness excused.)

MS. NORASK: People call ASA Greg Vaci.

(Witness sworn.)

GREGORY VACI,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. NORASK:

Q In a loud, clear voice, please introduce yourself.
A Gregory Vaci, V-a-c-i.
Q How are you employed?
A I am an assistant state's attorney.
Q Are you licensed to practice law in the State of Illinois?
A Yes.
Q When did you become so licensed?
A In November of 1990.
Q How long have you been working for the Cook

County State's Attorney's office?
A About five years.
Q What unit are you currently assigned to, sir?
A Right now I am assigned to the night narcotics unit.
Q Back in 1994, specifically, May 26th, can you tell us what unit you were assigned to back then?
A I was assigned to felony review unit.
Q Could you please explain to the ladies and gentlemen what the felony review unit of the Cook County State's Attorney's office is?
A Felony review unit is a unit in the state's attorney's office that's on call for 24 hours a day. We work in shifts of 12 hours and you're either assigned to the night shift or the morning shift; so you would work either 6 a.m. to 6 p.m. or 6 p.m. to 6 a.m. and you would get three days off in between each shift. Work three days on, three days off.
Q What is -- What are some of your duties or functions in the felony review unit?
A After an arrest is made by the police they will contact our unit and we'd go to the various areas, police areas and districts in the city to

assist the police in interviewing witnesses, victims and defendants in that case.

Q The unit covers the entire City of Chicago, County of cook?

A That's correct.

Q Directing your attention specifically to May 26th of 1994 at approximately midnight, did you receive an assignment to go to Area 1 in the investigation of the homicide of Myron Cochran and shooting of Billy Johnson?

A Yes.

Q What time did you arrive at Area 1, sir?

A I believe it was about ten minutes to midnight.

Q Did you meet with anyone when you arrived at Area 1?

A Yes.

Q With whom did you meet?

A I met with Detective O'Brien.

Q Did Detective O'Brien have any reports or notes that he provided you with that had been generated so far about this investigation?

A Yes.

Q Did you review those?

A Yes.
Q Did you also get a summary of what Detective O'Brien had begun so far?
A From him, yes.
Q Did you learn that they had a defendant in custody at Area 1 by the name of Cordell Williams?
A Yes.
Q Did you also learn that Mr. Williams had a conversation with Detective O'Brien before you arrived?
A Yes.
Q Did you then -- What did you do after you learned all that information?
A After speaking to Detective O'Brien I interviewed one witness who was at the area.
Q What was the name of that witness, sir?
A I believe it was Stanley Sanders.
Q Was he a witness to the incident that had occurred that was the subject of this investigation?
A Yes.
Q After you interviewed Mr. Sanders or Detective Sanders, what was the next thing that you did?
A I interviewed Cordell Williams.

Q When you went to interview Cordell Williams where was he located?

A He was in a small interview room at Area 1.

Q Is that on the upstairs at 51st and Wentworth?

A That's correct.

Q The person that you met when you walked into the interview room, do you see that person in court today?

A Yeah.

Q Could you please point to him and describe something he is wearing for the record?

A He is the gentleman with the white shirt and tie wearing the glasses.

MS. NORASK: May the record reflect in-court identification of Cordell Williams?

THE COURT: Yes.

BY MS. NORASK:

Q When you walked into the room was he handcuffed or unhandcuffed?

A Not handcuffed.

Q Did you introduce yourself?

A Yes.

Q How did you introduce yourself?

A I told him I was an assistant state's attorney, a lawyer and prosecutor, but I was not his lawyer. I asked if he understood that. He said he did.

Q Were you with anyone when you went into the interview room?

A Detective O'Brien.

Q After you introduced yourself did you advise the defendant of anything at that time?

A I advised him of his Miranda rights.

Q Did you do that by form or by memory?

A By memory.

Q Could you tell us what it is you said to the defendant?

A I said, do you understand you have the right to remain silent, that you don't have to talk to me. He said he understood that. I said that do you understand that anything you say to me is going to be used in a court of law. He understood that. I asked him if he understood he had the right to have an attorney present with him in the room while he was being questioned. He said he understood that. I asked him if he understood that if he couldn't afford to have an attorney present one will be provided free

of charge.

Q Did he indicate he understood all those rights?

A Yes. Then I asked if he still wished to talk to me. He said he did.

Q Did you then have a conversation with the defendant?

A Yes.

Q Who was asking questions during this conversation?

A I was.

Q How long did this conversation take place?

A I would say from half hour to 40 minutes.

Q At conclusion of this conversation did you ask him if he wished to memoralize what he told you in any fashion?

A Yes.

Q Did you ask him?

A I gave him the choice between what's termed a hand-written statement, I explained to him what that was, or a court-reported statement and I explained to him what that was. I explained to him he didn't have to have it written down at all.

Q What did you explain to him a handwritten

statement was?

A I explained a handwritten statement is a statement that is written out by myself based on what he is telling me in my own hand writing and then after that statement is taken down then he would have the opportunity to read the statement along with me, make any additions or corrections he wanted to make and sign each page of that statement.

Q How did you explain to him a court-reported statement would be taken?

A I explained a court-reported statement was a statement that is given to a court reporter similar to what you would see in a courtroom and that I would ask him a question, he would give an answer and the statement itself would reflect exactly what he says and what I say. After that statement was finished and typed up then he would have the opportunity to read it along with me, make any corrections or additions.

