# Exhibit 12

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS ) Case No. 94-CR-15518
vs. ) Charge: Murder
CORDELL WILLIAMS )

REPORT OF PROCEEDINGS had before the HONORABLE VINCENT M. GAUGHAN, Judge of said court, on the 23rd day of June, 1995.

APPEARANCES:

HONORABLE JACK O'MALLEY,
State's Attorney of Cook County, by:
MS. LAURA MORASK,
MR. BRIAN SEXTON,
MR. MICHAEL SMITH,
Assistant State's Attorneys,
appeared on behalf of the People;

MR. DAVID WIENER,
appeared on behalf of the Defendant.

Mary M. Flagg, CSR
Official Court Reporter
2650 South California Avenue
Chicago, Illinois 60608

# I N D E X

Date of Hearing: June 23, 1995

Page numbers: 1 through 202

Jury selection



SOTOS-WILLIAMS 11151

THE CLERK: People of the state of Illinois versus Cordell Williams.

MR. WIENER: Judge, for the ercord, my name is David Wiener. This is Cordell Williams who appears before the court.

Judge, as we know, Mr. Williams' clothes are being brought over from the jail. Someone told Mr. Williams this morning that he was not going to trial and that's why the clothes aren't here.

As you also know, Judge, I prepared an order for the defendant to get a haircut before Monday. He's not been allowed to get a haircut and the order had been on the file and you will get a haircut this weekend.

Judge, I've given Mr. Williams a piece of paper here that states that he understands that he's the defendant in this case and that he waives his right to have a jury decide whether or not he is eligible for the imposition of the death penalty. He also understands that by signing this he freely and voluntarily waives his right to have a jury decide whether the death penalty should be imposed. I've advised him to sign this.

I've talked to him about this and it's my

feeling that he understands what he has signed and I'm tendering that to Your Honor at this time.

THE COURT: Thank you very much. Mr. Williams, I have to ask you a couple questions too. Basically do you know that if the State was seeking the death penalty against you there would be two types of trial, one would be the guilt-innocent phase and you have a right to a jury on that and you're not giving up your right to a jury on that, you understand that?

THE DEFENDANT: Uh-huh.

THE COURT: So we'll move on. The other part is you have a right as your attorney has explained to you to have the jury decide the penalty phase, and there's two parts to the penalty phase. First of all, the jury would decide whether you would be eligible for the death penalty. That's a separate hearing and you want to give up your right by signing this document to that hearing, is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: The next phase if the jury found you eligible for death they would be the ones that would make a determination and recommend that the death penalty be given to you. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And by signing this document that means you are giving up your right to that phase also. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand basically that it would have to be a unanimous verdict by twelve jurors. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And that's basically what a jury trial is. They would hear the evidence on the eligibility for the death penalty and also on the sentencing phase if they decided that you were eligible. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And then they decide the facts and they would make the determinations. All right? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand that you're signing this document giving up your right to that part of the jury trial, is that correct?

THE DEFENDANT: Yes, I understand everything you said.

THE COURT: I make a determination that Mr.

Cordell Williams has been advised by his counsel and also advised by me and he has waived his rights to the jury for the eligibility and sentencing phase of the death case. All right.

MR. WIENER: If the State has no objections I would ask Your Honor do the entire voir dire because quite frankly I think the jury can be selected with Your Honor asking a submitted list of questions if either side has any. It is not a complicated case. It would seem to me appropriate that Your Honor do the voir dire himself. So on behalf of Mr. Williams I would waive the right if the State would.

THE COURT: It's completely discretionary with myself. It takes a little bit more time for the lawyers to do it, but the lawyers prepare the case and they know the facts better than anything else. And I think they will --

MR. WIENER: So even if the State and I agree --

THE COURT: You have no right to agree.

(The case was passed, after which the following proceedings were had:)

THE CLERK: Cordell Williams.

THE COURT: Madam sheriff, at this time pursuant to a court order that I issued to the jail that was

not complied with I am ordering all three of you so everybody is protected to allow the defendant to change into civilian clothes for his first degree murder jury trial.

MR. WIENER: Thank you, Judge.

(The case was passed, after which the following proceedings were had:)

THE CLERK: Cordell Williams.

THE COURT: Mr. Williams, what we're going to do is I'll introduce you and then you can stand up. Okay?

THE DEFENDANT: Yes, sir.

THE COURT: All right, fine. Good luck to both sides. Could you bring the jury in, please.

(The following proceedings were had in the presence and hearing of the prospective jurors:)

THE COURT: All right, good morning, ladies and gentlemen. Today you've been called as jurors to sit in the case of the people of the state of Illinois versus Cordell Williams. Robin, could you call fourteen of the prospective jurors, please.

THE CLERK: Brian McDuffin. Richard Franch. Wanda Epps. Willie Beal. Constantine Alexakos. Leo

Kerner. Michael Ellul. A. Roussi. Delores Kelsey. Doris Salent. Warren Schlatter. Tina Pippen. Sue Schultz.

Ladies and gentlemen, if you could have a seat in the outer courtroom. Perry, I want the door open too so that they can hear during voir dire examination. Okay? Thank you.

Ladies and gentlemen, what I would like to do right now is introduce the different parties to this lawsuit and also to the court personnel and myself. My name is Judge Vincent Gaughan. Now if anyone -- And these remarks apply -- when the attorneys will ask questions their remarks will apply to the people in the outer courtroom also.

If anybody knows the names of any of the parties or the names that I call out that may or may not be witnesses at the end of me reading the names if you could raise your hand and then we'll have additional questions at this time.

Right now what I would like to do is introduce the defense. The attorney for Mr. Williams today is Mr. David Wiener.

MR. WIENER: Good morning everybody. Good morning.

THE COURT: Now the defendant or the accused in this case is Mr. Cordell Williams.

THE DEFENDANT: Good morning. Good morning.

THE COURT: Representing the state of Illinois is Miss Laura Morask.

MS. MORASK: Good morning, ladies and gentlemen. Good morning, ladies and gentlemen.

THE COURT: Mr. Brian Sexton.

MR. SEXTON: Good morning, ladies and gentlemen. Good morning, folks.

THE COURT: And we also will be -- the State will also be joined by attorney Michael Smith. He is on trial in another courtroom and will either be joining us later this afternoon or else on Monday morning. All right. My court reporter is Mary Flagg, and our sheriffs here today are Liz Sheehy. And then we have Perry Dixon, and then Tom Nolan, and later on we will see Mike Strawzcyk. And last but not least my clerk Robin Sakow.

All right. Now at this time, ladies and gentlemen, I'm going to read a list of witnesses who may or may not be called (phonetic spellings): Miss Cochran, Mr. Johnson, Stanley Sanders, Alexander Pratt, L. Harwell, P. Balantine, Mr. Kane, Mr. Mangun,

a Detective Armata, Detective Dwyer, Detective Rose, Officer Dixon, evidence technician Batchelder, evidence technician Demarco, Detective Carroll, Detective O'Brien, Detective Stelleck, Detective Gurney, Detective Ryan, Detective Lenihan, Officer McMannon, Officer Theobolt, Officer Ernie Warner, assistant state's attorney Vaci, assistant state's attorney Beastie.

From the medical examiner's office Dr. Lifschultz, and there's a Sala Kahn, Pansa McMoore, Anre Rudek. And then there's a Mr. Janake and an Officer Blore.

Those are witnesses that may or may not be called. Does anybody know any of these people? All right, let the record reflect that nobody has raised their hand.

Ladies and gentlemen, I want to talk to you at this time about some of the basic principles of law that apply to all criminal cases. This will help you to follow the law and the evidence in this case. These are not your final and complete instructions. Those will come after you have heard all of the evidence and the final arguments of the lawyers.

When the time comes for giving instructions I

will read them to you and you will get them in writing along with verdict forms for your consideration. You must follow the law as I give it to you. You must not use your own ideas of what the law should be.

Mr. Williams is the only person on trial in this case today so as the evidence comes in you must judge the evidence as it pertains to Mr. Williams.

The charges against Mr. Williams are on or about May 26, 1994, at and within the county of Cook, Cordell Williams and Londell Harper committed the offense of first degree murder, in that they, without lawful justification, intentionally and knowingly shot and killed Billy Johnson with a gun, in violation of Chapter 720, Act 5, Section 9-1 A 1 of the Illinois Compiled Statutes, 1992, as amended.

The next count states on or about May 26, 1994 at and within the county of Cook Cordell Williams and Londell Harper committed the offense of first degree murder, in that he they, without lawful justification, shot and killed Billy Johnson with a gun, knowing that such a shooting with a gun created a strong probability of death or great bodily harm to Billy Johnson, in violation of Chapter 720, Act 5, Section 9-1 A 2 of the Illinois revised statutes --

compiled statutes.

The next count is on or about May 26, 1994 at and within the county of Cook Cordell Williams and Londell Harper committed the offense of first degree murder, in that they, without lawful justification, intentionally and knowingly shot and killed Myron Cochran, with a gun in violation of Chapter 720, Act 5 Section 9-1 A 1 of the Illinois compiled statutes 1992.

And the last count states on or about May 26, 1994 at and within the county of Cook Cordell Williams and Londell Harper committed the offense of first degree murder, in that they, without lawful justification, shot and killed Myron Cochran with a gun, knowing that such a shooting with a gun created a strong probability of death or great bodily harm to Myron Cochran, in violation of Chapter 720, Act 5, Section 9-1 A 2 of the Illinois Compiled Statutes 1992.

The charges in this case is contained in what is called an indictment. You must remember that the indictment is not to be considered as any evidence against the defendant nor does the law allow you to infer any presumption of guilt against the defendant

4

simply because he has been named in the indictment. The indictment is merely the formal way in which the defendant is placed on trial.

Under the law a defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all of the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The defendant is not required to prove his innocence nor is he required to present any evidence on his own behalf. He may rely upon the presumption of innocence.

Basically if you are selected as jurors you will be the judges of the facts in this case. That is, you and you alone will determine which witnesses to believe and how much weight to give to their testimony.

Part of my job is to tell you what the applicable law is and what evidence you may hear and

consider. After you have heard all of the evidence, the arguments of the lawyers and my instructions on the law you will receive written instructions and retire to the jury room to determine your verdicts.

If you become convinced beyond a reasonable doubt from all of the evidence in the case that the defendant is guilty as charged in the indictment it will be your duty to find him guilty.

On the other hand, if you after having hearing all of the evidence you are not convinced beyond a reasonable doubt of the defendant's guilt it will be your duty to find him not guilty. Whatever verdict you reach it will be your own and you do not have to explain it nor justify it to anyone at any time.

It is essential that you must not arrive at any decisions or conclusions of any kind until you have heard all of the evidence, the arguments of the lawyers and the laws that applies to this case.

During the trial you will hear the lawyers make objections. Don't hold it against either side when you hear objections. The lawyers are not trying to keep anything from you. They're doing their job and their duty. Objections help me and serve an

important purpose to make sure that you only get evidence on the issues that are involved in this case.

The number of objections made or which side has more objections sustained or overruled must have no effect at all on your consideration of the evidence.

The personalities of the lawyers are not at issue in this case and they should have no effect on your verdict forms.

There will be times when I'll excuse you from the courtroom or we'll excuse ourselves and go off on the side or into chambers to discuss points of law. You shouldn't let this annoy or bother you. The law requires that these discussions be held outside of your presence. That is the law's way of making sure that you only hear proper evidence.

There may be recesses or delays although we'll try to keep those at a minimum. At times we might begin a few minutes later than we hoped. The reason for that is that we have other cases on the call having nothing to do with this case or this defendant. We are using this time for a good purpose, so don't feel that the time is wasted if you have to wait for us.

Very shortly the lawyers will ask you some questions about yourselves. You must not feel that they are trying to embarrass you or put you on the spot or pry into your personal affairs. It is merely their way of learning something about you so that later on they can make informed decisions in the jury selection process.

Please be frank, open and complete in your answers. That is the only way to insure a fair jury to both sides.

For those of you who are going to be chosen as jurors I will give you this warning now and you will hear it again. Do not discuss this case with anyone. Not your own friends, your family or among yourselves and don't let anyone, including your fellow jurors, discuss it with you until you retire to the jury room to deliberate.

If anyone has spoken to you or should speak to you about this case or tries to influence you in any way before its final disposition either directly or indirectly it is your legal duty to report this to me immediately. You may consider that an order of this court.

Any attempt to violate it should be reported

5

to me at once. The fair thing to do is wait until you have heard everything before you begin discussing your case among yourselves and that will only be done in the jury room when you begin your deliberations.

When deciding this case you must not allow sympathy or prejudice to influence your verdict. Our system of law is based on the principle that a jury will decide the case on the law and on the evidence. That is the oath that you will take as jurors and I know you will be faithful to it. Robin, could you administer the oath.

(Prospective jurors sworn.)

THE COURT: Please be seated. All right, will the State begin please.

MS. MORASK: Thank you, Judge. Good morning, ladies and gentlemen. I'm going to ask you all a series of questions and I don't mean to pry into your personal affairs. We just have to ask you these questions to determine whether or not you would be good jurors.

BRIAN MC DUFFIN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q And I will begin with Brian McDuffin. You live in Homewood?

A Yes.

Q How long have you lived at that address?

A Five years.

Q And before that. Were you living in Chicago?

A Crete, Illinois.

Q And it says here that you are employed as a sales rep at PVI Gordon Corporation?

A Yes.

Q What kind of company is that?

A A chemical for agricultural golf courses, sports field related-type items.

Q And how long have you done that?

A Nine years.

Q And your wife is employed at --

A Kirschner.

Q Also in sales?

A Yes.

Q And you have two children ages, seven and eleven. Can you tell me their names?

A Justin and Brian.

Q And they're both in school, I take it?
A Right.
Q And you rent where you live and you've never served on a jury before?
A Right.
Q Do you have any friends or close family members who are connected to law enforcement in any way, lawyers, judges, state's attorneys, public defenders?
A I know some police officers.
Q Are you good friends with them or just acquaintances?
A Acquaintance.
Q Do you ever discuss their work?
A No.
Q Just so the fact that you know police officers won't affect your ability to be fair?
A No.
Q You have never been a victim of a crime?
A No.
Q Never been a witness of a crime?
A No.
Q Never been involved in the court system in any way, shape or form?

A Speeding ticket.
Q Do you have any family members who have ever been victims or witnesses or involved in the court system in any way, shape or form?
A No.
Q And you also have never been a party to a lawsuit and you are presently not a party to any lawsuit, never been involved in an accident?
A Correct.
Q Have you ever served in the military?
A No.
Q Would you be able to follow a law in Illinois that says when two or more people commit a crime together, each helping the other person to make that crime happen the law holds each person equally responsible for that crime?
MR. WIENER: Object to her recitation of the law at this time, Judge.
THE COURT: All right. To that objection will be overruled.
BY MS. MORASK:
Q Would you be able to follow such a law?
A Yes.
Q For example, if there was a shooting that

occurred and one person's job --

THE COURT: No hypotheticals.

MS. MORASK: Okay.

Q You would have no problem in following that law?

A No.

Q Now would you be able to listen to all of the evidence in this case and keep an open mind until you have heard all of the evidence and you saw all of the exhibits and you heard the law that Judge Gaughan will instruct you on?

A Yes.

Q And after you listen to all the evidence and after you have heard the law if the State had proven that Mr. Williams committed the offense of first degree murder beyond a reasonable doubt would you have any scruples about finding him guilty?

A No.

Q Do you have any problems sitting on this jury? Is there any emergency coming up in the next week that would prevent you from being able to keep your mind on jury duty?

A No.

Q Do you want to serve on this jury?

A Yes.

Q And do you belong to any associations or groups or have any hobbies?

A President of the Little League Association.

Q Well that's a good one. And how long have you been president of the Little League?

A Three years.

MS. MORASK: Thank you.

RICHARD FRENCH,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Mr. Franch, you live in Winnetka, correct?

A Yes.

Q And how long have you lived there, sir?

A Eighteen years.

Q And you are a lawyer at Jenner and Block, is that correct?

A Right.

Q How long have you been a lawyer at Jenner and Block?

A 28 years.

Q And what division are you in?

A Litigation. I'm a trial lawyer.
Q What kinds of trials?
A Criminal trials, civil trials, antitrust,, securities, contracts.
Q Do you pro bono work?
A Yes.
Q Have you done work here in the building?
A Yes.
Q When was the most recent case you've tried here?
A Well we had a case here a year ago.
Q Do you remember what courtroom?
A I don't remember the judge but --
Q Would the fact that you are a lawyer at Jenner and Block prevent you from being able to be fair to either side in this case?
A No.
Q And you have two children ages 21 and eighteen. Are they living at home or are they out of the home?
A At home.
Q What are their sexes and what are their names?
A Rick is my son and Kate is my daughter.

6

Q And are they attending school?
A Yes, college.
Q And you own your own home, never served on a juror. Obviously you have a lot of friends who are lawyers?
A Yes.
Q Do you have any friends who are state's attorneys or public defenders?
A No.
Q Judges or police officers?
A Judges, yes. Police officers, I've got a cousin who is a police officer.
Q Do you discuss his work?
A I don't talk to him. I haven't talked to him in ages.
Q You said you have friends who are judges, are you very close friends or acquaintances?
A Just -- Well I've had partners who are judges.
Q That wouldn't prevent you from being fair in this case, would it?
A No.
Q And you have never been victim of a crime?
A No.

Q Any member of your family or friends ever been the victim of a crime?

A No.

Q Never been involved in an accident where anybody was injured and are not presently a party to a lawsuit?

A Right.

Q Do you have any -- Do you belong to any associations?

A American College of Trial Lawyers, the American Bar Association, the American Law Institute, things like that.

Q Do you have any positions of leadership in any of those associations?

A No.

Q And do you have any problem with the law of accountability or responsibility where two or more people commit a crime each is responsible for the whole crime?

A No.

Q And do you have any problems serving on this jury of an emergency nature coming up the next week?

A Well I have a lot of things to do, but no.

Q Other than a lot of things to do?

A No.

Q If we prove to you beyond a reasonable doubt that Mr. Williams is guilty of first degree murder would you have any problems returning a guilty verdict?

A No.

MS. MORASK: Thank you, sir.

WANDA EPPS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Miss Epps?

A Yes.

Q Good morning.

A Good morning.

Q You live on the south side. How long have you lived at this address?

A Nine years.

Q And you are working for the United States bankruptcy court?

A Yes.

Q What does a case administrator do?

A Basically we keep a diary of what happened in

the bankruptcy case:

MR. WIENER: Miss Epps, I would just ask you to speak up a little bit. I can't hear you.

A Basically we keep a diary of what happens in a bankruptcy case from start to finish.

Q And I'm sorry, how long have you done that?

A 15 years, june 30.

Q Congratulations. And your husband is working at Elkay Manufacturing. What do they manufacture?

A Sinks.

Q And you have no children, you've never served on a jury but you have friends or family who are police officers or lawyers?

A Yes.

Q And let's take the police officers first. Are they family or friends?

A Friend. Acquaintances.

Q Do you discuss their work?

A No.

Q How about lawyers?

A My brother-in-law.

Q Is he involved in criminal law in any way?

A I think he does general.

Q Have you ever discussed his work?

A No.

Q So the fact that you know police officers and lawyers wouldn't affect your ability?

A No.

Q How about -- It says here that you have been the victim of a crime. Can you tell us about that?

A Car violations.

Q Did any of those crimes were the police called?

A Yes.

Q Were you satisfied with the work of the police?

A Yes.

Q Did any of the cases ever go to court?

A No.

Q Have you ever been to court in any capacity as a victim or witness or any other way?

A Traffic.

Q All right. And it says here that a member of your family or very close friend has been the victim of a crime?

A Yes.

Q What would that be?

A My nephew was killed.

Q And when did that happen?
A Two years ago.
Q Did the police find who did it?
A No. Yes. Yes, they did.
Q Was that in Chicago?
A Yes.
Q Were you satisfied with the work of the police?
A I don't know very much about the details.
Q Did you go to court at all?
A No.
Q Do you know what happened to the person that had been charged?
A He's in jail.
Q Was your family satisfied with what the outcome of the case?
A I don't think so.
Q Do you recall why or what particular part?
A I don't think they got everyone that was involved.
Q Okay. And do you know if they blamed the police, the prosecutor or the system?
A No. I would say the system.
Q You've never been a party to a lawsuit and

you've never been involved in an accident where anybody was injured, correct?

A No.

Q Now have you ever served in the military?

A No.

Q And do you belong to any associations or have any hobbies?

A No.

Q Do you have any problems coming up the next week of an emergency nature where you won't be able to serve on this jury?

A No.

Q And if we prove this defendant guilty of first degree murder beyond a reasonable doubt by the law and the evidence would you have any scruples about returning a verdict of guilty?

A No.

Q And do you want to serve on this jury?

A No.

MS. MORASK: Thank you for your honesty.

THE COURT: Best answer, too.

BY MS. MORASK:

Q Would you be able to follow the law that says when two or more people commit a crime together, each

7

helping the crime be committed, that each is equally responsible for the crime?

A Yes.

MS. MORASK: Thank you.

WILLIE BEAL,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Mr. Beal?

A Yes.

Q You live in Richton?

A Richton Park.

Q And how long have you lived at this address?

A A little better than a year.

Q And you are employed as a computer operator, and how long have you done that line of work?

A About seventeen years.

Q And your wife works as Methodist Hospital as an occupational therapist?

A Yes, sir.

Q How long has she been doing that?

A About six years.

Q You have two children, both boys, seven and

eleven?

A Yes.

Q You own your own home, never served on a jury?

A No.

Q Do you have any friends or family that are in law enforcement?

A I have an uncle that just retired. He was a Cook County sheriff out here.

Q All right. In 26th Street?

A Yes.

Q What's his name?

A Elmer Jones.

Q And would the fact that -- Did you ever discuss any of his work with him?

A No.

Q So is the fact that your uncle is a Cook County sheriff would not affect your ability to be fair?

A No.

Q And other than your uncle do you have any friends or family that are judges, lawyers, public defenders, state's attorneys, anything like that?

A Good friend that's cops.

Q Do you ever discuss their work?
A No.
Q Have you ever been an accused, a complainant or a witness in a criminal case?
A No.
Q Have you or any members of your family ever been involved in the court system?
A On trial?
Q Yes.
A I have a brother that was on trial.
Q And when was that?
A A little better than -- Actually about five or six months ago, actually.
Q Here?
A Yes.
Q And what was the charge?
A He was stealing -- Actually he had been in and out of jail several times.
Q Would the fact that he was on trial here would that prevent you from being fair to -- I assume there were prosecutors who were trying your brother, correct?
A Yes.
Q Would that prevent you from being fair to the

prosecution or the defense?

A No.

Q And does he have any cases that are still pending or is he currently in jail?

A He's in jail.

Q And do you know how long of a sentence he got?

A I think he got like eight to thirteen years.

Q Now other than your brother do you have any other involvement in the court system?

A No.

Q Have you ever had to be a witness or a victim?

A No.

Q It says that a member of your family or close friend has been the victim of a crime. What is that you marked yes? Maybe that's the -

A What was the question.

Q Says has any member of your family or a very close friend ever been the victim of a crime, and you marked yes?

A Well actually I was in a car accident and the guy is trying to sue me, but I had full coverage insurance and everything, so other than that.

Q All right. Is that case still pending? The lawsuit?
A Yes, it is.
Q And that's pending in the Circuit Court at the Daley Center?
A Yes.
Q And other than that you don't have any other lawsuits pending?
A No.
Q Have you ever served in the military?
A No.
Q Do you have any problems with the law that says that two or more people commit a crime together, helping each other out to make sure the crime gets committed that each is equally responsible for the crime no matter what parts they play?
A Yes, I do.
Q Do you have any problems with that law?
A No.
Q And if we prove that this defendant was guilty of first degree murder beyond a reasonable doubt would you have any scruples, morally, religious, any kind of scruples whatsoever in returning a verdict of guilty?

A No.
Q Do you have any problems coming up in the next week of an emergency nature that would prevent you from sitting on this jury?
A Other than vacation scheduled to go Vegas.
Q Do you have non-refundable plane tickets?
A You're right. Non-refundable.
Q When are you supposed to leave?
A On the 5th.
Q July 5?
A Yes.
MS. MORASK: Okay. We'll be done by then. Thank you, sir.
A Thank you.
THE COURT: Let's just make it very clear. We'll be done way before then.

CONSTANTINE ELECSAKOS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Mr. Elacsakos (phonetic spelling)?
A You got it.
Q You live in Des Plaines?

A Yes.
Q How long have you lived at that address?
A About a year and four months.
Q And before that where were you living?
A Chicago.
Q And you own your own home in Des Plaines, correct?
A No, I live with my parents.
Q I'm sorry. And never served on a jury. And are you currently a student?
A Yes, I'm a student. I'm going to Coyne Institute.
Q What are you studying?
A Heating and air.
Q And how long have you been going there?
A I'm going to start this month, July 12.
Q And it says here that -- you didn't mark down -- Do you have any friends or family that are in law enforcement?
A I have an uncle who is a lawyer that I very rarely talk to. I haven't seen him in a while.
Q Other than that?
A No.
Q And have you ever been an accused, a

8

complainant or a witness in a criminal case?

A No.

Q And it says you have been the victim of a crime?

A Yes, somebody broke into my car.

Q Were the police called?

A Yes.

Q Were you satisfied with the work of the police?

A Yes.

Q Did the case go to court?

A No.

Q And it says here that your immediate family or friend has been a victim of a crime. What does that refer to?

A I had a friend who was stabbed four times.

Q Did he live?

A Yes, he lived.

Q When did that happen?

A About a year, year and a half ago.

Q In Des Plaines?

A No, in Chicago.

Q And did they find who did that?

A No they didn't.

Q Were you and your friend satisfied with the work of the police?

A Yes.

Q And that case obviously never went to court?

A Right.

Q That wouldn't prevent you from being fair to either side in this case, would it?

A No.

Q And you have never been a party to a lawsuit and have never been involved in an accident where somebody was injured?

A No.

Q Now do you ever -- Have you ever been in the military?

A No.

Q Do you belong to any associations or have any hobbies?

A Just sports.

Q What kind of sports?

A Softball, bowling.

Q And do you have any problem with the law that where two or more people commit a crime together that each is responsible for the whole crime no matter what part they played, if they helped each other out in

committing the crime?

A No. I have no problem.

Q You would be able to follow that law?

A Yes.

Q And if we, the people of the state of Illinois, proved that the defendant Mr. Williams is guilty of first degree murder beyond a reasonable doubt would you have any scruples of any nature in returning a verdict of guilty?

A No.

Q Do you have anything coming up in the next week of an emergency nature?

A No.

Q Would you like to serve on this jury?

A Sure.

MS. MORASK: Thank you, sir.

LEO KERNER,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Mr. Kerner. You live in Park Forest?

A Yes.

Q How long have you lived at this address?

A Ten years.
Q And how long have you worked for Mason Dixon?
A About a month.
Q Where were you working before that?
A I was working for another trucking company up in Highland. Transit All.
Q And how long have you been a truck driver?
A Year and a half.
Q What were you doing before that?
A I was managing a glider flight school.
Q Okay. So you were teaching other people how to fly?
A Yes, and giving rides.
Q And where was that?
A South of Naperville.
Q How long were you doing that?
A Six years.
Q And you have one child who is 25?
A Yes.
Q Is that a boy or girl?
A My daughter.
Q And what's her name?
A Heather.
Q What is she do?

A She works at a day care center in St. Augustine, Florida.
Q Okay. As a teacher, counselor and whatever?
A As a helper I guess. I don't know.
Q Says you've never served on a jury. Do you have any friends or family in law enforcement. Police officers, lawyers, state's attorneys?
A No.
Q You have been the victim of a crime?
A Yes.
Q Can you tell us about that?
A Just my car was broken into and some professional items were stolen.
Q Did the police get called?
A Police got called, but there's nothing to go on.
Q Were you satisfied with the work they did?
A Sure. Absolutely.
Q Have you had any contact in any other way with the court system? Have you or any member of your family ever been --
A No.
Q Had to come as a witness, a defendant or a victim to court?

A No.
Q And you've never been a party to a lawsuit, never been involved in an accident, correct?
A Correct.
Q Have you ever served in the military?
A Yes.
Q Where and when?
A From 1960 to 1980, the Navy.
Q And where were you stationed?
A Brunswick, Maine. Quanset Point, Rhode Island. San Diego, California. Memphis, Tennessee.
Q What was your favorite place?
A Brunswick, Maine.
Q Between that and San Diego?
A San Diego was outstanding but I loved the summers in Maine.
Q Yeah. And you got out of the Navy when?
A November of '80.
Q Do you have anything coming up in the next week of an emergency nature that would prevent you?
A No.
Q Do you have any problem with the law that I've already explained to your fellow jurors with --
A None.

Q Two or more people committing a crime together each is fully responsible?
A No.
Q And if we proved that this defendant was guilty of first degree murder would you have any scruples, moral, religious, whatever scruples, about finding him guilty?
A No.
Q And would you like to sit on this jury?
A Not really but I will.
Q It will be interesting?
A Absolutely.
MS. MORASK: Thank you.
A You're welcome.

MICHAEL ELLUL,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION.

BY MS. MORASK:

Q Michael Ellul.
MR. WIENER: How is that spelled?
MS. MORASK: E-l-l-u-l.
MR. WIENER: Thank you.

9

BY MS. MORASK:

Q You live in Country Club Hills?

A Yeah.

Q How long have you lived there?

A Six years.

Q And you are a painter for MNK Custom Paints?

A Yes.

Q How long have you done that line of work?

A Been painting for 15 years. I'm self-employed for the last four.

Q Now your children, ages four, six and nine. Could you tell me their names and sexes?

A I got two boys and a daughter.

Q And what are their names?

A Is that necessary?

Q No. And you've never served on a jury, you own your own home, is that correct?

A Yes.

Q You have friends or family that are police officers?

A Yes. My ex brother-in-law is a cop.

Q Where?

A Midlothian.

Q And how long -- Do you ever discuss his work

with him?
A Not really, no.
Q It says you have been an accused, a complainant or a witness in a criminal case?
A Yes.
Q What were you referring to?
A Some assaults charges and some weapons charges.
Q That you yourself had?
A Yeah.
Q Okay. And how long ago was that?
A About three years ago.
Q Was that here in 26th Street?
A No. Markham.
Q Was the fact that you were an accused in a criminal case would that prevent you from being fair to either side in this case?
A Not really.
Q What was the outcome?
A It was dismissed.
Q And when you say not really -- Either yes -- I mean would it prevent you from being fair?
THE COURT: Sir, as you sit there right now can you look at either side and say I will not be fair to

the prosecution, I will not be fair to the defense. Do you have that thought that's blaring in your head?

A Yeah, because I don't want to be here.

THE COURT: Well, take a consensus maybe all of us don't want to be here. Let me explain something. This is the only time that your country, now that we have a volunteer armed forces, can require you to serve and it's absolutely necessary to all three forms of our government that the jury system be put in place. Okay? So I know it's an inconvenience and I do appreciate your service and everybody here is going through an inconvenience. Believe me.

A I understand.

THE COURT: Okay. Now if we could put that aside, now as you look at the prosecution can you give them a fair trial here today?

A Naturally. If the facts are presented right then it wouldn't be a problem with it.

THE COURT: As you look at Mr. Williams can you give him a fair trial here today?

A Yeah.

THE COURT: Thank you very much. Appreciate that. Proceed.

MS. MORASK: Thank you, Judge.

Q Do you have any problem with the law that says when two or more people commit a crime together they're each responsible for the crime?

A No.

Q And if the State proved that the defendant was guilty of first degree murder do you have any scruples that would prevent you from returning a guilty verdict?

A No.

Q Do you belong to any associations?

A No.

Q Do you have any hobbies?

A No.

MS. MORASK: All right, thank you sir.

A. ROUSSI,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION.

BY MS. MORASK:

Q A. Roussi, R-o-u-s-s-i. How long have you lived at that address?

A A year and a half.

Q And you are a salesperson for a real estate company?

A Yes.
Q How long have you been in that line?
A About six years now.
Q And is that real estate company also in Chicago?
A Yes.
Q And it sells houses?
A Yes.
Q You have three children, four months, six years and seven. You have your hands full. Are the six and seven-year-old in school?
A Yes.
Q And you have never served on a jury. Are any friends and family involved in law enforcement?
A No.
Q Have you ever been involved in the court system as a witness?
A No.
Q It says you have been the victim of a crime. Can you tell me what that was about?
A Yeah. I was -- My business was stabbed three times.
Q When?
A 1987.

Q All three times in 1987?
A Yes.
Q And what -- In your business? At your place of business?
A Yes.
Q Was any of the people caught by the police?
A No.
Q Were you dissatisfied or satisfied with the work?
A They did the work but it was too many to get.
MR. WIENER: Excuse me, Mr. Roussi. I ask you to speak up. I really can't hear what you are saying. I apologize.
A That's okay.
BY MS. MORASK:
Q How badly were you hurt?
A Well I was almost dead. For almost a month in the hospital.
Q In the hospital?
A Yes.
Q And was that the last time you were stabbed or the first time?
A That was the first and I hope the last.
MS. MORASK: Gosh, I'm sorry.

Q Would the fact that you have been a victim of a crime three different times would that prevent you from being fair in this case?

A Well I would like to be but emotionally is not. I mean --

Q Well you understand that the facts that are going to be presented in this case have nothing to do with what happened to you in that case?

A I still have -- Problem I do have is sometime the picture of it happen.

Q Then you're not concentrating on what's going on?

A I want to be fair. I mean -- This is a very serious matter. I want to be fair. This is -- I would like to serve but if I'm not fair for either side that would be responsible.

THE COURT: There's no right or wrong answer. You know, the full and complete answer. We appreciate your candor on this. So that's very good. Thank you.

MS. MORASK: Thank you, sir.

A Welcome.

DELORES KELSEY,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION.

