Case: 1:23-cv-14905 Document #: 135-14 Filed: 03/26/26 Page 1 of 284 PageID #:2963

CCCR-310

15-1373

FILED
APPELLATE COURT 1st DIST.
OCT 01 2009
STEVEN M. RAVID
CLERK

# Transcript of Record
## Appeal
## to

APPELLATE Court of Illinois

FIRST District

FILED
APPELLATE COURT 1ST DIST.
FEB 0 2014
STEVEN M. RAVID
CLERK

**Circuit Court No.** 94 CR 15518

**Trial Judge** VINCENT M. GAUGHAN

**Reviewing Court No.** 95-2887

94CR015518/A005

THE PEOPLE OF THE STATE OF ILLINOIS

**vs.**

CORDELL WILLIAMS

FILED
APPELLATE COURT
JUN 1 1997
GILBERT S. MARCHMAN
CLERK

FILED
APPELLATE COURT 1st DIST.
FEB 27 2018
THOMAS D. PALELLA
CLERK

## from
# CIRCUIT COURT
## of
# COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, CRIMINAL DIVISION

FILED
APPELLATE COURT 1st DIST.
SEP 23 2009
STEVEN M. RAVID
CLERK

FILED
APPELLATE COURT 1st DIST.
SEP 23 2009
STEVEN M. RAVID
CLERK

AURELIA PUCINSKI

Clerk of Court

VOLUME FOUR OF FIVE
REPORT OF PROCEEDINGS,

Per AP/LM Deputy

08-2409

V2 07196

SOTOS-WILLIAMS 11519

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
COOK COUNTY, ILLINOIS - CRIMINAL DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS )
) 94 CR 15518
vs. )
CORDELL WILLIAMS )

REPORT OF PROCEEDINGS had in the above-entitled cause before the Honorable VINCENT GAUGHN, Judge of said court, on the 27th day of June, A.D., 1995.

APPEARANCES:

HONORABLE JACK O'MALLEY,
State's Attorney, by
MR. MIKE SMITH &
MS. LAURA NORASK,
Assistant State's Attorneys,
appeared on behalf of the People;

MS. RITA FRY,
Public Defender of Cook County, by
MR. DEBRA GROHS,
Assistant Public Defender;
appeared on behalf of Londell Harper;

MR. DAVID WEINER,
appeared on behalf of Cordell Williams.

Patricia M. Kovats, C.S.R.
Official Court Reporter
License # 084-003455
Criminal Division

# I N D E X

WITNESS - JAMES O'BRIEN

Direct Examination........................3
Cross Examination........................30
Redirect Examination.....................50
Recross Examination......................52

WITNESS - ERNEST WARNER

Direct Examination.......................55

WITNESS - DAVID BERRY LIFSCHULTZ

Direct Examination.......................73

WITNESS - GREGORY VACI

Direct Examination.......................90

Reporter's Certificate..................114

THE COURT: Bring the jury out, please.

(Jury entered courtroom.)

THE COURT: Good morning, ladies and gentlemen. Thank you again for coming on time and everybody being here.

State, proceed. Call your next witness.

Proceed, Mr. Smith.

(Witness sworn.)

JAMES O'BRIEN,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q Sir, would you state your full name and spell your last name?

A Detective James O'Brien, O'B-r-i-e-n. Star number 20466.

Q How long have you been a Chicago police officer?

A Approximately, eight and a half years.

Q How long have you been a detective?

A Five years.

Q Do you work out of Area 1?
A Yes, I do.
Q How long have you worked out of Area 1?
A Since October of 1992.
Q Calling your attention to May 26, 1994, were you working out of Area 1 at that time?
A Yes, sir, I was.
Q Did you become involved in an investigation at that time of the murder of a Myron Cochran (phonetic spellings) and the attempted murder shooting of Billy Johnson?
A Yes, I did.
Q At that time, Mr. Johnson was still alive, is that correct?
A Yes.
Q What time did you start work on that day on the 26th of May?
A At that time that day I started work at 4:30 in the afternoon. I was working what we call third watch which is the afternoon shift.
Q Were you working with a partner?
A Yes, sir, I was.
Q What's your partner's name?
A Detective Jerry Caroll.

Q When you started your shift that day what was the first thing you did after receiving this assignment?

A At that time I had a conversation with the detectives from the day watch, Detective Stalik (phonetic spelling) and Gehrke who was assigned to the investigation prior to us.

Q Did you do anything else?

A At that time we also reviewed any of the reports or notes that had been taken or written up until that point.

Q Now, did you learn that there had been a suspect that had previously been arrested and was in custody at that time?

A Yes, sir, I did.

Q What was that individual's name?

A Cordell Williams.

Q Did you subsequently meet with him?

A Yes, I did.

Q Do you see that person in court?

A Yes, I do.

Q Please point to him and indicate something he is wearing?

A Defendant seated in the white shirt with

the tie with the glasses.

MR. SMITH: Indicating for the record he identified the defendant Cordell Williams.

BY MR. SMITH:

Q Now, detective, when you first spoke with Cordell Williams where was he at?

A He was in an interview room at Area 1 violent crimes.

Q When you met with him who else was with you?

A My partner Detective Jerry Caroll.

Q Do you know about what time this was?

A Approximately, 6:30 in the evening.

Q When you spoke to him what was the first thing that was said?

A Detective Caroll advised him of his rights.

Q What did he do that from?

A He did it from an FOP book.

MR. SMITH: There would be a stipulation at this time. Stipulation would be that if Detective O'Brien were to review an FOP book he would previously recite the rights that were read by Detectives Rose and Detectives Gehrke to the defendant.

MR. WEINER: We would so stipulate.

THE COURT: That stipulation would be moved into evidence.

BY MR. SMITH:

Q After he was advised of his rights, did he agree to talk with you?

A Yes, he did.

Q At that time, detective, what did you and your partner do?

A We had an interview with Cordell Williams concerning this incident.

Q What was said at that time?

A At that time we spoke to Cordell Williams. We initially -- Actually we confronted him with the statements he had made to the other detectives at about how inconsistent they were, about his first statement he had with two guys, Chris and Veno, that he dropped them off. He told the detectives he dropped them off and he was home by 1:03. When in fact we knew this wasn't true because when the police got to his house the engine was still warm on his car. That was after midnight well after the engine would have cooled off.

Second time he talked to the detectives he stated he was with Chris and Veno again.

That he dropped them off and then he added -- he picked some other guys up and that he wasn't responsible for what they did if they did anything while he was with them. And that the third time the detectives talked to him when Detective (inaudible) and Gehrke talked to him he stated the person we were looking for was Dave or a Day and that he took those detectives out and he led them around and they weren't able to come up with any solid information on this Dave or Day, that we didn't believe he was telling us the truth and we wanted him to be truthful with us.

Q At that time did you have -- Did he agree to talk to you -- talk with you more about what happened that night?

A Yes.

Q What did he tell you at that time?

A At this time Williams stated that the previous night he had been down at Northwestern Hospital visiting a person by the name of Parish McMoore who is a friend of his that had been shot and that he was coming back from the hospital and that a person by the name of -- he was now calling him Dayday or Dave was in his vehicle and that they were northbound on Halsted in the 7400 block approaching

74th Street when this Dayday said, "There's some bricks. Stop the car. There's some bricks." He stated he shouted it out in the sub shop.

Q Did he tell you what bricks meant?

A He stated bricks are street names that the Blackstones use for Gangster Disciples or Disciples which are rival gang members of the Blackstones.

Q Did he indicate if he was a Blackstone?

A Yes, he did. He stated he was a Blackstone.

Q The others that were with him?

A They were Blackstones also.

Q How many people was he able to give you a name for that were with him at that time?

A At this time he was only able to name Dave or Dayday. At this time he stated the other two people in the car he didn't know their name.

Q After he heard this term bricks which means Disciples, what was the next thing?

A He stated that Dayday told him to pull over and he stated that he pulled the car over to the curb and that he popped the trunk so that Dayday could get a gun out which was in the trunk. He stated that he had seen Dayday place a gun in the trunk earlier in

the evening.

Q Did he say he knew what Dayday was going to do with the gun?

A Yes, he did. He stated he knew Dayday was going to go in and shoot the disciples.

Q Did he say where he was going to shoot them at?

A In the sub shop.

Q What else did he tell you at that time?

A He stated that after Dayday retrieved the gun from the trunk he walked off towards the sub shop. A few moments later he heard a series of shots. I believe he stated four or five shots and he saw Dayday or Dave now running out of the sub shop running back towards his vehicle.

Q Did he indicate what the next thing that happened with regards to this Dayday?

A He stated that as Dayday was running towards his vehicle he started to pull off and that Dayday stumbled and fell, but was able to get up and get in the car and that he then sped from the scene and he also stated that while they were fleeing the scene he believed that an off-duty police officer chased him and was flashing lights behind him.

Q You indicate he was able to lose or elude this police officer?

A He indicated that he was able to elude the police officer by numerous traffic maneuvers and that he then let the other subjects off in the neighborhood and that he then went home.

Q Did he say he let all of them off at that time?

A Yes, he did.

Q At that time, detective, after speaking to him -- First of all, about how long was that conversation?

A The entire conversation lasted approximately an hour and a half.

Q After you spoke to him what was the next thing that happened?

A During the conversation when he named the person we were looking for, the shooter as Dayday. I was familiar with Dayday as a David Evans from another homicide investigation which I had been involved in two years prior to that. During the conversation with Williams we were able to obtain this other murder file. We in fact verified that Dayday or Dave was David Evans of 7306 South May and that Detective

Stalik and Gehrke were still at Area 1. I requested them to go downtown and obtain a Chicago police department records photograph of David Evans.

Q Did they bring that photo back?

A Yes.

Q Was it shown to Cordell William?

A Yes.

Q He identified that as the person being identified as Dayday?

A Yes, he did.

Q What was the next thing you did at that time?

A At that time after the interview we asked Williams if he was hungry. He indicated he was. We went and got him some hamburgers. I believe we got them from Checker's. We then allowed him to use the washroom. We placed him back in the interview room. We made sure the seargent knew he was still in the interview room and myself and my partner, Detective Caroll and Detective Stalik and Gehrke, we left Area 1 and went on the street and attempted to locate David Evans.

Q When you placed the defendant in the interview room was he handcuffed at all?

A No, the door was locked. He didn't have to be handcuffed.

Q Did you give him any instructions?

A I told him if he needed anything just to knock on the door. Other detectives or a supervisor will come to the door.

Q Is that a common procedure?

A Yes, it is done with every prisoner that's left in the interview room.

Q Now, did you go out at that time with other detectives and try to locate David Evans?

A Yes, I did.

Q Were you successful?

A No, we were not.

Q What did you do after your attempt to locate David Evans failed?

A After that failed we returned to Area 1 violent crimes and we contacted the state's attorney's office, the felony review unit.

Q Did you contact anybody else?

A We also contacted Officer Stanley Sanders from the 12th District to come in and try to identify -- see if he was able to identify the suspect shooter David Evans.

Q Did he identify a photo of David Evans?
A He identified a photograph of David Evans as the person he chased from the sub shop. Yes.
Q Detective, did a state's attorney arrive there?
A Yes.
Q About what time?
A Approximately midnight I would say.
Q Do you recall that state's attorney's name?
A I believe ASA Vaci.
Q V-a-c-i?
A Yes, sir.
Q When he arrived, do you remember was that about midnight?
A Approximately midnight, yes, sir.
Q What was the first thing you did when the state's attorney arrived?
A First thing we did with the state's attorney was we advised him of what the circumstances of the case was. By that time we had been informed by the hospital that the second victim had also expired from his wounds, that he had been pronounced dead approximately 8:30 that evening. We advised him of that fact. He was provided with any reports that had

been prepared or notes that had been written up to that point. He reviewed those notes and then he had a short conversation with Officer Sanders.

Q After that were you present for another interview with defendant Williams?

A Yes, I was.

Q About what time was that?

A That was approximately 12:30 in the morning.

Q Where was this interview at?

A Also in Area 1 violent crimes in the same interview room.

Q Who else was present besides yourself?

A Cordell Williams was present and ASA Vaci.

Q At that time did anyone advise him of anything?

A He was again advised of his rights. The state's attorney did it.

Q They are substantially the same Miranda rights that you previously stipulated to?

A Yes, they are.

Q Did the defendant at that time Cordell Williams speak with the state's attorney?

A Yes, he did.

Q At this time did you learn any new information?

A Yes, we did.

Q What else did he tell you at this time?

A During this conversation he gave basically the same account of the incident as he had to us in our first conversation with him. However, at this time William was able to name the other two people that were in the car as Londell and André and he was also able to name the type of gun that was used as a .45 caliber Ruger and he also was specific about where he dropped the individuals off at. He stated that he had dropped Londell off at 87th and Ashland after the shooting and that he had dropped David Evans and Andre off at 75th and Aberdeen after the shooting. Then he went home.

Q Prior to this he had said he dropped them all off in the neighbor at one time, is that correct?

A That's correct.

Q Prior to this he told you he didn't know the name of these other two individuals, is that right?

A That is correct.

Q Now, after this conversation with the

state's attorney, did the defendant agree to give a court-reported statement?

A Yes, he did.

Q Was a court reporter summonsed to Area 1 violent crimes?

A Yes, sir.

Q Were you present for the taking of the court-reported statement at approximately 2:30 in the morning?

A Yes, sir, I was.

Q And at the end of that court-reported statement was it typed up and reviewed by the defendant and the state's attorney along with yourself?

A Yes, it was.

Q Was it signed by the defendant, State's Attorney Vaci and yourself?

A Yes, it was, after it was checked for accuracy.

Q Was a photo also taken of Cordell Williams shortly after that?

A After the statement was signed, yes, sir.

Q Now, detective, after that, did you begin to search for these other people: Andre Roderick,

Rondell Harper and David Evans?
A Yes, we did.
Q Jumping back a second, Detective, when the defendant spoke to you regarding his whereabouts the night before, he stated they had first had gone to a hospital, is that correct?
A Yes.
Q To see whom?
A They had gone to Northwestern Memorial Hospital to visit a Parish McMoore.
Q Were you familiar with a Parish McMoore?
A Yes, sir, I was.
Q Do you know him to be in a gang?
A Yes.
MR. WEINER: Objection -- Withdraw it.
THE COURT: Okay.
BY MR. SMITH:
Q What gang do you know him to belong to?
A He is a Blackstone.
Q On this day you began to look for Harper and Evans?
A Yes, sir, it is.
Q Sometime after that was defendant Londell Harper arrested and charged in this case?

A Yes, he was.
Q And did you continue to look for the others?
A Yes, I did.
Q Now, subsequent to that, did you eventually get a warrant?
A For David Evans, yes, sir, I did.
Q After you received that warrant did you continue to frequent places that David Evans may have been at?
A As time permitted in between our other murder investigation we would frequently check the neighborhood that David Evans lived in but we were unable to locate him.
Q Calling your attention to August 15, 1994, were you contacted by any officers?
A Yes, I was.
Q Who contacted you?
A Officer Theo Boldt from the 7th police district.
Q Was information given to you regarding the location of David Evans?
A Yes, it was, sir.
Q Where did you proceed at that time?

A We proceeded to the area of Aurora, Illinois.

Q Specifically in Aurora, where did you go?

A We had received information from Officer Theo Boldt that David Evans who was the wanted shooter in this offense was hiding at an apartment building which was located behind a McDonald's on Farnsworth Avenue in Aurora.

Q Did you receive any other information?

A And that he was staying with an individual whose street name was Womack and Womack drove a green Jeep Grand Cherokee, sport utility vehicle.

Q When you went out to Aurora, did you find this location that matched the description?

A We exited I88 and Farnsworth. We went southbound into Aurora. We came across a McDonald's and sure enough behind the McDonald's there was a large apartment complex located directly behind it.

Q Did you locate anything else?

A We had to drive down a couple blocks further south to get into the parking apartment complex. We were in an unmarked vehicle. We drove in there, and the building closest to McDonald's, there was a green Jeep parked out by the building.

Q What did yourself and the team of detectives that you were with do?
A At that time we left the area. We went to a parking lot further down Farnsworth and we contacted the Aurora police gang unit to come and meet with us.
Q Did they meet with you and did you explain basically what your purpose in being there?
A Several officers from their gang unit met with us as well as one of the parole officers. We explained we were looking for a subject for a double homicide. That we had a warrant for him. We gave them all information I just gave to you and we then went to that location.
Q When you arrived at that location, did you basically set up a perimeter and move in?
A Yes, we did.
Q Which apartment did you focus your attention on?
A The apartment that the Grand Cherokee -- the green Grand Cherokee was parked outside of.
Q Before you had a chance to go up to that apartment, did anything happen?
A Yes, sir.
Q What happened?

A The grand Cherokee, two people came out of the apartment and entered the Grand Cherokee and left.

Q What if anything did you or your fellow officers do?

A A couple officers from the Aurora gang unit and two of the detectives, Detectives Beaudrow and Halloran that were from Area 1 violent crimes went after the Grand Cherokee and initiated a field stop on that vehicle.

Q Had you gone up to the apartment at this point?

A No.

Q Did they relay any information to you?

A After curbing the vehicle and had a conversation with the occupants they relayed information back to us that David Evans, Dayday, was inside the apartment.

Q What did you do when the other detectives and gang members from Aurora do?

A We approached the apartment. The Aurora detectives covered -- the Aurors gang officers covered a sliding glass door on the side of the apartment. Myself and my partner went to the front door.

Q What did you observe when you got to the

front door?

A I was able to look in and through the window in the door I was able to observe David Evans seated on a sofa inside that apartment.

Q What if anything did you do at that time?

A At that time I knocked. Evans asked who was it. I stated police. At that time I was able to observe him get up off the couch and run which would have been towards where the sliding glass doors were. I then, for the safety of the other officers, I kicked the door in and myself and Detective Caroll went in and arrested David Evans.

Q Was he subsequently transported back to Area 1?

A Yes, sir, he was.

Q Did you contact any witnesses regarding viewing a lineup?

A Yes, sir, I did.

Q Who did you contact?

A Officer Sanders and Mr. Pratt who was the civilian witness to this incident.

Q Now, did officer Sanders first view the lineup at approximately 8:00 p.m. on August 15, 1994?

A Yes, sir, he did.

Q Did he identify anyone?
A He immediately identified David Evans as the person he chased out of the sub shop, chased from the sub shop.
Q Same day about 11:30 in the evening, did Mr. Alexander Pratt view a lineup?
A Yes, he did.
Q Did he identify anybody?
A Yes, he did.
Q Who did he identify?
A He identified David Evans as the person he saw shoot and kill both the victims.
Q Detective, I'd ask you if you recognize what has been marked People's Exhibit Number 29 for identification?
A Yes, sir, I do.
Q What do you recognize that to be?
A This is the typed court-reported statement of Cordell Williams concerning this double homicide.
THE COURT: Mr. Smith, People's Number 29 is the same as Defense's 2. It is a supplemental report made out by Dwyer.
MR. SMITH: Judge, then this would be marked as -- If I could change the marking on this,

your Honor?

THE COURT: Sure. Thank you.

MR. SMITH: Marked as People's Exhibit number 34, Judge.

BY MR. SMITH:

Q Detective, People's Exhibit number 34, do you recognize what that is?

A Yes, sir, I do.

Q What do you recognize that to be?

A It's the typed court-reported statement of Cordell Williams taken at Area 1 on that evening concerning the double homicide.

Q Is that the original?

A I believe so, yes.

Q Is that in substantially the same condition as it was when the statement was taken by the state's attorney?

A Exactly.

Q I show you what's been marked as People's Group Exhibit 30A and 30B. 30A is an evidence envelope, is that correct?

A Yes, sir.

Q I show you what's marked as 30B. Do you recognize what People's 30B is?

A 30B is the photograph of Cordell Williams taken by the court reporter after the statement was taken from him at Area 1 violent crimes.

Q Showing you what's marked People's Exhibit Number 31 for identification. Do you recognize who that is a photograph of?

A This is also a photograph of Cordell Williams. It's a Cook County jail intake photo.

Q Does that truly and accurately depict how he appeared shortly after giving that statement?

A Yes, sir, it does.

Q Does the court -- Does the photo taken by the court reporter truly and accurately represent how Cordell Williams looked when he was there at the area?

A Yes, sir, it does.

Q I'll show you what's previously been marked People's Exhibit Number 12 for identification. Do you recognize what that is a photograph of?

A Yes, sir, I do.

Q What is that a photo of?

A This is a photograph of the lineup which was conducted with Officer Sanders with suspect David Evans.

Q Where is he located?

A Evans is seated in the fifth position. He is the subject on the end here.

Q I'll show you -- Does he have a red letter "S" over his head?

A Yes, he does.

Q Showing you People's Exhibit Number 1 for identification. Do you recognize what that is a photograph of?

A Yes, I do.

Q What is that a photo of?

A This is a photograph of the lineup which was viewed by Alexander Pratt later in the evening. It also contains one of the participants as suspect David Evans.

Q Is that the person who was identified?

A Yes, it is.

Q Is there any mark on that?

A There is an X over the number 4 subject in this lineup who is David Evans.

Q Showing you what's previously marked -- what is marked People's Exhibit Number 32 for identification. Do you recognize People's Exhibit 32 as a photograph?

A Yes, I do.

Q Who is that a photo of?
A Identification photograph of David Evans taken after a lineup.
Q Finally, showing you what's marked People's Exhibit Number 33 for identification. What is that a photograph of?
A This is also a photograph of David Evans. It is a photograph of his left arm, tattoos that are present on that arm.
Q Does that accurately, these photographs, represent the lineup and defendant David Evans after you had taken him into custody and after he was identified in those lineups?
A Yes, sir, they do.
Q Now, detective, did you determine in the course of your investigation the respective ages of David Evans, Londell Harper, Andre Roderick and Cordell Williams?
A Yes, I did.
Q What was their ages?
A Andre Roderick, David Evans and Londell Harper were all 17 at the time of this incident. Cordell William was 19 at this time of this incident.
Q With regards to the area where they live,

are you familiar with their addresses?

A Yes, I am.

Q Where did they live at?

A Cordell Williams live 7622 South Carpenter. Andre Roderick lived at 7570 South Carpenter. David Evans lived at 7306 South May. Londell Harper lived at 8822 south on Ashland.

Q Detective, when you first spoke to the defendant Cordell Williams, can you describe his demeanor?

A Initially when we went in the room his demeanor was, I would say, cocky.

Q Through the course of this investigation, did you subsequently learn that Billy Johnson had died of gunshot wound to his head, correct?

A That's correct.

Q Did you ever inform defendant Cordell William that the second victim had now died?

A Yes, we did.

Q What was his reaction to that?

A As a matter of fact, actually no response.

Q During any of the times when he spoke of this double murder, did he ever show any type of remorse or regret whatsoever?

A None at all.

MR. SMITH: May I have a moment, your Honor?

THE COURT: Yes.

(Brief pause.)

MR. SMITH: We have nothing further, Judge.

THE COURT: Cross-examination.

CROSS EXAMINATION

BY MR. WEINER:

Q Detective O'Brien, good morning.

A Good morning, sir.

Q When you first saw Cordell Williams on the morning of May 26th of 19 -- afternoon of May 26, 1994, was he wearing glasses?

A I believe so, yes, sir.

Q He was wearing glasses the first time you saw him and he was wearing glasses the entire evening, wasn't he?

A I believe so, yes, sir.

Q He was wearing -- What else was he wearing that you remember?

A I believe he was wearing some type of T-shirt and maybe a black shirt with a design and maybe red shorts. I don't specifically recall what

kind of pants he had on.

Q You didn't notice any tattoos on Cordell Williams?

A At that time, no, sir.

Q Did you ever during the time you were interviewing him?

A None on his lower arms, but I never had him take his shirt off to check further.

Q Was the exhibit 30B that you identified which was the court reporter's picture of Cordell Williams after his court-reported statement at 2:30 in the morning, is that correct?

A Yes, it is.

Q Officer, -- Detective, you took this interview of Cordell Williams on May 26th of 1994, is that right?

A Yes, sir.

Q You devoted approximately a five-page report to the interview, your going out and looking for David Evans and then coming back and meeting with the assistant state's attorney, isn't that true?

A We did a report. I'm not sure exactly how long. Yes, sir.

Q You filed that report on June 7th, 1994

some 13 days later, isn't that true?

A That would have been when the report was submitted, yes, sir.

Q Could you tell the ladies and gentlemen of the jury why you waited 13 days to file that report?

A This murder and the other 275 murders that we had in Area 1 aren't the only cases we're involved in. We come to work. What happens, we get assigned jobs. We always can't sit down and do our typing as soon as we'd like to. That's why we take notes. May is the beginning of the summer. The summer is when the majority of our murders and shootings happen. That was the first available moment we were able to get to that report.

