# Exhibit 13

## Deposition Transcript of B. Williams

## (Plaintiff's Mother)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORDELL WILLIAMS, )
)
Plaintiff, )
)
vs. ) No. 23-cv-14905
)
JAMES O'BRIEN, THE )
PERSONAL REPRESENTATIVE )
OF THE ESTATE OF WILLIAM )
FOLEY, THE CITY OF )
CHICAGO, a municipality, )
and UNKNOWN EMPLOYEES OF )
THE CITY OF CHICAGO, )
)
Defendants. )

VIDEOTAPED DEPOSITION OF BRENDA WILLIAMS
TAKEN REMOTELY VIA ZOOM
APRIL 25, 2025
10:00 A.M.

Reported remotely and transcribed by:
Rhonda Rhodes Bentley, CSR #084-002706

INDEX

REMOTE APPEARANCES:

For the Plaintiff:

Steven W. Becker
LAW OFFICE OF STEVEN W. BECKER LLC
Attorneys at Law
205 N. Michigan Avenue
Suite 810
Chicago, Illinois 60601
(312)396-4116
Swbeckerlaw@gmail.com

For the Defendant Officers:

Patrick R. Moran
ROCK FUSCO & CONNELLY, LLC
Attorneys at Law
333 W. Wacker Drive
19th Floor
Chicago, Illinois 60606
(312)494-1000
Pmoran@rfclaw.com

For the City of Chicago Defendants:

Lisa A Meador
The Sotos Law Firm, P.C.
Attorneys at Law
141 W. Jackson Blvd.
Suite 1240A
Chicago, Illinois 60604
Lmeador@jsotoslaw.com

ALSO PRESENT:

Nick Trotta, Videographer



INDEX - CONTINUED

EXAMINATION BY: PAGE
Ms. Meador.....................................5
Mr. Moran.....................................71

EXHIBITS: DESCRIPTION PAGE
(None marked)



STIPULATION

IT IS HEREBY EXPRESSLY STIPULATED AND AGREED by and between the parties that the discovery deposition of BRENDA WILLIAMS may be taken remotely via Zoom on behalf of the Defendants on April 25, 2025, pursuant to the applicable Supreme Court rules, local rules, and the Code of Civil Procedure governing said depositions.

IT IS FURTHER STIPULATED that the necessity for calling the Court Reporter for impeachment purposes is waived.



10:01 a.m.

THE VIDEOGRAPHER: Good morning. This is the beginning of media unit 1. We are now on the video record at 10:01 a.m. This is the videotaped discovery deposition of Brenda Williams being taken on April 25, 2025. This deposition is being taken on behalf of the defendant in the matter of Cordell Williams vs. James O'Brien, et al. The case number is 23-cv-14905 filed in the United States District Court for the Northern District of Illinois Eastern Division.

My name is Nick Trotta, certified legal videographer, representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois. The court reporter today is Rhonda Bentley also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent starting with the questioning attorney.

MS. MEADOR: Good morning. Lisa Meador on behalf of the City of Chicago.

MR. MORAN: This is Pat Moran on behalf of Defendants O'Brien and Foley.

MR. BECKER: And Steven Becker, B-e-c-k-e-r, on behalf of Plaintiff Cordell Williams.
THE VIDEOGRAPHER: Will the court reporter please swear in the witness.
(Witness sworn.)
BRENDA WILLIAMS,
having first been duly sworn, testifies as follows:
EXAMINATION
BY MS. MEADOR:
Q. Good morning, Mrs. Williams. When we were -- before we got on the record, I introduced myself to you, but I will again. My name is Lisa Meador, and I am an attorney representing the City of Chicago in a lawsuit filed by your son Cordell Williams, and we're going to talk about that today. Can you please state your name and spell it for the record.
A. My name is Brenda, B-r-e-n-d-a, Marie, M-a-r-i-e, Williams, W-i-l-l-i-a-m-s.
Q. Thank you. And, Mrs. Williams, have you ever given a deposition before?
A. No, I have not.
Q. Okay. So I'm just going to go over a



few ground rules which we -- are put in place to do our best for our court reporter here today to make sure that she is getting down accurately what everybody is saying. So I'm going to be asking you some questions. You will give me your best answer, and if at any point you don't understand the question I'm asking you, please let me know, and I'll be happy to rephrase it for you. Does that sound fair?
A. Yes.
Q. Is that a yes?
A. Yes. Yes.
Q. Okay. Okay. So another thing is the court reporter can't take down shrugs of the shoulder, nods of the head. She needs affirmative answers out loud and in words so that she can get your testimony accurately. So if you could do your best to follow that rule, I would appreciate it as well.
At any time if you want to take a break, let me know. We can do that. I would just ask you to answer any question that's pending before we take the break. Does that sound fair?
A. That's fine. That's fine.



Q. Okay. Okay. Great. And then the last thing is, you know, this is quite conversational, and there will be many times, I'm sure, where you will anticipate the question that I'm asking you, but in order for our court reporter to make sure that she gets down the full question, I would ask for you to wait for me to finish my question before you begin your answer, and I also will do my very level best to make sure I don't talk over you while you're giving your answer. Does that sound fair also?
A. That's fair.
Q. Okay. Great. Thank you, Mrs. Williams. So now, Mrs. Williams, you are not at home today; is that right?
A. No, I'm in New Orleans, Louisiana.
Q. Okay. And what is the address where you are currently at?
A. 558 Lauritella, L-a-u-r-i-t-e-l-l-a, Avenue.
Q. And is that in New Orleans proper?
A. Well, it's New Orleans, Louisiana. It's also part of Jefferson, Louisiana.
Q. Okay. All right. Thank you. And are you currently by yourself alone in the -- it



looks like you're in the kitchen.
A. There's nobody in the house but me.
Q. Okay.
A. I'm the only one here.
Q. Okay. Okay. And if at any time you have -- you know, we're trying to do our best here with remote depositions. At any time if you have an issue with the connection or somebody comes in and you -- you know, just let me know and we can take a quick break to make sure you're taking care of what you need to. Does that sound fair?
A. That's fair.
Q. Okay. All right. Wonderful. Mrs. Williams, what's your date of birth?
A. February 8, 1949.
Q. And what is your -- the address of your primary residence?
A. 76 -- --
Q. Your home.
A. 7622 South Carpenter Street, Chicago, Illinois 60620.
Q. And how long have you lived at 7622 South Carpenter Street?
A. About -- I guess about 40 years or

longer.
Q. Okay. Were you living at 7622 South Carpenter Street in the early 1990s?
A. Yes, I was.
Q. Okay. Do you know -- do you know when you -- what year you moved to that house on Carpenter Street?
A. 1985.
Q. Okay. And where did you live prior to 1985?
A. New Orleans, Louisiana.
Q. Okay.
A. Are you speaking before I come to Chicago or when I was in Chicago?
Q. When you were in Chicago. So did you live at -- I understand from what you're testifying to that you're from New Orleans, Louisiana, originally; is that right?
A. Yes, that's correct.
Q. Okay. And at some point you moved to Chicago, correct?
A. I moved to Chicago, correct.
Q. Okay. And was that in 1985?
A. No. I moved to Chicago in 1969.
Q. Okay. And then prior to living at



your current home on Carpenter Street, did you live somewhere else in Chicago or the Chicago area?
A. Yes, I did. I lived --
Q. Okay. Where --
A. -- 7626 Carpenter Street before we bought the house across the street.
Q. Okay. And how long did you live at 7626 Carpenter Street?
A. It's -- it was -- I can't -- I can't think that far back.
Q. Okay.
A. It was way back all I can say.
Q. Okay. That's fine. And all I'm asking is for you to tell me as best as you can. If you don't remember, that's just fine.
At the home on 7622 South Carpenter Street, who did you reside there with?
A. Odell Williams and Cordell Williams.
Q. And Odell Williams was your husband, correct?
A. Correct, he was.
Q. Okay. And it's my understanding that your husband had passed away; is that right?
A. Correct.



