# Exhibit 23

## Deposition Transcript of M. Hawilo

## (Working Group Member)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORDELL WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23 CV 14905 |
| | ) | |
| vs. | ) | Hon. Lindsay C. |
| | ) | Jenkins |
| JAMES O'BRIEN, THE PERSONAL | ) | |
| REPRESENTATIVE OF THE ESTATE | ) | Magistrate Judge |
| OF WILLIAM FOLEY, THE CITY OF | ) | Young B. Kim |
| CHICAGO, a municipality, and | ) | |
| UNKNOWN EMPLOYEES OF THE CITY | ) | |
| OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

The video-recorded deposition of MARIA HAWILO, taken pursuant to the Federal Rules of Civil Procedure, before Suzanne Thalji, Certified Shorthand Reporter No. 084-002337, at 333 West Wacker Drive, 19th Floor, Chicago, Illinois, on Wednesday, October 22, 2025, commencing at 10:01 o'clock a.m. pursuant to subpoena.

APPEARANCES:

LAW OFFICE OF STEVEN W. BECKER LLC
BY MR. STEVEN W. BECKER
205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
312.396.4116
swbeckerlaw@gmail.com

on behalf of the Plaintiff;

ROCK FUSCO & CONNELLY LLC
BY MR. PATRICK R. MORAN
333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000
pmoran@rfclaw.com
on behalf of the Defendant Officers;

THE SOTOS LAW FIRM, PC
BY MS. LISA M. MEADOR
141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300
lmeador@jsotoslaw.com
on behalf of the Defendant City of Chicago;

MS. CRISTIN DUFFY
MR. LYLE HENRETTY
Assistant State's Attorneys
69 West Washington Street, 32nd Floor
Chicago, Illinois 60602
773.350.0805
cristin.duffy@cookcountysao.org
lyle.henretty@cookcountysao.org
on behalf of the Cook County State's Attorney's Office;

(Continued)



APPEARANCES: (Continued)

AKERMAN LLP
BY MS. AMANDA J. HAMILTON
MR. GREGORY A. KUBLY
71 South Wacker Drive, 47th Floor
Chicago, Illinois 60606
312.634.5736
amanda.hamilton@akerman.com
gregory.kubly@akerman.com
on behalf of the Deponent.

ALSO PRESENT:
MR. PETER PREZZANO, Videographer



INDEX


| WITNESS | |
|---|---|
| MARIA HAWILO | |
| EXAMINED BY | PAGE |
| MR. MORAN | 6, 369 |
| MS. MEADOR | 361 |
| MR. BECKER | 368 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Working Group Procedure & Guidelines | 175 |
| Exhibit 2 | Email, CCSAO-WG 0119166-67 | 225 |
| Exhibit 3 | Email, CCSAO-WG 0124035-36 | 231 |
| Exhibit 4 | Draft Working Group Memorandum of Findings and Recommendation, CCSAO-WG 0103377-3406 | 233 |
| Exhibit 5 | Emails, CCSAO-WG 0166967-972 | 240 |
| Exhibit 6 | Email, CCSAO-WG 0163285 | 246 |
| Exhibit 7 | Affidavit of David Evans, W 453-454 | 254 |
| Exhibit 8 | Email, CCSAO-WG 0178633 | 263 |
| Exhibit 9 | Working Group Memorandum of Findings and Recommendation, CCSAO-WG 0008032-55 | 264 |
| Exhibit 10 | Email, CCSAO-WG 0174476 | 312 |
| Exhibit 11 | Summary of notes, CCSAO-WG 0134847-49 | 369 |




THE VIDEOGRAPHER: Good morning. This is the beginning of Media Unit 1. We are now on the video record at 10:01 a.m. according to the video monitor.

This is the video-recorded deposition of Maria Hawilo, being taken on October 22, 2025. We are located at 333 West Wacker Drive in Chicago, Illinois. This deposition is being taken on behalf of defendant in the matter of Cordell Williams versus James O'Brien, et al., Case No. 23 CV 14905, filed in the United States District Court for the Northern District of Illinois.

My name is Peter Prezzano, certified legal videographer representing Urlaub Bowen & Associates with offices at Chicago, Illinois. The court reporter is Suzanne Thalji, also of Urlaub Bowen & Associates.

Counsel, please identify yourselves for the video record and the parties which you represent.

MR. MORAN: Pat Moran on behalf of the police officer defendants.

MS. MEADOR: Lisa Meador on behalf of the

City of Chicago.
MR. BECKER: Steven Becker on behalf of the plaintiff Cordell Williams.
MS. HAMILTON: Amanda Hamilton on behalf of Ms. Hawilo.
MR. KUBLY: Greg Kubly on behalf of the witness.
MS. DUFFY: Cristin Duffy on behalf of Cook County State's Attorney Office.
MR. HENRETTY: And Lyle Henretty also on behalf of the Cook County State's Attorney's Office.
THE VIDEOGRAPHER: Will the court reporter please administer the oath, and we may proceed.
(Witness sworn.)
MARIA HAWILO,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. MORAN:
Q. All right. Great. Can you state your name and spell it for the record?
A. Sure. Maria Hawilo, M-a-r-i-a H-a-w-i-l-o.



Q. All right. Ms. Hawilo, have you ever given a deposition before?
A. I don't think so.
Q. Have you ever taken a deposition?
A. I think I have. I've taken maybe one or two.
Q. Okay.
A. But I don't -- I'm not entirely sure. I don't remember.
Q. All right. A couple ground rules to make things go smoother today.
A. Sure.
Q. Obviously I am going to be asking a lot of questions. If you do not understand one of my questions, will you please tell me?
A. Sure.
Q. Okay. Great. And if you do answer one of my questions, we are all going to assume you understood my question. Is that fair too?
A. Sure.
Q. All right. Great. If you need to take a break at any time, that's fine. Just let me -- if you can answer the pending question first, and obviously you know to let me finish and I'll let



you finish so our court reporter can take down everything.
A. Yes.
Q. Sound good?
A. Yes.
Q. All right. Great. So you are currently a professor of law at Loyola?
A. I'm a distinguished professor in residence at Loyola Law School.
Q. What classes do you teach?
A. Currently or in general?
Q. In general.
A. The first year doctrinal criminal law course, a juvenile justice seminar, and then I generally teach one or two seminars in the fall. This semester I am teaching a seminar called Mass Incarceration and a seminar called Victims of Crime: Their Rights Through the Criminal Process.
Q. Currently are you also a practicing lawyer?
A. I am not.
Q. When is the last time you were a practicing lawyer?
A. Let's see. I was a clinical faculty



member at Northwestern, and I don't know if you'd consider that a practicing lawyer or not. I don't know if our definitions of practicing lawyer are the same. It was a very different kind of practice than when I was --
Q. Sure.
A. -- a public defender in the DC Public Defender Service --
Q. Sure. Tell me --
A. -- which is when I think is the last time I practiced.
Q. All right. So you think -- all right.
A. I mean, do you see what I'm saying? I just -- I -- yes.
Q. I do see what you're saying. So I was going to ask you what's your definition of being a practicing lawyer?
A. I mean, the -- when I was full-time practice is my definition of being a practicing lawyer, and that was when I was in the DC Public Defender Service. Since then I did practice. I worked as a clinical faculty member, and in that vein, in the course of supervising students and pedagogically teaching students through that, I --

we represented folks.
Q. Okay. So on the clinical faculty you don't -- you just did that at Northwestern Law School?
A. Yes.
Q. Okay. And in that sense you would take on cases and have the students help with the cases?
A. Yes, and, you know -- yes, and all that that entailed --
Q. Okay.
A. -- counseling, pedagogical approaches, methodology, et cetera.
Q. Sure, sure. But part of that was you representing a criminal defendant in a criminal case?
A. I think mostly criminal defendants or juvenile defendants. There may have been -- you know, in -- there may have been an appellate case or two, maybe a post-conviction case.
Q. Sure. What percentage of your work at Northwestern involved you representing a client either in juvenile court, criminal court, or any other proceeding?
A. I don't know sitting here today. This



was a while ago.
Q. Sure.
A. I don't know.
Q. When did you start at Loyola?
A. 2019.
Q. And when did you start at Northwestern?
A. So -- hold on one second. My daughter was born in 2012. I think I started in the fall of 2013.
Q. At Northwestern?
A. At Northwestern -- or was it the fall of 2014? I don't know, Pat. Maybe fall of 2013 or fall of 2014.
Q. Okay.
A. I don't remember precisely.
Q. It's not a memory test.
A. Okay. Well --
Q. Approximately around that time?
A. Yeah, around that time.
Q. Okay. And prior to joining Northwestern's faculty, you were a public defender -- or with the public defender's office in Washington, DC?
A. I stayed home with my kids for -- had



kids, raised them, so there was a break there in between --
Q. Oh, okay.
A. -- for a period of time, and my memory is a little bit skewed on this because I took maternity leave for quite a bit of time at the Public Defender Service, then tried to go back for some part-time work and then eventually left. So I think I took a year and a half, maybe longer off in between.
Q. Okay. So what --
A. But before that --
Q. Yeah.
A. -- yes, I was at PDS.
Q. So what years were you full time at the public defender's office in DC starting and ending?
A. I believe -- so I believe I started after my clerkship, so it would have been maybe October 2004. Gosh, that dates me. Okay. October 2004 to either maybe 2011 or 2012, but I had my son in 2011, so maybe I left in 2012.
Q. Okay. And again that's approximately, right?
A. Approximately. I don't -- the dates



are a little bit hazy and fuzzy for me. I've had multiple children since then, and dates don't stick.
Q. Let's talk about your clinical work as a clinical professor --
A. Okay.
Q. -- over at Northwestern.
A. Um-hum.
Q. How many cases do you think you tried during that period of time?
A. Tried?
Q. Yeah.
A. Oh, I don't know. I can't give you an approximate number.
Q. So many, too much to count or --
A. No, but I just don't know. I don't remember.
Q. Okay. How about in Washington, DC, when you were a public defender, how many cases do you think you tried?
A. I don't remember.
Q. Okay. How about this? While you were at Northwestern's clinic, how many murder cases did you try, if you did any?

A. I don't know that like I did any full trials in murder cases. I don't remember sitting here today that I did. There may have been one I worked on or --
Q. Sure.
A. But not that I remember like going through a full trial.
Q. Okay. And then as a public defender, were you -- you know the concept, first chair, second chair?
A. Um-hum.
Q. You have to answer out loud.
A. Oh, yes, yes. Sorry.
Q. Were you a first chair in a murder trial in DC?
A. I think so, yeah.
Q. How many times do you think?
A. I won't remember this. I'm sorry.
Q. How about how many murder trials while you were in DC did you work on?
A. Work on? Oh, I don't remember. I also supervised murder cases. I won't remember. I don't remember that.
Q. Yeah. That brings up a good question.



While you were a public defender's office -- while you were at the public defender's office in DC, when did you become a supervisor?
A. When? I don't remember the exact date.
Q. Okay.
A. It would have been towards the end, but I don't remember when.
Q. Roughly how many years were you a supervisor?
A. I don't remember. I want to -- I mean -- I don't -- I don't remember. I want to say a couple, but I would be guessing with that.
Q. Okay.
A. Maybe two, three. I don't remember.
Q. Are you published?
A. Yes.
Q. And are you published in peer-review publications?
A. I think so, yes, like Northwestern Law Journal. I don't know if -- I mean, I recently edited an anthology. I don't know -- that's not considered peer review, I guess, but it's published --
Q. Great.



A. -- in the Loyola Law Journal.
Q. Okay. Have you -- I know you were part of a -- you are credited as an author of a book called Dismantling Mass Incarceration?
A. I want to be careful here. I'm an editor --
Q. Okay.
A. -- of a book called Dismantling Mass Incarceration: A Handbook for Change.
Q. Okay. So let's talk about that book for a little bit.
A. Okay. Sure.
Q. Did you contribute any written material to that book?
A. The three co-editors contributed the introductions to the -- the introduction to the anthology, the conclusion, and then the introductions to the chapters. We call them parts.
Q. Okay.
A. But the -- those introductions were actually -- it's not a prescriptive anthology. They were mostly summarizing, I hope in a readable way, the pieces that followed.
Q. And was that book intended to be like a



scholarly work or more for the general population?
A. It is -- I mean, you know, it is published for the general population.
Q. Right. Okay. And I haven't read the book, but as I understand from reading about it --
A. Okay.
Q. -- that it contains many different viewpoints on the issue of mass incarceration?
A. That's correct. It's not prescriptive. It is -- the goal, the hope is to advance different viewpoints and, you know, let folks sort of discover, consider, think about the different viewpoints. Some are diametrically opposed.
Q. To incarceration?
A. No, to the -- to the others' viewpoints, in other words, the pieces.
Q. Oh, right. I got you. So you put together different points of view --
A. A compilation.
Q. -- that would be against each other in some cases?
A. In some cases, yeah.
Q. Okay.
A. Yeah.

Q. Tell me, how do you define mass incarceration?
A. Oh, that's a really good question, and in fact it's not defined in the book for a reason. I -- you know, I won't personally define it. I don't -- I think that's a real challenge, and we don't personally define it because it's been defined in different ways.
David Garland's definition is, generally speaking, over-incarceration compared to other like countries and particularly where that incarceration is centered on particular groups.
I mean, you know, it's been defined as, you know, per capita increase in a prison population over the last five decades. It's been defined in a variety of ways. I think -- I don't have a precise definition for you.
Q. Does any contributor -- do any contributors to the book take the position that incarceration should be abolished?
A. Do any contributors to the book take the position -- I think, yes, there are some abolition pieces in the book.
Q. Okay.



A. I don't know if I'd quite frame it that way. I'm trying to think through the pieces right now, but I think there are some abolition-centered pieces in the book.
Q. So now I am going to ask you to tell me what you personally would define mass incarceration as.
A. Again, I don't have a precise definition. I just -- I don't -- I didn't personally define it, and I really don't personally define it.
Q. Does incarceration play a role in society?
A. Does it play a role? Can you just rephrase that for me?
Q. Should incarceration play a role in society; in other words, should it be in society?
A. Let me just -- can I rephrase your question so I'm sure I understand what you mean? I don't think I --
Q. One of the first rules, you can tell me if you don't understand, and I'll be happy to rephrase.
A. I just -- well, should incarceration



play a -- so do you mean, Pat, should there -- should an organized society have a carceral system --
Q. A prison system.
A. -- a prison system, et cetera, is that what you mean --
Q. A prison system.
A. -- a prison organized society? In my personal view? I mean, I don't know how my personal view is relevant. I, you know, tell the students all the time I don't want to engage in personal views.
Personally I think, yes, there should -- state systems, organized state systems should have ways to adjudicate harms, to mitigate harms, and to address and incapacitate folks who should be.
Q. Tell me what you understand the benefit of having a prison system is to society.
A. I mean, I think it -- again, I don't have a -- I don't sort of have a personal view that I could summarize in, you know, a few minutes here. I think that the research has shown that there are some benefits, including when there is certainty of



punishment deterrence benefits. I think that there are benefits to -- if -- you know, fair to both community safety but also to rule of law and to a functioning society.
Q. Okay. For certain crimes like murder --
A. Um-hum.
Q. -- do you believe a life sentence is an appropriate sentence?
A. I don't think I could answer that without having -- I mean, I've never been a judge, and I don't think I could answer that without having significant more information about --
Q. Sure.
A. -- all the circumstances, the individuals, and I don't think that's a question that's answerable.
Q. Is it fair to say that one of your areas of interest as a professor is the concept of incarceration and how it impacts society and the relationship of incarceration to society?
A. I think it's fair to say that one of my interests is the -- research interests is the concept of a criminal justice system or systems, so

to speak, and the role and impact and consequences that such a system can have. So I would say the system at large or systems at large rather than one focus.
Q. And has that been -- and that's an area you currently or have conducted research in?
A. I mean, I have published in some vein in that. I don't -- you know, again, research means different things to different people. I haven't gone into prison systems, for instance, and conducted --
Q. Well, in the broader sense.
A. Yeah. In the broader sense I think when you publish something, I think I can fairly call it research. I don't know if others would.
Q. Well, I mean in your professional setting --
A. Yeah.
Q. -- is that considered research?
A. I think that's considered research.
Q. Okay. Do you take a position that there should not be life sentences as a punishment for any crimes?
A. Again, I don't think that's a question



I could answer. I do not take that position and in the absence -- this is asked, you know, in a vacuum. I don't think that's answerable frankly.
Q. Okay. Why isn't it answerable?
A. I just don't have an opinion on it in a vacuum.
Q. Okay. But so I'm going to -- I don't mean to be too picky, but in one sense you just said you do think -- or you don't stand against it, but you don't think it's a question you could answer.
A. I don't -- I didn't say I don't stand against it. I just don't have a view on it in the absence of information.
Q. Okay. So it would be case by case?
A. I think there's a case by case, individualized determination, yeah.
Q. Okay. That's fair. Have you published anything else on incarceration, the concept of incarceration?
A. Oh, let me think. I mean, I don't know if this counts as the concept of incarceration. I have published, co-authored, paper -- a paper on -- let's see -- like the culture of a courtroom and,



you know, the -- sort of a -- like we looked at the Cook County court system, for instance, and looked at both qualitative and quantitative data to get a sense of, you know, how many felony cases, et cetera.
Q. Um-hum.
A. I don't know if that counts as a concept of incarceration, but I would count it as like in the field of criminal justice. I, you know -- I think I've co-authored a paper on sort of the time to trial, that sort of thing --
Q. Um-hum.
A. -- the length to disposition. I --
Q. Let me ask you this.
A. Okay.
Q. Your work with respect to Cook County's justice -- or the criminal court system in Cook County, did your work focus on whether it's fair or not and how it could be unfair?
A. I don't -- you know, I -- I think it's fair to say that in one of the -- I think in at least one of the publications, it focused on how to make it more fair --
Q. Can you explain --



A. -- or efficient.
Q. Oh, how to make the system more fair?
A. The system more fair or efficient.
Q. So that would mean that you found ways in which you thought it was unfair?
A. Or less efficient.
Q. Okay. What are the ways you recommended or came up with to make the system more fair, the Cook County criminal court system?
A. I think in that particular paper I don't remember. I think it's -- I don't remember the details, but, you know, for victims, for defendants, for family members, sort of having a more routine time to disposition.
Q. Um-hum. Did you just focus on time from indictment or charge to disposition of a case?
A. You know, that's a good question. I don't remember now the dataset or the -- I think in general, like from the time that the case is set in the courtroom, things like that, things like making information available, you know, continuances --
Q. Um-hum.
A. -- reducing the number of continuances, that sort of thing.

Q. By the way, did you try cases in Illinois as part of your work with the Northwestern clinic?
A. I think so, yeah.
Q. Okay. Have you ever done any appellate work?
A. I think I've -- I've handled an appellate case or two, yeah. I don't remember the details of it but --
Q. Have you ever worked as a prosecutor?
A. No. I mean, I don't know -- I didn't consider this work -- let me just be clear. I have not worked as a prosecutor. I was appointed in this position, but it was not --
Q. We are not even there yet.
A. -- as a prosecutor. Okay.
Q. Only one question at a time. So we'll get to the Working Group in a little bit.
A. Okay.
MS. HAMILTON: Fair clarification.
THE WITNESS: Yeah, but I --
BY MR. MORAN:
Q. No. I get it. I get it. It is a fair point, and we are going to come to the Working



Group because I understand that you were not technically a prosecutor in that sense.
A. Right. Yeah.
Q. But the question was just whether you've ever acted as a prosecutor --
A. No.
Q. -- worked as a prosecutor.
A. No.
Q. Okay. As part of your research, have you ever interviewed prosecutors?
A. You know, I may have conducted anonymous interviews as part of a like -- some qualitative research for one of the papers.
Q. As part of your research, have you ever interviewed detectives or police officers?
A. You know, I don't remember. I have sort of a hazy memory of speaking to a group of officers, again, more informal, anonymous research, but I don't -- I don't remember.
Q. And was that -- were those officers from Illinois or Chicago, Cook County?
A. I don't remember.
Q. The one you mentioned about maybe interviewing prosecutors or conducting some sort of



anonymous research, would that have been prosecutors from Illinois?
A. I think so, yeah.
Q. From the Cook County State's Attorney's Office?
A. I don't remember if they were Cook County.
Q. Have you had cases in the collar counties?
A. Collar counties, I think -- is Bridgeview a collar county?
Q. Bridgeview is Cook County.
A. Okay.
Q. Feels like it, but it's not.
A. Feels far away. I mean -- and what about -- I don't know. Is Skokie -- I don't remember if I had a case in Skokie. Is that a collar county?
Q. No, that's not either. That's Cook County.
A. Okay. I --
Q. How about this? I will make it easier for you. Have you had a case in DuPage County?
A. I don't think so, but I don't remember.



You know, there was a -- is -- there was a -- I was involved in a case in Lake Forest. That's not Cook County?
Q. That would be Lake County.
A. Yeah.
Q. Yeah. So you got one.
A. Okay.
Q. How about Will County?
A. I don't think so, but I don't remember.
Q. Okay.
A. I don't know.
Q. So would you have -- all right. See if this jogs your memory. The anonymous questionnaire, however you did it with the prosecutors, would that have been prosecutors outside of Cook County?
A. I don't remember. I don't know, and I don't know if it was -- you know, sitting here right now, I actually can't say for sure I did -- we did conduct an interview or interviews with prosecutors or if this was, you know, for something else or informal. I don't know, and I don't remember. Sorry.
Q. Okay. Well, that was going to be my

next question, if you remember the subject matter of that questionnaire or that anonymous interviewing --
A. You know, it had to do with like courtroom efficiency if it happened, but honestly as I sit here, I just can't remember if that happened with the prosecutor, with other, you know -- but basically, you know, how many continuances, efficient -- like efficiency in the courtroom, that sort of thing.
Q. Okay. Has any of -- and then setting aside the book, the mass incarceration book --
A. Um-hum.
Q. -- has any of your research focused on things such as racial disparity in criminal prosecutions or incarcerations?
A. You know, I think it -- I think it could fairly be said to be infused in some of the research even if it's not the primary focus, I would say.
Q. And how would it be infused?
A. I mean, you know, in some of the research you sort of summarize, as law review articles often do, the other studies that talk



about, you know, disparities in sentencing or disparities in -- and I'm not saying that's exactly what's in it.
Q. Um-hum.
A. But that's what I mean by racial disparities.
Q. Okay. Would it be fair to say then in those publications that you had, it was not a focus of the publication, but it was mentioned in the course of describing the issues that you were addressing?
A. I'm not sure if that's how I would characterize it. I think -- and again -- I think that some of the publications certainly discussed racial disparities.
Q. Have you -- how would you characterize it? I mean, you say discuss, and I'm trying to find out if it's a focus. How would you characterize it?
A. It's part of it. I don't know that, you know, it's fully a focus of any paper, but it's part of some of the papers published.
Q. Okay. Have you published any -- or do you have any publications in which you have



addressed how that issue can be addressed or remedied?
A. I mean, I think some of the pieces in the anthology address it.
Q. Is that the mass incarceration book?
A. Anthology, yeah, and I don't remember if some of the other sort of papers published deal with sort of reforms in that area.
Q. Have you ever worked on any innocence projects?
A. Worked on innocence projects? What do you mean by that?
Q. Been part of an innocence project in any shape, way, or form, either as a -- someone investigating cases or serving on a board or consulting or just a member?
A. So let me think. The -- in my work at Northwestern, sometimes with their conviction, wrong -- no, their clinic there, their wrongful conviction clinic -- I don't know if this is what you mean by innocence project, but there were a couple of cases, I think, that I either consulted on or worked or co-represented.
Q. Sure.



A. There was -- I did some pro bono work for Minnesota, their state's CR -- conviction review unit.
Q. Like a conviction integrity review?
A. Yeah. I don't know what they call it now, but before that was up and running, there was a -- let's see. There was a case, and I consulted with a group of folks coming out of there -- out of that Minnesota, and we sort of reviewed and investigated a particular case, put together a memo, sent it to -- I don't remember -- the -- you know, it was the -- Keith Ellison and those folks.
Q. When do you think that was?
A. I don't know. 2018, 2019. I don't know, 2020.
Q. Would it have been before your work with the Working Group?
A. Yes, although then, you know, they -- Minnesota -- or the Twin Cities maybe? They started -- the AG's office started this conviction unit, and I consulted with the woman who was running it --
Q. Um-hum.
A. -- you know, and then I think I -- as

part of my -- one of my classes, like we looked at, you know -- they have cases coming in. We looked at a broad range of them and basically told them, you know, these might be worth continuing to investigate.

Q. Okay. So I used the phrase innocence projects, and I think you rightly pointed out -- you wanted to make sure what I was talking about at the beginning of your answer. So obviously you identified a couple, like the clinic at Northwestern, the conviction integrity group in Minnesota.

What I am specifically referring to are things like the Exoneration Project here in Chicago, or like there's an Innocence Project, I think, out east in New York, where it's a private group that focuses on --

A. I see.

Q. -- on looking at cases that may involve wrongful convictions.

A. So the innocence one in New York, Barry Scheck was involved as part of this review in Minnesota, but I have not worked otherwise on that -- on the Innocence Project in New York.



Q. Okay.

A. I have not worked as far as I know for the Exoneration Project. I did apply for a position at Loevy --

Q. Um-hum.

A. -- and was offered a position, turned it down, but I did not -- I have never worked there.

Q. Got it.

A. Other innocence projects, in the way that you have defined it, let me -- let me just think. So the CRU would not count as that in Minnesota, and I don't recall working for any other --

Q. That's fine. So let's draw a distinction between government --

A. Those are government ones is how I would --

Q. -- government-established conviction integrity units --

A. Yeah.

Q. -- or departments and then other entities, private entities that are innocence projects or exoneration projects that focus on



wrongful convictions.

A. I don't think I have done work, other than how I've described it to you, in these -- what -- private entities the way that you have defined it.

Q. Um-hum. Okay.

A. Not that I remember.

Q. When did you apply at Loevy's office?

A. When or where?

Q. When.

A. You know, I call it the era of the pandemic. It was shortly after -- to the best of my recollection, it was like maybe in -- the position -- maybe early 2021 --

Q. Okay.

A. -- right around then. I don't -- I don't know for sure, but it was around the pandemic era. We were teaching online still, and it was a tough time. Let me put it that way.

Q. Sure. No. That's fair.

A. Teaching to a bunch of black boxes for, you know --

Q. Who did you interview with at Loevy's office?



A. You're testing my memory, Pat.

Q. How about Jon Loevy?

A. I don't -- I mean, I remember that Jon called me. I don't remember Jon being part of the interview. There was a woman, and I want to say it was his daughter --

Q. Okay.

A. -- or -- is that not -- I don't -- there was -- let's see.

Q. How about Russell --

A. Maybe a David. Does that -- David? And now I may be guessing. Maybe a Russ -- maybe Russell.

Q. Okay.

A. But I don't know for sure.

Q. All right.

A. Maybe -- it was like a -- to the best of my recollection, and I don't really have an independent one here, it was like a group of people in a Zoom call.

Q. Okay.

A. So --

Q. So does Russell Ainsworth ring a bell?

A. It does, but also, you know -- yes, but

I don't know if he was there for that and if my memory is hazy.
Q. David Owens, is that who you think you might have interviewed with?
A. I think so, but again --
Q. Yeah.
A. -- you know, I don't -- I can't remember for sure.
Q. Who offered you the position?
A. I think Jon offered the position.
Q. Okay. Why did you turn it down?
A. There were -- no offense, but civil work is not for me, and litigation is not where I want to be and, you know, timing, culture. I have three kids at home.
Q. Sure.
A. And I think this -- I was considering, you know, this consulting work and other things, and at the time that seemed a better fit. So I turned it down and then -- you know, I turned down the part time and consulting and chose to go in a different direction.
Q. Sure, sure. What prompted you to decide to apply over there at Loevy's office?



A. I at the time -- what I remember is that I was making -- I was in that phase. I was early 40s, making calls, teaching online, Zoom, and not seeing like humans for the most part.
Q. Um-hum.
A. And so, you know, started calling like the legal network and talking to people and having that, you know, like exploration phase; what else is out there; what else could be relevant.
And I think at the time I talked to -- I don't remember. I think it was Josh, and he said there's a position coming up if you're interested, and so I thought it's not -- it's not a bad practice as I try to advise people to go through a couple of these processes to sort of figure out where you really want to end up. Academia seems to be a good fit.
Q. And you're talking -- when you say "Josh," you mean Josh Tepfer?
A. Yes.
Q. Do you maintain relationships like whether professionally or socially with anyone from Loevy & Loevy currently?
A. Not currently. Josh I knew from my



work at -- or from -- you know, we were colleagues at Northwestern.
Q. Sure.
A. I don't have any current relationship with him, but, you know, I -- I'd say hi and be friendly and I don't -- I haven't -- I don't think I've seen him in a while.
Q. I mean, would you have any reservations about calling Russell or Jon if you thought they could assist with one of your projects?
A. I don't know them like that.
Q. Okay.
A. I've never interacted with them in any meaningful sense, so I -- probably. I just don't know them like that.
Q. I am going to ask you what you did to prepare for today.
A. Sure.
Q. And I'll tell you you don't have to tell me what you talked about with your two lawyers here, but for everything else you will. So can you tell me what you did to prepare for today?
A. Other than talking to the lawyers? I didn't otherwise do anything to prepare for today.



Q. Did you review any materials?
A. I didn't.
Q. Not even the memo that you sent to Kim Foxx regarding Cordell Williams?
A. I didn't.
Q. Okay. How many meetings did you have with your lawyers?
A. Two -- no, wait. Three -- maybe three meetings. The first meeting was with Vincent and Marc and then another -- for the preparation I met separately with them, and then I think met briefly like on Zoom a couple days ago, and I talked to Amanda over the phone yesterday.
Q. Okay. So you mentioned, I think, three --
A. One, two, three, is that right? I think that's right.
Q. Okay. Let's focus on the first one. You said Marc and Vincent were part of it.
A. Um-hum.
Q. You have to say yes or no.
A. Yes. Sorry.
Q. And were your lawyers present for that meeting?

A. Yes.
Q. Okay. And how long did that meeting last?
A. I don't remember. It was over Zoom. I don't remember.
Q. More than an hour?
A. I don't remember.
Q. More than four hours?
A. I highly doubt it.
Q. More than two hours?
A. I don't remember.
Q. Okay. Ten minutes?
A. I don't -- I don't remember, but I assume longer than 10 minutes.
Q. What I'm trying to do is put boundaries on it.
A. Yeah. I don't remember. I assume longer than 10 minutes. I assume shorter than four hours but --
Q. More than a half hour?
A. I don't know, Pat. I don't --
Q. Okay. How about the next meeting you had with your attorneys? This would be -- I think you -- whenever that was, who would have been present?
A. To prepare for today, you mean?
Q. Yes.
A. My attorneys were present.
Q. Was that in person or via Zoom?
A. That one was in person.
Q. And where did it take place?
A. At their office.
Q. And how long did that meeting last?
A. This is a slight guess, but I'm trying to put boundaries for you here.
Q. That's all right. Do your best.
A. Between an hour and two.
Q. Okay. Did you look at any documents during that meeting?
A. Not that I remember.
Q. Okay. And there was a third meeting?
A. Yes, over Zoom with Amanda.
Q. Okay. And how long did the Zoom meeting with Amanda last?
A. It didn't feel very long but -- that's what I can say about it. It didn't feel very long.
Q. An hour?
A. Maybe half hour, hour.





Q. Okay. When was the meeting that took place with you, Vincent, Marc, and your attorneys?
A. I don't remember. It was after we received notice of deposition, you know. I think I spoke briefly with Lyle after receiving a note about it. I think I spoke briefly with Vincent, asked did you get notice of deposition, et cetera, Marc, and then right after -- it was maybe a week or two later. I'm trying to -- I don't -- maybe a week or two after that, so not too long ago but --
Q. How about the meeting that lasted at your attorneys' office for one to two hours, when was that approximately?
A. Maybe a couple weeks ago.
Q. How about the Zoom meeting with just you and Amanda?
A. That one is better -- that was a couple days ago.
Q. Okay. Have you ever spoken to Vincent or Marc outside the presence of your attorneys about giving a deposition in this case?
A. Vincent and I spoke briefly after we -- after I received notice or we received notice of the deposition over phone, and Marc and I also spoke.
Q. What did you discuss with Vince on the phone? Is it Vince or Vincent?
A. I call him Vincent.
Q. Okay. So what did you discuss with Vincent on the phone?
A. I don't remember all the details, but in essence did you get this notice of deposition, you know. This process seems to be going on, like -- I don't know. I don't remember much about this case, and other than that, like we're witness -- you know, I think I may have said something like we're witnesses. All we can do is show up and answer the questions truthfully. I don't -- there may have been more. I just don't remember anything sort of --
Q. Do you have an independent recollection of Cordell Williams?
A. Of like what he looks like or what do you mean?
Q. Anything about him or the work you did related to his case?
A. I really don't. I will say the only sort of like independent memory I have is something

about -- and I may be mixing up facts but of hot car.
Q. Okay.
A. And that's about it. Like that's the -- what sticks in my brain for some reason.
Q. Um-hum. Did you have concerns about coming to give a deposition today?
A. I think pretty typical concerns. I've never given a deposition before. I've, you know -- sure, I was nervous and --
Q. Okay.
A. -- not entirely looking forward to this.
Q. I'm curious why you didn't review even the report you did for Kim Foxx.
A. I just -- I didn't. I don't know.
Q. You don't know why?
A. I -- I -- I just didn't review the report.
Q. Do you have access to it?
A. I think so, yeah.
Q. Do you have access to it on like a computer where you could just pull it up and review it?



