# Exhibit 24

# Deposition Transcript of R. Lanier

# (First ASA)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORDELL WILLIAMS, )
)
Plaintiff, )
)
vs. ) No. 23 CV 14905
)
JAMES O'BRIEN, THE ) Hon. Lindsay C. Jenkins
PERSONAL REPRESENTATIVE )
OF THE ESTATE OF WILLIAM ) Mag. Judge Young B. Kim
FOLEY, THE CITY OF )
CHICAGO, a municipality, )
and UNKNOWN EMPLOYEES OF )
THE CITY OF CHICAGO, )
)
Defendants. )

The video-recorded deposition of RISA LANIER, taken pursuant to the Federal Rules of Civil Procedure, before Katie K. Elliott, Certified Shorthand Reporter No. 084-004537, at 333 West Wacker Drive, 19th Floor, Chicago, Illinois, on Wednesday, October 29, 2025, commencing at 10:30 a.m. pursuant to subpoena.

APPEARANCES:

LAW OFFICE OF STEVEN W. BECKER, LLC, by
MR. STEVEN W. BECKER
(205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
312.396.4116
swbeckerlaw@gmail.com)
appeared on behalf of the plaintiff;

APPEARANCES: (Cont'd)
ROCK FUSCO & CONNELLY, LLC, by
MR. PATRICK R. MORAN
(333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000
pmoran@rfclaw.com)
appeared on behalf of the defendants
James O'Brien, the personal
representative of the Estate of
William Foley;

THE SOTOS LAW FIRM, PC, by
MS. LISA MEADOR
(141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300
lmeador@jsotoslaw.com)
appeared on behalf of the defendant
The City of Chicago, a municipality;

COOK COUNTY STATE'S ATTORNEY'S OFFICE,
by
MS. JENNIFER BAGBY and
MS. CRISTIN DUFFY
(69 West Washington Street, Suite 3200
Chicago, Illinois 60602
773.350.0805
jennifer.bagby@cookcountysao.org)
appeared on behalf of the Cook County
State's Attorney's Office;

AKERMAN LLP, by
MR. GREGORY A. KUBLY and
MS. AMANDA J. HAMILTON
(71 South Wacker Drive, 47th Floor
Chicago, Illinois 60606
gregory.kubly@akerman.com
amanda.hamilton@akerman.com)
appeared on behalf of the deponent.

ALSO PRESENT:
Robert Zellner, Legal Videographer

* * * * * * *



I N D E X


| Witness: | Page |
| --- | --- |
| RISA LANIER | |
| Examination by: | |
| Mr. Moran.................... | 5 |
| Ms. Meador.................. | 359 |
| Mr. Moran.................... | 361 |
| Mr. Becker.................. | 364 |


E X H I B I T S


| No. | Description | Marked/Referenced |
| --- | --- | --- |
| 1 | Email from Risa Lanier to Christopher Martin - 5/3/2023 - CCSAO-WG 157158.... | 64 |
| 2 | Working Group Procedures & Guidelines.. | 72 |
| 3 | Working Group Protocol - Effective: June 25, 2021 - CCSAO-WG 218-225....... | 160 |
| 4 | Affidavit of David Evans - W 153-154... | 191 |
| 5 | Meeting with David Evans - CCSAO-WG 134847-49............................. | 204 |
| 6 | People v. Williams..................... | 217 |
| 7 | People v. Williams - 5/10/2022 - Working Group Memorandum of Findings and Recommendation - CCSAO-WG 8032-8055............................. | 228 |
| 8 | Email from Lanier to Southerland - 5/11/2022 - CCSAO-WG 178659............ | 250 |
| 9 | Email from Lanier to Hawilo, Kadish, Southerland - 7/8/2022 - CCSAO-WG 157183-87............................. | 252 |
| 10 | Email from Lanier to Kimberly Foxx - 6/22/2022 - CCSAO-WG 157813............ | 262 |
| 11 | Handwritten Notes Made by Deponent at Deposition............................ | 270 |
| 12 | A. Pattern and Practice evidence provides a separate, independent ground for vacatur in the interests of justice - CCSAO-WG 0010889-907...... | 273 |
| 13 | Email from Risa Lanier to Multiple People - 6/8/2021- CCSAO-WG 129155-56.. | 346 |
| 14 | Emails between Lanier and Foxx - 10/3/2024 - CCSAO-WG 143446-47......... | 362 |


(Exhibits attached/scanned.)

- - -



THE VIDEOGRAPHER: And good morning. This is the beginning of media No. 1, and we are on the record at 10:30 a.m. central time. This is the video deposition of Risa Lanier taking place in the law offices of Rock -- Rock Fusco & Connelly, LLC, 333 West Wacker Drive on the 19th floor, Chicago, Illinois, 60606, on October 29, 2025.

This deposition is being taken on behalf of the defendant in the matter of Cordell Williams v. James O'Brien, et al., case No. 23 CV, dash, 14905 filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Robert Zellner, legal videographer, representing Urlaub Bowen & Associates with offices at 20 North Clark Street, suite 600, in Chicago, Illinois. And the court reporter today is Katie Elliott, also with Urlaub Bowen & Associates.

And, Counsel, will you please voice identify yourselves for the record and the parties you represent.

MR. MORAN: Pat Moran for the police officer defendants.



MS. MEADOR: Lisa Meador on behalf of the City of Chicago.

MS. DUFFY: Cristin Duffy, Cook County State's Attorney's Office.

MS. BAGBY: Jennifer Bagby, Cook County State's Attorney's Office.

MS. HAMILTON: Amanda Hamilton for the deponent.

MR. KUBLY: And Greg Kubly for the deponent.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

(Witness sworn.)

THE VIDEOGRAPHER: Please proceed.

RISA LANIER

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MORAN:

Q. All right. Excellent.

Okay. Can you state your name and spell it for the record, please.

A. Risa Lanier, R-i-s-a, L-a-n-i-e-r.

Q. All right, great.

Have you ever given a deposition

Page 6

before?
A. No.
Q. All right. It -- I'm going to be asking you a bunch of questions today. If you don't understand one of my questions, will you please tell me and I'll try and rephrase it for you.
A. Sure.
Q. Okay, great.
If you do answer any of my questions, we're going to assume that you understood the question; is that fair?
A. Sure.
Q. Okay. You can take a break at any time you want, but as long as you answer the pending question first; is that fair?
A. Yes.
Q. Okay. Also, there's going to be objections from time to time. I'm going to ask you about some of your communications with former state's attorney Kim Foxx or Thor Martin, who's one of -- part of the executive staff.
You may hear an objection called deliberative process. If you do, just stop and you may be instructed not to answer. When an objection

Page 7

is made, we're just going to assume that you're not going to answer the question.
I -- I assume you're going to follow the instruction, right?
A. I -- I plan to.
Q. Okay, all right. So we're going to -- we're creating a record for down the road. So when those objections are made, just let the person finish speaking. And if -- you know, unless there's some communication between me and one of the attorneys for the State here, I will or you will just -- we'll just move on to the next question, okay?
A. Sounds good.
Q. Okay, excellent.
What is your current job?
A. I am the vice president of policy and external affairs at Lawndale Christian Legal Center.
Q. Do you do any legal work at the Lawndale -- is it the Lawndale Christian ...
A. Legal Center.
Q. Legal Center.
Do you do any legal work for that entity?

Page 8

A. Explain "legal work."
Q. You're right. That's a good clarification.
So you're obviously -- or vice president, you said, of policy.
Do you act as like a general counsel for the clinic?
A. On one occasion, I have.
Q. Okay. What are your responsibilities?
A. I am the vice president of policy, so I am responsible for the strategic vision with regard to policy work at Lawndale Christian Legal Center, which means coalition building, drafting legislation, research, partnering with other research organizations, academia, policy groups to further whatever the policy goals are for the center.
Q. Okay. Now, the center has clients, right?
A. They do.
Q. Okay. Do you provide any legal services for the clients?
A. I do not.
Q. How did you -- by the way, is Marc

Page 9

Kadish on the board of directors?
A. He is.
Q. Is that how you got connected with the center?
A. Yes.
Q. How long have you known Marc Kadish?
A. For about two or three years now.
Q. How long were you -- did you work for the Cook County State's Attorney's Office?
A. 24 years and like nine months, so many days, hours, seconds.
Q. That was very precise.
Did you work as a lawyer anywhere else besides the Cook County State's Attorney's Office?
A. Not in my -- not as a -- no, not as a lawyer.
Q. Okay. So your entire legal career was with the Cook County State's Attorney's Office?
A. Indeed.
Q. During your time at the Cook County State's Attorney's Office, did you ever have a case against Marc Kadish?
A. No.

Page 10

Q. And how did it come about that Mr. Kadish connected you to the Lawndale Christian Legal Center?

A. Mr. Kadish connected me to Cliff Nellis for the purposes of a board position at the Lawndale Christian Legal Center, once he learned that I was leaving the Cook County State's Attorney's Office.

(Mr. Becker entered.)

BY MR. MORAN:

Q. And when did you decide to leave the Cook County State's Attorney's Office?

A. It was after -- that's a -- did I decide to leave, or did I learn that I was not going to be invited back is a better question.

I figured that with the change in administration, considering my position, I would not be retained by the Cook County State's Attorney's Office.

Q. Okay. So this would have been around the time when there was a change in administration?

A. Yes. Shortly there -- before.

Q. Okay. In November-ish of 2024?

A. September-ish.

Page 11

Q. Oh, okay.

A. Uh-hmm.

Q. And was it your assumption that -- or strike that.

At the time you -- in September of 2024 when you had decided to -- made the decision to leave or you felt like you had to leave, however you want to phrase it, were you at that time the first assistant?

A. I was.

Q. Okay. And was it your understanding at that time that you were not going to be retained in the role of first assistant?

A. That is correct.

Q. Okay. Was it your understanding as well that you would not be invited back in any capacity at the Cook County State's Attorney's Office?

A. That is my understanding.

Q. Where did you get that understanding?

A. That was through conversations with the chief of staff at that time Alyson Miller.

Q. And was it -- did -- tell me what -- what she told you.

Page 12

A. It was --

MS. BAGBY: Objection, deliberative and not relevant.

MR. MORAN: Are you -- are you declaring a privilege over this?

MS. BAGBY: I am.

MR. MORAN: Okay.

MS. BAGBY: Move on.

BY MR. MORAN:

Q. Was it your understanding that the new administration was not going to invite you back or the old administration was -- I mean, who is the decision maker here to your knowledge in terms of your employment with the Cook County State's Attorney's Office when you made the decision to leave?

A. The new administration.

Q. Okay.

MR. KUBLY: Just as you can see, the objections on deliberative process will likely come from that end of the table. Just make sure to give a pause --

THE WITNESS: Yeah.

MR. MORAN: Sure, of course.

Page 13

MR. KUBLY: -- when answering the questions just to make sure they have time to make the objections they need to.

MR. MORAN: We're all going to wait. When we hear those objections, we'll all wait, okay?

BY MR. MORAN:

Q. Okay. So approximately what day, if you know, did you leave the State's Attorney's Office?

A. My official last day of employment was November 30th, 2024.

Q. Got it.

During your time at the Cook County State's Attorney's Office, did you work in criminal prosecutions?

A. I did.

Q. Did you work in any other area of the State's Attorney's Office, and setting aside your time as first assistant?

A. No. Every assignment was under the criminal prosecution bureau.

Q. Prior to becoming a first assistant, what was your role as a state's attorney?

A. Chief deputy.

Q. And what were you chief deputy of?
A. The State's Attorney's Office.
Q. Oh, of the whole office.
A. Yes.
Q. Okay. That would include civil and criminal and other special areas of the office?
A. Correct.
Q. How long were you in that role?
A. Less than a year.
Q. All right. And after -- or prior to becoming the chief deputy of the State's Attorney's Office, what was your role with the State's Attorney's Office?
A. Chief of the criminal prosecutions bureau.
Q. And if you can recall, approximately what years?
A. 2018 to 2020, end of 2020, early 2021.
Q. Okay. Prior to 2018, what was your role with the State's Attorney's Office?
A. Or it may have extended beyond that. I don't -- I don't recall the exact number. It was a span of years, sorry.
Q. Yeah. And for these kind of questions,



I don't --
A. Yeah.
Q. -- need the exact numbers. Just your best approximation.
A. Uh-hmm.
Q. What was your role prior to becoming the chief of the criminal prosecutions?
A. Deputy chief of the criminal prosecution's bureau.
Q. And in these roles as chief and deputy chief of criminal prosecutions, did you try cases?
A. I did.
Q. Did you maintain a caseload?
A. Small.
Q. I take it those were the more high profile cases?
A. Yes and no.
Q. Okay. Prior to becoming deputy chief of criminal prosecutions, what role did you have?
A. Deputy supervisor, felony review.
Q. In felony -- as a deputy supervisor of felony review, were you trying cases at that time?
A. I had a caseload.
Q. As part of that caseload, were you



trying cases?
A. I may or may not have actually tried the case in the -- while I was in the position, but I was appearing in court.
Q. How long were you in the -- as deputy supervisor of felony review?
A. Year, year and a half.
Q. So at some point I assume in your career you were elevated to a first chair of a courtroom.
A. Yes.
Q. Okay. Tell me the roles you had between being deputy supervisor of felony review and the time you were first appointed as a first chair.
A. Deputy supervisor of domestic violence unit. And that's it.
Q. Oh, and that's it.
A. And then -- yeah.
Q. What year did you first approximately become a first chair of a courtroom?
A. Oh, wow. 2009 maybe.
Q. Okay. In your time prosecuting cases at the Cook County State's Attorney's Office, did



you have occasion to prosecute cases under an accountability theory?
A. Yes.
Q. How many times do you think? I'm going to probably challenge your memory here.
A. I don't know.
Q. Is it probably too many to remember?
A. Possibly.
Q. Okay. What do you understand accountability to be?
A. When someone is responsible for the actions of someone else because they've either aided, abetted; during, before, or after the commission of a crime.
Q. During your time at the Cook County State's Attorney's Office, did you ever have occasion to prosecute a case in which Detective James O'Brien was one of the state's witnesses?
A. I don't recall.
Q. How about same question with respect to John or Jack Halloran?
A. I believe so, yes.
Q. How about the same question with respect to Ken or Kenneth Boudreau?

Page 18

A. I'm not sure.
Q. How about same question with respect to a Detective William Foley?
A. I don't know.
Q. Same question, have you ever been -- did you ever have occasion to prosecute a case in which a Detective Stehlik was one of the witnesses for the state?
A. I don't recall.
Q. Okay. The case you recall with Halloran, was it just one case, or was it multiple cases?
A. The case with Halloran may or may not have been while I was on felony review, so I'm not sure if it was a case that I tried in a courtroom or a case that I worked on as an assistant in felony review. But I do remember working on a case that involved -- where Detective Halloran was one of the lead detectives.
Q. Got it.
And at the time that Detective Halloran was one of the lead detectives on that case, had you known of any of the misconduct allegations against him?

Page 19

A. No.
Q. Okay. When did you first become aware of the misconduct allegations against O'Brien, Halloran, or Boudreau or Stehlik in your career at the State's Attorney's Office?
A. When I was first assistant.
Q. Okay. Prior to the first assistant, is it fair to say you had no knowledge of the misconduct allegations against these detectives?
A. I did not.
Q. Got it.
Under accountability theory, have you ever prosecuted a case for first degree murder utilizing accountability as a basis to obtain a conviction?
A. I did.
Q. Approximately how many times?
A. More than twice.
Q. Do you believe you have a good familiarity as you sit here today with the requirements for a prosecutor in Illinois to obtain a conviction under an accountability theory?
A. I'm a little rusty, but I think so.
Q. Okay. Now, I want to ask you a little

Page 20

bit about your preparation for today.
A. Sure.
Q. And you don't have to tell me -- I'm going to ask you about your meetings with your lawyers, but you don't have to tell me what you actually discussed, because that's privileged.
Otherwise, I'm going to ask you what you looked and how often you met with them, okay?
So first question: Tell me generally what you did to prepare for today.
A. Nothing.
Q. Did you meet with your attorneys at all?
A. I did.
Q. How many times did you meet with your lawyers?
A. Once.
Q. And where was that meeting?
A. At their office.
Q. All right. And how long did the meeting last?
A. Hour and a half maybe? Maybe two hours?
Q. Who was present?
A. My lawyers. These two --
Q. These two attorneys --

Page 21

A. Yes.
Q. -- present today with you? Okay.
Nobody else?
A. No.
Q. All right. Did you look at any documents in this meeting with your lawyers?
A. I did not.
Q. Have you looked at any documents in preparation for today at all?
A. I did not.
Q. Did you speak with -- or strike that.
At some point did you get a subpoena for your deposition?
A. I did.
Q. Okay. And when did you first get that subpoena?
A. September? We're in October now.
Either late August or early September.
Q. Okay. And did you ever get a subpoena for any records? So not a deposition subpoena but just a subpoena for records.
A. No.
Q. Have you ever seen a subpoena for

records that was issued to the State's Attorney's Office?
A. I've seen lots of subpoenas for records that were issued to the State's Attorney's Office while I was there, yes.
Q. Okay, good clarification.
I mean with this case.
A. Not that I recall.
Q. Okay. So in November of 2024, or actually maybe late October or early November of 2024, my office issued a subpoena for records to the Cook County State's Attorney's Office under the case caption Cordell Williams v. City of Chicago, this -- this case.
Did you have occasion to see that subpoena at all?
A. I don't remember.
Q. When you first became aware that your deposition had been subpoenaed, did you have any conversations with Kim Foxx?
A. No.
Q. Have you spoken with Kim Foxx at all about the fact that your deposition is being taken?
A. No.



Q. How about did you have any conversations with Marc Kadish?
A. No.
Q. Any conversations since you got your subpoena regarding the subpoena with Maria Hawilo?
A. No.
Q. Any conversations since you got your subpoena regarding the subpoena with Vincent Southerland?
A. No.
Q. Any conversations since you got your subpoena with Thor Martin?
A. No.
Q. Okay. By the way, we were talking about first chair earlier.
Tell me what you understand first chair to be.
A. The lead attorney in a courtroom assigned to a courtroom at the Cook County State's Attorney's Office.
Q. All right. I'm curious, why did you agree to meet with your lawyers for 1.5 hours but not look at any documents in preparation for today?
A. Why did I agree to meet with my



attorneys? I'll answer that question first.
Because I was being deposed.
Q. Right.
So my question is: Why not also look at documents --
A. I don't have to.
Q. -- given that you -- I know you don't have to, but I mean -- or just let -- I'm sorry. Let me finish and --
A. Sure.
Q. -- I'll do the same. I should have told you that earlier.
Given that you're meeting with your attorneys and investing your time to meet with your attorneys, why not also look at any documents in preparation for today?
A. Because I don't have to. It was a meeting with my attorneys.
Q. Got it.
Do you have an independent recollection of the Working Group?
A. I do.
Q. Were you the point of contact for the Working Group at the Cook County State's Attorney's



Office?
A. I became the point of contact, yes.
Q. When did you first become the point of contact?
A. When I became the first assistant.
Q. Was it your understanding that the Working Group had already been established at the point in time when you became first assistant?
A. They had.
Q. Approximately, if you remember, what day did you -- what date did you become first assistant?
A. I don't know.
Q. Do you remember the month?
A. I don't.
Q. How long did you serve in that role?
A. Until I left.
Q. I mean how many years?
A. More than one. Possibly two complete years.
Q. In 2021, in say the spring of 2021, do you remember what role or what title you had at the State's Attorney's Office?
A. I don't remember if 2021 was the year I

Page 26

was chief deputy or if Joe Magats was still in the office.
Q. Have you -- let me ask you a question.
What do you understand the role of the Cook County State's Attorney's Office to be?
A. The role of the Cook County State's Attorney's Office is to prosecute misdemeanor, felony cases that they file or are filed in cases of certain misdemeanors and felonies in the court -- in the Circuit Court of Cook County, Criminal Division, assuming they have a basis for prosecution, very broadly generally speaking; and also to defend the County on the civil side.
Q. Okay. Does -- to your knowledge or -- yeah, does the State's Attorney's Office have any other role besides what you've described?
A. They have a broad role to -- as an ethical duty, to do justice. And whatever may fall under that particular bucket or ideal of justice is what they do.
So they do a lot of things.
Q. Right.
Do justice can be a very broad term.
A. Very broad.

Page 27

Q. Okay. What do you understand that to mean?
A. It's different in every situation.
Q. Well, does it have -- does the State's Attorney's Office have any policies to guide it in doing justice?
A. They have policies. They have practices. They have procedures. They have missions. They have visions. They do.
Q. It has -- it's a law enforcement function, right?
A. It is a law enforcement function, among other things.
Q. And would it be fair to say that the people of Cook County are essentially the client of the Cook County State's Attorney's Office?
A. Yes. They represent the People of the state of Illinois, specifically Cook County.
Q. When you were at the State's Attorney's Office, how many lawyers -- and I know it's going to vary, so just give me like the average -- were employed at the State's Attorney's Office?
Oh, actually, you know what, I take that back. That's too broad.

Page 28

How about during your time as either chief deputy or first assistant, how many lawyers were at the Cook County State's Attorney's Office?
A. It varied. Under 700, over 600.
Q. Okay. Somewhere between 600 and 700 lawyers?
A. Approximately.
Q. Okay. And the State's Attorney's Office, was it broken into -- obviously, there's a criminal prosecution side of it, right?
A. Correct.
Q. And then a civil side of it as well.
A. That's true.
Q. And then were there any other part -- were those the two main branches of the State's Attorney's Office when you were there?
A. And administrative.
Q. Administrative, okay.
A. Investigative.
Q. Investigative and administrative.
So four main groups.
A. That's fair to say.
Q. Okay. What part did the Conviction Integrity Unit fall under?

Page 29

A. The criminal.
No, I take that back. They were a standalone unit, actually, that was not attached to any bureau.
Q. Was that by design?
A. That was by design.
Q. What's the purpose of making sure the Conviction Integrity Unit is a standalone unit not attached to any bureau?
A. Because of the nature of the work that they did in reviewing convictions involving -- that involved actors from our office, in that we, the State's Attorney's Office, would have prosecuted those cases.
The Conviction Integrity Unit would review those cases for conviction integrity purposes. And it was important that they then did not report to or fall under any of the bureaus in which they were investigating cases that came out of.
Q. Got it.
Sort of a little bit like an internal affairs department at a police department. It needs to be separate in order to ensure the

fairness and integrity of the investigation.
A. That is a better way to put it.
Q. Okay. You can quote me if you want.
So by the way, how long, to your knowledge, did the Conviction Integrity Unit exist at the State's Attorney's Office before you left?
A. I don't recall under which state's attorney it was formed. I don't recall if it was Anita Alvarez or Dick Devine.
Q. Were you part of the state's attorney's management level when Kim Foxx was -- when she took office?
A. Can you be more specific about "management level"?
Q. Sure.
I understand you were -- you might have held a supervisory role.
A. Uh-hmm.
Q. And above that, there's management level positions; is that correct?
A. There's supervisory roles.
Q. For example, you could supervise a courtroom, or you could supervise felony review. And then above those supervisory level positions,



were there management positions, like you mentioned deputy chief or chief dep -- deputy?
A. So above those management roles would be bureau chiefs. And then above bureau chiefs would be the executive staff.
Q. Okay. Is there a distinction between supervision and management roles?
A. I use the term interchangeably.
Q. Okay. At what point does -- what's the -- I guess -- you wouldn't consider a bureau chief -- or actually, give me the -- give me the chain of command.
A. Sure.
First assistant.
Q. Yep.
A. Chief deputy, bureau chiefs.
Q. Uh-hmm.
A. And then from there, you have your supervisor levels.
Q. Got it.
A. And there may be a supervisor and then a deputy supervisor. So it just depends on the particular unit.
Q. Got it. When --



A. And that's on the criminal side.
Q. Understood.
And that was where you spent all your career.
A. All my career.
Q. Okay. When Kim Foxx took office, what role -- what title did you have at that time?
A. Deputy supervisor, felony review.
Q. Okay. Did you have any input in any of the decisions with respect to the Conviction Integrity Unit after Kim Foxx took office before you became a deputy chief?
A. Which deputy chief role?
Q. Any deputy chief role.
A. I had not.
Q. Did you ever have any input into decision making about the Conviction Integrity Unit before you became a first assistant?
A. Repeat that question?
Q. Did you ever have any input into decision making about the Conviction Integrity Unit before you became a first assistant?
A. As chief deputy, I would have had input as -- as to decision making. I just don't recall



whether I made any decisions while I was chief deputy.
Q. Of course.
When you were at the State's Attorney's Office after Kim Foxx took office, do you know whether Mark Rotert was brought in to run the Conviction Integrity Unit?
A. Yes.
Q. Okay. Do you know where he was brought in from?
A. A firm.
Q. A law -- a private law firm.
A. From my understanding.
Q. Got it.
Tell me what is the reason to bring someone in from outside the State's Attorney's Office, to your knowledge, to run the Conviction Integrity Unit?
A. I don't know that reason.
Q. No, not that reason.
Do you know of a reason to bring someone in from outside to run the Conviction Integrity Unit?
A. This is supposition, but I suppose you

would hire the person that you felt best qualified for the job, regardless of where they came from.

Q. Okay. So you would have no concerns about hiring from within the State's Attorney's Office for the role of director of the Conviction Integrity Unit?

A. I would have no problems hiring the person best qualified for any job, regardless of where they came from.

Q. Would one of the concerns about bringing leadership for the Conviction Integrity Unit be that you needed someone who had a certain level of independence from the rest of the office to ensure that the cases were investigated in a fair way and maintain the integrity of the investigation?

A. Are you --

MS. BAGBY: Objection to form, foundation. You can answer if you understand.

BY MR. MORAN:

Q. Go ahead.

A. Are you asking my personal opinion?

Q. Oh, yes. You were the first assistant for a while and you were -- you've been a chief



deputy, so you have familiarity with the needs at the office. And we just discussed why the Conviction Integrity Unit needs to be separate and standalone.

Did those concerns involve hiring a person to lead the off -- or the Conviction Integrity Unit?

MS. BAGBY: I'm going to object again. And to her point, are you asking her in her personal experience, in her personal opinion, or are you seeking testimony --

MR. MORAN: I'm not --

MS. BAGBY: -- about the office at the time she was the first assistant, because I think that's a little outside the scope.

MR. MORAN: I understand what you're getting at.

BY MR. MORAN:

Q. I'm not asking about what actual decision was made.

A. Uh-hmm.

Q. I'm asking what your belief is given your experience.

A. Are you asking me my belief as it -- as



a personal belief, or my belief as the decision was made by the State's Attorney's Office when they hired someone outside of the office to come into that particular role?

Q. Let me be -- I'll put it more bluntly.

Should the leader of the Conviction Integrity Unit be someone from outside the office in order to maintain integrity of the investigations?

A. The leader of the conviction integrity office -- unit of the Cook County State's Attorney's Office should be someone who is qualified for that role.

Q. What are the qualifications for the role?

A. Someone who -- and again, I'm asking from my personal belief, anyone qualified for any role would be someone who has some sort of criminal background -- criminal law practice background, that is -- criminal, a background in criminal procedure; and may understand how cases are prosecuted in terms of the parties involved, the actor -- the parties meaning who does what in a case, and relevant experience.



Q. What's relevant experience?

A. Relevant experience would be someone who is familiar, has a good familiarity with criminal law, whether it's federal, local.

Q. Okay. So --

A. And I'm sure a ton of other things that I just can't think of right now.

Q. That's okay. We're only going with what -- what you know.

The -- so just to be clear, we understand qualifications to be the leader of the Conviction Integrity Unit that you just listed off criminal law background, criminal procedure background, understanding of how cases are prosecuted and who does what, and relevant experience, meaning familiarity with criminal law.

A. And I'm sure a ton other things. We can sit here for hours, and I'm sure I can tick off a ton of other things.

But it would be the person best suited for the job based upon their qualifications, relevant experience, and of course, the interview.

Q. Sure, sure.

Before we even get to the interview,

Page 38

we're just talking about --
A. Sure.
Q. -- the primary things you want to see or you would want to see someone have applying for that job.
A. Sure.
Q. We just listed off I think one, two, three, four, five.
Is there anything else besides those five bullet points?
A. Let me think.
Can I have a piece of paper?
Q. Yeah, of course.
A. I think better when I write -- when I write.
Q. Now just --
A. Is that okay?
Q. It is okay, but --
A. Okay.
Q. -- just so you're aware, whatever you write down --
A. Sure, it's a --
Q. -- everyone will get to see, and we may make it --

Page 39

A. Of course.
Q. -- an exhibit.
There you go.
A. Thank you.
Q. And also, if you can't think of anything else, that's a fine answer as well.
A. You asked. I'll take the time to think about it.
Q. Go ahead.
A. Litigation background would be nice as well.
Q. Litigation background, okay.
And when you say "litigation background," do you mean civil litigation or criminal litigation or just any litigation?
A. I would prefer criminal. I would prefer criminal, but civil is okay, federal or local.
As the head, you're going to be supervising other people. I'd like to see some sort of relevant experience as a supervisor.
Q. Management type experience?
A. Supervisor, management, whatever.
Q. Okay.

Page 40

A. And I stated criminal procedure, good ... and I just put a good working knowledge of how cases are prosecuted.
I believe I answered that already.
Q. Yes. Let me -- let me just stop you right here, because I know you could probably go on forever, and I don't want to get to the like minutia. We're looking at the main things that you would look for.
Is there anything on your list that we haven't talked about that you haven't told us?
A. No.
Q. All right. Can you just read off your list real quick?
A. Sure.
Criminal law experience; litigation background, criminal, civil, federal local; relevant supervision experience; criminal procedure, my shorthand; good working knowledge of how cases are prosecuted. And then I have a dash here for any other points.
Q. Would you want someone with prosecution experience in the role of leading the Conviction Integrity Unit?

Page 41

A. Maybe, maybe not.
Q. Okay. Now, question -- same question with respect to the lawyer. Actually different question.
The lawyers who are going to be working in the Conviction Integrity Unit, what is their -- the role of those lawyers?
A. To review cases.
Q. Okay. Are those lawyers expected to litigate the cases, or is it just limited to review?
A. They are not expected to litigate.
They are expected to -- if necessary, they may appear in court, but in terms of trials, motions, and the like, not necessarily get into any litigation.
Q. Okay. So the primary function of the lawyers working in the Conviction Integrity Unit would be to investigate the cases?
A. Yes.
Q. Okay. And as part of the investigation, you would expect them to review the original files that the state's attorneys had or the State's Attorney's Office had regarding the prosecution, right?

Page 42

A. Yes. And recreate files that we may not have.
Q. Got it.
Would you expect the lawyers in the Conviction Integrity Unit to interview witnesses?
A. Yes.
Q. Do you expect lawyers in the Conviction Integrity Unit to speak with the detectives who worked on the cases?
A. That would depend.
Q. What would that depend on?
A. On whether those detectives -- it would depend on, One, the nature of the case itself; and then, Two, whether or not those officers or detectives were -- would agree to be spoken to, I think is the best way to put that.
Q. That's true with any witness, right?
A. Well, that's true.
Q. Would you expect the attorneys working in the Conviction Integrity Unit to make an effort to contact a detective if that attorney believed an interview would be useful in the investigation?
A. It depends.
Q. What would that depend on?

