# Exhibit 25

# Deposition Transcript of V. Southerland

# (Working Group Member)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORDELL WILLIAMS,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES O'BRIEN, THE PERSONAL REPRESENTATIVE OF THE ESTATE OF WILLIAM FOLEY, THE CITY OF CHICAGO, a municipality, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO,<br><br>Defendants. | ) | No. 23 CV 14905 |

The videotaped deposition of VINCENT SOUTHERLAND, taken in the above-entitled cause before Lucia R. Block, a notary public within and for the County of Cook and State of Illinois, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts, via videoconference, Chicago, Illinois, on the 24th day of October, 2025, at the hour of 10:05 a.m.

APPEARANCES: (Virtual/via videoconference)

LAW OFFICE OF STEVEN W. BECKER, by
MR. STEVEN W. BECKER
205 North Michigan Avenue, Suite 810
Chicago, IL 60601
312-396-4115
swbeckerlaw@gmail.com
On behalf of the Plaintiff;

ROCK FUSCO & CONNELLY, LLC, by
MR. PATRICK R. MORAN
333 West Wacker Drive, 19th Floor
Chicago, IL 60606
312-494-1000
pmoran@rfclaw.com
On behalf of the Defendant Officers;

THE SOTOS LAW FIRM, P.C., by
MS. LISA M. MEADOR
141 W. Jackson Blvd., Suite 1240A
Chicago, IL 60604
630-735-3300
lmeador@jsotoslaw.com
On behalf of the Defendant City of Chicago;

COOK COUNTY STATE'S ATTORNEY'S OFFICE
MR. LYLE HENRETTY, Assistant State's Attorney
MS. CRISTIN DUFFY, Assistant State's Attorney
69 West Washington Street, 32nd Floor
Chicago, IL 60602
312-603-1880
lyle.henretty@cookcountysao.org
cristin.duffy@cookcountysao.org
On behalf of the Cook County State's Attorney's Office;



APPEARANCES: (Continued)

AKERMAN LLP, by
MS. AMANDA J. HAMILTON
MR. GREGORY A. KUBLY
71 South Wacker Drive, 47th Floor
Chicago, IL 60606
312-870-8012
amanda.hamilton@akerman.com
gregory.kubly@akerman.com

On behalf of the witness.

ALSO PRESENT: Mr. Nick Trotta, Certified Legal Videographer

* * *



INDEX

| WITNESS | EXAMINATION |
|---|---|
| VINCENT SOUTHERLAND | |
| Direct Examination By Mr. Moran | 7 |
| Cross-Examination By Mr. Becker | 333 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| No. 1 | Working Group Procedures and Guidelines | 163 |
| No. 2 | CCSAO-WG-67728 to 67739 | 218 |
| No. 3 | CCSAO-WG-176169 to 176172 | 238 |
| No. 4 | CCSAO-WG-166967 to 166972 | 243 |
| No. 5 | CCSAO-WG-182616 to 182617 | 247 |
| No. 6 | CCSAO-WG-65675-65677 | 255 |
| No. 7 | W453-W454 | 262 |
| No. 8 | CCSAO-WG-115015 to 115016 | 279 |
| No. 9 | CCSAO-WG-134847 to 134849 | 286 |
| No. 10 | CCSAO-WG-8032 to CCS-WG-8055 | 290 |
| No. 11 | CCSAO-WG-174476 | 303 |
| No. 12 | CCSAO-WG 175428 to 175429 | 321 |



THE VIDEOGRAPHER: Good morning. This is the beginning of media unit one. We are now on the videorecord at 10:05 a.m.

This is the videotaped discovery deposition of Vincent Southerland being taken on October 24th, 2025.

This deposition is being taken on behalf of the defendant in the matter of Cordell Williams versus James O'Brien, et al.

The Case Number is 24 (verbatim) CV 14905 filed in the United States District Court for the Northern District of Illinois, Eastern Division.

My name is Nick Trotta, certified legal videographer representing Urlaub, Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.

The court reporter today is Lucy Block also of Urlaub, Bowen & Associates.

Counsel, please identify yourselves for the videorecord and the parties which you represent, starting with the questioning attorney.

MR. MORAN: This is Pat Moran. I

represent the police officer defendants.
MS. MEADOR: Good morning, Lisa Meador, M-e-a-d-o-r, on behalf of the City of Chicago.
MR. HENRETTY: This is Lyle Henretty on behalf of the Cook County State's Attorney's Office.
MR. KUBLY: Greg Kubly on --
MS. DUFFY: Good morning. Cris- -- I'm sorry.
Cristin Duffy on behalf of the Cook County State's Attorney's Office.
MR. KUBLY: You have Greg Kubly here on behalf of the witness.
MS. HAMILTON: Amanda Hamilton also on behalf of the witness.
MR. BECKER: And Steven Becker on behalf of the plaintiff, Cordell Williams.
THE VIDEOGRAPHER: Will the court reporter please swear in the witness.



(Witness sworn.)
VINCENT SOUTHERLAND,
called as a witness, having been first duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. MORAN:
Q. All right, sir, can you state your name and spell it for the record, please.
A. Yes. Vincent Southerland. My first name is spelled, V-i-n-c-e-n-t. My last name is spelled S-o-u-t-h-e-r-l-a-n-d. My middle name is Michael, M-i-c-h-a-e-l.
Q. All right. Thank you.
Have you ever given a deposition before?
A. No.
Q. Have you ever taken a deposition?
A. Yes.
Q. How many times do you think?
A. I've taken two or three.
Q. Okay. Just a couple ground rules to make things go smoother. Your lawyers may have already told you, I'm gonna ask you a lot of questions today.
If you do not understand one of my



questions, will you please tell me?
A. Yes.
Q. Okay. And I'll be happy to rephrase it for you.
If you do answer one of my questions, we're gonna assume that you understood the question; is that fair?
A. Yes.
Q. Okay. If you could, let me finish my questions, even though you may be able to anticipate what I'm gonna say, and I'll try and do the same for you. And that's so our court reporter can take everything down without interruption.
Does that sound fair?
A. Yes.
Q. Okay. You can take breaks whenever you want. I'd just ask that you answer the pending question first. Sound good?
A. Yes.
Q. Okay. Great.
Your current job title -- I know you're a law professor at NYU.
What's the -- what's your, like, official title as a law professor?



A. Right now I'm an associate professor of law at NYU School of Law. I'm -- I'm also the -- yeah. I mean, I'm the faculty director for the Center on Race and Equality and the Law.
And --
Q. Is that -- I'm sorry. Go ahead.
A. And executive director for Washington Square Legal Services, which is a clinical program.
Q. Are you also a practicing attorney?
A. I mean, I -- I practice within the context of my professional role, but, I guess -- I guess, I am as well.
Q. I guess, I -- in its most basic form, do you represent clients outside of teaching in the criminal justice system?
A. Oh, no, no, not out- -- not outside of teaching, not outside of -- unless it's connected to NY- -- NYU responsibilities, no, I don't have, like, a private, independent practice from that, no.
Q. Right.
A. Sorry --
Q. And with the clin- -- no, that's okay. That's a good clarification.

And with the Washington Square Legal Services is that a clinic at the law school in which students get practical experience representing -- working on real cases?
A. Yes, it is.
Q. And --
A. The -- yeah.
Q. No, go ahead.
A. Washington Square Legal Services is, kind of, the umbrella organization for all of the in-house clinics at the law school, so it's not just one --
Q. I see.
A. -- not just one clinic.
Q. Oh, 'cause it could be different practice areas?
A. Exactly.
Q. Got it. Got it.
And do you, as the executive director -- or did you say you're the executive director of the Washington Square Legal Clinic Services?
A. Yes.
Q. Okay. As the executive director, do you take your -- take cases on your own, specific



cases?
A. No, I do not.
Q. Okay. Do you handle any cases, as a practicing lawyer, in the context of any clinic at the law school?
A. Yes.
Q. And can you explain?
A. I am the director for the criminal defense and reentry clinic, which is one of the clinics under the umbrella of Washington Square Legal Services. And in that capacity I will, on occasion, enter an appearance in criminal cases for purposes of the clinic.
Q. How long have you been with NYU?
A. Since 2017.
Q. Were you teaching prior to 2017?
A. No, I was not, not -- not on a full-time basis, no.
Q. Were you in private practice?
A. I was a federal public defender immediately prior to joining NYU.
Q. And that would be equivalent to, like, the Cook County Public Defender's Office?
A. Yes, except I think the Cook County



Office handles matters in State Court, and I was a --
Q. Right.
A. I was in Federal Court, but, yes, it's essen- -- essentially the same sort of thing.
Q. Okay. Very good.
And have you ever been in private practice?
A. If you mean by "private practice," like -- like a -- I guess the equivalent of what you're doing, Mr. Moran, or -- or other folks who have their own firm, no. I've always been -- I've always worked for, like, public interest, nonprofit organizations so --
Q. Got it.
A. -- I guess I -- you know, just to, kind of, clarify.
Q. And how long were you work- -- did you work with the Federal Public Defender?
A. From 2015 -- from the beginning of 2015 until I came to NYU in -- in late January, maybe early February of 2017.
Q. Okay. And prior to that role, what were you doing?



A. Prior to being at the Federal Defender's Office, which I assume is what you're -- mean by "that role," I was a senior counsel at the NAACP Legal Defense Fund here in New York.
Q. How long did you work for the NAACP?
A. I worked for the NAACP Legal Defense Fund from 2008 until 2015.
Q. Prior to -- and did you do -- in that capacity, as a senior counsel, did you work on criminal cases?
A. I did.
Q. And you represented clients and -- who had been charged with crimes?
A. Yes.
Q. And was that limited to the New York City area or was it around the country or regional?
A. These were clients all over the country.
Q. And prior to the NAACP, where did you work?
A. Just -- just one small clarification about your question. It probably doesn't make a difference at all, but, the NAACP and NAACP LDF are two completely separate organizations.
Q. You know, that's a good point. Another

good clarification.
A. They share the same -- that same moniker, but -- and we often got a lot of, kind of, confused -- or not confused, we got a lot of solicitations or requests or questions about, like, what organization we were working for; but they -- they've been separate for -- for a long time. I don't want to create any confusion on my part about my own background --
Q. Fair point.
A. -- yeah, so I think your question was prior to the NAA- -- to LDF what was I -- where was I working --
Q. Yes.
A. -- right?
So from 2006 to 2008 I was a State Public Defender, a staff attorney, at the Bronx Defenders.
Q. And prior to 2006 where did you work?
A. Prior to that I was a E. Barrett Prettyman fellow at Georgetown University Law --
(Reporter interruption.)
THE WITNESS: I was an E., initial E period, Barrett, B-a-r-r-e-t-t, Prettyman,



P-r-e-t-t-y-m-a-n, fellow at Georgetown University Law Center for two years.
BY MR. MORAN:
Q. And what was that -- what were your responsibilities in that role?
A. The role was, in part, learning how to be a, kind of, clinical law professor; and, in part, it was handling criminal cases in DC Superior Court over the course of the two years. It was a training and teaching program.
Q. Prior to your fellowship, did you hold -- were you a lawyer? Were you still in law school?
A. Prior to my fellowship, I was a federal law clerk for two federal judges.
Q. When did you graduate from law school?
A. 2002.
Q. Got it.
And when you were working as a fellow, in your fellowship, were you -- and handling cases in -- in the criminal courts, were you supervised by anyone, or were you handling those on your own?
A. I was supervised by the two directors of the fellowship program but also handling the -- the



cases as well. And they -- yeah.
Q. Sure.
Now, I'm gonna ask you a little bit about trial experience.
How many trials do you think you've done in your professional career?
A. I'd say -- if -- if I had to, kind of, give you a rough estimate...
Q. Rough is fine.
A. Yeah, I'd say between -- between 20 and 30 trials over the course of my career.
Q. Okay. And of those trials, how many were you -- well, let me back up a second.
A. Sure.
Q. You know what that phrase "first chair" means?
A. Yes.
Q. Of those trials how many were you considered the first chair?
A. On all of them except for -- all but -- all but one was I the first chair. And -- and by "first chair" -- my -- my understanding of first chair is the primary responsible -- the primary attorney responsible for the -- for the trial.



That's the best of my understanding.
Q. Exactly. Exactly. Okay.
And of the trials how many were murder trials?
A. No murder trials.
Q. How about attempted murder?
A. One -- no, two. Two. Sorry.
Q. How about cases involving allegations of sexual assault?
A. None that I can remember.
Q. In the trial that you did, how many -- and, again, I know you're not gonna be able to tell me, so approximately is fine.
How -- how often or how many times were you cross-examining police officers or detectives?
A. If -- if I am putting kind of an -- just based on my own rough recollection of how many trials I've had, over the course of my career, I'd say in just about all of them I had to cross-examine a police officer or a detective.
Q. And so how about -- let's narrow the focus a little bit.
How many of those did you have to cross-examine the primary detective who

investigated the case?
A. Again, this is -- my -- my rough estimate, I'd say two or three.
Q. Have you ever, in your professional career, actually, even back in law school, been involved in a case where your role was that of an investigator? And I want to exclude the Working Group for that question.
Prior to the Working Group did you ever have an engagement where you were expected to conduct an investigation and reach a conclusion based on that investigation?
A. Mr. Moran, if you're asking me -- I just want to clarify just so I make sure I answer the right --
Q. Sure.
A. Are you -- are you asking me -- are you asking me if I'm -- if I was an investigator as, like, that's the only thing I was doing -- like, that is sole thing I was doing versus, you know, as part of my -- as a component of my work as a defense attorney or as part of my work as a -- you know, at one of the organizations we mentioned earlier?



Q. No, and that's a good clarification.
What I mean is where the primary function was of that an investigator, and you were not the defense attorney or the trial attorney?
A. No. No. I've not had -- I've not had that -- or been asked to -- to engage in that sort of work as my sole responsibility.
Q. Would -- would you consider the Working Group -- your role in the Working Group as that of an investigator?
A. I think part of it is -- is as an investigator --
(Simultaneous crosstalk. Reporter interruption.)
BY MR. MORAN:
Q. What is the other part?
A. I mean, I guess we had to draft and write up our, kind of, findings or conclusions about what we investigated.
Q. Well, but that would be the -- part of being an investigator, just like a police officer has to do a report with whatever they've investigated?
A. Yeah.



Q. Would you consider the documentation of your work as an investigator at least to be part of the responsibilities of an investigator?
A. Yeah. Yes.
Q. Okay. Would it be fair to say, then, that the Working Group was the first time, in your professional career, in which your primary function was that of an investigator?
A. Yes.
Q. Okay. Have -- have you been published before as a -- in -- in your work as a law professor?
A. Yes.
Q. In various law reviews, I -- I assume?
A. Yes.
Q. How about books? Have you published any books or chapters of books?
A. No. I was a -- I was an editor on -- on one book, but that wasn't a -- that wasn't something that I published myself.
Q. Right. What was the name of that book?
A. I think it's called -- I'm looking over my -- at my bookshelf to think of what the name was.



I think it's called "Race, Rights, and Redemption" and in a, kind of, subsequent edition of the same book was called "Carving Out a Humanity."
Q. Now, as a law professor, are you expected to publish frequently?
A. I'm not sure about frequently, but certainly regularly.
Q. Okay. What does "regularly" mean?
A. I think my -- the general expectation is every year or two.
Q. All right. And I assume you have a -- a particular focus of your scholarly work?
A. Yes.
Q. Okay. Now, obviously, I've seen your -- your website at your school, and it looks like you do focus on what role race would play in the criminal justice system. And I know that's a very shorthand way to describe it, and I know you probably could give me much more of an explanation, but am I correct about that?
A. Yes.
Q. Okay. And I assume, also, that includes looking at things like institutional racism, the

disproportionate number of black people that are in prison compared to white people, things of that nature; is that also correct?
A. Yes.
Q. Okay. Let me ask you something.
In your work with the Working Group, is that a -- is that something you brought to the investigation, like, that prospective, or point of view, and did you apply it to your work in the Working Group?
A. I mean, I think, with the Working Group, like, my -- I -- I approached the work with an open mind. And my goal was always to, kind of, follow the facts and information that we gathered to wherever it led us. So I don't know that I -- I -- there was anything unique about my background or scholarship that -- that I brought to the Working Group. I don't -- I don't think I did, but, you know -- yeah, so I -- I can't -- I can't say, as I sit here, you know, that that shaped anything in terms of how I thought about -- whatever I brought to the Working Group.
Q. Do you think your -- your views on the role of race in the criminal justice system



influenced your work at the Working Group at all?
A. I don't know if it -- I don't think it influenced my -- necessarily influenced the -- my views about the sorted decisions we made, but I think it certainly played a role in the way I thought about, you know, some of our conversations with witnesses. But I guess I have a hard time of separating, like, my, kind of, academic background from just my -- my own basic experiences as, you know, a black person in America and my experiences with the criminal system more generally.
Q. Well -- and, I guess, that's a -- that's a very fair point. Let me ask you this.
I mean, have you had encounters with the police yourself that you found were unfair or motivated by race or something like that?
A. Yes, I'm sure I have. The one thing that, kind of, comes to mind, most readily, was not necessarily with police officers, like NYPD or folks at the New York Police Department --
THE WITNESS: Sorry, Madam Court Reporter.
BY THE WITNESS:
A. (Continuing) -- or folks necessarily on



the police force. I mean, I certainly feel, like, I've -- I've been -- there was a time I was with my brother, and we were, kind of, holiday shopping. And we were at a mall in Connecticut. And the mall was packed. And cars were all over the parking lot. We couldn't figure out where our car was. And we were -- there was a -- I guess a report that was made that people were casing the parking lot looking for cars to break into.
And so the police, at that time, responded to the call and detained my brother and myself and accused us -- accused us of trying to steal cars.
I had a time where I came home from school, when I was in high school, and a neighbor reported that a black teenager was trying to break into a house. It turned out to be me walking into my own home. Was -- the police were called and -- and detained me then.
I've been called racial slurs in court by court officers here in New York. That was one experience early on in my career. So those things have happened.
Q. I'm sorry you had to go through those



things.
The -- you've been detained -- those moments where you were detained --
A. Mm-hmm.
Q. -- were you detained for a length -- any length of time beyond, say, like, the ten minutes it would have taken for the officers to figure out that they shouldn't have detained you?
A. No. No.
Q. Were you mistreated by the officers when they detained you?
A. Not beyond the initial decision to detain me, no.
Q. And, obviously, the offensive part of it is that you -- it seems like you were stopped simply because you're black?
A. Yes.
Q. Okay. And that was your view of those encounters?
A. Yes.
Q. Okay. Let me ask you this. Are you able to separate your personal experiences, when you're doing the work of the Working Group, and taking into account the fact that most of the

claims or the claimants that you're looking at come from predominantly black areas and the police officers involved are almost all white? Are you able to separate your own personal experiences in that context?
A. Yes. Yes.
Q. Okay. Did you -- did you, like, have to make a conscious effort to do that, or are you just -- because of your own professionalism you're able to do it?
A. It was my own professionalism. You know, I -- I try to assume the best of everybody that I encounter until I'm -- until I have a reason to believe otherwise, so, yeah.
Q. Okay. Let me ask you. Did -- did you do anything to prepare for your deposition today? And let me just caveat that by saying you don't have to tell me what you spoke about with your lawyers present. So if you had meetings with them or looked at documents, I can ask you about that; but, otherwise -- you know, you don't have to tell me what they told you and what you told them.
A. Right. No, beyond -- beyond the -- what you just -- beyond meeting with my counsel,



without, kind of, talking about what we talked about or discussed, no, I didn't do anything else to prepare for today -- today's deposition.
Q. Did you look at any documents?
A. No.
Q. You would have gotten a subpoena for documents from my office sometime in November of 2024; does that sound right?
A. Yes. Are -- your office is Rock Fusco?
Q. Correct.
A. Yes. Sorry I just didn't remember. Yes. Yes.
Q. That's okay.
And then you got a subpoena for a deposition -- I don't know. Did you get -- I -- I think we may have sent them to the State's Attorney's Office, actually, so --
A. Yeah.
Q. I want to -- I want to use those -- today's date and that point in time you got the subpoena from my office for documents as the bookends. That's the time frame I'm talking about.
A. Okay.
Q. Did you look at any documents from your



work in the Working Group after you became aware that we were conducting discovery into the Working Group?
A. Only for purposes of complying with the -- the -- I guess there were -- maybe the request in the -- in the -- I don't remember if it was in the initial subpoena in November or if it was a request that came later than that, but it was -- it was in between the -- the, kind of, book-ended period you just described. For purposes of providing whatever I had in my possession to, I guess, Mr. Henretty, that was the only time I looked at any -- any -- any Working Group related documents.
Q. Have you reviewed the report that was created by the Working Group regarding Cordell Williams at all prior to today, between the date you got the subpoena and today?
A. No.
Q. Have you looked at any emails you exchanged with your Working Group colleagues between the date you got the subpoena and today's date? And when I say look at them, I mean review them to refresh your memory, things like that?



A. No. No. The only -- again, the only time I would have -- would have looked at any materials related to any -- any of our work in the Working Group was to provide it to Mr. Henretty, but -- I didn't --
(Simultaneous crosstalk.)
BY THE WITNESS:
A. -- have anything else or reviewed anything at all.
(Reporter interruption.)
BY THE WITNESS:
A. I said I have not -- I have not looked at anything else or -- or viewed anything else at all. It was only for purposes of providing any documents that were related to the -- excuse me, to the subpoena, to comply with that.
BY MR. MORAN:
Q. Did -- by the way, did you know that the deposition of Maria Hawilo was taken the other day?
A. Did I know that it was taken? I knew that she has -- I know that she had a deposition taken. I don't know what date it was on. I know it was prior to mine.
Q. Did you speak with her in the last

couple of days at all?
A. No. No. I haven't spoken with her in -- no. No, I did not.
Q. Have you spoken with Marc Kadish in the last, say, three or four weeks?
A. I don't -- no. No, I have not spoken with him the last three or four weeks that I can recall. No.
Q. Have you had conversations with either Marc Kadish or Maria Hawilo since you got the document subpoena from my office outside the presence of your lawyers?
A. I'm sorry to -- Mr. Moran, the document -- was the document -- document subpoena the -- the first one in November, correct?
Q. How about this? Let me -- I'll ask it a better way so you don't have to think about when you got that.
Between November of 2024 and today's date, have you had conversations with either Maria Hawilo or Marc Kadish about your work with the Working Group outside the presence of your attorneys?
A. Yes.



Q. Okay. How many conversations?
A. Maybe two or three. Like, not -- not anything of significance in terms of the number of conversations we've had.
Q. And were these conversations where -- involving all three of you or just you and one or the other?
A. I had a conversation with -- or conversations with Maria. I don't remember having -- as I sit here today, I can't remember having conversations with Marc.
Q. It's not a -- it's not a quiz.
A. Yeah.
Q. If you don't remember, that's okay.
A. Yeah.
Q. Okay. So let's focus on those conversations with Maria.
You said roughly two or three?
A. Yeah.
Q. All right. And were those by phone, Zoom, or in person?
A. There were a couple by -- a few by phone and maybe -- maybe one in person.
Q. How about email communications as well?



I'm gonna include that.
A. There -- I think there may have been one email communication with the three of us that I can remember.
Q. To the best of your recollection, can you tell me what was discussed in these conversations?
A. The email communication was -- to the best of my memory, the one that we had was because someone whose -- the -- the counsel for one of the claimants reached out to the three of us to ask us what was happening with that individual's case and where our work stood.
And, I think, maybe Marc emailed the three of us, kind of, separate and asked, like, what should we do? And I think -- I said I'm not sure, but I forwarded it to Mr. Henretty 'cause it was -- it was after the -- after our work had concluded.
Q. Mm-hmm.
A. The -- the conversations that I had with Maria, by phone and in person, were all, kind of, her own -- kind of expressions of concern about having to be deposed and, you know, just having to



sit through a deposition. That was the extent of it.
Q. Are you concerned about being deposed?
A. No.
Q. Okay. Tell me what did Miss Hawilo tell you about her concerns about being deposed?
A. She -- she just said, like, she -- she was -- like, I think her primary question was, like, why are they deposing us? We didn't -- like, we're -- we're just investigating these cases, like, what do we have to do with anything?
Q. Have you ever done any civil work?
A. Yes.
Q. In what context?
A. So you'd asked me before if I -- when I was -- when I was at the NAACP Legal Defense Fund, we represented folks who were suing the police department in the City of New York because of police practices, and it was in that context that I was involved in civil work.
Q. Those have been Section 1983 lawsuits?
A. Yes. And then I also handled school desegregation cases in Alabama. I also handled some employment discrimination cases -- or an

employment discrimination case, excuse me, in Baltimore on behalf of some longshoremen --
(Reporter interruption.)
BY THE WITNESS:
A. On behalf of longshoremen, like, people who, like, worked at -- worked at the docks, basically.
I think that's the extent -- that I can remember, that's the extent of the civil litigation I've been involved in.
I know habeas corpus actions are sometimes seen as civil because they --
(Simultaneous crosstalk. Audio distortion.)
BY THE WITNESS:
A. -- so I've been involved in habeas corpus petitions as well to the extent that that falls within the parameters of civil litigation.
BY MR. MORAN:
Q. Sure. So you have some civil experience?
A. Some, yes.
Q. Okay. It sounds like you've done work in Federal Court in the civil context as well?



A. Yes. Yes.
Q. All right. Are you familiar with PACER?
A. Yes.
Q. Do you have access to it now?
A. I do.
Q. Okay. When you became aware that there was a subpoena from my law firm in this lawsuit, did you look up the lawsuit?
A. No.
Q. Have you ever seen the complaint that was filed in this lawsuit, Cordell Williams versus Detectives Foley and O'Brien?
A. No.
Q. Have you ever looked at any pleadings that were filed in this lawsuit?
A. No.
Q. Do you have an understanding of what the lawsuit is about?
A. No.
Q. No idea at all?
A. I mean, I -- I mean, I -- I can -- I can guess, based on the -- based on the caption, but I don't -- that'd just be -- be, like, speculating. I haven't -- I haven't looked or researched into it



at all, so, no.
Q. Well, based -- and that's -- and that's the only information that you would be able to utilize in -- in guessing, I guess, what the lawsuit is about is the caption itself?
A. Yes. Yes.
Q. Okay. Well, tell me what your best guess is.
A. My best guess is that Mr. Williams is suing the -- the -- the detectives or the police for something, for -- I guess, for his incarceration or arrest or, you know, his interaction with the criminal system.
Q. Do you have an independent recollection of Cordell Williams --
A. No.
Q. -- or his case I should say?
A. I mean, I -- not -- not -- you asked before if I had prepared. I mean, I -- I remember -- I remember the case. I remember his name. I'm sure there are things I could remember as we talk through or talk about, if that's what you want to talk about his case; but it was, like, some years ago. And -- so I don't have, like, a --



a photographic memory about everything that happened or went on in his -- his case.
Q. I understand you don't have a photographic memory. All I want to know is if you have an independent recollection of him or the case you investigated involving him without looking at any documents?
A. I -- I have some recollection of his case and him.
Q. What do you recall about it?
A. I believe he -- well, I know that he was young, like a teenager. I think there was some issue with, like, a -- a -- I remember there being something about a -- a car and, like, a shooting at a -- maybe at a school.
I remember him being alleged to have been, like, a passenger in the car. And I believe it was, like, the first case that we -- or one of the first cases or among the first cases that we looked at as a -- as a group, as a Working Group.
And so -- and I -- I think it was a case where the -- I believe the State's Attorney decided to -- to grant relief to Mr. Williams -- or, at least, petitioned to grant release to

Mr. Williams -- or petitioned the Court, excuse me, to grant relief to Mr. Williams. But that's maybe the extent of what I can remember.
Q. Okay. Between November 2024, when you got the document subpoena from my office and today's date, am I correct that you've not reviewed a single document from your time at the Working Group to refresh your recollection?
A. Yeah, I don't -- I don't remember -- not -- not for purposes of this deposition. I mean, I've certainly -- well, actually, those -- those were more documents from the Working Group, so no. Yes --
(Reporter interruption.)
BY THE WITNESS:
A. Yeah, sorry. I'm trying to remember what stuff I looked at -- or what stuff I've reviewed.
That's correct, Mr. Moran, I've not reviewed documents to refresh my recollection.
BY MR. MORAN:
Q. Okay. How many -- I think you mentioned that you did meet with your attorneys in preparation for today?



A. Yes.
Q. How many times did you meet with your attorneys? And -- and that includes telephonic, Zoom, or in-person?
A. I think -- so all the meetings have been by Zoom. I think maybe three times total.
Q. Okay. And let's go in reverse chronological order, so the most recent meeting first. Okay?
A. Okay.
Q. When was that?
A. This morning.
Q. How long did that meeting take?
A. 20 minutes.
Q. Okay. And was anyone else present besides -- well, strike that.
You have two attorneys here on your behalf today. Were they both present in that meeting?
A. Yes.
Q. Okay. Was anyone else present besides you three?
A. No.
Q. Did you look at any documents during



that meeting?
A. No.
Q. All right. How about the second -- the next meeting after -- we're going in reverse chronological order, so the -- the meeting that would have occurred after the most recent one?
A. It was probably about between ten days and, like, two weeks ago.
Q. Okay. And who was present in that meeting?
A. The same two individuals who are present this morning, Miss Hamilton and Mr. Kubly.
Q. Okay. Was anyone else present?
A. No.
Q. How long did that meeting last?
A. Between 45 minutes and -- maybe 45 to 55 minutes maybe. Maybe an hour.
Q. Did you look at any documents during the second meeting that happened 10 to 14 days ago and lasted about an hour?
A. No.
Q. Okay. And, then, in the first meeting, you had, when was that?
A. It was probably two or three weeks



before that second meeting.
Q. And who was present for that meeting?
A. So Mr. Kubly and Miss Hamilton and Mr. Kadish and Miss Hawilo.
Q. How long did this meeting last?
A. Maybe an hour.
Q. And did you review any documents during that meeting?
A. No.
Q. At this meeting in which Marc Kadish and Maria Hawilo attended with you, were they there in person?
A. I don't -- I think it was all by Zoom.
Q. So everybody was on Zoom?
A. It was on Zoom. I -- I can't remember, as I sit here, 'cause they were both in Chicago, as you know, but I don't --
Q. Right.
A. I -- I think -- I think we were all by Zoom.
Q. Okay. And when I was asking you if you reviewed documents during these meetings, I know you were attending by Zoom, did anyone put a document on the screen to look at?