Q Sir, what did he choose to do if anything?

A He chose the court-reported statement.

Q When he chose the court-reported statement what did you then do?

A I left the interview room and call the court report's office.

Q Now, did you ask Mr. Williams during your oral interview how he had been treated by the police so far till when you got there?

A Yes.

Q How did he respond he had been treated?

A He said he was treated well.

Q Did you notice or did you ask whether or not he had been provided with anything to eat?

A I asked him but I also noticed there was wrappers from Checker's hamburger. I asked him if he had eaten. He said he did. I asked him if he needed to use the bathroom or he wanted anything else.

Q What did he say say?

A No, he did the not.

Q While you were waiting for the court reporter to come, did you ever put your head in or look in on Mr. Williams to ask him how he was?

A Yeah. After I called the court reporter I would say there was about an hour and a half lapse between me calling and the court reporter coming. I periodically checked on Mr. Williams.

Q Now, during the oral conversation that you had with the defendant Williams and with Detective O'Brien present, were there any additional details

provided by the defendant that had not been provided earlier?

MR. WEINER: Objection to that because he wasn't there when the defendant provided information earlier.

THE COURT: Sustained.

BY MS. NORASK:

Q Sir, after you called the court reporter and the court reporter came, what was the next step that was done?

A The court reporter set up his equipment and I interviewed Cordell Williams again with Detective O'Brien present.

Q Approximately, what time did that happen?

A That was about 2:30.

Q The three of you went back in again, is that correct?

A That's correct.

Q How did that take place, the taking of the court-reported statement?

A There was a series of me asking him questions after I again admonished him of his Miranda rights, explained to him again I was the assistant state's attorney and not his attorney. And that I

asked him questions regarding the incident.
Q Did he respond to those questions and were they typed down?
A Yes.
Q Approximately, how long did that interview take place?
A Maybe eight to ten minutes.
Q Following the conclusion of that second interview, what happened?
A I explained to him that the -- explained to Cordell Williams that the court reporter would type up the statement and I would bring the written statement back to the room and we would both go over it together and at that time he could make any additions or corrections he wanted to make.
Q At that time did the court reporter leave the room to type up the statement?
A Yes.
Q Approximately, how much later did you go back into the room with the statement?
A Maybe 45 minutes.
Q Did anyone else go back in the room with you?
A Detective O'Brien.

Q When you went back into the room, could you explain the procedure that was done to go over the statement?
A Yes.
Q What was done?
A I explained to him that at first I would have him read part of the statement to make sure he could read and understand English. Then after he read, maybe, the first two or three lines I stopped him and I read the statement out loud as he followed along.
Q How was he following along?
A He would follow along with his finger.
Q Did you read each and every page out loud to the defendant?
A Yes.
Q After the statement was read as the defendant followed along, what if anything was done to each page of the statement?
A After reading each page we would, all three of us, would sign the bottom of each page and we'd move on to the next page and sign that.
Q At the end of the statement was that signed as well?

A Yes.

Q Did Cordell Williams wish to make any changes to the statement at any time during the review of the statement?

A No.

Q After the entire statement was reviewed and signed, what was the next thing that was done?

A I left the interview room and --

Q Was there a picture taken of Cordell Williams?

A Not by me. The court reporter took pictures.

Q After that picture was taken by the court reporter, did everyone sign that picture as well?

A Yes.

Q Was the date and the time placed on that photo?

A Yes.

Q During the court-reported statement, sir, did you show the defendant any exhibits?

A I showed him one picture.

Q What was that picture, sir?

A That was a picture of David Evans.

Q What was the purpose of showing him that

picture?

A Because he had, Cordell Williams, had stated that the person who had done the shooting, the actual shooting was Dayday, and we believed that to be David Evans so we confirmed that by showing him the picture. In the statement he identified Dayday to be David Evans.

Q He identified that photo as David Evans?

A That's correct.

Q I am going to show you what's previously been marked as Exhibit Number 30 B for identification and ask you if this is the photo of David Evans that was shown to Cordell Williams during the court-reported statement?

A Yes.

Q Does it truly and accurately show him on that date, time and location?

A Yes. I wrote on the back.

Q I'm also going to show you People's Exhibit Number 34 for identification and ask you to tell us if that is the original court-reported statement that you took on May 26th of 1994?

A Yes, the original.

Q How many pages does that consist of?

A It is a ten page typed written.

Q On each and every page is your signature, the signature of the defendant in your presence and signature of Detective O'Brien in your presence visible?

A Yes.

Q Were all of those placed there in your presence?

A Yes.

Q And is it in substantially the same condition as when this court-reported statement was taken?

A Yes.

Q I am going to show you People's Exhibit Number 30B.

THE COURT: You just said 30B?

MS. NORASK: This is going to be 30B. I believe David Evans is 30A.

THE COURT: Your witness testified 30B is a photo of David Evans.

MS. NORASK: They are both marked -- Let me take that back and remark it.

THE COURT: Show it to counsel before you attempt this again.

BY MS. NORASK:

Q Showing you a corrected marked exhibit, the same photo, now marked as 32. Is that the picture of David Evans?

A Yes.