BY MS. MORASK:

Q Miss Delores Kelsey?
A Yes.
Q Good afternoon. It says here that you are currently living in Chicago, correct?
A Right.
Q And how long have you lived at that address?
A 35 years.
Q And you are retired. I'm sorry. Your husband is retired from what line of work?
A From General Motors.
Q And how long did he work at General Motors?
A More than 30 years.
Q And you have seven children?
A Yes.
Q Can you start at the oldest, work your way to the youngest and tell me their names and what they're doing?
A Wow. I don't know what all of them are doing.

Q A few.

A My oldest lives in California. He's supervisor for some electrical company. I don't know exactly. And the one here that lives with me he works at CNA Insurance Company. And then my daughter in Kansas City is a telephone operator. And my daughter -- next daughter she's with her own business in computer consultant and with her husband. And the next one he's out of work. And the other one is a school teacher and the last one he is a meter reader for Edison.

Q The last two live in Chicago?

A Yes.

Q And the one who is a school teacher where does he teach school?

A 124th and State. I can't remember the name of the school.

Q And says you own your own home, never served on a jury. Do you have any friend or family who are in the law enforcement business?

A Not to my knowledge.

Q And you've never been involved in the court system in any capacity as a victim, a witness or an accused, is that correct?

A No.
Q Never had to go to court at all?
A No.
Q Have you ever been the victim of a crime?
A No.
Q Any friend or family been the victim of a crime?
A Not to my knowledge.
Q Any friends or family ever been arrested for a crime?
A Not to my knowledge.
Q And it says here that you've never been a party to a lawsuit but a member of your immediate family has been a party to a lawsuit. What does that refer to?
A He was hurt on the job so there was a lawsuit.
Q Your husband?
A No. My son.
Q And Miss Kelsey, would you be able to follow the law in Illinois that says when two or more people get together to commit a crime and they each help each other out that they're each responsible for the crime?
A I don't really understand that.

Q Well if one person does one part and another person does another part they're both responsible for the whole part if they help each other out.

MR. WIENER: Again I object to the definition of the law by the State.

THE COURT: Objection noted. Overruled.

BY MS. MORASK:

Q If one person has a job to play and another person has a different job in committing the crime they're each responsible for the other persons actions and their own actions for whatever happens during the crime?

A I guess I don't know.

Q You don't know if you would have a problem with that?

A I don't know.

Q Would you be able to follow the law?

A Yes, I can follow the law.

Q So if the judge told you that was the law in Illinois you would be able to follow it?

A Yes.

Q Now do you have -- belong to any associations or do you have any hobbies?

A No.

Q Do you like to read?
A Yes, I do.
Q What kind of things do you like to read?
A All kinds of literature.
Q And do you have any -- If the State proved that this defendant was guilty beyond a reasonable doubt of first degree murder would you have any religious or moral scruples about returning a guilty verdict?
A Well you mean religious? Yes, I would.
Q That would prevent you from sitting in judgment on a fellow person?
A Right.
MS. MORASK: Okay. Thank you.

WARREN SCHLATTER,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION.

BY MS. MORASK:

Q Mr. Warren Schlatter (phonetic spelling). You live in Mount Prospect for how long, sir?
A 34 years.
Q And how long have you worked for Northwestern Tool and Die?

A Since November of last year.
Q What were you doing before that?
A Also working for a mold builder and as a sales rep.
Q But a different one?
A Yes.
Q And have you ever served on a jury? Could you tell us where and when and what kind?
A It was at 13th and Michigan. Criminal court. It was a murder case also.
Q And how long ago was that?
A I'm going to say ten years ago.
Q Without telling us what the verdict was, did your jury come to a verdict?
A Yes.
Q And was there anything about that case that would prevent you from being fair to either side in this case?
A No.
Q Were you satisfied with the court system?
A Oh, yes. Absolutely.
Q It says you have friends or family that are police officers?
A Yes. I have a daughter-in-law that's a

11

police officer for the St. Louis police department.
Q And do you discuss her work?
A When I see her, yes.
Q Would the fact that you have a daughter-in-law who is a police officer make you give more weight to police testimony than other testimony?
A I don't think so, no.
Q So that wouldn't prevent you from being fair?
A No, ma'am.
Q And you've never been the victim of a crime, correct?
A No.
Q No member of your family or friends?
A No.
Q Never been a party to a lawsuit or involved in an accident?
A That's correct.
Q Have you ever served in the military?
A Yes, ma'am.
Q Where and when?
A I served in 1945 and '46 in Seoul, Korea.
Q And what branch?
A US Army.
Q Would you have any problem with the law of

accountability that where two or more people commit a crime together they're each equally responsible no matter what part they play?

A None whatsoever.

Q And if the State proved this defendant guilty of first degree murder beyond a reasonable doubt would you have any scruples against finding the defendant guilty?

A None whatsoever.

Q Do you have any emergencies coming up in the next week?

A No, ma'am.

MS. MORASK: Thank you, sir.

TINA PITTMAN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Tina Pittman (phonetically). Good afternoon. How long have you lived at this address, ma'am?

A It will be 30 years the end of August.

Q And it says here that you own your own home and you are -- have served on a jury. Can you tell us when did you serve on the jury?



SOTOS-WILLIAMS 11208

A Quite a few of them. Let me tell you. I served on a rape case here at 26th and California. I was called for a drug case but I refused it because I cannot do it on drugs because I have no compassion for people with drugs. And I was down at District Court downtown for a whole month and I was on the union case there. And then a couple years ago I was called here again but I wasn't called to hear a case.

Q Now the one where you did sit, let's start with the rape case. How long ago was that?

A It has to be about ten, maybe 15 years ago. Something like that.

Q Do you recall where it was?

A It was here at 26th and California.

Q And without telling us what the verdict was did your jury reach a verdict?

A Yes, they did.

Q Were you satisfied with how the court system worked?

A Yes.

Q Second jury I believe you said was federal court for a month?

A Well federal court I was down there -- Well I was -- I was here for the -- Federal court for a

month.

Q Was it an actual case or were you called up every day?

A No, I had to serve for a month on the federal court, and during the course of that month was the union case that I was picked on and I was there for maybe about two weeks or something like that.

Q How long ago was that?

A That was I would say in '89.

Q Was there anything about any of these cases that would affect your ability to be fair to either side?

A No. Just some of the things that were said that they want you to find him guilty on some things, they want you to find them not guilty on some of the other things and some of the cases you can't pick that way.

Q Would you be able to listen to our case, our facts, follow the judge's law that he's going to read you that applies only to this case, put all your other juries outside of your mind and render a verdict just on this case?

A I could accept, like I say, if they have a long list of pros and cons with it, and say you have

to find them guilty on all of them or not guilty on all of them and where you can't do that because some of the questions that would be asked you can't find them guilty on something, you can find them not guilty on others. I found that hard to do.

Q So you would have trouble following the law?

A Well not following the law. If they have things where you find them guilty on you have to find them guilty on everything, and some of the things --

Q Well you heard the judge read the indictment in this case. There's two counts of first degree murder and you heard that. And you'll be asked to either find him guilty or not guilty?

A Well if it's just one or other I think I could.

Q You would be able to handle that?

A If it's a long list of what they could be guilty of and what they can't be guilty on then I don't know if I can do that.

Q All right. I think I understand. Other than being a juror, have you ever been involved in the court system as a victim or a witness?

A Not in the court system. I know -- I had my purse stolen where I had to call the police but I

didn't go to court.

Q Were you satisfied with the work of the police?

A Yeah, to the extent that there wasn't too much they could do about that part.

Q And no member of your family or close friend has been the victim of a crime?

A No.

Q Do you belong to any associations?

A No, just Mt. Carmel Mother's Club. That's about all.

Q And do you have any problem with the law that says two or more people committing a crime together are equally responsible for the crime?

A No.

Q And if we prove that this defendant was guilty of first degree murder would you have any scruples in returning a guilty verdict?

A No.

Q Do you have any emergencies coming up in the next week?

12

A No, just helping my daughter who just had twins.

Q Oh, she did?

A Yes.
Q When?
A First of June.
Q Twin boys or girls?
A Girls.
Q Are they identical?
A That's what they're still trying to decide whether they are.
Q Can't they just look at them?
A They look identical to me but they have to tell us whether they are or not.
Q What are their names?
A Kiley and Kelsey.
Q Do you have any other grandchildren?
A I have ten.
Q Ten?
A Yeah.
Q Wow. How many children do you have?
A I had five. I lost three boys within a period of year and a half. The last one was last November was killed in a car accident.
Q I'm sorry. You got ten grandchildren?
A No, I got twelve now.
Q What's the oldest and youngest?

A It's oldest is 21 and the youngest were the babies just born.
Q Wow. Congratulations.
A Thank you.

SUE SCHULTZ,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Sue Schultz. Do I have that right?
A Yes.
Q You live in Chicago?
A Right.
Q And how long have you lived at that address?
A Five years.
Q And you are going to college -- You are working in college as an instructor?
A Right.
Q What is "ESS"?
A English as a second language.
Q And how long have you been teaching?
A About twelve, thirteen years.
Q And where did you go to college?
A Northeastern.

Q And you have never served on a jury but you do have friends or family that are police officers?
A I have cousins.
Q In Chicago?
A Uh-huh.
Q Do you know what districts they're out of?
A Foster Avenue.
Q Oh okay. And do you discuss their work?
A No.
Q So that wouldn't prevent you from being fair?
A Unh-unh.
Q You have been the victim of a crime?
A Yes.
Q Can you explain what that was?
A My apartment was robbed.
Q Did the police get called?
A Uh-huh.
Q Were you satisfied with the results of the work they did?
A So so.
Q Did the case ever go to court?
A No.
Q And it says here that friends or family have also been a victim?

A No. Well I have a distant cousin who has been -- who go to trial and stuff.
Q As an accused?
A As an accused, yes.
Q And how distant and when was that?
A A few years ago.
Q Was it a he or she?
A A he.
Q And what was he accused of?
A Arson.
Q Was that here in the building?
A No.
Q Was it?
A It was in the suburbs.
Q But in the Cook County system?
A No.
Q All right. Did you participate in any way?
A No.
Q Did you have to go to court, watch or anything?
A No.
Q Would that prevent you from being fair to either side?
A No.

Q And what was the outcome?
A Not guilty.
Q And you said it was a distant cousin?
A Yes.
Q Do you talk to that person?
A Yeah.
Q Also says you have never been a party to a lawsuit but you put a question mark about your immediate family. Does that mean you don't know?
A I don't know.
Q Do you have any problem with the law that I've already explained to all the jurors?
A Yeah I do.
Q You wouldn't be able to follow that law which is the law in Illinois?
A I don't know if I feel it's fair.
Q Okay. And I guess at this point if the judge told you that is the law then you would have a problem following the law?
A Yeah I would.
MS. MORASK: Thank you for your honesty. Brenda Jarrett. You're not Brenda Jarrett. I have the wrong card. What's your name?
A Doris Selent.

THE COURT: All right, can I have the attorneys approach.

(Whereupon a discussion was had off the record between court and counsel.)

MS. MORASK: I apologize.

DORIS SELENT,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Doris Selent. How long have you lived in Chicago Heights?

A My whole life.

MR. WIENER: I'm wondering if you could spell her last name.

MS. MORASK: S-e-l-e-n-t.

Q You work as a manager of Larry's Ribs?

A Yes.

Q Does Larry's Ribs sell ribs?

A Yes.

Q How long have you been doing that?

A The business has only been there since February, but the restaurant which owns the building

has been there for 34 years.

Q Before it was Larry's Rib it was something else?

A Yes.

Q And what was it before then?

A It was called Captain D's.

Q And you worked there the whole time?

A Yes.

Q You have three children ages 28, 19 and 17?

A Correct.

Q What does the 28 year old do?

A She's a beautician in the suburb.

Q How about the nineteen year old?

A She's a student at DeVry.

Q And the seventeen year old?

A Just a kid.

Q And you own your own home and you've never served on a jury, correct?

A Uh-huh.

Q Do you have any friends or family who are in law enforcement?

A No.

Q Not at all?

A No.

13

Q How about -- you've never been involved in the court system as an accused, a complainant or a witness?
A No.
Q But you have been the victim of a crime?
A Correct.
Q What was that about?
A I had my house broken into a year and a year and a half ago -- Just this past December.
Q Same house?
A Same house.
Q Oh God. Did they ever find anybody?
A No.
Q Were the police called?
A Yes.
Q Were you satisfied with their work?
A No.
Q What weren't you satisfied about?
A The fact that we know who did it, we gave them the footprints, the fingerprints of them and they still didn't go after them.
Q Suburban police?
A Yes.
Q The fact that you were dissatisfied with

Chicago Heights police work would you hold that against Chicago police officers that would testify in our case?

A No.

Q You understand there's a difference?

A Yeah. Totally different people.

Q Other than those two things you also marked that friend or family have been victims of a crime?

A Yes.

Q What does that refer to?

A My daughter had her car stolen.

Q And again, were the police called?

A Correct.

Q Better then?

A It was better.

Q Says that you were involved in an accident where somebody was injured, never been a party to a lawsuit. What was the accident?

A I was in a car accident by our house where the three of us were injured very badly in it and they tried suing us but because of my insurance they didn't succeed.

Q That case isn't pending, right?

A No.

Q Did that leave you -- Did that ever go to court?
A Yeah, I went to court.
Q That was in a civil court, right?
A I guess so.
Q For damages? Okay. Do you have any problem with the law of accountability that where two or more people commit a crime together?
A No.
Q You have no problem with that?
A No.
Q If we showed you that this defendant was guilty of first degree murder beyond a reasonable doubt would you have any problem returning a verdict of guilty?
A No.
Q Do you have any emergencies coming up in the next week?
A Yes. My seventeen-year-old son has to go to court Monday in Markham.
Q For what?
A Drug charges.
Q And he has a pending case in Markham?
A Yes.

Q And that's Monday?

A Monday.

Q Would the fact that he has a pending case, would that affect your ability to be fair?

A No.

THE COURT: Just for clarification, did the judge require you to go to court?

A Right. I'm like a single mother for him. I have nobody else who can go for him because he's a juvenile.

THE COURT: All right.

MS. MORASK: Okay. Thank you very much, ma'am. May I have a moment, Judge.

THE COURT: Yes.

(Brief pause.)

MS. MORASK: Here you go.

MR. WIENER: Thank you very much.

THE COURT: Mr. Wiener, after you have had time to review the cards you can begin when you're ready.

MR. WIENER: I will do that, Judge.

THE COURT: Take your time if you want.

MR. WIENER: Thank you. Hello, everybody. I'm going to address you as a group for a little while before I talk to you as individuals, if that's okay.

First question I have for you is you heard the judge earlier say that one of the basic concepts of our law is that a person is presumed innocent and that the charges brought against him are not any evidence of guilt. Anybody sitting here have any problem with that concept of law?

And counsel kept telling you about what the law was or in fact decided to tell you that if two or more people commit different parts of the same act that would you have any problem with holding them both responsible for that act, but you'll all allow the judge to tell you what the law is and then decide from the facts and applying that law whether or not anything has been proved against a person who is presumed innocent, is that right? Am I right? Does anybody have any problem with that?

WANDA EPPS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Now Miss Epps, I know you told counsel that your nephew had been killed?

A Yes.

Q And I know you also said that you didn't want to be on this jury?

A Yes.

Q And, as you know, this is an important case for both the State and for Mr. Williams?

A Yes.

Q And I'd like you to please be very, very honest with me. Would you be able to give Mr. Williams a fair trial and listen to the evidence fairly and presume him innocent, knowing that your nephew had been killed?

A I don't think so. I'm not sure.

MR. WIENER: Thank you very much.

THE COURT: Ma'am, but the important point is as you sit there right now will you hold it against Mr. Williams, who is not in any way related to the death of your family member? Do you understand this is a completely different charge.

A Right.

THE COURT: Now would you be able to follow the law as I instructed you? I'm not telling you to forget that incident, but could you put that aside and listen to the evidence as presented and listen to my instructions and then give Mr. Williams a fair trial?

14

A Yeah. And I have a problem with the justice system. So I can't say I can.

THE COURT: All right. Then as you sit there can you say that you won't give him a fair trial?

A No, I wouldn't say that.

THE COURT: So where are you at then? I mean you work in bankruptcy court. You know that the judge wouldn't allow the lawyers to do things like that. There's no right or wrong answer. What we're trying to do is just, you know, get your feelings, and everybody is affected by different things in life and that's -- And there's nothing wrong or right.

If you feel a certain way it's because of life experiences and nobody is holding anything against you because of that and we appreciate your honesty and your being candid. So it's uncomfortable for me as it is to you to ask the question again, but as pointed out by counsel it's a very, very serious matter both for the State and both for Mr. Williams.

So as you sit there would you be able to put the fact that there had been a death in your family aside and give Mr. Williams a fair trial?

A No.

THE COURT: Thank you very much. Appreciate that.

RICHARD FRENCH,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Mr. Franch, you are a lawyer and a person that does pro bono criminal work. And you have obviously been involved in cases of a serious nature and probably as serious as this case. The fact that you are a lawyer and have had previous criminal experience, would that interfere with you sitting on a jury of people who were not lawyers and rendering what might be previous thoughts and study on other matters with regard to Mr. Williams trial?

A No.

Q You've never been a member of the state's attorney's office?

A No.

Q Your work for Jenner and Block at least as a litigator has in the criminal area always been as a defense attorney, is that true?

A Yes.

Q Do you do work in federal court?

A I do more work in federal court than I do in

state court.

MICHAEL ELLUL,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Mr. Ellul?

A Yeah.

Q Mr. Ellul, it's important to -- Obviously to my client that you and everybody else on this jury give him a fair trial, as well as give the State a fair trial, and I know you told the State that you were charged with some charges about three years ago?

A Yes.

Q And you were probably rightfully, fairly angry with having been charged?

A Very much, yeah.

Q But it's important for me to figure out whether or not that you're going to necessarily hold the State accountable but that you feel that somehow justice would be better done if people like my client were prosecuted. So my question to you is this, do you have any problem at all looking at Cordell Williams and presuming him innocent?

A Not at the time, no.

Q When you look at him now can you look at him and say I presume him innocent of these charges?

A He's innocent until proven guilty, right?

Q Okay. So you could give him a fair trial, am I right?

A Yeah.

Q I really would like to know. I know your answers are short and I know that's the way you talk, but it's sort of important for me to hear what you want to say, not just what you think I want you to say because it seemed a little bit when counsel was asking you questions you answered yeah and stuff like that.

A Some of the questions aren't necessary to what I'm doing here.

Q I agree, and what's necessary for me to find out is will you have any difficulty giving Cordell Williams a fair trial?

A No, I would not.

MR. WIENER: Okay, thank you. If the State did not prove Cordell Williams guilty by a reasonable doubt would any of you have any difficulty finding him not guilty?

PROSPECTIVE JURORS: (No verbal response.)

WARREN SCHLATTER,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q I ask that to you, Mr. Schlatter, would you have any difficulty finding Cordell Williams not guilty?

A No.

Q You served on a murder jury before?

A That's correct.

Q That was about ten years ago over at 13th and Michigan?

A That's correct.

Q You know the facts of that case clearly are going to be completely different from the facts of this case?

A (Nodding.)

Q And I'm sure you reached a verdict in that case, as you said you did. But as you look at Cordell Williams here today can you say look, this is a guy that I've never seen before and I presume him innocent of these charges and if they don't prove him guilty beyond a reasonable doubt I will find him not guilty?

A     Yes.
Q     Any problem at all were that?
A     No.

TINA PIPPEN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q     Miss Pippen, you were on a prior rape jury and about what five other juries in the last five or six years?
A     Yes.
Q     That's a lot of juries?
A     And how, it is.  I think so.
Q     I agree, and as counsel said there are not going to be a lot of things to decide here.  It's just going to be is he guilty or is he innocent.  Now it's really important for me to know that getting that issue out of the way, getting the issue that there aren't going to be four hundred things for you to decide if somebody is innocent or guilty, if you can look at this young man and say right now I presume him to be innocent?
A     Because I don't even know him.

Q Well but the judge says everybody that is charged is presumed innocent of the charge?

A Right.

Q Can you look at Cordell Williams right now and disregard the charges against him and say I presume him innocent?

A Yeah. Because I have no idea what he's about.

15

Q Do any of you want to tell me something that you might not have been asked by counsel that can cause you to be either one way or another unable to give either Cordell Williams or the State a fair trial in this case? I wish you would tell me now because as I said before it's obviously important, not to the State, but to this young man.

So does anybody have anything to say that might impact on you being a juror here in the next week?

PROSPECTIVE JURORS: (No verbal response.)

MR. WIENER: Okay. Well I want to thank you all for listening to me and see you later.

THE COURT: All right. Liz, will you take the ladies and gentlemen back to the jury room, and then ladies and gentlemen in the outer court you can stand

up, go out into the outer corridor. We're going to continue on with the jury selection process.

(Whereupon, the following discussion was had out of the presence and hearing of the jury:)

THE COURT: All right. The State is excusing Mr. Richard Franch, F-r-a-n-c-h.

MS. MORASK: We are going to ask for cause on Wanda Epps. She said she could not be fair.

THE COURT: Any objections?

MR. WIENER: No.

THE COURT: All right. She will be excused for cause. Wanda E-p-p-s.

MS. MORASK: We are going to ask for cause on Willie Beal. He has a rap sheet which my partner is bringing in here.

MR. WIENER: Also he says he's a party to a civil lawsuit. Is that still grounds for excusing for cause?

THE COURT: Right.

MR. WIENER: So why bring his rap sheet?

MS. MORASK: Okay.

THE COURT: So it's a mutual motion for cause.

MR. WIENER: That's fine. I thought he was a

State juror. As far as I'm concerned.

THE COURT: Willie Beal, B-e-a-l.

MS. MORASK: I'm going to ask for cause on Michael Ellul. Bad attitude.

MR. WIENER: I object to cause.

THE COURT: Denied.

MR. WIENER: They're going to have to use a peremptory on that.

THE COURT: Yes. The State is using their second peremptory on Michael Ell --I'm sorry. E-l-c-u-l? We'll just dismiss him. There's no objection. The guy who can't speak English.

MS. MORASK: Delores Kelsey.

THE COURT: It's K-e-l-s-e-y. She said that because of her religious scruples could not find anybody guilty. Over the defense's objection the motion for cause will be sustained.

MS. MORASK: We accept the first panel.

MR. WIENER: Judge, I'm going to first of all move for cause on Mr. Roussi, who said that --

MS. MORASK: Just these four.

MR. WIENER: I'm going to move for peremptory on Mr. Duffin and on Mr. Schlatter.

THE COURT: All right. The defense has used their

peremptories on Mr. Brian McDuffin, M-c-D-u-f-f-i-n.

MR. WIENER: And Warren. S-c-h-a-t-e-r, first name Warren.

MR. WIENER: I'm moving for cause on Roussi. He said he had been stabbed three times and he said he couldn't concentrate and he couldn't render a fair verdict and I'm going to move for cause.

MR. SEXTON: Judge, we're not objecting.

THE COURT: Mutual motion for cause will be sustained as to both parties. His name is spelled R-o-u-s-s-i.

THE COURT: Mutual motion for cause as to Doris Selent, S-e-l-e-n-t.

MR. WIENER: For the rest of these things now that would be Mr. Kerner, Constantine Alexakos, Tina Pippen and Sue Schultz. Sue Schultz said she can't follow the law. She doesn't think it's fair. I'm moving for cause on Sue Schultz. Doesn't think accountability is fair.

MR. SEXTON: Mutual.

THE COURT: Mutual motion to excuse for cause will be sustained.

MR. WIENER: We have no objection to Kerner, Leo, K-e-r-n-e-r, L-e-o. Tina, Pippen, P-i-p-p-e-n. We

have no objection to these three.

(The following proceedings were had in the presence and hearing of the jury:)

THE COURT: Any seat that's available take it please. All right, thank you ladies and gentlemen. Robin.

THE CLERK: The following jurors have been excused. Sue Schultz. Doris Selent. A. Roussi. Brian McDuffin. Warren Schlatter. Delores Kelsey. Michael Ellul. Willie Beal. Wanda Epps. Richard Franch. Picolo Kazmiers (phonetic spelling).

THE COURT: That's the one they didn't talk to.

THE CLERK: Kris Kringle. How do you pronouce it?

A Kringle.

THE COURT: First name?

A Kris. I didn't recognize you without your sleigh. Zbigniew Gasior. Ulrich Gruns. Susan Mackey. Edwin Thibodeaux. Martha Valdez. Laurie Wills. Brian Chestleigh. Helene Greenwald. Thomas Habin. Hugo Christensen.

THE COURT: All right, ladies and gentlemen in the outer courtroom, what we're going to do now is break for lunch so I'd like you back here at about 2:15.

16

Come directly to room 202. Thank you very much.

Ladies and gentlemen, you're going to have lunch on the county. Liz, could you take the prospective jurors to the jury room. Prepare them for lunch and I want all the sheriffs out here. I want to talk to them.

(Lunch recess was taken.)

MR. WIENER: Judge, may the record reflect that the defendant is seated at counsel table.

THE COURT: Okay. Thank you.

MR. WIENER: And that a new face has appeared in the courtroom.

THE COURT: Ladies and gentlemen, at this time I would like to introduce Mr. Michael Smith. He's an assistant state's attorney.

MR. SMITH: Good afternoon, folks.

THE COURT: As I informed you, he was on a trial in a different courtroom and he's completed that matter and he has joined us at this time and he will be present throughout the case. All right. Mr. Wiener.

MR. WIENER: Thank you so very much.


SOTOS-WILLIAMS 11237

KRIS KRINGLE,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

First of all, Mr. Kringle, I want you to know that although I laughed when the judge said that, I share an affinity with you because about 15 years ago I appeared before a judge and she asked me -- in this building and she asked me to state my name for the record, and I said David Wiener and she laughed for about 15 minutes and everybody in the courtroom laughed, so believe me I would give my left arm to be Kris Kringle.

Q But getting on to the business at hand, Mr. Kringle, I see that you live in Orland Park?
A Yes.
Q And you've lived there for how long?
A In Orland Park about a year now.
Q And before that where did you live?
A I lived in Tinley Park in a home for about 23 years.
Q And you are married?
A Yes.

Q And your wife is also working, right?
A Yes.
Q And she's an accounting clerk?
A Yes.
Q And you are an electrician?
A Yes.
Q And you have two grown children?
A Yes.
Q What do they do for a living?
A Right now my son is at Southern Illinois University and my daughter is employed at Walgreen's in Orland.
Q What's your son studying in Southern Illinois?
A Well his goals is to be a chiropractor.
Q That's a good goal, especially when guys like you and I are over 50. I notice that on the back of your card you said that you've never been an accused, a complainant or a witness in a criminal case?
A No.
Q That you've never been the victim of a crime?
A Small things.
Q Such as?
A Long time ago I had my -- I didn't lock my

car and I was at a fast food place and came out and two guys was sitting in my car. I told him to get out and they were shuffling through my glove box. I told him to get out they left, took the license plate number, called the police and the police took care of the matter.

Q And beyond that I take it that there are no more serious matters in your background?

A No.

Q Has any member of your family or close friends been a victim of a crime? You also said no to that matter?

A Yeah.

Q Are you a party or have you been a party to a civil lawsuit?

A One thing that happens at my house one time and we had a house guest and this other person who was a friend of my son's came over and they had an argument. Well anyway this girl had a seizure on my back porch. Well then she went back and got a hold of a lawyer and she tried to sue us since she was on our property, but our insurance company took care of the matter and I guess she got some hospital payments out of it but that was all. Never went to court.

Q Wow, what do you think of those lawyers? You state here also that no member of your immediate family or a close friend is either a police officer, state's attorney or public defender or lawyer or judge, is that right?

A That's correct.

Q Okay. I want you to look at this young man, Cordell Williams, and I want you to tell me if you can presume him innocent as the judge has told you you must of anything he's charged with in this case?

A Yes, I could.

Q And will you make the State prove Cordell Williams guilty of anything beyond a reasonable doubt?

A Yes.

Q And in fact if you have a reasonable doubt would you have any difficulty in finding Cordell Williams innocent of the charges?

A No.

Q I know that we all watch T.V. and we've all seen the Simpson trial on T.V. and we know that Mr. Simpson is charged with --

THE COURT: All right, I'm sorry. I just don't want any references to Simpson. This trial is not going to be anything like that. It won't take as long

17

as that. So I just don't want it in the record.

MR. WIENER: Okay.

Q We're going to have a trial that's lasting pretty much to Wednesday or Thursday of next week. Any problem with that?

A I don't have a problem but my work probably would.

Q Meaning what?

A Meaning that a lot of vacation is going on right now and they need people as one or two guys go on vacation they look for another guys to taking your place.

Q So would it be a hardship for you to serve on this jury?

A No.

THE COURT: Mr. Kringle, the other thing is, I'm going to point this out, is if someone has an emergency or a hospitalization or something like that we certainly would excuse you, but your employer can't put any pressure on you or any employers can't. Not while I'm a judge, so I'm sure they'll do their lawful duty as a citizen of this country to accommodate you or anyone else in here. So I just want to make that clear.

BY MR. WIENER:

Q Mr. Kringle, is there anything in your background or anything that is going on in your life that would cause you to not either give the State or Cordell Williams a fair trial?

A No.

Q I know no matter how much we joke about our names in the beginning you know how serious a case this is and if you were seated on this jury would you follow the judge's instructions, follow the law and treat it as seriously as you know it must be to both the State and to Cordell Williams?

A Yes.

MR. WIENER: Thank you.

ZBIGNEW GASIOR,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Mr. Gasior. Mr. Gasior, you live in Chicago?

A Yes.

Q And you are married?

A Right.

Q How long have you lived at your current

address?

A Five years.

Q And you work as a loader?

A Right.

Q And at Joseph Ryerson?

A Right.

Q So you are pretty much lifting stuff a lot?

A Yeah.

Q That's problem good for you in terms of keeping in shape?

A Yes.

Q Your wife is also employed?

A Right.

Q You have two very small children?

A Right.

Q So we don't need to know what they're doing. You also wrote on the back of your jury form that you have never served on a jury?

A No.

Q That you don't know any police officers, public defender, state's attorney, lawyers or judges?

A No.

Q That you have never been an accused, a complainant or a witness in a criminal case?

A No.

Q You haven't been victim of a crime?

A No.

Q Not involved in an accident?

A No.

Q I want you to look at my client, Cordell Williams. Do you have any difficulty right now looking at him and presuming him innocent of the charges against him?

A No.

Q Are you saying that because you know I want to hear it or is that the way you really feel?

A That's how I feel.

Q Mr. Gasior, do you think that somebody who is brought to trial and is accused of a crime necessarily or is in fact probably guilty of a crime?

A Not necessarily.

Q Do you understand that under our system of law and our Constitution that a person is presumed innocent of the charges against him?

A Yes.

Q And do you agree with that concept?

A Yes.

Q Is there anything either in your background

or your current status that would cause you to not give either the State or Cordell Williams a fair trial here?

A No.

ULRICH GRUNS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q First name U-l-r-i-c-h, last name G-r-u-n-s, is that correct?

A Correct.

Q Mr. Gruns, you live in Palos Hills?

A Correct.

Q And you are married?

A Yes.

Q And your wife is a -- stays at home. She is unemployed, is that correct?

A Right now, yes.

Q Working at a more serious job?

A Yes.

Q How long in Palos Hills?

A Ten years.

Q And you are a machinist and an inspector?

A I'm a machinist programmer.
Q And what is that exactly?
A I program and set up robotic machinery.
Q And so you're in the high tech world?
A Right.
Q You passed all of us back at 26th Street and you're doing stuff that is sort of into the 21st Century?
A Right.
Q And you own your own home?
A Yes, I do.
Q And you've never served on a jury before?
A No.
Q And is it also true that you have no close friends or relatives that are police officers, state's attorneys, public defenders, lawyers and judges?
A Right.
Q Now it says here that you have been a party to a lawsuit, is that right?
A Yes.
Q Is that lawsuit now pending in the Circuit Court of Cook County?
A No.
Q So there's nothing going on there?

A No.

Q Do you have any difficulty with the concept and in fact one of basic tenets of the law that a person is presumed innocent of the charges against him?

A No, I have no problem with that.

Q As you look at Cordell Williams today do you have any difficulty presuming him innocent of the charges against him?

A No. No.

Q If the State does not prove Cordell guilty beyond a reasonable doubt can you go back there and say he's not guilty?

A Yes, I could say that.

Q Is there anything in your background or anything currently going on in your life that would cause you to either not give the State or Cordell Williams a fair trial?

A No.

MR. WIENER: Thank you.

SUSAN MACKEY,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Susan Mackey?
A Yes.
Q Good afternoon?
A Hi.
Q Susan, you are single?
A Yes.
Q And you live in Northlake?
A Yes.
Q And how long have you lived there?
A 30 years.
Q And you work for the Lake Brook Manufacturing Company?
A Yes.
Q Call people up and say where is the money?
A No, I actually invoice them. I don't have to talk with them.
Q You don't dun people?
A No.
Q That's good. And you have never served on a jury?
A No.
Q And you don't have any close friends that are

18

police officers, state's attorneys, public defenders, lawyers or judges?

A None.

Q But you have been the victim of a crime?

A Yes.

Q Exactly what type of crime is that?

A When I worked as a cashier, armed robbery.

Q When was that?

A Like twelve years ago.

Q And you worked cashier at what, a restaurant?

A A convenience store.

Q Were you injured?

A No.

Q And was the person caught?

A I don't believe so.

Q So you never had to go to court?

A No.

Q Are you angry that the person wasn't caught?

A Not at all. I forgot about it, actually.

Q And what other crimes have you been a victim of, if in fact there are any?

A A hit and run which I sued the person for damages to my car after we got him.

Q You got your money?

A Yes.
Q Good. Good. And you said that a member of your immediate family or close friend has been the victim of a crime?
A My brother owns a store and he was robbed.
Q Anything about that case that would cause you to not give --
A No. That's his business and his family.
Q It says here that you have been a party of a lawsuit. Is that the lawsuit you talked about?
A Hit and run.
Q Is that over with now?
A Yes. At least ten years.
Q And as you look at Cordell Williams today do you presume him to be innocent?
A Today he is innocent.
Q And if the State didn't prove him guilty beyond a reasonable doubt would you have any difficulty finding him not guilty?
A Not at all.
MR. WIENER: Okay, thank you very much.