Q So then you had plenty of opportunity. I mean at various times you and your partner, I believe Detective Caroll, to prepare a report which you discussed today with regard to the interview that you had with Cordell William, isn't that true?

A We had plenty of time, ample opportunity, sir?

Q What I'm saying, when you submitted this report on June 7th you had reviewed your notes?

A Yes, sir.

Q You had talked to Detective Caroll about his notes at the interview, isn't that correct?
A Yes, sir.
Q And as far as you're concerned, the report that you submitted basically in fact tells the statement that Cordell Williams gave to you and Detective Caroll that day, isn't that true?
A It is a summary of the statement, yes, sir.
Q Well, now, detective, you said that when you first talked to Cordell Williams you confronted him with the conflicting statements that he had made, isn't that true?
A Yes, sir.
Q One of those statement was that he had went to visit Parish McMoore at Northwestern?
A Yes.
Q You determined that to be the truth, isn't that also true?
A Yes, sir.
Q One of those statements was that he had been driving his mother's 1990 Ford Tempo, is that true?
A Yes.
Q You determined that that was the truth,

isn't that right?

A Yes, sir.

Q The first thing that the defendant said to you after you had confronted him was the statements was that after the defendant and the three other individuals visited Mr. McMoore they returned to the neighbor, isn't that true?

A Yes, sir.

Q He never told you, did he, that they were returning to the neighborhood to commit a murder, did he?

A No, sir.

Q He never told you that there was a plan by either he or Dayday or any of the other individuals in the car to come back and commit a crime, isn't that true?

A Not specifically planned, no, sir.

Q Did he tell you that there was any other kind of a plan?

A He stated that he had knowledge that Evans was going to shoot those individuals when they went into the sub shop.

Q I want to talk to you about the time you said this that they said he said when he came back to



SOTOS-WILLIAMS 11553

the neighborhood.

MR. SMITH: Objection.

THE COURT: If you understand it.

BY MR. WEINER:

Q I am talking about your first few pieces of conversation with him.

A Yes, sir.

Q When he said he was coming back to the neighborhood.

A Yes, sir.

Q Did he tell you that they were coming back to commit a crime?

A No, sir.

Q Did he tell you they had any discussion whatsoever about committing a crime?

A No, sir.

Q When he told you that Mr. Evans had put a gun in the trunk, where did he tell you he was at that time?

A When he had put the gun in the trunk?

Q Where was Mr. Williams?

A I don't recall where he said he was at that time.

Q Did he tell you -- not tell you he was in

the car and had popped the trunk?

A He said he popped the trunk to allow Evans access to the weapon at the time they stopped.

Q Didn't you say in your report that Mr. Williams knew that there was a gun in the car earlier in the evening because he had popped the trunk?

A I don't recall if we put those words in there. I know he stated he knew the gun was in the trunk because he seen Evans place it in there earlier.

Q Did he ever say he saw that gun before may 26, 1994?

A No, sir.

Q Did he ever say that David Evans or anybody else had shown him any gun before May 26th of 1994?

A Not at that time, no, sir.

Q At any time during the interview with yourself or the state's attorney, did he ever say that he had seen David Evans with that gun before May 26th of 1994?

A During the court-reported statement he was able to name the type of gun that Evans had.

Q I asked you if he had ever said he had ever seen that gun before?

A Specifically, no, sir, he did not.

Q So, when you were questioning Mr. Williams about his coming back to the neighborhood before the shooting, at no time did Mr. Williams tell you that he or anybody else in the car had told him that they were intending to use that weapon that night, did he?

A He didn't say that, no, sir.

Q Now, you said that he told you that when he was driving down Halsted a person behind him that he knew as Dayday -- By the way, he had told other police officers that the person's name was Dave or Day, didn't he?

A Yes, sir, he did.

Q That in fact is consistent with the term Dave and Dayday, isn't it?

A It's partial, yes, sir.

Q I mean I know it caused you to recollect that a person named Dayday was involved in another shooting?

A Yes, sir.

Q But he had told several other officers in fact had led some officers -- had been in a car with other officers looking for a person named Dave or Day earlier in the day, isn't that true?

A Right, but not in the right locations.

Q Well, isn't that a conclusion on your part? Did you know he was trying to take them to area store fronts where Mr. Evans hung out?

A I know David Evans. I know him from the other homicide investigation. I know where he lives. I know where he hangs out. I dealt with him, and where he took those other officers is not where David Evans hangs out. It's not where David Evans lives.

Q Of course, maybe Mr. Williams knew other areas where he hung out and they were different from where you knew he hung out as well, isn't that true?

A That's possible.

Q Were you with him during the time that he was in that car?

A No, sir, I was not.

Q Were you with him when he was going around with Officer Burke or any other officer trying to find an area?

A No, I was not.

Q So now, as they were driving in this car -- By the way, Mr. Williams never said he put the gun in the trunk, did he?

A No, sir, he did not.

Q Mr. Williams never said he handled that gun

in any way, did he?

A No, sir.

Q In fact, during the entire conversation that you had with Mr. Williams or the conversation that the state's attorney had with Mr. Williams, Mr. Williams never said that he had touched that gun at any time, did he?

A No, sir.

Q Now, you said that he said as they were driving along, Dayday said stop the car because he had seen some bricks in the sandwich shop, is that right?

A Yes, sir.

Q Did he ever tell you that Dayday said stop the car, keep it running, I'm going to go in there and shoot these guys and then come out and we're going to get away?

A In those words, no, sir.

Q In fact, what he said to you was Dayday yelled bricks, stop the car and he stopped the car, isn't that right.

A Yes, sir.

Q In fact, he told you he pulled the car over into a parking space, didn't he?

A He said he pulled the vehicle to the curb.

Q He told you he turned the vehicle off, didn't he?
A I don't recall if he said he turned the car off, sir.
Q Well, you said he told you that he then popped the trunk when -- I believe in your testimony when he pulled over the car, but isn't it a fact that Dayday tells Mr. Williams to pop the trunk?
A Yes, sir.
Q Mr. Williams didn't, as you testified, popped the trunk before Dayday told him to pop the trunk, did he?
A He popped the trunk for Evans, yes, sir.
Q He popped the trunk after Evans said pop the trunk, didn't he?
A If that's what the report says then that's what he said that night.
Q Do you know where he told you that he popped the trunk from?
A He was never specific whether it was an alarm or if it was a button in the glove box. He said pop the trunk.
Q Did he tell you he was in the car at the time he popped the trunk?

A Yes, sir.
Q He didn't go out to the back of car with Mr. Evans, did he?
A That's what he stated. No.
Q Now, you then said that he told you that he knew Mr. Evans was going to go in there and shoot those people?
A Yes, sir.
Q Did he ever tell you Mr. Evans told him he was going to do that?
A That Evans told him? No, sir, he didn't say that.
Q Didn't he tell you that after he popped the trunk that a member -- that another person in the car said shit, Evans is going in there or Dayday is going in there to shoot?
A No, sir, he never told us that.
Q Didn't he tell you that he only thought David Evans might shoot someone?
A No. He told us he knew he was going to shoot em.
Q Were you present at the court-reported statement?
A Yes, sir, I was.

Q Were you present when the state's attorney asked him what he thought David Evans was going to do?
A Yes, sir.
Q And didn't he answer that he had reason to believe that Evans was going to go in there and shoot?
A That's what he stated during the court reported -- That's not what he stated during our oral interview.
Q At the court-reported statement there was a court reporter there, wasn't there?
A Yes, sir.
Q He or she was taking down each and every word that this defendant said, isn't is that true?
A Yes, sir.
Q And at the court-reported statement the only notes that were taken by the court reporter were on a machine such as the court reporter sitting in front of you today, isn't that also true?
A Yes, sir, it is.
Q Now, the state's attorney had an interview with the defendant Cordell Williams before he made the court-reported statement, didn't he?
A Yes, sir, he did.
Q Did it surprise you at the reported

statement that the state's attorney asked Cordell Williams, Mr. Williams, what did you think that David Evans was going to do?

MR. SMITH: Objection to the form of the question.

THE COURT: Overruled. The detective can answer.

THE WITNESS: You asked me if I was surprised by what the state's attorney --

BY MR. WEINER:

Q Yes, sir.

A I can't say I was surprised by what the state's attorney did.

Q Did you ever hear David -- Cordell Williams tell the state's attorney that he knew there was a plan to kill those two individuals?

A Told the states attorney, no, sir.

Q Did he ever tell you he knew there was a plan to kill those two individuals?

A A plan?

Q Yes.

A No, he never said plan.

Q Did he ever tell you that he was, before that car stopped, there was some sort of an agreement

between anybody in that car and him that they were going to take that gun out and kill anybody?

A No, sir.

Q So when he said to you that he knew Evans was going to shoot those two people, why didn't you expand on that? Why didn't you say to him, well, how did you know?

A We continued on with the interview. We were trying to proceed in an orderly manner with the interview.

Q You have been a homicide -- violent crime detective for five years, right?

A Yes, sir.

Q You know that in an accountability case, don't you, that if there had been a prior plan, a prior agreement, it would clearly submit the state's case against the difficulty if in fact he were to be held accountable, isn't that true?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: Would you repeat that, sir?

BY MR. WEINER:

Q You know in an accountability case when someone is to be held accountable for the shooting by

another individual that it is very helpful to your case and to the state's case that you determine whether or not there had been a previous plan or an agreement by the participants, isn't that true?

A     A plan or an agreement for accountability? I don't think it has to be specifically a plan or agreement. I think he has to aid or abet prior or during the commission of an offense. That's my definition of accountability. When he stated that he knew that Evans was going to do the shooting and when he popped the trunk, he made himself accountable.

Q     Well, Detective O'Brien, you then were so satisfied that when he said I knew he was going to go in there and kill those two people that you just went on with the interview? You never asked another question about how he knew, is that your testimony?

A     You asked me --

Q     I'm asking you now.

A     When he stated he knew, he made himself accountable.

Q     You didn't have to ask him anything about how he knew, isn't that right?

A     As far as his knowledge?

Q     Yes.

A I am assuming he surmised from the circumstances.

Q Did you assume he surmised before or after he popped the trunk?

A I am assuming when Evans told him to pull over that he knew what was going to happen.

Q You assumed that but never asked him that, isn't that right, officer?

A I can't recall if I specifically asked him that or not.

Q You never asked him when he knew?

A He stated he knew when he pulled over.

Q He didn't state -- He stated he knew when he pullled over. I want to show you --

MR. SMITH: Objection. If there is a question I ask that the detective be allowed to answer the question.

THE COURT: Sure.

BY MR. WEINER:

Q Showing you what I marked as Defendant's Exhibit Number 3 for identification. I'll ask you if you recognize this document?

A Yes, sir, I do.

Q Is that the report that you made and

submitted on June 7th of 1994 with regard to the statement that Cordell Williams made to you?

A Yes, sir.

Q Can you tell the ladies and gentlemen of the jury where it says in that statement that he knew that Evans was going to kill the two individuals when he was told to stop the car?

A Do you want me to read it verbatim?

Q Read what you wrote.

A Sure. That they drove through the neighbor down Halsted northbound to 74th Street. Dayday who was seated behind the driver Williams shouted to Williams stop the car as Dayday had observed some bricks in the sub sandwich shop at 74th and Halsted. Williams explained the term bricks is street for disciples, a rival street gang. Dayday then tells Williams to pop the trunk. Williams knows there to be a handgun in the trunk as he observed Dayday place it in the trunk earlier in the evening. Williams does pop the trunk and Dayday retrieves the handgun and proceeds in the sandwich shop. Williams relates that he knows Dayday's intentions are to shoot at the individuals, parenthesis, bricks inside the store.

Q So my question is again: where does it say

in that report that he knew that Dayday was going to shoot the individuals when Dayday told him to stop the car?

A In the report it states that he popped the trunk and saw Evans heading towards the door of the sub shop. Again, this is a summary of his statement.

Q You are a pretty careful guy, aren't you, in terms of being a police detective, I would say, and would you not agree you are probably one of the most carefully prepared police detectives on the force, would you not agree, sir?

A Judging against what standards, sir?

Q Judging against the fine police officers that serve our city?

A I do my job.

Q In that report it says that he knew that Dayday was going to shoot after he popped the trunk and observed Evans going into the sub shop, isn't that true?

A You're turning the terms around. He never said after he popped the trunk. That sentence is after those other sentences.

Q I thought that's what you said. He never said -- You never said in that report, that summary,

that he ever said to you, Mr. Williams, that is that he knew what Evans was going to do at the time Evans said stop the car, did you?

THE COURT: Do you understand the question, detective?

THE WITNESS: I understand what he is getting at.

Again, that is a summary of what he told us. The order that his knowledge is placed in this is just in the summary fashion.

BY MR. WEINER:

Q You're saying that in a double homicide that you had 13 days to prepare a report in which it doesn't say anything about when he had knowledge, and you're saying that you understand accountability to be aiding and abetting either before or during the time of the commission of the offense that you summarized something that could be interpreted as being before, during or after Mr. Evans left the car with the gun. Is that what you're saying?

A Yes, sir.

MR. WEINER: Thank you, your Honor. I have no other questions of the detective.

THE COURT: Thank you.

MS. GROSS: Nothing.

THE COURT: State, redirect?

REDIRECT EXAMINATION

BY MR. SMITH:

Q Detective, defense counsel asked you about accountability. We also know there not need be an agreement in order to --

MR. WEINER: Objection.

THE COURT: Overruled at this time.

BY MR. SMITH:

Q You also know for accountability that there not need be an express plan or agreement to be accountable for a murder?

A That's correct.

Q As a matter of fact, many murders are done without a group sitting down and writing out their plans, aren't they?

A Most of them.

Q A lot of them are done on spare of the moment?

A That's correct.

Q Especially in the form of a driveby?

A Yes, sir.

Q Everybody has a part to play?

A Yes, sir.

Q In this instance after being told to pull over, the defendant did pull that car over, didn't he?

A Yes, sir, he did.

Q At that time he knew that Dave Evans was getting out of the car, correct?

A Yes, sir.

Q He popped the trunk so David Evans could get that gun?

A That's correct.

Q He knew that gun was in the trunk?

A Yes, sir.

Q He knew that Dave Evans was probably going to shoot those kids?

A Yes, sir.

Q He sat there and waited while David Evans went down to the sub shop, didn't he?

A Yes, sir, he did.

Q After the shooting he sat there and waited while David Evans made good his excape?

A He helped him. He made sure he made good his escape.

MR. WEINER: Objection; conclusion.

THE COURT: I will allow you latitude on

recross.

BY MR. SMITH:

Q Then he took off and then it led the police officer on a high speed car chase going up to anywhere from 60 to 90 miles an hour through side streets of the city?

A Yes, sir.

Q Dangering other people's lives to get his partner off?

A Yes.

Q And get rid of the murder

A Yes, sir.

Q -- get rid of that murder weapon?

A Yes, sir.

MR. SMITH: I have nothing further.

THE COURT: Thank you. Mr. Weiner

RECROSS EXAMINATION

BY MR. WEINER:

Q Detective, did Mr. Williams ever tell you he helped get rid of the murder weapon?

A Specifically, no, sir, he did not.

Q How about nonspecifically?

A No, he never said anything about what happened to the murder weapon. I'm sorry.

Q So when counsel asked you, that was an incorrect answer, is that true, he asked you if he was helping to get rid of the murder weapon. That was incorrect?
A No.
Q Didn't Mr. Williams tell you that when he heard the shots he pulled away from the curb and Evans almost didn't make it into the car?
A He stated Evans fell, yes, sir.
Q He stated that Evans fell twice trying to get into the car, didn't he?
A I don't know if Williams stated he fell twice.
Q How many times did he say that he fell?
A I remember he said he fell; so I don't remember if he said he fell twice.
Q He said he fell while the car was pulling away?
A As he began to pull away.
Q He told you, did he not, that if Evans hadn't gotten to the car he was going to go any way, didn't he?
A No, he never stated that, sir.
Q Well, did he not tell you that he was in a

panic when he heard the shots?

THE COURT: Sorry. There is several conversations. Could you be more specific as to foundation?

BY MR. WEINER:

Q Let me say this. Were you present during the court-reported statement where a court reporter had a machine and was taking down his statement word for word at 2:30 in the morning along with Gregory Vaci, the assistnat state's attorney?

A Yes, sir, I was.

Q Were you present when Mr. Williams said that when he heard the shots he was in a panic and in fact, he said he cranked up the car and tried to pull off as fast as possible?

A If that's in the court reported statement. I was present.

Q Isn't that what he told you when you sat with him in the interview room at Area 1 before you let him use the bathroom and fed him the Checker's hamburgers?

A No, sir.

Q Didn't he tell you, sir, at Area 1 that he was shocked and surprised when he heard those gunshots

and tried -- he had the car off and he tried to get out of there as quickly as possible?

A I don't recall him saying that at all.

MR. WEINER: No other questions of the detective.

MR. SMITH: Nothing further, Judge.

THE COURT: You can step down.

(Witness excused.)

MR. SMITH: We have one brief witness.

THE COURT: Fine.

(Witness sworn.)

(Witness sworn.)

ERNEST WARNER,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. NORASK:

Q Sir, could you tell us your full name and spell your last name for the court reporter?

A My name is Ernest Warner, W-a-r-n-e-r.

Q Sir, what is your occupation and by whom are you employed?

A I'm a firearms examiner for the Chicago

Police Department crime laboratory.

Q And how long have you been so employed as a firearms examiner?

A 29 years.

Q How long have you worked at the Chicago police department?

A 29 years.

Q As a firearms examiner for the Chicago Police Department, could you tell us some of your duties?

A My duties at the laboratory include receiving fired evidence, assigning laboratory control numbers to fired evidence, microscopically examining fired evidence, receiving weapons, assigning control numbers to weapons, test firing weapons and microscopically comparing test firings from weapons with evidence from crime scenes.

Q Can you give us some of your experience relative to firearms and firearms identification?

A I'd estimate during the course of my employment at the Chicago Police Department I've examined and testfired over 30,000 weapons and made a like number of microscopic comparisons of fired evidence.

Q Have you studied under recognized experts in the field of firearms examination?

A Yes. I studied under John C. Staufer (phonetic spelling), the former chief firearms examiner at the Chicago police department crime laboratory.

Q Have you read text books in the field of firearms identification and examination and do you keep up with the literature?

A Yes, I read the standard text books including Firearms Identification by Matthews, Firearms Evidence Investigation and Identification by Hatcher, Firearms Identification by Berard, Firearms Identification from the Ammunition Fired therein by Gunther and Gunther.

Q Do you belong to any professional organizations dealing with the area of firearms examination and identification?

A I'm a member of the International Association for Identification. I'm a member of the Midwestern Association of Forensic Scientists. I'm a charter member of the Association of Firearms and Tool Market Examiners.

MS. NORASK: At this time I would tender

the witness as an experts in the field of firearms examination and identification.

MR. WEINER: We'd accept his qualifications. I have no questions.

THE COURT: Thank you very much. Proceed.

BY MS. NORASK:

Q Sir, you explained that you have tested over 30,000 pieces of firearms evidence. Can you tell us some of the ways that you test and identify firearms evidence?

A The basis for identifying firearms evidence is similarity in the reproduction of class and individual characteristics on fired bullets and discharged cartridge cases.

Q Starting with class characteristic, what are class characteristics?

A Class characteristics are characteristics that are common to any number of weapons. They include caliber which is the nominal diameter of a fired bullet or the inside diameter of the barrel that fired that bullet. In the manufacturing of barrels of handguns, spiral grooves are cut in the barrel of the -- inside the barrel of the handgun in order to impart a spin to the bullet as it leaves the barrel of the

weapon. The purpose of imparting the spin to the bullet is to give the bullet gyroscopic stability, making it travel straighter.

The number of these grooves that are cut in the barrel of the weapon and imparted to the bullets from that barrel varies from manufacturer to manufacturer. As many as 22 grooves can be cut in the barrel; that is another class characteristic, the number of lands and grooves imparted to the bullets fired from a barrel.

Thirdly, whether the spiral is to the right or left varies from manufacturer to manufacturer. Many thousands of guns can have the spiral to the right. Many thousands and thousands of guns can have the spiral to the left, but that is a class characteristic. In order for me to identify two fired bullets as having come from the same gun, they must have the same class characteristics.

In addition to class characteristics, there are the individual characteristics on the lands and in the grooves of the barrel of the weapon which are imparted to the bullet fired through that barrel. These are the unique microscopic imperfections of the barrel that are the signature, so to speak, of the

barrel.

So in addition to having class characteristics we produced from fired bullet to fired bullet, I must also find a reproduction of individual characteristics on the lands and in the grooves of the bullet to identify two bullets as being fired in the same gun.

Q Sir, what sort of instruments or tests do you use to find those characteristics?

A We use a comparison microscope. A comparison microscope is essentially two microscopes founded side by side on two independent stages that allows the user to view under magnification part of an item on one stage and part of an item on the other stages simultaneously comparing the two items microscopically under magnification.

Q When you determine the class characteristics, do you compare what you find to known standards in the literature in your field?

A Yes.

Q Where do you get those known standards from, sir?

A The known standards that we use for comparison are obtained both from our test firing of

various weapons that we maintain a file of these standards. In addition, we use the GRC, general rifle characteristics file as published by the FBI on a yearly basis.

Q Do you commonly rely on those different files in forming your opinion as to whether bullets come from the same gun or fired evidence comes from the same gun?

A We don't rely on it to determine whether the evidence came from the same gun; rather, this information allows us to formulate an opinion of the type of gun it could have fired the evidence.

Q Are those files also commonly relied on in the field by other experts to determine the class characteristic or to determine what type of gun they may have come from?

A They are.

Q Did you examine evidence in this case in the homicide of Myron Cochran and Billy Johnson any fired evidence in this case?

A Yes, I did.

Q I'm going to show you what I've previously marked. I am going to show you what I previously marked as People's Exhibit Number 24. Could you open

that up, please? Do you recognize that outer envelope?
A Yes, I do.
Q How do you recognize it?
A By my initials on the envelope.
Q When did you place your initials on that envelope?
A In April of '95.
Q After would you have done your testing?
A Yes.
Q What is inside that evidence envelope?
A Two brown envelopes that bear my signature and the date 28, May, '94.
Q Does it -- Does it also have a number that you assigned to this case to keep track of the fired evidence?
A Yes, it does.
Q Can you tell us what the number is?
A 94-963.
Q Is that a number purely for your purposes in the crime lab that you assign a number?
A That is correct.
Q You also said your signature is on those two envelopes?

A Yes.
Q What is that to indicate?
A When I received these envelopes, the envelopes were in a sealed condition. I signed and dated the envelopes before I opened them.
Q What does the date indicate?
A That I opened them on the 28, May, '94.
Q Is that the day you did your testing?
A Yes.
Q Can you open the envelope that's labeled People's Exhibit Number 25? (Witness complied.) Can you tell us what is located there?
A One .25 caliber auto bullet.
Q How do you recognize that evidence as being evidence from this case?
A After opening the envelope and removing the fired bullet from it I marked the laboratory control number 94-963 on the fired bullet using a mechanical cabscriber. I also marked the letter C.
Q Did you make that marking on each of the pieces of fired evidence in this case?
A Yes, I did.
Q From where did that fired bullet come from?
A The writing on the envelope indicates the

fired bullet was recovered from floor next to the victim at 7403 South Halsted.

Q Could you tell us what's in People's Exhibit Number 26?

A Inside People's Exhibit Number 26 are five .45 auto caliber cartridge cases.

Q Does the envelope indicate those were recovered from the scene of the homicide?

A Yes.

Q And could you tell us what's located inside People's Exhibit Number 35?

A Inside People's Exhibit Number 35 is a brown envelope bearing my signature, the date 28, May, '94 and the laboratory control number 94-963 and the letter A.

Q What is that piece of evidence?

A This is a mutilated .45 auto caliber fired bullet.

Q Does the outer blue envelope indicate from where that came?

A The blue envelope indicates it's a bullet envelope from the office of the medical examiner's facility identifying the name Myron L. Cochran.

Q Did you learn that this was a bullet

recovered from the homicide victim Myron Cochran?

A Yes.

Q Finally, what's in People's Exhibit Number 36?

A Inside People's Exhibit Number 36 is a brown envelope cut open with my signature and the date 28, May, '94. Inside the brown envelope is a .45 auto caliber fired bullet marked with laboratory control number 94963 and the letter B.

Q Did you learn from where that was recovered?

A The writing on the blue envelope indicates it was recovered from victim Billy Johnson.

Q That writing is from the medical examiner's office, is that correct?

A That's correct.

Q With respect to your comparison, sir, were you able to make a comparison first with respect to all the shell casings?

A Yes, I was.

Q Now, what in your opinion to a reasonable degree of scientific certainty as a firearm's examiner, what was your opinion with respect first to the shell casings?

A The five discharged cartridge cases recovered from the scene of this investigation were in my opinion fired in one weapon to the exclusion of all other weapons.