Q. Okay. I'm sorry for your loss, Mrs. Williams. When did he pass away?
A. 2019.
Q. Okay. Thank you. And how long were you married?
A. 50- -- 53 years.
Q. Oh. Congratulations to you.
A. Thank you.
Q. When you were living at 76 -- strike that.
Are you currently employed?
A. I'm retired.
Q. Okay. Where'd you retire from?
A. Chicago Board of Education.
Q. How long did you work for the Chicago Board of Education?
A. 20 -- about 25 years.
Q. In the early 90s you were working for the Chicago Board of Education at that time, correct?
A. Correct.
Q. Okay. What was your role in that entity back then?
A. I was a manager. I was a lunchroom manager.



Q. I'm so sorry. Could you repeat that?
A. I was the lunchroom manager --
Q. A lunchroom --
A. -- in the food service department.
Q. Okay. And where did you work as the lunchroom manager?
A. Chelsea Elementary School.
Q. Do you remember where that was located about?
A. 71st and State -- right off 71st and State. I don't remember the address.
Q. Okay. Mrs. Williams, I mentioned earlier that we're here for your deposition related to your son's lawsuit. Can you tell me what it is that you know about the lawsuit that he has filed against the City of Chicago and former detectives O'Brien and Foley?
A. I really don't know anything about it --
Q. Okay.
A. -- because I don't -- I don't -- I just don't know anything about it.
Q. Okay. Mrs. Williams, do you understand that the lawsuit is related to your son's arrest and charging for a double murder

back in 1994?
A. I understand some of it, but I don't understand.
Q. Okay. All right. So let's talk about this. Cordell Williams is your only son, correct?
A. Correct.
Q. Okay. You have no other children?
A. No.
Q. I didn't mean to infer that only -- it was only sons that -- sons and daughters.
A. No, I have no other kids.
Q. Okay. And Cordell was released -- strike that.
You understand Cordell was charged with being involved in a double murder and was found guilty in court, correct?
A. Yes, correct.
Q. Okay. And more recently he was released from jail, right?
A. Yes.
Q. Okay. When was that?
A. I know it was year '22, but the exact date, I don't remember the exact date.
Q. Okay. When Cordell was released in



2022 did he come and live with you?
A. Yes, he did.
Q. Okay. Has he lived with you at all times from his release in 2022 to the present?
A. Yes.
Q. Okay. I just want to talk to you a little bit about the things that your son Cordell has done since his release in 2022. Okay. So can you tell me has he worked at all? Has he gotten any employment?
A. He tried to work. He did try to work.
Q. Do you know where at?
A. He tried to work at -- I think he did some work at Ford, some company -- I don't -- at Ford Motor Company. They lease a company to Ford. I'm not sure. He did -- I know he tried to work.
Q. Okay. Do you know if he's currently working?
A. No, he's not working.
Q. Okay. Do you know why? Is there a reason why he's not currently working to your knowledge?
A. He can't work. He has a bag on him.



Q. Are you talking about his colostomy bag?
A. Yeah, his colostomy bag and also his mental illness. Cordell can't -- he can't work nowhere.
Q. Now, do you know what the colostomy bag is for? For what illness?
A. All I know is Crohn's disease. What else I don't know.
Q. Do you have an understanding of what symptoms your son experiences as a result of his Crohn's disease that would prevent him from working?
A. I know his mental illness, that -- I'm not familiar. I know he's in a lot of pain. That I do know. He suffers a lot of pain from the Crohn's disease. I do know that.
Q. Okay. What kind of pain does he describe to you as a result of his Crohn's disease?
A. Cordell don't describe nothing to me for his Crohn's disease, but I can tell when he's hurting or something like, you know, but no.
Q. Okay. So you sense it, you see it -- him exhibiting pain because you live together and



you're his mother?
A. Yes, you can tell when something's going -- yeah, I can sense it.
Q. Okay. Has he ever expressed to you his desire to work?
A. Yes, he want to work.
Q. Okay. Has he talked to you at all about taking courses in order to advance him in his education since his release?
A. Yes, he take courses. Yes, he has.
Q. Okay. Do you know which ones he's taken?
A. No, I'm down here. I can't really tell you what he's taking because I've been down here for a while.
Q. Okay. Mrs. Williams, how long have you been down in New Orleans?
A. I came down here in -- I started back -- well, before he even got out I was coming back and forth to Chicago.
Q. Okay. And --
A. So I've --
Q. Please go ahead.
A. I've been down here for a while.
Q. And can you tell me briefly -- maybe

I'll put it this way. I don't -- I certainly am not trying to intrude on your family's medical situation, but it's my understanding from Cordell that you are in New Orleans caring for another family member; is that right?
A. My aunt has dementia.
Q. Okay. When was the last time that you were living steadily at the -- your Chicago home?
A. I just left him up there. I left him up there, about -- about -- a couple weeks ago.
Q. Okay.
A. I never changed address in Chicago, no.
Q. Okay. Are you going back and forth in -- you know, weekly or monthly between Chicago and New Orleans?
A. I go back, not no weekly, not no monthly, no.
Q. Okay. About how often do you go back and forth between Chicago and New Orleans?
A. I try to go back at least every three months.
Q. Okay. Mrs. Williams, you talked earlier about your son having mental health



issues. Can you tell me what you know about that?
A. I know he was -- he's seeing a doctor. He's seeing a doctor for mental health. He was on medication.
Q. Do you know --
A. Because we discussed -- I don't know who he's seeing. I know he goes back and forth to the doctor. I do know that.
Q. Okay. Do you know if he is in any therapy -- mental health therapy?
A. He was in mental health therapy.
Q. He is?
A. Yes, he is.
Q. Okay.
A. I do know he is in therapy.
Q. Okay. Do you know how often he goes or what kind of therapy he receives?
A. No, I don't because I'm down here.
Q. Okay. Have you ever gone to any therapy with him?
A. No, I have never been in his session, no.
Q. Okay. When -- you mentioned that Cordell worked for a short time at Ford Motor



Company, do you know how long he worked there?
A. I don't remember. I don't remember.
Q. Okay. Do you know if he quit or if he was terminated?
A. Oh, he didn't quit. No. I can tell you that. He was in the hospital. He was in the hospital and he couldn't go to work. He was in the hospital.
Q. Okay. Do you know when he was in the hospital?
A. He was in the hospital quite a few times, and I really cannot give you the dates because I don't remember the dates.
Q. Okay. And when you say he was in the hospital, was that related to his Crohn's disease?
A. Yes, it was. It was.
Q. Okay. Thank you. Do you know if Cordell has any source of income currently?
A. No, he has no income.
Q. Okay. Do you know other than working for Ford for that period of time since his release has he had any source of income?
A. My income.
Q. Okay.