A. I think so.
Q. And is that a -- I mean access at either your work computer or personal at home?
A. I have access to it, I think, yeah.
Q. Okay. Do you have your whole file from the work you did?
A. I don't remember. I don't know.
Q. Okay. Did you maintain files from your work with the Working Group on your own personal computer or work computer?
A. Yes. I maintained files from the Working Group on my personal computer, and there may be a couple on the work one.
Q. Okay. Did you ever make an effort to delete those files after your work was completed?
A. Did I make an effort to delete those? I don't think so. I don't know if I like deleted downloads and stuff like that that were slowing it down. Is that what you mean? I don't --
Q. No. Just whether you decided, okay, I'm done with this case. We'll delete these files.
A. I don't think so.
Q. Okay. When you spoke with Marc or Vince outside the presence of your attorneys --



A. Um-hum.
Q. -- did you have any discussion about the facts underlying the Cordell Williams case?
A. I -- do you mean after receiving notice of deposition or like ever?
Q. Well --
A. I mean --
Q. Ever. I mean --
A. Yes, for sure --
Q. -- how about this? At some point --
A. -- what we did, yes.
Q. I'll make it easier for you. At some point you got a subpoena from my office asking for documents, right?
A. Yeah.
Q. Okay. And that would have been your first notice that there was --
A. Yeah.
Q. -- we were -- at least -- the defendants in the lawsuit were looking at members of the Working Group for information?
A. Yes.
Q. Okay. And prior to getting that subpoena, did you know that Cordell Williams had



filed a lawsuit against the detectives who investigated him for murder?
A. Not that I remember.
Q. Okay. So that would have been your first notice that a lawsuit even existed?
A. I think so.
Q. Okay. So from the point you received that subpoena through today's date, did you have any conversations with Marc or Vincent outside the presence of your lawyers about the subpoenas or giving a deposition or what information we might be looking for?
A. I think we did have conversations. I don't remember sort of the gist of those conversations.
Q. Is there anything you can remember about the conversations?
A. I don't remember specifics. I mean, I think I -- you know, again, this is a bit of a guess, but I think Vincent -- I remember somebody said I don't remember much about the case or, you know, this is a long process. I don't remember.
Q. Did Vincent or Marc -- and we are talking about Vincent Southerland and Marc Kadish,

right?
A. Um-hum, yes.
Q. Did Vincent or Marc mention to you in any of these communications that they had reviewed the materials and, you know, had some thoughts about the materials?
A. I don't remember.
Q. Before you had the attorneys you have now, did you consider any of the attorneys at the Cook County State's Attorney's Office your attorney for purposes of responding to the subpoena?
A. I think Lyle Henretty and his group of people.
Q. Okay. Have you spoken to anybody outside of Marc Kadish and Vincent Southerland about Cordell Williams since you first got a subpoena from our office?
A. The deposition subpoena?
Q. Either subpoena.
A. I mean, I may have.
Q. Who did you talk to?
A. I can't -- I don't know. I may have talked to like friends, or I talked to Risa Lanier and said got the subpoena. I may have mentioned,



you know, I have gotten a subpoena.
I have never been through a process like this before. I don't -- you know --
Q. Do you know Kim Foxx personally?
A. I think I've met her a couple of times. I don't know if I would call that like personal relationship.
Q. Have you ever socialized with her, like gone out to dinner?
A. I have not gone out to dinner with Kim Foxx, no.
Q. Or did you ever just -- do you have her phone number in your contact list, her cell phone number?
A. Not that I know of.
Q. Do you have Risa's phone number?
A. Her like cell phone number?
Q. Yes.
A. I think -- I think when this work ended, Risa may have given us her contact -- her personal contact information. I don't know if I put it in the cell phone.
Q. It sounds like I think you mentioned just now -- tell me if I'm wrong -- that you did



speak with Risa after you got a subpoena?
A. Yes.
Q. Okay.
A. I remember doing that.
Q. And that's Risa Lanier, right?
A. Yes, yes.
Q. Okay. Was she still with the state's attorney's office when you talked to her?
A. Yes.
Q. Okay. And what did you discuss with her?
A. That I received the subpoena, I think, to the best of my recollection. I don't remember what, if anything, else I talked with her about.
Q. In any conversations you had with anyone we've been discussing outside the presence of your lawyers, did you talk about what to expect at this deposition?
A. I may have. I just don't remember like specific conversations. I may have.
Q. Like what kind of subjects?
A. I -- you know, what -- what kind of subjects. Generally, maybe like what to expect or length of time. I don't know, you know -- I just



don't remember. I'm sorry.
Q. Okay.
A. I don't remember.
Q. How about this? Do you have any concerns that during the deposition I'm going to go through your report and try and pick it apart?
A. Do I have concerns about that?
Q. Yeah.
A. I -- I -- I -- now sitting here I don't have concerns about it but --
Q. Did you?
A. Did I? I -- I -- I don't know. I just haven't like thought directly about that.
Q. Okay.
A. Sorry.
Q. Do you feel that you're close enough to Kim Foxx to be able to, when she was a state's attorney, email her directly and ask for help with any of your cases?
A. I would not characterize it as close enough with Kim Foxx, and I want to be careful about like attorney-client privilege. I do think that there was a -- I'm a little bit hazy on this, but there was a case where I think a supervisor or

another supervisor or something offered to have my colleagues and I meet with Ms. Foxx to discuss something related to it.

Q. Now, if you emailed Kim Foxx, that wouldn't be privileged? You as the defense attorney emailing Kim Foxx, the state's attorney, you would agree that's not a privileged communication, right?

A. I don't know. I can't -- I don't know that I can answer that. I don't know. If it's --

Q. How --

A. Privilege -- there may be attorney-client privileges there, so I don't know.

Q. How would --

A. And I don't know if I directly emailed but so --

Q. Okay. Well, I guess the first question is did you ever when you were a criminal defense attorney, acting as a criminal defense attorney, email Kim Foxx directly to request her assistance in the resolution of a case for one of your clients?

A. I don't remember and don't know if I personally emailed Kim Foxx asking about a



particular case.

Q. Okay. If that email had occurred, you have a concern as you sit here today that there could be -- that communication could be privileged?

A. I don't know.

Q. Tell me how the attorney-client privilege could apply to protect a communication between the defense attorney and the state's attorney.

A. I mean, I think if I was relaying information about my client, I think I would assert privilege.

Q. If you give the prosecutor information from your client, wouldn't that waive the privilege?

A. I don't -- I don't know. I --

Q. Okay. No, that's fair.

A. I really don't know.

Q. That's fair.

A. Yeah.

Q. Do you know how many -- strike that.

The state's attorney's office provided us with lots of documents from the Working Group and things of that nature. One of them is an



email from you to Kim Foxx. I can pull it out if you want. I didn't anticipate we'd need it today, but my question to you is this: If that email exists between you and Kim Foxx, as I've described it --

A. Um-hum.

Q. -- asking for help with resolving a case of one of your clients, do you have any reason as you sit here today to dispute that that happened?

A. I don't.

Q. All right. And since -- and during the time that Kim Foxx was state's attorney, do you have a memory of ever calling her directly?

A. I don't have a memory of calling her directly. I think -- and this is hazy, but it's been some years. My recollection is there was -- maybe there was a call or a Zoom or some meeting to discuss that case maybe, but I don't have a memory of calling her directly but I -- I don't have that memory, no.

Q. When you say "that case" --

A. The case that, you know --

Q. The one I just mentioned --



A. Yes.

Q. -- in the email?

A. Yes.

Q. Okay. So you have a -- do you have a memory of that email communication now?

A. I don't.

Q. Do you have a memory of that case?

A. Again, I mean, I told you -- I described what I remember. There may have been a case or -- that's the best of my memory, like independent recollection right now.

Q. Do you know Peter Neufeld?

A. Do I know him? Through the work of the Working Group, I've gotten to know him a bit, sure.

Q. Did you know him before you became a member of the Working Group?

A. I did not. I mean, before -- like in the lead up to it --

Q. Sure.

A. -- when he reached out, but, no, I did not.

Q. Do you know how it is that your name came up as a potential candidate for the Working Group?

A. I'm not exactly sure. I don't remember.
Q. Do you know who may have recommended you?
A. I don't know for sure. Like independently right now sitting here today, I don't.
Q. When's the last time you had a direct communication with Risa Lanier?
A. With Risa Lanier?
Q. Whether by phone or Zoom or face to face.
A. I think it was shortly after this -- you know, I want to say November or December of last year, but it may have been -- I want to say November or December of last year.
Q. Does the Working Group still exist?
A. Does it still exist? Not that I know of, no.
Q. Was it disbanded?
A. I -- I think -- I mean, I'm not doing any work on any cases. That's what I can say. I don't know if there's some other permutation of it. I don't know.



Q. Were you informed at some point to stop working as a Working Group member?
A. Yes.
Q. Who informed you?
A. I don't remember that person's name. Somebody from the state's attorney's office but also our -- yeah, I think.
Q. Let me ask you something. You were a member of the Working Group from maybe mid 2021 until November of 2024. Does that sound right?
A. I think that's about right.
Q. Okay. And you made recommendations in eight cases, seven or eight cases?
A. I won't remember the exact number.
Q. Does that sound approximately correct?
A. I don't remember. Ballpark figure? I just don't remember.
Q. Did you consider your work for the Working Group to be important work?
A. Sure.
Q. Work that you're proud of?
A. Work that -- you know, we took a lot of time and made a lot of effort and, you know, were considered -- was considered, yes.



Q. And many of the recommendations you made to Kim Foxx were made in the interest of justice, right?
A. In some instances and the -- my sort of understanding of it was the recommendation would go to Risa Lanier and Thor, and they would conduct a review. That's my understanding and then whatever recommendations were then made.
Q. Okay.
A. But I don't know if I -- I don't know if I'd characterize it as many.
Q. Let's focus on the justice part.
A. Okay.
Q. Okay? So what I'm getting at is the work you were doing --
A. Um-hum.
Q. -- was in the interest of justice, right?
A. That was one of a possible set of recommendations.
Q. One was you could recommend the conviction would be vacated based on actual innocence?
A. That's correct.



Q. Okay. Certainly that would be in the interest of justice, right, if someone -- an innocent person is in prison. Getting that person out is justice; wouldn't you agree?
A. If -- I mean, I think it is wrong to hold someone who is innocent in prison, sure.
Q. Right. It's morally wrong, right?
A. I think so, yeah.
Q. There are few things more important in life than getting innocent people out of prison. Wouldn't you agree with me?
A. I don't -- I mean, it's again not -- I think that it is important for a criminal justice system not to imprison innocent people, yes. I'd agree with that.
Q. The work you were doing was having a direct impact on the lives of people potentially that you thought were innocent and shouldn't be in prison?
A. I -- that's not how I would characterize it. I would characterize our work as conducting an independent review, an audit, providing nonbinding recommendations or --
Q. Okay.

A. -- opinions, advisory opinions to a second set of eyes who would then provide their own sort of nonbinding recommendations. That's how I would characterize it.

Q. Okay. And the second choice you had was vacating a conviction based on the interest of justice?

A. Yes.

Q. Okay. And justice is in the phrase, right? That is justice?

A. I'd agree with you. Justice is in the phrase.

Q. Okay. How do you define justice?

A. How do I personally define justice?

Q. Yeah.

A. Oh, I don't know that I could personally define justice. Fairness, you know, equities, sort of a rule of law as part of it. I don't know that I have a good definition for justice sitting here today.

Q. Okay. I'm just trying to get a gauge for how important you viewed this work given that you did accomplish, at least from what your memos to the state's attorney's office said, getting



certain people out of their convictions and out of prison based on what you thought was the interest of justice. Didn't you find that work important?

A. I think that the work is important, and it's important to conduct work like this. I don't believe that I'd characterize the work as sort of a direct line of getting people out, but I do think -- if the question is is this work important, yes, the work is important.

Q. Well, I mean if someone is in prison and they shouldn't be there and your work leads directly to that person getting out, for that person it's a life-changing event, right?

A. Again, the work of conducting an independent review, I think, is important. Ultimately, as I understood it, continue to understand it, the decision rests with other individuals in the state's attorney's office.

Q. You're answering a different question.

A. Okay. I mean, I don't -- I guess I -- if you're asking me if the work is important, the work is important.

Q. Okay. Well, no. Really the question is your work led directly to a life-changing event



for people that were released from prison?

A. I don't know that that's how I'd characterize it again, that it led directly to a life-changing event. I don't -- I don't know that's how I would -- I would not characterize it in that way. I just -- I agree that the work is really important.

Q. Really? You wouldn't say it's life changing to get out of prison?

A. It is life changing to get out of prison but you -- I'm really not trying to quibble with you, Pat. I'm not drawing a through line here between did my work lead directly. I think there are a lot of factors, and I just --

Q. Well, of course there's --

A. -- don't want to make it like a reductionist, A caused B. That's all I'm saying.

Q. No, no, no. I am not suggesting that at all.

A. Yeah. That's all.

Q. You and a group of people did an investigation, and you looked at all these different factors and conducted an analysis, applied standards, came to a conclusion --



A. Um-hum.

Q. -- and you did a lot of hard work, right?

A. That's right.

Q. Okay. And the fact of the matter is that work led to certain people being released from prison, right?

A. I -- this is the part that I don't know because I actually don't know what happened -- you know, how Risa and Thor, for instance, looked at the cases or what recommendations or what bases their recommendations were made on. I don't know ultimately how former State's Attorney Foxx looked at the cases and what the recommendations were based on. That's the part -- I just don't know. I can't answer that.

Q. Did you ever talk to Kim Foxx about any of your work with the Working Group?

A. I don't remember talking to Kim Foxx about any of my work with the group, Working Group.

Q. Okay. Did you ever get an email from Risa regarding Cordell Williams in which she said that State's Attorney Foxx agrees with your recommendation --

A. I --
Q. -- and is going to vacate the conviction?
A. I may have, yeah.
Q. Okay. That would suggest she agrees with whatever it is you wrote, right?
A. I don't know if she -- again, the recommendation is different than I think the reasons for it.
Q. Okay. Okay. So the reason I was asking about how important you view the work is do you remember -- I mean, you seem to not remember a lot of things about it, and I'm curious how much you do remember given that you view it as important work.
A. Remember about what?
Q. Your work with the Working Group.
A. I don't -- I think I don't -- can you rephrase the question?
Q. Sure. I have been asking you certain questions about the Working Group and what you did, and it seems like you have a hazy memory of a lot of this stuff.
A. About the specific facts, the details,



et cetera, sure. If you're -- I -- so what do I remember about what?
Q. Well, tell me, does any case stand out in your mind that you reviewed for the Working Group?
A. I don't -- you know, the -- there were a lot of documents in these cases, and a lot of the facts start to blur together.
Q. Sure.
A. And that's why I don't -- I don't have an independent recollection of one particular case and how that particular case stands out compared to the others if you're asking me about cases specifically.
Q. Just whether any -- any cases stand out for any reason at all.
A. I don't -- not a particular case.
Q. Okay. Do you maintain any social networking pages, like Facebook or any other ones?
A. God, I hope not. I don't think so.
Q. Okay. I take it you're not active on social networking?
A. I don't think so, no, no.
Q. So no Facebook page or whatever?



A. I hope not. If there is one, I don't -- I mean --
Q. Okay. Have you talked to Risa Lanier since November of 2024?
A. Again, I'm not sure if it was November or December of 2024. I just don't remember when that last meeting was.
Q. Yeah.
A. But, no, I don't remember talking to Risa Lanier since then.
Q. She's out of government work now, right?
A. I think so, yeah.
Q. Okay. Have you talked to her since she's been out of government work?
A. Not that I remember, no.
Q. Okay. How often do you communicate with Vincent Southerland?
A. You know, I talk to him a few times, like periodically. I have met him for lunch when he was in town.
Q. How about Marc Kadish, how often do you communicate with Marc Kadish?
A. Periodically as well, every couple



months --
Q. Meet for lunch or just --
A. -- maybe more. I haven't met him for lunch, although I keep meaning to.
Q. Okay.
A. Yeah. I'd like to.
Q. For your Working Group work, you were appointed as a special assistant state's attorney?
A. Yes.
Q. Okay. What do you understand that to mean?
A. I understood it to mean essentially providing -- conducting an independent investigation of certain cases and conducting both a factual and a pattern and practice investigation and then making -- essentially providing counsel to a second reviewing unit, making the nonbinding recommendation based on that independent investigation and it would -- sorry. You go ahead. You look like you want to ask something.
Q. Well, you can finish. Go ahead. Do you have anything else --
A. I think that --
Q. Who is this -- who were you making

consultation to?
A. Well, that's what I -- to the other sort of -- the reviewers, Risa Lanier, Thor, and then ultimately Kim Foxx.
Q. Okay. Did you have to swear an oath to become an assistant state's attorney --
A. Not that I remember.
Q. -- a special assistant?
A. Not that I remember.
Q. Did you have to sign anything?
A. I may have signed a confidentiality agreement, I think.
Q. Okay. And you were able to hold yourself out as a special assistant state's attorney when investigating the case, like communicating with other entities?
A. Yes.
Q. Did you use any law students in your work with the Working Group?
A. I did not use any of my law students. I believe we did have some of Vincent's law students who worked on the Working Group. Also we had law students assigned to us as part of the state's attorney like clerkship program or law



student, you know --
Q. I understand.
A. -- program.
Q. I just meant Loyola law students that were --
A. Oh, I'm sorry. Okay.
Q. Sorry. I should have been more clear.
A. Not that I remember, no.
Q. So Loyola law students would not have been involved in your work with the Working Group?
A. Not that I remember, no.
Q. Okay. Who approached you first about working with the Working Group?
A. I think it was Peter Neufeld.
Q. And what did he tell you?
A. To the best of my recollection, I think he laid out that there was this possibility of putting together an independent investigation or group of people to review Working Group cases -- or not Working Group cases, sorry. We weren't using the Working Group back then. To review cases involving certain detectives that had engaged in -- or that had come out of maybe the Englewood case and that this would be done in conjunction with the



state's attorney's office and that this would be sort of an independent audit of case reviews. That's sort of to the best of my recollection.
Q. Did Peter Neufeld explain to you why there was a need for a Working Group as opposed to utilizing the Conviction Integrity Unit?
A. I'm sure he did. I don't remember the exact details. It might have come out of the work -- I -- I think it came out of Englewood.
Q. You mean the Englewood Four case?
A. Yes, and to the best of my ability, I think Peter Neufeld and maybe lawyers at the state's attorney's office had agreed to conduct sort of an independent audit. Why not use a CI -- I wasn't -- he may have said it, and I just don't have a specific memory. I don't remember if there's a conflict or not. I don't know.
Q. If you don't know, it's okay to just say you don't know.
A. Yeah. I don't know why they -- that was sort of before like --
Q. Okay. Was it your understanding that the Working Group was created out of the settlement -- the County settlement of the



Englewood Four lawsuits?
A. It was never entirely clear to me why or how it was exactly created, but it was always my understanding that it had something to do with the Englewood Four.
Q. The settlement of the Englewood Four lawsuit?
A. Or the Englewood Four case.
Q. Have you ever seen a settlement agreement or document regarding Englewood Four?
A. I don't think I've ever seen a settlement agreement, but if it's among all the papers we had, I don't know. I -- I -- I think I've seen a memo about Englewood Four case, but I don't know if that's what you're talking about.
Q. Did Peter Neufeld tell you that the state's attorney or he felt that there was a conflict with the Conviction Integrity Unit reviewing cases involving these detectives?
A. I'm not sure.
Q. Okay. As far as -- as you sit here today, you are not aware of any -- why the Conviction Integrity Unit was not involved in the review of the cases that the Working Group ended up

reviewing?
A. I mean, I really don't have sort of a good sense of why. I may have been aware at some point, or I may have been told, but I don't -- I still don't really know why, no.
Q. Sure. Okay. So approximately when did Peter Neufeld contact you about working on the Working Group?
A. Gosh, I want to say 2021.
Q. And what was the -- after you had this discussion with him --
A. Um-hum.
Q. -- what was the next step?
A. I think -- again, he was going to explore -- the initial step was is this something you'd consider, and I said I would. I would want to know more about it. I don't, you know -- I wasn't familiar with a process like this. So he was going to explore whether this was -- what was going to happen, whether this was going to actually happen or not. So the next step was to continue communications maybe.
Q. Okay. At some point you agreed to be part of the Working Group?



A. At some point I did, yeah.
Q. Did you speak with anyone else besides Peter Neufeld before you agreed to become part of the Working Group --
A. I'm sure --
Q. -- about joining the Working Group?
A. Yes, I'm sure I did.
Q. Who else would you --
A. I wouldn't have -- I think I talked to Marc Kadish to say is this, you know -- I didn't know much about this process. I was unsure about it frankly.
Q. Did you know Marc Kadish prior to the Working Group?
A. You know, I think I may have met him through the course of one of these interviews that I've been describing for part of the research, but other than that, I don't remember meeting Marc --
Q. Okay.
A. -- before the Working Group, and if I did, I don't -- I certainly didn't know him well.
Q. Did you know Vincent Southerland before you joined the Working Group?
A. I did, although I didn't quite remember



it at the time, but he was a Georgetown Prettyman fellow, I think, at the same time as I was in the DC Public Defender Service and our like social -- you know, it's a small world in DC. Like socially I think we all see each other at parties or whatever.
Q. Okay. Did Vincent Southerland make any phone calls or communications with you or have any communications with you about you joining the Working Group?
A. I'm sure.
Q. Okay.
A. I'm sure I talked to Vincent. I'm sure I talked to Marc. I'm sure I -- I mean, I may have talked to others about it.
Q. Okay.
A. I don't have a specific recollection of who or when or --
Q. All right. I had asked you about when the Working Group was disbanded and how you were informed.
A. Um-hum.
Q. Do you remember? Who informed you again?



A. I don't remember -- the formal -- my understanding is we really stopped doing any work on the cases sometime in November, I think, of 2024, but I don't remember the person who sent a letter from the state's attorney's office.
Q. That would have coincided with Kim Foxx stepping down as state's attorney and a new state's attorney taking over?
A. I think that's right, yeah.
Q. Okay. Was the Working Group to your knowledge disbanded because Kim Foxx was leaving office?
A. I don't know.
Q. Why not keep the Working Group?
A. I don't know.
Q. Did you ask why are you guys disbanding this? We've got a lot of work to do?
A. I don't know that I asked that question.
Q. Why not?
A. I don't know. I mean, I just -- these were decisions that were made -- like not my lane. I don't know.
Q. Okay. Well, I mean before the Working

Group -- before you learned that the Working Group was going to be dissolved or disbanded, you had active cases you were investigating, right?
A. There were certainly a number of cases left, yes.
Q. Okay. And did you want to complete those investigations?
A. You know, I think the work is important. I think that -- I would have certainly thought about it if asked. I also was looking forward to having a little bit of time back.
Q. Okay. By the way, the Working Group, the group itself --
A. Um-hum.
Q. -- did it ever consider expanding the group to include other investigators, people like yourself who were reviewing the cases to sort of accomplish more?
A. I don't know about accomplishing more, but I think we may have thought about that.
Q. Yeah.
A. Just, you know, to -- we were resource constrained is probably the best way to put it, and there was a lot of material, and so I think we



certainly thought about that or talked about it. It's -- you know, in hindsight I think we definitely talked about it. We didn't expand it but --
Q. Did you ever ask Risa Lanier why the Working Group is being -- well, strike that.
Did you ever ask her why not continue the Working Group?
A. I don't remember asking her that question.
Q. I know.
A. But I don't know if -- I mean, you asked me if --
Q. Let me ask you this. Even if it's --
A. I don't think that was part of the -- yeah.
Q. Even if it's outside your lane --
A. Yeah.
Q. -- why not ask the question?
A. I just -- I don't know. I mean, this was sort of a -- a project that at least as I initially conceived it was not, you know, meant to last forever, I mean. So I don't know why sitting here today I didn't ask that question, but



obviously it wasn't something that I asked, I don't think.
Q. What became of the cases that you were reviewing at the time you were informed that the Working Group was going to be disbanded?
A. I -- what became of them? I'm not sure.
Q. Do you know, for example, whether those cases were transferred to the Conviction Integrity Unit?
A. Oh, I -- I don't know.
Q. Okay. Do you know whether anybody continued to investigate those cases from the state's attorney's office?
A. From the state's attorney's office? I don't know.
Q. Okay. In those cases that you had pending at the time you were told that the Conviction Integrity Unit --
A. Um-hum.
Q. -- was going to be disbanded, had you already made contact with the defendants in those cases or their attorneys to let them know that the Working Group was investigating and wanted to



collect information?
A. We may have, yes. You mean cases that were still -- like we were still undertaking or potentially going to start an investigation?
Q. Or ones that were ongoing at the time.
A. I think -- you know, I think we may have, yeah. Made contact now with the -- I don't remember making contact with the defendants in those cases. I remember, I think, making contact with like the defense attorneys.
Q. Yeah, right. That would be more likely, right?
A. Yes. Saying, you know, we're going to, you know, undertake this investigation.
Q. Okay. At the time the Working Group was disbanded --
A. Um-hum.
Q. -- did you have any concerns about the Conviction Integrity Unit taking over?
A. I don't think I did.
Q. Okay. If you had those kinds of concerns, would you have voiced them to Risa?
A. Maybe, but again I don't know that -- if I had them, I also might have just kept them to

myself in this instance. Like I don't think I did have concerns but --
Q. Or --
A. You mean because they were overburdened, or what do you mean?
Q. For any reason, if you had a concern about the Conviction Integrity Unit working on any case that you had started with the Working Group for any reason at all.
A. I don't remember voicing those concerns.
Q. And if you had those types of concerns, would you have discussed them with Marc Kadish and Vincent Southerland?
A. Maybe, yeah.
Q. Okay. To discuss what to do about it?
A. Sure, if we had those concerns or if I had those concerns. I don't -- as I sit here today, I don't remember --
Q. Okay.
A. -- having those conversations or having those concerns, but it's possible.
Q. For example, if you had a concern that the -- for a particular case that the Conviction



Integrity Unit might have a conflict in investigating it, do you have a recollection of that kind of concern?
A. I don't have a recollection of that kind of concern, no.
Q. I think I may have asked you in one way or another, but I'm going to try it again if I -- just to be sure I did ask you.
Why was the Working Group created?
A. Pat, as I sit here today, I really -- I don't know precisely why. I don't want to guess.
Q. Did the Working Group have a mandate?
A. As I viewed it, the Working Group was to conduct an independent investigation of the facts of an individual case and also patterns and practice as they relate to detectives involved in that case and to provide sort of again a nonbinding analysis or recommendation or advisory opinion based on that review.
Q. Okay.
A. And --
Q. Did you --
A. Oh, sorry.
Q. Go ahead.



A. No, I -- you know, and then, you know, provide one of three, no action, et cetera, the buckets we've talked about.
Q. Those three buckets?
A. Yeah.
Q. Could you make a recommendation outside of those three buckets?
A. You know, I didn't assume so, but I suppose we could have. I just -- I never -- I didn't assume we could, but I suppose we could have. I don't --
Q. Do you remember the Carl Manns case?
A. The name is definitely familiar, and again I think it was one of our early cases.
Q. Did the Working Group recommend in the Carl Manns case that if the conviction was not going to be vacated, he should receive clemency because of his health condition?
A. I don't remember recommending that. I don't remember making a recommendation -- I personally don't remember making a recommendation outside of those three buckets.
Q. Okay. Tell me, how do you define mandate? You said you personally would consider it



a mandate to do these things. How do you define the word mandate?
A. Just our guidelines, our sort of marching orders.
Q. Okay. And did you consider yourself -- as part of the mandate, the requirement was to be impartial?
A. Yes.
Q. And that's true with the investigation of the facts related to the case and the pattern and practice evidence?
A. Yes.
Q. Okay. Define impartial.
A. Sort of neutral investigators, fair, a review -- a fair review of the facts in the case, you know, after undertaking some information.
Q. Balanced, fair and balanced?
A. I think a fair and -- I would say, you know, neutral review of --
Q. Okay.
A. Like let the facts and the information sort of lead the recommendation.
Q. And you were -- was it part of the mandate to do a case-by-case analysis?

A. I don't know if that was part of -- when you say "mandate," let me just ask you -- like I don't know if those were the orders given to us as part of a guidelines, a case-by-case analysis. I -- we did do -- we did do a case-by-case analysis.
Q. Did the Working Group -- was the Working Group given discretion to help write the policies and procedures and guidelines that would govern its work?
A. The guidelines I believe were given to us, so that we were not involved in the creation of the guidelines. The protocol we developed as part of sort of a discretionary --
Q. Did you have any role in writing the protocol for a determination of innocence, vacating the conviction based on innocence?
A. I believe those came from -- that came from the guidelines is my --
Q. How about --
A. You mean like how -- what level of review -- you mean like substantial probability equals actual -- is that what you're talking about?
Q. Sure.



A. I think that came from the guidelines.
Q. Okay.
A. But I don't know if I've answered -- I don't know if we had the discretion to rewrite them. I don't know.
Q. Did you ever -- do you have any recollection of preparing any sort of guidance for the Working Group in how it reviews cases and what evidence it will consider, things of that nature?
A. Yes. I think that was part of the work we undertook initially as part of the protocol.
Q. Now, for someone who is a criminal defendant who has already been convicted --
A. Yes.
Q. -- one of the options to get relief is to file a post-conviction petition or an appeal, right?
A. Yes.
Q. Okay. And there's rules that govern those?
A. Yes.
Q. By statute?
A. Yes.
Q. Or case law?



A. Yes.
Q. Things like waiver could apply to arguments that were not raised in the lower courts?
A. Sure, procedural waiver, et cetera.
Q. Yeah. Another option for a criminal defendant who believes misconduct played a role would be to ask the Torture Inquiry Relief Commission or TIRC to review the case, make a recommendation?
A. Yes, I think that is an option. I don't know if it's an option for all defendants, but my understanding is it could be an option or it was.
Q. Another option for a criminal defendant would be to ask the Conviction Integrity Unit at the state's attorney's office to review the case and, if warranted, award relief -- or recommend relief, I should say?
A. Sorry. Ask the Conviction Integrity Unit --
Q. Yeah.
A. -- to review the case? Yes, I think that's an option.
Q. Okay. So you would potentially -- the



Working Group would potentially be a fourth option provided the case fell within the parameters of the Working Group?
A. I think that's right.
Q. Okay. And you understood that there were certain parameters for the Working Group -- for a case to be reviewed by the Working Group, right?
A. Generally speaking, yes.
Q. Okay. It had to -- the case had to involve one of seven detectives who investigated?
A. Initially that's -- that was my understanding, although I will say that I think it -- it -- we thought it was -- we thought of it or we investigated cases more holistically than that. In other words, if it involved a partner of one of the detectives, et cetera, some of the Area 1 folks, that was part of it, but we were, you know -- that was sort of the geographical --
Q. Did the Working Group have authority or discretion to expand the scope of its review?
A. Authority is --
Q. When I say "expand" --
A. I'm sorry.

Q. Let me just make sure you understand what I'm saying.
A. Yeah.
Q. Expand the scope of the types of cases it would review, in other words, not just one of these seven detectives or maybe a different type of crime, et cetera.
A. You know, I don't know about a different kind of crime, but I think we thought we had discretion beyond one of the seven detectives if we happened -- if we had a case and it involved, as I just said, say, a partner or a -- you know, part of this Area 1.
Q. Um-hum. So were all the detectives in Area 1 -- were cases that went through Area 1 -- any one of those cases could have been reviewed by the Working Group?
A. I don't think that's a fair characterization. I think it had to -- I -- as far as I know, the cases we reviewed either involved one of the seven detectives or people closely connected to one of the seven detectives.
Q. What does close --
A. But I don't -- yeah.



Q. What does it mean to be closely connected to one of the seven detectives?
A. As I just said, I think in my mind it was like a partner of one of the detectives even if --
Q. Okay. Anything besides a partner?
A. I -- I don't know. I'm not sure.
Q. Would you -- would it be fair to say that the Working Group was investigating the seven detectives?
A. I don't -- I don't think that's how I would think of it. I think the Working Group was conducting sort of two parallel investigations. One was in the facts of the case, and the other was on what I sort of characterize as pattern and practice of the detectives involved in these cases.
Q. As of 2021 when you became involved with the Working Group, were you aware of allegations of abuse coming out of Area 1?
A. As of 2021? I don't think I'd ever focused on it before I became involved. It just wasn't something that I really paid attention to.
Q. Were you aware that there were allegations of abuse coming out of Area 1?



A. I may have been but not something that sort of sticks in my mind.
Q. Were you aware that pattern and practice evidence regarding police misconduct was something that courts would potentially consider before you joined the Working Group?
A. I don't think I was aware of that.
Q. Tell me, what is pattern and practice evidence?
A. I think it's a multifaceted sort of incidence of, you know, behavior, coercion, psychological manipulation, et cetera, in these instances that you see, you know, over time or among different -- it's not like a one-off is the way I'd describe it.
Q. Okay. What's the purpose of using pattern and practice evidence in any given case?
A. I mean, with respect to the Working Group's work or in general?
Q. Well --
A. I don't know --
Q. Maybe this is a good clarification for you. Pattern and practice is a specific legal term, right? Is that your understanding?