Page 43

A. I think it would depend on the status of the officer or detective.
Q. What does it mean -- I'm sorry. Can you explain that?
A. I can. I'll use an example.
For example, if a detective or an officer had been convicted of a particular crime that has now -- or been convicted, accused, found to have been incredible in other similar situations, then no, the lawyers may not elect to speak to those officers or detectives in those circumstances, because their credibility has already been called into question, either by a judge or a tribunal of some sort.
Q. Got it.
So if the detectives' credibilities are already called into question, the attorney working in the Conviction Integrity Unit would be prohibited from contacting the detective?
A. I did not say prohibited. I said they may elect not to.
Q. Oh, they may elect not to.
Is there anything that prohibits them from contacting detectives who have been found

Page 44

to not have credibility?
A. There's no prohibition.
Q. Okay. Does an attorney working in the Conviction Integrity Unit need permission of a supervisor to reach out to a detective who worked on the case?
A. Not that I'm aware.
Q. When you -- when you were talking about credibility of the detective and the ways they were called into question, you identified examples like there's been a finding by a tribunal or they've been convicted of a crime.
Does -- is there a threshold in which a certain finding has to be made in order for a detective to be found incredible or not credible?
A. By a tribunal?
Q. No. For the -- for the example you gave, detectives who are found to not have credibility, what suffices to make that determination that the detective is not credible?
A. If there's been a finding by a tribunal or a judge or -- and then depositions, civil litigation, anything that would show a detective as not being -- that would demonstrate or -- I don't

Page 45

know -- lead one to believe that there's been some sort of incredibility finding against a detective.
Q. Okay.
A. Just generally speaking.
Q. Now, the Conviction Integrity Unit has its own policies and procedures in terms of what it investigates and what are the parameters of the cases it will accept; is that true?
A. They do have policies, yes.
Q. Okay. And they will look at cases -- the Conviction Integrity Unit will look at cases where a constitutional violation has been alleged; is that true?
MS. BAGBY: I'm going to object. And just for clarification, if you could maybe talk about at what period of time --
MR. MORAN: Oh, yeah.
MS. BAGBY: -- she's referring to?
MR. MORAN: That's fair. Yeah.
BY MR. MORAN:
Q. So I'm talking about the time between your role as a chief deputy through first assistant.
A. Okay.
Q. Yeah. That's about -- yeah, I think

Page 46

you said you became chief deputy in like 2019?
A. I did not.
Q. When did you become chief deputy?
A. Either 2021 or 2022. Whenever Joe Magats left the office.
Q. Ah, right.
And when did you become deputy chief of criminal prosecutions again?
A. 2017, 2018.
Q. Let's use that landmark.
So 2017 through the date you left, is it your understanding that the Conviction Integrity Unit would take cases in which a constitutional violation has been alleged?
A. I cannot speak to anything that happened prior to my becoming a member of the executive staff as to what the Conviction Integrity Unit did, because they were not a part of the criminal prosecutions bureau.
Q. Got it. So we'll use that time frame instead.
So at the time you were on the executive staff, would the Conviction Integrity Unit take cases in which a constitutional violation

Page 47

is alleged?
A. Can you be more specific when you're talking about a constitutional violation?
Q. A criminal defendant alleges the confession was coerced.
A. It is certainly some of the cases that I'm aware of had been -- where applications had been sent to the -- to the CIU, to the Conviction Integrity Unit for review.
Q. Okay. And did the Conviction Integrity Unit take those cases to your knowledge?
A. Sometimes.
Q. Okay. And in cases in which the criminal defendant alleges that the confession is coerced, that would be the implication is that the detectives working on the case, at least one detective, coerced the confession, right?
A. Or a state's attorney.
Sometimes they would apply in and say that the State's Attorney's Office had something to do with the coerced confession.
Q. Right.
But it -- the fact -- what I'm trying to get at is the world -- the possibility or

Page 48

the -- in the universe of cases that they take, they -- to your knowledge, they may have a case involving an accusation that a detective coerced a confession.
A. That is true.
Q. Okay. Does that accusation alone rise to the level of finding the detective not credible?
A. By whom?
Q. Well, you just gave me the cat -- or the situations in which a detective may be found not credible: Depositions, civil lawsuits, findings by tribunals.
I'm asking if the accusation that a detective coerced a confession by itself is enough to find the detective not credible?
A. I don't know that I can answer that question.
Q. Why not?
A. That would be a better question for someone in CIU as to their decision making.
Q. Got it.
As far as you know, there would be no prohibition at all in talking to a detective who had been accused of coercing a confession as part

Page 49

of the investigation by the CIU attorney?
A. When you say "prohibition," are you referring to policies, procedures, or practices?
Q. However it may be manifested.
If there's anything out there at the State's Attorney's Office that prohibits an attorney working in the CIU from talking to a detective because the detective was accused of coercing a confession.
A. There are no policies that I'm aware of.
Q. Did -- did you ever talk to Mark Rotert about his experiences in the Conviction Integrity Unit or about any cases that were in the Conviction Integrity Unit?
A. Maybe.
Q. As part of your role with the executive team on the state's attorney.
A. I may have.
Q. State's Attorney's Office.
The -- is it -- do you know whether Mark Rotert himself established policies and procedures at the State's Attorney's Office for the Conviction Integrity Unit?
A. I don't know that.

Q. Okay. Do you know whether the Conviction Integrity Unit hired people from within the office, or assigned people from within the office I guess may be a better way to put it, to work in the Conviction Integrity Unit?
A. Do I know that?
Q. Yeah.
A. Do I know if they did?
Yes, I know that they did that.
Q. Okay. And when that happened, was there any effort made to ensure that the prior experiences those attorneys had would not affect their investigations?
A. I was not a part of those decisions, so I don't know what the process was.
Q. How about when you were on the executive team? Are you aware of any -- anything put in place at the State's Attorney's Office to ensure that people assigned from within the office to work in the Conviction Integrity Unit did not bring or were -- maintained that level of independence we talked about earlier?
A. The level of independence that we talked about earlier concerned the CIU being



separate from the office, so can you expand a little bit on your question?
Q. Sure.
A. Yes.
Q. If you hire an attorney, you assign an attorney from within the office, there's a potential that that attorney may bring experiences that could affect the investigations of the Conviction Integrity Unit. Would you agree?
A. I would agree that the attorney would bring their experiences with them to any assignment.
As to whether or not it would affect the actual unit, I can't say yes or no to that.
Q. How could the State's Attorney's Office maintain the independence of the Cook County -- or of the Conviction Integrity Unit if it brings in lawyers from outside the unit who worked within the office?
A. There is a -- there is an -- I'm not going to say an application process, but there are conversations that happen with lawyers who come to the Conviction Integrity Unit explaining exactly what this unit does, what it stands for in terms of the integrity, the fairness of reviewing the cases



that they review. And there are questions asked as to whether or not someone could do the job, understanding what it is.
Q. Okay. So during the interview, you essentially put it to the person interviewing and say, Hey, this is what the requirements are. Do you think you can meet this role?
A. To my knowledge.
Q. Okay. Let me give you an example.
Let's say you have a lawyer at the Conviction Integrity Unit investigating a case who used to work in the office elsewhere; and that lawyer was supervised by another attorney at some point in the office, another assistant state's attorney.
The Conviction Integrity Unit lawyer is now investigating a case in which former supervisor was a felony review assistant and is now accused in that case of coercing a confession, or participating in the coercion of a confession.
Can that lawyer still review the conviction, or would there be any concerns about a conflict?
A. That was a lot. Can you say that again?



Q. Sure.
Do you understand the hypothetical?
A. There's a lawyer in the Conviction Integrity Unit who was reviewing a case where a person in the office was previously on felony review?
Q. A former -- a supervisor, former supervisor of that invest -- lawyer is accused of misconduct in the case that the lawyer's reviewing.
Do you have any concerns about that lawyer reviewing the conviction given the prior relationship -- supervisor/subordinate -- with the person accused of misconduct?
A. Are you asking about me personally? Or are you asking on behalf of the Cook County State's Attorney's Office as a previous first assistant?
Q. I'm asking --
A. Who are you asking?
Q. I'm asking you as the witness today who previously served as first assistant. I'm not asking for a specific example. I gave you a hypothetical. I'm asking if that's now a concern given your experiences on the executive team.
A. If you are asking me how I would

approach that situation. Is that what you're asking me?

Q. Yeah, I'm asking what -- is it a concern? I mean, it necessarily includes how you would approach it.

A. If I was aware that a lawyer who was assigned to the case -- because there will be, just by the nature of the office, would be reviewing the work of a previous supervisor, I personally would have a conversation with that person to ensure -- to let them know this is what the case is, do you have any concerns.

Or there may be steps taken to give it to someone else who wasn't supervised by that person. And more often than not, that's what was done, to my understanding.

Q. Got it. Okay. Let's take that first example you gave. You'd have the conversation with the attorney doing the investigation.

If the attorney told you, don't worry about it, this isn't going to affect the investigation, I can be impartial and I can do my job, would you accept that and allow the person to do the investigation?



A. I may not. I may just give it to someone else.

Q. Okay.

A. Just to maintain the integrity of --

Q. Of course.

A. -- of the -- of the review itself.

Not saying anything against the other person.

Q. No, no.

A. Just --

Q. Not --

A. Just as a precaution.

Q. Our hypothetical person is not offended.

A. Okay, good.

Q. So don't worry.

Okay. Did --

A. Can I stop you there?

Q. Yeah.

A. I have to take -- take a bathroom break, sorry.

MR. MORAN: Yeah, so we're going to go off the record.

THE VIDEOGRAPHER: Ending media 1 of the deposition of Risa Lanier. Off the record at



11:28 a.m.

(Recess taken.)

THE VIDEOGRAPHER: And beginning media 2 of the deposition of Risa Lanier. We're back on the record at 11:37 a.m.

BY MR. MORAN:

Q. All right. Ready to go again?

A. Yes.

Q. All right. During your time on the executive staff at the Cook County State's Attorney's Office, if you can recall how -- approximately how many attorneys worked in the Conviction Integrity Unit?

A. I don't recall.

Q. Okay. If the Conviction Integrity -- if you became aware that the Conviction Integrity Unit needed additional attorneys, would that have been a problem in trying to get more attorneys in the Conviction Integrity Unit to do the investigations?

A. We would send a communication out to see if there was anyone who was interested and post on -- post a job description.

Q. Would that be sent out within the



office?

A. Both internally and externally.

Q. Okay. Would the expectation be that you're going to get some response to that to fill whatever roles are needed?

A. We would hope.

Q. Okay. To your knowledge, did you ever -- when you were with the State's Attorney's Office and the executive team, was there ever a shortage of lawyers on the Conviction Integrity Unit that slowed down the work of the Conviction Integrity Unit?

A. There's a shortage of lawyers across the office.

Q. Right.

A. As to whether or not it slowed down the work itself, more cases, less attorneys.

Q. Right.

A. That math works wherever you work in the office.

Q. Uh-hmm, okay.

I can't -- did you say you don't recall how many -- roughly how many were in there?

A. I don't recall --

Page 58

Q. Yeah.
A. -- the number.
Q. Okay. By the way, do you -- are you friends with Kim Foxx? Like you socialize with her outside of work and stuff like that?
A. I talk to her outside of work, yes.
Q. Do you know what she's doing now like professionally?
A. You'd have to ask her.
Q. You don't know?
A. I don't really know.
Q. Okay. How often do you see her?
A. I've only seen her once since I left the office.
Q. In what context?
A. We had dinner.
Q. Oh, okay.
How long ago was that, you think?
A. Summer.
Q. Was it just the two of you, or was it a bigger group?
A. No, just the two of us.
Q. And did she tell you at that time where she was going professionally?

Page 59

A. She did not have steady employment at that time in terms of punching a clock 9:00 to 5:00.
Q. Yeah, I don't -- I don't imagine she would be punching a clock 9:00 to 5:00 given her -- her experience, but did she give you any idea like what she wanted to do or was planning on doing?
A. She had been doing a lot of things, but no solid plans to do one thing.
Q. Got it.
How about this? Do you know whether she's even practicing law?
A. I don't know.
Q. Tell me what you understand the Working Group to be.
A. The Working Group was a group of individuals who were reviewing certain types of cases involving -- and there was a list of detectives between a certain period of time.
Q. And what was the Working Group -- what was the purpose of reviewing these cases involving the list of detectives?
A. Are you asking me why the Working Group was formed?
Q. Well, that's another question. I can

Page 60

ask you that one if you want, but I mean, if you're more comfortable answering that --
A. I don't know.
Q. -- go for it.
A. Well, they were formed before I got to the executive staff. What I was told by the then first assistant when I became chief deputy is that this -- there was -- this Working Group was assembled to work on cases involving these particular detectives, and they were only sex and murder cases were the category of cases that they were looking at that had to fit certain parameters as -- and it was based upon some sort of conversation that occurred between the executive staff members and other lawyers prior to my getting there. That they were reviewing these certain number of cases, or these certain types of cases involving these detectives for the purposes, again, of reviewing the convictions for conviction integrity purposes.
Q. Is it the same thing the Conviction Integrity Unit would do but it was just given -- this work was given to this special group called the Working Group?

Page 61

A. Yeah. It was similar type of work.
Q. Okay. Now -- and I want to get -- and I want to make sure I wrote this down correctly so tell me if I'm wrong.
Based on conversations -- you think it was formed based on conversations between executive staff and other lawyers?
A. Correct, outside of the office.
Q. Got it.
A. And there was an agreement to form a special group, not attorneys comprised, who were a current assistant state's attorneys to review this bucket of cases.
Q. Was it your --
A. And I wasn't a part of all of the conversations, so I -- that is the best that I can give you based upon rec -- my recollection.
Q. And just so you know, I only -- we're only going on what you know. You don't have to guess or speculate, okay?
A. (Nodding.)
Q. And if you don't know the answer, just tell me.
A. Sure.

Page 62

Q. Okay. Do you know if there is an agreement, a written document, between the State's Attorney's Office and anybody else to form this Working Group?
A. There is.
Q. Have you seen this agreement?
A. I have.
Q. How long is it?
A. How long is the agreement?
Q. Yeah. Like how many pages?
A. More than one.
Q. More than --
A. More than two maybe.
Q. How about more than ten pages?
A. I don't recall.
Q. Is the agreement signed?
A. It is not a signed agreement, and let me re-categorize it.
It is not an agreement. It's a -- it's not an agreement as in a contract. It was a document that laid -- set forth the understanding between both parties, the State's Attorney's Office and the Lawyers' Committee as to the formation of the Working Group, the purpose of the formation of

Page 63

the Working Group, the type of work that the Working Group would be doing.
Q. Did you have a -- how good is your memory of this agreement?
A. Not that great.
Q. Okay. Can I show you something that might help you refresh your memory?
A. You may.
Q. Give me a second, because none of these are in order.
By the way, while I'm looking for this, do you remember whether anyone -- any specific names of any attorneys who were in this agreement?
A. I don't recall.
Q. Do you remember whose on -- who was on the Lawyers' Committee?
A. I know some of the names, two of the names.
Q. Tell me -- tell me who you remember.
A. Peter Neufeld, Craig Futterman.
Q. Did you know Peter Neufeld before you became part of the executive team?
A. I did not.

Page 64

Q. Did you know Craig Futterman before you became part of the executive team?
A. I did not.
Q. Had you ever heard of either one of them?
A. Not that I can recall.
MR. MORAN: Okay. This is -- we'll mark this as Exhibit 1.
(Deposition Exhibit No. 1, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. Ms. Lanier, you're looking at an email from you to Christopher Martin. And in the body of the email -- or first of all, do you recognize the email?
A. I don't have any independent knowledge of this email.
Q. Okay. Do you have any reason to believe this is not the email you sent to Christopher Martin?
A. I don't.
Q. Okay. We got this from the State's Attorney's Office.

Page 65

A. Okay.
Q. And it's Bates labeled CCSAO-WG 157158.
The reason I'm bringing this to your attention is that there's a reference to this agreement between -- and this is what it says in the email -- agreement between CCSAO and the Lawyers' Committee regarding the formation of the work -- of the WG --
A. Uh-hmm.
Q. -- Working Group.
Does this refresh your recollection at all about the agreement that we were just talking about, looking at this email?
A. There is a document that exists, like I said in my previous answer --
Q. Okay.
A. -- that was -- that set forth the parameters of this Working Group and outlined the conversations between -- with regard to the formation of the Working Group between the State's Attorney's Office and the Lawyers' Committee.
Q. Okay.
A. That's what I'm referring to.
Q. Got it.

Page 66

Now, it looks like in the email, it says, Attached please find the WG protocol and the agreement -- and I just read it off. I'm not going to read the whole thing again.
A. Yeah.
Q. But according to the email, the agreement should be attached to the email.
Do you see that, where it says that?
A. I do see that.
Q. Okay, great.
Now, I looked under the attachments, and we've -- we've looked at the attachments, and I'm not going to pull these out right now, but the documents that are identified under attachments do not appear to be an agreement between the State's Attorney's Office and the Lawyers' Committee.
Do you -- first of all, do you have any reason to disagree with that?
A. I don't know what documents you're referring to.
Q. It's listed right here under the titles of the documents: WG Procedures Final, Working Group protocols (approved), and Summary of Referrals unedited with attorneys appellate.

Page 67

A. Uh-hmm.
Q. You see that?
A. Uh-hmm.
Q. Is there a document to your knowledge that is entitled, agreement between Lawyers' Committee and -- or agreement with Lawyers' Committee?
A. Not to my knowledge, no.
Q. Okay. As you sit here today, do you know whether you intended for one of these documents to be the agreement referred to in the email?
A. I don't know what these documents are unless you show me what they are.
Q. Okay, no, that's fair. That's fair. I can do that in a little bit.
There is -- you see the underlined folder on the bottom?
A. Yes.
Q. Can you tell me what that is? Is that --
A. It says WG Recommendations.
Q. Okay. It looks like a hyperlink.
A. That's what it does look like.
Q. Okay. What was it a hyperlink to?

Page 68

A. WG Recommendations.
Q. Just what it says?
A. Just -- as far as I'm aware.
Q. Okay. Was there a folder that held all of the recommendations provided by the Working Group?
A. Where?
Q. Well, obviously it's a hyperlink to somewhere, right?
A. It's a hyperlink to something.
Q. Okay. And you're sending it to Thor Martin?
A. That is correct.
Q. Okay. So presumably, it's a hyperlink somewhere within the State's Attorney's Office where the files are stored electronically.
A. Correct.
Q. Okay. Was it your understanding that this folder contained only recommendations?
A. I don't know what it contained.
Q. Okay. Reading this email, do you have any understanding other than what's written on the page as to why you sent it to Chris -- or Thor Martin?

Page 69

A. Do I have any understanding other than what is written on the page as to why I sent this to Thor?
Q. Yes.
A. I don't understand that question.
Q. Sure.
It says: Attached please find the WG protocol and agreement between the CCSAO and the Lawyers' Committee regarding the formation of the WG. The below link is to all recommendations made thus far, including the pattern and practice memo. I have also attached a list of cases they are working on. Two more cases have been added, but are not included on the list.
That's what was written, right?
A. That is what is written.
Q. Okay. Why were you sending this information to Thor?
A. I don't remember.
Q. Okay. And as you sit here today, you're sure that nobody had -- there were no signatures on the agreement with -- that you had seen regarding the Working Group?
A. I don't remember.

Q. Okay, okay. Tell me to your -- the best of your knowledge what role Peter Neufeld had in the formation of the Working Group.
A. I don't know.
Q. Do you know if he had any role?
A. He was a part of conversations with people -- with folks in my office when they were putting this together.
Q. When you were at the Working Group, did you par -- or not -- sorry. You weren't at the Working Group.
When you were a part of the executive team at the State's Attorney's Office, did you participate at all in reviewing or editing any policies or procedures created by the Working Group to guide their work?
A. I reviewed it, yes.
Q. Did you make any edits or suggestions?
A. I don't know.
Q. You don't remember?
A. I don't remember.
Q. When you were at the Working Group -- or god, I said it again, sorry. This happens all -- to me all the time. So I'll start over.



When you were at the -- on the executive team of the State's Attorney's Office, did you participate in writing the procedures and guidelines of the Working Group with anyone within the State's Attorney's Office?
MS. BAGBY: Objection, form, foundation. I believe it misstates her testimony.
You can answer if you understand.
THE WITNESS: I did not write any policies or procedures or create the policies or procedures that the Working Group abided by.
BY MR. MORAN:
Q. As you sit here today, do you know whether when the Working Group was formed the State's Attorney's Office provided the Working Group with a document called procedures and guidelines?
A. I was not a part of any meetings or conversations when the Working Group was formed.
Q. So you're not familiar with what I'm talking about?
A. I am not.
Q. Okay. Give me one second.
MR. MORAN: This will be Exhibit No. 2.



(Deposition Exhibit No. 2, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. We're looking at Exhibit No. 2.
A. Yes.
Q. And this is a document called Working Group Procedures & Guidelines. Do you see that?
A. I do.
Q. Okay. Have you ever seen this document before?
A. I have.
Q. In what context have you seen it before?
A. As -- in my role as chief deputy, as well as first assistant.
Q. Okay. Do you know who created this document?
A. I do not.
Q. When did you first see it approximately?
A. In my role as chief deputy.
Q. Under -- in what context? Why were you reviewing it or --
A. This -- in the context of speaking with the then first assistant about what my duties



would de -- would entail and things that were happening at the executive level that I would be a part of.
Q. Uh-hmm.
A. So in my working with her.
Q. Got it.
A. Yes.
And this is the agreement that I am referring to in People's -- I'm sorry, not People's -- but your Exhibit No. 1.
Q. Old habits die hard, huh?
A. Yes.
Q. Okay. So just to be clear, you pointed out that the Exhibit No. 2 entitled Working Group Procedures & Guidelines is the agreement that was referred to earlier by you and in the email we just looked at, which is Exhibit No. 1.
A. That is correct.
Q. Okay. That is a very good clarification. Thank you.
Okay. So who did you take over for as first assistant?
A. Now Judge Jennifer Coleman.
Q. Okay. And when you took over for

Ms. Coleman or Judge Coleman, was it your understanding that the Working Group was just getting started, or was it already reviewing cases?
A. It was not reviewing cases yet. But the three members of the Working Group had already been established, agreed to work on the project ... yeah, that's where it was.
Q. Okay. Now, in Exhibit No. 2, I'll draw your attention to something.
MS. MEADOR: I can use that one.
BY MR. MORAN:
Q. I have a copy here I'm going to pull up. I think it's on the second page. Oh, actually, it's on the first page.
A. Okay.
Q. Last sentence in the first paragraph.
Under section 1, Overview, it says:
The Working Group may further define and interpret these Procedures & Guidelines as deemed appropriate.
You see that?
A. I see that.
Q. Would you agree that -- or strike that.
Is that what your understanding was that gave the Working Group the ability or the



power to create its own set of protocols?
A. I don't know.
Q. Okay. Now, you had mentioned that you had reviewed a set of protocols.
Is it your understanding that there was a separate set of protocols created by -- or just created apart from this document?
A. For the Working Group.
Q. Yeah.
A. There was a separate set of protocols, yes.
Q. Okay. Do you know as you sit here today whether Peter Neufeld had any role in drafting Exhibit No. 2, Working Group Procedures & Guidelines?
A. I don't know.
Q. Do you know whether -- or strike that.
And I take it you did not have any role in reviewing, editing, any role whatsoever in the creation of Exhibit 2?
A. I did not.
Q. Okay. And you first learned of it when you were taking over from Ms. Coleman.
A. Correct.



Q. Okay.
A. Well -- yes, in that she had been elevated to first assistant, and I was now --
Q. Taking over.
A. -- her chief deputy, yes.
Q. Right.
A. Yes.
Q. Okay. Tell me what you -- do you know whether the Working Group was created in connection with the settlement of a lawsuit?
A. Clarifying question: Meaning it was part of the settlement of a lawsuit? The Working Group?
Q. I would say in connection with, more broadly.
A. I was told that the Working Group was created based upon conversations between the State's Attorney's Office and the Lawyers' Committee, and this is well after the settlement of a lawsuit, but that it was created -- it was created after a settlement of a lawsuit.
I don't know how long after. That's the best I can tell you.
Q. Have you ever heard of the Englewood



Four lawsuits?
A. I have.
Q. What have you heard about those lawsuits?
A. I have heard about the Englewood Four case in general; the exoneration based upon DNA; that they sued the -- then defendants, slash, plaintiffs sued the City of Chicago, and they were awarded -- I don't know that it was -- it might have been -- it was a settlement, and that they were awarded a sum of money.
Q. Through the settlement.
A. Through the settlement, yes, yes.
Q. Okay. So the City agreed to settle the case, at least the cases against it brought by these plaintiffs who make up what's called the Englewood Four.
A. That is my understanding.
Q. Do you know why the City settled those cases?
A. I do not.
Q. Should settlements be considered by the Conviction Integrity Unit in assessing whether there's integrity to the convictions? Settlements

of past lawsuits against the detectives?
A. Should they be considered with regards to reviewing case for integrity purposes?
Q. Yeah. So you got a case with a detective who's been sued in the past, City agrees to settle the case in the past, and miscon -- misconduct alleged is similar to what is being alleged in the case the attorneys are reviewing in the Conviction Integrity Unit.
Should the Conviction Integrity Unit take into account the fact that one time or another or maybe multiple times the City settled a lawsuit against this detective?
A. From my understanding, the settlement alone would not cause an agreement of a reversal of a conviction.
Q. Should --
A. Is it something that they would be aware of? I'm sure they would be.
Q. So the question I'm asking is whether it should be considered at all.
A. The settlement itself.
Q. Yeah. As a factor in assessing the integrity of the conviction.



A. I don't think that the award of money would be a factor in and -- in and of itself.
Q. Okay. And you realize when I say "factor," I mean one of many factors to consider, right? Not dispositive --
A. Sure, sure.
Q. -- just a factor.
Should the settlement amounts, the fact that a case was settled against a detective or the amount of that settlement be considered as factor by the Conviction Integrity Unit in its analysis?
A. I don't know that the fact that money was awarded would be a factor.
Q. And that would be true regardless of how much money we're talking about.
A. Settlements are based upon what you all decide. How big or how small, it just depends on the case.
Q. Well, what I'm -- what I'm trying to make sure though is that would you agree that settlements are not a factor to be considered regardless of how much?
A. The settlement itself.



Q. Yes.
A. Correct.
Q. Okay. The -- do you know whether Peter Neufeld had a role in representing any of the plaintiffs in the Englewood Four cases?
A. I don't recall who those lawyers were.
Q. Have you ever heard the name Russell Ainsworth?
A. I have heard of the name.
Q. What do you know about Russell Ainsworth?
A. He's a lawyer.
Q. Have you ever gone up against him?
A. I have not.
Q. Did you -- I know you had many supervisory management roles.
Did you ever have any cases you were supervising in which one of the attorneys you were supervising went up against Russell Ainsworth?
A. As a first assistant, technically all of the attorneys came under me. So if they had a case with Russell Ainsworth, then the answer to that question would be yes.
Q. Yeah, I mean more that you were



personally aware of.
A. Not that I can recall.
Q. Okay. How about cases in which Peter Neufeld represented a defendant in the criminal courts in Cook County? Are you aware of any cases in which he represented a defendant?
A. I am not aware as I sit here today.
Q. As you sit here today, do you know whether April Perry had a role in the creation of the Working Group?
A. I don't know.
Q. Do you know whether Jennifer Coleman, now Judge Jennifer Coleman, had a role in the creation of the Working Group?
A. Yes.
Q. Do you know what her role was?
A. Specifically no, but I know she was part of those conversations.
Q. Okay. What you know about the creation of the Working Group is what you have heard from other people; is that true?
A. That is correct.
Q. Okay. Had you ever spoken to State's Attorney Kim Foxx about the creation of the Working

Group?
A. I may have.
Q. For example, like why it was created and why there's a need for it.
A. I don't recall what our specific conversations were.
Q. As you sit here today, do you know what the need for the Working Group was that motivated its creation?
A. The -- I have had conversations with Jennifer Coleman about why the Working Group was created. I can't tell you -- I can give you generalizations based upon my memory today.
Q. Go ahead.
A. Okay. The Working Group was created based upon conversations between the lawyers' group and the State's Attorney's Office regarding the creation of an independent unit outside of the State's Attorney's Office to review these cases involving these detectives here (indicating) that are listed in your Exhibit No. 2, and an agreement -- and I'm saying "agreement" loosely. This is based upon their conversations agreed that the -- that there would be outside individuals,



meaning those not employed by the State's Attorney's Office, who would review this -- review these cases for the purposes of ensuring fairness and integrity across the reviews.
Q. And was there to your knowledge a belief that the Conviction Integrity Unit could not perform these investigations with the same level of fairness and integrity?
A. I don't know.
Q. In your time at the State's Attorney's Office, whether it's on the executive committee or one of the roles you held just before that, did you ever have a concern that the Conviction Integrity Unit was not capable of conducting an investigation in a fair way with integrity?
A. Did I --
Q. Yeah.
A. -- personally?
Q. (Nodding).
A. No.
Q. Who's -- around the time that you became aware of the Working Group from Jennifer Coleman, who was running the -- or in charge of the Conviction Integrity Unit?



A. Nancy Adduci.
Q. Okay. And did she have anyone else assisting her with that function?
A. Oh, god, what was his name?
Q. Adam Weber?
A. Adam Weber, yes, thank you.
Q. Was Nancy Adduci -- Adduci -- is it right? Ah-doo-chee, right?
A. Ah-doo-chee.
Q. I should know that.
Was she hired from within the State's Attorney's Office to lead the Conviction Integrity Unit to your knowledge?
A. Yes, she was.
Q. And during your time as a member of the executive team, did you ever have any concerns that Nancy Adduci was not able to fairly manage the investigations of convictions with integrity?
MS. BAGBY: Objection, beyond the scope, and I'm actually going to direct her not to answer questions about Nancy Adduci.
MR. MORAN: Can you assert a privilege?
MS. BAGBY: I believe, yes, I can.
THE COURT REPORTER: I'm sorry. I can't hear



you.
MS. BAGBY: I believe, yes, I can.
MR. MORAN: You have to say what it is, what's the privilege.
MS. BAGBY: I believe that we're getting close to deliberative process privilege. I also believe we're getting close to interfering with other pending litigation.
MR. MORAN: Well, I'm not aware of any pending litigation involving --
MS. BAGBY: Nancy Adduci?
MR. MORAN: Yeah.
MS. DUFFY: She's suing the Cook County State's Attorney's Office.
MR. MORAN: Oh, she's suing --
MS. BAGBY: For wrongful termination.
MR. MORAN: Oh. Can you say whether that happened on her -- while she was there? I mean, I want to respect what you guys are doing, what your -- I understand where you're coming from. I want to tiptoe around it, so ...
MS. BAGBY: I think that your general questions about whether or not the conviction -- were fine. As we start to get into questions

Page 86

specifically about Nancy Adduci is where the problem lies, so ...
MS. MEADOR: Because of -- related to the other lawsuit but not this one.
MS. BAGBY: Correct.
MR. MORAN: It's got nothing to do with this case, right?
MS. BAGBY: Correct.
MR. MORAN: Okay. Let me think if I can -- let me think of a way to ask these questions so it doesn't contravene what you guys are concerned about.
BY MR. MORAN:
Q. Was Nancy Adduci still an employee of the State's Attorney's Office when you left?
A. No.
Q. Okay. Was she terminated under Kim Foxx's administration?
MS. BAGBY: Objection, exceeds the scope of her deposition, exceeds the scope of the notice. Again, we're getting into deliberative process privilege, and we're getting into --
MR. MORAN: I need to know the boundaries of this. So for me to respect what you're talking

Page 87

about, if she was terminated under Foxx's watch, then I can --
MS. BAGBY: I will represent to you it's a matter of public record that, yes, I think if you Google it, you will find when she was terminated.
MR. MORAN: I'm not going to Google it right now. I just need to know -- all right.
BY MR. MORAN:
Q. And is it -- I --
MR. MORAN: Can we go off the record for a second.
THE VIDEOGRAPHER: Going off the record at 12:12 p.m.
(Discussion off the record.)
THE VIDEOGRAPHER: We're back on the record at 12:14 p.m.
BY MR. MORAN:
Q. Okay. Just to be clear, when you were on the executive team at the State's Attorney's Office, is it true you did not have concerns about the fairness and integrity of the Conviction Integrity Unit?
MS. BAGBY: I'm going to object and ask you to narrow it in terms of -- of a time frame, of a --

Page 88

MR. MORAN: Executive team.
MS. BAGBY: Well, I think you could even narrow it even more to a time frame that is relevant to your case.
BY MR. MORAN:
Q. Well, I'll agree to narrow it to January 1, 2021, through the date you left.
A. Through November 30th, 2024?
Q. Yes.
A. Repeat your question?
Q. Did you have any concerns that the Conviction Integrity Unit could not conduct its investigations in a fair -- could not be fair -- or how did you phrase it? -- could not conduct investigations and ensure fairness and integrity in doing so?
MS. BAGBY: Again, I'm going to object that we're getting beyond the scope of what she is here to testify to and the issues in your particular case involving Condell Williams.
MR. MORAN: With all due respect, you know, I don't think we agree on the scope, but I mean ...
BY MR. MORAN:
Q. Go ahead.