A. No. No, we didn't review -- no. No one put any documents on the screen. There was no review of any documents.
Q. Do you think you're prepared to testify today?
A. Yes.
Q. You have a good enough recollection of your time at the Working Group and your work on Cordell Williams' case to talk about your work?
A. Yes.
Q. Can you tell me why you feel that way given that you haven't reviewed any of the materials the Working Group reviewed or generated in preparation for today?
A. I feel like I can answer the questions -- I'll be able to answer the questions that you -- you're gonna ask. I don't -- I don't know what else to tell you. I mean, I -- I did the work at the time we did the work, and whatever the work resulted in is what it resulted in, so...
Q. Okay. Do you feel you have a good enough memory of the -- your time at the Working Group to be able to answer the questions?
A. I think so. I mean, I don't know what



the questions are yet, but we'll see.
Q. Okay. Well, no, that's fair. I mean, obviously, if you were concerned, you might -- you -- you would have reviewed some documents, so it seems like you are confident in your ability to recall the events of your time at the Working Group; is that fair to say?
A. Yeah.
Q. Okay. Tell me something. Do you -- how did you first become aware of the Working Group?
A. When I was -- this was in, I think, the summer or maybe spring of 2021. I believe that was the -- around the time frame Peter Neufeld reached out to me and asked me if I had any interest in or would be interested in being part of an effort to review criminal cases arising out of Cook County, Illinois and asked whether or not he had my permission, I guess, to put my name forward as -- as a potential person who'd be inter- -- interested or willing to do this sort of work.
And, then, I said -- you know, I gave him permission to do so. And, then, I guess a few months after that was when I became aware of, you know, Mr. Kadish and Miss Hawilo. And, I think, it



was that -- it was at that point when we'd, kind of, been formed, so to speak. So that was -- that was my, kind of, first recollection of it -- or first time hearing about it.
Q. Before you joined the Working Group, did you know Marc Kadish?
A. No. No.
Q. Before joining the Working Group, did you know Maria Hawilo?
A. I knew Maria because -- Miss Hawilo because we had -- she was a -- yes. Yes. I'll just say -- I'll leave it that, yes, I did know her beforehand.
Q. Okay. How did you know her?
A. We were in D.C. at the same time when I was at Prettyman and she was at the Public Defender Service.
Q. Did you ever have cases together?
A. No.
Q. How did you and Miss Hawilo cross paths when you were in D.C.?
A. A lot of the training of the -- both the students and the fellows at the Prettyman, some of it was done by PDS attorneys -- Public Defender



Service attorneys. We, also -- and so I knew -- knew of and knew Maria in that context. We also would see each other in the courthouse when we were both handling our own individual cases.
Q. During that timeframe, did you ever talk to her about any of your cases and any of the, you know, difficulties you had or as -- you know, with a particular case or just sharing stories about cases?
A. No, not that I can remember at all.
Q. By the way, do you know how her name came up, like, how she was recommended to be part of the Working Group?
A. I have no idea.
Q. Did you know Peter Neufeld prior to joining the Working Group?
A. I did.
Q. How did you know Mr. Neufeld?
A. I think from my -- well, I knew -- I knew who he was before I, kind of, interacted with him just from -- from his work, his line of work, and Innocence Project, more generally.
And, then, I also knew he -- who he was from some of my work that I did at -- when I was at

the Legal Defense Fund.
Q. And when you were working for the Legal Defense Fund, did you, actually, cross paths with him, or did you just know of him because of his work?
A. I think we -- at some point he had -- he had done some work around, like, scientific -- or forensics and -- and with -- with the, like, National Institute of Science Technology. And -- and I'm trying to remember if we, like, reached out to him directly about that work for questions about one of our cases; but, as far as I remember, that might have been the only, kind of, like crossing -- crossing paths in that way, like, contact with him in that way back --
Q. I -- no, go ahead.
A. Back then. Sorry.
Q. During your time at NYU, have you had opportunities to get to know Mr. Neufeld better?
A. Yes. Over the years I've gotten to know him better, yes.
Q. Do you consider yourself friends with him?
A. I mean, we're like friendly. I



wouldn't, like, invite him to my birthday or anything. I mean, not that I have any -- I don't have any issues or problems with him. I mean, I guess, we're like --
Q. You're just not that close?
A. We're not -- yeah, we're not, like, super close, like, I -- you know --
Q. Okay.
A. -- like, we're -- yeah.
Q. Do you socialize together outside of work, for example, going out to lunch or dinner or going to Bar events?
A. No. I went to dinner once with him because he was -- the only time I've ever had a meal with him was when he came to visit a class that a colleague of mine was teaching, and the colleague invited me to the class as well. And we went out to dinner after the class with -- the person was, like, a guest lecturer in the class. And that was the only time I've had, like, a meal with him.
Q. Prior to Mr. Neufeld asking if you wanted to be part of the Working Group, did you have any understanding as to the criminal justice



system in Cook County, Illinois?
A. Not -- not beyond -- not, like -- not anything beyond, like, kind of, broad strokes about the criminal system in Cook County.
Q. So, in other words, like surface knowledge, something you might see in a national headline, but otherwise no?
A. Right. Right.
Q. Did you ever -- prior to joining the Working Group had you ever heard the Chicago area referred to as the "wrongful conviction capital of America"?
A. I don't think so, no.
Q. Prior to joining the Working Group, had you ever heard the name John Burge?
A. I bel- -- I'm pretty sure I had heard that name before, yes.
Q. How did you know about John Burge prior to joining the Working Group?
A. I knew that he had been involved in and worked with people who were involved in what came to light was the, kind of, renditioning and torture of people who had been suspects or accused of crimes in Chicago and that he had been caught



for -- or -- or that, kind of -- those things had been exposed, that there had been an effort to, I guess, prosecute him for that and that -- that there was, kind of, a -- like, a reparations, kind of, effort to try and compensate or make whole the people who had been arrested and -- and -- and, I guess, tortured under his -- his watch or as a result of his command.
Q. (Audio disruption) -- classes you teach at NYU?
A. I'm sorry. You said what classes do I teach at NYU? I teach a criminal defense and reentry clinic.
I have taught, in prior years, a colloquium on race and inequality.
I teach a first-year reading group on race in the criminal system.
I also taught a one-semester seminar by Zoom -- and I -- I think that was in -- I can't remember exa- -- it had to be around COVID because it was on Zoom -- on race in the criminal system more generally.
Q. In any of your classes, has the subject of Cook County or Chicago come up?

A. Only after -- only after the -- I'm trying to think. It certainly came up after the group -- or the Working Group started. Prior to that, I don't -- I don't think it ever came up. I can't remember it coming up.
Q. In any classes you've taught at -- in any classes you've taught prior to joining the Working Group, did you review any cases that came out of -- criminal cases that came out of Cook County or Chicago?
A. No.
Q. Had you ever heard the phrase "midnight crew" prior to joining the Working Group?
A. No, I don't believe so.
Q. Have you ever heard the phrase "Englewood Four"?
A. Prior to joining the Working Group, yes.
Q. And how did you become aware of the Englewood Four prior to joining the Working Group?
A. I'm sorry. You said how did I become aware of it --
Q. Yeah.
A. -- just popular press.
Q. Did -- when Mr. Neufeld -- actually, any conversations you had with Peter Neufeld, prior to joining the Working Group, did he ever talk about the Englewood Four cases?



A. He might have talked about them, but it wasn't -- they weren't -- they weren't, like, conversations that he and I were having. It might have been, like, in as -- if I went to, like, a -- like, I think, prior to the Working Group I might have gone to, like, an Innocence Project event or benefit or something along those lines, and it -- it might have come up in -- in the course of him, like, giving remarks or talking about it more broadly.
But I didn't have any -- the answer to your question is, no, I didn't have any, like, one-on-one conversations with him about Englewood Four.
Q. Well, it could have been conversations involving other people, just where he was talking about his experiences with Englewood Four or the cases he handled?
A. Not outside the context of, like, a large audience sort of setting --
Q. All right.



A. -- public setting.
Q. And, by the way, did Peter Neufeld tell you how the Working Group came about, how it was sort of -- what its incep- -- what motivated its inception?
A. He did. He did. He did.
Q. What did he tell you?
A. To the best of my memory -- and this is based both on what he told us, and, I think, he gave us a memo describing it -- it was, in large part, I think, triggered by the Englewood Four case and an effort to figure out if there were any other, kind of, follow-on concerns from what happened in that case with other cases in the Cook County criminal system.
Q. Have you ever seen the Englewood Four settlement agreement?
A. No. No, I've never seen the settlement agreement.
Q. Have you ever seen a document that -- it's about how the Working Group is being created in response to -- or as a -- as a result of the settlement of Englewood Four, in other words, an agreement by Cook County to create the Working Group pursuant to the settlement of Englewood Four?



A. No. I think -- I think -- no, I haven't seen any document to that effect. I think Peter may have said something along those lines, but there wasn't, like, a -- like, he -- I think he said it in the context of this was, like, related to the -- to the Englewood Four litigation. But I've never seen, like, a -- a document in the way that you described it.
Q. Prior to joining the Working Group, did you know John Loevy?
A. No.
Q. Had you heard of the law firm Loevy & Loevy?
A. No.
Q. Prior to joining Englewood -- or, I'm sorry, prior to joining -- now I've got that phrase in my head.
Prior to joining the Working Group, had you -- or did you know Russell Ainsworth?
A. No.
Q. Prior to joining the Working Group did you know Josh Tepfer?
A. No.

Q. Are you a member of any Innocence Projects?
A. No.
Q. Do you go to Innocence Project- -- I assume you go to Innocence Project's events. You just described going to a dinner.
A. Sure. Yep -- yes, I do.
Q. Okay. How -- how frequently do you go to those?
A. Probably like once every couple of years. I haven't been to one since 2022 or 3 maybe.
Q. In the events you've gone to, for the various Innocence Projects, was it -- a focus of discussion, among the group, ever wrongful convictions in Chicago or Cook County?
A. No.
Q. Prior to joining the Working Group, did you know Kim Foxx, the State's -- the former State's Attorney of Cook County?
A. Not personally, no.
Q. Did you know who she was when Peter Neufeld called and asked you to join the Working Group?



A. Yes.
Q. What would you know about her?
A. I knew that she had been elected as the Cook County State's Attorney. I knew that she was a black woman who had been in the State's Attorney's Office.
I, actually, don't know -- the reason I'm pausing and hesitating is 'cause I -- there was a point, before the Working Group, when I was involved in this -- and I think it must have been when I was at NYU, when I first came to NYU, when there was this -- there were a couple of organizations that were, kind of, like, consortiums of -- of -- of what they called, like, progressive prosecutors.
And there was -- I know, like, one gathering in Montgomery, Alabama that a bunch of -- a bunch of progressive prosecutors went to, along with myself and a few other folks, who were not prosecutors. She may have been at -- at that -- that gathering.
I know there's also, I think, a -- like a conference or a sym- -- like a symposium of some sort in New York. She may have been at one of



those events. And that might -- I think that might have been the first time I, actually, met her, like, personally and knew who she -- like, came to know who she was. But I just can't -- as I sit here now, I can't remember, like, with 100 percent certainty that she was there or not. I -- but I -- I imagine if that -- that was -- if I would have met her before the Working Group effort kicked off, that's when I would have come into -- first come into contact with her. And I'd heard -- I mean, I've heard about -- I heard of who she was 'cause Chicago's a big place to -- you know, a major city, so you have an understanding of who -- who's, kind of, running for office. And I've -- I've had, you know, from a national news sense, what was going on in Chicago, more generally, about the criminal system, but that was it.
Q. Had you ever made a donation to any of Miss Foxx's campaigns?
A. No, not that I can remember.
Q. You used the phrase "progressive prosecutors."
Can you tell me what you understand that to mean?



A. So I'll tell you what my understanding is. I understand it to mean prosecutors who are concerned about trying to make the criminal system operate more fairly and more equit- -- equitably -- equitably, sorry, for all people. That's my understanding of it, more reform-minded prosecutors.
Q. Do you think that phrase has taken on sort of a pejorative definition or a negative definition at all? You seem to -- making -- the reason I ask is that you wanted me to know that it was your understanding of the phrase.
A. Yeah, I mean, I think -- I think it's -- I think it has taken on a pejorative understanding, not really in my mind, but I think folks outside of my own, you know, sphere think of it as a -- as a -- as being a problem to be progressive or reform-minded in the criminal system.
So I think it's -- I think it's taken on a pejorative turn in that -- in that sense.
Q. Did you consider Kim Foxx to be a progressive prosecutor?
A. Yes. Mm-hmm.
Q. You were appointed as a Special

Assistant State's Attorney for the Working Group?
A. Yes.
Q. Tell me what you understand that to mean.
A. I understood that to mean that we would have access to the State's Attorney's -- State's Attorney's, like, file -- like, internal files and documents, that we would be able to, kind of, I guess, consult with and talk with people in the State's Attorney's Office without regard to concerns around confidentiality or -- or privilege, and that I had to continually -- doing what I was always doing as a -- non-sworn-in State's Attorney, which is abide by the law.
Q. Well, everyone's got that expectation, right?
A. That was -- that was my understanding of it. That was just a -- for purposes of doing our work.
Q. Okay. Did you ever see a Court order appointing you as a Special Assistant State's Attorney?
A. Not that I can recall, no.
Q. Do you remember signing a doc- -- or



a -- a document that contained an oath to become a Special Assistant State's Attorney?
A. I don't think I signed any documents with an oath. I think Risa administered an oath.
(Reporter interruption.)
THE WITNESS: Risa Lanier.
MR. MORAN: R-i-s-a.
BY MR. MORAN:
Q. Okay. And when did she -- and was this in person when she administered the oath to you?
A. I think it was over Zoom.
Q. Over Zoom? Okay. All right.
And what did you understand, in the broadest sense, to be the purpose of the Working Group?
A. In the broadest sense, I understood it to be investigating some cohort of cases where there were allegations raised by claimants of concerns with the, kind of, proceedings that led to their conviction and the -- the production of statements that they had given or that had been taken from them.
Q. And as a result of those allegations of abuse, was it your understanding that one of your



jobs was to investigate the integrity of the convictions?
A. Yes.
Q. All right. Prior to joining the Working Group had you ever worked for a Conviction Integrity Office or a unit with any prosecutor's office?
A. No.
Q. Have you ever consulted with any Conviction Integrity attorneys about cases under their review?
A. You mean prior to joining the Working Group?
Q. Yeah.
A. No.
Q. Prior to joining the Working Group, did you have an understanding as to what a Conviction Integrity Unit or office was?
A. Yes.
Q. Had you ever talked to any prosecutors about what -- excuse me. There's a dog barking. I'm gonna close the door.
(Brief pause.)



BY MR. MORAN:
Q. I apologize for that. I'm gonna start over. Okay?
Prior to joining the Working Group, had you ever spoken to any prosecutors about a Conviction Integrity Unit where the subject just came up in one way or another?
A. It- -- it's possible, but I can't remember a specific conversation, as I sit here right now.
Q. Okay. Did you under- -- or strike that.
Did you understand what the role of a con- -- someone -- a Conviction Integrity Unit was when you decided to join the Working Group?
A. Yes.
Q. What do you think the role was?
A. Of a Conviction Integrity Unit?
Q. Yeah.
A. To review criminal cases that an office had been involved in prosecuting to determine if there was any concerns about the integrity of the conviction or the guilt or innocence of the person who was -- had been convicted of the offense.
Q. All right. Had you done any research

about Conviction Integrity Units prior to joining the Working Group?
A. It's possible, as part of, like, broader legal scholarship; but, as I sit here now, I can't tell you specifics about the sort of research that I did.
Q. To your knowledge when did the first Conviction Integrity Unit in the United States -- when was it formed?
A. I think in Dallas, in Dallas County, Texas. I think the chief prosecutor there was Craig Watkins. And I think that was in, like, the -- I -- I'd -- if I'm -- if I had to, kind of, speculate, it -- it'd be probably 20 years ago, 15 -- between 15 and 20 years ago, possibly maybe even a little bit longer that.
Q. Your understanding that multiple other jurisdictions started forming their own conviction integrity review units after that?
A. Yes.
Q. Okay. So conviction integrity review is a fairly recent development in the last 20 years?
A. Yes, I think that's -- that's fair to say.



Q. Okay. And have you made conviction integrity review a subject of any of your classes or one of the talking or discussion topics?
A. It -- it's come up in one of our reading -- first-year reading group, but it wasn't -- it came up in the course of conversation from the students. It wasn't a topic that we had --
(Audio distortion.)
BY THE WITNESS:
A. -- said here's a thing we need to talk about basically.
(Reporter interruption.)
BY THE WITNESS:
A. (Continuing) -- It wasn't a topic that we had said, here's something we need to talk about as a class. It was something that came up in the course of conversation from students in the class itself. Sorry.
BY MR. MORAN:
Q. No problem.
Was it -- so, in other words, it was not -- conviction integrity review is not on any of the syllabus or syllabi that you created for your



classes?
A. Not that I can recall, no.
Q. Okay. What -- at some point the conviction -- or not -- strike that.
Not -- when you joined the Working Group, were you aware that Cook County had its own Conviction Integrity Unit?
A. I -- I think I assumed that they did because it's a large office, but I wasn't aware -- I wasn't aware specifically that they did.
Q. Did you ever gain an understanding as to why there was a need to create the Working Group if Cook County had its own Conviction Integrity Unit?
A. Yes.
Q. And what is that understanding?
A. That there were, potentially, lawyers from the State's Attorney's Office who were involved in the investigation and prosecution of the cases that might be under our review. In order to avoid a conflict, there needed to be an independent...
(Audio distortion. Reporter interruption.)
THE WITNESS: An independent group.



BY THE WITNESS:
A. (Continuing) -- Independent from the State's Attorney's Office, I mean.
BY MR. MORAN:
Q. Now, your group, the Working Group, had approximately 16 cases -- 16 claimants it reviewed; is that about right?
A. I -- I think that's right. There might have been more than just those individual cases, but I think that's -- that's right.
Q. Okay. Obviously, a very de minimis number compared to all of the other cases the Cook County State's Attorney's Office would have prosecuted over the years, agreed?
A. Yes.
Q. Okay. Wasn't -- wouldn't the concern you just identified always be present in the Conviction Integrity Unit, that attorneys there, if they worked on a case, should not be reviewing -- working on the underlying conviction should not be reviewing the conviction as part of the conviction integrity review process?
A. Yes.
Q. So why was there a need to create a

special group for these approximately 16 cases?
A. I -- I'm only able to speculate that there was still --
Q. Don't speculate. Tell me if you know. If you don't know, that's okay.
A. I don't -- I don't know.
Q. All right. The -- obviously you learned what -- your knowledge about whether there's a potential conflict or not is what you heard from somebody else, right?
A. Right.
Q. Okay. And you don't have personal knowledge of somebody in the Conviction Integrity Unit of the Cook County State's Attorney's Office and a concern about that person reviewing a particular case in -- in -- that comes through the Conviction Integrity Unit; would that be fair to say?
A. Right, I don't know, personally, of any conflicts myself that anybody has in that unit --
Q. And --
A. -- in the -- in the cases we reviewed, no.
Q. Do you agree with me that the conflict



of an Assistant State's Attorney performing a conviction integrity review of a case in which that same attorney participated in the prosecution in obtaining the conviction is that the attorney may be motivated by a desire to protect the conviction as opposed to be conducting an independent review?
A. I can't speak to what their motivation might be. I think it could be -- you know, there could be multiple concerns raised by a conflict.
Q. Yeah, that's not my question. It's a little different. It's whether the mere fact that a person was involved in the underlying -- obtaining the underlying conviction could create the perception that that person is motivated in protecting the con- -- by protecting the conviction as opposed to conducting an independent review, which gives rise to a need for a separate, independent investigator to be involved?
A. Yeah, I mean, I guess, I just don't -- I don't know if it's --
Q. Did the question not make sense?
A. Yeah, I think -- I think -- so, I guess, there's -- there's a couple things that -- that I'm, like, a little bit -- that I want to clarify.



So, first, I don't know -- I don't know if the issue with the concern of -- over the conflict was one that there was a conflict with the people in the -- in the Conviction Integrity Unit of the Office or the Office, like, more broadly, so I don't want to, kind of, mischaracterize, like, what the concern was or might have been.
My understanding was it was concern with the Office overall and not just with the Conviction Integrity Unit. I never heard anything that -- or never was told anything that said, like, this person working in the CIU, Conviction Integrity Unit, has a conflict, so I don't -- I don't -- I can't speak to that.
And I think your -- your question about, like, why there -- why there might have been a need and what the, kind of, nature of the conflict would have signaled to the folks outside the Office, I just don't -- I guess, I'm -- I'm struggling to answer it 'cause I think it may be that the person's not, like, trying to protect their conviction, it may just be that they're operating with a lens that doesn't allow them to see the full range of what happened or what possibly happened or



to follow every, kind of, piece of evidence in the way that would change the outcome that they initially came to. So I think it could be multiple things that could create a challenge or a conflict for somebody who's operating in that position.
Q. Sure. Okay. Let me -- I want to make the question easier --
A. Okay. Thank you.
Q. -- yeah. It's no problem.
What do you think is the problem -- or do you think there is a problem with allowing the prosecutor who helped obtain the conviction also conducting a conviction integrity review years later?
A. Yes.
Q. What is that problem?
A. I think part of the problem is that they're reviewing their own work, and so they are -- or potentially reviewing their own work and so they may, naturally, just through human error, kind of, not be as rigorous or as attentive to things that contradict what they had done years before. I think that could be one, kind of, unintentional and un- -- an unintentional challenge

with their review.
I think the other concern or challenge with their -- reviewing their own work could be what you had described earlier which is the appearance that they may be trying to protect -- or be more willing to protect the work that they've done in the past by not being willing to -- to correct the record or correct their own mistakes should they -- should they have found mistakes in the course of their review.
Q. Okay.
A. So I think those are -- those are the two -- I think -- I think the other problem could be that if they, you know, beyond trying to protect their own work product or beyond just psychologically not seeing the full picture, they may, also -- there may be, also -- I know there are, kind of, dynamics within an office, where if you work with a colleague, and now you're reviewing their work and your own work, that you may have some concern about creating tension with that colleague or that set of colleagues. So I think that's, also, a potential challenge or concern.
Q. Okay. You'd mentioned that -- what your



understanding, at least, as far as the reason for the creation of the Working Group, was that there were attorneys in the Office, more broadly, who may not have been in the Conviction Integrity Unit, and there was a concern about those attorneys simply being in the Office for the cases that you were reviewing; is that a fair assessment?
A. I don't know if -- I don't know if it was a matter of them simply being -- I never talked with anybody about, like, the nature of the --
Q. Yeah.
A. -- like, the depth of it, I just understood it to mean that there was a concern about potential involvement of those --
Q. Mm-hmm.
A. -- of folks in the Office in the cases we were reviewing. That was --
Q. Now, that's true -- as I pointed out earlier, that's true for pretty much any case that goes through the Conviction Integrity Unit. If somebody in the Office who's not in the Conviction Integrity Unit is still there -- somebody in the Office who obtained the conviction is still working there in some capacity or another, that concern



could, also, still be there about a potential conflict, right?
A. Yes.
Q. Okay. What distinguishes the cases you looked at? I want you to look back on your own experiences with the Working Group.
Is there anything distinguishing about those cases that you recognized there was a need to move those cases out of the Conviction Integrity Unit and have a special group like yours review them?
A. As I reflect back on my experiences, I don't -- I don't know how to -- I guess, I'm not quite sure how to answer that question. I didn't -- it wasn't as though I ran, like, a conflict check or tried to figure out --
Q. Let me clarify. I'm not -- I'm not suggesting that you purposely looked at that --
A. Right.
Q. -- just you have the experience, you worked on the cases --
A. Yeah.
Q. -- did you, at any point, come to realize, oh, yeah, there's a reason for these cases



not to be in the Conviction Integrity Unit? And if -- and if you didn't have that realization, if you don't know, that's a fine answer, too.
A. I don't know. I don't know.
Q. Okay. So, in other words, you don't know why those cases were singled out to be with the Working Group?
A. Well, I -- so I think that's a little bit of a different question and may go in a different direction than what you may be asking.
I -- I was, I think, told at some point, I'm not sure by who, like, how we -- how the, kind of, cohort of cases that we were reviewing came to us; but I was never told, like, these particular cases are coming to you because of a potential conflict or because someone in the Office or the CIU worked on them.
So I think it was, like, two separate -- it was almost, like, two separate issues or conversations, so to speak, not that I had a particular conver- -- not that I had a specific conversation, but one was you need to have an independent group because of a concern about the overarching conflict and the other was these are

the cases that you're gonna be looking at.
Q. I understand that. I guess, I -- I should have been more clear.
Other than what you were told --
A. Yeah.
Q. -- that there was a concern about a conflict, do you have any other knowledge as to why those cases would have been singled out for the Working Group?
A. No.
Q. The Working Group is disbanded or dissolved in November of 2024; is that your understanding?
A. Yes.
Q. How were you notified that it was disbanded or dissolved?
A. I think either a -- a Zoom call -- probably a Zoom call with Risa Lanier and Christopher Martin or Thor Martin right around the time that the, I think, current State's Attorney was elected, and we were told that our work was coming to a close, to complete our work within, I think, at the time was -- it was within, like, a week or something like that, and that was it.



Q. Did you consider the work you were doing with the Working Group to be important?
A. Yes.
Q. Why?
A. 'Cause people's lives were -- it was concerning people's lives. It was concerning the integrity of the criminal system in Cook County, Illinois.
Q. So individually it concerned people's lives. That's one aspect, right?
A. Mm-hmm. Yes.
Q. And, then, more broadly speaking, it concerns the integrity of the criminal justice system in Cook County as well, right?
A. Yes.
Q. Okay. And those are -- those are very important subjects; would you agree?
A. Yes.
Q. And for the people whom you recommended that the conviction should be vacated, those indi- -- and if the State's Attorney agrees, which she did in some cases -- or in many cases, I should say, those people were released from lengthy prison sentences. The convictions were reversed,



and they were released from prison, right?
A. I -- I don't know, as I sit here, how many cases that she recommended -- or that she followed our nonbinding recommendation; but, in some instances, people had already served their sentences.
Q. Yeah. I guess, that's -- I -- I don't want to get too lost in the weeds.
What I'm suggesting is you, through your work the State's Attorney, had a basis to decide that some convictions should be reversed, right?
A. Yes.
Q. And, through your work, the State's Attorney -- if the State's Attorney agreed with your recommendation to reverse the conviction, some people were released from lengthy prison sentences?
A. Yes.
Q. Would you agree that being released from a lengthy prison sentence, being released from prison, is a life-changing event for those individuals?
A. Yes.
Q. Okay. And when you talk about how important your work is to the individual lives,



is -- are you taking that into consideration in how, for those individuals whose convictions were reversed, those are life-changing events?
A. Yes.
Q. Okay. Does it also -- do you, also, take into account the fact that you were, also, evaluating the detectives who conducted the investigations?
A. I was evaluating their work, but, yes.
Q. Okay. And, in some cases, your conclusions are that the detectives engaged in misconduct, right?
A. Yes.
Q. And do you recognize that by reaching those conclusions that has an effect on those detectives as well?
A. Yes.
Q. Because if the reason for the recommendation, which the State's Attorney follows, is that the conviction lacks integrity -- lacks integrity, as a result of police misconduct, there's potential consequences for those detectives?
A. I mean, I don't know what the

consequences are for -- for them. And, actually, I should say, I don't actually know what the repercussions are for them. I just know, you know, generally --
Q. Okay.
A. -- what -- people who -- they get released from prison --
(Audio distortion. Reporter interruption.)
BY THE WITNESS:
A. I just -- I don't -- I don't know what the consequences are for -- for them -- for the detectives. I just know, generally, what the consequences are for people who are released -- if someone's released from prison. I have no idea what happens to the detectives or anyone else involved -- who was involved in the cases.
BY MR. MORAN:
Q. With -- during your work with the Working Group, was that ever a consideration that if you're gonna -- you know, there's potential consequences for individuals who you find that engage in misconduct?
A. I'm sorry, was -- are you asking me if



I -- if I thought about the -- what -- could you just ask the question again. I'm sorry. I just didn't quite --
Q. Yeah, of course.
A. -- understand the question. I might have mis- -- I misunderstood what you asked -- what you were asking, sort of, before I answered. I just want to --
Q. Okay. I'm happy to rephrase any question you want. Okay?
A. All right.
Q. All right. During the course of your work with the Working Group, did you ever consider the potential consequences to detectives when you found that certain detectives had engaged in misconduct?
A. No.
Q. Now, taking into account the fact that you considered the work you were doing with the Working Group important, and recognizing that the potential impact was life-changing for some people, did you have any questions about why the Group was being disbanded?
A. I mean, I -- I had -- I had questions,



but I -- it wasn't my place to -- to, you know, raise, in any way, you know, any of those questions. I felt like -- yeah.
Q. What were you told was the reason the Working Group was being disbanded?
A. I wasn't given a reason.
Q. Who communicated the -- or you said it was either Risa or Thor Martin who communicated to you via Zoom that it was gonna --
A. Yeah.
Q. -- be disbanded?
A. Yes. I can't remember if it was -- I believe it was -- I believe they were both -- I believe it was a Zoom meeting between Risa, Thor, and the three of us, Marc, Maria, and I, I believe, and we were told it was being disbanded.
Q. Did you agree with the decision to disband the Working Group?
(Reporter interruption.)
BY MR. MORAN:
Q. Did you agree with the decision to disband the Working Group?
A. I mean, I -- it wasn't my decision to make, so I -- I didn't have, like, a -- I didn't



have an agree or disagree view about it.
Q. Well, I understand it's not your decision to make, and it's not your place to argue with them, but that's a different question.
I mean, personally, do you agree with the decision to disband the Working Group given that you're doing this important work that potentially has life-changing effects for people?
A. I mean, I -- I guess -- I feel, like, the work -- like, this sort of work should continue, you know, going forward; but I -- you know, again, I was, you know, beholden to whatever the -- whatever the folks who were, kind of, superior to us wanted us -- or decided to do.
Q. Were you told, at any point, that there's a concern about the new administration coming into the State's Attorney's Office doing something that was -- and how the new administration would handle the Working Group?
A. I'm sure it -- it came up in conversations at some point that there was a new administration coming and that they -- that new administration would have a different -- a different approach or different view of the

necessity of our work, and so I understood that; but I didn't have a -- until -- until we were told it was disbanded or -- or that our work was complete, I had no idea of what was going to happen or what the next administration would or would not do.

I, also, didn't know who -- I, also, did not know who the next administration would be.

Q. Sure.

Did you and Marc Kadish and Maria Hawilo ever have conversations among yourselves about the -- the Working Group being dissolved, why it's happening? How can we keep it going? Should we recommend that it stay --

A. -- I'm sure -- yeah, I'm sure we had con- -- I'm sorry. I didn't mean to -- I didn't mean to talk over you --

Q. That's okay.

A. -- Mr. Moran.

I'm sure we had conversations as a -- as a group, among the three of us, about all those things, about -- yeah, about all three of those things.

Q. What were the discussions?



A. Discussions along the lines of -- more of -- of questioning or wondering, like, what was going to happen when a new -- when the administration's -- when the administration changes, discussions about whether or not we, as a group, should make suggestions about how to think about conviction review work, more generally, in Cook County; discussions about whether or not we would be asked if we wanted to continue our work or we would talk to anybody about what was going to happen. All of the conversations was more of, like, wondering than -- than any --

Q. Sure.

A. -- clear, like --

Q. Let me ask you this. At the time you're working -- your work for the -- or the time the Working Group was disbanded, was the -- one of the people in charge of the Working Group Adam Weber?

A. I don't think in charge of the Working Group, but -- but he -- is he --

Q. Not the Working Group, I'm sorry, the Conviction Integrity Unit?

A. Yeah, I think he -- I think he was in the Conviction Integrity Unit, like,



really early on -- well, not early on, early on in our Working Group tenure, like, at the very beginning, but I think he left.

Q. Okay. I guess what I'm getting at is did -- I mean, did -- did either -- any of you, you, Maria Hawilo, or Marc Kadish, reach out to anybody in the State's Attorney -- after the change in administration of the State's Attorney's Office, I should say, to either ask about keeping the group going or make recommendations based on your own experiences on how the Conviction Integrity Unit could be a better unit?

A. I -- I can't speak for Marc and Maria. I don't know what they did or did not do. I know I did not reach out to them. And I know that we didn't have, as a group, any -- we -- we never, as a group, reached out to -- reached out to anyone in the State's Attorney's Office to talk about how to continue the work. Again, I -- I don't know what Marc and Maria did. I don't --

Q. Sure.

A. -- I assume they did not --

Q. Did you have any -- why, given the importance of the work, would none of you have



either pushed back on the decision to disband the group or offer recommendations or suggestions for the Conviction Integrity Unit to be a better unit?

A. We were told that our work was to review the cases that were assigned to us and followed the orders that we were given by the chief prosecutor.

Q. Okay. That doesn't really answer the question. I understand that those were your orders, what you were told to do, but you do -- you did retain independent discretion over your work, right?

A. Yeah. Yes, we did.

Q. And you could have made recommendations given how important the work is, right?

A. I suppose we could have. I don't -- but that was not our -- our role.

Q. Did the subject -- did the notion of making a recommendation to the State's Attorney Office about the Conviction Integrity Unit even enter your mind at all when you were told that the group was gonna be disbanded?