Q Back to 30B. Can you tell us if that is a picture the court reporter took of Cordell Williams after the court-reported statement?

A Yes, it is the picture.

Q Can you look at the back and tell us if this is your signature, the signature of Cordell Williams and signature of Detective O'Brien?

A Yes, also the court reporter.

Q That accurately shows Cordell Williams after he finished the court-reported statement, is that correct?

A Right.

Q Can you tell us, sir, what was the defendant's demeanor during the court-reported statement?

A He was unemotional.

Q Can you also tell us whether or not the defendant ever told you if his father had been allowed to see him and he had been allowed to speak with his

father?

A Yes, he did tell me that.

Q When did he tell you that?

A During the oral statement.

MS. NORASK: Judge, at this time I would ask that the identification marks be stricken and subject to cross examination the assitant state's attorney be allowed to publish the statement.

MR. WEINER: I have no objection.

THE COURT: Okay. Fine.

THE COURT: That will be the order.

MR. WEINER: Judge, if I may, may I approach for a second?

THE COURT: Yes.

MR. WEINER: May.

(Discussion had off the record.).

THE COURT: Thank you. Proceed, state.

BY MS. NORASK:

Q Mr. Vaci, would you please publish the statement to the ladies and gentlemen of the jury?

A Sure.

"Regarding the fatal shooting Byron Cochran and Billy Johnson. Statement of Cordell

Williams taken in the interview room, second floor, Area 1 headquarters, 51st and Wentworth, Chicago, Cook County, Illinois on Friday May 27, 1994 at 2:30 a.m. Present: Gregory Vaci, assistant state's attorney, Detective Jim O'Brien star number 20466 Area 1 Violent Crimes. Reported by Timothy D. Bennet, Illinois state license number 842628 book number 9405-27.

"Mr. Vaci: Let the record reflect we are in an interview room at Area 1 violent crimes. Today's date is May 27, 1994. Time is 2:30 a.m. Present in the room with me is assistant state's attorney Gregory Vaci, V-a-c-i, Detective Jim O'Brien star number 20466, the court reporter and Cordell Williams. We are here to take the statement of Cordell Williams concerning the investigation of the fatal shooting of Myron Cochran, C-o-c-h-r-a-n, and Billy Johnson which occurred on May 26, 1994 at approximately 12:20 a.m. at 7403 South Halsted at the Honey Sub Restaurant.

"Examination by Mr. Vaci: Question: Cordell, I talked to you earlier and explained that I am an assistant state's Attorney, a lawyer and prosecutor and not your lawyer, is that correct? Answer: Yes. Question: Before we spoke I advised you

of your constitutional rights, is that correct?
Answer: Yes. Question: I'm going to read you your rights again. Do you understand you have the right to remain silent? Answer: Yes. Question: Do you understand anything you say can be used against you in a court of law? Answer: Yes. Question: Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned? Answer: Yes. Question: Do you understand if you cannot afford to hire a lawyer and you want one a lawyer will be appointed by the court to represent you before any questioning? Answer: Yes. Question: Understanding these rights, do you wish to talk to us now? Answer: Yes.
Question: Calling your attention to May 26, 1994 at around 12:20 in the morning, who were you with at that time? Answer: I was with Londell, Dayday and Andre. Question: Where were you? Answer: We were coming from westbound on 83rd and we took South Chicago over to 76th, 76th down and over to Halsted. Question: You were in a car? Answer: Yes. Question: Whose car were you in? Answer: My mother's car. Question: What type of car was it? Answer: '94 Tempo.
Question: You said you were with Dayday? Answer:

Yes. Question: Do you know him by any other name? Answer: No. Question: Showing you what will be marked as Exhibit A for the statement is a photograph. Do you recognize who is in the photograph? Answer: Yes. Question: Who is that? Answer: Dayday. Question: That is the person who was in the car that night? Answer: Yes. Question: Where was Dayday sitting in the car? Answer: Behind the driver which is me. Question: Where was Londell sitting? Answer: In the passenger seat. Question: Where was Andre sitting. Answer: Behind the passenger. Question: Is Dayday a member of a gang? Answer: Yes. Question: What gang is he a member of? Answer: Black Peastone. Question: While the four of you were in the car, was there a gun in the car? Answer: Yes. Question: Where was the gun? Answer: In the trunk. Question: What type of gun was it? Answer: I believe a .45 Ruger. Question: Who put the gun in the trunk? Answer: Dayday. Question: Where were you when Dayday but the gun in the trunk? Answer: I was in the car. I had popped the trunk. Question: Where did you go when the four of you were in the car? Answer: We went -- We were traveling down Halsted. As we traveled down Halsted he said pull over, pull

over, pull over. Question: Who said that? Answer: Dayday. Question: Why did he tell you to pull over? Answer: He said he saw some bricks which was believed to be Disciples. Question: Did you know at the time that bricks were Disciples? Answer: Yes. I know what they call them. That is the name they had called them by. Question: Are the Blackstones and Disciples at war? Answer: They are rivals, yes. Question: Did you know that at that time? Answer. Question: What did you do next? Answer: I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk. Question: Why did he ask you to pop the trunk. Answer: He was trying to get to the gun. Question: What did you think Dayday was going to do? Answer: I was led to believe he was going to shoot somebody. Question: How did you pop the trunk? Answer: With my alarm. Question: What did you see Dayday do next? Answer: He went to the trunk. I believe I guess he got the gun and he then proceeded to walk to the submarine shop. Question: What did you see next? Answer: I didn't see anything. I heard the shots. I heard about four or five shots. Question: What happened after you heard the shots? Answer: After hearing the shots we