EDWIN THIBODEAUX,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Edwin Thibodeaux, T-h-i-b-o-d-e-a-u-x, is that correct?
A That's correct.
Q And Mr. Thibodeaux, you live in Chicago?
A Yes.
Q How long have you lived at your current address?
A 28 years.
Q And you are retired?
A That's right.
Q And you are married?
A That's right, sir.
Q And it says here that you know some lawyers?
A Yes, I have a relative that's a lawyer. A distant relative.
Q A distant relative?
A Well he's my sister-in-law's husband.
Q Now how far is he in terms of miles away. Is he somebody you see?

A He's close, yeah.
Q Do you see him often?
A Oh, yes.
Q What kind of law does he practice?
A Divorce, business. Several categories.
Q Does he ever practice criminal law?
A I don't recall him being in the criminal case.
Q Have you ever talked about a criminal case with him?
A No.
Q In terms of his practice. Okay. You don't know any police officers?
A We'll yes, but some of them is retired.
Q So you have some friends who are police officers?
A Used to. They're retired.
Q You don't see them very much anymore?
A No.
Q Were they Chicago police officers?
A Yes, sir.
Q And when was the last time that you saw one of your close friends who were retired police officers?

A Oh, many years ago. Twenty years ago, I imagine. 15.
Q You said you were retired. What kind of work did you do?
A I was an a cartographer.
Q A cartographer?
A Yes.
Q You made maps?
A Maps and sort of like a draftsman. Worked on the existing street areas.
Q And did you work for the same --
A Chicago -- City Hall. Department of Planning and Development.
Q You must have a tremendous pension now. You must be very happy?
A Well yeah, I have a pension, but I don't know how tremendous it is.
Q Other than that do you know any state's attorneys or public defenders or judges?
A Just one. He's deceased. He was a state's attorney.
Q Good friend of yours?
A Well I knew him.
Q Says here that you've never been a party to

any lawsuit?
A No.
Q And it says here that you are -- have been a victim of a crime or somebody in your family has been a victim of a crime?
A Yes.
Q What kind of crime was that?
A Well one of them was small. That was a house burglarized. And the other one was my granddaughter was raped.
Q When was that, sir?
A Sometime in March.
Q Of this year?
A Yeah.
Q And has the person been caught?
A Yes.
Q And is that person now being prosecuted?
A Yes.
Q In Cook County?
A Yes.
Q And that case is pending, I take it, is that correct?
A Yes. She's usually going in treatment.
Q Is there anything about that case or anything

else in your background or currently in your life that would cause you not to be able to give either the State or Mr. Williams a fair trial?

A No.

Q You feel you can give both sides a fair trial?

A Yes.

Q Do you feel that if the State does not prove Mr. Williams guilty of anything that you can find him not guilty, find him innocent of the charges?

A He's proven not guilty, yes.

Q Will you make the State prove their case beyond a reasonable doubt?

A Yes.

MR. WIENER: Thank you, sir.

MARTHA VALDEZ,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Martha Valdez?

A Yes.

Q Good afternoon.

A Good afternoon.

19

Q Martha, you live in Chicago?
A Yes, I do.
Q And how long have you lived in Chicago?
A For about three and a half years.
Q And where did you live before that?
A I'm sorry. At the address. At three and a half year.
Q Three and a half years at the same address, but you lived in Chicago pretty much your entire life?
A Yes.
Q And you are a teacher assistant?
A I am.
Q And you work for the Board of Education?
A Yes.
Q And you are married?
A Uh-huh.
Q Your husband is a truck driver?
A Uh-huh.
Q You have three children?
A Yes.
Q Who is taking care of those children?
A At this time my mother.
Q And your children are five months of age, one and a half and two and a half years of age?

A Correct.
Q Is that going to be a problem in terms of being here next week, having three small children?
A I tell you my five months old has been pretty sick and she has high fevers, and they think it might be to her kidneys and I've been taking her in and out of the hospital.
Q So you believe it would be a hardship to serve?
A I believe so.
Q My next question to you is you also say here on the jury information form that you have some either relatives or close friends who are police officers?
A Yes. There are friends. There are about five friends. One of them is very close.
Q Are they Chicago police officers?
A Yes.
Q And do you know the real close friend, where does that close friend work out of, if you know?
A He works -- I'm not sure. Over by 18th and Damen.
Q And how often do you get together with him?
A Every time there's special events, birthday or something like that.

Q Now you know, I know one thing over my lifetime and that is that police officers and lawyers like to talk about things and they're doing it all the time. Do you often talk to him about cases and things that he's on?

A Yes.

Q He talks to you a lot about those things?

A Yes.

Q Would that cause you to give a police officer's testimony on the witness stand any special weight because you have good and close friends that are police officers?

A No.

Q As you look at Cordell Williams here in the courtroom today can you presume him to be innocent?

A Yes.

Q Do you know that, as the judge said, that that indictment which he read the charges is just a piece of paper that brings Cordell before you as a member of the jury?

A Yes.

Q And it's not evidence of guilt in any way?

A Correct.

Q Is there anything in your background or

currently going on in your life that would cause you not to give the State or Cordell Williams a fair trial?

A Basically just my child is sick. That's all.

MR. WIENER: We will address that. Thank you very much. Miss Wills.

LAURIE WILLS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Miss Wills, you are single and you live in Garden Homes, Illinois.

A Yes, sir.

Q Where is Garden Homes, Illinois?

A It's right across the street from Chicago over by Blue Island and Alsip. It's unincorporated.

Q And how long have you lived in Garden Homes?

A Nineteen years. I live with my parents.

Q So it's been there a while?

A Yes.

Q And you are a day care worker?

A Yes.

Q And you rent at this moment in your life,

right?

A Yes.

Q And you've never served on a jury and it says here you don't have any friends or relatives who are police officers, state's attorneys, public defenders, lawyers or judges and everything else is marked no?

A Boy, that makes it a lot easier. Have any of the questions that I've asked any of the other potential jurors caused you to remember something that you want to tell me?

A No.

Q As you look at Cordell Williams sitting in the courtroom today do you have any difficulty presuming him innocent of the charges?

A No.

Q Do you have any difficulty with the concept that he is going to be innocent unless the State proves him guilty beyond a reasonable doubt?

A No.

Q The State could not prove him guilty beyond a reasonable doubt would you have any trouble finding him -- rendering a verdict of not guilty?

A No.

Q Is there anything in your background or

currently going on in your life that in fact would cause you not to be able to give either the State or Cordell Williams a fair trial?

A No.

MR. WIENER: Thank you.

BRIAN CHESTLEIGH,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Brian Chestleigh. Good afternoon, Brian, and you are living in Chicago?

A Correct.

Q And you lived in Chicago how long, sir?

A 23 years.

Q Sort of like your entire life, right?

A Right.

Q And you are an airline caterer?

A Right.

Q Can you do me a favor and improve that food a little bit?

A I don't actually prepare the food. I just put it on the planes.

Q Okay. When I tell my wife that you're not

20

responsible she'll feel a lot better about it. What airlines do you cater?

A United.

Q Over at O'Hare?

A Right.

Q How long have you had that job?

A About nine months now.

Q And it says here that you have never served on a jury but you do have a close friend or a relative who is a police officer?

A Right.

Q Who would that be?

A My father.

Q Your father is a police officer?

A Correct.

Q Is he a Chicago police officer?

A Yeah. Cook County, yes.

Q He works for Chicago or the Cook County sheriff?

A Cook County sheriff.

Q And as a Cook County sheriff does he work as a police officer or does he work in the corrections department?

A Corrections.

Q So is he over here at the jail?
A Right.
Q So the fact that your father is a Cook County correctional officer would that in any way cause you to not be able to give either the State or Cordell Williams a fair trial?
A No. That wouldn't.
Q I notice by the way you are answering that something might cause you not to be able to give either the State or Cordell Williams a fair trial. What would that be?
A I really just don't believe in the justice system too much, you know. As far as this case goes, you know, it's happened to me before. Not of that magnitude but sometimes you in the wrong place at the wrong time you might get blamed for something.
Q First of all tell us -- You've been the victim of a crime obviously?
A Well not of that magnitude.
Q What kind of of a crime?
A Something minor. Minor things. I have had my apartment broken into before.
Q But as you look at Cordell Williams you feel that the justice system doesn't work so you feel that

somehow you can't give him a fair trial, is that what you're saying?

A I'm not saying I wouldn't be able to give him a fair trial. I just don't think he would be able to get a fair trial period. That's the way I feel.

Q I see. I hate to do this, but could you tell me a little bit more about why you feel that way?

A Like I said, I just don't trust the justice system. You know. Being the wrong place -- You know, you fit the description. You know. It doesn't even matter. It's been plenty of times I've been pulled over for anything. Doesn't even matter. You can come from a store, anything. I just don't believe in it.

MR. WIENER: Okay Mr. Chestleigh. I thank you very much.

HELENE GREENWALD,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q And we'll go on to somebody I'm sure that believes in the system and that would be Helene Greenwald?

A Yes.

Q Helene Greenwald is an assistant United States attorney?

A That's correct.

Q She can probably talk about the system.

MR. CHESSLEY: Please do.

BY MR. WIENER:

Q You know of course many FBI agents?

A Yes.

Q Many D.E.A. agents?

A Yes.

Q And many other people who served as protectors of our safety in the peace of our society. And I'm wondering if you in fact know and would know that in this case there are going to be about twenty or 30 police officers testifying, and I want to ask you if in fact you as a prosecutor, as an assistant U.S. attorney could be fair, could you hear that testimony without -- and I know how prosecutors prepare their case, without saying to yourself well the guy must be telling the truth because he's a police officer?

A I believe so. I've thought about that. I really have, and I think or I know so mainly because,

one, I know that to be the law and I would follow the law. And two, it's something I guess I do anyways in my own job because I do have to evaluate. I don't just believe everything that comes across my desk, so I believe yes, I would follow the law and treat officers the same way I would treat any witness and evaluate their testimony.

Q Now in your job as an assistant U.S. attorney you say a case comes across your desk and let's say a couple of D.E.A. agents have made an investigation and you have some sort of approval authority before you, I guess before it goes up to somebody else, right?

A Uh-huh.

Q And have you in fact as an assistant U.S. attorney disapproved charges that came across your desk?

A Because I didn't think that we could prove the case or there was insufficient evidence?

Q Or because for example you disbelieved the reports by a police officer. Have you ever done that?

THE COURT: If you consider that work product you don't have to answer that.

A Well I guess actually in answering that question to be honest, and I don't know if he wants

side bars in this kind of situation.

THE COURT: Not at all. Everybody is interested.

A I guess what my answer to it would be that I haven't not charged a case because of that. However I handle civil rights cases from my office, as well, and I have prosecuted police officers. So and in one of those cases that I tried last year and the public there was a false report written so --

BY MR. WIENER:

Q So you know police officers are human and can do what anybody else in our society can do, either be good or bad, truthful or not truthful?

A Yes.

Q I don't want to put words in your mouth. You're an assistant U.S. attorney. Your husband is a lawyer?

A He is.

Q And he works for the very prestigious firm of Mayer, Brown and Platt?

A Yes.

Q What type of work does he do?

A It's strictly civil. He's an appellate lawyer.

Q And you live in Chicago. And have no

children and obviously you've never served on a jury before?

A Right.

Q I don't know why I say obviously. It says here that you have been a party to a lawsuit?

A I currently am.

Q Is that in the Cook County system?

A It's in federal court.

Q And is that a lawsuit of a civil nature?

A It is.

Q And is there anything about that lawsuit that would cause you not to be able to be fair in this particular case?

A No.

Q And as you look at Cordell William I'm sure you have no difficulty presuming him innocent?

A I do not.

Q And you have no difficulty with the concept that he is innocent unless he's proved guilty beyond a reasonable doubt?

A Absolutely.

Q And you have no difficulty with telling me that at the end of the case that if the State has not proved him guilty beyond a reasonable doubt you will

vote not guilty?
A Absolutely.
MR. WIENER: Thank you very much.

THOMAS HABIN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Thomas Habin, H-a-b-i-n. Good afternoon sir.
Q Mr. Habin, you live in Des Plaines?
A Yes.
Q And you are a mechanic for Fleena Enterprise (phonetic spelling)?
A Yes.
Q What is Fleena Enterprise?
A They make office supplies for like time clocks and slots for paper that you put in your files.
Q So you're pretty busy, I take it?
A I got good days and bad days.
Q Don't we all. And how long have you worked there?
A I'll be going on there for twelve years.
Q And you have two children and their ages are 37 and 34. And could you tell us what they do for a

living?

A Well one is a nurse and one is management.

Q And the one who is in management, in what field of life is that person in management? Is he or she a manager for a hospital or --

A On Wacker Drive there for the Kendry building over there. She's in charge of the shows and all that. She's in charge like the whole room and everything.

Q Pretty nice. Says here that you don't have any close friends or relatives who are police officers, state's attorneys, public defenders, lawyers or judges?

A No.

Q And that you have been a party to a lawsuit, am I correct?

A Yes.

Q And you've been involved in an accident where a person was injured?

A Yes.

Q Is that lawsuit still pending?

A No, it's over.

Q Was that a lawsuit in Cook County here?

A Yes.

Q And you were a party to it?
A Yes.
Q And is there anything about that lawsuit cause you to have any misgivings about being a juror in this particular case?
A No.
Q Is there anything about serving into the latter part of next week which would cause you a hardship?
A No.
Q As you look at Cordell Williams do you have any difficulty presuming him innocent of these charges?
A I guess so.
Q When you say you guess so does that mean you guess that you have difficulty presuming him to be innocent or tell me what you mean?
A Well he's got a pretty long list against him. It's not just one thing against him but there's many things against him.
Q You mean the charges against him?
A Yes.
Q So you assume because he's charged with a crime that he's probably guilty?

A No, I'm not saying that he's guilty.
Q But you have difficulty presuming him to be innocent?
A Well I'm trying to be fair and honest myself.
Q Absolutely. I know you are.
A Say like if he did some one thing wrong, okay, but if there's various things wrong with him, so I mean there's a lot against him.

THE COURT: Sir, let me explain something, and this applies to everybody in the outer court there. Mr. Williams is charged in an indictment and that's a formal method of bringing him to trial. As I told you before, and I just want to reiterate it for everybody to hear, that is not any inference of guilt, it's not any evidence of guilt. All it is is a formal method of bringing Mr. Williams to trial.

As Mr. Williams sits there our state Constitution and the Constitution of our United States says that he is presumed innocent. If we just stop right now and I ask for a jury verdict because no evidence will be presented he is presumed to be innocent everybody would be duty bound to find him not guilty. And that's the way our law is and that's the way our Constitution is. Do you have any problems

with that?

A No I don't have no problems.

THE COURT: Good. And everybody, the prosecution, myself and the defense appreciates honest answers.

MR. WIENER: Absolutely.

A The thing is there are going to be a lot of witnesses to this trial. This will be a pretty long trial.

THE COURT: As we said, Wednesday or Thursday is Wednesday or Thursday, and it will end by then. Now do you have any -- as you sit there now as I brought the law up to date can you give Mr. Cordell Williams a fair trial?

A I don't think so, to be honest.

THE COURT: Appreciate that. Thank you.

A It would be on my mind.

THE COURT: Honest answers are the best answers.

A You know, I'm sorry.

THE COURT: Don't be sorry for it. God love you. You're telling the truth.

MR. WIENER: Thanks for telling the truth.

A You're welcome.

2

HUGO CHRISTENSEN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Mr. Christensen, sir you live in Park Ridge?
A Yes.
Q And you are single?
A Yes.
Q You are retired. You are a teacher or were a teacher?
A Yes.
Q Where did you teach?
A I taught in Chicago.
Q And where in Chicago?
A In Park Ridge High School.
Q And what subjects did you teach?
A History, social studies.
Q And so you are very involved in civics and government and have a fairly good understanding of the workings of government?
A I hope so.
Q I'm sure you do. How long did you stay -- How long have you lived in Park Ridge?

A 29 years.

Q And it says here you've never served on a jury?

A No.

Q And it says here also that you have no friend or close friend or immediate family members who are police officers, state's attorneys, public defenders, lawyers or judges, is that true?

A Well I had an uncle who was a policeman in Sweden 50 years ago.

Q I'm going to mark that box. No. Were you born in Sweden, sir?

A Yes.

Q I take it that when you were born in Sweden criminal justice system there was -- didn't have to work too hard, right?

A Different.

Q Different. Okay. Says here that you have been the party to a lawsuit?

A Yes.

Q What kind of a lawsuit is that?

A Small claims.

Q Is that still pending?

A No.

Q Is there anything at all about your background or about what's happening in your life right now that would cause you not to be able to give the State or Cordell Williams a fair trial?

A No.

Q As you look at Cordell William right now can you presume him to be innocent?

A Yes.

Q Will you presume him to be innocent throughout the entire trial until you go into that jury room?

A Yes, sir.

Q And will you make the State prove him guilty beyond a reasonable doubt?

A Yes.

Q And if they don't prove him guilty beyond a reasonable doubt will you find him not guilty?

A Yes.

MR. WIENER: Thank you, sir. Thank you very much.

EXAMINATION

BY MS. MORASK:

Mr. Kringle, do you remember the question I was asking everybody earlier about when two people commit a crime together and each person has a specific

job to do that both people are responsible for the entire crime. Do you have any problem with that law, with following that law?

A No.

Q You would be able to follow that law?

A Yes.

Q And if we, the people of the state of Illinois, prove to you beyond a reasonable doubt that Cordell Williams was guilty of first degree murder would you have any scruples, moral, religious or any scruples whatsoever about returning a guilty verdict?

A If you could prove it.

Q And then you would be able to return a guilty verdict?

A Yeah.

Q And do you have any -- I'm sorry. I think I already asked you, you don't have a problem next week sitting on this jury other than work?

A Right.

MS. MORASK: Which I know is very important. Mr. Gruns, the same question that I've been asking everybody else about the law of responsibility, when two people commit a crime together. Do you have any problem with that concept?

A No, I don't.

Q Will you be able to follow that?

A Yes.

Q And would you likewise be able to if we proved beyond a reasonable doubt that the evidence and the law that Judge Gaughan will instruct you on we proved Mr. Williams guilty of first degree murder do you have any scruples of any nature that would prevent you from returning a verdict of guilty?

A No.

Q Mr. Thibodeaux. I'm sorry. I apologize.

THE COURT: Sir, what nationality is that? Franch?

A Well I'm from New Orleans, Louisiana.

THE COURT: I thought so.

A And my mother was Creole.

BY MS. MORASK:

Q You said that your niece I believe had a case pending in -- It was a victim of a crime?

A It was yeah.

Q And --

A Not niece. Granddaughter.

Q And that case is still going on?

A No.

Q It's over?
A The case is over and the person is convicted but she still goes and have treatment.
Q Did the person go to jail?
A Yes. He's gone to jail.
Q Did you go to court?
A No, I didn't.
Q Your family members do?
A My son did.
Q Can you tell me whether or not they were satisfied with the work of the police and the prosecutors in the case?
A I think he was.
Q And the same question that I've been asking everybody else, do you understand and would be able to follow the law that when two people commit a crime together no matter what part they play, if they help each other commit the crime they're both responsible for the crime?
A Yeah.
Q Could you follow that law?
A I think I can.
Q And if we showed you beyond a reasonable doubt that Mr. Williams is guilty of first degree

murder would you have any problem whatsoever returning a guilty verdict?

A Unless proven innocent.

Q So you would be able to return a guilty verdict?

A Yeah.

THE COURT: All right. Mr. Thibodeaux, do you understand that our law and our Constitution says that Mr. Williams does not have to prove his innocence.

A He doesn't have to prove he's innocent.

THE COURT: Right. He's presumed innocent. He doesn't have to -- He could rely on the presumption of innocence. Do you understand that?

A No.

THE COURT: Do you understand -- you work for the city so you should know the laws that you work for and these are the laws of our state, our city and of the Constitution of the United States. Can you follow the law as I will give it to you?

A I think I can.

THE COURT: Okay. I will give you the law that Mr. Williams is presumed to be innocent. Can you abide by that. Do you have --

A He's presumed to be innocent?

3

THE COURT: Exactly. Presumed to be innocent.

A Yes. I follow that.

THE COURT: This is not a Napoleonic code.

A Unless proven guilty.

THE COURT: No, no. He's presumed to be innocent and then if the State proves him guilty beyond a reasonable doubt then it would be your duty to sign a guilty verdict. Do you understand that?

A Yes, sir.

THE COURT: Do you have any qualms about that?

A No, sir.

THE COURT: Do you have any qualms about the fact that Mr. Williams does not have to prove his innocence and that is the law of the land also?

A I don't know -- Well I'm kind of mixed up on that.

THE COURT: I just want you to think about it. Again there's no bad answers. Okay?

A Okay.

THE COURT: And what both sides want is frank, complete answers so that they can make sure that both sides get fair trials. Okay?

A Yes, sir.

THE COURT: Now let's run by this once more. Our

Constitution both at the state level and the United States level says that Mr. Williams does not have to present any evidence on his own behalf. Do you understand that?

A Yes.

THE COURT: Can you live with that as you sit there as a juror?

A Well --

THE COURT: Remember there's no --

A That's a tough cookie to crumble.

THE COURT: There's no bad answer.

A So give me that again, Judge.

THE COURT: Both our Constitutions, both at the state and the United States Constitution says that Mr. Williams does not have to prove he is innocent. Do you understand that?

A Yes.

THE COURT: And he does not have to present any evidence. Do you understand that also?

A Yes.

THE COURT: You can't hold that against him?

A Yes.

THE COURT: Can you live with that?

A Well I guess I'll have to.

THE COURT: Fine. Once you take the oath as a juror would you abide by the law as I give it to you?

A Yes, sir.

THE COURT: And you would not use your conception of what the law would be, is that correct?

A Yes, sir.

THE COURT: And as you sit there right now can you give Mr. Williams a fair trial?

A Yes, sir.

THE COURT: Thank you very much. I'm sorry, State. Go ahead.

MS. MORASK: Thank you. Thank you, sir.

A You're welcome.

MS. MORASK: Mr. Gasior, sir, would you be able to follow the law that I've explained to everybody else that when two or more people commit a crime that they're equally responsible.

A Yes.

Q And if we prove to you beyond a reasonable doubt that Mr. Williams is guilty of first degree murder would you have any problem signing a guilty verdict?

A No.

Q And do you have -- Do you belong to any

associations or clubs or any hobbies?
A No.
Q And do you have any problems coming up the next week that would render you --
A No. Only on vacation next week.
Q Is it a vacation that you've already bought and paid for?
A No, no. Just from work.
THE COURT: When would your vacation start?
A Monday. There's no problem.
MS. MORASK: Thank you, sir. Laurie Wills. The same question that I was asking everybody else. Do you understand that law and would you have any problem in following the law of responsibility?
A No.
Q And similarly, if the People proved that this defendant was guilty beyond a reasonable doubt of first degree murder do you have any scruples, whatever kind they are, religious, moral or anything in returning a verdict of guilty?
A No.
Q And do you belong to any associations or have any hobbies or anything that you like to read particularly?

A No.

MS. MORASK: Thank you. Martha Valdez. Same thing that I've been asking. Do you have any problem with that law?

A No.

Q You would be able to follow the law?

A Yes.

Q And would you be able to sign a guilty verdict if we were able to prove to you that the defendant was guilty of first degree murder beyond a reasonable doubt?

A Yes.

MS. MORASK: Mr. Christensen?

A Yes.

Q The question that I've been asking everybody about when two people commit a crime together and each person is equally responsible for the whole crime that they help each other out no matter what part they play, would you be able to follow that law?

A Yes.

Q And if we, the State, proved the defendant guilty of first degree murder would you have any problem or any scruples in signing a verdict of guilty?

A If it involves the death penalty I would not sign it.

MS. MORASK: Well this is --

THE COURT: Let me explain that. The death penalty is not involved in this case. Everybody in the outer courtroom and inner courtroom, the death penalty is not involved in this case.

A Okay.

MS. MORASK: May I have a moment Judge.

THE COURT: Sure.

MR. WIENER: Judge, I have a question from Miss Pippen.

A Can I ask you why doesn't a person have to prove they're innocent. It just has to be the plaintiff has to prove they're guilty. Why is it?

THE COURT: That would go back in history. And it comes back -- It's nothing to do with the present government that we have under our Constitution, but what used to happen is you would have kings or emperors and say you're guilty, and then they would have to prove they're innocent and you would have the power of government and all the resources against one individual.

Then our revolution came about concerning

4

this and some of the standards that they put down that they had suffered -- It wasn't something that they learned theoretically. They were there when someone pointed a finger at them and they had to get out from underneath it, and the other people on the other side had armies, navies at the time, so they evolved our Constitution that they said one of the things when an individual is charged by the government should be the presumption of innocence, and that's why the defendant doesn't have to prove his innocence. And it evolved again not through college courses or anything else like that but through centuries of human beings being oppressed. Okay?

MS. MORASK: I have nothing further.

THE COURT: Liz, could you take our ladies and gentlemen back to the jury room. Ladies and gentlemen in the outer courtroom, if you want to stand up, move around or if you want to be seated, be my guest. We're going to continue on with the jury selection process.

(Whereupon, the following discussion was had out of the presence and hearing of the jury:)

MR. WIENER: On the record, the first panel has

three people we've already chosen. One of them is Miss Pipps who asked about not being able to prove your innocence. Beyond that I have Mr. Kris Kringle and I have no objection to the first panel. I'll accept the first panel.

MR. SMITH: On this first one we'll dismiss Mr. Kringle.

MR. WIENER: That's State number 3, right, Judge?

THE COURT: Right.

MR. WIENER: We accept this panel, too. Gruns is the next?

MS. MORASK: Right.

MR. WIENER: I'll accept this panel.

THE COURT: The first panel that has been selected is Miss Tina Pipps, Constantine Alexakos, Leo Kerner, K-e-r-n-e-r, Ulrich, U-l-r-i-c-h, Gruns, G-r-u-n-s

MR. WIENER: Zbigniew Gasior would be my number 3 challenge. Z-b-i-g-n-i-e-w G-a-s-i-o-r.

THE COURT: Okay that's defense number 3.

MR. WIENER: Mr. Thibodeaux would be my number 4. T-h-i-b-o-d-e-a-u-x. I accept Miss Mackey and Helene Greenwald, the U.S. attorney. Martha Valdez I'm moving for cause. She has a five-month-old child who has kidneys problems, she said would be a tremendous

hardship.

THE COURT: Really you're moving for compassion rather than for cause.

MR. WIENER: But I don't want it to be directed to my peremptory.

THE COURT: Any objections on that? Seeing no objection, she'll be excused for cause.

MR. WIENER: I'll accept Laurie Wills and I'll accept Brian Chestleigh. I accept the panel.

MS. MORASK: Right off the bat we're asking for cause on Mr. Chestleigh.

MR. WIENER: Why?

MS. MORASK: He said your client could never get a fair trial because anybody could be put in a lineup. He's been stopped millions of times by the cops.

MR. WIENER: Well I object. Strongly.

THE COURT: All right. Mr. Chestleigh, C-h-e-s-t-l-e-i-g-h, first name Brian, stated that he didn't believe in the justice system and that people couldn't get a fair trial, and therefore I will excuse him for cause over the defense objection.

MR. WIENER: Strong objection.

THE COURT: Over the defense's strong objection.

MR. WIENER: We're moving for cause on Habin, who

was honest enough.

THE COURT: He said he would have qualms about the presumption of innocence.

MR. WIENER: He was honest.

THE COURT: Mutual motion for exclusion for cause sustained.

MR. SMITH: Judge, so far we have used three challenges, is that correct?

MR. WIENER: Yes.

MR. SMITH: We'll dismiss Susan Mackey.

MR. WIENER: You said no backsliding. Mackey was accepted.

MS. MORASK: No, she wasn't.

THE COURT: Off the record.

(Whereupon a discussion was had off the record between court and counsel.)

MR. SMITH: Susan Mackey is our number 4 and Hugo Christensen is our number five.

MR. WIENER: We accept those.

(The following proceedings were had in the presence and hearing of the prospective jurors:)

THE COURT: All right, court's back in session.

Just pick any seat. That's fine. Any seat.

All right. Will everybody please be seated. Thank you.

THE CLERK: The following jurors have been dismissed, Susan Mackey, Hugo Christensen. I'd like to thank everybody, thank you for participating in the jury selection process. Thomas Habin. Brian Chestleigh. Martha Valdez. Edwin Thibodeaux. Zbigniew Gasior and Kris Kringle.

The following jurors will be the first panel: Ulrich Gruns. Tina Pippen. Constantine Alexakos and Leo Kerner, please raise your right hand.

(Jurors sworn.)

THE COURT: What I'd like you to do is come back directly on Monday morning to this courtroom. This is room 202, as you know. Come back at 10:30. Keep your juror badges. They treat you as VIP people. And they'll let you in the parking lot for free. We'll have juice and some coffee and donuts for you. Thank you very much. And don't discuss the case with anybody.

Again, thank you for your participation. Thank you.

THE CLERK: Daniel Welter, Judy Chernick.

A JUROR: Excuse me, Judge. I'm sorry to interrupt. Is it possible that I may make a phone call? Because if I'm not going to be at work on Monday I have to let someone know today.

THE COURT: Any objection?

MS. MORASK: No, no.

THE CLERK: Duk Soo Wang, Peggy Allen. Vincenzo Custino, Clare Pomento, James Malloy, Pamela Perry. Alma Porter. Mary Watts. Elvin Byrd. Henry Janajewski.

DANIEL WELTER,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Mr. Welter?

A Yes.

Q Says you live in the city of Chicago. How long have you lived in the city?

A That address all my life.

Q And you are also employed as an attorney?

A Correct.

Q Can you pronounce the name of your company?

A Sure. Defrenza, D-e-f-r-e-n-z-a, and

Tolmatsky.

Q And what kind of firm is that?

A General, basically personal litigation. I do some bankruptcy. Real estate closings. Do some criminal defense work.

Q You do criminal defense work in this building?

A No, mainly in the district. We're up in Skokie, so most of our criminal stuff is up there.

Q Where did you go to law school?

A John Marshall.

Q Would the fact that you are an attorney prevent you from being able to sit on this jury?

A No.

Q Be fair to either side, prosecution and defense?

A No, that would pose no problem.

Q Says also that you have served on a jury?

A Yes.

Q Can you tell us when that was?

A I believe it was in the spring of 1989.

Q Was it a criminal case?

A Yeah, it was here.

Q And without telling us what the verdict was,

did your jury reach a verdict?

A No we didn't.

Q It was hung?

A Yes.

Q And what was the crime?

A Possession of a stolen vehicle and maybe trespass to property, I believe.

Q And did you come away with any particular opinion of the criminal court system either favorable or unfavorable?

A No.

Q Either prosecution or defense in that particular case?

A No.

Q And obviously you know other lawyers?

A Yes.

Q Do you know many criminal lawyers?

A A few here and not -- not that well, no.

Q Any prosecutors?

A I went to school with people that are now, but not really.

Q Or judges or police officers that are good friends?

A Couple guys on the softball team I know are

sheriffs.

Q I take it you play softball?

A Right.

Q You've also been the victim of a crime. Could you tell us what that was about?

A Somebody smashed in the window of my car.

Q Did the police get called?

A No.

Q So that was the only time. You never had to go to court as a victim or witness?

A No.

Q Says a member of your family or very close friend has also been the victim of a crime?

A Again, I think my dad had a couple of cars stolen over the years.

Q Nothing that involved anybody going to court?

A Right.

Q But you have been a party to a lawsuit and you have been involved in an accident where someone was injured. Could you tell us about the lawsuit?

A Those were collection cites. One I was the defendant in and then a couple I've been the plaintiff in.

Q And that's all done?
A Correct.
Q And what was the accident where somebody was injured?
A I don't know how I remembered it, but I remember I was in high school and I got in a fender bender and I think the person that I hit made a claim against my insurance company.
Q That's obviously long over, right?
A Right.
Q Do you have any problem with the law that I've explained to everybody about the law of accountability?
A No.
Q You wouldn't have any problem following that law?
A Correct.
Q And if we did show you that the defendant was guilty of first degree murder by the law and the evidence that you're going to hear would you have any problem whatsoever signing a guilty verdict?
A No.
Q Do you have -- Other than softball are you in any associations or --

6

A I think the Chicago Bar and maybe the Trial Lawyers Association.
Q Do you have any positions of leadership in any of those?
A No.
Q Do you have any problems -- emergency type of problem coming up in the next week that would prevent you from serving?
A Nothing.
MS. MORASK: Thank you, sir.

JUDY CHERNICK,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Judy Chernick, (phonetic spelling).
A Yes.
Q How long have you lived in Chicago?
A All my life.
Q And you work at Ameritech. What exactly are your duties as a general clerk? What do you do?
A It's an engineering office, payroll.
Q And how long have you worked there?
A Ten years.

Q And you have one child who is five years old, and you have served on a jury. Is that a criminal case or a civil case?

A On a civil.

Q Over at the Daley Center?

A No, this was out in the suburbs.

Q Do you remember what kind of case it was?

A Just car accident.

Q Did your jury reach a verdict?

A No, no.

Q It was -- Did it plead beforehand or was it hung, do you remember?

A Hung.

Q It also says that you have friends or family that are police officers and lawyers?

A Yes.

Q You are familiar -- Let's start with the police officers, is that friend or family?

A My brothers. Two brothers.

Q Are they Chicago police?

A Yes.

Q Do[illegible] know what district they serve?

A [illegible] homicide detective by Harrison and the other is desk sergeant by Addison and

6

A I think the Chicago Bar and maybe the Trial Lawyers Association.
Q Do you have any positions of leadership in any of those?
A No.
Q Do you have any problems -- emergency type of problem coming up in the next week that would prevent you from serving?
A Nothing.
MS. MORASK: Thank you, sir.

JUDY CHERNICK,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Judy Chernick, (phonetic spelling).
A Yes.
Q How long have you lived in Chicago?
A All my life.
Q And you work at Ameritech. What exactly are your duties as a general clerk? What do you do?
A It's an engineering office, payroll.
Q And how long have you worked there?
A Ten years.