Q Similarly, sir, in your expert opinion are those five cartridge casings consistent with being fired from a .45 Ruger semiautomatic handgun?

A Yes.

Q Now, with respect to the bullets, the bullet first that was recovered from the floor at the scene of the shooting, were you able to make a comparison of that bullet to the bullet recovered from the body of Myron Cochran?

A No, I was not.

Q Why were you not able to make that comparison?

A The bullet that I marked "A" identified as coming from Myron Cochran is too mutilated. It doesn't bear enough surface that was in contact with the barrel that fired it to have individual characteristics allowing me to form a definite conclusion with that bullet.

Q What are some of the factors that cause mutilation of a bullet?

A Essentially, when a bullet strikes something harder than itself and the surface of the bullet breaks away or impacts on something harder than itself and deforms --

Q It looks mutilated?

A Yes.

Q Would entering into somebody's brain hitting bones, would that cause mutilation?

A Certainly.

Q Do you commonly term that as not suitable for comparison?

A That's correct.

Q Now, comparing the fired bullet that you recovered from the floor of the -- that was recovered from the floor of the scene of the homicide to the bullet recovered from Billy Johnson, were you able to make a comparison in those two bullets?

A Yes, I was.

Q In your opinion, to a reasonable degree of scientific certainly as an expert in the field of firearms examination, what was your opinion with respect to those two bullets?

A In my opinion, the bullet recovered from the crime scene and the bullet recovered from the body

of Billy Johnson were fired from one gun and only one gun.

Q Also, sir, were the bullets that you recovered or that were recovered and that you examined consistent with being fired from a .45 caliber Ruger semiautomatic handgun?

A All three of the fired bullets are .45 caliber. All three of the fired bullets are rifles with six lands and grooves incline to the right and those are the class characteristics of a Ruger semiautomatic handgun.

Q Can you tell us, sir, with what frequency a .45 caliber Ruger is seen in your crime lab?

A Very infrequently.

Q Can you tell us the approximate cost of a .45 caliber Ruger?

A Several hundres.

MS. NORASK: Thank you. May I have a moment?

THE COURT: Sure.

(Brief pause.)

MS. NORASK: Judge, I have nothing further.

MR. WEINER: I have no questions.

MS. GROSS: No questions.

THE COURT: Thank you, officer. You can step down.

THE COURT: We will break for lunch now.

(Whereupon, a lunch recess was taken and the matter was recalled.)

MR. WEINER: It's come to my attention Mr. Smith told me yesterday he was going to call a gang expert. I'm moving in limine. Testimony with regard to gangs, how they do it, how they would act, tattoos and stuff can only prejudice this jury against my client. I'm asking they don't call the gang expert.

MS. GROSS: I join in that motion. In my client's statement he says he is a gang member and defines what bricks are. We are not contesting that issue.

THE COURT: It's already in the record what they are. Are you going to call somebody?

MR. SMITH: Yes, Judge. We will call Tom McMahon, gang expert, to talk about the fact the area the victims were killed in is an area -- was an area that is controlled by Gangster Disciples or the Disciples street gang. These defendants, as part of our theory and as part of the evidence, is that

they're going through rival gang territory knowing this area to be completely controlled by the opposite gang. Thus explaining completely unexplainable action, no prior apparent motive for the action that was done in this case. The defendants admit they are Blackstones, correct. This area --

THE COURT: You don't have your witnesses here?

MR. SMITH: Absolutely.

THE COURT: In this courtroom right now?

MR. SMITH: No, your Honor.

THE COURT: Take a look before you go on.

MR. SMITH: The only person in here is the State's Attorney.

THE COURT: Let him complete.

MR. WEINER: Sure.

MR. SMITH: It's relevant because it shows why they picked these two victims out of nowhere and it shows that the territory with young men this age in that territory would likely be members of the Gangster Disciples or Disciples street gang otherwise giving explanation and fully explaining the defendant's statements themselves. In addition, this was known and revealed to defense counsel well in advance.

MR. WEINER: Yesterday.

MR. SMITH: Also, listed in our answer to discovery. It was stated to me at the time that's no problem as far as gang experts and it's entirely reliable. He says prejudicial. It is probative. It is not like the gun issue. It is probative. It is directly relevant and it's --

THE COURT: What will he be testifying about?

MR. WEINER: Let me comment for a second. All these guys lives within a five block radius of the shooting. My guy lives --

THE COURT: Wait a minute. You consider five blocks in an urban area like a strange neighborhood?

MR. SMITH: That street is controlled by the Disciples, Judge.

THE COURT: You're saying -- I'm still a little upset you weren't here on time. You know we have a schedule to keep.

MR. SMITH: I apologize. I don't know what it has to do with this issue.

THE COURT: Because we don't have the time I'm going to reserve my ruling right now. Then

I'm going to see -- I want everybody here at 9:30 tomorrow. Then if you're not, I am making my ruling at 9:30 tomorrow.

MR. SMITH: The expert is ready to testify today.

THE COURT: Fine. He is not testifying today. If you want my ruling I will make it right now.

MR. SMITH: Judge, I thought we could get them all on this afternoon.

THE COURT: Take a look at the time.

MR. SMITH: Can I tell the gang expert to come back tomorrow morning?

THE COURT: If you don't want the ruling today you certainly can tell him to come back tomorrow.

Bring the jury out.

(Jury entered courtroom.)

MS. NORASK: We call Dr. Lifschultz, medical examiner.

(Witness sworn.)

DAVID BERRY LIFSCHULTZ,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SMITH:

Q Sir, state your full name and spell your last name.

A My name is David Berry Lifschultz, L-i-f-s-c-h-u-l-t-z.

Q How are you employed?

A Cook County medical examiner's office in Chicago. My job is staff forensic pathologist.

Q Are you licensed to practice medicine in the State of Illinois?

A Yes, I am.

Q How long have you been licensed, doctor, in the State of Illinois?

A I've been licensed since 1978.

Q Now, with regards to your duties as a medical examiner, would you tell the ladies and gentlemen of the jury your educational background with which you acquire your degree?

A In 1972 I received a bachelor's degree with

honors from Harvard University. Then in 1977 I received my doctor of medicine from Loyola University medical school in Maywood, Illinois. In 1981 I finished a four-year residency in general anatomic pathology at Northwestern University Medical School in Chicago. In 1982 I finished one year residency in forensic pathology at the Cook County Medical Examiners'. Since 1982 I have been employed there at the Cook County medical examiner's office as staff forensic pathologist.

Q Can you please describe to us what pathology is?

A Basically general anatomic pathology which is what I studied at Northwestern is the study of diseases and injuries in the tissues of the body, whether we look at the tissues with our naked eye or with aid of the microscope.

Q Now, would you please describe what forensic pathology is?

A Forensic pathology is a subspecialty of general anatomic pathology where we use the principles of the general and pathology to investigate deaths which are sudden and unexpected or possibly violent.

Q What are your duties as a medical examiner?

A Basically, it's my duty to help with the investigation of sudden and unexpected, possibly violent deaths by examining the bodies of people who have died and trying to determine exactly why they died.

Q Have you conducted a number of autopsies, an approximate number of autopsies as a medical examiner?

A Yes, I have.

Q Approximately, how many have you done?

A I perform about 300 autopsies each year and I've been in our office for about 13 years. So I performed nearly 4,000 autopsies.

Q Prior to today's date, have you been qualified as an expert in the field of forensic pathology in the Circuit Court of Cook County?

A Yes, I have.

Q How many times have you been found to be qualified as an expert?

A I testify and have been qualified about once every month and I've been at the office for 13 years; so I've been qualified almost 150 times.

MR. SMITH: At this time, we would offer Dr. Lifschultz as an expert in the field of forensic

pathology.

MR. WEINER: We accept his qualifications. We have no questions.

MS. GROSS: No questions.

THE COURT: Proceed, state.

BY MR. SMITH:

Q Doctor, calling your attention to May 26th of 1994, did you have occasion to perform a postmortem examination or an autopsy on a person by the name of Myron Cochran?

A Yes, I did.

Q When you performed the postmortem examination, do you use any type of identification tag?

A Yes, we do.

Q What is that?

A Mr. Cochran was given the number 435, May, 1994. So all the pictures that we had taken for his case and for all the documents associated with the case we used that number, 435, May 1994.

Q Is that shown in information and as a basis for identification?

A Yes.

Q Did you do an external examination on the

body of Myron Cochran?

A Yes.

Q What were the results of the your external examination?

A When I examined his body I really only found one injury.

Q Where was that injury?

A The injury was on the middle back of the head in this area where I am pointing to.

MR. SMITH: Indicating for the record just above the neck on the back of the skull.

THE COURT: Record will so indicate.

THE WITNESS: This was a gunshot wound of entrance. In the course of this, perforating the skin of the back of head, the bone in the back of the skull, it went through the brain and then we recovered from beneath the skin of the left cheek in just about the area I am pointing to here with my fingers --

MR. SMITH: Indicating for the record approximately one inch beneath the left eye.

THE WITNESS: A large caliber metal jacketed lead bullet. The course of the wound was from back to front. It was from right to left and then it was slightly upwards.

BY MR. SMITH:

Q Now, doctor, would that injury be consistent with an individual tilting their head when shot from behind?

A Yes, that would be possible.

Q Doctor, did you also do an internal examination?

A Yes, I did.

Q What was the result of your internal examination?

A When we performed the internal examination other than the injury due to the brain and skull due to the gunshot wound that I have just described, the only other finding was a passive congestion or backing up of blood into the lungs which is very common in cases like this when a person doesn't bleed to death.

Q Doctor, did you form an opinion based on a reasonable degree of medical and scientific certainty as to the cause of death of Mr. Myron Cochran?

A Yes.

Q What is that opinion?

A Myron Cochran died as a result of gunshot wound of the head.

Q Now, as part of your examination, doctor,

are body fluids also tested for drugs or alcohol?

A Yes.

Q Do you rely on that in forming your opinion?

A Yes.

Q What was the result of the examination of the body fluids of Mr. Myron Cochran?

A We tested the body fluids for cocaine, alcohol and opiates. We found that the test for cocaine was negative. We also found that the test for drinking alcohol was negative and the test for opiates which are drugs like heroin was also negative.

Q Now, doctor, did you find any evidence of any close-range firing in this case?

A No. None that we could see.

Q Would you please explain what close-range firing means?

A When there is a close-range firing, if the gun is less than six inches from the target we may see deposits of soot or gun smoke on the target. At the tip of the gun it is less than about foot and a half from the target. We may see what's called powder stippling which is a tattooing of the target by small pieces of burning or unburnt gunpowder that come out

of the gun with the bullet.

Q Did you find any evidence of that in the victim in this case Myron Cochran?

A No.

Q Is there anything that would impede the build up of the stippling on the skin?

A Yes.

Q What is that?

A If there were some sort of intermediary target like a piece of clothing or hat that would, for all practical purposes, stop the flow of soot or powder tattooing to the skin.

MR. SMITH: May I approach the witness?

THE COURT: Yes.

BY MR. SMITH:

Q Showing you what's marked People's Exhibit Number 35 for identification. Do you recognize what that envelope is?

A Yes.

Q Is that the envelope that you filled out with regards to the victim in this case Myron Cochran?

A Yes.

Q Did you place the bullet that you recovered from the victim Myron Cochran's brain in that

envelope?
A Yes, I did.
Q Would you please look in that envelope? Do you recognize what's contained in that envelope?
A Yes.
Q Is that the bullet that you recovered from Myron Cochran and placed in the blue medical examiner's envelope?
A Yes.
Q Was it in a sealed condition when it left your hand, doctor?
A Yes.
Q In substantially the same condition as it was when you retrieved it from the victim?
A The envelope is a little different. There is some writing on it. Of course it's been cut open.
Q But otherwise it is in the same substantially same condition?
A Yes.
Q Showing you what's marked People's Exhibit Number 37 for identification. Do you recognize what that's a photograph of?
A Yes, I do.
Q What is that a photograph of of?

A This is a picture of the face of the man who was identified to me as Myron Cochran.

Q Showing you what's marked People's Exhibit Number 38 for identification. Do you recognize what that is a photograph of?

A Yes, I do.

Q What is is it a photo of?

A This is a picture that I had taken of the back of the head of Myron Cochran and the hair has been shaved away by us and it shows the gunshot wound of entrance on the middle back of the head.

Q Finally, showing you what's marked People's Exhibit Number 39 for identification. Would you please tell us what that is a photograph of?

A Yes. This is simply a picture of that same gunshot wound on the back of the head of Myron Cochran but it's much closer.

Q Did all these photographs contain the identification tag 435, May of 1994?

A Yes, they do.

Q Doctor, do these photos we've showed you People's 37, 38 and 39 truly and accuratley represent the victim as he appeared when you did your postmortem examination?

A Yes, they do.
Q Now, doctor, calling your attention to May 27th of 1994. Did you have occasion on that day on May 27, '94 to perform an autopsy postmortem exam on a person by the name of Billy Johnson?
A Yes.
Q What identification label was given to this particular autopsy?
A He was given the case number 452, May of 1994.
Q Doctor, di you assigned that tag number to a photograph taken with identification number on it?
A Yes, they were.
Q Did you make an external examination of the victim at that time?
A Yes, I did.
Q Did you find any evidence of injury?
A Yes, I did.
Q What evidence of injury did you find, doctor?
A When I examined the body I found three injuries on the body of Mr. Johnson.
Q What was the first injury that you noted?
A The injury that we numbered number 1 was a

gunshot wound of the back of the head, and the course of this wound perforated the skin of the back of the head, the skull. It penetrated the brain and then the bullet ricocheted off the inner surface of the left side of the brain and bounced back directly along the bullet path so that the bullet was recovered actually from the brain quite close to the entrance gunshot wound.

Q Did you find any other evidence of injury?

A Yes, I did.

Q What is that, doctor?

A When we examined the back of the right shoulder we found that there was a gunshot wound of entrance on the back of the right shoulder in the area I am pointing to here. The course of this wound perforated the skin of the right shoulder, the soft tissues of the shoulder and under arm, and then there was an exit gunshot wound in the right axilla or under arm area where I am pointing to here.

MR. SMITH: Indicating for the record the wound of entrance on the rear right shoulder blade and the exit under the right armpit.

THE COURT: Proceed.

BY MR. SMITH:

Q Would that be referred to as a through-and-through gunshot wound?

A Yes.

Q You didn't recover any bullet at that time, did you?

A No, not from that wound.

Q Did you find any other injuries?

A Yes, I did.

Q What is is that?

A The gunshot wound or injury that I numbered number 3 was of the back of the fifth or little finger of the left hand and this was an injury that would be consistent with a graze gunshot wound, not a gunshot wound that actually went through the finger or skin but just grazed or rubbed up against the skin.

Q Did you also do an internal examination?

A Yes, I did.

Q What were the results of that?

A When we performed the internal examination other than the injury due to the gunshot wound to the head and gunshot wound to the back, we really didn't find anything abnormal inside the body.

Q Did you recover a bullet from that head injury?

A Yes, I did.
Q Doctor, showing you People's Exhibit Number 36 for identification. Is that the bullet envelope that you used to seal the bullet that you recovered from Mr. Billy Johnson?
A Yes, it is.
Q Does that contain identification number 254, May of '94?
A Yes.
Q Have you viewed the bullet that is contained in that envelope, doctor?
A I viewed it before, but let me look again.
Yes, I have.
Q Doctor, is that substantially in the same condition as it was when you recovered it from that victim?
A Yes, it is.
Q Did you place it in the sealed medical examiner envelope after you recovered it?
A Yes, I did.
Q Showing you what's marked a series of photos. If you could describe what they are. Showing you People's Exhibit Number 40 for identification. Could you tell us what that is?

A This is a picture that I had taken of the back of the head of Mr. Johnson and it shows as did the other picture of the back of the head that the hair has been shaved away from the gunshot wound of the back of the head and in the center of the picture I could see a gunshot wound of entrance on the back of Mr. Jackson's head.

Q Showing you what's marked People's Exhibit number 41 for identification. Do you recognize what that is, doctor?

A Yes, I do.

Q What is that?

A This is a picture of the bullet that I recovered from the head of Mr. Johnson.

Q Showing you what's marked People's Exhibit number 42 for identification. Do you recognize this photo?

A Yes.

Q What is that, doctor?

A This is a picture of the back of the right shoulder of Mr. Johnson, case number 452, May '94. It shows a gunshot wound of entrance of the right back shoulder with some adjacent dark discoloration of the skin or bruising of the skin which is often associated

with gunshot wounds.

Q How could you tell the difference between an entrance and exit wound?

A A gunshot wound of entrance characteristically has a margin of abrasion or scraping away of the skin which occurs when the bullet passes through the skin on its way in.

Q Showing you People's Exhibit Number 43 for identification. What is that a photograph of?

A This is a picture that I had taken of the under arm or axillary region of Mr. Johnson and it shows in addition to our case tag 452, May '94, a lacerated gunshot wound of exit in the underarm area.

Q How could you tell it is an exit wound?

A It has characteristics of the exit wound which is the gunshot wound is lacerated or torn. This occurs when the bullet passes through the skin on its way out and tears the skin.

Q Showing you what's marked People's Exhibit number 44 for identification and ask you if you recognize what that is?

A This is a picture that I had taken of the left hand of Mr. Johnson and it shows the injury of the little finger of the left hand which is consistent

with a grazed gunshot wound.

Q Finally, showing you People's Exhibit Number 14 for identification. Is that the identification photo for Mr. Billy Johnson?

A Yes. This is a picture of the face of the man who was identified to me as Billy Johnson.

Q Do these photographs truly and accurately show how he appeared when you performed that postmortem examination?

A Yes, they do.

Q Did you also, doctor, as part of the examination with regards to Mr. Johnson test the body fluids?

A Yes, I did.

Q Would you -- Did you rely on that in arriving at your opinion?

A Yes.

Q When tested for narcotics and alcohol, what was the result of that?

A Just as in the other case, we tested the body fluids for alcohol, drinking alcohol, for cocaine, breakdown of cocaine and for opiates which are drugs like heroin. All these tests were negative.

MR. SMITH: We have nothing further.

MR. WEINER: I don't have any questions from Dr. Lifschultz.

MS. GROSS: No questions.

THE COURT: Doctor, can you step down.

(Witness excused.)

MS. NORASK: People call ASA Greg Vaci.

(Witness sworn.)

GREGORY VACI,

a witness called on behalf of the People of the State of Illinois, having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. NORASK:

Q In a loud, clear voice, please introduce yourself.

A Gregory Vaci, V-a-c-i.

Q How are you employed?

A I am an assistant state's attorney.

Q Are you licensed to practice law in the State of Illinois?

A Yes.

Q When did you become so licensed?

A In November of 1990.

Q How long have you been working for the Cook

County State's Attorney's office?
A About five years.
Q What unit are you currently assigned to, sir?
A Right now I am assigned to the night narcotics unit.
Q Back in 1994, specifically, May 26th, can you tell us what unit you were assigned to back then?
A I was assigned to felony review unit.
Q Could you please explain to the ladies and gentlemen what the felony review unit of the Cook County State's Attorney's office is?
A Felony review unit is a unit in the state's attorney's office that's on call for 24 hours a day. We work in shifts of 12 hours and you're either assigned to the night shift or the morning shift; so you would work either 6 a.m. to 6 p.m. or 6 p.m. to 6 a.m. and you would get three days off in between each shift. Work three days on, three days off.
Q What is -- What are some of your duties or functions in the felony review unit?
A After an arrest is made by the police they will contact our unit and we'd go to the various areas, police areas and districts in the city to

assist the police in interviewing witnesses, victims and defendants in that case.

Q The unit covers the entire City of Chicago, County of cook?

A That's correct.

Q Directing your attention specifically to May 26th of 1994 at approximately midnight, did you receive an assignment to go to Area 1 in the investigation of the homicide of Myron Cochran and shooting of Billy Johnson?

A Yes.

Q What time did you arrive at Area 1, sir?

A I believe it was about ten minutes to midnight.

Q Did you meet with anyone when you arrived at Area 1?

A Yes.

Q With whom did you meet?

A I met with Detective O'Brien.

Q Did Detective O'Brien have any reports or notes that he provided you with that had been generated so far about this investigation?

A Yes.

Q Did you review those?

A Yes.
Q Did you also get a summary of what Detective O'Brien had begun so far?
A From him, yes.
Q Did you learn that they had a defendant in custody at Area 1 by the name of Cordell Williams?
A Yes.
Q Did you also learn that Mr. Williams had a conversation with Detective O'Brien before you arrived?
A Yes.
Q Did you then -- What did you do after you learned all that information?
A After speaking to Detective O'Brien I interviewed one witness who was at the area.
Q What was the name of that witness, sir?
A I believe it was Stanley Sanders.
Q Was he a witness to the incident that had occurred that was the subject of this investigation?
A Yes.
Q After you interviewed Mr. Sanders or Detective Sanders, what was the next thing that you did?
A I interviewed Cordell Williams.

Q When you went to interview Cordell Williams where was he located?

A He was in a small interview room at Area 1.

Q Is that on the upstairs at 51st and Wentworth?

A That's correct.

Q The person that you met when you walked into the interview room, do you see that person in court today?

A Yeah.

Q Could you please point to him and describe something he is wearing for the record?

A He is the gentleman with the white shirt and tie wearing the glasses.

MS. NORASK: May the record reflect in-court identification of Cordell Williams?

THE COURT: Yes.

BY MS. NORASK:

Q When you walked into the room was he handcuffed or unhandcuffed?

A Not handcuffed.

Q Did you introduce yourself?

A Yes.

Q How did you introduce yourself?

A I told him I was an assistant state's attorney, a lawyer and prosecutor, but I was not his lawyer. I asked if he understood that. He said he did.

Q Were you with anyone when you went into the interview room?

A Detective O'Brien.

Q After you introduced yourself did you advise the defendant of anything at that time?

A I advised him of his Miranda rights.

Q Did you do that by form or by memory?

A By memory.

Q Could you tell us what it is you said to the defendant?

A I said, do you understand you have the right to remain silent, that you don't have to talk to me. He said he understood that. I said that do you understand that anything you say to me is going to be used in a court of law. He understood that. I asked him if he understood he had the right to have an attorney present with him in the room while he was being questioned. He said he understood that. I asked him if he understood that if he couldn't afford to have an attorney present one will be provided free

of charge.
Q Did he indicate he understood all those rights?
A Yes. Then I asked if he still wished to talk to me. He said he did.
Q Did you then have a conversation with the defendant?
A Yes.
Q Who was asking questions during this conversation?
A I was.
Q How long did this conversation take place?
A I would say from half hour to 40 minutes.
Q At conclusion of this conversation did you ask him if he wished to memoralize what he told you in any fashion?
A Yes.
Q Did you ask him?
A I gave him the choice between what's termed a hand-written statement, I explained to him what that was, or a court-reported statement and I explained to him what that was. I explained to him he didn't have to have it written down at all.
Q What did you explain to him a handwritten

statement was?

A I explained a handwritten statement is a statement that is written out by myself based on what he is telling me in my own hand writing and then after that statement is taken down then he would have the opportunity to read the statement along with me, make any additions or corrections he wanted to make and sign each page of that statement.

Q How did you explain to him a court-reported statement would be taken?

A I explained a court-reported statement was a statement that is given to a court reporter similar to what you would see in a courtroom and that I would ask him a question, he would give an answer and the statement itself would reflect exactly what he says and what I say. After that statement was finished and typed up then he would have the opportunity to read it along with me, make any corrections or additions.

Q Sir, what did he choose to do if anything?

A He chose the court-reported statement.

Q When he chose the court-reported statement what did you then do?

A I left the interview room and call the court report's office.

Q Now, did you ask Mr. Williams during your oral interview how he had been treated by the police so far till when you got there?

A Yes.

Q How did he respond he had been treated?

A He said he was treated well.

Q Did you notice or did you ask whether or not he had been provided with anything to eat?

A I asked him but I also noticed there was wrappers from Checker's hamburger. I asked him if he had eaten. He said he did. I asked him if he needed to use the bathroom or he wanted anything else.

Q What did he say say?

A No, he did the not.

Q While you were waiting for the court reporter to come, did you ever put your head in or look in on Mr. Williams to ask him how he was?

A Yeah. After I called the court reporter I would say there was about an hour and a half lapse between me calling and the court reporter coming. I periodically checked on Mr. Williams.

Q Now, during the oral conversation that you had with the defendant Williams and with Detective O'Brien present, were there any additional details

provided by the defendant that had not been provided earlier?

MR. WEINER: Objection to that because he wasn't there when the defendant provided information earlier.

THE COURT: Sustained.

BY MS. NORASK:

Q Sir, after you called the court reporter and the court reporter came, what was the next step that was done?

A The court reporter set up his equipment and I interviewed Cordell Williams again with Detective O'Brien present.

Q Approximately, what time did that happen?

A That was about 2:30.