A. I took care of Cordell.
Q. Okay. And when you say your income, is that your retirement?
A. Yes, my retirement and money I have saved, yes.
Q. Okay. Mrs. Williams, Cordell told us that he received approximately $277,000 from the State from his certificate of innocence?
A. Uh-huh.
Q. And you're aware of that?
A. Yes. I'm aware of that, yes. I'm aware of that.
Q. Okay. He told us that he gave you that money. Is that accurate?
A. That's accurate.
Q. Okay. And can you tell me what you have done with that money?
A. I issue money out to him. I don't want him without no money. That's what I've done with that money.
Q. Have you kept it in a bank account for him?
A. In my account, yes.
Q. Okay. Is it -- Mrs. Williams, is it a regular bank account or some sort of investment

account?
A. No, it's a bank account.
Q. Okay. And when you said you take care of Cordell, is that part of how you're taking care of him is giving him money out of that account?
A. Now it is, but I was giving money out of my account at first, yeah.
Q. Okay. Okay. Cordell told us that you were nice enough to buy him a car. Is that right?
A. The car's in my name, yes, it is.
Q. Okay. Okay. And did you pay for that car from this $277,000, or did you take a loan on that?
A. Car has a loan on it.
Q. Okay. And are you paying the loan on that car from your own personal money or from the fund of this 277,000?
A. I do pay out because he has a car note, yes.
Q. Okay. And are you using that money -- strike that.
Is it -- is it fair to assume you do not have a mortgage on your house on Carpenter



Street?
A. Still have a mortgage.
Q. You do. Okay. Are you using any of the $277,000 to pay toward your living expenses for you and Cordell like the mortgage and your utilities?
A. No.
Q. You are not?
A. I am not. I am not.
Q. Okay. Do you know how much of the $277,000 about is left?
A. Not really because he -- the car note is quite high. That car note -- I'm paying the car note out of that, and for the -- my mortgage, that comes out of my pension.
Q. Okay. Okay. Does Cordell have access to that money like a debit card or a credit card that he can use?
A. He has to call -- he calls me for money when he need it and I give it to him. No, he has no --
Q. Okay. Do you give him cash, or do you send him money electronically some way?
A. I send it electronic. Zelle it to him. I do Zelle him money. Whenever he needs



money, I Zelle it to him.
Q. Does he have his own bank account then that you send the money to?
A. He has account, yes.
Q. Okay. Do you know since Cordell's release in 2 -- 2022, has he had -- made any friendships that you're aware of?
A. No, I don't know.
Q. You don't know. Okay. Does he have a girlfriend?
A. He has a girlfriend.
Q. Okay. What's her name?
A. Charlene.
Q. And was he seeing Charlene prior to going to jail?
A. No, I don't -- I don't know nothing about Charlene. I -- was going -- - no because Cordell was in school, no, not that I know of.
Q. Okay. Do you know if they were friends before he went to jail, if they knew each other?
A. No, I don't.
Q. Okay. Have you met her?
A. I met her.
Q. Okay. Do you like her?



A. I like her.
Q. Okay. Do you think that she is good for Cordell?
A. Mothers think -- by being a mother I don't never think nobody is really -- I'm being honest with you, no --
Q. I'm a mother. I get it.
A. I don't, and I'm not going to lie about it. I don't. I -- that's just something he has to decide.
Q. Okay.
A. Friends with her. I let him talk with her, yes.
Q. Okay. Do you -- in the times you've seen them interact together, do you think that she helps his mental or emotional state?
A. Yes, I do.
Q. Okay. Tell me why.
A. Because when he -- he -- Cordell, he gets jittery, and he needs someone to talk to him, and I think by her sit down and talk to him, he has somebody to communicate with. Keep him going back to where he come from. I don't want -- you know, I just want somebody to just be a companion for him and she is.

Q. Okay. Are you a person who Cordell relies on to talk with about his feelings and his stress or anxiety?
A. He tends to hide things from me. As far as his stress. I can tell when he gets jittery, but I think every mother can tell something's going on, but no, he doesn't really sit down and talk to me and tell me everything he got on his mind. No, he does not do that.
Q. Okay. When you say jittery, what do you mean by that?
A. He gets nervous. He gets tense sometimes. He gets nervous. I guess the trauma he went through, I guess that make him go back thinking. That's all I can say. I can't say what's in his mind, no, I can't say that because I don't know.
Q. Okay. So is it fair to say that you see certain times when Cordell is stressed or anxious or jittery as you described it, but he has not conveyed to you why he's feeling like that?
A. That's true. He hasn't.
Q. Okay. Thinking about Cordell since his release, is there any other -- can you



describe his daily activities for me?
A. I know he -- he goes to -- sometimes he talks to the minister at the church be talking to him. He goes to some kind of center. He goes to a center. I'd say he really -- he -- he's not an outgoing person. I can just say that. No. He doesn't go out like he -- no, like, you think the average person goes out. He doesn't go anywhere. He basically -- Cordell basically be in the house a lot.
Q. Does he -- does Cordell have any hobbies?
A. He reads a lot.
Q. Okay. Anything else?
A. He -- he just reads a lot. He sits up there and look at the TV. Other than that I really can't tell you because I don't know.
Q. Okay. So I'd like to ask you -- to talk a little bit about Cordell back in early 1990. Okay. So 1991 through 1994 about. Okay. He was in high school at that time, right?
A. Yes, he graduated from high school, correct.
Q. Okay. What year did he graduate from high school?