A. Yes.
Q. Okay. There's actually a rule that governs this sort of evidence called Rule 404(b). Did you know that?
A. I -- yes. I mean, that sounds right. I don't know right now. Yes, like an MO, et cetera.
Q. Have you ever reviewed Illinois Rule of Evidence 404(b)?
A. I'm sure I have but --
Q. As part of your work --
A. -- not recently, no.
Q. As part of your work with the Working Group?
A. I don't think I reviewed it as part of my -- it may have been in cases, but, no, I don't think I reviewed it as part of my work for the Working Group.
Q. Have you ever reviewed Federal Rule of Evidence 404(b)?
A. I'm sure I have --
Q. Okay.
A. -- in the course of, you know, my work in the past but --

Q. These rules govern the use of other misconduct evidence in any given case, right?
A. Sure, yes.
Q. Okay. And pattern and practice would be one of the types of misconduct, other misconduct evidence that you may be able to use, right?
A. Sure, yes.
Q. Okay. What is the point in any given case of relying on pattern and practice evidence? And I want you to draw on all of your experience as both a criminal law professor and a criminal defense attorney.
A. I mean, the point is not to -- you know, the point is essentially a modus operandi or to allow sort of other character evidence that would not be suggestive of guilt in any particular case, but to sort of -- when there is MO or some other identity evidence, et cetera, that kind of evidence can help inform -- support some of the arguments.
Q. How specific does the pattern and practice have to be to be useful?
A. I mean, I think there are different -- I don't -- I think specific enough so that it can



help either identify the person or the pattern, the kind of pattern, but I think it's case dependent.
Q. Um-hum. So someone who is accused of various types of misconduct over a number of --
A. Yeah.
Q. -- years like one of these detectives --
A. Um-hum.
Q. -- can all of that misconduct be lumped together to say, well, there's a pattern here?
A. I think it depends on sort of the timing of the allegations, the kind of misconduct alleged, the people alleging it. There's, you know, a number of different factors that -- the timing of when the allegations occurred.
Q. How does the timing help?
A. I think if there's an allegation in 1970 and there's not another one until 1990, you know, I think it would be challenging to say that that's a pattern.
Q. Okay. What other factors do you consider besides timing?
A. Well, I just named a few, you know, where, how it took place, whether there's



similar --
Q. Like a specific type of conduct?
A. The specific kind of conduct, yeah.
Q. Okay. So, for example, if a detective is accused of not doing anything and watching another detective physically abuse somebody, and then a year later that same detective who watched is accused of actually abusing somebody, is that similar enough by -- using, I mean, physical abuse, for that detective -- where these are allegations that are not proven, but in one instance the detective has watched -- is accused of watching physical abuse, and in the other the detective is accused of committing physical abuse? Could those be lumped together to establish a pattern?
A. I think it depends if there are other allegations of, you know, watching and not doing anything and engaging in either, you know -- what we'll call abuse.
Q. At what point in -- the Working Group reached a conclusion about pattern and practice evidence with respect to Area 1 detectives?
A. At what point?
Q. No. I'm sorry. I started a new



question. I should have clarified.
Did the Working Group reach a conclusion at some point regarding pattern and practice in certain detectives from Area 1?
A. I think it was an evolving conclusion. I think that there were certainly patterns that we reviewed that sort of evolved over time and in the course of conducting the investigation.
Q. Do you recognize or do you agree with me that in the cases you reviewed, the claimants could have been lying about the abuse?
A. I think that's certainly a possibility.
Q. Okay. How do you as an investigator reconcile the potential for a claimant who is lying about abuse with unproven allegations of abuse and apply it to your review of the case?
A. I think that it -- I think this is why precisely it's important to conduct both the factual allegation, just speaking for myself, and pattern and practice investigation rather than rely solely or exclusively or even entirely on pattern and practice.
Q. Did the Working Group make credibility determinations regarding allegations of abuse?

A. I think that we may have, yes.
Q. Did the Working Group make credibility determinations about the detectives that were -- who were part of any case you investigated?
A. I don't know if we made determinative credibility determinations but we -- I think it would be fair to say that we reached some conclusions or stated our reasons maybe is the better way to put it with respect to, you know, where there was an allegation and where the detectives' testimony contradicted that allegation.
Q. Do you know whether the detectives that were part of the Working Group investigation had ever denied committing the abuse?
A. I think in -- yes. I think we had transcripts and other materials, suppression hearings, et cetera, where they denied it.
Q. Okay. Did you review those transcripts?
A. Yes.
Q. Did you draw conclusions, credibility determinations based on the review of those transcripts as to those denials?
A. I don't know -- again, I don't -- I



would not phrase it as credibility determinations, but we certainly considered those and reached our reasons based on multiple factors in each case.
Q. Well, in Cordell Williams I think you wrote into your report that, simply put, you believe Cordell Williams, right?
A. I don't remember exactly what I wrote in the report --
Q. All right.
A. -- or what we wrote in the report but we --
Q. Well --
A. You're asking about credibility allegations with respect to the detectives.
Q. Well, that's my point. If you believe Cordell Williams --
A. Yeah.
Q. -- and Detective O'Brien is denying that he did any of this stuff --
A. Right.
Q. -- aren't you drawing a credibility determination as to both Cordell Williams' allegations and the denial by Detective O'Brien?
A. I think -- again, I don't remember



exactly how it was phrased in the report, but I believe we credited his -- we did credit Mr. Williams' allegations.
Q. Did you or any other member of the Working Group do any legal research to establish standards of review or standards that should be applied in your review of the cases?
A. I think we did. I think I tried to. I think we did. We certainly discussed it and -- for long periods of time.
Q. Tell me any of the authoritative sources you looked at for these standards.
A. Again, I won't remember all of it, but I think we looked at case law, and I won't remember the names of the cases, to try to better understand how and what to apply in making these reviewing decisions. I think we discussed it. I, you know --
Q. What subjects did you look at case law for?
A. In general, sort of application of pattern and practice, I think, what weight to give the allegations or evidence, you know. I don't remember now as I sit here today exactly what, but



I remember reading cases.
Q. Okay. To the best of your ability, whatever you remember is all I'm asking.
A. That -- that's what I remember.
Q. Okay. How about the standard you should apply in coming to an interest of justice determination, did you do any research on that?
A. I think we did conduct some research on that. I think we certainly, you know, reviewed, I think, maybe a protocol or something, and then we discussed it and may have looked at cases on interest of -- I may have looked at some cases to help guide us.
Q. Okay. Do you remember anything about these cases that you looked at to help guide you with an interest of justice finding?
A. I don't. I mean, I think, you know -- I don't. I know we had some discussions about it, but I don't remember specifics, not about the cases, not about how we -- as I sit here today, how we sort of, you know, decided we'd proceed on interest of justice.
Q. Would it be fair to say that your review of case law and authorities to come up with

the standards you were going to apply occurred over time as you were reviewing the cases?

A. I think it's fair to say that they certainly evolved, right, as you sort of gain a little bit more understanding of the work. There was a protocol that we established, again, closer to the beginning, but I think it's fair to say that some of this organically evolves.

Q. Have you ever made a donation to Kim Foxx's political campaign?

A. I don't remember doing so but I -- there may have been one event I attended years and years ago, and the only reason I remember this is because I was very pregnant and due any day, and I don't know if I did make a donation.

I tend not to make donations to political people, but there may have been some money at the door. I don't remember.

Q. Did you ever consider yourself an advocate when you were working with the Working Group?

A. An advocate? I don't think that's how I would phrase it.

Q. Okay. An Advocate would be someone who



is advocating on behalf of one party or another, right?

A. Yes. I mean, I think that we conducted sort of an independent investigation and certainly, you know, had internally our disagreements, discussions.

Q. In resolving disputed evidence, was it a practice of the Working Group to give the benefit of the doubt to the claimant?

A. In resolving disputed evidence, I don't -- again, I think that the way I thought about it or think about it is the Working Group would consider -- if there had been some establishment of pattern and practice, usually within the case, and there was sufficient evidence of the allegation, then the claimant -- you know, we would consider the case without, for instance, the statement.

Q. So you would take the confession or whatever out of --

A. If there had been evidence that there was coercion or some other psychological abuse, et cetera.

Q. Evidence in addition to the pattern and



practice?

A. Yes, evidence in addition usually to the pattern and practice.

Q. So for someone like Cordell Williams --

A. Yeah.

Q. -- who alleges abuse --

A. Yeah.

Q. -- you look at whether there's pattern and practice, and then you look at whether there's other evidence to support the allegation of abuse?

A. I typically start with -- and I don't know specifically about Cordell Williams but with the -- we did start with the factual investigation --

Q. Sure.

A. -- in the Cordell Williams case. Is that -- and then to the extent that there is a pattern and practice that supports those allegations, whether within the case or outside of the case, then we'd apply that, right? We were tasked with sort of conducting a -- what's it called? -- a parallel review.

Q. To your knowledge had the state's attorney's office already made a determination that



pattern and practice evidence exists for the seven detectives who were identified as a part of the Working Group's scope of review?

A. I don't know if they had. We were not directed to apply pattern and practice, so to speak. In other words, we had -- you know, we could independently make a determination. Whether they had or not, I don't know. I'm not sure.

Q. So your understanding was the Working Group could decide to disregard pattern and practice altogether?

A. I don't know if we could because I think -- as I sit here today, I think the guidelines sort of required both a review of pattern and practice and -- but I -- so I don't know if we could entirely discard it, but I don't -- we did not -- what I'm saying is if the state's attorney had made some finding of pattern and practice, they did not require us, as far as I know, to apply it.

Q. Okay. So in every case you had, there was an allegation of abuse, right, some sort of abusive conduct that led to coercive -- coercive statement?

A. Or, you know, a witness -- I don't know if in every case. I don't know. But, yes, in -- there was some allegation.
Q. That either the criminal defendant or a witness had been coerced into giving a statement by the police?
A. Or identifying someone or something like that.
Q. Okay. So at the very start of your analysis of any case, you're dealing with an allegation of abuse --
A. Um-hum.
Q. -- right?
A. At the start of the analysis -- again, I would rephrase that a little bit. I'm dealing with sort of looking at the factual -- like the facts of the case. I usually start with an appellate opinion or something of that sort. Is that what you mean?
Q. No, no, no, no.
A. Oh.
Q. I mean not the process you went through.
A. Oh, sorry. Okay.



Q. When a case comes to you --
A. Yes.
Q. -- as a member of the Working Group --
A. Yes.
Q. -- there is already an allegation of abuse, right?
A. That's my understanding, yes.
Q. Okay. And the seven detectives have been identified as -- one of them at least being involved in the investigation that led to the conviction?
A. In general I think that's how these cases were given to us --
Q. Yes.
A. -- in general.
Q. Exactly, right.
A. That's what I think.
Q. Would you look in determining -- in making your -- or decisions on the underlying facts of the case, would you look for any other evidence of abuse to determine whether the abuse happened, for example, physical injuries, outcry shortly after, things of that nature?
A. Yes.



Q. Okay. Could you rely only on the allegation of abuse and nothing else to conclude that there's enough evidence here to reverse the conviction?
A. I don't think relying solely on the allegation as you're phrasing it and nothing else, without considering other factors. Could we? I don't know if we could. I don't think we did.
Q. Okay. In any of the cases that you reviewed, do you remember ever returning a recommendation to the state's attorney's office that it should take no action?
A. I think so.
Q. Which one?
A. I don't remember the name, the names.
Q. Okay. Did you have any role in creating the quarterly reports that were submitted to the state's attorney's office?
A. Yes.
Q. Was that -- did you take the primary lead on drafting these reports?
A. I mostly drafted and then, you know, the group worked as a group. They add or revised or whatever.



Q. Okay. Was it your role to sort of take the first attempt at drafting either the recommendations or the quarterly reports?
A. Let me -- the quarterly reports I drafted, I think, for the most part. The recommendations, I don't -- I did not initially, I don't think, draft all of them. That wasn't my role.
Q. Okay. Did the Working Group make credibility determinations about the veracity of an allegation of abuse without evidence of physical injury or recent -- or recent in time to the charge, recent outcry?
A. Or what?
Q. Outcry. Do you know what I mean by outcry?
A. I -- I think I do know what you mean by outcry, but did we make recommendations?
Q. That there was a credible case -- or strike that. Let me ask it again.
Did you make any recommendations to reverse a conviction in the interest of justice where you only had pattern and practice evidence and an allegation of abuse and no other evidence

beyond the allegation and pattern and practice to demonstrate or support the allegation of abuse?
A. I don't remember.
Q. Okay. Is that something that you think the Working Group would have done is make a recommendation without some evidence outside of pattern and practice and the allegation by the criminal defendants that abuse had occurred?
A. I don't -- I don't remember that being done, but I don't remember that.
Q. If the Working Group were to determine that the detectives who investigated the case were not on the list of seven detectives, seven or eight detectives --
A. Uh-huh.
Q. -- and none of those detectives were partners with anyone on the list of seven to eight detectives, would the Working Group then return the case to the state's attorney's office because it's outside the scope or mandate of the Working Group's review?
A. I think if there was no connection, I'd imagine that, yes.
Q. Was the fact that the detectives were



all from Area 1 connection enough to keep the case?
A. I don't know if that's connection enough. I think in some instances, you know, where the names are unknown, that -- and it was in -- you know, sort of around the same detectives or same time frame, that might have been sufficient to conduct a review.
Q. Do you know what the Lawyers' Committee is?
A. Generally, yes.
Q. What was the Lawyers' Committee?
A. As I understood it or understand it, a group of the civil lawyers who I think, you know, worked on developing this.
Q. Were they to your knowledge plaintiffs' civil rights lawyers?
A. I think so. I mean, the -- you know, for the most part in my mind it was like Peter Neufeld, but I don't know if they were all plaintiffs -- I don't know.
Q. Did you know Peter Neufeld to have a practice as a -- at least in part a plaintiffs' civil rights lawyer?
A. Yeah, I think so.



Q. Do you know anyone else who was on the Lawyers' Committee?
A. Did I know anyone else --
Q. Yeah.
A. -- who was on the Lawyers' Committee?
Q. Who was on -- like not personally, but do you know who else was on the Lawyers' Committee?
A. You know, I think -- I'm sure it was in like a document, but like as I sit here today, can I name them? I don't know if I could.
Q. Okay. Josh Tepfer?
A. He may have been on the Lawyers' Committee.
Q. Russell Ainsworth?
A. He may have been on it.
Q. Okay.
A. I don't have -- I don't have an independent recollection, but I take you at your word --
Q. Sure.
A. -- if you're saying they were, sure.
Q. What did you understand the purpose of the Lawyers' Committee to be?
A. My understanding was that they were



working to sort of put -- like to adopt a sort of independent working group.
Q. Were you aware that the Lawyers' Committee -- one of the roles of the Lawyers' Committee was to send cases -- identify the cases for the Working Group to review?
A. It wasn't entirely clear to me how that happened. I think -- I heard something about the sheets put up in the -- or the, you know, forms put up in the prison or prisons. I think they -- I don't know if they -- it was sort of -- we received the cases. There were a couple more that came later, but we received a set of cases. So I don't -- I can't speak to their process or to that process earlier on. At least I don't remember.
Q. One of the cases that you received later on, was that Jerry Gillespie?
A. Yeah. I think that wasn't on the list.
Q. Not initially, right?
A. Yeah. I don't -- yeah.
Q. It was added later on?
A. I believe that's right.
Q. And the Working Group made a recommendation on Jerry Gillespie?

A. Yes.
Q. By the way, do you follow any of these people who you made recommendations on, the criminal defendants -- do you know anything about what those individuals ended up doing, like whether they filed lawsuits or --
A. I don't know, but I don't know if I like read in the newspaper, or, you know, I may have looked once years ago. I don't follow this now, but I may have. I don't know.
Q. Did the Working Group consult with anyone on the Lawyers' Committee --
A. Uh-huh.
Q. -- about the work of the Working Group or the cases that were investigated?
A. I don't know what you mean by consult with, but there were, you know --
Q. Let's stop there --
A. -- certainly --
Q. -- because I will explain it for you, okay?
A. Okay.
Q. What do you understand consult with to mean?



A. Like have conversations.
Q. Okay. Anything further?
A. That's what I understand it to mean.
Q. Okay. So you could pick up the phone or send an email or have a face-to-face meeting and discuss specific things about your work as a Working Group member or in general about the Working Group or specific things about cases you're investigating?
A. To the best of my recollection, there may have been some conversations about the general work of the Working Group or gathering information, et cetera. I don't recall if there were conversations, and I don't think there were, about specifics about each of the cases, but, you know -- I don't remember.
Q. Did the Working Group -- I mean, you heard -- it sounds like you heard that the Working Group identified cases -- or not -- sorry.
A. No, no, we did not identify cases.
Q. No, no, no. I know. I know.
A. Okay.
Q. I'm backing up. I made a mistake.
A. Okay. That's okay.



Q. So I'll start over.
A. I just don't want you to misunderstand me. We did not --
Q. No, no. I'm not misunderstanding.
Was it your understanding at least maybe you had heard that the Lawyers' Committee was identifying cases for the Working Group to look at?
A. What I -- my -- again, I never got -- I don't think I ever really got clarity on this. So I don't know if this is hazy memory or lack of clarity, but I remember something about forms in the prisons --
Q. Um-hum.
A. -- like being put up. Now, who did that? You know, I think that must have come from the Lawyers' Committee. I think that -- I don't know if the -- what the case process was like, whether it was identification between the state's attorney's office and the Lawyers' Committee of those cases.
I'm not quite sure how they landed on those particular cases or what -- or the process is what I'm saying. It may be somewhere in some paper, but I just don't quite know how -- we were



given a group of cases initially.
Q. I just want to know if you had an impression one way or another --
A. That was my -- that's what sticks in my head is like this --
Q. Well, let me get the question out.
A. Oh, yeah. Sorry.
Q. I just want to know if you had an impression, whether it was confirmed or not, that the Lawyers' Committee was identifying cases for the Working Group to review.
A. I don't know if I have an impression of it. I do have some recollection of, you know, again these forms being presented in prisons and then --
Q. Okay. So you created quarterly reports and Marc or Vincent then -- you would send them around for Marc or Vincent to look at and edit potentially, right?
A. Yes, edit, change. They were pretty -- yeah, and then sent to Risa --
Q. Okay.
A. -- for any changes or edits.
Q. And you knew -- did you know that the

quarterly reports were also going to the Lawyers' Committee?
A. That was my understanding, that that was part of the guidelines.
Q. What was the point of sending quarterly reports about your work to the Lawyers' Committee?
A. I -- as I understood it, part of the guidelines was to update on the work, and that's my understanding.
Q. Why does the Lawyers' Committee need an update?
A. I don't know. I don't know.
Q. Did you ever ask?
A. I didn't, I don't think.
Q. Were there ever any concerns when you became a Working Group member about conflicts of interest?
A. Maybe, or they appear -- I mean, to the extent that they're -- if there were, you know, particular issues that arose, if that's what you mean, we would discuss those.
Q. For example, a Working Group member couldn't also be representing one of the claimants before the Working Group. That would be a



conflict, right?
A. Yes, I think that's right.
Q. Okay. Did the guidelines or the procedures that you received from the state's attorney's office have any information about conflicts of interest?
A. I think they had some information about, you know, appearance of a conflict, certain, you know --
Q. Okay. How about imputed conflicts, do you know what those are?
A. I don't think so.
Q. Where a law firm may be conflicted out from representing somebody because one of its lawyers represented an adverse party, even though the lawyer who may represent -- is getting conflicted out didn't actually represent the adverse party. Do you follow me?
A. I think so.
Q. Okay. It's actually in the Rules of Professional Conduct. Did anyone look at the Rules of Professional Conduct, by the way, about conflicts of interest when you joined the Working Group?



A. I don't remember doing so. I don't --
Q. So an example of an imputed conflict would be if the Working Group agreed to -- or made a recommendation to vacate a conviction and then that person went to a different attorney at Mayer Brown to file a civil rights lawsuit, in that sense Mayer Brown could be conflicted out because of the imputed conflict. Does that make sense?
A. It makes sense potentially. I don't know. I'm not an expert on this, but --
Q. Okay.
A. -- I understand what you're saying.
Q. Was there any concern or any discussion among the Working Group members about the potential for a conflict of interest with lawyer committees -- members of the Lawyers' Committee representing claimants after a conviction had been reversed?
A. I don't remember those discussions. I don't remember that we thought about it. I don't remember thinking about it.
Q. Do you know whether any member of the Working Group currently represents somebody whose conviction was reversed based on a recommendation



of the Working Group -- I'm sorry, members of --
A. I don't think a member of the Working Group --
Q. Yeah. I know. I know. I know. I keep getting these things confused.
A. Yeah.
Q. Are you aware of any member of the Lawyers' Committee who is representing an individual whose conviction was reversed based on a recommendation of the Working Group?
A. Whether I'm aware of any member of the Lawyers' Committee? I have -- I'm not aware. I don't remember. I am not aware. I don't have an independent recollection, you know. I'm sort of trying to think if there's a newspaper article or something, but I don't have any independent recollection.
Q. Are you aware of any member -- are you aware of any situations in which a law firm in which a member of the Lawyers' Committee is employed or a partner is representing someone whose conviction was reversed based on a recommendation by the Working Group?
A. Member of a law firm?

Q. Yes.
A. Of the associated -- I don't know if -- maybe.
Q. Would you agree with me that there at least would be an appearance of a conflict --
A. Um-hum.
Q. -- if a member of a law firm -- or if a law firm at which one of the members of the Lawyers' Committee was working represented a person in a civil rights lawsuit based on the reversal of a conviction recommended by the Working Group?
A. I am not sure. I don't know. I think that that's --
Q. What would you need to know?
A. You know, I would maybe consult with an ethics lawyer and ask those questions, whether there's a -- don't law firms have those -- what are they called, walls? Is it walls or barriers or whatever that is? I don't know. I don't know enough about this.
Q. I'm just curious whether you would agree at least there could be a perception of a conflict?
A. I think there could certainly be a



perception of a conflict and --
Q. If the Lawyers' Committee is recommending cases for the Working Group to review, those cases end up with reverse convictions and then the law firm at which one of the Lawyer Committee members works ends up representing that person in the civil rights lawsuit, doesn't that, at least on the surface, look like there could be a conflict?
A. Pat, I don't know if the -- you know, as I said, I'm not sure that that's the process where the Lawyers' Committee is recommending certain cases and then to the Working Group. I'm not sure that that's the process, but I can understand why, you know, one might want to be careful of appearances of conflicts, sure.
Q. Okay. Is it a concern you would have as a member of the Working Group that whoever ends up representing one of these claimants in a civil rights lawsuit has no connection whatsoever to the Working Group or the Lawyers' Committee?
A. I certainly don't think it's advisable for the Working Group members to represent the claimants in these cases.



Q. Not Working Group members, Lawyers' Committee.
A. Oh, lawyers -- I thought you said Working Group and Lawyers' Committee but okay.
MR. MORAN: Can you read back the question. I keep confusing this, and I don't want the record to be --
THE WITNESS: Me?
MR. MORAN: No. She is going to read back the question, so I don't --
(Question read.)
MR. MORAN: So I asked it wrong again.
Q. Would you have any concern that a member of the Lawyers' Committee represents a claimant in a civil rights lawsuit where the Working Group made a reverse conviction -- or a recommendation to reverse a conviction?
A. Would I personally have a concern?
Q. Yeah.
A. I don't -- I don't -- you know, I don't think that -- I just haven't -- I don't know. I don't know.
Q. Did the Working Group do any initial investigation to become familiar with the pattern



and practice evidence when it first started doing its work?
A. Initial investigation to become familiar -- sure, sure.
Q. Okay. Did you attend a meeting at Loevy & Loevy's office in September -- or November of 2021 where a presentation was made about pattern and practice evidence?
A. I do remember attending a meeting early on. I don't know about November 2021 but I -- if you have that date --
Q. Yeah.
A. Early on where there was presentation made about, to the best of my knowledge, particular cases involving these detectives.
Q. And did the meeting last approximately two hours?
A. If you -- I mean, I -- I know --
Q. You can say you don't remember.
A. I don't remember. It might have been a morning or -- I don't know if it was two or three or one. I don't know.
Q. Were you given any materials at the meeting?

A. Ooh, maybe.
Q. Were you given any materials prior to the meeting to review for the meeting at Loevy & Loevy?
A. Not that I remember. I don't -- but I don't know. Maybe.
Q. Who, if you recall, made the presentation?
A. There was a woman, and I don't know her name, and I don't know that I'd ever met her, but made presentation and then I -- maybe Russell or -- I think that's what I remember.
Q. Was the woman's name Heather?
A. I don't remember.
Q. What topics were discussed?
A. I -- I don't remember the specifics. I think it was -- I don't remember the specifics.
Q. Was a PowerPoint presentation utilized?
A. I think there was a PowerPoint, or I remember something about a PowerPoint, but I don't remember specifics.
Q. Okay. In this presentation were you given information in which at least the presenters believed a pattern and practice existed?



Let me ask it a different way. Were you given information that a pattern and practice existed? Were you basically told that?
A. I don't know if we were told that. I don't remember -- again, I don't remember the specifics. I think there was some discussion of like a particular -- you know, cases or something that -- where there was pattern -- where there was -- where like the implication is there was a pattern. Maybe that's the way that I would think about it.
Q. At this presentation at Loevy & Loevy's office, did the presenters identify the specific patterns and specific detectives?
A. I think -- again, I don't have a good memory of it. I think in the course of talking about a case or something, there was some discussion about, you know, some pattern.
Q. In your review as a Working Group member of the cases, did you at some point conclude that detectives are probably lying when they deny the abuse because of the pattern and practice that you had observed?
A. That I had observed?



Q. Not observed, but investigated.
A. I think, you know, we concluded that there were -- that there was a pattern based on, you know, the cases, the allegations, some of the Circuit Court cases we reviewed. I think we concluded that there is more likely than not a pattern for some of the detectives. I don't know that we made that conclusion -- you keep saying detectives. It was -- because it was somewhat case specific. I don't know that I could say that we concluded so for every single one of the detectives.
Q. Did you ever reach a determination on your own personally that there's enough evidence here of a pattern?
A. I think our determinations were mostly reached as group consensus, and my determinations personally, I think, evolved but I --
Q. Did you ever suggest to the group that this pattern and practice evidence is enough, and really that's all we need to make a decision on recommending to vacate the conviction?
A. I don't -- not that I recall. My recollection is that we conducted a factual



investigation.
Q. Okay. Tell me, did the Working Group also look at new evidence that surfaced or became known after the conviction was obtained? It wasn't available to the prosecutors or the defense during the underlying trial.
A. Look at new evidence? I think so.
Q. So, for example, pattern and practice would be considered new evidence if there's pattern and practice allegations that occur after the case was tried.
A. Oh, sure, yeah.
Q. That would be new evidence, right?
A. Sure.
Q. All right. Would you also consider any other new evidence that you thought was relevant?
A. I think so. I think we considered, you know -- we tried to conduct an investigation and consider evidence that may have not been available at the time.
Q. So could the Working Group rely on new evidence to reach a conclusion that the conviction should be vacated based on actual innocence?
A. On actual innocence? We certainly

could rely on that. Are you asking if we made a recommendation of actual innocence in a --
Q. No. If you could.
A. Oh, I think we could rely on that.
Q. Yeah. For example, if DNA testing --
A. Sure.
Q. -- was done years later --
A. Sure, yes.
Q. -- that showed this guy couldn't have committed the crime, you could point to that and say this guy is innocent?
A. Sure. I think we could rely on that.
Q. Could you also rely on new evidence to make a recommendation to vacate based on the interest of justice?
A. Yes, I think we could rely on that.
Q. Okay. Did you ever -- or could you rely on new evidence to make a determination that if the case were tried again, it likely would not result in a conviction?
A. I think we -- it's not quite how at least I remember thinking about it or the group discussing it, but, you know, maybe, maybe, yes. I think we could rely on that and think about whether



if retried now, would this evidence have been -- you know, if this had been available to the court or to the parties at the time, that sort of thing.
Q. When you're evaluating -- one of the things you did as a member of the working group was evaluate whether the confession or statement given by the defendant was voluntarily given or coerced, right?
A. Yes.
Q. Okay. One of the factors you'd look at -- is one of the factors you looked at the truthfulness of the statement or the confession?
A. Yes. I think we certainly considered the truthfulness, understanding -- yes, let's leave it --
Q. So, for example, if there were inconsistencies in the statement or confession with other evidence that showed these things can't be true, that would be a factor that weighs towards an involuntary or coerced statement?
A. That's right, but if there were other corroborative -- told someone else, et cetera, that would be a factor that weighs the other way --
Q. Okay.



A. -- if that's what you're asking.
Q. Well, I'll just ask the question.
A. Okay.
Q. If you found evidence that the confession was substantially true, would that weigh in favor of a finding that this confession was not coerced?
A. It's certainly a factor to consider, but I think we could also make a finding that if a confession were coerced, even if true -- in other words, this was not an innocence determination necessarily, right? Those were not -- then it's one of the factors to consider but not necessarily dispositive maybe.
Q. How about if the confession is substantially true, is it a factor that weighs against believing that -- the allegations of coercion or abuse?
A. Not necessarily, not necessarily. I think it depends on, you know -- I think coerced confessions can be truthful confessions.
Q. Oh, I understand that. But would you also consider the truthfulness of a confession in evaluating whether the allegations of abuse are



true?
A. I would certainly consider the truthfulness of the confession along with what -- whether, you know, the investigation developed that there were -- there was truth to those -- to that confession, in other words. But the truthfulness of the confession is not necessarily dispositive as to the question of whether a coercion or --
Q. I think the question was a little bit different, though.
A. Okay.
Q. One of the factors you would consider is the truthfulness of the confession in evaluating whether the confession was coerced, just a factor, right?
A. We would certainly consider the truthfulness of the confession in evaluating the case, yes.
Q. And that would include evaluating the allegations of abuse too?
A. It would be one of the factors considered.
Q. In fact, you have to do that if you're conducting an impartial investigation, right?

A. It's certainly a factor that's considered, yes.
Q. And if you had corroborating evidence to support the truthfulness of the confession by another witness --
A. Yes.
Q. -- would that evidence also be a factor to consider in evaluating whether the confession was coerced?
A. It is a factor to consider whether the confession was coerced, but, again, not dispositive. It's one of several.
Q. And is it a factor to consider in assessing whether the allegations of abuse are true?
A. I think it is a factor to consider with respect to -- in the entirety of the case, including any allegations of coercion or manipulation, et cetera, but it is one of several factors that I think are important.
Q. If you -- if it's undisputed that the criminal defendant provided substantially true statements to the detectives before any coercion or abuse occurred that are inculpatory --



A. Um-hum.
Q. -- that end up in the confession where there is now an allegation of abuse or coercion --
A. Okay.
Q. Do you understand my question so far --
A. I --
Q. -- because you look like you don't?
A. Well, let -- let's -- okay.
Q. How about this? I am going to give you a scenario.
A. Okay.
Q. Let's assume the person you are -- claimant, the person who --
A. The defendant --
Q. The criminal defendant --
A. -- makes an allegation. Okay.
Q. -- gives a statement -- gives inculpatory statements to the detective before any abuse occurs and the defendant agrees, I gave these statements to the detective before any abuse occurred, and these are inculpatory statements --
A. Okay.
Q. -- and these statements form the foundation of the confession that is ultimately



obtained hours later --
A. Okay.
Q. -- and the defendant agrees that he gave the confession, court reported or handwritten, hours later after he was abused --
A. Um-hum. Yes.
Q. -- but the foundation of all those things in that statement were all given to the detectives before any abuse occurred --
A. Okay.
Q. -- in that situation would you consider the fact that the inculpatory statements were given before any abuse occurred in evaluating whether to make a recommendation to vacate the conviction?
A. I think it is a factor to consider in evaluating -- whether to make a recommendation? Yes, I think that is a factor to consider in evaluating -- I think they're -- you know, among probably --
Q. Many others.
A. -- many others, yeah.
Q. Is it a factor to consider in evaluating whether the allegations of abuse are true?



A. I think it may be a factor to consider in evaluating a later allegation of abuse and the truthfulness of it but, again, not dispositive.
Q. Sure. Is it a factor to consider in evaluating whether the ultimate court-reported or hand confession -- or handwritten confession was coerced?
A. I certainly think it depends on other factors. It's a factor to consider. It's, you know --
Q. Um-hum. Do you have any recollection of running into that situation?
A. Oh, I don't as I sit here today. I don't, but I don't know. I don't remember.
Q. Tell me something. In the cases that were reviewed by the Working Group, did the Working Group consider whether institutional racism played a role, even though you could not identify any evidence that a police officer involved in the investigation was motivated by a racial animus?
A. I think that in discussion of cases and discussion of some of the factors, we certainly considered, you know, how bias -- when you say institutional racism, I will say -- I think of

bias, implicit bias and -- played a role in sort of some of the outcomes or --
Q. Were you able to establish that any of the detectives were actually biased?
A. Were actually biased? I think it's -- I -- I don't -- I don't think we established like dispositive, you know, this person is X. Like I don't think we pointed a finger in that way at any of the detectives. I think that there was certainly discussion about bias.
Q. How would you apply the fact that -- you know, the concept of bias or institutional racism --
A. Sure.
Q. -- to the specific facts of any case in evaluating whether that could have played a role in the confession being elicited?
A. Sure. I mean, these were cases that happened a long time ago, and I think that there were, you know -- perhaps people from marginalized communities were not as credited or as believed or disbelieved, and that was one of many factors to consider in terms of how bias may influence a perception or credibility determinations or, you



know, whether or not the person chose to testify, et cetera.
Q. So in your answer you use words like perhaps and may have. Would you agree that that is essentially speculation?
A. I don't -- you're asking me to sort of remember back. I think that there is research on the topic of bias in the criminal justice system that is nonspeculative, and I think that that -- there are factors that can be considered and one factor not dispositive in making determinations.
Q. Is that part of the mandate of the Working Group?
A. I don't -- what was part of the mandate, the bias?
Q. Considering bias or institutional racism or --
A. I don't think -- I would not consider it part of a mandate.
Q. Okay. Were any decisions made in part because of a belief that a defendant may have felt overwhelmed by -- because of how race played a role?
A. Was a decision made causally as a



result of that?
Q. Yeah.
A. I don't think that would have been, as I recall, the only factor that would have -- it would not have been a dispositive factor, though it may have been considered.
Q. Not dispositive but a causative factor, in other words --
A. No, not dispositive, but it may have been. I said not cause -- like I would not draw a causal line there but not dispositive, but it may have been a factor to consider among others.
Q. Okay. What would you need to consider that factor, what kind of evidence?
A. To consider whether bias played a role?
Q. Well, when you say "bias," we are talking about like concepts of institutional racism, right?
A. I am talking about the concept of implied or racial bias, implied racial bias, implied bias in general, you know, whether it's -- based on, you know -- there are class issues, other interrelated issues. That's what I'm talking about.