Page 89

A. Do I answer or not? I don't know.
MS. BAGBY: Yes, you can answer.
THE WITNESS: Okay. That is a wide time frame.
BY MR. MORAN:
Q. Okay. How about between January 1, 2021, and October 7, 2022? Did you have any concerns that the Conviction Integrity Unit could not perform its functions while ensuring fairness and integrity?
A. At some point while I was on the executive staff, there were concerns about the Conviction Integrity Unit in terms of the work that they were doing.
However, I would not classify it as concerns about fairness or integrity, but there did become concerns about the Conviction Integrity Unit.
Q. Give me a rough approximate time frame (mic interruption).
A. Towards the latter part of my time on the executive staff.
Q. So you'd have been first assistant already.
A. I would have been first assistant at

Page 90

the time.
Q. Okay. Looks like you were first assistant -- you became first assistant at some point in 2021?
A. I became -- I think it was 20 -- or 20 -- 2021 might be right.
After Joe Magats left the office. That's like my --
Q. All right, I get it.
A. -- my time frame there. Like all of the things happened after he left --
Q. All right.
A. -- after he retired, and I can't remember when exactly he retired.
Q. Would it be fair to say --
A. It was during COVID.
Q. All right. Would it be fair to say that whatever concerns you had towards the end of your time as the first assistant were not concerns that led to the creation of the Working Group?
A. That's fair to say. In terms of concerns that I had, yes.
Q. Yes, yes.
When was the Working Group

Page 91

disbanded?
A. Prior to my leaving the office. They were -- their work was wrapped up.
Q. Did the Working Group have any pending cases remaining as of the date it was disbanded or dissolved?
A. There were cases that the Working Group did not review that were on the original list, but I can't recall if it's because we were wrapping up their work.
As I sit here today, I recall that one of those cases may have been pending, had a post-conviction matter pending where they were actually in -- either in litigation or heading towards litigation for the same issues that the Working Group would have been reviewing the case for, so there was no review of that case.
So there may have been one other case that was referred to the Conviction Integrity Unit for a particular reason, but I can't recall what it was today.
Q. Was it a policy or procedure or practice that the Working Group would not review cases that were going through the post-conviction

Page 92

process?
A. I don't know, because I recall that this matter actually had something pending in court while they were reviewing the case.
Q. When you say "this matter," you mean Cordell --
A. Cordell Williams.
Q. That is correct. Cordell Williams was going through a post-conviction --
A. Uh-hmm.
Q. -- when the Working Group was reviewing the case.
A. Correct.
Q. So would it be fair to say that that was not a limitation?
A. That was not a limitation.
Q. Okay. When the Working Group was disbanded or dissolved, did the cases that it was supposed to be reviewing, those remaining cases on the list, were those cases sent to the Conviction Integrity Unit?
A. There was one case that I recall was a pending post-conviction that was either in litigation or heading towards litigation. So from

Page 93

what I recall, the lawyer elected to proceed with the post-conviction matter.
Q. Okay. And what about the other ones?
A. And then there was one more case that I recall there was a referral to the Conviction Integrity Unit from -- I could be wrong, I could be making this up, but I think that that happened.
Q. Do you believe that the Conviction -- or strike that.
Yeah, do you believe that the Working Group's work was important?
A. Yes.
Q. Do you agree that the Working Group's work could have been performed by the Conviction Integrity Unit?
A. I don't know.
Q. You don't know or you don't remember?
A. I don't know.
Q. What would you need to know to answer that question?
A. I don't know. You have -- I don't know.
Q. I mean, from your experiences with the State's Attorney's Office as a first assistant and a chief deputy and your collaborations with the

Page 94

Working Group --
A. Uh-hmm.
Q. -- are you unable to say whether the work the Working Group was done could have been performed by the Conviction Integrity Unit?
A. The nature of the work that they were doing is similar to work that the Conviction Integrity Unit had done before, to my understanding.
The reason why they were created is something different.
Q. Sure.
Do you know -- and what makes the cases the Working Group was investigating unique or significant enough that the Conviction Integrity Unit could not do that work?
A. I was not a part of those conversations, so I don't know.
Q. You don't know from just your proximity to the Working Group in terms of collaborating with them or talking about it with anyone at the State's Attorney's Office?
A. Again, it's the same answer I gave you before in talking with the then first assistant

Page 95

Jennifer Coleman that there was conversations between the State's Attorney's Office and the Lawyers' Committee about the formation of a group outside of the people who were employed by the Cook County State's Attorney's Office to review these case -- these cases for the purposes of ensuring independence, fairness, integrity.
With re -- with respect to whatever the issues were that had been discussed between the Lawyers' Committee and the State's Attorney's Office, I was not privileged to those conversations.
Q. And as you sit here today, you don't know what the concerns were about independence, fairness, and integrity of the investigation that necessitated forming the Working Group?
A. I don't know what the specific conversation was about.
Q. Okay. You -- you don't know any details about it. Is that fair to --
A. I don't --
Q. -- say?
A. -- know any details about this conversation, correct.
Q. Okay. And there's no way I can jog

Page 96

your memory --
A. Oh, I'm sorry.
(Discussion off the record.)
BY MR. MORAN:
Q. So let me ask again. I'm trying to see if I can jog your memory, obviously, as to whether --
A. Sure.
Q. -- you remember anything about why there was a need to create this Working Group.
And is it fair to say that no matter what question I ask, you just don't know what was the motivation behind the need to create the Working Group, other than you were told there's a need to ensure independence fairness and integrity?
A. I don't recall --
Q. Okay.
A. -- what -- well, One, I wasn't a part of the original conversations. And from what I recall about my conversations with Jennifer Coleman, that's what she outlined for me.
Q. Did you ever have a conversation about the formation of the Working Group with Kim Foxx?
MS. BAGBY: Objection, asked and answered.
You can answer it again.

Page 97

THE WITNESS: The answer is no, I don't think so.
BY MR. MORAN:
Q. Okay, okay. As you sit here today, from your own personal experiences at the -- on the executive team of the State's Attorney's Office, is there anything that would have prevented the Working Group from investigating the convictions of the individuals on the list that was ultimately created for the Working Group to investigate?
A. I'm sorry. Can you say that one more time?
Q. Yeah, let me -- let me ask a better question.
At some point a list was created of cases for the Working Group to investigate.
A. That's correct.
Q. Okay. 16 cases roughly?
A. (Nodding.)
Q. You have --
A. Yes.
Q. -- to answer out loud.
A. Yes.
Q. And all those cases were supposed to

have in common that one of those seven detectives had a role in the investigation or eliciting a statement from a witness or the criminal defendant.
A. Yes.
Q. Okay. Based on your experiences on the executive team and at the State's Attorney's Office, is there any reason you have to believe that the working -- or that the Conviction Integrity Unit could not have investigated those cases on that list?
A. Outside of the agreement or conversations between the Lawyers' Committee and the State's Attorney's Office?
Q. Yeah, setting aside whatever agreement existed.
A. I am not aware.
Q. Okay. Do you know if the State's Attorneys is statutorily allowed to delegate duties to a private lawyer?
A. Yes.
Q. In what context?
A. Special assistant state's attorneys.
Q. Okay.
A. Uh-hmm.



Q. The person appointed as a special assistant state's attorney has to take an oath; is that correct?
A. They don't raise their hand to take an oath, but there's a document that is signed.
Q. They sign under -- do they sign it under penalty of perjury?
A. Is it under penalty of perjury?
Q. Well, how about this, it's a document that's signed in which the person agrees and swears that they will uphold whatever the oath is for the -- to become a special assistant, the person becoming a special assistant signs the document affirming that they're willing to perform those functions.
A. I don't recall that I -- I don't recall whether the state's attorney's oath is in that document.
Q. Okay.
A. But there is a document that is -- that is signed by attorneys who are appointed as special state's attorneys that they would conduct whatever work -- whatever the scope of work is and that they would be -- basically to put it very generally and



you know, first grade-ish, they would be like assistant state's attorneys in that all of the privileges would pass on, all the confidentiality rules, all of that passes through to that person.
Q. Okay. So and I understand that you may not know it verbatim, whatever the oath is that's either -- you know, they say verbally with their hand raised or they sign a document, is it your understanding that that is governed by Illinois law? There's a statute that governs the appointment of assistant -- special assistant state's attorneys.
A. There is to my knowledge a statute that governs the appointment of special assistant state's attorneys, yes.
Q. Do you know if Peter Neufeld was appointed as a special assistant state's attorney?
A. I don't know that.
Q. And how would we find that out if we want --
A. Contact the State's Attorney's Office.
Q. Okay, that's fair.
And do you know if Russell Ainsworth was appointed a special assistant state's attorney?



A. Ever in life?
Q. Yeah.
A. I don't know.
Q. How about in the context of being on the Lawyers' Committee? Were any members of the Lawyers' Committee appointed as special assistant state's attorneys?
A. They were not.
Q. Why not, if you know?
A. I don't know, but they weren't doing any work.
Q. Was Peter Neufeld reviewing quarterly reports by the Working Group?
A. He was sent quarterly reports.
As to whether he reviewed them, you'd have to ask Peter.
Q. Of course. But he was given the opportunity to review them.
A. He was sent quarterly reports.
Q. And those quarterly reports were intended to go to the entire Lawyers' Committee; is that true?
A. According to the Working Group procedures and guidelines, yes.

Page 102

Q. And you were just looking at Exhibit 2, right?
A. Exhibit 2.
Q. Okay. And in your time at the Working Group, I think we talked a little bit about the fact that you reviewed the protocols created by the members of the Working Group?
A. Yes.
Q. Did Peter Neufeld have an opportunity to review those protocols?
A. Not that I'm aware of.
Q. Did Peter -- and let me ask -- and I know you may not remember everything that transpired. And I will tell you that we received, you know, upwards of 200,000 pages of records from the State's Attorney's Office, so I can't show you every document that might help you refresh your memory.
But I will ask you this: If there's an email reflecting -- that you were a part of reflecting that Peter Neufeld was sent protocols to review or anything else to review, do you have any reason to dispute what was in those emails?
A. I don't know what was in those emails.

Page 103

Q. Okay. For example, if an email written by you indicated that Peter Neufeld was going to review a specific document, do you have any reason to believe that email is not accurate?
A. I would have to see the specific email to know what you're referring to.
Q. Got it.
Did Peter Neufeld have an opportunity to review the recommendations of the Working Group?
A. No.
Q. He was never sent a recommendation?
A. I never sent any recommendations to Peter Neufeld.
Q. Got it.
Do you know whether he ever had a chance to review the recommendations though?
A. I don't know.
Q. Do you know if Peter Neufeld was involved in discussions about what to do with certain cases that the Working Group was going to review?
A. Can you be more specific? That's a --
Q. Sure, like --

Page 104

A. -- very broad question.
Q. -- whether a case should be reviewed by the Working Group or whether the case fit the parameters of the Working Group or what should be done with the case the Working Group was reviewing.
A. What do you mean by what should be done with the case?
Q. I mean disposition.
A. Those are three different questions. Take them one at a time.
Q. Well, hold on. Those are examples. You asked for --
A. Okay.
Q. -- examples, so I'm not asking --
A. I don't --
Q. I meant to give you them as examples --
A. Okay.
Q. -- so ...
A. I don't know.
Q. Okay. Working Group was dissolved or disbanded somewhere in -- was it November of 2024?
A. They finished their work in -- the project was wrapped in 2024, November of 2024.
Q. We had taken the deposition of two of

Page 105

the Working Group members in the last week.
I think one of them -- I think it was Vincent Southerland agreed that there were four cases remaining as of the date he was told the Working Group was going to be dissolved.
Do you have any reason to disagree with that?
A. I don't know.
Q. For example, do you have a memory that, Nope, all the work was done, there were no cases left?
A. No. As I explained before, there was a case that had a post-conviction matter pending that I remember, so they did not review that case.
There was another case that I believe for whatever reason, and I don't remember the specifics of the conversation, but I recall that it was referred to the Conviction Integrity Unit.
As to whether or not there were any other cases as I sit here, I don't remember.
Q. Fair enough.
Why was the Working Group disbanded?
A. The project was wrapped because it was

a project under State's Attorney Kimberly Foxx, and so it was decided that the project would wrap up.
Q. Why not continue it under the new administration, or at least give the new administration a chance to continue it?
MS. BAGBY: I'm going to object, calls for speculation.
BY MR. MORAN:
Q. Go ahead.
A. It calls for speculation. I don't know.
Q. Was there a discussion about wrapping up the Working Group that coincides with the date that Kim Foxx stepped down as state's attorney?
A. I'm sorry. Say that again.
Q. Was there a discussion that you're aware of in which a decision was made to wrap up the states -- or the Working Group because Kim Foxx was stepping down as state's attorney?
A. There was a discussion about wrapping up the work of the Working Group, but I don't recall the specifics of that discussion.
Q. As you sit here today, can you think of any reason why the Working Group should not have continued on with additional cases that fit the



parameters of its mandate?
MS. BAGBY: I'm going to object, calls for speculation and outside the scope of her knowledge as she's not a part of this administration.
MR. MORAN: That's not my question.
MS. BAGBY: You can answer if you understand.
THE WITNESS: I'm sorry. Repeat the question again, please.
MR. MORAN: Can you repeat the question, please?
(The record was read as follows:
Q. As you sit here today, can you think of any reason why the Working Group should not have continued on with additional cases that fit the parameters of its mandate?)
THE WITNESS: Thank you.
As I sit here today, I recall that there were discussions about the Working Group, but I don't recall the specifics of the discussion.
BY MR. MORAN:
Q. Well, I understand that.
A. Uh-hmm.
Q. I'm not asking about discussions. I moved on past that.



I'm trying to find out if you are aware of any reason that the Working Group could not continue on with its work under the new administration given the same parameters and its mandate. Additional cases.
A. I don't recall because I don't remember the discussions that -- the specifics of the discussion.
Q. Okay. Was the -- was the Working Group required to perform a case-by-case analysis?
A. Yes.
Q. Okay. And that would be important in order to investigate the actual facts of the case, right?
A. Yes. They can't investigate another case while investigating that case. So one case at a time based upon the facts of that case.
Q. I'm sure they could have multiple investigations going at once, but you can't just assume that the conviction is good or bad without actually conducting an investigation into the facts of that case.
A. I would agree to that.
Q. And in your role as first assistant,



the Working Group provided you with the recommendations, the final recommendations.
A. Yes.
Q. And then you would review the recommendation and provide it to State's Attorney Kim Foxx.
A. Yes.
Q. All right. And then would there be a discussion between you and Kim Foxx as to what to do with the recommendation?
A. Yes.
Q. And was that always the case?
A. Yes.
Q. Okay. And prior to having that discussion with Kim Foxx, if you thought there were questions about the investigation based on your reading of the recommendation, would you go back to the Working Group and ask those questions?
A. Yes.
Q. Okay. Would it be your expectation that the Working Group would provide you with all of the relevant facts needed to make a decision?
A. Yes. Or I'd ask questions.
Q. Right.

Page 110

A. Yes.
Q. And I assume obviously in your role as first assistant you were very busy.
A. Yes.
Q. Okay. So would it be fair to say that you did not have time to go and re-review all of the reports or witness summaries that the Working Group had gone through?
A. I would not conduct an independent case review. However, in reading their recommendation, if there were documents that I felt I needed to review, I would ask for those documents.
Q. Okay. Would it be fair to say that you had to rely on the Working Group's reports containing the final recommendation to gain an understanding of the relevant facts and the relevant documents?
A. I relied on their reports, our conversations, and any documents that I myself reviewed as a part of my review of a particular case.
Q. Okay. And I think this may be another way of saying it, but one of the ways you would know what questions to ask is by reading the report

Page 111

and gaining an understanding of the Working Group's reasoning and basis for the recommendation.
A. Say that one more time? I'm sorry.
Q. I'm going to have her read it back --
A. Okay.
Q. -- so I don't mess it up.
(The record was read as follows:
Q. Okay. And I think this may be another way of saying it, but one of the ways you would know what questions to ask is by reading the report and gaining an understanding of the Working Group's reasoning and basis for the recommendation.)

THE WITNESS: I would know what questions to ask based upon my reading of the report.
BY MR. MORAN:
Q. Yeah, exactly, okay.
Was there anything in place that prevented the Working Group from contacting the seven detectives who had been accused of misconduct?
A. And what do you mean by anything in place?
Q. Any prohibition, policy, practice, procedure, guideline?
A. Not that I'm aware of.

Page 112

Q. Was there even a recommendation to the Working Group, you know, Don't -- don't talk to the detectives?
A. There was no recommendation.
Q. Okay. Did the Working Group have independent discretion to conduct its own investigation?
A. They did.
Q. The -- is there anything that prevented the Working Group members from reaching out to the attorneys representing the detectives to discuss the allegations against the detectives?
A. Not that I'm aware of.
Q. Was there anything that prevented the Working Group from reaching out to the former prosecutors or the prosecutors who handled the underlying criminal case to discuss the underlying criminal case with them?
A. No.
Q. Do you know if that actually happened? The Working Group reached out to detectives or attorneys for detectives or the prosecutors who handled the underlying case?
A. I don't recall the Working Group

Page 113

reaching out to any of the detectives listed in the Working Group procedure and guidelines.
Q. And you're not aware of anyone saying, Don't go talk to those people.
A. I am not aware of a directive saying, Don't talk to them.
Q. Okay. And if you became aware that a Working Group member wanted to reach out to say Detective Halloran or Detective Boudreau or one of the prosecutors who handled the underlying criminal investigation, would you have taken a position about talking to any of those people, the Working Group talking to any of those people?
A. No. This was an independent investigation.
Q. Okay. By the way, on Exhibit 2, I think under Overview -- oh, no, it's under Objectives, the fourth line down.
You see the phrase, independent and impartial fact-based recommendations?
A. I see that.
Q. Okay. That's your understanding of what --
A. Excuse me.

Page 114

Q. -- the Working Group was supposed to be doing.
A. Correct.
Q. Okay. Did -- give me your best understanding of what was the Working Group investigating.
A. They were investigating homicides or sex offenses where -- involving one of the seven detectives listed -- at least one of the seven detectives listed in Exhibit No. 2, where there were confessions elicited from the defendant in those cases, overview.
Q. Would it be fair to say the Working Group was investigating the detectives?
A. No.
Q. Why not?
A. That's not what they were doing.
Q. Okay. And from -- as you sit here today, you don't believe they should have been doing that.
A. No.
Q. Okay. Can we talk about the Lawyers' Committee?
Do you know how the Lawyers'

Page 115

Committee was formed?
A. I don't.
Q. Do you know how the Lawyers' Committee selected its members --
A. I don't.
Q. -- or its members were selected?
And this is true, you're not -- you're -- the fact that you don't know is you didn't hear about how it was formed from anybody in any discussions? You just don't know at all.
A. I don't know at all.
Q. Okay. Did you ever ask how this Lawyers' Committee was formed?
A. Not that I can recall.
Q. Did you communicate -- I know there's emails involving Peter Neufeld that you're either CCed on or you're -- you're on those emails, I've seen them.
Do you have a memory of speaking directly to Peter Neufeld, either by phone, in person, or via email, about any of the cases under review by the Working Group?
A. Can you be more specific in terms of what you mean by about the cases under review?

Page 116

Q. Here's a report, here's the quarterly report, here's the recommendation or fielding any questions from him he may have based on what he read.
A. I sent him quarterly reports.
Q. Did he ever -- did he ever send back or communicate any of his questions to you?
A. He may have.
Q. Okay. Do you have a memory of discussing anything related to the Working Group with any other member of the Lawyers' Committee?
A. No. I don't have a memory.
Q. All right. For example, Craig Futterman.
A. I don't know if I ever spoke to Craig Futterman.
Q. Or Russell Ainsworth.
A. I don't know that I ever spoke to Russell Ainsworth.
Q. What do you understand the purpose of the Lawyers' Committee to be?
A. The only understanding I have of the Lawyers' Committee is based upon this particular project, and that they were a group of attorneys

Page 117

who were -- from the work that they did, they all did similar work.
Q. What kind of work do you --
A. Whether it was an exoneration projects or innocence projects or represented individuals in civil rights claims against the police departments.
Q. Okay. I was just going to ask what kind of work do you think they did, and it sounds like you just answered that question before I asked it.
So your understanding is the Lawyers' Committee members either were involved in an innocence project or an exoneration project or doing plaintiff civil rights work.
And I can't remember the third one that you said. What was it?
A. I think that might have been the third one.
Q. Okay. Other than selecting cases for the Working Group to review, did the Lawyers' Committee have any other purpose?
A. The Lawyers' Committee did not select cases for the -- for the Working Group to review.
Q. How did the cases get selected?

Page 118

A. It's my understanding that there was a notice that was sent out to the Illinois Department of Corrections and maybe circulated amongst the defense bar in case any -- any of the defense bar had represented any of the defendants who had murder convictions or sex convictions in which there was a confession given by -- by the defendant and that involved one of the seven detectives; and that one of those seven detectives worked on those cases.
Q. Do you know who sent out the notices?
A. I don't know.
Q. Okay. Do you know who received the notices and conducted the first review?
A. The notices were received by the Conviction Integrity Unit, who then reviewed the cases and compiled the list of 16.
Q. Okay. Do you have a memory of seeing any emails from Peter Neufeld discussing the cases that should be reviewed?
A. In the initial compilation of the 16 cases?
Q. Either initially or thereafter.
A. There may have been emails about cases

Page 119

as to whether or not they should be reviewed.
Q. Do you know why the Lawyers' Committee was getting quarterly reports about the Conviction Integrity Unit's work? I mean, I'm sorry. Let me ask it again. I said it wrong.
Do you know why the Lawyers' Committee was getting quarterly reports about the Working Group's work?
A. Yes. It was contained in the -- in Exhibit No. 2.
Q. Right.
A. That's all I know. It was in there. It was part of the understanding of what would occur during the formation and the -- during the -- during this project, and that they would receive quarterly reviews that set forth whether -- how many cases were reviewed, how many cases were left to be reviewed, and how many recommendations had been sent to the State's Attorney's Office.
The quarterly report did not encompass any substantive information about the reviews --
Q. Didn't the quarterly reports --
A. -- that I'm aware of.

Page 120

Q. -- discuss the status of the cases and whether they'd been sent for recommendation and whether the state's attorney had made a decision?
A. I just said that.
Q. Okay. Should the -- I mean, so I get that that's written in Exhibit 2; that the quart -- the Lawyers' Committee gets quarterly reports.
A. Yes.
Q. My question is: Why does the Lawyers' Committee need quarterly reports?
A. I don't know. I wasn't part of that conversation.
Q. Okay. No, that's fair enough. I mean -- and it's not whether you're part of the conversation. I mean, you had a role in this -- you know, in the relationship between the State's Attorney's Office and the Working Group for a handful of years, so you may have acquired that knowledge through that role.
A. I did not acquire that knowledge through that role.
Q. And as you sit here today, do you have any idea why the Lawyers' Committee would need updates on a quarterly basis regarding the Working

Page 121

Group's progress?
A. I believe I just answered that question.
Q. Based on what's written in the document?
A. Yes.
Q. Okay. I'm talking about outside --
A. And whatever agreement or conversations existed prior to my stepping in. This was something that had been worked out.
Q. Let's go through Exhibit No. 2 for a minute. Do you have it in front of you?
A. I do.
Q. Okay.
MR. MORAN: And does anyone need -- you know, it's almost 1:00 o'clock. Does anyone need a break?
THE WITNESS: I do. I have to use the bathroom. I'm sorry.
MR. MORAN: Let's take a quick break. We can go off the record.
THE VIDEOGRAPHER: Ending media 2, the deposition of Risa Lanier. Off the record at 12:50 p.m.
(Recess taken.)
THE VIDEOGRAPHER: And beginning media 3, the

deposition of Risa Lanier. We're back on the record at 1:00 p.m.

BY MR. MORAN:

Q. Okay. So we were about to look at Exhibit No. 2. Do you have that in front of you?

A. I do.

Q. Okay, great.

So I want to direct your attention to section 2, Objectives, and the very last sentence, it says: As defined further below, the State's Attorney expects the Working Group to consider, among other things, the past allegations as part of its assessment of the present cases under review. You see that?

A. I do.

Q. Okay. You understand that's a direction to the Working Group to consider the past allegations of misconduct against the detectives.

A. Yes.

Q. Okay. Was it your understanding that the Working Group was going to also consider whether those allegations are true?

A. Yes.

Q. Okay. So they should have been



investigating, for example, whether allegations made in other cases were credible or not.

A. They would consider allegations made in other -- other cases and draw their own determination as to what their assessment of those allegations were.

Q. Right.

Was it permissible -- permissible for the Working Group, according to your understanding of this direction, to consider the accumulation of allegations against any particular detective and just conclude that there's so many allegations that these detectives must have been engaged in misconduct?

A. I'm sorry. You said was it permissible --

Q. Yes.

A. -- for them to do that.

It was permissible for them to reach whatever conclusions they reached based upon their investigation of the matter.

Q. Okay. Was it your understanding that the Working Group was going to make a determination that there was no need to look into the specific



allegations against each detective because the mere accumulation of complaints or allegations against the detectives was sufficient to conclude that those allegations are credible?

A. I would not agree with that broadly speaking. I think it was really based upon the facts of the case.

Q. Okay.

A. So the -- the allegations were considered in the context of each individual case. Like these allegations exist, yes, and now I must also review this case, understanding that these allegations exist.

Q. Sure, understood.

Was it your expectation that the Working Group would say the accumulation of allegations against any particular detective is sufficient for us to believe that coercion occurred in this case and that the -- the confession should be disregarded?

A. Can you say the first part of that again? I got lost in the second part.

MR. MORAN: Can you read it back? I want to make sure I'm not messing it up.



(The record was read as follows:
Q. Was it your expectation that the Working Group would say the accumulation of allegations against any particular detective sufficient for us to believe that coercion occurred in this case and that the confession should be disregarded?)

THE WITNESS: It was my expectation that they would make their recommendation based upon their analysis of the case in whatever form that took when they wrote it in -- in their particular writing.

BY MR. MORAN:

Q. Well, I understand that.

A. Yeah.

Q. I guess my -- my question is a little bit more specific.

Was it your expectation that the Working Group would decide to disregard a confession in the conviction that they were investigating merely because there are so many allegations against the detective involved in obtaining the confession that those other allegations of misconduct are sufficient to conclude the confession in the case they were

investigating is coerced or was coerced?

A. It is my expectation that they would reach their conclusions however they reach their conclusions.

Q. Okay.

A. I had no broad expectations of how they would come back on anything.

Q. Except they had to consider past allegations against the detectives.

A. That is what is written in the Working Group Procedures & Guidelines, Exhibit No. 2.

Q. How is it --

A. Not that they were -- the state's attorney expects the Working Group to consider, among other things, the past allegations as part of its assessment of the present cases under review.

Q. Right. That's what it says.

A. That's what it says.

Q. Okay. How is it possible to conduct an impartial investigation if at the outset of the investigation the investigators are required to consider past allegations against the detectives of misconduct?

A. It's possible.



Q. I know. I'm asking how.

A. The same way you would consider anything that's put in front of you. One thing is more dispositive than another. Just because it's considered doesn't mean that it's necessarily dispositive.

Q. Okay.

A. It's --

Q. Was the --

A. It was as a part of this assessment, not as the whole assessment.

Q. Did the Working Group have the leeway to disregard past allegations of misconduct against the detectives in its assessment of the cases under its review?

A. The Working Group was able to consider or not consider whatever information they thought germane to its investigation.

Q. Okay. But according to this document, they didn't have that leeway. They had to consider the past allegations of misconduct, right?

A. The document says what it says.

Q. In the selection of the Working Group, and this is under No. 3, I'm paraphrasing, but



essentially -- and this is at the bottom of the first page going onto the second page entitled Working Group Members.

A. Yes.

Q. The Working Group will be selected -- one will be selected by the Lawyers' Committee, one by the Conviction Integrity Unit, and one jointly by the Conviction Integrity Unit and the Lawyers' Committee.

You see that?

A. I do.

Q. Okay. Was there -- to your knowledge, was there any discussion, and even I -- I know this is maybe before your time, but whether you're aware of whether there was any discussion at any point in time of including a prosecutor in the conviction -- or in the Working Group?

A. I am not aware.

Q. Do you know prior to you becoming aware of the Working Group did you know who Vincent Southerland was?

A. No.

Q. Did you know who Maria Hawilo was?

A. No.



Q. Okay. Obviously during your time at the Working Group, you communicated them -- with them often enough to get to know them a little bit.

Did you come to the understanding that they both had backgrounds as professors in criminal law and in criminal defense work?

A. At the time that they were reporting -- I'll put that in quotation marks -- to me, they were -- Vincent was a professor at NYU, and I believe he may have been part of their legal clinic.

Q. Uh-hmm.

A. And Maria was a professor at Loyola, and I believe that she may have also been a part of a clinic there -- Loyola or Kent, one of the schools here in Chicago. She may have been a part of their -- of their whatever clinic that they have there, may have been.

As to what they did prior to those designations, I have no idea.

Q. Got it.

Would it be your expectation that the Working Group, in conducting any analysis of the cases it's reviewing, would know what is required by the State to prove the elements of the

Page 130

crime that -- of the conviction that they're investigating?
A. They should -- Vincent was not a lawyer in the State of Illinois, but he certainly could have figured out and done the research as to what the elements of the crime were.
Q. Right. We're only talking about mostly first-degree murder.
A. Yeah.
Q. Some sex crime cases.
A. Uh-hmm.
Q. You have to say yes or no.
A. Oh, I said -- yes, yes, yes.
Q. And accountability, right?
A. If it was a part of the case.
Q. Okay. So if accountability was a part of the case, you -- your expectation would be that the Working Group members would be aware of what is required by the State to prove the crime under an accountability theory?
A. That they would understand the elements of the crime, correct.
Q. Okay. Now, under the Working Group, under section 3, the very -- this is on the second

Page 131

page, but the end of the paragraph, there's a discussion about what the Working Group -- limitations on the Working Group's representation of any detectives or criminal defendants who they were investigating. Do you see that?
A. Yes, the last sentence.
Q. Okay. That's essentially to prevent conflicts of interest.
A. One moment, please.
Q. Yeah, go ahead, take your time.
A. I can only assume what this is for because I didn't write the document, nor was I involved in its creation, but it looks like conflicts of interest or -- but there's an other part here about fiduciary relationship as well, so that would -- you know, meaning that they could not represent any of these folks either or draw money or anything like that, so yeah.
Q. Right. And you probably know that when a lawyer represents a client, as a matter of law, a fiduciary relationship exists.
A. Sure.
Q. Okay. The -- and the State's Attorney of course would have an incentive ensuring that no

Page 132

conflicts of interest were present in the Working Group's work, right?
A. Can you explain what you mean by "incentive" just a little bit more.
Q. Well, sure. The Working Group is -- they're appointed as special assistants, right?
A. Uh-hmm.
Q. You have to say yes or no.
A. Yes, yes.
Q. And the Working Group is now performing work, though it is independent, but on behalf of the State's Attorney's Office, right?
A. That is correct.
Q. And the work that the Working Group is performing may have life-changing impacts on the lives of the people who were convicted.
A. It may.
Q. And the family members of the victims of the crime too.
A. It may.
Q. Okay. Because if a conviction is reversed, someone gets out of prison who was sentenced to life, and there has to be notification to the family members of that fact, right?

Page 133

A. There is.
Q. Okay. You'd want to ensure that a Working Group member investigating a conviction had not previously represented that criminal defendant, right?
A. That is correct.
Q. Okay. Because that would be a big conflict of interest.
A. That would be a conflict of interest.
Q. Okay. Do you know if there was anything put in place to prevent conflicts of interest involving the Lawyers' Committee?
A. To my knowledge, the Lawyers' Committee were not to represent any of the defendants that were being -- whose cases were being reviewed.
Q. Uh-hmm. And once those cases had been reviewed and a recommendation had been made to vacate a conviction, in the -- was there any concern about members of the Lawyers' Committee then representing that individual in a civil rights lawsuit against the detectives who were involved in investigating the crime?
A. Yes. To my knowledge, that was not supposed to occur.

Q. Okay. Do you know --
A. That there was an agreement.
Q. Do you know if it did occur?
A. I don't know.
Q. Okay. And when you say it wasn't supposed to occur, was something put in writing like in this document that says, Hey, Lawyers' Committee members, you cannot represent any of the individuals whose convictions may be reversed in a civil rights lawsuit?
A. Let me read the entire document, and I'll tell you whether or not it's in this document.
Q. Okay. Do you want to take a break so you can do that?
A. That's up to you whether we break or not, but I need to read the document.
Q. No, that's fine. But we'll take a break so you can do that.
A. Okay.
MR. MORAN: So we're going to go off the record.
THE VIDEOGRAPHER: Going off the record at 1:13 p.m.
(Recess taken.)



THE VIDEOGRAPHER: Back on the record at 1:23 p.m.
BY MR. MORAN:
Q. Okay. You've had an opportunity to review the entirety of Exhibit No. 2.
A. I did.
Q. Okay.
A. Thank you.
Q. Fantastic.
So I'm going to have our court reporter read back the last question, because, frankly, I don't remember it and ...
(The record was read as follows:
Q. Okay. And when you say it wasn't supposed to occur, was something put in writing like in this document that says, Hey, Lawyers' Committee members, you cannot represent any of the individuals whose convictions may be reversed in a civil rights lawsuit?
A. Let me read the entire document, and I'll tell you whether or not it's in this document.)
BY MR. MORAN:
Q. Okay. So you've had the chance to review it, and is there anything in Exhibit No. 2 that prohibits Lawyers' Committee members from



representing individuals whose convictions are reversed based on the Working Group's investigation in a plain -- in a civil rights lawsuit?
A. There's nothing contained in Exhibit No. 2 -- there's no information contained in Exhibit No. 2 that answers that question, as Exhibit No. 2 contains information regarding the Working Group only and not the Lawyers' Committee.
My understanding about the Lawyers' Committee and whether or not they were allowed to represent any of those defendants who were -- whose convictions were reviewed by the Working Group pursuant to this particular project did not come from Exhibit No. 2, but rather from conversations that I've had about this project from Jennifer Coleman and was also mentioned to me by Peter Neufeld during conversations that the Lawyers' Committee -- there was an agreement that the Lawyers' Committee would not be -- would not represent any of these defendants.
Q. Okay. Now --
A. In any --
Q. Go ahead.
A. In any lawsuits connected with this



project.
Q. Okay. So first question: Do you know if that was put in writing somewhere?
A. I don't know.
Q. All right. Second question: You identified Exhibit No. 2 as the agreement between the State's Attorney's Office and the Lawyers' Committee; is that right?
A. I keep referring to it as an agreement because that's my own term. It is called the Working Group Procedures & Guidelines.
Q. Okay. This is what you understood to be -- to contain the terms of whatever agreement existed between the Lawyers' Committee and the State's Attorney's Office.
A. It contains the -- this is the outcropping of a conversation about this project between the Lawyers' Committee and the State's Attorney's Office, what the project would consist of, and the procedures and guidelines governing the Working Group that was form -- formed.
Q. Okay. This verbal prohibition that you just explained, that's a fair way to describe it, right?