A. Not to my knowledge. Not that I can remember.

Q. As a Working Group -- you considered

yourself a Working Group investigator? As a member of the Working Group, you were an investigator?
A. I think that's fair, yes.
Q. Okay. Do you consider yourself impartial?
A. Yes.
Q. How do you define "impartial"?
A. "Impartial" I would define as someone who is willing and able to examine the facts and evidence with a fair and open -- open mind without -- without a, kind of, preconceived or predisposed answer to the questions you're investigating.
Q. Was it the role of the Working Group to conduct investigations on a case-by-case basis?
A. Yes.
Q. What does that mean, to conduct a case-by-case analysis?
A. To me that means immerse yourselves in the investigation of each individual case and make findings and recommendations based on that particular case.
Q. Based -- based on the facts of those cases?



A. Right.
Q. Okay. You're also supposed to look at pattern and practice evidence for the seven detectives who are identified as being part of the parameters of the Working Group?
A. Yes.
Q. What do you understand "pattern and practice" to be?
A. I understand that to be a, kind of, broader and comprehensive and systemic look at --
(Reporter interruption.)
BY THE WITNESS:
A. I understand it to be a broader, comprehensive -- comprehensive and systemic examination of the behaviors of particular detectives or law enforcement officers and the sorts of practices that they engage in.
BY MR. MORAN:
Q. What -- did you apply any standards to determine what constitutes practice -- pattern and practice in your work with the Working Group?
A. Can you clarify the question for me when you say "apply any standards."
Q. Sure. Let me -- I'll back up a second



and give you some context.
For example, the Rules of Evidence, Federal Rules of Evidence and the Illinois Rules of Evidence govern other act or other misconduct-type evidence that can be brought into a case. You're aware of that, right?
A. Yes.
Q. Okay, typically referred to as character evidence or prior bad acts or other acts, things of that nature; is that right?
A. Yes.
Q. Okay. And in your time as a practicing attorney, did you encounter cases where you had to deal with that type of evidence coming -- either you chal- -- you tried to prevent it from coming in against your client or it did come in against your client?
A. Yes.
Q. Okay. And there are standards required for that type of evidence to be admissible in any case, civil and criminal; would you agree?
A. Yes.
Q. Okay. Do you consider pattern and practice to fall into that category of evidence,



like Rule 404(b) evidence, character evidence?
A. I believe so, yes.
Q. Okay. Did you do any research, when you joined the Working Group, to determine how you were gonna evaluate pattern and practice evidence?
A. I don't -- I don't remember, as I sit here now.
Q. Do you recall whether the Working Group developed any standards based on the case law or the Rules of Evidence to determine what would constitute pattern and practice evidence against a specific detective?
A. I don't remember.
Q. Does pattern and practice require any specific misconduct, specific acts, in order to be considered part of the pattern and practice?
A. No, I don't know the answer to that.
Q. Does pattern -- can -- for -- in establishing a pattern and practice -- or to reach a pattern and practice finding, with any specific detective, can you lump all allegations of misconduct together regardless of what those allegations are?
A. I -- I -- I think, if -- if you're

talking about trying to figure out the -- if there's a pattern or practice for -- with respect to a specific detective or a specific individual, I think your question may turn on, like, the nature of the allegations or the nature of the conduct.

I guess, maybe, I can answer by way of example, like, if -- if you have somebody who's, like -- who, you know -- I'm trying to give, like, a random example.

But if the issue -- if the concern is, like, they chew gum all the time, and they're not supposed to chew gum on the -- on the job versus they, like, beat people -- or beat confessions out of people, I'm not necessarily sure that I would care about them chewing gum as much as I would care about them beating confessions out of people in establishing a pattern or practice. So, I guess, that's -- I don't know if that answers the question, but I think --

Q. Okay. Well, let's -- let's just clarify something.

Are you aware of anywhere in the United States where any Court has deemed chewing gum on the job to rise to the level of police misconduct?



A. No, but I'm not sure if that was -- I'm not trying to be cute. I'm just -- I don't know if I answered your question in the way that --

Q. Yeah, I'm -- I'm gonna clarify it, but, I think -- you know, that's an extreme example. And I don't -- I don't think we're talking about infractions that are similar in vain to chewing gum on the job or not having your shirt tucked in or something like that. So I'm gonna -- I'm gonna give you a better question --

A. Okay.

Q. -- so you can answer it. Does that sound good?

A. Yeah.

Q. Okay. I'm talking about specifically with the Working Group.

A. Okay.

Q. As a Working Group member who conducted -- and I want you to draw on your experiences -- could you just lump different types of allegations of police misconduct together to conclude that a specific detective or group of detectives had a pattern and practice?

A. I mean, I -- I don't know. The only



allegations that we had were things that were involving complaints of beatings and other sorts of conduct along those lines. So I don't -- I'm not sure what the answer to the question is. I just -- I don't know what to tell you. I didn't have, like, a -- there wasn't some, like, large set of examples that would fall outside of the confines of what we might think of is, like, shocking and concerning conduct by officers.

Q. Did the Working Group make an effort to determine whether there is a specific pattern of behavior, in other words, types of physical abuse or types of mental coercion among these detectives?

A. Yes. Yes.

Q. And in those instances would the Working Group have lumped different types of behaviors together to conclude a pattern and practice existed?

A. I mean, are we talking about, for example, one officer always slaps somebody, another officer always punches people, then, yeah, we would lump those things together.

Q. Okay. How about an officer who leaves the room, doesn't observe the physical abuse,



another officer comes in and engages in physical abuse with the detainee in one case and in another case the officer who left the room is accused of, actually, engaging in the physical abuse, would you -- and in the first case the officer who didn't do anything allegedly has knowledge of the abuse, can you take those two cases together against the officer who left the room and say there's a pattern of abuse?

A. Yes, I would, because in the hypothetical you gave -- or the example you gave everybody knows what happened, including the person who had left the room, and came back and saw the aftermath of the abuse. So, yes, I would -- I would think that to the extent that they all, in the example you gave, are working together and have knowledge of what happened, and, you know, you said the officer who left the room didn't do anything wrong, I think by leaving the room and coming back in and having knowledge of the abuse and not saying anything or doing anything about it or stopping it from happening, yes, I would -- I would say that was part of the way in which you would think about a pattern or practice of misconduct by the police

officers, yes.
Q. And, by the way, I should point out these are allegations of abuse.
A. Right. I mean --
Q. We don't know if the abuse happened. It's alleged.
A. Well, the example you gave I don't know -- I don't know if you said they were alleged or --
Q. I did. That's why I'm clarifying.
A. Right.
Q. Does your answer -- does that change your answer?
A. If it's an allegation versus whether I knew that it happened?
Q. Yeah.
A. I mean, if it -- an allegation's an allegation. I think the -- I think the answer would really depend on, in some ways, how many allegations. So if one person is saying this happened -- if one person gives the example that you just gave, that's one thing. If 30 or 40 or 50 or 100 people who don't know each other and have no connection to each other gave the same example,



that, I think, may raise some real questions, in my mind, about how are all these allegations exactly the same if no one knows one another, not connected to each other.
Q. So let me just make sure I understand.
If you are confronted with a case where an officer is alleged to have observed abuse and not intervened and then another case where that same officer is alleged to have engaged in the physical abuse, and those are the only two allegations you're aware of against that officer, you may not conclude there's a pattern simply because these are allegations and there's not enough allegations to -- to develop the pattern?
A. Yes.
Q. Okay. And the fact that in one instance it's observing abuse and the other instance it's committing the abuse, that really doesn't make a difference in the analysis because they're both part of the same kind of misconduct?
A. Yes.
Q. Okay. But if the number -- numbers of allegations increase and there's a lot of allegations that aren't -- nobody knows for certain



whether they happened, but you're confronted with these allegations, then you're more likely to find a pattern of abuse just based on the sheer number of allegations?
A. Yes, but I, also, think the other, kind of, factors in thinking about a pattern of abuse, in light of -- to your number of allegations, is you would think about other officers on the -- or other law enforcement officials in the department or among the police force who don't have hundreds of allegations against them.
And so I think it would be more than just the sheer number of allegations. I think it would require me to think about -- or I would want to think about, like what the comparator is.
Q. If you would, also -- if you're gonna do that, if you're gonna go to that level, you'd want to know, among all the officers on the police force, what their specific jobs are. For example, if you have a uniformed police officer who sits at a desk all day long at the police station, you probably shouldn't have many accusations of physical abuse against that guy; but if you have somebody who's serving in a violent crime area, the



potential for allegations increases simply because that person is out in an area where physical confrontations are more likely; would you agree?
A. Mr. Moran, I hate to do this to you, but you broke up for a second in the middle of your --
Q. That's okay.
A. -- question. I don't know if it was my internet or if it was -- or if -- or what -- but I heard you say -- I heard you -- I heard you up until the point where you said the person sitting at a desk you wouldn't expect to have many allegations against them.
And, then, the second part I didn't -- I didn't quite catch.
Q. That's okay.
Does the context -- you'd have to look at what the specific police officer's roles are in determining whether there should -- you know, there would be allegations of abuse. For example, someone who's in the police station all day long doing paperwork would be in a different context than somebody who's a street officer in a violent crime area where physical confrontations may be even more likely?

A. I think it's true, in terms of who allegations might be leveled against, yes.
Q. I'm gonna take a 30-second break.
We don't have to leave, but I'll be back in 30 seconds. I'm gonna try and fix something on my internet.
A. Okay. Thank you.
MR. MORAN: Counsel, do you -- do you want to take a longer break right now, I guess, Mr. Southerland?
THE WITNESS: I'm -- I'm okay, but I don't know if --
THE VIDEOGRAPHER: Do we want to go off the record or...
MR. MORAN: Yeah, we can go off the record.
THE VIDEOGRAPHER: Okay. Going off the record at 12:06 p.m.
(Short recess.)
THE VIDEOGRAPHER: This is the beginning of media unit two.
We are going back on the record at 12:15 p.m.



BY MR. MORAN:
Q. Okay. Are you ready to get back started, Mr. Southerland?
A. Yes.
Q. Okay. Great. Did the Working Group -- was the Working Group given some policies or guidelines from the State's Attorney's Office when it began its work?
A. We -- we, Marc, Maria, and I -- I don't believe -- I -- I know I was not personally given any, kind of, policies or anything along those lines when we started our work. We were -- or I know I was, and I believe Marc and Maria were as well asked to sign a -- a -- sort of a confidentiality agreement, but that was the extent of what we were given, I believe.
And, I believe, also, I will say -- I think I was given -- I know I was given some policies around like travel or reimbursement and, like, timekeeping for, like, a -- I guess -- I guess it must have been for County employees, in general. It seemed like a -- like, kind of, more like a government -- like a general government guideline about how to...



Q. I meant more specific towards your substantive work, not --
(Simultaneous crosstalk. Reporter interruption.)
BY MR. MORAN:
Q. (Continuing) -- substantive work.
A. Okay.
THE WITNESS: Sorry about that. I'm sorry, Madam Court Reporter, again.
BY THE WITNESS:
A. No, not that I recall were we given any guidelines about our work as a Working Group.
BY MR. MORAN:
Q. Okay. Did the Working Group develop its own written protocols or standards or guidelines that would guide it in investigating the cases?
A. Yes, we did.
Q. And did the Working Group ever come to a determination that it should apply a presumption of innocence to the claimants? And by "claimants" I mean the criminal defendants you were investigating.
A. I -- as I sit here right now, I don't believe that we did come to some conclusion about



applying as a group -- as a -- about applying a presumption of innocence to the claimants. I don't think that was part of -- I don't -- as I sit here now, I can't remember that that was a part of our discussion or the guidelines themselves.
Q. Do you have an independent recollection of ever applying a presumption of innocence yourself or advocating for that?
A. I -- I don't remember advocating for that. I -- I don't remember if it came up or not in our conversations about the guidelines themselves. It may have come up in our conversations with other Conviction Integrity Units in other parts of the country as we were thinking about the work we were gonna undertake, but I can't remember advocating for something specific along those lines myself.
Q. Did -- who -- did one of the group, sort of, take the lead on writing or drafting protocols?
A. Maria really took the lead on drafting the protocols.
Q. And did anyone research any case law or statutes or any authority for how your work should be guided?

A. I can't speak for -- I'm sorry, I said Maria. I meant Miss Hawilo before --
Q. That's okay.
A. I assume you know who I'm -- when I say "Maria."
Q. Yeah.
A. I can't speak for what Miss Hawilo or Mr. Kadish did in terms of their research. I know I did not independently conduct research myself.
We did consult with people about the work we were undertaking, but that was the extent of the research that we did.
Q. And just so you know, she -- she referred to you as "Vincent" throughout her deposition, so it's okay to call her Maria.
A. All right. So I'll call her -- I'll call her Maria. Thank you.
Q. It's up to you. It's your preference.
Okay. So -- and when -- when I asked if any of you had researched, I -- I want to make sure you understand that that includes giving -- like, delegating that type of assignment to one of the law clerks or interns who would have been assigned to work with the Working Group. Did anybody



delegate that sort of work out?
A. I can't remember -- I don't -- I don't know, but I can't remember if -- if anyone did.
Q. Did you consider yourself to be an advocate as a member of the Working Group?
A. No.
Q. And tell me why.
A. I guess I understand a advocate as someone who is, like, pushing for a particular position with respect to an issue or a concern.
And, I think -- I didn't see myself as, like, pushing for a particular position in that -- in that way. Like, I didn't see myself as a lawyer for the claimant or -- or a lawyer or a counsel or an advocate on behalf of the detectives or on behalf of the State's Attorney's Office. I saw myself as investigating the cases and trying to come to some conclusion based on the information that we had gathered.
Q. Right. And so you, obviously, recognize the difference between an advocate who represents somebody and tries advocate a position for that person --
A. Right.



Q. -- and somebody who's taking an impartial look at the facts and conducting a fair and impartial analysis?
A. Yes.
Q. Okay. And you would categorize your work as being a fair and impartial analysis and not advocacy?
A. Yes.
Q. Okay. The -- you, obviously, recognize there are other avenues to have a conviction reversed besides going to the Working Group? For example, there could be appeals, the post-conviction process, actually going through the Conviction Integrity Unit, those would be options, potentially, for a criminal defendant?
A. Yes.
Q. Okay. And in Illinois there's something called the Torture Inquiry Review Commission that reviews claims of alleged police abuse? You've heard of that?
A. Yes.
Q. Right. And that's another avenue, potentially, assuming the allegations fit the scope of review by that commission?



A. Yes, I understand the Torture Inquiry and Review -- I don't know if it's "Review" or "Relief" Commission to be an avenue for folks to have their claims heard, but I -- I -- I guess I just want to be careful to -- to be clear I don't know that -- yeah, I think it's an avenue. I don't know that it -- it necessarily, like, by design, will result in that effect the same way that an appeal or a post-conviction motion will result in that effect of having a conviction reversed.
I think -- I think, TIRC, the relief that they can provide is -- falls short of what would happen in a post-conviction setting or in a -- an appeals setting, in some respect.
Q. That's act- -- that's true. The TIRC commission makes a recommendation, then the case goes back to the Circuit Court for a hearing on whether the abuse actually happened?
A. Right. Right.
Q. But that is, nonetheless, an avenue for a potential criminal defendant is to go through the -- go through TIRC, the commission, and if they were to get a finding -- a favorable finding, their case would be back before a judge for a review on

potential abuse?
A. Yes, although it has to fall within -- like you said, within the parameters of their jurisdiction, and I understand --
Q. Mm-hmm.
A. -- but -- as I understand it, excuse me.
Q. When you were reviewing a particular case, did you, or anyone else in the Working Group, do any research to determine what the State had to prove to obtain the conviction?
A. Mr. Moran, I'm -- I'm not trying to be -- I'm not trying to be difficult, but I just want to make sure I'm clear on your question.
Do you mean -- are you asking, like, we had to -- did we have to -- did we have to sort out, like, what the elements of the crime were, or -- or was it specific to a -- the case or the evidence that was in the case or maybe -- maybe just clarify what you -- what you mean by --
Q. Like, for example, you, personally, had not tried a murder case in the past --
A. Right.
Q. -- you told us that earlier.
And you were predominantly review- -- I



think all of the cases you reviewed for the Working Group were murder cases?
A. Right.
Q. Okay. Did you do you any research to inform yourself as to what the State would have to prove to obtain a murder conviction?
A. No.
Q. Do you do any -- some of the cases you reviewed involved a conviction of first-degree murder under an accountability theory; do you have that recollection?
A. Yes.
Q. In fact, that was Cordell Williams. He was convicted of murder under an accountability theory. Did you know that?
A. Yes.
Q. All right. Do you have recollection, I should say. I know you did know it at one point, but do you have that recollection today?
A. Yes. Yes.
Q. Okay. Did anybody review what the State is required to prove to obtain a murder conviction under an accountability theory?
A. I don't know what -- I don't know what



Marc and Maria did. I know I did not review that -- the specifics of those -- those sorts of elements myself.
Q. As you sit here today, do you know what the State was required to prove to establish -- or to obtain a conviction of murder under an accountability theory against Cordell Williams?
A. As I sit here today, I can tell you, kind of, the -- the case -- the Supreme Court case name about felony murder or accounts -- or, excuse me, about murder under an accountability theory around knowledge and intent of the folks who were involved in the crime itself; but I can't give you specific details without going back and reviewing it myself.
Q. Well, you don't have to cite the actual case law, but can you tell me, to the best of your ability, what the State is required to prove to establish -- or to obtain a conviction of murder under an accountability theory?
A. As best I can understand it, the -- you have to prove that a homicide happened; that the homicide happened with -- it was intentional with malice; that the manner of -- person had the



relevant mens rea and actus reus in terms of, like, mental intent and took actions to commit the homicide and understand -- the person who was under an accountability theory would have to have, perhaps, the same mens rea in terms of engaging in -- knowingly engaging in con- -- conduct that they knew was going to lead to a homicide.
And that would be my understanding of what they would have to prove under an accountability theory and that -- that they -- that the folks who were involved were, kind of -- all had the same basis of knowledge -- or at least were engaged in conduct that was close enough to the same basis of knowledge that you couldn't presume anything else otherwise.
Q. Is that how you applied your analysis to Cordell Williams?
A. I don't know what -- I can't remember what we specified with respect to Cordell Williams.
Q. Under an accountability theory does the person convicted of an accountability theory have to form an intent to participate in the actual crime that was committed, in other words, the homicide, if the intent was only to commit -- or to

engage in a different type of behavior that was a lesser crime?

A. I don't know the answer to that. I mean, I believe, that there's -- there's a foreseeability element as well. So I've had cases where individuals, in other contexts, were -- said they were just, like, the getaway driver, and the robbery took place inside of a -- of a establishment, for example. And the robbery that took place inside the establishment -- you know, there was no, kind of, intent going in with anybody harming anyone or killing anyone, and the people who committed the robbery inside the establishment killed a person inside the establishment.

And so, in that instance, the example that I'm giving, the, sort of, getaway driver knew the robbery was gonna happen, knew that it was for- -- it was reasonably foreseeable that some sort of fatality or some sort of homicide could happen under those sorts of circumstances, but they weren't the one pulling the trigger, and they weren't the one who actually did the shooting themselves. So their mens rea might -- might not have been precisely or exactly the same as the --



their codefendants inside the establishment who committed the robbery and homicide, but it was foreseeable enough, through their involvement, that a homicide would happen and, therefore, they were guilty under an accountability theory. So that's my understanding of the law.

Q. Okay. So the getaway driver, for an armed robbery that results in a murder, the driver himself, can be convicted under an accountability theory of murder because of the fact that he participated in the armed robbery as the getaway driver even if a murder wasn't planned? That's, kind of, what you're saying?

A. Yes.

Q. Okay. Define "mens rea" for me.

A. Mens rea is the mental state that's to -- that's required to commit a crime. Every criminal statute has a mens rea element to it.

Q. Okay. In the case of Cordell Williams, he was the driver; is that your recollection?

A. I can't remember if he was the driver. I know he was -- I know there was a car involved. I know that he was in the car.

Q. Okay. We're gonna get to -- I'll show



the paperwork in a little bit and -- to help you remember, but I'm gonna represent to you right now he's the driver.

A. Okay.

Q. He's told to pull over by another guy in a car who claims to see an opposing gang member. There's a gun in the trunk. The person who told Cordell Williams to pull over tells him to pop the trunk and wait here.

And he -- that person gets out of the car, grabs the gun, goes into the restaurant where the opposing gang members are and shoots them.

Under that fact pattern, what does the State need to establish an accountability theory of murder against Cordell Williams?

A. Under that fact pattern, I think the State would need to be able to prove that Cordell Williams knew that there were guns in the trunk; knew that the -- whoever got out of the car and went back to the trunk took the guns out of the trunk and went into the -- went into the establishment.

I think that the State would probably need to be able to prove that when the person said



pull over and got out of the car and went into the trunk and went into the store, that it was foreseeable on Cordell Williams' part that the homicide -- or the shooting that happened inside the establishment was going to happen. And so, yeah, I think -- I think they would have to prove all those -- those pieces.

Q. Okay. Would you agree with me that foreseeability is an objective analysis?

A. So -- so I think it's an objective question about whether or not something is foreseeable. I think -- and this may be, like, more academic than anything else. I think that what's foreseeable to some individuals is not necessarily foreseeable to every individual based on the way that your -- your brain might operate or different categories of folks' brains might operate, and so...

Q. Well, let me ask you -- let me ask you this since you brought that up.

In the foreseeability test under the law, do you know what the actual test is?

A. As I'm sitting here right now, I can't tell you like chapter and verse what the

foreseeability test is, no.
Q. Let me -- let me see if this refreshes your memory: What a reasonable person knew or should have known under the same or similar circumstances.
Does that sound like a foreseeability test?
A. That sounds right. That sounds right. And, I guess, what I'm -- what I'm, like, struggling over is the "reasonable person" part because I think the reasonable person language is -- it -- it's not -- I won't -- I won't say it's, like, subjective, meaning it's just, like, what I believe it should be; but I -- I think it -- I think it shifts with who you define as a person, right?
So I think an adult is gonna have a lot more of a sense of what is foreseeable than, say, like, a 12-year-old or a 13-year-old.
Q. Of course. Of course.
(Simultaneous crosstalk.)
BY MR. MORAN:
Q. Go ahead.
A. Sorry. Sorry. I'm not -- and I'm not



sure if that -- if what I just said about, you know, an adult versus, like, a 12- or a 13-year-old makes a difference in terms of when you're saying an objective -- objective test, but that's -- that's, I guess, what I'm having, like, a little bit of -- that's what's kind of popping into my mind.
Q. Well, that's a question for the jury to resolve, right, whether someone is -- whether that -- under that set of circumstances a reasonable person would know or should have known that a murder could have occurred?
A. Yes, I think that's right.
Q. Okay. So Cordell Williams is 19 years old. If he knows that there's a gun in the trunk, he knows that he stopped the car so his companion could confront opposing gang members in opposing gang member territory, and he pops the trunk so that person could go in and confront the two individuals who are, ultimately, murdered, would you agree with me that there's sufficient evidence there that Cordell Williams could be -- or it -- may be accountable under -- or may be liable for the murder if it was under an accountability



theory?
A. So I think on the facts that you just described, which is that -- which assumes that Cordell Williams, like, knows all these -- knows all the -- knows, kind of, all the -- the sequence of events you just -- that you just laid out, that he knows that -- I think -- I think -- I'm just repeating just to make sure I didn't miss anything you said, that he knows that -- there's guns in the trunk; he knows that his -- that the person, codefendant, whoever's in the car, is going to the trunk to get the guns; he knows there's, kind of, gang members that the person who gets the guns from the trunk wants to confront, I think -- I think, under those circumstances, there's enough evidence for the prosecution to -- to make its argument to the jury.
I don't know what a jury, you know -- I mean, we know what the jury did in this instance, but I don't know what a jury -- you know, what -- I can't speak to what every juror -- what every juror -- every juror would do under those circumstances, but I agree that there's enough evidence there for the prosecution to make its



case.
Q. Be enough evidence to get a conviction?
A. I -- I don't know. I don't know.
Q. What more would you need to know to say --
(Audio distortion. Reporter interruption.)
BY MR. MORAN:
Q. What more would you need to know to say that there's enough evidence to get a conviction against Cordell Williams under an accountability theory of murder?
A. Oh, I think -- I guess what I'm asking -- I guess what I'm saying is I don't know, like, what's gonna happen if you tried Cordell Williams' like 30 times to a jury.
If you're asking me are there enough facts there for them -- for the jury to -- for the jury to convict him, I think, certainly there's enough facts there.
Is that the -- is that gonna be true every single time that those set of facts come before a jury, I have no idea. I can't tell you.
Q. Well, the State only has to try the case

once, right?
A. Yes.
Q. In fact, the State can only try the case once because if there's an acquittal, he's protected by double jeopardy, right?
A. Right -- well, if there's a mistrial, he's not. So -- so they could try it -- they could have to try it more than once.
And, you know, if we're talking about Cordell Williams' case, yes, that, generally, is -- it's true, but I'm sure there are more accountability murder cases than just Cordell Williams' case. And so if you had the same facts with 30 different people, I have no idea what's gonna -- what's gonna happen in those cases.
But if you're saying, kind of, are the ingredients there to make -- the ingredients necessary in the recipe to make -- to lead to a conviction, then, yes, I think you can reasonably argue that.
Q. One way to inform your analysis would have been to do some legal research on the status of accountability law in Illinois in 1994 and 1995 to see what kinds of cases were sufficient to



obtain a conviction and what kinds weren't, true?
A. I suppose. I wasn't necessarily -- yeah, I suppose that's true.
Q. The -- what did you understand to be the scope of your mandate as a member of the Working Group -- well, actually, let me back up a second.
Did you agree that -- do you agree that the Working Group had a mandate?
A. Yes.
Q. What did you understand the scope of the mandate to be?
A. To review allegations of -- allegations raised by claimants of law enforcement misconduct, to then determine whether or not the misconduct existed, and, to the extent it existed, did it diminish or undermine the integrity of the convictions that had been obtained, or was there evidence that the individual, who was charged with a crime and convicted, was, actually, innocent of that crime; or if neither those -- neither of those first two things existed, then to take no action at all -- or to recommend that we -- and to make a recommend- -- sorry. Sorry. The end of the analysis -- the end of the piece for all three of



those -- these, kind of, pathways is to make a recommendation to the State's Attorney.
Q. So you're speaking to the three potential choices you had, vacate the conviction based on innocence, vacate the conviction based on interest of justice, or take no action?
A. Yes.
Q. Okay. Did you understand the Working Group to have a broader mandate than those three potential outcomes?
A. No.
Q. And what was, specifically, the Working Group investigating?
A. We were investigating allegations of law enforcement misconduct in criminal cases in Cook County, Illinois.
Q. Okay. So, in other words -- would it be fair to say, I guess, that you were investigating the detectives?
A. No, I don't think we were investigating the detectives. I think we were investigating what happened in -- with respect to the investigation in the cases. Investigation and prosecution of the cases, excuse me.



Q. I want to come back to the pattern and practice for a second because we were talking about how, if there's an accumulation of allegations of abuse, you mentioned the -- the larger the number or accumulation of allegations the more likely it is you'll find that there's a pattern or practice; do you remember that?
A. Yes.
Q. Okay. How is pattern and practice different from propensity evidence?
A. I -- I think, like, if -- if we -- if you step back -- I don't know that it is -- I don't know that there's like a ton of daylight between propensity evidence and pattern and practice evidence. I do think that there -- it feels like there's some similarities, although, I think, pattern and practice feels like it requires a larger number of examples than propensity evidence.
When I've heard propensity evidence, I've heard it in the context of a -- of a criminal trial and is often -- because prosecutors are trying to say that this person committed this crime before and, therefore, they must be guilty of this other crime they're on trial for now.

So, I guess, I -- I think about pattern and practice as a little bit broader and wider ranging than that.
Q. Is propensity evidence admissible in one of those criminal cases?
A. No, it's not -- not admissible -- well, I mean, it depends on the nature of the conviction and -- and -- and, kind of, how it's being used; but, generally, no, it's not admissible.
Q. Generally speaking, it's not allowed -- propensity evidence isn't allowed to prove that the criminal defendant did something consistent with another act?
A. Generally, that's right, although propensity level evidence comes in all the time in criminal --
Q. For other reasons?
A. Yeah, for other reasons, and it uses -- used -- used for purposes of propensity even though the judge instructs them not -- jurors not to use it for those purposes.
Q. Okay. So there are exceptions to the rule that evidence of other acts can come into evidence to be used only for specific purposes;



that's under the rules, right?
A. Yes. And there are, also -- there are, also, specific evidence rules that encourage the admission of evidence to demonstrate that someone has acted incon- -- consistent with their past behavior --
(Audio distortion. Reporter interruption.)
BY THE WITNESS:
A. (Continuing) -- Has acted consistent with their past behavior. So evidence that looks at, you know, for example, a person who always has, like -- like, a signature crime, for example, that sort of evidence can come -- that sort of testimony or evidence can come into -- come into play.
BY MR. MORAN:
Q. So let me just -- yeah, let me just stop you right there because I want to make sure I understand. Like, a signature crime would be a very, very specific fact associated with each crime that helps establish that the person who committed all those crimes is the same person?
A. Right.
Q. That would be similar to



modus-operandi-type evidence?
A. Right.
Q. Okay. And that's the relevance of allowing that evidence in, it is not just that the murder or the crime occurred, it's the fact that they're associated with it is this unique, specific fact in each crime that creates the likelihood that it would be the same person?
A. Yes.
Q. Okay. What is the relevance of pattern and practice evidence that makes it different from propensity evidence?
A. I mean, in terms of the work that the Working Group was engaged in or conducting, I was not focused on or considering or thinking about the Rules of Evidence.
Q. Oh, I understand that. And that's fair.
Now -- in fact, you're not even bound by the Rules of Evidence, right?
A. Right.
Q. Okay. But, nevertheless, would you agree there has to be some relevance, otherwise you can't impartially consider it in your analysis, right?



A. Right -- well, I think if -- if the same -- if the same set of detectives are -- are alleged to have beaten or abused or engaged in certain sorts of conduct repeatedly, to me, that weighs on their credibility and, also, weighs on our assessment of what possibly could have happened in a -- in a instance where they are interacting with a person who is saying that they, too -- in their experience, too, was consistent with what this broader pattern or practice of behavior looks like, right?
So if we have, you know, countless examples of a detective always slapping somebody with the back of their hand and an individual says, you know, I was taken into police custody, and they slapped me with the back of their hand, that's gonna weigh on my -- at least for me, personally, it's gonna weigh on my understanding of what possibly could have happened.
Q. And that would be a -- sort of a unique signature-type piece of evidence this abuse always happens in a very specific way with this detective.
A. It could be any sort of abuse, I think. It doesn't --

Q. Well, in the example you -- I'm sorry, the example you gave involves a unique thing.
A. Right. The example I gave involves a unique thing, but I wasn't speaking any specific case, I was just giving an example.
I -- I think if -- if the -- if the general allegation is, you know, this detective or this set of detectives beat me up, and we have -- and the -- kind of, the pattern or practice bucket is that some detectives kick and punch, some detectives threaten with guns, some detectives punch and slap, then I'm not so much concerned with did they kick you with your right foot or your left foot or did they slap you or punch you? I think the broader point is these detectives were abusive. There's abuse in this particular case, at least according to what we might understand the evidence to show, as that will weigh on my concerns about the -- the case itself.
Q. Now, you knew going in, right, that the group of detectives, who were part of the scope of the review, had multiple allegations against them of abuse, right?
A. I knew going in -- I don't know -- I



don't know that I knew that -- actually, let me -- let me back up.
When you say "knew going in," do you mean when I first became aware of the Working Group or when our work got under way or at what point are you saying, kind of, knew --
Q. Well --
A. -- going in?
Q. -- the framework that you were asked to be part of was there's seven detectives who had been identified as having multiple allegations of abuse, and these are cases in which they were involved, in one way or another, in eliciting a statement or investigating a crime.
Your role is to determine that those convictions still have integrity in light of the multiple allegations of abuse against the detectives, right?
A. Yes. I see what you're saying, yes.
Q. All right. So you knew going in that you were gonna be dealing with detectives who had been accused on a number of occasions of abuse?
A. Yes.
Q. All right. If the number of allegations



are sufficient to draw a conclusion that there's a pattern and practice of abuse against the detectives, how -- without -- and let me back up a second. Let me strike that. Let me ask a different question. Okay.
Do you have to find out whether the abuse actually occurred? In all these multiple allegations of abuse against the detectives, as part of the Working Group, did you need to determine whether the abuse actually occurred?
A. I think we needed to determine whether or not it -- it occurred in the case that we were investigating. I don't know that we -- I mean, we couldn't have figured out if it occurred in all the allegations that had ever been leveled against all these detectives.
Q. Mm-hmm. And, by the way, did anybody ever interview the detectives?
A. Not -- not that I know of. I did not.
Q. Did anybody try and interview the detectives?
A. Not to my knowledge.
Q. Did anybody reach out to attorneys who represented the detectives to inquire about



interviews?
A. I did not myself. I -- I don't know if anybody else did.
Q. Do you know whether these detectives have denied the allegations against them?
A. Oh, I'm certain they've denied the allegations against them because we read transcripts of other proceedings where they were alleged to have abused people, and every transcript and every piece of information I've ever read they denied the allegations.
Q. Okay. So you've got situation where the detectives all say they didn't do it, and there's various allegations against them from multiple different people, and you're confronted with, essentially, disputed allegations, right?
A. Disputed by them, by the detectives, yes.
Q. Okay. Well, when you say "disputed by them," I mean, is there another participant in that back and forth? I mean, you've got the people who have been convicted of the crime saying the detectives abused them, and you've got the detectives say that didn't happen.