all turned around in a fransic. We seen Dayday running out of the shop. Question: When you saw Dayday running out of the shop, why what did you do? Answer: I cranked up my car in trying to pull off as quick as possible. Question: What did you see Dayday do? Answer: He was trying to run to catch up to the car. He snatched the door open. Question: What happened next? Answer: As he snatched the door open and tried to get in I was already pulling off so he slipped. He got back up and ran. The door was still open and he jumped in. Question: What did you do after Dayday got in? Answer: I was paranoid. I said what the fuck had gone on. You know. He just said pull the fuck off, pull the fuck off. Go. Go. Go. That is when I observed the off duty officer behind us. Question: What was the officer doing behind you? Answer: He had flashed his lights. Question: What did you do? Answer: I had proceeded to make a left on 73rd. Question: How fast were you going? Answer: About between 70 and 90 miles per hour. Question: Why were you going that fast? Answer: I was paranoid and scared. Question: Where did you go? Answer: I went down to Aberdeen, made a left and went down to 75th and put Dayday out. Question: What do you mean

put him out? Answer: Just put him out, told him to get out. Question: What happened next? Answer: After that I don't know where he ran to or what he did, but I left and took Londell home. Question: What did you do after that? Answer: I went home myself. Question: Where do you live? Answer: 7622 South Carpenter. Question: While you have been here have you had anything to eat? Answer: Yes. Question: What did you have to eat? Question: A couple of sandwiches and a couple burgers from Checker's. Question: Did you have anything to drink? Answer: Yes. Question: What did you have to drink? Answer: Pop and water. Question: Cordell, are you able to read and write English well? Answer: Yes. Question: Were you able to use the bathroom while you have been here? Answer: Yes. Question: Have the police treated you well while you have been here? Answer: Yes. Question: Have I, as the assistant state's attorney treated you well? Answer: Yes. Question: Have any promises or threats been made to you in return for your statement here today? Answer: No. Question: Are you under the influence of drugs or alcohol while you have been giving this statement. Answer: No. Question: Have you been able to answer

-- speak to your father while you have been here? Answer: Yes. Question: The court reporter will now type uo your statement and we will read over the entire statement together. You will be allowed to make any additions other corrections you wish. Do you understand? Answer: Yes.

"Mr. Vaci: This will conclude the statement of Mr. Cordell Williams. The time is now 2:37 a.m."

MS. NORASK: Thank you. I have nothing further, Judge.

MR. WEINER: I am going to ask since I --

THE COURT: Here's the thing. Ladies and gentlemen, we're going to conclude the evidence for today. We are several minutes early, but what I'd like you to do is come back here tomorrow at approximately -- make it 10:30 again. In all likelihood this trial will go to the jury tomorrow so make your schedule accordingly. Don't discuss this case among yourself or with anyone else.

(Whereupon, the above-entitled matter was continued to June 28, 1995.)

CROSS EXAMINATION

BY MR. WEINER:

Q. Mr. Vaci, good morning to you.

A. Good morning, counsel.

Q. Mr. Vaci, you arrived at Area One still on the day of May the 26th of 1994 about ten minutes to midnight, is that right?

A. That's correct.

Q. And the first thing you did was to have a conversation with Detective O'Brien, is that right?

A. Correct.

Q. And during that conversation, you reviewed reports from Detective O'Brien and other detectives and police officers with regard to this matter, isn't that true?

A. That's right.

Q. How long did your conversation with Detective O'Brien last on the evening of May 26th and the morning of May 27th?

A. The first conversation I had with him I would say maybe 15 minutes, 20 minutes.

Q. And during that time, he showed you his notes?

A. He showed me the reports that had been generated up to that point.

Q. Did he show you the notes that he took regarding the conversation that he had with Cordell Williams?

A. I don't believe I saw any of his progress reports.

Q. Were you aware that he had had conversations with Cordell Williams within a couple of hours prior to you coming to the Area One police headquarters?

A. Yes, I was aware.

Q. And so he orally then told you what information that he had with regard to that interview, is that what you are saying?

A. Yes.

Q. Now the next thing you did at Area One was to interview a witness by the name of a Stanley Sanders, is that right?

A. Right.

Q. And he would be at that point a police officer, am I correct?

A. He was a police officer.

Q. That's correct. And you know him now to be a police detective, is that true?

A. I didn't know that, no.
Q. After talking to Stanley Sanders, you then talked to this young man, Cordell Williams, is that right?
A. That's right.
Q. And you said your conversation with Cordell Williams lasted 30 or 40 minutes, is that right?
A. First conversation I had with him, yes.
Q. And that was the conversation prior to the court reported statement, isn't that correct?
A. Yes.
Q. Now attorney Vaci, I noticed that you did prepare a memorandum with regard to your interview with Mr. Williams and the subsequent court reported statement?
A. Correct.
Q. And I notice as well that in the memorandum there are no facts or substance included in the memorandum with regard to the court reported-- excuse me, with regard to the oral statement, is that true?
A. I don't understand what you mean by facts or substance.
Q. Well, you agree that in the written

statement of Cordell Williams, which is in evidence, Cordell talks about what occurred that night?