Q And you have one child who is five years old, and you have served on a jury. Is that a criminal case or a civil case?

A On a civil.

Q Over at the Daley Center?

A No, this was out in the suburbs.

Q Do you remember what kind of case it was?

A Just car accident.

Q Did your jury reach a verdict?

A No, no.

Q It was -- Did it plead beforehand or was it hung, do you remember?

A Hung.

Q It also says that you have friends or family that are police officers and lawyers?

A Yes.

Q You are familiar -- Let's start with the police officers, is that friend or family?

A My brothers. Two brothers.

Q Are they Chicago police?

A Yes.

Q Do you know what district they serve?

A One is homicide detective by Harrison and Kedzie. And the other is desk sergeant by Addison and

Halsted.

Q Okay. And do you discuss their work?

A Sometimes.

Q That wouldn't prevent you from giving both sides a fair trial, would it?

A No.

Q It says that you have been the victim of a crime as well as having friend and family as victims of crime. First yourself --

A Well hit and run accident for myself.

Q You were a victim of a hit and run?

A Yes.

Q And how long ago was that?

A Long time ago.

Q Did that go to court?

A No.

Q Were the police involved?

A Yeah, but nobody was caught.

Q Were you satisfied with the job they did?

A Uh-huh.

Q And what about where you marked the friend or family?

A Family. Auto accident.

Q But nothing that resulted in going to court?

Have you ever been involved in the courtroom as a witness?
A No.
Q Is that what you meant when you marked member of your family has been a party to a lawsuit?
A Yes.
Q Is that involving an auto accident or something else?
A My nephew.
Q What was your nephew?
A For a theft.
Q He was being suued for a theft or he had to go to court?
A Well he's in court.
Q He's in court now?
A Right.
Q As a defendant. Is he the person being charged?
A Right.
Q Do you know where that's at?
A In the suburbs.
Q What suburb?
A I'm not sure.
Q Do you go to court with him or are you

familiar with the case at all?

A Yeah. No.

Q Would that prevent you from being fair to the prosecution or to the defense in this case?

A No.

Q Did you say you do go to court with him or you don't?

A No, I don't.

Q Thank you. The same question that I've been asking everybody else about two people committing a crime together, would you have any problems with that concept or following that law?

A No.

Q And if we showed you the evidence and the law that Cordell Williams was guilty of first degree murder would you have any hesitation or scruples in signing a guilty verdict?

A No.

Q And do you have any emergency type problems coming up in the next week?

A No.

MS. MORASK: Thank you.

DOO SUK WANG,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Mr. Wang?
A Yes.
Q You also live in the city of Chicago. How long have you lived at this address, sir?
A More than seven years.
Q And you are working at the Holiday Inn City Center? And how long have you held this job?
A A year.
Q I'm sorry, sir. You're going to have to speak up so the court reporter can hear you.
A A year or so. I moved there some years and came back after --
Q You worked there before and then you came back and worked there again?
A Yes.
Q You have three children age 27, 26 and 24, can you tell me what they do?
A Everybody in college.
Q And the 27-year-old, is that a boy or girl,

man or woman?

A Daughter, son, daughter.

Q And the daughter is in college where?

A Champaign. Major in graduated from over there and she study accounting course because it's hard to find a job.

Q The 26-year-old, that's your son?

A Yes.

Q And what does he do?

A In school also. He's major in lawyer course but I don't know, sometimes change.

Q Right now for the time being he wants to be a lawyer?

A Yes.

Q And the 24-year-old daughter, is she also in college?

A Graduate this year and she majored in accounting. She worked for bank as executive secretary.

Q And you didn't mark -- Do you have any friend or family who are in law enforcement who are police or judges or lawyers?

A No.

Q And you've never been involved in the court

7

system as a victim, a witness or accused?

A No.

Q Never been the victim of a crime?

A No.

Q And sir, do you have any problem with the concepts of the law that I've already explained to all the people about two people committing a crime together being equally responsible for the crime. Do you understand that law?

A Uh-huh.

Q Would you be able to follow it?

A Yes.

Q And if the People showed you that the defendant was guilty of first degree murder beyond a reasonable doubt would you have any problem signing a guilty verdict?

A No.

Q You don't have a problem?

A No.

Q And in the next few days, probably Wednesday or Thursday do you have any emergency things that are coming up that you wouldn't be able to sit on this jury?

A Problem is my job very important, you know.

So I have to order everything. Very busy. That's why a lot of problems. That's why even lunch time I call over there in the morning. I call over there because I have to set up everything. So without me --

Q Are you the only one that works in the food storeroom?

A Yes. Without me nothing going over there.

Q We can make provisions for something to be done. Thank you.

THE COURT: Would you be able to make your calls from here if we made phones available for you?

A Yes.

THE COURT: You would be able to place the orders for your business from here?

A No because I have to call so I have to know the amount. It's hard. Also I have some more problem. Maybe you understand but this morning I came here. I explain to what's that? I can't speak English well. So somebody speak fast, you know, I couldn't understand. I miss it. I explain but everything fine. That's why I came here. I tried to follow.

Q Are you having trouble following?

A Yeah, sometimes I couldn't understand you

when you ask somebody else.

Q Okay. If people talk slower would you have trouble or is it just the language?

A Talk slow. Also my age is more than 60 years old.

MS. MORASK: Okay. We will definitely take that into account. Thank you.

PEGGY ALLEN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Peggy Allen?

A Yes.

Q How long have you lived in Lansing?

A 24 years.

Q And how long have you worked for Blue Cross?

A Approximately seven years.

Q And your husband is in the Lansing Fire Department?

A Part time.

Q And also Blue Cross?

A Correct.

Q And how long has he been a firefighter?

A For about three years.
Q And you never served on a jury but you do have friends and family who are police officers or lawyers?
A Friend.
Q And are the police Chicago police?
A Yes.
Q Do you know what district?
A 2nd District.
Q Are they very close friends? Do you see them all the time?
A One.
Q Do you discuss his or her work?
A I do not.
Q So that wouldn't affect your ability to be fair in this case?
A No.
Q Who are the lawyers that you know?
A He's a friend. He's in real estate.
Q Never been a victim of a crime, never been involved in a court as a victim or a witness?
A Correct.
Q Never been a party to a lawsuit and never been involved in an accident?

A Yes.
Q Do you have any problem with the law of accountability or responsibility?
A No.
Q You will be able to follow that law?
A Yes.
Q And if we showed to you that the defendant was guilty beyond a reasonable doubt by the law that the judge will give you and by the evidence that we will show you do you have any problem signing a guilty verdict?
A No.
Q Do you have any emergencies coming up in the next few days that --
A Not that I know of.
Q That's the problem. You usually don't know about emergencies. I guess that's a dumb question. Thank you.

VINCENZO CIUSTINO,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Vincenzo Ciustino.

Q You live in Des Plaines for how long, sir?
A Seventeen years.
Q And you are a machine operator at Dyemasters for how long?
A Eleven years.
Q And your wife works at American Electric, correct?
A Correct.
Q And how long has she done that?
A About 15 years.
Q Your three children are out of the home, I assume, 32?
A One is still home.
Q Never get rid of 'em. What do they do?
A Mother and daughter they both work the same place.
Q And then what are the other two doing. The 34-year-old?
A 34-year-old, she's married.
Q And the 32-year-old?
A That's the one she still home.
Q And the 27-year-old?
A Is my son. He's living Los Angeles.
Q What does he do?

A In California.
Q And you own your own home and you do have friends and family that are police officers?
A Yes, my son-in-law's father.
Q Is that out in Des Plaines or in the city of Chicago?
A He live in Des Plaines.
Q Do you talk to him about his work or anything like that?
A No. I see him once in a while.
Q And never been a victim, never been involved in the court system, never been a party to a lawsuit, never been in an accident where somebody was injured. None of the above?
A No.
Q Sir, do you have any problem with following the law of accountability where two people commit the crime together they're both responsible for what happens?
A No.
THE COURT: Excuse me. Can I have the attorneys up here for a second. Off the record.

8

(Whereupon a discussion was had
off the record between
court and counsel.)

THE COURT: Thank you.

MS. MORASK: Would you be able to follow that law?

A I have same problem this gentleman. I don't understand.

Q With the language?

A Yes.

Q And that would make you unable?

A I don't want to say yes or no because most of the questions I don't understand.

Q Okay. I appreciate your honesty. Thank you, sir.

CLARE KIMENTO,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Clare Kimento. Is that a "K"?

A Yes.

Q You live in Forest Park for how long?

A Twenty years.

Q And how long have you worked for the back man

(phonetically) --
A Seven years.
Q And you have two children age 15 and ten in school?
A Yep.
Q You own your own home. You have served on a jury. Could you tell us when and where?
A About three years ago here. Criminal case. Yes, we came to a verdict.
MS. MORASK: Thank you.
THE COURT: God love you.
BY MS. MORASK:
Q Do you know what kind of a crime it was?
A Assault with a deadly weapon.
Q All right. I'm done with you. No.
A That's okay.
Q Police officer, lawyer, friends?
A Friend.
Q No family. Do you discuss their work and would it affect your ability --
A No.
Q You marked accused, a complainant or a witness?
A I was witness to a murder in a bank. Nothing

ever happened because I guess the guy was crazy anyway so it never went to trial. It was bizarre.

Q How long ago was that?

A About 15 years ago.

Q So you never went to court on that, you just witnessed it?

A No, we just witnessed it and chatted about it a lot of times.

Q With the police?

A Yeah, and here.

Q Were you satisfied with the police you came in contact with?

A Yeah, it was fine.

Q You have been the victim of a crime and so has a friend or family member?

A Yes.

Q What is that?

A My father was assaulted with a gun, robbed mugged whatever. Outside the house. It was a long time ago.

Q Did that come to court?

A No.

Q Were you satisfied with the police working there?

A There was nothing they could do. They were gone. Somebody broke into our window and stole my wallet.

Q Do you have any problem with the law of accountability?

A No.

Q And if we showed you that the defendant was guilty of first degree murder beyond a reasonable doubt would you have any problem signing a guilty verdict?

A No.

MS. MORASK: Thank you.

A You're welcome.

JAMES MALLOY,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q James Malloy?

A Yes.

Q You live in Chicago, and how long have you lived at this address?

A Three years.

Q And you are a psychotherapist at Circle

Family Care. Can you tell me what kind of place --

A Community mental health clinic. Outpatient clinic in the Humboldt Park area.

Q How long have you been doing that?

A Almost four years.

Q Before that were you working as a psychotherapist?

A I was in school before that.

Q Where?

A Antioch New England graduate school in New Hampshire.

Q Have you ever had to testify in court as a therapist in any capacity, as an expert or anything like that?

A No.

Q Have you ever come into contact with the court system as a victim or a witness?

A As a victim twenty years ago I was working in a store and I was the only one there and somebody came in, robbed the store, stuck a knife in my back and robbed the store.

Q Did you --

A I went to the police station and looked at mug shots and they never --

Q When you say stuck a knife in your back, did it go in?
A It didn't go in.
Q Nobody was ever caught?
A Right.
Q Were you satisfied with the work of the police?
A Well no, they didn't catch anybody, but it was in New York. What can you ask for.
Q You also mark that a member of your family has been a victim of a crime. What was that in?
A My sister was mugged. Not severely hurt. And my mother had a wallet stolen from her purse.
Q Did any of those cases go to court or were you involved in the court system in any way?
A No.
Q Would you have any problem following the law of accountability?
A No, not as I understand it now. I assume the judge would explain it better later.
Q Thanks.
A Well in more detail for me.
MS. MORASK: I'm not allowed to right now. But you wouldn't have any problem following the law?

A As the judge explains it to me.
Q And would you have any problem signing a guilty verdict if the people proved the defendant was guilty beyond a reasonable doubt of first degree murder?
A No.

PAMELA PERRY,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Pamela Perry. You also live in Chicago. How long have you lived at that address?
A A year and a half.
Q Before that where?
A I lived nine blocks away.
Q So you lived in Chicago?
A Yeah.
Q Your are an account assistant, how long have you done that line of work?
A Twelve years.
Q You do have friends or family that are police officers and lawyers?
A Yes.

9

Q Family or friends?
A Friends.
Q And are the police Chicago police?
A Uh-huh.
Q Do you know what district or area?
A They're at 12th street.
Q Do you discuss their work with them?
A Occasionally. Not that much.
Q How about the lawyer?
A He's real estate.
Q It says you've never been the victim of a crime but some friend or family member has been?
A My best friend was raped.
Q And when was that?
A Twelve years ago.
Q In Chicago?
A Uh-huh.
Q Did that case go to court?
A They never caught him.
Q Were you involved in that, I mean as a witness or in any capacity?
A No.
Q Was she satisfied with the work or were you satisfied with the work of the police?

A Uh-huh.

Q Do you have any problems with the concepts of accountability or responsibility?

A None.

Q And if the People proved to you that the defendant was guilty of first degree murder beyond a reasonable doubt would you have any problem signing a guilty verdict?

A No.

Q Do you have anything coming up in the next week that would be impossible to sit on this jury?

A No.

MS. MORASK: Thank you.

ALMA PORTER,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Alma Porter.

A Here.

Q You live in South Holland?

A Yes.

Q And how long have you lived at this address?

A I lived at that address two years. Before

that I lived in South Holland also.

Q And you work for the Department of Housing and Urban Development as a housing manager specialist?

A I work with Native Americans on reservations.

Q How long have you done that?

A Eighteen years.

Q And your husband works at ComEd as an electrical mechanic. How long has he done that?

A Seventeen years.

Q Four children, 28, 27, 20 and 17?

A My daughter isn't doing anything, the 28. My son is 27 years old. He isn't in the states. My twenty-year-old is in college and my seventeen-year-old is still in high school.

Q And you've never served on a jury. Do you have any friend or family that are police officers, lawyers, state's attorney, public defenders or judges?

A No.

Q You did mark that you've been the victim of a crime. Can you tell us what that was?

A I was robbed in 1983 of my purse and jewelry.

Q Did that case go to court?

A Uh-huh.

Q And did you testify?

A It was a juvenile. I didn't testify. I was just in court.
Q You went to juvenile court?
A Yes.
Q Was the case resolved to your satisfaction?
A I never heard anything after that.
Q Were you satisfied with the work that the police and the prosecutor did?
A Yes.
Q Did it leave you with a bad or good taste of the court system?
A I don't know.
Q Didn't matter?
A Didn't matter.
Q You've never been a party to a lawsuit or been involved in an accident where someone was injured, correct?
A No.
Q Do you have any problem following the law of accountability or responsibility?
A No.
Q And if we showed you that the defendant was guilty of first degree murder with the law and the evidence would you have any scruples with signing a

guilty verdict?

A No.

MS. MORASK: Thank you.

MARY WATTS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Mary Watts. You also live in Chicago. How long have you lived at this address?

A Twenty years.

Q And you also work for Ameritech as a technician. How long have you worked for them?

A 21 years.

Q You have three children, nineteen, 21 and 23. What do they do?

A The 23-year-old she's going for her majors in industrial science technology. The 20-year-old has an apartment and he works at a shoe store and the 19-year-old is going to school for psychology.

Q And do they all still live with you?

A Just the youngest one.

Q And you own your own home. You have been the victim of a crime. Can you tell us about that?

A Well my purse was stolen a long time ago but someone called and said they found my wallet and my credit cards were in there.

Q So it never went to court?

A No.

Q You ever been a party to a lawsuit. Can you tell us what that involved?

A Car accident.

Q Is that over with?

A Yes.

Q Do you have any friends or family in law enforcement?

A No.

Q And would you have any problem returning a guilty verdict if we proved that the defendant was guilty beyond a reasonable doubt of first degree murder?

A No.

Q And would you have any problems following the law of accountability?

A No.

MS. MORASK: Thank you.

ALVIN BYRD,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY THE COURT:

Q Alvin Byrd?
A Here.
Q You also live in Chicago. How long have you lived at this address?
A 32 years.
Q And you work as an assembler at A.B. Dick Company?
A Right.
Q What do you assemble?
A Offset printing machines.
Q How long have you worked there?
A Nine years.
Q And you own your own home, never served on a jury. Do you have friends or family in law enforcement?
A No, I don't.
Q And you've marked no for everything else, never been a victim, never seen a crime -- never had a crime, right?

A No. No I've never seen a crime.
Q And none of your family or friends have ever been a victim, never been involved in the court system in any fashion?
A No.
Q Okay. And never been in a lawsuit or an accident where somebody was injured?
A No.
Q Do you have any scruples about signing a guilty verdict if we proved to you that the defendant was guilty of first degree murder?
A No.
Q And do you have any problem following the law of responsibility or accountability as I've explained it to your fellow jurors?
A No.
MS. MORASK: Thank you, sir.
A Sure.

HENRY JANUSZEWSKI,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MS. MORASK:

Q Henry Januszewski?

A Yes.
Q You live in Norridge. How long have you lived there?
A Five years.
Q And how long have you worked at the Joslyn Manufacturing?
A Fourteen.
Q And you also own your own home, never served on a jury. Do you have any friends or family in the law enforcement?
A No.
Q Never been involved in the court system as a victim, witness, nothing?
A No.
Q Never been a victim of a crime?
A No.
Q None of your family or friends?
A No.
Q Sir, would you have any problems signing a guilty verdict if we proved to you that the defendant was guilty of first degree murder?
A No.
Q Would you have any problems following the law of responsibility for the crime that I've explained to

everybody. Would have any problem following that law?

A No.

MS. MORASK: Thank you.

MR. WIENER: Ladies and gentlemen, I think that in the -- earlier I was talking to Mr. Williams and I was sort of surprised by Miss Pipp's question and that asking the judge to explain why somebody doesn't have to prove his or her innocence. And I'm wondering if right now anyone can tell me honestly if you have any difficulty with the concept that if the State puts on a case and the State doesn't prove Mr. Williams guilty of the charges against him beyond a reasonable doubt do any of you think that then he has to come on and prove his innocence or do you agree with the concept that it's the State's burden to prove him guilty beyond a reasonable doubt?

Does anybody have any trouble with that concept? I only ask you that because Miss Pipps asked that after we had questioned her quite a long time and I want to give my client the fairest representation I have and that is to again ask you to be very, very honest with me.

If the State didn't prove their case would it be all right if Cordell Williams didn't testify,

didn't put any evidence on, didn't bring any witnesses in? Could you find him not guilty of the charge? Does anybody have any problem with that? Please raise your hand if you do.

All of you looking at Mr. Williams can you presume him to be innocent of those charges? Does anybody have any trouble with that? Does anybody have any trouble with the concept that if the State cannot prove him guilty that if he's not accountable that if he didn't do an act with another person that they couldn't prove that that you would find him not guilty. Anybody have any problem with that?

EXAMINATION

BY MR. WIENER:

Q Now Mr. -- is it Januszewski?

A Yes.

Q Do you have any trouble with the English language. Would you have any trouble in listening to witnesses in this case because this is a very important case both to the State and to Mr. Williams, listening to the witness and listening to what they say and being able to understand everything?

A So far I haven't have any problems.

Q So you don't anticipate having any problem at

all?

A No.

Q Miss Chernick, your brother is a homicide detective. How lucky for us. And I know I have a sister who is not a homicide detective, boy does she talk to me a lot. Does your brother talk to you about his cases?

A Sometimes.

Q And would it cause you to not be able to give Cordell Williams a fair trial that your brother is a Chicago police homicide detective?

A I don't think it would be a problem.

Q You don't think it would be a problem at all?

A No.

Q Okay. Miss Allen, you got lots of friends who are police officers?

A In the Lansing area. I know one who is in the Chicago area.

Q Is he a real close friend?

A He is a friend of my husband's. I do not discuss--

Q You don't discuss his cases?

A No. I have no interest in listening to what he has to say. Not here. I'm talking about --

Q You have no interest. He turns you off completely, right?
A Yes.
Q Got it.
A Nothing against the courtroom here.
Q And finally, is it Mr. Ciustino. You're Mr. Ciustino and you're Miss Komento.
All right. Miss Komento, here's my question. As you sit there today you have that prior jury experience?
A Yes.
Q And did you tell me that they did reach a verdict?
A Yes, we did.
Q And it was here at 26th Street?
A Uh-huh.
Q And can I ask you were you the foreperson of that jury?
A No.
Q And that wasn't a murder trial was it?
A No, it was not.
Q Would you have any difficulty separating that trial from this trial?
A Not at all.

Q Not at all?
A No.
Q And do you have any difficulty, please be honest, looking at Cordell Williams today and saying I will presume him to be innocent of these charges?
A No.
Q No difficulty?
A No.
MR. WIENER: Thank you. Judge, I have no other questions.
THE COURT: Thank you very much. Tom, could you take the ladies and gentlemen of the jury back to the jury room.
Ladies and gentlemen, again the same provisions if you want to stand up, sit down or do anything you want to make yourself comfortable.

(Whereupon, the following discussion was had out of the presence and hearing of the prospective jurors:)

11

MR. WIENER: In this first panel, Judge, our four peremptory challenge would be Judy Chernick, C-h-e-r-n-i-c-k.
On the next panel we'll accept Peggy Allen and the lawyer Dan Welter. So we'll accept this

panel.

THE COURT: Thank you. State.

MR. SMITH: We'll accept that panel, Judge.

MR. WIENER: You got Helene Greenwald, G-r-e-e-n-w-a-l-d, Laurie Wills, W-i-l-l-s, Peggy Allen A-l-l-e-n, and Dan Welter, W-e-l-t-e-r. Now we get to do the next panel.

THE COURT: Right.

MS. MORASK: Duk Soo Wang.

MR. WIENER: I will agree.

THE COURT: Mr. Wang there is a mutual motion to exclude as to both parties. That will be sustained

MS. MORASK: We're exercising our sixth challenge.

MR. SMITH: James Malloy. Judge, we'll exercise one on Alma Porter.

MR. WIENER: Judge, I'd be moving for cause --

THE COURT: They haven't made their selection yet.

MR. WIENER: They've exercised all their challenges.

THE COURT: They haven't tendered a panel.

MR. SMITH: We'll accept this panel, Judge.

MR. WIENER: Judge, I will on behalf of Vincenzo Ciustino -- he said he had a language problem. And will have very much difficulty with the language.

Judge, I'd move for cause on Vincenzo.

MS. MORASK: I don't think he had a language problem.

THE COURT: He said he did.

MR. SMITH: Judge, he didn't seem to have any problems with my questions. I think it's starting a run here because Mr. Duk Wang obviously had a language problem. I don't see that this guy has a language problem.

MR. WIENER: It's a double murder trial.

THE COURT: Off the record.

(Whereupon a discussion was had off the record between court and counsel.)

THE COURT: On the record. The defense has made a motion to excuse Mr. Vincenzo.

MR. WIENER: For cause.

THE COURT: C-i-u-s-t-i-n-o for cause. That would be sustained.

MR. WIENER: Judge our number five would be Clare Komento.

MR. SMITH: No no. That's your number seven.

MR. WIENER: Number six.

THE COURT: That's K-i-m-e-n-t-o.

MR. WIENER: I accept this last panel.

THE COURT: J-a-n-u-s-z-e-w-s-k-i, Pamula, Perry, P-e-r-r-y. Mary Watts. Alvin Byrd.

(The following proceedings were had in the presence and hearing of the jurors:)

THE COURT: All right, Liz, could you bring the jury back out.

All right. Will everybody please be seated. Thank you very much.

THE CLERK: The following jurors have been dismissed. Clare Kimento, Vincenzo Ciustino, Alma Porter, James Malloy, Duk Soo Wang, Judy Chernick.

THE COURT: Thank you very much now. The first four will be part of the second panel. Helene Greenwald, Laurie Wills, Peggy Allen and Daniel Welter. The following jurors will be part of the third panel. Henry Januszewski. Pamela Perry. Mary Watts and Alvin Byrd. Please raise your right hand.

(Second and third panel sworn.)

THE COURT: Ladies and gentlemen, will you step down. I just have a couple words for you. Again the general admonishment is don't discuss this case among anybody or let it be discussed in front of you.

The other thing is on behalf of the prosecution and defense and myself we would like to thank you very much for participating in the jury trial.

What I'd like you to do Monday come back here at 10:30 in the morning. We'll have provisions for like mini breakfast. We'll have rolls, juice and donuts and coffee I think and just come directly here. You get free parking across the street in the county parking lot. Wear your badges when you come in the door and they'll give you VIP treatment at the front door. I'm not promising.

We'll see you Monday at about 10:30 and we'll be done by Thursday.

THE CLERK: Ralph Kern, John Cooper, Patricia Stevens, Barbara Nobles.

THE COURT: Mr. Wiener.

MR. WIENER: Thank you.

RALPH KERN,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Mr. Kern, how are you, sir?

A All right.
Q Spelled K-e-r-n, is that true?
A Yes.
Q And you live in Chicago?
A Yes.
Q How long have you lived there, sir?
A All my life.
Q And you are married?
A Yes.
Q And you have -- Your wife is employed?
A No.
Q She's not employed. She's a housewife. I just can't read. And you have never served on a jury?
A No.
Q But you have friend that are police officers and lawyers, am I right?
A Yes.
Q Tell me about the police officer friends. Are they relatives?
A No, they're just guys I knew from the neighborhood.
Q Are they Chicago police officers?
A Yeah.
Q How many guys basically do you know that are

friends and police officers?

A I have about two right now.

Q See them often?

A No, not lately. Last ten years, no.

Q Do they wear uniforms or are they detectives?

A One is plain clothes and one is in uniform.

Q The guy in uniform do you know what he's assigned to do?

A I really don't know. You've been either an accused, a complainant or a witness in a criminal case?

A Well I was -- I had my truck broken into. They stole all my tools about three times already. And I went to court for my daughter. She got raped. Like I say, about the law I don't like the way it went to begin with. The prosecutor sold her out. The guy got out and kept going around and doing the same thing again and I don't like that one bit and I'm not happy with it.

Q You heard all the questions that I asked all the other jurors, am I correct?

A Yes.

Q Do you have any difficulty with any of those questions?

A No.

Q You can presume Cordell Williams innocent as you look at him today.

A Yeah.

Q Do you have any difficulty doing that?

A No.

Q You make the State prove him guilty beyond a reasonable doubt?

A Like I said, on the evidence. I just have to go by that there.

Q And if he wasn't accountable for somebody else's crime you wouldn't find him guilty, right?

A No.

TRISHA STEVENS,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Trisha Stevens, good afternoon?

A Good afternoon.

Q You're a student?

A Yes, at Illinois State University.

Q What are you studying?

A Elementary education.

Q Are you off school for the summer at the moment?
A Yes.
Q So there would be no problem coming here next week?
A No.
Q You live in Schaumburg?
A Yes.
Q Lived there all your life?
A Yes.
Q You say that you've never served on a jury?
A No.
Q Don't have any close friends or relatives who are in the criminal justice system?
A No.
Q You have been or a member of your family have been the victim of a crime?
A Probably when I was about seven years old our house got broken into.
Q Okay and that's the last time?
A Yes.
Q And it says here you've been involved in an accident where somebody was injured?
A About maybe five years ago I got hit and I

just hurt my neck.

Q Did you file a lawsuit?

A No.

Q So there's nothing pending in the court system?

A No.

Q Now you're a student and so you've been studying here this process for the last several hours?

A Yes.

Q Any questions from me or about the justice system or about the questions that counsel or I asked of you?

A No.

Q Any difficulty in giving either side a fair trial?

A No.

BARBARA NOBLES,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Miss Nobles?

A Yes.

Q Miss Nobles, you live in Wheeling?

A Yes.

Q How long have you lived there?

A 34 years.

Q And you are a financial planner?

A Yes.

Q I'll give you my card after the trial. You served on a jury before, am I right?

A I was part of a federal petit jury pool. Never really went.

Q So you never got called to --

A No. Came close but never tried anyone.

Q And it looks like you don't have any friends or relatives who are police officers, state's attorneys or public defenders?

A Not anymore.

Q Cordell Williams over there, any problem with in looking at him and saying he's innocent at this point in the trial or before the trial starts?

A No, I have no problem with that.

Q If the State's didn't prove him guilty beyond a reasonable doubt would you have any problem finding him not guilty?

A No.

Q Says here you've been the victim or member of

your family member has been the victim of a crime?

A It's a close business associate of mine.

Q What happened?

A Tuesday of this week he was robbed and assaulted. Shot with a .357 magnum in a hotel parking lot in Waco, Texas by two men.

Q Here's my question to you. Got a case here that is accusing my client, this young man of being -- charged with a double homicide in which guns were involved. Does the fact that your close friend had been assaulted and shot would that cause you in any way not to be able to give Cordell Williams a fair trial?

A No.

JOHN COOPER,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Finally, Mr. Cooper?

A Yes.

Q Good afternoon?

A Hi.

Q You are single?

A Yes.
Q You are a security officer?
A Uh-huh.
Q For Per Mar Security (phonetically)?
A Right.
Q What do you make more secure or who do you make more secure, a building?
A Yes, apartment building.
Q And where is that, in Chicago?
A Yes.
Q And do you carry a gun in your line of work?
A No, I don't.
Q And it says here that you've never served on a jury, that you don't have any close friends who are police officers, state's attorneys, public defenders or anybody else, am I correct?
A True.
Q But you have close friends?
A Yes.
Q You've never been the victim of a crime?
A Right.
Q And you have never been an accused, a complainant or a witness in a criminal case, right?
A True.

Q Any difficulty with any of these questions either counsel or I have asked you before in terms of giving each side a fair trial?

A Yes, I do have a problem with that.

Q Tell me what your problem is?

A I feel like the laws here in the United States not good enough. I feel like this, if somebody take another person life that person's life should be taken too.

Q Let me ask you a person. What if the person is proved innocent or not guilty of being involved in taking another person's life, do you feel that if that is the case, that the State couldn't prove Cordell Williams guilty beyond a reasonable doubt that could you sign a verdict of not guilty?

A No.

Q You couldn't.

MR. WIENER: Well thank you for being honest.

THE COURT: Mr. Wiener, we're going to have to put one more person in.

THE CLERK: Brian McCullick.

BRIAN MC CULLICK,

a prospective juror, having been first duly sworn, was examined as follows:

EXAMINATION

BY MR. WIENER:

Q Good afternoon, Mr. McCullick.
A Yes.
Q Live in Schaumburg?
A My mother does. I'm home for the summer.
Q You're --
A At a summer job.
Q Your summer job is a caddy and your winter job is a --
A Graduate student.
Q At?
A University of Georgia.
Q What are you studying there?
A Physical education.
Q You have a close friend who is a lawyer?
A A buddy who just graduated law school. He went to work for his father's firm. He hasn't tried anything. He's studying for the bar.
Q The only thing you have checked is either yourself or a member of your family has been a victim of a crime?
A Grandparent's house was robbed years ago.
Q Any difficulty giving Cordell William a fair

trial?

A No.

Q From giving the State a fair trial?

A No.

Q You heard all those concepts that counsel has rightfully suggested to you about accountability?

A Yes.

Q If they prove beyond a reasonable doubt that Cordell Williams was accountable for a murder you'll find him guilty wouldn't you?

A Yes.

Q But if they didn't prove that you would find him innocent, wouldn't you?

A Yes.

THE COURT: Thank you. State.

MS. MORASK: Judge, I have no questions.

THE COURT: Liz, would you take everybody back to the jury room.

(Whereupon, the following discussion was had out of the presence and hearing of the jurors:)

MR. SMITH: We'll accept the first alternate Mr. Kern.

MR. WIENER: I challenge Mr. Kern peremptorily.

THE COURT: You go first now.

MR. WIENER: I accept Trisha Stevens.

MR. SMITH: Judge, we'll exercise our challenge on Trisha Stevens.

MR. WIENER: Next is Brian McCullick.

THE COURT: You take him unless you have something for cause.

MS. MORASK: We have nothing for cause.

MR. WIENER: I accept McCullick.

THE COURT: Now you both have one challenge again. Mr. Brian McCullick is the first alternate. Brian M-c-C-u-l-l-i-c-k.

MR. WIENER: Excusing Cooper for cause.

I'll agree on Nobles.

MR. SMITH: We'll agree, Nobles.

THE COURT: She's the second alternate and McCullick is the first one.

(The following proceedings
were had in the presence
and hearing of the jurors:)

THE CLERK: Following jurors have been dismissed John Cooper, Trisha Stevens, Ralph Kern. Brian McCullick, you're the first alternate. Barbara Nobles, you're the second alternate. Please stand

raise your right hand.

(Two alternates sworn.)

THE COURT: Will you both step up here, please. Again, I'd like to thank you very much for your participation and again like I told everybody else this is the only time you can be called by your government to do any government service. There is no draft for armed services, so I'd like you not to discuss this case among yourselves or with anyone else over the weekend.

Come back here directly to room 202 at 10:30 on Monday morning and I'll give you an update about scheduling.

Keep your juror badges. They treat you as VIP's. And they'll let you in the parking lot for free. We'll have juice and some coffee and donuts for you. Thank you very much. And don't discuss the case with anybody.

Again, thank you for your participation. Thank you.

THE COURT: Thank you very much. Ladies and gentlemen thank you very much. We appreciate your participation.

Have a great weekend. Bye now. You're

dismissed.

MR. WIENER: Good night, Judge.

(Whereupon, the matter was continued until June 26, 1995.)

* * * * *



SOTOS-WILLIAMS 11353

STATE OF ILLINOIS )
) SS.
COUNTY OF C O O K )

I, Mary M. Flagg, C.S.R., an Official Court Reporter for the Circuit Court of Cook County, County Department, Criminal Division, do hereby certify that I reported in shorthand the proceedings had at the hearing of the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the Honorable VINCENT M. GAUGHAN, Judge of said court.

Mary M. Flagg

Official Court Reporter

Dated this 27th day of November, 1995.

(Rev. 4/2 /92) CCCR 0056

STATE OF ILLINOIS )
COOK COUNTY ) ss.

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true and complete copy of .... VOLUME ........... OF A ........... VOLUME . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 95-2887

in a certain cause............ LATELY ............ pending in said Court, between The people of the State of Illinois ........ WERE ........, Plaintiff and CORDELL WILLIAMS ........ WAS ........ Defendant .....