Q The three of you went back in again, is that correct?

A That's correct.

Q How did that take place, the taking of the court-reported statement?

A There was a series of me asking him questions after I again admonished him of his Miranda rights, explained to him again I was the assistant state's attorney and not his attorney. And that I

asked him questions regarding the incident.

Q Did he respond to those questions and were they typed down?

A Yes.

Q Approximately, how long did that interview take place?

A Maybe eight to ten minutes.

Q Following the conclusion of that second interview, what happened?

A I explained to him that the -- explained to Cordell Williams that the court reporter would type up the statement and I would bring the written statement back to the room and we would both go over it together and at that time he could make any additions or corrections he wanted to make.

Q At that time did the court reporter leave the room to type up the statement?

A Yes.

Q Approximately, how much later did you go back into the room with the statement?

A Maybe 45 minutes.

Q Did anyone else go back in the room with you?

A Detective O'Brien.

Q When you went back into the room, could you explain the procedure that was done to go over the statement?

A Yes.

Q What was done?

A I explained to him that at first I would have him read part of the statement to make sure he could read and understand English. Then after he read, maybe, the first two or three lines I stopped him and I read the statement out loud as he followed along.

Q How was he following along?

A He would follow along with his finger.

Q Did you read each and every page out loud to the defendant?

A Yes.

Q After the statement was read as the defendant followed along, what if anything was done to each page of the statement?

A After reading each page we would, all three of us, would sign the bottom of each page and we'd move on to the next page and sign that.

Q At the end of the statement was that signed as well?

A Yes.
Q Did Cordell Williams wish to make any changes to the statement at any time during the review of the statement?
A No.
Q After the entire statement was reviewed and signed, what was the next thing that was done?
A I left the interview room and --
Q Was there a picture taken of Cordell Williams?
A Not by me. The court reporter took pictures.
Q After that picture was taken by the court reporter, did everyone sign that picture as well?
A Yes.
Q Was the date and the time placed on that photo?
A Yes.
Q During the court-reported statement, sir, did you show the defendant any exhibits?
A I showed him one picture.
Q What was that picture, sir?
A That was a picture of David Evans.
Q What was the purpose of showing him that

picture?

A Because he had, Cordell Williams, had stated that the person who had done the shooting, the actual shooting was Dayday, and we believed that to be David Evans so we confirmed that by showing him the picture. In the statement he identified Dayday to be David Evans.

Q He identified that photo as David Evans?

A That's correct.

Q I am going to show you what's previously been marked as Exhibit Number 30 B for identification and ask you if this is the photo of David Evans that was shown to Cordell Williams during the court-reported statement?

A Yes.

Q Does it truly and accurately show him on that date, time and location?

A Yes. I wrote on the back.

Q I'm also going to show you People's Exhibit Number 34 for identification and ask you to tell us if that is the original court-reported statement that you took on May 26th of 1994?

A Yes, the original.

Q How many pages does that consist of?

A It is a ten page typed written.

Q On each and every page is your signature, the signature of the defendant in your presence and signature of Detective O'Brien in your presence visible?

A Yes.

Q Were all of those placed there in your presence?

A Yes.

Q And is it in substantially the same condition as when this court-reported statement was taken?

A Yes.

Q I am going to show you People's Exhibit Number 30B.

THE COURT: You just said 30B?

MS. NORASK: This is going to be 30B. I believe David Evans is 30A.

THE COURT: Your witness testified 30B is a photo of David Evans.

MS. NORASK: They are both marked -- Let me take that back and remark it.

THE COURT: Show it to counsel before you attempt this again.

BY MS. NORASK:

Q Showing you a corrected marked exhibit, the same photo, now marked as 32. Is that the picture of David Evans?

A Yes.

Q Back to 30B. Can you tell us if that is a picture the court reporter took of Cordell Williams after the court-reported statement?

A Yes, it is the picture.

Q Can you look at the back and tell us if this is your signature, the signature of Cordell Williams and signature of Detective O'Brien?

A Yes, also the court reporter.

Q That accurately shows Cordell Williams after he finished the court-reported statement, is that correct?

A Right.

Q Can you tell us, sir, what was the defendant's demeanor during the court-reported statement?

A He was unemotional.

Q Can you also tell us whether or not the defendant ever told you if his father had been allowed to see him and he had been allowed to speak with his

father?

A Yes, he did tell me that.

Q When did he tell you that?

A During the oral statement.

MS. NORASK: Judge, at this time I would ask that the identification marks be stricken and subject to cross examination the assitant state's attorney be allowed to publish the statement.

MR. WEINER: I have no objection.

THE COURT: Okay. Fine.

THE COURT: That will be the order.

MR. WEINER: Judge, if I may, may I approach for a second?

THE COURT: Yes.

MR. WEINER: May.

(Discussion had off the record.).

THE COURT: Thank you. Proceed, state.

BY MS. NORASK:

Q Mr. Vaci, would you please publish the statement to the ladies and gentlemen of the jury?

A Sure.

"Regarding the fatal shooting Byron Cochran and Billy Johnson. Statement of Cordell

Williams taken in the interview room, second floor, Area 1 headquarters, 51st and Wentworth, Chicago, Cook County, Illinois on Friday May 27, 1994 at 2:30 a.m. Present: Gregory Vaci, assistant state's attorney, Detective Jim O'Brien star number 20466 Area 1 Violent Crimes. Reported by Timothy D. Bennet, Illinois state license number 842628 book number 9405-27.

"Mr. Vaci: Let the record reflect we are in an interview room at Area 1 violent crimes. Today's date is May 27, 1994. Time is 2:30 a.m. Present in the room with me is assistant state's attorney Gregory Vaci, V-a-c-i, Detective Jim O'Brien star number 20466, the court reporter and Cordell Williams. We are here to take the statement of Cordell Williams concerning the investigation of the fatal shooting of Myron Cochran, C-o-c-h-r-a-n, and Billy Johnson which occurred on May 26, 1994 at approximately 12:20 a.m. at 7403 South Halsted at the Honey Sub Restaurant.

"Examination by Mr. Vaci: Question: Cordell, I talked to you earlier and explained that I am an assistant state's Attorney, a lawyer and prosecutor and not your lawyer, is that correct? Answer: Yes. Question: Before we spoke I advised you

of your constitutional rights, is that correct? Answer: Yes. Question: I'm going to read you your rights again. Do you understand you have the right to remain silent? Answer: Yes. Question: Do you understand anything you say can be used against you in a court of law? Answer: Yes. Question: Do you understand you have the right to talk to a lawyer and have him present with you while you are being questioned? Answer: Yes. Question: Do you understand if you cannot afford to hire a lawyer and you want one a lawyer will be appointed by the court to represent you before any questioning? Answer: Yes. Question: Understanding these rights, do you wish to talk to us now? Answer: Yes.

Question: Calling your attention to May 26, 1994 at around 12:20 in the morning, who were you with at that time? Answer: I was with Londell, Dayday and Andre. Question: Where were you? Answer: We were coming from westbound on 83rd and we took South Chicago over to 76th, 76th down and over to Halsted. Question: You were in a car? Answer: Yes. Question: Whose car were you in? Answer: My mother's car. Question: What type of car was it? Answer: '94 Tempo. Question: You said you were with Dayday? Answer:

Yes. Question: Do you know him by any other name? Answer: No. Question: Showing you what will be marked as Exhibit A for the statement is a photograph. Do you recognize who is in the photograph? Answer: Yes. Question: Who is that? Answer: Dayday. Question: That is the person who was in the car that night? Answer: Yes. Question: Where was Dayday sitting in the car? Answer: Behind the driver which is me. Question: Where was Londell sitting? Answer: In the passenger seat. Question: Where was Andre sitting. Answer: Behind the passenger. Question: Is Dayday a member of a gang? Answer: Yes. Question: What gang is he a member of? Answer: Black Peastone. Question: While the four of you were in the car, was there a gun in the car? Answer: Yes. Question: Where was the gun? Answer: In the trunk. Question: What type of gun was it? Answer: I believe a .45 Ruger. Question: Who put the gun in the trunk? Answer: Dayday. Question: Where were you when Dayday but the gun in the trunk? Answer: I was in the car. I had popped the trunk. Question: Where did you go when the four of you were in the car? Answer: We went -- We were traveling down Halsted. As we traveled down Halsted he said pull over, pull

over, pull over. Question: Who said that? Answer: Dayday. Question: Why did he tell you to pull over? Answer: He said he saw some bricks which was believed to be Disciples. Question: Did you know at the time that bricks were Disciples? Answer: Yes. I know what they call them. That is the name they had called them by. Question: Are the Blackstones and Disciples at war? Answer: They are rivals, yes. Question: Did you know that at that time? Answer. Question: What did you do next? Answer: I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk. Question: Why did he ask you to pop the trunk. Answer: He was trying to get to the gun. Question: What did you think Dayday was going to do? Answer: I was led to believe he was going to shoot somebody. Question: How did you pop the trunk? Answer: With my alarm. Question: What did you see Dayday do next? Answer: He went to the trunk. I believe I guess he got the gun and he then proceeded to walk to the submarine shop. Question: What did you see next? Answer: I didn't see anything. I heard the shots. I heard about four or five shots. Question: What happened after you heard the shots? Answer: After hearing the shots we

all turned around in a fransic. We seen Dayday running out of the shop. Question: When you saw Dayday running out of the shop, why what did you do? Answer: I cranked up my car in trying to pull off as quick as possible. Question: What did you see Dayday do? Answer: He was trying to run to catch up to the car. He snatched the door open. Question: What happened next? Answer: As he snatched the door open and tried to get in I was already pulling off so he slipped. He got back up and ran. The door was still open and he jumped in. Question: What did you do after Dayday got in? Answer: I was paranoid. I said what the fuck had gone on. You know. He just said pull the fuck off, pull the fuck off. Go. Go. Go. That is when I observed the off duty officer behind us. Question: What was the officer doing behind you? Answer: He had flashed his lights. Question: What did you do? Answer: I had proceeded to make a left on 73rd. Question: How fast were you going? Answer: About between 70 and 90 miles per hour. Question: Why were you going that fast? Answer: I was paranoid and scared. Question: Where did you go? Answer: I went down to Aberdeen, made a left and went down to 75th and put Dayday out. Question: What do you mean

put him out? Answer: Just put him out, told him to get out. Question: What happened next? Answer: After that I don't know where he ran to or what he did, but I left and took Londell home. Question: What did you do after that? Answer: I went home myself. Question: Where do you live? Answer: 7622 South Carpenter. Question: While you have been here have you had anything to eat? Answer: Yes. Question: What did you have to eat? Question: A couple of sandwiches and a couple burgers from Checker's. Question: Did you have anything to drink? Answer: Yes. Question: What did you have to drink? Answer: Pop and water. Question: Cordell, are you able to read and write English well? Answer: Yes. Question: Were you able to use the bathroom while you have been here? Answer: Yes. Question: Have the police treated you well while you have been here? Answer: Yes. Question: Have I, as the assistant state's attorney treated you well? Answer: Yes. Question: Have any promises or threats been made to you in return for your statement here today? Answer: No. Question: Are you under the influence of drugs or alcohol while you have been giving this statement. Answer: No. Question: Have you been able to answer

-- speak to your father while you have been here? Answer: Yes. Question: The court reporter will now type uo your statement and we will read over the entire statement together. You will be allowed to make any additions other corrections you wish. Do you understand? Answer: Yes.

"Mr. Vaci: This will conclude the statement of Mr. Cordell Williams. The time is now 2:37 a.m."

MS. NORASK: Thank you. I have nothing further, Judge.

MR. WEINER: I am going to ask since I --

THE COURT: Here's the thing. Ladies and gentlemen, we're going to conclude the evidence for today. We are several minutes early, but what I'd like you to do is come back here tomorrow at approximately -- make it 10:30 again. In all likelihood this trial will go to the jury tomorrow so make your schedule accordingly. Don't discuss this case among yourself or with anyone else.

(Whereupon, the above-entitled matter was continued to June 28, 1995.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, PATRICIA M. KOVATS, Official Shorthand Reporter of the Circuit Court of Cook County, County Department-Criminal Division, do hereby certify that I reported in shorthand the proceedings had in the above-entitled cause, and that the foregoing is a true and correct transcript of the proceedings had.

Patricia M. Kovats

Official Shorthand Reporter
Circuit Court of Cook County
County Department
Criminal Division
License No. 084-003455

(Rev. 4/2 /92) CCCR 0056

STATE OF ILLINOIS )
COOK COUNTY ) ss.

I, AURELIA PUCINSKI, Clerk of the Circuit Court of Cook County, in said County and State and Keeper of the Records and Seal thereof, do hereby certify the above and foregoing to be a true and complete copy of ....VOLUME ............OF A ..........VOLUME ..

RECORD CONSISTING OF THE REPORT OF PROCEEDINGS, ONLY. NO PRAECIPE HAVING BEEN FILED PURSUANT TO THE NOTICE OF APPEAL FILED IN THE APPELLATE COURT UNDER APPELLATE COURT NO. 95-2887

in a certain cause.......... LATELY .......... pending in said Court, between

The people of the State of Illinois ....... WERE ......., Plaintiff and

CORDELL WILLIAMS ....... WAS ....... Defendant .....

Witness, AURELIA PUCINSKI, Clerk of the Court and the Seal thereof, at Chicago,. In said

County, ...JANUARY 25, ................, 19..96.

Aurelia ... Pucinski [signature]

94CR
15518

FILED
APPELLATE COURT 1st DIST.
OCT 0 1 2009
STEVEN M. RAVID
CLERK

Transcript
Appeal
to

APPELLATE Court of Illinois
FIRST District

FILED
APPELLATE COURT 1ST DIST.
FEB 04 2014
STEVEN M. RAVID
CLERK

Circuit Court No. 94 CR 15518
Trial Judge VINCENT M. GAUGHAN
Reviewing Court No. 95-2887

94CR015518/A006

FILED
APPELLATE COURT 1st DIST.
FEB 27 2018
THOMAS D. PALELLA
CLERK

THE PEOPLE OF THE STATE OF ILLINOIS

vs.

CORDELL WILLIAMS

FILED
APPELLATE COURT
JUN 1997
GILBERT S. MARCHMAN
CLERK

15-1373

from
CIRCUIT COURT
of
COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

FILED
APPELLATE COURT 1st DIST.
SEP 2 3 2009
STEVEN M. RAVID
CLERK

AURELIA PUCINSKI
Clerk of Court

VOLUME FIVE OF FIVE
REPORT OF PROCEEDINGS,

Per AP/LMJ Deputy

08-2409

SOTOS-WILLIAMS 11635

2796

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

THE PEOPLE OF THE )
STATE OF ILLINOIS )
) No. 94-CR-15518
-vs- )
) Charge: Murder
CORDELL WILLIAMS )

REPORT OF PROCEEDINGS of the trial before the Honorable VINCENT GAUGHAN and a Jury on June 28, 1995.

APPEARANCES:

HONORABLE JACK O'MALLEY,
State's Attorney of Cook County, by
MR. MICHAEL SMITH,
MS. LAURA MORASK,
Assistant State's Attorneys,
appeared for the People;

MR. DAVID WEINER,
appeared for the Defendant.

# INDEX

Date of Hearing: 6-28-95
Page Numbers: H-1 to H-144

## PROCEEDINGS


| LIST OF WITNESSES | DX | CX | RDX | RCX | RDX |
|---|---|---|---|---|---|
| Motion in limine Pg. 3 | | | | | |
| GREG VACI | | 19 | | | |
| State rests- Pg. 67 | | | | | |
| Motion for directed finding- Pg. 67 | | | | | |
| Defense rests- Pg. 72 | | | | | |
| Closing Arguments- Pgs. 72, 98, 114 | | | | | |
| Jury Instructions- Pg. 129 | | | | | |
| Jury Instruction Conference- Pg. 138 | | | | | |

INDEX

Date of hearing: June 29, 1995

Pages: I-1 to I-9

---

CONTINUANCE


SOTOS-WILLIAMS 11638

# INDEX

Date of Proceedings: 8-10-95

Page Numbers: J-1 through J-33

## PROCEEDINGS


Defendant waives jury for death phase --------------J-3
Motion for New Trial ---------------------------------J-5

| WITNESSES: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| ODELL WILLIAMS | J-17 | | | |
| BRENDA WILLIAMS | J-20 | | | |

Aggravation ----------------------------------------J-23
Mitigation -----------------------------------------J-27
Sentencing -----------------------------------------J-30

THE CLERK: Cordell Williams and Londell Harper.

THE COURT: All right. This is People of the State of Illinois versus Cordell Williams. There has been a motion in limine made by Mr. Weiner to prohibit the state from having a gang specialist testify.

MR. WEINER: May I expand on that for a moment?

THE COURT: Go ahead.

MR. WEINER: Judge, after the state, Mr. Smith, made a proffer yesterday that the gang expert would be called to show that the witness-- excuse me, that the defendants were coming down to Halsted Street to in fact be in rival gang territory, I took the opportunity to review the reports and the evidence in the case.

First of all, Halsted is a major thoroughfare. We are not talking about people coming to an area that is a side street like 26th and something or other, and getting off at 26th Street to go see the Two-Sixer or Kings.

But next of all Evans, Williams and Ruddock-- Evans lives at 7306 South May; Williams, 7622 South Carpenter; Andre Ruddock, 7505 South

Carpenter, three to five blocks from where the incident took place.

Next, in Dwyer's report, the defendant says to Dwyer that he was driving the car and that he dropped Vino and Chris off and he went to the vicinity of 83rd and Exchange. In the statement to O'Brien, which I think is the most significant statement, because O'Brien I believe is the most thorough and extraordinarily competent of all the violent detectives that I have come across, Detective O'Brien wrote down that Williams said they were returning to the neighborhood.

Now obviously the neighborhood includes Halsted when you live three to five blocks away from that area.

And finally, Judge, the State asks your Honor to put on a gang expert to show that there was some plan when the only evidence in the record and that is the evidence of the defendant's statement as to what in fact occurred shows that this was a spontaneous act, stop the car. Stop the car. Bricks, bricks, stop the car.

Judge, the evidence, no matter what-- and the state is correct in saying it doesn't have to be

an explicit plan in an accountability murder case, but the evidence in this case is it was a spontaneous act. And the actions after that can be argued as to accountability or not.

Judge, it would be extraordinarily prejudicial because gang membership is not an issue here. We have in the record that everybody here was a member of a gang, and that Cordell Williams admitted he was. Extraordinarily prejudicial to allow the gang expert to testify, and for those reasons, we ask you to limit and exclude the gang expert's testimony.

MS. GROHS: I don't know if you want to hear anything from me at this point.

THE COURT: All right.

MS. GROHS: I haven't been able to speak this entire trial.

THE COURT: Go ahead.

MS. GROHS: Judge, I would just adopt Mr. Weiner's argument. In the case law that Mr. Smith I believe is going to cite, and in the cases that he is going to provide for you they talk about the state proving motive or showing motive.

In this case there is no motive that is

at issue. There is no denying these young men were gang members. They admitted to it. You haven't heard my client's statement yet, but you will. And in that he explains he is a member of the gang; he defines what a brick is; he says that his gang is at war with the other gangs. He said that Day-Day had previously had problems with this other gang. It's not an issue in this trial, Judge, and it may be probative. All this gang stuff is probative, but it's extremely prejudicial.

So I would ask that you not allow the testimony.

THE COURT: All right.

MR. SMITH: Your Honor, in light of defense counsel's argument, in the case law that I have provided, Judge, three cases, People versus Jackson, which is 145 Illinois Appellate 3rd, 626; People versus Colon, which is 162 Illinois 2nd, 23, and finally, People versus Carson, which is 238 Illinois Appellate 3rd, 457.

Your Honor, as defense counsel has stated, there is evidence to a degree as to the defendants and their gang involvement. That however does not end the issue of gang motive in this case

at all by any stretch of the imagination, because the pivotal point here is also why are these two victims shot. Never mind our defendants being gang members, why are these two victims shot.

What can the gang expert supply to ordinary citizens to explain why two kids who-- now the testimony is they weren't in a gang, that jury is thinking why in God's name are those two kids shot for nothing in that area.

The expert can provide the information and explain an otherwise inexplicable act with no other motive, no other type of normal escalation of hostilities, no talking whatsoever. This jury has to be confused about the significance of them being in that place. Why are these two kids who are not gang members all of a sudden become targets.

The expert can explain the significance of where they were at, and motive is under Colon provides that motive is-- an evidence of motive as long as it is, there is some evidence of it. Of course it was in the discretion of the Court.

I believe the trier of fact, especially with regards to the jury, is entitled to hear this information to help clue them in as to what exactly

went on, and must explain why these two individuals were picked out.

The Carson case is especially almost on point, Judge. Very briefly, the facts are gang expert testified regarding gang turf, territory and rivalry to explain sniper shooting from one building in the projects to another building. He also talked about gang affiliation of one of the victims in that case because he had a tattoo on that was a Cobra.

Applying those facts to this case is almost mirrored, especially with regards to both defendants' statements. They admit their gang membership. That means it's still an issue. It was admitted there in Carson. But it still has to be fleshed out, especially Cordell Williams' statement where he hedges quite a bit throughout his statement. The motive is not crystal clear, especially the terminology bricks.

In addition to-- in Carson, Judge, the co-defendant in that case also told the defendant that was charged, the accountable person, that the victim prior to that had shot at him and that the victim was a Cobra, member of a rival gang.

Here you have the co-defendant, David

Evans, identifying the victims, potential victims as bricks, which are members of a rival gang. You have another parallel fact exactly on point that explains why these kids are picked out.

And finally, Judge, in the Carson case, the co-defendant took a gun and pointed it. Thereby the Court reasoned that the defendant himself, the accountable individual, was aware that retaliation was contemplated. Here after identifying the rival gang members who they thought were rival gang members, the defendant David Evans asked Cordell Williams to pop the trunk because he needs to get to that gun. He knows he is getting the gun to do the shooting.

It's directly on point with Carson again, once again, Judge, showing that there is contemplation of some retaliation.

It's relevant, Judge, to show the motive here, common design among these fellow gang members, and the three cases that I have cited to your Honor I believe fall on all points.

Especially in Carson where it is mentioned, your Honor, the Court does mention in fact that the defendants do give statements and the

defendant gives a statement relating to the gang shooting.

However the Court specifically quoted on page 368," Davis testimony"-- Davis is the gang expert, your Honor," Davis testimony tended to explain the implications of gang involvement originally provided in the defendant's statement which inferred gang related motives for the shooting."

And that is exactly what we have here, Judge. There is no explanation here, even less than that case, as to why these two individuals were picked out. And that is what the gang expert could testify to.

In addition, a photo previously identified Judge, People's Exhibit Number 33, is a photo of the arm of David Evans. In that case there are tattoos on that photo, there is letters BPS, and five star, five-pointed star. And there is a tattoo which would only be able to be signified by the expert as a pitchfork which is upside down showing extreme disrespect, as the expert would testify, showing a very strong animosity towards the rival gang of the Black P Stones, which these letters

would stand for, which is what the five-pointed star stands for.

And the upside down pitchfork shows a great deal of animosity that this individual has for members of the rival gang. It flushes it out. The jury is not going to have the idea of what these tattoos mean. They are directly relevant, they go to the motive, and we would ask your Honor that you allow this gang expert testimony.

MR. WEINER: May I respond?

THE COURT: Yes.

MR. WEINER: In Detective O'Brien's report, Judge, the defendant orally says to O'Brien that Day-Day says--

THE COURT: Well, also testified to by Detective O'Brien.

MR. WEINER: And testified to by Detective O'Brien. Excuse me.

Day-Day said that he shouted to Williams to stop the car, Day-Day observed some bricks in the sub sandwich shop. Williams explained as O'Brien testified the term bricks is a street vernacular for Disciples, a rival street gang.

Day-Day then tells Williams to pop the

trunk.

Now in the written statement, which is in evidence, the defendant indicates--

THE COURT: On page five.

MR. WEINER: On page five-- well first of all on page four, they acknowledge that they are all members of a gang.

On page five, he said he saw some bricks which was believed to be Disciples.

Question: " Did you know at that time that the bricks were Disciples?"

" Yes, I know what they call them. That is the name they had called them by."

" Are the Black Stones and Disciples at war?"

Answer: " They are rivals, yes."

Question: " Did you know that at the time?"

Answer. " Yes".

So, Judge you're talking about an issue that although Mr. Smith says this jury is unclear about, I am not contesting that Day-Day under any theory of the law had Mr. Williams stop the car for any purpose other than to kill rival gang members.

I think that's in the evidence, it's clear to the jury, the jury is aware of it, and any more evidence of that point, Judge, it is extraordinarily cumulative and prejudicial and I'd ask your Honor to limit it.