A. Cordell graduated in '94.
Q. And Cordell indicated to us that he had expected to graduate earlier but had to take or retake some additional courses. Does that ring a bell for you as accurate?
A. He did have to take driver's ed, and I don't remember what else. You know what, that's kind of long to go back because I don't remember that far back, but I do know he had to take driver's ed and he did take the courses that he got to take. I do remember that.
Q. Okay.
A. He did take -- whatever he had to take I know because he did graduate, but he didn't march, no.
Q. Okay. Did -- what high school did he graduate from?
A. Now it's -- it changed the name to Martin -- Martin Luther King High School -- King's High School. He went to Lindblom, but he had to go take the courses at King's High School.
Q. So how long was he at Lindblom?
A. He was at Lindblom until he had to go back and take those courses.
Q. Okay. So was the bulk of his high



school education at Lindblom?
A. Yes, correct.
Q. Okay. Okay. And then he had to take some additional courses at Martin Luther King High School?
A. Yes.
Q. Okay. Thank you for clarifying that. Did -- how were Cordell's grades in high school?
A. Cordell's grades was good. He was a -- as a freshman will -- he was -- I think in math -- he went to Lindblom because he was good in math.
Q. Did he ever have any issues in high school with poor grades that you're aware of?
A. I don't remember it, no. I don't think he did. No.
Q. Okay. Okay. Did he ever have any issues in high school with gang activity?
A. No, I don't know anything about that. No, he didn't.
Q. Okay. Do you know -- do you know if Cordell was in a gang while in high school?
A. No, I do not.
Q. Okay. Do you know -- Cordell has told us that he was part of the Vice Lords gang

beginning at the age of seven through about the age of 12. Are you aware of that?
A. No, I don't know nothing about that, no. No.
Q. Okay. Cordell also told us that after about the age of 12 he joined the Black Stone gang. Are you aware of that?
A. I never heard of that.
Q. Okay. Were you ever -- strike that.
Did you ever speak with anyone at Lindblom or Martin Luther King High School about Cordell being involved in fights?
A. No, I have not.
Q. Okay. While he was in high school, did he ever come home and was beaten up?
A. Not that I know of. I don't remember that, no.
Q. Okay. It's my -- strike that.
At some point during while Cordell was in high school did he have a job? Did he work at all?
A. He did have a part-time job. He did.
Q. Okay. Where did he work?
A. I remember he worked at Jewels in the evenings after school and somewhere else. He



worked at -- part-time at -- was it FedEx? It was some kind of FedEx or some packaging company, but he only worked there like part-time.
Q. Do you know when it was that he started working part-time jobs?
A. It must have been about 16, 17 -- at 17.
Q. Okay. Did Cordell have his own bank account while he was in high school?
A. He got my husband's social security, but he didn't have his own bank account, no.
Q. Okay. When you say he got my husband's social security, what do you mean by that?
A. Oh, there was a -- Odell had got sick and he was drawing Odell's social security, but it wasn't going to him, no.
Q. Okay. So when he earned money at his part-time jobs, did he give that money to you?
A. He did.
Q. And then did you give him spending money?
A. Yes, I did.
Q. And it's my understanding, Mrs. Williams, that your husband Odell had worked for



Ford Motor Company; is that right?
A. That's right.
Q. Okay. And then he became ill, correct?
A. Yes, he did. Correct.
Q. Okay. Did he retire from Ford?
A. After a certain length of time, yes, he had to retire.
Q. Okay. Did he retire before he became ill or after?
A. After.
Q. And did he -- strike that.
Did you receive as a family retirement benefits from his work at Ford?
A. Wasn't getting that because he was deceased because I always held me a job.
Q. And did you -- once he retired from Ford was he receiving his retirement benefit?
A. He was getting disability, Odell was.
Q. Okay. I understand. And when did your husband become ill?
A. Well, we bought that house over there when -- after we found out Odell was sick.
Q. Okay. Was Cordell close with your husband?



A. Oh, yes. Yes. Oh, yes, he was.
Q. And did he -- did Cordell help take his father to medical appointments once he could drive?
A. Yes, he did.
Q. Did you ever notice that Cordell would wear any gang colors or gang -- like wear his hat in a certain way like that you saw?
A. I don't understand what you mean by gang, quote, colors because I bought his clothes. He didn't -- - never went shopping, so I don't know what you mean by gang colors because -- I just -- just like now, I pick up clothes and send them to him. So I don't know what you saying about gang colors because to me I could be wearing certain color and it could be considered gang color. So you have to explain it to me.
Q. Okay. Did Cordell ask you to buy him clothes in certain colors like red or black?
A. No.
Q. Okay.
A. Huh-uh.
Q. Did Cordell ever talk to you about his involvement in selling drugs for the Black Stones?

A. No, I don't know nothing about that, no.
Q. Okay. Are you -- did you ever -- strike that.
Were you ever aware that Cordell had spending money that was separate from money you gave him?
A. No.
Q. Okay. In 1994 Cordell was driving a 1994 Ford Tempo. Was that your car?
A. Yes, it was.
Q. Okay. At that time how many cars did you and your husband have?
A. Odell had his car and I had mine.
Q. Okay. And did -- were your two cars in addition to the Tempo that Cordell drove?
A. The Tempo was my car.
Q. Okay.
A. And Odell had his car.
Q. Okay. Do you -- strike that.
It's my understanding that around 1994 your husband had a .38, a gun, for protection in the house. Were you aware of that at the time?
A. No because I didn't see no gun in the house.



Q. Okay.
A. I don't know. I can't -- I can't answer something I don't know, and I don't know.
Q. That's fair. And I don't want you to speculate. I'm just asking about what you knew at that time. Okay?
A. No, I didn't.
Q. Okay. Were you ever aware that Cordell was carrying the .38 that your husband had at the house?
A. No. No.
Q. Okay. Did you ever have -- strike that.
Did you ever become aware through Lindblom or Martin Luther King schools that Cordell was missing school or truant at all?
A. No.
Q. What kind of things -- activities was Cordell doing in 1993-1994 besides school?
A. I had him in a program -- he was in the program with a Masonic organization. He was a junior craft master, and then he was involved with different groups on -- in the church and stuff like that, but anything else I don't -- I don't remember. A lot of stuff I don't remember.



Q. Okay. What was he doing with the Masonic organization?
A. Masonry.
Q. How often did he do that?
A. They had their meetings once a month.
Q. What about his involvement with the church, what was he doing there?
A. They had youth groups when I was -- you know, they had youth groups in the church.
Q. And how often did he attend those meetings or activities?
A. He only went to meetings like if I went to church and I had a meeting of choir or something like that he would go.
Q. Okay. Did he hang out with friends that you recall?
A. No, I don't know any -- no, not -- I never seen Cordell -- every now and then I would see a friend come by the house. No because I worked.
Q. Okay. Do you remember any of his friends around 1993 or 1994?
A. No, I don't.
Q. Do you know if he had a girlfriend back then?



A. Only thing I know one girl he took to prom.
Q. Do you know if they were dating at the time?
A. I do not know. I'll be honest. I don't know.
Q. Okay. Okay. Mrs. Williams, I want to talk to you about May 26 of 1994, okay? And just for your frame of reference, that's the day that the police came to talk to Cordell about the murders, okay?
A. Okay.
Q. Do you -- what's your memory of that night/early morning?
A. I don't remember too much about it, and the reason why I -- I -- I don't remember. I try not to remember. I'm going to be honest. I try not to remember. I remember police coming to the house, but other than that -- I don't remember too much about that night. I really just blacked -- I don't remember.
Q. Okay. Prior to May 26 of 1994 had you ever had the police come to your house about Cordell?

A. No. Not -- no.
Q. Had -- prior to then had you ever gone to the police station because Cordell had been arrested?
A. No. I had not.
Q. Did your husband -- are you aware of whether or not your husband ever went to the police station prior to that day for -- because Cordell had been arrested?
A. Okay. What do you mean prior? You have to explain, first of all, because I don't --
Q. Absolutely. So time frame of reference is May 26 of 1994, which was the night of the murders which Cordell then was charged with. Okay? So prior to then, did you ever become aware that Cordell had been arrested --
A. Yes.
Q. -- for other -- for something else?
A. No, nothing else that I know of, no.
Q. Okay. Did you ever have to go to court for Cordell prior to May of 1994?
A. No.
Q. Okay. Did your husband ever have to go to court prior to May of 1994 for Cordell?
A. No.