What would I have needed to make a finding like that? I can't answer that question right now, but I think in general, you know, were there statements about why a defendant should not testify, whether they be believed or not believed because of who they presented as, statements about -- or any sort of evidence about why defendant may have made an outcry or not made an outcry, things like that is what was considered. I don't know that there was -- in other words, I can't point you to one --
Q. Sure.
A. -- single factor.
Q. But when you're -- when you're -- when you're considering like why a defendant may have done this or may not have done this, without knowing what the thought process was, aren't you essentially speculating?
A. I don't think so. A review was -- based on, you know, a review of the material we had investigation and discussion.
Q. When you look at a case -- you predominantly looked at murder and sexual assault cases if I'm not mistaken?

A. I don't -- I don't know if we had any sexual assault cases but, yes.
Q. It would have been all murder cases?
A. There may have been some we didn't get to. I just don't remember.
Q. In any one of the cases you reviewed --
A. Um-hum.
Q. -- did you also research or review the elements the State needed to prove to obtain a conviction?
A. I don't know if we -- if I researched specifically the elements, but it would have been in the -- the elements were like listed in the appellate court opinion or in some of the pleadings we read, et cetera.
Q. Would that have been something you put into your opinions or recommendations to the state's attorney's office, that the State would have had an inability to prove X, Y, or Z to obtain this conviction?
A. An inability to prove X, Y, or Z?
Q. Sure, any element, any specific element of the crime.
A. I don't remember.



Q. Did you ever -- Cordell Williams was one of the cases you reviewed in which he was convicted under an accountability theory for murder. Do you remember that?
A. I -- I don't know if I have an independent recollection of it, but I don't think he was the shooter so --
Q. Okay. Do you know what the accountability theory is?
A. Yes, I know what an accountability theory is. So I take you at your word. Okay.
Q. Yeah. Okay. What do you understand accountability to mean?
A. You know, could be help facilitate essentially the crime.
Q. Do you know as you sit here now what the State needs to show to establish accountability under a theory of murder?
A. I think, you know, factors like providing the weapon or acting as a lookout, things like that.
Q. Okay. So, for example, driving the shooter to the crime could be a piece of evidence that would help establish accountability?



A. Driving the shooter to the crime? I think so. I mean, it depends on other factors, but, yeah, I think so. That could certainly be a piece of evidence introduced.
Q. Giving the shooter access to the gun used in the crime, that would be an element to establish accountability?
A. Again, I think so. I think some of the mens rea elements might be necessary --
Q. Sure.
A. -- there, so I don't -- depends on the mens rea.
Q. If the shooter declares an intent to go in and confront individuals after giving the shooter access to the crime, that would be something that could be used by the State to establish accountability, right?
MS. MEADOR: Access to the weapon.
THE WITNESS: I think that access to the -- sorry, just tell me --
BY MR. MORAN:
Q. I'm sorry. I said it wrong. If the shooter declares an intent to go in and confront individuals with the gun to which the driver gave



the shooter access to --
A. Yeah.
Q. -- in other words, the shooter says I'm going to go in there and confront these people --
A. Sure.
Q. -- open the trunk. Shooter -- and shooter takes the gun and goes in and confronts the people. That's evidence that could be used to establish accountability?
A. I think it can be used. Again, it depends on the mens rea and other -- yes.
Q. Mens rea is an important factor, right?
A. It surely can be. It really depends on the kind of case. I mean, there are some cases where --
Q. Sure.
A. -- it isn't, right? Strict liability cases, but it certainly can be.
Q. And mens rea is another phrase for specific intent?
A. No. I think it's the mental state.
Q. Just the mental state?
A. Yes, culpable mental state is --
Q. Okay. Intent to commit a crime?

146

A. The particular crime charged, yes.
Q. Okay. Does it have to be the particular crime charged?
A. Again, it depends, right? A felony murder doesn't necessarily have to be the charge --
Q. I mean under Illinois law --
A. I guess --
Q. -- do you know whether someone facing an accountability charge has to have already agreed to participate in the specific crime charged?
A. No. That's what I'm saying. I think it -- that's why mens rea can be a significant factor.
Q. Yeah.
A. It just depends on the facts of the case and the crimes charged.
Q. Okay. So if the shooter says I'm going to go in and confront these guys, wait here, and the driver hears that, is that evidence that helps establish mens rea?
A. You know, I -- again, it can. It certainly can. I think it depends on a number of other factors. I don't know without reviewing the case as a whole.

147

Q. Sure. What other factors do you need to know?
A. I don't -- did the driver hear it; did the driver see the gun, those kinds of things.
Q. Did the driver know about the gun?
A. Did the driver know -- yeah. I mean, I -- there are other factors, and I would have to look at -- there would have to be more of a holistic review.
Q. Okay.
A. So sitting here today, I don't think I can answer these questions adequately frankly.
Q. Sure. I'll fill in some of the blanks for you. Driver knows about the gun. Driver is aware of the gun. It was put into the trunk of the car by the shooter.
A. Okay.
Q. Driver hears the statement, Pull over. I see opposing gang members. Driver hears the statement, Pop the trunk. Driver hears the statement, I'm going in there to see if that's them.
A. Um-hum.
Q. Are those facts enough to establish an

148

accountability theory of murder if shooter goes in and shoots the people inside the store that he saw them at?
A. They may be. They may be.
Q. Why may be?
A. I just again --
Q. What are the facts you need to know?
A. I don't -- I don't -- I mean, I just -- I don't know. I think -- I'm just not comfortable making sort of a conclusion based on some of these hypotheticals, but they may be.
Q. So what -- when you say "may be" --
A. To charge someone with accountability.
Q. Sure, to charge and to convict?
A. Again, it depends on what the evidence shows.
Q. The evidence shows what I just said.
A. Sure. I -- it may well be enough to convict and charge.
Q. Okay. That would be a decision for the fact finder, right?
A. That would be part decisions for the fact finder.
Q. Okay. If -- no. I want to back -- I

149

want to ask you another question about that. When you say "may be" --
A. Um-hum.
Q. -- the flip side to that is that it may not be, right?
A. I think it's a possibility, yeah.
Q. Okay. What would you need to know in addition to the hypothetical I gave you to say that's enough evidence to convict on an accountability theory?
A. I don't know. I don't know.
Q. What would you need to know to say that that is not enough evidence to convict on an accountability theory?
A. I don't know. I mean, it depends on -- I don't know.
Q. Did the Working Group in its analysis of the case review the case in terms of what evidence would be admissible if a case was retried?
A. In its analysis of any case?
Q. Yeah.
A. We may have reviewed -- just considered that as a factor.
Q. Why consider it as a factor?

A. I think it goes to the strength of a case in general.
Q. Yeah. So, for example, you have evidence in your possession that points towards guilt, but you know it's not admissible. Would you say, you know what? We really shouldn't consider that evidence then?
A. You know, I know that that was a subject of debate and discussion, and I don't know that we've ever really resolved it. Personally I think -- well, I'll just leave it at that.
Q. No. Go ahead.
A. No. That's okay. I'm just going to leave it at that.
Q. You know what my next question is going to be. What do you personally think?
A. I don't -- I don't have -- I think -- I think it's certainly fair to consider.
Q. How about the flip side? If you have evidence that potentially could support a claim of abuse but it's not admissible evidence, would you say, you know what, we shouldn't consider that?
A. Again, I think it's certainly fair to consider. That's what I was saying.



Q. Oh, fair to consider it regardless of whether it's admissible?
A. I think it's fair to consider it in sort of discussing recommendations.
Q. Did you ever get any guidance either through the printed procedures and policies that you got from the state's attorney's office or through some other source that the Working Group should try and avoid making credibility determinations where possible?
A. Not that I remember.
Q. I assume you're familiar with the case law on voluntariness of a confession?
A. Yes --
Q. Okay.
A. -- somewhat.
Q. Well, is that something you teach?
A. Not really, not right now, not in criminal law.
Q. Not in the intro criminal law class for the first years?
A. No. That's a crim pro.
Q. Okay. So courts have identified it as the totality of circumstances test.



A. Yes.
Q. Did you apply that in your review of the cases?
A. I think we may have. I think there were -- we may have considered them or called them factors to consider, but, you know, what are the circumstances of the allegation, how did the allegation come out, how did the -- you know, a number of different factors.
Q. Length of time in custody?
A. Length of time, yes, duration, number of --
Q. Okay.
A. -- interrogations, age, those kinds of things.
Q. When you were conducting your analysis as part of the Working Group --
A. Um-hum.
Q. -- did you view length of detention as the same as length of interrogation?
A. Not necessarily. I think there are two -- I think we considered length of detention as a factor, and length of interrogation where there was that information available was considered as



sort of a separate factor. I don't think they're the same. I don't think we thought of them as the same --
Q. So, in other words --
A. -- or tried not to.
Q. -- someone could be detained for 12 hours but only be questioned for one hour?
A. That's certainly true.
Q. Okay. And you would not -- or you did not as you were -- as you sit here today -- or strike that.
In your work as a Working Group member, you did not equate the one-hour questioning or interrogation with the 12-hour detention to assume it was 12 hours of interrogation?
A. Not that I remember.
Q. Okay.
A. I think we tried to consider those separately.
Q. Would you also consider whether food or drink was given during the time in detention or custody?
A. That was a consideration, sure.
Q. Did you consider whether restroom

breaks were afforded?
A. That was a consideration, sure.
Q. Would you consider whether during time of detention the defendant was left alone and given an opportunity to rest?
A. I think that's something to consider, I mean, in determining voluntariness, yeah, sure.
Q. Is there a per se time frame where you as a Working Group investigator decided if the detention is longer than this, it must be coercive?
A. Not as a dispositive factor as far as I remember.
Q. Okay.
A. Certainly length of detention played into consideration of coercion, if that's what you're asking.
Q. Would you agree that there can be instances in which someone is held for 24 to 26 hours and it's not coercion?
A. I think there can be. I think it is a lengthy period of detention, however.
Q. Okay. But you would agree that it is not -- the fact that someone is held for 24 to 26 hours is not by itself enough to find that the --



whatever statement was given was coerced?
A. Not necessarily on its own, but it is certainly a factor that should be considered.
Q. Okay. What other factors besides length of detention, length of interrogation, opportunities to have food, restroom breaks and drinks --
A. Number of interrogations, time of day or night.
Q. Um-hum.
A. You know, door closed, door open, whether guns were visible, not visible, age of the defendant. These are, I think, all factors to consider.
Q. Is someone of the age of 19 years old -- is that a dispositive factor that you would rely on to say that there must have been coercion?
A. I don't think I would frame it that way, no.
Q. Okay. You said number of interrogations. I want to focus on that for a minute.
A. Sure.
Q. If a police officer questions a suspect



for five minutes, five or 10 minutes on the street --
A. Um-hum.
Q. -- and ultimately that person is arrested and brought to the police station --
A. Um-hum.
Q. -- and then an interrogation takes place later, do you consider that initial questioning by the police officer to be an interrogation?
A. I think that can be considered a questioning, yes.
Q. Do you draw a distinction between questioning versus interview versus interrogation?
A. I think so. I think, you know, if it's an interview and -- yes, I think so.
Q. Tell me the difference.
A. You know, there -- a brief stop, what's your name, what are you doing in this neighborhood is different to me than, say, a questioning of several minutes, where were you, what were you doing --
Q. Um-hum.
A. -- versus an interview which may or may



not take place with, say, an attorney at a time and place of someone's choosing versus an interrogation where the person being interrogated is, you know, removed from sort of -- is more isolated and questioned.
Q. Cordell Williams was -- or the car he was driving --
A. Um-hum.
Q. -- somebody identified the car, license plate number. It was traced back -- it was his mother's car, traced back to his mother's house. Police went to the house. He was the last person known to be driving the car. This is after the murder took place --
A. Okay.
Q. -- in which he fled the scene at a high rate of speed. At least the driver did. And all the police know is that the car is connected to the house. Cordell Williams is the last known driver of the car, and the radiator is still hot. And this is the car seen speeding away from a murder.
Do the police at that moment have probable cause to take Cordell Williams in for questioning?

A. I -- you know, they may. I don't know. I can't -- I'm not going to sort of give you my personal opinion about whether police have probable cause, but there's -- they may. They certainly may on those facts, sure.
Q. How about your opinion as the Working Group member who reviewed the case who's got a background as a criminal defense attorney and a law professor?
A. I just said I think they certainly may on that, on those facts.
Q. In determining whether a confession is coerced through physical abuse --
A. Um-hum.
Q. -- do you look for evidence of a physical injury?
A. That is certainly a factor we would ask about and look for, yes.
Q. And if there is no evidence of a physical injury, do you consider that in assessing whether abuse took place, physical abuse?
A. We certainly do consider -- or I think that should be considered in assessing whether physical abuse took place. I think it depends on



what the allegation of abuse is but --
Q. Sure. You'd want to -- one of the things you'd want to look at, I'm sure, is whether given the allegation of abuse, there should be an injury, right?
A. Right.
Q. Or other -- some other observable evidence of the physical abuse, right?
A. I think that's certainly a factor, yeah.
Q. Yeah. And if the allegation of physical abuse where you would expect to find evidence of an injury or some other physical, observable evidence of an injury and you don't see that, you consider that in evaluating whether the abuse really took place?
A. I think it can be considered in evaluating the allegations of abuse. However, I think you also have to consider other factors like, you know -- well, I think you have to consider other factors.
Q. Like what?
A. Whether there was good documentation of every person who came through, of what --



documentation of, you know, physical makeup, whether lawyers at the time were asking about injuries and taking photos, other such factors.
Q. Yeah.
A. In other words, it's a factor to consider. It's just not dispositive.
Q. And you as a Working Group member reviewing the case, if you had photographs taken shortly after the alleged abuse, would you rely on those photographs as a factor in assessing the allegations of abuse?
A. I think one -- we could rely somewhat on the photographs. I -- again, it depends on other factors, clarity, time, kind of allegation, et cetera, but, sure, it's something to review, to consider.
Q. I can't remember if I asked you this, and I want to make sure I ask it. Did the Working Group make any attempt to interview detectives?
A. I don't -- no, not as far as I know.
Q. Why not?
A. You know, in short because the detectives -- we had testimony from the detectives with respect to I think the cases that we were



looking at and had their -- you know, what they -- their denials of the allegations.
Q. Did you have any other questions you might want to ask the detectives?
A. I -- as I sit here today, I think, you know, we certainly discussed it, considered it. We reviewed the material we had and felt that we had material we could consider with respect to that.
Q. If you wanted to talk to the detectives, is that something you would have tried to do?
A. Is it something we would have tried to do? Potentially, sure.
Q. And you could have, right? You could have asked either the detectives or their attorneys if you could have an opportunity to speak about --
A. I think we could have, yeah.
Q. I'm going to turn back to the other acts evidence -- other bad acts evidence. Is it appropriate to consider someone's history of alcohol abuse in your work as a Working Group investigator even where there's no evidence that the alcohol abuse played a role in the case?
A. I don't -- I don't know. I don't know

that I could answer that. I don't know.
Q. Have you as a criminal defense attorney ever had to try and get alcohol evidence or drug evidence barred that you thought was unrelated to the crime at issue?
A. Sure. I'm sure I must have but -- I'm sure I must have.
Q. Okay.
A. But I'm not sure I was successful.
Q. What would be the harm in allowing that kind of evidence in against a criminal defendant?
A. Against a criminal defendant? I think bad character evidence can bleed into guilt on the particular charge in ways that are unfair or prejudicial -- unfairly prejudicial. They may be relevant, but it also may be unfairly prejudicial. Let's put it that way.
Q. Well, one reason it could be unfair is that it's not relevant, right?
A. Yes, or in some cases it may be relevant but --
Q. Unfair?
A. -- the unfairness of it, right, the prejudice of it --



Q. Unduly prejudicial?
A. That's right.
Q. I think that's the phrase you are looking for.
A. I think that's the phrase I was looking for, Pat.
Q. Wouldn't that be true in the civil context too?
A. I don't -- again, honestly I don't know enough about the civil context in this area but, sure, I think propensity evidence or character evidence --
Q. How about --
A. -- can be unfair.
Q. Same question with respect to evidence of a criminal defendant's gang membership where there is no evidence that membership in a gang was a factor in the crime that was committed, is that problematic to let that evidence in?
A. I think it certainly can be, sure.
Q. What precautions can be taken from your view as a Working Group member to consider evidence like that but not let it become prejudicial?
A. You know, a fair and sort of -- a fair



review of the entirety of the case I think is important. I think it's important to conduct a factual investigation and not let it be an investigation entirely of pattern and practice because I think that's what you're getting at here. So that's -- those are the kinds of precautions, a discussion with other members so that, you know, disagreements can be debated and --
Q. Right. So one of the reasons you want to limit or prohibit this kind of other misconduct evidence is that it could be unfair, unduly prejudicial to the person it's admitted against, right?
A. In a criminal case, yes.
Q. In any case really, right?
A. I'm more familiar in the criminal context, but, yeah, I think it's important in a court, certainly.
Q. Did the Working Group consider a criminal defendant's arrest background or criminal history, other convictions in assessing the case?
A. I think I certainly remember reviewing that material. I don't know that it was considered in terms of making, you know -- I don't -- it would



not have been a dispositive factor, but I think I certainly remember reviewing that kind of material.
Q. Um-hum. The Working Group took issue in some cases with criminal defense attorneys withdrawing a motion to suppress. Remember that?
A. I don't remember the specifics. I do remember that the Working Group certainly took issues -- considered defense attorneys and some of their failures --
Q. Um-hum.
A. -- in these cases.
Q. Well, I am talking about specifically withdrawing a motion to suppress.
A. Maybe.
Q. Okay. The motion to suppress, typically, the criminal defendant would have to testify about the interaction with the police so the court has evidence to make a decision on the motion, right?
A. Not in all cases.
Q. I understand it's not all.
A. But in some cases, sure.
Q. Yeah.
A. But not in all cases. I don't think

actually that's necessarily the case.
Q. Now, in any pleading that's filed, would you agree an attorney has to have a good-faith basis for the allegations in the pleading?
A. Sure.
Q. Okay. And if the attorney learns through the client that the allegations in the pleading are not true, the rules require that the pleading be withdrawn or amended. Would you agree?
A. I think so, yeah.
Q. Okay. Same rules apply to putting a witness on the witness stand? If the attorney becomes aware that the testimony that would be given is false, the attorney has an obligation to not allow false testimony?
A. If the attorney is aware of the falsity, yeah, the attorney has an obligation not to allow it.
Q. In the case -- in any case where the Working Group reviewed a motion to suppress that was withdrawn, did you or the other members of the Working Group determine whether the attorney who withdrew the motion did so because of a concern about false allegations or false testimony?



A. Not that I recall.
Q. What could you do as a Working Group member to look into that concern?
A. I mean, I -- I don't -- I may have reached out to the attorneys, read the transcripts, asked whether the court asked those questions.
Q. Um-hum. Well, in -- if the attorney learned the information from the client and it gave the attorney concern that the client might perjure himself, would you agree that the attorney cannot reveal to the court what that specific communication was?
A. I think short of a waiver, sure, but the -- you know, I'm saying whether the court inquired of the defendant or the attorney --
Q. Um-hum.
A. -- these are the factors we'd look into, could look into.
MR. MORAN: It's 1:00 o'clock.
THE WITNESS: Okay.
MR. MORAN: Do you want to take a break, or do you want to take a break?
THE REPORTER: Yes.
MS. MEADOR: She rules.



MR. MORAN: She trumps you.
THE WITNESS: She rules. That's right. That's what I'm trying to say.
THE REPORTER: Even 10 minutes. I don't need lunch. I just need a break.
MR. MORAN: Whatever you want.
THE VIDEOGRAPHER: This ends Media Unit 1, now going off the record at 1:00 p.m.
(Whereupon, a luncheon recess was taken from 1:00 p.m. to 1:42 p.m., after which time the proceedings resumed as follows:)
THE VIDEOGRAPHER: This is the beginning of Media Unit 2, now going back on the record at 1:42 p.m.
MARIA HAWILO,
having been previously sworn, was examined and testified further as follows:
DIRECT EXAMINATION (Resumed)
BY MR. MORAN:
Q. All right. You ready to get back started?
A. Sure.
Q. Okay. Excellent. In the pattern and



practice evidence, were you able to establish that any of the allegations had been proven as true?
A. In the pattern and practice evidence? Again, I don't know that I'd characterize it as proven as true. You mean the past pattern and practice allegations or the ones we were reviewing?
Q. The cases you reviewed.
A. In the cases we were reviewing, the particular allegations?
Q. Right. So just --
A. Like -- oh.
Q. To be clear, you had two parallel investigations, right?
A. Yes.
Q. Okay. You had the underlying case, and then you had the pattern and practice?
A. Yes.
Q. Okay. The pattern and practice you reviewed or investigated, did you find that any of the allegations had been proven true?
A. I think we found that there was -- the allegations -- some of the allegations were credible based on our review, our sort of holistic review of the facts and the pattern and practice

investigation.
Q. That's your assessment, credible, right?
A. That's our assessment, yes.
Q. Okay.
A. I don't know about proven -- I don't know what that means.
Q. In other words, a judicial finding or another court or whatever or jury has reviewed the same facts and concluded, yes, this happened?
A. I see what you're saying. I think that in some instances for some of the pattern and practice allegations, to the best of my recollection, I recall seeing Circuit Court cases or appellate cases where the court said that there is evidence of pattern and practice that is, you know, consistent with the allegations, if that's what you mean.
Q. Right.
A. There were also obviously civil cases that had either been settled --
Q. Do you know why the civil cases settled?
A. As I sit here today, I don't have a



memory of it. I don't -- I wouldn't know the intricacies of each of the civil cases, no.
Q. Did you ever know why the civil cases settled?
A. I don't -- I don't think I would say I knew, no.
Q. Like, for example, you don't know the reasoning of the City in a case in deciding to settle a civil rights case against the City and one of the detectives or --
A. I don't think I know the reasoning.
Q. Okay. And in your decision-making as part of the Working Group, did you rely on civil settlements as a factor to consider?
A. I think we relied on cases that had -- yes, wrongful conviction cases or civil settlements as a factor to consider, but, again, I don't -- not dispositive.
Q. How could a settlement carry any weight in your analysis given that you don't know the reasons for the settlement?
A. I think that where there is, for instance, more than one settlement involving the detectives at issue in the case, that is a factor



to consider, that there is more than one settlement, that it got all the way to a civil suit and that --
Q. By that analogy you could take a criminal defendant's background of judgments against him or convictions and say that's a factor to consider too?
A. I don't think it's the same analogy, but I think if you were applying pattern and practice or other crimes evidenced to a criminal defendant in a criminal defense case, you can certainly consider those factors and whether or not, if you're a court, to admit other crimes evidence.
Q. Did you consider those factors as part of the working -- I mean, why not consider those factors in the Working Group's analysis, whether the criminal defendant has a long record or a short record of criminal misconduct?
A. I don't know whether or not we -- it doesn't stand out in my mind whether or not we considered it.
Q. Well, the question is should you?
A. Should you consider those factors?



Q. As a member of the Working Group.
A. As a member of the Working Group, that criminal -- the defendant's past criminal history, arrest history or conviction or whatever?
Q. Arrest, convictions.
A. I'm not sure. I don't know.
Q. It sounds like --
A. It may be.
Q. -- from your answer that was not a significant factor -- or it was not a factor the Working Group considered in its analysis?
A. No. I think what I said was I don't know if we considered it in its analysis -- in the analysis. I think --
Q. I guess what I am getting at --
A. Yeah.
Q. -- is if you don't know whether you should consider it, doesn't that sort of give you the answer that you did not really consider it?
A. Just as I sit here today, I don't -- I don't recall, you know, exactly whether or not we considered it, but it may be a factor to consider. I'm not sure, though.
Q. How do you know -- I want to come back

to your discussion -- you had said at one point people from marginalized communities may not have been believed.
A. Um-hum, yes.
Q. How do you know that?
A. I don't know that. I think that there is some research, but also I think in my own experience, representing people, there is -- there was a sense back then that, you know, people in certain communities were more likely to be stopped, were more likely to, you know, sort of not be credited in some ways. I don't -- how do I know that? I don't know that that's a question I can answer.
Q. But do you have any evidence that that happened in any of the cases you reviewed?
A. Evidence that defendants who made claims were not believed?
Q. Yeah, because they were marginalized.
A. I don't think of it as a causative factor. I think it is -- when you were asking me about that, it was part of sort of --
Q. The bias discussion.
A. -- how does bias --



Q. Yeah.
A. -- inject itself into the system, and so I think that's just based on my prior experience.
Q. Okay. Did you find also that the victims in the marginalized communities were not believed?
A. That the victims -- I think there is evidence of victims not being credited or believed.
Q. Okay. Did you find that in the cases you reviewed as part of the Working Group?
A. I don't -- again, I don't know that we made that specific of a finding.
MR. MORAN: Okay. I want to give you -- oh, I am going to start with some exhibits. Mark that as No. 1, please.
(Hawilo Deposition Exhibit 1 was marked for identification.)
MS. MEADOR: Do you need one?
MR. MORAN: I don't need one, no.
Q. All right. You are looking at Exhibit No. 1. Do you recognize it?
A. Yes, I recognize it.
Q. Can you tell me what it is, what you



understand it to be?
A. I think what I understand this to be, it's the procedures and guidelines that the Working Group was given.
Q. Okay. And do you understand these to be the official procedures and guidelines that you were expected to follow?
A. I think -- I understand that we were given these set of guidelines and that we -- and they sort of formed the basis of the initial Working Group.
Q. Okay. Is there another set of guidelines besides this that you were expected to follow?
A. I don't know about expected. I think there was the protocol that we developed maybe.
Q. So a written protocol separate from this document, Exhibit No. 1?
A. I think so, yeah. There was -- I think there was a protocol as well but -- but it's -- I don't know about expected to follow. These were what we were provided and --
Q. Did the Working Group come up with any of the protocols in Exhibit 1?



A. I don't think so.
Q. Did the Working Group come up with a separate document of protocols that were written out so that you could look at any time?
A. Yes.
Q. Okay.
A. We developed a protocol.
Q. Okay. So, by the way, is the protocol that you developed different from Exhibit No. 1 in any way?
A. Oh, I don't remember, but I think there are -- I don't know if it's different or if it's just additional information.
Q. Yeah. It wouldn't contradict what you were given by the state's attorney; would it?
A. Not that I know of, but I don't -- I don't know.
Q. Okay.
A. Not that I know of, not that I can remember.
Q. All right. So let's take a look at the first page, in the second sentence, "The review will be conducted by an independent Working Group consisting of three Special Assistant State's

Attorneys who will report and make recommendations to the State's Attorney of Cook County...."
Did I read that correctly?
A. Yes.
Q. Okay. So right in the first paragraph it tells you that you're going to be independent, and your recommendations will eventually at least go to the state's attorney, right?
A. Yes.
Q. Okay. And as a special assistant state's attorney, further down, you "...possess all rights, privileges and immunities afforded to an Assistant State's Attorney."
A. I'm sure it says that. I don't know exactly where, but, yes, I'm sure it says that.
Q. It's in the next sentence after the parenthetical Working Group.
A. Okay. Yes.
Q. Okay. And the last sentence of that paragraph says, "The Working Group may further define and interpret these Procedures & Guidelines as deemed appropriate."
A. Yes.
Q. Is that how you came about making up



your own protocols?
A. I don't know if that's how we came about doing it or whether Risa suggested that we might want to develop a group of guidelines.
Q. Um-hum.
A. I don't remember, but what I understood this to mean is that this is, you know, an interpretation of the guidelines or protocols. We have some -- we have discretion to sort of interpret that.
Q. I got it. Okay. Under "Objectives," the next paragraph, about four -- three lines down, I'm going to read the phrase "to make independent and impartial fact-based recommendations." Do you see that phrase?
A. Yes.
Q. Okay. That's where you got that you have to be impartial and independent?
A. I mean, I think I got it from sort of -- in general.
Q. Right, right. But it's -- obviously the direction here from the state's attorney is be impartial and be independent?
A. Yes.



Q. Okay. I want to direct your attention to a phrase about two-thirds of the way down.
A. Um-hum.
Q. Five lines up from the bottom of the paragraph.
A. Okay.
Q. And it's talking about what you're going to be investigating, and it uses the phrase "purportedly inculpatory confessions or admissions from defendants." Do you see that?
A. Yes.
Q. Okay. Do you have an understanding as to why the state's attorney described confessions and admissions from defendants as purported?
A. I don't.
Q. Okay. That would signal a lack of confidence or belief in the confessions or admissions given by these defendants?
A. That's not how I interpreted this. I mean, I interpreted this as sort of a working memo.
Q. Okay.
A. And that they -- we were independent in terms of our assessment, but I do see the phrase, and I don't know why it's there.



Q. Okay. So it had no impact on your review?
A. Not that this was in the guidelines, no.
Q. Okay. All right. The next sentence says: The past allegations resulted in various outcomes, including lawsuit settlements, certificates of innocence and court decisions in favor of and against defendants.
And then the next sentence: As further defined below, the State's Attorney expects the Working Group to consider, among other things, the past allegations as part of its assessment of the present cases under review.
Do you see that?
A. I do. Just one small correction. You said against the defendants. I see detectives.
Q. Oh, yeah. I'm sorry. You're right. It's detectives, yeah.
A. But I do see that, yes, otherwise.
Q. The point is the state's attorney expects the Working Group to consider as part of its analysis past allegations as part of its assessment of the present cases under review, true?

A. That's what it says here, yes.
Q. Okay. How can you conduct an impartial evaluation if part of your analysis always includes there's these allegations against these detectives?
A. I think -- I think it is certainly possible, and we did conduct an impartial review of the individual cases and a pattern and practice that included these prior allegations. I think that's part of conducting one portion of the review.
Q. Do you see the footnote at the bottom?
A. Yes.
Q. It identifies the Lawyers' Committee?
A. Yes.
Q. Okay.
A. Yes, I see that.
Q. Having reviewed the list of names in the Lawyers' Committee, do you have any reason to believe that this is not the Lawyers' Committee?
A. I don't.
Q. Okay. Were any names added to the Lawyers' Committee to your knowledge?
A. Not that I know of.



Q. Are you personal friends with anyone on the Lawyers' Committee?
A. I think Steve Drizin is a friend. I don't know -- we're not close, but again we're colleagues.
Q. Um-hum.
A. I like Steve. I'm friendly with him. We've already talked about Josh Tepfer. That's a former colleague and, you know, friendly with him but I don't -- otherwise, no.
Q. Did you talk to any of these individuals about any of your work on the Working Group?
A. About the cases specifically? Again, not that I remember discussing the cases, but it may have happened.
Q. How about how you should evaluate the cases or things of that nature, like --
A. How I should -- like sort of the general process?
Q. Yeah.
A. I think I recall initially -- I don't remember about all of the individuals, but maybe Peter Neufeld providing a memo and I won't -- I



don't remember all of it, about, you know, evaluation and a discussion around this, evaluation of the cases.
You'll have to forgive me because like the law or the basis for it is hazy, but as a class of cases rather than --
Q. Um-hum.
A. -- this individual investigation and I don't -- we -- that's not how we proceeded.
Q. Okay. Let's go back up to that paragraph under "Objectives."
A. Sure.
Q. And it defines the seven detectives.
A. Yes.
Q. We see the names Kenneth Boudreau, Richard Paladino, James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and Patrick McCafferty.
Do you know why those names were included?
A. I would be guessing. I think it had something to do with Englewood, but I'm -- but I'm not sure.
Q. Did anyone who spoke to you or



recruited you for the Working Group, like Peter Neufeld or anyone else, explain to you that there is a belief that these detectives are continuously abusing suspects and they need to investigate whether the cases they handled resulted in, you know, improper convictions?
A. Maybe early on as an explanation for why this Working Group was formed. I don't know if they said it that way, but like the gist of it, that there's -- these detectives may have been involved or were involved in their view in coercion and -- but, yeah.
Q. Okay. So on the top of the next page --
A. Um-hum.
Q. -- there's a description of how you can ensure impartiality. Do you see "To ensure impartiality," and it goes on to explain how things will be done? Did the Working Group follow these recommendations -- these guidelines on impartiality?
A. I think we certainly tried to. I didn't -- we didn't -- I don't -- I didn't represent any claimants, nor was I a member of a

committee considering the allegation from any claimant.

I'm trying to remember if I was on some unrelated advisory board and then they ended up representing claimant and I withdrew from -- I don't remember. But I think we certainly tried to.

We don't represent -- I don't represent the detectives and with respect to -- and I read that last sentence to mean we can't be involved in referring the claimants' cases to any of these individuals.

Q. Sure. Of course, if you're reporting to the Lawyers' Committee on what the status is, they would know if you had made a recommendation, if the recommendation had been agreed upon by the state's attorney, right?

A. I think it depends what the quarterly report said. What the recommendation was, I'm not sure -- I don't remember as I sit here today whether we said what the recommendation was and whether there was agreement.

Q. Okay. Are you aware of anything that was in place in writing to address conflicts with the Lawyers' Committee or to ensure the Lawyers'



Committee doesn't have an influence in the outcome of your work?

A. I'm not aware of any.

Q. Okay. I want to direct your attention to "Resources." This is a paragraph that describes the resources available to the Working Group members, including resources made available by the Conviction Integrity Unit.

Do you see that?

A. Yes.

Q. Okay. In the middle of the paragraph beginning with the word, "Aside from these limited circumstances" --

A. Okay. Yes.

Q. -- "the CIU of the CCSAO will not participate or engage in any activities or discussions on the cases actively under review or the final recommendations by the Working Group," do you see that?