A. No.
Q. How would you -- if it's not in writing, I mean --
A. It's not in writing. And you are describing it as a prohibition. There was -- to my understanding, the Lawyers' Committee were not going to represent any of these defendants.
Q. Okay. The agreement was the Lawyers' Committee would not represent any of these defendants in a civil rights lawsuit after the conviction is reversed.
A. That is my understanding.
Q. Okay. And that is because of the need to prevent potential conflicts of interest, right?
A. That was based upon whatever the conversations were between the State's Attorney's Office and the Lawyers' Committee, and whatever their reasoning was.
Q. Well, no, I'm asking your understanding now, which is what you just explained.
Did you understand that agreement to mean -- or to be in place in order to prevent conflicts of interest?
A. Not just conflicts of interest. The --



the Lawyers' Committee informing the Working Group with the State's Attorney's Office. This was not a for profit type of project but one about justice and the integrity of these convictions with regard to these detectives who were involved who had all of these allegations against them and just the reviewing of that case.
So there was no -- from what I understand and what my expectations are, that there was no -- that there's an agreement -- there was -- there was no -- this was -- there was no incentive for the Lawyers' Committee to go out and represent these folks who had convictions or -- overturned as a result of this project because this was not an incentive based type of project.
Q. Got it, okay, very good.
And was it your understanding then that this -- whatever this agreement was in which the Lawyers' Committee members would not represent the plaintiffs would also extend to the law firms at which the lawyer committee members were partners?
A. I don't know --
Q. Wouldn't --
A. -- because I don't know what law firms



they were a part of. I have no idea.
Q. In terms of your expectation though being -- this being about a project about justice and not for profit, wouldn't the same analysis apply?
A. Perhaps.
Q. Do you know what an imputed conflict of interest is?
A. I do.
Q. What do you understand it to be?
A. If there's a conflict of interest amongst a lawyer, it is also imputed to the members of their firm.
Q. Got it, okay.
You had said -- when I asked you if this was a conflict, you said not just a conflict, and then you pointed out about how this is not a for profit endeavor.
A. Correct.
Q. Would you agree that your answer suggests that yes, there was a conflict, but there is more to it than just preventing a conflict of interest, right?
A. Yes.



Q. Okay. However, that conflict of interest could also -- would also be an imputed conflict extending from the lawyer on the Lawyers' Committee to the rest of the law firm?
A. If that's -- if that's governed by imputed conflicts. If that's what the law says, then that's what the law says.
Q. Well, you just explained your understanding of it.
That fits within your understanding, doesn't it?
A. Sometimes.
Q. Okay. So I want to ask you some other questions about this document real quick.
At the bottom of the second page under Reporting, the last sentence says: In the interest of transparency, the recommendations of the Working Group and their reasoning will be made public, along with the decision of the State's Attorney. Do you see that?
A. I do see that.
Q. Okay. Were the decisions or -- yeah, was that done?
A. No.

Page 142

Q. Do you know why?
A. Yes.
Q. Why is that?
A. Because there's a deliberative process privilege. And so they -- so while it does say in the interest of transparency, the documents were not made public because contained within those documents was deliberative process.
Q. Okay. And -- I'm trying to think of the best way to ask this.
A. Sure.
Q. How do you know that that's the reason? How did you come to the knowledge --
A. That was my reason.
Q. Your reason.
A. My reason.
Q. So you decided to overrule the policy and the guidelines.
A. I sure did.
Q. Okay. Did you discuss that with Kim Foxx?
A. I did.
Q. And did you discuss it with Peter Neufeld?

Page 143

A. I did.
Q. Why'd you discuss it with Mr. Neufeld?
A. Because he asked were -- were the recommendations going to be made public, and I said no.
Q. Okay. Is it your belief as you sit here today that whoever drafted this -- and I know you don't know who -- made a mistake by including this sentence; that the reasoning and the reports would be made public, along with the decision of the State's Attorney?
A. I don't know if they made a mistake or not.
Q. Okay. Because it sounds -- it sounds like it was included regardless of whether there's a deliberative process privilege for the sake of transparency.
A. I don't know why it was included.
Q. Okay. Were the decisions of the Working -- not decisions, but the recommendations of the Working Group ever made or disclosed outside of the State's Attorney's Office?
A. Not by me.
Q. Do you know if Peter Neufeld ever was

Page 144

given a copy of a recommendation by the Working Group?
A. I don't know that.
Q. Are there -- do you remember when I was asking you earlier if the State's Attorney could delegate duties or responsibilities to a private lawyer, and you explained that, yes, as long as the lawyer was appointed a special assistant state's attorney.
A. Yes.
Q. Okay. If -- is a state's attorney allowed to, to your knowledge under the law, allowed to delegate any responsibilities or duties to a private lawyer who is not a special assistant state's attorney?
A. I'm sorry. Is an assistant state's attorney, are you --
Q. Is not.
A. Is that what you're --
Q. Yeah, so what I'm -- I'll repeat it.
A. Yeah.
Q. That's fine.
Is it permissible or is the State's Attorney allowed under the law to delegate any

Page 145

duties and responsibilities to a private lawyer who is not appointed or sworn in as a special assistant state's attorney?
A. I am not aware of any law that would prohibit that or allow it. I am only aware of the law establishing special assistant state's attorneys.
Q. Okay. Under -- this is the third page under Internal Communications, section VI?
A. Yes.
Q. And it says: The Working Group may communicate with the Conviction Integrity Unit, the Lawyers' Committee, and lawyers for each claimant about its general practices and other claims involving the detectives and the general status and progress of the investigation.
Do you see that?
A. I do see that.
Q. Okay. I want to focus on communicating regarding other claims involving the detectives.
Was there any communication to the Working Group that it was also permissible to communicate with lawyers for the detectives about the claims involving the detectives?

A. I don't remember any conversations about that.

Q. How about any communication with the Working Group that it was permissible to communicate with prosecutors about the claims against the detectives? Prosecutors who handled the underlying criminal case.

A. I don't remember any specific conversations regarding that.

Q. Okay. Do you know -- by the way, did you review the bills the Working Group members submitted to the State's Attorney's Office?

A. I did.

Q. And so you -- in the -- each line item has a description of what they did and things of that nature.

A. Yes.

Q. I assume you became aware that members of the Working Group had met with certain law firms, like Loevy & Loevy or the People's Law Office, that have a practice representing plaintiffs in civil rights lawsuits.

A. I recall that they spoke to other lawyers.



Q. Not specifically --

A. I don't -- I don't recall specifically who without looking at anything.

Q. Okay. I'm going to ask you about section -- we'll go to the fifth page, and this is under the section called Review Procedures. And I want to focus on C at the top of the page.

A. Okay.

Q. Okay. C contains a direction to the Working Group. Would you agree with me?

A. C contains -- I'm sorry, you say a direction to the Working Group?

Q. Yeah, a requirement actually is more like it, I guess.

In other words, the Working Group will consider or will perform a case-by-case assessment.

A. That is what it says.

Q. That's a requirement of the Working Group, agreed?

A. It says: The Working Group will perform a case-by-case assessment.

Q. Okay. And a pattern assessment of all cases as well.



A. That is correct.

Q. Okay. And the pattern assessment shall consider the history of misconduct of the detectives as well as any history of testifying falsely.

A. That is what it says.

Q. Okay. Do you read this as giving the Working Group the discretion to ignore its pattern assessment in reaching a conclusion regarding the cases it is investigating?

A. I read this as saying that the Working Group will perform a case-by-case assessment and a pattern assessment and what the pattern assessment shall consider. It does not give a prohibition or doesn't give a directive as to whether or not they should or should not consider pattern assessment.

Q. To your knowledge, is pattern assessment -- was the Working Group required to consider pattern assessment in its case -- in its ultimate evaluation of a specific case it is investigating?

A. The Working Group was required to investigate the case, any and all claims, and make their determination based upon their investigation.



Q. That would be part of --

A. There was not a requirement that they had to do any specific thing other than consider everything that you have and make your recommendation.

Q. And be impartial.

A. Of course and be impartial.

Q. That's actually written into the procedures, right?

A. That they shall be impartial.

Q. Yes.

What do you understand impartial to mean?

A. Impartial means impartial. I don't have Webster's dictionary --

Q. You don't have to.

A. -- in my head.

Q. Give me -- give me your best understanding of impartial.

A. That you shall not be partial; meaning you should not favor one -- one side or the -- over the other, but that you are to look at this, putting aside any biases, putting aside anything that would cause you to favor one thing over the

other.
Q. And would impartial also mean being fair?
A. Yes.
Q. Okay. Let's jump down to section D.
A. Section D.
Q. Okay. These are the three options for the Working Group in reaching its conclusions.
Would you agree with me?
A. Yes.
Q. Okay. There's one based on -- vacating based on innocence, then vacating based on interest of justice, and then taking no further action.
A. That is correct.
Q. Okay. Was the Working Group allowed to make a recommendation outside of these three conclusions?
A. No. This is what their conclusions -- this is what their recommendations were. Those are the three categories.
Q. Right.
A. Yes.
Q. And in discussing the categories with the Working Group members that they may have



reached, was there ever discussion about the fact that maybe the case should be retried?
A. There may have been.
Q. Okay. Would that have been an option for the State's Attorney to consider?
A. State's Attorney can consider all options available to the State's Attorney's Office.
Q. Okay. And would that have been something the Working Group could have written into the document, like something along the lines of, We recommend vacating in the interest of justice, however you may want to consider retrying this case?
A. Is that there's something that they could have?
Q. Yeah.
A. If it was part of their recommendation.
Q. Nothing prevented them from saying something like that.
A. There's nothing in this document that says you can't say that.
Q. Okay. Now, under No. 1 regarding innocence, there's two components: One, if you're going to make a recommendation based on evidence --



or on innocence, there must be new evidence, right?
A. Yes.
Q. Okay. And that new evidence gives rise to a substantial probability that the convicted defendant was not the person who committed the offense.
A. That is correct.
Q. Okay. Do you agree that that's a high standard?
A. It's a standard. I don't know what you mean by high, like reasonable doubt? But --
Q. Well --
A. -- high burden.
Q. -- yeah, beyond a reasonable doubt is a high standard, isn't it?
A. It's a high burden.
Q. Yeah.
A. That's what they say.
I don't know that it's a high standard more than it could be a hard standard. I don't know.
Q. Okay.
A. Depends on the -- on what the investigation uncovers.



Q. Now, would you agree with me that the Working Group is allowed to consider new evidence.
And let me -- let me be more specific.
A. Yes, please.
Q. New evidence that was not available when the case was tried originally.
A. They are able to consider any evidence that they have collected as a result of their investigation.
Q. And that could include new evidence that was not available to the prosecution or defense when the case was originally tried, right?
A. It could if it was part of the things that they reviewed --
Q. Sure.
A. -- and collected and came across, sure.
Q. Well, if it's something they're not aware of, obviously they're not going to review it, right?
A. They're allowed to review whatever evidence they uncovered in their investigation.
Q. Okay. Now, in the interest of justice, I want to focus on a couple things.

Page 154

One, the determination -- the recommendation will entail a determination by the Working Group that any credible information exists to cause a loss of confidence in the integrity of the conviction.

You see that?

A. I see this.

Q. Okay. So the Working Group has the discretion to identify any -- any credible evidence that it deems credible as a basis for losing confidence in the conviction, regardless of what that evidence is?

A. It says "any."

Q. And then I want to jump down to right after -- right after that, including any evidence of the seven detectives' involvement in obtaining a statement from the defendant. This determination will take into consideration any overall patterns that emerged during the review, including what the Working Group learns from other cases involving any of these seven detectives.

I'm just going to stop there.

A. Sure.

(Brief interruption.)

Page 155

MR. MORAN: Can you read back the question before the phone interrupted us.

(The record was read as follows:

Q. And then I want to jump down to right after that, including any evidence of the seven detectives' involvement in obtaining a statement from the defendant. This determination will take into consideration any overall patterns that emerged during the review, including what the Working Group learns from other cases involving any of these seven detectives. I'm just going to stop there.)

THE COURT REPORTER: And then there was an interruption.

BY MR. MORAN:

Q. Okay. So do you agree that in considering whether there's credible evidence to cause a loss of confidence in the integrity of the conviction the Working Group is required to consider patterns of misconduct that emerged during its review from other cases involving the seven detectives?

A. Say that one more time, sorry.

Q. Sure.

Do you agree that as part -- the

Page 156

Working Group's required to consider patterns of misconduct from other cases involving the seven detectives in deciding whether there's a loss of confidence in the integrity of the conviction?

A. It says: This determination will take into consideration any overall patterns that emerged during the review, including what the Working Group learns from other cases involving any of these seven detectives and/or information in the specific case that results in a loss of confidence. That's what it says.

Q. Yes.

So the Working Group will consider both of those things that you just read.

A. They will take into consideration any overall patterns emerging during the review, what they learned from any other cases involving these detectives and/or information in the specific case that results in the loss of confidence.

Q. Okay. Does this mean to you, reading of the document, that the Working Group can disregard the patterns of misconduct or the patterns of -- yeah, the patterns of misconduct that emerged during your review?

Page 157

A. What this means to me is that they can take it into consideration, but in making their ultimate recommendation, they may or may not give credence to it, depending on the case itself.

Q. Okay.

A. That's what it means to me.

Q. Okay. And should the Working Group then make decisions based only on those patterns of misconduct without regard to the underlying facts of the case?

A. You said should they. I'm sorry.

Q. Yeah.

A. Their recommendation should be based upon any information that they learned during the course of their investigation that would lead them to that recommendation, which would include the facts of the case.

Q. My -- my question is a little different.

A. Okay.

Q. I'm asking if --

A. Give it to me again.

Q. -- they should be making the determination based only on the pattern of misconduct.

A. I would not expect the Working Group to not look into the case, meaning not read the case file, understand what's happening with that case, and just make a recommendation, like, Oh, these detectives were involved in this case, so it must be -- we'll just, you know, make a recommendation on either one or two based upon the fact that these detectives were involved in this case, and there's this pattern concerning them.
Q. Okay.
A. My expectation is that the Working Group members would have conducted an investigation and considered all things in making their recommendation.
Q. And you would -- you would expect the Working -- well, strike that.
Would you expect the Working Group to, as part of its investigation, declare the confession unreliable based on the pattern of misconduct without verifying whether the allegations are true, and then reach a conclusion that without the confession, the State could never meet its burden?
A. Say the first part of your question



again?
MR. MORAN: She's -- I'm going to have her read it back --
THE WITNESS: Thank you.
MR. MORAN: -- because I kind of don't want to screw it up.
(The record was read as follows:
Q. Would you expect the Working Group to, as part of its investigation, declare the confession unreliable based on the pattern of misconduct without verifying whether the allegations are true, and then reach a conclusion that without the confession, the State could never meet its burden?)
THE WITNESS: I would expect the Working Group to make their recommendation based upon their review of the case, any information that they are relying on and that they gathered as a part of that investigation, and come to a conclusion.
BY MR. MORAN:
Q. That is --
A. This is very case specific. These recommendations are made on a case-by-case basis, so I can't --
Q. I understand.



A. -- answer in over generalizations.
Q. So I just want to focus on the question that was asked, which was limited to considering -- or disregarding the confession based on pattern and practice and concluding that the State can't meet its burden without regard to whether the allegations of abuse in that case are true.
A. My answer is still the same.
MR. MORAN: Okay. Okay. Hang on a second. I'm going to give you another exhibit.
(Deposition Exhibit No. 3, Witness Lanier, was marked for identification 10/29/2025.)
MR. MORAN: All right. What number are we on?
THE COURT REPORTER: No. 3.
BY MR. MORAN:
Q. All right. We're looking at Exhibit No. 3, and this doesn't have a title, but it says effective June 25, 2021. And I will tell you that the file name of the document had the word Working Group protocol in it, okay?
Do you recognize the document?
A. I do recognize this document.
Q. Okay. Tell me what you understand it



to be.
A. The Working Group protocol.
Q. And who drafted this document?
A. The Working Group.
Q. All right. Is this a document that -- and you reviewed this document before it was approved by the State's Attorney?
A. I did.
Q. All right. Did you make any edits or changes?
A. I don't recall.
Q. And do you need a moment to review the document, or do you feel comfortable enough talking about it right now?
A. If you want to ask me questions, then I need to read it.
Q. Okay. How about this, I'll point you to a part of the document, and if you decide that in order to answer the question you need to read it fully or more in depth, I'll give you that opportunity.
A. That's fair.
Q. Okay. So the one thing I want to point out though is that you may have -- you may notice

Page 162

as you're looking at it now that it does contain a lot of the language that was in Exhibit 2, the Procedures & Guidelines that we just looked at.
Did you notice that?
A. I would have to read it.
Q. Okay. Let's look under Objective.
A. Sure.
Q. Very first sentence says: The conduct of the detective -- the detectives named above has been the subject of civil lawsuits, vacated convictions, Illinois Torture Inquiry Relief Commission decisions, and post-conviction proceedings.
Is it your understanding that all of those allegations are one of the reasons that these seven detectives are identified as being part of the Working Group's mandate?
A. Yes.
Q. Okay. And at the bottom of the page, it identifies -- I'm going to -- by -- starting with the sentence, by doing so, all right? Well, it talks about the mission of the Working Group. That whole paragraph talks about the mission of the Working Group. Do you see it?

Page 163

A. I see the paragraph, yes.
Q. Okay. It says: The mission of the Working Group is to determine in each case -- in each of the present cases whether the conviction lacks integrity, or whether new evidence, including any evidence related to past allegations against the Detectives, undermines the integrity of the conviction.
I want to stop there.
Obviously the reference to new evidence, as you pointed out earlier, can be any new evidence, right?
A. Sure.
Q. And, By doing so -- I'm reading again from the document -- By doing so, the objective of the review is to conduct a comprehensive assessment of convictions obtained as a result of the Detectives' investigations and make impartial fact-based determinations as to each case.
That's consistent with the opening paragraph of Exhibit No. 2.
A. The opening paragraph of Exhibit No. 2?
Q. Oh, I'm sorry, the second paragraph --
A. Okay.

Page 164

Q. -- where it talks about conducting an impartial investigation.
A. I see similar language in that make impartial fact-based determinations as to each case appears in both paragraphs.
Q. Right. They're consistent, right?
A. It appears in both paragraphs.
Q. Okay, great.
So let's go to the second -- or yeah, the second page of Exhibit No. 3 under Scope of Review. I'm going to look at the second paragraph.
It says: As further described in the implemation -- Implementation Section below, Section V, the focus of the review will be the role and conduct of the Detectives during the investigation and subsequent proceedings.
You see that?
A. I see this.
Q. Okay. Do you agree that that was the focus of the investigation or the focus of the Working Group's review?
A. No, I don't agree.
Q. Why not?

Page 165

A. Because reading further, If -- if claims are presented that exclusively allege misconduct of other members of the Chicago Police Department, and any other individuals, these cases will be handled through normal CCSAO and/or CIU channels.
So reading the entire paragraph together, the focus of the review is on reviewing cases involved -- in cases where the seven detectives listed in this document, as well as in Exhibit No. 2, did work on that case.
So in other words, if there are -- if this is a case where none of those detectives were involved in the case at all, those cases would go to the CIU.
Q. Right. I think --
A. And that's what that means.
Q. I think what you just pointed out is that there's a distinction between the Working Group's mandate to review cases involving the seven detectives and other cases involving misconduct alleged against other detectives, which will go back --
A. To other -- yes.

Page 166

Q. -- back to the State's Attorney's Office.
A. Yes.
Q. Okay. So just as far as the seven detectives go --
A. Yes.
Q. -- which is a defined term. You see it's got a capital D under detectives?
A. Yes.
Q. Okay. The focus of the review will be the role and conduct of the Detectives during the investigations and subsequent proceedings.
Agreed?
A. Am I agreed as to what?
Q. That the focus of the review involving the case -- of the cases involving those seven identified detectives will be on their role and conduct during the investigation and subsequent proceedings.
A. The focus of the review would be to determine whether or not the cases lack integrity, and part of that assessment would include the conduct of the detectives in question, yes.
Q. Part of what you just said is not

Page 167

within those two paragraphs of Scope of Review that was written by the Working Group.
A. It's in there.
Q. Where does it say that? In those two paragraphs under Scope of Review?
A. Sure does.
Q. I know, but where? I'm not miss -- maybe I'm missing it, but it says the focus --
A. That's the interpretation.
Q. Oh, that's the interpretation.
A. Yes.
Q. Okay. That's different.
The -- under the Independence of Working Group, there's two paragraphs, and I want to direct your attention to the second paragraph.
A. Okay.
Q. And it outlines who the Working Group may arrange meetings with.
A. Uh-hmm.
Q. And consultations with.
Do you see that?
A. I do see that.
Q. Okay. And similar to what we looked at earlier, there's a reference to representatives,

Page 168

past legal representatives of convicted individuals whose cases have been vacated, exonerees. It also expands to other expertise deemed relevant by the Working Group to conduct its work.
If you want to take a moment to read the whole paragraph --
A. Yes.
Q. -- go ahead.
A. Thank you. (Complying.)
Okay.
Q. Okay. Do you agree with me that the -- this paragraph outlines different types of groups the Working Group could consult with as part of its research?
A. Yes.
Q. Okay. And does it limit the Working Group to only discussing the case or the research with, for example, plaintiff's attorneys who handle civil rights claims or attorneys that work in innocence projects or exoneration projects?
A. Does it limit them?
Q. Yeah.
A. No, it does not.
Q. Okay. So they're free to go and talk,

Page 169

even according to this paragraph, they could go talk to attorneys for the detectives or the detectives themselves, if they deem it warranted as part of their research.
A. Any other expertise deemed relevant by the Working Group to conduct its work.
Q. Okay. Do you read this as meaning that the Working Group should just collect the allegations against the detectives, tally up those allegations, and conclude there's enough here for us to believe that they must have engaged in misconduct?
A. Can she read back the first part of your sentence, unless you know it. Say it again.
Q. She's going to read it back for you.
(The record was read as follows:
Q. Okay. Do you read this as meaning that the Working Group should just collect the allegations against the detectives, tally up those allegations, and conclude there's enough here for us to believe that they must have engaged in misconduct?)
THE WITNESS: I read this to believe that the Working Group can gather information from a variety of sources to help with this investigation.

BY MR. MORAN:
Q. Okay. Would you expect the Working Group to limit its research to the collection of allegations against the seven detectives from plaintiff's civil rights lawyers or innocence projects lawyers, and then reach a conclusion that these detectives have a pattern of engaging in misconduct and must have engaged in misconduct in the particular cases that they're investigating?
A. My expectation is that the Working Group would gather any information from any sources that would help it reach -- that would help it reach its decision in any case.
Q. Okay. That actually doesn't answer the question. I -- it's a very specific yes-or-no question with a very limited fact pattern.
Do you want her to read it back to you?
A. No, because that is my answer.
Q. Okay. You can't answer yes or no?
A. It's not a yes-or-no question. That is my answer.
Q. And if you became aware that the Working Group had limited its research to just



speaking with plaintiff's civil rights lawyers or attorneys in the innocence project world or other exoneration project world, would you have any concerns that the Working Group has limited itself in its own research?
A. I expect the Working Group to gather whatever information it needs from wherever it needs and whomever they need in order to conduct an assessment of these cases.
Q. Right.
A. It's an independent group, so I would expect them to do the work that they felt they needed to do in order to reach conclusions.
Q. It's an independent group who submitted recommendations that you reviewed, right?
A. I did review them.
Q. And asked questions based on the review?
A. I did.
Q. You didn't just accept the recommendations at face value, right?
A. I did not.
Q. In fact, you applied a critical analysis to their recommendations to ensure that whatever they're recommending is something that you



could pass along to State's Attorney Kim Foxx.
A. That's fair to say.
Q. Okay. And in that critical review, did you ever question the sources that the Working Group relied on for its pattern and practice assessment?
A. I'm not sure what specific questions I asked as I reviewed each case.
Q. Just in general, did you ever question the sources that the Working Group relied on in reaching its conclusions?
A. I may have.
Q. In fact, there was instances in which Marc Kadish offered dissenting opinions or concurring opinions to the opinions offered or the recommendation offered by Maria Hawilo and Vincent Southerland, right?
A. That occurred.
Q. Okay. Obviously when there's a disagreement like that, that might raise questions for you as the person reviewing provide -- conducting this critical analysis of their recommendations, right?
A. There are questions raised in every



case.
Q. Okay. But when there's a disagreement among the Working Group, does that give you reason to look more closely?
A. I look closely at every case.
Q. Okay. And the mere fact that a disagreement existed didn't create any additional work on your part.
A. There are disagreements among lawyers in the same office. You ask questions.
Q. Okay. And you would expect -- as you pointed out, you would expect the Working Group to conduct -- well, let me ask you this.
Would you expect the Working Group to conduct a full and complete analysis of the facts, the relevant facts before any conclusions that are provided to you?
A. Yes.
Q. And would you expect the Working Group to conduct a full and complete analysis of any recommendations they provided to you?
A. I'm sorry.
Q. Yeah, let me ask that again.
A. Yeah.

Page 174

Q. Would you expect the Working Group to conduct a full and complete analysis of the facts and data that supports any recommendation it provided to you?
A. I would expect them to complete an analysis of the case and whether it's full is wholly dependent on what they believe is germane to reach their -- their investigation -- or I'm sorry -- to reach their recommendation.
I'm getting tired.
Q. That's okay. No, I --
A. To reach their recommendation.
So I don't know what you -- what encompasses "full." I expect them to conduct an investigation and analysis.
Q. Okay. And part of that analysis that you just described, you would expect it to be an impartial analysis.
A. Yes.
Q. Okay. I want to drop down to -- this is the fourth page under Category B Claims?
A. Page 4?
Q. Yes. Actually, no, under C, Phase III Investigation of Individual Claims. This is at the

Page 175

bottom of the fourth page.
Okay.
A. Excuse me.
Q. And you see on the fifth page, there's a list --
A. I'm sorry.
Q. -- of bullet points.
A. Yes.
Q. Now, the bullet points, the preface to the bullet points, the last sentence of the paragraph at the top, it says: For the purpose of this review, the Working Group may ascertain information on the following for each case.
And there's a number of bullet points. I want to drop down to the one beginning with, The existence of sufficient.
Do you see that? It's in the middle of the page.
A. Yes.
Q. The existence of sufficient and credible evidence corroborating the involvement of the convicted persons in the commission of the crime. The Working Group will determine what constitutes sufficient and credible evidence but

Page 176

should consider evidence such as recovered physical evidence or reliable forensic evidence.
Do you see that?
A. I see that.
Q. Okay. Would you agree with me that that is telling the Working Group that it should consider evidence that corroborates the criminal defendants' involvement in the crime, being provided examples?
A. It's -- so these bullet points and the par -- and the sentence that you pointed out says, the purpose of this review, the Working Group may ascertain information on the following for each of this case, and all those bullet points listed, including the paragraph you just read.
Q. Okay. In other words, evidence that would support the conviction?
A. Yes.
Q. Okay. Now, further down, it says -- this is like three bullet or four bullet points down from where we just read.
The degree to which evidence supporting innocence or reasonable doubt was overlooked, failed to be investigated, or otherwise

Page 177

dismissed.
You see that?
A. I see that.
Q. That's one of the things the Working Group can consider.
A. Yes.
Q. All right.
A. Or may ascertain information on --
Q. Right.
A. -- is what it says, yes.
Q. And then there's a catch-all at the very bottom: Any other facts, circumstances, or evidence the Working Group deems relevant to the integrity and reliability of the investigate -- or the convictions under review.
Do you see that?
A. I see that.
Q. Okay. That's a broad consideration of facts for the Working Group to consider.
A. It's broad.
Q. There's a section on the next page that's bullet -- or in bold.
Final recommendations on each case will be a result of the Phase III and Phase IV

assessments. In Phase III the Working Group will conduct a case specific review as noted above. In Phase IV, the Working Group will assess patterns of misconduct both alleged and documented and apply these patterns to the individual cases under review.

I'm going to stop there for a second.

Given that you reviewed this document before it was approved and may have -- may or may not have made some edits to it, do you know what it means by a distinction that's being drawn between documented -- alleged and documented allegations of misconduct or patterns of misconduct?

A. As I sit here today, do I know what this is referring to?

Q. Yeah.

A. No.

Q. Okay. What is the difference between alleged patterns of misconduct and documented patterns of misconduct?

A. Wait, hold on.

I don't know.

Q. Okay. So the next sentence says, and this is in that paragraph: The Working Group will



apply heightened scrutiny to any cases impacted by said pattern and make appropriate recommendations for relief in the interest of justice, unless substantial evidence exists to overcome the impact of the "defendant's" involvement.

See that?

A. Detective's involvement.

Q. Did I -- didn't I say that?

A. You did not.

Q. Let me ask it again so I ask the question correctly for the record.

The Working Group will apply heightened scrutiny to any cases impacted by said pattern and make appropriate recommendations for relief in the interest of justice, unless substantial evidence exists to overcome the impact of the Detective's involvement.

A. I see that.

Q. Okay. What is the -- what is the heightened scrutiny?

A. I don't know what the heightened scrutiny. It just says it would apply heightened scrutiny.

Q. Okay. Is there a legal source or an



authoritative source the Working Group looked to to come up with the heightened scrutiny analysis?

A. I don't know.

Q. Did you ask?

A. I don't know.

Q. You don't know if you asked?

A. I don't remember.

Q. Okay.

A. No, I don't remember.

Q. No, that's fine, that's fine.

Is there -- and what does it mean that the -- they will make appropriate recommendations for relief in the interest of justice, unless substantial evidence exists to overcome the impact of the "defendant's" involvement. That last section or that last phrase, what do you understand that to mean?

A. Detective's involvement.

Q. Did I -- oh, god, I'm sorry. I meant detectives. It's getting late for me too.

A. I read it to mean -- I understand it to mean what it says.

Q. Okay. Let me ask if you agree with this.



A. Sure.

Q. Those phrases combined, meaning that once the Working Group concludes that there's a pattern of misconduct, both alleged -- or once the Working Group finds that a pattern of misconduct exists, it will apply a heightened scrutiny, which requires them to make appropriate relief in the interest of justice, unless there's substantial evidence to overcome the detective's involvement.

A. That's what it says.

Q. Okay. In other words, the pattern and practice evidence creates the presumption that the conviction lacks integrity, unless there's proof that rises to a substantial level to overcome that presumption.

A. That would have to be based on the facts of -- of the case.

Q. Of course it would.

A. Yeah.

Q. But that's what the --

A. I don't know.

Q. -- sentence is saying. That's what the instruction is saying.

A. The instructions say what the

instructions say.
Q. Do you agree though that once the Working Group concludes that there's a pattern of misconduct it is required to find -- or to vacate the conviction in the interest of justice, unless there is substantial evidence to overcome that presumption?
A. I don't know that they're required to do that. They're required to reach whatever conclusion they reach based upon the assessment of their cases.
Q. But that's not what -- what you just said is not what this document says (indicating), right?
A. I said whatever I just said.
Q. No, I understand.
What you just described is not what's written into this protocol for the Working Group. The protocol says something different.
A. Counsel, what I can tell you is that when the Working Group made their recommendations, they made them based upon their review of the case itself, their review of the allegations, any other information that they may have gathered, and they



made a recommendation.
Q. Do you know whether the Working Group presumed that the conviction had to be vacated in the interest of justice based on a pattern of misconduct?
MS. BAGBY: Objection, calls for speculation.
You can answer if you understand.
THE WITNESS: I would have to see the actual case recommendations in order to answer that question, because I don't recall.
BY MR. MORAN:
Q. You don't have an independent recollection of that happening?
A. I don't have an independent recollection of the wording they used in their recommendations to be able to answer that question.
Q. Okay. Give me one second.
Are you aware of any requirement that shifts the burden of establishing the integrity of the conviction to the State's Attorney's Office after or once the Working Group finds that a pattern and practice exists?
A. Oh, I'm sorry. Can you say that again?
Q. Yeah.