Is there somebody other -- is there some other voice you would have expected to hear from?
A. No, but you said they're disputed allegations. And I -- what I'm telling you is that the people who were abused by them didn't dispute the allegations. They said that they were abused by them. And, also --
Q. Well, they're --
(Simultaneous crosstalk. Audio distortion. Reporter interruption.)
BY MR. MORAN:
Q. Go ahead. Sorry.
BY THE WITNESS:
A. (Continuing) -- That they were abused by the detectives. And, also -- there are, also, instances, in other cases, talking with family members of the folks who had been convicted, who also described abuse by the detectives, that they had either heard about or witnessed -- I think it was -- I think it -- to my recollection was heard about at the time that it happened or -- at the time the abuse happened.
And, at least, in one instance there was



what appeared to be evidence -- pretty clear evidence of abuse by -- by one -- by a detective, or at least some law enforcement official -- photographic evidence of abuse.
BY MR. MORAN:
Q. Do you remember the name of that case?
A. I can't remember the name of the case. It was -- it was one of the, kind of -- the reason why it comes to mind is because it was one of the last ones that we had worked on -- or began to investigate. And in the case there was a lineup photo. And in the lineup photo the person appeared to have bruising -- a black eye and bruising over -- not a black eye, but bruising over their eye over the -- over one side of their face.
Q. Do you remember the name or --
A. I don't remember the name of the individual or the case, no. I just know it was one of the last ones that we were asked to work on. I can't even remember -- I can't remember, even as I sit here, if it was a case where -- like, I can't remember, like, what happened with the case after we submitted our recommendation on it. And I, also, can't tell you -- yeah, I can't remember the



name of the case, unfortunately.
Q. Okay. All right. So you brought something up, and I want to be clear about something.
Okay. There are people who make the allegations of abuse, right?
A. Yes.
Q. Yeah, you wouldn't expect them to dispute their own allegations, right?
A. Right.
Q. Okay. And then there are people who deny the abuse, right?
A. Right.
Q. The people who are accused say, no, that didn't happen?
A. Yes.
Q. That, by its very nature, means the allegations are disputed; agreed?
A. Yes.
Q. Okay. No different than someone accused of a crime. They plead not guilty; the allegation of committing the crime or the charge is disputed, right?
A. Yes.



Q. Okay. So did the Working Group consider, in determining whether the abuse occurred, like -- and we're talking about physical abuse -- evidence of physical injury?
A. Did we consider evidence of physical injury? Yes. When -- when we could find -- or when we were able to see evidence of physical injury, we -- we're talking about physical abuse?
Q. Yeah.
A. Yes, we -- we consider that. I guess, I want to clarify one thing, which was that we also -- the, sort of, abuse or conduct was not limited simply to a physical -- simply -- "simply" makes it sounds like I'm under- -- undervaluing the -- the, kind of, allegation, but it wasn't simply --
Q. I get it.
A. Okay.
Q. That's why I said "physical abuse." I'm drawing a distinction for you, okay, so physical versus mental coercion. All right. We're only talking about physical abuse right now.
With physical abuse, when you're looking for evidence of injury, do you also look at

whether, based on the allegations of the type of physical abuse, there should be some evidence of a physical injury?
A. Yes, we do and did -- or speaking for myself, as -- as a -- as a member of this group, I did look for places where there should be evidence of physical injury.
Q. And when there was no evidence of physical injury where you thought you should find it, did you consider that in evaluating the credibility of the allegation?
A. Yes.
Q. Did you also look for things -- like, for example, outside of a physical injury whether there should be other evidence of abuse, like torn clothing or broken glasses or something like that?
A. Yes, I mean -- I think we looked for any evidence that we could find that would help us understand what happened.
Q. Okay. And, by the way, in determining whether a confession is coerced, did you rely on any standards in reaching those conclusions?
A. So speaking for myself, in terms of thinking about coerced confessions, I believe, but



I can't say with certainty, as I sit here, but I think we -- we may have spoken with -- spoken with at least one expert who talked about coerced confessions and the nature of police interrogations.
Q. Would that be Saul Kassin?
A. Yes.
Q. And I noticed a number of his Law Review at Cornell -- maybe Law Review or other types of publications are footnoted throughout some of the reports.
Did you read all of those publications?
A. I mean, I can't tell you all the publications that he -- that he produced or that were footnoted; but to the extent that there was a piece of information that he provided and wrote about, I would have -- I would have read it or reviewed it.
Q. Now, Saul Kassin identified for you potential risk factors of false confessions; is that fair to say?
A. I can't tell -- I don't know if he did that in the course of a conversation or if I took that away from his scholarly work and writings,



but, yes.
Q. I mean, it's in the footnotes that are in the reports that cite to, for example, length of detention, provision of food and water, age of the detainee, things of that nature.
I mean, you're familiar with those types of risk factors?
A. Yes. Yes.
Q. Okay. Did you talk to anyone who holds an opposing view that there isn't sufficient research to say that those factors are truly risk factors for false confessions?
A. No.
Q. Do you know of anyone who holds an opposing view?
A. Who holds a view that length of detention, age, provision of foot and water, isolation -- that those are not risk factors for a false confession? No.
Q. No, they're not necess- -- necessarily specifically those risk fac- -- potential risk factors but just, in general, that there isn't sufficient research for a variety of the risk factors that other scholars have identified?



A. No. No, I don't -- I didn't talk to anyone who holds that opinion. And, no, I don't know any -- of anybody who holds that opinion.
Q. Have you ever heard of Michael Welner?
A. No.
Q. He's based in New York. He was an expert in one of the -- I think one of the infamous New York cases involving wrongful convictions.
A. I don't know who he is, no.
Q. Okay. Was any effort made to find whether there are opposing views on the research?
A. I can only say what I did. No, I didn't -- I didn't make any effort to find opposing views on that -- on that research, no.
Q. You never asked Peter Neufeld for any advice on how you should be going about your investigation?
A. No. Not about our investigation, no.
Q. Was it the scope of the Working Group to make credibility determinations?
A. Say it one more time.
Q. Was it the scope of the Working Group to make credibility determinations?
A. I -- I think -- I don't know that there

was an explicit command that would make deter- -- credibility determinations; but I think that was implicit in the course of the work that we were doing.
Q. You did make credibility determinations; is that accurate?
A. Yes.
Q. I want to return to our discussion about conflicts of interest -- well, actually, no, I want to ask something else. Sorry.
The Lawyers' Committee, do you know what that is?
A. Yes.
Q. Okay. Did you know who was on the Lawyers' Committee at any point in time throughout your tenure with the Working Group?
A. Yes.
Q. Who did you know was on the Lawyers' Committee?
A. I can only give you the -- who I remembered -- who I remember, as I sit here right now. I believe it was -- I believe it was Peter Neufeld. I believe Josh Tepfer. I believe Russell Ainsworth. I think, but I'm not certain, I -- I



think Craig Futterman. I think Joey Mogul. I -- I don't know -- there's somebody else, I think, who worked for Loevy & Loevy. And I can't remember if Josh worked for Loevy -- Josh Tepfer worked for Loevy & Loevy or not, but I think -- and I already mentioned his name, but I think there was another attorney who worked for Loevy & Loevy. And I don't know if that person was on the Lawyers' Committee or just was an associate of someone from Loevy & Loevy.
Q. Sure.
A. But that's -- yeah --
Q. That's, actually, a pretty good memory of the list. I'm impressed.
Okay. So did you know any of these individuals before you became a member of the Working Group other than Peter Neufeld and the two we discussed earlier, Russell Ainsworth and Josh Tepfer?
A. I -- I knew who Craig Futterman was because he's a law professor in Chicago. And, like I said, I knew Peter, but that was it, though.
Q. Okay.
A. I didn't know any -- I did not know any



of the other folks.
Q. Was it your understanding that the Lawyers' Committee would provide the cases for the Working Group to review?
A. The State's Attorney's Office gave us the cases. That was my understanding.
Q. Oh.
A. Yeah.
Q. Do you know whether the Lawyers' Committee had any role in finding the cases for the Working Group to review?
A. Yes.
Q. Okay. What do you understand that role to be?
A. I believe -- I don't know if it was the -- the Lawyers' Committee or some, like, subsection of -- or some part of the Lawyers' Committee or -- I'm not sure exactly who it was; but I understood -- I understood their role to be reaching out to correctional facilities across Illinois, working with the State's Attorney's Office, to try and determine if there were individuals who had -- the officers who were involved in the -- or the detectives who were



involved in the Englewood Four cases, if those detectives were involved in other individuals' cases...
Q. Mm-hmm.
A. (Continuing) ...and that those individuals would then fill out some sort of like a claim form or a -- or maybe that's not the right word, but, like, a -- like a inquiry form or something like that to, like, say, here's my name, here's the detectives I think were involved, and here's who I think you should -- you, whoever "you" is gonna be, should look at my case.
And, then, I -- I don't know, like, what the pools of cases were. All I know is the, kind of, final group of cases we got were the cases that were in the State's Attorney's Office -- physically in the State's Attorney's Office, like, the physical files and on the SharePoint.
Q. By the way, you mentioned SharePoint. There was a SharePoint -- that's a link where you guys could store files and share files?
A. Yeah. It was, like, a virtual --
Q. Yeah.
A. -- like, a virtual, like, data -- case

management, and, I guess -- what's the word I'm looking for...

Q. Okay. So could the Working Group members, also, at the same time, represent one of the criminal defendants the Working Group was investigating?

A. Did the Working Group members?

Q. Yeah.

A. You mean Marc, Maria, and myself? No.

Q. Yeah. That would be a conflict of interest, right?

A. Right. Right.

Q. Could Lawyer Committee members represent the individuals who -- criminal defendants the Working Group was investigating?

A. Not that I know of.

Q. Okay.

A. I think -- I think we very early on -- we were either told or were, you know, concerned with making sure that that was not the case, that there was no connection between the -- the claimants who we were -- whose cases we were looking at and the Lawyers' Committee.

Q. But could law firms at which the



Lawyers' Committee worked -- members of the Lawyers' Committee worked represent those criminal defendants either during the Working Group's work or after in a -- maybe a civil lawsuit even though the -- the member of the Lawyers' Committee is not involved in the case?

A. I don't -- I don't know the answer to that. I mean, I -- I don't think we ever -- I'm trying to think if -- if -- I don't remember that -- I don't -- I don't remember that com- -- I don't remember that coming up as an -- as an issue.

I think we -- I think we wanted to make sure -- or wanted to avoid Lawyers' Committee members representing the folks whose cases we were working on. And I think --

Q. Just to be clear I'm talking about the law firms of the Lawyer Committee members, so --

A. Yeah.

Q. -- if -- if you don't know, you don't know, and that's okay.

A. Yeah, I don't -- I just don't know. I don't know --

Q. All right.

A. Sorry.



Q. That's okay.

We were talking about new evidence.

Did the Lawyers' Committee consider new evidence that wasn't available during the criminal trial?

A. You mean -- you mean our Working Group?

Q. Yeah, I'm sorry. I'm getting all these phrases mixed up.

Did the -- let me ask it again.

Did the Working Group consider new evidence that wasn't available during the criminal trial?

A. I can't tell you, as I sit here, if we did or did not --

Q. I don't need a specific -- you don't have to give me a specific example.

Just, in general, could you consider new evidence that wasn't available at the criminal trial?

A. Yes, I think we could.

Q. Yeah. For example, if you had DNA evidence that excluded the criminal defendant from the crime, you'd, of course, consider that in your analysis, right?



A. Yes. Yes. Yes.

Q. And that DNA evidence would not have been available back in the early '90s or the mid '90s because of the advances in the testing?

A. That's right. That's right.

Q. Okay.

A. And, also -- also, just to clarify one piece, you said evidence that might not have been available at the time of trial. In some instances there may be -- may have been evidence that was available at the time of trial but just was not advanced --

Q. Discovered. Yeah.

A. And so we would -- we would -- I think we -- I think we, as a group -- at least I'll say for myself could consider that evidence.

Q. All right. If you had evidence that wasn't available during the criminal trial that demonstrated the criminal defendant's guilt, would you also consider that?

A. Yes, we could.

Q. Okay. Do you have a memory of doing that or considering that type of evidence?

A. I'm sure that there were cases that --

where there was evidence of the claimants' guilt that we did consider. I can't give you a specific recollection of a particular case where that happened, but...
Q. Now, we talked about the three conclusions the Working Group could reach, vacating on the basis of innocence, vacating on the basis of interest of justice, and then no action?
A. Yes.
Q. Could the Working Group rely on new evidence that wasn't available at the criminal trial to reach any one of those three conclusions?
A. Yes.
Q. Okay. Did the Working Group ever -- well, strike that.
Did the Working Group consider a claimant's -- or a criminal defendant's criminal background in its evaluation of the conviction's integrity, in other words, other crimes for which the person may have been arrested or convicted of?
A. Only -- only insofar as it -- as it might have informed our investigation. So exam- -- the best example I can, kind of, give you without -- you know, will tell you exactly which



case or when it came up or what the precise context was is an exam- -- is when an individual had been arrested by or had interactions with the same, kind of, area, I guess. We call them "precincts" here in New York, but, like, the same area in terms of the Police Department or if they had been incarcerated at some other point. So it -- it didn't -- so I think it came up in that -- in that context. Like I said, I can't tell you what specific -- what particular case that, sort of, consideration came up, but that was, I think, the extent of how -- how, at least, I considered it for myself.
Q. Okay. Is it appropriate to consider the criminal defendant's criminal background in evaluating, for example, whether he's telling the truth or whether he really committed the crime?
A. I think it would depend on the circumstances.
Q. So, in other words, there's some cases you would consider it and some cases maybe not?
A. I -- I -- yes, I think that's right. I think it just depends on the -- on the circumstances. If a person told me they'd never



been convicted of a crime before and I look at their criminal record and they've been convicted of a crime, then that would undermine their credibility, at least with respect to that statement.
Q. I mean something a little different. I don't -- I don't mean whether they lied about committing a crime, I mean whether just the accumulation of convictions or arrests --
A. Uh-huh.
Q. -- would be a factor in you assessing whether that person actually did commit the crime in question?
A. No.
Q. Why not?
A. Why wouldn't I consider their criminal history as evidence or proof of whether or not they committed the crime?
Q. Mm-hmm.
A. I guess I just don't -- I just don't think about the -- I don't think that a prior criminal conviction, at least in the context of our -- our work, was proof that a person committed the crime that they had been convicted of later on.



Q. Do you think it would be unfair to look at a person's past criminal history or history of misconduct to determine whether that -- that history shows the person committed the crime in question? You think that would be unfair to do?
A. I don't think it would be unfair. I think it would just help shed some light on -- on other parts of the investigation of the facts that we're trying to uncover.
Q. Okay. So you -- I thought you just said that you would not consider a criminal defendant's criminal background or arrest history in evaluating whether the person committed the crime in question; is that --
A. No, I said --
Q. -- true?
A. No, I said I would -- I said I would not consider their past criminal history or their criminal background as proof they committed a crime, but I didn't say I would not think about their -- their past at all as part of the overall, like, wholistic evaluation of the facts in front of us. So --
Q. I'm talking about the crime --

A. -- a person --
Q. Go ahead.
(Simultaneous crosstalk. Reporter interruption.)
MR. MORAN: I cut him off. I'm sorry. I said "go ahead."
BY THE WITNESS:
A. So, yeah, I mean, I -- I think -- I think if -- if the example I'm thinking about is -- yeah, I mean, I -- I guess I just think about the conviction as one additional fact to -- to consider, but I don't think there's any -- I don't think I would -- I -- I wouldn't say that that's like the -- the touchstone of the proof that the person committed a crime.
BY MR. MORAN:
Q. The question I asked is limited to whether you would consider the person's criminal history or arrest history in determining whether that person committed the crime in question? In other words, is it a factor you should be considering or not?
A. No, I wouldn't consider that alone, no.
Q. I didn't say whether you'd consider it



alone.
So the question I asked is whether you would consider a criminal defendant's criminal history or arrest history in evaluating whether that criminal defendant committed the crime in question?
A. And the answer I'm telling you is, no, I would not consider that alone.
Q. Well, how -- okay. But do you understand the difference is you're telling me -- you're answering a different question. I didn't ask you if you were gonna consider it alone. I asked you if you would consider it at all?
Would you consider the person's criminal background and arrest history in evaluating whether that person committed the crime in question?
A. But the question you're asking me is not really clear. What I'm saying to you is, if a person's telling me -- or if a person comm- -- is convicted of a crime, right, and -- what's required to prove they con- -- convicted that -- or have convicted -- or committed that crime is that they had some prior conviction or some prior issue, that I would consider that, yes. But I wouldn't then



say, okay, the person definitely did this before so they're guilty now. If that's the question you're asking me, the second one, then, no I wouldn't do that.
But if you're saying is a conviction a part of the -- the broader, general stew, the things we have to think about, then, yes, I would consider it. But if you're saying just because they committed something before, then they did something now, no, I wouldn't do that. I wouldn't think of that -- think of thing -- think of things in those terms because my clients have often had lengthy criminal histories, criminal records, and I don't consider that as proof that they committed the crime that they're charged with when I'm representing them. So, no, I would not consider it.
BY MR. MORAN:
Q. So we're talking about your work as a Working Group member, but you just drew a distinction between or -- or pointed out that, as a criminal defense lawyer, you would not hold it against your client if they have a criminal background in evaluating whether they committed a



crime in question, okay? I understand the difference. And we're talking about two different things.
But let's focus on you as a criminal defense lawyer. Do you agree it would be unfair to consider your client's criminal -- or criminal background in evaluating whether that person committed the crime?
A. Yes.
Q. Okay. Now, as Working Group member, did you also consider it unfair to evaluate -- or consider it -- consider the criminal defendant's criminal background in evaluating whether that criminal defendant actually committed the crime for which he was convicted that you're investigating?
A. I guess -- I guess I just don't -- like, I'm having a hard time drawing a distinction between the question you're ask- -- asking me for both roles, like -- yes, I don't think --
Q. It's unfair in both cases, right?
(Reporter interruption.)
BY MR. MORAN:
Q. It's unfair in both situations, right?
A. I -- I don't think it's fair to say that

a person committed this crime before and, therefore, they are guilty of this crime now, right.

Q. Okay. Even if there's an accumulation of arrests or convictions, it would still be unfair to consider that history in determining whether the person committed the crime in question, agreed?

A. Yes.

Q. Okay. Did you consider, in your work with the Working Group, evaluating the integrity of the conviction, whether the criminal defendant had a history of lying, either giving fabricated testimony or lying to you and your colleagues about the crime?

A. I mean, I, personally, weighed their credibility. I didn't go back and research every -- or investigate every time they've ever given a statement to anybody. So I -- I listened to what individuals told us and weighed it against the things that we had understood about the case as we investigated it.

Q. And this is only pertaining to situations in which you're aware of fabricated testimony or if -- you know, the -- the per- -- the



criminal defendant lying to either you or police officers or someone else, not whether you investigated that. If you become aware of fabricated testimony or that the person has lied to you, as one of the investigators or your colleagues, do you consider that in evaluating whether the person's allegations are true?

A. I -- I guess I have a -- I'm struggling a little bit over the -- over the idea of, like, lying, right? If it's an intentional misrepresentation and someone's purposefully misleading us or lying to us, then, yes, that would, I think, be something you would consider. If someone is -- if someone's memory about events are -- are different, or their story has changed from one period of time to another but it's still generally consistent with what they said before, then I'd -- I would weigh that and -- of course, but I think it's a little bit different if someone's aim is to intentionally mislead or lie.

Q. How about this? If the criminal defendant testifies in court one way because he thinks it may be helpful during the trial and then during the conviction integrity review says, I lied



during -- during the trial, here's what really happened, do you hold the fact that the person has lied under oath and is changing their story? Do you hold that against him?

A. Not necessarily, no, I don't, because -- no, not necessarily, no, I don't.

Q. Okay. Do you consider in -- tell me why. Why wouldn't you hold that against him?

A. Because that, I think, there are, also, times that people say things in court, or otherwise, that may reflect a different reality than what is the concern at the time.

So I've had -- I've certainly been in situations where -- and, actually, a federal judge wrote an entire book about why the process of guilty pleas are problematic because you have somebody who's being asked in court: Did anyone pressure? Did anyone promise you anything? Are you -- are you pleading guilty because you are, in fact, guilty?

And I can almost guarantee you that if that's happening, millions of times across the country, everybody who's in that situation -- or a lot of people who are in that situation are saying:



Yes, I was pressured; yes, I was promised that if I plead guilty, this will happen to me; I'm pleading guilty 'cause I want to get out of prison, not -- or out of jail not because I, actually, am accu- -- am -- am, you know, guilty of the offense that -- that I'm pleading guilty to.

So I don't -- I guess, I don't hold in high regard as, like, gospel everything that's said in court.

Q. Okay. No -- and I understand where you're coming from, so I want to draw a distinction.

And what you just pointed out, the pressure, just could be coming from the system itself? There's a higher penalty if you go to trial and a lesser penalty if you admit guilt or no penalty, and the person may just do the cost-benefit analysis without respect to innocence or guilt; is that what you're trying to say?

A. Right.

Q. And I'm gonna -- I think this is a little bit different.

A criminal defendant has the right to remain silent. A criminal defendant goes to trial

knowing that the defendant has the right to remain silent. A criminal defendant elects to get on the witness stand and testify in a way that person thinks will be helpful. And then later on, after the person's convicted, says I lied. I lied because my lawyer told me this -- so I lied because of whatever.

Do you hold that against the criminal defendant who is now claiming that he got on the witness stand and lied?

A. Not necessarily, no.

Q. Okay. When you say "not necessarily," that means there's a possibility you won't hold it against him, but there's also the flip side.

So what are the circumstances in which you would hold it against a criminal defendant as a con- -- member of the conviction -- or as a member of the Working Group investigating the integrity of the conviction for having testified falsely?

A. When would I hold it against somebody?

Q. Yeah.

A. I guess it would -- I guess it would really turn on what they're saying now and if what they're saying now is more consistent with our



understanding of the facts as they were at the time.

Q. Did you do that? Did you hold it against a criminal defendant in the -- do you have a memory of holding it against somebody who testified falsely in evaluating a case for the Working Group?

A. I'm sure I did. I can't tell you a specific -- a particular case, though.

Q. Is it appropriate to consider a criminal defendant's drug use or alcohol abuse if there's no way to connect that abuse to the crime that was committed?

A. Appropriate to consider it for what?

Q. In evaluating whether the person committed the crime?

A. I don't -- I just don't know. I don't -- I don't -- I don't know.

Q. Have you ever had a case, as a criminal defense lawyer, where the State or the Government was trying to get in evidence of drug use or alcoholism even though the State or Government couldn't connect that drug use or alcohol use to the crime committed?



A. I've -- I've not had that situation myself, no.

Q. Do you think it should be allowed for the State to put in evidence that so and so is an alcoholic or is a drug abuser even though the State can't connect that drug use or alcohol use to the crime that was committed?

A. No, I don't -- I don't think so.

Q. How about gang membership? Should the State be allowed to put in evidence of gang membership against a criminal defendant when there's no way for the State to prove that gang membership was a factor in the crime that was committed?

A. No.

Q. Is it fair for the Working Group to consider drug use or alcohol use in evaluating any witness or criminal defendant when there's no way for the Working Group to connect the drug use or alcohol abuse to the events at issue?

A. I can only say, for myself, I -- I -- I can -- I can only remember maybe one or two cases where the claimant or one of the codefendants in the case had like a substance-use problem or a



concern. And in those instances it was, I think, more central to the reason why the person had committed the crime that they did, so I don't -- I mean, I -- I wouldn't -- I can't -- I can't think of an instance when I, myself, personally, considered that as like a concern for witnesses or for -- or for the -- or for the claimant, the defendant. I just -- I just -- I can't -- yeah, I guess that's the best I can tell you.

Q. As an impartial member of the Working Group, do you agree it would be unfair to consider a witness's alcohol use or drug abuse if you were unable to show that that drug use or alcohol abuse played a factor in whatever the witness's relevance to the crime was?

A. I think -- I think you -- I think asked would I -- would I -- is it -- would it be unfair for me to -- for us to -- or for me, as a member of the Working Group, to consider their alcohol or drug use in the case it was not -- as a factor in my decision-making if it was not tied to the actual facts of the case. So, for example, if the person was just, you know, a serious or heavy drug user or an alcoholic, would that be something -- and I -- I

guess, I would -- not I guess. What I would say is, no, I wouldn't -- I wouldn't consider that as a -- as a factor.

Q. Okay. Great. I'm gonna start looking at exhibits right now. And this is a good breaking point if anyone does want to take a break.

THE STENOGRAPHIC REPORTER: I could certainly use a break, Mr. Moran.

MR. MORAN: Figured as much.

THE VIDEOGRAPHER: All right.

MR. KUBLY: Vincent, what would you like?

MR. MORAN: Do you want to -- we can go off the record right now.

THE VIDEOGRAPHER: Going off the recorded at 1:39 p.m.

(Short recess.)

THE VIDEOGRAPHER: This is the beginning of media unit three.

We're going back on the record at 2:03 p.m.

BY MR. MORAN:

Q. All right, Mr. Southerland. Are you ready to go?



A. Yep.

MR. MORAN: All right. I'm gonna share what we'll call Exhibit Number 1.

(Exhibit No. 1 was identified.)

BY MR. MORAN:

Q. Okay. And this is called Working Group Procedures and Guidelines. It doesn't have a Bates number, but it is six pages long.

And do you want me to -- have you seen this document before, sir?

A. Yes.

Q. Okay. Do you want me to slowly scroll through it so you can take a look?

A. Yes, 'cause I can't remember if this is something that we created or if we had to...

Q. I can tell you, if this refreshes your memory, I don't know if it will, but at Maria Hawilo's deposition she testified that this was given to the Working Group by the State's Attorney's Office.

A. Okay. Yes. I do remember this. Okay. Yeah. I had forgotten -- I had forgotten about this completely. Sorry about that.

Q. Okay. So do you want me to just go back



to the top and we can start discussing the document?

A. Sure. Sure. Yeah. And before when I think I said I had only gotten guidelines around, like, billing and stuff, I -- I had forgotten about this completely, so sorry about that.

Q. Oh, no worries. No worries. Okay. Very good. All right.

So it's on the letterhead of the Cook County State's Attorney's Office; would you agree with me?

A. Yes. It looks like that, yep.

Q. Okay. And at -- the very first sentence says: This document outlines the general objectives, procedures, and expectations for a review of murder and sex case involving seven Chicago Police Department detectives hereinafter called the "Guidelines."

Did you read this document through when you first got it?

A. Yes.

Q. Okay. And you would have familiarized yourself with the requirements under this document?

A. Yes.



Q. Okay. And you can see, in the third sentence, it indicates that the review will be conducted by an independent Working Group consisting of three special Assistant State's Attorneys who will report and make recommendations to the State's Attorney of Cook County --

A. Yes.

Q. -- do you see that?

A. Yes.

Q. Okay. And you were one of the three Working -- independent Working Group members?

A. Yes.

Q. What did it mean to be "independent"?

A. To me it meant that we were not employees of the State's Attorney's Office in the way that a -- that a ordinary Cook County State- -- Assistant State's Attorney would be -- that we were not beholden to anything beyond the -- the sorts of procedures and guidelines that described our work that the -- that are -- that are laid out in this document here that you provided, that we didn't have -- that we're not required to make a particular recommendation, one way or another, or -- among only the three, that we were not

required to con- -- or that we could consult with or could not consult with anyone that we wanted to; that we were, kind of, operating separate and apart from the State's Attorney's Office or any- -- or anyone else, for that matter, about the work that we were doing and conducting.

Q. Okay. Did -- when's the last time you read this document through?

A. Probably -- probably a couple years ago. I can't remember if this document has any further information about, like, our -- the -- the, kind of, protocol that Maria had written, if there was anything that -- that was -- you know, that Maria took the lead on writing, if there was anything --

(Simultaneous crosstalk.)

BY MR. MORAN:

Q. Well, let me -- yeah, let me stop you right there 'cause this might help.

The last sentence of the first paragraph do you see it says: The Working Group may further define and interpret these procedures and guidelines as deemed appropriate.

A. Yes.

Q. Do you see that? Okay.



Is that what -- does that help you remember whether there's a separate document created by Maria that further refined or defined the procedures and guidelines or created the set of protocols, however you want to put it.

A. Yes, I think there -- that was -- that was a separate document that Maria took the lead on drafting, and I think Marc and I both reviewed and had input and weighed in on.

And, I think -- yes. Yes.

Q. Okay. Very good. So I want to direct your attention to the end of the third line under II, Objectives. This is -- and we're gonna call this document the Procedures and Guidelines; is that fair?

A. Yes.

Q. So Exhibit 1 we'll refer to as the Procedures and Guidelines.

And if you look -- and I'm gonna put my cursor here and just highlight in blue where I'm -- or do you see -- well, I can't highlight in blue, but do you see where my cursor is over the word "make"?

A. I see the cross, yep. Yes.



Q. So I'm gonna use this little highlighter for the purpose of -- do you see that word "make"?

A. Yep. Yes.

Q. Okay. That's -- that's where I'm gonna start. I'm gonna unhighlight that, though.

A. Okay.

Q. (As read:) Make independent and impartial fact-based determinations as to each case.

That's what is being described as the role of the Working Group members; would you agree?

A. It says "recommendations," but, yes.

Q. Okay. So, obviously, it's written right into the document that you would be impartial?

A. Yes.

Q. Okay. And then it further defines the detectives as Kenneth Boudreau, Richard Paladino James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and Patrick McCafferty as the detectives; agreed?

A. Yes.

Q. Did the Working Group have the discretion to expand the scope of this review beyond the seven detectives?



A. I don't know what the bounds of our discretion were, but I -- I do know that there were other detectives beyond these seven who were involved in the cases that we examined.

Q. Right. I understand. I just -- my question is limited to whether you understood the Working Group to have the independent discretion or authority to expand the scope of this review beyond the seven detectives identified in the pol- -- policies -- or procedures and guidelines?

A. I don't know.

Q. Okay. All right. Hold on one second.

(Brief pause.)

BY MR. MORAN:

Q. I'm gonna direct your attention to the bottom of "Objectives." And it indicates: The State's Attorney expects the Working Group to consider, among other things, the past allegations as part of its assessment of the present cases under review; do you see that?