A. Correct.

Q. And I'm asking you whether or not in your memorandum you include any facts about what Cordell reported in your oral interview with him?

A. No. I don't believe so.

Q. Now the court reported statement you said took only eight to ten minutes to conclude, is that right?

A. Approximately.

Q. And you made notes during your oral conversation with Mr. Williams, is that right?

A. I made notes regarding the case, not specifically regarding the oral conversation.

Q. I want to ask you if there is anything different that Mr. Williams said at the court reported statement that he said to you during your conversation with him before the court reporter was called.

A. Could you rephrase that?

Q. Yes. I'd be happy to because I sometimes speak in long sentences, so I will rephrase it.

Did Cordell Williams say anything

different in his court reported statement while you were present than he said to you during your conversation with him during those 30 or 40 minutes?

A. Yes.

Q. And what was that?

A. During the oral statement, he phrased things differently than he did during the court reported statement.

Q. Okay. Well, was there anything of substance that he said differently?

A. I don't believe in the oral statement, I don't believe he mentioned the type of gun that was put in the trunk.

Q. You don't believe it or do you know?

A. That's my recollection is that the first time I heard the type of gun was in the court reported statement.

Q. But you have no notes, am I correct, that show that what Mr. Williams told you in the oral statement was any different with regard to that gun, isn't that true?

A. Right. I don't take notes during the oral statements.

Q. Other than that substantive point, that you

say you remember or seem to recollect with regard to the gun, was there any other substantive difference in the statement given to the court reporter by Cordell Williams and the statement he gave to you during that 30 or 40 minutes?

A. During the oral statement, he didn't mention that he was panicking during-- or when he drove the car away. That came up in the court reported statement.

Q. And did you make any notes or any reports at all about his not mentioning that he panicked in the oral statement?

A. No. As I said, I don't take notes during the oral statements.

Q. How many months were you on felony review during that period of time before you were assigned back to a courtroom?

MR. SMITH: Objection.

THE COURT: Could you rephrase that.

MR. WEINER: Q. Well, how long was your tour of felony review during the later part of May of 1994?

A. At that time I had been on felony review for about five months.

Q. And in those five months, how many

statements did you take?

A. In total?

Q. Yes, sir?

A. I would estimate about 12 to 15.

Q. And were those all in homicide cases?

A. No.

Q. And in those 12 to 15 cases, did you take any notes of the statements that you took orally before you went to either a court reporter or hand wrote a statement?

A. No.

Q. And are you saying to the ladies and gentlemen of the jury today that you are sure that Mr. Williams didn't mention what type of a gun it was during the oral statement?

A. That's my recollection.

Q. Are you saying that you are sure that he said he didn't panic during the oral statement?

A. Yes.

Q. Okay. What other substantive differences are there or were there during the oral statement and the written statement before a court reporter?

A. Well, in the question when I asked him what did he think Day-Day was going to do--

Q. Um-hum?
A. He in the oral statement did not say I was led to believe that he was going to shoot somebody.
Q. What did he say?
A. He said I thought he was going to shoot somebody.
Q. He said I thought he was going to shoot somebody?
A. Yes.
Q. You remember that, don't you?
A. Pretty clearly, yes.
Q. Did he tell you in the oral statement if Day-Day had ever said to him before the trunk was popped I am going to shoot somebody?
A. I don't recall him saying that.
Q. Did he ever tell you that before the trunk was popped that anybody in the car said we are going to shoot somebody?
A. No.
Q. Did he ever tell you that before that trunk was popped in the oral statement to you that anybody agreed in the car to commit a crime on their way down Halsted?
A. I'm sorry, could you rephrase.

Q. Yes. Did he ever tell you that before he popped the trunk and Mr. Evans took the gun out, that there was any discussion in the car about committing a crime while the car was going down Halsted?

A. No.

Q. Now I want to draw your attention to the court reported statement of Cordell Williams, and I am going to ask if possible if I can-- as opposed to asking counsel to recall, if I can give him a copy of this statement to maybe expedite matters.

THE COURT: Any objection, state?

MR. SMITH: No, Judge.

MR. WEINER: Thank you.

May I approach?

THE COURT: Certainly.

MR. WEINER: Q. Mr. Vaci, I am going to ask you to turn to page three.

You asked-- after you gave Mr. Williams his rights, you asked him if he wanted to talk to you and he said he would, isn't that correct?

A. Yes.

Q. And you then asked him on May 26th at around 12:20 in the morning who he was with at that time,

isn't that true?
A. Yes.
Q. And he told you he was with Londell, Day-Day and Andre, isn't that correct?
A. Yes.
Q. And he had told you that when you talked to him for 30 or 40 minutes orally before the court reported statement, hadn't he?
A. Yes.
Q. And then you asked him where he was, and he told you he was coming westbound on 83rd. That means he was coming from the east, isn't that true, sir?
A. Right.
Q. Okay. Then he took South Chicago over to 76th, and 76th over to Halsted, right?
A. Right.
Q. You asked him if he was in a car; he said he was in his mother's car. And you asked him what type of car it was, and he told you, isn't that correct?
A. Correct.
Q. Your next question to him was, and you said you were with Day-Day, am I right?