Witness, AURELIA PUCINSKI, Clerk of the Court and the Seal thereof, at Chicago,. In said County, .. JANUARY .25, ..............., 19. .96 .

Aurelia Pucinski

15-1373

CCCR-310

FILED
APPELLATE COURT 1st DIST.
OCT 0 1 2009
STEVEN M. RAVID
CLERK

# Transcript of Record
## Appeal
## to

APPELLATE Court of Illinois
FIRST District

FILED
APPELLATE COURT 1st DIST.
FEB 27 2018
THOMAS D. PALELLA
CLERK

FILED
APPELLATE COURT 1st DIST.
FEB 04 2014
STEVEN M. RAVID
CLERK

**Circuit Court No.** 94 CR 15518
**Trial Judge** VINCENT M. GAUGHAN
**Reviewing Court No.** 95-2887

94CR015518/A004

THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

CORDELL WILLIAMS

FILED
APPELLATE COURT
JUN 11 1997
GILBERT S. MARCHMAN
CLERK

**from**
# CIRCUIT COURT
**of**
# COOK COUNTY, ILLINOIS
DEPARTMENT, CRIMINAL DIVISION

FILED
APPELLATE COURT 1st DIST.
SEP 23 2009
STEVEN M. RAVID
CLERK

**AURELIA PUCINSKI**
**Clerk of Court**

VOLUME THREE OF FIVE
REPORT OF PROCEEDINGS,

AP/LMJ
Per ______
Deputy

08-2409

12-0746

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
)
-vs- ) No. 94 CR 15518
)
CORDELL WILLIAMS and LONDELL HARPER )

REPORT OF PROCEEDINGS had at the jury trial of the above-entitled cause before the Honorable VINCENT M. GAUGHAN, one of the Judges of said Division, on the 26th day of June, A.D., 1995.

PRESENT:

MR. JACK O'MALLEY, Cook County State's Attorney by
MR. MICHAEL SMITH, Assistant State's Attorney,
MS. LAURA MORASK, Assistant State's Attorney,

on behalf of the People;

MR. DAVID WEINER,

on behalf of the Defendant, Williams;

MS. RITA FRY, Cook County Public Defender by
MS. DEBRA GROHS, Assistant Public Defender,

on behalf of the Defendant, Harper.

# I N D E X

Page 1 of 2

DATE OF PROCEEDINGS: June 26, 1995
PAGES: F-1 through F-159
COURT REPORTER: Elizabeth A. Reyes


| WITNESS | PAGE |
|---|---|
| Motion in limine | 2 |
| Opening statements | |
| by Mr. Smith | 12 |
| by Mr. Weiner | 20 |
| Alexander Pratt | |
| Direct examination by Ms. Morask | 23 |
| Cross examination by Mr. Weiner | 40 |
| Opening statement by Ms. Grohs | 44 |
| Detective Stanley Sanders | |
| Direct examination by Mr. Smith | 46 |
| Cross examination by Mr. Weiner | 64 |
| Cansaida Cochran | |
| Direct examination by Ms. Morask | 73 |
| Gloria Johnson | |
| Direct examination by Mr. Smith | 79 |
| Officer Lashondra Harrell | |
| Direct examination by Mr. Smith | 83 |
| Officer Robert Mangan | |
| Direct examination by Ms. Morask | 92 |
| Cross examination by Mr. Weiner | 97 |
| Detective Dennis Dwyer | |
| Direct examination by Mr. Smith | 99 |
| Cross examination by Mr. Weiner | 108 |
| Redirect examination by Mr. Smith | 114 |
| Investigator Frank DeMarco | |
| Direct examination by Ms. Morask | 116 |

# I N D E X
Page 2 of 2


| | |
|---|---|
| Detective Michael Rose | |
| Direct examination by Ms. Morask | 127 |
| Cross examination by Mr. Weiner | 137 |
| Redirect examination by Ms. Morask | 141 |
| Recross examination by Mr. Weiner | 144 |
| Detective Cliff Gehrke | |
| Direct examination by Mr. Smith | 145 |
| Cross examination by Mr. Weiner | 153 |

(Whereupon the following proceedings were had in court outside the presence of the jury.)

THE COURT: Let me have the attorneys up here. Back on the record.

MR. WEINER: For the record David Weiner. I represent Cordell Williams. For the purposes of this motion I'll waive his appearance.

Officer -- Detective Ron Armata and Detective Dennis Dwyer, Armata, 20202, and Dwyer's number is 220211, made a report in which they stated that they interviewed Cordell Williams' father, Odel Williams who said that he had found a 38 caliber five shot two barrel revolver in the alley about five or six years ago. And he said that he had had this gun hidden in his rear porch but he discovered it missing earlier this evening.

Later when my client was interviewed by these two detectives the report states that regarding his father's missing revolver that he stated he took the gun about one week ago and someone took it out of the vehicle he was using and has no knowledge as to its whereabouts.

The fact that it's a 38 caliber revolver and the fact that the State is intending to introduce evidence in this case that a 45 semi-automatic handgun was used to kill the two victims we find is -- is extremely prejudicial. And although

there is some probative value the fact that either Detective Dwyer or Armata would testify to that would clearly -- the prejudicial value clearly outweighs any probative value that that testimony would enhance.

So we would ask your Honor to limit the State and ask them -- order them not to testify through either of these two detectives as to Mr. Odel Williams' conversation or to the conversation with the Defendant about that particular handgun.

THE COURT: State?

MR. SMITH: Judge, we previously had this discussion. Of course it's probative. As Defense counsel stated, the weapon was taken from the trunk. We think it should be allowed.

THE COURT: All right. My ruling is that the death weapon was a 45 caliber. That was a semi-automatic weapon, is that correct, Mr. Weiner?

MR. WEINER: Yes, it is.

THE COURT: Now, the other weapon that they're talking about is a two inch Smith and Wesson 38 five round revolver, is that correct?

MR. WEINER: That's true, yes, sir.

THE COURT: My finding after looking at the arguments I find that the -- the probative value is outweighed by the prejudicial value that would be done to Mr. Williams and, therefore, the motion in limine will lie as to those two detectives and that

specific conversation.

MR. WEINER: Thank you very much, Judge.

THE COURT: All right. We have to -- could you bring Mr. Williams out. Where is your client.

MS. GROHS: In the back.

THE COURT: Bring the other person out too, Mr. Harper. You got a jury waiver? Do I have to admonish him as to the death penalty too?

MR. SMITH: No. How old is your guy?

MS. GROHS: 17.

THE COURT: Okay. All right. Mr. Harper, is it your intention to waive your right to a jury trial?

DEFENDANT HARPER: Yes.

THE COURT: Okay. I know your lawyer has explained this to you. But basically a jury trial would be 12 people who would be gathered from a cross section of registered voters of Cook County. What they would do in your case is hear the evidence, determine what the facts were and determine your innocence or guilt. They would have nothing to do wth your punishment. Do you understand that?

DEFENDANT HARPER: Okay.

THE COURT: Help him out a little bit. All right. Take him back and you can talk to him. Come on. If you didn't talk to him before now, shame on you.

Bring the United States -- Assistant United States Attorney out.

JUROR GREENWALD: Hi, Judge.

THE COURT: Hi, Ma'am. Could you state your name.

JUROR GREENWALD: Helen Greenwald.

THE COURT: And could you spell your last name.

JUROR GREENWALD: G R E E N W A L D.

THE COURT: There was a disclosure to one of the sheriffs that you knew First Assistant Andrea Zopp, is that correct?

JUROR GREENWALD: Yes.

THE COURT: Did you know her from the United States Attorney's office?

JUROR GREENWALD: I do.

THE COURT: Would the fact that you know Miss Andrea Zopp deny -- deny Mr. Williams a fair trial in your mind?

JUROR GREENWALD: Absolutely not. But the reason I checked that out in my box that I had someone else -- it hadn't come up. The main thing I wanted to make sure -- on my way home I realized that she was coming to my house for dinner with about eight other people on Saturday night. It was an event that had been planned for about two months. And I did not tell her I was on a jury. I don't believe she has a clue. And it was not discussed at all. In fact I tried to avoid her the entire evening but I wanted to make sure you all knew it. And I am

confident it will not affect me at all.

MR. WEINER: I am confident.

THE COURT: Thank you very much.

JUROR GREENWALD: Sure.

THE COURT: We really appreciate that.

JUROR GREENWALD: Sure.

THE COURT: All right. Just back on the record. State, there's no objection that this person be allowed to sit on the jury?

MR. SMITH: No, Judge.

THE COURT: All right. Defense, no objection.

MR. WEINER: None whatsoever.

THE COURT: Thank you. All right. Yes? All right. Mr. Harper, we're going through this thing. Do you understand basically -- has your lawyer explained what a jury is?

DEFENDANT HARPER: Yes, sir.

THE COURT: All right. I've explained it. Are there any questions about your right to a jury trial that you'd like to ask me?

DEFENDANT HARPER: No, sir.

THE COURT: All right. Basically it's -- again it would be 12 people gathered from a cross section of registered voters of Cook County. What they would do in your case is hear the evidence and determine the facts. Do you understand that?

DEFENDANT HARPER: Yes, sir.

THE COURT: All right. Then they would decide your innocence or guilt. Do you understand that also?

DEFENDANT HARPER: Yes, sir.

THE COURT: Okay. And if you were found guilty, they would have nothing to do your punishment. Do you understand that?

DEFENDANT HARPER: Yes, sir.

THE COURT: All right. You're the only person in the world that can give up your right to a jury trial. I cannot order you to give up that right nor can your attorney give that right up for you. Do you understand that?

DEFENDANT HARPER: Yes, sir.

THE COURT: Okay. By signing this document entitled jury waiver that means you want me to hear the case and you want to give up your Constitutional right to a jury trial, is that correct?

DEFENDANT HARPER: Yes, sir.

THE COURT: Okay. Fine. All right. I determine that Mr. Harper understands what a jury trial is and knowingly waives his rights to a jury trial.

Mr. Harper, what I would like you to do is have a seat at counsel's table with your attorney.

DEFENDANT HARPER: Yes.

THE COURT: Thank you.

MR. WEINER: I would make a preliminary motion to exclude all witnesses obviously. I want to put that on the record.

MR. SMITH: I join in that.

THE COURT: All right. Mutual motion to exclude all witnesses will be sustained as to all the parties including Mr. Harper. All right. Please bring the jury out.

THE SHERIFF: Everybody please rise.

(Whereupon the following proceedings were had in court in the presence of the jury.)

THE COURT: Ladies and gentlemen, when you come into the courtroom, everybody is standing in your honor so don't wait for them to sit down because they won't sit down until you sit down. Okay? All right. Our two alternates in the very last two seats. They are the only ones with reserved seating. Okay. Will everybody else please sit down. Thank you very much.

Ladies and gentlemen, what I'm going to do right now is have you sworn in as a whole. Robin, please.

(Whereupon the jury was sworn to hear the cause)

THE CLERK: Please be seated.

THE COURT: Ladies and gentlemen, you now have been sworn as a jury to try this case. By your verdicts you will decide the disputed issues of fact. The Court decides the questions of law that arise during the trial. And before you retire to deliberate at the close of the trial the Court will instruct you

on the law that you are to follow in applying it in reaching your verdicts.

You should give careful attention to the testimony and the evidence as it is received and presented for your consideration but you should not form or express any opinion about this case until you retire to the jury room to consider your verdicts after having heard all of the evidence, the closing arguments of the attorneys and the charge of the Court.

During the trial you must not discuss the case among yourselves or with anyone else or permit anyone to discuss it in your presence.

You must not visit the scene of the occurrence that is the subject of this trial unless the Court directs the jury to view the scene.

From time to time during the trial I may be called upon to make rulings of law on objections or motions made by the attorneys. You should not infer from any such ruling that I have any opinions as to the merits of the case favoring one side or the other. And if I -- and if I sustain an objection to a question asked of a witness and do not permit it to be answered, you should not speculate on what the answer might have been nor draw any inference from the question itself.

Until this case is submitted to you for your deliberations you must not discuss this case among yourselves or

remain within hearing distance of anyone discussing it. After this case has been submitted to you, you must discuss this case only in the jury room when all of the members of the jury are present.

You are to keep an open mind and you must not decide any issues in this case until the case is submitted to you for your deliberations under the instruction of the Court.

Ladies and gentlemen, what I would like to do right now is introduce two additional people. One is Mr. Londell Harper. He's an accused in this case. Mr. Harper, you can stand up if you want. And his attorney is Ms. Debra Grohs.

MS. GROHS: Good afternoon.

DEFENDANT HARPER: Good afternoon.

THE COURT: As you know, Cordell Williams is taking a jury trial. So when you hear evidence, what you must do is apply that evidence as it applies to Mr. Williams. Mr. Harper is taking a -- what is known as a bench trial or a trial by a judge. I'm the trier of facts in that case. What might happen during this case is that because we have two separate trials going on at the same time you might be excused from the courtroom while we hear additional evidence concerning Mr. Harper's case. I don't know if we're going to be put at that stage but if we are what I just want you to do is not think anything of that. Just apply the evidence and listen to the

evidence as it applies to Mr. Williams. Don't get annoyed if you have to get up and don't -- if you want to take it out on someone, take it out on me but not on the attorneys. Thank you very much.

All right. All right. Opening -- ladies and gentlemen, let me give you a cap -- a capsule view of what a trial is. It's broken into several parts.

Probably the most stressful or the most disorienting was what you went through on the jury selection. You're coming out to a new area geographically and culturally. You're being put in a room. You don't know what to expect. So the worst is over with. All right. That was the jury selection process.

Now what we go into is the trial which is divided into two different components. Today we're going to have opening statements of the lawyers. What that basically is is that what the lawyers expect the evidence to show. Again what they say in opening statements or closing arguments are not to be considered as evidence. The following part after the opening statements is the evidentiary part of the trial. There you'll see exhibits and hear testimony from the witness stand. Following that will be closing arguments and there the attorneys present their views of what evidence they have proven and reasonable inferences to be drawn from that evidence. Again what they say at closing arguments cannot be considered evidence. And anything that

disagrees with the evidence as you heard it must be disregarded in terms of what the lawyers say. Following that I will read the instructions to you and then you will get them in writing and begin your deliberations after that. So basically that's the overall view of the trial.

What we found out over the years is what irritates juries a little bit and probably any other human being in the world is the uncertainty so what I'm trying -- I'll keep you up to date for a schedule. Right now we're going to probably hear evidence until -- ballpark figure until around 6:00 p.m. tonight. There are other things that have been scheduled in advance on tomorrow. Tomorrow we should be hearing evidence until approximately 3:00 p.m. in the afternoon and then I will recess this trial and go on with the other matters after that. And as I get updates, I'll let you know more and more for scheduling. Okay. So thank you, ladies and gentlemen.

Opening statements, Mr. Smith.

MR. SMITH: Yes, Judge. Good afternoon.

Ladies and gentlemen, Myron Cochran and Billy Johnson made a big mistake on May 26th of 1994. And the big mistake that these two kids made was that they were in the wrong place at the wrong time. And for that mistake for being in the wrong place at the wrong time they paid for that the ultimate debt.

They paid with their lives because while they were

standing in the sub shop, small store on 74th and -- and Halsted, while they were sitting in there or standing in there because there is no area to sit waiting for their food there was a group that was driving by.

And that group was looking for some rival gang members because that group was a group of black p stone gang members. And the Defendant over here is a black p stone gang member despite how he's dressed up. His partner over here is also one. So were the other two guys that were in the car, Andre Rudik and another person by the name of David Evans.

And as this group was driving in that area looking for some disciples who is their rival of the black p stones, as they were on their little hit squad, these two kids happened to be in the storefront area where they stood out like sore thumbs because as you'll see the photos, there's nothing covering those windows. It's very bright inside. And they could have easily been seen and they absolutely were. And at that point the group of assassins targets these two. And after they targeted them and made them or identified them as being members of a rival gang or being disciples, after they did that, that is when the plan started to go into action.

That is when Defendant here, Cordell Williams continued to drive the car because that car belonged to his family, to his mom. He's the driver of the car. And pursuant

to their plan after they identified these rival gang members who they thought were rival gang members, he pulled across 74th Street still on Halsted and then he pulled the car over and then he stopped the car.

And the gunman, the tough guy, the guy that was going to pull the trigger on those two lives got out of the car. But he got out of the car without a gun and he needed a gun and that 45 caliber semi-automatic, that cannon was waiting in the trunk. In the trunk of that car. And he had to get in there so his partner here, his Co-Defendant popped that trunk for him because he had to get to his weapon in order to do -- to do their little retaliation hit.

So he grabbed that gun and he walked back across 74th Street. And as he walked back across 74th, this is David Evans, his partner remained in the get away car with Cordell Williams behind that steering wheel with the car running with the lights off waiting for his buddy to finish business over at the sub shop.

And as his partner, David Evans went further, he went into that sub shop. He walked into that sub shop. Myron Cochran was standing in front of the sub shop right near where he was ordering and Billy Johnson was more towards the window. We believe he was looking out the window at some point.

He walked up without saying word one, nothing, no

conversation, no argument. Just one gunshot right in the back of his head. And from the angle of the gunshot, folks, it's consistent with the fact that Myron Cochran was looking up at the menu at the time. He was probably dead before he hit the ground with three $1 bills clutched in his hand. He lay on the ground bleeding and meanwhile the get away driver was waiting in the get away car.

But his partner's job wasn't done yet because there were two there. Evans wheeled right away after taking down his first victim and put the gun -- pointed it at the back of the head of Billy Johnson who is still looking out the window, shot number two sending another bullet into another young man's brain as he had just done. And with that Billy Johnson immediately hit the ground.

He did not leave at that point. He was not done because their job was to finish these two off. Even though they both lay on the ground bleeding with bullets in their head, he turned back around again to Myron Cochran who he had shot first who was over by the counter and he shot at him again while he was laying on the ground dying or dead in all likelihood. And while that third shot rang out, he was waiting patiently behind that steering wheel with the engine running for his buddy to help him make his get away.

But then at that time David Evans turned again and he

went back to Billy Johnson who was on the ground. Billy Johnson was not killed by that first bullet. He was still alive to some degree and he shot two more times at Billy Johnson as he laid on the ground one time hitting him in around the armpit area. It was a through and through shot.

After his five shots, he took off outside that sub shop. When he came out of that sub shop, he started for his partners in the get away car where they were waiting for him successfully completing his mission.

And as he began to run towards that get away car, something that had -- he had not figured out had happened and that was that Officer Stan Sanders was on his way home. Stan Sanders is a Chicago police officer. He just happened to be right across the street when he heard some shots and he looks up and he sees a guy running out of that sub shop taking off across 74th Street. Sanders does a u-turn and follows him. And this person who he subsequently identified as David Evans begins to run towards that -- that car that was waiting for him, that car sitting there with its lights off. As he ran towards the car, he stumbled two times. Officer Sanders got out of his car, pulled his service revolver as he ran after him and David Evans continued to run towards that car. And then the car fired up, pulled out and the back door was pushed open, the back rear passenger door behind the Defendant here, Cordell Williams and

somebody helped him into the car. Their buddy, David Evans.

After they made their pick up, after he got his partner, they took off. When I say they took off, he was the driver. They took him away from that scene as fast as he could without his lights on taking off down Halsted. Officer Sanders jumped back in the car. As Officer Sanders took off after him in his civilian car and as he was chasing him, they went through the Defendant -- the Defendant took him through a number of side streets at speeds of anywhere from 70 to 90 miles an hour with the killer in his car and with the weapon that killed these two kids in his car.

And as he took him on this high speed chase, he eventually lost Officer Sanders. And at various points he turned all of his lights off in order to get out of there. And he did well because he did get away from Officer Sanders.

And when he got away from Officer Sanders, he dropped the murderer off. He got rid of the weapon at that time and he dropped his other buddies off and then he went home. Mission accomplished.

These four black p stones had just come from visiting a friend of theirs named Paris McMoore who had been shot. They were on their way home from the hospital from visiting their buddy who had been shot.

And now he was resting at home comfortably but that

Officer Sanders being sharp as he was got the license plate. He returned to the scene. He saw what was happening. He saw that one of the kids was still alive. And they traced that license plate to Cordell Williams' house.

They went over there. The car was sitting right out in front of the house. Williams came out. Originally he said he hadn't driven it and then he gave a number of stories and then he said well, he got home at 10:30. This is really -- approximately 1:30 in the morning. The officers felt that the car was still hot. They ended up -- then Officer Sanders came over and identified that vehicle as being the one that he was chasing and they placed him under arrest, Cordell Williams. And eventually after giving numerous different stories he gave a court reported statement to an Assistant State's Attorney admitting to his involvement in this case.

The -- after talking to the Defendant, the police began to look for his other partners, David Evans of course, the shooter, and Londell Harper here and another person by the name of Andre Wright. They -- they eventually were able to get ahold of Londell Harper obviously. And they eventually in August of '94 finally got the shooter, Mr. David Evans who was identified in a lineup by a person that was in that store and by Officer Sanders as being the one that did the shooting.

The group that the Defendant was in that night, those

four people, him and his partners planned to go out and to shoot some rival gang members. And after they made that plan, they acted on it and this Defendant over here helped out. He was an intrical part of this. He was the driver, the classic driver of the get away car. And in this case he aided and abetted in the planning of this -- of this double murder because 20 hours later after being shot young Billy Johnson died at Cook County Hospital. He aided and abetted in the planning and after the planning he aided and abetted in the commission of this murder, this double murder and helped out. And then he helped his partners flee from the scene. He shared with his fellow gang members a common goal that night, a common design that they were going to hurt some rival gang members. And so as he shared that common plan with his buddies so does he share in the responsibility, so does he share in the blood on his hands and he is as responsible as if his finger was on that trigger. He is legally accountable for the actions of his partner and under the law --

MR. WEINER: Objection to the statement of the law. These are opening statements.

THE COURT: All right. Stay away from the law. State, move on.

MR. SMITH: Ladies and gentlemen, they worked as a team that night and they worked together and he shares in the spoils which

is two dead young men. This is a classic case of the get away driver. This Defendant is involved in this up to his ears. This was premeditated. This was a well planned happening and he is as responsible as the killer.

We ask that after you view the evidence and you hear the law that his Honor is going to give you with regard to this on legal accountability that you return a verdict that is consistent with the law and that's consistent with what the evidence that you're going to hear from the witness stand and hold him responsible for the murder of Myron Cochran and Billy Johnson. Thank you.

THE COURT: Thank you, Mr. Smith. Mr. Weiner.

MR. WEINER: Thank you, your Honor. Good afternoon everybody.

Cordell Williams is many things and you'll learn that from a number of police officers who take the witness stand. You'll learn that Cordell Williams is 19 years of age. You'll learn that Cordell Williams lives in a house with his mother and father. You'll learn that Cordell Williams at the time of his arrest was working, worked for the Board of Education. You'll learn that Cordell Williams was a high school graduate. You'll learn that from the police officers in the case. You'll learn one other thing, that Cordell Williams is a member of a gang.

Mr. Smith tells you that despite the way that he

dresses today Cordell Williams is a gang banger. Well, you'll learn from the testimony of the officers how Cordell Williams was dressed on the day that he was arrested, what he looked like, if he met Mr. Smith's description of what a classic gang banger looks like.

Cordell Williams drove his mother's car that night, the night that these two young men were killed. And you'll learn that he picked up three other men. And you'll learn through the testimony of the police officers that one of those men had a gun. And Cordell Williams you'll learn from the testimony of the police officers told him put that gun in the trunk. Cordell Williams popped the trunk and the man put the gun in the trunk.

You'll learn that Cordell Williams and three other persons went to visit a friend over at Northwestern Memorial Hospital.

You will see through a diagram which has been made up by the State's Attorney's office that David Evans' house was in fact on the way that the car was driving at the time that it stopped.

You'll learn as well that when the car which was on Halsted in which Mr. Williams was driving was going down Halsted Mr. Williams was in the front seat, another gentleman was to his right. Mr. Evans was behind him in the back seat.

And you'll learn that Mr. Evans said bricks meaning other gang members, gang members of a different gang, stop the car. You'll learn that Mr. Williams stopped the car.

But Mr. Smith tells you that the evidence will show that there was a previous plan, that there was a plan here to look for other gang members and in fact to shoot them, to kill them. But you'll learn because you will -- you're going to hear from the State's Attorney that took Cordell Williams' statement that at the time the Defendant stopped the car and popped the trunk that the car wasn't running, that the motor was off. So Mr. Smith tells you that the evidence is going to show he was the classic get away driver but the evidence isn't going to show that at all.

You're going to hear too that Mr. Williams in this statement that he made to the State's Attorney said that when he heard the shots he was in a panic. He didn't know what was going on.

You're going to learn that he said he had to start the car. You're going to learn from witnesses and from Mr. Williams that Mr. Evans slipped twice, almost didn't make it into the car. You're going to learn that as soon as this chase was over that Mr. Williams ordered Mr. Evans out of the car.

You're going to learn that there was no plan whatsoever. You're going to learn that at no time that night



SOTOS-WILLIAMS 11380

introduce yourself to the ladies and gentlemen of the jury.

A My name is Alexander Pratt.

Q And could you spell your last name for the Court Reporter.

A P R A T T.

Q Mr. Pratt, are you currently living in the City of Chicago?

A Yes, I am.

Q And how long have you been living in the city?

A All my life.

Q How old of a gentleman are you?

A 38.

Q And are you married, sir?

A Yes, I am.

Q And do you have any children?

A Yes, I do.

Q How many do you have?

A Two boys.

Q And are you currently employed, sir?

A Yes, I am.

Q Where are you employed?

A A&R Security.

Q What is your occupation?

A Electronic technician alarm installer.

Q How long have you done that line of work, sir?
A 15 years or better.
Q Sir, I want to take you back to the evening of May 26th of 1994 at approximately 11:30 at night. Do you recall where you were?
A Yes, I do.
Q Could you tell us where you were.
A I had just left a lounge shooting pool.
Q Did you stop off somewhere?
A Yes.
Q Where is it that you stopped off, sir?
A The Honey Sub submarine shop.
Q Where is that located?
A 74th and Halsted.
Q And were you alone or were you with anybody?
A I was by myself.
Q Can you tell us -- could you describe for us briefly the Honey Sub shop.
A It's a sandwich shop, neighborhood type sandwich shop. No counters. It has a kind of a walk up type counter where you do your ordering, bullet proof glass and the windows are all glass windows.
Q All right. When you walked in, was there anyone else in the store at that time?

A Yes, there were.

Q And how many people would you say that were in there?

A There were two youths.

Q Did those two youths eventually leave while you were placing your order?

A Yes, they did.

Q And what was the next thing that you did after you walked in?

A After I walked in, I placed my order.

Q Do you recall what you ordered?

A Yes, I do.

Q What did you order?

A Double cheeseburger and an extra order of fries.

Q Okay. And after you placed your order, did you observe anyone else walking into the store?

A Yes, I did.

Q And can you tell us what you observed.

A This was after the first two youths had left and then the two victims, they entered -- entered into the restaurant.

Q And could you tell whether or not they knew each other? Were they friends apparently to you?

A Yes, they were acquainted with one another.

Q Okay. They came in together?

A Yes.

Q Can you tell us a little bit about the lighting conditions in the store.

A Fluorescent lighting. It was fairly well lit.

Q After they came in, had you already placed your order?

A Yes.

Q And where did you go while you were waiting for your order?

A I had walked out to -- once I placed my order I walked out to my vehicle and just walked out of there to get some air. Then I walked back in the restaurant.

Q And when you walked back in the restaurant, did you see where the two boys were?

A Yes.

Q And can you tell us where they were.

A One of the fellows was at the counter and the other one was standing in the window.

Q All right. When you say standing in the window, was his back to the counter or was his front -- was he facing out or was he facing in?

A The gentleman at the window?

Q Yes.

A His back was facing the counter.

Q All right. So he was looking out the window apparently?

A Correct.

Q The person that was at the counter, could you tell whether or not he had anything in his hand? Did you see anything?

A He had some money.

Q All right. And was he looking up or what direction was he looking?

A Kind of looking up at the menu or look over at the -- the employee working in the restaurant.

Q All right. And where is the menu in relation to the window?

A It's up above.

Q And as you were standing there, what was the next thing that happened?

A I got my order -- well, my order was ready. I kind of looked in my bag just to be sure that the order was correct. I started heading out the door. At that time a gentleman came in with a weapon drawn.

Q Okay. When you say a weapon drawn, can you describe the weapon to the ladies and gentlemen of the jury.

A 45 automatic, kind of -- not a polish but a brush type of a material.

Q All right. And was it drawn as soon as he walked in?

A Yes, it was.

Q And how was it drawn? Could you demonstrate how he was

holding it.

A It was extended.

MS. MORASK: Indicating for the record the witness has extended his right arm.

THE COURT: The record will so reflect.

MS. MORASK: Thank you.

Q Now, could you also describe the man to us who walked in.

A With the weapon, is this --

Q Yes.

A Kind of between the fair skin, dark skin, approximately five ten, five eleven, 160, 175 pounds, dark colored pants, black pants, red sweater with a hood drawn, had a baseball cap with some white -- some type of white ornament on the bill of the cap.

Q When he walked in -- into the shop with the weapon drawn, did he have to walk by you?

A Yes.

Q And after he walked by you, what did you see him do, sir?

A As he walked by, I kind of turned and was observing him at the same time. He walked up to the gentleman that was at the counter and just pulled the trigger, shot him in the back of the head.

Q How close was this person who pulled the trigger to the first victim as he shot him in the back of the head?
A I would say that the -- the weapon was almost at the back of his head.
Q Did this person with the trigger say anything at all up until that point?
A Nothing.
Q What was the next thing that you saw?
A I was almost at the door, the entrance of the doorway. He turned and fired a shot at the gentleman that was standing in the window.
Q And after he fired the shot at the gentleman who was standing in the window, what happened to that person?
A He fell.
Q And -- had the first victim also fallen?
A The first victim also fell, was on the ground.
Q How far were you from the man with the gun when he fired the second shot?
A I had gotten outside of the doorway at that point.
Q But you could -- but you could still see in?
A Correct.
Q Was there anything blocking your view whatsoever?
A Nothing.
Q What was the next thing that happened?

A He turned back to the first victim and shot him, shot at him while he was on the ground.

Q Okay. And what did you see him do after he again shot the first victim?

A Then he turned and shot the second victim while he was on the ground.

Q Did he move over to where the second victim was?

A Kind of turned and just shot down.

Q And how many times did he shoot the second victim again?

A Twice.

Q And now tell us again where are you standing at this point.

A At that point I was probably in the middle of the street.

Q Okay. In front of the subway shop?

A Correct.

Q Could you see clearly inside?

A Yes.

Q What was the next thing that happened?

A I broke and ran southbound on Halsted towards the railroad tracks and I got maybe two stores down, make 50 feet or so. I turned around and I could see the gentleman -- the shooter getting into a vehicle just north of 74th and Halsted.

Q All right. And you said you were approximately 50 feet

away at this point.

A Correct.

Q Now, this vehicle, where was it in relation to the curb?

A It had -- it was kind of in the middle of the street.

Q It had already pulled away from the curb?

A Right.

Q Was there any other vehicles out on the street that were -- that grabbed your attention at that point?

A An off -- looked like an unmarked police car.

Q All right. Now, before we talk about the unmarked police car, what did you see the Defendant do -- I am sorry, Mr. Evans do in relation to that car that was in the middle of the street?

A Once I turned, I could see -- see him trying to get into the back of this vehicle on the driver's side.

Q Now, was the engine of that car off or on?

A It was on.

Q All right. And did you see anything unusual about any of the doors?

A Driver's -- rear driver's door was open.

Q All right. Did it appear to you as if the Defendant -- I am sorry, as if Mr. Evans knew where he was running to?

A Yes, he did.

Q All right. And when you say he tried to get in, what

happened?

A Seemed like he kind of lost the grab -- grasp of the door or trying to get in the car as he was moving and he seemed to be getting up from off of the ground.

Q All right. And as the shooter got up from off the ground, did he eventually make it into the car?

A Yes, he did.

Q Once he got into the car did the car door close?

A I can't say if it closed or not but I saw the car pull off.

Q All right. And in what direction did the car pull off?

A Northbound on Halsted.

Q And how fast would you estimate, if you can, sir, how fast car the pulled off once the shooter had gotten into the car?

A It was pretty rapid.

Q Did you hear anything unusual when the car pulled off?

A Well, at that same time I did hear some tires squealing.

Q Okay. Now, could you describe this car for us.

A Four door kind of a midsize car, midsize type of car. At the time I thought it was kind of darker in color.

Q Now, after that car sped off, what was the next thing that you saw?

A Well, at the same time as that vehicle was taking off,

the unmarked police car did a 180 degree turn in the middle of the street right there at 74th and Halsted.

Q And what did that police car do after it did the turn?

A He started to pursue that vehicle at the same time I started to go back to my vehicle.

Q After you went back to your vehicle, where did you go?

A I headed northbound on Halsted to about 72nd and Halsted and I didn't see the vehicle anymore.

Q And then what did you do, sir?

A I went down to 71st and Halsted, the Amoco Gas Station where I made a call to the police department.

Q Okay. And did you return to the scene?

A Yes, I did.

Q And once you returned to the scene, did you go back inside the subway shop?

A I made another call from -- from the pay phone to 911 and then went back into the restaurant again.

Q And when you went back into the restaurant, did you observe anything about either of the victims at that point?

A The first victim was lying on the floor. He still had the money in his hand that I observed him with earlier. The second victim that was in the window, he was laying on the floor kind of like in trauma or shock.

Q You could -- could you tell he was still alive?

A Yes.
Q Did the police eventually arrive?
A Yes, they did.
Q And did you talk to the police?
A Yes, I did.
Q Now, I want to move you ahead a few months to August 15th of 1994. Did you receive a phone call from some police officers on that day?
A Yes, I did.
Q All right. And did you go anywhere in response to that phone call?
A Yes, I did.
Q Where did you go, sir?
A 51st and Wentworth.
Q And what was your purpose in going to 51st and Wentworth?
A To view -- view a lineup.
Q All right. And when you arrived there, did you meet with some police officers?
A Yes, I did.
Q Would that be O'Brien -- Detective O'Brien?
A Yes.
Q And did you then view a lineup?
A Yes, I did.