MS. GROHS: And just one further comment, Judge, I cannot believe that a gang expert could testify that a particular gang controls a major thoroughfare like Halsted Street. They might control the side streets that are off to the, you know, off to the side going east and west and north and south, but certainly not Halsted Street, nobody controls Halsted Street. It's a major thoroughfare that these young man have to take to go wherever they are going to go.

And in this situation, Day-Day lived just north of there and the other two lived just south of there and west of there and they were coming from the east, they have to come through that way.

So the evidence that is in right now is that they were taking those people home. There is no evidence that they were driving down that street purposely looking for opposing gang members.

It's a major thoroughfare and the

evidence is clear so far that it was a spontaneous act.

THE COURT: All right. As far as Mr. Londell Harper is concerned, right now I don't know any statement that he's made and specifically testimony concerning him, so I will not make a ruling on that motion at this time. All right.

Concerning Mr. Cordell Williams, Detective O'Brien testified, as was pointed out by counsel for Mr. Williams, and also the statement was admitted in by Mr. Cordell Williams concerning gang involvement concerning motive.

The state certainly has a right to prove motive, and the gang expert testimony as relied on in Carson, is within a discretion of the Court.

At this time, my ruling is that it's cumulative because there is evidence both by Detective O'Brien and also by Assistant State's Attorney Vaci concerning statements, one court reported statement and the other an oral statement that was reduced by Detective O'Brien in his report.

If the defense puts on evidence, whether it's through cross examination or in their case in

chief, and I won't exclude-- during the state's case in chief, contesting the motive or contesting the statements concerning Mr. Williams being in a gang or the Disciples being a rival gang of the P Stones, I certainly will allow the state to call their gang crime expert in their case in chief if that evidence comes out then.

Or if the defense puts on evidence, I will certainly allow the state to call their gang specialist in rebuttal. But at this time my ruling is that it's cumulative.

MR. WEINER: Thank you, your Honor.

MR. SMITH: Your Honor, I ask that I possibly be allowed to recall Detective O'Brien possibly to explain his otherwise unexplainable tattoos, his knowledge that are on David Evans.

And in addition, his personal knowledge as to the gang that is on or controls the area of 74th and Halsted being as he's worked there his entire career as a detective in the Englewood area.

THE COURT: That will be denied. All right.

Is the State here-- Mr. Vaci.

MR. WEINER: Yes.

THE COURT: All right.

THE COURT: State, how many more witnesses-- I'm not asking you who you have-- in your case in chief after this.

MS. MORASK: Probably one.

THE COURT: One additional one, okay.

MS. MORASK: Possibly.

THE COURT: How many more witnesses?

MR. SMITH: This will be, in light of the Court's ruling, this will be our last witness.

THE COURT: Okay, fine.

MR. SMITH: Can I correct just with regard to these photos that I--

THE COURT: Certainly do that, please.

MR. SMITH: For the record with regards to people's exhibits that would be previously marked as of yesterday, there was a mistake in the numbering on my behalf, and I previously discussed this with defense counsel.

People's Exhibit Number 32-A would be the photo identified by the state's attorney and I believe Detective O'Brien as being the photo of David Evans that was identified by Cordell Williams in the course of his court reported statement.

THE COURT: All right, what were you marking

that before as, 30-A?

MR. SMITH: Yes, Judge.

THE COURT: All right. So is that will be 32-A. Okay.

MR. SMITH: And 32-B, your Honor, would be the large photo of the defendant, David Evans.

THE COURT: After the lineup?

MR. SMITH: After the lineup identified by Detective O'Brien previously.

THE COURT: All right.

Here is something I want the attorneys-- do you want the jury to break for lunch, state, defense before we have closing arguments?

MR. WEINER: Yes, Judge.

THE COURT: All right. The defense said that-- what is your feeling?

MR. SMITH: We can argue, Judge. We are ready. In light of the fact that this is the last witness, I don't think there is a lot of surprises. I don't see any reason that-- if it's fine with the Court, we have been waiting, and without the gang expert testifying, if this witness just has cross examination--

THE COURT: All right. That's what we will do

then, we will go straight through.

MS. GROHS: Judge, after this witness though I would like my client and I to be excused during the closing arguments so I can go handle the rest of the call in the building.

MR. WEINER: After this witness is called, I'd ask for a few minutes time to talk to my client.

THE COURT: Oh, certainly.

My interpretation to Mr. Smith saying going straight through means we are not going to break for lunch.

MS. GROHS: Okay.

THE COURT: And yes, Mr. Harper and his attorney will not have to be present. All right.

Could you bring the jury out, please.

(The following proceedings were had in the presence and hearing of the jury:)

THE COURT: Good morning, ladies and gentlemen, would you please be seated. Thank you.

All right. Cross examination, Mr. Weiner.

MR. WEINER: Thank you, Judge

CROSS EXAMINATION

BY MR. WEINER:

Q. Mr. Vaci, good morning to you.

A. Good morning, counsel.

Q. Mr. Vaci, you arrived at Area One still on the day of May the 26th of 1994 about ten minutes to midnight, is that right?

A. That's correct.

Q. And the first thing you did was to have a conversation with Detective O'Brien, is that right?

A. Correct.

Q. And during that conversation, you reviewed reports from Detective O'Brien and other detectives and police officers with regard to this matter, isn't that true?

A. That's right.

Q. How long did your conversation with Detective O'Brien last on the evening of May 26th and the morning of May 27th?

A. The first conversation I had with him I would say maybe 15 minutes, 20 minutes.

Q. And during that time, he showed you his notes?

A. He showed me the reports that had been generated up to that point.

Q. Did he show you the notes that he took regarding the conversation that he had with Cordell Williams?

A. I don't believe I saw any of his progress reports.

Q. Were you aware that he had had conversations with Cordell Williams within a couple of hours prior to you coming to the Area One police headquarters?

A. Yes, I was aware.

Q. And so he orally then told you what information that he had with regard to that interview, is that what you are saying?

A. Yes.

Q. Now the next thing you did at Area One was to interview a witness by the name of a Stanley Sanders, is that right?

A. Right.

Q. And he would be at that point a police officer, am I correct?

A. He was a police officer.

Q. That's correct. And you know him now to be a police detective, is that true?

A. I didn't know that, no.
Q. After talking to Stanley Sanders, you then talked to this young man, Cordell Williams, is that right?
A. That's right.
Q. And you said your conversation with Cordell Williams lasted 30 or 40 minutes, is that right?
A. First conversation I had with him, yes.
Q. And that was the conversation prior to the court reported statement, isn't that correct?
A. Yes.
Q. Now attorney Vaci, I noticed that you did prepare a memorandum with regard to your interview with Mr. Williams and the subsequent court reported statement?
A. Correct.
Q. And I notice as well that in the memorandum there are no facts or substance included in the memorandum with regard to the court reported-- excuse me, with regard to the oral statement, is that true?
A. I don't understand what you mean by facts or substance.
Q. Well, you agree that in the written

statement of Cordell Williams, which is in evidence, Cordell talks about what occurred that night?

A. Correct.

Q. And I'm asking you whether or not in your memorandum you include any facts about what Cordell reported in your oral interview with him?

A. No. I don't believe so.

Q. Now the court reported statement you said took only eight to ten minutes to conclude, is that right?

A. Approximately.

Q. And you made notes during your oral conversation with Mr. Williams, is that right?

A. I made notes regarding the case, not specifically regarding the oral conversation.

Q. I want to ask you if there is anything different that Mr. Williams said at the court reported statement that he said to you during your conversation with him before the court reporter was called.

A. Could you rephrase that?

Q. Yes. I'd be happy to because I sometimes speak in long sentences, so I will rephrase it.

Did Cordell Williams say anything

different in his court reported statement while you were present than he said to you during your conversation with him during those 30 or 40 minutes?

A. Yes.

Q. And what was that?

A. During the oral statement, he phrased things differently than he did during the court reported statement.

Q. Okay. Well, was there anything of substance that he said differently?

A. I don't believe in the oral statement, I don't believe he mentioned the type of gun that was put in the trunk.

Q. You don't believe it or do you know?

A. That's my recollection is that the first time I heard the type of gun was in the court reported statement.

Q. But you have no notes, am I correct, that show that what Mr. Williams told you in the oral statement was any different with regard to that gun, isn't that true?

A. Right. I don't take notes during the oral statements.

Q. Other than that substantive point, that you

say you remember or seem to recollect with regard to the gun, was there any other substantive difference in the statement given to the court reporter by Cordell Williams and the statement he gave to you during that 30 or 40 minutes?

A. During the oral statement, he didn't mention that he was panicking during-- or when he drove the car away. That came up in the court reported statement.

Q. And did you make any notes or any reports at all about his not mentioning that he panicked in the oral statement?

A. No. As I said, I don't take notes during the oral statements.

Q. How many months were you on felony review during that period of time before you were assigned back to a courtroom?

MR. SMITH: Objection.

THE COURT: Could you rephrase that.

MR. WEINER: Q. Well, how long was your tour of felony review during the later part of May of 1994?

A. At that time I had been on felony review for about five months.

Q. And in those five months, how many

statements did you take?

A. In total?

Q. Yes, sir?

A. I would estimate about 12 to 15.

Q. And were those all in homicide cases?

A. No.

Q. And in those 12 to 15 cases, did you take any notes of the statements that you took orally before you went to either a court reporter or hand wrote a statement?

A. No.

Q. And are you saying to the ladies and gentlemen of the jury today that you are sure that Mr. Williams didn't mention what type of a gun it was during the oral statement?

A. That's my recollection.

Q. Are you saying that you are sure that he said he didn't panic during the oral statement?

A. Yes.

Q. Okay. What other substantive differences are there or were there during the oral statement and the written statement before a court reporter?

A. Well, in the question when I asked him what did he think Day-Day was going to do--

Q. Um-hum?

A. He in the oral statement did not say I was led to believe that he was going to shoot somebody.

Q. What did he say?

A. He said I thought he was going to shoot somebody.

Q. He said I thought he was going to shoot somebody?

A. Yes.

Q. You remember that, don't you?

A. Pretty clearly, yes.

Q. Did he tell you in the oral statement if Day-Day had ever said to him before the trunk was popped I am going to shoot somebody?

A. I don't recall him saying that.

Q. Did he ever tell you that before the trunk was popped that anybody in the car said we are going to shoot somebody?

A. No.

Q. Did he ever tell you that before that trunk was popped in the oral statement to you that anybody agreed in the car to commit a crime on their way down Halsted?

A. I'm sorry, could you rephrase.

Q. Yes. Did he ever tell you that before he popped the trunk and Mr. Evans took the gun out, that there was any discussion in the car about committing a crime while the car was going down Halsted?

A. No.

Q. Now I want to draw your attention to the court reported statement of Cordell Williams, and I am going to ask if possible if I can-- as opposed to asking counsel to recall, if I can give him a copy of this statement to maybe expedite matters.

THE COURT: Any objection, state?

MR. SMITH: No, Judge.

MR. WEINER: Thank you.

May I approach?

THE COURT: Certainly.

MR. WEINER: Q. Mr. Vaci, I am going to ask you to turn to page three.

You asked-- after you gave Mr. Williams his rights, you asked him if he wanted to talk to you and he said he would, isn't that correct?

A. Yes.

Q. And you then asked him on May 26th at around 12:20 in the morning who he was with at that time,



SOTOS-WILLIAMS 11668

isn't that true?

A. Yes.

Q. And he told you he was with Londell, Day-Day and Andre, isn't that correct?

A. Yes.

Q. And he had told you that when you talked to him for 30 or 40 minutes orally before the court reported statement, hadn't he?

A. Yes.

Q. And then you asked him where he was, and he told you he was coming westbound on 83rd. That means he was coming from the east, isn't that true, sir?

A. Right.

Q. Okay. Then he took South Chicago over to 76th, and 76th over to Halsted, right?

A. Right.

Q. You asked him if he was in a car; he said he was in his mother's car. And you asked him what type of car it was, and he told you, isn't that correct?

A. Correct.

Q. Your next question to him was, and you said you were with Day-Day, am I right?

A. Yes.

Q. And you asked him if he knew-- if he knew Day-Day by any other name, and he said no, isn't that correct?

A. Right.

Q. And then you showed him-- may I approach the witness?

THE COURT: Yes.

MR. WEINER: Q. You showed him what has been previously marked as state's exhibit number 32-A in evidence. Did you show him that picture?

A. Yes.

Q. And when he looked at that picture, did he identify that person as Day-Day?

A. Yes, he did.

Q. Okay. So-- thank you very much.

And you asked him where Day-Day was sitting in the car, and he said he was behind him, which means Cordell Williams, he was in the back seat behind Cordell, isn't that right?

A. Behind the driver, which was Cordell.

Q. Well, Cordell did tell you he was driving?

A. Yes.

Q. And then he asked you where Andre was

sitting, and André was sitting behind the passenger, isn't that right?

A. Yes.

Q. You then asked him if Day-Day is a member of a gang, and he said yes. And you asked him what kind of a gang, and he said Black P Stone, isn't that right?

A. Yes.

Q. And you asked him while the four were in the car, was there a gun in the car, and he said yes, isn't that correct?

A. Yes.

Q. And then if we turn the page, you asked him where the gun was, he said in the trunk, right?

A. Yes.

Q. Now then you asked him what kind of a gun it was, and you said now to the ladies and gentlemen of the jury that you asked that question even though in your oral conversation with Mr. Williams in which you didn't take notes, he didn't to the best of your recollection remember or say what type of gun it was. You asked him the question anyway, isn't that correct?

A. Right.

Q. And he said I believe a .45 Ruger?
A. Right.
Q. Now in either of your conversations with Mr. Williams, whether it be your oral conversation or your court reported conversation, did Mr. Williams ever say to you that he had touched or handled that gun?
A. I don't believe so.
Q. In fact, if we go on, you asked him where he was when Day-Day put the gun in the trunk, and he answered you, did he not, I was in the car. I had popped the trunk. Isn't that true?
A. Yes.
Q. So it was your understanding that David Evans was outside the car with the gun and Mr. Williams was inside the car and somehow pushed some sort of button to have that trunk open, isn't that true?
A. According to what Mr. Williams said, yes.
Q. Okay. And is that any different from what he told you during the oral conversation you had with him before the court reporter was called?
A. No, it's about the same.
Q. Okay. You asked him where did you go when

the four of you were in the car and he said we were traveling down Halsted, isn't that true?

A. Yes.

Q. Now before we get to the next part, and the next part is when Mr. Evans said pull over, to pull over, did he ever tell you either in your oral conversation or that-- or in the court reported statement that before Mr. Evans said pull over, pull over, that he intended to kill anybody or that anybody in the car intended to kill anybody as far as he knew?

A. When you say he, are you referring to--

Q. Cordell Williams.

A. Could you restate that then?

Q. Before Mr. Evans said pull over, pull over, did Mr. Williams tell you that he, Cordell Williams, had any intent to use that gun to kill somebody or anybody in the car he knew had any intent to use that car to kill anybody?

A. Mr. Williams never stated that he had any intent to kill anybody.

Q. Okay. So the next thing that happened was as they traveled down Halsted, he had said pull over, pull over, pull over, and you then said who

said that, isn't that correct?

A. Right.

Q. And he said Day-Day, meaning David Evans?

A. Yes.

Q. And you asked him why he told you to pull over, and he said he saw some bricks, which were believed to be Disciples, right?

A. Yes.

Q. And you went into that and you asked him if he knew the bricks were Disciples, and he said yes, isn't that correct?

A. Yes.

Q. And you asked him because you had previously-- he had previously told you he was a gang member, if the Black Stones and the Disciples at war, and he answered yeah, they are rivals. Isn't that true?

A. Actually he denied being a gang member to me.

Q. Well, let me ask you a question. You asked him what gang Day-Day was a member of?

A. Yes.

Q. Where does it say that he denied in this statement or in any other statement denied being a

gang member to you?

A. He denied that in our oral conversation.

Q. Well sir, did you ever, ever submit a report saying that Mr. Williams denied being a member of the P Stones?

A. I would have to look at my folder that I prepared.

MR. WEINER: Could I have a moment, Judge?

THE COURT: Yes.

Q. When you say you'd have to look at your folder, sir, does that mean you did take notes?

A. I prepared a felony review folder regarding the case.

Q. Regarding the oral interview?

A. No, regarding the-- all the information taken down, victim information, information on the defendant.

Q. Well, if you-- if you didn't take notes about the oral interview where-- what-- where would the folder show that you in fact-- that he denied gang membership to you?

A. I would have to see on the--

Q. Well, were you aware that Detective O'Brien told you that he was a member of the-- of the Black

Stones?

A. Yes.

Q. So you are saying he told Detective O'Brien that he was a gang member but he denied it to you?

A. Correct.

Q. And when was this?

A. When was what?

Q. That he denied it to you?

A. During our oral conversation.

Q. That you didn't take notes down of, right?

A. Right.

Q. Well let's go on, if we may.

I want to draw your attention to page five. You asked him if he knew at the time that bricks were Disciples.

A. Yes.

Q. And he answered yes.

You asked him if the Black Stones and the Disciples were at war and he said they are rivals, yes. Isn't that true?

A. Yes.

Q. And you asked him if he knew that at the time, and he said yes, didn't he?

A. Right.

Q. Now the next thing you said to him is what did you do next. Now before you go on, the only thing that he had told you both in your oral and the court reported statement at that time that caused him to pull over was that David Evans had said stop the car, stop the car, bricks, isn't that true?

A. Well, he-- that he said that David Evans said that he saw some bricks.

Q. Okay. Stop the car, stop the car, I see some bricks, isn't that true?

A. Correct.

Q. He never told you there was any discussion before that about anybody killing any bricks, did he?

A. No.

Q. So the next thing you said to him was what did you do next, and he said I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk, right?

A. Yes.

Q. Now did he tell you where he was when he popped that trunk?

A. I believe he was still in the car.

Q. Did he ever tell you that he had gotten out

of that car and actually saw or touched or handled the gun at that time?

A. No.

Q. And you then asked him why-- why did he ask you to pop the trunk, and he answered he was trying to get the gun, isn't that right?

A. Yes.

Q. Now you had a 30 to 40 minute conversation with Mr. Williams before the court reporter arrived, and the next question you asked him during this conversation with the court reporter is what did you think Day-Day was going to do.

And you asked him that because as you testified here earlier, Mr. Williams said to you I thought David Evans-- in your oral statement-- was going to kill somebody.

A. Or shoot somebody.

Q. Or shoot somebody.

A. Yes.

Q. When did he say he thought that that was going to happen?

A. Can you rephrase that?

Q. When, at what point in time did he say that he thought David Evans was going to shoot somebody?

A. During our oral conversation.

Q. No, I meant what point in time in the sequence of events did he tell you that he thought David Evans was going to shoot somebody?

A. When David Evans got out of the car and went to the trunk.

Q. So it's your understanding that Cordell Williams thought that David Evans was going to kill somebody when David Evans got out of the car to retrieve the gun? Is that your testimony?

A. Well I can't say what, you know, at what specific point he thought that, but from his statement is all I have to go by. And that's what it appears he is saying.

Q. He is saying that after the trunk was popped and after Evans left the car, as far as you can interpret that statement, that that's when he thought Evans was going to shoot something, isn't that true?

MR. SMITH: Objection. That was not-- I didn't understand that to be the testimony, Judge. Rephrase it maybe.

THE COURT: Do you understand the question?

THE WITNESS: He's asking for my interpretation.

MR. WEINER: He just said how he understood it.

THE COURT: Well, if he understood it, go ahead, then answer it.

THE WITNESS: According to the-- to his statement, I assume he came to that conclusion after-- sometime between when David Evans said he saw some bricks and told him to pull over and got out to go to the trunk.

MR. WEINER: Q. Okay. You never asked him when David Evans said stop the car, what he thought was going to happen at that time, did you?

A. Did I ask him that?

Q. Yes? You didn't ask him that question at that time, did you?

A. I don't recall asking him that question.

Q. And you didn't ask him the question after David Evans said I see some bricks what he thought David Evans was going to do, did you?

A. I don't think I asked him that question at that point.

Q. You asked him the question in the court reported statement after he said I popped the trunk, didn't you? On page six.

A. Yes.

Q. So in the sequence of events, did you ask Cordell Williams with respect to what he thought Evans was going to do, the trunk had already been popped, hadn't it?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: No, I believe-- I asked him that question after I asked him the question why did he ask you to pop the trunk and--

MR. WEINER: Q. Well, on page six up there it says answer, I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk.

And then two questions later, you asked him, what did you think Day-Day was going to do, isn't that true?

A. Two questions later, yes.

Q. And two questions-- two answers before that he had said he had already popped the trunk, didn't he?

A. That's what he said.

Q. Okay. And you asked him how he popped the trunk and he said with his alarm, isn't that true?

A. Yes.

Q. Now you asked him what Day-Day did next, and he said, didn't he, he went to the trunk and I believe, I guess he got the gun, and then he proceeded to walk to the submarine shop, isn't that correct?

A. Yes.

Q. And then you said what did you see next, and he said I didn't see anything, I heard shots, I heard about four or five shots? Isn't that right?

A. Yes.

Q. You asked him what happened; he said after hearing the shots, we all turned around in a frantic and we saw Day-Day running out of the shop. Isn't that right?

A. Yes.

Q. You asked him when you saw Day-Day running out of the shop, what did you do. And he said I cranked up my car.

Now what did you take his statement, I cranked up my car, to mean, sir?

A. What did I take it to mean?

MS. MORASK: Objection, it's irrelevant what he took it to mean.

THE COURT: Overruled.

THE WITNESS: I took-- at that time took it to mean he revved up the engine, tried to pull off as quick as possible.

MR. WEINER: Q. Well, didn't he tell you, sir, in your oral statement, that the car was parked on Halsted at approximately 7410 South Halsted?

A. In that vicinity.

Q. And he told you that the car was parked against the curb, didn't he, in your oral statement?

A. That I don't recall.

Q. And he told you that the motor was off, didn't he?

A. No.

Q. Did he ever tell you that the motor was running?

A. I don't know if he specifically said that.

Q. If we can go on.

He answered, I cranked up my car and tried to pull out as quick as possible.

Then you asked him on page seven, what did you see Day-Day do. And he answered, he was trying to run to catch up to the car. Now he snatched the door open.

Cordell Williams told you that the car

was moving when David Evans was running to the car, didn't he?

A. During this statement?

Q. Yes?

A. Yes.

Q. And he told you that in the oral statement, didn't he?

A. Not like this.

Q. You recall the oral statement?

A. Yes.

Q. What did he say in the oral statement, was the car moving or was it stopped?

A. During the oral statement, the car was not moving.

Q. So that's another substantive difference between the oral statement and this, is that right?

A. Yes.

Q. And you have no notes to confirm that he said that though, right?

A. To confirm that he said that during the oral statement?

Q. That the car was stopped?

A. No.

Q. Okay. But in this statement to the court

reporter, he said the car was moving. Isn't that true?

A. Yes.

Q. And you asked him what happened next, and he said as he snatched the door open and tried to get in, I was pulling off, so he slipped. And he got up and ran. And the door was still open and he jumped in. Isn't that right?

A. Yes.

Q. Then you asked him what did he do after Day-Day got in. And he said he was paranoid, he said-- I said what the fuck had gone on, you know. And he said pull the fuck off, pull the fuck off, go, go, go.

And then he said that's when I observed the off-duty police officer behind us. Isn't that right?

A. Yes.

Q. Then he talked about where he went. He saw the officer flash his lights, that Cordell made a left on 73rd and he was going 75-- between 75 and 90 miles an hour. And you asked him why; he said he was paranoid and scared. Isn't that right?

A. Yes.

Q. Then you asked him where he went, and he said I went down Aberdeen and I made a left and went down to 75th and put Day-Day out, isn't that correct?

A. Yes.

Q. Now turning to page eight, you then asked him what did you mean, put him out, and said, just put him out, I told him to get out. Didn't he?

A. That's what the statement says.

Q. Okay. Now is that different from what he told you in your oral statement?

A. That part I don't recall if--

Q. He told you both times, didn't he, in the oral statement that he wanted David Evans out of his car, and he told him to get out of his car, isn't that true?

A. Not in those words, no.

Q. Well, by just putting him out and told him to get out, he didn't say drop him at his house, did he?

A. I don't recall the exact words, but he did not-- in the oral statement he didn't make it sound like he told him to get out.

Q. Okay. In the court reported statement, did

it make it sound like he told him to get out?

A. Yes.

Q. And that was, what did you say, about an hour and-a-half after your oral statement?

A. About, right.

Q. Did he talk to you in between that time other than you checking up on him and seeing that he was okay?

A. No.

Q. Okay. Then you asked him what happened next and then he said after that I don't know where he ran to or what he did, but I left and took Londell home. And then finally you asked him what did you do, and he said I went home myself. Isn't that right?

A. Yes.

Q. Now, isn't it true, attorney Vaci, that during both conversations you had with Cordell Williams, that he never indicated to you any knowledge of David Evans' intent to shoot anybody until the car was stopped, the trunk was open and Evans was either going to the trunk or going to the submarine store?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: Could you rephrase that?