Q. No?
A. Not that I recall. No.
Q. Okay. So as you sit here today do you have any memory of Cordell being arrested for possession of burglary tools, possession of a weapon, mob action, anything like that?
A. No.
Q. Okay.
A. I'm not aware of nothing like that.
Q. Okay. Would it surprise you to learn that he had been arrested several times prior?
A. Yes, it would because I don't remember -- I don't know nothing about that.
Q. Okay. Okay. So going back to May 26 of 1994, do you remember the police coming to your house?
A. I remember them coming to my house. I remember that.
Q. Okay. And do you remember what you were told?
A. I wasn't told anything.
Q. Okay.
A. I wasn't told anything.
Q. Okay. So the -- so the police came to your door, and did they ask to see Cordell?



A. All I can -- I remember police coming to the door. Odell went to the door.
Q. Okay.
A. And I don't know what they told Odell. No.
Q. Okay. So is it fair to say then, Mrs. Williams, that you weren't in the area of the front door to know what the police said when they came to your house that morning?
A. No because I was in bed. That wasn't morning. I was in bed when they came out.
Q. Do you know what time it was?
A. No, because we had went to bed.
Q. Okay. Do you remember whether it was after midnight into the next morning?
A. It had to be after midnight.
Q. Okay. Do you know what time Cordell came home that night?
A. No, I don't.
Q. Okay. Do you remember telling the police that you had gotten up at 1 a.m. and Cordell was home when you, you know, got up at 1 a.m.?
A. No, I don't remember that.
Q. Okay. Do you know as you sit here today if that's true?
A. Repeat the question.
Q. Do you know -- as you sit here today do you know if it's true that you got up at 1 a.m. and Cordell was home?
A. I don't remember.
Q. Okay.
A. So long ago. I don't remember.
Q. I understand. I am just trying to gauge what you do remember and what you don't, and, of course, if you don't remember, then you don't remember. That's perfectly fine.
A. I don't remember that.
Q. Okay. Do you -- strike that.
Did your husband tell you that -- at that time that the -- your car, the 1994 Ford Tempo, was connected to a murder that had just happened?
A. No, Odell did not tell me that.
Q. Okay. Do you remember what Odell told you why the police were there?
A. Odell told me -- the only thing I can tell you Odell said that the police was there because it was a shooting, and somebody had said that they identified the car. That's all I

remember --
Q. Okay.
A. -- but my car was -- if I'm not mistaken I think my car was in the garage.
Q. Okay. Do you know when your car got put in the garage that night?
A. No, I don't. I don't remember, no.
Q. And Cordell had had your car out that night, right?
A. Yes, Cordell had my car, yes.
Q. Okay. Okay. Did -- do you know if strike that.
Did you or your husband tell the police that Cordell had been out in your car that night?
A. The police didn't talk to me, and I don't know what -- what they told -- what Odell said. I don't know.
Q. Okay. Did -- at some point did the police ask to speak to Cordell at your house?
A. No, I don't. All I know is there was -- Cordell was in the bed. Cordell was asleep --
Q. Okay.
A. -- when the police went in there



because I think Odell took the police to the room where Cordell was in.
Q. Okay. Did -- do you remember if the police told you where they were taking Cordell?
A. No, they didn't -- no, I don't.
Q. Okay. Who is Derek Burnett?
A. That was -- Derek lived down the street from us. He went to school with Cordell.
Q. How old was Derek in 1994?
A. I don't know.
Q. Was he similar in age -- I'm sorry.
A. I think around the same age. I don't know.
Q. Okay. Do you -- do you recall your husband contacting Derek Burnett about Cordell being taken to the police station?
A. I know Odell talked to Derek. I know that, yes.
Q. Do you know why he called Derek?
A. No, I don't. I don't.
Q. Did you know Derek?
A. When they was going to school together, yes. They went to school together.
Q. Okay. Were Derek and Cordell friends?



A. He lived on the block with us. I guess you would say. I'm not sure. I know they went to school together. That's all I know. I don't even know nothing about Derek.
Q. Okay. I'm just trying to --
A. I understand what you're trying -- I understand quite well. Yes, I do.
Q. Okay. I'm just trying to figure out if you know why -- why Derek? Why -- why contact Derek at that time?
A. We didn't have no -- we didn't have no relatives in Chicago.
Q. Okay.
A. So I don't know that. Derek would come down sometimes and sit with Odell, but why Derek I can't tell you because I don't know.
Q. That's fair. Do you know if Derek had any involvement with the Chicago Police Department or a different police department?
A. No, I do not.
Q. Back in 1993-1994 was there a block club for your area on Carpenter?
A. We always had block clubs over there. Ever since I've been there we had block club.
Q. Okay. And were you part of the block



club?
A. I participate with them.
Q. As part of the block club did -- were there any meetings that talked about, you know, gang activity and things of that nature?
A. No because we didn't have no gang activities over there.
Q. Okay. Were you aware at that time of what gangs were in your general area?
A. No, I was not. Like I say I worked, I was not aware of what was going on in the area. I went home, went to work and back home.
Q. Okay. Did -- were any of the block club meetings to address crime issues in the area that you recall?
A. We didn't have no crime area that I can recall. Everybody that was in that block was older people. We didn't have no young kids in that block.
Q. Okay. So nothing to address, you know, stolen cars, or you know, damaged property, things like that, and how to address issues like that that came around on the block?
A. No, not that I know of.
Q. Okay. Was there any -- were there

any community policing meetings at that time, 1993, 1994 to your knowledge?
A. I don't remember that, no.
Q. Okay. Did you ever go to any community policing meetings back then?
A. No because we didn't have -- we never heard of it back -- during that time, no. Like I said, I've been in that block a long time. No.
Q. Okay. Did -- so going back to May 26 of 1994 did Derek Burnett come down to your house after your husband spoke with him?
A. I do not remember.
Q. Okay. Did you talk with your husband about going to the police station?
A. No.
Q. Do you know if your husband went to the police station?
A. Oh, he went. Yes, he went.
Q. Okay. And did you have any conversations with him like, okay, you go to the police station, I'm going to get ready for work, I got to go to work, or something like that?
A. No. No. No. No. Huh-uh. No.
Q. Okay. Do you know if Derek Burnett went with your husband to the police station?



A. I know somebody went with him. Yeah, I think Derek did go with him.
Q. Okay. Did you go to work that day?
A. No, I don't -- no. Miss, I was out of it. I just couldn't handle it. No. I couldn't handle it. No.
Q. Okay. Did you talk with your husband when he came back from the police station?
A. Yes, I talked with him. He came back crying, and he just said --
Q. Okay.
A. -- he don't know why they did that to him.
Q. Okay. What do you mean he said he didn't know why they did that to him?
A. Oh, he just come back crying. He come back crying. Me and my husband both was totally hysteric because we had never had to deal with nothing like that, and a lot of stuff Odell kept saying because I just broke -- I just broke down and I couldn't handle it. I couldn't handle it.
Q. Did you talk with Derek Burnett at all --
A. No, I did not talk with Derek.