A. Yes.

Q. Do you know why that restriction was in place?

A. I don't know.

Q. Were there any discussions with members



of the Conviction Integrity Unit on the particulars of any of the cases under review?

A. Again, there -- I recall -- we do -- I do recall meeting with members of the CIU at the time to discuss generally, you know, their practices and how they investigated cases and what kinds of police reports. My recollection, this is what I am thinking of. Might be in a file. I think, you know, going through the CIU to ask for --

Q. I am talking about different from asking them to find a file. I mean like --

A. No, no. Like what would be a file --

Q. -- substantive participation in the work under review.

A. I don't think they engaged in substantive participation. There may have been -- and I'm trying to remember discussions with members -- I certainly think we talked with them about how they approach cases, how they approach investigations --

Q. Um-hum.

A. -- as a part of information gathering, not as a part of deliberation in a case.



Q. Got it. By the way, were you given something called a protocol for Guevara cases?

A. Maybe. From the state's attorney's office?

Q. Yeah, from the Conviction Integrity Unit.

A. We were given protocol, but I don't -- I just don't remember if it's -- you said for Guevara. I don't remember if it's for that, but I do recall getting a protocol.

Q. Okay. I want to direct your attention to closer to the bottom.

A. Um-hum.

Q. I'm going to read the sentence: Following the dissolution of the Working Group, any later consideration of nonvacated cases previously subject to Working Group's review will be in accordance with all CIU practices and protocols as defined by the CIU of the state's attorney's office.

Do you see that?

A. Can you just -- where is it, here (indicating)?

Q. Sure. It's at the bottom -- look for

the phrase "Following the dissolution of."
A. Oh, the CIU following the dissolution of --
Q. Yes.
A. Okay. The Working Group may be virtually?
Q. This is under "Resources," at the bottom of the paragraph for "Resources."
A. Okay.
Q. Following the dissolution of the Working Group, any later consideration of non-vacated cases --
A. Oh, I see it. Got it. Okay.
Q. -- previously subject to the Working Group's review will be in accordance with all Conviction Integrity Unit practices and protocols -- I'm not going to finish the sentence.
A. Yes, that's fine.
Q. Okay. You see where I'm at?
A. Yes, I do.
Q. Okay. Do you know -- we talked a little bit about this earlier; I want to see if this refreshes your memory -- why the cases under your review would have gone to the Conviction



Integrity Unit?
A. I don't know, and I don't remember.
Q. And why before dissolution of the Working Group would the Conviction Integrity Unit have been prohibited from any active -- engaging in any activities or discussions on the cases under review or the final recommendations?
A. I'm not sure.
Q. Okay. None of this refreshes your memory?
A. It doesn't. I just don't -- I'm not sure.
Q. Okay. I am going to direct your attention to "Reporting," and the second full sentence under the section on reporting --
A. Sure.
Q. -- Section V, "The Working Group shall also provide a short quarterly report to the Lawyers' Committee that summarizes the status and progress of the investigation of each case."
And I know you did that. My question is does reviewing this at all refresh your recollection as to why those reports had to go to the court -- or Lawyers' Committee?



A. I don't know why and in general -- my recollection is that the reports went to Risa --
Q. Um-hum.
A. -- and Thor, and then they would send them, but there may have been some that went directly. But I know that's not what you're asking. You're asking does this -- I don't know why. I'm not sure.
Q. Okay. Did anyone from the Lawyers' Committee ever follow up with you or your colleagues based on a quarterly report for follow-up questions or comments?
A. They may have, yeah. I mean, I don't -- I don't recall -- it would have been Peter.
Q. Um-hum.
A. And he may have followed up with what is, you know -- is there a quarterly report coming or --
Q. I mean about specific cases.
A. I don't remember. About specific cases in the -- you know, like how -- generally, how is the investigation going; is there anything necessary. But I don't remember having discussions



about specific cases, but I --
Q. Okay.
A. -- can't say for sure.
Q. Last sentence --
A. Yeah.
Q. -- on Section V, "Reporting" at the bottom of the page, "In the interest of transparency, the recommendations of the Working Group and their reasoning will be made public, along with the decision of the State's Attorney," do you see that?
A. Yes.
Q. Do you know if those decision -- your recommendations and the state's attorney's decisions were ever made public?
A. I don't know.
Q. Did you ever ask?
A. Did I ever ask? To make them public or --
Q. Or if they had been made public or where you could find them.
A. Oh, I see. Did I ever ask the state's attorney's office --
Q. Yeah.

A. -- whether they had been made public? I don't remember asking.
Q. Conceivably, if your recommendations, you, part of the Working Group, had been made public, the victims' families would have access to those and be able to read through the recommendations, right?
A. Conceivably, yes.
Q. Did you have any concerns that the victims' families may reach out to you about the recommendations made by the Working Group?
A. I didn't have concerns that the victims' family would reach out to us. I, you know -- as I understood it, the state's attorney's office would be in charge of discussions with victims' families.
Q. Okay. Do you have any idea why it was decided to make the recommendations of the Working Group and its reasoning public alongside the decision of the state's attorney?
A. I don't know why it was decided. I don't know if -- it was made public. I don't know why. I'm not sure.
Q. Under communications, Section VI, I am



going to look at the second paragraph.
A. Okay.
Q. And the second full sentence talks about your communications, and it says the Working Group may communicate with the CIU, the Lawyers' Committee, and lawyers for each claimant about its general practices and other claims involving the detectives, general status and progress of the investigation.
And the following sentence says the CIU shall not communicate or discuss any of these cases actively under review with the Working Group.
I want to stop there because there is a condition, but it's not relevant to my question.
Do you have any idea why there was another prohibition included here, limiting your communications with the Conviction Integrity Unit to general practices and other detectives or things you need but not allowing communications about the specific cases you're investigating?
A. Right, or the status or progress of the investigation. I don't -- I'm not sure.
Q. Okay. And this doesn't help you



remember at all?
A. No.
Q. Okay. Let's see. All right. The Working Group -- and this is under "Individuals Germane to Investigations." This is under your "External Communications," Section VII.
A. Okay. I'm there. C, yeah.
Q. C. It says: The Working Group can arrange meetings and receive information from innocence projects, outside organizations, and past legal representatives of defendants whose cases have been vacated and the exonerees. And the purpose of the meetings may include discussions of general noncase-specific facts and views regarding coercive police interviewing techniques, fabrication of evidence, credibility of particular detectives, information known to the public about the detectives, or case facts and views involving an attorney's past representation of a client.
A. I see that.
Q. Okay. In other words, you're allowed to investigate essentially the detectives through innocence projects, former attorneys who represented exonorees, things of that nature?



A. Sure, to gather information from --
Q. Sure.
A. -- you know, any entity that might prove useful.
Q. Okay. Is there any provision in these guidelines that offers you a similar opportunity to conduct an investigation from the point of view -- or of any representatives of the detectives in terms of finding out whether they deny the allegations, how hard they can test the allegations, things of that nature?
A. Not explicitly stated, although I don't think the guidelines would prohibit it, but that's up for -- I mean, not explicitly stated if that's what you're asking.
Q. Yeah, that is what I'm asking.
A. Yeah. It's not explicitly stated.
Q. Okay. And did the Working Group make an effort to conduct sort of the mirror image of this type of investigation and looking at whether the allegations of abuse are true?
A. The mirror image of -- no.
Q. Yeah, let me -- it's a bad question. Did the Working Group conduct any -- as part of its

investigation, did the Working Group make an effort to determine whether any claimants' allegations of abuse are true?
A. Any claimant's allegations. I think as part of an investigation, the entirety of the case, sure.
Q. Right.
A. We made an effort to determine whether the -- whether the allegations should receive weight, whether there was corroboration or not.
Q. And was it -- after the first case you investigated, first two or three cases you investigated -- strike that. Let me back up a second.
Were most of your cases involving Area 1 detectives?
A. I think so.
Q. Okay.
A. Yeah.
Q. And after the first one or two or three cases you investigated involving Area 1 detectives, did you at that point conclude that the pattern and practice evidence is legitimate and we should apply that in every case we review going forward?



A. I think there was -- I think there was -- I can't speak for the group, but, you know, we sort of discussed whether there was a basis -- there certainly seemed to be a basis, maybe not after the first or second but for the pattern and practice allegations, and I think there was discussion on when and how to apply it. That was a matter of discussion over the entirety of the project.
Q. In your meetings with legal representatives of defendants whose cases have been vacated --
A. The claimants' cases --
Q. Yeah.
A. -- or defendants' cases? Okay, yes.
Q. For example, you met with Loevy & Loevy's office.
A. Oh, you don't mean the cases under our review.
Q. Well, no. I mean specific to this paragraph here that we just read: The purpose of the meetings may include discussions of general noncase-specific facts and views regarding coercive police interviewing techniques, fabrication of



evidence, credibility of particular detectives, information known to the public about the detectives, or case facts and views involving an attorney's past representation of a client. Right?
A. I see that, yeah.
Q. Okay. That essentially is pattern and practice evidence that you would be able to gather?
A. Yes. I think that's part of information gathering.
Q. Okay. In your approach or review of these cases, did you take into account that the defense -- or the attorneys representing the defendants may have an interest in advocating a certain position to you as the independent and impartial investigator in order to achieve a result that would favor their work going forward?
A. I certainly think -- you know, we considered the weight is the way I would phrase it of -- as you would with anybody you're gathering information from, how much weight to give what is being stated, how much credit to give it or not, and I think that's why, you know, it's important to sort of consider and conduct a full investigation --



Q. Okay. How did --
A. -- that includes something outside of, you know, a meeting.
Q. So, in other words, you consider the weight of the information you received from these attorneys on the cases they had and the possibility that these attorneys are advocating a position that may not be -- may be one-sided?
A. Sure. I think that that's a fair -- I think that's a fair factor to consider. The source of the information is certainly something to consider and --
Q. Is that addressed in any of the reports you created?
A. The source of the information? I'm not sure. I mean, I think we tried to address, you know, in general where -- what information we sort of relied upon but --
Q. The pattern and practice evidence is an accumulation of allegations against specific detectives, right?
A. Yes.
Q. Okay. Allegations made over a period of time?

A. Allegations made over a period of time.
Q. Okay. And the more allegations that accrue, the greater the weight of the pattern and practice of it?
A. I think it depends. I mean, if there are allegations that accrue and, you know, courts -- all the courts that have looked at them have completely dismissed them, I'm not sure that simply looking at a number is sufficient for pattern and practice. In other words, sure, the number matters. The timing matters. There are a number of factors. I just don't think that --
Q. Well --
A. -- we can sort of say with a certainty --
Q. Doesn't accumulation, the sheer number of allegations -- isn't that a factor in your consideration of pattern and practice?
A. For sure.
Q. And if those numbers increase, is that also a consideration?
A. If -- the more numbers of allegations, that's a consideration, sure.
Q. Right. Because at some point you say,



well, all of these people can't be wrong. They can't all be making it up, right?
A. I mean, that's one conclusion to draw from that. That's one conclusion, sure.
Q. I know I'm paraphrasing, but isn't that sort of a conclusion you reached in some of the decisions -- many of the decisions you sent to the state's attorney?
A. I think -- you know, again, without going back multiple years and sort of thinking about the rationale and something I just can't access right now, I think that it's certainly a factor that was part of the reason for the recommendation, but the factual investigation was also part of, you know, how the recommendations were reached. So it was -- I don't know that I would say it's a sole factor or dispositive factor.
Q. I didn't say it was a sole factor.
A. Yeah.
Q. Did you issue -- I mean, essentially I said -- what I said was -- I paraphrased, but essentially you were informing the state's attorney that there's so much alleged against these detectives, we believe the allegations against the



detectives?
A. I think that was certainly one of the factors that we --
Q. Yeah.
A. -- stated as our -- among our reasons for the recommendations.
Q. By the way, you mentioned that you're still having trouble remembering some of this stuff, and I'm curious if having been questioned by me for three hours already, has that helped you refresh your memory about any of your work?
A. Well, I think I -- you know, I've tried to answer what I can remember independently.
Q. I know. I'm just asking if it's helping.
A. I think I need a question, but I don't -- I'm trying to answer to the best of my ability here.
Q. Okay.
A. Okay.
Q. By the way, do you know how -- strike that. Let me back up a second.
In your analysis of the pattern and practice evidence, did you give any consideration



of the fact that inmates in the prisons may discuss certain detectives frequently and spread stories about certain detectives frequently?
A. I certainly think we discussed it. I think we discussed it, or at least I think I would have considered that.
Q. That would be a factor to consider in weighing the credibility of the allegations of abuse, don't you think?
A. I think it is certainly a factor to consider.
Q. How did the Working Group reconcile that or consider that factor?
A. I think it was considered as part of what I'd call sort of outcry evidence, when were these allegations first raised, how were they raised, were there widespread reports of it happening -- I mean allegations, and then it's raised. Again, not dispositive but certainly something that we talked about.
Q. Now, outcry evidence is based on -- the weight of outcry evidence is dependent on timing, right?
A. The weight of -- is dependent on

timing. Timing is one of the considerations as to whether it's sort of outcry or not. I mean --
Q. Okay.
A. Do you know what I'm saying?
Q. Yeah.
A. Timing is part of like the definition of outcry.
Q. No, that's okay. An outcry is the first time -- you guys -- I mean -- when I say "you guys," I mean the Working Group. It's all over the reports, initial outcry or recent outcry. Outcry is when the criminal defendant first expresses to somebody verbally or in writing I've been -- I was beaten up by the police, and that's the only reason I confessed or something along those lines?
A. Along those -- like this thing happened to me.
Q. Yeah. Okay. So in that context the timing of when the outcry occurred is relevant in assessing whether that outcry is fabricated or not?
A. Right, or whether it is an outcry, in other words.
Q. Right. If it's not fabricated, then it is an outcry. I mean, it's an outcry no matter



what because it's somebody complaining about how they were treated, right?
A. Sure. I guess -- I mean, I think we might be saying the same things, but I just want to be clear that, you know, one can have an outcry 20 years later, and I don't know that I would qualify that as an outcry just because it's --
Q. Um-hum.
A. -- 20 years later versus -- the timing goes into whether, in my mind at least, it's called outcry evidence.
Q. Got it. Okay. Someone who is -- gives a statement to police, is charged with murder, being charged with murder must be a traumatic event; would you agree?
A. Sure.
Q. Because that person is facing the prospect of a lot of time in prison?
A. Sure.
Q. Okay. Isn't it possible for someone to realize that the next day or shortly after giving the statement to police and look for ways to undermine the statement by fabricating a story about misconduct?



A. It's certainly possible, yes.
Q. Okay. Did you run into that in any of your work with the Working Group?
A. I don't know if I -- if we ran into that specific scenario, but consideration of reasons for making the allegation was part of our discussion, sure.
Q. By the way, those appellate decisions you reviewed about pattern and practice evidence, those were decisions reversing trial courts who had found that the criminal defendant had not established pattern and practice and that the confession should not be deemed inadmissible?
A. I don't know if they were all -- some of them were -- I think some of them -- I mean, I -- gosh, I don't -- I thought I also reviewed -- I think I reviewed some of them affirming --
Q. Okay.
A. -- not just reversing.
Q. In the ones that reversed a trial court's decision to uphold the conviction --
A. Sure.
Q. -- and deny the post-conviction relief, did you notice whether the appellate court was



making new findings of fact that -- because it disagreed with findings the trial court had made?
A. In the ones that affirmed the conviction?
Q. No.
A. Reversed --
Q. Yeah, affirmed the conviction, yes.
A. Affirmed the conviction?
Q. Yes.
A. Did the appellate court make new findings of fact?
Q. In other words, replace the trial court's findings with its own findings.
A. Oh, I can't -- I can't remember the details of the cases. I don't -- that doesn't like -- as I sit here doesn't resonate, like nothing is triggered, but I don't --
Q. That would be unusual if an appellate court made new factual findings to replace those made by the trial court, don't you think?
A. I think new factual findings, yes. I think a restatement of facts in a way that, you know, courts can do or viewing the facts in a different light is maybe the best way to say it.

Q. Sure.
A. I'm not sure that's all that unusual, no.
Q. Okay. I want to look at the next page under Section VIII, "Review Procedures."
A. Section VIII?
Q. Section VIII-C --
A. Okay.
Q. -- under "Assessment of Claims."
A. Okay.
Q. It notes, regarding pattern and practice, the pattern assessments of all cases or -- "The pattern assessment shall consider the history of misconduct of the detectives as well as any history of testifying falsely."
Do you see that?
A. Yes.
Q. Did you encounter any instances in which a court had found that the detectives had testified falsely?
A. I don't remember.
Q. Did you make any determinations that the detectives had given false testimony as the Working Group members?



A. I don't remember.
Q. Okay. In the pattern and practice appellate decisions you reviewed --
A. Um-hum.
Q. -- that either reverse a trial court affirming the conviction --
A. Um-hum.
Q. -- or -- you know, that find in favor of the criminal defendant -- let's just put it that way --
A. Okay.
Q. -- did those cases take a position that because of the pattern and practice evidence, the accumulation of it or the volume of it, the defendants -- the detectives must have committed the abuse, and their denials on the witness stand must be false?
A. I don't remember reading cases where it stated --
Q. Quite like that?
A. -- in the way that you stated it.
Q. I'm paraphrasing, of course, but in any way, shape, or form like that, do you remember reviewing those types of cases?



A. I -- you know, I remember reviewing a case where I think the -- I don't know if it's the appellate court or the one -- anyways, a court said just given the number of allegations, that's a -- I think -- I'm paraphrasing as well here, that's a factor to consider and should be given weight against the credibility of what the detective said, but I don't remember sort of reading it in any context the way that you're --
Q. Okay.
A. -- asking.
Q. I see the next section that follows is "Recommendations"?
A. Yes.
Q. Okay. Now, up to this point we reviewed some of the guidance or direction on how the Working Group should be investigating the cases and what it should be investigating.
A. Um-hum.
Q. Agreed?
A. Yes.
Q. And thus far the topics we've covered have provided specific instructions on how the detectives should be investigated, agreed?



A. I think -- I don't know if -- I would not phrase it as provided specific instruction. I think there's some guidance as to how to go about conducting both the factual investigation and a pattern and practice investigation.
Q. Okay. First of all, is it specific guidance? You would agree it's specific?
A. Again, I think it is -- I think it's sort of less -- sort of -- what is it, directive than -- or at least my interpretation is it's less directive than the way that I'm hearing you phrase the question.
Q. Oh.
A. This was a work in process. This was, you know --
Q. Here, let me give you an example.
A. Okay.
Q. We will go back to Subparagraph C of Section VIII.
A. Sure.
Q. The sentence I read earlier was, "The pattern assessment shall consider the history of misconduct of the detectives as well as any history of testifying falsely."

Would you agree with me that is
not -- that is a direction?
A. I would agree that the word shall implies a direction, but I also think that this document has to be read as a whole, and part of it is that the -- you know, the state's attorney's office is asking us to conduct an independent investigation, and with that comes some ability to sort of figure out as we're investigating whether that directive makes sense, shall consider this.
Q. Did you follow that direction?
A. I think we considered the history of misconduct. As part of the pattern and practice? Again, sure, it was part of the factors to consider.
Q. Okay. Let me be clear.
A. Okay.
Q. I read this --
A. Yeah.
Q. -- and I'm asking -- and obviously you agree the word "shall" denotes that this is a mandatory requirement, right? That's what the word --
A. I think the word "shall" denotes that.



I am telling you that in my -- my own personal view of this is that this is a document that should be read holistically as a whole and that my experience is that we were given sort of some -- we were given discretion to conduct an independent examination in order to provide a nonbinding recommendation, which the state's attorney could then --
Q. Okay.
A. -- do whatever they want with.
Q. So directions -- so -- just to be clear, I understand you read it holistically and you think you have flexibility, but did you consider what -- according to Section C, history of misconduct of the detectives --
A. Sure.
Q. -- and the history of testifying falsely?
A. I think we certainly considered the history of misconduct. I don't know as I sit here today whether we specifically considered the history of testifying falsely, but we may well have.
Q. Did you ever alert the state's attorney's office, whether it's Risa, Kim Foxx, or



anyone else, you think this sentence in Section C should not be a mandatory requirement and that you should have leeway to not consider a history of misconduct or a history of testifying falsely by the detective?
A. I don't think we specifically -- I don't recall specifically saying to Risa, I do not think this should be considered. On the other hand, my recollection is that, you know, we were sort of permitted to conduct an independent review.
Q. Did you ever alert the state's attorney's office, whether it's Risa, Kim Foxx, or anybody else, Thor Martin, that this document should be viewed in a holistic way and that -- wherein which you have flexibility and it should not be so rigidly enforced?
A. I don't think I specifically -- I don't recall specifically saying this document should not be rigidly enforced.
Q. Okay. So let's look at the recommendations --
A. Sure.
Q. -- under Section D, which is just below. And I want to focus on No. 1,



"Recommendation of Vacatur" -- I hope I pronounced that right -- "based on Innocence." This recommendation will entail a Working Group finding that there is new evidence in the individual case which gives rise to a substantial probability that the convicted defendant was not the person who committed the crime. Agreed?
A. Yes, I see that.
Q. Okay. Would you agree that that involves two specific elements: One, it has to be new evidence, and, two, that new evidence rises to a substantial probability that the convicted defendant is not the person who committed the offense?
A. I would agree that substantial probability is the standard and, you know, again -- yes, the new evidence is in here, but I think that can be consideration of -- yes, that those words are in here, yes.
Q. Okay. Well, is it two requirements or not?
A. I -- yes. The recommendation says that, you know --
Q. Okay.

A. -- this finding is based -- this recommendation.
Q. As part of the recommendation -- this is the next sentence --
A. Um-hum.
Q. -- the Working Group will make factual findings that led the Working Group to determine the defendant was not criminally responsible for performing the acts of the offense.
Okay. Do you read that to mean that you actually have to identify the specific facts that support your position that the conviction should be vacated based on innocence?
A. I read it to mean that we should identify the reasons that would support a vacatur on the basis of innocence, yes.
Q. Did you recommend vacatur on the basis of innocence in any of the cases you reviewed?
A. Gosh, not that I remember but -- not that I remember.
Q. Would you agree with me this is a high standard to meet?
A. I think it is a high standard to meet.
Q. Okay. Now, the second choice is



vacatur based on interests of justice. Agreed?
A. Yes.
Q. Okay. And there's a few elements in there, one of which is "any credible information exists to cause a loss of confidence in the integrity of the conviction." You see that?
A. Yes.
Q. Okay. Including any of the seven detectives' involvement in obtaining the statement from the defendant, and then there's a -- the sentence stops. Okay.
A. Yes.
Q. Another element that you can take into consideration is any overall patterns that emerge during the review, including what the Working Group learns from other cases involving any of these seven detectives and/or information in the specific case that results in the loss of confidence. Agreed?
A. I see that, yes.
Q. So, in other words, it's sort of intermingling, but you can rely on the pattern and practice evidence or case-specific information that causes you to lose confidence in the conviction?



A. Sure, yes.
Q. Okay. Next sentence, "Such a recommendation will not entail a finding that the defendant was innocent of the crime...."
A. That's right.
Q. See that?
A. Yes.
Q. Okay. Do you read that as not entailing a finding of No. 1 or just not entailing a finding -- No. 1 meaning substantial probability of innocence as defined in No. 1 or just -- it's just not a finding of innocence?
A. I read it now to mean, and I can't -- I don't know exactly how I read it then but that it wouldn't entail a finding based on innocence in No. 1, vacatur based on innocence, a substantial probability.
Q. Okay. So the sentence I just read, "Such a recommendation will not entail a finding that the defendant was innocent...", you read that to mean that you couldn't satisfy the requirements of No. 1, recommendation of vacatur based on innocence?
A. Yes, that the finding -- it does not --



this recommendation doesn't, as I read it, require a finding or entail a finding that the defendant should be granted a vacatur based on innocence as laid out in No. 1.
Q. Okay. So nothing precludes a finding in No. 2 that even though we don't think there's a substantial probability that the defendant did not commit the crime, we think there is evidence of innocence?
A. I think we -- I think we could make such a statement, a recommendation even if it's under vacatur, yes.
Q. And if you did think there was evidence of innocence, would you have included that in your recommendation to the state's attorney?
A. Oh, I think so, yes.
Q. Okay. Is it fair to say that if you did not believe there was evidence of innocence, you would not have included that kind of language in a recommendation to the state's attorney?
A. I think that if -- again, if the members of the Working Group did not believe that the evidence rose to the level of innocence, then we would not have included that.

Q. Okay. The last phrase after that sentence, such a recommendation may or may not include a finding of any wrongdoing by the detectives or any other individuals associated to the case.
So would you agree then -- first of all, I read that correctly, right?
A. Yes, I think so.
Q. All right. You agree you had the ability to make a finding of wrongdoing against the detectives who investigated the case?
A. Sure. I think we -- this is what I'm trying to say. I think that we were -- we really were conducting an independent investigation and were not prohibited from including factors that we relied upon, and that includes the factor you just mentioned. If we agreed that there was wrongdoing, we could have included that specifically.
Q. But your independent investigation did not include any attempts to speak directly with the detectives?
A. It did not. We had their testimony.
Q. And did you have -- you had the trial testimony regarding Cordell Williams, right, from the detective?



A. I think so, yes.
Q. Do you think that trial testimony was as complete and sufficient as you needed to reach a conclusion?
A. I think we looked at -- my recollection, and I don't have an independent one, but I think that we reviewed more than trial testimony.
Q. Um-hum.
A. So that alone would not have been -- if you're asking me would that have been sufficient in a case, I don't think so.
Q. I know you reviewed deposition testimony as well, right?
A. I think we reviewed deposition testimony -- or I don't know if it's post-conviction statements or -- I don't remember but --
Q. In any of your conversations with attorneys for formerly convicted defendants, like the attorneys at Loevy & Loevy, did any of these attorneys tell you that any of the detectives you were investigating had at one point asserted a Fifth Amendment right to silence?



A. I don't remember if it came up in a conversation, but I -- I think -- I definitely remember hearing it. So it may have been in conversation or seeing it in some pleading or -- it certainly is something that came up that I remember as I sit --
Q. Do you hold it against the detectives for having done that at one point?
A. I don't -- again, I think it's certainly something to state. I don't think that a case should be based on -- or that an allegation could be corroborated as a result of a Fifth Amendment privilege assertion.
Q. Okay. You as someone who has practiced as a criminal defense attorney --
A. That's right. That's right.
Q. -- you wouldn't hold it against someone for --
A. I'm telling you where my perspective is on this.
Q. So you can't hold it against someone for taking the Fifth, right?
A. I would not -- as I said, I think it is certainly something that can be discussed --



Q. Um-hum.
A. -- that can be evaluated, that can be a factor, but as a dispositive factor in reaching a conclusion, that's probably not, you know -- I don't imagine that that be the only factor.
MR. MORAN: Okay. I want to give you another exhibit. We will mark this one as No. 2.
THE WITNESS: Do you want this one back or --
MR. MORAN: You can just set it in the middle. We might come back to it.
(Hawilo Deposition Exhibit 2 was marked for identification.)
THE WITNESS: Okay.
BY MR. MORAN:
Q. So you're looking at Exhibit No. 2. This is an email from Steven Becker to you, I believe, with information about the case regarding Cordell Williams; is that correct?
A. Yes. I think to Marc and to me but, yes.
Q. Okay. And he's identifying in that email specific information provided to you; is that correct?
A. Specific information -- yes, to --

226

"Good morning Maria and Marc," is that what you're talking about, that portion of the email and --
Q. Well --
A. -- specific group of documents? Yes.
Q. Yeah. He's identified them by number.
A. Yes.
Q. So signed statement from Cordell Williams, an affidavit from Odell Williams, a statement of Derrick Burnett, and an affidavit from David Evans, the co-defendant?
A. Yes --
Q. Okay.
A. -- I see that.
Q. And I'm giving this to you to refresh your recollection as to when you would have received this information, but according to the date on Exhibit 2, it is November 22, 2021 --
A. Sure.
Q. -- that you would have received it.
A. Yes.
Q. Okay. Would you have made it a point to review all the information provided by Mr. Becker before you went about interviewing witnesses?

227

A. Not necessarily.
Q. And why --
A. I mean, I think -- I don't know that -- I'm not recollecting specifically about the case, but in general I don't know that we would review all the information provided by defendants' counsel before we interviewed witnesses. We may be interviewing witnesses in conjunction with, at a parallel time, before. I don't know that we would have made it a point.
Q. So, for example, you have a statement from Cordell Williams?
A. Yes.
Q. You would want to review that before you talked to Cordell Williams, right?
A. That is -- yes. That would be good if we got it in time, sure.
Q. And you have a statement from Derrick Burnett. You want to use that before you talk to him, right?
A. I -- again, not necessarily but --
Q. When you say "not necessarily," what would be the benefit of interviewing a witness without actually having reviewed background

228

information about what that witness purports to say?
A. I mean, I think, you know, sometimes the benefit is to try to interview the witness before defense counsel can interview the witness so that we can get --
Q. I mean, you're the Working Group attorney, right?
A. Right.
Q. Okay. Are you concerned that defense counsel, Mr. Becker, would -- should not be part of the interviews? Are you worried about information he may get before you?
A. No. I just -- there -- as you lay out sort of the investigation, you just try to do the work as you're able to. I mean, you know, if a witness is available on a specific date, you might go ahead and take the opportunity of --
Q. Um-hum. At the time Mr. Williams would have still been in prison, right?
A. I think so, yes.
Q. Okay. So you would have had to arrange to go meet with him?
A. I think so, yes.

229

Q. Okay. Same thing with David Evans, he would have still been in prison as well, right?
A. I just don't remember.
Q. All right. Do you have a recollection of David Evans or interviewing him?
A. Not an independent recollection.
Q. Certainly you would have reviewed these materials before you completed your report that went to the state's attorney regarding Cordell Williams?
A. I think we would have tried to, sure.
Q. Okay. It wouldn't be a very complete investigation if you didn't review, for example, affidavits or signed statements?
A. I mean, I don't -- you know, we tried to review -- we try to do our best to review the material available to us and conduct our investigation in light of that material available to us.
Q. Have you ever seen the deposition given by Cordell Williams in this lawsuit?
A. In what lawsuit?
Q. This one.
A. In this lawsuit?

Q. Yeah.
A. No.
Q. Have you ever seen a deposition given by Cordell Williams?
A. I don't remember.
Q. Have you ever seen a deposition given by David Evans?
A. I don't remember.
Q. Have you reviewed any of the pleadings filed in this lawsuit?
A. Pleadings in this lawsuit?
Q. Yeah.
A. I don't think so, but I don't remember.
Q. Okay. Do you believe you may have -- strike that. Yeah.
Do you believe you may have submitted your report to the state's attorney without actually having reviewed the materials identified in this email from Steven Becker on November 22, 2021?
A. I don't know.
Q. Really, you don't know?
A. I don't -- I just don't remember.
MR. MORAN: Okay. I want to show you another



exhibit. Oh, fiddlesticks.
MS. MEADOR: That's an industry term.
MR. MORAN: Yeah. Oh, it's double-sided. Okay. We're saving paper.
(Hawilo Deposition Exhibit 3 was marked for identification.)
BY MR. MORAN:
Q. Okay. We're looking at Exhibit No. 3 now. This is an email from Rob Olmstead to, I believe, you regarding information provided by the Torture Inquiry Relief Commission; is that correct?
A. Yes, to me, to Vincent, and to Marc, yes.
Q. Right. Okay. Was a subpoena issued from the Working Group to the -- to TIRC?
A. No.
Q. Did you just make a request for information?
A. Yes.
Q. Okay. I want to direct your attention to the part on Cordell Williams, which is on the next page, I think. Do you see that?
A. Yes.
Q. He points out that because you're



prosecutors, he can give you unredacted information.
A. Yes.
Q. Okay. Did you let him know that you're not really a prosecutor?
A. I don't know how to answer that question. I let him know sort of what the Working Group was and that we were appointed in this special prosecutor dimension. That's what I let him know.
Q. Special assistant state's attorney?
A. Yes, and that we did not -- you know, we didn't -- that's -- that's what I let him know.
Q. Did you view yourself as a member of the Working Group to have a law enforcement role?
A. No.
Q. Okay. Because he specifically refers to law enforcement in the email to you.
A. Yes. I did not view myself to have a law enforcement role.
Q. Okay. Did anybody set him straight on the fact that you're not really prosecutors, you and Marc and Vincent?
A. I think that we honestly told him that



we were -- we had been appointed to review, conduct this audit.
Q. The information that you were provided by Rob Olmstead --
A. Yes.
Q. -- did you review that information for the report you ultimately provided?
A. I think so, yes, but I don't -- I don't have a specific recollection.
MR. MORAN: Okay. I am going to ask you about something else real quick.
(Hawilo Deposition Exhibit 4 was marked for identification.)
BY MR. MORAN:
Q. So we're looking at Exhibit No. 4. This is a draft memo called "WORKING GROUP MEMORANDUM OF FINDINGS AND RECOMMENDATION, EXECUTIVE SUMMARY," regarding the case of Jerry Gillespie, and it has handwritten edits on it --
A. Um-hum.
Q. -- starting at page CCSAO-WG 0103377 through 0103406.
All right. Do you recognize this document?

A. Not -- I don't have an independent recollection of this document.
Q. Okay. Do you recognize the handwriting on the document?
A. I don't.
Q. When you received edits from your colleagues, did one of them give you handwritten edits?
A. I don't -- I don't know. I think -- I don't know if the -- I don't even know if I drafted a first draft of this one.
Q. Right.
A. So I don't know if I would have received edits. I think -- I'm trying to remember. I don't know if Marc ever gave handwritten edits, or we might have. I don't remember.
Q. Okay. I am going to focus -- so you -- as you sit here today, you can't tell whether that's Marc Kadish's handwriting?
A. I just don't -- I don't recognize the -- I don't know. I don't remember.
Q. Is there anyone besides Marc Kadish or Vincent Southerland who would have been making handwritten edits to these reports?