Are you aware of any requirements that shifts the burden of establishing the integrity of the conviction to the State's Attorney's Office once the burden -- or once the Working Group finds that a pattern and practice exists?
A. I don't know that I quite understand your question.
Q. Sure. Tell me what you don't understand.
A. Yes. The shifting the burden to the state's attorney and the rest of whatever you said.
Q. Right.
A. Yes.
Q. So Working Group concludes there's a pattern and practice in this case.
A. Okay.
Q. All right. And the Working Group believes that the State's Attorney now is obligated to establish the integrity of the conviction.
Are you aware of any situation where that happened?
A. Where -- where the Working Group said, Now the State's Attorney you're required to



establish ...
Q. Yeah.
A. I don't even understand your question, so I'm going to say no.
Q. Well, you know what -- you know what burden shifting is, right?
A. I'm sorry?
Q. You know what burden shifting is, right?
A. I know what burden shifting is --
Q. Yes, yes.
A. -- in the context of litigation, yes.
Q. Okay. Now, in the same -- in the same vain as burden shifting, are you aware of any situation where the Working Group advised the State's Attorney's Office that after it concludes or once it concludes that a pattern exists of misconduct involving any specific detective for a case it's reviewing, that the State's Attorney should be required to prove or establish the integrity of the conviction?
A. I don't recall that.
Q. Are you aware of -- I want to show you -- did you ever attend a meeting or maybe it's a Zoom conference, whatever, where Peter Neufeld

attended, and he provided a presentation or an overview of the Working Group and the necessity of its work?
A. No, I don't believe so.
Q. Okay. That doesn't ring a bell at all?
A. That doesn't ring a bell.
Q. All right. I'm going to pull up another exhibit for you.
The name Cordell Williams, you -- I think you said you have a vague recollection of Cordell Williams?
A. Super vague.
Q. Super vague.
A. Super vague.
Q. Tell me what you remember.
A. I remember that Cordell Williams was a case reviewed by the Working Group. I also remember that Cordell Williams had a post-conviction matter pending before Judge Gaughn.
Q. Uh-hmm. Anything else?
A. That's it.
Q. That's it. Okay.
The -- do you remember whether it was --



A. Excuse me.
Q. -- a murder case or a different kind of case?
A. I believe it was a murder case.
Q. Do you know whether like it involved shooting or some other violence that caused the murder?
A. I remember it involved some violence that caused a --
Q. Yeah, they usually do, right?
A. -- that caused the murder. That's all I remember.
Q. The manner or methodology of the crime?
A. I don't remember any specifics about the case.
Q. Okay, all right. That's fine.
MR. MORAN: We're going to take a quick break for a second.
(Discussion off the record.)
THE VIDEOGRAPHER: Going off the record at 2:18 p.m.
(Recess taken.)
THE VIDEOGRAPHER: And beginning media 4, the deposition of Risa Lanier. We're back on the



record at 2:31 p.m.
MR. MORAN: Okay. Can you do me a favor and read back that last question? I can't remember where we were.
(The record was read as follows:
Q. Do you know whether like it involved shooting or some other violence that caused the murder?
A. I remember it involved some violence that caused a murder.
Q. Yeah, they usually do, right?
A. -- that caused the murder. That's all I remember.
Q. The manner or methodology of the crime?
A. I don't remember any specifics about the case.)

BY MR. MORAN:
Q. Okay. So we were just talking about what you remember about the Cordell Williams case.
Do you remember at all what the Working Group recommendation was?
A. Yes.
Q. What was the recommendation?
A. Just taking a beat.
I think it was vacatur in the interest of justice.
Q. Okay. And do you have a recollection



of asking any questions or requesting any information from the Working Group?
A. I don't remember.
Q. Do you remember any issues or having to discuss any issues about the recommendation with the Working Group?
A. I don't remember.
Q. Okay. Do you even know -- or strike that.
Do you know as you sit here today whether the Cordell Williams case was the first recommendation the State's Attorney's Office had received from the Working Group?
A. I don't remember.
Q. All right. I'm going to give you something to look at regarding the case, and that will be as soon as I find it.
I'm going to represent to you, as I'm digging up this exhibit for you, a couple of facts to consider.
Cordell Williams was convicted of a double murder that involved the shooting deaths of two individuals in which Cordell Williams was convicted on an accountability theory.

Okay. Does that ring a bell at all?
A. No.
Q. Okay. Cordell Williams was accused of, for lack of a better way to put it, being the person who drove to the crime scene and then driving away from the crime scene with the shooter.
Does that ring a bell at all?
A. No.
Q. Okay. Does the name David Evans ring a bell at all?
A. No.
Q. Do you have a recollection as to which detective or detectives were involved in investigating the Cordell Williams case?
A. I do not.
Q. Does the name James O'Brien ring a bell?
A. James O'Brien rings a bell as to one of the detectives involved in this Working Group project.
Q. Apart from that, do you know him to have had any involvement with the Cordell Williams case?
A. I don't recall.
Q. Here we go. All right.



I want to give you a document to look at.
A. Sure.
(Deposition Exhibit No. 4, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. So we're looking at Exhibit No.?
THE COURT REPORTER: 4.
BY MR. MORAN:
Q. -- 4, and this is the -- entitled Affidavit of David Evans. Do you see that?
A. I see that written there, yes.
Q. Okay. Have you ever seen this document before?
A. I don't know.
Q. Okay. So take a quick look at it, see if you can familiarize yourself with it, and let me know when you're done.
A. Okay.
Q. All right. You've had a chance to review the affidavit?
A. I did.
Q. Okay, great. So I want to go over a



couple parts of it with you.
First of all, I'll represent to you that David Evans was convicted of the shooting as well, and given a life sentence, but then it was reduced to six years because he was I think 17 at the time of the crime, so he got -- he was supposed to be sentenced as a juvenile.
David Evans wrote this affidavit, according to the affidavit, which is on page 2, at least he signed it on August 13, 2017.
You see that?
A. I see that.
Q. Okay. And I believe he was convicted in 1995.
Would you agree with me that David Evans has made inculpatory statements in this affidavit about himself? And if you want to look specifically at paragraph 7.
A. Paragraph 7 reads: In a awful case of mistaken identity, I shot and killed two individuals Myron Cochran and Billy Johnson at that restaurant, and ran back to Cordell's car with an unmarked police car behind me giving chase.
Q. Okay. Does that sound like an



inculpatory statement to you?
A. David Evans, the author of this affidavit, indicates they shot and killed two individuals.
Q. Well, he shot and killed two individuals.
A. Correct. This person.
Q. Yeah.
A. Yes.
Q. Yes.
Do you agree with me by signing this affidavit, writing it and signing it, assuming this is really his affidavit, he's waived his right to remain silent about the crime.
A. He's made statements incriminating himself in this -- in this affidavit.
Q. Okay. He's not remaining silent, right?
A. He is not remaining silent.
Q. Okay. Which of course he has a right to do under the Fifth Amendment if he so chooses, right?
A. Yes.
Q. Okay. The affidavit describes the events according to David Evans leading up to the

Page 194

actual shooting. Would you agree?
A. That's fair, yes.
Q. Okay. So in paragraph 1, I'm going to paraphrase a little bit, but he indicates that he was at a party with Cordell Williams at a mutual friend's house and that Cordell Williams provided a ride -- ride home for those going his way.
Is that fair?
A. He says that on a particular date at 12:00 a.m. after a night of partying, he was at a mutual friend's house. Cordell Williams was providing a ride home for those going his way.
That's what it says --
Q. Okay.
A. -- in No. 1.
Q. And in paragraph 2, he indicates that while at the party he brandished a gun so prior to letting him into the car Cordell popped the trunk and told him he had to put the gun into the trunk.
A. That's what it says in paragraph 2.
Q. Okay. Would you agree that according to paragraph 2, at least according to David Evans, Cordell Williams has knowledge of the gun in the trunk?

Page 195

A. That's fair to say.
Q. Paragraph 3: As we were blocks away from my house, I thought I saw rival gang members in a restaurant who had been trying to shoot me.
Paragraph 4: I demanded Cordell to pull over, pull over. He did.
Paragraph 5: I told Cordell to -- and this is in quotes -- "pop the trunk and wait right here. I want to see if that's these -- and then he uses the N word, end quote.
A. Uh-hmm.
Q. You see those paragraphs?
A. I see those paragraphs.
Q. Okay. Would it be fair to say that according to David Evans he instructed Cordell Williams to pull over?
A. Yes.
Q. And Cordell Williams followed his instruction to pull over.
A. That's what it says in No. 4.
Q. Okay. And in No. 5, he instructed Cordell to pop the trunk and wait here.
A. Correct.
Q. While he goes and checks -- I'm going

Page 196

to paraphrase, but to see if that's the individuals that --
A. Yes.
Q. That's the individuals.
A. That's the people, yes. That's what No. 5 says.
Q. All right. Would you agree with me that Cordell Williams has knowledge that David Evans has asked for the area of the car where the gun is located to be opened up?
A. Yes.
Q. And that he wants to go in and confront certain individuals.
A. He wanted to go and see if that's those people.
Q. Right, exactly. Okay.
A. Well, that's not exactly. It says he wants to see. It doesn't say confront but see.
Q. Okay, he wants to see.
And the implication is that he was going to take the gun with him to go see those people, right?
MS. BAGBY: Objection, calls for speculation.
You can answer.

Page 197

BY MR. MORAN:
Q. Now --
A. It says what it says.
Q. I understand it says what it says.
Now I want -- now I'm asking you these questions as someone with, what is it, like 25 years experience in criminal prosecutions?
A. Sure.
Q. Okay. A prosecutor reading this would understand that David Evans is a potential witness to a murder involving himself and Cordell Williams, true?
A. He's a defendant.
Q. Defendants can be witnesses, right?
A. Sure.
Q. They can testify, can't they?
A. Sure.
Q. In fact, David Evans could take a plea and testify against Cordell Williams as a witness, right?
A. He could have.
Q. Right.
In this context, David Evans has written an affidavit years later describing the

events that took place, right?
A. He is -- he has written an affidavit.
Q. And if the State were considering whether to try Cordell Williams for the murder in 2017 after this affidavit is written, a prosecutor would consider David Evans as a potential witness, right?
MR. BECKER: I'm going to object on speculation grounds.
MS. BAGBY: You can answer.
THE WITNESS: They could.
BY MR. MORAN:
Q. And one of the things a prosecutor may want to elicit is that David Evans told Cordell to pull over and pop the trunk, right?
MR. BECKER: Same objection.
THE WITNESS: A prosecutor could make whatever -- I don't know -- I -- they could consider him as a witness and ask him any questions based upon his affidavit.
BY MR. MORAN:
Q. Okay. And one of the implications of his affidavit is that Cordell Williams knew the gun was in the trunk and knew David Evans took the gun



out of the trunk to go and see the individuals.
A. One of the impli -- one of the implications -- I'm sorry.
What were -- what were your words?
Q. One of the implications of the affidavit is that Cordell Williams -- actually, not an implication. He expressly states it, Cordell Williams told him to put the gun in the trunk.
Therefore, Cordell must have known the gun was in the trunk, right?
A. Yes.
Q. And one of the implications by telling Cordell to pop the trunk and wait here is that he was going to take the gun out of the trunk and go in to wherever these individuals were, take it with him to wherever these individuals were?
MR. BECKER: I'm going to object on speculation grounds.
BY MR. MORAN:
Q. Do you have to speculate?
A. I mean, that's -- you are asking me to speculate.
Q. So you, as a career prosecutor, can't answer that question?



A. What is -- what are you asking me?
Q. I'm asking you --
A. Ask that question again because I got lost in it.
Q. Is this evidence that Cordell Williams knew there was a gun in the trunk and knew David Evans had taken the gun out of the trunk? This affidavit?
A. There --
MR. BECKER: Objection speculation.
BY MR. MORAN:
Q. Go ahead.
MR. KUBLY: You can answer.
THE WITNESS: Thank you.
There -- Cordell Williams knew that the gun was in the trunk, yes.
Whether or not he knew that he actually took the gun out of the trunk after he popped it is not reflected in this affidavit, whether Cordell Williams knew that.
BY MR. MORAN:
Q. Right.
So would a prosecutor who's going to charge the crime be able to rely on this affidavit



to find probable cause exists for a felony murder charge against -- or not -- I'm not -- sorry, not felony murder -- for an accountability murder charge against Cordell Williams?
MR. BECKER: I'm going to object --
MS. BAGBY: Objection.
MR. BECKER: -- calls for a legal conclusion and speculation.
MS. BAGBY: And form of the question.
You can answer if you understand.
THE WITNESS: Maybe.
BY MR. MORAN:
Q. You don't know?
A. I said maybe.
Q. Okay. If Cordell Williams knew the gun was in the trunk and Cordell Williams allowed -- pulled over as David Evans instructed him so David Evans could confront rival gang members and allowed David Evans to get the -- the gun out of the trunk to do that, would that be sufficient evidence or would that be evidence consistent with an accountability theory of murder?
MR. BECKER: Objection, again calls for a legal conclusion, speculation.

THE WITNESS: What you are asking is not reflected in this document?
BY MR. MORAN:
Q. Why do you say that?
A. Rival gang members -- rival gang members, not in there, but -- and also, I think in your question there was also whether or not Cordell Williams knew that he had taken the gun out.
Nevertheless, my answer is maybe.
Q. Okay. Tell me something.
A. Uh-hmm.
Q. If the Working Group had obtained this affidavit, would you want to know about it in your review of their report?
A. I can only assume, yes. As I sit here today, I don't know however many years ago this was, but, sure, I would want to know about it.
Q. Because David Evans makes admissions in this affidavit that arguably could be used by a prosecutor in a case -- in a retrial against Cordell Williams. Would you agree?
A. Because there are -- there's information in this affidavit about the case.
Q. And it's relevant to the case, right?



A. It's relevant.
Q. And of course, you'd want to know about all relevant information that the Working Group had acquired in its investigation of the case, right?
A. After reading the report, I would want to know about information that they reviewed, had access to, and would question anything in the report that I had questions about.
Q. Okay.
A. And ask to see anything in the report that led them to their particular conclusion or analysis that I thought was germane in helping me to reach my own conclusion.
Q. And would this -- is this information germane to your conclusion as to whether to accept or reject a recommendation by the Working Group regarding Cordell Williams?
A. I don't know. I would have to read the entire report.
Q. Sure.
Just from looking at this affidavit, you can't say whether this is something you would think you'd want to see though?
A. I don't --



Q. Or know about I guess.
A. I don't recall anything about this case, so --
Q. I understand.
A. -- I don't know.
Q. Okay. I'm going to give you another exhibit. I just lost the copies. Oh, there we go.
(Deposition Exhibit No. 5, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. You're looking at Exhibit No. 6, I believe, or 5?
Okay. Exhibit No. 5 is -- the title of is it Meeting with David Evans, and in parentheses, via zoom, Evans in custody, close parentheses. And on the bottom is CCSAO-WG 134847. That's the first page.
A. Uh-hmm.
Q. Have you seen this document before?
A. I don't know.
Q. Okay. I take it you don't have any memory of seeing --
A. I don't have any memory.



Q. Okay. You're free to look at it if you want, but I can point to you -- I'm not going to ask you to go over the whole thing. There's a specific thing I want to ask you about, okay?
Understanding what we just looked at from David Evans, the affidavit, if the Working Group had the affidavit in hand before it interviewed David Evans, would you expect the Working Group to ask David Evans questions about that affidavit?
MR. BECKER: I'm going to object on speculation grounds.
THE WITNESS: I would expect them, if they're interviewing a witness, to ask any questions that they need to ask in order to conduct their investigation. Whether it's using a police report or anything, whatever they needed to ask, whatever they needed to use in order to conduct their investigation.
BY MR. MORAN:
Q. Did the Working Group need to ask that -- David Evans about the affidavit?
A. I don't know. They conducted the investigation.

Q. You reviewed it though.
A. I reviewed what?
Q. The investigation.
A. I did.
Q. You reviewed the recommendation.
A. I did.
Q. And what is it, like -- the reports generally were in the neighborhood of like 20 to 30 single-spaced pages?
A. They were voluminous.
Q. Yeah. They contain a lot of information to review, right?
A. They were voluminous, yeah.
Q. Okay. Would you expect based on your own experience as a prosecutor that the Working Group would have asked some questions of David Evans about his affidavit?
A. I would have expected them to ask whatever questions they needed to ask in order to investigate the case.
Q. And to you, it doesn't matter what those questions are?
MS. BAGBY: Objection, argumentative.
You can answer.



THE WITNESS: Okay.
BY MR. MORAN:
Q. I'm not trying to argue with you.
A. No, no, no.
Q. Because it sounds to me like your position is, Hey, ask whatever you want, it's not my concern, and I'm trying to find out are you concerned that they're asking certain questions to conduct a fair and impartial investigation?
MS. BAGBY: Objection, mischaracterizes what her testimony has been and is also argumentative.
BY MR. MORAN:
Q. Go ahead.
A. My question remains the same. I would expect them to ask any questions that will help them to investigate the case, whatever questions those needed to be.
Q. Okay. I want to direct your attention to Exhibit No. 5.
A. Yes.
Q. On the bottom of the first page, beginning with the paragraph: He knows that he grabbed the gun and moved on and shot the guys. Frank didn't get out of the car because there was



only one gun. It never reached the point where either of them had ever killed anyone.
Okay. I only read that for context.
A. Okay.
Q. But what -- what I'm going to ask you about is below that.
A. Okay.
Q. Cordell is asking why, what do you want, what for? Don't do nothing crazy or stupid. Maybe 20 seconds.
Okay?
A. Yes.
Q. In the sequence of events, Cordell's asking -- he's describing Cordell Williams' telling him, Don't do anything crazy or stupid, okay? Now --
MS. BAGBY: Objection -- oh, I'm sorry. I thought you were done.
BY MR. MORAN:
Q. Assuming that Cordell Williams makes that statement to David Evans before David Evans goes in to see the individual, is this a statement that you want questions asked about? That Cordell Williams said, Don't do anything crazy or stupid?
MS. BAGBY: Objection, form.



MR. BECKER: Objection, speculation.
THE WITNESS: It appears to be a ques -- a part of their -- I'm assuming this is the Working Group's investigation -- or I'm sorry -- interview with David Evans.
I don't know what they asked. This is just a summary of their investigation -- a summary of their interview.
BY MR. MORAN:
Q. Well, you, as someone with, you know, I think 25 -- if I get the years wrong, I'm sorry. I think 25 years pros --
A. Close enough.
Q. -- being a criminal prosecutor.
I mean, you've handled enough cases to know that certain questions should be asked in order to investigate a crime and find out whether there's sufficient evidence to support bringing a charge or not, or whether you can meet your burden or not.
And you reviewed these reports from the Working Group, and you can -- are you able to tell from reviewing reports whether the Working Group followed up on certain lines of questioning?

A. I can't tell.
Q. Okay. If you knew that David Ev -- or I'm sorry -- Cordell Williams said, Don't do anything crazy -- or, Don't do nothing crazy or stupid to David Evans before David Evans took the gun and went in to -- or strike that. Let me ask it a better way.
If you knew that Cordell Williams said, Don't do nothing crazy or stupid before he went in to confront the individuals, would you as a prosecutor ask any questions to follow up on that of David Evans?
A. I may.
Q. What kind of questions?
A. I'd ask any questions based upon that statement and the facts of the case that I was aware of, based upon my review of any other statements made or documents or whatever have you, in order to help me make a decision.
Q. Do you agree with me that a crime for which Cordell Will -- Williams was convicted of accountability under a murder -- or murder under an accountability theory requires that he has a certain level of intent?



MR. BECKER: I'm going to object. It calls for a legal conclusion.
MS. BAGBY: You can answer.
THE WITNESS: Does that mean I can answer? Okay.
There has to be elements of accountability present in order to bring charges.
BY MR. MORAN:
Q. And one of those elements is some intent to participate in a crime, right?
MR. BECKER: Same objection, calls for a legal conclusion.
THE WITNESS: There has to be evidence that he somehow -- a person who is charged on an accountability theory somehow aided, abetted, during, before, or after the commission of a crime, and whatever else the jury instruction says that I can't remember right now.
BY MR. MORAN:
Q. Uh-hmm.
So if Cordell Williams was aware that David Evans had the gun and took the gun in to see these individuals --
A. Sure.



Q. -- does Cordell Williams have the requisite intent for a crime?
MR. BECKER: Objection, calls for a legal conclusion.
MR. KUBLY: You can answer.
MR. MORAN: Oh, actually, let me --
(Simultaneous cross-talk.)
MS. BAGBY: I'm actually going to object as well because I actually think it misstates what the legal requirements are, but --
BY MR. MORAN:
Q. Here we go. This is 720 ILCS 5/5-2C.
You know that statute, right?
A. Maybe. I'd have to see it.
Q. A person is legally accountable for the conduct of another person when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets or agrees or attempts to aid such other person --
THE COURT REPORTER: I apologize. I'm sorry. Could you slow down a little bit, Counsel?
MR. MORAN: Yeah, sorry.
THE COURT REPORTER: That's okay.



BY MR. MORAN:
Q. -- in the planning or commission of the events.
Does that sound like what you understand --
A. Sounds like the law.
Q. Sounds like the law.
If Cordell Williams knows David Evans -- or if Cordell Williams knows about the gun in the trunk, stops the car so David Evans can get out and see about these individuals that David Evans thought had tried to shoot him before, gives him access to the gun, and knows David Evans is taking the gun to go see about those individuals, do you agree that Cordell Williams now has the requisite level of intent under an accountability theory?
MR. BECKER: Again, object on the grounds that it calls for a legal conclusion.
THE WITNESS: Maybe, maybe.
Because mere presence without more doesn't necessarily make you accountable.
BY MR. MORAN:
Q. It's not mere presence though, is it,

if he pulls over to confront, or pulls over to allow the person out of the car, gives access to the gun, waits for -- and allows the person -- or so the person can go, the shooter can go and see about these individuals.
MR. BECKER: I'm going to object as argumentative and again calls for a legal conclusion.
THE WITNESS: And I -- my answer is going to be, I mean, that's an argument to be made in for -- if in favor of accountability, and there's an argument to be made against accountability in that situation.
BY MR. MORAN:
Q. Exactly, right.
That's a great point.
A. But it's an argument.
Q. It's an argument to be made for accountability, and there's also an argument in those facts to be made against accountability, right?
A. Yeah.
Q. Exactly.
And you, as the person reviewing the



report from the Working Group, would want to know the facts on both sides of that argument given that they're conducting an impartial investigation, right?
A. I would want to know -- I would read their report and ask any questions that I needed to ask in order to make and derive -- in order to make my own conclusion or recommendation.
Q. Is it your understanding under the -- you've heard of the common design rule, right?
A. Yes, common plan scheme design.
Q. Right.
When two or more people engage in a common criminal design or agreement, any acts in furtherance of that design or agreement committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of those further acts.
Does that sound like the law to you?
A. Sounds like the law.
Q. Okay. You'd agree with me that under the common-design rule, proof of the common design need not be supported by words of agreement but may



be drawn from the circumstances surrounding the commission of the act.
A. They may be drawn, yes.
Q. Okay. And those circumstances, some of which are described in David Evans' affidavit, right?
MR. BECKER: Again, I'm going to object. It calls for a legal conclusion.
THE WITNESS: I would say that the circumstances here, there are arguments in favor of and certainly against.
BY MR. MORAN:
Q. Okay. Do you agree that under the common design rule that the defendant who's been charged need not share the intent of the shooter, the person who committed the act?
MR. BECKER: Again, I'm going to object. It calls for a legal conclusion.
THE WITNESS: Can I see the law? Does it say that in there?
BY MR. MORAN:
Q. You sure can.
A. Thank you.
Q. Give me one second.



And I'll tell you exactly what I'm reading from. It's a case called People v. Williams. Here we go.
(Deposition Exhibit No. 6, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. All right. So I've given you the case People v. Williams with the citation 216 IL App (1st) 133459, 64 N.E.3d 1086.
Do you want me to direct you to where I was reading from?
A. You can if you want to.
Q. Okay. Well, you wanted to see what I was reading from, right?
A. Yeah, sure.
Q. Okay. So I had cited the statute. And if you look at the paragraph number 38, the Court cites the statute.
A. Uh-hmm.
Q. Agreed?
A. Paragraph 38.
Q. Yes.
A. Yes.

Q. Okay. And I indicated that a defendant may be deemed accountable for acts performed -- actually, I didn't say this, but I will say it.
In this case, under paragraph 30 -- in paragraph 38, the court cites or states, Defendant may be deemed accountable for acts performed by another pursuant to a common criminal plan or purpose.
Do you see that?
A. I see that.
Q. And that cites a case called People v. Taylor, right?
A. It does.
Q. A 1995 case.
And then the next paragraph, which is paragraph 39, it describes the common design rule that I read earlier. Do you see that?
A. Paragraph 39?
Q. Yes.
A. Yes.
Q. Okay. And further down, it says, Proof of the common design need not be supported by words of agreement but may be drawn from the circumstances surrounding the commission of the act.



A. That is true.
Q. Okay.
A. It says that.
Q. I want to direct your attention to the top of the page.
Now, I will tell you that this is in the context of a post-conviction proceeding --
A. Okay.
Q. -- where the court views the evidence I believe in the light most favorable to the State. At least that's what may have been said earlier, but I'm not citing this for that purpose.
I want you to see the facts here that were used to obtain the conviction.
A. Okay.
Q. When the defendant noticed a group of rival gang members on the platform, he told Brooks to stop the car and then went to the platform to confront them.
A. I'm sorry. Can you point me to the page of where you're reading this from?
Q. I'm sorry. It's paragraph 40 on --
A. Oh, paragraph 40.
Q. But it's in the second column.



And mid sentence: When defendant noticed a group of rival gang members on the platform, he told Brooks to stop the car and then went to the platform to confront them. Once on the platform, and after Sapp announced they were "hook killers," defendant approached Lejman and swung a cane at Lejman. In the ensuing chaos, co-defendant Hardy grabbed the victim and both men fell onto the train tracks.
And then further down, it describes how the victim was electrocuted on the train tracks.
A. Uh-hmm.
Q. Okay. You see where I'm reading at.
A. Yes.
Q. Okay. And do you see one of the consistencies here in this case with Cordell Williams case, at least according to David Evans' affidavit, is that David Evans instructed or saw what he believed were people who had tried to shoot him and instructed Cordell Williams to stop the car, right?
A. Yes, the only consistency I see is that he noticed -- that he told someone -- that someone told Brooks here to stop the car. Who is he? He



being Evans -- that the defendant, meaning Williams in this case, right, is the defendant? Yes.
Q. Uh-hmm.
A. Told Brooks to stop the car.
Q. Yes.
A. Okay.
Q. And then defendant Williams got out of the car, right?
A. Defendant Williams got out of the car.
Q. So did David Evans?
A. He -- wait, I'm sorry. He told Brooks to stop the car and went to the platform to confront them.
Q. And David Evans got out of the car after he told Cordell Williams to stop, right?
A. Sure.
Q. And then defendant Williams went to confront the group he saw, right?
A. Yes.
Q. And according to David Evans, he went to see the people he saw.
A. Well, one says confront -- Williams says confront; Evans says he wants to see if those were the people.

Page 222

Q. Yes.
And obviously in this case, People v. Williams, the fact pattern is that a fight ensued in which the victim fell -- was pushed onto the el tracks and was electrocuted.
A. Uh-hmm.
Q. You have to say yes or no.
A. Oh, I'm sorry, yes. I'm sorry.
Q. Okay. And in the fact pattern for David Evans, he went into this restaurant, according to him, shot two people he thought were the ones who had tried to shoot him, but it turns out, according to David Evans, it was a tragic mistake, right?
A. That was a very compound question.
Can you say it again or have it repeated?
Q. The difference here is that the victim was electrocuted after the confrontation versus the case involving David Evans and Cordell Williams where the victims were shot after David Evans went in to see if they were the ones he was looking for.
A. Yes. In this case, there is no shooting. There is the defendant swinging --

Page 223

swinging a cane at Lejman, who I assume is one of the victims, and someone fell on the track. Both men fell on -- onto the train tracks.
Q. Right.
A. And one was electrocuted.
Q. Now, I'm going to jump down to the next page under paragraph 43, another point of law cited by the court.
A. Okay.
Q. Where the court is recounting from another case.
The court also noted that to be accountable for the shooting under the common design rule, defendant need not have shared Grimes's intent to fire the rifle; rather, by setting out to commit a crime with Grimes, defendant rendered himself legally accountable for the shooting.
You see that?
A. I see that.
Q. Is that a fair -- or do you agree with that reading of the law in this case?
A. I agree that that's what's written in this opinion.

Page 224

Q. Okay. In paragraph 45, which is on the second column on the same page.
A. Yes.
Q. In the parenthetical following the cite to the Supreme Court case: Our supreme court acknowledged that the common design rule does impose liability for murder, even though a misdemeanor was originally intended.
Is that a fair reading of the law to your knowledge?
A. That is a fair reading of the words written in this opinion.
Q. I know, I understand that. My question is a little different.
Is that a fair reading of the law to your knowledge?
A. I didn't read the Terry case, so I can't -- I don't know.
Q. Do you know whether that -- based on your 25 years as a criminal prosecutor, whether that is the law? That murder can -- that common design rule can impose liability for murder -- murder, even though a misdemeanor was originally intended?

Page 225

MS. BAGBY: I'm going to object. This is beyond the scope of this witness. The purpose of her deposition, why she is here. She is not here as an expert witness in criminal law and criminal procedure. While I know she's knowledgeable, extremely knowledgeable about criminal law, we're so far away from Cordell Williams that --
MR. MORAN: We are --
MR. BECKER: And I'm going to object on the grounds that it calls for a legal conclusion.
MR. MORAN: Yeah, I know. And so first of all, there's no scope written in the subpoena. You don't get to decide scope. I appreciate where you're coming from --
MS. BAGBY: Well, your -- actually, I'm going to back up, because the subpoena I believe called for 30(b)(6) witnesses, and that is still an issue to be -- under dispute that hasn't been ruled on by the court, and you're now going down the road of her speaking for the office in other -- any other context --
MR. MORAN: No.
MS. BAGBY: -- and getting her expert opinion, and that is not why she's here.

Page 226

MR. MORAN: I'm entitled to ask these questions. You've made your objection. I'm going to move on. This is not a 30(b)(6) witness. You haven't designated her, so I'm ready to move on.
MS. BAGBY: Right, I have not designated her.
BY MR. MORAN:
Q. Okay. And yes, your witness -- or not your witness. I'm sorry.
You do have expertise in criminal law. Is that fair to say?
A. I am a 24-year practitioner.
Q. In criminal pros --
A. I know what I know.
Q. Okay. So my questions about the law and your knowledge of the law, not necessarily what's written on the page, whether you can agree that that is the law based on your 25 years of experience. Are you able to do that?
A. Counsel, I --
MR. BECKER: I'm going to object on the grounds that it calls for a legal conclusion.
MR. MORAN: That question? Whether she can do it?

Page 227

BY MR. MORAN:
Q. Okay. Go ahead.
A. Can you read that back? Or can you --
Q. So --
A. -- say it back, yes.
Q. Yeah, I'll say it back. I'm asking you questions --
A. Yes.
Q. -- based on your 25 years experience as a criminal prosecutor whether you can tell me that this is what you understand the law to be, given that you are the person who reviewed the recommendation by the Working Group regarding Cordell Williams?
A. I understand what accountability is.
Q. Okay. This is from paragraph 47, our -- and this is another statement by the court on a point of law.
Our supreme court has held there is no question that one can be held accountable for a crime other than the one that was planned or intended, provided it was committed in furtherance of the crime that was planned or intended.
Do you agree that that is a fair

Page 228

statement of the law?
A. I agree.
Q. Okay. So I'm going to ask you about another exhibit because we're motoring along.
By the way -- strike that.
I'm going to show you the report that the Working Group submitted to you.
(Deposition Exhibit No. 7, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. Ms. Lanier, Exhibit No. 7 is the report dated May 10, 2022, People v. Cordell Williams entitled Working Group Memorandum of Findings and Recommendation.
My question is: Do you recognize the document?
A. It looks like one of the recommendations that they would have -- that the Working Group would have submitted. And at the top it says, People v. Cordell Williams.
Q. Right. Do you have an independent -- or strike that.
Does looking at this document right

Page 229

now, and I know you haven't looked through all of it, do you have any recollection of seeing this before?
A. I'm sure -- I saw all recommendations.
Q. No, I know you did.
A. Yeah.
Q. I'm trying to find out if you remember this particular one out of all the recommendations, now that it's in front of you.
A. I remember seeing a Cordell Williams' recommendation, yes.
Q. Okay. Perfect.
So I'm going to go through a couple things.
A. Sure.
Q. If at any time you feel like you need to read more, you just let me know, okay?
A. Okay.
Q. So let's take a look at the first paragraph.
A. Okay.
Q. In the very first line: Working Group recommends a vacatur based on the interest of justice.