A. Yes.

Q. Okay. Do you read that as being a requirement that the Working Group had to consider the past allegations of the detectives in its

analysis?
A. I don't read it as a -- as a mandate as much as their hope.
Q. Their -- their hope? Is that what you said?
A. Yeah, like, they -- that they expect or they hope that we will, but I -- I didn't read -- I don't read it as -- it says "expects." I don't think it -- I don't think of that as, like, a -- a must.
Q. Okay. So in any particular case, the Working Group could completely disregard pattern and practice and reach a decision based on other factors?
A. I think, based on this document, it could; but I think our protocol required that we -- or at least -- I can- -- I don't have the protocol in front of me. I can't tell you what the language in the protocol said, but do I remember the protocol included some consideration of pattern and practice.
Q. By the way, in the protocol that was created, did the Working Group have the discretion to create protocols that contradicted any of the



guidelines or procedures?
A. I don't know.
Q. Do you have any recollection of reading anything in this document that gave the Working Group the power to create protocols that conflicted with the procedures and guidelines?
A. I don't remember reading anything in this document that -- that allowed for that.
Q. Okay. I'm gonna direct your attention to the paragraph entitled -- or the section entitled "Working Group Members," which is III. And you can see in the second sentence it talks about how the Working Group is selected. One member is selected by -- based on the recommendation of the Lawyers' Committee; one is selected based on the recommendation of the Conviction Integrity Unit; and the third is jointly recommended by the Conviction Integrity Unit and the Lawyers' Committee; do you see that?
A. Yes.
Q. Okay. Do -- and at the very bottom of the first page you can see the list of people on the Lawyers' Committee in the footnote.
A. Yes.



Q. Do you know if that list ever expanded to include more people?
A. I don't know.
Q. Do you know if anyone was replaced on the Lawyers' Committee, in other words, someone steps off and another person joins?
A. I don't know if anybody stepped off or not. I just -- I just don't -- I can't remember or don't -- don't know if anyone did.
Q. Okay. I want to direct your attention to, sort of, the first paragraph on the next page. This is still under the Section III regarding Working Group Members.
And it has language in there about what Working Group members may or may not do in order to avoid a conflict of interest; do you see that?
A. Yes.
Q. Okay. Do you recall seeing any similar language regarding a conflict of interest for the Lawyers' Committee or members of the Lawyers' Committee?
A. Just to -- just to clarify, Mr. Moran, do you mean similar language saying that -- like, no one on the Lawyers' Committee could be involved



in any of the cases that were -- for our view, or maybe could you just clarify the -- what you're -- what you're asking.
Q. So if you look where my cursor is --
A. Yeah.
Q. -- or the word "no"?
A. Yes.
Q. It says: No member of the Working Group may be a current or formal legal representatives of any of the detectives involved in the review, and that's --
A. Yes.
Q. -- important because you can't be an advocate for the detective and conduct an impartial review of a case investigated by the detective, right?
A. Yes.
Q. Okay. And then the next sentence says: No member of the Working Group may be involved in any current or future referral or other fiduciary relationship with any of the claimants, detectives, Cook County State's Attorney's Office staff or members of the Lawyers' Committee; do you see that?
A. Yes.

Q. Okay. And that's also important because it helps protect the impartiality of the members of the Lawyers' Committee; agreed?
A. Yes.
Q. Okay. And the concern here is that wearing, essentially, what's -- would be referred to as -- referred to as two hats; in other words, on the one hand, having loyalty to one particular client or interests and, on the other hand, having a loyalty to another, that would be a classic conflict of interest, right?
A. Yes.
Q. Okay. Are you aware of any language published anywhere, whether it's by one of your protocols that Maria Hawilo created or that Marc Kadish created or that you created or anyone from the State's Attorney's Office created, that spoke to the potential for a conflict of interest involving a Lawyers' Committee member representing one of the claimants?
A. I -- I can't remember any language to that effect, as I'm -- as I'm sitting here now. I -- I feel like I remember conversations -- I can't say with who -- or I can't remember with



who -- that every effort was made to avoid that sort of a situation where someone from the Lawyer's Committee was rep- -- representing a claimant, as far as I can remember. But that's the extent of my memory of it.
Q. And how about this? Do you have any knowledge of any written document addressing the law firms at which Lawyers' Committee members working representing any of the claimants, either during or after the Working Group's review?
A. Not -- not that I recall.
Q. Okay.
A. I don't know -- I don't know if such documents exists, but I don't remember seeing anything along those Lines.
Q. Have you ever heard the phrase "imputed conflict of interest"?
A. Yes.
Q. What do you understand that to mean?
A. That means if one person has a -- if someone's working in an organization or an entity, and they have a conflict, then their colleagues have a conflict as well, like, the conflict is --
Q. Right.



A. -- includes them as well.
Q. So at a law firm, if one lawyer has a conflict who's a partner at a law firm or employee of a law firm, an imputed conflict would mean that the rest of the members of the law firm also have a conflict based on the same set of circumstances?
A. Yes.
Q. Okay. Do you know if there was any language published by the State's Attorney's Office or in the protocols addressing the potential for an imputed conflict of interest involving a law firm at which a Lawyers' Committee -- a Lawyers' Committee member works?
A. I -- I don't remember seeing anything along those lines.
Q. Okay. I'm gonna drop down to "Resources." And this is a paragraph that discusses the reso- -- in part, the resources the Working Group could utilize from the Conviction Integrity Unit; do you agree with me?
A. Yes.
Q. All right. I want to direct your attention to where my cursor is, the word "aside"; do you see it?



A. Yes.
Q. All right. It says: Aside from these limited circumstances, the CIU of the Cook County State's Attorney's Office will not participate in recommendations by the Working Group.
Do you see that?
A. Yes.
Q. Do you know why that language was there?
A. I'd only be able to speculate.
Q. Okay. And that would be similar to what we discussed earlier, that you heard that there was a potential conflict with allowing the Work- -- the Conviction Integrity Unit work on these cases while other attorneys within the State's Attorney's Office, who may have worked on the underlying conviction, were still employed by the State's Attorney's Office; is that true?
A. I believe that's -- that's, generally, true. I think -- I think the issue or the concern was with the Office itself having involvement in these cases and not necessarily anybody in particular from the Conviction Integrity Unit.
Q. Right.
A. Yeah.

Q. But you don't -- as we discussed earlier, you don't know why that concern existed?
A. No, I mean, I -- yeah, I think that's -- that's correct.
Q. Okay. I want to direct your attention to the cursor. It's over the word "following"; do you see it?
A. Yes.
Q. Okay. (As read:) Following the dissolution of -- and I'm gonna read it.
(As read:) Following the dissolution of the Working Group, any later consideration of non-vacated cases previously subject to the Working Group's review will be in accordance with all CIU practices and protocols as defined by the CIU of the Cook County State's Attorney's Office.
Do you see that language, sir?
A. Yes.
Q. All right. Do you agree with me that that suggests that the Conviction Integrity Unit would end up taking over cases that were pending at the dissolution of the Working Group?
A. Yes, although it seems like it's a little bit broader than just cases that were



pending. It seems like it's speaking to cases where there was a -- where -- where there was -- the case was not vacated. So I assume this language to mean both cases that may be pending or cases where -- that were not vacated by the State's Attorney and -- and had been reviewed by the Working Group as being back in the, sort of, place of being able to be reviewed by the CIU.
Q. Okay. Either way, it does seem, from this language, that either pending cases or cases that were not vacated at the dissolution of the Working Group would end up back with the Conviction Integrity Unit --
A. Yes.
Q. -- true? Okay.
And my question for you is this. Do you know why, given what you had heard about the concern regarding a conflict with the Conviction Integrity Unit, that cases the Working Group was working on would have been sent to the Conviction Integrity Unit at the dissolution or disbandment of the Working Group?
A. No, I don't know.
Q. Do you agree with me that this seems



inconsistent -- this language that I just -- we just read off seems inconsistent with the notion that there's a conflict of interest that prevents the Conviction Integrity Unit from reviewing the same cases the Working Group was reviewing?
A. I -- I don't know. And, again, I don't know if was a con- -- conflict with the Conviction Integrity Unit. I think it was a concern around -- with respect to the entire Office and not anybody, in particular, at the CIU, but I --
Q. I get that.
A. -- don't know --
Q. I guess, more broadly speaking, does this lang- -- would you agree that this language seems inconsistent with the notion of preventing the Conviction Integrity Unit from reviewing Working Group cases on the basis that the Office itself had a conflict?
A. I don't know 'cause I don't know what the drafter of this document had in mind in terms of what might happen or how -- what procedure they might use after our dissolution as a Working Group.
Q. Did you ever ask about that --
A. No.



Q. -- for clarification?
A. No.
Q. Do you know who drafted this document, by the way?
A. No.
Q. Okay. You understand, though, this to be the official procedures and guidelines applicable to the Working Group, though, right?
A. One -- one set of them, yes.
Q. That would be the protocols that Maria Hawilo had drafted?
A. Yes, that she -- she drafted along with Marc and myself.
Q. Okay. I'm gonna go down to "Reporting." Do you see my cursor?
A. Yes.
Q. Okay. And I'm gonna start reading there. It's over the word "The."
(As read:) The Working Group shall provide a short quarterly report to the Lawyers' Committee that summarizes the status and progress of the investigation of each case.
The question for you --
A. Yeah.

Q. -- sir, is, do you know why the Lawyers' Committee would require status reports from the Working Group on the specific cases?
A. No, I don't know why.
Q. Did the Lawyers' Committee participate in any way, shape, or form in discussing how to resolve the cases or what finding the Working Group should have --
A. No.
Q. -- or should make, I should say. Let's see.
Further down it says: At the conclusion of the review, the Working Group shall present a written report containing recommendations on each case for the consideration of the State's Attorney is further discussed in Section VII(D) below and that the State's Attorney can accept, reject, or modify any of the recommendations made by the Working Group.
Was it your understanding, based on this language and the language in the Section VII(D) below that, ultimately, State's Attorney Kim Foxx was going to make a decision based on the recommendation?



A. Yes.
Q. Okay. And I suppose you understand that members of her -- of her executive team, like Risa Lanier or Thor Martin, would be reviewing your reports before she made a final decision?
A. Yes.
Q. Okay. Now, at the very last sentence, under the section entitled "Reporting" on Exhibit 1, the procedures and guidelines, it says: In the interest of transparency, the recommendation of the Working Group and their reasoning will be made public along with the decision of the State's Attorney.
Do you see that?
A. Yes.
Q. Do you know what the purpose of making the Working Group's recommendation and reasoning public is?
A. Not beyond what it says in the -- just at the beginning of the sentence, "in the interest of transparency."
Q. Do you know if the reports were ever made public?
A. I don't know.



Q. Did you ever ask if the reports had been made public?
A. No, I have not asked.
Q. When -- I think you said Cordell Williams was one of the first cases you made a recommendation on, you as the Working Group?
A. I believe that's correct, yes.
Q. At the time the recommendation was made, was there any concern about victims of the families -- or the family members of the victims, how they would react to the news that Cordell Williams' conviction had been vacated and he'd been released from prison?
A. I can't speak for Marc and Maria. I can say that I think it was a concern that we raised with the State's Attorney's Office and were told that their -- they have a -- a unit that -- that deals with those sorts of concerns and that that was their purview, that our role was to conduct the investigation and make a recommendation, and that was as far as it went.
Q. Did you ever gain an understanding as to why the recommendation and reasoning of the Working Group would be made public alongside the decision



of the State's Attorney?
A. No, I did not, not beyond what it says here in the document, in the interest of transparency.
Q. Okay. The next section talks about communications with members of the State's Attorney's Office.
A. Yes.
Q. And I'm gonna direct your attention to the second paragraph where it says -- do you see my cursor over the word "The"?
A. Yes.
Q. Okay. It says: The Working Group may communicate with the Conviction Integrity Unit, the Lawyers' Committee, and the lawyers for each claimant about its general practices, other claims involving the detectives, and the general status and progress of the investigation.
I'm gonna stop there.
A. Yes.
Q. Did you read this as setting boundaries on who you were allowed to communicate with about the work you were doing?
A. I -- I guess I read it as less -- less

about boundaries, like, you can only speak to these -- this set of folks, and more as -- I guess more, like, you can speak to these people, if you want to, but you don't have to sort of thing. So I guess -- I guess -- yeah. I mean --
Q. Yeah, I would say more like guidance, that you have the option of speaking to these people, which is why the word "may" is used?
A. Right. Right.
Q. Okay. So you see you can talk to the Lawyers' Committee, members of the Lawyers' Committee, right?
A. Yes.
Q. By the way, did you know that most of the members of the Lawyers' Committee had -- are plaintiffs' civil rights lawyers?
A. I -- I know that now -- or I came -- I -- I learned that over time. I think I -- I think my understanding of the -- of -- of our, kind of -- the formation of the Working Group led me to understand that.
Q. Okay. So you knew, sort of, at the outset, that the Lawyers' Committee would have a number of plaintiff civil rights lawyers on it?



A. I didn't know the individuals, so -- but I assumed that that was the case, yes.
Q. Okay. And, obviously, one of the options, under this section we just read, is that you could speak with lawyers for each claimant about its general practices and other claims involving the detectives and the general status progress of the investigation.
Do you see that?
A. Yes.
Q. Okay. And the lawyers for the claimants could include plaintiff civil rights lawyers, right?
A. I -- I suppose. I don't -- I don't -- I don't know.
Q. Let me ask you something.
Did it occur to you, at any point in time, that the suggestions provided by the State's Attorneys Office as to who you would talk to about the detectives and the claims against them were advocates who had an interest in building cases against these detectives?
A. No.
Q. Why not?



A. Because I didn't really care about talking with them or anyone else. I was concerned with the work we were doing in terms of investigating the cases. So I -- I could care less about what happens after we make our recommendation. I mean, not that I could care less, I -- I want justice to be done, but I could care less about the lawyers we were talking to or what their potential advocacy roles or concerns were. I was concerned with ensuring that justice was done in the work that we did.
Q. So when you're given a presentation by attorneys who are plaintiff civil rights lawyers about these detectives you were going to investigate and the allegations against these detectives, you did not consider that you were receiving this information from a particular source that might have a bias or interest in seeing detectives -- these very same detectives -- or seeing -- yeah, seeing the claim- -- or your findings against these detectives have -- make findings against the detectives, you didn't consider that at all?
A. No, I did- -- I, honestly, did not -- I



mean, I've been honest with you the entire time. I don't -- I didn't -- I took the information that they gave us and -- or anyone we spoke with gave us and weighed it against the investigation that we were conducting. I didn't -- I was not concerned with or nor did I care about, like, what their role was or what their -- you know, what their possible role was. I didn't ask them. I didn't -- 'cause it never occurred to me to be concerned about it.
Q. In all of your work with the Working Group...
A. Mm-hmm.
Q. (Continuing) ...did you ever consider the source of the information in evaluating whether it's credible?
A. Yes.
Q. In what context?
A. In the context of witnesses we spoke with; in the context of reports that we reviewed where -- where law enforcement wrote stories that were inconsistent and completely incredible because the facts that they provided didn't make sense or could not have happened as the way they described; in the context of what witnesses might have said

about what they had experienced or seen and to the extent that those things were not possible or couldn't be borne out by the facts that we had found term- -- in the course of our investigation.
Yeah, we consider people's credibility all the time.
Q. And do you consider whether the source of the information had bias?
A. Yes.
Q. How so?
A. Well, I think, in part -- in the course of our -- as a group, in the course of our conversations and deliberations, among the three of us, I think that was always a concern or a consideration that was raised by -- that we -- that we raised.
Q. Did you raise that concern with respect to the detectives, that they would be expected to lie in order to protect themselves?
A. I -- I can't say that we -- that we did, as I'm sitting here right now, nor can I say that we, kind of, had a reason as to why they may or may not have lied or told the truth.
Q. Did you consider whether family members



of the convicted -- the criminal defendants had a bias in making detectives look like they had abused the -- their family member?
A. I don't know that we were -- we were concerned with, like, the source or, like, what their aim vis- -vis their bias may have been, but I -- I am sure we thought about whether or not they might have been biased for some reason.
Q. Did you ever conclude that you can't give a lot of weight to representations made by family members because there is a potential for the family member to exaggerate what happened?
A. I can't say, as I sit here, exactly why we might have not have given weight to a particular family member's testimony or -- or, I guess -- or their account of -- of things. It could have been because of the passage of time and the fail- -- failure of their memory, a host of other reasons. Like, I -- I'm sure we gave it appropriate weight.
Q. Okay. Did -- hang on a second.
(Brief pause.)
BY MR. MORAN:
Q. Do you know if there was any guidance provided by the State's Attorney's Office, or in



your own protocols, about speaking with -- whether you could or should speak with detectives or the attorneys representing the detectives?
A. So the question you asked was do I know if there was any guidance in the protocols or from the State's Attorney's Office that -- that bear --
Q. In the Work- -- in the procedures or guidelines or in the protocols you created, did you guys ever create any of your own guidance, or did you read about it, where similar to the options we just went over to talk to the claimant's attorneys or criminal defense attorneys about their views on the detectives, whether you could have gotten other sources of information you could have gone to to get the opposite view?
A. I -- I guess I'll answer by saying I don't believe we were -- no one prevented us or -- or, actually, let me just ask you to rephrase your question 'cause I'm not sure I'm quite getting what you're trying to ask.
Q. Sure. Let's take a look at that sentence again under "Communications." Let's see. That was: The Working Group may communicate with the Conviction Integrity Unit, the Lawyers'



Committee, and the lawyers for each claimant about its general practices, other claims involving the detectives, and the general status and progress of the investigation.
Okay?
A. Right.
Q. Now -- well, let's zero in on other claims about -- involving the detectives.
A. Right.
Q. Right there. Okay? You've been given three options there under these procedures and guidelines to get -- to gather information about the detectives.
A. Right.
Q. Agreed?
A. Yes.
Q. And at least two of those potentially would come from biased sources, the Lawyers' Committee and the lawyers for the claimants who are advocat- -- who either are advocating or have advocated in the past that the detectives are serial abusers; would you agree?
A. I mean, I don't know if they're advocates or biased -- I mean, I don't know if

they're biased or not. I don't -- I don't know what their allegations are. I don't know what the scope of their -- all their work is, so I -- I'm not gonna characterize anything about them as individuals or their advocacy or representation.
Q. Well, not that there's anything wrong with being an advocate. It's perfectly reasonable. But the point is you would be getting information from individuals who are providing it from the perspective of an advocate.
A. Okay.
Q. Well, do you agree with that?
A. I don't know what perspective they're providing it for -- for -- they're provide- -- I look at them as they're the lawyers for whatever individuals who they're representing. I -- I didn't feel like I was -- if -- if what you're asking is are -- were there other sources that we could have considered, or are we -- were we limited, I -- I don't feel like we were limited. I don't --
Q. That's not what I'm asking. What I'm asking is do you agree that this -- these two sources, the members of the Lawyers' Committee and



the attorneys who represent the claimants who are convicted that you're investigating, they are advocates who have -- who have advocated or are advocating that the detectives engage in regular abuse; would you agree with that?
A. No, I don't know. I -- I'm not gonna be able to give you an answer on that one 'cause I have no idea of what the scope of their overarching work is.
Q. Mr. Ainsworth. He's on the committee, right, the Lawyers' Committee?
A. Yes.
Q. Josh Tepfer also on the Lawyers' Committee?
A. Yes.
Q. Okay. Didn't you attend a meeting at Loevy & Loevy where they work that lasted two hours in which they made a presentation -- or at least Russell made a presentation about the detectives?
A. Yes.
Q. Okay. And during the course of that presentation, did you learn whether Loevy & Loevy -- the attorneys at Loevy & Loevy had been able to gather that information through its



representation of plaintiffs who had alleged that those detectives had abused them?
A. So I don't know how long the meeting lasted, if it was two hours, a hour and a half, two and a half -- I have no idea how long the meeting lasted. I believe they gathered that information from whatever sources they had. I didn't -- I -- I believe it was from their legal work.
Q. Just to be clear, you're unsure today, as you sit here today, whether Russell Ainsworth is in a -- a plaintiff's attorney who represented -- who provided information about the detectives based on his experiences as a plaintiff's attorney representing individuals who accused the detectives of misconduct?
A. No, that's, actually, not what I said. What I said is I -- I don't know how long the meeting lasted. I don't know if it was two hours, two and a half hours, hour and a half. I don't know how long the meeting was.
And the second thing I said was I believe they gathered or obtained the information through their legal work. That's what I said.
Q. And their -- their legal work was on



behalf of individuals who sued the detectives that you were investigating, true?
A. I'm sure they did. I don't know -- it could have been through other legal work, too. I have no idea. All I know is they gave us information about the detectives who we were -- whose cases we were investigating. Again, we're not investigating the detectives themselves.
Q. Well, you got deposition transcripts from civil cases, didn't you, you from Loevy & Loevy?
A. Yes.
Q. Okay. And you were -- at the presentation that was made was a PowerPoint used?
A. I can't remember.
Q. Were specific detectives discussed?
A. I'm sure there were, but I can't remember which ones.
Q. Okay. Where do you think Loevy & Loevy -- or these attorneys from Loevy & Loevy got that information about the specific detectives if not through their work representing plaintiffs who sued those detectives?
A. I can't tell you.

Q. Let me ask you this. Would you agree that a plaintiff's attorney who regularly sues the detectives you're investigating, for the same kind of allegations of misconduct, would have an interest in seeing the allegations against those detectives increase in order to perpetuate that type of pattern and practice evidence? In other words -- 'cause, I mean, you agreed earlier, the more there is, the more likely it must be. Don't these attorneys have an interest in seeing that happen?
A. I have no idea what their interest is.
Q. Are you able to draw a conclusion at all based on the -- of the question?
A. No.
Q. Okay. So that -- I think what I -- what initially got us off on that tangent was I asked if you were aware of any language similar to what we just read suggesting that you could speak with either the detectives or the detectives' attorneys about their perspective of the allegations.
A. I don't remember any -- any language in -- in this document or our protocol that suggested that, no.



Q. Okay. I'm gonna go to Section VIII, Review Procedures, and it's under C., Assessment of Claims. Here we are. Okay.
And this discuss the claims you'll assess and then the recommendations you can make; do you see that?
A. Yes.
Q. Under Assessment of Claims it says: The Working Group will perform a case-by-case assessment of each individual case and a pattern assessment of all cases, and the pattern assessment shall consider the history of misconduct of the detectives as well as any history of testifying falsely; do you see that?
A. Yes.
Q. Okay. That second sentence that "the pattern assessment shall consider," do you agree that that is a mandatory requirement?
A. That we -- that -- the sentence "shall consider the history of misconduct as well as" --
(Reporter interruption.)
BY THE WITNESS:
A. Would I -- would I agree that the -- that the "shall consider the history" as a



mandatory -- as a -- as a mandate and a command that we must -- should -- that we have to consider their history of misconduct, as well as their history of testifying falsely? Yes. I mean, that's what the -- that's what the language says.
Q. Okay. And which means no matter how you -- where you land on your evaluation of the individual cases, you always have to consider the history of misconduct against the detectives and the history of testifying falsely, right?
A. Yes.
Q. Okay. Now, did you know that in that sentence, the word "whether" is not used? In other words, it doesn't say the pattern assessment shall consider "whether" there is a history of misconduct or "whether" there is history of testifying falsely; would you agree with me?
A. Yes, the word "whether" is not in the sentence.
Q. In other words, you're not being asked to determine whether there is a pattern or whether they testified falsely, you're being asked to consider the fact that there is a pattern and that they have testified falsely?



A. Yes.
Q. Okay. Let me ask you. How is it possible to conduct an impartial evaluation of the convictions if you must consider the fact that there is pattern of abuse and that these detectives have testified falsely?
A. By investigating the cases, gathering the facts, talking to the claimants, and making a determination about what happened in the case and what their role was in the case itself.
Q. That would be the individual case assessment, right?
A. Right.
Q. How can that be impartial, though, if you're required to consider there's a pattern of abuse and that the police -- these detectives testified falsely?
A. 'Cause I don't assume that just because these detectives might have abused people in the past or there's allegations of abusing people in the past or that they testified falsely in the past or there's allegations of that, that that necessarily means they did anything in this particular case.

Q. Okay. So that would give you the option of disregarding the pattern and practice evidence, right, what you just said?
A. I suppose it -- I guess -- I suppose so.
Q. But that's not what it says in Section C.; agreed?
A. I don't think that Section C. says anything about us, like -- our mandate's that we must consider the pattern in every single case. I think what Section C. says -- just by the language says the pattern assessment has to consider these, but it doesn't say we have to consider the pattern assessment in every single case.
Q. Well, I don't want to quibble with you, but, I mean, the sentence reads: The pattern assessment shall consider. It doesn't distinguish between cases. It doesn't --
A. Right. But the first sentence --
(Simultaneous crosstalk. Audio distortion.)
BY MR. MORAN:
Q. -- limit that consideration in any way; agreed?
A. The first -- the first sentence of



the -- of the -- of the paragraph says: Will perform a case-by-case assessment and a pattern assessment. But I don't -- it doesn't provide any guidance about how much weight you need to give to that pattern assessment, how -- how -- because there's certainly cases I'm -- I -- I can think of, without knowing the names of the cases.
If -- if we conducted a review in the way that you're suggesting, the very fact that the detective's names were on the case would mean that automatically there would be a vacatur of the conviction -- or a recommendation to vacate the conviction, and that's not what happened so --
Q. Right. So let -- let's talk about that for a second.
Under what circumstances would you recommended no action be taken where there's a pattern of abuse according to the pattern and practice assessments?
A. So in -- for a host of the detectives that we were -- whose cases -- who worked on these cases, there was a pattern of abuse that they engaged in.
There was one case, for example, that we



recommended to take no action on where the individual had been convicted of killing someone, leaving their body in the bathtub, and driving from Chicago to Detroit or somewhere in Michigan. Their family turned them in. Detroit police picked that person up -- or maybe Chicago police picked the person up and drove them back to Chicago, where they were eventually prosecuted.
I believe that one of the detectives who were named in the case was involved in the transportation of that individual. I believe there's also a potential where one of the detectives involved had -- had spoken with one of the individual's family members. That's an example where we recommended taking no action, but the detectives involved had a pattern of misconduct.
Q. Okay. So what -- what -- I mean, I -- I know you're talking out loud to, sort of, remember the details of the case to refresh your memory, but, specifically, what factors in that situation led the Working Group to say no action in light of the fact that there's a pattern of abuse involving one of the detectives?
A. 'Cause there was no -- there was no



credible allegations that -- of abuse by the detectives during the course of the investigation of the case, despite (audio distortion) and abuse.
(Reporter interruption.)
BY THE WITNESS:
A. (Continuing) -- Despite the fact that they had a pattern of misconduct and abuse over the course of their broader, overarching or other cases. So I -- I believe, in that case, we spoke with the -- the witness, and that witness didn't reveal or provide anything that gave us any concern or sense that they had been pressured, coerced, beaten, or otherwise harassed or harmed in the way that witnesses -- where claimants in other cases had been by these detectives or some combination of them. So that's an example of a --
Q. Wait -- sorry. Go ahead.
A. That's an example of a case where there's concerns about the -- the conduct that they were engaged in overall, right, and we can consider that; but considering it, it's irrelevant because there's no -- nothing in the case we're looking at that connects that pattern of misconduct and abuse -- and history of abuse and misconduct with

what happened in the actual facts of the case.
Q. Okay. So one thing I want to ask about is how many -- in considering the pattern and practice of abuse, did the Working Group consider how many allegations there are of abuse compared to how many cases overall the detectives had worked on or obtained confessions or statements?
A. No. There's no way for us to know the answer to that.
Q. Was that -- was a discussion even had regarding conducting that kind of evaluation?
A. Not that I can remember.
Q. Was there ever concern, among the members of the Working Group, that people inside the prison would pass along or share stories of abuse or allegations of abuse that were -- that worked -- that were, essentially, that -- that were successful in getting convictions reversed, to determine whether -- in -- in evaluating the credibility of the allegations?
A. Yes, there was certainly concern. And, certainly -- that we certainly had conversations about that.
Q. Okay. And how -- how did you address



that concern?
A. I think the -- the way we addressed it was talking it through and trying to figure out if there was a possibility that these individuals had a connection between one another -- or had been in contact with one another, but that was the extent of it.
We, of course, can't talk to everybody in prison --
(Audio disruption. Reporter interruption.)
BY THE WITNESS:
A. Of course, we can't talk to everyone in every prison who's been incarcerated with any of the claimants or any of the witnesses, so -- you know, it certainly came up as -- in conversation amongst Marc and Maria and myself.
BY MR. MORAN:
Q. Okay. Let's look at the recommendations. The first one recommending a conviction be vacated based on innocence. And it says: This recommendation will entail a Working Group finding that there is new evidence in the individual case which gives rise to a substantial



probability that the convicted defendant was not the person who committed the offense; do you see that?
A. Yes.
Q. Okay. Do you agree with me that that finding requires -- has two components to it: One, there's been new evidence discovered; and, two, that creates a substantial probability that the convicted defendant did not commit the crime?
A. Yes.
Q. Okay. Do you also agree that that's a high standard?
A. Yes.
Q. Are you aware of any case the Working Group worked on where it reached a conclusion that the conviction should be -- should be vacated based on innocence?
A. I -- I can't remember, as I sit here, if we have -- if all three of us ever came to that conclusion. As I -- I just can't tell you.
Q. Okay. Let's look at vacating -- a recommendation to vacate the conviction based on the interest of justice. Okay?
A. Yes.



Q. And it says under that: This recommendation will entail a determination by the Working Group that any credible information exists to cause a loss of confidence in the integrity of the conviction, including any of the seven detective's involvement in obtaining a statement from the defendant; do you see that?
A. Yes.
Q. Okay. Do you agree that this is a lower standard than the innocence standard?
A. I think it's lower only in the sense that "innocence," in my mind, means that if they tried the case today with the new evidence, there's no way the person will be convicted; whereas interest of justice means, to me, something a little bit different, i.e., that, yes, a conviction might flow from a retrial today, but the evidence that we found demonstrated that the process itself to get to that conviction was corrupted in some way.
Q. Okay. So -- but still a lower standard, right, when compared to number one, which requires new evidence that rises to a substantial probability that the defendant did not commit the

offense?
A. I -- I -- I don't know, necessarily, how to answer that. I guess, it's -- I mean, I think our consideration of the evidence is -- is at the same...
Q. Okay. No, that's fine. If -- if -- if it's a question you can't answer, you can just say that.
So it goes on to say: This determination, under the interest of justice, will take into account -- or take into consideration any overall patterns that emerge during the review, including what the Working Group learns from other cases involving any of these seven detectives.
And I'm gonna stop there. Would you agree with me that the determination of vacating on the interest of justice involves consideration of the patterns -- or strike that. Let me -- much more basic.
This is a requirement for consideration; in other words, you have to -- you will take it into account, for consideration, information learned about pattern -- patterns of abuse involving the seven detectives in other cases when



you make a recommendation to vacate based on the interest of justice?
A. Yes.
Q. Okay. And as we looked at earlier, you had the option of talking to attorneys who were from either the Lawyers' Committee or attorneys who represent the claimants regarding other cases involving the detectives, true?
A. Yes.
Q. Okay. Let's look down at the sentence that begins with "Such a recommendation."
(As read:) Such a recommendation will -- will not entail a finding that the defendant was innocent of the crime.
I'm gonna stop there.
Do you read to mean that your finding for a recommendation to vacate based on the interest of justice does not include a finding of innocence that rises to the level described in Number 1, which involves new evidence creating a substantial probability that the defendant did not commit the crime?
A. Yes, I think so. Let me try and answer it this way.



I didn't -- I -- I read that to mean that even if the person was -- I guess I -- I can answer it best by giving an example.
If the person was on video committing the crime and arrested by these detectives, and, in an effort to gather more information or more evidence, they decided to beat this individual into providing a confession to the crime, I wouldn't have to make a finding that just because they're on tape committing the crime that that would then, therefore, prevent me from saying that the interest of justice had not been satisfied.
Q. Yeah, I think we're talking about different things.
I'm just asking whether that sentence means you couldn't find that there was new evidence of innocence that -- that created a substantial probability of innocence or that it doesn't have to find -- you don't have to find that the person's innocent at all?
A. I think I -- I think I understand what you're asking me. And -- and -- and I -- I think -- I guess what I'm -- what I'm saying is I didn't -- I read these options, the vacated based



on innocence and vacated based on the interest of justice is not mutually exclusive.
I -- I read it as I could find -- or we could find or we could recom- -- make a recommendation based on our view that there was new evidence that demonstrated the person was innocent. We could make a recommendation that the case should be vacated in the interest of justice, but that one did not preclude the other.
Q. Okay. So if you made a recommendation to vacate based on the interest of justice, you could still include in your finding that you have suspicions or you believe it's possible that the person is innocent?
A. Yes. Yes. And I -- yes. That's right.
Q. Is one of the possibilities could you also recommend -- given that you were -- had the discretion to add to these guidelines and procedures, could you also recommend a retrial?
A. I think -- I don't know if it was in this -- it might have been in this document. I -- I can't remember if there was -- in this document or -- or elsewhere that we were -- that was part of what we were able to consider.