A. Yes.
Q. And you asked him if he knew-- if he knew Day-Day by any other name, and he said no, isn't that correct?
A. Right.
Q. And then you showed him-- may I approach the witness?
THE COURT: Yes.
MR. WEINER: Q. You showed him what has been previously marked as state's exhibit number 32-A in evidence. Did you show him that picture?
A. Yes.
Q. And when he looked at that picture, did he identify that person as Day-Day?
A. Yes, he did.
Q. Okay. So-- thank you very much.
And you asked him where Day-Day was sitting in the car, and he said he was behind him, which means Cordell Williams, he was in the back seat behind Cordell, isn't that right?
A. Behind the driver, which was Cordell.
Q. Well, Cordell did tell you he was driving?
A. Yes.
Q. And then he asked you where Andre was

sitting, and André was sitting behind the passenger, isn't that right?

A. Yes.

Q. You then asked him if Day-Day is a member of a gang, and he said yes. And you asked him what kind of a gang, and he said Black P Stone, isn't that right?

A. Yes.

Q. And you asked him while the four were in the car, was there a gun in the car, and he said yes, isn't that correct?

A. Yes.

Q. And then if we turn the page, you asked him where the gun was, he said in the trunk, right?

A. Yes.

Q. Now then you asked him what kind of a gun it was, and you said now to the ladies and gentlemen of the jury that you asked that question even though in your oral conversation with Mr. Williams in which you didn't take notes, he didn't to the best of your recollection remember or say what type of gun it was. You asked him the question anyway, isn't that correct?

A. Right.

Q. And he said I believe a .45 Ruger?

A. Right.

Q. Now in either of your conversations with Mr. Williams, whether it be your oral conversation or your court reported conversation, did Mr. Williams ever say to you that he had touched or handled that gun?

A. I don't believe so.

Q. In fact, if we go on, you asked him where he was when Day-Day put the gun in the trunk, and he answered you, did he not, I was in the car. I had popped the trunk. Isn't that true?

A. Yes.

Q. So it was your understanding that David Evans was outside the car with the gun and Mr. Williams was inside the car and somehow pushed some sort of button to have that trunk open, isn't that true?

A. According to what Mr. Williams said, yes.

Q. Okay. And is that any different from what he told you during the oral conversation you had with him before the court reporter was called?

A. No, it's about the same.

Q. Okay. You asked him where did you go when

the four of you were in the car and he said we were traveling down Halsted, isn't that true?

A. Yes.

Q. Now before we get to the next part, and the next part is when Mr. Evans said pull over, to pull over, did he ever tell you either in your oral conversation or that-- or in the court reported statement that before Mr. Evans said pull over, pull over, that he intended to kill anybody or that anybody in the car intended to kill anybody as far as he knew?

A. When you say he, are you referring to--

Q. Cordell Williams.

A. Could you restate that then?

Q. Before Mr. Evans said pull over, pull over, did Mr. Williams tell you that he, Cordell Williams, had any intent to use that gun to kill somebody or anybody in the car he knew had any intent to use that car to kill anybody?

A. Mr. Williams never stated that he had any intent to kill anybody.

Q. Okay. So the next thing that happened was as they traveled down Halsted, he had said pull over, pull over, pull over, and you then said who

said that, isn't that correct?

A. Right.

Q. And he said Day-Day, meaning David Evans?

A. Yes.

Q. And you asked him why he told you to pull over, and he said he saw some bricks, which were believed to be Disciples, right?

A. Yes.

Q. And you went into that and you asked him if he knew the bricks were Disciples, and he said yes, isn't that correct?

A. Yes.

Q. And you asked him because you had previously-- he had previously told you he was a gang member, if the Black Stones and the Disciples at war, and he answered yeah, they are rivals. Isn't that true?

A. Actually he denied being a gang member to me.

Q. Well, let me ask you a question. You asked him what gang Day-Day was a member of?

A. Yes.

Q. Where does it say that he denied in this statement or in any other statement denied being a

gang member to you?

A. He denied that in our oral conversation.

Q. Well sir, did you ever, ever submit a report saying that Mr. Williams denied being a member of the P Stones?

A. I would have to look at my folder that I prepared.

MR. WEINER: Could I have a moment, Judge?

THE COURT: Yes.

Q. When you say you'd have to look at your folder, sir, does that mean you did take notes?

A. I prepared a felony review folder regarding the case.

Q. Regarding the oral interview?

A. No, regarding the-- all the information taken down, victim information, information on the defendant.

Q. Well, if you-- if you didn't take notes about the oral interview where-- what-- where would the folder show that you in fact-- that he denied gang membership to you?

A. I would have to see on the--

Q. Well, were you aware that Detective O'Brien told you that he was a member of the-- of the Black

Stones?

A. Yes.

Q. So you are saying he told Detective O'Brien that he was a gang member but he denied it to you?

A. Correct.

Q. And when was this?

A. When was what?

Q. That he denied it to you?

A. During our oral conversation.

Q. That you didn't take notes down of, right?

A. Right.

Q. Well let's go on, if we may.

I want to draw your attention to page five. You asked him if he knew at the time that bricks were Disciples.

A. Yes.

Q. And he answered yes.

You asked him if the Black Stones and the Disciples were at war and he said they are rivals, yes. Isn't that true?