Q And can you describe for us how many people were in this lineup?
A Five -- five individuals.
Q Okay. And did each person in the lineup -- were they asked to do something in relation to you?
A Yes, they did.
Q What did they do?
A They were each asked to walk, take maybe three steps forward and then turn around.
Q Okay. And you were in a separate room?
A Yes, behind a one way mirror.
Q Did you make any identification at that time?
A Yes, I did.
Q And do you recall the number of the person that you identified?
A Number four.
Q And who did you identify him as being, sir?
A The shooter of the incident.
Q All right. Now, I'm going to show you a series of photos which I am going to mark and show to counsel first. First I'm going to show you People's Exhibit Number 1 for identification. What is that a photo of, sir?
A The individuals that were in the lineup.
Q All right. And does it also -- does it show the person

that you identified as the shooter?

A Yes, it does.

Q And what position is he in this lineup?

A Number above him is -- or Number 6 which is the fourth person.

Q Okay. Could you just put an X over his head of the person that you identified on August 15th as the shooter. Thank you, sir. Indicating for the record he's marked an X over the fourth person.

Now, People's Exhibit Number 2, can you tell us what this is a picture of.

A That's the picture of the restaurant.

Q Okay. That shows the Honey Sub shop?

A Correct.

Q And if you look into the window, you can see the counter, is that correct?

A Yes, you can.

Q So in other words the counter is directly across from the window as you walk in.

A Yes.

Q All right. People's Exhibit Number 3, what does that show?

A That's another view of the Honey Sub restaurant.

Q Does it also show a northbound view of Halsted?

A Yes, it does.
Q All right. And would the area where the car was waiting be shown in this photo?
A Yes, it does.
Q All right. Could you place an X where -- approximately where the area where the car was waiting for the shooter in that photo?
A Okay.
Q Indicating that the witness has placed a X off to the left of the photo. And that was you said how far north of the corner of 74th and Halsted?
A Maybe half of a store.
Q All right. People's Exhibit Number 4 for identification, what does that show?
A That's the first victim.
Q All right. And does it show the menu above the board as well as the victim lying on the left on the bottom?
A Yes, it does.
Q Does it also show the three dollar bills clasped in his hand?
A Yes, it does.
Q What's People's Exhibit Number 5 show, sir?
A That's a view of the restaurant with victim one and the location where victim two was at.



SOTOS-WILLIAMS 11395

Q All right. And how can you tell the location where victim two was at?
A That was the point where he was standing when he was shot.
Q All right. And is there a large area of blood there as well as his jacket that he was wearing?
A Yes, it is.
Q And People's Exhibit Number 6 for identification, is this a close up view of the first victim?
A Yes, it is.
Q All right. And finally People's Exhibit Number 7 for identification, is this a close up view of the blood and the surrounding area where the second victim was?
A Yes, it is.
Q And do all these photos, People's Exhibits 2 through 7 truly and accurately depict the scene as it appeared on that night?
A Yes, it does.
Q And does People's Exhibit Number 1 truly and accurately show the lineup that you viewed on August 15th?
A Yes, it is
MS. MORASK: May I have a moment, Judge?
THE COURT: Um-hm.
(Brief pause)

MS. MORASK: Thank you, Mr. Pratt. I have nothing further, Judge.

THE COURT: All right. Mr. Weiner.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Mr. Pratt.

A Good afternoon.

Q Mr. Pratt, were you inside or outside the submarine shop when the person with the gun came in?

A I was inside.

Q At that time did you see the car?

A No, I didn't.

Q At that time did you know whether the car's engine was running or not?

A No.

Q At that time did you know whether the car's lights were on or not?

A No.

Q At the time did you know where the car was parked?

A No.

Q Now, how long of a time transpired between the time that the shooter shot the first shot until he went and finally shot that last shot?

A Matter of three seconds, four seconds.

Q Okay. He shot the first guy in the head, correct?
A Correct.
Q Goes and shoots the second guy who is seated, right?
A Correct. He wasn't -- he was standing.
Q Standing, excuse me. Goes back and shoots the first guy again?
A Yes, he does.
Q How many times?
A One.
Q And then he goes back and shoots the second guy.
A Yes, he does.
Q Does he stop on his way out?
A I really couldn't tell because I was already out of the restaurant and I was running in the southbound direction.
Q Okay. Now, when you saw the shooter try to get into that car and you saw that that man slipped, was the car moving?
A It looked like it was moving.
Q And how many times did the man slip, the shooter?
A I observed maybe one time, once.
Q When was the first time that your attention was drawn to the car?
A Once I turned as I was running down -- southbound on Halsted once I turned and I could see the shooter running in that direction to the vehicle.

Q Were the lights of the car on then?
A I really didn't pay attention to it then.
Q So you first noticed the car after you heard and saw all those shots, am I correct?
A That was afterward, right.
Q You had been in there, first victim shot, second victim shot, first victim shot again, second victim shot again. How many shots did you hear?
A Five.
Q Do you know when the driver of that car started that car?
A No.
Q All you know is that the car was started when you saw the shooter running to the car, is that right?
A Yes.
Q Did you see the driver of that car?
A No, I didn't.
Q Did you see how he was dressed that night, the driver of that car?
A No --
MS. MORASK: Objection.
THE COURT: Overruled.
MS. MORASK: He just said he didn't see him.
THE COURT: Overruled.

A No, I didn't.
MR. WEINER: Q Did you see this man in the submarine shop that night?
A No.
Q Did you see this man in the automobile that night?
A No.
MR. WEINER: I have no other questions of the witness.
MS. GROHS: None.
THE COURT: No cross examination?
MS. GROHS: No, sir.
THE COURT: Thank you. State, redirect.
MS. MORASK: I have nothing further.
THE COURT: Thank you, sir. You can step down. Could I have a -- attorneys up here just for a moment.

(Whereupon, a discussion was had off the record in court outside the hearing of the jury.)

THE COURT: Ladies and gentlemen, at this time we're going to break for lunch. We'll see you after lunch. All right. Have a good lunch.

(Whereupon the following proceedings were had in court outside the presence of the jury.)

THE COURT: All right. Why don't everybody be seated. How long is your opening statement going to be? Mr. Harper, sit down please. All right. Barry, we're going to have opening

statements. Off the record.

(Discussion had off the record)

THE COURT: All right. Mr. Weiner, you don't have to stay for opening statements.

MR. WEINER: Pardon me?

THE COURT: You don't have to stay for opening statements.

MR. WEINER: I want to.

THE COURT: Okay. Great. I appreciate that. Mr. Smith, do you adopt your opening statement?

MR. SMITH: Yes. Yes, I do.

THE COURT: Miss Grohs. I want that door closed and nobody knocking on it.

THE SHERIFF: Yes, sir. Can we bring the jury through?

THE COURT: No.

MS. GROHS: I believe the evidence is going to show Londell was nothing more than a passenger in that car, that he didn't say anything, that he didn't do anything, that there was no plan.

He made a court reported statement that you're going to hear. And in that statement he says that he was at 83rd and Houston I think -- I believe it was. And he saw the first of them at the car and asked them for a ride home. He saw a gun which he described as big and black and he saw them put it in the trunk of the car. He came down to the car and asked them if

he could get a ride home. They said yes. He got into the front passenger seat of the car.

And as they were driving somebody in the back seat named Pugi who is also known as Andre Rudik said, "There goes some bricks." David Evans yelled stop the car or pull over, to something to that effect. That Cordell Williams and Dai Dai, David Evans, jumped out of the car. That he heard the shots. That David Evans came and ran and got back in the car. They drove off and eventually everybody was dropped off and Londell was taken home.

At no time was there a plan, no time was there a discussion to go shooting gang members. That he was there merely to go for a ride -- get a ride home. That he didn't say anything. He didn't do anything. He was very cooperative with the police. He surrendered himself and made a statement.

And there is absolutely no evidence that he aided or abetted in any way and that I'd ask that you find him not guilty.

THE COURT: Thank you. All right. You can take the people back and then you can proceed with the jury.

THE SHERIFF: Thank you, sir.

MR. WEINER: When do you want us back, sir?

THE COURT: 2:15.

(Lunch recess taken)

THE COURT: Will you please bring the jury out.

THE SHERIFF: All rise for the jury.

(Whereupon the following proceedings were had in court in the presence of the jury.)

THE COURT: Will everybody please be seated. State, call your next witness.

MR. SMITH: People call Stan Sanders.

THE COURT: Officer, step around the Court Reporter, step up to the stand and remain standing please. Raise your right hand.

DETECTIVE STAN SANDERS,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE COURT: Have a seat. Could you keep your voice up. Thank you very much. Proceed, State.

MR. SMITH: Q Sir, would you please state your full name and spell your last name.

A My name is Detective Stanley Sanders, S A N D E R S.

Q And, Detective, how long have you been with the Chicago Police Department?

A 18 years.

Q How long have you been a detective?

A Since March.

Q It will be March of '95?
A Yes, sir.
Q Now, do you recall, Detective, where you were assigned on May 26th of 1994?
A Yes, sir. I was assigned to the 12th District. That's at Racine and Monroe.
Q And what area does the -- are the boundaries basically for the 12th District?
A The boundaries are from Madison north to 22nd Street south, from Halsted to Western.
Q Now, calling your attention to the 25th of May of '94, did you work on that day?
A Yes, sir, I did.
Q And was that in the 12th District?
A Yes, sir.
Q Calling your attention to approximately 12:15 a.m., early morning hours of the 26th of May, 1994, do you recall where you were at -- at about that time?
A Yes, sir, I do.
Q And where is that at?
A That would be south on Halsted, about 7400 south.
Q And were you in a car at that time?
A Yes, sir. I was in my personal vehicle.
Q Was anyone else with you?

A No, sir.
Q Did anything unusual happen at that time?
A Yes, sir, it did.
Q And would you please tell the ladies and gentlemen of the jury what happened.
A While I was waiting at the light at 7400 south on Halsted, I heard several gunshots.
Q And what was the next thing that you did?
A Well, the light changed and I proceeded through the light. And I observed a black male running from a submarine shop at 7403 South Halsted.
Q And which direction did this individual run?
A He ran out of the submarine shop and he started to run in the street north on Halsted.
Q Did you see anyone coming from that sub shop prior to that individual?
A Yes, sir. I observed an older individual run out before and start to run south on Halsted.
Q Now, where were you at when this second individual came out and started to run northbound?
A I was directly in front of the submarine shop at 7403 South Halsted.
Q And you're headed in what direction?
A I'm headed south.

Q So that would be across the street from you basically?
A Right across the street, yes, sir.
Q What did you do at that time?
A After I observed him run out of the submarine shop and start to run north on Halsted, I made a u-turn in the middle of the street and started to follow him.
Q And can you please tell us where he was at when you made that u-turn.
A He had crossed 74th Street and started to run north.
Q Was he on the sidewalk or where was he located?
A No. He had ran off the sidewalk and he was running down the street along the side of the parked cars.
Q And which side of the street would that be -- be on?
A That would be on the east side of the street running north.
Q Now, when he came out, this individual came out of the sub shop, the younger one, did you notice anything unusual when he came out of that sub shop?
A Yes. He appeared to be fumbling with something underneath his sweatshirt.
Q After you turned your car around, what was the next thing that you did?
A After I turned my car around and I crossed the intersection at 74th Street going north, I was directly behind

him. And this individual stumbled and fell to the ground.
Q What did you do at that time, Officer?
A I drew my service revolver and told him, "Police, stop. Police, stop."
Q Did you get out of the car first?
A Yes, sir, I did.
Q Was that after he stumbled?
A That was after he stumbled, yes, sir.
Q What did he do at this point?
A He got up and he continued to fumble whatever he had underneath his sweatshirt and appeared to be running towards a vehicle that was parked on the east side of the street on Halsted.
Q Well, backing up a second, when you said, "Stop police," did he look at you?
A Yes, sir, he did. He turned around and looked at me and continued to run.
Q Now, when was the first time you noticed a vehicle?
A This individual then stumbled again and -- and about the second time that he stumbled I observed a vehicle pulling out of a parked -- a parking spot on Halsted.
Q All right. And would you tell us where this -- this vehicle was located.
A That vehicle would probably have to be at about 7347 on

Halsted.

Q Was it in the middle of the street or was it on -- alongside the curb?

A It was parked alongside of the curb.

Q And when you first -- when your attention was first drawn to that vehicle, what was it doing?

A It was starting to gradually pull out of the parking spot.

Q All right. When you say gradually, was it pulling out fast or was it -- can you approximate how fast it was pulling --

A Just a couple miles an hour. Just a normal, you know, pulling out from the curb.

Q Could you tell if it had its headlights on at that time?

A No, sir. It had no -- no lights.

Q Now, what was the next thing you noticed about this individual as he was running in that direction?

A Well, I -- I noticed that the individual was still fumbling with something underneath his sweatshirt. And as the car pulled out of the parking spot, I noticed that the back door of this vehicle came open.

Q Which back door?

A That would be the back door on the driver's side.

Q Was this a four door vehicle?

A Yes, sir, it was.

Q And when you noticed that -- well, when this back door opened, had -- had this individual, the one that you were chasing, was he the one that opened it?
A No, sir.
Q After that back door opened, what did this individual that you were chasing do?
A That individual started to reach for the door and I observed some hand from the back seat reach for him.
Q And what happened when you saw that hand come out and reach for him?
A He was close enough to the car to gain entry into the vehicle.
Q What happened after he got into the car?
A After he got into the car, I immediately ran back to my car and started to follow this vehicle north on Halsted.
Q All right. After he got into the car, Detective, was the door shut?
A Yes, sir.
Q And what did you do at that point?
A Well, after the door shut, that's when I got back to my vehicle and started to follow that car north on Halsted.
Q As you were following the car north on Halsted, did it have its lights on at that time?
A No, sir.

Q About how far did you follow it on Halsted?
A To 7300 south, about a block.
Q What happened at 73rd and Halsted?
A At about 73rd and Halsted, the vehicle's lights came on.
Q And did it turn at all at that time?
A Yes. And at that particular time the vehicle made a left turn off Halsted onto 73rd Street going west.
Q Did you follow it?
A Yes, I did.
Q About how far behind this -- this vehicle were you?
A About half a block.
Q And about what speed were you -- would you estimate the other vehicle would be going at this time?
A Well, when we got to 73rd Street and -- and started going west, I would imagine we were doing about 60 to 70 miles an hour.
Q How far did you chase this vehicle westbound on 73rd Street?
A From Halsted to Carpenter Street.
Q And once you got to Carpenter did the vehicle turn at that time?
A Yes, sir, it did.
Q And which way?
A That vehicle turned -- made another left turn, started

going south on Carpenter Street.

Q Did you follow that?

A Yes, sir, I did.

Q And when you got on Carpenter Street, would you please tell the ladies and gentlemen how far you followed this vehicle.

A I followed the vehicle to 7500 south on Carpenter. And that's about the time -- I mean they were really barreling down. He went straight through the stop sign at 75th Street without even touching the brake pedal.

Q How could you tell that?

A Because I saw no brakelights.

Q Did he still have headlights on at the time when he hit 75th Street and Carpenter?

A Yes. He still had the lights on then.

Q About how fast do you think you were going at that time coming down Carpenter?

A I probably was doing about 60 miles an hour.

Q After the car went through 75th, did you stop at that stop sign or slow?

A Yes, sir, I did.

Q And did you go through the stop sign?

A Yes, I did.

Q All right. Could you please tell the ladies and gentlemen where the vehicle went at that time.

A Well, I had to slow my vehicle down to get through the stop sign at 75th Street. About the time that vehicle got to the middle of the block, the lights went off and I lost that vehicle at about that time.

Q Now, what were the road conditions like that night or the weather if you recall?

A Well, that night it had -- it was a little drizzling rain earlier so that night the streets were -- were wet or damp.

Q And after you lost this vehicle that you were chasing, did you go back to the sub shop where you had heard the shots come from?

A Yes, sir, I did.

Q And when you arrived there, did you go -- actually go into the sub shop?

A Yes, sir, I did.

Q Were any other police officers on the scene at that time?

A They were just starting to arrive at about that time.

Q And did you go inside and see any of the victims that had been shot?

A Yes, sir, I did.

Q And were they alive at that time?

A There was one victim that appeared to be near the front window, he appeared to be breathing just a little bit.

Q Did you note anything about the other victim?
A The other victim that was near the counter, he had money in his hand.
Q And did he appear to have been dead at that time?
A Yes, sir.
Q Now, did you remain on the scene basically when a lot of the emergency personnel arrived and other detectives and Crime Lab personnel?
A Yes, sir, I did.
Q While you were chasing this car, did you get any information regarding it?
A Yes, sir, I did.
Q And what information did you get?
A I got a license plate number from this vehicle.
Q And do you recall that license plate number?
A I believe it's BN 9244.
Q And did you give that to your fellow officers when you got back to the sub shop at 74th and -- 7403 Halsted?
A Yes, sir, I did.
Q While you were there at the scene, did you learn that the police -- other officers had located that -- that car with that license plate number, BN 9244?
A Yes, sir.
Q And did you go over to the location where they had found

it?

A Yes, sir.

Q Would that be at 7622 South Carpenter?

A Yes, sir.

Q And was that the same vehicle that you identified as being the same vehicle you had been chasing earlier?

A Yes, sir.

Q Now, after this obviously, Detective, you spoke to violent crime detectives from area one?

A That's correct, sir.

Q And did you subsequently view a lineup on August 15th of 1994?

A Yes, sir.

Q And did you recognize anyone in that lineup?

A Yes, sir, I did.

Q And who did you recognize?

A I recognized that person as being the person that I had saw running out of the submarine shop and the person had ran north on Halsted to a waiting vehicle at about 7347.

Q And you picked him out of that lineup obviously, is that correct?

A That's correct.

MR. SMITH: Judge, I'd ask that the detective be allowed to come down and view People's Exhibit Number 8.

MR. WEINER: Judge, I have no objection. I'm wondering if -- if I may stand around.

THE COURT: Oh, sure.

MR. WEINER: Thank you very much.

THE COURT: Do you want to put it on an easel, Mr. Smith?

MR. SMITH: Yes, that's fine.

THE COURT: Why don't you do that and then I'll have the detective step down.

MR. SMITH: Where would the best spot be?

THE COURT: It's your evidence.

MR. SMITH: Right in the middle.

THE COURT: Mr. Weiner, do you want to step on this side?

MR. WEINER: I don't want to block the jury's view.

THE COURT: Step up, Detective.

THE WITNESS: Thanks.

MR. SMITH: Q I'll ask you to identify what's marked as People's Exhibit Number 8 for identification.

A Yes, sir.

Q Would that assist you in explaining your testimony to the jury?

A Yes, sir.

Q Is this the area around 7403 South Halsted?

A Yes, sir, it is.

Q And does this diagram truly and accurately represent

that area?

A Yes, sir, it does.

Q Now, without marking would you please show the ladies and gentlemen of the jury where you were parked at when you first began to hear the -- the shots.

A When I first heard the first shot, I was stopped at the light right here just north of 74th Street on Halsted.

Q And you were heading southbound, is that correct?

A Yes, sir. I would have been going southbound.

Q And where is it that you made a u-turn?

A After I heard several shots, the light changed and I proceeded through this intersection. This is 74th Street. And at about right here directly across from this Honey Sub this is where I observed that individual run out of this submarine shop. After he ran out of the submarine shop, he ran across the sidewalk and started running north down Halsted in the street. This is where I made my u-turn, right here directly in front of the sub shop.

Q Now, as you followed this individual -- did you subsequently learn his name to be David Evans?

A Yes, sir, I did.

Q Is this after you identified him in the lineup?

A That's correct, sir.

Q Okay. As you followed David Evans, you mentioned that

you noticed a vehicle parked at the curb.

A That's correct, sir.

Q All right. Would you please draw a square where you saw -- square or rectangle where you saw that vehicle parked.

A Yes, sir. This vehicle would have been parked at the curb.

MR. SMITH: Indicating for the record, your Honor, a red square just north of 74th Street.

Q And could you please, Detective, show us the path that David Evans took from the front -- the first time you saw him coming out of the Honey Sub until he arrived at the vehicle.

A Yes, sir. While I was stopped right here directly in front of the sub shop, I observed the Defendant, David Evans run out of -- of the sub shop into the street crossing 74th Street and running north across 74th Street.

Q And did he eventually get up to the vehicle?

A Yes, after stumbling twice. About that time the vehicle pulled away from the curb.

Q After he got in the vehicle, what happened at that point?

A After he got into the vehicle, I immediately ran back to my vehicle. My vehicle would have been about right here, right where he stumbled and fell because after he stumbled and fell, that's when I exited my vehicle and -- and told him, "Police,

stop. Police, stop." He was on the ground. And he continued to fumble with whatever he had underneath his sweatshirt and continued to make good his escape into the vehicle.

Q Now, can you describe the speed or the rate of speed of which that car that you were -- that the Defendant Evans jumped into left that scene.

A I mean after -- after David Evans got into this vehicle, this -- this car just really shot out. It just peeled off.

Q And is that when you ran back and got into your car?

A Yes, sir, it is.

Q I have nothing further. You can take your seat, Detective.

A Thank you.

MR. WEINER: Can you leave the diagram up?

THE COURT: I don't know if he's done.

MR. SMITH: I'm not done though.

THE COURT: You'll leave it in a convenient spot.

MR. SMITH: I'll put it back.

MR. WEINER: Thank you.

MR. SMITH: May I approach the witness, your Honor?

THE COURT: Certainly.

MR. SMITH: Q Detective, I'll show you what's been previously marked as People's Exhibit Number 2 for identification, ask you if you recognize what's shown in that

photograph.

A Yes, sir, I do.

Q And what -- would you tell the ladies and gentlemen of the jury what that's a photograph of.

A This particular photograph is a photograph of the submarine shop located at 7403 south on Halsted.

Q And does that truly and accurately show how it appeared on May 26th of '94?

A Yes, sir, it does.

Q Now, I'll show you what will be marked as People's Exhibit Number 9, 10 and 11. And would you please tell the ladies and gentlemen what People's Exhibit Number 9 is.

A This particular photograph is a photograph of the vehicle that was parked at approximately 7347 on Halsted Street, the one in I which --

THE COURT: Detective, there's an appropriate time that those be published. Don't be showing them to the jury.

THE WITNESS: Thank you, your Honor.

MR. SMITH: Judge, if I may, I apologize.

THE COURT: No, no. We're -- nobody is associating blame. Just a correction.

MR. SMITH: Q With regards to People's Exhibit Number 9, is that the vehicle that you saw pulling off from the 7300 block that David Evans jumped in?

A That's correct, sir.
Q Okay. And I'll ask you to look at People's Exhibit Number 10.
MR. WEINER: Did he say 7300 block?
THE COURT: I am sorry. I didn't hear. What was the question?
(Question and answer read)
MR. SMITH: Q Now, I'll show you what's marked as People's Exhibit Number 10 and People's Exhibit Number 11. And do you recognize what that's photographs of.
A Yes, sir, I do.
Q And what is that photographs of.
A This is also -- both photos are also photographs of the vehicle that was at the 7300 block of South Halsted.
Q And is the license plate visible from those photographs?
A Yes, at the time, rear license plate on the rear of this car.
Q And do those photos, 9, 10 and 11 truly and accurately show how that car appeared approximately 1:30 in the morning on May 26th of '94?
A Yes, sir, it does.
Q Now, finally I'll show you what's marked as People's Exhibit Number 12 for identification, Detective. Do you recognize what that is?

A Yes, sir.
Q And what do you recognize that to be?
A This particular photograph is a photograph of the four individuals, the one David Evans who is in the right of this particular photograph that I saw enter that vehicle.
Q And would you please put an S over that individual's head that you identified.
A Yes.
MR. SMITH: Thank you. Indicating for the record, your Honor, an S above the head of the individual fifth from the left.
Q He's the last one in that row, is that correct?
A Yes, sir.
MR. SMITH: May I have a moment, your Honor?
THE COURT: Sure.

(Brief pause)

MR. SMITH: Q Detective, can you tell us what the distance is from Halsted to Carpenter Street?
A That distance is about three and-a-half blocks.
MR. SMITH: Thank you. I have nothing further.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Detective.
A Good afternoon.

Q Congratulations on your new detective.
A Thank you.
Q Detective, you first went back to the sub shop and talked to the reporting officers, the blue and whites that came to investigate the scene, is that true?
A That's correct.
Q And at that time, sir, did you ever tell the officers -- do you remember their names by the way?
A One officer I believe was Harrell. I don't remember the names of the rest.
Q Okay. Would I refresh you if I told you the other officer's name was was Balentine?
A Yes, sir.
Q Did you ever tell either of those officers that you got out of your car and announced your office to the man who was running?
A Yes, sir, I did.
Q Okay. And later that day you actually went back down to talk to homicide detectives, is that true, later on that morning?
A Yes, sir.
Q That would be Detective Armata and Detective Dwyer, isn't that right?
A I believe those were the names of the detectives.

Q And did you tell them that you got out of your car and in fact announced your office?

A Yes, sir.

Q Pulled your service revolver?

A Yes, sir, I did.

Q Did you tell them that when you first saw the car that the car was pulling away and that Mr. Evans fell twice trying to enter the car?

A Would you repeat it.

Q Of course I will, sir.

Did you tell the two detectives who you talked to -- by the way where did you talk to those detectives at?

A That would have been out of area -- area one and --

Q Would you tell the ladies and gentlemen of the jury where area one is.

A Area one is detective division located at 5100 south on Wentworth.

Q You got there sometime that morning, is that correct?

A That's correct.

Q And you were interviewed, is that right?

A That's correct.

Q As a witness, true?

A Correct.

Q And where in fact did you sit when you were interviewed

as a witness at area one, if you remember?
A Well, their office is located on the second floor of that particular building.
Q And you talked to them for about how long and told them about what happened?
A Basically we were there all morning.
Q Okay. And you say you told them that you got out of your car and announced your office and you pulled your service revolver with regard to Mr. Evans, is that true?
A Yes, sir, at some particular point of the interview.
Q And did you tell them that Mr. Evans stumbled before the car moved?
A Yes, sir.
Q Isn't it a fact, sir, that on that morning, on the morning of May the 26th of 1994 that that -- at area one at 51st and Wentworth up on the second floor at the detective's office you said that the car was pulling away and Mr. Evans fell twice trying to enter the vehicle as it was pulling away? Did you tell them that?
A Yes, sir, I believe so.
Q So is it your testimony here today that he fell twice before the car pulled away and then fell twice after the car was pulling away?
A He fell twice before the car pulled away.

Q All right. Now, maybe you didn't get my question because I want to be very, very sure of your answer.

A Yes, sir.

Q Did you tell Detective Armata and Detective Dwyer, the two homicide detectives that as the vehicle was pulling away that Mr. Evans fell twice trying to enter the vehicle? In other words that the -- the vehicle was moving when Mr. Evans --

MR. SMITH: Objection to the form of the question, your Honor.

THE COURT: Officer -- Detective, do you understand the question?

THE WITNESS: I believe I understand what he is trying to get at.

THE COURT: Okay. Why don't you answer it. Thank you.

A What was happening is the Defendant fell twice. The vehicle pulled away from the curb. He -- he fell twice before the vehicle pulled away.

MR. WEINER: Q So you're saying the vehicle was stopped when he fell twice.

A Yes.

Q And my question to you, sir, is this: Didn't you tell Detective Armata and Detective Dwyer that Mr. Evans fell twice while the vehicle was moving trying to get into the car?

A I believe I told them that he fell twice before the

vehicle pulled away.

Q Okay. Now, my next question to you, sir, is this: The vehicle when you first saw it, it was in a parking space on Halsted, wasn't it, sir?

A Yes, sir, it was.

Q It was not in the middle of the street on Halsted, was it, sir?

A When I first saw it?

Q Yes, sir.

A No.

Q And in fact when you first saw the vehicle the vehicle's lights were out, isn't that true?

A That's correct.

Q And when you first saw the vehicle, the vehicle was pulling away from the parking spot, isn't that true?

A I saw the vehicle parked at the curb.

Q Okay. And then after that you saw the vehicle pull away from the parking spot, isn't that true?

A That's right.

Q And the vehicle turned its lights on, isn't that true?

A No, sir.

Q Did the vehicle turn its lights on after it pulled away?

A Yes, sir.

Q When was that, sir?

A At approximately 73rd Street.

Q How far did you chase it before it turned its lights on?

A That would be from the corner of seven -- from the corner block south of 7300 to the north part of the street of 7300.

Q Which is less than a block, is that right?

A Less than a block, sir.

Q And it's when the vehicle turns its lights on that you could see the license plate on the rear of the car, isn't that true, sir?

A Repeat the question again, sir.

Q I would be happy to.

It's when the vehicle turned its lights on that you could see the license plate on the back of the car, isn't that true, sir?

A That's correct.

Q So in fact the driver of that vehicle by turning his lights on allowed you to take the notation of the license plate number which you gave the officers in the sub shop, isn't that true?

MR. SMITH: Objection.

THE COURT: Overruled. The detective can answer.

A No. I didn't write -- I didn't write a plate down. I just memorized the plate.

MR. WEINER: Q Well, then my question is in fact the driver of that vehicle by turning his lights on allowed you to memorize the plate number, isn't that true?

MR. SMITH: Objection as to what the driver did and why the driver would turn the lights on.

THE COURT: I will allow the detective to answer. Go ahead, Detective.

A I could probably have seen the plates without him turning the lights on.

MR. WEINER: Q But you just testified that the first time you saw the plates was when his lights were on, isn't that true?

A Yes, sir.

Q Okay. I'm really not here to argue with you.

A Yeah. I understand.

Q Okay. Now, sir, if somebody were to say -- to come up and testify that when David Evans got into the car the car was a half a store from the submarine shop and in the middle of the street, would that in fact refresh your recollection of where the car actually was?

MR. SMITH: Objection.

THE COURT: I'll let him answer that one narrow question. You can answer that, Detective.

A He has to repeat that again.

THE COURT: Sure. Go ahead.

MR. WEINER: Q Let me ask you this: How far was the car from the submarine shop when you saw it parked on Halsted?

A Oh, that would have been from seven -- 7403 to 7347. I would imagine that would be 50 or 60 feet.

Q How many stores are in between the sub shop and the -- where you saw the car parked at the time you saw the car at the curb?

A How many stores --

Q Are between the sub shop and where the car was parked.

A Well, there would be the shop that would be on the corner. I believe that's 7401. And there might have been two to three shops on the north side of Halsted.

Q It was across the intersection where you saw it parked, is that right, sir?

A Yes, sir.

MR. WEINER: Judge, I am not going to be needing to use the diagram so I'm going to conclude my examination of Officer Sanders at this time. Thank you very much.

MS. GROHS: May I adopt? And I have no other questions.

THE COURT: Certainly. The record will reflect that. Redirect, State.

MR. SMITH: We have no further questions, Judge.

THE COURT: Thank you, Detective. You can step down.

THE WITNESS: Thank you, your Honor.

THE SHERIFF: Step up to the jury box, Ma'am. This box. I'm sorry.

THE CLERK: Please raise your right hand.

CANSADIA COCHRAN,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MORASK:

THE CLERK: Please be seated.

THE COURT: All right. Proceed.

MS. MORASK: Q In a loud and clear voice could you tell the ladies and gentlemen of the jury your full name and then spell your last name for the Court Reporter.

A Cansadia Cochran, C O C H R A N.

Q And, Miss Cochran, are you currently living in the City of Chicago?

A Yes.

Q And how long have you lived in the City of Chicago?

A 39 years.

Q Do you have any children right now?

A Yes.

Q And how many children do you have?

A One.

Q Okay. And is that a boy or a girl?

A A girl.
Q Are you employed right now?
A Yes.
Q Where are you working?
A Falpro.
Q And what kind of work do you do?
A Machine operator.
Q How long have you done that kind of work?
A About 16 years.
Q Okay. I want to take you back to May 25th of 1994. Did you have another child at that time?
A Yes, I did.
Q And what was his name?
A Myron Cochran.
Q How old was Myron?
A 18.
Q And did Myron attend school?
A Yes.
Q Where did he go to school?
A Cosmopolitan.
Q What is Cosmopolitan?
A Like an alternative high school.
Q Okay. And what year was he in at Cosmopolitan?
A Junior.

Q Was Myron employed at that time?
A Yes.
Q Where was he working at?
A Popeye's Chicken located on 54th and Halsted.
Q All right. And before that had he been employed?
A Yes.
Q And where was he employed before then?
A McDonald's, Water Tower Place.
Q To your knowledge did Myron have a friend named Billy Johnson?
A Yes, he did.
Q And how long had Myron and Billy Johnson been friends?
A Since September of '91.
Q And do you know how good a friends they were or how close they were?
A Best of friends, like brothers.
Q How often would you see Myron over -- how often would you see Billy over at your house?
A Seven days a week.
Q Okay. And how often would Myron go over to Billy's house?
A Seven days a week.
Q To your knowledge was your son involved in any gang?
A No, not at all.

Q All right. Did he -- you said he had a job. Did he also have a girlfriend?
A Yes, he did.
Q And what was her name?
A Brenda Carrion.
THE COURT: State, move on.
MR. SMITH: Q On that particular evening of May 25th, did you see your son that evening?
A Yes.
Q Approximately what time did you see your son?
A It was about 5:00 o'clock.
Q All right. And did you have a conversation with him about where he was going that evening?
A Yes.
Q All right. And where was he going to go?
A At first he told me he wasn't going nowhere. And then Billy called and he said that they was going to see the Crow over in Forest City.
Q A movie?
A Yes.
Q And were you at the house when Myron left?
A Yes.
Q And do you know whom he left with?
A He left by hisself and he went to Billy's house.

Q And approximately what time was it that he left?
A 7:00, 7:15, somewhere in there.
Q Okay. And when he left, was your son in good health?
A Excellent health.
Q Did you ever see your son alive again?
A No.
Q Did you get a phone call or a visit from the police that evening or the following morning?
A A visit from the police.
Q And do you recall approximately what time that was?
A It was either -- it was either ten minutes to 4:00 or 4:00 o'clock.
Q Okay. And did they notify you that your son had been killed?
A Yes.
Q Did you have to go somewhere to make an identification?
A Yes.
Q And where did you go?
A Coroner's office.
Q I'm going to show you what I've marked previously as People's Exhibit Number 13, ask can you tell us what People's Exhibit Number 13 shows.
A That's a picture of my son, Myron.
Q Okay. And could you tell us when that was taken.