MR. WEINER: Q. Isn't it true that during your oral statement with Mr. Williams, and the written statement taken before a court reporter, that Mr. Williams told you that he didn't think or know about David Evans' intent to shoot anyone until the car was stopped, the trunk was open and Mr. Evans was out of the car.

MR. SMITH: Objection to the form of the question, your Honor.

THE COURT: Counsel, do you understand the question?

THE WITNESS: I'm not following it.

THE COURT: All right. Well, listen, you have a right when you don't understand the question, just ask the attorney to clarify it.

Would you repeat the question-- or, I'm sorry, don't repeat it, could you clarify it.

MR. WEINER: I will say it differently and shorter, I hope.

Q. Isn't it true that both in the oral statement and in the court reported statement, that Mr. Williams told you that he didn't think that the

first-- excuse me, that the first time he thought that David Evans was going to shoot someone was when David Evans was out of the car?

A. The order-- I can't recall the order that he-- or specifically when he said he thought David Evans was going to shoot somebody in the oral statement. I think it's clear in the court reported statement when he said that.

Q. Which is?

A. I asked him the question after he-- after David Evans told him to pull over, because he said he saw some bricks.

Q. And--

A. And then--

Q. Also after--

A. I asked him what he did next; he said he pulled over across 74th Street and popped the trunk because he asked him to pop the trunk.

And then I asked why did he ask you to pop the trunk, and he said because he was trying to get to the gun.

Q. Um-hum?

A. I don't know if David Evans told him that he was trying to get to the gun or if he just assumed

that he was trying to get to the gun.

Q. You don't know that, do you?

A. I don't.

Q. He never told you that either in your oral conversation with him or in fact in this court reported statement, did he?

A. Told me what?

Q. If he knew that?

A. Well, he did know because he said why did he ask you to pop the trunk; he said he was trying to get to the gun.

Q. Okay. And when did you ask him, as you just said, what he thought in terms of sequence David Evans was going to do?

MR. SMITH: Objection, Judge, it's been asked and answered.

THE COURT: Sustained as to that.

MR. WEINER: Thank you very much, attorney Vaci, I have no other questions.

THE COURT: Thank you.

Redirect.

MS. MORASK: Judge I have nothing.

THE COURT: You can step down.

(Witness excused.)

THE COURT: Ladies and gentlemen, at this time we are going to have a short recess, so could you take the jurors to the jury room. Thank you.

Would everybody please rise.

(The following proceedings were had out of the presence and hearing of the jury:)

THE COURT: Okay. Concerning this evidence-- are they-- state-- off the record.

(A discussion was had between Court and counsel, off the record, after which the following proceedings were had:)

THE COURT: On the record.

People's number 1 is the lineup photo.

MR. WEINER: I have no objection.

THE COURT: No objection; that will be admitted and also published to the jury.

People's number 2 is the photo of the Honey Sub Shop.

MR. WEINER: No objection.

THE COURT: All right.

People's Number 3 is photo northbound on Halsted.

MR. WEINER: No objection.

THE COURT: Okay. Admitted and go back.

People's Number 4 is a view of Halsted-- I'm sorry, that was-- okay.

People's Number 4 is a photo of Mr. Cochran. Okay.

MR. WEINER: No objection.

THE COURT: All right. That will be admitted; it will go back.

People's Number 5 is a photo let's see, restaurant with first victim and area where second victim was.

MR. WEINER: I have no objection.

THE COURT: That will be admitted; go back.

Number 6 is a close-up of Mr. Cochran.

MR. WEINER: No objection. I know that-- you have had two pictures of Mr. Cochran, this third is more bloody and it really doesn't add anything other than the fact we all concede he had the money in his hand.

THE COURT: All right. Over defense objection, that will be admitted; that will go back also.

Number seven is a close-up of the area of Billy Johnson and the shell casings. All right.

MR. WEINER: I object for the record.

THE COURT: Okay. Over defense objection that will be admitted, it's probative value showing where the shell casings were.

People's Number 8, diagram of--

MR. WEINER: No objection.

THE COURT: What is this?

MR. WEINER: Halsted.

THE COURT: No objection; that goes back also.

All right. Number nine is a photograph of which car?

MR. SMITH: Cordell Williams' car.

MR. WEINER: No objection.

MR. SMITH: Nine, 10 and 11 are photographs of the--

MR. WEINER: No objection.

THE COURT: Pick one, which one you want going back.

MR. SMITH: The only reason I have three is one is a side photo and the other shows the license plates. So how about 9 and 10 and we will withdraw 11.

MR. WEINER: Why don't you show 9 and 11 because--

MR. SMITH: Very good; withdraw 10--

THE COURT: You don't have to withdraw, and I will admit it, but it doesn't have to go back.

MR. WEINER: Nine and 11 will go back.

THE COURT: Nine and 11 will go back. But all three will be admitted.

People's number 12 is a photo of--

MR. WEINER: Another lineup picture by another individual. No objection.

THE COURT: That will be admitted to go back.

People's number 13.

MR. WEINER: Live photo of Mr. Cochran, I have no objection.

THE COURT: All right. That will be admitted and go back. Concerning now the morgue photos, you are going to pick the probative ones that you need. All right I am not going to let them all go back.

People's number 14, I will admit them, but I am not going to allow them to go back.

People's Number 14 is a death photo of Mr. Cochran.

MR. SMITH: Yes, Judge.

THE COURT: All right. That will be admitted. All right. Are you moving to have that go back?

Here's whole thing, you certainly will be allowed-- that could go back because if you want to show the injury on the other one, because you have to show the same head.

MR. SMITH: All right.

THE COURT: All right, that would be admitted.

Number 15 is a live photo of Mr. Johnson.

MR. WEINER: No objection to that.

THE COURT: All right. Number 15 is admitted to go back.

And number 16 is a morgue photo of Mr. Johnson.

MR. WEINER: Take a look at it, Judge, I find it to be gruesome and I am going to object.

THE COURT: All right. Was he shot-- he was shot in the back.

MR. SMITH: Judge, the testimony was he was shot in the back of the head, and the bullet came up and ricocheted off the front of the head and went back, and this shows that injury.

THE COURT: Over defense objection, that will be admitted into evidence and it will go back to the jury because it shows the nature of the injury as testified to by the forensic pathologist.

People's number 17.

MR. WEINER: It's just a repeat of one of the earlier photographs, it shows Cochran on the ground; it shows the bloody area where the second victim was, and it's-- I mean it's the fourth photo we have of the same.

THE COURT: All right. That will be admitted into evidence but not published.

MR. SMITH: Okay.

THE COURT: All right. Photo number 18 of Mr. Cochran's jacket.

MR. WEINER: No objection.

THE COURT: All right, with shell casings, I'm sorry. All right.

All right live bullet, that will be admitted and that will be published to the jury.

Number 19, photo showing two shell casings, is that correct?

MR. WEINER: No objection.

THE COURT: All right. That will be admitted and go back.

MS. GROHS: Judge, I am going to go, if that's okay.

THE COURT: Do you want it your client-- you

might as well go back, too.

You can take Mr. Harper back. All right.

All right, 20 is Mr. Cochran's jacket and shell casings.

MR. WEINER: No objection.

THE COURT: That will be admitted in to go back.

All right. Number 21.

MR. WEINER: I mean we have the previous picture-- I know there is a circled casing in there, a couple of them--

THE COURT: All right. That will be admitted in, but it wouldn't be published.

MR. SMITH: Judge, there is a difference here, your Honor.

THE COURT: I'm sorry then.

MR. SMITH: -- which I hadn't pointed out, the other photos you can not see that there is one shell casing that's been circled, because it was underneath the jacket it was not visible from the other vantage point.

THE COURT: All right. I am reversing myself, it will be admitted in and published. All right.

MR. WEINER: The next photo is a picture of blood that I just think is---.



SOTOS-WILLIAMS 11698

MR. SMITH: There is no shell casings there.

THE COURT: That will be admitted in, but it won't be published. All right.

You have no objection to that being admitted in?

MR. WEINER: Not really.

THE COURT: But it won't be published.

MR. WEINER: I don't want to see it.

THE COURT: Number 23 is a close-up of Mr. Cochran.

MR. WEINER: Another death photo of Mr. Cochran, I don't know how many death photos face up we need.

THE COURT: All right. That one will be admitted.

MR. SMITH: Judge, may I address the Court. There was some testimony regarding close range firing, okay, by the pathologist, and he said that close range firing, there is no evidence of that on Mr. Cochran.

And if he were wearing some outer clothing, here it in fact shows he has a hood on, and baseball cap. I think for that purpose--

THE COURT: What about the other photos?

MR. SMITH: I don't know if the other photo

shows that.

MR. WEINER: So why don't we put one in and not the other.

THE COURT: He was laying on his side.

MR. WEINER: No, there is a death photo face-- two death photo faces of Mr. Cochran.

THE COURT: This will be admitted and won't go back.

MR. SMITH: It will not, Judge?

THE COURT: It will not because it's cumulative.

All right. People's Number 24 is the jacket of the evidence envelope. Do you--

MR. WEINER: No objection.

THE COURT: Do you want it going back though?

MS. MORASK: Just the jacket, no.

THE COURT: All right, state.

MR. SMITH: Yes, Judge, we ask that it go in.

THE COURT: The jacket? It's just a big envelope.

MR. SMITH: No, Judge, I'm sorry.

THE COURT: Okay. That would be admitted in but it won't be published.

Number 25 is a fired bullet next to Mr. Cochran, is that correct?

MR. WEINER: No objection.

THE COURT: That will be admitted in and that will go back.

Number 26 is five shell casings, is that correct?

MR. WEINER: No objection.

THE COURT: No objection, that will also go back.

All right FOP is withdrawn.

MS. MORASK: Yes.

MR. SMITH: Judge, may we keep those the plastic on both? That would be 25 and 26.

MR. WEINER: I don't have any objection to that.

THE COURT: Sure. Okay.

All right. The FOP book is withdrawn.

All right. All right number 28, that's a GPR of RO's conversation.

MR. SMITH: Withdrawn.

THE COURT: Okay. Number 29 is the supplemental.

MR. SMITH: Withdrawn.

THE COURT: It's also defendant's under two; that is withdrawn.

All right number 30-A.

MS. MORASK: 30-A is withdrawn, is the envelope that has the--

THE COURT: Number 30-B is the photo of Mr. Williams after his statement.

MR. WEINER: No objection.

THE COURT: That will be admitted in and published.

All right. Number 31 is a photo of the defendant.

MR. WEINER: I object to that.

THE COURT: Jail intake.

MR. WEINER: They have got a picture of him sitting there, and then they take his glasses off and they put a number down on him. And there is no question of identification here, Judge. I am certainly objecting.

THE COURT: All right. That will be admitted in, but that won't be published.

MR. SMITH: Judge, is there--

THE COURT: I'm sorry, go ahead.

MR. SMITH: Just for the sake of the argument, your Honor, defense counsel has made quite a point of the appearance of the defendant and it is relevant in his opening statement and his cross

examinations.

We can take out the fact that it is an intake photo, however it is relevant especially in light of points being brought out by defense counsel, not the state.

MR. WEINER: Just a black and white of what he was wearing when he was sitting in a chair and they took the glasses off for the picture. And it's a mug picture, and makes him look like public enemy number one.

MS. MORASK: The officer said he looks completely different with the glasses off.

MR. WEINER: There is no question of identification in this case.

THE COURT: You mean the officer that went to his home?

MS. MORASK: Right.

THE COURT: Okay.

MS. MORASK: He made a big display.

MR. WEINER: I just said--

THE COURT: Well, he still couldn't identify--

MR. SMITH: The officer said how he changed his appearance.

MR. WEINER: Well, every other officer identified

the little picture.

THE COURT: All right. That will be admitted and it won't go back.

Number 33, photo David Evans.

MR. WEINER: I have no objection.

THE COURT: All right. Let me take a look at that.

This is 32-A. All right. Let me take a look at it.

MR. WEINER: I don't have any objection to that.

THE COURT: All right. That will be admitted in and go back, 32-A. All right 33 is a-- what is 33 now?

MR. SMITH: We got 32-B.

THE COURT: A photo of Mr. Evans after the lineup. All right, any objection?

MR. WEINER: No.

THE COURT: All right. That will be admitted and published.

33 now is--

MR. WEINER: Tattooed arm of Mr. Evans, I object. There is no issue as to gang membership. Again it can only inflame the jury against my defendant, and since there's been no-- you haven't

allowed any evidence to show what those things mean, I don't particularly think that the jury should see it.

In fact I would strenuously object to the jury seeing that picture of his arm.

MR. SMITH: Judge, that's the double-edged sword, now defense counsel is arguing out of both sides of his mouth. He is yelling if anyone did come in and identify it, now he is screaming because no one did.

THE COURT: Okay. Number 33 will be admitted in and go back to the jury.

Thirty-four is court reported statement.

MS. MORASK: Yes.

MR. WEINER: I have no objection to that being admitted and going back to the jury.

THE COURT: People's Number 34 is the court reported statement of Mr. Williams. It will be admitted and go back to the jury.

People's number 35 is a mutilated .45 caliber taken from Mr. Cochran, is that correct.

MR. WEINER: I have no objection.

THE COURT: All right. That's admitted in and will go back.

All right. People's Number 36 is the brown evidence envelope.

MR. WEINER: No objection.

MS. MORASK: With the bullet from the victim Johnson.

THE COURT: Okay. That will be admitted and go back.

People's Number 37 is again a face of Mr. Cochran.

MR. WEINER: I don't know why we have to have two faces of this.

THE COURT: All right. I will admit it in but it will not be published.

All right. People's Number 38, which is a photograph of the back of the head.

MR. WEINER: Take a look at this. I mean we know where he was shot, Judge. What does it do other than to inflame the jury.

THE COURT: All right. The state has a right to proof-- I'm sorry, state, go ahead.

MR. SMITH: Judge, I believe it is directly relevant to corroborate the testimony of the witness and of the doctor.

THE COURT: All right. I find that it is

probative, 38 will be admitted in over defense objection and will be published to the jury.

People's Number 39 which is--

MR. SMITH: Close-up of that.

MR. WEINER: I object.

THE COURT: That will be admitted in, it will not be published. All right.

People's number 40 is a photograph of the back of the head of Mr. Jackson.

MR. WEINER: Your Honor, same objection.

THE COURT: All right. That would be admitted in and published.

All right. People's Number 41 is a photograph of the bullet that was in Mr. Johnson. All right that's admitted in-- I'm sorry.

MR. WEINER: No objection.

THE COURT: And no objection, admitted in and published.

Photograph-- let's see number 42 is a photograph of the gunshot wound to the right shoulder.

MR. WEINER: I have no objection.

THE COURT: That would be admitted in and published.

People's Number 43 is a photograph of the exit wound.

MR. SMITH: And the armpit, your Honor.

MR. WEINER: No objection.

THE COURT: That will be admitted in and published.

People's 44 is a photograph of the little finger of the left hand showing the glancing bullet wound. Any objection?

MR. WEINER: No objection.

THE COURT: That will be admitted in and published, too.

MR. WEINER: Can I ask one question? Could I talk to my client about testifying?

THE COURT: Sure.

MR. WEINER: It's almost 1:00 o'clock and the jury-- I'd prefer you give them 45 minute for lunch.

THE COURT: Well, I am bringing lunch up. I will have them have lunch afterwards.

MR. WEINER: After the--

THE COURT: After the argument.

MR. WEINER: That is going to be about and hour and a half.

THE COURT: Here's the whole thing, I appreciate

your concern for the jury, and that's nice. But they were suppose to be here at 10:30 at which time they were fed.

MR. WEINER: Okay.

MR. WEINER: Let me have some time with my client.

THE COURT: Are you going to move any of your-- all right just for the edification of the attorneys--, this is off the record.

(A discussion was had between Court and counsel, off the record, after which the following proceedings were had:)

THE COURT: State, at this time are you resting outside the presence of the jury.

MR. SMITH: Yes, your Honor. We'd be resting and ask that our exhibits be moved into evidence.

THE COURT: All right. They will be moved in according to the prior ruling preserving the defense's objection.

MR. WEINER: Judge, I have a motion for directed verdict of not guilty. I would argue that the state has not proven Cordell Williams accountable, that they did not prove on May the 26th of 1994 that

Cordell Williams before or during the commission of the offense; that is the shooting of the two individuals, and with the intent to promote or facilitate the commission of those two killings that he knowingly solicited or aided or abetted or agreed to aid or attempted to aid the other person in the planning or the commission of those murders.

And as is such, your Honor, I'd ask you to direct the jury to find the defendant not guilty at the end of the state's evidence.

THE COURT: Thank you.

State.

MR. SMITH: Your Honor, the Court has heard the evidence with regards to this case, and in addition to the defendant's own statement which on its face is sufficient to find the defendant guilty beyond a reasonable doubt.

In addition the eye witness testimony which further supports the defendant's statement and the testimony of the medical examiner, which further corroborates that statement, we ask that at the end of-- the state's case was proved beyond a reasonable doubt and we ask that you deny the defendant's motion.

THE COURT: Any response?

MR. WEINER: No, I have no response.

THE COURT: Motion for directed verdict will be denied.

MR. WEINER: Judge, at this time--

THE COURT: Again, we are outside the presence of the jury.

Go ahead.

MR. WEINER: At this time I have had a conversation over the last few days with Mr. Williams, and it culminated in our conversation in the conference room.

Mr. Williams knows he has a constitutional right to testify at his own defense, and he has as well a constitutional right to remain silent.

Mr. Williams has asked me to tell your Honor that he wishes not to testify today, and he understands that after you admonish him and if he still agrees, he will not be testifying.

We are going to then rest our case in front of jury and argue to the jury after offering no evidence on Mr. Williams' behalf.

THE COURT: Counsel, may I have your permission

to address your client.

MR. WEINER: Please do.

THE COURT: Thank you.

Mr. Williams, is that your understanding of your constitutional rights?

DEFENDANT WILLIAMS: Yes, sir.

THE COURT: All right. Just-- I know your attorney has explained them to you, I cannot order you to testify, I cannot order you to not testify nor can your attorney.

Do you understand that?

DEFENDANT WILLIAMS: Yes, sir.

THE COURT: Those are purely absolute rights that you have.

Do you understand that?

DEFENDANT WILLIAMS: Yes, sir, I understand all that, sir.

THE COURT: And at this time you wish to exercise your constitutional right and not testify, is that correct?

DEFENDANT WILLIAMS; That is correct.

THE COURT: Thank you very much, Mr. Williams.

MR. WEINER: One other thing, Judge, I just ask you to ask Mr. Williams if there has been any force

or pressure applied to cause him not to testify. I just want the record to be clear that he is doing it of his own free will.

THE COURT: Mr. Williams, you heard what your attorney said. Are you doing this of your own free will?

DEFENDANT WILLIAMS: Yes, sir, I am.

THE COURT: Thank you very much.

Again, the sequence will be when the jury comes back out, state, move your exhibits in; you will rest; Mr. Weiner will rest; then we will go on to closing arguments.

Could you bring out the jury.

(The following proceedings were had in the presence and hearing of the jury:)

THE COURT: Please be seated. Thank you.

State?

MR. SMITH: Your Honor, at this time we would ask that the exhibit labels be stricken and that-- the identification marks be stricken and the exhibits moved into evidence, and with that we would rest our case.

THE COURT: All right. Pursuant to the

discussion that we have already previously had and abiding by the rulings that have been made, they will be moved into evidence.

All right, state rests. Defense?

MR. WEINER: Your Honor, at this time the defense rests.

THE COURT: Thank you.

Ladies and gentlemen, what has occurred right now is that we have concluded with the evidentiary portion of the trial. So basically there are three more components left, one will be the closing argument; the next will be the reading of the instructions of law; and then the final will be your deliberations. So we are getting close to the end at this time.

All right. Remember again what the attorneys say is not evidence, and anything that conflicts with the evidence as you recall it should be disregarded. Okay.

All right. At this time state, opening statement.

MS. MORASK: Thank you, Judge.

CLOSING ARGUMENT

BY MS. MORASK:

May it please the Court, ladies and gentlemen, on May 26th of 1994, Billy Johnson and Myron Cochran were brutally and senselessly slaughtered, they were shot down as they were in a place that they had a right to be at a time that they had a right to be there doing something that each of us has a right to do. They were ordering food in a sub shop in the Honey Sub Shop, in a public place open during business hours in our City of Chicago.

They were brutally slaughtered at that point. And we now know who is responsible for turning first Myron Cochran from this 19-year-old boy who worked for a living, went to high school, had a girl friend, turning him from this to this on that evening.

We now know who is responsible for turning Billy Johnson, also working at Popeye's, here seen with his girl friend, friends-- I'm sorry friends, very close friends with Myron, from turning him from this into this.

We now know who is responsible for those actions and we know who is responsible. It is the team of Cordell Williams and his partners in crime,

Day-Day, known as David Evans, Pudgy, also known as Andre Ruddick, and Londell Harper.

That is who is responsible for turning those two lives, for causing that senseless carnage.

And, ladies and gentlemen, you should be outraged by this crime. This crime is absolutely outrageous. That you cannot walk into a subway shop and order fries and a Coke without getting executed at point-blank range in the back of the head.

Look at this picture. It is a photo of outrage. He is clutching three dollar bills.

Remember what Alexander Pratt said, that he is looking up at the menu and he gets shot, slaughtered while he is trying to decide between a large and a small fries. This is outrageous.

And you now know what Cordell Williams knew then, but what he lied about initially, who the actual trigger man was, and that was David Evans. But you also now know what Cordell Williams knew then, and that is that Cordell Williams is just as responsible for turning the Honey Subway Shop at 74th and Halsted into the little shop of horrors.

He is just as responsible for the blood of those two boys as if he had walked into that shop

and pulled those-- that trigger of the .45 caliber Ruger semi-automatic handgun over and over and over and over into those two boys' brains.

And you know why he is just as responsible, because of the law of responsibility, the law of accountability, the law of partnership, the law we went over and over in voir dire, the law that all of you said that you understood and that you could follow. And this is the law of the land in Illinois. And it is a fair law, and the law makes sense.

When two or more people get together and do a crime, they should each have to take the blame. Would it be fair that only Londell Harper, David Evans and Andre Ruddick take the blame for this crime. Cordell Williams as one of the major players should also take the blame. That is fair and the law is common sense.

Most crimes are committed by more than one person, so you need the law of accountability, the law of responsibility that says when two or more people commit a crime together and help each other out towards a common goal, they are each guilty. And you are going to get an instruction that says

exactly that.

And this instruction is going to go back with you to the jury room. And every time that you are deliberating on this case, you should think about this instruction. When you hear David Evans' name, you substitute Cordell Williams because of this instruction.

And this reads: A person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of on offense he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of the offense.

Now just as Detective O'Brien told you, you may not have any express plan or any express agreement where you sit down at a table and say we are going to do this. All we have to show you is that this guy helped out in this crime. And it doesn't matter when that intent was formed as long as it was formed during or before the commission of the offense.

And it's absolutely formed before. And I

will explain to you how we have shown that.

I want to go through how we have shown you this defendant is overwhelmingly responsible. All of his actions that he took that night show that he darn well knew what he was going to do, he darn well knew what he wanted to do, and that was to get some rival gang-bangers.

And how do we know about this laundry list of accountability. We know from two eye witnesses, Alexander Pratt, Stanley Sanders, and from all of the-- their testimony that you heard about what the defendant's actions were. That's how you look at somebody's intent, ladies and gentlemen, their actions. You can never open their brains and see what they are thinking, you look at their actions to figure out what they were thinking.

Let's slow the picture down and take what he did step by step by step. A veritable freeze frame of each picture of accountability.

First, he is instrumental in the setup and the picking of the target. He knows he is a member of the Black Stones; all of his friends are members of the Black Stones. How do we know that, because he told Detective O'Brien that, and he told

you that in his court reported statement, to Assistant State's Attorney Greg Vaci.

And you will get this back there in the jury room to read with you.

And, question: " Is Day-Day a member of a gang?" Answer: "Yes."

Question:" What gang is he a member of?" Answer: Black P Stone."

He knew everybody as well as himself is a member of a gang. He knew that they were going to 74th and Halsted from Northwestern Memorial Hospital. And he knew that bricks are rival gang members. So think about it. Of course he knew that they were looking for bricks.

Now we have the identifiable target, and he tells you that in his court reported statement.

Question: " Why did he tell you to pull over?" Answer: " He said he saw some bricks, which was believed to be Disciples."

Question:" Did you know at the time that bricks were Disciples?" Answer: " Yes. I know what they call them, that is the name they are called by."

Question: " Are the Black Stones and

Disciples at war?" Answer: " They are rivals, yes."

Question: " Did you know that at the time?" Answer: "Yes".