Q. -- after --
A. No.
Q. Okay. Let me -- and I know you know where I'm going with the question. Let me just finish so that the court reporter --
A. Okay.
Q. -- can get us down. It happens all the time.
A. Okay.
Q. Did you talk with Derek Burnett after your husband came back to -- from the police station? That day did you ever talk with him?
A. No.
Q. Okay. Did you ever talk with Derek Burnett at any time after your husband went to the police station on May 26 of 1994?
A. No, I did not. No.
Q. Okay. When your husband came back from the police station, did he tell you that Cordell was being charged?
A. Yes, he did.
Q. Okay. And did he tell you what he was being charged with?
A. Yes, he did.
Q. What did he say to your best



recollection?
A. He said -- all he could say there was shooting -- he was charged with some shooting that happened. Two guys had got -- two young men had got killed. That's all I know. That's all I really remember.
Q. Did you know who the two young men were?
A. No, I did not. No.
Q. Did your husband tell you anyone else who was involved --
A. No, he didn't.
Q. -- in the shooting with Cordell?
A. No, he didn't.
Q. Did -- did your husband tell you that Cordell was accused of pulling the trigger?
A. No, Odell did not tell me nothing like that, no.
Q. Okay. Did he tell you that he was being charged because he was the driver for the shooter?
A. Odell just told me was that it was a shooting that he was involved in. Odell didn't tell me nothing but -- nothing but no -- Odell kept a lot of stuff in. No, Odell did not tell

me nothing like that. No, huh-uh.
Q. Okay. When was the first time you saw Cordell after May 26 of 1994 when he was charged?
A. I don't even remember what date I went there. I can't give you no date because I don't remember.
Q. Okay. When you say went there, where did you go?
A. I think I went to -- well, I guess I just went 27th and California, where everybody goes, that's the holding --
Q. Okay.
A. Yeah.
Q. Okay. When you first saw him, was it in court or was it in Cook County Jail?
A. I seen him in Cook County Jail.
Q. Do you remember what -- how long it was from when he was taken by the police from your home until you next saw him?
A. No, I don't.
Q. Who -- was it just you and Cordell, or was your husband present also?
A. When?
Q. When you saw him -- I'm so sorry.



That was a bad question.
When you saw -- let me start over.
When you next saw Cordell after he was taken to the police station, were -- was it just you, or were you with your husband also?
A. I'm not sure. I really -- I'm not sure. I -- I really don't remember back that far. I really -- some things I can remember. Some things I don't.
Q. That's fair, and, Mrs. Williams, this isn't a memory test. You feel free -- whatever you can remember, that's fine. If you can't remember, that's fine too. Okay?
Did you -- strike that. When you next saw Cordell, did you see him at Cook County Jail in person?
A. I went to Cook County Jail. We did. Both of us went to Cook County Jail, but what you mean in person?
Q. So did you -- were you able to sit down in a room and meet with him? Did you see him physically?
A. I see him but I couldn't touch him or anything.
Q. Okay. How did he look to you?



A. I don't know. Like Cordell, I guess. I'm not sure. I can't. Like I said, I don't remember it. I don't remember back then. I can't remember.
Q. Okay. Back in 1994 Cordell wore glasses, right?
A. Sometimes he wore glasses. Sometimes he wore contacts.
Q. Okay. Do you remember if he was wearing his glasses when you saw him at Cook County Jail that first time?
A. No, I don't -- no, I don't remember.
Q. Do you remember any of the conversations that you and your husband had with Cordell when you first met with him at Cook County Jail?
A. No, I don't.
Q. At some point you -- strike that.
At some point a lawyer -- a private attorney was hired for Cordell, right?
A. Yes.
Q. Okay. Do you remember who that was?
A. His last name I think was Wiener. I didn't get him. One of the young ladies I knew recommended him.



Q. Okay.
A. Weiner or Winer, I'm not sure. Weiner or Winer.
Q. Okay. And that's what I was going to ask you. Do you know how you got his name?
A. A young lady I know was working for his mother, but I had never had an attorney so I really didn't know.
Q. Okay. Did you and your husband pay for him to represent Cordell?
A. Yes, we did.
Q. Okay. And how did you -- strike that.
Did you have to provide a retainer, a sum of money for him to work on the case?
A. We gave him some money, but I don't remember exactly how much it was.
Q. Okay. Do you remember how you got that money to pay him?
A. We had savings.
Q. Okay. So you didn't have to get a loan or anything like that to give him -- give the attorney that money?
A. No.
Q. Did you meet with the attorney about

representing Cordell?
A. Me and Odell did.
Q. Okay. Was Cordell present during that meeting?
A. No.
Q. And just to be clear, you -- was the purpose of the meeting in order to hire him to represent Cordell, right?
A. Yes. Yes.
Q. Okay. And do you remember what you talked about with him at that time other than paying him?
A. I don't -- no, I don't. I don't remember.
Q. Okay. Do you remember Cordell being at the Cook County Jail for a while before his trial?
A. Yes, I know he was back there, yes.
Q. Okay. How often did you go see him there?
A. As often as I can.
Q. Okay. Was it weekly? Was it every day? Was it once a month? How often if you can recall?
A. Every time they would let me go back



there, I went back there. Every time -- because -- I went back there probably every -- more than week -- whenever they said you can come visit. I didn't have nobody else to visit but him. That's all I had was him. I had to go see him.
Q. So when you say whenever they let me go back, do you mean that you would go when he had court and then go back and they would let you --
A. No.
Q. -- go back --
A. No.
Q. -- back and sit with him?
A. No. No. I went before that.
Q. Okay. And so do you know if -- how often you went to see him there?
A. I think if I'm not -- I don't remember, but if I -- it's -- I'm trying to think, but I know they had certain days. I'm not sure, but I went, and it wasn't no month, it wasn't no two weeks. I went. Every -- I went -- I think at least every time they said you can go in there. I don't remember dates, but I didn't miss going. I went.
Q. Okay. Did you also talk with him on



the phone while he was there at Cook County Jail?
A. Yes.
Q. Okay. And how often did you talk with him?
A. Whenever he was allowed to call the house.
Q. Okay. At the times where you met with him or talked with him on the phone, did he tell you about the events that led up to him being charged for the shooting at all?
A. No, we didn't talk about no shooting because I couldn't handle it. No. I could not handle that. We didn't talk about no shooting.
Q. Okay. Did -- at any time when you met with him or talked with him on the phone, did you ever talk about his interactions with the police?
A. No.
Q. Okay. Did you -- while he was in Cook County Jail did you write back and forth with Cordell, letters or cards?
A. No, I went and seen him.
Q. Did you have any meetings with Cordell's attorney after he agreed to represent him?