A. I don't think so.
Q. So the universe of possibilities is --
A. Or me. Yeah. I don't recognize it. I don't know.
Q. This isn't your handwriting; is it?
A. I don't think so. I don't know. I really don't know.
Q. All right. I want to focus on the footnote on the first page.
A. Okay.
Q. You actually have a question. We would like to discuss actual innocence versus interest of justice. We don't believe there is credible evidence of guilt, but we aren't sure whether/at what point to consider the presumption of innocence in reviewing the evidence. At a minimum, you all agree that the conviction should be vacated on the interest of justice.
Is that a question that was directed to Risa Lanier and Kim Foxx?
A. We didn't -- I don't recall ever sort of meeting with Kim Foxx -- like Kim Foxx to discuss this. It would have been to Risa and --
Q. Risa.



A. -- Thor, I think, and sometimes in these -- I think what you can see is we were sort of wrestling with a whole bunch of things, including the standards for when to apply presumption of innocence, if to apply it at all. It may have been directed to Risa. It may have been just sort of a footnote for us to discuss --
Q. Okay.
A. -- as a Working Group. I don't know. This is sort of part of our deliberation.
Q. Now, the opinion regarding Jerry Gillespie or the recommendation was made after the recommendation of Cordell Williams. Does that sound true?
A. I don't remember, but I -- I think that case came -- wasn't -- I think that case came later maybe.
Q. Okay.
A. I don't --
Q. The presumption of innocence, is that anywhere in the procedure and guidelines that we looked at, Exhibit No. 1?
A. Not -- not that I remember, the phrase presumption of innocence.



Q. Okay. Is that something that the Working Group at some point included in its own protocol?
A. I don't know that it was included in the protocol. It was something that the Working Group, I think, discussed. I don't have a specific recollection.
Q. Now, the presumption of innocence applies before trial --
A. Right.
Q. -- or during trial but before conviction?
A. Before conviction, yes.
Q. Okay. And you are reviewing the case of somebody who has already been convicted?
A. Correct.
Q. What is the logic of applying a presumption of innocence to somebody -- when you are doing a conviction integrity review of someone who is already convicted?
A. I mean, I think that was one of the questions, whether it makes sense to consider -- if we are -- what posture to consider the case in. If there is evidence that, you know, is -- if there

may not be credible evidence of guilt, are we -- do we sort of look at the case and apply a presumption analysis once we've made a determination that there may not be credible evidence of guilt, or do we not? What posture to put sort of the defendant in is one of the questions we discussed.

Q. How is it an independent and impartial review of an existing conviction if you're applying a presumption of innocence to the person who was convicted?

A. I don't think that's what this says. That's not how it's framed, and I don't think that's what the discussions were about. It was whether or not to apply it, how to address this question or discussion.

Q. Okay.

A. I don't think that, you know, this is -- anyway, I'll leave it there.

MR. MORAN: That wasn't really my question. You know, can you read back the question.

(Question read.)

THE WITNESS: I think we performed an independent and impartial review. We considered the weight to give evidence or not give certain



pieces.

BY MR. MORAN:

Q. I get that. What I'm asking about is much more specific. If you were to apply this presumption of innocence, how -- to a review of a conviction's integrity, how could that be an impartial review, if your starting point is this person is innocent?

A. I don't think that that's what this says, and that's not what -- how we started the discussions.

Q. Okay. This says you're not sure whether/at what point to consider the presumption of innocence in reviewing the evidence.

A. The question I think we were trying to get that -- get at here is that line between actual innocence and interest of justice, that determination; how do we address those cases that may fall between that line, and we're not entirely sure.

Q. Did you ever get an answer to that question?

A. I don't have sort of a specific recollection of this.



Q. Would the presumption of innocence be a consideration if you can't reach that first threshold of substantial likelihood of innocence, actual innocence?

A. I don't -- not -- I don't think so, but I don't know. I don't -- I'm not sure.

MR. MORAN: Okay. Okay. I am going to give you another exhibit.

Q. By the way, if you thought it was necessary to have more than one conversation with a criminal defendant whose conviction you're investigating, would you do that or at least attempt to?

A. Maybe.

Q. When you say "maybe," why are you not sure?

A. I mean, I -- if -- if we couldn't get the information from some other avenue or source.

MR. MORAN: All right. Hang on a second. All right. What are we on now?

THE REPORTER: Five.

(Hawilo Deposition Exhibit 5 was marked for identification.)

BY MR. MORAN:



Q. All right. You are looking at Exhibit No. 5. This is an email from you to your colleagues, Vincent Southerland and Marc Kadish, dated October 13, 2022, and this is -- you're sharing your thoughts about Detective Boudreau and the pattern and practice evidence.

Do you want to take a minute to look at it?

A. Sure. At this first email? Yes, I'm looking at it.

Q. Yeah. You might want to look at the trailing emails as well just to make sure you got a --

A. Okay.

Q. Actually, you should read all of it. I'm sorry.

A. I should read all of it?

Q. Yeah.

A. Okay.

Q. Okay. So the first email from you to your colleagues, you're asking the question about Boudreau, the exhibit list, spreadsheet.

In the second paragraph you state: I'm a bit confused about why the state would appeal

Howard's ruling but also vacate convictions for the same reason, Cordell Williams, which seems inconsistent to you.

What were you talking about there, if you remember?

A. Oh, I don't remember.

Q. Okay.

A. I don't know what Howard's ruling was. I don't remember.

Q. Okay. And if you scroll down -- or not scroll but look at the --

A. Sure.

Q. -- emails, starting at the very beginning on the last page --

A. Okay.

Q. -- there is an email from Marc Kadish to Jon Loevy explaining -- this is on page CCSAO-WG 0166971, an email from Marc Kadish to Jon Loevy explaining that you guys have been appointed special assistant state's attorneys and what you were trying to do.

Do you see that email?

A. Yes, I do.

Q. And then if you track up from that



email, you can see that a meeting was arranged at Loevy & Loevy in which Russell Ainsworth and Heather Donnell Lewis would present -- give a presentation.

A. Yes, I see that.

Q. Okay. Does this refresh your recollection at all about the meeting?

A. Not about the specifics, but as I -- I think I said before, I remember there was a meeting.

Q. Yeah, yeah.

A. And I think I remembered the woman. I don't remember her name. So I just don't know if it was Heather or not, but I take this at their word, and I thought I remembered Russell there. I don't know if David was there or not. I just don't know.

Q. If you look at the page labeled 0166969, at the very top --

A. Okay.

Q. -- there is a link to a Dropbox.

A. Yes.

Q. Did you download the materials from that link?



A. I think so or -- I don't know if I did personally or if a paralegal or --

Q. Right.

A. -- somebody did, but I think so.

Q. You guys, you, the Working Group, had a shared file, like a share link file that you could go into that all of you could access?

A. Yes.

Q. You shared that with the state's attorney's office?

A. The state's attorney's office, I think, shared it with us, yes.

Q. Oh, the other way around.

A. Yeah.

Q. Okay. Did you download the materials from Loevy & Loevy on to your own personal computer or work computer?

A. Maybe.

Q. You still have those?

A. I don't remember.

Q. Okay. Would they have been identified in any specific way, like in a folder that said, you know, from the Loevy & Loevy meeting?

A. I don't know if they would have been



identified in that way or -- maybe. I mean, we were trying to keep that file organized, but I don't remember.

Q. Okay. In the email -- now, you can see your email questioning the confusion about appealing one ruling and not appealing another or vacating another is attached to the string of emails that goes back to the meeting with Loevy & Loevy beginning on -- with Marc Kadish's email on November 11, 2021.

A. Yes, although I doubt I would have sent that email. Let me just look at the list of recipients. No. My email was sent to Vincent and Marc, not to Loevy & Loevy.

Q. No. I understand that.

A. Oh, okay.

Q. I'm saying it's sort of your email to them --

A. I forwarded that, yes.

Q. It's a string.

A. Yes, yes.

Q. Okay. Did you get extra -- or information about Boudreau from Loevy & Loevy?

A. About Boudreau?

Q. Yeah.
A. I don't remember. Maybe in the -- I'm trying to see. Is it any -- is it in here somewhere? I don't remember --
Q. Okay.
A. -- but maybe.
MR. MORAN: Well, if you don't remember, that's fine. Let me give you another exhibit real quick here.
(Hawilo Deposition Exhibit 6 was marked for identification.)
BY MR. MORAN:
Q. Okay. We are looking at Exhibit No. 6 right now, and this is an email from you to your colleagues Marc Kadish and Vincent Southerland, dated April 14, 2022, and the subject line is Cordell Williams/Pattern and Practice/O'Brien, Stelhik.
Do you see that?
A. I do.
Q. Okay. And do you recognize the email?
A. I see it. I don't have an independent recollection of it, but, yes, I see it.
Q. Did you have a chance to review it as



you were --
A. Right now, yes.
Q. Okay.
A. I'm looking at it.
Q. All right. Do you want a second, or do you want me to start firing off questions?
A. No, that's okay.
Q. Okay. This is after you've had a chance to read the material from TIRC. This is what you say at the beginning. I started to read O'Brien's pattern and practice file, which are TIRC reports, and find myself more than disturbed by these reports. I have attached here submission from the attorneys detailing some of O'Brien and Stelhik abuse. These two detectives were involved in Williams' interrogation and indeed were the two detectives who told them they didn't believe him and ultimately secured the confession. I'm just going to stop there.
Would it be fair to say -- first of all, I read all that correctly, right?
A. You did.
Q. Okay. Would it be fair to say at this point when you sent this email, you were expressing



your belief or your -- I guess your opinions about O'Brien and Stelhik based on the review of the TIRC material?
A. I was expressing sort of my like impressions at the time.
Q. Yeah. Are those impressions -- did those impressions change at all up to the point you submitted that report, the final report to the state's attorney?
A. What final report? Sorry.
Q. Regarding Cordell Williams.
A. Oh, regarding Cordell Williams. I'm not sure. I mean, this is part of -- honestly, it's a deliberative discussion and disagreement. This was part of -- not disagreement, discussion, debate, how are we to consider this. I'm not sure as I sit here today whether it changed over time or if it changed over time. I don't know.
Q. In the transcripts that you had, did you review any testimony from O'Brien regarding allegations made against him by Cordell Williams --
A. I don't --
Q. -- prior to submitting your report about Cordell Williams to the state's attorney?



A. I don't remember.
Q. Okay. You point out -- or you attach actually to this material you've received from attorneys detailing some of O'Brien, Stelhik abuse -- the O'Brien, Stelhik abuse.
Who are the attorneys who provided that information?
A. I don't know. I don't remember.
Q. Did you question the veracity of any of that information you were given by these attorneys?
A. I think we were -- I mean, I think as part of the process, we considered all of this information in reaching our recommendations.
Q. Because in the email you wrote, you pointed out that you find it disturbing, right?
A. That those were my impressions as I was reading these reports as I see here.
Q. Did you question whether you needed to find out if any of these allegations are really true?
A. Did I question that? I think that was part of the process we were undertaking --
Q. Okay. Because --
A. -- the investigation we were

undertaking. You know, something may be disturbing without it resulting in sort of the culmination of, you know, the recommendation or the evidence, but that's part of the process we were undertaking.
Q. So as of the date you wrote this, you still had an open mind?
A. Yes. I think we maintained an open mind throughout the process.
Q. Okay. I want to direct your attention to the next paragraph. You write: Why isn't the submission and evidence of pattern and practice developed through these submissions sufficient to render a finding that the conviction lacks integrity?
I'm going to stop there. Why did you ask that question?
A. Because we were really wrestling with how to address the pattern and practice evidence within the investigation itself, how to -- what to weigh it, how much to weigh it. This was part of our sort of discussion and in some cases back-and-forth debate and disagreements and --
Q. And the next question you ask, "Aren't these reports (note the date of the transcript)



credible evidence of abuse, and, if we find credible evidence of abuse in different cases, isn't that enough to conclude the conviction lacks integrity?"
Did I read that correctly?
A. Yes.
Q. Okay. Did anyone answer those questions for you?
A. I don't remember.
Q. How is it you're asking these questions but still maintaining an open mind that these allegations which led you to ask these questions may not be true?
A. Oh, I think it's certainly part of the process to ask questions.
Q. You're asking about short-circuiting the process.
A. That's not my impression of this.
Q. Aren't you asking why the pattern and practice evidence isn't enough to render a finding that the conviction lacks integrity?
A. I'm asking whether given what we are seeing in pattern and practice is this factor at this point enough to conclude. I'm asking. Sure.



I'm wanting to have a discussion with my Working Group colleagues about this.
Q. Well, did you have the discussion?
A. I don't remember as I sit here today.
Q. I mean, this would be a -- would you agree with me that this would be a significant move, I guess, to take only these allegations, find them credible and tell the state's attorney that we think the conviction lacks integrity because the allegations we reviewed from TIRC?
A. I would not describe that as a significant move, but I think it is fair to consider the entirety of the evidence.
Q. Okay. But this isn't considering the entirety of the evidence. This is asking why we can't just reach a conclusion now based on what we learned from TIRC.
A. I am at -- you know, I think I've said what I've said, which is this is something that we -- I wanted to address as part of our discussion given these -- how to interpret these allegations.
Q. And why didn't you ask that?
A. I wanted to sort of ask -- I don't know if I did or not. I'm not sure. I just don't



remember.
Q. Well, take a look at the exhibit. I mean, the questions you asked don't include how should we interpret this evidence.
A. You know, you're asking me to provide context years later for an email I sent. In my mind these were questions that were sort of percolating and part of the process of discussion. That's -- no more and no less.
Q. Look, I understand that this is a while ago.
A. Yeah.
Q. But I also think, you know, you knew you were coming here to testify about this case, and you knew that these documents were provided to us. So I'm not sure, you know, why you wouldn't have reviewed some materials to help you refresh your memory.
I think it's fair to ask right now whether you were intending to short-circuit the investigation, and I won't even say short-circuit because that's too pejorative.
You were intending to move the investigation along to a conclusion based on the

fact that you found this disturbing evidence about Detective O'Brien. Is that a fair statement?
A. I don't recall that being my intent.
Q. Okay. And you're sure that you don't remember anything about what your colleagues may have told you regarding those two questions?
A. I just don't have an independent recollection of that right now.
(Hawilo Deposition Exhibit 7 was marked for identification.)
BY MR. MORAN:
Q. Okay. We are looking at Exhibit No. 7, which is an affidavit of David Evans. It's printed on two sides, and it's labeled W 453 and W 454.
Do you recognize this document?
A. I don't remember.
Q. Okay. Do you have any reason to believe it's not the affidavit of David Evans that was provided to you by Mr. Becker?
A. I don't have any reason to believe that.
Q. Okay. Do you have any reason to believe that this is not the affidavit of David Evans that you may have reviewed at some point in



the course of your investigation of Cordell Williams' conviction?
A. I don't have any reason to believe that.
Q. Okay. I want to direct your attention -- did you have a chance to review the specific paragraphs? Do you want to take a moment?
A. Briefly. That's okay. You can ask about a paragraph.
Q. Okay. I want to direct your attention to paragraph 2.
A. Sure.
Q. It says, "While at the party I brandished my gun so prior to letting me into his car Cordell popped the trunk and told me I had to put my gun in the trunk, and I did."
I'm just going to stop there. Would you agree with me that according to David Evans at least, based on that paragraph 2 of his affidavit, Cordell Williams had knowledge of the gun in the trunk?
A. I think that's what it says in David Evans' affidavit, yes.
Q. Okay. Paragraph 3, "As we were blocks



away from my house I thought I saw rival members in a restaurant who had been trying to shoot me."
Number 4: I demanded to Cordell pull over, and he did.
Would you agree with me that according to the affidavit, David Evans at least says he saw the rival members and directed Cordell to pull over?
A. That's what it says in the affidavit, yes.
Q. Okay. Number 5: I told Cordell to, and this is in quotations, pop the trunk and wait here. I wanna see if that's these N word, end quote.
Did I -- is that fair to say that's what he says?
A. Yes.
Q. Okay. Now, you know -- or do you know that when someone uses quotation marks like that in an affidavit or in a report, it is meant to indicate a verbatim reflection of what was actually said?
A. I'm not sure if that's how the affidavit is prepared, but I don't have any reason



to doubt that when someone is using quotation marks, they're expressing the words of the party.
Q. What was actually said?
A. Yeah, what was said.
Q. Okay. Assuming he said directly to Cordell Williams and Cordell Williams heard him say that, Cordell Williams would have known that David Evans wanted the trunk opened so he could presumably get something out of it and then confront the two individuals he saw in the restaurant?
A. Assuming that Cordell Williams would have known? Maybe. I don't know what -- I mean, I can't as I sit here say what Cordell Williams would have known but maybe. That's an assumption you can make from this, true.
Q. Well, he makes the statement directly to Cordell Williams?
A. Yes, and if he had heard it, then, yes, I think that's an assumption that can be made.
Q. Okay. I immediately -- and Cordell popped the trunk for him -- according to David Evans, Cordell Williams popped the trunk, right?
A. Yes, that's what it says here.

Q. And Cordell Williams knew the gun was in the trunk?
A. That's what it says here.
Q. Okay. Paragraph 6, "I immediately jumped out, grabbed my gun from the trunk and proceeded walking towards those individuals that I saw."
And then in the next paragraph he describes that he shot the individuals and ran back to Cordell's car with an unmarked police car behind him.
David Evans is taking ownership at this point of committing the crime?
A. That's what it says on here, yes.
Q. Okay. Would you agree that by submitting an affidavit like this and making it known, David Evans is waiving any potential right he has to remain silent about his participation in this crime?
A. I'm not sure about any potential right, but he's certainly --
Q. He's not remaining silent?
A. He's not remaining silent is the way --
Q. Yeah.



A. -- I would put it.
Q. All right. Let's see. I jumped into Cordell's car and I was in a panic -- this is paragraph 8 -- yelling drive, drive, drive. That's the police.
Assuming Cordell Williams actually heard that statement, he would have known that they're being chased by the police?
A. Assuming he heard the statement --
Q. Okay.
A. -- it would appear so.
Q. I want to drop down to paragraphs 10 and 11. He writes: I had never killed anyone before. I had also -- I also had never partnered in any type of shooting with Cordell before. We did not plan to do this shooting.
Okay. So based on what he's saying, this was a spur of the moment event?
A. I think that's a fair reading of it.
Q. Okay. Let me ask you something. Even in the spur of the moment, if one person provides assistance to the other to commit a spur of the moment crime, does it make it any less culpable?
A. I think it depends on the charge in



terms of culpability, but I think one can certainly be culpable in the spur of the moment versus premeditation, et cetera.
Q. Sure. Okay. In paragraph 11 he writes: I believe Cordell pulled over, let me get my gun, and waited on me because I had never done this before, and I believe he thought I wouldn't go as far as I did.
See that?
A. I do see that.
Q. Now, obviously this is his speculation?
A. I think that's a fair reading of this.
Q. Okay. But let's take his speculation and unpack it a little bit. If he's correct that Cordell agreed to let him get the gun and waited on him because he had never done this before, didn't think he would go as far as he did, does that lessen Cordell's culpability in an accountability theory for murder?
A. Again, I don't -- I don't know. I'm not sure. I think one can be culpable even if one didn't think it would go as far under the accountability theory.
Q. Right. So he could be culpable for



this even though he didn't expect David Evans to go in there and shoot these guys?
A. I think that could certainly be a finding. I, you know --
Q. Okay. Then he writes in paragraph 11 -- this is the next -- there is a space, and it looks like another paragraph, but it's not numbered. In addition, my uncle was a high ranking member in our gang, and I was one of some rank also. Cordell was not. I believe Cordell was reluctant to resist me because I was well known to get member -- members violated for showing cowardice against our rival.
Do you see that right there?
A. I do see it.
Q. Okay. Would you agree with me he's trying to explain or mitigate -- I should say mitigate Cordell Williams' culpability or responsibility in the crime?
A. I'm not sure what he's trying to do here.
Q. Okay.
A. I don't know.
Q. Does that explanation provide

mitigation or -- for Cordell Williams' culpability in the crime?
A. I'm not sure. I don't know.
Q. Okay. All right. You can set that one aside for a second.
A. Okay.
Q. By the way, going over this, does it refresh your recollection as to reading it or reviewing it as part of the case?
A. It doesn't.
Q. Okay. By the way, would you describe yourself as the person who led the work on the Cordell Williams' investigation?
A. You know, I think that -- my recollection is that I might have drafted that initial memo, that I may have draft -- I don't know if I drafted an investigative memo, but the way the Working Group really worked is really as a group, just like constant discussions and debates. And so I personally, you know, do not consider myself to have led any particular work, but I think, you know, others might. I don't know. We were also -- yeah.
MR. MORAN: What are we on?



THE REPORTER: Eight.
(Hawilo Deposition Exhibit 8 was marked for identification.)
BY MR. MORAN:
Q. Okay. We're on Exhibit No. 8. This is an email from Vincent Southerland to Risa Lanier, dated May 10, 2022, where he is sending her the final memo in claimant Cordell Williams' case, and he gives you credit for really leading the work on it. I just want to see if this helps you remember.
A. You know, I don't think -- I think Vincent is a lovely person who -- I think that -- again, this -- I think this is a case where I drafted the initial memo and, you know, started to pull together the documents, et cetera.
Q. Um-hum.
A. But I -- I don't know what to say about what Vincent said about me.
Q. No. I just wanted to see --
A. You know, I --
Q. -- if it helped you remember at all.
Oh, man. We're missing a document. Fiddlesticks. All right. I guess we'll use --
MS. MEADOR: Want to take a break?



MR. MORAN: No. We can come back -- I'll get that printed some other time.
MS. MEADOR: You better ask your court reporter.
Nine, right?
MR. MORAN: Nine.
(Hawilo Deposition Exhibit 9 was marked for identification.)
BY MR. MORAN:
Q. I should ask, I mean, do you want to take a break --
A. I think we should --
Q. -- because this is a longer document. It's going to take some time to get through.
A. I think it's fine for me.
Q. You sure?
A. Yeah.
Q. Okay. All right. Very good. So we're looking at the document called People versus Cordell Williams, dated May 22, 2022, "WORKING GROUP MEMORANDUM OF FINDINGS AND RECOMMENDATION, EXECUTIVE SUMMARY." Did I read that correctly?
A. Yes.
Q. All right. And this is -- extends



from -- the Bates label on the document is CCSAO-WG 0008032 to 8055.
Now, I know you haven't -- apparently have not read this in -- well, let me ask you, when is the last time you read this report?
A. Oh, I don't remember. I might have looked at it in the last year, but I don't remember.
Q. Okay.
A. Not recent enough for me to really --
Q. All right. So as we're going through it, if you find that you want to take a look at it in any more depth and take a break, you're welcome to do that --
A. Okay.
Q. -- if you think -- in order to answer a question. Just let me know. Is that fair?
A. Sure.
Q. Okay. So on the very first page, you say -- or your group says the Working Group recommends vacatur based on interest of justice, and there is sufficient credible evidence that causes a loss of confidence in the integrity of

Mr. Williams' conviction, and further on you describe it being -- the recommendation is based on the totality of circumstances underlying his case, including, but not limited to, the facts learned during our investigation and the overreaching -- overarching pattern of misconduct, coercion, physical and psychological abuse, and bias exhibited by certain Area 1 detectives.

Okay. I have a question about bias.

A. Okay.

Q. What specifically -- what bias did you identify?

A. I don't remember. I -- I -- I don't remember.

Q. Okay. Did you identify bias by a specific detective?

A. I don't have an independent recollection of this.

Q. Got it. Okay. Under "STATE'S EVIDENCE AT TRIAL" --

A. Okay.

Q. Okay? And really throughout the State's evidence -- or strike that.

This is a rendition of what was used



in the criminal court in 1995 or 4, whenever his conviction was entered, that the State used to get the conviction.

A. Again, I just don't have an independent recollection. It makes sense that that would be a rendition of what was used in the criminal --

Q. Okay.

A. -- court, but I'm --

Q. All right. The State's evidence at trial, obviously in that description you would not have included things like David Evans' affidavit because that's dated 2017, and of course in the '90s when this case was tried, David Evans would not -- was a codefendant who would not have been testifying against a codefendant?

A. I mean, that makes sense to me.

Q. Okay. There's a discussion in the next section about Williams' theory at trial.

A. Okay.

Q. And I'm curious -- you write -- or not you. I keep saying "you," but I know this is the Working Group compilation. So if I make that mistake, please don't hold it against me.

But the memo states in the second



paragraph in Section II, "At trial, Mr. Wiener failed in any meaningful way to counter the state's theory, and instead adopted much of it. Mr. Wiener all but conceded Mr. Williams' guilt."

And I'm curious, in what way did he concede guilt?

A. I don't remember.

Q. Okay. Let's see. Do you -- by the way, at any point when you did your investigation, were you able to locate David Wiener?

A. I don't know. I don't know.

Q. And I know you guys take issue in this report with his decision to withdraw the motion to suppress?

A. Yeah. I just don't remember if we did or didn't. I don't have -- I just don't remember.

Q. All right. If you couldn't find him, could you have relied on investigators from the state's attorney's office to locate him?

A. I presume so.

Q. Is that something that was done?

A. That was done in the cases? I think in, you know --

Q. I mean with respect to Mr. -- you know,



David Wiener --

A. Oh.

Q. -- the attorney who represented Cordell Williams.

A. I don't -- I don't remember.

Q. Okay. So the -- Williams' theory at trial is three paragraphs long, and two of the paragraphs take issue with David Wiener's performance as his defense attorney.

A. Okay.

Q. Would you agree?

A. I don't know if I would phrase it that way. I think it's -- in opening and closing he told the jury Williams never planned to kill anyone, conceded that Williams stopped the car. I don't know if "take issue with" is the right phrasing. I would try to --

Q. All right. In conceding that Mr. Williams stopped the car and also conceding that Mr. Williams heard Mr. Evans say he saw a rival gang member, would you agree -- it sounds like your point here is that he's essentially conceding evidence of guilt?

A. That's -- I mean, that's what it reads

like.
Q. Okay. And that's also the same evidence provided by David Evans in his affidavit; would you agree?
A. I think in that affidavit we reviewed, that's --
Q. Okay. And the third paragraph in the section points out misconduct related to David Wiener that ended up getting him disbarred as an attorney, which occurred sometime in 2014 or 2015.
A. Yes.
Q. Okay. You can see the case number before the ARD -- or before the Supreme Court, 2014PR00117, regarding David Paul Wiener, right?
A. Yes, I see that.
Q. Okay. It looks like as you recount or the memo recounts, he neglected three cases, failed to return $9000 in unearned fees, and misrepresented the status of one of his cases and also failed to adhere to a program to monitor his alcohol use.
A. That's what it says.
Q. Okay. Did you learn whether Mr. Wiener had developed an alcoholism problem as of 2014 or



2015?
A. I don't remember. I don't -- I don't -- I don't -- I don't have -- I don't have any memory of it.
Q. Now, the purpose of pointing this out at this point and later in the memo is that this is evidence relied upon by the Working Group to find that David Wiener failed Cordell Williams or provided ineffective assistance of counsel?
A. I think it's a factor -- I mean, I don't remember, but I would imagine it's a factor to consider.
Q. Did you uncover any evidence that David Wiener committed any of these acts while representing Cordell Williams?
A. I don't remember.
Q. Did you uncover any evidence that David Wiener was an alcoholic in 1995?
A. I don't know, and I don't -- I just don't have a recollection of that.
Q. If you did recover evidence that he actually was an alcoholic which affected his performance with Cordell Williams during the trial, you would have included that in the memo, right?



A. I'm not sure. I don't -- I don't remember. I mean, I -- maybe. I'd hope to, but I don't know.
Q. Okay.
A. As I sit here, I don't know.
Q. I just want to --
A. There may have been things we missed, you know. We're --
Q. That's not really the question.
A. Oh.
Q. Okay. If you knew of evidence --
A. Yeah.
Q. -- that he was an alcoholic when he represented Cordell Williams at trial, would you have included it in this memo, taking into consideration that you pointed out he had an alcohol problem in 2015?
A. Possibly. I hoped we would have included it, but we may not have, or we may have missed it. I don't know.
Q. Well, if you missed it, you can't --
A. Like missed including it, not --
Q. Oh, I see.
A. Yes.



Q. Would the fact -- if you had discovered that he was an alcoholic in 1995 that affected his performance with Cordell Williams and intended to include it but somehow forgot, there should be evidence in your email communications or in your file regarding this -- showing that he had an alcohol problem in the '90s?
A. Possibly, or it may have been something we discussed.
Q. Okay. And we talked a little bit about this earlier. This is the next section in the document called "CORDELL WILLIAMS' INTERROGATION."
A. Um-hum, yes.
Q. The interrogation times are based on police report, testimony -- the testimony by the detectives according to the first sentence. Is that accurate?
A. That's what the sentence says.
Q. Okay. Did you rely on Cordell Williams for any of the times or the number of interrogations or interviews, I should say?
A. I just don't remember.
Q. Now, at this point in the report, these are characterized as interviews, but later on when

you're conducting the analysis, these are characterized as interrogations. This is much later in the report.
A. Okay.
Q. My question is what is the difference between an interview and interrogation?
A. I think -- again, it is case specific, and in some instances it means, you know, the interrogation is either lengthier or is in a police setting versus stop somebody outside. I don't know that we really sort of highlighted differences in that way or focused on it as a difference.
Q. Okay. Do you have any idea how long the first interview at Mr. Williams' home lasted at 1:00 a.m.?
A. I don't recall.
Q. Do you know what time Mr. Williams brought the car home?
A. I don't recall.
Q. Okay. If the evidence shows it was roughly around 12:30 a.m. when the car was observed fleeing the scene of the crime, do you have any reason to disagree with that?
A. I don't.



Q. It would mean the police arrived at his home roughly 30 minutes later.
A. I think that's right.
Q. Okay. Do you know if it was detectives or uniform police officers who talked to him first?
A. I don't remember. It might be in here. I don't remember.
Q. If it's the uniform officers who talked to him first and asked him who was driving the car and when he last drove it, is it fair to characterize that interview as an interrogation?
A. I -- I -- again, I don't think that we focused on sort of defining or describing these as different. So I just don't know that whether it's fair or not is something we entirely focused on, and, therefore, I don't have an opinion on that.
Q. And I think you said earlier that one of the things you would look at in evaluating whether a confession is coerced is the number of interrogations?
A. Yes, but I don't know that I -- in my mind I'm not thinking interrogation versus interviews in that scenario.
Q. Okay. Well, that's why I asked if



there's a difference, and I think you just tried to point out a difference a couple answers ago.
A. Yeah. I mean, some -- I think if I sort of focused on it and thought about it, I would highlight some of the differences that I just said, but I'm not sure that that was -- you know, years ago as I was conducting -- or as we were conducting this review, I'm not sure if that's sort of a highlight or a factor --
Q. Okay.
A. -- that distinction. That's all I'm saying.
Q. Let me ask you this. Is one of the concerns about multiple or numerous interrogations in any period of time that the interrogations apply pressure, and a cumulative effect of all of this pressure combined with the repeated questioning that indicates the detectives don't believe him is coercive?
A. I'm not sure as it relates to Williams, but I think in general that can be a concern.
Q. Okay. Didn't the Working Group memo regarding Mr. Williams find -- you can page further if you want -- that there were nine interrogations



which had a coercive effect?
A. It may have. It may well have the number of interrogations as a factor.
Q. In your list here on page 2 --
A. Sure.
Q. -- the first interrogation -- I'm sorry, the first interview takes place at 1:00 a.m., and the second interview takes place at 1:20 a.m.
Was it -- are you suggesting or is the Working Group suggesting in that description that the first interview lasted 20 minutes and the second interview began after the first interview of 20 minutes?
A. I'm not sure. I don't know if it lasted five minutes -- I don't know what I was suggesting as I sit here today or what we were suggesting. It may have been five minutes and then a separate interview 15 minutes later. I don't know.
Q. Okay. If you know how long the interviews last, you would have noted it in the report, right?
A. Generally, as a matter of sort of

process, I think we would have noted it or hoped to note it.
Q. Okay. And then further down you provide more of a narrative timeline. This is on the bottom of page 3.
A. Yes.
Q. Okay. And I want to go through some of these interviews.
A. Sure.
Q. Mr. Williams was -- this is under Interview 2 on page -- I guess on the fourth page.
A. Okay.
Q. "The police reports indicate a formal arrest at 1:30AM on May 26, 1994."
That arrest was based on the fact that at least to your knowledge, according to the report, what Mr. Williams had told Detective Dwyer and the uniform police officers about being the driver of the car and when he got home with it?
A. I -- I -- I can't say as I sit here today. I think you could draw that conclusion based on what's written, but I can't say.
Q. Okay. In the various interviews that Mr. Williams gave, did you find it to be undisputed



that he did not give the police complete or truthful information during the course of the interviews?
A. The various inter -- I don't -- I can't recall what findings we made or did not make.
Q. Okay. Let me ask you something, and this is under "Interview #7."
A. Okay.
Q. You write -- not you. I'm sorry. But the memo states at the very end: After this interrogation he was provided food and allowed to use the bathroom.
Okay. Was it your understanding based on the evidence you reviewed for this timeline of interviews that Mr. Williams was not allowed any food between the time he was taken into custody at 1:30 in the morning to 6:30 p.m. after he spoke with Detective O'Brien?
A. I don't remember.
Q. Okay. Obviously you wrote that in here. Is that a finding that was made or -- not you wrote that, but it's part of the memo. Is that a finding that you as the group made?
A. I don't know if it's -- if I would



characterize it as a finding. I think it's part of the information that -- I don't -- I don't know if it's a finding or simply part of information we reviewed.
Q. Okay.
A. Like that's the sort of -- in other words, that might have been the first time that referenced that food was available, but that doesn't --
Q. Sure.
A. I'm not sure that we could find that because it wasn't made --
Q. On the next page, and this is on 8037, the sixth page of the document --
A. Sure.
Q. -- under "B. Motion to suppress statements" --
A. Sure.
Q. Okay. This is a more in-depth explanation of that motion and what was alleged and what happened. The motion argued, and this is in the first paragraph, Mr. -- or that Williams made the following allegations: He requested an attorney and to talk to his father at least 10



times but was denied each time; that detectives failed to provide him food and opportunity to use the bathroom; and significantly that during the interrogation at least one officer, name unknown, slapped him on his forehead several times with an open hand.
Okay. If Mr. Williams -- strike that.
If the defense attorney knows that Mr. Williams was allowed to speak with his father and was given food and an opportunity to use the bathroom much earlier in the process before he gave any statement to police, those are arguments that the lawyer would have to withdraw, right?
A. I'm not sure. I am not sure if -- I'm not sure.
Q. Okay. By the way, under the section "POST-TRIAL AND APPEAL," when you describe where his appeals went and his posttrial motions for post-conviction relief, would you agree with me that you as the Working Group, you all as the Working Group, are not constrained by the technical rules that govern posttrial petitions -- or petitions for posttrial relief or appeals?