And below, the Working Group writes: Our loss of confidence in the integrity of the conviction and our accompanying recommendation is based on the totality of the circumstances underlying his case, including, but not limited to, facts learned during our investigation and the overarching pattern of misconduct, coercion, physical and psychological abuse, and bias exhibited by certain Area One detectives.

Did I read that correctly?

A. You did.

Q. Okay. Do you agree with me that totality of the circumstances should necessarily include if the Working Group is aware of it the affidavit of David Evans?

A. It could. It looks like the totality of the circumstances would be the facts learned during their investigation, whatever that might encompass.

Q. Okay. What -- obviously that's a phrase that's used in the legal community quite often.

What do you understand "totality of the circumstances" to mean?



A. Oh, my gosh.

Exactly what it says. All of the circumstances.

Q. Okay. Now, would you agree with me that because that affidavit we looked at from David Evans is dated 2017 --

A. Yes.

Q. -- it was not available at the criminal trial that occurred in 1995.

A. I would agree with that.

Q. Okay. And if David Evans has asserted his right to remain silent in 1995, that would mean that he could not be called as a witness against Cordell Williams by the state, would you agree, in 1995.

A. In 1995, if he had asserted his right to remain silent.

That depends, because there are circumstances where even during a pending case, we may call a codefendant. They may not want to testify. Doesn't mean that we don't call them to the stand.

Q. Would you call him if you know he's going to take the Fifth? I mean, can you even --



(Simultaneous cross-talk.)

A. Depends --

Q. -- do that if he's --

A. I don't know --

Q. -- going to take the Fifth?

A. -- that you can.

Q. Sound like it would be prejudicial to the defendant.

A. I don't know.

Q. Okay. Either way, if he's not talking, the information in that affidavit is not available to the state in 1995.

Would you agree with that? At least from David Evans.

A. If he did not say it prior or during the prosecution at some point, if it's not written anywhere, then I would say it's not available.

Q. Okay. Do you want to take a look at -- there's a section called State's Evidence At Trial. It's a few paragraphs. It's like five short paragraphs long, I think.

Do you want to review it to answer any further questions, or do you want to skip over it? I mean, it's up to you if you want to



familiarize yourself with what the State alleged to the extent it matters to you, but I'm going to ask questions about something else. I'm giving you an opportunity to just review this for context.

A. Why don't you ask your question and I'll let you know.

Q. Okay. We're going to go down to a section entitled Summary of Interviews Conducted By the Working Group, which is on the ninth page of the document, page 9. If you go to the page 10, that describes the interview with David Evans, okay?

I'm going to ask you to take a look at that and tell me -- or strike that.

I'll represent to you, and you can read it if you want, but there's no mention of the affidavit in the summary of the interview with David Evans. If you need a moment to review it, you're certainly welcome to look at it.

A. Okay.

Q. Do you want to read through the entire section or that summary of his -- I'm just asking if you want to take a moment to do that.

A. If you're going to ask me a question about something that's on the paper, then --

Q. It's perfectly fine --
A. -- I don't know.
Q. -- if you want to do that. I'm just asking if that's what you're going to do.
A. Yeah.
MR. MORAN: Off the record for a second.
THE VIDEOGRAPHER: Going off the record at 3:22 p.m.
(Brief pause.)
THE VIDEOGRAPHER: Back on the record at 3:24 p.m.
BY MR. MORAN:
Q. Okay. So, Ms. Lanier, you've had a chance to read through the section in the report regarding this interview with David Evans, and -- is that true?
A. I did.
Q. Okay. And would I be correct in saying that there's no mention of the affidavit in the summary of the interview with David Evans?
A. You are correct.
Q. Okay. And from reading the summary of the interview with affad -- or with David Evans, can you tell whether just based on your reading



whether the subject of the affidavit even came up?
A. I cannot tell.
Q. Okay. Now, we looked at a summary of an interview that was typed out earlier.
Do you remember that? I think it was Exhibit No. ...
A. 5.
Q. 5, yes, okay.
And do you remember I pointed out that one line where David Evans says that Cordell Williams told him, Don't do any -- Don't do nothing crazy or stupid, or something like that?
A. Yes.
Q. Okay. Do you see any reference to that comment in the summary of the interview with David Evans in the report that was submitted by the Working Group?
A. No.
Q. Okay. I'm going to direct your attention to another section further below. And this is a summary of -- and this is letter C on page 11, and the heading is Cordell Williams.
And it's summary of the interview with Cordell Williams by Ms. Hawilo, or taken by



Ms. Hawilo, and there are 16 subparagraphs, if you look through to the page 13.
Okay. Paragraph 2, there's a description of the event or part of the events at issue, and I'm going to read it: Williams stayed at the party for two to three hours and then decided to drive home. He had to work the next day. He offered rides to anyone who wanted them. At some point before Williams himself got in the car, Evans asked for his keys. He gave him the keys. Williams believed Evans may have put the gun in the trunk at that time, but Williams did not see him, nor did they discuss it.
Do you see that?
A. I do.
Q. Okay. Do you agree that there are inconsistencies between that paragraph and what David Evans alleges in his affidavit about Williams' knowledge of the gun?
A. Yes.
Q. Okay. And one of the inconsistencies is that David Evans states that Cordell Williams told him to put the gun in the trunk and popped the trunk for him to do it.



And Cordell Williams states, according to this summary, that Evans asked for his keys, which he gave to Evans, and he's unsure -- can only say -- or it says may have put -- Evans may have put the gun in the trunk but did not see him do it.
Do you agree that those are inconsistencies with David Evans' affidavit?
A. I would say that they say different things, yes.
Q. Okay. I'm going to drop down to another page, and this is the page, page 14, under the heading Affidavits.
And do you see this paragraph contains a description of the affidavits that were submitted to the Working Group.
A. Yes, I see.
Q. Okay. Do you want to read the whole paragraph before I ask a question about it?
A. Sure.
Yes.
Q. Okay. Do you agree with me that there is a single sentence describing the contents of David Evans' affidavit in the paragraph under the

heading Affidavits?
A. Yes, there's one sentence.
Q. Okay. And that sentence indicates that according to the affidavit Cordell popped the trunk when Evans told him to do so, but that neither Cordell nor Evans had planned any shooting.
Did I read that correctly?
A. You did.
Q. Okay. Now, according to the law we looked at earlier, and if you want to look back at it, People v. Williams, there doesn't have to be an agreed plan between Cordell Williams and David Evans to do a shooting for Cordell to be convicted under an accountability theory, agree?
MR. BECKER: And I'm going to object, calls for a legal conclusion.
THE WITNESS: I would say that People v. Williams, without having read the entire case, is specific to the facts as presented in this particular case. That would be People v. Williams.
BY MR. MORAN:
Q. You did agree with the statement of the law that they don't have to share the common plan to commit the same crime.



A. I would agree with under an accountability theory there has to be evidence of the -- there has to be evidence that a party has aided or abetted some time, either before or during the commission of the crime, in order for them to be found -- in order for that law to apply.
Q. Right.
What I asked though was didn't you agree earlier that it is the law that the two individuals, the defendant and the person who actually commits the shooting, do not need to have shared the same intent under an accountability theory.
MR. BECKER: Again, objection, calls for a legal conclusion.
THE WITNESS: I think there has to be a little bit more there, Counsel.
BY MR. MORAN:
Q. Okay. What do you think needs to be there?
A. Well, that there has to be some plan to commit some sort of crime, not just the intent.
Q. Right.
A. But there has to be a plan to -- to



actually commit a crime.
Q. Is it a crime to confront somebody with a gun? At least in 1995.
A. That sounds like aggravated assault?
Q. Yeah.
A. That's what it sounds like. And I'm just reading more facts into that than maybe you are actually providing for me, in that --
Q. That's okay.
A. -- you actually walk up to someone, brandish the gun, and actually threaten them in some sort of way, if that's what you mean by confronting them. Then that would be aggravated assault.
As opposed to someone walking up to someone in the street and saying, Hey, look at my new gun --
Q. Okay.
A. -- which would not be.
Q. And that's clearly not what happened in this case. David Evans did not, according to his affidavit, walk up and say, Hey, look at my new gun, right?
A. He did more than that.



Q. Yeah, he did more than that.
Is possession -- was possession of a handgun in 1995 a crime?
A. I assume it might have been.
Q. Yeah.
A. If you did not have proper credentials maybe in -- and whatever the law may have been in '95, I don't know. I was in college at that time, so ...
Q. All right. So --
A. I don't know the state of the law in Illinois.
Q. The point that the Working Group is making, that neither Cordell nor Evans had planned any shooting, your understanding of the law, under your understanding of the accountability theory, is that point relevant that whether they planned to shoot him or not -- or shoot these two individuals or not?
MR. BECKER: Again, I'm going to call -- it calls for a legal conclusion. I'm going to object again.
THE WITNESS: It's a factor to take into consideration.

BY MR. MORAN:
Q. Okay. Now, we talked about what's in the report about the affidavit.
A. Yes.
Q. Let's talk about some things that aren't in there.
A. Okay.
Q. The aff -- the paragraph does not indicate that David Evans said Cordell Williams told him to put the gun in the trunk, right?
A. No, the report does not say that.
Q. The report does not indicate that David Evans told Cordell to pop the trunk and wait here while I go see about these individuals.
A. No, the aff -- the report does not say that.
Q. The report does not indicate that David Evans told Cordell Williams to pull over because he thought he saw two individuals who had tried to shoot him, agreed?
A. That the report doesn't say that?
Q. Yeah.
A. No, and neither does the affidavit.
Q. I think paragraph 2 or 3 says --



actually, it's paragraph 3: As we were blocks away from my house I thought I saw rival members in a restaurant who had been trying to shoot me.
A. Yes, which is different than what you just said.
Q. So the information in paragraph 3, would you agree is not contained in the report?
A. It is not contained on page 14 under E, Affidavits. I have not read the entire report.
Q. Understood.
A. Yeah.
Q. Under the section entitled Affidavits, there's no mention of paragraph 3 of David Evans' affidavit in which he says, while we were blocks away from my house, I thought I saw rival members in a restaurant who had been trying to shoot me.
A. Agreed.
Q. Okay. And that sentence or that -- yeah, that sentence is also not contained in the summary of the interview that you read through earlier just moments ago --
A. One moment.
Q. -- on page 9. Yeah, go ahead.
A. Correct.



Q. Okay. And there's no indication in the paragraph under Affidavit or in the interview section with David Evans a couple pages before that he -- he told Cordell Williams -- or strike that -- that he said -- that he left the car with the gun, shot the two individuals, and then ran back to the car, or went back to the car, Cordell Williams' car.
A. I'm sorry. Please say that again?
Q. Sure.
The rest of the affidavit describes that David Evans went into this restaurant, shot the two individuals, and then went back to Cordell Williams' car.
That information contained in the affidavit is not contained under the paragraph in the report entitled Affidavits or in the paragraph -- or the section of the report describing the interview with David Evans.
A. That's correct.
Q. Okay. I want to -- now you see the section under Recommendation and Reasons?
A. I do.
Q. Okay. This is a -- starts on page 14, and it's a lengthy section. I will give you an



opportunity to read it, if you need to, to answer the question, but we'll go off the record.
Before I do that, I want to ask you: Do you have any recollection of reading in this report the two competing arguments we discussed earlier that the affidavit may give rise to; that there's a case to be made that Cordell Williams could be guilty under an accountability theory, and there's a case to be made that he isn't?
A. I have no independent recollection what's contained in this report.
Q. Okay. Let's assume for a minute it's not in there.
Is that something you would have made a point to ask the Working Group about if you had known that this affidavit existed?
MR. BECKER: And I'm going to object on speculation grounds.
THE WITNESS: I don't know.
BY MR. MORAN:
Q. What would you need to --
A. I don't know what --
Q. -- know to answer the question?
A. I would need independent knowledge of

Page 246

what I thought, what I asked when I read this report and what I asked for; what I saw, what I needed to see, what our conversations were in order to answer your question.

Q. So you need to sort of go back in time and be back in the moment.

A. That's fair to say.

Q. Okay. And you're unable to answer that question based on your own experience as you sit here today as a person who did these reviews with the Working Group and also has 25 years of criminal prosecution experience.

A. Counsel, the only thing I can tell you is that as I read these reports, I would have asked questions and asked to see documents. Anything that I felt I needed to see in order to have conversations and come to my own conclusion and recommendations.

Q. If there's no other mention of David Evans' affidavit in this report, other than that one sentence we looked at --

A. Uh-hmm.

Q. -- how would you know to ask any other questions about the affidavit and the information

Page 247

in it?

MR. BECKER: Objection, speculation.

THE WITNESS: I would just be speculating, because I don't recall what I wrote. But if there's a mention of any report or affidavit or -- or even an interview, if I felt necessary, I would have asked to see it so that I could review it.

BY MR. MORAN:

Q. I understand.

So let's go back up to that section on the affidavit, and this is on page 14.

A. 14.

Q. Okay. So the sentence is right in front of you.

A. Yes.

Q. Is reviewing that sentence right now -- or based on your review of that sentence right now, is that the type of information that you would require further information about in reviewing a report regarding Cordell Williams, or this report about --

MR. BECKER: Objection, speculation.

BY MR. MORAN:

Q. Just let me finish. This report -- let

Page 248

me ask it again.

Just looking at the sentence describing David Evans' affidavit in this report, is that something that you can say from looking at that sentence that would lead you to ask for more information about David Evans?

A. I can't tell you what --

MR. BECKER: Objection, speculation.

THE WITNESS: Sorry.

BY MR. MORAN:

Q. That's okay.

MR. BECKER: Go ahead.

THE WITNESS: I can't tell you what I did when I received this report.

As I sit here today, I would ask to see all of the affidavits listed in section E.

BY MR. MORAN:

Q. You would?

A. As I sit here today, I would ask to receive to --

Q. Okay.

A. -- to review all of the affidavits listed in section E. As to what I did at the time, I do not recall.

Page 249

Q. No, fair enough, fair enough.

So assuming you did back then what you're saying you would do today, asking to see all of the affidavits identified in section E, you'd expect those email -- or affidavits to have been emailed to you?

A. Maybe, unless we were meeting in person to talk about the case.

Q. Okay. And then you would have -- so obviously if they emailed an affidavit to you, we should have a record of that in one of the emails we received from the State's Attorney's Office.

A. I assume you would.

Q. Yeah.

And --

A. If it was emailed, yes.

Q. And if the affidavit was saved to the SharePoint file, there should be an electronic record of that being saved at some point.

A. It should appear in the SharePoint file.

Q. Right.

And there should be metadata showing when it was saved and by whom, right?

A. I assume if those things are usually

done. You're asking the non IT tech -- tech person here.
Q. That's all right. If you don't know, you don't know. Don't worry about it.
A. I assume.
Q. Okay. And so let's take a look at another exhibit real quick. This may help you remember some of it.
MR. MORAN: Here we go.
(Deposition Exhibit No. 8, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. So we're looking at Exhibit No. 8 right now. And take a quick moment to read through that, please, so -- and let me know when you've had a chance.
A. Okay. Thank you.
Q. Okay. So Exhibit 8 is a couple of emails. The top one is from you to the members of the Working Group indicating that you received the Cordell Williams' report or the memo on Cordell Williams, and you're looking forward to a discussion that has been planned for Monday.



A. Okay.
Q. Is that right?
A. That's what it says.
Q. Okay. And on the bottom is an email from Vincent Southerland to you indicating that the -- the memo for the Cordell Williams case is attached, and he credits Maria Hawilo for taking the lead on it.
A. Correct.
Q. Okay. Now, according to this, you got the memo on May 10, 2022; is that right?
A. Yes. Assuming there's an attachment somewhere that's not reflected on here, yes.
Q. Right, right.
And so whatever conversation you would have had with the Working Group about Cordell Williams obviously would have occurred after May 22 or May 10, 2022.
A. Yes.
Q. All right. Now, I'll represent to you that Cordell Williams' case was officially vacated and nolled on October 7 of 2022, okay?
A. Okay.
Q. Do you have any independent



recollection of that?
A. Of the case being nolled on that particular day?
Q. Yeah.
A. I just know the case was nolled.
Q. Yeah, okay. No, that's fair.
So we're going to be talking about that time frame, May --
A. Okay.
Q. -- 10, 2022, to October 7th of 2022.
A. Sure.
Q. Ah, here we are.
(Deposition Exhibit No. 9, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. We're looking at Exhibit 9, and this is a series of emails. And you're welcome to read through the whole thing if you want to, but I'm going to focus on the one at -- the two at the top on the first page.
A. Okay.
Q. Okay. And this -- these are emails dated July 8th of 2022.



A. Uh-hmm.
Q. Okay. The one below the one on the very top is from Maria Hawilo. She writes: We would love to touch base regarding Cordell Williams. We have a call scheduled for this afternoon at 3:00 Central Time. We can speak from 2:30 to 3, if you're free then or 4:15.
See that?
A. I see that.
Q. Okay. And at the top you responded that you have doctor's appointment, but you provided information regarding the recommendation for Cordell Williams.
And you wrote: In short, the S.A. has agreed with your recommendation, and will be providing relief at the next court date.
You see that?
A. I see that.
Q. Okay. You agree that's a response to the status of the Cordell Williams memo provided by the Working Group based on the email you received below it?
A. I don't.
Q. Why not?

Page 254

A. Because in the subject line, it just says regarding Jamie De Avila follow up at the top of the email.
Q. Right. So we can look down below at the email that you received from Maria Hawilo, and it looks like the topic of conversation apparently switched from Jamie De Avila follow-up to Cordell Williams.
A. I don't know that my response is to Cordell Williams or if it's in response to Jamie De Avila.
Q. Okay. So if you want to read through the whole thing, you're welcome to. We can start at the -- the very first email to see if the context fits the Cordell Williams case or --
A. Okay.
Q. -- De Avila.
And there's an email from Elizabeth Mazur --
A. Uh-hmm.
Q. -- on the page labeled CCSAO WG 157186, which was written on May 3rd, and describing her rep -- informing you that she represents Mr. De Avila, and there's a FOIA request that was

Page 255

submitted.
Do you see that?
A. I see that.
Q. Okay. And then there's an email above it from Maria Hawilo dated May 3rd responding to Liz Mazur thanking her for the representation agreement and indicating she'll check and get back to her on the common law record.
A. I see that.
Q. Okay. And above that, there's an email from Liz Mazur dated May 25th of 2022 asking if police reports regarding Mr. De Avila's case can be shared.
You see that?
A. I see that.
Q. Okay. And above that email is an email from Eliz -- or Maria Hawilo dated May 25th of 2022 indicating that she's going to ask about the police reports.
A. Okay.
Q. Do you see that?
A. I see that.
Q. And that's on page WG 157185.
A. Yes.

Page 256

Q. Okay. Above that is another email from Elizabeth Mazur thanking Maria, indicating she got a response on the FOIA request from the Chicago Police Department, and then indicating one of the responses in bold with more information.
Do you see that?
A. Wait, I'm sorry.
I'm sorry. From Elizabeth Beth to Maria.
Q. Yes. Indicating she --
A. Yes, yes, yes. I see that --
Q. -- that she's contemplating a challenge to the bolded response --
A. Yes.
Q. -- in court.
A. Yes, yes.
Q. Okay. Above that, which starts on the next page, WG 157184, at the bottom Maria Hawilo wrote on June 30th to you asking how you're doing and checking in on next steps.
And then she writes: I'd like to provide these police reports if at all possible. How do you think we should proceed?
A. Yes.

Page 257

Q. And above that, you wrote back on July 5th indicating you'd been at a conference, you just reviewed the email, and requesting a couple of days to respond. You see that?
A. I see that.
Q. And then she wrote back to you on July 5th of 2022 indicating her -- you know, of course you had time to respond, and then providing her availability and what she planned on doing, indicating she's available to schedule a meeting if you want.
A. Yes.
Q. Okay. And above that, you wrote in response on July 7th of 2022: Would you like to speak briefly about Cordell Williams?
See that? And this is on page WG -- CCSAO-WG 157183.
A. On July 7th.
Q. Yes.
A. Yes, I see that.
Q. Okay. And then above that, Marc Kadish wrote on July 7th yes. We understand that his last court date on 6/30 the case was continued again. We were informed that a state's attorney did not

Page 258

appear. Is that --
A. I see Marc -- yes, I see that response.
Q. Okay. Maria Hawilo then responded on July 8th saying Hi, Risa, thanks very much. We would love to touch base regarding Cordell Williams, and then providing her availability.
A. Uh-hmm.
Q. You see that?
A. Yes.
Q. Okay. And the email at the very top of the page you write you have a doctor's appointment, you don't know how long it will last, but in short, the state's attorney has agreed with your recommendation and will be providing relief at the next court date.
A. Yes.
Q. You see that?
A. I see that.
Q. Having gone through all of the emails, do you agree that you were responding that the state's attorney agreed with the recommendation regarding Cordell Williams?
A. I have no independent recollection of this. However, from the reading of the -- from the

Page 259

reading of this document, that's what it appears.
Q. Okay. Fair enough.
Now, assuming that as of July 7th, you're informing them or -- July 8th, I'm sorry, July 8, 2022 --
A. Yes.
Q. -- you're informing the Working Group that the state's attorney agreed with the recommendations regarding Cordell Williams.
Would it be fair to say that any conversation that you felt needed to be had with the Working Group about Cordell Williams to provide the State's Attorney with more information would have occurred between May 10, 2022, and July 8, 2022?
A. I think that's fair to say.
Q. Okay. Having gone through these emails --
A. Uh-hmm.
Q. -- do you have any memory of having that type of conversation?
A. I don't remember any conversations about this case.
Q. Okay. And if a call had been

Page 260

scheduled, typically did you -- when you scheduled calls with the Working Group, did you utilize like the Outlook or whatever was on the computers to send invites and things of that nature?
A. No.
Q. Okay. How did you -- how did you communicate scheduling times for --
A. They used Zoom which we didn't use, and so we would discuss the scheduling. And usually it was Vincent who would send the Zoom link.
Q. Okay. And the Zoom link would be contained in an invite or just a regular email?
I'm trying to find out if it's --
A. Definitely in an email. For sure in an email.
Q. Okay.
A. I don't know that there was a -- no, there were no invitations. I don't know about invitations from Zoom. But I know for sure it would appear in an email. And if I didn't get it, I would ask, Send me the Zoom link.
Q. Okay. What I'm trying to find out is, No. 1, did you use the sort of service on Outlook or any of the other email services where you can

Page 261

invite people to the conversation, or where you accept an invitation?
A. No, I would get a Zoom link.
Q. Okay. And the second question was if you did utilize that information, it would be in the information -- it would be saved somewhere along --
A. It would be on some computer.
Q. At the State's Attorney's Office.
A. System somewhere in the Cloud. I don't know.
Q. Okay, fair enough. Fair enough.
All right. I want to give you another document to look at real quick.
A. There were also phone calls sometimes too.
Q. Would there be any documentation anywhere that you're aware of at the State's Attorney's Office --
A. Oh.
Q. Let me get the question.
Any documentation you're aware of at the State's Attorney's Office of a scheduled phone call or meeting or Zoom meeting to go over specific

cases?
A. It would be in -- in emails probably.
Q. Uh-hmm.
A. Yeah, yeah.
Q. Okay. So if there was something scheduled, we should have an email of it from the production by the State's Attorney's Office.
A. If there was some sort of meeting scheduled and we were appearing via Zoom or even in Marc Kadish's office. Sometimes we met and sometimes we did phone calls. There would usually be an email precipitating that saying, Hey, let's meet.
Q. Okay. I'll give you another exhibit real quick. Here we go.
(Deposition Exhibit No. 10, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. Okay. We're looking at Exhibit No. 10, and this is an email from you to Kimberly Foxx dated June 22, 2022, and you advised her that attached are the cases I would like to discuss during tomorrow's meeting. The Cordell Williams



case is from the Working Group who is proposing action be taken.
You see that?
A. I do.
Q. Okay. And you can see under the attachments, there's an attachment called Cordell Williams Work Product Memo May 5 2022?
A. Yes.
Q. And there's a document called Pattern and Practice evidence Williams.
You see that?
A. I do.
Q. Okay. Prior to submitting these documents to State's Attorney Foxx, would you have had any conversations you thought were necessary with the Working Group in order to prepare to answer any questions from the State's Attorney?
A. I can't recall what happened in this particular case, but that's common practice.
Q. Okay. You'd want to make sure as a matter of practice that when you're moving a recommendation up to the State's Attorney you're confident and you have all the information you need to answer any of her questions.



A. That's fair.
Q. Okay. Would it be fair to say then that if a conversation occurred with you and the Working Group about Cordell Williams and their recommendation, it would have occurred sometime between May 10, 2022, and June 22, 2022?
A. Yes.
Q. Okay. Now, the email refers to a conversation that apparently is scheduled to take place, according to this email, on June 23, 2022, true?
A. That's what it says.
Q. Okay. Was that a meeting planned specifically to discuss Cordell Williams?
A. I don't know.
Q. All right. If -- by the way, any recommendation that comes from either -- I know it's written into the Working Group policy that the State's Attorney makes the final call on whether to accept or reject or modify the Working Group's recommendation, right?
A. To accept, reject -- I don't know if the word "modify" was in there, but she just -- she makes the last call.



Q. Okay. I mean, it says what it says, right?
A. It says what it says.
Q. Fair enough. Okay.
If a decision comes from the Conviction Integrity Unit -- or not a decision, but a recommendation comes from the Conviction Integrity Unit to vacate a conviction, can anyone at the State's Attorney's Office approve of that decision without informing the State's Attorney? In other words, does it have to go to the State's Attorney, or can that decision be made by someone below the State's Attorney?
MS. BAGBY: I'm just going to object to the time frame.
MR. MORAN: Oh, yeah, that's fair.
MS. BAGBY: As opposed to --
MR. MORAN: No, that's a fair point.
BY MR. MORAN:
Q. So we're talking about during your time on the executive committee when you would have obviously been aware of things going on at the Conviction Integrity Unit.
During that time period, could or

Page 266

were decisions regarding recommendations by the Conviction Integrity Unit made by the State's Attorney?
A. Yes.
Q. Okay. Could those decisions be made by someone below the State's Attorney if the recommendation was to vacate a conviction?
A. Depending on -- it would depend on the case.
Q. Like the -- the seriousness of the crime?
A. No, it would depend on the case itself.
Q. Like what factors would --
A. For example, there was a slew of cases involving drug convictions that were --
Q. Are you talking about Watts?
A. Yeah, the Watts cases, yes.
So some of those decisions were made by persons other than the State's Attorney.
Q. Okay. How about something more along the lines of Cordell Williams. Someone's convicted of murder, facing a very long -- or has a very long sentence, maybe a life sentence or somewhere short of that but very long, and the work -- and the

Page 267

Conviction Integrity Unit makes a recommendation to vacate the conviction on the basis that there's a lack of integrity in the conviction.
Does that recommendation have to go to Kim Foxx?
A. When I was tasked with making those decisions, I would discuss it with the State's Attorney.
Q. Okay. You'd want to make sure she -- she knew about it and approved of it.
A. Yes.
Q. Okay. Would one of the reasons be for making sure she was in the loop or -- yeah, that there's a potential for press coverage of vacating a conviction, you want to make sure if she's asked about it that she's aware of the situation and can answer questions, if necessary?
A. Is that the primary reason? No.
It's so that she knows that this is what's happening in her office, and do you agree with this, regardless of what collateral things may happen.
Q. Sure, no, I understand that. I just -- I wanted to know if it's one of the reasons to make

Page 268

sure she's aware, or is it even a factor that you consider?
A. No, because we have no idea what the press will pick up on and what they won't.
Q. By the way --
A. Gotta love the press.
Q. -- should the work Working Group be making -- consider as factor media reports about the detectives and allegations in the media reports that the detectives engaged in misconduct?
A. They were free to consider any information that they gathered as a result of their investigation to make their decisions.
Q. Is the media a reliable source of information in deciding -- for the Working Group to consider in making its recommendations? Like media reports about the detectives?
Actually, let me ask it a better way.
A. Yeah.
Q. Do you consider the media to be reliable and credible source of information for either the Conviction Integrity Unit or the Working Group to consider in making recommendations about whether to vacate a conviction?

Page 269

A. I believe that the media may point to information that they may want to gather or consider in invest -- during their investigation or investigate further. They can be a source of information.
Q. You wouldn't have any concerns that the Working Group or the Conviction Integrity Unit relied in part on media reports in reaching its conclusions?
A. If it's just on the media report itself?
Q. As a factor. I'm asking about as a factor.
A. No. I'm saying that if it's just based upon the media report itself without any sort of follow-up as to whether or not the information is reliable, then that's a concern in any situation.
Q. Okay. So in a situation where the Working Group or the Conviction Integrity Unit is relying on media reports about the detectives, your expectation would be that if you're going to look at the media reports, make sure you follow up to confirm that whatever you're relying on is credible and accurate.

A. Go get the information that they're talking about.
Q. Fair enough. Okay.
THE WITNESS: I'm going to need a break in like 5 minutes.
MR. MORAN: Why don't we take one now.
THE WITNESS: That's fine.
THE VIDEOGRAPHER: Ending media 4, the deposition of Risa Lanier. Off the record at 4:06 p.m.
(Recess taken.)
(Deposition Exhibit No. 11, Witness Lanier, was marked for identification 10/29/2025.)
THE VIDEOGRAPHER: And beginning media 5 of the deposition of Risa Lanier. Back on the record at 4:17 p.m.
BY MR. MORAN:
Q. Okay. You ready to get back going?
A. Yes.
Q. Okay. So we just marked the handwritten notes you made earlier in -- I can't remember what the question was in response to, but it is Exhibit No. 11.



So is that fair to say?
A. Yes.
Q. Okay, great.
I want to direct your attention back to Exhibit No. 10?
A. Yes.
Q. And tell me to the best of your recollection everything you discussed with Kim Foxx regarding Cordell Williams.
MS. BAGBY: Objection. That's privileged. You can answer if --
MR. MORAN: No, I know. I knew you were going to do that.
MS. MEADOR: We just have to make our record.
MR. MORAN: We gotta make a little bit of a record.
MS. BAGBY: I was like, Wow, you just came out with that --
(Laughter.)
MR. MORAN: Yeah, I know, yeah.
MS. BAGBY: -- straightforward, and I didn't have a look at that.
BY MR. MORAN:
Q. Did you discuss with Kim Foxx the



affidavit of David Evans?
MS. BAGBY: Objection, privileged.
MR. MORAN: And you're citing deliberative process.
MS. BAGBY: Yes.
BY MR. MORAN:
Q. Did you discuss with Kim Foxx whether there is sufficient evidence to retry Cordell Williams?
MS. BAGBY: Objection, deliberative process privilege.
BY MR. MORAN:
Q. Did you discuss with Kim Foxx any of the specific interviews that were identified in the memo that was dated May 22nd -- May 10th of 2022?
MS. BAGBY: Objection, privileged.
BY MR. MORAN:
Q. Did you discuss with Kim Foxx whether the decision to vacate the conviction was based on a belief in innocence in any way, shape, or form?
MS. BAGBY: Objection, privilege.
BY MR. MORAN:
Q. Okay. I'm going to show you another exhibit.



(Discussion off the record.)
(Deposition Exhibit No. 12, Witness Lanier, was marked for identification 10/29/2025.)
BY MR. MORAN:
Q. All right. We're looking at Exhibit Number --
MS. MEADOR: 12.
BY MR. MORAN:
Q. This is a document, it doesn't have a title on it, but the file name indicates that it's pattern and practice evidence. And you can see at the very top it's got a heading, A, Pattern and practice evidence provides a separate independent ground for vacatur in the interest of justice.
Do you see that?
A. I see that.
Q. Okay. Have you seen this document before?
A. Possibly.
Q. Do you recognize it?
A. I don't recognize it.
Q. Okay. Want to page through it a little bit and just see if you're familiar with any parts

of it.
A. Yes, I've seen this before.
Q. Okay. And what do you understand it to be?
A. This is based upon -- this is without reading the entire document, it appears to be a document that discusses what it says at the top, which is pattern and practice evidence.
Q. Okay. And do you have an independent recollection of this document?
A. I don't.
Q. Do you remember whether this is a document you discussed with State's Attorney Foxx?
MS. BAGBY: Objection, privileged.
MR. MORAN: Whether the discussion happened I don't think is privileged.
MS. BAGBY: Well, you didn't ask her you asked her whether the -- you asked her whether this was part of the discussion.
MR. MORAN: Yeah, whether they discussed it. That's not privileged.
MS. BAGBY: Whether they discussed a particular topic?
MR. MORAN: Yeah.