Q. Well, let me ask you this. I'm not gonna make you read this thing line by line, but if there's nothing in here that precludes you from making a recommendation to have a retrial as opposed to vacating based on innocence or vacating based on interest of justice or no further action...
A. I mean, I --
Q. Well, let me back up a second. You're suggesting right now that you think there may have been some kind of written document that precluded you from making a finding to have a retrial?
A. No, no, that's not what I'm suggesting. What I'm -- what I'm saying is I think that there was a -- I think that there was a -- there might have been a document that suggested we were supposed to conduct that sort of analysis to say -- to -- to -- to make a suggestion or make a recommendation about whether or not there was a retrial, not -- not that it precluded us from making that recommendation but that -- that we were -- that was part of, kind of, our general considerations or maybe how we were supposed to think about the vacatur itself. I just can't



remember what -- where I read that --
Q. No, that's fine.
A. I --
Q. How about this? No, go ahead.
A. I took these as the three recommendations that we were supposed to be able to make.
Q. Okay. Did you feel that you could, if you felt it was warranted, recommend a retrial?
A. I didn't really -- I didn't really think about that as part of our -- I -- I felt, like, that was, ultimately, you know, up to the State's Attorney, if that's what they want to do with the case. I just felt like our recommendations were supposed to be these three. And when I -- when I'm talking about a retrial, I -- I think it was more along the lines of what evidence remains absent the concern about the evidence that was potentially problematic; but I really can't remember, you know, that that was --
Q. When you say "problematic," what do you mean?
A. Problematic meaning that it was a coerced confession --



Q. Oh, oh, oh.
A. -- or something that --
Q. Okay. So let's take, for example, you decide that the confession should not be considered because of -- you have a belief that it was coerced, but you recognize that there's evidence of guilt. And you could -- one of your options is to weigh whether that evidence of guilt is sufficient to have -- for the State to have gotten a conviction to meet the beyond-a-reasonable-doubt standard of proof; another option would be to tell the State's Attorney we think this is the situation, you may want to consider a retrial given that there is evidence of guilt.
A. Right. So in the example you gave, we would do everything up until the last phrase you say, like, you may want to consider a retrial.
Our goal, at least my goal, in the course of providing recommendations, was to provide the State's Attorney with all the information that we gather, in the course of our investigation, and say here's, kind of, where we stand or here's what's recommended based on our recommendation -- or based on our investigation and work falling into



these of one these categories under -- under D. here, the vacatur based on innocence, interest of justice, or take no action.
Q. All right.
A. And we left it as the State's Attorney's prerogative to do what they want to do with the case or cases after we had conducted our investigation --
Q. Sure.
(Simultaneous crosstalk. Reporter interruption.)
BY THE WITNESS:
A. I think I might have said we took it as their prerogative to do what they wanted to do with it after we made our recommendation. I have no idea what a prosecutor considers or weighs when they're deciding to -- to retry a case or what the State's Attorney's Office would want to consider when they're deciding whether or not to retry a case.
BY MR. MORAN:
Q. Okay. I'm gonna show you a new exhibit.
A. Okay.
Q. We'll call this Exhibit Number 2.

(Exhibit No. 2 was identified.)
BY MR. MORAN:
Q. Okay. Sir, can you -- we'll call this Exhibit Number 2.
Can you see the document?
A. Yes.
Q. Okay. This is a 12-page document starting with Bates Number CCSAO-WG-67728.
A. Yes.
Q. And going through 67739.
A. Okay.
Q. Okay. Mr. Southerland, I'll represent to you that the way we received this file you can see that -- or maybe you might able to see, I don't know, at the very top, but it looks like it has your initials at the front of it as if you had taken these notes.
A. Yes.
Q. Okay. And I'm gonna scroll through and just ask if you can tell me if you -- slow down, if up want. I'm going to go slowly, not too slow, just to make sure that this looks like the notes you took that are represented here.
A. Yes.



Q. Okay. Can I go back up to the top?
A. Sure.
Q. Unless you need to see more of it.
A. I -- I can't remember the entire document, but you can go up to the top. That's fine.
Q. Okay. Okay. So these would have been notes that you had taken in the course of your work with the Working Group?
A. Yes.
Q. Okay. And it looks like the very -- you know, this page is -- the first page we're looking at isn't titled, but it looks like you have notes here on how to bill, which you probably would have read in the document we just looked at; is that fair to say?
A. Yes.
Q. Okay. I want to go to the next page. This one's called Note of Conversation with Lawyers' Committee that took place on July 9, 2021.
My question for you is, first of all, do you remember this Lawyers' Committee meeting on July 9, 2021?
A. No, I don't remember the conversation.



Q. Do you remember who from the Lawyers' Committee would have participated at all?
A. No.
Q. Do you remember whether you were even in Chicago in around July 9th of 2021?
A. I doubt that I was at that point, but I -- I can't remember.
Q. Do you think this would have been like a telephone call or a Zoom communica- -- communication?
A. I don't know. I'd have to be -- I'd have to guess. I'd only -- it'd only be guessing.
Q. Okay. Fair enough. Let's look at the language.
The first entry is: We can craft a protocol along the lines of what the Lawyers' Committee have suggested and they think the Cook County State's Attorney's Office or Foxx will adopt it --
A. Yes.
Q. -- agreed? Okay.
Did the Lawyers' Committee help write the protocol that the Working Group utilized?
A. No, they didn't help write it. I think



we -- I think we reached out to them amongst a bunch of other folks who were doing conviction integrity work to get a sense of what their protocols were and got suggestions from everybody. And then it ended up Maria, along with Marc and I, drafting the one that we ultimately landed on.
Q. Okay. And were the suggestions provided by the Lawyers' Committee used in the final version of the protocols?
A. No, they were not.
Q. And do you remember what those suggestions were?
A. I can tell you what the broad outlines of the suggestions were was -- there was a -- I think a question of doing a -- kind of, like, a case-by-case -- like individual review of each case versus, I think, maybe placing more weight on the, kind of -- on the -- on a concern about misconduct.
And the -- the best -- best way I could remember it -- or the best way I can, kind of, characterize or think about it is there have been a bunch of cases where crime labs, for example, in like Massachusetts, in Washington State, in other places across the country, have been shown to have

somebody -- a chemist or someone in that lab who -- whose work tainted, like, thousands of cases. And rather than review every single one of those thousands of cases, as a -- as a -- as a general matter, vacating them as a whole versus going through each one of those cases.

And I think the -- that was -- that was the, like, crux of the question in -- in the course of developing a protocol was whether or not we're gonna -- this is gonna be a -- a work that'd last -- would last for -- for, you know, a number of -- kind of, some -- some unknown period of time ahead or if we were to just say we think that the detectives who are involved in this case because they were involved in the Englewood Four case, where they beat and torturing suspects and witnesses and -- and the Englewood Four themselves that we should, therefore --

Q. Let me --

A. -- assume that they did the same sort of thing in all the cases we were reviewing, and, therefore --

Q. Sure.

A. -- vacate as a whole. And we ended up



not adopting that -- that line of thinking.

I think the other piece of it or other question, I think, that I can't really remember or have as much -- I don't have really --

Q. Wait --

A. -- as much detail --

Q. -- before you -- before you launch into that, let me see if these lines that are in your notes help you remember any of it 'cause I think that probably would be more helpful than forcing you to try and remember things like that. Is that okay?

A. Yeah. Sure. Yes.

Q. So the first entry -- or the second entry says: Statement wasn't supposed to be in cases -- or wasn't suppressed in cases where confessions were coerced.

That would, obviously, be true in the cases you're reviewing, the confessions were utilized as evidence against the convicted defendants; agreed?

A. Yes. Yes. Of course.

Q. But then the next sentence says: No way that you can go back in and make any assessment of



their credibility.

What is -- or is that a -- something you learned from the -- or at least a suggestion from the Working Group, that you cannot go back in and make an assessment of credibility?

A. I -- I don't know. If it's a suggestion that it would have come from the -- if these are notes of the conversation with Lawyers' Committee, not the -- not the Working Group. I think you said the Working Group --

Q. Oh, I'm sorry. I said -- yeah, I meant the Lawyers' Committee. I'm sorry.

A. I -- I would have to -- I'd only able to guess what -- what I'm referring to here in terms of the -- in terms of the credibility question.

Q. Okay. The next sentence is: The confession alone is enough to upset the integrity of the conviction; do you see that?

A. Right.

Q. Okay. Is that a suggestion from the Working -- or from the Lawyers' Committee?

A. Again, I don't -- I don't -- I don't know. I'm -- I'd have to only guess that because these are notes of a conversation with them, that



they're talking about the coerced confession is enough to -- like the concern about a coerced confession is enough to --

(Reporter interruption.)

BY THE WITNESS:

A. (Continuing) -- If these are notes of the con- -- of a conversation with the Lawyers' Committee, then my assumption is that the -- that line is referring to the problematic confession, by itself, would upend the integrity of the -- of a conviction.

BY MR. MORAN:

Q. In other words, if you find that the confession was coerced, then that -- that's enough to find that the conviction lacks integrity, and you could make a recommendation that the conviction should be reversed in the interest of justice was essentially where that leads to, right?

A. Yes, but that's also where the law -- that's what the laws says, too.

Q. Actually, wouldn't the law say that you -- the defendant could be retried?

A. I'm not sure what the remedy would be, but what I can tell you is that if a -- if it's a

coerced confession, then the conviction gets vacated.
Q. Right. Of course.
The next sentence: We can't make an independent assessment of the reliability of these confessions without an independent means of seeing what the cops did in these cases.
Okay. That is also information you learned from the Work- -- or the Lawyers' Committee?
A. I don't know if it's something I learned from them, but I -- what I could tell you is just what it says here. These are notes of a conversation with the Lawyers' Committee, and that's what I wrote.
Q. Do you read this to mean that you really don't have a way to go back and assess the relia- -- reliability of these confessions unless you have some independent way of seeing what the cops did?
A. I read that to be what the -- what the notes from the conversation with the Lawyers' Committee reveal.
Q. Okay. I want to -- I mean, do you agree



with that, that you need an independent way of evaluating what the detectives did in order to evaluate the reliability of the confessions?
A. I mean, I -- I -- I guess, if I -- if I'm thinking about what "independent" means, what that -- what that means to me is I would need to be able to see their work, but -- and so, I guess, that's --
Q. Okay?
A. -- something -- that's the best I can tell you.
Q. Well, would the allegations alone by the criminal defendant of abuse be -- fall within the category of independent means?
A. No, not their allegation by themselves and alone, no.
Q. Okay. Okay. I want to turn to the next page, which is under Notes of convo with Adam Weber and Nancy Adducie, July 20, 2021.
And, by the way, do you know -- do you remember from -- from reading this do you recall that Adam Weber and Nancy Adducie were, essentially, in charge of the Conviction Integrity Unit in July of 2021 at the Cook County State's



Attorney's Office?
A. I think that's right, yes.
Q. Okay. I'm gonna drop down to one specific entry. It's called the Guev- -- Guevara protocol is a beast. They did it for very specific reasons. We can distill that down for us.
Do you see that?
A. Yes.
Q. Do you know what the Guevara protocol is?
A. I think it's related to another Chicago Police Department detective who has -- was -- or it was related to a -- a Chicago Police Department detective who was involved in misconduct.
Q. Did you ever see the Guevara protocol?
A. I can't remember if I did.
Q. Do you know if they showed it to you during this meeting?
A. I don't remember.
Q. Okay. And this is what you wrote here: They did it for very specific reasons, semicolon, we can distill that down for us.
Who's the "we" in that sentence -- or in that phrase?



A. I don't -- I don't know.
Q. The -- the -- the reason I ask is I can't tell whether it -- from what you wrote whether you were intending to distill that down based on the protocol you received or whether you expected Adam Weber and Nancy Adducie to distill it down and provide it to you?
A. I -- I -- as I sit here right now, I can't remember who the "we" is referring to; but I also know that we -- we -- or, at least, myself -- and I believe this is true for Marc and Maria, but I -- I don't know what their exact thoughts about it were, but I -- I know that we -- I did not expect anyone from the State's Attorney's Office or the CIU to -- to write a protocol for us. I -- I think this was in the proc- -- I think this -- we were in the process, when this note was written, of trying to craft or protocol and -- and find sources for our protocol.
Q. Okay. I'm gonna turn to the next page, which is a conversation -- notes of a conversation with David Lewis, Dara Kesselheim, Donna Patalano from the Suffolk County DA's office; do you see that?

A. Yes.
Q. Okay. And it looks like these are notes of a conversation about, at least, their conviction integrity review at the Suffolk County DA's office, true?
A. Yes.
Q. Okay. I want to direct your attention to the middle where it says: There's a difference between a fair trial and actual innocence, you could assent to a motion for a new trial, but that doesn't mean you just give up, you might still try the case if you have enough evidence to try the case.
A. Yes.
Q. Do you see that?
A. Yes.
Q. Is it your understanding that they were advising that if you find there wasn't fair trial, you should consider whether you should retry the case?
A. I -- I -- I think that's what that is referring to, in terms of like their own -- their own process, this -- this, kind of -- like, how -- how -- I think this is how they -- how they



considered or how they thought about this sort of work, that, sort of, like, systemic versus indep- -- or individual review. I think that's what it says at the top of the document. It's the same, kind of, debate or back and forth that is referenced in the -- what I was referencing earlier about, kind of, how you think about conducting this sort of review.
And so, I think, there -- I think that was -- I think these are all notes just reflecting their -- their process in Massachusetts and Suffolk County.
Q. However they're -- they're describing their process as -- to help you formulate how you're gonna conduct your own process, right?
A. Yes.
Q. That was the point of having the conversation, wasn't it?
A. It was, but I don't -- I don't know -- I mean, I can't -- like I said, as I sit here right now, I can't remember -- or don't -- don't know how far along the decision tree this piece of concern was ours, i.e., I don't know if we, as I sit here now, were tasked with or required to tell the



State's Attorney whether or not to retry the case, so...
Q. The -- the next paragraph -- well, I want to cut -- drop down to where it says: Could be a first cut. We're dismissing for interest of justice, then the decision is how to resolve the case. Do we retry nolle, or do we negotiate, figure out some other resolution? In their lab cases, they are looking at it from the perspective that these cases were tainted, so the next -- and then the thought's not finished.
Was there serious consideration given by the Working Group as to whether the recommendation to vacate the conviction, under the interest of justice, should include a suggestion or a recommendation to consider a retrial?
A. I imagine we had conversations like that, but I -- I don't know, as I sit here right now. I can't tell you.
Q. Okay. Here's one I'm gonna highlight it in blue a little bit. And this is -- you wrote down a suggestion from Maria.
(As read:) Suggests dismissing for interest of justice and then do a second-level



assessment about innocence/nolle or seek a new trial.
Do you see that?
A. Yes.
Q. Okay. Did that conversation go anywhere, or did that thought go anywhere in terms of conversations or deliberations?
A. I don't -- I don't remember. I don't think so.
Q. Okay.
A. I'd just be -- I'd only be guessing about, kind of, what that could -- that could mean. It could mean if we think the case should be -- because we had, like, those three steps or those three options on the -- on the guidelines and protocols. It could be her saying maybe we go through the dismissal for the interest of justice first; and, then, if that's -- if we de- -- if we decide to make that determination, then the second, kind of, question is was the person actually innocent, but I -- I just don't know.
Q. Sure. Question for you. I've skipped ahead to Page 7 of this document of Exhibit Number 2. And these are notes under the heading

September 30, 2021, "Decide on the three cases."
And you have questions for Risa at the next meeting, one of which is how to deal with other Boudreau cases. The CIU is getting Boudreau cases.
Do you see that?
A. Yes.
Q. Why would cases involving Boudreau end up back with the Conviction Integrity Unit if the Working Group was set up to address cases that, in part, involved Boudreau?
A. I don't know. I think that might have been the question.
Q. Okay. Did you ever find out why the Conviction Integrity Unit would continue to get Boudreau cases?
A. I -- I don't know. I don't know if we found out. I don't -- I can't remember what, kind of, happened or what the answers were from -- from Risa to those questions or even if we pursued them beyond this.
Q. Okay. I'm gonna skip up to Page 11. And this is, I think, the heading "Student Work," but down at the bottom you have some specific



bullet points for the students to look up?
A. Yes.
Q. The first one says: Rotten water, dash, polluting the waters of justice lines in cases of misconduct.
A. Yes.
Q. What does that mean?
A. So Marc ref- -- Marc referred to some case by -- that was written by a judge, maybe, in the 7th Circuit. And I think the language that was in the case was exact- -- was that language.
Q. So find that case?
A. Yeah, so it was more -- it was, like, find that case.
Q. Got it. Okay. And the next bullet point is: Length of average interrogation, semicolon, Reid technique, why it's been discredited.
Is it your understanding that the Reid technique has discredited?
A. I think discredited as -- as a -- as a legitimate interrogation technique given the ways in which it's used.
Q. So is that a "yes" or --



A. I mean, it hasn't been discredited by everybody because police still use it, so...
Q. Okay. Where -- I mean, for example, are you aware of any Court opinion that says the Reid technique is discredited, and if it's used, it's indicative of a involuntary confession?
A. No, I'm not aware of any court cases that have said that, but that doesn't mean they don't exist.
Q. Okay. All right. "History of policing in Chicago." And underneath there's three bullet points. New Yorker article on Area 1 and Area 3; Boudreau depositions; and O'Brien depositions.
The New Yorker article. Let's start with that one.
Do you know -- is that the article about Tyrone Hood?
A. I don't know. I don't know. There -- there were -- there was a couple of, like, longer form articles in New Yorker and maybe in other sources, too, and I just -- I can't remember, as I sit here, what -- what the actual articles were.
Q. Did you review the New Yorker article about Tyrone Hood?



A. I don't know. I may have.
Q. Does the name Tyrone Hood ring a bell?
A. Not especially.
Q. Did you receive the New Yorker article from any of the attorneys at Loevy & Loevy's office?
A. Not that I can recall, but I don't -- I don't remember.
Q. And the depositions of Boudreau and O'Brien, do you know where you got those?
A. If we had any sort of depositions, we -- I -- I don't know. I, honestly, don't know.
Q. Okay. These would have been depositions taken in the civil rights cases in which Boudreau and O'Brien are either defendants or witnesses, true?
A. I don't know.
Q. Okay. Did you read any depositions of Boudreau or O'Brien in which you came away thinking, you know, I don't -- I don't think there was abuse here; I don't think these guys are lying about their denials?
A. I -- I don't know that I -- that I drew any particular conclusion from their -- any of the

depositions that I read of theirs.
Q. Did you ever walk away from reading those deposition and think they sound credible?
A. No, I didn't make any credibility determination about them based on their deposition.
Q. Did you make any credibility determination about Detective O'Brien or Detective Boudreau at all?
A. I think, over time, I made the determination that Boudreau and other detectives -- I can't remember specifically Detective O'Brien, but I remember, you know, in terms of these detectives that they had really serious credibility problems.
Q. Okay. But you don't know if that was O'Brien or Boudreau or some other detective?
A. I -- I can't tell, specifically, which ones or who it was, but I know, as a group, they all had real concerns -- or really -- at least really concerned me.
Q. Got it. I'm going to put up Exhibit Number 3.
(Exhibit No. 3 was identified.)



BY MR. MORAN:
Q. So these are your billing -- it's a billing statement that you, I believe, sent for the period of December 2021 to the Cook County State's Attorney's Office. Does this look familiar to you?
A. Yes.
Q. Okay. Do you want me to scroll through it so you can have a better look at it, or do you want to talk about it?
A. Why don't we talk about it.
Q. Okay. So I want to just go over a couple of entries. There's -- for example, on December 3rd and 7th you have one-hour entries each for reviewing pattern and practice materials related to detectives?
A. Yes.
Q. My question is where did you get those materials, if you remember?
A. I don't remember. I don't know what materials they were. I know that we had -- I know that some of the materials we gathered -- I -- I just can't -- I can't speak to the specificity of -- to what these materials are, so I'm not gonna just speculate or guess, but...



Q. Okay. No, that's fine.
On December 9th you had an interview of David Evans, and I'll represent to you that's a witness in the Cordell Williams case; do you see that?
A. Yes.
Q. Does that name ring a bell from reviewing this?
A. I mean, the name -- I remember the -- I recognize the name. I can't tell you anything about him in particular.
Q. The interview lasted 1.2 hours, according to your billing entry, true?
A. Yes.
Q. All right. Do you recall, from looking at this billing entry, whether Maria Hawilo or Marc Kadish were with you for the interview of David Evans?
A. Not from looking at this entry. No, I can't tell you if they were or not.
Q. Okay. I want to drop down to a meeting you had with Steve Drizin regarding Detective Cassidy.
Do you know who Steve Drizin is?



A. Yes. He's a -- I can't remember if he's -- I can't remember if he's a -- a law professor or teaches as an adjunct, but I know -- I know that he's a lawyer. I know that he's handled false confession cases -- or cases where there were allegations of a false confession or coerced confession. So I know that much.
Q. Okay. And it looks like the meeting with Steve Drizin lasted 2.5 hours. That's on December 16, 2021?
A. Yes.
Q. And further down you reviewed a memo provide- -- or prepared by Steve Drizin on December 20th, 2021, for an hour; does that look right?
A. Yes.
Q. Okay. And, then, further down, at the very bottom of the page, the entry for January 6, 2022, shows that you had a meeting with Jan Sussler and Flint Taylor of the People's Law Office regarding pattern and practice misconduct and abuse that lasted 1.5 hours?
A. Yes.
Q. Okay. Do you know if that meeting was

in person or via Zoom?
A. I -- I think it was by Zoom; but, I -- I apologize 'cause I can't -- I really can't remember. I -- I took a -- a number of trips out to Chicago, and I can't remember when I was there in person. I don't know if -- when I was there on Zoom -- or when we -- when we were talking by Zoom.
Q. Okay.
A. I just -- I just can't remember.
Q. That's okay.
I'm gonna go to the next page. At the very top, on January 18 of 2022, it looks like you had a meeting that lasted 2.2 hours with David Owens and the Working Group regarding Detective Boudreau and Area 1 detectives; do you see that?
A. Yes.
Q. Okay. Do you know if you were provided any materials from David Owens?
A. I -- I don't remember if he gave us any materials at that meeting or as a result of that conversation. I -- I just can't -- I can't remember, from that conversation, if he gave us materials or not. I know, at some point, he did give us -- he did send us a transcript of one of



these detectives, maybe Detective Boudreau, but I can't remember if he gave us materials at that meeting you just referred to.
Q. Okay. And I just want to point out, for your entry on February 17 of 2022, since we were talking about it, it looks like you had a meeting with Professor Saul Kassin on false confessions that lasted 1.2 hours --
A. Yes.
Q. -- do you see that?
A. Yeah.
Q. Okay. Was that meeting -- I assume that meeting was probably via Zoom, but maybe it was in person. I don't know.
A. I think it was probably over Zoom.
Q. Yeah. Okay. Okay. So I'm gonna take this one down; put up another exhibit for you.
(Exhibit No. 4 was identified.)
BY MR. MORAN:
Q. All right. We'll call this one Exhibit Number, I believe, 4. And this is a string of emails. Now, I'll slowly go through it, but it starts with one beginning -- or with the date line October 13, 2022; do you see that?



A. Yep. Yes.
Q. Okay. And that's from Maria Hawilo to you and Marc Kadish. And I'm gonna scroll down.
You can see the chain now includes -- there's an email from David Owens. It includes Russell Ainsworth to you and Marc Kadish and Maria Hawilo dated October 12, 2022.
A. Yes.
Q. Below that there's an email from -- there's an email from Maria Hawilo dated January 20, 2022.
A. Yes.
Q. And then it looks like an email from Russell Ainsworth to the group, including David Owens, dated January 20, 2022, an email from Maria Hawilo dated January 19, 2022.
I'm gonna keep scrolling down, but --
A. Okay.
Q. -- there's an email from Russell Ainsworth to the group, including David Owens and Heather Lewis Donnell dated November 17, 2021; do you see that?
A. Yes. Yes.
Q. Okay. And that includes Dropbox -- a



Dropbox link from materials to review in anticipation of a meeting at Loevy & Loevy's office at 9:00 a.m., it looks like, according to the email.
A. Yes.
Q. Okay. By the way, did you download those materials?
A. I can't remember. If I -- if I did, they would be on SharePoint, I think.
Q. So does refresh your recollection about meeting with Loevy & Loevy -- members of Loevy & Loevy about the detectives?
A. Yes. I -- I don't think I was unclear about meeting with them, but -- I believe, yes, I -- I understand it talks about us having a meeting -- or a meeting that is to come.
Q. Right. Okay. I'm gonna go to the email from David Owens in October of 2022. Right here.
A. Yes.
Q. And you can see that there are references to individuals you're not investigating, like Clayborn Smith, Marcellous Pittman?
A. Yes.
Q. And the testimony of O'Brien and

Boudreau in the Hill-Young-Williams cases?
A. Yes.
Q. It looks like Mr. Owens was providing this information to you because he thought it might be useful for the Working Group to consider; agreed?
A. Yes.
Q. Okay. Did you agree that this information was useful?
A. I can't tell you what exactly information was that he provided, but what I know is that we wanted to -- like, whatever information that we were able to obtain we would review.
Q. Okay. From any source, right?
A. Yes.
Q. All right. And did you seek out information from any source to review as part of your work with the Working Group?
A. Did we seek out information from any source?
Q. Yeah.
A. Yes. Yes.
Q. Okay. The information that was included in that Dropbox link that we looked at a minute ago



from Russell Ainsworth, do you know if that information made its way into the SharePoint file?
A. I don't know.
Q. Okay. I'll take this down. I'm going to find a new exhibit to talk about.
All right. This will Exhibit Number 6, right?
THE STENOGRAPHIC REPORTER: I think this might be 5, Counsel.
MR. MORAN: Oh, I'm sorry. Five. You're right. My apologies. Okay.
(Exhibit No. 5 was identified.)
BY MR. MORAN:
Q. I see the top of the page it says: Carl Mann's dash work product memo, Maria H. and Vincent Vincent S.; do you see that?
A. Yes.
Q. Do you recognize this document?
A. I mean, kind of. I mean, I can't tell you wrote it or drafted it, but I feel like it does -- somewhat familiar. Yeah.
Q. Does Carl Manns ring a bell -- the name Carl Manns?
A. Yes.



Q. So it looks like, from the very first paragraph, there's a disagreement between you and Maria on -- or -- yeah, you and Maria Hawilo, on one hand, and Marc Kadish, on the other hand, as to how to resolve the Marc -- or the Carl Manns case.
A. Yes.
Q. Okay. And it seems like Marc Kadish believed that no action should be taken, and you and Maria Hawilo believed that the conviction should be vacated in the interest of justice?
A. Yes.
Q. Okay. I want to -- I brought this up because there's something at the end of this document that I want to ask you about.
Under the paragraph -- the second full paragraph on the page, beginning with the word "Second," it says: Second, some of these concerns can be resolved by our protocol, which notes that in making recommendations, upon a determination that there is a pattern of misconduct among our cases, we -- and this is quoted -- will apply heightened scrutiny to any cases impacted by said pattern and make appropriate recommendations for relief in the interest of justice, unless



substantial evidence exists to overcome the impact of the detective's involvement, end quote.
And then the second sentence indicates -- and this is another quoted remark: We assess the strengths or weaknesses of the claimant's case without consideration of any statement made by the convicted person in determining how to advise the State's Attorney; do you see that?
A. Yes.
Q. Okay. Was that part of the protocol as of May of 2022 when the Working Group made its recommendation to the State's Attorney regarding Cordell Williams?
A. I can only answer by telling you that we didn't -- that the first thing we did was -- or not the first thing, but -- but before we reviewed the cases or before we conducted our investigation, we created the protocol. So if the protocol was created before we started looking at Mr. Williams' case, then -- then, yes, this would have been part of the protocol.
Q. Okay. So, at least from your memory, what I just read off was part of the protocol prior

to working on Cordell Williams' case?
A. Yes, I think prior to working on any cases.
Q. Okay. I want to focus on the heightened scrutiny language. It says: We apply heightened scrutiny to any cases impacted by said pattern.
What is "heightened scrutiny"?
A. I think of it as greater -- greater weight...
Q. In what sense?
A. In the sense that we have a finding that there's pattern or practice of misconduct in the course of the cases that we're reviewing and over time, the weight of that pattern grows heavier.
Q. What do you mean by "over time"? Like, over the course of your --
A. Well, meaning at the --
Q. -- few years reviewing for the Working Group or over the course of time in the allegations of abuse?
A. Well, meaning that, at the beginning of this effort, we'd only looked at one case. By the end of the time of looking at the -- at the -- looking at all the cases, what we discovered -- or



what we continually discovered was that the detectives were repeatedly involved in abusing and beating up and coercing and threatening and otherwise engaged in problematic behavior and repeatedly heard that from claimant after claimant, witness after witness. Not every single person, not every single claimant, but, at a certain point, it becomes hard to believe that everyone is telling the same story consistently, that they were snatched up off the street, abducted, isolated from their family, from anyone that they cared or knew about, beaten, threatened, punched, kicked, coerced to confess to something they, actually, didn't have all the facts --
Q. But did --
A. -- about or to and that that was just --
Q. Okay.
A. -- a made-up story by 15, 20, 30 people. And so over time, I think, the point of this language was to think about it in those terms.
Q. So let me -- let's back up a second.
Prior to getting deep involved in any cases, so you're -- you're, essentially -- well, let's back up a second. I'm gonna start over.



In July of '22 you're working on how to structure your review, what kind of protocols you should be writing. At some point, before you dig into any cases, you're -- you established the protocol. And then in -- in September and October and November, you're looking at Cordell Williams and another case, I think, Carl Manns, and during that same time you're meeting with law firms like Loevy & Loevy, attorneys from the People's Law Office for meetings that last multiple hours and provided -- and you're provided with information in the form of deposition transcripts, trial testimony, hearing testimony to inform your analysis of pattern and practice, right?
A. That's right. We're also receiving information from TIRC about allegations that have been made against these detectives.
We're also talking to the claimants in the cases and the witnesses in the case themselves. We're also reviewing the paperwork and documentation that was in the State's Attorney's files. We're also talking to witnesses in the cases, so --
Q. Right. But the point is you've -- at



the very outset of your investigation, you already have a lot of information pointing to allegations of -- that would -- ultimately you would use to support pattern and practice in the form of depositions, presentations by lawyers who were advocates for the criminal defendants or the civil rights plaintiffs, trial testimony, things like that.
Do you agree, as of that stage, you had already developed a foundation for your pattern and practice analysis? And this is in the beginning of your review around, you know, the end of 2021, the last quarter of 2021?
A. I mean, I think we certainly had a -- a lot of information. We also had court rulings from judges in Chicago that talked about detectives who were either incredible or -- or who the court thought had engaged in misconduct. So there was certainly a lot of information about misconduct that the -- that law enforcement had been alleged to have engaged in.
Q. Okay. So now you've written into the protocol -- you, as the Working Group, have written into your protocol that you apply a heightened

scrutiny to any case impacted by the pattern and practice in order to make appropriate remedy -- recommendations for relief in the interest of justice. Okay. And that's before you start reviewing the Cordell Williams case, true?
A. Yes, protocol was written before we started reviewing Cordell Williams' case.
Q. How can it be an impartial review if you're applying a heightened scrutiny based on a -- a conclusion that a pattern and practice exists during the course of the investigation or at the outset of the investigation?
A. Because -- just because a pattern and practice exists doesn't mean that, in that instance, or that particular case, that that was -- that the officers or detectives engaged in misconduct.
Q. Well, isn't that the functional equivalent of saying, hey, criminal defendant, we think you committed the crime because you have a history of committing crimes?
A. I didn't see it that way.
Q. Isn't it, essentially, propensity evidence that these detectives must have engaged in



misconduct because there's a pattern and practice?
A. No, I didn't see it that way.
Q. Why not?
A. I just didn't.
Q. Was there a source for the protocol that was written where you applied this heightened scrutiny, an authoritative source like case law or a statute?
A. I can't tell you that. I can't tell you that.
Q. Did anybody do any research to find -- to support this heightened scrutiny evaluation standard when you find that a pattern and practice exists?
A. I'm not sure what anybody else did.
Q. You didn't -- you're not aware of any of that research being done; is that correct?
A. I can only speak for myself. I didn't conduct such research --
Q. Okay.
A. -- that I can recall.
Q. I'm gonna take this one down and get you a new exhibit in a minute. Okay.
(Exhibit No. 6 was identified.)