A. Yes.

Q. And you asked him if he knew that at the time, and he said yes, didn't he?

A. Right.

Q. Now the next thing you said to him is what did you do next. Now before you go on, the only thing that he had told you both in your oral and the court reported statement at that time that caused him to pull over was that David Evans had said stop the car, stop the car, bricks, isn't that true?

A. Well, he-- that he said that David Evans said that he saw some bricks.

Q. Okay. Stop the car, stop the car, I see some bricks, isn't that true?

A. Correct.

Q. He never told you there was any discussion before that about anybody killing any bricks, did he?

A. No.

Q. So the next thing you said to him was what did you do next, and he said I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk, right?

A. Yes.

Q. Now did he tell you where he was when he popped that trunk?

A. I believe he was still in the car.

Q. Did he ever tell you that he had gotten out

of that car and actually saw or touched or handled the gun at that time?

A. No.

Q. And you then asked him why-- why did he ask you to pop the trunk, and he answered he was trying to get the gun, isn't that right?

A. Yes.

Q. Now you had a 30 to 40 minute conversation with Mr. Williams before the court reporter arrived, and the next question you asked him during this conversation with the court reporter is what did you think Day-Day was going to do.

And you asked him that because as you testified here earlier, Mr. Williams said to you I thought David Evans-- in your oral statement-- was going to kill somebody.

A. Or shoot somebody.

Q. Or shoot somebody.

A. Yes.

Q. When did he say he thought that that was going to happen?

A. Can you rephrase that?

Q. When, at what point in time did he say that he thought David Evans was going to shoot somebody?

A. During our oral conversation.

Q. No, I meant what point in time in the sequence of events did he tell you that he thought David Evans was going to shoot somebody?

A. When David Evans got out of the car and went to the trunk.

Q. So it's your understanding that Cordell Williams thought that David Evans was going to kill somebody when David Evans got out of the car to retrieve the gun? Is that your testimony?

A. Well I can't say what, you know, at what specific point he thought that, but from his statement is all I have to go by. And that's what it appears he is saying.

Q. He is saying that after the trunk was popped and after Evans left the car, as far as you can interpret that statement, that that's when he thought Evans was going to shoot something, isn't that true?

MR. SMITH: Objection. That was not-- I didn't understand that to be the testimony, Judge. Rephrase it maybe.

THE COURT: Do you understand the question?

THE WITNESS: He's asking for my interpretation.

MR. WEINER: He just said how he understood it.

THE COURT: Well, if he understood it, go ahead, then answer it.

THE WITNESS: According to the-- to his statement, I assume he came to that conclusion after-- sometime between when David Evans said he saw some bricks and told him to pull over and got out to go to the trunk.

MR. WEINER: Q. Okay. You never asked him when David Evans said stop the car, what he thought was going to happen at that time, did you?

A. Did I ask him that?

Q. Yes? You didn't ask him that question at that time, did you?

A. I don't recall asking him that question.

Q. And you didn't ask him the question after David Evans said I see some bricks what he thought David Evans was going to do, did you?

A. I don't think I asked him that question at that point.

Q. You asked him the question in the court reported statement after he said I popped the trunk, didn't you? On page six.

A. Yes.

Q. So in the sequence of events, did you ask Cordell Williams with respect to what he thought Evans was going to do, the trunk had already been popped, hadn't it?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: No, I believe-- I asked him that question after I asked him the question why did he ask you to pop the trunk and--

MR. WEINER: Q. Well, on page six up there it says answer, I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk.

And then two questions later, you asked him, what did you think Day-Day was going to do, isn't that true?

A. Two questions later, yes.

Q. And two questions-- two answers before that he had said he had already popped the trunk, didn't he?

A. That's what he said.

Q. Okay. And you asked him how he popped the trunk and he said with his alarm, isn't that true?

A. Yes.

Q. Now you asked him what Day-Day did next, and he said, didn't he, he went to the trunk and I believe, I guess he got the gun, and then he proceeded to walk to the submarine shop, isn't that correct?

A. Yes.

Q. And then you said what did you see next, and he said I didn't see anything, I heard shots, I heard about four or five shots? Isn't that right?

A. Yes.

Q. You asked him what happened; he said after hearing the shots, we all turned around in a frantic and we saw Day-Day running out of the shop. Isn't that right?

A. Yes.

Q. You asked him when you saw Day-Day running out of the shop, what did you do. And he said I cranked up my car.

Now what did you take his statement, I cranked up my car, to mean, sir?

A. What did I take it to mean?

MS. MORASK: Objection, it's irrelevant what he took it to mean.

THE COURT: Overruled.

THE WITNESS: I took-- at that time took it to mean he revved up the engine, tried to pull off as quick as possible.

MR. WEINER: Q. Well, didn't he tell you, sir, in your oral statement, that the car was parked on Halsted at approximately 7410 South Halsted?

A. In that vicinity.

Q. And he told you that the car was parked against the curb, didn't he, in your oral statement?

A. That I don't recall.

Q. And he told you that the motor was off, didn't he?

A. No.

Q. Did he ever tell you that the motor was running?

A. I don't know if he specifically said that.

Q. If we can go on.

He answered, I cranked up my car and tried to pull out as quick as possible.