A Maybe June of '93. That's the year book picture from the high school.

Q Does that truly and accurately show how he looked in May of '94?

A Yes.

MS. MORASK: Okay. Judge, I believe at this time there would be a stipulation and agreement between the parties, that being the People of the State of Illinois through their Assistant State's Attorneys Laura Morask and Michael Smith and Cordell Williams through his attorney, Mr. Weiner and Londell Harper through his attorney, Miss Grohs that if People's Exhibit Number 14 were shown to the witness, Miss Cochran she would identify it as a picture of her son that she identified at the Cook County Medical Examiner's office. So stipulated?

MR. WEINER: Yes, we would stipulate so.

MS. GROHS: So stipulated.

THE COURT: Those stipulations will be allowed and moved into evidence.

MS. MORASK: Thank you, Miss Cochran. I have nothing further.

MR. WEINER: Your Honor, I have no questions of Miss Cochran.

MS. GROHS: No questions.

THE COURT: Thank you, Ma'am. You can step down.

MR. SMITH: Judge -- judge, with no objection I ask that Miss Cochran be allowed to remain in the courtroom.

THE COURT: If there's no objection.

MR. WEINER: I have no objection.

MS. GROHS: No objection.

THE COURT: Thank you. Ma'am, could you step up here please. Step around the Court Reporter.

THE CLERK: Raise your right hand.

GLORIA JOHNSON,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE CLERK: Please be seated.

THE COURT: Mr. Smith, proceed.

MR. SMITH: Q Ma'am, would you please state your full name and spell your last name.

A Gloria Jean Johnson. J O H N S O N.

Q How old are you, Miss Johnson?

A 34.

Q And calling your attention to May 25th of 1994, at that time how many children did you have?

A Six.

Q And was one of your children -- one of your sons named

Billy?
A Yes.
Q And how old was Billy on May 25th of 1994?
A 19.
Q When was -- strike that.
Was Billy working at this time?
A Yes, he was.
Q Where did he work at?
A Popeye's on 54th and Halsted.
Q And had Billy graduated from high school?
A Yes, he did.
Q And where did he go to high school?
A He went to DuSable High School.
Q Who was he living with on May 25th of '94?
A My grand -- my mother.
Q Did he also have a friend by the name of Myron Cochran?
A Yes, he did.
Q Now, when was the last time you saw Billy prior to May 25th or May 26th of 1994?
A Two weeks before.
Q And where had you seen him at?
A At my mother's house.
Q And was he in good health at that time?
A Yes, he was.

Q I'll show what's marked as People's Exhibit Number 15.

MR. SMITH: May I approach, your Honor?

THE COURT: Yes.

MR. SMITH: Q Miss Johnson, I'll ask you to tell the folks if you recognize what People's Exhibit Number 15 for identification is.

A This Billy graduation night, prom night, graduation night.

Q Was that for his prom night of 1993?

A Yes.

Q Does this truly and accurately represent the general condition he was in prior to May 25th of 1994?

A Yes.

MR. SMITH: Your Honor, with regards to People's Exhibit Number 16, there would be a stipulation between the parties at this time that -- the stipulation would be, ladies and gentlemen, that if shown People's Exhibit Number 16 for identification Mrs. Johnson would identify it to be a morgue photo of her son.

MR. WEINER: I would certainly stipulate to that.

MS. GROHS: Stipulate.

THE COURT: All right. Those stipulations will be allowed and moved into evidence.

MR. SMITH: Q Did you subsequently go to the medical --

learn that your son had been shot on May 26th of 1994?

A Yes.

Q And did you go down to the medical examiner's office?

A I went to County Hospital.

Q And that's where he was -- and when you first saw him at County Hospital, was he still alive at that time?

A I think he was brain dead.

Q Later on that same day on the 26th did they pronounce him dead at about 8:00 o'clock in the evening?

A Yes.

MR. SMITH: May I have a moment, your Honor?

THE COURT: Um-hm.

MR. SMITH: Q To your knowledge was your son Billy in a gang at all?

A Absolutely not. He wasn't in a gang.

MR. SMITH: I have nothing further.

MR. WEINER: Judge, I have no questions of Mrs. Johnson.

MS. GROHS: No questions.

THE COURT: Ma'am, you can step down.

THE WITNESS: Thank you.

MR. SMITH: She can stay?

MR. WEINER: Of course. I have no objection.

THE SHERIFF: Ma'am, please step up here to the witness stand, face the clerk.

OFFICER LASHONDRA HARRELL,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE CLERK: Please be seated.
THE COURT: All right. Proceed, Mr. Smith.
MR. SMITH: Q Officer, would you please state your full name and spell your last name.
A Lashondra Michelle Harrell, H A R R E L L.
Q And how long have you been a Chicago police officer?
A For two years.
Q Now, calling your attention to May 26th of 1994, were you working on that day?
A Yes, I was, sir.
Q And what shift were you -- first of all, what shift were you on?
A I was from 6:00 to 2:00. 6:00 p.m., 2:00 o'clock in the morning, rapid response.
Q All right. And what do you mean by rapid response?
A We go to all in progress calls.
Q What district were you working in?
A 7th District.
Q Is that commonly referred to as the Englewood district?



SOTOS-WILLIAMS 11440

A Yes, sir.
Q And what are the general boundaries of the Englewood district?
A That's from 55th to 75th, from about the Dan Ryan to Seeley.
Q Now, on that date would you have been working with a partner also?
A Yes, I was, sir.
Q What's your partner's name?
A Officer Balentine.
Q Now, at approximately 20 minutes after midnight on the 26th did you receive a radio dispatch?
A Yes, we did.
Q And what was the nature of that dispatch?
A There was a man shot.
Q And did it also give a location?
A Yes, it did.
Q And what was the location, Officer?
A It was 7403 South Halsted.
Q What did you and your partner do at that time?
A When we arrived on the scene, we got out to investigate what they had said over the dispatch over the air.
Q Now, about how long from the time that you got that radio dispatch did it take you to get to 74 --

A It was exactly five minutes. We were right up the street.
Q So when you arrived at that location, what's at 7403?
A It's Honey Sub Restaurant. It's like a carry out place. It's no chairs or anything.
Q Did you go into the restaurant at that time?
A Yes, I did.
Q And were you the first police car to arrive at the scene?
A Yes, we were.
Q All right. When you first went into that Honey Sub Restaurant, what -- what did you see?
A We saw two bodies on the floor.
Q Now, where was the first body that you saw?
A The first body I saw was by a counter.
Q Okay. And did you notice any injury on this individual?
A Yes, I did.
Q Was it the bodies of two young men also?
A Yes, it was.
Q First person that you saw by the counter, did you later on find out that that was a person by the name of Myron Cochran?
A Yes, sir.
Q All right. What injuries did you notice about him?
A I noticed excessive amount of blood by his head.

Q Did you notice anything else about him at that time?
A Yes. In his -- in his hand, I believe right hand he had $3.00 that was clutched with a fist.
Q Did he appear to be dead at that time?
A Yes, he did appear at that time.
Q Now, you said there was a second victim?
A Right. He was by the window. He was like pointing west. It was another victim there.
Q And did you later on learn that this young man's name was Billy Johnson?
A Yes, we did.
Q And did you notice any injury about him at that time?
A Yes, he also had blood profusely all over -- all over his head.
Q Was he alive at that point?
A Yes, he was.
Q What was the next thing that you did, Officer?
A We started the dispatching the ambulance to come to the scene.
Q And did an ambulance and other emergency personnel arrive?
A Yes, they did.
Q Did you notice any type of fired evidence in that area?
A Yes. At the time when I noticed on the floor there were

five casings looked like from a 45.

Q When you say casings, shell casing?

A Shell casing, yes, cartridge casings.

Q Cartridge casings?

A Yes.

Q In other words the bullet had already been expended out of those shell casings?

A Yes, sir.

Q At that time did an evidence technician subsequently arrive and also take various photos?

A Yes, they did, sir.

Q And you were assigned to what would be called the paper car, is that correct?

A Yes.

Q And would you please tell the Court what the paper car does?

A The paper car is the car assigned to whatever was going on that particular time. We get there. We observe the situation. We find out what's going on. We start taking down notes. We are the people who start the investigation.

MR. SMITH: May I approach, Judge?

THE COURT: Sure.

MR. SMITH: Q I'm going to show you a series of photos, officer. And could you please identify them and describe what

they are. I'll show you what's marked as People's Exhibits Number 2 and 3.

A Okay. This is --

Q Do you recognize what those are?

A Yes. The Honey Sub Restaurant, the location of the scene.

Q And that's both 2 and 3?

A 2 and 3.

Q Those are photos of the outside, is that correct?

A Yes, it is, sir.

Q I show you what's been previously marked as People's Exhibit Number 4 for identification. Do you recognize what that's a photo of?

A Yes. That's Mr. Cochran right there on the floor and that's -- that's the counter I was saying where he was lying on the --

Q I'm showing you People's Exhibit Number 5. Do you recognize what that's a photo of?

A That's Mr. Cochran again and this is Mr. Johnson's jacket right over here.

Q All right. Indicating -- could you describe the jacket.

A Bloody.

Q What color is it?

A Red and black.

Q At the time these photos were taken Mr. Johnson had already been taken away by an ambulance, is that correct?

A Taken by an ambulance to Cook County Hospital.

Q But did -- his jacket was taken off by paramedics and remained at the scene?

A Yes, yes.

Q I'll show what's marked as People's Exhibit Number 6. Do you recognize what that's a photograph of?

A Yes, Mr. Cochran.

Q I will show you what's parked as People's Exhibit Number 7.

MR. WEINER: Is that 17 or 7?

THE COURT: 7.

MR. SMITH: 7.

MR. WEINER: Thank you.

MR. SMITH: Q It's previously marked as People's Exhibit Number 7. Is that a close up of the photo in the area where --

A Mr. Johnson's jacket.

Q Now, I'll show you what's marked as People's 17. Is that also another photo of the area where Mr. Johnson was at and with Myron Cochran?

A Yes, sir.

Q I'll show you People's Exhibit 18 for identification. Is that also a photo of --

A This is --
Q Of the jacket?
A Yes. Mr. Cochran's jacket.
Q I show what's marked as People's Exhibit Number 19. Is that also a photo of some fired shell casings on the ground?
A Yes. Yes, it is.
Q I'll show you what's marked as People's Exhibit Number 20 for identification. What is that a photo of?
A Mr. Johnson's jacket and the casings that's on the floor.
Q Does that also show -- is that on the -- taken on the inside?
A On the inside of the restaurant, yes.
Q Does that show the front door?
A Yes, it does.
Q All right. I'll show you what's marked as People's Exhibit Number 21 for identification.
A Mr. Johnson's jacket again.
Q And is that a further close up?
A Yes, it is.
Q I'll show you what's marked as People's 22 for identification. Is that also a close up of the area where the victim was lying?
A Yes.

Q And finally I will show you what's marked as People's Exhibit Number 23.
A Mr. Cochran.
Q Is this a photo of Mr. Cochran?
A Yes, it is, sir.
Q And that would be when he was turned over at the scene?
A Right, exactly.
Q Do those photographs that I have just shown you truly and accurately show how that sub restaurant appeared and how the victims appeared on May 26th of 199 --
A It exactly does.
Q That area, Officer, outside of the sub shop, what -- what kind of lighting is out there?
A It's very good light. You have a street lamp -- light post right on the corner. And inside the Honey Sub Restaurant is also very well lit.
MR. SMITH: May I have a moment, Judge?
THE COURT: Um-hm.
(Brief pause)
MR. SMITH: I have nothing further.
MR. WEINER: Judge, I have no questions of Officer Harrell.
MS. GROHS: No questions.
THE COURT: Thank you, Officer. You can step down.
THE WITNESS: Thank you.

MS. MORASK: Judge, People call Officer Mangan.

THE SHERIFF: Please step up in the witness box and face the clerk, Officer.

OFFICER ROBERT MANGAN,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MORASK:

THE CLERK: Please be seated.

THE COURT: All right. Proceed, State.

MS. MORASK: Thank you.

Q Sir, could you please tell the ladies and gentlemen of the jury your name, star number and unit of assignment.

A Robert J. Mangan, M A N G A N, star Number 4688. I now work in the 10th District, Chicago Police Department.

Q How long have you been a Chicago police officer?

A Seven and-a-half years.

Q Back on May 26th of 1994 what district were you working?

A I was assigned to the 7th District.

Q Okay. And when you were assigned to the 7th District, what was your partner's name?

A Michael Kane.

Q And on May 26th of 1994 in the early morning hours, were you on duty?

A Yes, I was.

Q All right. And at approximately 1:30 in the morning, did you receive or monitor a call over the radio?

A Yes, we did.

Q What was the nature of that call?

A There was a flash message sent on a vehicle wanted for a homicide. It was a 1990 or '89 Ford four door with a license plate of BN 9244.

Q All right. And was there a location where the car was supposed to be at when you were monitoring the message?

A Yes. The address the car was registered to was 7622 South Carpenter.

Q And did you proceed to that location?

A Yes, we did.

Q What's located there, Officer?

A A single family residence.

Q Did you notice anything in front of the house?

A Yes. The vehicle was parked there directly in front of the house.

Q And what did you do at that time when you saw the vehicle parked in front of the house?

A My partner and I exited our vehicle and proceeded to ring the door bell of the residence.

Q Okay. And were you met by anybody at the door?

A Yes, we were.
Q Did that person introduce themselves?
A Yes.
Q What was that person's name?
A Brenda Williams.
Q And did you learn from her the person who had driven the car last?
A Yes.
Q And who was that?
A Her son, Cordell Williams.
Q And did that person eventually come to the door?
A Yes.
Q Did you see the person at that time?
A Yes.
Q Do you see that person today in court?
A Yes, I do.
Q Could you please point to him and describe something he's wearing for the ladies and gentlemen.
A He's all the way on the end to the right table next to the female attorney with the black shirt.
Q I want you to --
MR. WEINER: Let the record reflect that the officer has identified Mr. Harper.
MS. MORASK: Judge, may I rephrase my question?

THE COURT: The record is going to reflect that.

MR. WEINER: I want the record to reflect that.

THE COURT: It is going to reflect. So go on.

MS. MORASK: Q When you saw Mr. Williams at that time -- first of all, Officer, I want you to look around the courtroom and look at the counsel --

MR. WEINER: We'll stipulate now that he can identify the Defendant.

MS. MORASK: That's not my question.

THE COURT: Don't be offering stipulations, Counselor.

MS. MORASK: Q Did the person who came to the door back on May 26, 1994 look like this person sitting here right now?

A No, he did not.

Q Did he look different from that?

A Yes, he did.

Q Okay. Now, the person who came to the door, did he introduce himself as Cordell Williams or did his brother introduce him as such?

A His mother did.

Q Did you have a conversation with him?

A The extent of the conversation I had with him was if he was driving the vehicle to which he replied yes. I asked him what time did he get home. He said he got home at 10:30. I asked if he had loaned his car to anybody else. He stated no,

that he was the last person driving the vehicle.

Q All right. And where did that conversation take place?

A In the front room of the mother's residence.

Q And do you know what vehicle he was referring to?

A Yes.

Q And what vehicle was that?

A The 1990 Ford Tempo, four door.

Q And at that time were other detectives or officers arriving on the scene?

A Yes, they were.

Q And did you turn -- did you turn Cordell Williams over to Detective Dwyer or did he arrive on the scene?

A Yes, I did. Well, he went out to the vehicle on his own. I followed him out.

Q Mr. Williams or Detective Dwyer?

A Yes. No. Detective Dwyer was outside.

Q All right. And then once Mr. Williams was outside, was he placed under arrest by Detective Dwyer?

A Yes, he was.

Q And was he transported by yourself?

A Yes, he was.

Q Where did you transport him to?

A Area one, 51st and Wentworth.

Q And when you transported him to area one, was that the

end of your duties in relation to this case?
A Yes, it was.
MS. MORASK: All right. May I have a moment, Judge?
THE COURT: Sure.
(Brief pause)
MS. MORASK: Q I'm going to show you what's already been marked and shown to counsel as People's Exhibit 9, 10 and 11. Can you tell us what People's Exhibit 9 shows.
A This was the vehicle that was parked in front of 7622 South Carpenter with the license of BN 9244.
Q And is that the vehicle that Mr. Williams told you he had just driven?
A Yes, it is.
Q All right. And is People's Exhibit 10 and 11 two different views showing the license plate that you've just described to the ladies and gentlemen of the jury?
A Yes, it is.
Q And do all three of those truly and accurately show the vehicle as it appeared when you saw it in front of Mr. William's house?
A Yes, it does.
MS. MORASK: Thank you, Officer. I have nothing further.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Officer.
A Good afternoon, sir.
Q How different did Mr. Williams look that day than he does today?
A Well, his hair was shorter and he wasn't wearing glasses.
Q Okay. What was he wearing?
A Pair of shorts and I believe a T-shirt.
Q Was he wearing a hooded sweatshirt that day?
A When we met him at his home, no.
Q Was he wearing a baseball cap?
A No.
Q Did you observe any tatoos on his body?
A No, sir.
Q You had a conversation with him, is that correct?
A Yes, I did.
Q Was he polite with you?
A Yes, he was.
Q Detective Dwyer then came to the location?
A Yes. He was outside by the vehicle.
Q And Mr. Williams went out and talked to Detective Dwyer?
A Yes, he walked out.
Q Did you see Mr. Williams being placed under arrest by Detective Dwyer?

A Yes, I did.
Q And after you transported Mr. Williams to the police department, you didn't process him in terms of asking him questions about himself at the time that you -- that he was arrested, is that correct?
A No, sir.
Q Somebody else did that, is that true?
A Yes.
MR. WEINER: Thank you very much. I have no other questions of the officer.
THE COURT: Thank you.
MS. GROHS: No questions.
THE COURT: Thank you.
MS. MORASK: We have nothing further.
THE COURT: Thank you. You can step down, Officer.
THE CLERK: Please raise your right hand.

DETECTIVE DENNIS DWYER,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE CLERK: Please be seated.
THE COURT: Proceed, Mr. Smith.
MR. SMITH: Q Detective, would you please state your full

name and spell your last name.
A Detective Dennis T. Dwyer, D W Y E R, star Number 20211.
Q How long have you been a Chicago police officer?
A 24 years.
Q And how long have you been a detective?
A 18 years next month.
Q Where are you assigned?
A Area one.
Q Could you tell us the general boundaries that encompass area one?
A Currently the area one is bounded by the lake on the east, approximately the Stevenson Expressway on the north, in someplaces 75th Street on the south, other places 87th Street out on the south all the way to Harlem Avenue.
Q Now, on May 26th of 1994, were you working in area one?
A Yes, sir, I was.
Q And do you remember on May 26th what shift you were working?
A I was working the first watch.
Q What time does that go from?
A I start at 12:30 a.m., 00:30 hours.
Q And were you working with a partner on that day?
A Yes, sir, I was.
Q And what was your partner's name?

A Detective Ron Armata, A R M A T A, star Number 20202.
Q And did you receive an assignment shortly after coming to work there?
A Yes, sir, I did.
Q And what was the nature of your assignment?
A Two people shot, one dead, one on the way to the hospital from the submarine sandwich shop at 7403 South Halsted.
Q What did you do at that time?
A At that time responded to the scene.
Q Now, the scene located there is a small submarine shop?
A Yes, sir.
Q The -- how many victims are present when you got there?
A There was one subject dead on the floor. The other subject had been removed by paramedics.
Q The person that was there dead on the scene, did you learn later on his name to be Myron Cochran?
A Yes, sir, I did.
Q Now, after that, Detective, did you remain at the scene to continue your investigation?
A Yes, sir, I did.
Q And did Crime Lab personnel arrive and take various photographs of that scene?
A Yes, sir, they did.
Q Now, while you were there conducting your investigation

at the sub shop, did you receive any information regarding the vehicle used in this double shooting?
A Yes, sir, I did.
Q And what information did you learn at that time?
A At that time learned from the beat officers that the car that had been followed from the scene by an off duty police officer had been located at 7622 South Carpenter.
Q What did you do at that time?
A At that time we went to that location.
Q And when you arrived there, did you see the car that had previously been described by the Chicago Police Officer Sanders?
A Yes, sir.
Q And do you recall the license plate on that vehicle?
A Bravo, Nori, 9244.
Q And what did you do when you saw this -- saw this car?
A At that time I approached the front of the vehicle and noted a large amount of heat coming off the radiator of the automobile.
Q Now, about what time would this have been, Detective?
A This had to be approximately 1:15, 1:20 in the morning.
Q And while you were out there, did anyone else come out to the area where the car was located?
A Yes, sir.
Q And who was that?

A Cordell Williams.

Q And did that person identify himself?

A Yes, sir.

Q Do you see that person in court?

A Yes, sir, I do.

Q Could you please describe something he's wearing.

A He's wearing a white shirt and a dark tie. He's seated at the defense table over there.

MR. SMITH: Indicating for the record he's identified the Defendant.

THE COURT: The record so reflects.

MR. SMITH: Q Now, at this time when he came out was there any conversation?

A Yes, sir.

Q All right. And who spoke first?

A He spoke first.

Q And what did he say?

A He asked what was happening, what was up.

Q And what, if anything, did you say to him at that point?

A I asked whose car this was.

Q And what did he say?

A At that time he said it was his mother's car. I asked who was driving it last. And he said he had been driving it but he had arrived home at 10:30 p.m.

Q And this was approximately 1:15 in the morning?
A Yes, sir.
Q And you previously stated you had put your hand by the -- where at at the car?
A Near the front radiator. You could feel the heat emanating out from the grille from the radiator.
Q What did that lead you to believe?
A That the car had just recently been driven.
Q After that did Officer Sanders arrive on the scene at 7622?
A Yes, sir, he did.
Q Did he identify that being the car that he had chased?
A Yes, sir, he did.
Q Was the Defendant, Cordell Williams who you've identified here in court placed under arrest?
A Yes, sir, he was.
Q Was he subsequently transported back to area one?
A Yes, sir, he was.
Q Now, where is area one located at?
A It's located at 5101 South Wentworth on the second floor.
Q And at the time -- backing up a second, Detective. At the time that you arrested Cordell Williams, did you advise him of anything?

A Yes, sir, I did.
Q And what did you advise him of?
A His constitutional rights.
Q What did you do that from?
A From memory.
Q Please recite the same rights that you gave him when you placed him under arrest that early morning hours.
MR. WEINER: If the State would accept the stipulation, I would stipulate that he gave him his rights.
MR. SMITH: Judge, I would like the officer --
THE COURT: That's your prerogative.
MR. SMITH: I appreciate that.
MR. WEINER: You're quite welcome.
MR. SMITH: Q Would you please state the rights you gave the Defendant.
A You have the right to remain silent. If you choose not to remain silent, anything you say or write can and will be used as evidence against you in court.
You have the right to have an attorney. You have the right to have that attorney present with you during any questioning. If you cannot afford an attorney, one will be appointed to you at no charge.
And I asked him if he understands those rights. He answered in the affirmative to all the questions.

Q Did you question him out there at that time?
A No, sir.
Q About what time was it, do you know, Detective, that you placed him formally under arrest?
A About 1:30 a.m.
Q Now, later on you said you went back to area one, is that correct?
A Yes, sir.
Q At that time did you interview other witnesses to this shooting?
A Yes, sir, I did.
Q When you were done talking to those witnesses, did you have a chance to have a conversation with the Defendant, Cordell Williams?
A Yes, sir, I did.
Q And about what time would that have been?
A That was at 03:55 a.m.
Q And where would it have been at that you spoke to the Defendant Williams at?
A We took him into the sergeant's room and sat down, advised him of his rights again.
Q And that first time you advised him you didn't ask him any questions basically, is that correct?
A That's right.

Q At this time who -- who else was present with you when you interviewed him?

A My partner, Detective Ron Armata.

Q Now, at that time did you have a conversation with him about where he was at that evening?

A Yes, sir, I did.

Q And what did Cordell Williams tell you regarding that?

A As to his movements that evening, he said he had gone over to 83rd and Exchange and he had picked up two friends known as Veno and Chris and that they had gone to Northwestern Hospital to visit a friend who was in the hospital, victim of a gunshot. And after they left the hospital, they returned to the vicinity of 83rd and Saginaw where they did some drinking. And then he dropped off Veno and Chris and returned home at 10:30 p.m.

Q Now, about how long was this interview you had with the Defendant?

A 25 minutes, a half an hour.

Q Did he admit that he had any knowledge of this shooting over on -- in the sub shop on 74th and Halsted?

A He denied any knowledge of the shooting.

Q Now, after this, Detective, did you prepare a report with regard to the information that you had learned with regards to the shooting including what the witnesses said and the

Defendant?

A Yes, sir.

Q And did you turn that investigation over the following morning to other detectives for follow up?

A Yes, sir, I did.

MR. SMITH: May I have a moment, Judge?

THE COURT: Sure.

(Brief pause)

MR. SMITH: I've nothing further.

THE COURT: Cross examination.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Detective.

A Good afternoon.

Q Detective, on May 26th of 1994 when Mr. Williams came to your car, do you remember how he was dressed, sir?

A No, sir, not offhand I don't.

Q Okay. After arresting the Defendant, you brought him down to area one and you processed him, is that correct?

A I had the -- one of the uniformed cars transport him into the area. We did not transport him ourselves.

Q Once he got to the area one, you asked him questions with respect to areas of identification and background which would commonly be known as processing a Defendant, isn't that

true?

A Yes, sir.

Q And when you asked him how old he was, what did Cordell Williams tell you how old he was, if you remember?

A I don't -- I don't recall his birthday or his age.

Q Well, would there be anything that would refresh your recollection, Officer?

A Probably my report.

Q Would that be your arrest report, sir?

A The arrest report or the -- our supplemental report.

Q I'm going to mark this as Defendant's Exhibit Number 1.

MR. WEINER: May I approach the witness?

THE COURT: Sure.

MR. WEINER: Q Sir, do you recognize what's been marked as Defendant's Exhibit Number 1 for identification?

A Yes, sir. It's a copy of an arrest report.

Q And does your name appear on that report?

A Yes, sir, it does.

MR. WEINER: And may the witness have that report up there, Judge? I am going to ask him a few questions if the State doesn't object rather than continuing to withdraw with regard to the processing information.

THE COURT: All right. I'll let him have it right now but if there's any objection by the State we'll consider that at the

proper time. All right. Go ahead.

MR. WEINER: Q When you asked him his age, how old did he tell you he was?

A 19 years old, sir.

Q Did you ask him if he was employed?

A Yes, sir, I did.

Q Did he tell you if he was in fact employed?

A Yes, sir.

Q Where did he say he was working?

MR. SMITH: Objection.

MR. WEINER: Judge, the State went into conversations. I think I have a right to secure information from the officer about other things that the Defendant said.

MR. SMITH: Relevance.

THE COURT: Overruled.

MR. WEINER: Q Where did he say he was working?

A Board of Education.

Q You arrested him at his -- at a single family home, is that true, Officer?

A Out in front of the house, yes, sir.

Q Did you determine whether or not he lived there with his parents when you arrested him?

A Yes, sir, we did.

Q At the First District, sir, you said -- when Mr. Smith

asked you, you said you also had occasion to interview other witnesses, isn't that true?

A Yes, sir.

Q One of those witnesses would be Officer Stanley Sanders, the off duty officer that in fact reported the license plate of the car to the beat officers, isn't that true?

A Yes, sir.

Q When you interviewed Officer Sanders, where in fact did you interview Officer Sanders?

A In area one.

Q And would that be in your office on the second floor?

A Yes, sir.

Q And for how long had you interviewed Officer Sanders?

A 20 -- 20 minutes to a half an hour.

Q Did Officer Sanders tell you about the seeing the man run from the submarine shop and get into the car?

A Yes, sir.

Q Did Officer Sanders ever tell you that he got out of his car and pulled his weapon and announced his office?

A I believe he did mention that.

Q Did you include that in your report, sir?

A I don't recall if it's in the sup or not.

MR. SMITH: May I mark this Defendant's Exhibit Number 2 for identification. May I approach?

THE COURT: Yes.

MR. WEINER: Q I show you what's been marked as Defendant's Exhibit Number 2 for identification. Do you recognize that report?

A Yes, sir.

Q Is that the supplemental report that you prepared with regard to your investigation in the morning hours of May 26th of 1994 with regard to the deaths of Mr. Cochran and Mr. Johnson?

A Yes, sir. That's the report that my partner and I prepared. I actually typed it.

Q In that report, does it indicate that Officer Sanders stated that he had gotten out of his car, pulled his weapon and announced his office?

A No, sir, it doesn't mention it in the report.

Q Thank you. Officer, do you recall when Officer Sanders talked to you did he tell you that in fact the person with the gun fell down or tripped twice while running from the store?

A Yes, sir.

Q Did he tell you whether or not the car which the person got into was moving or was parked when the person tripped twice?

A I -- as I recall it, he said the guy fell once and the car started to pull away and he got up and he fell again as the car was pulling away.

Q Officer, isn't it a fact that in your report which has

been marked Defendant's Exhibit Number 2 for identification that Mr. Sanders told you that the vehicle was pulling away and that the gun man fell twice trying to enter the car?

A That's the way I remembered it, sir.

Q May I approach the witness? I'm asking you again to look at the report that you identified as People's Exhibit Number 2 for identification. Do you see in the body of that report what Officer Sanders told you which Detective Armata typed up with respect to what -- whether in fact the person had tripped?

A Yes, sir.

Q What is in fact -- what does the report say, sir?

A It says that he fell twice trying to enter said vehicle.

Q And what does it say about the car, was it moving or stationary, sir?

A Vehicle was pulling away.

Q So does that refresh your recollection, sir?

A That's the way it is in the report but I seem to remember that he fell once and fell once while the car was pulling away.

Q This report, sir, was made on May 26th of 1994.

A Yes, sir.

Q The day that you interviewed Mr. Sanders, is that true?

A Yes.

Q Also by the way one other question for you: When you interviewed Mr. Williams and did the processing, did you ask Mr. Williams if he was a member of a gang?

A Yes, sir, I believe we did.

Q And what did he say to you?

A I don't recall at this time.

Q Isn't it a fact that -- that he did tell you he was a member of a gang?

A I don't recall right offhand.

MR. WEINER: I have no other questions of the officer. Thank you very much.

THE COURT: State, redirect? I am sorry. Miss Grohs.

MS. GROHS: No questions.

THE COURT: Okay. Thank you.

REDIRECT EXAMINATION

BY MR. SMITH:

Q Detective, the report that you prepared is a supplemental report, is that correct?

A Yes, sir, it is.

Q Do you put down everything that you're told by a witness?

A No, sir.

Q Is it a summary of what you're told?

A Yes, sir. On its face it's a summarization of the facts

we compile during the course of the investigation.

MR. SMITH: May I have a moment, Judge?

THE COURT: Um-hm.

(Brief pause)

MR. SMITH: I have nothing further.

MR. WEINER: Judge, I have no other questions.

THE COURT: Okay. Thank you, Detective.

We're supposed to have some refreshments up here about 4:00 o'clock so that's where Barry went. Let me find out. State and Defense, can you come up here. Okay.

(Whereupon a discussion was had off the record in the courtroom out of the hearing of the jury.)

THE COURT: All right. Ladies and gentlemen, what we're going to do is take a break right now. And, Barry, could you take everybody back to the jury room. Again don't discuss this matter among yourselves. Thank you.

(Whereupon the following proceedings were had in court outside the presence of the jury.)

THE COURT: Mr. Sheriff, I'm going to order you to get potato chips. The accused have said they haven't had anything to eat so I'm going to allow their families to get them something to eat. They can have those too.

THE SHERIFF: Right now, your Honor?

THE COURT: Sure.

DEFENDANT WILLIAMS: Thank you, your Honor.

(Recess taken)

THE COURT: All right. Bring the jury out please.

(Whereupon the following proceedings were had in court in the presence of the jury.)

THE COURT: All right. Court is back in session. Will everybody please be seated. You look happy now that you've had those great refreshments. State, could you call your next witness.

MS. MORASK: Yes, Judge. People call Officer Frank DeMarco.

THE COURT: How do you do? Can you just step around and step on the witness stand. Thank you.

INVESTIGATOR FRANK DeMARCO,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MORASK:

THE CLERK: Thank you. Please be seated.

MS. MORASK: Q Sir, could you please introduce yourself to the ladies and gentlemen of the jury.

A Police forensic investigator Frank DeMarco, D E capital M A R C O, star Number 12802.

Q And are you employed by the Chicago Police Department?

A Yes, I am.

Q How long have you been a forensic investigator?
A 18 years.
Q Can you please explain to the ladies and gentlemen some of the duties and functions of a forensic investigator?
A Yes. I select, preserve and transport physical evidence recovered from crime scenes. I photograph crime scenes. I look for possible ridge impressions. I fingerprint and photograph the dead.
Q Do you specialize in any type of crime scene?
A Homicides.
Q Now, I'm going to take you back to May 26th of 1994. Were you on duty at that time?
A Yes, I was.
Q And who was your partner at that time?
A Tom Bacheler.
Q Were you called to a crime scene located at the Honey Sub Shop on South Halsted Street?
A Yes, Ma'am.
Q Do you recall approximately what time you were notified to go to the crime scene?
A Yes. It was approximately 12:35 a.m. in the morning.
Q When you arrived at the crime scene, did you learn it had been protected by the beat officers and by some detectives?
A Yes, Ma'am.