Now what is really important here is then with all of that knowledge in his mind, the knowledge that he is a member of a rival gang, they are going into rival gang territory, his friends are in the same gang as he is, they are looking for bricks, they have just visited Northwestern Memorial Hospital where their friend had been shot and they are all hopped up about it, and he tells them something else in his statement, that he put the gun in the trunk or he allowed the gun to be put in the trunk of the car before they go to Halsted.

Why oh why did he do that if it wasn't because they had been planning all along to get some bricks. That was the point of going to 74th and Halsted. And he tells you that right here in his court reported statement on page four and page five.

Question: " While the four of you were in the car, was there a gun in the car?" Answer: "Yes. "

Question: : Where was the gun?"
Answer: " In the trunk."

Question:" What type of gun was it?" Answer: " I believe a .45 Ruger.

Question: " Who put a gun in the trunk?" Answer: "Day-Day. "

Question: " Where were you when Day-Day put the gun in the trunk?" Answer: " I was in the car, I had popped the trunk."

Question: " Where did you go when the four of you were in the car, this is now after the gun is in the car?" Answer: " We went traveling down Halsted."

Well of course he knew what they were going to do that way earlier. This plan, this idea to get bricks is an ongoing living rivalry. These kind of crimes are done on the spur of the moment. You put the gun in the car because you want to get your bricks. But you don't know when you are going to see them, and when you see them, that's when the plan to shoot forms.

And it's an ongoing thing. And you know from his own words that he knew what was going down. And not only that, look at how instrumental he is in making sure that gun got to that scene.

That's the next detail that he does in

this freeze frame of accountability. He actually made sure the gun got in the trunk. How did he do it, he popped the trunk, otherwise Day-Day couldn't have put the gun in the trunk. He allowed his vehicle to be used to carry the murder weapon to the murder scene. And not only that, he drove the murder weapon to the murder scene. And not only that, he popped the trunk again allowing David Evans to get access to that murder weapon.

Who had control over this gun for the entire time until David Evans took it out of the trunk? This defendant had control over that gun from the moment it was put in there before they went to Halsted to the moment that David Evans took it out of there. And he allowed that crime to happen. He made sure that crime would happen by taking that gun to that scene. That in and of itself right there without anything else would be enough to find him guilty of first degree murder.

But there is more, much more. Now you have four things he's done. He's targeted the rivals, he's gone to the scene with the gun and popped the trunk to get the gun. Now what does he do. Day-Day tells him to pull over, so he pulls

over. Day-Day tells him-- he then popped the trunk. He doesn't get told to pop the trunk, he pulls over and he pops the trunk because he knows Day-Day wants the gun.

And again that's in his court reported statement in his only words. And we were traveling down Halsted and he said pull over, pull over, pull over. Question:" Who said that?" Answer:"Day-Day."

Question:" Why did he tell you to pull over?" Answer: " He said he saw some bricks which he believed to be Disciples."

Question: " What did you do next?" Answer: " I pulled over across 74th Street and popped the trunk. He asked me to pop the trunk and I popped the trunk."

Question: " Why did he ask you to pop the trunk?" Answer: " He was trying to get to the gun."

So he knew exactly what was going down. And he made sure it would happen. That is absolutely aiding, abetting, promoting, facilitating an agreement, an agreement to get bricks. It's overwhelming so far.

And there is still more. What does he do next, pops the trunk. He knows David Evans gets the

gun. David Evans then walks to the subway shop. This is a pretty key point. We know David Evans walks to the subway shop. The only way we can know that David Evans walks to the subway shop is if he is looking in his rearview mirror because he is parked up here and the subway shop is down here.

So obviously he has now begun his next part of his job which is to be the getaway driver. So he is now watching to see when David Evans is going to go in and do his part of the job, which is the trigger man, so that he can get ready to be the getaway driver.

And that's the next part of his job is to be the getaway driver. And make no mistake about it, ladies and gentlemen, this guy is the classic getaway driver in this case. This is absolutely classic. No matter how much questioning on cross examination about at what point did the car pull away at, at what point did it burst out and trying to make it sound like he would have left the guy behind.

Think about the evidence that you heard from Stanley Sanders. He told you that this car was parked over here with the engine running and the

lights off. It's waiting. If he is not the getaway driver, why is he even waiting.

MR. WEINER: Objection, Stanley Sanders never said that the engine was running.

MS. MORASK: Judge, he absolutely did.

THE COURT: All right, the jury has heard the evidence.

MS. MORASK: If he waits at this intersection, he clearly intends to be a getaway driver otherwise why doesn't he just leave and go home.

Obviously that one little fact makes him a getaway driver, but there is so much more. He is waiting, engine running, lights out. And he sees Day-Day walk down here. He is watching in the rearview mirror. Then what does Stanley Sanders tell you what happens. He hears the shot, he sees the guy running directly to the waiting car.

Day-Day knows exactly where to run because that's the plan. And he runs there as the defendant slowly pulls out. And Stanley Sanders sees all that.

Now Alexander Pratt couldn't see him slowly pull out because he is running southbound at this time. And then finally he turns around, he

sees when this car has got to the middle of the street and David Evans is trying to get in.

Now here defense counsel is making a big deal about this falling as if Cordell Williams was going to take off without David Evans. Ladies and gentlemen, that's nonsense. David Evans was clumsy; that's why he fell. He had a hot smoking instrument of death under his t-shirt after brutally executing two people in cold blood, and he had to high-tail it out of there. That's why he fell trying to get into the car as it's pulling away slowly.

And then what happens, according to Officer Sanders. The door opens for him, again classic example of getaway car. The door is open for him because they are acting as a team. They go to help this guy to make his getaway because it's all of their getaway.

So the door opens for him and he falls again. And then somebody reaches their hand out, now this is really helping, and pulls David Evans, helps him into the car.

Ladies and gentlemen, it could have been any one of their four arms or eight arms, it could have been any one of them, Cordell Williams, David

Evans, Andre Ruddick or Londell Harper.

But they are acting as a team, to make sure he gets away. And you know what the thing that happens, the horrible brutal slaying that happens in the subway shop is further and absolute evidence of Cordell Williams intention to be a getaway driver, because while he waits what does Alexander Pratt tell you happens in that subway shop. David Evans calmly, coolly, collectedly strides in as Alexander Pratt is checking an order of fries, and Myron Cochran is looking up at the menu and Billy Johnson is standing over by the window.

This guy calmly, coolly, collectively walks in with the gun up already pointed while he walks straight up to his target, straight up to his prey, one shot in the back of the head, over to Billy; one shot to Billy, downs them both and then as a really strong picture of the hatred these gangs have, has to go do it again, one more shot to Billy-- to Myron and two more to Billy.

And then he goes out. Why, oh why is he able to do this so calmly, so coolly and so deliberately. You know why, because he has a getaway car waiting for him right here. He knows

that he can get away with no problem. That's why he is so outrageously brutal in a public place in the middle of the streets of the City of Chicago, because they planned it that way. That's why the getaway car was here.

And it worked. After he gets pulled into the car, what else does this guy do to show you that he is the getaway car and had every intention of being the getaway driver and had every intention that this crime go down and that they get free, he peels out of there at that time. And how do we know that, we know that because Alexander Pratt told you that he heard tires squeal and Stanley Sanders said he took off at a high rate of speed and he followed them, and because the defendant tells you that he engaged in a high speed chase with an off duty police officer.

He wants you to believe that he wasn't a getaway driver, yet he is leading an off duty police officer on a high speed chase through the streets of Chicago.

And you will read those words. That's when I observed the off duty police officer behind us.


SOTOS-WILLIAMS 11733

Question: " What was the officer doing behind you?" Answer: " He had flashed his lights." Question:" And what did you do?" I had proceeded to make a left on 73rd."

Question:" How fast were you going?" Answer:" About between 75 and 90 miles per hour."

Ladies and gentlemen, a double homicide merits a particularly high rate of speed, doesn't it, to be doing this over hill, over dale chase through the streets of Chicago. Of course he is the getaway driver. That right there is absolute proof.

And in Illinois, ladies and gentlemen, you can consider the defendant's flight as evidence of guilt.

MR. WEINER: Objection, there's no instruction to that effect.

MS. MORASK: The law is--

THE COURT: There is no instruction, you are correct, counsel.

You can argue it. Overruled.

MS. MORASK: You will get an instruction pertaining to what I am talking about called circumstantial evidence. And that instruction will read as follows:" Circumstantial evidence is the

proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant.

" Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.

Circumstantial evidence is just logical inferences, like if you go to bed at night and the forecast is for snow, but the ground is bare; you wake up in the morning and it's a winter wonderland. You didn't see it snow but you know it snowed.

You can make those same logical inferences throughout this trial. A person flees from the police because they are guilty of something. A person leads an off duty police officers on a high speed chase at 90 miles an hour through the streets of Chicago because he just committed a horrible crime which was helping to make sure that a double murder got committed.

There is more in the laundry list of responsibility. After he had almost fulfilled his job of turning the 1990 Tempo into the vehicle of death, now his part of the job is to drop everybody



SOTOS-WILLIAMS 11735

off, to make sure we separate the murderers from each other and the murderers from the crime scene and the crime scene from the weapon, to make sure you don't get caught. And he did that.

And how do we know that he did that, because he told Detective O'Brien and he told you, ladies and gentlemen, through the court reported statement that you are going to read.

And after he dropped them off, he went home and embarked on his final job in the commission of this crime, which was to lie if he were to get caught by the police.

And those lies started as soon as the police got to his house when Detective Dwyer felt that radiator at about 1:30 at night. You can use your common sense that a radiator at 1:30 at night is not going to still be hot from driving around at 10:30 in the evening, which is what he told the police in this case.

And then the lies continued. He was confronted with one thing, say another thing; he lied over a course of hours to a bunch of different detectives. And you know what that shows, it shows the shifting sands of a guilty mind because you are



SOTOS-WILLIAMS 11737

trying to think of something to say to get out of what you did.

But then finally when Detective O'Brien confronted him with enough of these inconsistencies, some of these nuggets of truth about what he did came out. The nuggets of truth about how he put the gun in the car, he insured they could get in, the nugget of truth about how he popped the trunk to get it out, the nugget of truth about how he waited in the car for Day-Day, knew what was going to go down, all those nuggets of truth, ladies and gentlemen are a confession to murder and his overwhelming responsibility for what happened to these two boys.

You are also going to receive some other instructions from the Judge. And he will read them to you, and you will get a copy of them back in the jury room. And they are intimidating, you just follow the instructions like guidelines. And they make sense. And you are to going to hear that for us to prove this defendant guilty of first degree murder, first you have to have a separate instruction for each victim.

But for us to prove this defendant guilty of first degree murder of Billy Johnson, we have to



SOTOS-WILLIAMS 11738

show you two things. Now when you read this instruction, you have to read it with the accountability instruction together. And you use them together and I will show you how.

First, that the defendant or one for whose conduct he is legally responsible performed the acts which caused the death of Myron Cochran. And there is that language, or one for whose conduct he is legally responsible.

So you substitute David Evans' name for Cordell Williams.

MR. WEINER: Objection to that, Judge.

THE COURT: Sustained. Move on.

MS. MORASK: You are going to hear though that if you hold him legally responsible it is as if his hand is on the trigger.

MR. WEINER: Objection to her explanation of the law, Judge.

THE COURT: It's argument, overruled.

MS. MORASK: Therefore, if you find that Cordell Williams is responsible for what happened that night, then all we have to show is that David Evans caused the death, which is apparent because Dr. Lifschultz told you that David Evans caused-- or

that the gunshot wounds caused each death, both to Billy Johnson and Myron Cochran.

And then the second thing we have to show you is that when the death was caused, the person who caused the death or one for whose conduct he is legally responsible intended to kill or do great bodily harm, or knew that his act would cause death or great bodily harm, or knew that his acts created a strong probability of death or great bodily harm.

Ladies and gentlemen, when David Evans walked into that subway shop with that gun, he intended to kill those boys. Everybody in the car knew that he intended to kill those boys. You don't point-blank shoot somebody in the head without intending to kill.

That's the most culpable mental state of the three. You only have to pick one mental state. If you find that he intended to kill, we have proved murder. You don't even have to keep going, but we have also proved; if you find he intended to kill, we have also proved that he knew his action would cause death and there was a strong probability his action would cause death.

So it's those two things that we have to

show you. And what we have to show you is that Cordell Williams is responsible for what happened that night. And that is how we show you first degree murder. And you read the law of accountability at the same time that you read the murder instructions.

You are also going to get an instruction about the credibility of the witnesses and how you people, you folks are the judges of the credibility of the witnesses. It's your job to judge the facts, what you believe and what you don't.

But this instruction tells you some of the things to take into account: Bias, interest, ability to observe, opportunity to observe, memory, manner while testifying, and any prejudice the person may have.

And the way that you know that all of these witnesses were credible is by looking at the physical evidence. The physical evidence supports everything that everybody told you. Alexander Pratt saw the shooting go down, he saw David Evans shoot five times. There is five cartridge casings recovered, three from the place where Billy Johnson was where Alexander Pratt said David Evans shot

three times; two from the place where Myron Cochran was.

There was a bullet that was too mangled to compare. Dr. Lifschultz told you that one of the bullet in Billy Johnson ricocheted off the bone-- Myron Cochran, I'm sorry. That's why it was too mangled to compare.

Officer Warner from the firearms lab told you that all the shells came from the same gun, all the bullets except the one he couldn't compare came from the same gun, they were all consistent with a .45 caliber Ruger.

And that certainly confirms what the defendant tells you in his court reported statement that a .45 caliber Ruger was used and that it was one person who did the shooting in the subway shop with the gun that Cordell Williams made sure would get into the killer's hands.

All of that physical evidence shows you that the witnesses are telling the truth. And the photos that show you the sheer brutality of this crime, the photos that show you the sheer carnage of what happened in that subway shop again confirm for you that these guys had it all set up, that the

reason he was able to commit so much damage in such a short time is because he knew he had his getaway driver waiting.

Other than the facts and the physical evidence and the instructions the Judge is going to give you, you have something else to use as a guideline when you deliberate, and that is your common sense, your common sense about how people behalf, how people act and how things go down, and about how gangs acted.

And your common sense is your feeling right here, ladies and gentlemen. And your common sense tells you that he and everybody in that car knew and intended to get some bricks and they would stop at nothing. These gang hatreds fester, they simmer and then they explode into orgies of violence. That's how they operate.

And the sheer brutality shown by that photo shows you the hatred that those guys have for people that they think are opposing gang members who turned out not to be. And that is the ultimate tragedy in this case. This guy made a choice to be a gang-banger, and his buddies in his car made a choice to be a gang-banger. Myron Cochran never

made that choice; Billy Johnson never made that choice, they were wrenched into this unending cycle of retaliation for a shooting, for retaliation for a shooting, and were wrenched in unwillingly.

And ladies and gentlemen, when you make choices in this life, you also have to take the responsibility that comes along with it.

I make choices every day. I made a choice to be a prosecutor; I have a responsibility to prosecute crimes. The judge makes a choice to be a judge; he has the responsibility to make sure that this guy gets a fair trial, and he did. The defense lawyer has a responsibility to defend his client to the best of his ability and he did his responsibility.

The defendant made a choice to be a gang-banger, to take that car, to turn it into a getaway car, to allow that gun to be put in the car, to make sure that gun got out of the car into the hands of David Evans and to get some bricks. He made that choice and he has to take that responsibility.

And, ladies and gentlemen, you made a choice, too. By answering your questions last



SOTOS-WILLIAMS 11748

Friday honestly and by telling us that you could be fair and follow the law, you made a choice to do your duty as citizens and sit on this jury. And now it's your responsibility, it's your responsibility to follow the law that you swore you could follow, and it's your responsibility.

And we are asking you to take that responsibility and stop him from flight, from his 90 mile an hour flight from responsibility for what he did that night of May 26th. And you can stop that flight from responsibility, you can hold him responsible by returning two verdicts, guilty of the first degree murder of Myron Cochran and guilty of the first degree murder of Bill Johnson.

Thank you.

THE COURT: Thank you.

Could I have the attorneys up here a second.

(A discussion was had between Court and counsel, off the record, after which the following proceedings were had:)

THE COURT: All right. Thank you.

MR. WEINER: Your Honor, may I proceed?

THE COURT: Yes, Mr. Weiner, please.

CLOSING ARGUMENT

BY MR. WEINER.

Good afternoon, everybody. I want to thank the state for telling me what my choice was. The state said I had a choice to defend Mr. Williams to the best of my ability. I chose to defend Mr. Williams because Mr. Williams is not accountable for the actions of David Evans. Let's be clear that the state can't tell you what my choice is, I can.

Next, I want to tell you that before we get to the statements of Cordell Williams, that I want you to use your common sense and your experience in the community to determine whether in fact the physical actions by Mr. Williams were in fact those of a person who knew beforehand or at the time that these two boys were killed, that they were in fact going to be killed.

You have read stories for years about gang killings in Chicago, in Cook County and around the country. How many of those gang killings have you read about where a gun, which in fact is in a car,-- is in a trunk when people see other persons that they believe to be gang members.

You read about drive-bys. In the drive-bys, is the car stopped, does the person get out, open the trunk and take out a gun and shoot somebody? No. There is a gun in the car, there is a gun in the car because there is a plan by the people in the car to use that gun that is in the car, I mean in the car. One of the people in the car in the front seat or the back seat has that gun on his person.

It didn't happen here. Where does Cordell Williams live. You heard from the testimony that he lives at 7622 South Carpenter. This shooting occurred at 74th and Halsted. You know the City of Chicago, you can decide how far that is away from where this shooting took place.

The state tells you oh, that they were all coming there with that gun in the trunk to go find some rival gang members. They were bent on revenge. Well, use your experience and common sense and if you know the City of Chicago, determine how far 74th and Halsted is from 76th and Carpenter.

It's as if to say the Cordell Williams was planning to shoot some rival gang members in his own backyard.

What else do we know about the physical evidence in the case. We know that at the time of the shooting, Cordell Williams parked his car, one witness said in the middle of the street, Mr. Pratt. But let's talk about what Mr. Sanders said, across the street at 74th Street, some three and-a-half stores from where the submarine shop was. Was it in the middle of the street, it was parked. I contend to you that if Mr. Cordell Williams was a getaway driver, he would have been in the middle of the street waiting for David Evans to come out of that shop and not have to pull out from a parking space.

But another thing counsel says to you, she says there is evidence here that Mr. Sanders said, or Officer Sanders said that the motor was running. Officer Sanders, Detective Sanders today never said the motor was running. Detective Sanders said that he saw the car pulling out from the curb, and he said to you that the car was stopped when he saw David Evans run to it.

But what did he tell Detective Dwyer and what did Detective Dwyer say to you that Detective Sanders said to him. He said and he read it to you,

he said that Detective Sanders said that the vehicle was pulling away and the offender fell twice trying to enter the vehicle. Does a getaway driver try to run away from the guy he is trying to help get away.

Now assuming that Officer Sanders is correct, that the car was stopped and parked, and assuming that Officer Sanders never said that the motor was running, what else does Cordell Williams do. He puts on his lights to let Detective Sanders see his license plate. Detective Sanders said, well, I might have been able to tell the license plate without looking at his-- without having him put his lights on, but he put on the lights which gave me the opportunity to know in my mind the license plate on the Tempo.

We all know the getaway drivers want the people that are chasing them to know the license number of their mother's car so that they turn on the lights so that the person chasing them can make a mental-- or write down that license plate so that they can get caught later. Doesn't make sense based on your experience and your common sense.

Now let's talk about what Cordell

Williams said to the vast array of officers and the state's attorney that he talked to. First of all, I want you to be sure that my questioning of the state's attorneys-- state's attorney and the police officers, that there was nothing personal involved. These are people of good will, and I hope you understand that I was doing my job and don't hold any of my questions or my form of questioning against me.

But I had to ask if reports were taken. I had to ask the length of time between a statement was taken and the reports submitted. I had to ask if in fact they in did an oral interview as opposed to an interview with the court reporter, that there were some-- there was some evidence of what Cordell Williams said. Why, because Cordell Williams is accused of the double homicide of Myron Cochran and Billy Johnson.

And I would expect you should expect that every officer that talked to and every state's attorney that talked to Cordell Williams would have written down everything possible they could write down about what Cordell Williams said and did at those times.

Now before we get into what Cordell Williams said and what he did, I want to go over with you the instructions which counsel went over with you with regard to accountability. Counsel said, well, we all agreed in jury selection that one person who was-- is responsible for the acts of another if he is doing-- if he is involved in those acts. Yeah, we agree with that. We certainly agree with that.

But the instruction that the judge is going to read you is that a person is legally responsible for the conduct of another person when either before or during the commission of the offense, and with the intent to promote or facilitate the commission of an offense, he knowingly aids, solicits, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense.

Now if you agree that he was within an area very close to his own home, then on that day you must agree that the act of violence that killed these two people was something spontaneous, a spur of the moment act. There could not have been an explicit plan. Why in the world would Cordell

Williams in, you know, the City of Chicago, agree to a plan after being out east at Northwestern Hospital and being in the vicinity of his home to kill two people within a short radius of where he lived.

There was no plan. Halsted as you know is a major artery in the City of Chicago. It's a major street, everybody uses it. It goes from way, way north almost to the lake to way, way south. It's probably the longest or one of the longer running streets in the City of Chicago.

Now is the fact that they came from the hospital and went down a street on 74th Street near 76th Street, two blocks away from where Mr. Williams lived, does that show that they were bent on revenge, that they were out to get bricks. Of course this doesn't. So we have to look at the defendant's statements because that is the evidence that the state has presented to you to determine what the defendant knew and if in fact he with the intent to promote or facilitate the commission of an offense knowingly solicited, aided and abetted or agreed to aid or attempted to aid the other person in committing the offense.

We know that the first officer that saw

him, and the officer that saw him in his home and then when he went out-- when Mr. Williams went out to see Detective Dwyer, that Mr. Williams told Detective Dwyer that he had driven his mother's car. We know that is true. Yeah, we know he didn't mention anything about the killings here, he said he got home at 10:30. We know that's not true.

We know he is taken into custody and we know that when he is in custody, he admits to Detective Dwyer that he went to visit Mr. Darjen (phonetic spelling) at Northwestern Hospital. We know that's true.

He said that he went to visit him with two persons that he named, the names were Vino and Chris. We know that detectives went to the hospital and interviewed Darjen and he said that Cordell Williams was there with two people he knew, the person in the hospital, as Vino and Chris.

Up to that point, he had not said anything about being there at the shooting. Absolutely right. That is, he was either withholding evidence or he was not wanting to tell something that he thought that he might be involved with.

But to say that he was hiding a plan, to say that he was bent on revenge, there is no evidence to support that.

But let's go on. He then talks to Officer Gehrke. Now this is something that I think you should be amazed at. Officer Gehrke takes him out for an hour and-a-half, drives him around. He tells Officer Gehrke about a person named Dave or Day. It turns out to be David Evans; it's the truth. Has him go out and look for places where that person can be found.

Officer Gehrke doesn't write a report. I hope you find that to be, as a person of good will in a double homicide, somewhat incredible. But anyway, Gehrke says, well, it was my impression he really wasn't trying to help us. Whether he was or he wasn't, there is no report, we can't test his memory. We can only remember that Officer Gehrke said that he told him the truth about Dave or Day and said that he knew some store areas where he might hang out.

And that's when Officer O'Brien, Detective O'Brien comes into the picture. We remember him because he memorialized all four of the

occupants addresses in his mind. He told you what their addresses were. We remember him because he is extraordinarily intelligent, as his testimony showed, that he is an extraordinarily good police detective because of the ways that he told you the reasons that he didn't put the report in for 13 days. He said, well, we had 275 shootings, we were investigating so many of them. We didn't have to put this report in, so we didn't do it until June the 7th.

So we know he is an intelligent-- and we know he is a very, very, very complete and a fact-- facts are important to him. So he writes a report which he submits 13 days later about the interview that he had with Cordell Williams. And he says that Cordell Williams tells him, he told you, that there were three male blacks in the car with him. We know that's true. He says that he knows that one of the them is known as Dave or Day-Day, he is in the back seat behind him. We know that's true.

He said they were returning to the neighborhood. He put that in his report. They were returning to the neighborhood. Whose neighborhood? Cordell Williams' neighborhood. Officer O'Brien

wrote it in his report, and that they were in the neighborhood when Day-Day said stop the car, stop the car as Day-Day had observed some bricks in the sub sandwich shop at 74th and Halsted.

He said that Cordell explained the term of bricks is a street term for Disciples, which was a rival street gang.

Day-Day tells Williams to pop the trunk. He knows there is a handgun in the truck, as he observed Day-Day to place it in the trunk earlier in the evening. Williams pops the trunk and Day-Day retrieves the gun and proceeds into the sandwich shop.