A. I think we met with him about twice.
Q. Okay. Did you meet with him about Cordell filing a motion to suppress his confession?
A. I don't remember that.
Q. Okay. Do you -- are you aware that Cordell provided a court-reported confession regarding the shooting?
A. No, I'm not.
Q. Okay. So is it fair to say as you sit here today you've never read his court-reported confession regarding his involvement in the shootings?
A. I have never read it, no.
Q. Okay. Have you ever talked with Cordell about his confession?
A. No.
Q. Did -- to your knowledge did your husband ever speak with Cordell about testifying in court regarding his motion to suppress his confession?
A. I can't tell you what him and Cordell talked about because I don't know.
Q. Okay. I'm just asking if you ever were told by either Cordell or your husband that

-- that your husband wanted to testify?
A. No, I don't. I don't know.
Q. Okay. When -- strike that.
Did you go and attend court when Cordell's case was being heard?
A. Yes.
Q. Okay. Did you go every time the case --
A. Yes.
Q. -- was --
A. Yes.
Q. Okay. And you were able to see him then?
A. Yes.
Q. Okay. Were you able to then go and talk with him in a --
A. No.
Q. -- conference room?
A. No, huh-uh.
Q. Okay. After -- strike that.
Did you -- you testified in the sentencing portion of Cordell's criminal trial, right?
A. I may have, but I don't remember. I may have.



Q. Okay. When Cordell's case went to trial, did you attend every day of the trial?
A. Yes, I did. Yes.
Q. Okay. Did you at that point become aware that -- of the circumstances of the shooting?
A. Okay. Explain to me what you mean aware.
Q. Sure. So you attended Cordell's trial, and you heard the state's attorney talk about the shooting itself, right?
A. I heard -- I did hear --
Q. Okay.
A. -- but I can't tell you exactly what I heard.
Q. Okay. Did you at that point hear about Cordell's confession to his involvement in the shooting?
A. I don't remember that. That I don't remember.
Q. Okay. Do you remember if Cordell ever testified in the trial?
A. I don't think -- I don't remember Cordell getting up there, no.
Q. Okay. Did you ever have a



conversation with Cordell about whether or not he should testify at his trial?
A. I don't remember that neither.
Q. Okay. Did you know David Evans back in 1994?
A. I had never -- no. I had never seen David.
Q. Okay.
A. I had never seen him.
Q. When you sat through Cordell's trial, did you become aware that David Evans was the person who shot the two boys?
A. I -- I -- I don't know. I don't know anything about David Evans, and I can't say I remember what they said. I don't.
Q. Do you recall -- strike that.
Did -- in sitting at the trial did you become aware that the two boys who were shot were 16 and 18 years old?
A. Miss, like I told you, I don't remember. I can't go back and tell you what they said or nothing. I don't remember.
Q. Okay. After the shooting happened did you hear any talk in your neighborhood or at your block club meetings about the shootings?



A. Nothing came up in the block club or the neighborhood, no.
Q. Did you see anything on the news about it?
A. No, I did not.
Q. Is it fair to say that you didn't know the families of the two boys who were killed?
A. Correct. I didn't know them.
Q. Okay. And I apologize. I know we talked about this a little bit, but if you can just refresh my recollection, you said that you might have testified for Cordell related to his criminal case but you don't recall; is that accurate?
A. I don't recall. No, I don't.
Q. Okay. Okay. Do you know if your husband testified?
A. I don't recall that either.
Q. What are -- Mrs. Williams, what were your feelings at the time in 1994, if you can tell me, about Cordell's involvement in the shooting?
A. Like I say, that's a long time. I was -- I was hurt because I know -- because it

wasn't true. I never would believe my -- I know he wasn't involved in nothing like that, but I feel like at that time I don't -- I can only say I was hurt.
Q. Why do you say you know he wasn't involved in anything like that?
A. Because he wasn't raised that way. He was -- Cordell -- I had never seen Cordell -- Cordell was not raised that way. It was -- we only had that one child, and we took care of that one child, and we loved that one child, and we made sure that nothing happened to him. We loved him.
Q. Did you feel let down?
A. No. Why would I feel let down?
Q. Why not?
A. Because I don't -- I didn't believe -- I know he didn't do nothing like that. I know he wasn't involved in nothing like that. No. That's my child. I know it wasn't my child.
Q. Are you aware that Cordell acknowledges that he was in the car with David Evans and was aware that David Evans had a gun and was aware that Evans was involved in the shootings, and drove away with Evans after the



shootings?
A. No, I was not --
MR. BECKER: I'm going to object -- I'm going to object that was a compound question. If you could please separate the statements.
MS. MEADOR: Sure. Sure. I can do that.
BY MS. MEADOR:
Q. Mrs. Williams, are you aware that Cordell admits that he knew Evans had a gun when they were leaving the party that night?
A. I don't know anything about no party, no.
Q. Okay.
A. No, I do not.
Q. So here -- okay. So are you aware that Cordell admits that he told Evans to put his gun in the trunk of your car before they would drive off?
A. Cordell never talked to me about that.
Q. Okay. Are you aware that Cordell admits that he was driving down the street with Evans and two other people when Evans told him he saw a couple of rival gang members and directed



Cordell to pull over?
A. No, I don't know anything about that.
Q. Okay. Are you aware that Cordell admits that Evans told him to pull over and open the trunk of your car --
A. No.
Q. -- where his gun was?
A. No, I don't know anything about that.
Q. Okay. Are you aware that Cordell admits that Evans then walked away towards the shop where the rival gang members were and Cordell heard the shooting?
A. No, I don't know anything about that.
Q. Okay. Are you aware that Cordell admits that he heard the gunshots and knew Evans was involved?
A. No, I do not know.
Q. Okay. Are you aware that after Cordell -- strike that.
Are you aware that Cordell admits that after he heard the shootings, Evans jumped back in the car and they took off?
A. No, I don't know nothing about that.
Q. Okay. Do you have any -- strike that.



Knowing as you sit here today that Cordell admits to these things, do you have any thoughts that are different as to whether or not he was involved in the shootings?
A. No, I don't have no thoughts because I don't -- I don't have no thoughts so I don't know what Cordell admit to.
Q. Okay.
A. I don't know.
MS. MEADOR: Give me one second. So why don't we take a quick break, and come back in maybe ten minutes. Does that sound fair?
THE WITNESS: I'll be sitting here.
MS. MEADOR: Okay.
THE VIDEOGRAPHER: All right. Going off the record at 11:29 a.m.
(A break was taken.)
THE VIDEOGRAPHER: This is the beginning of media unit 2. We're going back on the record at 11:39 a.m.
BY MS. MEADOR:
Q. Okay. Mrs. Williams, I just have a few -- a few more questions for you, okay? So we talked a few minutes ago about the things that your son Cordell has admitted to related to his

involvement in the shooting, right?
A. That's what you told me, yes.
Q. Okay. So you said you didn't believe that Cordell was involved. Knowing now that Cordell has admitted to his involvement, knowing David Evans had a gun, they saw rival gang members, Cordell pulled over and opened the trunk for Evans to get the gun, and Evans then left and executed these two boys and came back to the car, and Cordell took off, do you agree that he was involved in the shooting?
MR. BECKER: Again I'm going to object. That was a compound question again. If you could separate those, please, Lisa.
MS. MEADOR: I'm going to leave the question as is. I appreciate your objection, but I'll leave it as is. You can answer my question.
A. I don't know -- I don't know what Cordell told you. I wasn't there. I didn't hear Cordell tell you that. So I can't disagree or agree because I don't know. I don't know if he told you that or not.
Q. Okay. If he did say the things that I've told you, would you agree that he was involved in the shootings?