A. I think that's fair. I think our -- I mean, we were simply providing this nonbinding recommendation, and we were not sort of constrained by technical rules, procedural rules.
Q. Okay. I want to focus on -- this is on the seventh page --
A. Okay.
Q. -- under 8038. It's in the second -- the second full paragraph.
A. Um-hum.
Q. "In May of 2006, Mr. Williams filed a complaint with the Office of Professional Responsibility...", and he writes -- he describes his interrogation as a 27-hour interrogation.
A. Yes.
Q. Okay. Obviously, you agree that that is not accurate because he was not interrogated for 27 hours straight?
A. I -- I don't have a recollection, but I don't -- I -- just based on what I just reviewed, it does not appear he was interrogated for 27 straight hours.
Q. Right, right. Okay. Okay. In the footnote on that page, you write that the



Conviction Integrity Unit recreated its files.
A. Um-hum.
Q. How do we know that the recreated file is complete and accurate?
A. I don't know.
Q. Is there any way for you as the Working Group to determine whether the recreated file is complete?
A. Not that I -- I -- not that I know of. I don't know. I'm not sure if there's a way.
Q. Let me ask you something. In all of the cases you review --
A. Yeah.
Q. -- and reach findings on, do you have an appreciation that your findings could impact the detectives and that allegations -- you're sort of substantiating allegations of abuse?
A. I think, yes, I think we have -- I think we have or had an appreciation that it can certainly impact the decision makers maybe or the detectives or the victims -- you know, I think we considered sort of the whole case and understood that, you know, they were all real people --
Q. Okay.



A. -- and tried to do the best we could.
Q. Sure. Okay.
A. Okay.
Q. How did -- later in the report -- and we're going to get to it. Maybe you will remember this. Maybe you won't. You talk about how the missing files shouldn't be held against Cordell Williams. In other words, you are giving him the benefit of the doubt that he shouldn't suffer because a file isn't complete or isn't there.
A. I don't have a specific recollection, but what I think that means is that the burden shouldn't be on the defendant to, you know -- if there's missing evidence, that the burden shouldn't be on the defendant to explain the missing evidence.
Q. The criminal defendant?
A. The criminal defendant, yeah.
Q. Yeah.
A. Or claimant, I guess, you're -- you're saying claimant.
Q. Well, either way.
A. Okay.
Q. The person who was convicted, right?



We'll call him that.
A. Okay.
Q. Is it fair to shift responsibility of that to the detectives?
A. I don't think the shift of the burden is on the detectives. I think that the shift then goes to the State.
Q. Okay.
A. It's not the detectives.
Q. All right. Because there are -- the information in those files could help show that the detectives did not commit the abuse that ultimately was concluded in this case?
A. It may have or, you know, might have shown other allegations, but, yes, the information in those files could indicate other factors to consider.
Q. One of the findings you could have made is that it's not fair that the file is not available, and, therefore, in the interest of justice, we think Cordell Williams should be released. However, we're not making any findings about abuse because the evidence is not all there?
A. That could have -- maybe that could

have been a reason for the recommendation. I think we had latitude in terms of reasons.
Q. Was that recommendation made?
A. I don't remember.
Q. Okay. I guess we'll circle back to that question.
So the next page, and this is on the eighth page, begins the description of the Working Group investigation, including a description of the evidence and the files requested and the investigative steps taken.
A. Okay.
Q. Okay. I want to direct your attention to the bottom of that section.
A. Okay.
Q. The last couple paragraphs before summary of interviews conducted by Working Group.
A. Okay.
Q. Actually, it's the second to last paragraph.
A. Okay.
Q. The Working Group has reviewed deposition transcripts involving Detective Boudreau -- O'Brien, Boudreau, and other Area 1



detectives.
A. Okay.
Q. Okay. Why was Detective Boudreau -- why was his deposition being reviewed if the only detective -- or he was not one of the detectives who was involved in investigating the case involving Cordell Williams?
A. I'm not sure. I don't know. I don't have a specific recollection of why.
Q. Was his deposition provided by Loevy & Loevy?
A. I'm not sure. I'm not sure if it was from TIRC, from Loevy -- I'm not sure.
Q. And do you know which case the deposition was from?
A. I don't remember. I don't know.
Q. Do you know whether Detective Boudreau has been a target of allegations, multiple allegations as you sit here today?
A. Of what, allegations of what?
Q. Abuse.
A. Sorry. I believe he has, but I don't -- I mean --
Q. What about other detectives at Area 1,



which other detectives were you looking -- or did you get deposition transcripts?
A. I don't remember.
Q. The depositions of Boudreau and these other Area 1 detectives, were they relevant to your analysis?
A. They may have been. I don't -- I don't know.
Q. Okay. Were you looking -- the pattern and practice evidence you were looking at in this case, were you looking at it with respect to only Detective Foley and Detective Boudreau -- I'm sorry, Detective O'Brien, or were you looking at it in terms of Area 1 in general?
A. I don't remember if it was a sort of a general assessment or particular detective in this case.
Q. Why would you be looking at other detectives who are uninvolved in the investigation for pattern and practice evidence?
A. I'm not sure. I don't know as I sit here what the rationale was.
Q. Okay. I want to come to the description of David Evans.



A. Okay.
Q. The paragraphs you write -- I am not going to read all of them to you.
A. Okay.
Q. But obviously you -- or the group recounts David Evans' description of a previous time he was arrested and interviewed by Detective O'Brien and his interrogation in the murder -- same murder Cordell Williams was convicted of. And he describes the various forms of abuse he alleges against Detective O'Brien.
A. Yes, I see that.
Q. Okay. There is no description in this or -- I mean, there's no commentary in this description regarding David Evans' interview of his role in the crime. Would you agree?
A. I don't -- I don't see it here, a specific description of sort of the events that transpired.
Q. There's also no description of David Evans' affidavit in this section regarding his interview by the Working Group.
A. Yeah. I don't see that in here.
Q. Okay. Did anyone -- when David Evans

was interviewed by the Working Group, did anyone ask him about the statements he made in the affidavit?
A. I don't remember.
Q. Did anyone show him the affidavit?
A. I don't -- I don't remember.
Q. If the Working Group had asked Mr. Evans about the affidavit he provided in 2017, would that have been reflected in this section about the interview with David Evans?
A. Maybe, yeah --
Q. Would you agree with me --
A. -- if that had been asked.
Q. -- that David Evans' affidavit would constitute new evidence?
A. That his affidavit would constitute new evidence? I'm not sure. I mean, new evidence in David Evans' case? Maybe.
Q. Cordell Williams?
A. In Cordell Williams' case? I'm not sure.
Q. The investigation you're conducting --
A. Yeah.
Q. -- right?



A. Yeah.
Q. I mean, he made it in 2017.
A. Sure.
Q. So it didn't exist before then?
A. Sure.
Q. And it contains inculpatory statements by him, right?
A. Sure, but it's -- well, I don't know if it's consistent with trial testimony or not as I sit here today. So I can't say -- that's why -- I can't say if it's new or not.
Q. Let's just do one question at a time. It contains inculpatory statements?
A. By David Evans, yes.
Q. Yes. And it contains evidence that could be used against Cordell Williams?
A. That is inculpatory against Cordell Williams in the affidavit, yes.
Q. In other words, if David Evans -- if there was a retrial in this case, State could subpoena David Evans, call him to testify, confront him with the affidavit and ask him if those statements are true?
A. Perhaps. I don't know. I'm not sure



about what the State could or could not do in that stage but perhaps, sure.
Q. But isn't that the concept of new evidence? It could be used by either the State or the defense?
A. Potentially. I mean, I just don't know -- I can't say about admissibility, but it could -- it could.
Q. Shouldn't have that affidavit been discussed in the section regarding David Evans?
A. Maybe. I don't know. I sort of just don't have a recollection of the time frame here.
Q. Okay. And it looks like under David Evans' section there's no date as to when he was interviewed?
A. Yes. I don't see that.
Q. Okay. But if you jump down to Section C, Cordell Williams --
A. Okay.
Q. -- it reflects the date you interviewed Mr. Williams with Steven Becker present?
A. Yeah, that's right.
Q. Okay. And that was on November 30, 2021?



A. That's what it says here. I really don't remember the dates but --
Q. That's okay.
A. That's fine.
Q. Now, remember I showed you that email from Mr. Becker in which he sent you the affidavit of David Evans, right?
A. Yes, you did show me that email.
Q. If you want to take a look at it, I think you're going to find that the date you received that affidavit was roughly nine to 10 days before this interview with Cordell Williams.
A. Okay.
Q. Okay. Would you have made an effort to review the affidavit by the codefendant regarding his knowledge of the crime before interviewing Mr. Williams?
A. I mean, I would hope so, but also I'm not, you know -- as I sit here today, would I inadvertently have missed it? I don't know. I can't say for sure, but I certainly hope I would have made an effort.
Q. Yeah. If you had that affidavit when you interviewed Cordell Williams, you would be able

to ask him did you hear Cordell -- or did you hear David Evans say wait here while I go in and confront these two guys?
A. If I had the affidavit or if I --
Q. Yeah.
A. I mean, I -- I suppose.
Q. You could actually show him the affidavit and say is this true?
A. I could --
Q. Are these allegations true?
A. I could, yes.
Q. Okay. And if you had the affidavit, you could ask him did he know that David Evans had taken the gun from the car to go in and confront these two individuals?
A. I mean, I think, yes, if I had the affidavit. Also I could just ask him with or without the affidavit but, yes.
Q. Did you ask him those questions?
A. I don't remember.
Q. Let's look at paragraph 2.
A. Sure.
Q. It says: Williams stayed at the party for two to three hours and then decided to drive



home. He had work the next day. He offered rides to anyone who wanted them. At some point before Williams himself got in the car, Evans asked for his keys. He gave him his keys. Williams believes Evans may have put the gun in the trunk at the time, but Williams did not see him do it, nor did they discuss it.
You see that?
A. Yes.
Q. Okay. That's what Williams told you?
A. That's -- yes. I mean, that's what's here, yes.
Q. Okay. I'm sure -- I mean, obviously since you wrote down what he was saying to you, not verbatim, there's no reason to doubt this is what Williams told you?
A. No, that's not what I'm -- yeah. I'm not saying I'm doubting that.
Q. Okay.
A. I'm just -- yeah.
Q. Do you agree with me that this explanation that Cordell Williams gave you is contradicted by David Evans' affidavit?
A. I think parts of it are, but the part



Williams believes Evans may have put the gun in the trunk at that time is somewhat consistent, but I don't know. I think --
Q. Do you want to look at the affidavit again?
A. No. I don't think I need to. I mean, I just -- I'm not sure. As I look at these, I don't know that it's -- I would agree that it's fully contradicted, but I could see you making that argument.
Q. Why don't you grab it real quick.
A. Sure.
Q. And he wrote, and this is in paragraph 2: While at the party I brandished my gun, so prior to letting me into the car, Cordell popped the trunk and told me I had to put my gun in the trunk, and I did.
Don't you agree that that paragraph is inconsistent with what Cordell Williams told you, that he gave his keys to Evans, he thinks Evans may have put the gun in the trunk but didn't see it, and they didn't discuss it?
A. I think it's contradictory with the -- this discussing it, yes.



Q. Should that contradiction have been pointed out in this report to the state's attorney?
A. I'm not sure. I think we tried to point out what we could and, you know, tried to point out to the best of our ability the relevant information and the reasons for the recommendation.
Q. Do you agree that the information in David Evans' affidavit is relevant?
A. Sure, I think it's relevant. I don't know how much emphasis -- I don't -- as I sit here today, I'm not sure how much emphasis we placed on David Evans.
Q. Well, they can't both be telling the truth, right?
A. I think what I'm saying is I'm not sure how much emphasis we placed on that particular witness who made different statements. As I sit here today, I don't know.
Q. Well, you -- I mean, would you agree he's not just some witness. He's the person who committed the crime?
A. Yeah, the codefendant. I think, you know, again, we tried to provide the information to the best of our ability.

Q. My only question is do you agree that David Evans' affidavit, particularly paragraph 2 that we just read, is relevant to this analysis?
A. I think it could be. I think it's not all -- I'm not -- I don't have a recollection, but I'm not sure it's all that different from the trial evidence. I think it's sort of part and parcel of the theory of accountability.
Q. Now, I assume --
A. But I don't know.
Q. I assume you're not going to remember, but I'll just represent to you David Evans did not testify at Cordell Williams' trial.
A. Okay.
Q. David Evans didn't give a statement to police. David Evans didn't say anything, and he maintained his right to silence.
A. Okay.
Q. Now, if that's all true, the information in this affidavit would not have been available in 1994 or 5, whenever this case was tried.
A. Okay.
Q. Agreed?



A. It would not have been available in '94 or '95.
Q. An impartial analysis of the evidence, shouldn't it point out that David Evans made these statements --
A. I --
Q. -- to the reader?
A. Sorry.
Q. Go ahead.
A. No, I disagree with that characterization. I thought that we tried to provide an impartial -- we did provide an impartial analysis, and we tried to relay to the extent that we could most of the information.
Q. That's not my question. Shouldn't an impartial analysis of the case include a reference to the fact that David Evans gave this affidavit and made this statement in the affidavit that contradicts Cordell Williams?
A. Again, I don't -- it was certainly not -- if the statement -- if the affidavit was not included specifically, it was not as a result of -- it's the characterization of impartial versus partial. I -- again, I think we did --



Q. Okay. Take the word out. Shouldn't this analysis, this memo, include the fact that David Evans gave an affidavit, and he included information in the affidavit that contradicts Cordell Williams' description of the events?
A. I think in hindsight, you know, having more information might be better, sure, including this affidavit in the memo.
Q. In paragraph 8 --
A. Sure.
Q. -- and this is on page 8043 --
A. Okay.
Q. -- Cordell Williams tells you he went home -- "Williams went home" -- this is what's written -- "and was distraught. He fell asleep and at some point, police came to the door."
Now, I'm going to stop there.
A. Um-hum.
Q. We talked earlier about the fact that if the car is seen fleeing from the scene at 12:30 and the police arrive at 1:00 o'clock, only 30 minutes would have elapsed between the time of the car being seen and the time the police arrived, right?



A. Or the time that the -- you know, from what we can pull from the police reports and --
Q. Okay.
A. -- transcripts, et cetera.
Q. Now, you also know from your discussions with Cordell Williams that he kicked David Williams [sic] out of the car at some point after he fled the police?
A. That's what he -- that's what it says here, yes. I don't independently recall that, but that's what it says.
Q. And do you know whether he dropped off the other passengers?
A. I don't remember.
Q. Okay. Now, having just observed or just -- obviously, his description to you is that he's aware that David Evans committed this crime. He's distraught. It upset him. Did he describe it to you as a traumatic event?
A. I don't remember how he described it --
Q. Okay.
A. -- or if that's the impression I had. I don't remember.
Q. Did you question at all how it is he

went home in this distraught state only -- within 30 minutes of being in the proximity of a double murder and he somehow fell asleep?
A. I -- I don't have a recollection of what I thought about or what I considered. In other words, I don't have a recollection of, you know, fell asleep, how could he have fallen asleep after witnessing this traumatic event. I don't remember thinking -- what I thought then.
Q. And you cross-examined witnesses before, right?
A. Sure.
Q. Okay. And sometimes you need to cross-examine people to find out, hey, there's an inconsistency here. How does this make sense? Did you do that with Cordell Williams?
A. Did I cross-examine him about an inconsistency?
Q. Did you --
A. I don't -- I wouldn't describe the interviews as cross-examinations. They were information-gathering interviews.
Q. No, no. You have experience with cross-examination?



A. Yes.
Q. And you obviously know how to ask pointed questions when the evidence doesn't make sense, right?
A. I think so, yeah.
Q. Okay. Did you do that with Cordell Williams?
A. Again, I don't have a recollection of how I conducted the particular interview, whether they were pointed questions or -- you know, trying to get at evidence that was inconsistent.
Q. Did you take handwritten notes during your interview of Cordell Williams?
A. I might have, yeah.
Q. Okay. Do you still have -- those would have been produced to the state's attorney?
A. I think so, yeah.
Q. Okay. Okay.
A. I don't know if I took handwritten or if I typed. I don't know.
Q. You were interviewing him in a prison.
A. Yeah.
Q. So I know there's restrictions on what you can bring in there.



A. Yeah. I just don't have a memory of it.
Q. All right. Okay. Cordell Williams described being struck by Detective Foley, and this is in paragraph 14 of your description --
A. Okay.
Q. -- of the conversation with Cordell Williams.
A. Okay.
Q. At some point, and this is described further down, he explained that he recognized -- he knew -- he came to realize it was Foley who struck him because when he was at one of the prisons, he interacted with Arnold Day and realized -- and Day had a picture of Detective Foley, among other detectives, and he recognized the picture as the person who struck him.
A. Okay.
Q. Okay. Does that fact create any concern on your part that information about detectives and potential abuse by detectives is being circulated around the prison?
A. I'm not sure if it creates concerns. I'm not sure as I sit here today if it creates



concerns about detectives circulating information -- or information about detectives being circulated. I'm not sure I thought about it, I guess.
Q. Because if the inmates in the prison are becoming aware of specific allegations that others are making that seem successful, they may adopt those allegations as their own and fabricate stories about being abused, right?
A. That's certainly a possibility.
Q. Is that something you investigated?
A. Whether --
Q. Whether Cordell Williams was exaggerating or fabricating any of his story based on information he learned either in jail or in prison?
A. Again, I think we tried to conduct a thorough investigation of the allegations he was making.
Q. That doesn't answer the question. Do you want her to read it --
A. I think those are -- I mean, that's part of the question, right, whether we investigated whether he was getting these

allegations from the prison?
MR. MORAN: No. It's a specific yes or no question. Actually, I'll ask her to read it back to you.
(Record read).
THE WITNESS: I think as part of -- I'm not sure. As I sit here today, I don't know. All I can say is, you know, we tried to conduct a holistic investigation.
MR. MORAN: Okay. In five minutes you want to take a break?
THE WITNESS: In five minutes do I want to take a break?
MR. MORAN: Or do you want to take one now?
THE WITNESS: I -- whatever. I guess I -- what is your sense of -- can I ask that, how long?
MR. MORAN: I think -- we're at -- so we've been on the record -- let's go off the record real quick.
THE VIDEOGRAPHER: Now going off the record at 4:13 p.m., this ends Media Unit 2.
(Recess taken.)
THE VIDEOGRAPHER: This begins Media Unit 3, now going back on the record at 4:29 p.m.



BY MR. MORAN:
Q. Okay. Are you all set to get going again?
A. Oh, yes.
Q. Okay. Good. Okay. I want to direct your attention to the section on affidavits.
A. The section on affidavits.
Q. This is following Brenda Williams's on page 8045, the 14th page just before "RECOMMENDATION AND REASONS."
A. Yes.
Q. Okay. This is where you describe the different affidavits that were submitted to the Working Group.
A. That's what it looks like, yeah.
Q. Okay. I want to direct your attention to the last three -- last two sentences. I'm going to read them into the record. It says, "We also received an affidavit filed by David Evans in 2017, and provided to us by Mr. Becker. Evans stated that Cordell popped the trunk when Evans told him to do so, but that neither Cordell nor Evans had planned any shooting."
That's what it says, right?



A. It is.
Q. Okay. Do you agree that that is not a full description of the statements in the affidavit?
A. I agree that it does not contain the entire statements in the affidavit nor -- apparently nor do the other --
Q. Right.
A. -- affidavits listed here.
Q. If the person reading this report -- this is the only information in the report about the affidavit. There is no other mention about the fact that David Evans alleges that Cordell popped the trunk so he could put the gun -- told him he had to put his gun in the trunk and that he said to Cordell to pull over. He sees the bricks, the opposing gang members, and to wait here while he goes in and checks on them -- or confronts them.
The reader would not know any of the other information in the affidavit?
A. If -- I don't know if the reader would know any of the other information from other sources, testimony at trial, statements, et cetera, but would not know the entirety of the statements



in the affidavit.
Q. What other source of information is available for the statements made by David Evans in his affidavit other than David Evans or his affidavit?
A. I don't know. I am not sure if there would have been other sources if this is --
Q. Well, that's my --
A. It tracks with the trial theory. I don't know.
Q. Right, but as this even points out -- the sentence in the report points out this is the affidavit filed in 2017, long after the trial, right?
A. Yes.
Q. Okay. So if this is all the reader has to go on, then the reader doesn't know that David Evans offered a contradictory statement to Cordell Williams regarding Cordell Williams' knowledge of the gun in the car?
A. I'm not -- again, I'm not sure that there would be no other contradictory statements from other sources.
Q. That's not my question.

A. But with respect to the affidavit, this is what is stated in here about the contents of the affidavit.
Q. I understand that, and that doesn't really answer the question. It's really just a yes or no question. Do you want it read back?
A. No. I'm just not sure how else to answer it. This is what is -- these two sentences that you just read provide a summary of the content of this affidavit but do not list the entirety of the statements of the affidavit. So that's my answer to that question.
Q. It's a yes or no question. So the question is this, okay, and I'm going to ask it again. Shouldn't -- or if the reader only goes on what's in this report, doesn't look at the affidavit, the reader would not know that there's additional information in this affidavit that contradicts Cordell Williams' statement about his knowledge of the gun. Don't you agree with that?
A. I'm not sure.
Q. What more do you need to answer the question?
A. I mean, I'm just not sure if there



wouldn't be other additional evidence in the file that would have been stated, so I'm just not sure.
Q. What other additional evidence can you think of that would equate to David Evans saying that Cordell Williams instructed him to put his gun in Cordell Williams' trunk, in the trunk of his car?
A. I don't know. I don't know if it would have been in Williams' initial statements. I don't know. I'm just not sure.
Q. I mean, if you knew that, if you knew that Cordell Williams had told David Evans to put the gun in the trunk, you would have of course included that in the report, right?
A. I would hope so.
Q. Okay. And if you knew that David -- Cordell Williams knew the reason David Evans got out and asked him to pop the trunk was to take the gun and confront individuals in the restaurant, you would have included that in the report, right?
A. Again, I would hope to include a summary of what was available.
Q. Because that would be important for the reader to know?



A. Perhaps. I mean, yes, or the reader could ask for additional information, yes.
Q. Okay. Can you think of any reason why more information was not included in this report regarding David Evans' affidavit?
A. As I sit here today, I can't.
Q. Okay. I will show you one other exhibit real quick.
A. Okay.
MS. MEADOR: We're on 10.
MR. MORAN: Yes.
(Hawilo Deposition Exhibit 10 was marked for identification.)
BY MR. MORAN:
Q. Okay. We are looking at Exhibit No. 10. This is an email from Vincent Southerland to you with the subject line "Questions for Cordell Williams," dated November 30, 2021. Is that true?
A. Yes.
Q. Okay. And I'm going to paraphrase, but essentially he provides what he thinks you should ask Cordell Williams about at your interview of Cordell Williams?
A. Yes. Vincent provides in this document



what it says. The most basic ones will be --
Q. Okay.
A. -- these questions.
Q. And that's four bullet-pointed questions that he wants you to ask, right?
A. Or ask about, yes.
Q. Okay.
A. That's what I see here.
Q. Did you have your own outline of questions for your interview of Cordell Williams?
A. I don't remember.
Q. When you're preparing questions for an interview like that, do you usually handwrite them, or do you type them out?
A. I don't know. I don't remember if I would have typed a list of questions. I don't remember, and I don't know if I usually handwrite or type them out. As I sit here, I can't remember.
Q. Would you agree with me there's no mention of the affidavit by David Evans in the list of questions that Vincent Southerland sent to you?
A. It does not say affidavit in this list of questions --
Q. Okay.

A. -- the Evans affidavit.
Q. All right. It doesn't mention the affidavit at all, right?
A. It does not. It says what he knew, didn't know was going to happen vis-a-vis the shooting.
Q. Okay.
A. But it does not specifically say affidavit.
Q. So basic open-ended description of the actual beating, torture, coercion, including specific details, hands, phone book, other weapons, threats, handcuffed, denied food and water. Those are the subjects he wanted you to address, right?
A. That's what it says here, yes.
Q. Did you ask Cordell Williams in the form of leading questions whether he was struck with a phone book, whether he was handcuffed, whether he was denied food and water?
A. I don't remember doing so, as I said, in the form of leading questions, but I don't remember. I don't have an exact memory of the form of the questions.
Q. Okay. The third bullet point --



A. Yes, I see that.
Q. -- his relationship with his lawyer who of course was terrible, told him to withdraw his motion.
Had you already formed a conclusion that Cordell Williams' attorney was terrible?
A. I'm not sure if at that point I had or hadn't or if the Working Group had formed that conclusion.
Q. Do you agree with his description that the lawyer was terrible?
A. I don't know as I sit here today. I don't remember all of the specifics of it.
Q. Okay. How about the last question, "What he knew and didn't know was going to happen vis-a-vis the shooting," did you ask him that topic? Did you ask him that topic, questions under that topic?
A. I imagine I would have, like what did -- you know, what happened, those lines of questions, but I don't have a specific recollection of --
Q. Those would be -- those questions would be a great opportunity to confront Mr. Williams



with the affidavit by David Evans, right?
A. Perhaps, sure.
Q. Okay. By the way, your description in the report, and I know you have a separate memo that sort of --
A. In this memo?
Q. You created a separate memo of your interview with Cordell Williams that essentially tracks almost exactly what you've included in the report.
A. Okay. I don't remember but --
Q. Do these 16 paragraphs represent what Mr. Williams told you in nonverbatim format?
A. I don't -- I mean, you know, I tried to capture it, but if I inadvertently did not capture all of it or failed to adequately convey it, that's always a possibility.
Q. Okay. So under the recommendations and reasons -- this is Section VIII --
A. Okay.
Q. -- and sort of similar to what's written in the introduction, the pattern of misconduct, coercion, physical and psychological abuse, and bias exhibited by certain Area 1



detectives --
A. Okay.
Q. -- did you reach a conclusion that Detective O'Brien had exhibited bias in connection with Cordell Williams?
A. I'm not sure if we reached that conclusion. I don't remember. I don't know.
Q. Is bias another way for the Working Group to describe something called tunnel vision?
A. I'm not sure if those two were connected. As I sit here, I'm not sure at the time if those two were connected --
Q. Do you know what tunnel vision is?
A. -- or described tunnel vision.
Q. Do you know what I mean by tunnel vision?
A. I mean, I think focusing on one set theory and pursuing that set theory.
Q. Right.
A. Is that --
Q. Yeah.
A. Is that what you mean?
Q. That's exactly what I mean.
A. Okay.

Q. Someone who has tunnel vision zeros in on their belief or their set theory and ignores evidence to the contrary --
A. Okay.
Q. -- that would not support their belief.
A. Okay.
Q. That's your understanding as well?
A. I think that -- that's a fair description of it, sure.
Q. Okay. Under Section A --
A. Under Section A, okay.
Q. -- of Section 8, "The Circumstances surrounding Williams' detention and interrogation supports our recommendation of vacatur in the interests of justice," and this is the section, I think, where you -- or your report -- or the report goes over the reasons the Working Group believes the conviction should be vacated, right?
A. I think that -- yes --
Q. Okay.
A. -- the basis for it, I guess.
Q. Okay. And this is in the first paragraph.
A. Okay.



Q. In October of '94 Cordell Williams filed a suppression motion asserting specific physical abuse during his interrogation.
Was the Working Group able to confirm that Cordell Williams actually did disclose abuse sooner than October of 20 -- or of 1994?
A. I don't have a specific recollection of it.
Q. Okay.
A. I don't know if -- I'm -- I don't specifically recall. I don't recall --
Q. Okay.
A. -- whether we were able to confirm that before that date.
Q. Now, Mr. Williams' father, Odell Williams, allegedly completed an affidavit or a statement that he signed saying that Mr. Williams told him he had been struck.
A. I don't remember. Is that -- is the affidavit --
Q. I'm not done with the question.
A. Okay.
Q. But I'm giving you the background --
A. Oh, okay, yeah.



Q. -- so I don't have to go yanking out other exhibits.
Okay. Mr. Odell Williams is deceased.
A. Okay.
Q. And I think he would have been deceased as of the time of your investigation.
A. Okay.
Q. Okay. If all that's true, what weight do you give an affidavit by somebody who you cannot -- who's deceased so you can't call him up and ask him questions about the affidavit?
A. I think it -- we consider it. I'm not sure it gets a lot of weight, but it certainly should be part of a consideration.
Q. Now, if you have evidence that the claimant, like Cordell Williams, has given statements inconsistent to other witnesses to the crime, like David Evans, the shooter, does that create any concern for you that Cordell Williams has not been completely honest about his allegations of abuse?
A. Perhaps. I don't know sitting here today whether, you know -- what concerns we had or



didn't have.
Q. Okay. Now, would -- you got this affidavit from Mr. Becker, you know, from David Evans in November of 2021.
A. Okay.
Q. Made your recommendation to State's Attorney Foxx in May of 2022.
A. Okay.
Q. During that period of time, did anyone from the Working Group read David Evans' affidavit?
A. I imagine we did. I don't have a specific recollection of it, but it says we reviewed an affidavit filed by David Evans, but I don't have a specific recollection.
Q. Right. In your report you wouldn't have said you reviewed it if you hadn't actually reviewed it?
A. I would hope not. I mean just --
Q. Was there a conscious decision by the Working Group to exclude information from David Evans' affidavit that supported the integrity of the conviction?
A. I don't recall making a -- making conscious decisions or the Working Group making

conscious decisions to, you know, intentionally ignore evidence.
Q. Okay. I'm going to ask you this question, and we're going to turn to page 8046, second paragraph --
A. 8046.
Q. -- beginning with the word "Critically."
A. Okay.
Q. Towards the end and this is after -- I will read the paragraph. Mr. Williams made his allegations long before any news reports related to these detectives or indeed any abusive conduct by Chicago Police Department officers during that era became public knowledge.
Now, I've read that correctly, right?
A. You did.
Q. Okay. We're talking about Mr. Williams' allegations of abuse made in 1994?
A. I think so.
Q. In your review of pattern and practice evidence, did you come across the name Jon Burge?
A. Yes.



Q. Okay. You know who he is, right?
A. Yes.
Q. He's infamous.
A. I don't know him, but, yes, I know of him.
Q. You've heard of him?
A. Yes, yes, I've heard of him, sure.
Q. Okay. Do you know when Jon Burge was removed from the police department?
A. Oh, gosh. I don't know.
Q. Do you know when he was fired?
A. I don't remember. I don't remember.
Q. Jon Burge was taken out of service in 1990 and fired by 1993 --
A. Okay.
Q. -- and it would have been in the press --
A. Okay.
Q. -- based on allegations that he tortured suspects routinely.
A. Okay.
Q. Did you know that?
A. I don't know if I knew that. I just don't have a specific recollection of it.



Q. If that's all true, it would have been in the media available to Cordell Williams before he was arrested?
A. Jon Burge's --
Q. Sure.
A. Sure, as it -- maybe, as it relates to Jon Burge, but I'm not -- I don't know. I mean, beyond -- if those are the dates.
Q. Let me ask you this. Do you think it's relevant that Jon Burge -- the allegations against Jon Burge were made public in the media in the early '90s before Cordell Williams was arrested for this murder?
A. I'm not sure if I think that's relevant.
Q. Why not?
A. I'm not sure that allegations concerning a different individual are relevant, entirely relevant. I just -- they could be, but I'm not sure as I sit here.
Q. It sounds like you're -- you're not completely on the fence and that you're sort of leaning towards not relevant but leaving the door open a little bit.



A. I don't -- you know, I just -- I don't know if it's relevant or not relevant.
Q. Okay. Would you apply that exact analysis to the information you learned about Detective Boudreau and all the other Area 1 detectives incorporated in your investigation who had no involvement in this investigation?
A. Whether the information coming out in the media was relevant or not relevant?
Q. Relevant to your analysis.
A. Relevant to the analysis? Again, I'm not sure if it's relevant if the allegations of Boudreau and other detectives had come out in the media prior to this analysis.
Q. No, no. I'm talking about from your perspective as someone investigating pattern and practice evidence involving a detective who was involved in this investigation, I want you to tell me why allegations against other detectives who weren't involved in the investigation of the murder Cordell Williams was accused of would be relevant to your own work on the Working Group with respect to Cordell Williams' conviction if you don't think the allegations against Detective Burge, Jon Burge,

being in the media are relevant to whether Cordell Williams would have been privy to those allegations?