Okay. It's your privilege to assert.
BY MR. MORAN:
Q. Okay. And you can see this document is 19 pages. And actually I'm going to put the Bates label on the record, CCSAO-WG 10889 all the way through CCSAO-WG 10907.
Now, if this -- assuming this is the pattern and practice memo that was referred to on Exhibit No. 10 that you emailed to Kim Foxx, this would be the memo that outlines the Working Group's final assessment on practice -- pattern and practice evidence that was submitted in connection with the Cordell Williams memo.
A. Assuming, yes.
Q. Okay. And you would expect that the Working Group in this pattern and practice memo included all of the relevant information that supported its conclusions and recommendation related to pattern and practice.
A. I don't know what's in this document without reading it.
Q. No. Would you expect the Working Group to have included all the relevant evidence that



supports their conclusions and recommendation related to pattern and practice?
A. All of the relevant evidence, sure, that --
Q. Okay.
A. Well, all of the evidence that they found relevant, yes.
Q. Understood.
Now, at the very top, it starts off with a description of the protocol?
A. Uh-hmm.
Q. You see we went over that earlier that the Working Group will perform a case by case assessment of each individual case and a pattern assessment of all cases, which is called the pattern assessment, right?
A. Yes.
Q. Okay. Memo we looked at dated May 10, 2022, that would be the case-by-case assessment regarding Cordell Williams.
A. Sorry.
Q. You're free to look at both. In fact, you may want to keep that out for a second.
A. I'm sorry. The May -- which one? What



exhibit, Counsel?
Q. It is Exhibit Number -- the memo.
Exhibit 7.
A. Okay. Wait a minute. Ah, found it.
Okay.
Q. All right. So you've got the Exhibit 7 which is the memo conducting the actual case specific evaluation, which is described as the individual case assessment on the protocol for the Working Group.
And then you've got a memo discussing pattern and practice, which is defined as the pattern assessment under the protocol for the Working Group.
A. That's fair, yes.
Q. Okay. And it would have been your practice -- I know you don't remember, but would it have been your practice to read these two documents in conjunction with each other before passing it up to Kim Foxx?
A. Yes.
Q. Okay. And as we -- I was pointing out earlier that the protocol -- excerpts from the protocol are typed in italics at the top of the

first page on the -- on Exhibit No. 12.
A. Yes.
Q. Okay. Is it your understanding that the Working Group would also expand its consideration of the pattern and practice evidence beyond the seven detectives to any detective working in that time frame at the same police station or area? They call them areas, right?
A. They are called areas, yes.
I don't recall that.
Q. Okay. As you sit here today, do you believe that was the -- a part of the protocol for the Working Group to expand its consideration of pattern and practice evidence regarding detectives who did not participate in the underlying investigation of the conviction being investigated?
A. One more time, please.
Q. Sure.
The Working Group is investigating, for example, Cordell Williams' conviction.
A. Yes.
Q. All right. And so obviously there's certain detectives associated with that case, like Detective O'Brien, that the Working Group is also



investigating.
A. Yes.
Q. Okay. Is it your understanding the Working Group would also expand beyond Detective O'Brien and look at pattern and practice of other detectives who had no involvement in the Cordell Williams' investigation?
A. As it relates to -- the Working Group, in investigating all of the cases, looked at pattern and practice for all seven detectives.
Q. Of course.
A. Yes.
Now, are you referring to detectives beyond the seven?
Q. I am.
A. I don't know if that was done or not.
Q. Okay. Would it have been within the mandate of the Working Group to consider pattern and practice evidence against other detectives who were not named as one of the seven, or not one of the detectives who actually had a role in investigating the underlying conviction?
A. The appropriateness of that would depend on the case itself.



Q. Okay.
A. So I -- that's the only way I can answer that.
Q. I want to put it in another context.
Is it permissible to consider merely the proximity and relationship of individuals in determining whether someone committed an act? In other words, two people are in the same gang, one of the gang members is -- there's evidence of murder against one of the gang members.
Because that gang member is associated with other members in the gang and they hang out in the same proximity or territory, is it fair to assume that all of those gang members probably were involved?
A. Isn't that what RICO does? I'm just kidding. I mean, it kind of does, right?
If you're looking for a particular charge to determine who is involved, you look at who was involved, and whether there's evidence against that particular person in order to charge that particular case, if that's what you're asking me.
Q. You need specific evidence, right?



A. Yes. Against a particular person if you're looking to charge them with a particular crime.
Q. How about when you're assessing whether you can get other act evidence admissible or admitted into evidence?
A. Give me more, please.
Q. Can you -- can you bring in evidence of a gang member's membership in a gang without any proof that that membership in the gang is relevant to the crime?
A. There's a motion for that, and the judge will decide.
Q. Yeah, I know the judge will decide.
A. So it depends on the facts of the case and the evidence that's adduced during that motion.
Q. Okay. So in a situation where you have somebody who's accused of a crime and that person has -- is part of a group, like a gang, can you get in other misconduct by other gang members in order to help show that the person committed -- accused of committing the crime actually did commit that crime?
MR. BECKER: I'm going to object, calls for a

legal conclusion.
THE WITNESS: I don't believe that you can in a court of law as you're presenting evidence at trial.
BY MR. MORAN:
Q. Right. The -- that would essentially be guilt by association, right?
A. I don't know that the evidence would be admissible.
Q. Okay.
A. At trial in a criminal case.
Q. All right. Now, I want to direct your attention on the first page still, the last full paragraph before all the footnotes.
It says: Our protocol establishes that once we determine such a practice exists, we must apply the heightened scrutiny to any case under review impacted by such a pattern, and make a recommendation in the interests of justice unless substantial evidence exists to overcome the impact of said pattern.
And we read that earlier. Do you remember?
A. We did.



Q. Okay. And that's almost verbatim from the protocols that were written by the Working Group.
A. That is correct.
Q. All right. And then there's an explanation to how this standard difference -- is different from the standard applied by the Torture Inquiry Relief Commission.
See that?
A. I see the sentence, yes.
Q. Okay. Now, is it your understanding that they call it TIRC. Can we just call it TIRC?
A. We can.
Q. Okay. TIRC reviews cases pursuant to a mandate by law.
A. Yes.
Q. All right. And there's specific requirements under the law for the cases to be reviewed by TIRC.
A. That's fair to say.
Q. Okay. And TIRC is empowered to make recommendations that ultimately may result in a case being sent back to the circuit court to conduct an evidentiary hearing on whether torture



actually occurred, or whether there's enough evidence of torture to set aside the conviction.
A. Okay. Yes.
Q. TIRC by itself has zero power to vacate convictions.
A. Correct.
Q. And TIRC doesn't even recommend vacating convictions. All it recommends is sending a case to the circuit court for an evidentiary hearing.
A. Based upon their finding that torture existed, then I believe that's -- or that there's evidence of torture, yes.
Q. And the evidentiary threshold for TIRC to reach a conclusion that there's sufficient information for a case to go back to the circuit court for an evidentiary hearing, is that -- do you know what that standard is?
A. As I sit here, no.
Q. Okay. Do you know what the standard applied by the Working Group was to make a determination that a pattern of misconduct exists against any particular detectives?
A. A standard, no, no.



Q. Like what threshold of evidence is sufficient to reach a conclusion that a pattern exists, something along those lines.
A. I am not aware of any hard and fast, Oh, one allegation is enough, two allegations is enough, three, four.
I'm not aware of any firm standard.
Q. How about this? For example, are you aware of any standard -- and I know you -- I'm going to try and jog your memory, okay, so I'm going to give you examples.
A. Okay, sure.
Q. Are you aware of any standard where the Working Group must reach a conclusion that X number of allegations are found to be credible; and therefore, it can reach the conclusion that there is a pattern and practice?
A. I don't recall that.
Q. How about a standard in which the Working Group articulates that as long as there is X number of allegations against a detective, regardless of whether those allegations are proven or found to be credible, the allegations and accumulation are sufficient to find a pattern and

Page 286

practice?
A. I don't recall that.
Q. Okay. Are you aware of any standard that guides the Working Group into how much evidence it needs to find that a pattern and practice exists?
A. Numerically, no.
Q. Whether it's numerically or in any context.
A. No.
Q. Okay.
(Discussion off the record.)
BY MR. MORAN:
Q. Now, you can see the Working Group on the next -- sorry. Under A, there's a discussion on the second page or -- or mention on the second page in the last paragraph of Jon Burge.
You see that?
A. I do.
Q. Okay. Do you know the history of Jon Burge? Like when he was put under investigation? When he was fired?
A. As I sit here today, I don't recall that.

Page 287

Q. Okay. The Working Group in the next section describes the history of abuse and torture at the Chicago Police Department. It's on -- it starts on page 10891, which is the third page. You see that? It's under the heading Culture of Police Abuse: From Areas 2 and 3 to Area 1.
A. Yes.
Q. See that? Okay. Further on --
A. Excuse me.
Q. Bless you.
There is a discussion of Jon Burge, and I'm not going to go over everything that's said, but I'm going to paraphrase a little bit. So if you want to confirm what I'm saying, you're welcome to check it out. But discussion of Jon Burge, and his connection to the detectives being investigated, including James O'Brien, Kenny -- Kenneth Boudreau, and Jack Halloran and Stehlik -- or John Halloran and Stehlik.
What evidence is required, to your knowledge, whether -- actually, is there a standard that guides the Working Group in assessing what evidence is needed to draw a connection between Jon Burge and the individual detectives that were being

Page 288

identified in this report?
A. I'm sorry. Is there a what?
Q. A standard that guides the Working Group in establishing what facts are needed to establish a connection between Jon Burge and the detectives being investigated.
A. Not that I'm aware of.
Q. Okay. At the time Jon Burge was put under investigation, he was a commander at Area Three. Did you know that?
A. I'm sure I did.
Q. At some point --
A. I don't --
Q. -- right?
A. I don't recall where he was at the time.
Q. At some point Jon Burge was relieved of duty prior to him being fired. Did you know that?
A. Yes.
Q. Okay. Would you expect that to be mentioned in the Working Group's memo?
A. I don't know.
Q. If the Working Group is trying -- or strike that.
The detectives -- Detective

Page 289

Boudreau, Detective O'Brien, Detective Halloran -- the Working Group actually points out in this memo came up through the same detective class.
Were you aware of that?
A. As I sit here, I have no independent knowledge of what's contained in this document.
Q. Assume for a minute they came up in the same detective class and became detectives in 1990, around that time frame, okay?
Jon Burge has already been accused of misconduct related to the conviction of Andrew Wilson.
Do you know who Andrew Wilson is?
A. Maybe.
Q. Okay. Do you know the Wilson brothers were convicted of murdering two police officers?
A. Yes, thank you.
Q. Jackie Wilson was released from custody, I don't know, maybe two years ago?
A. Yes, I recall this.
Q. Okay. And Andrew Wilson was his brother, okay?
A. (Nodding.)
Q. Andrew Wilson alleged that he was

Page 290

tortured into giving a confession.
Did you know that?
A. I'm sure I did.
Q. Okay. There were actually physical injuries associated or to -- found on Andrew Wilson after his interrogation that was relied upon by the investigators who accused Jon Burge of misconduct.
Did you know that?
A. I recall there being injuries.
Q. Okay. The reason I'm asking you these questions is to find out what you remember now about --
A. Yeah.
Q. -- the connection with Jon Burge and the detectives that the Working Group is drawing a connection to.
A. Okay.
Q. As a commander -- I mean, obviously you've worked in a paramilitary type structure at the State's Attorney's Office where you have state's attorney, first assistant, chief deputy, and then bureau chiefs, and so on and so forth, right?
A. That is your characterization of it

Page 291

being paramilitary.
I worked in a structured office.
Q. Okay. Well, I asked you earlier what the chain of command was, and that's -- chain of command is a nomenclature for that type of structure, right?
A. Sure.
Q. Okay. Because --
A. If that's what you want to say.
Q. -- when I asked the question, you understood what I meant, right? When I said, What's the chain of command at the State's Attorney's Office, and you identified it?
A. Yes.
Q. Okay. And the police departments have a chain of command as well, right?
A. And so does my office now, a not-for-profit.
Q. Right, exactly.
A. Yes.
Q. And the police department at an area, do you know who the highest ranking officer is? What's the title of the highest ranking officer?
A. I would hope it's the superintendent.

Page 292

Q. The superintendent.
But the superintendent is not assigned to any particular area, right?
A. Right.
Q. That's at the headquarters level.
A. He would be the highest-ranking officer in the police department.
Q. The highest-ranking position assigned to an area --
A. Okay.
Q. -- or to a division or a bureau?
A. Yes.
Q. Do you know what that rank is?
A. I believe it's the commander.
Q. The commander, okay.
A. Yeah.
Q. Now, a commander obviously has a lot of responsibilities, right?
A. I assume without knowing what the responsibilities of a commander.
Q. As a first assistant, you can draw on your own experience and say, you were at the top of an office of 6 to 700 lawyers, you know that there's a lot of work in that type of position,

Page 293

right?
A. In the first assistant's position, yes.
Q. Okay. And would it be your role as first assistant, or even when you were deputy chief or something of that nature, to have regular interactions with frontline assistant state's attorneys on the specifics of their cases?
A. I did sometimes.
Q. Sure. There's --
A. Sure.
Q. -- always the exception.
A. Sure.
Q. But on a regular basis.
A. Day to day?
Q. So you'd be involved in the decision-making process on day-to-day cases for the frontline assistant state's attorneys?
A. No, that was a question mark. I said day to day?
Q. Or you're asking me day to day.
A. I'm asking you.
Q. Yeah, okay. Well, I'm going to ask you: Were you involved on a day-to-day basis with the frontline state's attorneys on the specific

Page 294

details and decisions of their cases? And we're talking about misdemeanors, small felonies, you know, things of that nature.

A. Not usually.

Q. And would it be your expectation that a commander also in the Chicago Police Department is not involved in the frontline detectives' day-to-day operations on the cases they're handling and the specific details?

A. Assuming that's not a part of what they do, then no.

Q. Okay. Is it sufficient in your mind to draw a connection between Jon Burge as a commander and a brand new detective, and say because that detective worked under Jon Burge as a commander that Jon -- that that detective now is more likely to have committed physical abuse or mental coercion of the individuals being investigated for crimes?

A. I would think it would be fair to draw a connection if the particular detective was engaged and found to have engaged in any sort of misconduct similar to that of Jon Burge to say that this misconduct -- as a brand new detective under Jon Burge, I could see a connection being drawn

Page 295

there.

Q. Sure.

A. Yeah.

Q. Sure.

And that's if the detective was found to have engaged in that misconduct, right? It has to be -- he has to be found to have engaged in it, and it must be similar, the same to what Jon Burge was accused of doing.

A. In the same vein.

Q. Yeah.

A. I mean, it doesn't have to be the exact same thing, but sure.

Q. Okay. So in the report that we were looking at, the pattern and practice report, the -- there's a description of how -- and you can see even in the title of this section that we were looking at, Culture of Police Abuse: From Areas 2 and 3 to Area 1. That because these detectives went -- detectives like Boudreau and O'Brien and Halloran started at Area Three and then eventually moved to Area One.

There's a description on I think pages 4 and 5 that -- or at least an explanation

Page 296

for the reasoning that the Working Group believes these individual detectives took with them a culture of abuse and misconduct from Areas Three to Area One.

If you want to take a look real quick, I'm paraphrasing obviously, but if you want to take a look real quick at those pages. This would be on pages 4 and 5.

A. Okay. I'm sorry. Can you repeat your question?

Q. You know, I'll have her read it back.

A. Oh, sure.

(The record was read as follows:

Q. Okay. So in the report that we were looking at, the pattern and practice report, there's a description of how -- and you can see even in the title of this section that we were looking at police abuse from Areas Two -- )

MR. MORAN: I'll reask it.

BY MR. MORAN:

Q. Okay. So you just reviewed the couple pages from the report, Exhibit No. 12, under the first heading --

A. Excuse me.

Page 297

Q. -- Culture of Police Abuse: From Areas 2 to 3, and I believe you looked at pages 4 and 5.

My question was: Do you agree that this generally is a description of how the detectives who worked under area -- or under Jon Burge while he was technically a commander at Area Three brought with them a culture of abuse to Area One?

A. I would agree that those detectives who worked -- that the -- excuse me -- that the documents, and I'm summarizing this, says generally that the detectives while working in one area would have -- that the transfer of them from one area to another did not mean that their culture was not transferred from one area to another.

Q. That's another way --

A. That they took -- they it with them.

Q. Fair enough, okay.

And you can see on the bottom of page 5, there's a short two sen -- or, yeah, one-sentence paragraph that says: Having established the relationship in close working environment, we now set out allegations against the detectives involved in Williams' investigation.

Do you see that?
A. I see that.
Q. Okay. Part of the analysis is that these detectives worked in proximity to each other at the same location. Would you agree?
A. Generally, sure.
Q. Okay.
A. Yes.
Q. In other words, the Working Group was drawing a conclusion that because these detectives worked under Jon Burge at Area Three they would have known each other, there were times they interacted and worked together; and therefore that is a factor that is considered in the conclusion that the detectives brought with them whatever culture of abuse existed with them to Area One.
Is that a fair statement?
A. Not just that, but also it says in -- on page 5 that some of these named detectives have been alleged to have worked in concert with "Boge" -- I'm sorry -- Burge. Foley, for instance, has been named in multiple complaints in civil suits as having worked with Burge to coerce claimants.



So it's more than just they worked under them, but they are also named as perpetrators in whatever -- it's a complaint or a civil suit -- as -- or there are allegations against them as perpetrators eliciting false statements or engaging in some sort of misconduct along with Burge or along with one another.
Q. Right. So someone like Foley who's name is one of the seven -- do you need to take that call?
A. I'm sorry, can I -- yes.
MR. MORAN: Yeah, go ahead. We'll go off the record.
THE VIDEOGRAPHER: Going off the record at 4:52 p.m.
(Brief pause.)
THE VIDEOGRAPHER: Back on the record at 4:53 p.m.
BY MR. MORAN:
Q. Okay. And I think it's important to point out what the Working Group has described in these paragraphs are allegations, right? What you were just reading from, allegations of abuse or -- against Foley, a variety of other people, right?



A. Well, I don't know if the rest of the document contains any court findings or anything like that against them, but I just --
Q. We're just talking about these pages right here.
A. Just that particular paragraph --
Q. Yeah.
A. Yes.
Q. Okay. And the -- I guess the point is -- or strike that. I want to come down to another question for you, okay?
Now, the Working Group -- there's a transition here at the bottom of the page. Now it wants to turn to a discussion of the Williams case and the allegations made by Cordell Williams.
Do you see that?
A. I see that.
Q. Okay. Williams has repeatedly alleged that James O'Brien engaged in psychological coercion and threats, okay? You see that?
A. I see that.
Q. And then it goes on to allege, Williams alleged that O'Brien withheld food and drink.
I'm going to stop there.



Did you inquire with the Working Group how it reached that conclusion?
A. I don't recall.
Q. Okay. Is it based to your knowledge on Cordell Williams' interview with the Working Group?
A. I don't recall.
Q. All right. Let's assume for a minute it is, and you're welcome to look at that 16-point paragraph if you want. But if it did come from O'Brien -- or strike that.
If it did come from Cordell Williams that he was denied food during his time at Area One, would you expect Cordell Williams to testify consistently with that under oath in his own lawsuit?
MR. BECKER: Objection, speculation.
THE WITNESS: I don't know. It depends on the question asked.
BY MR. MORAN:
Q. Were you denied food?
That's a question, right?
A. I'd expect him to answer the question that he was asked.
Q. Okay. But would you expect his

Page 302

statements to the Working Group to be consistent with his sworn testimony later on on the exact same subject matter?

A. If he were asked a question related to whatever they discussed in the inter -- in their interview, I -- something as simple as, Were you denied food, I would expect him to answer that question.

Q. Of course.

A. Right.

Q. Right. Would you expect -- so he answers it to the Working Group and says, I was not allowed to have any food during the 27 hours I was at Area One.

A. Yes.

Q. Okay. That would be problematic, right?

A. Yes.

Q. Okay. You as a career prosecutor, you recognize that denying someone food for that length of period -- or that period of time before getting an incriminating statement creates problems.

A. Certainly raises eyebrows.

Q. Okay. And if that was Cordell Williams' position to the Working Group when he's

Page 303

trying to explain the reasons --

A. Excuse me.

Q. -- that he gave an incriminating statement, you'd obviously expect him to remain consistent with that statement when he gave sworn testimony on the exact same subject matter, right?

A. I would.

Q. Okay. In his deposition in this case, Cordell Williams testified that before he ever met Detective O'Brien, he was -- he was given multiple cheeseburgers from Checkers, the restaurant somewhere near Area One.

Were you aware of that?

A. Was I aware that he was given Checkers?

Q. That he admits he was given cheeseburgers to eat that day that he was at Area One.

A. I'm not aware of that.

Q. Before he ever encountered Detective O'Brien.

A. As I sit here today, I am not aware of that.

Q. Okay. Now, if you knew back when you read this memo that Cordell Williams had given

Page 304

testimony in a lawsuit that was inconsistent with the claims he made to the Working Group about being fed while he was at Area One, would that create any concerns for you about the truthfulness of the claims he had made to the Working Group?

MR. BECKER: Objection, speculation.

THE WITNESS: I don't know what I knew back then or what I reviewed, so I can only answer as to as I sit here today.

BY MR. MORAN:

Q. Yeah, of course.

A. Okay. If I knew that he had said something in a deposition that was different than what he said to the Working Group, I would ask questions.

Q. Would you have concerns that whether he -- what he's telling the Working Group is true or not?

A. I would certainly have questions.

Q. Okay. And you'd have questions because that is a concern that you'd want to address, right?

A. I would have questions because he said something that is different than what he's saying to the Working Group.

Page 305

Q. Okay. Let's go back and look at this page, the bottom of page 5, okay?

The next phrase: Detective O'Brien refused to allow him to call a lawyer.

You see that?

A. I see that.

Q. Okay. Now, if Cordell Williams testifies in his own lawsuit that he agreed to speak with the detectives voluntarily, would that be inconsistent with his claim that he was denied a lawyer?

MR. BECKER: Objection, speculation.

THE WITNESS: It depends on the context.

BY MR. MORAN:

Q. Usually when a criminal defendant asks for a lawyer, right, it is because the criminal defendant wants to speak with a lawyer before continuing on with a conversation with the detectives.

A. Where now you're putting an actual time frame on it.

So if -- if he indicated that he asked for a lawyer prior to being questioned or when he was given his Miranda warnings to the

Working Group and then said something different during his -- during his deposition --
Q. Uh-hmm.
A. -- then for the same time frame, like I -- when they gave me Miranda or I never asked for a lawyer or asked to call a lawyer prior to -- so if it's the same context, then it would appear to be inconsistent.
Q. Okay. So for example, if Cordell Williams -- Cordell Williams testifies that he agreed to speak with O'Brien when O'Brien first met him, and here he's saying that O'Brien denied him a lawyer, do you have any reason to believe that those -- the statement in this report and his testimony in the deposition are inconsistent then?
A. It depends on when he asked for the lawyer.
Q. Sure, okay.
O'Brien threatened to arrest or do something to Williams' dad.
According to Cordell -- Cordell Williams' deposition testimony, he does not have personal knowledge of a threat by O'Brien to arrest his father.



Is that inconsistent with the statement here in the report?
A. No. That may just mean that I don't remember.
Q. Okay. You're giving him the benefit of the doubt then?
A. Well, I'm just -- you asked me a question; that's my answer.
Q. Okay. Another possibility is that he's -- it is inconsistent, and he's not telling the truth, right?
A. It could be.
Q. If -- in his statement to the Working Group -- here's the next sentence.
A. Yes.
Q. Or strike that. Let me back up a second.
If it turns out that Detective O'Brien did not threaten Cordell Williams' father, in other words, Cordell Williams agrees -- or strike that.
If it turns out he did not threaten Cordell Williams' father, that would be inconsistent with the allegation in this report;



agreed?
MR. BECKER: Objection, speculation.
THE WITNESS: I'm sorry. Wait.
If it turns out that the detective did not threaten his father.
BY MR. MORAN:
Q. Yes.
A. Sorry, it's getting late.
Q. That's okay.
A. I'm trying to work this out in my head.
Q. It's simple really.
A. Yeah.
Q. If Detective O'Brien did not threaten to arrest or do something to Mr. Williams' father, would you agree then that fact is inconsistent with the allegation in this report that O'Brien threatened to arrest or do something to Williams' father?
A. Yes.
Q. Okay. I'm going to read out the next sentence.
In his statement to the Working Group, Williams said that O'Brien kept his gun on the table pointed towards Williams during Williams'



court-reported statement, okay? You see that?
A. Yes.
Q. Now, have you ever been present for the taking of a court-reported statement with a detective and a criminal defendant?
A. No.
Q. Not even on felony review?
A. We called for videographers in my day.
Q. All right.
A. So there were no court reporters, no. Sorry.
Q. Did detectives -- or strike -- well, so you've been -- but I mean, you've observed these statements, right, or you just called --
A. I have not observed a court-reported statement taken --
Q. Okay.
A. Yeah.
Q. All right. At his deposition, Mr. Williams testified that he thought there was a gun in the room, but he admitted that he never saw a gun.
Would that be inconsistent with his claim to the Working Group that Detective

Page 310

"Williams" pointed a gun at him?
A. Yes.
Q. Okay. The next handful of sentence describes what other individuals have testified to.
Londell Harper, Williams' co-defendant alleged slapping and "threants" -- threats against his mother, without describing who made those threats. And, David Evans, the shooter convicted of the mur -- of the murder and the backseat passenger, told us that O'Brien smacked him around and threatened to kill him. Okay?
A. And threatened him.
Q. And threatened him. I'm sorry. And threatened him, yes.
Okay. Now, those allegations are -- let me ask you this. How does -- assuming that all you know is that these individuals allege that O'Brien or some other detective did these things. They're inter -- they're not present when Cordell Williams is interviewed at all.
How does the fact that these allegations exist by other witnesses prove or establish that O'Brien did anything abusive to Cordell Williams?

Page 311

A. Are you asking me to -- to draw a conclusion that the Working Group came to?
Q. No, I'm asking you to read --
A. No.
Q. -- the sentences here and answer the question.
How does this help support an allegation that O'Brien committed any abuse towards Cordell Williams? The fact that other people have accused him in the same investigation of committing some form of abuse.
A. I believe it's looking at -- it's establishing a pattern and practice. That is what this is doing.
Q. Okay. And remember we talked about what you need to establish a pattern? Like what kind of standards might be required to guide --
A. Sure.
Q. -- in finding a pattern?
Are you aware of any rules in evidence that govern pattern and practice?
A. I don't know. As I sit here right now, I can't recall any.
Q. Okay. For example, I think for a long

Page 312

time in Illinois it was under the common law, other acts, other prior bad acts, or something like that. And now it's codified in the rules of evidence, Illinois Rule of Evidence 404(b), similar to Federal Rule of Evidence 404(b), what types of other misconduct is admissible to prove various things.
A. Sure.
Q. Okay. Is -- to your knowledge, is it acceptable or admis -- or allowed to bring in other acts of misconduct to show that there's a propensity for O'Brien to have committed the acts alleged by Cordell Williams?
A. Under the law?
Q. Yeah.
A. Propen --
MR. BECKER: I'm going to object. That calls for a legal conclusion.
THE WITNESS: Propensity evidence is certainly admissible in certain cases, yes.
BY MR. MORAN:
Q. Is it propensity evidence, or is it being offered for something else?
A. It's being offered for propensity, yes.

Page 313

Q. Okay. For example, if you're going to try and show a pattern, what's the relevance of showing the pattern?
A. It's -- it's used in domestic violence cases. You can -- you can admit propensity evidence to show a pattern against someone to -- to support an allegation that this new thing did happen based upon the propens -- propensity evidence.
Q. Okay.
A. That is allowed.
Q. Does the pattern have to -- does there have to be a consistent fact pattern?
A. There has to be -- it's -- they have to be similar acts of conduct.
Q. Cordell Williams. Okay, so let's look back at these sentences.
A. Sure.
Q. Londell Harper accuses an unnamed detective of slapping him and threatening his mother. David Evans, the person convicted of the crime of shooting the individuals, told the Working Group that O'Brien smacked him around and threatened him.

Do you see that?
A. Yes.
Q. Okay. Cordell Williams does not allege any physical abuse by Detective O'Brien.
A. In this -- as is listed in the bottom, in the -- at the last -- as it is listed in the last paragraph on page 5.
Q. Correct.
So whatever happened with Londell Harper and David Evans, is that consistent enough in your mind to establish that O'Brien engaged in any misconduct with Cordell Williams?
A. It could be.
Q. You'd need more facts.
A. Possibly.
Q. Okay. Well, when you say "could be," that means it also could not be, right?
A. That's true.
Q. Okay. I want to direct your attention to the next page, and this is the -- I'm going to direct -- it's the next sentence at the top.
It says: Stehlik was also significantly involved in the investigation interrogation of Williams, as detailed in our



factual memo.
Okay. In the timeline, according to Williams' deposition testimony, Stehlik, he didn't even remember Stehlik, okay? He remembers Gehrke, who was Stehlik's partner, but he doesn't remember Stehlik.
According to Williams, the first detectives who interviewed him did not do anything abusive to him at all. That would have been the group of Stehlik and Gehrke.
If that's -- taking what I said as true, that Williams gave this testimony in his deposition, do you agree then that at least as far as the way dep -- Williams' deposition went, Stehlik is not implicated in the misconduct.
A. I can only go by what you're telling me today, because I don't know what you're talking about.
Q. Yeah, no. I'm representing to you that this was the testimony given, right?
A. I can't say yes or no to that, because I don't know what --
Q. Okay.
A. -- you're talking about.



Q. So if Cordell Williams agrees that the initial detective did not abuse him and the alleged abuse began with mental coercion by Detective O'Brien, and did not see any other detectives besides O'Brien and Foley after that, would you agree then that according to that testimony by Williams, assuming what I'm telling you is true, that Stehlik could not have been implicated in any misconduct.
A. I don't know, Counsel.
Q. Okay. Further down at the end of the next paragraph, it says --
A. Yes.
Q. -- The Working Group requested Foley's employment records for the days in question, but has not received those records. We cannot say who it was that physically assaulted Williams, but include allegations against Foley in this memo as well.
Okay. Does just reading that create any questions for you?
A. I don't know if it did or not.
Q. In reading it today, does it raise any questions for you?



A. Okay. Let me read the entire paragraph --
Q. Sure.
A. -- so I can put it into context.
Okay. What is your question again, please?
Q. Does just reading those two sentences create any questions for you? The Working Group requested Foley's employment record for the days in question, but has not received those records. We cannot say who it was that physically assaulted Williams, but include allegations against Foley in this memo as well.
A. Any type of questions like what?
Q. Could you get the FoI -- Foley's employment records? Did you ask the Chicago police for the Foley's employment records? Is there any way of finding out whether Foley was there that day? Those kinds of questions.
A. I don't know if I asked those or not.
Q. Those are -- would you agree with me that those are relevant questions?
A. They could be.
Q. Because if Foley wasn't there that day,

Page 318

then it wouldn't have been -- Foley would not have been involved in the investigation, right?
A. That is true.
Q. And if Foley wasn't there that day and O'Brien's not part of the group of seven, then this investigation by the Working Group should go back to the Conviction Integrity Unit, right?
A. If Foley is not there that day and O'Brien is not a part of the seven?
Q. Correct.
A. I'm not sure who else was involved.
Q. Well, let's put it this way.
If nobody on this list of seven was involved --
A. Uh-hmm.
Q. -- and the Working Group can't say if Foley was involved because there's no evidence that Foley was actually involved -- or strike that.
Let me ask it a different way.
If the employment records show that Foley was not there that day and none of the other individuals on the list of seven are alleged to have been involved in the investigation of Williams for those -- that -- those murders.

Page 319

A. Uh-hmm.
Q. In that situation, would you agree that the investigation of the conviction should have been returned to the Conviction Integrity Unit?
A. I don't -- if it wasn't brought to my attention beforehand, then I would not have known.
Q. No, no, I --
A. So, right, so I don't -- I don't know.
Q. So to be fair, I'm not suggesting that you did anything wrong, okay?
A. No, yeah, I understand that.
Q. So what I'm saying is giving -- taking the facts I'm telling you, that if the -- the employment records show that Foley was not there and nobody else involved in the investigation of Cordell Williams for this double homicide is on the list of seven detectives, shouldn't this investigation have been returned to the Conviction Integrity Unit?
A. So I'm just going to speculate here.
So had the Working Group actually received the records, because they said they never received Foley's records, so they could not -- they could not make a determination as to whether he was

Page 320

or was not the person involved, other than whatever information they received by -- other than whatever information they received from the defendant and any outside sources.
But if your question is had they conclusively determined that Foley was not involved, and since O'Brien's name was not on the list, then this would not fit within the protocol that was established for this Working Group in terms of the types of cases that they reviewed.
Q. Okay. And if -- and if the Working Group knew all this information, you'd expect them to tell you this, right?
A. I would hope that they would.
Q. Okay. I want to direct your attention to the next paragraph. It discusses Detective Boudreau.
A. Yes.
Q. And the Working Group explains that Boudreau -- evidence regarding Boudreau's involvement in the wider investigation of the homicide, as well as the allegations of abuse overall against Boudreau, because he participated in the lineup procedure involving a codefendant

Page 321

Evans.
Is it fair to consider Boudreau's history of allegations, abuse allegations, in evaluating Cordell Williams, the integrity of his conviction, when there's no evidence that Boudreau played any role in investigating Cordell Williams or eliciting his confession?
A. Without reading both of these documents, Exhibit 7 and 12, 7 and 12 fully, I can't answer that question because I don't know. As I sit here, I don't have an independent recollection of the extent to which any allegations against Boudreau were actually used in reaching any conclusions in this matter.
Q. Yeah. So let me give you two things, okay?
A. Sure.
Q. One, David Evans was arrested months later, not at the same time as Cordell Williams. So whatever happened with David Evans would have been remote in time to whatever happened with Cordell Williams.
A. Okay.
Q. Second, the Working Group's point,

which we can get to later on, is that Boudreau is included because of his involvement in the wider investigation months later with David Evans; and therefore it's fair to consider the abuse allegations against him in its pattern and practice assessment.