BY MR. MORAN:
Q. Okay. Mr. Southerland, you're looking at Exhibit Number 6, I believe. And this is the quarterly report prepared by the Working Group to the State's Attorney's Office dated August of 2024?
A. Okay.
Q. Is that correct?
A. Yes.
Q. Okay. Do you want me to scroll through it real quick so you can get -- take a look and become familiar with it?
A. No, that's okay.
Q. Okay. Then you could see this one has two Bates labels on it -- or, actually, it has one Bates label on it, CCSAO Working Group 65675 to 65677; agreed?
A. Yes.
Q. Okay. I want to talk a little bit about -- hang on a second.
(Brief pause.)
BY MR. MORAN:
Q. The -- this discusses -- and this is in the paragraph beginning with: In October 2021. It says: We outlined our work.



A. Yes.
Q. And it looks like since that time you developed your protocol, would that be correct? That's your recollection?
A. Yes.
Q. Okay. And at the end of the paragraph it identifies cases that you reviewed -- or that you've completed your review, including -- and this is starting with Reginald Chapman, Tyrone Delaney, Cordell Williams, Carl Manns, Nick Escamilla, Miguel Morales, Tyrone Reyna, Jamie DeAvila -- DeAvila, Jerry Gillespie, Richard Anthony, Willie Hughes, Oily Thomas, Tyrone Daniels, Lorenzo Guye, and Ellean Nance; does that sound correct?
A. Yes.
Q. Okay. And then further down this document discusses the different cases in which you made recommendations as of August of 2024, and the status of those recommendations?
A. Yes.
Q. Okay. I want to focus on Carl Manns.
It indicates that the State's Attorney did not agree with the majority's review but indicated the State would not oppose clemency based

on medical issues; do you see that?
A. Yes.
Q. Did the Working Group either formally, in its recommendation, or informally, in conversations with the State's Attorney's Office, suggest that if his -- Carl Manns' conviction would not be vacated he should be granted clemency?
A. Nothing beyond -- nothing beyond what it says there, that they -- that they would not oppose clemency, but that was the extent of it. We -- we didn't --
Q. Okay.
A. We didn't -- we didn't -- we didn't suggest to them -- if what you're asking is whether or not we suggested they should grant clemency or he should seek clemency, we didn't make that suggestion. That -- that wouldn't have come from us.
Q. And at the very end, you can see the -- this is on the last page of the memo under the heading: A majority of the Working Group submitted its recommendation memo -- or strike that. I'm talking about something else.
Below that: The Working Group will



begin investigating the following cases: Carl Williams, Joseph Davis, Enrique Valdez, and Antoine Mason?
A. Yes.
Q. Did the Working Group complete its review of those cases prior to the disbandment of the Working Group and -- in November of 2024?
A. I don't remember how far along we got on -- on -- on any of the cases. I -- I feel like we got pretty far along on Carl Williams' case. I think there was some issue with Mr. Davis's case that first -- I can't remember what -- like, what exactly it was, but I think that was -- you had asked earlier if I had any conversation with Marc and Maria since we were made aware of a deposition. And I said at the time that someone reached out about a case, and I suggested that we send it to Mr. Henretty -- or the State's Attorney's Office. I think it was Joseph Davi- -- Joseph Davis' case.
Enrique -- Enrique Valdez, I don't know if -- I can't remember if we made a recommendation on that case, but that might have been the case that I was describing where there was visible evidence of physical abuse.



And in Antoine Mason's case I don't believe we -- we completed recommendation on 'cause I think this was -- if this was in August of 2024, and we were disbanded shortly thereafter, I don't -- I just don't remember -- I can't -- I just can't tell you, like, which ones actually provided a full recommendation memo on and which ones we didn't.
But I know Mr. Williams' --
Q. Okay.
A. -- case -- Mr. Williams' case I remember that 'cause it was more recent and because -- as I'm sitting here now I'm trying to recall -- there was some issue about if it was the right Carl Williams or the wrong Carl Williams or if there was a different --
Q. That's okay.
MR. MORAN: I'm about to switch exhibits. Does anyone -- I need to jump off for a minute. Does anything else need a break?
MS. DUFFY: Sure.
MS. MEADOR: Fine with me.
MR. MORAN: Can you tell me what's



left on the -- how much time is left?
THE VIDEOGRAPHER: Sure. Do you want that before we go off, or do you want to...
MR. MORAN: Just go off the record now.
THE VIDEOGRAPHER: Yep. Going off the record at 4:06 p.m.
(Short recess.)
THE VIDEOGRAPHER: This is the beginning of media unit four. We're going back on the record at 4:17 p.m.
BY MR. MORAN:
Q. All right. Mr. Southerland, are you ready to get back started for the final stretch here?
A. Yes.
Q. All right. I'm gonna show you another exhibit real quick. We're gonna dig into your review of the Cordell Williams case.
A. Okay.
Q. By the way, does our discussion thus far have -- has it helped you refresh your memory at all about your work on the Cordell Williams case?
A. No, not -- not really. I mean, I

remember the -- I remember the basics of the case -- basics of the case from what you -- a question you asked earlier on, but -- but that's the extent of it.
Q. Okay. Actually, hold on a second. I pulled up the wrong document. My apologies.
(Exhibit No. 7 was identified.)
BY MR. MORAN:
Q. Okay. We're looking at what I believe will now be Exhibit Number 8 (verbatim), which is the affidavit of David Evans; do you see that?
A. Yes.
Q. Okay. And you can see that this is a handwritten document. And I'm gonna scroll through it slowly.
Do you have a recollection of reading this document?
A. Vaguely.
Q. Okay. You can see there's a signature of David Evans at the bottom of Page 2 underneath the federal verification statute and the Illinois version of the verification statute as well.
A. Yes.
Q. Okay. Essentially, that -- are you



familiar with that federal statute for verifying documents?
A. I can't say that I've -- that I know the, kind of, language of the statute itself; but I -- I guess I have some familiarity with it.
Q. Okay. Without -- not saying it word-for-word, but, essentially, is swearing under oath that -- as he's written down on the document under penalty of perjury that everything he's saying is true and accurate?
A. Right. Right. Yes, that's my understanding of it.
Q. Okay. So let's go back to the top. And do you remember we talked a little bit about -- I gave you a little bit about of the facts of Cordell Williams. He was driving a car, pulled over. David Ev- -- or the shooter got out, it's David Evans, told Cordell Williams to pop the trunk and then went inside to confront two opposing gang members who he shot and killed; do you remember that?
A. Yes, I remember you -- you told me that earlier, yes.
Q. Okay. Do you have any reason to believe



that's not the fact pattern that you investigated when you were working on the Working Group?
A. No, I don't have any reason to believe that's not the fact pattern.
Q. Okay. So the affidavit we're about to go through is what David Evans says happened. And I believe this is dated -- do you see at the bottom of Page 2, August 13, 2017 --
A. Yes.
Q. -- do you see that?
Okay. So he would have been providing this affidavit more than 20 years after the trial actually occurred with Cordell Williams --
A. Okay.
Q. -- agreed?
A. Yes.
Q. Okay. So let's look at Paragraph 1. On or about May 12 -- on or about 12:00 a.m., May 26, 1994, after a night of partying, which included smoking marijuana, stuffed cigars, drinking malt liquor and brandy at a mutual friend's house, Cordell Williams was providing a ride home for those going his way; do you see that?
A. Yes.



Q. Okay. And he's included number K53669. I'll represent to you, I think, that's his inmate number at the Illinois Department of Corrections.
A. Okay.
Q. Okay. Paragraph 2: While at the party, I brandished my gun, so prior to letting me into his car Cordell popped the trunk and told me I had to put my gun in the trunk, and I did; do you see that?
A. Yes.
Q. Okay. Would you agree with me that based on that paragraph, the implication of this paragraph is that Cordell Williams knew that David Evans' gun was in the trunk?
A. Yeah, I -- I suppose that's a -- a fair reading of it, yes.
Q. Is there any other way to read that, to say that Cordell Williams had no knowledge that a gun was in the trunk?
A. I -- I suppose -- I suppose not.
Q. Okay. Let's look at Paragraph 3.
(As read:) As we were blocks away from my house, I thought I saw rival gang members in a restaurant who had been trying to shoot me.

Paragraph 4: I demanded Cordell to -- and this is in quotes -- "pull over," "pull over," and he did.
Do you see that?
A. Yes.
Q. Okay. Now, do you understand the use of quotation marks to be a verbatim reflection of what statements were actually said?
A. Yeah, I -- I suppose that's correct. I assume that to be what -- what the affiant is saying that he said.
Q. Okay. Paragraph 5: I told Cordell to -- and this is in quotations -- "pop" the trunk and wait right here. I wanna see if that's these -- and then he uses the "N" word, end quotation; agreed?
A. Yes.
Q. Okay. Do you agree with me that the implication of Paragraph 5 -- 3, 4, and 5 is that David Evans saw what he believed were rival gang members, told Cordell to pull over, and then told Cordell to open the trunk and wait -- wait here so if he could see if that's the individuals he suspected?



A. Yes.
Q. Okay. Is there any other way to read that, to say that Cordell Williams did not have knowledge of what was going on in that moment?
A. That he told him to pull over and pop the trunk and he wants to see if these are the people, I -- I think that's a fair reading of what he told Cordell Williams to do. I can't tell you what Cordell Williams knew or didn't know.
Q. But the implication from the statements, if you were called as a witness, would be that Cordell Williams had knowledge of the purpose of pulling over, that David Evans said -- asked to get the gun, that he did get the gun, and his purpose was to go in and confront the individuals in the restaurant?
A. I have no idea about him getting the gun or not. It just says: Pop the trunk and wait here, I want to see if that's them.
Q. Okay.
A. So I have -- I have no idea what Cordell Williams knew or didn't know about what Evans did or did not take out of the trunk.
Q. The question is is it a fair statement



that this -- these allegations in Paragraph 3, 4, and 5, and the implication of those paragraphs, is that Cordell Williams knew -- he'd been told to pull over because David Evans spotted rival gang members and had been told to pop the trunk and been told to wait here so if he could -- David Evans could go see if those are the individuals?
A. I think that's -- I think that's right. I don't -- like I said, I don't know if it was -- there doesn't seem to be -- seem to me to be any indication in Paragraph 3, 4, and 5 about David Evans taking anything out of the trunk or doing anything out of the trunk or -- that would -- that would reveal that to Cordell Williams.
Q. Right. So -- and -- and you're familiar with the concept of circumstantial evidence, right?
A. Yes.
Q. Okay. You can infer from certain facts that certain conclusions are true; that's what circumstantial evidence is?
A. Yes.
Q. Okay. Cordell knows the gun's in the trunk because he told David Evans to put it in the trunk, right? That's according to this.



A. At least -- at least according to this, yes.
Q. And Cordell knows that he was told to pop the trunk, which he did, because David Evans, the owner of the gun, told him to pop the trunk, right?
A. Yeah. I -- I think you can -- that's a fair read that he told him to pop the trunk and told him to wait there and told him to pull over, yes.
Q. And wouldn't you expect the State, if the State were gonna use this affidavit as evidence -- or testimony from David Evans as evidence, this was the testimony, the State would argue that Cordell Williams must have known that David Evans retrieved a gun from the trunk because he knew the gun was in the trunk, he told him to put the gun in the trunk, and then Cordell Williams was then told to pull over and pop the trunk, right?
A. I guess that might be the State's argument. I have no idea what else is in the trunk. I don't know what David Evans saw when he opened the trunk. I don't know if there's a

baseball bat in there. I don't know if there's a tire iron -- iron in there. I think there are a lot of other things that could have been in the trunk -- things he said pop the trunk for.

So I agree with what it says in Paragraphs 3, 4, and 5. He told him to pull over, told him to pop the trunk, and he told him to wait here. I can't --

Q. All great questions.

Was there something else in the truck that Cordell Williams might have thought David Evans was retrieving, right?

A. I have no -- yeah. Yeah, I have no idea what -- what --

Q. Yeah. I know. I know. But I'm just pointing out. That's a fair question, right?

A. I think so.

Q. Yeah. Did you ask Cordell Williams that question?

A. I don't recall. I don't remember if I spoke with Cordell Williams or asked him questions myself.

Q. Do you have any memory of telling Maria Hawilo, who did speak with Cordell Williams, to



make sure you ask whether he understood a gun was being -- that David Evans was asking to take a gun out of the trunk?

A. I -- I don't remember.

Q. Okay. Next paragraph. This is Paragraph Number 6.

(As read:) I immediately jumped out, grabbed my gun from the trunk, and proceeded walking towards those individuals that I saw.

And then in the next paragraph he describes what he calls an awful case of mistaken identity in which he shot both individuals and killed them.

And as he walked out of the restaurant towards Cordell's car noticed that there was an unmarked police car behind him chasing him; do you see that?

A. Yes.

Q. In Paragraph 8 he says he jumped into Cordell's car and was in a panic yelling -- and this is, again, in quotes, "Drive. Drive. That's the police"; do you see that?

A. Yes.

Q. Okay. As of this point, do you agree



with me that there's sufficient evidence for the State to prosecute Cordell Williams for murder under an accountability theory?

A. I don't -- I don't know.

Q. Why not?

MR. BECKER: This is -- this is Steve Becker. I'm going to object on the ground you're calling for a legal conclusion.

BY MR. MORAN:

Q. You can go ahead and answer.

A. I have no idea.

Q. If Cordell Williams understood and facilitated the plan for David Evans to confront rival gang members with a gun, even though he didn't expect David Evans to actually pull the trigger, do you agree that under an accountability theory that Cordell Williams can be convicted of first-degree murder?

MR. BECKER: This is Steve Becker again. Same objection. It calls for a legal conclusion.

BY THE WITNESS:

A. Again, I -- I don't know. I -- I think prosecutors have the discretion to prosecute



anything they want.

BY MR. MORAN:

Q. Yeah, I understand that, but that's a different question.

Is there sufficient evidence to bring a case against Cordell Williams for murder under an accountability theory because he facilitated -- knowingly facilitated David Evans retrieving the gun?

A. Again, I don't -- I don't know.

Q. Did you draw a conclusion at all in this case that without the confession that Cordell Williams gave, it was a court-reported confession, that the State had insufficient evidence to meet its burden beyond a reasonable doubt?

A. I can't remember the -- the case --

Q. Okay.

A. -- details enough to be able to tell you how we arrived at our conclusion.

Q. I'm gonna jump down to Paragraph 10.

It says: I never killed anyone before. I also had never partnered in any type of shooting with Cordell before. We did not plan to do this shooting.

I'm gonna stop there.
Under your understanding of an accountability theory for murder, does there have to be a specific plan to do the shooting for the State to prove its case?
A. I don't -- I don't believe so based on what we talked about earlier, but I -- you know, like I said, I have no idea what -- how we arrived at our recommendation in this case.
Q. Okay. Look at Paragraph 11. Oops, sorry.
(As read:) I believe Cordell pulled over, let me get my gun, and waited on me because I had never done this before. And I believe he thought I wouldn't go as far as I did.
I'm gonna stop there. Now, his belief on what Cordell Williams thought, would you agree, is speculation?
A. Would I agree that what he's saying is speculation? I --
Q. Would you agree that Dav- -- what David Evans thinks Cordell Williams thought is speculation?
A. I mean, based on what's written here, it



says: I believe he thought, so I have to assume that that's -- that says what it says.
Q. I'm asking whether you agree that this is a spec- -- a speculation?
A. I -- I -- I don't know. I don't know what -- I don't know what to tell you. I don't know if it's something he had a conversation with him about or knew --
Q. You can say "I don't know." If you don't know, it's okay.
A. I don't know. I don't know.
Q. All right. Now, let's assume for a minute that Cordell Williams really thought he wouldn't go as far as he did, okay? Just assume that for a minute, that David Evans is correct, Cordell Williams did not believe David Evans would go as far as he did. Necessarily then, Cordell Williams knows David Evans brought a gun into the store; agreed?
A. I -- I don't -- I don't -- I don't know that I can agree with that if we -- if there still isn't any indication -- I mean, I guess, the -- the only -- I think the only way you can -- you can make that assumption is if you agree that he --



"he" meaning Cordell Williams, based on the hypothetical you gave, kind of, knew -- knew all the other relevant pieces, i.e., that he knew -- in other words, that he knew that Evans went to the trunk, took out a gun, and -- and that there -- there was some sort of -- a conversation between the two of them or some indication between the two of them that they -- that he knew what was -- what was happening and what was going on.
Q. So you've got an affidavit here from the actual killer, who has now, by completing this affidavit, given up his right to remain silent, to the extent that right ever existed still because of his conviction. That right is now gone because he's waived the right to remain silent, right?
A. I don't think you waive your right to remain silent just because you've provided an affidavit.
Q. Okay. Well, he's not remaining silent; would you agree?
A. Yes, I would agree with that.
Q. Okay. And he's told you that Cordell Williams knows about the gun, told him to put the gun in the trunk, right? We can go back and read



the lines, if you want. I thought this was -- I think this is --
A. Yeah, based on the affidavit.
Q. -- I don't think -- this -- this part shouldn't really be -- you know, there's no real dispute here. David Evans is saying that Cordell Williams told him to put the gun in the trunk, right?
A. Yes.
MR. BECKER: This is Steve Becker again.
I'm -- I'm gonna object. This is asked and answered.
BY MR. MORAN:
Q. So we know from the affidavit that -- the following things: Cordell Williams told David Evans to put the gun in the trunk; David Evans put the gun in the trunk; David Evans told Cordell Williams to pull over; David Evans told him to pop the trunk; David Evans said, Wait here while -- I want to see if that's these individuals; and then he went into the store and shot people.
Under these facts, you can't say that there is a reasonable basis to conclude that

Cordell Williams was aware that David Evans took a gun into the store or the restaurant?
A. Again, I have no idea what Cordell Williams knew at the time he -- 'cause I'm not in Cordell Williams' head, so --
Q. You're -- you're an investigator. You're not in anybody's head. You can only go based on what's on the evidence, right?
A. Right. And the evidence you just read to me was an affidavit that didn't give an indication that he saw this person took -- take a gun out of the trunk.
Q. That's what you need?
A. Well, you asked me if I -- if I knew what Cordell Williams knew about what was --
Q. No, no, no. I did not ask you that. I asked is there a reasonable basis to conclude that Cordell Williams was aware that David Evans took a gun out of the trunk to go into that restaurant, a reasonable basis to conclude, as an investigator, that Cordell Williams had the knowledge that David Evans took the gun into the restaurant?
A. I don't know.
MR. BECKER: Again, this is Steve



Becker. I'm gonna object, asked and answered.
MR. MORAN: Okay. I'm gonna show you another document. This will be Exhibit Number 9.
MS. MEADOR: I think this is 8, Pat. I think the affidavit was 7.
MR. MORAN: Was it?
MS. MEADOR: I think so.
MR. MORAN: Hang on a second.
MS. MEADOR: I think you called it 8 by mistake. I could be wrong.
MR. MORAN: No, the --
MR. BECKER: I think Lisa's correct.
(Reporter interruption.)
MR. MORAN: No -- oh, you're right. I did. You're right. You're right, Lisa. This is 8, and the affidavit is 7.
MS. MEADOR: Okay.
MR. MORAN: My mistake.
MS. MEADOR: No, no, no. That's okay. Just making sure we're tracking.
(Exhibit No. 8 was identified.)



BY MR. MORAN:
Q. Okay. We're looking at Exhibit Number 8 now, which is an -- an email string. And the very top email's from Maria Hawilo dated November 22nd, 2021, and the very first thing she writes is: Agreed re, regarding, the Evans statement.
I'm gonna scroll down.
The bottom -- and we're going to read from the bottom. The email at the bottom -- or that starts the string is from Steven Becker dated November 22nd, 2021, and it's addressed to Maria Hawilo and Marc Kadish. Do you see that, Mr. Southerland?
A. Yes.
Q. Okay. Had you ever seen this email before, by the way?
A. I can- --
Q. I mean, you're, obviously, on the one that Maria sent, but, I mean, does this -- do you recognize or remember these emails?
A. No, I don't remember these emails.
Q. Okay. And you can see that -- I'm not gonna read all of Mr. Becker's email, but he identifies four things that are attached that he's



providing to Maria Hawilo and Marc Kadish in connection with Cordell Williams; do you see that?
A. Yes.
Q. And one of them the is affidavit of David Evans as the codefendant dated August 2017 regarding the incident; do you see that?
A. Yes.
Q. Okay. Now, I want to look at the email from Marc Kadish. This is later in the day -- actually, only five minutes later, on November 22nd, 2021.
And he writes: The one item we have not seen before was the statement from David Evans; do you see that?
A. Yes.
Q. And then Maria writes: Agreed regarding the evidence statement. I'd like to discuss today.
Do you have a memory of reading the Evans affidavit based on these emails?
A. No, but I can't remember much at all about this case from five -- four years ago.
Q. Do you remember any discussion with Maria Hawilo and Marc Kadish about the affidavit submitted by David Evans?

A. No, I don't remember any conversation with them about it.
Q. Now, was there any discussion about the fact that David Evans has made allegations in the affidavit that the State arguably could have used as evidence against Cordell Williams?
A. I -- I can't remember if we had any conversations about that or along those lines.
Q. Evaluating whether the State could have met its burden of proof without the affidavit -- or, I'm sorry, without Cordell Williams' court-reported statement, was there a discussion about whether the State could have used testimony from David Evans consistent with the affidavit to prove its case?
A. I don't recall or remember having those sorts of conversations.
Q. Okay. Based on your years of experience as a criminal defense lawyer, and as a professor of criminal law, would you agree that the allegations -- or the statements made in David Evans' affidavit could be used by the State as evidence against Cordell Williams to establish or to meet its burden of proof -- or to try and meet



its burden of proof of murder under an accountability theory?
MR. BECKER: Again, this is Steve Becker. I object on the grounds this is calling for a legal conclusion.
BY MR. MORAN:
Q. Go ahead.
A. I -- I mean, I -- I think the State can use whatever evidence that it wants to use to try and prove its case. I don't know how successful or how unsuccessful they would be, but I think they could --
Q. That's not my question. My question is whether you discussed that fact with your colleagues in assessing whether the State could meet its burden of proof, which, by the way --
A. No, your question was, actually -- yeah, your question was, actually, as a defense attorney and your experience --
Q. Oh, you're right. You're right. I'm -- I'm sorry. You're right, I'm sorry. My mistake.
Yeah, as a defense attorney and a professor of law, do you recognize that the State could arguably use the testimony from David Evans



consistent with his affidavit as evidence against Cordell Williams to prove a case of murder under an accountability theory.
A. Again, I don't know if they would be able to prove their case or not. I think they could attempt to and try to, but I don't -- I don't know that it would necessarily prove it.
Q. Do you agree with me that the fact that David Evans submitted an affidavit that creates the implication that Cordell Williams was aware of the gun in the trunk and stopped the car and opened the trunk so David Evans could get the gun -- think should have been disclosed in your final memo to the State's Attorney?
A. I -- I -- I mean, I -- I assume we would disclose whatever we had found or investigated, so I don't -- I don't know -- you know, I -- I don't know what -- I'm not sure -- I'm not sure how to answer that.
Q. I'm asking whether the State's Attorney should be made aware of the affidavit and the allegations in it in your final report and recommendation as the Working Group -- or from the Working Group?



A. I -- I don't know. I mean, it's -- I -- I guess -- I guess so, but I -- I just don't know. I mean, I -- are you asking me if we did or if they should have been?
Q. Should have been. As an impartial investigator, isn't it your job to provide the State's Attorney with both sides -- all of the evidence and -- so the State's Attorney can make a -- a thoughtful decision based on your recommendation?
A. I mean, I saw my job as providing -- providing the State's Attorney with all the work that we did, so...
Q. Well, the question is whether you should provide all of -- as an impartial investigator, isn't it your job to provide the State's Attorney with all the relevant information necessary to make a decision?
A. I mean, I don't know what's relevant to -- to -- to their decision about what to -- what -- her decision about what to do with each case. What I can tell you is that I saw our obligation and our role as to provide the State's Attorney with a full picture of all the work that

we did in the investigation we conducted and our recommendation.

Q. Okay. Which would include making the State's Attorney aware of the affidavit from David Evans, right?

A. If that was part of our investigation and part of the -- what we relied on in reaching our conclusions or making our recommendation, then, yes.

Q. What do you mean "if"? That was part of your investigation. I mean, we talked about it at the very beginning. You're an impartial investigator. You're evaluating all of the evidence. This is part of the evidence. Shouldn't that be made -- communicated to the State's Attorney in your final report? And by that I mean the affidavit of David Evans.

A. I suppose so.

MR. MORAN: I'm gonna show you another exhibit. Okay. This will be Exhibit Number 9.

(Exhibit No. 9 was identified.)

BY MR. MORAN:

Q. This is the notes from a meeting with



David Evans. It just says: Meeting with David Evans and, in parentheses, via Zoom, Evans in custody.

Do you remember -- do these notes look familiar to you?

A. Vaguely.

Q. Do you know who created the notes?

A. No.

Q. Do you know if you were at this meeting with David Evans?

A. No, I don't know if I was or not.

Q. Okay. I want to -- I'm gonna scroll through a little bit and ask that you read along. And if -- if I'm going too fast, please tell me, but -- and as I'm going through, I want you to look for whether the affidavit is discussed, specifically his affidavit.

(Brief pause.)

BY MR. MORAN:

Q. Okay. I've reached the end of the document, and, Mr. Southerland, did you see any discussion specifically of Mr. Evans' affidavit?

A. No.

Q. Okay. Then do you recall, from looking



at your billing records, that you met with David Evans for 1.2 hours at -- in December of 2021. I think it was December 9th or something like that. I can pull it back up if you want, but do you have a recollection we talked about that earlier?

A. Yes, I remember we talked about it earlier. Mm-hmm.

Q. Okay. And at least we know you were at the meeting.

The -- my question to you is did anyone confront David Evans with his affidavit and ask him if it was true?

A. I can't remember if anyone did or not.

Q. Did anyone ask him specific questions based on his affidavit?

A. I don't remember if anybody -- what anyone asked him.

Q. For example, the questions you raised, right, like did Cordell know he got the gun as opposed to all the other things that could be in the trunk. Did you ask David Evans any of those questions?

A. As I sit hear right now, I -- I really can't remember.



Q. Did you or anyone else ask David Evans whether there was anything else in the trunk?

A. I can't remember.

Q. If you had asked David Evans these types of questions about his affidavit, whether the affidavit is true, whether there were other things in the trunk, whether Cordell may have realized or knew -- whether he knew about the gun, that David Evans had taken the gun out of the trunk, would you have had made an effort to document that somewhere?

MR. BECKER: I'm gonna -- this is Steve Becker. I'm gonna object on speculation.

BY MR. MORAN:

Q. Go ahead, Mr. Southerland.

A. I don't know that we would have documented the questions we asked. I think what we would have documented was whatever he said during the course of our conversation with him, our interview with him.

Q. Do you see any -- I mean, we just went through this.

Do you see any reference in these notes of the meeting with David Evans to a discussion of

whether Cordell knew the gun was in the trunk or whether he may have thought David Evans took something else out of the trunk?
A. Well, it says right there, knows -- knows Cordell knew it because Cordell told him to put the gun in the trunk.
Q. Right. He means know -- he knows Cordell knew the gun was in the trunk, right?
A. Right.
Q. Okay. Did you ask him where -- where they pulled over? Was it opposing -- was it a different gang's territory?
A. I can't remember what we asked.
Q. Okay. Did any -- from this document can you tell whether there was any discussion at all, any of the allegations raised in David Evans' affidavit?
A. I -- I just don't -- I'd have to be speculating, so I -- I don't know.
Q. Okay. I'm gonna pull up another document for you real quick.
Give me one second.
(Exhibit No. 10 was identified.)



BY MR. MORAN:
Q. This will be Exhibit Number 10.
This is the -- it's entitled: People v. Cordell Williams, dated May 10, 2022, Working Group Memorandum of Findings and Recommendation Executive Summary; do you see that?
A. Yes.
Q. Okay. Do you recognize this to be the final memo of your findings and recommendations as -- or the Working Group's findings and recommendation regarding Cordell Williams submitted on May 10, 2022?
A. I assume this was the final memo, yes.
Q. Okay. And this is 24 pages long. It starts with Bates label CCSAO-WG-8032 to CCS-WG-8055; do you see that?
A. Yes.
Q. It includes a concurring opinion by Marc Kadish; do you see that?
A. Yes.
Q. Does that help refresh your memory about this case, the fact that Marc Kadish issued a concurring opinion instead of joining you and Maria Hawilo?



A. Not -- not especially because we often, as a group, had differences of -- differences of opinion about what the ultimate recommendation should be. And I know that there were a couple of occasions where Marc provided, what he called, a concurring opinion or -- you know, a separate opinion or, you know -- I can't remember if I ever did or if Maria ever did as well, but I -- I think we all had -- there were certainly a lot of -- at least some cases where we just viewed things differently --
Q. Okay.
A. -- so it doesn't --
(Simultaneous crosstalk. Audio distortion.)
BY THE WITNESS:
A. -- recollection for this case.
(Reporter clarification.)
BY THE WITNESS:
A. It does not refresh -- refresh my recollection with respect to this case in particular, no.
BY MR. MORAN:
Q. Okay. I want to direct your attention



to the first paragraph under Executive Summary, and it indicates that: For the reasons set forth below, there's sufficient credible information that causes a loss of confidence in the integrity of Mr. Williams' conviction. Our loss of confidence in the integrity of the conviction and accompanying recommendation is based on the totality of circumstances underlying his case, including but not limited to, the facts learned during our investigation and the overreaching -- overarching pattern of misconduct, coercion, physical and psychological abuse and bias exhibited by certain Area 1 detectives.
A. Yes.
Q. That's your understanding of law -- you know, a summary of the reasons that the Working Group reached its conclusion?
A. Yes.
Q. What is the bias exhibited by certain detectives?
A. I couldn't tell you without knowing the case itself.
Q. Was race a factor, in your mind, in this case involving Cordell Williams?

A. I can't tell you specifically with respect to this case. I -- I can't tell if you it was or was not.
Q. The totality of the circumstances referred to in this paragraph, does that include the affidavit of David Evans?
A. I can't tell you what that refers to. I can't remember.
Q. All right. It should include the affidavit of David Evans, would you agree, if it really is the totality of the circumstances?
A. I'm just -- I'd just be speculating. I have no idea what it refers to.
Q. All right. Was Cordell Williams -- the fact that his conviction was reversed in the -- or strike that.
The fact that the Working Group recommended reversing the conviction, and, in fact, that it was reversed involving allegations of police misconduct, was that referred to in any other Working Group memos about other cases?
A. I -- I can't remember if it was referred to in other cases -- or other recommendation memo.
Q. In other words, was it cited as support



for a pattern and practice finding --
A. I don't --
Q. -- in the -- the investigation into the Cordell Williams case?
A. I don't remember if it was or not.
Q. Okay. And you understand the phrase, "totality of the circumstances," having been, you know, a lawyer for many years and a law professor, right?
(Reporter interruption.)
BY MR. MORAN:
Q. Do you understand the phrase "totality of the circumstances" having been a law professor and a lawyer for many years?
A. Yes.
Q. All right. It's, actually, a phrase used by the U.S. Supreme Court in evaluating whether a confession is voluntary or not, right?
A. Yes.
Q. Okay. And you understand how that phrase has been defined in various court cases?
A. I understand how it's defined generally. I can't tell you what -- how a specific court has defined it.