Then you asked him on page seven, what did you see Day-Day do. And he answered, he was trying to run to catch up to the car. Now he snatched the door open.

Cordell Williams told you that the car

was moving when David Evans was running to the car, didn't he?

A. During this statement?

Q. Yes?

A. Yes.

Q. And he told you that in the oral statement, didn't he?

A. Not like this.

Q. You recall the oral statement?

A. Yes.

Q. What did he say in the oral statement, was the car moving or was it stopped?

A. During the oral statement, the car was not moving.

Q. So that's another substantive difference between the oral statement and this, is that right?

A. Yes.

Q. And you have no notes to confirm that he said that though, right?

A. To confirm that he said that during the oral statement?

Q. That the car was stopped?

A. No.

Q. Okay. But in this statement to the court

reporter, he said the car was moving. Isn't that true?

A. Yes.

Q. And you asked him what happened next, and he said as he snatched the door open and tried to get in, I was pulling off, so he slipped. And he got up and ran. And the door was still open and he jumped in. Isn't that right?

A. Yes.

Q. Then you asked him what did he do after Day-Day got in. And he said he was paranoid, he said-- I said what the fuck had gone on, you know. And he said pull the fuck off, pull the fuck off, go, go, go.

And then he said that's when I observed the off-duty police officer behind us. Isn't that right?

A. Yes.

Q. Then he talked about where he went. He saw the officer flash his lights, that Cordell made a left on 73rd and he was going 75-- between 75 and 90 miles an hour. And you asked him why; he said he was paranoid and scared. Isn't that right?

A. Yes.

Q. Then you asked him where he went, and he said I went down Aberdeen and I made a left and went down to 75th and put Day-Day out, isn't that correct?

A. Yes.

Q. Now turning to page eight, you then asked him what did you mean, put him out, and said, just put him out, I told him to get out. Didn't he?

A. That's what the statement says.

Q. Okay. Now is that different from what he told you in your oral statement?

A. That part I don't recall if--

Q. He told you both times, didn't he, in the oral statement that he wanted David Evans out of his car, and he told him to get out of his car, isn't that true?

A. Not in those words, no.

Q. Well, by just putting him out and told him to get out, he didn't say drop him at his house, did he?

A. I don't recall the exact words, but he did not-- in the oral statement he didn't make it sound like he told him to get out.

Q. Okay. In the court reported statement, did

it make it sound like he told him to get out?

A. Yes.

Q. And that was, what did you say, about an hour and-a-half after your oral statement?

A. About, right.

Q. Did he talk to you in between that time other than you checking up on him and seeing that he was okay?

A. No.

Q. Okay. Then you asked him what happened next and then he said after that I don't know where he ran to or what he did, but I left and took Londell home. And then finally you asked him what did you do, and he said I went home myself. Isn't that right?

A. Yes.

Q. Now, isn't it true, attorney Vaci, that during both conversations you had with Cordell Williams, that he never indicated to you any knowledge of David Evans' intent to shoot anybody until the car was stopped, the trunk was open and Evans was either going to the trunk or going to the submarine store?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: Could you rephrase that?

MR. WEINER: Q. Isn't it true that during your oral statement with Mr. Williams, and the written statement taken before a court reporter, that Mr. Williams told you that he didn't think or know about David Evans' intent to shoot anyone until the car was stopped, the trunk was open and Mr. Evans was out of the car.

MR. SMITH: Objection to the form of the question, your Honor.

THE COURT: Counsel, do you understand the question?

THE WITNESS: I'm not following it.

THE COURT: All right. Well, listen, you have a right when you don't understand the question, just ask the attorney to clarify it.

Would you repeat the question-- or, I'm sorry, don't repeat it, could you clarify it.

MR. WEINER: I will say it differently and shorter, I hope.

Q. Isn't it true that both in the oral statement and in the court reported statement, that Mr. Williams told you that he didn't think that the

first-- excuse me, that the first time he thought that David Evans was going to shoot someone was when David Evans was out of the car?

A. The order-- I can't recall the order that he-- or specifically when he said he thought David Evans was going to shoot somebody in the oral statement. I think it's clear in the court reported statement when he said that.

Q. Which is?

A. I asked him the question after he-- after David Evans told him to pull over, because he said he saw some bricks.

Q. And--

A. And then--

Q. Also after--

A. I asked him what he did next; he said he pulled over across 74th Street and popped the trunk because he asked him to pop the trunk.

And then I asked why did he ask you to pop the trunk, and he said because he was trying to get to the gun.

Q. Um-hum?

A. I don't know if David Evans told him that he was trying to get to the gun or if he just assumed

that he was trying to get to the gun.

Q. You don't know that, do you?

A. I don't.

Q. He never told you that either in your oral conversation with him or in fact in this court reported statement, did he?

A. Told me what?

Q. If he knew that?

A. Well, he did know because he said why did he ask you to pop the trunk; he said he was trying to get to the gun.

Q. Okay. And when did you ask him, as you just said, what he thought in terms of sequence David Evans was going to do?

MR. SMITH: Objection, Judge, it's been asked and answered.

THE COURT: Sustained as to that.

MR. WEINER: Thank you very much, attorney Vaci, I have no other questions.

THE COURT: Thank you.

Redirect.

MS. MORASK: Judge I have nothing.

THE COURT: You can step down.

(Witness excused.)