Q And did you go into the crime scene?
A Yes, I did.
Q What was the first steps that you and your fellow forensic investigator did?
A After the scene was being protected, we walked inside and observed one dead victim that was lying on the -- on the floor. The second victim that had been shot was removed prior to our arrival on the scene.
Q Did you observe the location where the second victim had been lying before he was removed?
A Yes. He was lying near the front glass plate window of the sandwich shop.
Q All right. Now, Officer, what is the first step that you take? Is that photographing the scene?
A I photograph the scene as I find it when I arrive.
Q All right. After you finish photographing the scene, what was the next step in your investigation?
A Visual examination of the victim revealed a gunshot wound to the head.
Q All right. And after you observed the gunshot wound to the head, did you observe anything else unusual about the victim? Was he holding anything?
A Yes. Some money. He had some money in his hand.
Q What was the next thing that you did?

A Well, after photographing the wound and identification photo, I fingerprinted the victim right on the scene.
Q Okay. And after you fingerprinted the victim, did you search for physical evidence?
A Yes. Then I conducted a search for possible firearms evidence.
Q And were you successful? Did you locate any firearms evidence?
A Yes, Ma'am.
Q And what did you locate?
A I found five spent 45 caliber cartridge cases.
Q Did you locate any fired evidence?
A Yes, and one fired bullet.
Q All right. Now, can you describe first of all the location of two of the shell casings that you found?
A Yeah. Two of the spent cartridge cases I found near the doorway leading to the kitchen area on the floor.
Q So would that have been in proximity to the first victim lying by the counter?
A Yes, right.
Q Where did you find the other three shell casings?
A They were recovered near the front window glass pane window, three cartridge cases on the floor.
Q And where did you find the fired bullet?

A The fired bullet was next to the dead victim.
Q All right. After you located -- did you photograph that fired evidence?
A Yes, Ma'am.
Q And once you photographed the fired evidence, what steps did you take to inventory and preserve it?
A I placed the cartridge cases in an evidence envelope, marked them, the location where they were recovered, put the date, also our initials. And also we processed them for any possible ridge impression before we hand carried them down to the Chicago Police Department Crime Lab to inventory them and send them to the proper units of the firearms section.
Q And once you were done with this investigation did you hand carry those down to the Chicago Police Crime Lab?
A Yes, Ma'am.
Q And to your knowledge were they turned over to the firearms department?
A Yes, Ma'am.
Q Okay. Now, I'm going to show you some photos that have previously been marked in relation to the fired evidence we've been discussing. First People's Exhibit Number 5. Is that an overall picture of where the two victims were?
A Yes, this is correct. This is an overall view showing the one dead victim and one victim that was removed near the

front of the sandwich shop.
Q Were there any articles of clothing left from the victim that had been removed?
A I believe there was a jacket or some type of clothing, yes.
Q All right. And that's visible on that photo, is that correct?
A Yes.
Q Now, in People's Exhibit 19, does this photo show two of the cartridge cases that were found by the victim that was at the food counter?
A Yes. Those are two spent cartridge cases on the floor here near the doorway leading to the kitchen area.
Q Okay. I'd like you to take this pen and please circle each of those cartridge casings for us.
MS. MORASK: Indicating for the record that the officer has circled two cartridge casings, one at the bottom right and one at the middle top left.
Q Now, Officer, People's Exhibit Number 18, what does that show?
A Yes. This is a close up showing the fired bullet that I recovered next to the dead victim that was lying on the floor here.
Q All right. And that's again by the food counter, is

that correct?
A Right, near the kitchen area.
Q Could you also circle that.
A (Exhibit marked)
Q Now, People's Exhibit Number 7, does this also show any cartridge casings in that photo?
A Yes. This is an overall view showing the victim that was removed prior to our arrival, his clothing and also two spent cartridge cases.
Q All right. Did you learn that there was a third cartridge case and that's hidden by the jacket?
A Yes. It's right behind the jacket on the floor.
Q Could you please circle the two cartridge casings that are visible.
A (Exhibit marked)
Q Is there also a large area of blood showing where that second victim was found?
A That's correct.
Q All right. And People's Exhibit Number 21, does that show the cartridge casings that had been hidden from the other view?
A Yes. This is a close up view of the jacket and also showing the spent cartridge case and the blood next to the jacket.

Q And is there --
A Next to the wall.
Q Is there another cartridge casing visible in that photo?
A Yes.
Q Could you please circle both of those.
A (Exhibit marked)
Q Now, you said these were two types of cartridge casings?
A Those were 45 caliber spent cartridge cases.
Q All right. And that would be consistent with being fired from a 45 semi-automatic gun, is that correct?
A That's correct, Ma'am.
Q Is it correct that a semi-automatic ejects the casings when it's -- when the bullet is fired?
A Yes, Ma'am.
Q All right. And just so that we're clear there's three casings by the victim at the window and two casings by the victim at the food counter.
A Yes. There was two by the dead victim and three by the victim that was removed prior to our arrival.
Q All right. I'm going to show you what I've previously marked as People's Exhibit 25. I'm sorry. 24.
THE COURT: Is that going to be group?
MS. MORASK: No. I have 24 as the envelope and then inside is 25 and 26.

Q All right. Can you first of all tell us what People's Exhibit 24 is.

A Yes. This is the envelope that the firearms section of the Chicago Police Department Crime Laboratory places my evidence that I recover from the scene.

Q All right. And can you tell us what is -- what was inside what I just took out of People's Exhibit Number 24.

A Yes. This is also another plastic envelope that firearms examiners use when they place my evidence envelopes that I recover from the scene.

Q All right. And now these are marked People's Exhibit 25 and 26. First with respect to People's Exhibit 25, can you tell us what that is.

A Yes. This is one fired bullet recovered from the floor next to the victim at 7403 South Halsted.

Q Okay.

A It's the fired bullet that was next to the dead victim.

Q And that was the bullet that you placed in that envelope.

A That's correct.

Q And subsequently inventoried and hand carried to the --

A Right. Our markings are on the back here over the flap, F.J.D. and T.B., Tom Bacheler.

Q And you seal it and it was later opened by a firearms

technician, is that correct?

A That's correct.

Q All right. People's Exhibit Number 26, can you open that and tell us what it is.

A Yes. These are the five spent 45 caliber cartridge cases that I recovered from the floor, three from the one victim that was removed prior to our arrival and the two near the vic -- the dead victim on the floor.

Q Now, on each of these exhibits, People's Number 25 and 26, do you assign them an inventory number that is a unique number to keep track of them through the system?

A Yes. In the inventory book they all have numbers and that's the number that whatever is available we use that inventory number to inventory the firearms evidence.

Q And do you mark that on the envelope as well?

A Also the envelope itself on the bottom.

Q Okay. Could you tell us what the inventory number is for the fired bullet, People's Exhibit Number 25.

A Yes. Fire -- firearms evidence is inventoried on the same inventory slip which is 1323338.

Q All right.

A And the same for the spent cartridge cases.

Q Now, are People's Exhibits 25 and 26 in the same condition as when you recovered them from the scene at the Honey

Sub sandwich shop?

A Yes, Ma'am.

Q All right. And the photos that I showed you before regarding the fired evidence, do those truly and accurately show the scene as you processed it on May 26th of 1994?

A Yes, Ma'am.

Q Now, after you were done, Officer, at the sub shop, did you get a notification to go somewhere else?

A Yes. While we're still processing the scene, we were notified by the detectives that -- to proceed to 7622 South Carpenter. They had a suspected vehicle from 7403 South Halsted parked in front on the street which was a Ford, beige, four door Ford.

Q And did you subsequently photograph that car?

A Yes. We arrived on the scene. We photographed the interior and the exterior of the vehicle.

MS. MORASK: Okay. Just may I have a moment, Judge?

THE COURT: Um-hm.

(Brief pause)

MS. MORASK: Thank you, Officer. I have nothing further.

MR. WEINER: Judge, I have no questions of the officers.

MS. GROHS: No questions.

THE COURT: Thank you, Officer.

THE WITNESS: Thank you, your Honor.

MS. MORASK: People call Detective Rose.

DETECTIVE MICHAEL ROSE,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MORASK:

THE CLERK: Please be seated.

THE COURT: Proceed, State.

MS. MORASK: Thank you, Judge.

Q Sir, could you please tell us your name and spell your last name for the Court Reporter.

A Detective Michael Rose, R O S E.

Q And what is your star number and your current unit of assignment?

A My star numb is 20698. I am assigned to the detective division, area one, violent crimes.

Q And how long have you been a Chicago police officer?

A 13 years.

Q How long have you been a detective?

A Four years.

Q And how long have you been at area one?

A Four years.

Q Okay. Taking you back to May 26th of 1994, were you on duty that day?

A Yes, Ma'am.
Q Were you assigned to a follow up investigation of the homicide of Myron Cochran and Billy Johnson?
A Yes, Ma'am.
Q I am sorry. Of Myron Cochran at that point.
A Yes.
Q Could you tell us at what point you became involved in the investigation.
A Just before 2:00 o'clock in the morning on that date.
Q All right. And were you accompanied by a partner?
A I was working at that time with Detective James Jones.
Q And what were you asked to do in particular for this investigation?
A Myself and Detective Jones met up with Detectives Armata and Dwyer in the vicinity of 76th and Carpenter and Detectives Armata and Dwyer asked us to go to Cook County Hospital and check on the condition of Mr. Billy Johnson.
Q And did you do that?
A Yes, I did.
Q What did you learn about the condition of Billy Johnson at that point?
A When myself and Detective Jones arrived at County Hospital, we met with Doctor Crosby. Doctor Crosby told us that Billy Johnson had a gunshot wound to the back of the head which

was embedded up near the forehead and he had another gunshot wound to the right chest. It was a through and through gunshot wound near the right armpit area.

Q And did you learn what his condition was?

A Doctor Crosby told us he was very critical and Doctor Crosby didn't expect him to make it.

Q What was the next step that you and your partner did?

A Detectives Armata and Dwyer asked us to notify the Cochran family and the Johnson family about what had happened to their sons.

Q And did you do that?

A Yes, we did.

Q And after you did that, did you go back to area one?

A Yes, we did.

Q All right. Were you at that time asked to transport any witnesses into area one?

A Yes, Ma'am. We were asked to transport a male, Arabic who was either the owner or the manager of the sub shop where this incident happened and also a male, black witness back to their homes.

Q Would that have been Alexander Pratt?

A Yes, Ma'am.

Q And once you did that, did you come back to area one?

A Yes, we did.

Q And at that point what was the next step you took in this investigation?

A Now it was just before 7:00 o'clock in the morning. Detectives Armata and Dwyer were getting their paperwork together and they were about to start their scene report on this incident. And detectives Armata and Dwyer asked me to go into interview room number two and talk to Cordell.

Q Now, when you say Cordell, are you referring to Cordell Williams?

A Yes, Ma'am.

Q All right. And do you see that person in court today?

A That's Cordell with the white shirt and tie on.

MS. MORASK: May the record reflect the in court identification of the Defendant, Cordell Williams?

THE COURT: The record so reflects.

MS. MORASK: Q Had you learned that he had been earlier arrested by Detective Dwyer at his home?

A Yes, Ma'am.

Q And when you first went into the interview room, what was the first thing that you said to him?

A I introduced myself.

Q All right. And how did you do that?

A I said my name is Detective Rose and I told him I would be assisting in this investigation also.

Q And approximately what time was that, sir?
A Be right around 7:00 o'clock in the morning.
Q Was there anybody else in the room other than you and the Defendant?
A No, Ma'am.
Q Was he cuffed or uncuffed at that time?
A He was not cuffed.
Q All right. And after you introduced yourself, did you advise him of anything?
A I advised him of his Miranda rights from my Fraternal Order of Police book.
Q Do you have a copy of that with you?
A I have got the '95 version.
Q Does it have the same Miranda rights?
A Yes.
Q Could you tell us what you advised him from your FOP book.
MR. WEINER: Stipulate if the State would accept.
THE COURT: I want the State to show you the book first.
MS. MORASK: Q Do you have your book here?
A Yes, Ma'am.
Q All right.
THE COURT: Then mark it.
MS. MORASK: I will.

Q I'll show you what I have marked as People's Exhibit Number 27. Is this the copy of the FOP book?
A That's the 1995 book, yes, Ma'am.
Q Can you describe -- explain to the ladies and gentlemen what an FOP book is.
A It's -- there is a calendar inside of the book, all the different court keys and courtrooms are located in it, important phone numbers are located in it. Towards the back of the book we've got some different department guidelines and the Miranda warnings are also printed out in the back of the book.
Q Could you please look up the Miranda warnings you read to Mr. Williams back on May 26th of 1994?
A They're on Page 126. I think it was 126 of the '94 book also.
Q Could you tell us now what you read to him back then.
A I read him the rights one by one. The first right I read him: "Do you understand that you have the right to remain silent?" Cordell said that he understood that.
I told him that he had -- did he understand that anything he said could be used against you in a court of law or other proceedings and he replied that he understood that.
I said, "Do you understand that you have the right to talk to a lawyer before we ask you any questions and to have him with you during the questioning?" He said he understood that.

I said, "If you cannot afford or otherwise obtain a lawyer and you wanted one, a lawyer would be appointed for you and we will not ask you any questions until a lawyer has been appointed." I asked him if he understood that right and he said he did.

And I said, "If you decide to answer now with or without a lawyer, you still have the right to stop the questioning at any time or to stop the questioning for the purpose of consulting a lawyer." I asked him if he understood that. He said he did.

And I said, "You may waive the right to advice of counsel and your right to remain silent and you may answer questions or make a statement without consulting a lawyer if you so desire." I asked him if he understood that. He said he did.

I said, "Do you understand each of those rights?" He said he did.

And then I asked him if he wanted to tell me what had happened earlier on this evening.

Q Okay. And after you asked him to tell you about what had happened earlier, what did he respond?

A He said that he did.

Q I am sorry?

A He said he wanted to talk with me.

Q And what did you say to him and what did Mr. Williams

say to you?
A Well, I asked him, "What had you done or where had you been earlier in the evening?"
Q And what did he respond?
A He said earlier or later in the evening on the 25th of May he had gone up to Northwestern Memorial Hospital to visit a Mr. Paris McMoore and he had gone up to Northwestern with a Veno and a Chris, that he had gone up there in his parents' Ford. He had gone up there to visit Paris McMoore because Paris McMoore had been shot and he was recuperating at Northwestern. And Paris had been shot in the vicinity of 80th and Sangamon or Saginaw. I don't know which one of those it was.
He said he left Northwestern Hospital about 8:00 o'clock in the evening and he left with Veno and Chris. They went to the southeast side to Veno's house. I asked him where Veno lived on the southeast side. He says, well, he can't tell me. He couldn't tell me what street it was. He couldn't tell me an address and he couldn't tell me how he got there. "Well, how did you find the place? You were driving the car." And he didn't respond to that question at all.
Q All right. What was the next thing that you asked?
A I asked him, "What did you guys do when you were at Veno and Chris'?" And he says they were drinking a little bit. And he says after they drank for a while he left. And I asked him

who he left Veno's with. And he said, "I didn't know the guys. It was two or three guys."

Q He was unable to give you names of any of them at that point?

A He couldn't tell me anything about them. He couldn't tell me their names. He couldn't tell me if they were gang members. He couldn't tell me where they wanted to go. He couldn't tell me where he wanted to drop them off at.

Q Was he able to -- back up -- backing up a little bit, was he able to provide you the last name of this Veno or this Chris?

A No.

Q Or any address whatsoever for Veno or for Chris?

A No. He couldn't explain to me how to find Veno or Chris' house.

Q After he told you he left Veno and Chris' house with these two or three people that he didn't know who they were, what did he tell you they were doing next?

A They were driving along and he couldn't tell me where they were driving to. As I said before, he couldn't tell me the names of the two or the three guys that were in the car with him. He says at some point they pulled to a stop. And then Cordell said, "I am not responsible for what happened next. It wasn't my fault."

Q What did you say then?

A "Well, you're not responsible for what?" And it was like no response to that. So I said, "Well, are you talking about the shooting in the sub shop?" And he said again, "It's not my fault. I am not responsible." So then I asked him, "Well, after the shooting in the sub shop, did you drive the people away from the sub shop?"

Q And what was his response?

A There was no response to that.

Q No -- nothing at all.

A No.

Q Okay. What was the next thing you asked him?

A I asked him where he went after that. There's really no response to that question. I asked him, "What time did you make it on home?" And he said sometime between 11:00 p.m. and midnight.

Q Did you ask him where he took the people that he left with?

A Well, I asked him if he drove the people away after the shooting. There was no response to that.

Q All right. And he doesn't -- he was unable to provide you with any information as to how they got out of his car.

A No. It was more like he wanted -- wasn't going to answer. There was just no answer.

MR. WEINER: Objection.

THE COURT: Sustained. The jury will disregard the comment by the detective.

MS. MORASK: Q What time did you say he told you at this time that he had gotten home?

A Sometime between 11:00 p.m. and midnight.

Q Okay. Now, could you tell us approximately how long that conversation took.

A 20 minutes or so.

Q All right. And at the end of that conversation, did you leave the room?

A Yes, I did.

Q And was that your last step in this investigation?

A Just after 8:00 o'clock I walked Cordell down to the lock up, but there was no more interviewing of Cordell by me.

MS. MORASK: Okay. May I have a moment, Judge?

THE COURT: Certainly.

(Brief pause)

MS. MORASK: Thank you, Detective. I have nothing further.

THE COURT: Thank you. Mr. Weiner.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Detective.

A How you doing, sir?

Q How are you?

A All right.

Q Detective, you didn't make a report on this case, did you?

A No, sir.

Q You interviewed the Defendant for 20 or 25 minutes and you asked him questions, read him his Miranda rights, he answered questions as you described and you didn't make a report on a double homicide case, is that right?

A I wasn't the reporting officer, sir.

Q Well, is it your testimony today that when you're not the reporting officer on an homicide case and you interview a witness and that witness answers questions that it -- you at no time are responsible to write a report?

A Detectives Dwyer and Armata were writing the report. And I met with them and I gave them my notes on this matter.

Q Okay. Now, you remember of course what Cordell Williams was wearing when you in fact interviewed him in the witness room, don't you?

A No, I couldn't tell you what he was wearing.

Q Well, do you remember if he was wearing long pants or shorts?

A I have no idea.

Q But you remember each question you asked him and each

answer that he gave, right?
A Yes, sir.
Q Without writing a report, right?
A I had my notes there, sir.
Q Now, sir, he told you he was driving his mother's car that night, is that right?
A I think he referred to it as the family car, sir.
Q All right. And did he tell you what kind of a car it was?
A He said it was a '90 Ford.
Q And did you subsequently discover that in fact a 1990 Ford was the vehicle in which -- was in fact inventoried and -- and identified by the witnesses in this case?
A Yes, sir.
Q So he told you the truth about that, didn't he?
A Yes, he did.
Q He told you too, didn't he, that he was driving people, two or three people in this car at the time that you asked him what happened at the time of the shooting, isn't this true?
A Are you referring to when he first left the hospital or at the time of the shooting?
Q At the time of the shooting.
A Yes. Yeah. He said there was two or three people in the car with him.



SOTOS-WILLIAMS 11496

Q And you subsequently learned that there were three people in the car with him when in fact the shooting took place, isn't that true?

A Yes, sir.

Q That was the truth, wasn't it?

A Yes, sir.

Q And you said that some of the things that he in fact -- the questions that you made to him he had no response at all, isn't that correct?

A Yes, sir.

Q Like you asked if he drove away after the shooting. He didn't answer, right?

A That's correct.

Q And you asked what time he got home. He said between 11:00 and 12:00, is that correct?

A Yes, sir.

Q Did you ask him if he was wearing a watch that night?

A No, sir.

Q Did you ask him if there was a clock in the car that was working?

A No, sir.

Q Did you ask him if anybody else in the car was wearing a watch?

A No, sir.

Q So as far as you know when he said he got home between 11:00 and 12:00 he was telling the truth, wasn't he, Detective Rose?

A That's what he told me.

Q By the way, Detective Rose, do you remember him when you were in the interview room wearing a hooded sweatshirt?

A I don't remember any of his clothing in the interview room, sir.

Q Well, would you remember if he was wearing a hat tilted to one side?

A I wouldn't let somebody wear a hat tilted to one side in our interview room.

Q So was he wearing a hat tilted to one side?

A I don't believe so, no.

Q While you were interviewing him, did you notice any tatoos about the body or face of Cordell Williams?

A No, sir.

MR. WEINER: Thank you, Detective Rose. I have no other questions.

MS. GROHS: No questions.

THE COURT: Redirect, State.

MS. MORASK: Yes, Judge.

REDIRECT EXAMINATION

BY MS. MORASK:

Q Your interview was after Detective Dwyer's, correct?
A Yes.
Q He had already interviewed the Defendant once?
A Yes, Ma'am.
Q Now, counsel asked you some questions about reports. I am going to show you People's Exhibit Number 28 for identification and People's Exhibit Number 29. Showing you People's Exhibit Number 28, would that be a report of the conversation that you had with Cordell Williams on May 26th of 1995?
A That's my --
Q 1994. I am sorry.
A That's my general progress report of that conversation.
Q And does that embody the entire conversation, your notes of the conversation that you had?
A Yes, Ma'am.
Q And does it include the -- your signature, the date, the time, the actual location, interview room two, the name and all the -- of the pertinent facts that you just told the ladies and gentlemen of the jury?
A Everything except the time.
Q Okay. And I'm going to show you People's Group Exhibit Number 29. This a detective's sup?
A That's Detective Armata and Dwyer's progress report.

MR. WEINER: Objection to Detectives Armata's and Dwyer's report, Judge.

THE COURT: At this time -- at this time all that's happening is it's being marked.

MS. MORASK: Q On the last page of Detective Armata and Dwyer's -- you told us earlier on cross examination that you had given all your information including your notes to Detective Dwyer. On Page 10 is your conversation with the Defendant, Cordell Williams embodied in the supplemental report?

MR. WEINER: Objection. He didn't make the report. His signature is not on it. I object.

THE COURT: Well, he can identify what the conversation was. Overruled.

MR. WEINER: Okay.

MS. MORASK: Q That paragraph?

A Yes, Ma'am.

THE COURT: I am not going to let him go into that conversation.

MR. WEINER: Thank you.

MS. MORASK: Q That last paragraph embodies your conversation that you had with Cordell Williams, is that correct?

A Yes, Ma'am.

THE COURT: Just for clarification, People's Group Number 29

is the same as Defense Number 2?

MR. WEINER: Yes.

THE COURT: Okay. Thank you.

MS. MORASK: Thank you, Detective. I have nothing further.

THE COURT: Thanks.

RECROSS EXAMINATION

BY MR. WEINER:

Q Detective Rose, when I asked you if you made a report on this case, you said no, am I correct?

A Yes, sir.

Q These field notes, that's not a report, is it?

A No. Those are my notes, sir.

Q So when counsel told you that you made a report and she told you this and said your name, office, you signed it, it's not a report at all, is it?

MR. SMITH: Objection.

THE COURT: Overruled.

A Well, the title of that form is a general progress report but it's not field notes.

Q It's notes that you take and it's not submitted as a report as you understand the term report, isn't that true?

A Well, it's required to be submitted, but it's not a report as Detective Dwyer's and Armata's reports.

Q It's notes that you took, correct?

A Yes.

MR. WEINER: Thank you. No further questions.

THE COURT: Miss Grohs, nothing?

MS. GROHS: Nothing.

THE COURT: Anything else, State?

MS. MORASK: No, Judge.

THE COURT: Thank you, Detective. Could I -- could I have the attorneys approach please.

(Whereupon a discussion was had off the record in the courtroom out of the hearing of the jury.)

THE COURT: All right. Ladies and gentlemen, just to keep you apprised this will be the -- the next witness that's coming out will be the last witness of today. Okay? Will you step around the Court Reporter, step on the witness stand and remain standing please.

DETECTIVE CLIFF GEHRKE,

called as a witness on behalf of the People, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

THE CLERK: Please be seated.

THE COURT: Proceed, Mr. Smith.

MR. SMITH: Q Sir, would you please state your full name and spell your last name.

A Detective Cliff Gehrke, G E H R K E.

Q And how long have you been employed by the Chicago Police Department?

A Approximately nine years.

Q And how long have you been a detective?

A Three years and some months.

Q Now, are you currently assigned to area one, violent crimes?

A Yes.

Q Have you been assigned there since you became a detective?

A Yes.

Q Now, on May 26th of 1994, were you working on that day?

A Yes.

Q And what shift were you working?

A The day shift.

Q What time would that begin at, Detective?

A I got in about 8:00 o'clock. It usually starts about 8:30.

Q And when you got in at about 8:00 or 8:30, did you become involved in an investigation of a double shooting that occurred at a sub shop on seven -- at 7403 South Halsted?

A Yes.

Q Who did you meet with at that time?

A The midnight shift detectives, Detective Rose, Dwyer, Armata.

Q And did they pass on to you information?

A Yes.

Q At that time was there a Defendant in custody by the name of Cordell Williams?

A Yes.

Q And did you subsequently come into contact with Cordell Williams?

A Yes.

Q Do you see that individual in court?

A Yes.

Q Please point to him.

A He is wearing the glasses with the white shirt and the tie there.

MR. SMITH: Indicating for the record he's identified the Defendant, Cordell Williams.

THE COURT: The record will so reflect.

MR. SMITH: Q When you first started working on this case, did the other fellow detectives pass on information regarding what Cordell Williams had told them?

A Yes.

Q Now, what did you and your partner, Detective Stalik do at that time?

A We went out to track down this information of what it was Mr. Williams had said a friend --

MR. WEINER: Objection to what Mr. Williams had said not to this officer.

THE COURT: Sustained.

MR. SMITH: Q Did you go speak to anyone?

A Yes.

Q And where did you go to speak to this individual?

A Northwestern Hospital.

Q And who were you going there to speak to?

A Young man by the name of Paris McMoore.

Q And was there a Paris McMoore?

A Yes.

Q And did you in fact speak to him?

A Yes.

Q Was -- what injuries was he suffering from at that time?

A He had -- had been shot.

Q Did he indicate that Defendant had been there the evening before?

A Yes.

Q And after you spoke to this Paris McMoore, did you then begin to look for anyone else?

A Yes.

Q Who did you begin to look for at that time?

A Couple individuals that Mr. McMoore had said were also at the hospital.
Q Who -- had they been named by anyone else?
A Yes.
Q Who is that?
A By Mr. Williams.
Q And who did you go looking for?
A They were just known as Veno and Chris. And we went around the southeast side, various locations trying to find any information on them.
Q And did you have certain locations that you began to look around?
A I believe we started out around 87th and Houston. We also went over to the area two seeing if we could get any nickname information.
Q Now, did you -- after looking -- after speaking to Mr. McMoore at the hospital and after looking for this Veno and Chris and further after going over to area two, did you return back to your area, area one?
A Yes.
Q And about what time did you get back to area one?
A About 1:30.
Q Would that be in the afternoon of the 26th?
A Afternoon, yes.

Q And when you got back to area one, was anybody there with regards to -- in relation to the Defendant, Cordell Williams?

A Yes. There was some family members there.

Q Who was there?

A I believe his father was there, a friend of the family and another young man. I don't know what his relation was.

Q And where were they at when you got back to area one?

A They were in the -- up in the front by the entrance to the office.

Q At that time what, if anything, did you do with regards to the Defendant, Cordell Williams' father and the two other individuals with him?

A I let them go back and talk to the Defendant.

Q About how long were they back there talking with the Defendant?

A About ten minutes.

Q Were you in there at that time?

A No.

Q Did you eventually go in and talk with the Defendant?

A Yes.

Q And at that time did you advise him of his rights?

A Yes.

Q And did you do that from memory or from an FOP book?

A Our little police book, the FOP book.
Q Did he indicate he understood those rights?
A Yes.
Q And at that time did you ask him anything with regards to the identity of who was with him the evening before?
A Yes.
Q And what did he tell you at that time?
A He said that he wanted to cooperate. That the guy we were looking for was a fellow by the name of Dave and he was called Day.
Q D A Y?
A That's the pronunciation, yeah, phonetically.
Q He said that was his nickname?
A He was known as Day. He believed his first name -- real first name was Dave.
Q Did he give you any more information about this person Day or Dave?
A Yeah. He told us that he had some locations around 87th and Exchange I believe. He had a couple of houses he might have stayed at and a couple of places that he hung out at.
Q Was he able to describe where this individual lived?
A No, not specifically but he said he might be able to -- to recognize it if he drove by it.
Q Incidentally when you were talking to him at this time,

was his father present?

A Yes. The other three people were still there.

Q What did you do after he gave you this information?

A We went with him and went out looking to see if we could find Day.

Q And when you went out with him, who was in the vehicle?

A Myself, my partner and Mr. Williams.

Q And where did you go at that time?

A Where I told you, around 87th and Exchange, up and down -- couple of corner stores and stuff where allegedly this guy was going to, you know, hang out at.

Q And was he able to point anything out?

A No.

Q About how long were you out there with him looking for this location?

A Probably an hour and-a-half.

Q What did you do after an hour and-a-half?

A Well, got -- it was apparent to me that he -- that we weren't getting anywhere, that we were not on to anything and we drove back to the area.

Q When you drove back to the area, do you know about what time you got back?

A About 4:30.

Q And when you got back at 4:30, was anyone else there at

that time?

A The afternoon shift was just starting to come in. We turned the investigation over to them.

Q Was his -- was any -- any of the Defendant's Cordell Williams' family there?

A I think the father and one of the other people were still there.

Q Was he allowed to see them at that time?

A Yes.

Q Who were some of the detectives that you turned this investigation over to?

A O'Brien, Carroll.

Q Did you have any more personal contact with the Defendant, Cordell William?

A After that, no.

MR. SMITH: May I have a moment, your Honor?

THE COURT: Um-hm.

(Brief pause)

MR. SMITH: I have nothing further.

CROSS EXAMINATION

BY MR. WEINER:

Q Good afternoon, Detective.

A Hi.

Q Detective, you had received -- oh, by the way do you

remember what Cordell Williams was wearing the day that you took him out in this car?
A No.
Q Do you remember if he was wearing a hooded sweatshirt?
A No, I don't.
Q Was he wearing a cap?
A I don't believe so but I couldn't be positive.
Q Okay. Now, you had received information from other detectives that Mr. Williams had given them and you proceeded over to Northwestern Memorial Hospital, is that correct?
A Yes.
Q And the information was that Mr. Williams had visited a person at Northwestern Memorial Hospital by the name of Paris McMoore, is that correct?
A Paris McMoore, yes.
Q You located Mr. McMoore, am I correct?
A Yes.
Q And he confirmed that information, is that correct?
A Yes.
Q So the information that you received through the other detectives proved to be true, did it not, about him visiting the night before?
A Yes.
Q He also -- you also received information from these

detectives that there were two other people visiting and that Mr. Williams had called them Veno and Chris, isn't that true?

A Yes.

Q And Mr. McMoore called them Veno and Chris, isn't that true?

A Yes.

Q And in fact your investigation proved that at least the information given to you by other detectives proved to be correct, isn't that true?

A Yes.

Q Now, later you said you went back to area one and you saw the Defendant's father and another family member and a friend and you allowed them to speak to the Defendant, isn't that correct?

A Yes.

Q And he indicated to you that he would be helpful and try to help you find a person by the name of Dave whose nickname was Day, isn't that right?

A Yes.

Q Did you -- did you believe during the hour and-a-half that you were in the car with Mr. Williams that he was in fact being helpful in trying to find that location?

A No, not after --

Q Why is that?

A We were just driving around too many circles. He just couldn't pick anything out as I recall.
Q Okay. But were you driving around in the daylight?
A Yes.
Q And did he in fact tell you that the night before that he had been driving around at -- after dark?
A No. We didn't -- we didn't -- we didn't bring up when he was driving.
Q You didn't bring up when he was driving around.
During the time that you were driving down the street, did Mr. Williams say some houses looked familiar?
A No, not houses. I think it was a couple of storefronts, corners that he said that he would -- would most likely be hanging around at.
Q Would you describe Mr. Williams' behavior in the car as cooperative?
A Yes. On the surface, yes.
Q Now, do you believe that he was trying to hide the location of Mr. -- of Dave or Day from you?
A My own opinion is that he wasn't really anxious to show us exactly where Dave was.
Q But he had volunteered to go with you and he did in fact go with you for an hour and-a-half, is that correct?
A Yes.

Q And when you got back to the station, you turned him over to the afternoon shift officers, is that correct?

A Yes.

Q You never made a report on this case, did you?

A No, I didn't make any.

Q Did you make any field notes?

A No.

MR. WEINER: Thank you, Officer. I appreciate it.

THE COURT: Miss Grohs, any cross examination?

MS. GROHS: No, sir.

THE COURT: State, any redirect?

MS. MORASK: Just a minute. One minute.

(Brief pause)

MR. SMITH: I have nothing further.

THE COURT: Nothing further?

MR. SMITH: No.

THE COURT: You can step down, Detective.

Ladies and gentlemen, what we've done today right now is concluded with all the evidence that we're going to hear today.

I appreciate the way you showed up this morning and thank you very much. Again come in at 10:30. We will try to get to this as close as possible. As you have seen, we had some difficulties today with something not related to anybody on

trial here. Again we'll try and provide -- we're going to have Eggs Benedict there, something of that order anyway. All right. See you tomorrow at 10:30.

Don't discuss this case among yourselves or have anybody discuss it with you.

(Which were all the proceedings had on this date)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, ELIZABETH A. REYES, Official Shorthand Reporter of the Circuit Court of Cook County, County Department-Criminal Division, do hereby certify that I reported in shorthand the evidence had in the above-entitled cause and that the foregoing is a true and correct transcript of all the evidence heard.

Elizabeth A Reyes
Official Shorthand Reporter
License No. 084-001910
Circuit Court of Cook County
County Department
Criminal Division

Dated this 5th day of October A.D., 1995.

(Rev. 4/2 /92) CCCR 0056

STATE OF ILLINOIS )
COOK COUNTY ) ss.

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true and complete copy of .... VOLUME ........... OF A ............ VOLUME . RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 95-2887

in a certain cause ........ LATELY ........ pending in said Court, between

The people of the State of Illinois ........ WERE ........, Plaintiff and

CORDELL WILLIAMS ........ WAS ........ Defendant .....

Witness, AURELIA PUCINSKI, Clerk of the Court and the Seal thereof, at Chicago,. In said

County, . . JANUARY . 25, ................, 19.96 . .

Aurelia Pucinski