Now Detective O'Brien I think you know is a wonderful police officer. He is extremely able. In his report he said the Cordell Williams said that he knew that it was-- it was Day-Day's intention to shoot the individuals inside the store and he put that in the report as he said after Evans got out of the car, retrieved the gun and went into the store.

If Cordell Williams was aware or thought that David Evans was going to kill those individuals after the trunk was popped and Evans took the gun and went into the store, then he is not before or

during the commission of the offense legally accountable for David Evans' actions.

We have State's Attorney Vaci who testified yesterday and today. He talks to Cordell Williams for 30 or 40 minutes and doesn't write a note about what Cordell Williams said. And then goes in to an eight or ten minute interview with Cordell Williams into the interview room with a court reporter present.

And yes, just as counsel did, I want to go over a few things that were said in that court reported statement which you will see and have with you.

He told him at that time, 12:30 in the morning, he was with three other persons; he named them. He told the court reporter and State's Attorney Vaci where he was going. They were coming westbound on 83rd Street; they took Chicago-- South Chicago over to 76th, and 76th to Halsted.

Where does Cordell Williams live, 7622 South Carpenter as he told investigator, Detective O'Brien, he was returning to the neighborhood. He was in his mother's car.

He was shown a picture of Day-Day; he

identified it. He told where Day-Day day was sitting. He said that Day-Day was a member of the Black P Stones. He said there was a gun in the car. He said that Day-Day put the gun in the trunk.

And you know we have heard from every police officer here and from the state's attorney that he-- Cordell Williams never told anybody that he had ever handled that gun or had been anywhere other than in the car when the gun was put in and taken out of the car.

He said he believed it was a .45 Ruger.

And then he said we were traveling down Halsted, and he said pull over, pull over, pull over. If you believe that, at that point there was no plan. The first thing he heard was pull over, pull over, pull over. Then he said that Day-Day said there is some bricks. And then after the car was stopped, he said pop the trunk.

Now here's a state's attorney that talked to him for 30 or 40-- 30 or 40 minutes and then has this court reported statement and says to him what did you think Day-Day was going to do. I submit to you, ladies and gentlemen, what he thought Day-Day

was going to do does not make him accountable for the actions of David Evans. There has to be, as you are going to see in the instructions, the intent to promote or facilitate the commission of an offense. What he thinks is going to happen does not make this young man accountable for the deaths of two other men by another man's hand.

Why would a state's attorney who sees an individual for 30 or 40 minutes and has a lengthy conversation with him go into and be ready to take a statement, because he's taken 12 or 15 other statements in the five months that he's been on felony review, why would he ask the question what did you think that he was going to do.

The reason is that Cordell Williams as he said, as State's Attorney Vaci said, told him in the oral statement that Cordell Williams thought that's what he was going to do.

And the next question is when. The next question is when. And just as in Detective O'Brien's report, the question was asked, what did you think Day-Day was going to do. And it was asked after the question on page six, after he had popped the trunk.

I submit to you, ladies and gentlemen of the jury, that it was put there not by accident, that that is in fact what Cordell Williams told Detective O'Brien and Cordell Williams told State's Attorney Vaci, that he only thought he was going to go in there and shoot. Doesn't have to be the smartest guy in the world-- but that he only thought that after the trunk was popped and Evans left the car.

And if in fact that is what he thought, he is not legally accountable for the actions of David Evans.

We know that he tried to get away and he did successfully get away. And we know he was taken into custody. I will argue to you, and as counsel stated, I made a choice, I made a choice to represent Cordell Williams because Cordell Williams, my choice, is not guilty of murder. He is not a part of any plan, he is not and he did not before or during the commission of any crime agree to help out in that crime.

I am confident when you review the evidence that this young man will be found to be not accountable and as such innocent of these crimes.



SOTOS-WILLIAMS 11768

Thank you very much.

THE COURT: Thank you, Mr. Weiner.

Mr. Smith.

REBUTTAL ARGUMENT

BY MR. SMITH:

Ladies and gentlemen, the fact that people such as this defendant decide to commit a crime does not warrant throwing mud on everybody else that has to pick up after you and clean up the blood, talk to the families and let them know what happened or what he did.

The fact that you don't sit down and make notes on everything doesn't make him any less guilty of the murder that he is.

Now one thing you know, folks, is looks are deceiving. Okay. And not to make a lot of it, but one thing you know as you go through life, if anything that you learn from your experience is no one can teach it to you, you can't get it out of any book, you can't learn it from anybody else, you get it from your everyday working with people and knowing people, raising kids, whatever.

The thing is one of the first things you learn is you don't judge a book by its cover. It's

an old saying, but it makes sense. You don't judge somebody by the way they sit over here with their Coke bottle glasses and their hair like they are and their little tie, like he was that night, because that night he was killer. And make no mistake about it.

That is an absolute insult to think that these guys driving down the street-- he knows there is a gun in the trunk. And it's amazing how he can tell you so much about this gun when he says he never saw it. But he tells you it's a .45 Ruger semi-automatic.

Remember the firearms expert telling you--

MR. WEINER: Judge, there is no evidence he said it was a semi-automatic. He said I believe it was a .45 Ruger. That's the only evidence.

THE COURT: Sustained as to that.

MR. SMITH: Ladies and gentlemen, he said he believed it was a .45 Ruger. That gun is a very rare gun, and you heard that from the firearms expert.

How is this guy going to know it's a .45 Ruger. And you know also the firearms expert told

you that gun costs several hundred dollars. You think they are going to be passing that thing around like someone got a new bike, looking at that gun. You know that.

And they are gunned up because they just saw one of their buddies, their fellow gang members that got shot. So they are all gunned up. And they are in his car.

And you're darned right they are out looking for somebody to kill. They are going right down Halsted looking for somebody. And for these two poor kids, and I'm not going to talk about it anymore because I am talking about the facts, for them to get-- just the crime itself is so incredibly maddening, and words do not do it justice.

And they also do not do justice for him because it's his words that have him here today, and it's his actions.

Folks, remember the statement that he gave is his statement. And as my partner told you, every time he gave a little bit and they caught him in a lie, he moved a step further, just like you do with a kid, except he is no kid.

As a matter of fact, when you are

considering who is in charge in this group, he is the driver, he's got the most responsibility so far in the car, it's his car. He is the oldest by two years of all these guys. This guy is 19. Every single one of the other ones is 17. So he's got another peg-- another notch in his belt as far as who's running and who is involved in that group.

And as they are going down that street, folks, you know when his buddies, you know what they are doing, and you didn't get it out of his mouth exactly, and you heard it a million times, but use, you know, your common sense that you have got.

When they are gunned up, when they finally get their target, the pilot here is going to enable them to get into a position where they can do their kill, get their target. And notice that defense counsel says he doesn't pull over right away. Well, that's garbage, because this is what happened.

And as you can see from this diagram, folks, when you got it back there, you can all see, look how this individual came running out. Look how David Evans came running out. He swung right out in the middle of the street. He didn't run along that



SOTOS-WILLIAMS 11772

sidewalk. You want to know why, because his buddy was waiting down the block and he knew that he had to get to the passenger side of the rear driver's side door. He knew he had to go on the outside of that car. And that car is sitting there waiting for him.

And another thing, notice he didn't pull over as soon as they saw these guys, the bricks, as soon as they saw what they thought were Disciples. He doesn't pull over right away because he is sharper than that. This guy over here, folks, is a sophisticated criminal, and you can tell by his actions and his statements. He is sharp enough to get the car away from the front of the store and pull it down a little bit. And then he is sharp enough to turn the lights off and he is sharp enough to wait.

For him to say, and this is semantics about what came first where, I mean would you ask somebody a question beforehand. What about asking him as he is driving down here. At this time did he think he was going to get out of the car with a gun and shoot somebody in the sub shop. Well, no, the action hadn't happened yet. You ask the question

after the action happens.

They got their target, the target's identified. He put this guy in the position to do the kill; then he hands him the gun. He literally by popping that trunk hands him the gun as if you were standing there and say give me a gun, I want to shoot somebody. Here's the gun. Boom. You are just as guilty as the guy that pulled the trigger.

And it makes sense because when you are running in a little group like that, one guy might not have enough guts to do it, but what one gang-banger doesn't have enough guts to do a couple will discuss and four of them will go out and do it, and that's what he did.

And ask yourself this, he says he knew he was getting a gun when he popped the trunk, when he pulled over he knows what is going on. You 14 people weren't raised in a vacuum, you know what the story is, you've got to, it happens every day.

Defense counsel told you that you see enough of these drive-by shootings. Well, as a prosecutor, we see enough of these drive-by shootings, too. This is one of the more sophisticated drive-by shootings because these guys

are sharp enough to keep that gun in a trunk. If they get pulled over by the cops, that gun is in the trunk.

Believe me, defense counsel can laugh and make faces, but he is getting paid for that and that's fine. As he told you, he is paid to represent him and he's going to say what he's got to say to get his client off; that's good. I am saying the truth in order to hold him responsible.

This is a sophisticated shooting because these guys are sharp enough; they are cool enough not to let their faces be shown. And he's got that gun in that trunk and he knows darn well what is going to happen.

Now when they got their target and they got the means and he's got them, he's got his troops close enough, he pops the trunk. Asked him what is he going to do. I believe he was going to go shoot him. Obviously.

I mean what did he think he was going to do when he popped the trunk. Isn't that somewhat of an asinine idea. Does he think he was going to get the spare, run into that sub shop and roll over their toes. How is that, bricks. Roll over their

toes. It would be funny if it wasn't such a sad situation.

What in God's name was he going to do going into that trunk. Go get jumper cables, go up and pinch the two guys coming out of there. Yeah, I pinched them, we got 'em, we're out of here, let's go, we got the bricks.

No, no, no. No, my friend. Right then he knew they were going for that gun. And that's common sense and that's how it works. He is presumed innocent, he is not presumed intelligent, even though this drive-by is one of the more sophisticated ones because it's a stop and go. Let your man go in, let your man come out.

And this stuff about in his statement how he pulled away real quick and everything, you look at the distance here. If the defendant wants to get out of there, you think he's got a little time here while his buddy is trying to run across this intersection to get out of there.

And he wants to make it in his statement, look in his statement how many self-serving statements he is saying there. Well, they called them the bricks. They put the gun in the trunk or

he put the gun in the trunk.

What are some of the other ones. You can look at the statement, folks. I panicked. Who, what happened. He wants all of a sudden-- he says I wanted to know when he got in the car what happened.

Oh, well what did you think happened. What did you think happened when he got back in the car after you just let your buddy get a gun, you identify some targets and heard popping and you get chased by the police.

What happened, did you get a sub for all of us. Come on. That's just a ridiculous lie.

And you know what, Detective O'Brien told him that, he hit him with each one of his inconsistencies. Was this kid mistreated at all. Absolutely not. He is not a kid, he is 19, at that time he was. He was the oldest guy of this group of killers. But he got to sit in there with his dad, his father came in there and sat with him at the police station before he even gave the statement.

He had time to think plenty about what his statement was going to be, folks, plenty of time in order to curve it.

And as you go through his statement, I

was led to believe that David Evans was going to shoot somebody.

The state's attorney told you, I mean they will take down exactly-- he knows exactly what he was doing. I mean he is the architect and the author, he is the poet of the statement you are going to see. He gave a lot of earlier ones, the most far reaching was to Detective O'Brien, and then he backs off during this statement.

Then he said he was frantic. Well he's not frantic because a shooting went down, he is frantic because Officer Sanders caught him. That's why he is frantic. Make no mistake about it, because otherwise they are getting away with a double murder, and Officer Sanders ruined their little celebration because I guarantee you when they were at the end of that block, they would be slapping, high-fiving and celebrating that they just got away with killing two guys that they thought were in a rival gang. Guaranteed.

But Officer Sanders rained on their parade and he did some extraordinary work, put his own life on the line, because by all rights, folks, and it had to be going through your head, Officer

Sanders probably could have shot David Evans right there. But there's an important thing, Officer Sanders is not a killer, Officer Sanders told you he didn't see a gun at that time. He sees a gun running from the scene, it's probably the worst nightmare a police officer would have to live with. And he held back in this case.

And at that time he was still able to get-- in the meantime a door pops open. His statement, he talks about well, yeah, I am trying to pull away as fast as I can but this guy with lightning speed, his partner, is able to get up alongside of the car, and he says he snatched the door open and then he fell on the ground but then he got up again and got in the car. That's impossible because he didn't open the door. His buddies are sitting there waiting. Sanders told you how all of a sudden the door pops open, a hand comes out and helps their shooter back in the car so they can make their getaway.

And the defendant tells you in his statement how he went right down the block and then he started to drop people off after going 90 miles an hour down the side streets.


SOTOS-WILLIAMS 11780

Well that, too, is a lie. And we know that because Officer Sanders told you that because he chased this guy and he didn't go down Aberdeen like he said in his statement, he went down Carpenter, the street you live on. And he went right down Carpenter, folks, and he went through that sign-- through the stop sign at 75th Street at about 90 miles an hour without touching the brakes, and then turned his lights off.

The statement says, well, I stopped at 75th and let my buddy-- I told him get out of the car. That's a big, tough guy. Now he's got him throwing him out of the car. You just killed two guys, now get out of the car. Come on, what's with that. That's a slap in the face, this guy's statement.

But the statement in itself without anything else, folks, he is guilty of both murders, he is an integral part of that scheme. He is at the hub of that scheme. He enabled it, he provided the gun and provided the escape.

When you are talking about that accountability instruction which has been read to you a couple of times, I'm not going to talk about

it, but there is some very good language in there.

When someone agrees to aid or attempts to aid another. His partner didn't even need to complete this murder, he didn't have to. If he attempted to help him, he is guilty of murder.

MR. WEINER: Objection, that's incorrect.

THE COURT: Ladies and gentlemen, I will instruct you as to the law, and I want you to disregard the last statement by the state's attorney.

Objection sustained.

MR. SMITH: You look at that statement, folks, and you see where it says agrees to aid or attempts to aid another in the planning or commission of an offense. You look at that instruction, folks, and see what it says.

Nevertheless, his mission was completed, so he is guilty. The blood is on his hands no matter how he is trying to wipe it away with all his ridiculous argument about a plan.

Every drive-by, you think they sit down, this sophisticated group of people are going to sit down, map things out, mileage, who owes a buck fifty for what, we will all pitch in for gas, then there

is a bullet so there is another couple of bucks each here. Come on. These are killers, they are not sophisticated as much as he is, but they are killers and they work when they got the opportunity from coming back, from seeing a buddy shot, a fellow gang member, they are juiced up and they are looking for trouble, and they found it.

But the people that found the trouble aren't here. We are here to speak for them.

One final important thing, folks, and you have listened to a lot of argument. The demeanor of the defendant is an incredibly important thing, because people can say whatever they want but as was said, actions speak a lot louder than words, and you know that from going through life.

And you think being involved in a double shooting when he is told about the murder, remember each person that talked to him, how was he when you talked to him, was he upset, was he like a frightened kitten, was he like at all nervous when they were talking to him. Detective O'Brien, he was cocky. And the state's attorney, he was very unemotional.

Later on O'Brien talked to him because he



SOTOS-WILLIAMS 11784

had to go in there and he wanted to let this defendant know that Billy Johnson had just died 20 hours after they were involved in this assassination, 20 hours later after fighting for his life, Billy Johnson is dead. What was his reaction, matter of fact.

What does that tell you. Doesn't that tell you a heck of a lot more than him sitting there saying he didn't know what they were going to do when they went to the trunk. Doesn't that tell you a heck of a lot more about him than anything you have heard. It tells you how cold he is, how calculated, how this means nothing to him, getting out from under this is the main thing.

These two bodies mean nothing to him and it showed when he was talking about it to the detectives, didn't care if an extra guy died, no remorse. Flight, a vicious escape, a vicious attempt at an escape because he knows he is guilty. And no remorse for the dead.

The defendant, ladies and gentlemen, had several arguments. And common sense, ladies and gentlemen, would just destroy most of those. But the facts are right before you, folks, and we are



SOTOS-WILLIAMS 11786

very lucky that first of all Officer Sanders was going by at the time and very lucky his partner didn't decide to turn a gun on Mr. Pratt and make it a triple because then we'd have nobody and they'd still be out there.

But we got lucky. The evidence is here; it is sufficient to find him guilty. He is involved in this, he aided and he abetted in the planning of this and in the commission of this, and he is guilty as David Evans because there were four fingers on that trigger when it was pulled after it hit each kid behind the back of the head, and his was one of them.

We ask that you find him guilty not because of what is being said, but because the evidence supports it and the law supports it and it's the right thing to do.

And we ask that you return a verdict of guilty, folks, for both counts of murder.

Thank you.

THE COURT: Thank you.

Ladies and gentlemen, at this time I am going to give you your instructions, and you will later get these in writing in the jury room with

your deliberations.

" Members of the jury, the evidence and arguments in this case have been completed, and I now will instruct you as to the law.

" The law that applies to the case is stated in these instructions, and it is your duty to follow all of them. You must not single out certain instructions and disregard others. When I use the word "he" in these instructions, I mean a male or a female.

" It is your duty to determine the facts and to determine them only from the evidence in this case. You are to apply the law to the facts and in this way decide the case.

" You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberations. It is the function of the trial judge to determine the sentence should there be a verdict of guilty.

" Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry.

" From time to time it has been the duty

of this Court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. You should disregard questions and exhibits which were withdrawn or to which objections were sustained.

" Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

" You should disregard testimony and exhibits which the Court has refused or stricken.

" The evidence which you should consider consists only of the testimony of the witnesses and the exhibits which the Court has received.

" You should consider all the evidence in the light of your own observations and experience in life.

" Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be.

" Faithful performance by you of your duties as jurors is vital to the administration of justice."

" Only you are the judges of the

believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

" Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

"The defendant is charged with the offense of first degree murder of Myron Cochran and first degree murder of Billy Johnson. The defendant has pleaded not guilty."

" The indictment in this case is the formal method of accusing the defendant of an

offense and placing him on trial. It is not any evidence against the defendant and does not create any inference of guilt."

"The defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

"The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

" The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict.

" Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts, which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in

arriving at your verdict."

"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statement, and, if so, what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

" A person commits the offense of first degree murder when he kills an individual if, in performing the acts which caused the death, he intends to kill or do great bodily harm to that individual; or he knows that such acts will cause death to that individual; or he knew that such acts create a strong probability of death or great bodily harm to that individual."

"To sustain the charge of first degree murder, the State must prove the following propositions: First, that the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Myron Cochran; and second, that when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Myron Cochran; or he knew that his acts would cause death to Myron Cochran; or he knew that his acts created a strong probability of death or great bodily harm to Myron Cochran.

"If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

"If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

"To sustain the charge of first degree murder, the State must prove the following propositions: First, that the defendant, or one for whose conduct he is legally responsible, performed

the acts which caused the death of Billy Johnson; and second, that when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Billy Johnson; or he knew that his acts would cause death to Billy Johnson; or he knew that his acts created a strong probability of death or great bodily harm to Billy Johnson.

"If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

"If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

"When you retire to the jury room you will first elect one of your members as your foreperson. He or she will preside during your deliberations upon your verdict.

"Your agreement upon a verdict must be unanimous. Your verdict must be in writing and signed by all of you, including your foreperson.

"The defendant is charged with the

offenses of first degree murder of Myron Cochran and first degree murder of Billy Johnson.

" You will receive four forms of verdict. As to each charge, you will be provided with both a "not guilty" and "guilty" form of verdict. From these two verdict forms, with regard to a particular charge, you should select the one verdict form that reflects your verdict on that charge and sign it as I have stated. Do not write on the other verdict form on that charge. Sign only one verdict form on that charge."

The following are the verdict forms: "We, the jury, find the defendant, Cordell Williams, not guilty of first degree murder of Myron Cochran."

" We, the jury, find the defendant, Cordell Williams, guilty of first degree murder of Myron Cochran."

" We, the jury, find the defendant, Cordell Williams, not guilty of first degree murder of Billy Johnson."

" We, the jury, find the defendant, Cordell Williams, guilty of first degree murder of Billy Johnson."

At this time, could you swear the

sheriffs.

(Deputies sworn.)

THE COURT: Could you have a seat.

The two alternates, if you could go to the jury room, have them get their belongings and then have them come out, I'd like to talk to them for a few minutes.

(Brief pause.)

THE COURT: Deputy, could you take the jury back to the jury room, please.

(Whereupon, the jury retired to deliberate, after which the following proceedings were had in open court out of their presence:)

THE COURT: All right. We have agreed upon prior to instructions being given to the jury, that we were going to have an oral jury instruction on the record. We have had the informal jury instruction off the record.

At this time I am going to go through the jury instructions.

All right, State's Number 1 is I.P.I. 1.01; no objection, given.

MR. WEINER: No objection.

THE COURT: State's Number 2 is I.P.I. 1.02.

MR. WEINER: No objection.

THE COURT: No objection, given.

State's Number 3 is I.P.I. 1.03.

MR. WEINER: No objection.

THE COURT: Given.

THE COURT: State's number 4 is 2.01.

MR. WEINER: No objection.

THE COURT: Given.

THE COURT: State's Number 5 is 2.02.

MR. WEINER: No objection.

THE COURT: State's Number 6 is 2.03.

MR. WEINER: No objection.

THE COURT: State's Number 7 is 2.04.

MR. WEINER: No objection.

THE COURT: State's Number 8 is I.P.I. 3.02.

MR. WEINER: Object.

THE COURT: Defense objection, given.

State's Number 9 is 3.06-3.07, no objection, given.

State's Number 10 is 5.03, no objection, given.

State's Number 11 is 7.01A, no objection.

State's Number 12 is 7.02A, no objection, given.

State's number 13 is 7.02A, no objection, given.

State's Number 14 is 26.01, no objection, given.

State's Number 15 is 26.02, no objection, given.

State's Number 16 is 26.05, no objection, given.

State's Number 17 is 26.02, no objection, given.

State's Number 18 is 26.05, no objection, given.

MS. MORASK: Judge, people had offered instruction 3.05, but counsel had asked that it not be give so we withdraw it.

MR. WEINER: Yes, that's true.

THE COURT: All right. That will be reflected in the record.

Have all the attorneys had time to look at the exhibits?

MR. WEINER: Yes. They can go back.

THE COURT: Mr. Sheriff, can you take the

instructions back and take Mr. Williams back.

(A recess was had while the jury deliberated, during which the following proceedings were had:)

THE COURT: All right. The jury has sent out a question. " In deciding"-- excuse mean," In the aiding and abetting instruction, what does during the commission of the offense include? Does it include escape? Thank you, the jury."

All right. I have called both the defense and the prosecution upon receiving this note and there were discussions. The discussion was not an agreement, the defense has agreed with the following proposed answer to the jury question; the prosecution has not.

What I am going to send back to the jury says: " Dear Jury: In the instruction where the phrase during the commission of an offense is used, the jury should decide the meaning of that phrase. Thank you, Judge Vince Gaughan."

All right, prosecution, you can state your objection.

MR. SMITH: Judge, we would strongly object. We believe that what the jury has-- the question has

come to the Court is a question of law, and we believe that the Court-- were it a question of fact, can tell the jury to continue their deliberations or that is a question for the jury.

In fact they are asking regarding when the commission of an offense is completed. Previous Illinois case law, People versus John Burke, 85 Illinois Appellate 3rd, 939, and People versus Eugene Johnson, 55 Illinois Decision 2nd, 62, those cases go for the proposition that an offense is not completed when-- and the quote is, the persons allegedly involved are still making efforts to win their way to a place of safety."

We believe that is clearly the case. We propose a non- I.P.I. Instruction stating under the law in Illinois the offense has not been completed if the persons allegedly involved in the offense are still making efforts to win their way to a place of safety. We believe under the case law we cited, and in light of the question, that that is the proper answer and should go back to the jury.

THE COURT: And the instruction.

MR. SMITH: Yes, your Honor.

THE COURT: All right, do you have--

MR. WEINER: I would only object and I think that's not the law, that that is a decision based on a felony murder case which is in fact not been decided by the Appellate Court.

I ask your Honor to send back the answer to the jury's question as you have proposed to do.

THE COURT: All right. The only thing that I didn't say before, and I am going to just add that one sentence, please continue to deliberate. That's all I am going to do.

All right. Would you send this back to the jury over the state's objection.

All right. I am going to give them about a half an hour. After that time, if they are not done at a quarter to nine-- if they are not done by a quarter to nine, ship them, I'm not saying anything to them. I want them back here at 8:00 o'clock deliberating. Okay.

(The matter was continued to June 29, 1995.)

IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

COOK COUNTY, ILLINOIS

I, NOREEN SULLIVAN ERICKSON, an Official Court Reporter for the Circuit Court of Cook County, Cook Judicial Circuit of Illinois, do hereby certify that I reported in shorthand the proceedings had on the hearing in the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the Honorable VINCENT GAUGHAN, Judge of said court.

Noreen Sullivan Erick

OFFICIAL COURT REPORTER