A. Again I can --
MR. BECKER: Again I'm just going to make an objection. Mrs. Williams, just a moment. I'm going to object on speculation.
MS. MEADOR: Go ahead, Mrs. Williams.
MR. BECKER: Go ahead. You can answer now.
A. I don't know what he told you or not. So I can't agree because I don't know.
BY MS. MEADOR:
Q. Okay. I'm asking you a little bit of a different question, okay? So I want you to assume that he did tell me these things two days ago during his deposition. Okay. So assuming that's true, would you agree now that your son was involved in the shooting?
A. Again --
MR. BECKER: Again I'm going to object on speculation. Go ahead, Ms. Williams.
A. Again -- I -- not -- I can't say I agree and I can't say I disagree because I don't know if he told you that.
BY MS. MEADOR:
Q. Right, but I'm asking you to assume that he did.



A. I'm not going to assume anything.
Q. Okay. Did you hear from anyone at all from May 26 of 1994 to the present that Cordell was abused by the police?
A. I haven't talked to no one.
Q. Okay. Have you heard from anyone from May 26 of 1994 to the present that Cordell was coerced into confessing by the police?
A. Again I haven't talked to anyone.
Q. So is that a no?
A. All I'm just saying I haven't talked to anyone.
Q. No one's told you that?
A. My husband told me that. No one else told me that. My husband told me --
Q. What did you --
A. My husband say they abused him. Now, that's about all I can tell you.
Q. What did he tell you?
A. He just said I couldn't believe that they was doing him that way. That's all he said. My husband kept things into his self.
Q. What led you to believe that the police were coercing Cordell when your husband said I can't believe they were doing that?



A. Don't the police coerce -- coerce everybody?
Q. Is that -- is that the reason why you thought -- you assumed --
A. My husband --
Q. Okay. Hold on. Let me just -- I know it's easy to see -- to see what I'm talking about, just so that our court reporter can get it all down, okay? Is it your belief that the police coerce everybody?
A. Yes.
Q. Okay. What's that based on?
A. Things that I see in the news.
Q. Like what?
A. What's on TV in the news.
Q. Can you be -- can you give me any specific examples?
A. Just like I said the -- I looking at the news, whatever comes up on the news. They just talking about things on the news, but as far as Cordell concerned I can't say what happened, and, you know. So that ties in, it's getting on my nerves. I can't. I can't deal with it.
Q. I'm sorry. What's -- what's getting on your nerves?

A. You keep telling me back and forth. Cordell say this, Cordell say that. I don't know whether Cordell told you that or not.
Q. Right. But we're talking about what you say your husband told you. I'm not talking about what --
A. My husband -- -
Q. -- Cordell said.
A. My husband -- my husband didn't do too much talking because I couldn't handle it, okay? Bottom line. He couldn't handle it. Have you ever seen a grown man break down and cry? My husband couldn't handle it. My husband kept a lot of stuff to his self. That's what took him out of here, bottom line.
Q. And your husband said to you I can't believe they're doing that, right?
A. Yes, he did.
Q. Okay. Did he say anything else to you?
A. He said they beat him.
Q. He did say that. So now you're saying --
A. He --
Q. So now you're testifying that he said



-- your husband said that they beat him?
A. He didn't give me no details.
Q. Okay. Did he say anything else besides I can't believe they're doing that and they beat him?
A. My husband kept a lot of stuff to his self. No, he did not.
Q. Okay. And did he say who he meant by they?
A. No, he did not.
MS. MEADOR: Okay. I think that's all the questions I have.
Pat, did you have any questions?

EXAMINATION

BY MR. MORAN:
Q. You know, I just thought of one. Ma'am, again my name is Pat Moran and I represent the officers, and I understand this is a difficult thing to talk about, and I know you suffered a loss with your son going to prison for as long as he did so I'll be quick, okay? Can you hear me okay?
A. I can hear you.
Q. Okay. Good. Do you assume that the police coerced or -- yeah, coerced your son



because of the things you've seen on the news?
A. No, I don't know what I believe.
Q. Okay.
A. I don't know what they done.
MR. MORAN: Fair enough. Yep. That's it. That's all I have. Thank you, ma'am.
MR. BECKER: No questions. No questions on behalf of the plaintiff.
MS. MEADOR: Okay. Do you want to talk with Mrs. Williams about waiving or reserving signature, Steve?
MR. BECKER: Yeah. Sure. Mrs. Williams, so you have the opportunity to either reserve signature or waive. What that means is you have a right to review the whole transcript if you wish, but you cannot change any of your answers, for example, from yes to no, but it would just be for any typographical errors; otherwise you can just waive signature and assume that the court reporter has transcribed your testimony accurately.
THE WITNESS: Waive it because I don't want to look at nothing. Waive it.
MR. BECKER: Okay. Very good. So she's going to waive signature.



MS. MEADOR: Okay. That sounds good. Mrs. Williams, thank you for your time today. We appreciate it.
THE WITNESS: Okay. Thanks.
COURT REPORTER: And before you hang up, are you --
MR. MORAN: Go ahead.
COURT REPORTER: Are you going to order the transcript?
MR. MORAN: Yeah, you can hang up, Mrs. Williams. Thank you very much.
MS. MEADOR: Yes, we'll order.
COURT REPORTER: E-tran or PDF?
MS. MEADOR: Yeah, that's fine. Not video right now. Just the E-tran.
COURT REPORTER: Mr. Moran, do you want a copy?
MR. MORAN: I do not.
THE VIDEOGRAPHER: I'll just take us off real quick. This concludes media unit 2 of today's deposition of Brenda Williams. We're going off the record at 11:49 a.m. Thank you.
(The deposition was concluded at 11:49 a.m., and the signature of the deponent was waived.)

CERTIFICATION

I, Rhonda Rhodes Bentley, CSR, a Certified Shorthand Reporter (IL), do hereby certify that BRENDA WILLIAMS, came before me on April 25, 2025, and swore before me to testify to the truth, the whole truth and nothing but the truth regarding her knowledge touching upon the matter in controversy.

I do further certify that I did take stenographic notes of the questions propounded to said witness and her answers thereto and that said notes were reduced to typewritten form under my direction and supervision.

I do further certify that the attached and foregoing is a true, correct and complete copy of my notes and that said testimony is now herewith returned. I do further certify that said deposition was taken remotely via Zoom.

I do further certify that I am not related in any way to any of the parties involved in this action and have no interest in the outcome thereof. Dated at Divernon, Illinois, the 30th day of April, 2025.

______________________________
Rhonda Rhodes Bentley, CSR
CSR# 084-002706