A. I'm not sure whether -- I mean if -- it may be that if Detective Boudreau or other of the named detectives were working at the same time, in the same area, if information about them had come out in the media before these allegations, that may well be relevant to --

Q. No. I'm drawing a distinction between your acceptance of pattern and practice evidence against detectives not involved in the case versus your belief whether Cordell Williams could have learned information to use in fabricating abuse allegations could have come from the press reports about Jon Burge.

A. I see what you're trying to draw, but I guess what I'm saying is in the way that I understand your question is that Jon -- you know, when you asked about Jon Burge being in the media before '94 and whether that would have been relevant to an analysis of whether Williams knew about that media and, therefore, made an outcry, and I'm not sure if that's relevant if the



detective is not in any way connected.

And that's different from what I think I'm hearing about whether unconnected detectives working in the same area were partnering with these folks, whether information about their patterns and practice may be relevant. It may be. I don't know.

Q. Well, the point is if Cordell Williams was aware of the news reports regarding Jon Burge, easily could have thought, hey, why not -- why shouldn't I make up those -- why shouldn't I make those same allegations to try and get out of this?

A. I don't know. I don't know.

Q. It's not something you considered?

A. Did we consider it?

Q. Yeah.

A. I'm not sure that we considered the Jon Burge allegations in the media.

Q. Because you pointed out that allegations -- his allegations came out long before any news reports related to these detectives, which tend to indicate -- or at least I read that as suggesting that lends credibility to his allegation as being something not made up based on what he saw



in the press?

A. I think it -- again, as I sit here, I can't sort of think -- say what I was thinking -- what we were thinking at the time or what discussions there were. I can read what's here and surmise that, you know, it may be that if there had been allegations in news reports before his allegation was made, that's something to consider or --

Q. Okay.

A. -- you think about how much weight to give it, I guess.

Q. The next page -- or actually, is this the next -- no. This is at the bottom of the page. Under length of detention, number of interrogations, and timing, it's written: Detectives subjected Mr. Williams to a series of interrogations that began outside of his home --

A. Okay.

Q. -- and which continued to 3:55 a.m., and then you provide the different times.

A. Okay.

Q. Okay. Is that including the moments in which uniformed officers asked Mr. Williams



questions about his activities that night?

A. I'm not sure.

Q. Okay.

A. I don't know.

Q. Do you notice how here you're using the word interrogations, but above you called them interviews?

A. In the section where we lay it out?

Q. Yeah.

A. Sure. I see that in one section it's called -- I'll just go back to it. Part III that's titled "CORDELL WILLIAMS' INTERROGATION," that part, page 2 --

Q. Um-hum.

A. -- the interrogation times, and then we list them as interviews, and then here we're using --

Q. I just want to know if you notice that you make that -- you change the use of the word from interview to interrogation.

A. Sure.

Q. Okay. So on the next page the footnotes all cite a series of publications or articles by people like Saul Kassin, Douglas Keene?

A. Sure.
Q. Did the Working Group find that research on its own?
A. I don't remember.
Q. Where would the Working Group have gotten that research?
A. I don't remember.
Q. In the middle of the page, beginning with the paragraph -- or in the paragraph that begins with the word "Here" --
A. Okay.
Q. -- the last sentence says: Multiple interrogations suggest to the suspect that he is not to be believed, fostering a coercive environment which then can yield to a false confession.
Did Mr. Williams give you that information, or did he make it clear to you in any way, shape, or form that he felt the multiple interrogations gave him a feeling that he was not to be believed?
A. I don't remember.
Q. That's something you would have asked him about?



A. I -- I don't remember if I specifically asked him that. I don't recall.
Q. If he gave you this impression that the cumulative effect of the interrogations made him feel like he wasn't going to be believed, is that something you would have included?
A. I'm not sure. I mean, I'm not sure.
Q. In the next paragraph there is an effort to explain the possible motivation for striking Mr. Williams.
A. I see that, yeah.
Q. It says, "...Williams' claims of abuse are corroborated by the possibility that after he continuously denied involvement a detective might have become frustrated and then slapped him and punched him in the stomach."
Okay. Did I read that correctly?
A. Yes.
Q. All right. How does -- tell me what you -- how do you define corroborating evidence?
A. Perhaps supported.
Q. Okay. Does it have to be actual evidence? Like corroborating evidence is actually evidence that supports another conclusion, right?



A. Potentially or arguments that support it.
Q. Well, then it's not corroborating evidence; is it?
A. I don't -- it says "claims of abuse are corroborated."
Q. Okay.
A. I --
Q. How does -- do you agree with me that this is speculation about what a detective might have done based on a possibility?
A. I don't know about speculation. I don't know if I'd use that word, but that, you know, if -- I am not sure what we were thinking or why we included this part as I sit here.
Q. How does the possibility of a detective becoming frustrated lead to the conclusion that the detective might also decide to use violence -- how is that not speculation?
A. I'm -- I don't know. I mean, it --
Q. Do you have any evidence that this happened?
A. Well, the allegations and the --
Q. Yeah. Besides Cordell Williams, do you



have any evidence that --
A. Well, I mean, I think -- again, we gave our reasons for the recommendation after conducting --
Q. I understand.
A. -- our review. So I can't say sitting here today, you know, what evidence there is in here about what may or may not have happened.
Q. Did you read all these publications cited in the footnotes on page 16 of the report?
A. I don't remember.
Q. Have you ever read any of those publications?
A. I would hope so, but again I don't remember.
Q. Okay. Do you have any evidence to suggest that Mr. Williams' age played a role in his decision to give a statement?
A. I mean, I think age -- I don't -- I don't know about in the Williams case specifically, but I think age can play a role.
Q. Okay. Did you make any effort to determine whether Mr. Williams' age played a role?
A. Again, I think we made an effort to

conduct an investigation with respect to that specific piece.
Q. Ma'am, you're not --
A. I'm not sure -- I'm not sure that I can say we made an effort to determine --
Q. Most of these are just --
A. -- exactly what age --
Q. -- yes or no.
A. -- played a role, right?
Q. With all due respect, most of these are just yes or no questions. You don't have to keep repeating that you feel like you did an impartial investigation and things like that. I get it.
I just want to know if a specific effort was made to determine if his age was a factor in his decision to confess.
A. I am not sure. I don't remember.
Q. Okay. On the bottom of page 17 --
A. Okay.
Q. Actually, strike that. I'm going to back up a second.
Did anyone ask Mr. Williams questions about his prior interactions with police before he was arrested for the murder?



A. I don't remember if that was asked.
Q. Did anyone ask Mr. Williams about whether he'd ever been questioned by police before and understood his rights?
A. I'm not sure.
Q. Aren't those relevant considerations in evaluating whether his age is a factor?
A. Sure, they can be.
Q. Okay. Because if he has a working knowledge of how to behave or what to expect with the police, that overcomes potential naivete that a juvenile might have in the police interrogation setting?
A. It can.
Q. Let me ask you something. In the middle of the page at the bottom -- or middle of the paragraph at the bottom of page 17 --
A. Okay.
Q. -- you write -- or it's written, "Again, this is strikingly similar to Mr. Williams' claims that detectives threatened to harm his father...."
A. Yeah.
Q. And you're comparing it to an



allegation made by Mr. Harper and other -- other witness.
A. Okay.
Q. If it turns out Mr. Williams agrees that he has no real knowledge that detectives threatened his father --
A. Okay.
Q. -- do you agree then that this factor would not weigh in favor of coercion?
A. Yeah, perhaps not.
Q. Okay. At the end of this paragraph, it's written that Mr. Harper's experiences and Mr. Williams' experiences both corroborate Mr. Williams' allegations of physical abuse.
I'm going to stop there.
A. Okay.
Q. By "Mr. Williams' experiences" are you talking about Cordell Williams?
A. Yes, I think so, yes.
Q. So another way of saying that, setting aside Harper for a minute, is that Cordell Williams' experiences corroborate his own allegations of physical abuse?
A. I think that -- I mean, the way I read



it is the similarities between the two.
Q. Okay. So Mr. Harper's allegations --
A. The similarities between Harper's and Williams' corroborate --
Q. Okay.
A. -- Williams' experiences. That's how I read that.
Q. Did Mr. Harper provide a description of experiences that matched almost identically Mr. Williams'?
A. I don't recall what Harper said as I sit here. I see the -- like what's on this memo, but I don't remember --
Q. Okay.
A. -- what exactly he told us.
Q. Okay. So Mr. Harper's and Mr. Williams' experiences support a pattern of culture of abuse among detectives at Area 1, particularly O'Brien and others investigating the case.
Okay. Do you agree with me by that conclusion it seems to incorporate multiple detectives at Area 1 who may or may not have been involved in this investigation?

A. Again, as I sit here, I sort of just don't have recall about what exactly it says, but I think it -- what it says is support a pattern of culture of abuse among detectives, particularly this detective and others investigating this case.
Q. Okay. Let's look at the top of the next page.
A. Okay.
Q. This is where there's a description -- it says, "...Evans recalled detectives slapping him around with an open hand, cussing at him, and at times choking him. Evans specifically recalled O'Brien slapping him around. Again, a similar physical allegation corroborates Williams' own allegations."
I'm going to stop there.
A. Okay.
Q. I think it's undisputed in this case. Mr. Williams does not accuse O'Brien of striking him. Are you aware of that?
A. I don't remember.
Q. If Mr. O'Brien -- if Mr. Williams does not -- Cordell Williams does not accuse Detective O'Brien of striking him or even being in the room



when he was struck --
A. Okay.
Q. -- how could Evans's experiences with Detective O'Brien corroborate what Mr. Williams -- what Cordell Williams is alleging?
A. I think the corroborate -- again, I'm guessing a little bit as to the -- what -- the connection here, but I think it's the physical allegation itself and not against a particular detective that corroborates Williams' own experience.
Q. Okay. This allegation about placing a phone book on Mr. Williams' stomach and then punching him, is it your understanding that a detective placed a telephone book on Mr. Williams and then punched the telephone book?
A. It -- what it says here -- I'm just reading from the report. He further alleged detectives placed a phone book on his stomach and punched him in the stomach. I think that's what it means.
Q. Okay. Let me ask you something. If the detectives provide inconsistent explanations with what you know the evidence to be --



A. Yeah.
Q. -- do you hold that against the detectives?
A. Potentially, sure.
Q. Because that would undermine their denials and their explanation of how the investigation unfolded?
A. I think it's a factor to consider. I think there were -- for instance -- I don't have a specific recollection, but in general I'm sure there were inconsistencies about the -- you know, among the detectives who testified about, you know, who else may have been present or times or things like that, and those are inconsistencies. I think it depends on the kinds of inconsistencies we're talking about but certainly a factor to consider.
Q. Okay. At the beginning of this paragraph, under "Inconsistencies and Concerns" --
A. Um-hum.
Q. -- it's written, "Mr. Williams' allegations have been inconsistent at times."
A. Yes.
Q. Okay. But then further through this paragraph -- or this paragraph, and I'm going to



paraphrase, essentially states that there's no concern about those inconsistencies. You're not concerned about them.
A. In this paragraph?
Q. Yeah.
A. I -- I mean, the thing is titled "Inconsistencies and Concerns," and so I think the point of raising the inconsistencies is that we have concerns about those inconsistencies and --
Q. Okay.
A. -- you know, the decision makers should review that.
Q. At the end of the first paragraph, it's written, "Detectives, of course, may have lied to Williams about the state of the investigation...."
Do you have evidence that detectives actually did that?
A. I am not sure what this -- as I sit here, I'm not sure what this refers to. So I don't know.
Q. Okay. Why introduce the possibility of detectives lying to Williams about the state of the investigation if you have no evidence that it actually happened?

A. I don't know what this refers to, how it connects. I just don't know.
Q. Okay.
A. I'm not sure. I don't remember.
Q. At the end of the paragraph, you write -- or it's written, "Despite these inconsistencies, we conclude there is sufficient, credible evidence that undermines the integrity of the conviction. We credit Williams' multiple statements alleging abuse, and believe him."
I'm going to stop there. The reasons for that conclusion are all set forth above in this section?
A. I think we tried to set forth the reasons above.
Q. Okay. Was the affidavit by David Evans considered at all --
A. I think --
Q. -- in your --
A. I'm sorry.
Q. -- in this decision to credit Mr. Williams' allegations?
A. I -- as I sit here, I don't recall, but it was listed among those items we considered.



Q. Now, if someone lies about their involvement in the crime, in other words, saying -- trying to create distance between him or herself and the crime, even though that person was involved in the crime, would you agree that that lie is evidence of a guilty conscience?
A. It can be.
Q. Okay. What else can it be?
A. Evidence of fear, evidence of not trying to implicate someone else, evidence of not wanting to be involved. I don't -- I'm just sort of naming --
Q. Right.
A. -- guessing reasons off the top of my head.
Q. It would be your job as the investigator to find out what it actually is, right?
A. To the extent that that's possible, it's to review the evidence, the files.
Q. And overall in the broad context, one of your functions is a truth-seeking function?
A. I think overall one of the functions is to, yes, sort of make a determination based on the



evidence as we see it --
Q. Yeah.
A. -- on one of those three buckets.
Q. And if you're confronted with disputed evidence, one of the things you may want to do as an investigator is to try and determine what's true?
A. Sure, to the extent that we can, yes.
Q. Um-hum. Now, when you have someone who lies about their involvement in the crime and -- or, you know, gives a story that's inconsistent, whether you want to call it a lie or not or say it's because of fear, it's not true, and also includes allegations that the detectives abused him -- the person only confessed because of abuse by the detectives, doesn't that create doubt in your mind about whether those allegations of abuse are true?
A. Doesn't it create doubt -- it could, sure. I don't know if it did. I just don't know. But, sure, it could. It could be a factor to consider.
Q. Shouldn't that be part of the analysis?
A. Maybe, and it may have been in our



discussions. I just don't recall.
Q. In the section where you talk about -- where it's talked about believing Mr. Williams --
A. Okay.
Q. -- shouldn't there be some description of the fact that Mr. Williams gave an explanation of his involvement in the crime that was inconsistent with what the shooter said?
A. I'm -- I -- I -- perhaps. I'm not sure. I mean, I think we tried to lay out some of the inconsistencies, but perhaps there could have been more. I don't know.
Q. By the way, at any point in time was Mr. Williams under oath when you spoke with him?
A. No, I don't think so.
Q. Are you aware of any testimony he gave under oath about this crime or his involvement in the crime?
A. As I sit here, I don't remember.
Q. Okay. The affidavit by David Evans was given under oath, right?
A. I think so. It's an affidavit.
Q. If you look at the last page, he cites both the federal statute and the Illinois statute

on verification of statements.
A. Yes.
Q. Okay.
A. I see that.
Q. Both of which are punishable by perjury?
A. Sure.
Q. Does that weigh at all in your analysis that David Evans gave a statement under oath implicating Cordell Williams in the crime?
A. It may have. I don't remember.
Q. Okay. Shouldn't it be a part of the investigation?
A. Perhaps, yes.
Q. And shouldn't the fact that David Evans gave a statement under oath subjecting himself to perjury be -- that implicates Cordell Williams in the crime be mentioned in your report to the state's attorney?
A. I -- well, I think I've said that we did write it in the affidavit section but perhaps.
Q. On page 8050 --
A. Okay.
Q. -- this is the 19th page of the report.



A. Okay.
Q. The very first paragraph talks about what the State relied on to prove its case?
A. Yes.
Q. Okay. The last phrase I want to read, "...we find the lack of independent physical evidence and witnesses to the crime warrants a vacatur in the interests of justice."
Do you see that?
A. Yes.
Q. Isn't David Evans an independent witness to the crime?
A. He certainly is an independent witness to the crime, but I think -- I don't know what -- what -- in the context of what this refers to. I don't know if it refers to in the trial itself.
Q. You are free to read the paragraph.
A. I am. I think it may refer to the -- at the time of trial.
Q. Sure. In Section B, the title, "State's reliance on Williams' statements at trial provides additional credible evidence supporting vacatur."
A. In Section B?



Q. Yeah.
A. Yes.
Q. So the very first paragraph is pointing out that the State relied almost entirely on Williams' admissions, right?
A. At the trial, yeah.
Q. Yes. And then the Working Group points out there's a lack of independent physical evidence and witnesses to the crime, which warrants a vacatur in the interest of justice, right?
A. Yes, at the -- again, I don't know the context for this and may have been referring to at the trial, but I don't know.
Q. Do you agree with me that as -- well, actually, we went over the trial evidence earlier, remember?
A. Right.
Q. It was earlier in your report.
A. Yes. I just don't know if this statement is referring back to that. I just don't have the --
Q. Okay.
A. -- like particular context for this.
Q. Do you agree with me that David Evans



is a witness to the crime?
A. Yes, David Evans is a witness to the crime.
Q. Should David Evans be mentioned as a witness to the crime?
A. Should -- yes, David Evans should be mentioned as a witness to the crime.
Q. In this section?
A. I don't know that I agree he needed to be mentioned in this section but --
Q. Do you have any -- you know -- strike that. Let me back up a second.
The next paragraph describes the police officer, the off-duty police officer who observed the shooting and the car fleeing and David Evans running to the car.
A. Okay.
Q. Is there any -- did the Working Group have any concern about the believability or credibility of Officer Sanders?
A. Not that I recall, but I don't -- I don't recall, but not that I recall.
Q. Okay. In describing what the State relied on --

A. Yes.
Q. -- as proof --
A. Okay.
Q. -- and one of the points of this section is to say if you take the confession out of the picture --
A. Um-hum.
Q. -- is there any other evidence to prove guilt, right?
A. Right, at the trial, yes.
Q. Okay. Obviously, David Evans' affidavit wasn't available at trial. We discussed that earlier?
A. Right, so I -- yes.
Q. Okay.
A. Okay.
Q. Was there a discussion of what would happen if the case was retried without Cordell Williams' confession?
A. I don't remember having that discussion. I don't remember.
Q. That's a recommendation the Working Group could have made is to retry him and call David Evans as a witness?



A. I don't know that I considered that among the buckets of sort of vacatur, vacatur on innocence grounds, vacatur on --
Q. It's a possibility, though? You could have recommended that --
A. I -- I'm not -- I'm not --
Q. -- as a possibility?
A. Oh, sorry. I suppose nothing prevented us, but I just don't think we considered -- I at least don't as I sit here think I considered other recommendations.
Q. Okay. I want to direct your attention to page 8052, which is the 21st page of the report.
A. Okay.
Q. In the middle of the page, paragraph beginning, We cannot conclude that Williams is factually-innocent of the offense -- offenses.
Okay. That's the official position of the Working Group?
A. I think that is one of the conclusions we reach, yes.
Q. Okay.
A. That's fair to say.
Q. And part of the explanation is,



"Mr. Williams told Ms. Hawilo he did indeed stop the car when told to do so by Evans, that he popped the trunk when asked, and believe Evans may have had a gun, but wasn't sure," right?
A. That's part of the explanation listed here, yes.
Q. Okay. Obviously, there's no mention in that paragraph of David Evans' affidavit that contradicts his knowledge about the gun?
A. There's no mention of Evans' affidavit here explicitly in this paragraph.
Q. Okay. And then it's written, "Instead, we believe the weakness of the evidence against Mr. Williams incentivized detectives to coerce a confession."
What's the basis for that conclusion?
A. I think a review of the record.
Q. What in the record --
A. The evidence -- the -- I don't -- I don't have an independent recollection of it. I don't know, but I would imagine a review of the entirety of the record at the time.
Q. Isn't the Working Group speculating as



to what motivated the detectives?
A. I'm not sure.
Q. I mean, if you had evidence to show that the detectives were motivated to coerce a confession based on the weakness of the case, would you have cited that in the report?
A. I think that we tried to cite in the report the relevant evidence.
Q. It's just a yes or no question.
A. That's not -- again, I don't know. I'm not sure.
Q. I mean, you want to be --
A. There was evidence cited in the report. Whether that sort of is the kind of evidence that you're thinking of, I'm not sure.
Q. You want to be as complete and thorough as you could, right?
A. Sure, sure.
Q. Okay. And part of being complete and thorough is when you draw a conclusion like this, you support it with some facts to demonstrate it's not just guesswork, right?
A. Sure, and I --
Q. By the way, did the Working Group look

at any cases that weren't solved by these detectives, like the detectives investigating this case -- the Cordell Williams case?
A. That weren't solved by these detectives?
Q. Yeah. So let me -- I'll ask it in a better way. Do you as -- did the Working Group look into the ratio of cases that went unsolved by these detectives where they couldn't get statements from people and there was no evidence and the statements were -- for whatever reason, versus the cases that the detectives closed?
A. Not that I remember.
Q. Is that a relevant consideration when deciding whether detectives would just get frustrated because the evidence is weak and start abusing or coercing evidence?
A. Perhaps, sure.
Q. Shouldn't that have been done before reaching a conclusion that these detectives were incentivized to coerce a confession from Cordell Williams by the weakness of the evidence?
A. I -- we did what we believed sort of to be the best investigation.



Q. Okay. Actually, that was a yes or no question.
A. Again, shouldn't it have been done? I don't know that it should have been done.
Q. All right. In the next paragraph it said we don't have proof of his actual innocence. We do have doubts or we have doubts about the truthfulness of the entirety of the confession, based on the level of pressure placed on Williams and combined with the physical assault.
A. Um-hum.
Q. Let me ask you this.
A. Sure.
Q. Did you draw -- I mean you read through -- or members of the Working Group, you or one of the other two, read through the court-reported confession?
A. Yes, I'm sure we did.
Q. Okay.
A. I don't -- but I'm sure we did.
Q. Did you have that with you when you interviewed Mr. Williams?
A. I don't remember.
Q. Did you go over line by line what was



true and what wasn't?
A. I don't remember.
Q. Is that something that you would have done as an impartial investigator?
A. I don't remember if that's how we would have approached it or whether we would have approached it by asking tell us what happened. I don't remember.
Q. If that had happened and you learned from Mr. Williams that the court-reported confession is substantially true with only a few areas that he identified as falsehoods --
A. Right.
Q. -- would that be something that you would consider in deciding whether his confession was coerced?
A. I think that's a factor to consider.
Q. Okay. That would -- if he hadn't made those admissions to you in an interview, that the confession was substantially true, then obviously you wouldn't be able to conclude as you do here as a member of the Working Group that you have doubts about the truthfulness of the entirety of the confession?



A. I think -- I don't exactly know what this refers to, but it may refer to the entirety of the statements. There are portions of it that were truthful. There were portions that were untruthful. I don't know.
Q. Okay. On the next page there's a discussion about ineffective assistance of counsel.
A. Yes. I see that.
Q. And this is where the description of David Wiener's performance and his problems with the ARDC are discussed.
A. Yes, I see that.
Q. Okay. Does this refresh your recollection as to whether any of the misconduct alleged against David Wiener or his alcoholism played a role in his representation of Cordell Williams?
A. I don't remember it -- I don't remember.
Q. There's a concurring opinion on the next page by Marc Kadish?
A. Yes.
Q. Do you know why he gave a concurring opinion?

A. I'm not sure. I think -- I'm not sure exactly why. I don't remember why.
Q. Okay. Did you help him draft or edit the concurring opinion?
A. I don't recall.
Q. Okay.
A. I don't know if I would have seen it and --
Q. Did he --
A. -- I said is this -- I'm not sure about this -- I don't remember.
Q. I know drafts of the opinion for Cordell Williams were circulated among you and Marc Kadish --
A. Yes.
Q. -- and Vincent Southerland.
Did Mr. Kadish circulate drafts of his concurring opinion for review by you and Vincent Southerland?
A. Maybe. I don't know.
Q. One second. Did you have an answer?
A. I think I said maybe.
Q. Okay.
A. I don't remember if he circulated this



one or circulated -- I don't remember.
MR. MORAN: Can we get a quick time check?
THE VIDEOGRAPHER: Yeah. You got 33 minutes left.
MS. MEADOR: Do you want to take a minute?
MR. MORAN: Yeah. Can we have a minute?
THE WITNESS: Sure, whatever.
THE VIDEOGRAPHER: This ends Media Unit 3, now going off the record at 5:25 p.m.
(Recess taken.)
THE VIDEOGRAPHER: This begins Media Unit 4, now going back on the record at 5:32 p.m.
BY MR. MORAN:
Q. Ms. Hawilo, did you or any of the other Working Group members ever have an opportunity to speak with the assistant state's attorney who took Cordell Williams' court-reported confession?
A. Not that I remember, but I don't know if -- I don't remember if one of the Working Group members may have reached out to that person or the trial attorney, but I -- I don't remember doing so.
Q. Do you remember whether any effort was made to contact either that assistant state's attorney who took the court-reported confession or



the assistant state's attorneys who tried the case?
A. I don't remember making such an effort.
Q. How about the court reporter who took the statement, was any effort made to contact the court reporter who took the statement?
A. Not that I remember, no.
Q. Okay. And would you agree that those individuals potentially could have information, relevant information about whether Cordell Williams appeared to be injured or whether the police officer in the room was acting in a way that gave them concerns?
A. Potentially. I don't remember seeing court reporter testimony, but I believe there -- I don't know if in this case, but my recollection is in some of these cases there was testimony by the assistants in the room.
Q. Right. No. I get that. I mean did -- well, actually, did you -- the assistant state's attorney who took the court-reported confession, his name is Greg Vaci.
Do you have a recollection of reviewing his testimony?
A. I don't remember.



Q. Okay. And assuming the court reporter did not testify, you obviously had the court reporter information. You could have tried to locate that person, right?
A. Sure, we could have tried.
MR. MORAN: Okay. That's all I have right now. I am going to turn it over to my colleague here.
THE WITNESS: Okay.

CROSS-EXAMINATION

BY MS. MEADOR:
Q. I'm going to try and be real quick so we can be done.
So just following up on the questions from Mr. Moran, Greg Vaci was the assistant state's attorney conducting the felony review in the Williams case. Are you aware of that as you sit here today?
A. I don't have an independent recollection of that name. I may have been aware of it back then.
Q. Okay. And is it fair to say that the felony review state's attorney would have had an opportunity to see Mr. Williams at the police

362

station, right?
A. Yes, I think so.
Q. And he could have observed his injuries?
A. Yes, to the extent they were observable, I think --
Q. Okay. And he could have observed Mr. Williams' just physical appearance, right?
A. Yes, I think so.
Q. Okay. And he would have -- are you aware that as part of a felony review, state's attorneys' processes, they speak with -- he or she would speak with the individual giving the confession alone?
A. I'm aware that it happens in cases, sure. I don't know if it happened in this case. I don't have an independent recollection of that.
Q. Okay. And are you aware of the reason why that's done?
A. I assume or believe it has to do with, you know, asking about whether there was misconduct during the interrogation or -- among maybe other reasons.
Q. Okay. And so I will represent to you

363

that part of the reason why that's done is to ask the suspect outside of the presence of the detective or detectives whether they were physically abused, whether they were threatened, whether they received food, were given restroom breaks, or, you know, just essentially the integrity of the confession that this individual was about to give, right?
A. I accept that representation.
Q. Is that fair?
A. Yes.
Q. All right. So all of those things, would you agree, would be important information for independent verification of a witness who was present at the time with the detectives and with Cordell Williams to have interviewed?
A. I think that's certainly a factor to consider.
Q. Okay. Did you ever -- did you ever have any discussions with the Working Group about trying to interview the felony review state's attorney here?
A. In the Cordell Williams case?
Q. Yeah.

364

A. We may have, yes. Like trying to interview generally the felony review state's attorney or the line attorney. We may have had those discussions.
Q. As you sit here today, are you aware of interviewing the felony review state's attorney in any of the cases that you reviewed?
A. I don't remember.
Q. Okay. As you sit here today, do you have a recollection of interviewing the trial state's attorney in any of the cases you reviewed?
A. Whether the Working Group interviewed any of the trial state's attorneys? I don't have a specific recollection of that or any member of the Working Group. As I sit here, I don't remember.
Q. Okay.
A. It may have happened. It may not have. I don't remember.
Q. Okay. And I apologize. I can't exactly remember your answer. Did you have any conversations with the working group about trying to interview the court reporter who would have been present for Mr. Williams' confession?
A. You know, I don't -- as I sit here, I

365

don't recall that that was like something we talked about. Again, I may be misremembering, but the court reporter investigation doesn't stand out to me.
Q. Okay. And you would agree that would have been an independent witness who could have provided you information about Mr. Williams' physical appearance, right?
A. Sure.
Q. Okay. And this witness could also have provided information about how Mr. Williams presented in terms of his speech and mannerisms during his interactions with him at the police station, right?
A. With the court reporter?
Q. Yeah.
A. I presume so.
Q. Did you ever see a court order appointing you or the other members of the Working Group as special assistant state's attorneys? Is that the right term? Did I use the right term?
A. A court order?
Q. Court order.
A. I'm not -- I don't remember seeing one.

Q. Okay. Are you aware whether or not that's required under the law for you to be acting as a special assistant state's attorney?
A. I'm not aware.
Q. You testified earlier that you took notes during your interviews of individuals during your investigations; is that right?
A. I don't know if I testified to that. I don't know if I remember what -- I think with respect to the Williams case is what I was asked and I don't -- I thought I remembered taking notes during the interview. I don't remember typed notes. I don't remember.
Q. Okay. Do you -- was it -- let me ask it this way. Since you don't -- you don't -- is it accurate that you don't have a specific recollection as to whether or not you took notes while you interviewed various individuals related to the Williams investigation?
A. I don't have right now an independent recollection, but I may have taken notes of those interviews.
Q. Okay. And if you took notes, would you have saved them?



A. I think so. I mean, I -- like those typed memos, if that's what you mean, I think so.
Q. I don't -- I can't -- I don't want to quantify. It's not what I mean. It's what you mean in terms of any --
A. I don't --
Q. Wait. Hold on.
A. I'm sorry.
Q. No, no. That's okay. It happens all the time.
Just in terms of whatever procedures you did in terms of taking notes. I don't want to speculate on what that might be.
A. I hope I would have saved them. I don't have sort of a specific memory, but I think I would have saved a memo or notes summarizing an interview.
Q. Okay. Do you have a specific recollection of taking notes contemporaneous with you interviewing any individuals for the Williams investigation?
A. I don't have a -- I don't specifically remember, but again I may have.
MS. MEADOR: Okay. That's all the questions



I have. Thank you.
MR. MORAN: I have nothing else. Steve, you have questions?
MS. HAMILTON: Very short.
THE VIDEOGRAPHER: Sorry. I will just get you a mic over here. As long as it's close to you, it's fine.

CROSS-EXAMINATION

BY MR. BECKER:
Q. Ms. Hawilo, you were not responsible for making the ultimate decision as to whether to vacate Mr. Williams' convictions; is that correct?
A. That's correct.
Q. And you did not make that decision; is that correct?
A. That's correct.
Q. And you were not responsible for making the decision as to whether to oppose Mr. Williams' certificate of innocence petition; is that correct?
A. That's correct.
Q. And you did not make that decision, correct?
A. That's correct.
MR. BECKER: No further questions.



MR. MORAN: I do have one quick thing I want to --
THE WITNESS: Sure.
MR. MORAN: -- ask you to do, and then I'm done.
THE WITNESS: Okay.
MR. MORAN: Just confirm one more exhibit.
MS. MEADOR: I think that's 11.
MR. KUBLY: Yes, it's 11.
(Hawilo Deposition Exhibit 11 was marked for identification.)
THE WITNESS: Thank you.

REDIRECT EXAMINATION

BY MR. MORAN:
Q. Okay. We're looking at Exhibit No. 11, Ms. Hawilo, and it looks like a typed out summary of notes from a meeting with David Evans taken via Zoom while Evans was in custody. Is that accurate?
A. Yes, that's what this looks like.
Q. Okay. Are these notes that you took?
A. Maybe. I don't have an independent recollection of whether these are notes I took, but they could well have been notes typed out.
Q. Does this look like the format that you

370

would normally take notes during an interview?
A. Sometimes, yes, just sort of retyping sometimes. I don't -- you know, sometimes it might have been handwritten and then typed out. I don't -- but this -- it would not be surprising to me.
Q. Given that it was a Zoom interview, is it more likely then that you would have used a computer to take notes?
A. Maybe, yeah. I don't know.
Q. All right.
A. But maybe.
Q. Assuming these are your notes, you would obviously try to make them as complete and accurate as you could?
A. I would hope so. I mean, if these are my notes, I would hope so.
MR. MORAN: Okay. That's all I have.
THE WITNESS: Okay. All good?
MR. HENRETTY: I have like 45 minutes. I'm kidding.
THE WITNESS: Is that it?
MS. MEADOR: Yes.
THE VIDEOGRAPHER: This concludes today's

371

proceedings --
MR. MORAN: Whoa, whoa, whoa, whoa. Signature?
MS. HAMILTON: Do you want me to explain?
MR. KUBLY: Yeah, yeah, yeah. Go for it.
MS. HAMILTON: So what you can do is you can either reserve signature, in which case you would get an opportunity to review the transcript, see that the court reporter took down everything accurately. You would have a chance to review it and then sign off on it. Otherwise, you can waive signature and presume that everything was taken down properly, because obviously you can't change any of your answers upon reviewing it.
Does the firm generally have a policy --
MR. KUBLY: Correct typos and --
MS. HAMILTON: Does the firm generally have a policy one way or the other?
MR. KUBLY: It's entirely up to you. If you want to read it, you can. If not, people waive all the time.
MR. MORAN: You only have 30 days to do it once it's published, printed, and if you don't,

372

it's automatically --
THE WITNESS: I guess waive.
MS. HAMILTON: Show signature as waived, please. Thank you.
MS. MEADOR: Thank you.
THE VIDEOGRAPHER: This concludes the deposition, now going off the record at 5:46 p.m.

FURTHER DEPONENT SAITH NOT ...

373

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Suzanne Thalji, do hereby certify that MARIA HAWILO was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was waived by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 5th day of November, 2025.

Suzanne Thalji
Illinois CSR No. 084-002337
Notary Public, Cook County, Illinois
My commission expires May 6, 2028