Now, I'm not going to force you to go find that, and I'm not going to look it up for you right now because we're short on time, but assuming that's all true, okay, what I just said, is it fair and impartial to consider Boudreau's history of -- allegations of abuse in conducting this pattern and practice assessment with respect to Cordell Williams and the detectives who investigated him?

A. They can consider whatever they want to consider. Again, to the extent that it actually led to or helped form an opinion is a different story.

Q. Well, that's the point. It did help form an opinion; that there's a culture of abuse overall at Area One that infected this investigation.

A. Well, I think there was the showing



that there's a pattern of abuse, and there's a document that says, Well, here's the pattern of abuse. But as it relates to Cordell Williams, again, I can only -- again, I have not read the entire report.

Q. Recently, right?

A. Recently.

Q. Because you did read it at one time.

A. At one point I did, yes.

Q. I wanted to ask you -- I'm -- you know, I understand you don't remember reading this stuff, okay, but what I'm asking you now as someone who reviews this, and when you're standing in review of the work of the Working Group, okay, as you sit here today, would you expect a fair and impartial investigation to incorporate allegations of individuals, allegations against individuals who had no role in the investigation that's being -- or the conviction that's being inter -- or investigated?

A. I would ask questions.

Q. Okay. Like why? Questions like why are we considering this with respect to O'Brien or Foley when -- questions like that?



A. I would ask questions. I don't know ...

As I sit here today, I can tell you what questions I would ask today, but I don't know what I asked in 2022.

Q. Okay. I'm going to direct your attention to a couple of things. This is on page 12 under section 3.

A. Okay.

Q. And do you see the title, it says, Summary of complaints involving O'Brien, Stehlik, and other named detectives in concert with O'Brien.

A. Yes.

Q. Okay. Do you know what "in concert" means?

A. Together.

Q. So they can show that these detectives that they're including worked together with O'Brien on the case in the Cordell Williams case?

A. I don't know that. I just know what "in concert" means.

Q. Oh, I got it. In the vacuum.

Okay. Would you ask like what they meant by in concert if you had asked questions? Is that one of the questions you might ask?



A. I don't know without reviewing the entire document because you're taking things out of context, so I don't know.

Q. Okay. There's a reference to -- and this is the second paragraph under the heading.

We note that Illinois courts have observed that Detective O'Brien -- Detectives O'Brien, Halloran, and detectives involved in this audit have numerous allegations of torture pending against them. And then there's a case cited, Pittman.

Do you know the Pittman case?

A. I don't recall.

Q. Pittman was a case that went through -- or the conviction was reversed under I think -- under Kim Foxx's watch, but shortly before -- at some point shortly before she left office, okay. And the State did not oppose vacating the conviction.

Is that a decision that you would have been involved in not to oppose a conviction?

A. For Pittman?

Q. For in general. If someone files a post-conviction petition and the State elects not

to object to the petition, does that -- and it's a conviction for murder, does that rise to the level of the first assistant?
A. Yes, it could.
Q. Okay. Is there any situation you can think of where you as first assistant would not have been made aware of a case in which the State has elected not to oppose a post-conviction petition involving someone who'd been convicted of murder?
A. I don't know if that did happen or not.
Q. Okay. So Pittman cited as an example, and specifically about coercion allegations that Detectives O'Brien and Halloran, okay?
A. Okay.
Q. Do you know who represents Pittman now?
A. I do not know that.
Q. Okay. That would be Loevy & Loevy.
Have you ever heard of that law firm?
A. I have.
Q. What do you know about that law firm?
A. They do a lot of civil rights, or they do a lot of work with defendants who have been exonerated.



Q. Plaintiffs' civil rights, right?
A. Yes.
Q. Suing detectives, police departments for having violated the individual's rights.
A. That is correct.
Q. Okay. And do you know where the Working Group got the information from about the Pittman case?
A. I don't know that.
Q. All right. Do you know if the Pittman case was dis -- so let me back up a second.
Remember I mentioned that the Working Group went to a two-hour presentation at Loevy & Loevy? I think I asked you about that, whether you knew about it?
A. No, you asked me if I attended a presentation given by Peter Neufeld.
Q. Oh, okay. So scratch that.
The Working Group attended a two-hour session presentation at the offices of Loevy & Loevy where Russell Ainsworth and another attorney gave a presentation on misconduct allegations against several detectives, including Halloran, O'Brien, and Boudreau, and provided



information before the meeting for the Working Group to review in anticipation of the meeting.
Okay?
This is all stuff that came out in the depositions of Maria Hawilo and Vincent Southerland, okay?
A. Okay.
Q. Just for context.
A. Okay.
Q. Would you agree with me then one of the sources of information the Working Group went to to establish foundation for its pattern and practice conclusions was a law firm that specializes in plaintiffs' civil rights?
A. I would agree that one of the sources of information that they gathered to help them conduct their investigations came from other lawyers.
Q. Who practice civil rights law on the plaintiff's side.
A. If they receive information from Loevy & Loevy and that's what Loevy & Loevy does, then I'd agree yes.
Q. Should the Working Group be questioning



the source of the information?
A. It depends on what they're receiving.
If they're receiving depositions, I mean, that's pretty black and white as we can see here.
Q. No. I mean, when they're getting a presentation showing that from the perspective of these attorneys who practice plaintiff civil rights law that there are certain detectives who they believe are engaged in a pattern of mal -- abuse.
So in other words, the plaintiff lawyers are providing the conclusions and evidence the plaintiffs' lawyers deem relevant in supporting those conclusions to the Working Group.
Do you understand what I'm -- like the pipe effect?
A. I understand what you just said.
Q. Okay.
A. Yes.
Q. Do you have any concerns that the Working Group should be asking questions given that the attorneys providing the information have an incentive seeing the Working Group draw a conclusion that Detectives O'Brien or Halloran, Boudreau, or anyone of the others at Area One

engaged in a pattern of malpractice either in this memo or with respect to Cordell Williams?
A. Would they have an incentive?
Q. The plaintiff lawyers, yes.
A. I don't know.
Q. Because as you can read -- you -- as we go through this, you'll see that the Working Group's drawn a conclusion that the sheer number of allegations against these detectives is enough to draw a conclusion that some of those allegations must be true. And if some of those allegations are true, that the conviction -- or the confession that Cordell Williams gave is now called into question.
Is that one of the takeaways you got from reviewing all this when you did review it?
A. I don't know.
Q. That doesn't ring a bell at all?
A. I don't recall.
Q. Okay. Obviously the words are the words in the document, right?
A. The words are the words in the document.
Q. And if that's what the document ultimately concludes, that the sheer number of allegations are enough, would you agree with me



that the plaintiff lawyers who are providing information to the impartial investigators have an incentive in seeing those investigators add to the allegations or add to the conclusions that the detectives committed misconduct?
A. I can't --
MR. BECKER: Objection, speculation.
BY MR. MORAN:
Q. Go ahead.
A. I'm sorry. I can't ans -- I cannot answer on behalf of what someone else has incentive of about or not. I can't answer that. I don't know.
Q. You know, when we talked about it earlier with respect to the Lawyers' Committee representing plaintiffs who -- or individuals whose convictions had been reversed, you seemed quite comfortable discussing the financial incentive that may be there and the reason -- as a reason the Lawyers' Committee should not be representing those individuals.
Do you remember that testimony?
A. I remember that conversation, yes.
Q. Why were you able to talk about



financial incentive in that context but not in the question I just asked?
MS. BAGBY: Objection, argumentative. You can answer.
THE WITNESS: Because I -- thank you.
Because I cannot speculate as to the incentive or the reasons why someone else did what they did.
BY MR. MORAN:
Q. No, I'm not asking you to speculate.
A. I think you are.
Q. I'm asking whether you, as someone whose reviewed all the work by the Working Group, recognizes the potential for conflicts of interest, can see whether or can say whether the Working Group is getting all of its information about the pattern and practice evidence from a source that specializes in suing police officers on behalf of individuals whose convictions were vacated; that those individ -- those attorneys may have an incentive in seeing certain conclusions reached by the Working Group.
MR. BECKER: Objection, speculation.
THE WITNESS: To the extent that I just



answered that question, my answer is my answer.
However, I will also note that the Working Group in gathering their information, plaintiff's attorneys were not their only source. They gathered information from a lot of different sources.
They gathered information from the TIRC. They had other court cases and court opinions and transcripts that they gathered from other sources. So they used a variety of information in forming whatever conclusions they formed.
BY MR. MORAN:
Q. Sure.
Do you know whether the information gathered from TIRC is information that came from one of the plaintiff lawyers that the Working Group consulted with?
A. I do know that the Working Group had conversations with people at TIRC and were -- and they were able to receive information from the TIRC directly.
Q. Okay. Now I understand what you're saying.

A. Sure.
Q. The question is a little different.
Is there any concern at all about getting information from sources that might have a financial incentive in the outcome of what the invest -- or the -- or the Working Group's investigation?
A. The Working Group is free to talk to whomever they needed to talk to in order to gather the necessary documents that they were to base their ultimate recommendations on.
Q. Okay. The -- I want to direct your attention to page 13.
A. Yes.
Q. Okay. On page 13.
And there's a list of cases that extends to page 16. It's 15 cases, okay? You see that?
A. I'm sorry. From 13 to --
Q. 15.
A. To 15.
Q. Or no, I'm sorry. Page 13 to 16, but there's 15 numbered cases that the Working Group identifies.



A. From the court of appeals in the Tyler case.
Q. Yes, yes, yes.
A. Yes. There are 15 paragraphs related to whatever's taken from the court of appeals in Tyler as it described the claims.
Q. And is it sufficient for the Working Group just to take the list from the court of appeals in Tyler?
A. And do what with it?
Q. And assume that that is a list reliable enough for the Working Group to cite as evidence of a pattern of practice without investigating any of these cases?
A. Is it sufficient to rely on the Illinois court of appeals in their opinion? Is that what you're asking me? Because that's --
Q. Well --
A. -- what it seems like they did here.
Q. I understand that they cited a list of cases from the Illinois court of appeals.
Would you expect the Working Group to do any further investigation of these cases cited by the Tyler court?



A. Considering the -- I don't know that I would seeing as though they are summarizing what the court indicated in People v. Tyler. And the -- the appeals decision regarding that in -- on page 13 in paragraph 2.
It starts with People v. Tyler, summarize -- the court is summarizing a substate of -- a subset of cases in which O'Brien acting in concert with others such as Boudreau, Foley, and Halloran were alleged to have abused or coerced individuals -- excuse me -- into giving false statements. The court of appeals noted that detectives need not individually have physically abused a witness or suspect, but instead when detectives play an active role in an investigation and their actions in concert result in conviction, it is crucial to consider the claims of a systemic pattern of abuse in the context of several officers working together to obtain a false confession in the case at bar.
I think it is appropriate for any lawyer to rely on an opinion authored by a court.
Q. Okay. And where were you reading from? What page?



A. This is page 13, second paragraph.
Q. Okay. 13, second paragraph from the top, People -- okay.
So one of the questions, one of the quote that you just read --
A. Yes.
Q. -- it's to consider the claims of systemic pattern of abuse in the context of several officers working together to obtain a false confession in the case at bar.
Now, the court is saying consider those, right? That's what the direction is. It's fair to consider those allegations.
A. In the context of the entire sentence, yes.
Q. Yes, of course.
But is it also fair if you're conducting a fair and impartial investigation to consider whether the list here fairly and accurately describes what occurred? In other words, not just the allegations. Something more.
A. I don't think I understand that question.
Q. Well, we talked about this earlier.

Page 338

Are the allegations alone sufficient.
Now, the Illinois Appellate Court is saying the allegations alone should be considered, right, in assessing the systemic pattern of abuse.
But is that the extent of the analysis? Just consider the allegations alone?
I'm asking about from the perspective of the Working Group.
A. Oh, I'm sorry.
It is my understanding that the Working Group considered the allegations in the context of the facts of every specific individual case, and the facts of that case, the circumstances surrounding the case. And one of the things that they considered was also the allegations of abuse.
Q. Okay. I want to direct your attention to bottom of page 18. And this is where the Working Group describes how it's not limited in its analysis in the same way that a post-conviction evidentiary hearing might be limited, beginning with the word "however."
You're there?
A. Oh, yes, I'm here.
Q. Okay. So it says: We are not limited

Page 339

by the legal standard that applies to post-conviction evidentiary hearings. Nor does our review require the claimant to prove systemic evidence of torture, nor does it require the claimant to prove the outcome of the suppression hearing would have differed given the new information.
Okay. And then it goes on to describe what their role is: As special prosecutors tasked with doing justice, our review is broader, and the burden is not solely on the claimant.
I'm going to stop right there.
A. Okay.
Q. Is there any burden on the claimant in what the Working Group was doing?
A. I think they were referring to the post-conviction burden and whether that's a true burden or not. But that's what -- the right burden or not. But I think they were referring back to the post-conviction. What they said in the previous paragraph about the burden in the -- or in the previous sentences about their -- the legal standard that applies to post-conviction

Page 340

proceedings.
Q. Now they've drawn a distinction between their role, and they say, Instead, as special prosecutors tasked with doing justice, our review -- and let's just stop there.
A. Sure.
Q. Our review.
That would mean the Working Group.
A. The Working Group.
Q. -- is broader and the burden is not solely on the claimant.
I'm just going to stop right there.
A. Okay.
Q. So now the Working Group has recognized that their review is broader and they're not requiring -- or they're saying the burden is not solely on the plain -- or the claimant, meaning the person who is claiming that the conviction was obtained through misconduct, right?
A. I think they're referring back to the previous statement. That's the way I read this.
Q. Okay. It says -- I'm not going -- I mean, if that's how you read it, that's how you read it.

Page 341

A. That's how I read it.
Q. Okay.
A. That's how I interpret it.
Q. Even though it says, our review is broader, meaning the Working Group's review, and the burden is not solely on the claimant --
A. Yes, because you're --
MR. BECKER: I'm going to object. That's argumentative. She's already answered the question.
BY MR. MORAN:
Q. Go ahead.
A. I was going to say you're taking two sentences out of context. You have to read it in the context of the entire paragraph where it talks about the legal standard of the post-conviction and what happens during post-conviction proceedings, and they're not limited to that.
Q. Okay. So --
A. That's the way I interpret this.
Q. Fair enough.
So the next sentence, instead. And obviously instead meaning as opposed to or different from, right?
A. Yes.

Page 342

Q. If our investigation reveals any credible evidence of systemic abuse, we conclude that any credible evidence of systemic abuse is sufficient to apply a pattern and practice analysis.
A. That's what it says.
Q. They're talking about their review, the Working Group's review, correct?
A. Correct.
Q. Okay. The next sentence: Moreover, once we determine -- meaning the Working Group, right?
A. Yes.
Q. -- that credible evidence of systemic abuse exists, the burden is on the state to disprove such evidence. You see that?
A. I do see that.
Q. Okay. I want to talk about that sentence.
A. Yes.
Q. The Working Group is saying here that when it's reached a conclusion about pattern and practice, the burden is on the State to prove -- to disprove such evidence, okay?
A. That's what that says.

Page 343

Q. Okay. Is that part of the protocol that was agreed to with the Working Group?
A. I don't recall that written in any -- in the protocol document that we reviewed today.
Q. Is that a standard taken from the post-conviction world?
A. That's a good question.
It may be.
Q. Okay. Was it within the purview of the Working Group to take selected parts of the standards from post-conviction or another type of review and apply those selected types of standards to its own review of cases?
A. The Working Group were to -- the protocols that set forth the work and the scope of their work is what they were governed by, and I put that in quotation marks.
Q. Okay. Was the State --
A. There is no legal standard applied to the work that they did.
Q. Did the Working Group invite the State to disprove any of the evidence of the pattern and practice?
A. Not that I recall.

Page 344

Q. Now, we went over a bunch of these cases and the 15 cited from Tyler, the Tyler appellate opinion?
A. Yes.
Q. Let's see. Tyler was decided when?
According to the citation, 2015. It's People v. Tyler, 2015 IL App 2d -- or 1st -- 123470, and this is on page 13.
A. Yes.
Q. Okay. All of this -- these cases that were cited by Tyler would have been within the knowledge of the State's Attorney's Office long before the Working Group was formed, agreed?
A. I don't know. I would think so.
Q. Okay. So you can see from the Tyler citation that it's a First District case, right?
A. That is correct.
Q. Okay. And they're talking about in Tyler the detectives from the Chicago Police Department, right?
A. That is correct.
Q. Okay. So Tyler would have been a case that went through the Cook County State's Attorney's Office?

Page 345

A. That is correct.
Q. Okay. And as a result, the Cook County State's Attorney's Office must have become aware at some point, not necessarily you, but somebody within the office was aware of the cases that were cited as examples by the Tyler court?
A. I can't answer that. I can only talk about what I was aware of.
Q. Well, not just you. I mean, you were part of a group; you were given information by Jennifer Coleman; you spoke with the Working Group members; you spoke with Kim Foxx.
Right?
A. Yes, I spoke with people.
Q. So if you know, what I'd like to know is given that the State is aware -- somebody at the State is aware of the cases that were cited by Tyler before the Working Group is created, what is the need of the Working Group to reach a pattern and practice conclusion?
A. I don't know who was aware of what.
Q. Well, I understand. I'm just based on your own knowledge and your own experiences working at the Cook County State's Attorney's Office in the

time frame you did which you were involved with the Working Group, why is there a need for the Working Group to evaluate pattern and practice when there's all these courts that the Working Group identified that has already identified a pattern and practice?

A. That is not a question that I can answer because I was not involved in any conversations related to the formation of the Working Group.

Q. You did hear Peter Neufeld give an explanation about the Working Group, right?

A. I didn't hear Peter Neufeld give an explanation about the Working Group that I can recall.

Q. Let me see if this -- I got an email that might refresh your recollection. Give me a second. I think we're almost done, by the way.

(Deposition Exhibit No. 13, Witness Lanier, was marked for identification 10/29/2025.)

BY MR. MORAN:

Q. We're looking at Exhibit 13. This is the email from you to members of the Working Group



and other individuals from the State's Attorney's Office, and it's a longer email.

But essentially you're starting out by thanking Maria Hawilo, Vincent Southerland, and Marc Kadish for their agreeing to be members of the Working Group, right?

A. Yes.

Q. Do you want to read through just the email on the first page? Actually the first paragraph?

A. Sure.

Q. Go ahead.

A. (Complying.)

Okay.

Q. Okay. The first paragraph you make a reference to Peter, and this is what it says: Yesterday, Peter provided a great overview of how this group came to be and the necessity of this work, and we are all excited for you to begin this work as the first independent committee ever formed to conduct this type of assessment from the Cook County State's Attorney's Office.

Did I read that correctly?

A. You did.



Q. Okay. Does this help you remember at all what Peter Neufeld said?

A. It does not.

Q. You don't remember a single thing he mentioned about the overview or the need for the work?

A. I don't remember a thing.

Q. Okay. As you -- strike that.

Let me ask you this: Was the Working Group -- did the Working Group ever, in all of the cases it reviewed, reach a conclusion that a pattern and practice did not exist?

A. I don't recall.

Q. Okay. If there's -- if the Working Group is citing -- citing things that somebody at the State's Attorney's Office arguably knew about, potentially Peter Neufeld through his work on other lawsuits that he had against the City of Chicago, why can't the Conviction Integrity Unit take this information that the Working Group had about pattern and practice, analyze it, reach the same conclusions, and provide it to you or the State's Attorney?

A. Counsel, I don't know, because this was



something that was formed prior to my stepping into the role as chief deputy.

Q. Do you know whether the state -- or the Working Group was formed for the purpose of reaching a conclusion that pattern and practice existed of abuse as opposed to deciding whether those patterns existed?

A. No.

Q. Do you have any -- or let me ask you this.

The way this standard was set where the Working Group, if it concludes a pattern and practice exists, has to apply this heightened scrutiny and then requires a certain level of evidence to support the conviction once the scrutiny or once the pattern and practice evidence is found to exist, does that -- is that consistent with being fair and impartial in your mind?

A. Can you repeat that again?

Q. Yeah. She's going to repeat it for you.

(The record was read as follows:

Q. The way this standard was set where the Working Group, if it concludes a pattern and practice exists, has to apply this heightened scrutiny and then requires a certain level

Page 350

of evidence to support the conviction once the scrutiny or once the pattern and practice evidence is found to exist, does that -- is that consistent with being fair and impartial in your mind?)
THE WITNESS: It's not inconsistent.
BY MR. MORAN:
Q. Spoken like a true lawyer.
Okay. But I'm going to -- I'm going to see -- I want you to see if you can answer the question the way I asked it.
Is it consistent?
A. It's not inconsistent.
Q. Why not?
A. The Working Group was tasked at looking at cases and reviewing cases for the purposes of determining whether or not the convictions were -- that there was integrity assoc -- that there was integrity in the investigation and the prosecution of these cases. They were free to use any information that they gathered, apply their standards or their protocol, and then reach a conclusion.
Q. Do you have expectations as to what constitutes fair and impartial by any investigator?

Page 351

A. Yes. That they -- that any investigator would have looked at the case, all of the facts, all of the circumstances, weighted -- applied whatever weight that they felt needed to be applied in reaching a conclusion that did not necessarily favor one side or the other.
However, the weight to be applied to any sort of evidence would really depend on the circumstances in those cases, of the facts specific to that particular case.
Q. Sure.
And the Working Group, when it gave you its recommendations, had already weighed the evidence and drawn conclusions based on its weighing of the evidence, right?
A. That is correct.
Q. And you would expect in the process of weighing the evidence that the Working Group would be fair and impartial, right?
A. That they would be open minded.
Q. Okay. I thought --
A. Open minded.
Q. I don't know want to quibble with you, but we looked at the policy or the procedures a

Page 352

long time ago, and it said it was to conduct an impartial and independent investigation, right?
A. That's what it says.
Q. Now, part of being impartial is being an open mind -- having an open mind, right?
A. That is correct.
Q. Okay. Part of being impartial is being fair.
A. I would agree with that.
Q. Part of being impartial is resisting the urge of tunnel vision.
A. To the best of your ability.
Q. These are all the same things that are alleged against the detectives, right? That they need to keep an open mind when they conduct their investigations; not draw predetermined conclusions or surface level conclusions; to accept and review evidence that may be inconsistent with their own theories of the case.
A. Sure.
Q. Because that's what you would want from an impartial detective as well?
A. That's what you would want from anybody in exercising impartiality.

Page 353

Q. And let me ask you this: If detectives became aware of a witness who provided statements that indicated somebody else, not the criminal defendant, committed the crime, that would fall under what's known as Brady evidence, right?
A. Yes.
Q. That evidence has to be disclosed to the other side, the criminal defendant, right?
A. That is correct.
Q. Okay. What if it's a close call? You're not sure if it's Brady, but potentially one could argue that the evidence would be helpful to the defendant.
In your experience as a criminal prosecutor for 25 years, do you err on the side of caution and give that evidence over to the defendant?
MR. BECKER: I'm going to object on the ground it calls for a legal conclusion.
THE WITNESS: In my 25 years as a prosecutor, you disclose everything.
BY MR. MORAN:
Q. No matter what.
A. Disclose it. And engage in motion

Page 354

practice.
Q. And that's what -- let me ask you something.
Is that what you would have expected from the Working Group too?
A. That they would disclose everything and engage in motion practice?
Q. No, no, no. Disclose everything that they learned in their investigation.
A. I would expect that in writing their reports to me that they would disclose all relevant information that led them to reach whatever conclusion they reached.
Q. Do you recognize that when they do reach conclusions they may be impacting the lives of the people who were convicted?
A. That they would be impacting the lives.
Q. Sure.
They make a decision whether to vacate -- or they not make a decision. They make a recommendation to vacate a conviction or not, take no action, that has an impact on the live -- the life of the person who was convicted, right?
A. A simple recommendation doesn't

Page 355

necessarily have an impact.
Q. Sure.
A. And that's all that they were doing. They were making recommendations.
Q. May have an impact, I should say.
A. It -- depending on what follow-up action, what actions followed from that recommendation.
Q. Do you agree that's also true with respect to the detectives who were being investigated? That the Working Group's decisions may have an impact on their lives?
A. Depending on whatever action was taken following the recommendations.
MR. MORAN: I'm going to take a quick break, and we'll be right back.
THE VIDEOGRAPHER: Ending media 4, the deposition of Risa Lanier. Off the record at 5:56 p.m.
(Brief recess.)
THE VIDEOGRAPHER: Beginning media 6 of the deposition of Risa Lanier. We're back on the record at 6:05 p.m.

Page 356

BY MR. MORAN:
Q. Okay. I'm going to direct your attention to page 18 of that Exhibit No. 12.
A. Yes.
Q. Okay. Bottom of the page, the Working Group writes, Unlike the conclusions reached by Judge Maldonado and Hooks, we place great weight on the number of allegations against Boudreau, Foley, O'Brien, and Stehlik. Perhaps some of the allegations were untrue or mistaken, but given the sheer number of allegations made by different people ...
I'm not going to finish the whole thing, but you get the gist of it.
A. I'm sorry. What page? I'm on page 18?
Q. Yeah.
A. Am I reading the right ...
Q. You're reading in the wrong area.
A. Oh, that's -- sorry, wrong one. I was reading 7. We're in 12, yes, okay.
Okay, thank you.
Q. All right. On the bottom of page 18, the Working Group points out that, it places great weight on the number of allegations against

Page 357

Boudreau, Foley, O'Brien, and Stehlik, and finds that perhaps some of the invest -- allegations were untrue or mistaken, but given the sheer number of allegations made by different people, unknown to each other around the same time, it strains credulity to believe all of these allegations were fabricated, mistaken, or exaggerated.
Okay, I'm going to stop there.
We talked a little bit about that earlier, considering the sheer number of allegations.
Does this refresh your recollection at all as to whether you had any discussions with the Working Group about relying on the number of allegations in part as a factor in reaching its conclusions?
A. It does not.
Q. Okay. I want to draw your attention down below on page 19.
The sentence reads: Finally, the entry of settlements by the City of Chicago involving civil cases against O'Brien, Foley, Boudreau, and Stehlik all weigh heavily toward a pattern of abuse by these detectives.

See that?
A. I see it.
Q. Okay. Now, we talked earlier about this, and you I believe had indicated that the settlements and the amounts of settlements should not be considered as a factor in assessing the pattern.
A. I said in and of itself.
Q. Right. It's a factor. Not in and of --
A. It's a factor.
Q. Okay. Was any discussion had with anybody from the City about the reasons for settlement?
A. By who?
Q. The Working Group.
A. I don't know if the Working Group talked to anyone at the City.
Q. Okay. Did you have any conversations with any members of the Working Group about what they know as to why the City may have settled any of the cases?
A. I don't recall.
Q. The -- do you recognize -- do you agree that the City may have other reasons for settling



cases other than a belief in that it cannot -- or a belief that O'Brien, Foley, Boudreau, and Stehlik engaged in a pattern of misconduct?
A. I agree that there could be numerous reasons for settling cases.
Q. And these cases that are settled, do you know how long the City litigated before settling?
A. I do not.
MR. MORAN: I think -- yes, I will stop for now. I'm going to stop. Thank you very much. I'm going to turn it over to my colleague here, Lisa.
MS. MEADOR: Just a few -- oh, I'll sharing. We're sharing. That's all right.
EXAMINATION
BY MS. MEADOR:
Q. Ms. Lanier, just a few questions.
Did you ever have an occasion where the recommendations of the Working Group were not --
(Coughing.)
THE COURT REPORTER: I apologize, Lisa. Were not ...
MS. MEADOR: He coughed.
MR. MORAN: Oh, sorry.



BY MS. MEADOR:
Q. Were not adopted.
A. Yes.
Q. Okay. How many occasions?
A. I don't recall.
Q. And do -- do you know what the basis of those -- the reasoning why the recommendations weren't adopted?
A. I don't recall.
Q. Okay. Do you know how many cases there were where the recommendation was not adopted?
A. I don't know. I don't recall.
Q. Do you recall any of those specific cases by name?
A. No. The name -- one name definitely escapes me. I do remember -- oh, no, I don't remember.
Q. Okay. You talked earlier about the Working Group indicating with regard to the Williams investigation that they had not received time cards or time sheets reflecting whether or not Foley was working at the time Mr. Williams was at the Area.
Do you remember that?



A. Yes. That they had not received whatever records, employment records that they were looking for.
Q. Okay. Do you know -- strike that.
Was there any time constraint put on the amount of time the Working Group could investigate a case?
A. There was not.
Q. Okay. There was -- was there any deadline for the Working Group to submit the recommendations in the Williams case?
A. No.
MS. MEADOR: That's all I have. Thank you.
MR. MORAN: I just have one question.
FURTHER EXAMINATION
BY MR. MORAN:
Q. Do you remember the Carl Mann -- do you remember the Carl Manns case?
A. Carl Manns.
Q. Okay. In Carl Manns, there was a recommendation made, but clemency was the decision for Carl Manns.
A. There was a recommendation that was made. The State -- our office decided not to

follow the recommendation. And then there was a conversation about what other avenues Mr. Mann's could -- could go down. I don't know, like I can't think right now. Whatever other avenues he could explore --

Q. Yeah.

A. -- with regards to his conviction, and clemency was one of those avenues.

Q. Let me just have you look at this real quick.

(Deposition Exhibit No. 14, Witness Lanier, was marked for identification 10/29/2025.)

BY MR. MORAN:

Q. Okay. You're looking at Exhibit 14, which is an email from you to the State's Attorney I believe regarding Carl Manns, and a letter that had been drafted to the Prisoner Review Board withdrawing the objection to clemency.

A. Yes.

Q. Okay. In the letter -- or in the email, you refer to a conversation -- I'm sorry.

MS. MEADOR: That's okay.



BY MR. MORAN:

Q. -- and it says this: This defendant's matter was reviewed by the Working Group and after a discussion we decided that the conviction should stand, but the natural life sentence was no longer appropriate.

Do you see that?

A. I see that.

Q. And this is the reference to not objecting to clemency.

A. Yes.

Q. Okay. Was the discussion with the Working Group?

A. No.

Q. Who was it with?

A. I am referring to the discussion between myself and the State's Attorney.

Q. Oh. So the email to the State's Attorney is referring to a discussion you and her had regarding Mr. Manns.

A. Yes.

MR. MORAN: Okay, very good. That's it. So that's all I have.



EXAMINATION

BY MR. BECKER:

Q. Ms. Lanier, then I just have two questions for you.

A. Yes.

Q. You were not responsible for making the ultimate decision as to whether to vacate Mr. Williams' convictions; is that correct?

A. That is correct.

Q. And you did not make that decision; is that correct?

A. The State's Attorney made the final decision.

MR. BECKER: Thank you very much. No further questions.

MS. MEADOR: Reserve?

MR. MORAN: You guys --

MR. KUBLY: Yeah. So in depositions, you're given the opportunity to review your -- review the transcript to make sure that there are no typographical errors. You can correct spellings and stuff, but you can't change your testimony.

If you ask to read the transcript, you'll get a copy of the transcript. You have



30 days to review it and sign off on it. Otherwise, you can waive signature, which says, I trust that the court reporter is recording everything accurately, I don't want to read this thing again, and -- and you don't have to read it again.

THE WITNESS: Okay.

MR. KUBLY: The choice is yours though whether you want to waive or reserve. We frequently advise people to waive.

THE WITNESS: Are you advising me to waive?

MR. KUBLY: Sure.

THE WITNESS: Okay, I'll waive.

THE VIDEOGRAPHER: This concludes today's deposition of Risa Lanier. Off the record at 6:15 p.m.

(The proceedings adjourned at 6:15 p.m.)

REPORTER'S CERTIFICATE

I, Katie K. Elliott, do hereby certify that RISA LANIER was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was waived by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 19th day of November 2025.

______________________________

Illinois CSR No. 084-004537