Q. Okay. Do you agree that the totality of the circumstances should include all relevant evidence that factors into a decision one way or the other?
A. I think that's a fair -- a fair characterization.
Q. Okay. I'm gonna -- I'm gonna find a section I want to talk about with you. And this is on Page 11 of the document, of this memo.
And this is a -- you can see the heading: C. Cordell Williams; do you see that, sir?
A. Yes.
Q. Okay. And this reflects a conversation that Maria Hawilo had with Cordell Williams on November 30, 2021, at Statesville Prison with Mr. Williams' attorney, Steven Becker, present, true?
A. Yes.
Q. Okay. Have you seen -- and I'm assuming you've seen this before, but do you have any recollection of seeing these -- this summary of the conversation with Cordell Williams?
A. I'm sure I saw it at the time that we



drafted and created the memo, but I can't tell you I have some independent recollection of it, as I sit here right now.
Q. Okay. I want to direct your attention to Paragraph 2. This is Mr. Williams' description of the night -- the events that occurred that night.
He says: They stayed at the party for two to three hours, then decide- -- decided to drive home. He had to work the next day. He offered rides to anyone who wanted them. At some point before Williams got into the car Evans asked for his keys. He gave his keys. Williams believes Evans may have put the gun in the trunk at that time, but Williams did not see him do it, nor did they discuss it.
Do you see that?
A. Yep. Yes.
Q. Okay. Do you remember we just went over what Mr. Evans says in his affidavit?
A. Yes.
Q. That Cordell Williams saw him with the gun and told him to put the gun in the trunk and popped the trunk so Mr. Evans could put it in the

trunk?
A. Yes.
Q. Do you agree with me that what Mr. Williams says and what Mr. Evans says about Evans putting the gun in the trunk are inconsistent?
A. I think, in some ways, they're inconsistent, and in some ways they're -- they're consistent.
Q. Okay --
A. The basic --
Q. -- well --
A. -- the basic -- the basic point is he put the gun in the trunk --
(Audio distortion. Reporter interruption.)
BY THE WITNESS:
A. (Continuing) -- The basic point is that Evans put the gun in the trunk.
BY MR. MORAN:
Q. Okay. Actually, the basic point is whether Cordell Williams knew the gun was in the trunk. So let's take a look at what Mr. Evans wrote, again, which is Exhibit Number 7. I'm gonna



toggle over to it.
Do you see it, sir?
A. Okay.
Q. Okay. Under Paragraph 2: While at the party I brandished my gun, so prior to letting me into his car Cordell popped the trunk and told me I had to put my gun in the trunk, and I did --
A. Okay.
Q. -- do you see that?
A. Mm-hmm.
Q. Okay. And what we just were looking at -- hang on a second.
(Brief pause.)
MR. MORAN: I can't see the top here.
BY MR. MORAN:
Q. Under Paragraph 2 is that -- Mr. Williams says: He believes Evans put the gun in the trunk, but Williams did see him do it, nor did they discuss it.
A. Okay.
Q. Do you -- do you see that?
Now, we know, from what Evans says, there was a discussion about putting the gun in the trunk, right, at least according to Evans?



A. I -- I -- I guess so. I don't -- I don't know if I would call that a discussion, but...
Q. Do you -- or don't we know, from what Evans says, that Cordell told him to put the gun in the trunk?
A. Yeah. Yes.
Q. So you have this inconsistency; agreed?
A. Again, I don't -- I don't know -- I guess, I -- I don't see those as -- as especially inconsistent.
Q. How is it that Mr. Evans' statements that Cordell told him to be -- to put the gun in the trunk is consistent with Mr. Williams statement that they had no discussion at all about the gun being in the trunk?
MR. BECKER: This is Steve Becker again. I'm gonna object to asked and answered.
BY THE WITNESS:
A. 'Cause to me a discussion implies that there's some back and forth, a conversation. And what Mr. Evans' affidavit says is he told me to put the gun in the trunk, and I put the gun in the



trunk.
BY MR. MORAN:
Q. And how could Mr. Williams' statement that he believed Evans may have put the gun in the trunk, did not see him do it, how is that consistent with Mr. Evans' statement that he brandished a gun and Cordell Williams told him to put the gun in the trunk and popped the trunk for him to do it?
A. I don't know. I can't tell you what Cordell Williams saw or could have seen. I can't tell you what Evans did or did not do. I -- I'm sorry. I don't -- I don't know how to answer.
Q. The question is -- that's okay.
I -- the questions you asked earlier, like, does Cordell Williams know whether there were other things in the trunk, when he was told to pull over and pop the trunk, were those questions asked Cordell Williams, according to this summary? And I'll slowly scroll through to the end.
(Witness peruses document.)
BY THE WITNESS:
A. I don't know what questions were asked. I just have the summary of the -- of what Williams

apparently said, so I can't tell you what was asked --
BY MR. MORAN:
Q. Does the summary -- I'm sorry.
Does the summary contain any indication to you that there was any discussion about David Evans' affidavit with Cordell Williams?
A. I mean, I -- I -- I don't know.
Q. I mean, how -- do you need to read it again, or do you want -- I mean, do you need time to read it? I mean, we can take a break if you want it read it over.
A. No, I don't want to break, but what I'm saying to you is I don't know what Maria asked Mr. Williams. So I don't know if there was a conversation about the affidavit during the -- during the -- during the course of their discussion. I don't know what was asked of Williams.
Q. My question is: Based on the information in front you on that exhibit, can you say whether there was any questions asked about the affidavit?
MR. KUBLY: Objection; asked and



answered.

BY THE WITNESS:
A. I can't tell you --
MR. BECKER: Yeah, same objection.
THE WITNESS: Sorry, Madam Court Reporter.
BY THE WITNESS:
A. I -- I can't tell you what was asked. I -- I don't -- I can't -- I just don't know. I don't know -- I don't know what their conversation was. All I have is the notes or the -- kind of, the lines that were contained in the memo that you just show me. But that's all I can tell you.
Q. Okay. So we really have one more exhibit real quick.
(Exhibit No. 11 was identified.)
BY MR. MORAN:
Okay. This is Exhibit 11. This is an email that you wrote to Maria Hawilo on November 30th, 2021, about your -- about the interview with Cordell Williams. And you provided some questions for her; do you see that?
A. Yes.



Q. Okay. Now, this is eight days after you all had received the affidavit of David Evans?
A. Yes. Okay.
Q. It doesn't look like you included any questions about the affidavit in these recommendations to Maria Hawilo; is that correct?
A. Yes, that's correct.
Q. Do you know why there was no recommendation or suggestion to ask about the affidavit or the allegations in it?
A. I don't know why. I can only speculate, and so I don't want to do that. So, no, I don't know why.
Q. Did the Working Group disregard the affidavit from David Evans?
A. I can't -- as I sit here right now, I can't tell you how much weight we gave it, how much we considered it, whether we considered it. I think our focus or concern was about the beatings and --
Q. Sure.
A. -- coercion and other misconduct that the detectives are alleged to have been involved in, engaged in, and that was, sort of, what the



focus of the questions are there, which is why I asked about beating, the torture --
Q. Sure.
A. -- coercion --
(Simultaneous crosstalk. Audio distortion.)
BY MR. MORAN:
Q. And one of your -- isn't -- as an impartial investigator, one of your jobs would have been to determine whether Cordell Williams' allegations of abuse were true or had credit, right?
A. Yes.
Q. And one of the ways you evaluate whether his allegations of abuse should be credited is by determining whether he's offering -- his statements are consistent with other witnesses, right?
A. That might be one way, yes.
Q. Whether he's telling the truth about other events that other witnesses contradict?
A. I suppose so, yes.
Q. All right. I'm gonna take this down for a second.
MR. MORAN: Can we go off the record

for 30 seconds, please? I apologize. I have a kid calling me constantly right now, and I have to find out what that is about.
THE VIDEOGRAPHER: Yep.
Going off the record at 5:11 p.m.
(Short recess.)
THE VIDEOGRAPHER: This is the beginning of media unit five.
We're going back on the record at 5:16 p.m.
BY MR. MORAN:
Q. All right. Okay, Mr. Southerland, I'm gonna go back -- we're gonna go back to the -- the memo dated May of 2022 -- May 10th of 2022, the recommendation for Cordell Williams.
Okay. Do you see it, sir, on your screen?
A. Not yet. Yes, I see it now.
Q. Okay. Great. Okay.
So we're just looking at the section on Cordell Williams, and I had asked you a number of questions about whether the affidavit has been mentioned at least from your reading of this summary created by Mrs. Hawilo. And I think you



told me you don't see it there; agreed?
A. I mean, I -- I said I have no idea if it was mentioned or not.
Q. I know. What I'm asking is based on the lang- -- the information in this summary of 16 points, does it appear that the affidavit was discussed at all?
A. Again, I don't -- I don't know.
Q. Okay. So let's -- I'm gonna scroll up.
Just above it is the section regarding David Evans. This is under B., and we're looking at Page 10 of Exhibit Number 10. And I want you to take a look at it real quick. I'm going to slowly scroll through it.
My question for you, sir, is do you see any reference to Mr. Evans' affidavit in the summary of the interview with him?
A. No.
Q. Okay. In fact, does it look like that there's any discussion at all of the shooting itself in the summary regarding David Evans?
A. I don't know what was discussed. It's not -- there's not- - there's nothing written in here about the shooting, no.



Q. Right. That's what I'm asking about.
Does the summary contain any information about the actual shooting from David Evans?
A. It doesn't appear to, no.
Q. Okay. It does, however, contain David Evans' allegations of abuse, right?
A. Yes.
Q. Okay. By the way, do you know whether Cordell Williams and David Evans were in the same gang?
A. I can't remember. I don't know.
Q. Is that a conversation that you or any other members of the Working Group had with David Evans or Cordell Williams?
A. I can't speak for what -- anyone else -- Marc or Maria did. I -- I don't remember or recall those --
Q. Okay.
A. -- conversations.
Q. I want to scroll down to the section on affidavits. This is under E. on Page 14. There's a single paragraph about the affidavits received by the Working Group; do you see that?
A. Yes.



Q. There's a -- one sentence mentioned of the one provided by David Evans; do you see that?
A. Yes.
Q. And it says: Evans stated that Cordell popped the trunk when Evans told him to do so but that neither Cordell, nor Evans, had planned any shooting; do you see that?
A. Yes.
Q. Okay. Now, we agreed earlier that in order for the State to prove its case against Cordell Williams, under an accountability theory, it doesn't have to prove that Cordell had planned to do a shooting, right?
MR. BECKER: I'm gonna -- this is Steve Becker. I'm gonna object again. You're calling for a legal conclusion.
BY THE WITNESS:
A. I mean, I -- I don't know how to answer that question. I don't know what the State needs or would have to prove under the circumstances. I can just tell you that the sentence says what it says.
BY MR. MORAN:
Q. I understand that. Yeah. Would you

agree with me that the sentence, the single sentence here about David Evans' affidavit, does not fully describe David Evans' affidavit?
A. I -- I -- I suppose it does not. I mean, it --
Q. Do you want to look at the affidavit again?
A. No.
Q. Okay. So the Working Group made a choice as to what information would be included, regarding the affidavit from David Evans, in the ultimate report that went to the State's Attorney; would you agree with that?
A. I mean, I -- I -- I guess -- I don't know that we made some conscious choice to include or not include anything. I -- I don't remember what we, ultimately, provided to the State's Attorney beyond this recommendation memo.
Q. I mean, I understand you may not have a memory of this, but we know that you participated in the investigation, right?
A. Yes.
Q. And we know that you helped with the drafting of the memo, you made recommendations and



edits, right?
A. Yes.
Q. It was collaborative project, right?
A. Yes.
Q. And, ultimately, the Working Group, whoever made the -- it doesn't really matter who made the decision, ultimately, the Working Group, as a group, agreed that the only information from David Evans' affidavit that was gonna be included, under the section entitled "Affidavits," was that Evans stated that Cordell popped the trunk when Evans told him to do so, but that neither Cordell, nor Evans had planned any shooting, right?
A. That's what it says.
Q. That's what you, as a collaborative group, decided should be included regarding David Evans' affidavit?
A. That's what the memo says, yes.
Q. Right. Which means, necessarily, that information was left out, right?
A. What you read is what the memo says. I'm not sure what else you want me to -- to tell you. I can't answer anything else beyond that.
Q. And I -- I understand it's late. I'm



sorry I kept you here so long, but all I want you to do is answer the question, really. These are just yes-or-no questions, right?
I mean, obviously not all of the information was included in the memo -- or at least in this section under "Affidavits" regarding David Evans' affidavit, right?
A. In every case that we investigated, I gave -- we -- we provided all the information that we could or that we investigated with respect to the case. The last thing I want to do is be in a position of having a case where the State's Attorney is making a -- making a decision based on our nonbinding recommendation in a memo where anyone is in the dark about any of the things that we examined or looked at.
So to the extent that there's information in there, that's what we provided. I can't tell you what else we provided beyond that. I can't tell you what else we discussed. I can't tell you what questions we asked. This was four and a half years ago, almost five years ago now. I can barely even remember the case itself, so --
Q. Then why didn't you review the memo



before this deposition? I mean, you knew we were gonna talk about it.
A. 'Cause I have no obligation to review anything.
Q. Okay. That's fine. I get it.
MR. BECKER: This is Steve Becker. I'm gonna object. That's argumentative.
MR. KUBLY: Pat, Pat, it's getting pretty argumentative. The tone is fine it's just like there's a lot of commentary going in. Can we -- can we just keep it -- keep it level the way it's been the first six hours?
MR. MORAN: I think I am being just fine right now. And I understand it's late, and people are getting frustrated. So let's just keep moving, okay. Fair enough?
BY MR. MORAN:
Q. Okay. Mr. Southerland, I'm -- you had just mentioned that you put in all the information that you could in these memos. And I -- I hate to belabor a point, but, I mean, you'd have to agree with me that you did not include all of the information from David Evans' affidavit in the description of David Evans' affidavit, right?

MR. BECKER: This is -- this is Steve Becker. I'm gonna, again, object. This is asked and answered, repeatedly.
MR. MORAN: It has not been answered.
BY THE WITNESS:
A. No, we did not copy and paste David Evans' affidavit into our memo.
BY MR. MORAN:
Q. Okay. So the part about Cordell Williams instructing David Evans to put the gun in the trunk did not make it into the memo, right?
A. Not under the affidavits, but I think in -- in other parts of the memo that you flashed on the screen earlier, with respect to the State's case and the recitation of the facts from the prosecutor's perspective, there is a discussion there that says that Cordell Williams told David Evans to put the gun in the trunk.
(Simultaneous crosstalk.)
BY MR. MORAN:
Q. I'm sorry. Go ahead.
A. Not in this section here, no. We didn't copy and paste the affidavit and provide -- but I, also, don't know whether or not we provided those



affi- -- that affidavit to the State's Attorney or to -- to Miss Lanier at the time because it was often the case that we would provide our memo to them. We'd meet with them 'cause they had questions about our recommendation. And to the extent that they asked for or sought additional documents that were -- that we relied upon or that were part of our recommendation, we would provide those.
I can't tell you, as I sit here right now, what we did or did not provide, but what's in the memo is in the memo.
Q. Okay. I understand what's in the memo is in the memo.
So let's talk about that part about the State's case. I skipped over that because that's talking about the State's case back in 1995, right, when the trial happened?
A. That's right.
Q. Okay. And David Evans submitted his memo in 2017, right?
A. That's right. That's what it says here, yeah.
Q. So that affidavit would not have been



available to the State in 2000- -- in 1995; would you agree?
A. Yes.
Q. Okay. So, really, the only place to talk about David Evans' affidavit is in the section regarding affidavits or the summary of David Evans' interview?
A. Okay.
Q. Do you agree?
A. Again, I -- I can't tell what con- -- I don't remember the conversations we had with Miss Lanier or anyone else, when we submitted our memo. I can't tell you whether or not she asked for and we provided his affidavit then. I don't -- I just don't know.
Q. So you had mentioned that you may not have provided the affidavit to the State's Attorney's Office. And, I guess, my question is would you -- wouldn't you, as a matter of course, have uploaded the affidavit once you received it to the SharePoint file that you had with the State's Attorney's Office?
A. Whatever materials we obtained in the course of an investigation are on SharePoint. So



I -- I -- I don't have access to SharePoint. I haven't had access to it since our work came to a conclusion, so I don't -- I don't know what's on the SharePoint file.
Q. Oh, I understand. My question is a little different.
Would you -- and I know you don't remember right now, as you sit here today; but would it have been your practice back then to have uploaded all information you got to the SharePoint file?
A. I -- I believe so. I mean, I -- I don't --
Q. Right.
A. -- it's not as though we had some other independent place to store materials beyond SharePoint file -- the SharePoint site, so --
Q. And a --
A. -- yes.
Q. Do you agree that the reader of this document would only know that David affidavit -- David Evans' affidavit says that Cordell popped the trunk, that -- that neither Cordell, nor Evans, had planned any shooting?

A. I -- I can't speculate as to what a reader would take away from what that sentence says beyond what it says on the page.
Q. Well, you don't have to speculate. Is there any -- any other information in this document about David Evans' affidavit?
A. Again, I mean, I -- if you're telling me this is a place where the only conversation about affidavits is, then, that's what it is. I don't know -- I'm not sure what else I can tell you.
Q. Okay. How about this? I'll represent to you that, at least when I read this document, I did not find any evidence -- or any mention of David Evans' affidavit other than in the section we're looking at right now. So if that's true, if this document doesn't contain any other reference to the affidavit, other than this one sentence in this paragraph we're talking about, would you agree then that whoever the -- whoever reads this document would only know the information in this document about David Evans' affidavit?
A. Again, I'm just speculating about what other folks, kind of, would know about an affidavit or wouldn't know about an affidavit.



I -- what I can say is that -- would they read the sentence, and they take away whatever understanding they have of the sentence as it says it right there --
(Reporter interruption.)
BY THE WITNESS:
A. Sure. What I'm saying is whatever is in the -- on the -- I'm -- I'm only -- I'd only be speculating about what other -- what other people would take away from what is written there.
What I can tell you is that what the sentence says is what the sentence says and what they read into it or what they understand from the sentence is what they understand from it. I -- I can't speculate beyond that.
Q. Okay. Okay. Let me ask you this.
Do you stand by this document, this memo, that you've written -- or that you, as the group wrote? I mean, the final memo to the State's Attorney?
A. Do I stand by it?
Q. Yeah.
A. Yes.
Q. Would you have had provided the State's



Attorney with any other information in support of your recommendation regarding Cordell Williams other than this final memo dated May 10, 2022?
A. I don't know. As I mentioned before, whenever we would submit a recommendation memo, we would also have a conversation with -- or maybe several conversations with Miss Lanier and Mr.- -- and/or Mr. Martin. And to the extent that they would ask for additional documents or support of things that we had written in our recommendation memo or work that we had done in terms of our investigation, we would provide that as well.
So I -- I don't know what else -- if anything else we provided in this instance.
Q. Sure. And let me clarify. I understand that there may have been follow-up questions. I mean, when you submitted the memo that stated -- the one we're looking at in Exhibit Number 10, to the State's Attorney Office, would you have submitted anything else in addition to this memo in support of your recommendation?
A. Not beyond what I just described, which is if we have a follow-up conversation and they ask for additional documents or materials, we provide



those materials. But I can't tell you, as I sit here now, whether or not that happened in this inst- -- individual case.
Q. Okay. I'm gonna ask you a couple questions about some edits you made to this document, and then, I think, we're gonna be -- or at least I will be done. So I'm gonna pull up another document for you real quick.
(Exhibit No. 12 was identified.)
BY MR. MORAN:
Q. Okay. Mr. Southerland, you're looking at what will be Exhibit Number, I believe, 12.
And this is an outline of what eventually became the Working Group memo of findings and recommendations; do you see that?
A. Yes.
Q. It's not nearly as long, so I'm just gonna scroll -- scroll to the last page. And you can see there's two Bates labels on it. I'll go to the front -- first page.
One is NYU010574, and one is CCSAO-WG-0175428; do you see that?
A. Yes.
Q. Do you know why there's an NYU Bates

label on this document?
A. No.
Q. Do you know whether it was used in connection with some other case, or is it just how it's produced to the State's Attorney?
A. I don't -- I'd have to be -- I'd have to speculate.
Q. Yeah.
A. I -- I assume it's how it was produced to the State's Attorney, but I didn't -- I don't know of any other purposes for this -- this document.
Q. I want to come to the -- focus on the notes in the margin. Can you see those okay?
A. Yes.
Q. Do you want me to expand it?
A. No, that's okay.
Q. Okay. I'm gonna expand it a little bit for me.
Okay. So we're looking in the first comment. It says: VMS1. Do you recognize that to be an indicator that you created that comment?
A. Yes.
Q. Okay. Does -- (As read:) We have a



capacious view of the standard in that it requires looking at a multitude of factors that touch on the integrity of the conviction; do you see that?
A. Yes.
Q. Okay. What does it mean by "a capacious"?
A. I'd have to just speculate now, as I sit here, but I think it means that we look at all the evidence that we can obtain.
Q. That would include, obviously, David Evans' affidavit?
A. Yes. Among other things, yeah.
Q. Okay. And "a capacious view of the standard," so it's describing the standard.
What standard is -- are you considering in this -- in this comment to the document?
A. I think it must be in the interest of justice 'cause it says: Explain what we mean by interest of justice.
Q. Okay. And did that standard incorporate the heightened scrutiny that we looked at earlier in that other case?
A. I don't remember.
Q. All right. So in the next comment --



I'll kinda use a little shorthand here.
It says: I think, coming out of the gate with the conviction, without touching on it, situates your mindset that the conviction is solid rather than that these police are scumbags.
It sounds it me like you're trying to -- or you're suggesting that the introduction needs to be different in order to alert the reader about the misconduct of the police or your view -- or the views of the police. I don't necessarily think you intended to write "scumbags" in the official document but that the focus was gonna be on the police rather than the fact that -- in order to avoid giving the impression that the conviction was solid; is that true?
A. No, I think what I mean by -- by that is that a -- a conviction has, like, an anchoring bias to it, meaning that you presume or assume that because a person is guilty that you no longer have to have any, sort of, scrutiny in terms of how you got to that point. And, so, if we start with, as we do in appellate opinions and court cases, the fact that the person is convicted of a crime, then all of the other stuff that comes after that, I



think, in a lot people's minds, goes out the window versus talking through the fact that the way in which this whole enterprise came about was because detectives were involved in securing false confessions and coerced confessions and torturing, the Englewood Four, and made up, falsified evidence, created a cheat sheet, to help their confederates testify falsely under oath.
Q. Well, you don't have to go over all that. I mean, I -- I understand. My question's a little bit more geared towards the introduction.
So it sounds like --
A. Right. And that's what --
Q. -- you compared it to an --
A. -- I'm talking about.
Q. You compared it to an appellate brief. And would you agree with me that an appellate brief is providing an explanation about a decision and not advocating?
A. No, I compared it to an appellate court decision.
Q. Yeah -- yeah, that's what I mean. Appellate -- not a brief, but an opinion. I apologize, I...

A. I don't -- I don't think it's -- it -- it does help to explain how you arrive at a decision; but I also think, in the context of the work that we were doing or engaged in, it's useful to talk through concerns beyond the -- the conviction itself because our overarching, I think, investigation in this case was not necessarily about where -- I think the determinational point was not gonna be that -- one about whether or not Mr. Williams was, ultimately, innocent, but, instead, whether or not there was some concern around the conduct of -- of detectives that undermined the integrity of the conviction itself. And --

Q. Do you have an independent memory of that, or are you speculating right now that that was the position that you were gonna take?

A. I'm -- I'm speculating right now that that was the position we were gonna take based on the --

Q. Okay.

A. -- brief look at the memo that you showed me and, you know --

Q. And you don't have to speculate.



I want to run through the last questions and then set you off on your way.

So, obviously, the -- the memo is what it is, as you pointed out, and it contains the language that it contains. And we can just read that, and that will tell us what the rationale was, right?

A. Yes.

Q. Okay. So I want to focus on the -- well, I do want to ask a question.

Would you -- would you agree with me that when you're starting out trying to make it seem like the -- or give the reader that the impression that the police are scumbags, that that seems more like advocacy than it does taking an impartial view and providing an impartial explanation of the case?

A. I don't -- I don't see it as -- as advocacy or inconsistent with being impartial if you -- if our investigation, actually, led us to believe that the police officers engaged in misconduct 'cause I think if anyone is -- is sworn to uphold the law and they involve -- engage in misconduct, then, unfortunately, the facts are



where they lead us to.

Q. Okay. I want to jump down to the next comment. There's a space, so it's comment VMS4.

You write: I need to look at the protocol more closely, and they may be something we state earlier when detailing out standard of review, but I thought we had made the point that with a pattern and practice we have a presumption; do you see that?

A. Yes.

Q. What is the presumption?

A. I think the issue with the presumption was part of the -- referencing the -- the protocol. And it was the language about -- in the protocol itself about there being a -- I think it's the second half of the -- of that -- of that first -- of that phrase in the first line of the protocol about pattern and practice. It says something along the lines of if there's a pattern or practice, we apply a heightened scrutiny unless there's something that --

(Reporter interruption.)

BY THE WITNESS:

A. (Continued) -- Something along the lines



of if there's a pattern and practice, then we apply a heightened scrutiny, unless -- and I can't remember what the language -- what the rest of the language says there, but...

BY MR. MORAN:

Q. Is there a presumption of innocence with the pattern and practice?

A. A presumption of innocence? No. No, we --

Q. Is there --

A. -- we didn't have any --

(Simultaneous crosstalk. Reporter interruption.)

BY THE WITNESS:

A. We didn't have -- we did not -- we did not have any conversation about a presumption of innocence.

BY MR. MORAN:

Q. Okay. Is there a presumption that the confession is coerced with the pattern and practice?

A. I -- I don't know. I don't know.

Q. As you sit here today, do you actually know you meant by this reference to a

"presumption"?
A. I -- I can't tell you exactly what I meant by the reference, as I sit here today.
Q. Okay.
A. I do -- I do think that the -- I do think that the comment is referring to our protocol, but I -- I just can't, as I sit here today, tell you exactly what it was referencing.
Q. Well, if you don't -- I mean, listen, it's fine if you don't know. You can just say that. Okay? You don't have to struggle to come up with an answer.
The comment number VMS5. Let's take a look at that real quick. And it says: This can also include why we think it's okay that he can't ID the exact detective in light of all we know; along with potentially nodding to the broader Area 1, they were all in it together, point.
Okay. I read that to mean that even if you can't identify the detective who struck him, it seems like everybody at Area 1 was engaged in misconduct, so that should be sufficient for your conclusion; is that accurate?
A. I think that comment is referring to --



I think it is -- kind of says what it -- what it says there that he may or may not be able to tell you exactly which detective it -- it was but that all the detectives in the Area 1, who were part of our mandate, if they were working together, and working together on this case, then they -- then that's the big- -- that's the larger concern.
Q. Okay. So we went over the list of detectives earlier, and, obviously, Foley is one of them who's on the list, right?
A. That's right.
Q. Okay. And he couldn't identify Detective Foley, which is referred to in your comment, right?
A. That's right.
Q. Okay. The other detective is Detective O'Brien, and he's not on your list, right?
A. I -- I'll take your word for that. I don't know -- as I sit here now, I can't tell you the detectives who are or are not on our list.
Q. Yeah. So we'll -- I'll represent to you right now, for purposes of the question, that O'Brien's not on your list -- or wasn't on the Working Group's list.



Shouldn't the case then have been referred back to the Conviction Integrity Unit once the Working Group became aware that Foley, likely, was not -- or you couldn't confirm that Foley was part of the investigation?
A. I don't know. There were -- at -- at some point, along the course of our work, it became pretty apparent that there were a host of detectives who were not involved in Englewood Four case but who were partners with or worked with the detectives who were on our list. And I believe we made that fact known to the -- to the State's Attorney's Office and continued with our review or investigation of the cases that were in front us.
Q. Okay. And the reason I ask is that it doesn't seem like your comment is drawing that conclusion that someone else at Area 1 worked in close proximity or partnered with Detective O'Brien, it's just saying the detectives at Area 1 were all in it together, right?
A. That's what the comment says. I can't tell you what -- what -- if there was anything more beyond that based on reading it right now and -- and trying to remember right now.



Q. I --
MR. KUBLY: Pat, I got five minutes left before we're at seven hours.
MR. MORAN: Yeah, I'm gonna -- I -- I think I'm done right now. So I will thank you for your time and turn it over to whoever wants to pick up the baton.
MS. MEADOR: I don't have any additional questions. Thank you.
MR. BECKER: Mr. Southerland, I just a very short amount of questions for you.
THE WITNESS: Okay.
MR. BECKER: This is Steve Becker.

EXAMINATION

BY MR. BECKER:
Q. Mr. Southerland, you were not responsible for making the ultimate decision as to whether to vacate Mr. Williams' convictions; is that correct?
A. That's correct.
Q. And you did not make that decision; is that correct?
A. That's correct.
Q. And you were not responsible for making

334

the decision as to whether to oppose Mr. Williams' certificate of innocence petition; is that correct?
A. That's correct.
Q. And you did not make that decision; is that also correct?
A. That's correct.
MR. BECKER: Thank you. No further questions.
MR. MORAN: I think we're all done unless if anyone has anything else?
Did you -- did you guys explain signature, or...
MR. KUBLY: I have not.
So, Vincent, at the end of the deposition you have a choice. You can either request that the transcript be provided to you, you get 30 days to read it, and it allows you the opportunity to correct any errors where your answer might have been mistranscribed. It does not allow you the opportunity to change your answers; otherwise, you can waive signature, which means that you do not need to read through the transcript and then -- then sign off on.

335

You're just trusting that the court reporter got all the testimony down accurately today. The choice is up to you. We frequently will advise to go ahead and waive.
THE WITNESS: All right. I trust Miss Block, so I'll waive.
MR. KUBLY: Sounds perfect. Then thank you very much.
MR. MORAN: Mr. Southerland, thanks for your time today. I'm sorry we kept you so long.
MR. KUBLY: Thank you very much, Vincent. And you can -- you can hop off. You don't -- you don't need to be around for the attorneys talking.
MR. HENRETTY: Nice to see you again, Vincent.
MS. MEADOR: Thank you.
THE VIDEOGRAPHER: I'll take -- I'll take us off.
MS. DUFFY: Once we're off the record, I have one other quick thing to just address with the attorneys scheduling-wise.
THE VIDEOGRAPHER: This concludes

336

today's video deposition of Vincent Southerland. We're going off the record at 5:50 p.m.
THE STENOGRAPHIC REPORTER: Pat, are you ordering the transcript?
MR. MORAN: Yeah, I'm gonna order.
THE STENOGRAPHIC REPORTER: Does anybody need a copy?
MS. DUFFY: The State's Attorney's Office does.
DEPOSITION CONCLUDED AT 5:50 p.m.

337

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Lucia R. Block, a notary public within and for the County of Cook and State of Illinois, do hereby certify that heretofore, to-wit, on the 24th day of October, 2025, Vincent Southerland appeared virtually before me, a witness in a certain cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein Cordell Williams is plaintiff and James O'Brien, et al., are defendants.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me, in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature of the witness to the foregoing deposition was waived by agreement of counsel for the respective parties.

I further certify that there were present at the taking of this deposition the attorneys as hereinbefore noted.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

In testimony whereof I have hereunto set my hand and affixed my notarial seal this 12th day of November, 2025.

Lucia R. Block, CSR #084-003160
Notary Public, Cook County, Illinois