# Exhibit 26

## Deposition Transcript of M. Kadish

## (Working Group Member)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CORDELL WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 23 CV 14905 |
| | ) | |
| JAMES O'BRIEN, THE | ) | Hon. Lindsay C. Jenkins |
| PERSONAL REPRESENTATIVE | ) | |
| OF THE ESTATE OF WILLIAM | ) | Mag. Judge Young B. Kim |
| FOLEY, THE CITY OF | ) | |
| CHICAGO, a municipality, | ) | |
| and UNKNOWN EMPLOYEES OF | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

The video-recorded deposition of MARC R. KADISH, taken pursuant to the Federal Rules of Civil Procedure, before Kathleen A. Hillgard, Certified Shorthand Reporter, No. 084-4093, and Katie K. Elliott, Certified Shorthand Reporter No. 084-4537, at 71 South Wacker Drive, 47th Floor, Chicago, Illinois, on Thursday, October 30, 2025, commencing at 10:17 a.m. pursuant to subpoena.

APPEARANCES:

LAW OFFICE OF STEVEN W. BECKER, LLC, by
MR. STEVEN W. BECKER
(205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
312.396.4116
swbeckerlaw@gmail.com)
appeared on behalf of the plaintiff;

APPEARANCES: (Cont'd)
ROCK FUSCO & CONNELLY, LLC, by
MR. PATRICK R. MORAN
(333 West Wacker Drive, 19th Floor
Chicago, Illinois 60606
312.494.1000
pmoran@rfclaw.com)
appeared on behalf of the defendants James O'Brien, the personal representative of the Estate of William Foley;

THE SOTOS LAW FIRM, PC, by
MS. LISA M. MEADOR
(141 West Jackson Boulevard, Suite 1240A
Chicago, Illinois 60604
630.735.3300
lmeador@jsotoslaw.com)
appeared on behalf of the defendant The City of Chicago;

COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
MS. CRISTIN DUFFY
Assistant State's Attorney
(69 West Washington Street, 32nd Floor
Chicago, Illinois 60602
773.350.0805
cristin.duffy@cookcountysao.org))
appeared on behalf of the Cook County State's Attorney's Office;

AKERMAN LLP, by
MR. GREGORY A. KUBLY
MS. AMANDA J. HAMILTON
(71 South Wacker Drive, 46th Floor
Chicago, Illinois 60606
312.634.5700
gregory.kubly@akerman.com
amanda.hamilton@akerman.com)
appeared on behalf of the deponent;



APPEARANCES: (Cont'd)
MAYER BROWN, LLP, by
MS. LAUREN R. NOLL
(71 South Wacker Drive, Suite 4034
Chicago, Illinois 60606-4637
312.782.0600
lfnoll@mayerbrown.com)
appeared on behalf of the deponent.

ALSO PRESENT:
Marvin Oltman, Legal Videographer

* * * * * * * *



I N D E X


Witness: Page

MARC R. KADISH

Examination by:

Mr. Moran.................... 7
Mr. Becker................... 227


E X H I B I T S


No. Description Marked/Referenced

1 Working Group Procedures & Guidelines - 6 pgs................................ 84
2 Effective June 25, 2021 - Overview - CCSAO-WG 0000218-225................... 85
3 6/8/2021 email from Risa Lanier to Multiple People - CCSAO-WG 129155-56 .. 122
4 11/23/21 email from Maria Hawilo to Kadish and Southerland re: Bob Milan - CCSAO-WG 0047024-26.................. 125
5 12/6/21 email from Kadish to Hawilo, Re: Englewood Audit, Tyrone Delaney - CCSAO-WG 0120402-4..................... 127
6 9/27/21 email from Kadish to Southerland and Hawilo - re: Misc. - CCSAO-WG 0161317-19.................... 130
7 8/2/22 email from Kadish to Hawilo re: Proposed agenda for Thursday meeting - CCSAO-WG 465198-9............ 134
8 David Evans Affidavit -W453, W454...... 142
9 11/22/21 email from Steven Becker to Hawilo and Kadish, Subject: Cordell Williams - CCSAO-WG 0119166-67......... 148
10 11/22/21 email from Maria Hawilo to Marc Kadish Re: Cordell Williams - CCSAO-WG 0115015-16.................... 150
11 People v Cordell Williams - May 10, 2022 - Working Group Memorandum of




EXHIBITS: Cont'd


No. Description Marked/Referenced

12 People v Cordell Williams Working Group Memorandum of Findings and Recommendation with handwritten note - 32 pgs............................... 157
13 A. Pattern and Practice evidence provides a separate, independent ground for vacatur in the interests of justice - CCSAO-WG 0010889-907...... 199
14 To: Maria Hawilo, Vincent Southerland - From: Marc Kadish - RE: Cordell Williams - draft of 2/28/22 - CCSAO-WG 0008227-28.................... 202


(Exhibits attached/scanned.)

\- - -

THE VIDEOGRAPHER: We are now on the record. My name is Marvin Oltman, representing Urlaub Bowen & Associates.
Today's date is October 30th, 2025. The time is now 10:17 a.m. We are located at 71 South -- 71 South Wacker Drive, Suite 4800, in Chicago, Illinois.
This deposition is captioned Cordell Williams versus James O'Brien, et al. The case number is 23 CV 14905. The name of the witness today is Marc Kadish.
Will counsel please identify themselves and the parties they represent, beginning with the party noticing this proceeding.
MR. MORAN: Pat Moran on behalf of the police officer defendants.
MS. MEADOR: Lisa Meador, M-e-a-d-o-r, on behalf of the City of Chicago.
MS. DUFFY: Cristin Duffy on behalf of Cook County State's Attorney's Office.
MR. BECKER: Steven Becker on behalf of the plaintiff.
MS. HAMILTON: Amanda Hamilton on behalf of the deponent.



MS. NOLL: Lauren Noll on behalf of the witness.
MR. KUBLY: Greg Kubly on behalf of the deponent.
THE VIDEOGRAPHER: Before we swear in the witness, give me one moment.
Unfortunately we have to go off the record really quickly just to fix a technical problem before we begin.
We are going off the record at 10:18 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We are now going back on the record at 10:19 a.m.
Will the court reporter please swear in the witness so that we can continue.
(Witness sworn.)
MARC R. KADISH
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. MORAN:
Q. All right. Can you state your full name and spell it for the record, please.



A. Marc, M-a-r-c, Kadish, K-a-d-i-s-h.
Q. All right. Mr. Kadish, have you ever given a deposition before?
A. Yes.
Q. About how many times?
A. I can't -- I can't remember exactly.
Q. Okay. I'm just going to go over two ground rules with you that you may remember already and you may have discussed with your attorneys.
I'm going to ask a bunch of questions today. If you don't understand one of my questions, will you please tell me?
A. I will.
Q. Okay. And if you do answer any of my questions, we'll assume that you understood the question; is that fair?
A. I'll do my best.
Q. Okay. You are currently a partner -- or not a partner. I mean, what's your role at Mayer Brown? I know you're at Mayer Brown.
A. I'm considered pro bono advisor.
Q. Pro bono advisor.
And I know you taught at Kent for many years. How many --



A. Yes.
Q. How many years did you teach at Kent?
A. From October 1, 1979 to May 30 -- 30 or 31, 1999.
Q. Okay. And since 1999, have you done any teaching?
A. Yes.
Q. Where at?
A. I taught a course at Northwestern law school.
Q. What -- go ahead.
A. I taught a two-week course on international human rights in Bangkok on behalf of Chicago-Kent. I have done oversees law teaching in Cambodia and Armenia and have participated in classes or spoken at a law school in Paris, a University in Belgium.
Q. Okay. And while you were at Kent, did you also work in the criminal defense clinic?
A. Yes.
Q. And you had an active criminal defense practice?
A. Yes.
Q. And was your criminal practice

primarily in the Chicago area?
A. I'm sorry. Could you repeat that?
Q. Sure. Was it primarily in the Chicago area?
A. Yes.
Q. Did you ever have cases in which Detective John Halloran was one of the witnesses for the state?
A. Not that I can remember.
Q. How about same question with respect to Ken Boudreau?
A. Not that I can remember.
Q. Same question with respect to James O'Brien?
A. I do not recall that name.
Q. How about same question with respect to Stehlik, Detective Stehlik?
A. Not that I can recall.
Q. How about Detective William Foley, does that ring a bell?
A. Not really.
Q. All right. I'm going to ask you what you did to prepare for the deposition. And of course your conversations with your lawyers are



privilegeD, so you don't have to tell me what --
A. I spoke with Ms. Hamilton and Mr. Kubly. I spoke with Lauren, Ms. Noll.
Q. Okay. Did you review any documents?
A. No.
Q. How many times did you meet with any of your lawyers? And by "meet," I mean whether it's a -- I should rephrase.
How many times did you have a communication with any of your lawyers in preparation for today?
A. I can't -- I can't tell you exactly.
Q. Approximately?
A. I believe I met twice with the lawyers from Akerman.
Q. Did you meet separately with Ms. Noll as well?
A. I have met separately with Ms. Noll.
Q. How much time in the meetings you had with the attorneys at Akerman if you can recall?
A. How long did each meeting go?
Q. Um-hmm.
A. Less than an hour.
Q. And how many times did you meet with



Ms. Noll?
A. I can't recall.
Q. And how long approximately were you your meetings with Ms. Noll?
A. They were relatively brief.
Q. Do you have an independent recollection of your time working with the Working Group?
A. I remember working with the Working Group.
Q. Do you have an independent recollection of the Cordell Williams case?
A. Some memory of it.
Q. Can you tell me what you recall, please?
A. I recall writing what I call a concurring opinion with respect to the recommendation.
Q. Anything else?
A. Not really.
Q. All right. Do you have a memory of any of the details of the crime for which Mr. Williams was convicted?
A. I remember that it was a shooting, a candy store, something about license plates, a



witness, something about a hot hood of a car.
Q. As you sit here today, do you remember any details about Mr. Williams role in the crime?
A. I believe he was the driver.
Q. Okay. And as far as like -- is it your -- I guess do you have a memory of the theory under which he was convicted?
A. Aiding and abetting, accountability.
Q. The person who's alleged to have aided and abetted, do you remember that person's name?
A. No.
Q. Do you remember any details about what that person did?
A. I'm confused. What person are you referring to?
Q. The person who committed the actual crime that --
A. You mean the shooter?
Q. The shooter. There you go.
A. Don't remember his name.
Q. Okay. Obviously you recall that it involved a shooting, though?
A. It was a shooting, yes.
Q. Okay. Do you remember how many victims

at all?
A. I believe there were two. I'm not sure.
Q. Do you have any recollection of what the state's evidence was against Mr. Williams?
A. Not right now, no.
Q. Okay.
THE VIDEOGRAPHER: Counsel, is this a point we can pause for a second?
MR. MORAN: Sure.
THE VIDEOGRAPHER: We're now going off the record at 10:26 am.
(Recess taken.)
THE VIDEOGRAPHER: We're now back on the record at 10:27 a.m.
BY MR. MORAN:
Q. Okay. By the way, when you were teaching at Kent, what were the classes that you taught?
A. I taught evidence. And then I established a special course called evidence -- evidence advocacy. I taught criminal law, but only for one or two -- one or two times. I taught various lawyering skills classes through the



clinic. And in my last semester I taught a seminar on a death penalty case that I had been appointed to.
Q. Okay. And what is the difference between evidence and evidence advocacy?
A. Evidence would be your typical three-credit evidence class with a large classroom. Excuse me.
And evidence advocacy was designed because students did not seem to be able to make the transition from what they learned in class to what actually happened in a court, so it was a special four-credit course. Three credits were typical evidence. And then for the fourth credit I broke the class into groups of 15 or so people, and they were given evidence problems to argue before various lawyers who would agree to come in and act as judges.
Q. Okay. Somewhat similar to mock trials in the --
A. Yes.
Q. All right.
A. But limited to a specific evidentiary issue.



Q. Got it.
And now as the pro bono director here -- or at Mayer Brown --
A. I'm not the director.
Q. I'm sorry. I did get that wrong. Pro bono advisor. What are your responsibilities?
A. To assist in pro bono matters that occur within the firm, to assist and provide information to the director of pro bono activities, to serve on various boards of directors of not-for-profit groups in the city.
Q. As a pro bono advisor at Mayer Brown, do you handle cases of your own?
A. I used to. I've cut down on my -- especially my criminal appearances, criminal court appearances.
Q. And when you moved over to Mayer Brown and were doing criminal court appearances as a pro bono advisor, did you --
A. Then I was the director of pro bono activities.
Q. Oh, okay. Did you -- was your criminal practice at that time still limited to the Chicago area or had it expanded beyond the Chicago area?



A. Mostly Chicago.
Q. And did you handle cases that were not criminal, for example, a civil rights lawsuit or --
A. I would do inmate civil rights cases when appointed and assist in immigration matters, immigration cases.
Q. Would you consider your role now more of a consulting-type role?
A. Yes.
Q. And the types of cases that you're consulting on now, what are -- what kinds of cases are those?
A. Inmate civil rights, immigration matters, and, you know, doing the work on the boards of various organizations.
Q. You're familiar with the conviction integrity unit at the Cook County State's Attorney's Office?
A. I'm sorry. Could you repeat that?
Q. Yeah.
Are you familiar with the conviction integrity unit at the --
A. Yes.
Q. -- state's attorney's office?

Do you know when the conviction integrity unit was established?
A. No.
Q. Have you ever had any cases of your own before or going through the conviction integrity unit?
A. Not that I can recall.
Q. I assume that in your criminal practice you've had postconviction proceedings on behalf of various clients.
A. Some.
Q. What percentage of your practice over the years, and I know this is going to be a generalization, do you think was primarily postconviction work?
A. Very few.
Q. You obviously know what the Working Group is as --
A. Yes.
Q. -- a former member?
Tell me what you understand the Working Group to have been.
A. Professor Sutherland, Professor Hawilo, and myself were appointed as Special Cook County



State's Attorneys to investigate a number of old murder cases that were assigned to us.
Q. And what was -- if you know, what was the purpose of creating the Working Group?
A. To look at conviction -- prior convictions in murder cases that were assigned to us.
Q. Did you ever gain an understanding as to why those cases were not going through the conviction integrity unit?
A. Some of them did at some point. I don't know why we were formed.
Q. Who first contacted you about becoming a member of the Working Group?
A. Judge -- now Judge Jennifer Coleman.
Q. And when she contacted you to -- do you have a memory of that conversation when she contacted you?
A. Actually I do.
Q. Did she explain what the purpose of the Working Group was going to be other than what you've already told us?
A. Not really.
Q. Did you ask her why -- why the state's



attorney's office needs a Working Group comprised of private attorneys when there are -- when there's a conviction integrity unit?
A. I did not ask her that. I didn't think it was my job. She asked me if I would be interested in serving on this group. And I said I had to check with the firm, and I did.
Q. Okay. Did you ever gain an understanding that the state's attorney's office believed that some kind of conflict existed that prevented the conviction integrity unit from reviewing the cases that were assigned to the Working Group?
A. No, I don't know.
Q. Did you ever speak with a person by the name of Peter Neufeld?
A. I've spoken with Mr. Neufeld.
Q. Do you know him personally?
A. I know him -- I don't know what you mean by "personally."
Q. That's a fair point.
How about before becoming a member of the Working Group had you ever spoken to Mr. Neufeld before?



A. Yes.
Q. In what context?
A. His partner Barry Scheck is an old professional acquaintance of mine. We met when we were teaching in a special trial advocacy program at Emory Law School.
Q. And did you have regular contact with Mr. Neufeld prior to joining the Working Group?
A. No.
Q. How often do you think you spoke with him before joining the Working Group?
A. I can't say.
Q. Okay. So now -- actually, strike that.
When you were considering accepting the invitation to join the Working Group, did you have a conversation with Peter Neufeld about the Working Group?
A. We had some general conversations.
Q. Do you have a memory of what was discussed in those conversations?
A. Just the formation of the -- of the group. Nothing specific.
Q. Did you ever gain an understanding as to whether the Working Group was formed pursuant to

a settlement agreement between a case Mr. Neufeld was handling and --
A. I have no personal knowledge of that.
Q. Okay. Did you ever hear about such a thing?
A. What case are you referring to specifically?
Q. The Englewood Four cases.
A. I'm aware of what the Englewood Four case was.
Q. Okay. Did you ever hear from -- whether from Mr. Neufeld or anybody else, whether the Working Group was formed pursuant to an agreement between -- with the people representing the Englewood Four plaintiffs and the state's attorney's office?
A. I have no independent knowledge of that.
Q. When you say "independent," what do you mean?
A. I don't know anything about the relationship between the lawyers and the Englewood Four and the state's attorney's office or Mr. Neufeld.



Q. Got it.
Have you ever seen -- yeah. Are you aware of any documents that you were provided as a member of the Working Group that described an agreement between the attorneys for the Englewood Four plaintiffs and the state's attorney's office?
A. I saw no such document or documents.
Q. Are you familiar with something called the Lawyers' Committee?
A. You're referring to the Lawyers' Committee with respect to the Working Group?
Q. Yes.
A. I know that there was such a thing.
Q. Do you have any memory of which lawyers were on the Lawyers' Committee?
A. Not -- not really.
Q. When you were contacted by Ms. Coleman to become a member of the Working Group, did the Working Group exist at that point to your knowledge?
A. No. It did not exist.
Q. Were you the first person who accepted an invitation to join the Working Group to your knowledge?



A. I don't know that.
Q. Did you have any role in discussing other potential candidates to join the Working Group?
A. No.
Q. Were you ever approached by anyone from the state's attorney's office about who you thought might be a good person to join the Working Group?
A. No.
Q. Did you speak with anyone else at the state's attorney's office about joining the Working Group other than Jennifer Coleman?
A. Not in the formation, no.
Q. At some point you began reporting to a person by the name of Risa Lanier?
A. Yes.
Q. She took over for Jennifer Coleman?
A. Yes.
Q. Apart from Risa Lanier and Jennifer Coleman, did you ever have conversations or did you communicate with anyone else at the state's attorney's office about the work being performed by the Working Group?
A. Yes.



Q. Who would that be?
A. Thor Martin.
Q. And approximately when during your -- let me back up a second.
According to the records we've seen, it sounds like you joined the Working Group in 2021?
A. Correct.
Q. Okay. And the Working Group was disbanded or dissolved in November of 2024?
A. Correct.
Q. Okay. In that timeframe, when do you think you first started communicating on a regular basis with Thor Martin about the Working Group's work?
A. Can't remember exactly. Possibly halfway through.
Q. And same question with respect to Risa Lanier. Approximately when in the window of time that you were on the Working Group did you begin communicating with her on a regular basis about the Working Group?
A. From the beginning of the group, from the beginning of the formation of the group.

Q. Did you know Risa Lanier prior to joining the Working Group?
A. Not that I remember, no.
Q. Did you know Thor Martin before joining the Working Group?
A. Yes.
Q. How so?
A. He was a state's attorney in Judge Linn's courtroom, and we did -- with the agreement of the presiding judge, we did a fair amount of pro bono cases in front of Judge Linn.
My wife is a public -- a supervisor in the public defender's officer and she had worked against Mr. Martin on a number of occasions, Thor Martin.
Q. By the way, do you know someone from the public -- who used to work at the public defender's office by the name of Renee Frisch?
A. No.
Q. Did you ever have cases with Jennifer Coleman prior to joining the Working Group?
A. No.
Q. How do you know her?
A. She was one of my clinic students.



Q. Of course.
Prior to joining the Working Group -- or strike that.
When you were considering joining the Working Group, did you have any conversations with the state's attorney, Kim Foxx, about joining the Working Group?
A. No.
Q. During your time at the Working Group from 2021 through 2024, did you ever have any communications with Kim Foxx in any way connected with your work with the Working Group?
A. No.
Q. Have you ever spoken to Kim Foxx?
A. Yes.
Q. In what context?
A. A number of years ago I was asked by the Chicago Humanities Festival to work on putting together a program for The Trial of Hamlet in the murder of Polonius. And it was a play that had been written by a European playwright. He was not obviously familiar with Cook County proceedings, and I was asked to redraft documents to reflect Cook County practices. And then we had I think



three or four days of the mock trial through the Humanities Festival, and the Humanities Festival director had selected Ms. Foxx to be the prosecutor on the opening night of the program.
I met with every partici- -- or I attempted to meet with every participant, the judges who had volunteered, the lawyers who had agreed to be prosecutors or defendants. And I met with Ms. Foxx for approximately a half hour to talk about the Hamlet case.
Q. So you can add playwright to your c.v., at least part?
A. Didn't get paid for it, didn't go -- my career didn't go any further either.
Q. Not unlike many playwrights starting out I would imagine.
A. No, no.
Q. I -- I'm sorry. Can you tell me your wife's name?
A. She goes under the name of -- well, her first name is Suzin, S-u-z-i-n, and she goes in court under the name of Farber, her maiden name, F-a-r-b-e-r.
Q. Did you ever discuss your Working Group



cases with her?
A. Rarely.
Q. Mr. Williams' attorney when his case was tried was a person by the name of David Wiener "Winer." How do you say his last name?
A. I think it was David Wiener.
Q. David Wiener.
You know that -- you know him?
A. Knew him. I believe he's dead.
Q. Yes. That is correct.
Did you ever have cases with him?
A. Not that I can recall.
Q. And did your wife ever have cases with him?
A. She's been a public defender for almost -- since she graduated law school in 1987.
MS. MEADOR: She wouldn't want you to say.
THE WITNESS: So I'm sure she must have had some interaction with him.
BY MR. MORAN:
Q. Right.
And to your knowledge, was Mr. Wiener always a criminal defense lawyer?
A. I don't know.

Q. For example, do you know whether he ever worked for the state's attorney's office?
A. I don't know.
Q. Okay. I read in some of the documents that you had formed somewhat of an opinion about his performance as a criminal defense lawyer.
A. Yes.
Q. What is that opinion?
A. Low.
THE VIDEOGRAPHER: Excuse me. I'm having trouble hearing you.
THE WITNESS: Low.
BY MR. MORAN:
Q. Why did you form that -- what's the basis of that opinion?
A. I more specifically would probably have to see my recommendation, but I thought his work in in this case led me to believe that he was -- I don't want to use the word guilty, but I thought it was ineffective assistance of counsel.
Q. Right. I think you used the phrase slow guilty plea to describe how he had handled Mr. Williams' defense.
A. That's possible.



Q. Okay. Do you have a memory of what specifically Mr. Wiener did in his performance of -- yeah, in representing Mr. Williams that made his work ineffective?
A. I think he had filed -- we did a lot of cases during the four -- four years, so it's a little hard to remember.
I think it had something to do with filing a motion to suppress and then withdrawing it without having a hearing. I can't remember specifically.
Q. Okay. Now, it sounds like the concern you have is that when the attorney made the decision to withdraw the motion to suppress, the judge was not either prompted to or did not adequately question Cordell Williams to ensure that he was waiving the right to bring that motion?
A. I believe so.
Q. Okay. Is there anything else about the withdraw of the motion that you -- or his performance, I should say, that you felt fell below the standard that you would expect from a criminal defense attorney?
A. I'm not certain, but once the



confession went in I did not know what grounds there were for defending Mr. Williams.
Q. Did you review Mr. Williams' court-reported confession?
A. Yes. I would have.
Q. Okay. Did you ever have an opportunity to speak with Mr. Wiener about his work for Mr. Williams?
A. I believe he was dead by that time.
Q. Okay.
A. Or disbarred or disappeared, but did not speak with him.
Q. Do you know if any attempt was made to locate him by the Working Group?
A. Again, I believe he was dead by that time.
Q. I believe he passed away in -- at least from what I read in 2023. And you would have reviewed -- your recommendation for Mr. Williams -- the Working Group's recommendation, I should say, along with your concurring opinion was delivered to the state's attorney's office on May 10th of 2022.
Do you have any reason to believe that those dates are not accurate?



A. No. I'll take your word for it.
Q. Okay. Assuming he was still living at the time, would the Working Group have made efforts to locate this person?
A. I would have recommended talking to any lawyer who was involved in these cases.
Q. By "any lawyer," do you mean criminal defense lawyer or prosecutor as well?
A. Both.
Q. To your knowledge, did the Working Group reach out to prosecutors who handled the underlying criminal trials to interview them?
A. I did.
Q. In which case, if you recall?
A. Any case where there was a prosecutor who was still available, I would try to contact them.
Q. That was -- you would always do that as a matter of just your own practice?
A. I was the one that was more familiar with the customs and practices of criminal work in Cook County. Professor Sutherland was from New York. Professor Hawilo was at Loyola, but had not really been a practicing criminal defense attorney.

Q. Okay.
A. In Chicago.
Q. Did you know either of them, Professor Sutherland or Professor Hawilo, before you joined the Working Group?
A. I had not met Professor Sutherland before the Working Group was established. I am -- I was reminded that I once had a meeting with another adjunct faculty member from Northwestern Law School and that Professor Hawilo was in that meeting, but there was just three of us. But I did not -- excuse me. I did not recall that until she reminded me.
Q. Okay. So for all practical purposes, the first opportunity you would have had to get to know either one of them would have been through the Working Group?
A. Yes.
Q. All right. Did -- in the dynamics of the Working Group was there a leader?
A. No.
Q. Okay. Was there -- I know -- or I saw, I should say, that there are some opinions, I should -- recommendations in which you dissented?



A. Yes.
Q. And some in which you gave concurring opinions?
A. Yes.
Q. Okay. Was there ever a situation in which you were part of the majority and either Professor Sutherland or Professor Hawilo dissented or gave a concurring opinion?
A. I -- there would be, you know, discussions, disagreements among the three of us. I don't recall specifically if I wrote a majority opinion and they dissented or concurred from it, but obviously working on those many cases over that period of time there would be discussions and disagreements.
Q. Yeah. I'm trying to find out if there was ever a situation in which one -- one of them was in the minority and you were part of the majority of -- on a recommendation that went to the state's attorney's office?
A. I can't recall specifically.
Q. And generally speaking, what were the disagreements about, any you can recall?
A. Whether the convictions -- whether the



recommendation should be to set aside the conviction in the interest of justice or whether or not there was a determination that the person was actually innocent.
Q. Now, I'll -- we're going to look at some records in little bit and the procedures that outlined the different decisions that could be made by the Working Group.
But as far as I know, you were allowed, "you" as the Working Group, were allowed to recommend to vacate a conviction based on actual innocence?
A. Yes.
Q. Vacate a conviction based on interest of justice?
A. Yes.
Q. And then take no action?
A. Yes.
Q. All right. Could the Working Group make recommendations outside of those three areas?
A. I -- not really, no. No.
Q. Could the Working Group recommend, whether formally or informally, or just suggest that a case should be retried, that the conviction



should be vacated but the case should be retried?
A. That decision was up to the state's attorney's office. We just made one of those three recommendations.
Q. Right. All the -- all of the decisions were up to the state's attorney's office, right?
A. Yes.
Q. Okay. My question is really just directed at whether you could have made such a recommendation.
A. About retrying? Yeah, no. We did not make recommendations on retrying them. It was limited to -- if a conviction was set aside in the interest of justice, then the state's attorney's office made the determination as to whether or not they would retry the case. We did not opine on that at all.
Q. Did you ever offer information to the state's attorney about belief in guilt or innocence even if you're not -- in the context of a recommendation in the interest of justice?
A. The interest of justice was different than the question of actual innocence.
Q. Right. Yeah. You know what? We'll

come back to that in a -- after I show you the documents. I think that would be easier to discuss at that point.

Can you think of any other types of disagreements you had with the members of the Working Group besides what recommendation to make and whether there was evidence of actual innocence?

A. We had discussion -- we -- in every case there was a discussion of the facts and there was an examination of police reports, statements made by the defendants and witnesses.

Q. In the analysis performed by the Working Group when you were thinking of vacating a conviction based on -- or recommending to vacate a conviction based on the interest of justice, was there any analysis about whether the state could carry its burden if the confession was removed from the state's evidence?

A. There -- there would be discussions about a case where the question of guilt rested solely on a confession if there was no independent evidence other than the confession itself.

Q. How about cases where there was other evidence of guilt, was there ever a discussion as



to whether that evidence would be sufficient for the state to carry its burden if the state could not use the confession?

A. I'm sure we discussed that, but again, our recommendation had nothing to do with recommending retrial.

Q. Understood.

Did you ever encounter cases where you thought, you know, this is one that probably should be retried, it doesn't really fit into taking no action, but it doesn't really fit into vacating the conviction on the interest of justice?

A. I'm not sure that I could answer that. Could you rephrase it in another way?

MR. MORAN: You know, I'll ask her to --

THE WITNESS: Sure.

(The record was read as follows:

Q. Did you ever encounter cases where you thought, you know, this is one that probably should be retried, it doesn't really fit into taking no action, but it doesn't really fit into vacating the



conviction on the interest of justice?)

THE WITNESS: I'm not sure I can answer that.

BY MR. MORAN:

Q. If you thought the state should do something besides what is allowed in terms of those three recommendations, regardless of whether you're allowed to do it or not, would you have inquired with the state at all, like with Risa Lanier or Jennifer Coleman?

A. I -- we had no -- once Judge Coleman asked me to be the nominee at the state's attorney's office for the project I had no further dealings with her.

Q. Oh, okay. Well, really the question is -- I mean, those are just examples. It could be anybody at the state's attorney's office who you spoke with.

I just -- I'm just trying to find out if you ever inquired about the ability to make different kinds of recommendations.

A. One area of law that I've been interested in is the question of sentencing of juveniles and emerging adults and sometimes



sentencing might be something I was concerned with.

Q. Do you know if that was a concern in the Cordell Williams case?

A. I believe it was, in my opinion.

Q. And did you have conversations with anyone at the state's attorney's office about a motion to reduce his sentence in the event that the state's attorney's office did not agree to vacate his conviction?

A. The only people we ever spoke with were Risa Lanier or Thor Martin.

Q. Those two individuals, did you ever talk to those two individuals about whether the state should file its own motion or not oppose a motion by Mr. Williams' attorney to reduce his -- Mr. Williams's sentence if the state was not going to accept a recommendation to vacate the conviction?

A. Again, there was some discussions in some cases about sentencing options. I do not know if they were ever followed through and I don't know if those were -- I can't recall, but I -- I've always been concerned about specifically emerging adult cases, the sentencing of them.

Q. And define an emerging adult.
A. My understanding of the law of emerging adults is anyone who is 18 through 21. And there's some talk of expanding it a little bit beyond 21, but my understanding was that it affected post-juvenile status, which I would took to mean 18 to 21.
Q. And what is it about that age range that warrants special consideration in terms of sentencing?
A. According to the medical profession, people of that age do not have fully-formed brain development to understand the consequences of their actions and -- yeah. Basically consequences of their actions and, you know, their sense of moral development, I guess you'd call it.
Q. Okay. Now, obviously that's a generalization, right?
A. Yes.
Q. Okay. And there could be cases in which someone who's 18 or 19 has enough life experience to have understood the moral consequences of the actions?
A. Depends on the individual case.



Q. When the Working Group was disbanded, how did you learn of that?
A. I mean, I knew that a new state's attorney was coming in. I knew that -- that we were going to be disbanded.
Q. Did you view your work on the Working Group as important?
A. I hoped it would be.
Q. And why?
A. If someone was wrongly convicted, I think it's important to have justice done, and I've always been interested in justice.
Q. Okay. And that -- that concept of justice, one of the most important things that a law enforcement agency can do is to ensure that people who did not commit the crimes are not wrongfully convicted, right?
A. Yes.
Q. So did you view your work as having life-changing effects on the people who were involved, for example, the criminal defendant?
A. If someone was in jail and they were in -- if someone was in prison and they were wrongfully convicted, of course that would have an



impact on their life because they would be released hopefully.
Q. Can you think of any reason not to continue the Working Group under the new administration?
A. That was a decision made by Eileen -- I always forget if it's Burke O'Neill or O'Neill Burke.
Q. Oh, it's your understanding that she's the one who disbanded the Working Group?
A. Yes.
Q. Approximately when did you learn the Working Group was going to be disbanded?
A. As soon as it -- based on Ms. Burke's public statements.
Q. Which public statements specifically?
A. I don't recall specifically.
Q. How about generally. What do you -- what's the gist of what she said that led you to believe she would not allow the Working Group to continue?
A. I just knew that there's political differences between Ms. O'Neill Burke and Kim Foxx.
Q. Were you alerted that the Working Group



was going to be disbanded by Risa Lanier?
A. Yes. Risa told us that we were going to be disbanded.
Q. Did you have any cases pending at the moment?
A. What do you mean "pending"?
Q. Cases under review.
A. Yes.
Q. Roughly how many?
A. Don't recall.
Q. More than five?
A. Probably.
Q. Do you know whether those cases went to the conviction integrity unit?
A. I have no idea.
Q. Do you have any idea what happened with those cases?
A. No.
Q. What specifically did Risa Lanier tell you when she informed you that the Working Group was going to be disbanded?
A. Just that we were going to be disbanded.
Q. Did you ask why?
A. Pardon?

Q. Did you ask why?
A. I knew why. I mean, it was just apparent.
Q. All right. Tell me what -- what you know.
A. I -- I was -- my wife and I attended, you know, some public coffee where Eileen spoke, and there was a fundraiser at Judge Cohen's and his wife's house in Michigan that Eileen spoke at.
Q. And that's where you heard her make statements that led you to believe the Working Group would not continue?
A. That they were going to -- yeah. That they were going to look differently.
Q. Did she specifically mention the Working Group?
A. She knew that I was a member of the Working Group.
Q. Right, but in her statements at the fundraiser to the group did she specifically mention the Working Group?
A. I asked the question, and she told the group that I was part of a group that was looking into wrongful convictions.



Q. Okay. And did she say anything else besides that?
A. Not that I recall.
Q. And from that statement alone you drew the conclusion that she would not continue the Working Group?
A. That was my feeling, yes.
Q. Did you ever ask anyone in the new administration about continuing the Working Group?
A. No.
Q. Why not?
A. Because we were told it was over. And I thought I had done my best during the three years that we did it, put in a lot of hours on it.
Q. When Risa Lanier told you that the Working Group was going to be disbanded, was that before or after this fundraiser that you attended in Michigan?
A. I can't recall.
Q. By the way, did you make a donation to --
A. No, we did not.
Q. Did you ever make a donation to Kim Foxx's campaign?



A. Not that I recall.
Q. Okay. So when Risa Lanier told you that the Working Group was going to be disbanded, did you ask her any questions at all?
A. I suppose we asked her what was going to happen with the recommendations that we had made.
Q. And what was her response?
A. It was under consideration.
Q. Now, there were recommendations that were made that had not yet been decided as of the date you learned from Risa Lanier that the Working Group was going to be disbanded, right?
A. Yes.
Q. Was any action taken on those recommendations prior to Kim Foxx leaving office to your knowledge?
A. Not to my knowledge.
Q. Did you ever inquire with the new administration about the recommendations that were made after you invested all of the time and effort in investigating the cases?
A. No.
Q. And why not ask those questions or



inquire about that?
A. It wasn't my job.
Q. Did it have to be your job?
A. I just knew that I -- you know. I believe we got a letter signed by the state's attorney, the new state's attorney, thanking us for our time, but telling us that the project was being disbanded.
Q. Oh, do you still have that letter?
A. No. I -- I don't know where it is. I didn't keep it.
Q. Yeah.
A. Or it's just in materials. I -- I haven't looked at it.
Q. Obviously you know we sent a subpoena for documents to you and the other Working Group members. Do you remember that?
A. Yes.
Q. Okay. And the state's attorney's office handled responding to that subpoena?
A. Well, I -- Ms. Noll and I did.
Q. Okay. Do you know if that letter was included in the documents that were provided?
A. I have no independent recollection.

Q. Okay. Now, I want to go back to my question about asking about the new administration about continuing on or making decisions on the recommendations that were made, and you had said it wasn't your job. Do you remember that?
A. Yes.
Q. Okay. Any of those recommendations made in the interest of justice?
A. There were recommendations that were made in the interest of justice. That was one of the three recommendations we could make.
Q. Yeah. I'm referring to the pending cases where you had made a recommendation but no action had been taken as of the date Kim Foxx stepped down and Eileen Burke took over.
A. What -- there were pending recommendations. I can't recall if they were in the interest of justice.
Q. Okay. More broadly speaking, given that you agree your work was a matter of justice --
A. Hopefully.
Q. -- did it have to be your job to inquire?
A. I'm not sure that I follow you.



Q. What I'm suggesting is if you believe it's -- your work is in the interest of justice, you're -- you're doing justice, are you limited in any way by your job in inquiring with the state's attorney -- the new state's attorney about continuing this work?
A. I did not think that it was my position to go -- look, I had practiced in the Cook County courts for a long time. You get to understand what's possible and not possible. There was a new state's attorney and that was the end of the project.
There were cases that we had made recommendations, they weren't acted upon. I was disappointed, but I knew that it was over.
Q. Okay. The -- and as you sit here today, you can't remember anything about those cases that --
A. Not specifically, no.
Q. All right. At any point in time from any source did you learn any reasons the new administration had for not continuing the work of the Working Group?
A. No. I just knew it was over.



Q. Okay. The --
MR. KUBLY: Pat, before you continue to the next --
MR. MORAN: You want to take a break?
MR. KUBLY: Can we take like a two-minute break?
MR. MORAN: Of course.
THE VIDEOGRAPHER: We are now going off the record at 11:14 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We are now going back on the record at 11:24 a.m.
BY MR. MORAN:
Q. All right. Ready to get going again, Mr. Kadish?
A. Yeah.
Q. Okay. I want to ask you a question about the conviction integrity unit.
What do you understand the purpose of the conviction integrity unit to have been or to be?
A. To make certain that convictions have integrity.
Q. How does the conviction integrity unit



go about that?
A. I wasn't a member of the conviction integrity unit, so I don't know.
Q. Do you have any understanding at all of what the conviction integrity unit does to make sure that convictions have integrity?
A. I assume they investigate cases, look at court files, look at police reports, grand jury transcripts, transcripts of trials and motions to suppress.
Q. Similar to what you did as a member of the Working Group?
A. But we did not -- yes.
Q. Okay. To your knowledge, is there any significant difference between what the Working Group was doing and what you understand was the role of the conviction integrity unit?
A. Initially we did not have any investigators assigned to us. We did not have subpoena power.
Q. I guess I mean more on the -- not procedurally, but the subject matter of your work, like substantively.
Is there any real difference between

what the conviction integrity unit was doing and what the Working Group was doing?
A. I'm not certain how to answer that. They were supposed to look into the integrity of convictions. I think our mandate was larger because of the notion of the interest of justice. I think they were -- they were concerned if -- if I remember correctly, they were limited to questions of actual innocence, where -- excuse me, under our protocol we had this conception called the interest of justice.
Q. And do you believe that's one of the reasons that the Working Group was created?
A. I don't know.
Q. Now, when you joined the Working Group, had you ever worked as part of any project or group on behalf of a governmental entity investigating the integrity of a conviction?
A. No, not -- not as part of a -- not as part of a governmental entity, no.
Q. Right.
And as you were -- you had become a special assistant state's attorney pursuant to your role as a member of the Working Group, right?



A. Yes.
Q. Do you know if that's governed by statute, becoming a special assistant?
A. I don't know.
Q. Do you have to take an oath, like raise your right hand and swear an oath to become a special assistant?
A. Not that I'm aware of.
Q. Did you have to sign a document affirming that you were going to abide by whatever oath is required to become a special assistant state's attorney?
A. I assume we signed something.
Q. Did you consider yourselves prosecutors, the Working Group?
A. No.
Q. You as a Working Group member?
A. No.
Q. When you joined the Working Group, did you and your colleagues on the Working Group communicate with other prosecutor's offices that had conviction integrity units to gain an understanding of kind of what they did and how that would help inform your work?



A. Yes.
Q. And did you also talk to the Cook County State's Attorney's Office conviction integrity unit about how they did their work?
A. Not really.
Q. Can you explain?
A. We -- we did not have a -- we did not work on a case together with them. We had access and space in the conviction integrity unit where the cases that had been assigned to us where files had been located were placed in that office.
So we would see the people in the unit. And if we had questions, we were supposed to ask the people, you know, could they obtain this for us, could they obtain that for us.
Q. Okay. And what you've just described, it sounds like resources, you could utilize the resources available from the conviction integrity unit?
A. I don't know what you mean by that.
Q. Office space?
A. Office space, yes.
Q. File storage?
A. Yes.



Q. Investigators eventually?
A. Not initially.
Q. Right. At some point you were allowed to use investigators from the conviction integrity unit?
A. We had one investigator.
Q. Okay. So what I'm talking about is -- the question I was asking is geared more towards research to gain an understanding of what your role should be on the Working Group.
In conducting the research -- let me back up a second.
Your communications with these other prosecutor's offices conviction integrity units, would it be fair to say that that was research?
A. Yes.
Q. Okay. Did you do any similar type of research with the Cook County State's Attorney's office conviction integrity unit?
A. No. I'm not -- I'm not certain how to answer that.
Q. So in other words, asking how the conviction integrity unit went about its work, how did it select its cases, how did it -- what was it

looking for in assessing the integrity of a conviction?
A. We --
Q. Or I --
A. We didn't -- we had a few meetings with Nancy Adduci, and when she left we also talked with Adam Weber. And we had discussions, but our work was different than theirs. And as I now think I recall, they only were -- they only considered questions of actual innocence to the best of my recollection.
Q. To your knowledge, is there anything that prevented the state's attorney's office from expanding the scope of the conviction integrity unit's mandate to include questions of justice?
A. Well, I mean, the conviction integrity unit was supposed to be concerned with justice if there's wrongful convictions. It was beyond our mandate to make political discussions or tell them they were doing things right or wrong.
Q. Yeah. That's not the question I'm asking.
What I'm trying to find out is do you have any knowledge as to whether the state's



attorney -- state's attorney's office could have expanded the role of the conviction integrity unit to allow it to recommend vacating convictions based on the interest of justice instead of actual innocence?
A. I -- not to my knowledge, no. I do not believe there was discussions about interest of justice.
Q. Do you agree with me that the state's attorney had the power to expand the scope of the conviction integrity unit at the Cook County State's Attorney's Office so that unit could recommend vacating convictions based on the interest of justice?
A. I can't -- I can't answer for the new state's attorney and the actions that she has taken.
Q. We're going to come back to that in a second.
What about the old state's attorney, Kim Foxx, anything that prevented her from expanding the scope or the role of the conviction integrity unit to make recommendations based on the interest of justice?



A. That -- that would be up to her. We just had the protocol that had been established and that was it.
Q. Now, you had just mentioned actions she had taken in reference to the new state's attorney, Eileen Burke. What actions were you talking about?
A. I mean, I -- I knew that she had formed an advisory committee to look into conviction integrity, and I have no idea what they did.
Q. Okay. Anything wrong with the state's attorney doing that, the new state's attorney, creating an advisory committee to --
A. No.
Q. -- provide feedback on doing conviction integrity investigations?
A. No.
Q. Do you know what the role of the Cook County State's Attorney Office is?
A. Do I know what the role --
Q. Yeah.
A. -- of the state's attorney's office is?
Q. Correct.
A. To try criminal cases that are brought before the courts.



Q. Okay. That would be a law enforcement type function?
A. I don't know if I would call it law enforcement. There are the police and, as they say in the -- what's the famous TV with the --
Q. Law and Order?
A. Law and Order. There are the police, there are the state's attorneys, and what they do.
Q. Okay. The police investigate the crimes and the state's attorneys prosecute them, right?
A. Yes.
My wife yells at me all the time for continuing to watch them and how I know how many stars in the entertainment industry started there.
Q. Okay. Does the state's attorney's have -- does the state's attorney's office have a role outside of just prosecuting crimes?
A. I believe there -- I believe this -- that issue has come to the forefront during the Trump administration. I remember what Justice Jackson said years ago about what the role of a prosecutor was; it was to seek justice, not just to be concerned with getting a conviction.

Q. Okay. So would you agree that regardless of whether it's actually happening, whether you believe it's actually happening in practice, that the state's attorney's office should be seeking justice and if that includes getting a conviction so be it?
A. Yeah. If there's evidence to demonstrate that someone has been found to be guilty beyond a reasonable doubt, I have no problem with that proposition.
Q. All right. Did -- did the Working Group interview detectives who investigated the crimes?
A. We had the police reports and we read the police reports carefully. If I knew who a particular officer was -- but it is very difficult to speak with a police officer during the pendency of a case. I never had an experience of a police officer coming up to me and saying, Oh, Marc, let me tell you what I did wrong.
Q. Of course that wouldn't happen, right? That would be -- that's almost farcical to suggest, right?
A. Yes.



Q. Okay. But you as the defense attorney, in your career as a criminal defense lawyer, you could have approached an officer on your own and asked the officer if he or she would be willing to speak with you?
A. I would try, yes.
Q. Okay. And you as an investigator on the Working Group, you could have approached a detective who long ago investigated the crime for the conviction you're investigating and asked if that officer or that detective would be willing to talk to you, right?
A. We were assigned -- I don't know how the cases were selected.
Q. Yeah. That's not what I'm talking about.
I'm asking if you could have talked to detectives during your work on the Working Group as --
A. Theoretically.
Q. -- as part of your investigation?
A. Theoretically.
Q. And is there anything that prevented you from talking to detectives as part --



A. Only the knowledge that they wouldn't talk to us.
Q. All right. Well, we'll get to that in a second.
Is there anything that was in place preventing you as an investigator -- or as a member of the Working Group from reaching out to a detective to see if that detective would talk to you?
A. Some of the detectives were dead, some of them were no longer with the force, and that was it.
Q. Right.
So what I'm trying to find out is if there was a policy or a procedure or a direction that you were not to call detectives?
A. No.
Q. Okay. If you felt it was important enough to speak with a detective and that detective was still alive and reachable, would you have made an effort to reach out?
A. The investigator who was eventually assigned to us would have -- could have tried himself.



Q. Did the Working Group ask the investigator that was assigned to go out and see if any detectives would speak with you?
A. I don't recall.
Q. Okay. How about anyone from the City of Chicago, did the Working Group reach out to anyone from the City of Chicago, given the fact that the -- well, let me back up a second.
Is it your understanding that one of the boundaries or parameters of the Working Group was to investigate certain convictions involving a list of seven detectives who had some role in investigating the underlying crime?
A. Yes.
Q. Okay. And do you know why those detectives were on that list?
A. No.
Q. No idea at all?
A. No.
Q. Were you informed at any point by the state's attorney's office that these detectives on that -- the list of seven detectives was based on a group of -- or they were on that list because there were a number of complaints of misconduct and abuse

against those detectives?
A. We never knew why we were assigned those seven detectives.
Q. Okay. Did you know going -- at the beginning of your work on the Working Group that those seven detectives had a number of complaints against them for alleged abuse?
A. At that time at the formation of the group I was not familiar with any of the seven.
Q. Would you char- -- as you sit here today, would you characterize your work on the Working Group as, in whole or in part, conducting investigations of these detectives?
A. The cases we were assigned supposedly involved these detectives.
Q. Right. Were you investigating the detectives?
A. No. I -- that's difficult to answer in that we were assigned to investigate a case. If these detectives were involved in more than one of these cases, you would have to look at that question.
Q. We're going to come back to that.
Did the Working Group develop its



own standards of review?
A. Yes. By that I mean approach to an understanding of a case so it would be natural that in looking into all these cases you would try to be evenhanded.
Q. Did you view your role as a member of the Working Group as being impartial?
A. Yes.
Q. And independent?
A. Yes.
Q. Tell me what impartial means.
A. That we did not bring preexisting ideology to or preexisting notions to our work.
Q. So every case would be viewed in a fair and impartial manner?
A. I hope so.
Q. Did you ever run into a situation in the Working Group where you felt that anyone on the group was not being fair and impartial?
A. No.
Q. Would it be fair to say -- let me back up here.
You obviously knew you were creating recommendations for the state's attorney herself to



review?
A. Yes. My understanding is that Kim Foxx would make the ultimate decision.
Q. Okay. And the reports -- I've seen some of the reports. They seem to be, you know, in the range of 20 to 30 pages, single spaced. Does that sound --
A. Some of them yes.
Q. It feels lengthy to read?
A. Are they lengthy to read?
Q. Yeah.
A. Yes. I -- yes, some of them were.
Q. And those reports contained a lot of information, would you agree?
A. Yes.
Q. Do you have an understanding when you submitted a report to the state's attorney's office the state's attorney herself was going to rely on the information provided by the Working Group in making a decision?
A. I did not know how the state's attorney would make a decision. We never met with Kim Foxx.
Q. Right.
A. We never spoke with Kim Foxx.



Q. My question is more geared towards the Working Group's understanding as to whether Kim Foxx or even Risa Lanier would be relying on the information provided by the Working Group to support the recommendation.
A. I assume they read the report. And it would be up to them to determine how -- how they agree or disagree.
Q. And do you agree that it would have been important then to include all of the relevant information for the state's attorney to consider in whether -- in deciding whether to accept, reject, or modify the recommendation?
A. Whether they did an independent investigation I don't know. We wrote a report; that went to Risa Lanier. What happened to it after that we did not control.
Q. Right.
I'm talking about in the process of writing the report, did you as a member of the Working Group want to make sure the reports were complete and accurate?
A. We would try.
Q. And contained all of the relevant

information?
A. One would hope so.
Q. And the Working Group made the effort to do that?
A. I believe so.
Q. Okay. I think I might have asked you earlier, but I can't remember. So I apologize if this is --
A. That's okay.
Q. -- sounds like a repeat question.
A. I'll accept your apology.
Q. Good.
What do you understand the purpose of the Lawyers' Committee to be?
A. I have no idea.
Q. Were you aware that the -- strike that.
You knew the Working Group was required to submit quarterly reports to the state's attorney?
A. That the Working Group was.
Q. Yes.
A. Yes.
Q. Did you help draft or edit those quarterly reports?



A. I believe Maria drafted most of them. I would -- we would all review it.
Q. Right.
And I assume that any -- whenever anyone in the Working Group took the lead on drafting a document like a report or a quarterly report or a recommendation, it was passed around and all three of you could collaborate and make suggestions and edits and things of that nature?
A. Yeah. That would -- that's why there was three of us.
Q. Right.
Were you aware that the quarterly reports created by the Working Group were also being sent to the Lawyers' Committee?
A. I had no knowledge of that.
Q. Do you -- you know Russell Ainsworth?
A. Pardon?
Q. Do you know Russell Ainsworth?
A. I know who he is.
Q. Do you know him personally or professionally?
A. I -- I believe he's part of the Loevy firm.



Q. Right.
How about Craig Futterman, do you know him?
A. Craig I know independently from having -- actually, I -- I used to participate -- let me modify my earlier answer about other teaching opportunities.
For a number of years I would participate in the Mandel Legal Aid Clinic Trial Advocacy Program and I met Professor Futterman through that. Because traditionally I gave a speech at the end of the program on how to organize and get ready for trial and then how they should as graduates -- becoming graduates of the University of Chicago Law School and going mostly to large firms they should engage in pro bono work in their career.
Q. And the Mandel Legal Aid Clinic is at the University of Chicago, right?
A. Yes.
Q. Okay. Do you know Josh Tepfer?
A. I have seen him. I have never really done any work with him.
Q. Do you know any lawyers from the



People's Law Office?
A. Yes.
Q. Like Joey Mogul?
A. Yes.
Q. Flint Taylor, I assume?
A. Yes.
Q. Do you know what the -- do you know what the work of Loevy & Loevy is, like what -- how would you describe their practice?
A. The most successful -- most successful firm possibly in the country doing this kind of work.
Q. What do you mean by "this kind of work"?
A. Wrongful convictions, inmate civil rights.
Q. Okay. They're plaintiff civil rights lawyers, right?
A. Yes.
Q. Okay. And same thing with the People's Law Office, are they plaintiff civil rights lawyers to your knowledge?
A. Yes.
Q. Okay. The -- I was going to ask

another question.
Oh, did you consider it your role on the Working Group to be an advocate?
A. Well, if I investigated a case and reached a decision I would be an advocate for my position.
Q. Right, understood. I mean prior to reaching a conclusion. Did you have -- I mean, you described it earlier as being independent and impartial, right?
A. Hopefully, yes.
Q. Okay. Would you agree with me that's different from being an advocate?
A. Well, I don't know how to answer that. I mean, if you -- if you are a lawyer representing a client, you are an advocate.
Q. Exactly.
A. We -- we did not have a client specifically in this. I don't know how you would define our relationship with the state's attorney's office. They weren't our clients.
Q. Okay.
A. So ...
Q. Well, I'm -- you had just drawn a



comparison with a lawyer who has a client. And the lawyer who has a client is an advocate on behalf of the client, right?
A. Yes.
Q. Okay. Did the Working Group have a similar role as opposed to -- yeah. Would you consider the Working Group to have a similar role, to be an advocate on behalf of any person or entity?
A. No.
MR. MORAN: Okay. It's -- I'm about to switch to a different topic. It's 11:52.
Do you guys want to stop?
MR. KUBLY: You want to reconvene at 12:30?
MR. MORAN: Whatever is --
THE WITNESS: It's fine with me.
MS. MEADOR: You can go off the record.
MR. MORAN: Yeah. We can go off the record.
THE VIDEOGRAPHER: We're now going off the record at 11:52 a.m.
(Recess taken.)
(Change of reporters.)
THE VIDEOGRAPHER: We are now going back on the record at 1:08 p.m.



BY MR. MORAN:
Q. All right. Mr. Kadish, ready to get started again?
A. Yes.
Q. Okay. We were talking about the Lawyers' Committee before I think we took a break. And I want to ask a couple more questions.
Do you have any knowledge that flyers or claim forms were being distributed in the Department of Corrections to find individuals who had convictions involving one of the seven detectives?
A. There was a form that we received that had been distributed. I have no knowledge of who made that form or who it went to.
Q. Got it.
On the form, do you have a direct recollection of ever seeing the law firm, whatever it's called -- I can't remember -- but Peter Neufeld's law firm as the place the claim form should be sent to?
A. I believe that's correct.
Q. Okay. And in the process of collecting the claim forms and then deciding which ones would



be ultimately picked for the Working Group, is it your understanding that the claim forms went from Mr. Neufeld's office to the Conviction Integrity Unit, and then eventually to the Working Group?
A. I have no knowledge of that.
Q. Okay. Do you know who played a role in selecting cases from the claim forms that Mr. Neufeld's law firm received?
A. We were just told which cases to investigate. We had nothing to do with the selection of cases initially.
Q. Okay. Do you have any knowledge of any lawyer on the Lawyers' Committee attempting to get the Working Group to review a case?
A. I know that Ms. Mogul represented one person. I wasn't -- that's all I know, yeah.
Q. Do you have any knowledge of, for example, an attorney trying to get -- or attorney from the Lawyers' Committee trying to get the Working Group to review the Jerry Gillespie case?
A. I remember the name Gillespie, and I can't remember if that was the one that Andrea Lyon represented him on. And that's one I have a vague -- I thought it was Andrea Lyon on

Mr. Gillespie.
Q. I think I asked that question wrong. I probably said a lawyer from the Working Group getting the -- or the Working Group to try and review a case. I meant a lawyer from the Lawyers' Committee trying to get the Working Group to review the Jerry Gillespie case. Do you have any knowledge of that?
A. No. I think -- I think the request would be made to the State's Attorney's Office to maybe Risa Lanier.
I don't recall any member of the Working Group contacting us to add a case to our, shall we say, collection.
Q. Yeah. What I'm talking about is any lawyer from the Lawyers' Committee attempting to get a case on the list of cases for the Working Group to review. Do you have any knowledge of that happening?
A. No, I don't remember.
Q. Okay. I'm going to show you an exhibit real quick. Apologize for -- I had picked up -- I turned up a bunch of exhibits that I thought we'd start with, and the one I'm thinking of now I



didn't. One second.
By the way, at the time the Working Group was conducting its work, do you know whether the Cook County State's Attorney's Office had engaged any special prosecutors to handle specific cases that were going through the postconviction process?
A. You mean -- by that do you mean were -- did the State's Attorney's Office hire people other than ourselves to investigate specific cases.
Q. Well, if it's in the post-conviction petition process, it would be a special prosecutor who's handling the case on behalf of the State in that litigation. Are you aware of that happening?
A. Well, I know that there's a Post-Conviction Unit.
Q. Right. My question is, are you aware of any of that work from the Post-Conviction Unit being sent to a special assistant state's attorney special prosecutor to handle the case?
A. I'm not exactly sure what you mean by that.
Q. Well, have you ever heard of a special prosecutor?



A. Well, I was a special prosecutor.
Q. In what context?
A. Who, me?
Q. Yeah.
A. Appointed by the State's Attorney's Office.
Q. You mean for the Working Group.
A. Yeah.
Q. Okay. So I thought you told me earlier you didn't view yourself as a prosecutor.
A. Well, my title was, you know, as a special prosecutor appointed.
Q. Okay.
A. But I didn't view myself as a prosecutor.
Q. So sometimes -- I mean, do you have any knowledge of -- I mean, you're aware of the concept of a special prosecutor being brought in to prosecute a case in which maybe the governmental entity has a conflict.
A. I've heard of that.
Q. Okay. For example, President Trump was the subject of an investigation by a special prosecutor, right?



A. Yes.
Q. Similarly, do you have any knowledge of the Cook County State's Attorney's Office identifying a special prosecutor to handle the post-conviction petition in which the State would be defending the conviction?
A. Yes.
Q. Okay. Do you know of any -- and was that going on at the time you were working at the Working Group?
A. Yes.
Q. Okay. And who do you -- do you know anyone who was doing that?
A. Bob Milan.
Q. Did you have any communications with Bob Milan about the Working Group?
A. From time to time.
Q. What did you discuss?
A. Lots of things.
Q. Let's start with this: Do you remember any specific conversations? Like, whether it's by phone or Zoom or in person?
A. I had one or two in-person meetings with Bob. He was a former Kent student.

Q. Right.
A. In the clinic.
Q. And this is while you were part of the Working Group.
A. Yes.
Q. Were you discussing Working Group business or issues at all?
A. Issues where, I wouldn't say our jurisdiction overlapped, but in his work as a special prosecutor, he had what I would just call limited jurisdiction.
Q. Describe what you mean by that.
A. My understanding is that if the Torture Commission recommended a case should go back to 26th Street and a decision was made to reopen that case, Mr. Milan became the prosecutor for that case.
Q. Okay. And the Torture Commission, I assume you mean the Torture Inquiry Relief Commission.
A. TIRC.
Q. Which everyone calls TIRC, right?
A. Right.
Q. And TIRC would review a case, make a determination of whether there's evidence of



torture, and then send the case back to the circuit court for an evidentiary hearing.
A. Yes.
Q. And your understanding is Bob Milan then would represent the State in the evidentiary hearing.
A. Yes.
Q. Understood.
Do you know if, from your conversations with Bob Milan, whether any attorneys were attempting to get him to send his cases to the Working Group?
A. Would you repeat that?
Q. Yeah. Do you have any knowledge, from your conversations with Bob Milan, of other attorneys attempting to get Mr. Milan to send cases he had as a special prosecutor to the Working Group?
A. Not that I can recall.
Q. Did the Working Group -- I mentioned the name Jerry Gillespie. Do you have an independent recollection of Jerry Gillespie?
A. I remember he was one of the cases we reviewed. I do not remember the facts of the case.
Q. Okay. Do you have any -- are you aware



that the Jerry Gillespie case was at one time assigned to Bob Milan?
A. No, I do not know that, or I do not recall that.
Q. All right. Let me give you an exhibit real quick.
(Deposition Exhibit No. 1, Witness Kadish, was marked for identification 10/30/2025.)
(Discussion off the record.)
BY MR. MORAN:
Q. Okay. Mr. Kadish, we're looking at Exhibit Number 1, which is entitled Working Group, I believe Procedures and Guidelines. Is that accurate?
A. Yes. That's what I'm reading.
Q. You have -- is this document familiar to you?
A. I remember that there was a Working Group Procedures and Guidelines paper.
Q. Do you want to page through it real quick just to make sure you're familiar with it?
A. I remember this document.
Q. Okay. Very good.



Did you have any role in drafting this document?
A. There was a number of, I thought different documents that went back and forth. I believe Professor Hawilo did the main -- if there were drafting done by our group as opposed to being sent to us, Professor Hawilo mostly drafted that, and Professor Southerland and I would, you know, make comments.
Q. Let me give you one more exhibit that might help you remember.
(Deposition Exhibit No. 2, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. Mr. Kadish, what I just handed you -- or Exhibit 2 was just handed to you, which is -- doesn't have a title on it, but it does have a heading on it. One second. And it says: Effective June 25, 2021, and then beneath it it says Overview.
Do you recognize this document?
A. Less than Exhibit Number 1.
Q. Okay. So I'm going to direct your

attention back to Exhibit Number 1. And under the first paragraph, under Overview, the last sentence of that paragraph states: The Working Group may further define and interpret these procedures and guidelines as deemed appropriate.
And I want you to take a look at -- or, strike that.
Do you have any, based on the information I just gave you in that sentence -- and if you want to read further into paragraph 1 -- do you have any recollection that you were given the Working Group Procedures and Guidelines first and then -- exhibit -- and that which is Exhibit Number 1, and then the Working Group prepared Exhibit Number 2, which are protocols?
A. Like I say, I have much more specific memory of Exhibit 1 and the language than I do of Exhibit 2. As of right now, I don't even remember Exhibit 2.
Q. Okay. So we're going to talk about just a couple of areas of each document. And if you think you need to read more to gain context in order to answer questions, just let me know, and we'll give you an opportunity to do that.



A. All right.
MS. NOLL: Let me reiterate that I want to make sure you have time to read the whole document if it's necessary to answer.
THE WITNESS: I have not read Exhibit 2. Like I say, I do not have at this point independent memory of this document at all.
BY MR. MORAN:
Q. That's fine. We'll -- if you need more time to review the document, we'll cross that bridge when we need to. Does that sound fair?
A. Sure.
Q. Okay. So let's look at Exhibit Number 1 for a second. And that's the Working Group Procedures and Guidelines.
And under Objectives, it's actually written -- and this is on the third going to the fourth line -- it's written into the document that "the Working Group is to make independent and impartial fact-based recommendations as to each case."
We discussed that earlier that that was your understanding of one of the roles of the Working Group.



A. Correct.
Q. Okay. I want to drop down to the -- there's a defined word actually discussing detectives, Chicago Police Department detectives, and it says: The seven detectives are Kenneth Boudreau, Richard Paladino, James Cassidy, Thomas Coughlin, William Foley, Frank Valadez, and Patrick McCafferty, collectively "the detectives."
Do you see that?
A. Yes.
Q. Now, I'm going to paraphrase sort of, but further down it discusses the fact that the detectives are the subjects of allegations of torture, coercive techniques, fabrication of evidence in obtaining inculpatory confessions or admissions from defendants. Is that fair to say?
A. Yes, I see that.
Q. At the very end of this paragraph, the last sentence: As defined further below, the State's Attorney expects the Working Group to consider, among other things, the past allegations as part of its assessment of the present cases under review.
You see that?



A. Yes.
Q. Did you understand that as a direction to the Working Group to consider past allegations of the detectives who were involved in any one of the cases the Working Group was reviewing?
A. This sentence says what this sentence says, and it says that we could take into account past allegations against them.
Q. Yeah, I guess what I'm getting at is, did you read this sentence as a requirement to consider those past allegations, or an option to consider those past allegations?
A. Under the protocol, we were supposed to take that into account. It didn't say what weight we should give that or how we should handle that.
Q. Okay. So explain what you mean by that. And what I'm getting at is, number one -- actually, let me back up a second. I'll ask a different question that makes more sense.
Are you required to consider the past allegations according to the procedures?
A. I would say that we were required to look at that.
Q. Okay. And I think what you were

pointing out is that you had independent discretion to assign the weight that you felt appropriate to that evidence.
A. Well, now the question is, when you say "you," who do you mean by "you"?
Q. The Working Group.
A. There would be differences as to how the three of us might take that into account.
Q. What kind of differences?
A. I taught evidence for a number of years. I used to be -- I was familiar with Federal Rule 404(b) about other instances of misconduct. Simply because there was an allegation of something in the past, to me did not mean that it happened each and every time.
Q. Okay. And I think what you're -- the rule you referenced is the rule that bars using past allegations or other allegations of misconduct to establish propensity that the person in question committed the act at issue.
A. Yes, basically.
Q. All right. And did your Working Group colleagues disagree with you on that point?
A. Yes.



Q. Was that the source of some of the debates between you -- or disagreements, I should say, we talked about earlier -- disagreements between you and the other Working Group members?
A. Yes.
Q. By the way, based on your experience with the Working Group, as you sit here today, do you think there would have been any value in having an attorney who had a history as a criminal prosecutor on the Working Group?
A. All I can say is I was the nominee of the State's Attorney's office. They selected me as their nominee, and I can make no further judgment on that.
Q. No, I'm not asking you to judge your selection at all or the selection of your colleagues. I'm just asking whether it would have been beneficial to have someone with deeper background as a criminal prosecutor who brings a point of view that might be different from --
A. Abstractly, perhaps; but, again, I was the nominee of the State's Attorney's office.
Q. Understood.
A. You would have to ask them.



Q. So now let's take a look -- and, by the way, the Lawyers' Committee is described in a footnote at the bottom of the page. Do you see that?
A. Yes, that's correct.
Q. Do you know of -- do you know -- strike that.
We talked about some of the individuals you know of or you know on the Lawyers' Committee earlier --
A. Yeah.
Q. -- remember?
The other names on the Lawyers' Committee that we didn't discuss, Mary Katherine McCarthy, Steve Drizin, and Assistant Public Defender Julie Koehler. Do you know those individuals?
A. I now know that Julie I believe is the head of the Murder Task Force. I do not remember doing a case with her or having met her.
Q. Okay. What about Steve Drizin?
A. Nothing but respect for the professor.
Q. Well, I mean, do you know him personally?



A. I don't know what you mean by "personally."
Q. Well, you -- how about this: Have you met him?
A. Sure.
Q. On more than one occasion?
A. Sure.
Q. Have you attended any -- have you had any cases together?
A. No.
Q. Have you collaborated in any projects together?
A. No.
Q. Have you socialized with him?
A. No.
Q. In what context have you met him?
A. I believe at one point we consulted him on -- we just wanted to talk with him about, you know, his experiences, what might help us do our job better. But we did not discuss any specific cases --
Q. Understood.
A. -- that we were assigned.
Q. And you're talking about while you were

on the Working Group.
A. Yes.
Q. Would that fall under what we described earlier as part of the Working Group's research?
A. Yes.
Q. Okay. Did you also have an opportunity to meet with Russell Ainsworth in the process of conducting research?
A. I think we spoke with him -- I'm a little bit -- there's a lot of lawyers at Loevy.
Q. Yeah.
A. We met with one or two of them, you know, for general background, and they -- but I do not -- at this moment, I do not believe that there was any overlap between a case we were investigating and their representation of it. I'm not certain, again, because of the number of cases that we were assigned.
Q. Yeah, my question is a little different. I'm not talking about a specific case that you had. I'm just keeping it limited to the research the Working Group was doing at the, sort of the outset of the project.
A. If you know of a specific case, you can



ask me. At this point, I don't remember a specific case that we spoke with Russell about.
Q. Yeah, I'm not -- the question is not directed at any cases.
Did you go to Loevy & Loevy to have a meeting with attorneys, including Russell, about the detectives and their --
A. I think so.
Q. -- information they had about the detectives?
A. I think so.
Q. Okay. And did they provide you with materials to review for the meeting?
A. I do not recall.
Q. Did they provide you with deposition testimony to review after the meeting?
A. I know we had a binder about Boudreau and Halloran. I do not remember where it came from.
Q. Okay. So the next section in the document, Exhibit Number 2, is called Working Group Members, and it's exhibit -- or, I'm sorry, section number III.
MS. NOLL: Exhibit 1 or 2?
MR. MORAN: I'm sorry. Exhibit 1.



THE WITNESS: Oh, Working Group -- oh, you mean with the Roman Numeral III.
BY MR. MORAN:
Q. Exactly.
A. Okay.
Q. Exactly.
Okay. And, you know, at the beginning of that paragraph going on to the next page, it discusses how the Working Group was selected. One member appointed by the Lawyers' Committee, one by the Conviction Integrity Unit, and one jointly.
A. Yes, I see that sentence.
Q. Do you have any knowledge as to whether -- who was appointed by who?
A. I believe that Professor Southerland was the nominee of the Lawyers' Committee. I believe that Professor Hawilo was a joint recommendation. And it's -- quite frankly, I didn't know -- and I was recommended by the CIU unit because all I knew is I got the call from Judge Coleman.
Q. Okay.
A. Now Judge Coleman.



Q. Now, further down at the end of the -- well, sort of -- towards the end of the paragraph, starting with the word "no member." Do you see that?
A. Yes.
Q. It says: No member of the Working Group may be a current or former legal representative of any of the detectives involved in the review. I'm going to stop there.
A. Yes.
Q. Okay. You understand that to mean basically that the Working Group members can't represent the detectives.
A. Correct.
Q. Okay. Do you agree that if that had happened, that could create conflict of interest?
A. Yes.
Q. And the conflict would be loyalties to two different potentially opposing interests.
A. Yes.
Q. Okay. The next sentence says: No member of the Working Group may be involved in any current or future referral or other fiduciary relationship with any of the claimants, detectives,

CCSAO staff or members of the Lawyers' Committee.
Do you see that?
A. Yes.
Q. Again, same purpose: To try and prevent a conflict of interest.
A. Right.
Q. Okay. Are you aware of anything that you reviewed in your time with the Working Group that prohibited the Lawyers' Committee lawyers from representing any of the claimants after a conviction is reversed? In a civil rights lawsuit.
A. Repeat that.
Q. Are you aware of any prohibition similar to what we just read that would prevent a Lawyers' Committee lawyer from representing any of the claimants in a civil rights lawsuit after the conviction is vacated?
A. Ms. Mogul represented one individual. Initially we had not recall -- we were un -- eventually we felt uncomfortable about the fact that Ms. Mogul was representing this person. I do not remember whether it was for purposes of a civil action or it was still an attempt to set aside a conviction.



Q. Okay. We'll come back to that one in a second. Okay.
I'm more concerned about whether you are aware of a document that contains a prohibition preventing a Lawyers' Committee lawyer from representing a claimant really either before the lawyer for the Working Group or after a conviction is vacated in a civil rights lawsuit?
A. To my memory, footnote 1 was the only thing we ever received about the so-called lawyers' group.
Q. Okay. And you had just identified a concern the Working Group had about Joey Mogul representing a claimant potentially that would be before the Working Group, given her status as a member of the Lawyers' Committee.
A. We were -- I was concerned about it.
Q. Okay. In that situation, do you know if the Working Group declined to take on the case?
A. If I remember correctly, I do not believe we made a recommendation in that case. I do not recall whether it was because we, excuse me, flagged that with Ms. Lanier or what.
I believe that after discussions,



if any discussion took place, it may have been by Professor Hawilo.
Q. Okay. And is it fair to say that the concern you had is because of a potential conflict of interest in that Joey Mogul was on the Lawyers' Committee and also representing a claimant?
A. Again, based on footnote number 1 in our -- I mean, we did not look at this case every -- we did not look at this Exhibit Number 1 every time we had a meeting to discuss something, but that was something that did concern me.
Q. Okay. Now, do you agree with me that there is a conflict with a lawyer from the Lawyers' Committee representing a claimant after a conviction is reversed based on a recommendation from the Working Group in a civil rights case?
A. The instance with Ms. Mogul was the only one. And, again, my memory is that we did not -- either did not complete -- I'm just -- I don't remember what happened with that particular case. I do not think that there was a determination being asked.
Q. I'm not asking about that case. I'm going to move past that case now.



A. All right.
Q. More generally speaking, would you agree with me that there is a conflict of interest with a Lawyers' Committee lawyer agreeing to represent a claimant in a plaintiff's civil rights lawsuit against the detectives after the conviction has been vacated based on a recommendation from the Working Group?
A. That would be a problem.
Q. Okay. And the problem would be that there is the financial incentive that the Lawyers' Committee lawyer has.
A. Well, yes.
Q. Okay. Have you ever heard of an imputed conflict of interest?
A. Pardon?
Q. Have you ever heard the phrase "imputed conflict of interest"?
A. Vaguely.
Q. What do you understand it to mean?
A. Actually, I'm not sure. Could you explain it to me?
Q. I'd be happy to explain --
MS. NOLL: He's not here, obviously, as an

expert witness on conflicts and how they're applied to a particular fact scenario. So I just want to be clear, you're not asking him to opine on how conflicts are interpreted or what -- the definition of certain kinds of conflicts.

MR. MORAN: We're not going too far down the road --

MS. NOLL: Okay.

MR. MORAN: -- of the Rules of Professional Conduct.

BY MR. MORAN:

Q. I'll give you an example.

Let's say a claimant has a conviction reversed based on a recommendation from the Working Group.

A. All right.

Q. Do you agree then, because of your involvement with the Working Group, the claimant could not hire a lawyer from Mayer Brown to represent that claimant in a plaintiff's civil rights lawsuit because the conflict of interest that you would have is imputed to the other attorneys at your law firm?

A. Of course, Mayer Brown does not,



because of our relationship to this city, we do not represent inmates, we do not represent people in wrongful civil actions at this point.

Q. Yeah, that's -- it was just an example. I'm not suggesting that Mayer Brown would. But I'll give you -- we'll take Mayer Brown out of the example.

Let's say that you work at the ABC law firm, filled with lawyers, and pursuant to a recommendation made by the Working Group, the claimant's conviction is vacated.

Do you agree that another or -- another lawyer would be prohibited at the ABC law firm, assuming you worked there, from taking the plaintiff's civil rights case against the detectives based on the reversal of the conviction?

A. Yes.

MR. KUBLY: Objection; calls for a legal conclusion.

BY MR. MORAN:

Q. In other words, the conflict that you would have as a member of the ABC law firm is imputed to the other lawyer at the firm.

MR. KUBLY: Same objection.



MS. NOLL: Join.

THE WITNESS: Okay.

BY MR. MORAN:

Q. Okay. I was just asking it, but -- if that makes sense. You asked for an explanation; I gave it to you.

A. All right.

Q. All right. In the context of the Lawyers' Committee lawyer, do you agree then -- or would you agree that another lawyer at a firm like, say, Loevy & Loevy or the People's Law Office, would not be able to accept one of the claimants whose conviction was reversed based on the recommendation of the Working Group because there is an imputed conflict?

A. That's what footnote number 1 seems to get at.

Q. Okay. All right. We're going to move past that now to a different section.

The --

A. Actually, could you point to language in Exhibit 1 or Exhibit 2 which specifically states that?

Q. That addresses a conflict of interest



by the Lawyers' Committee?

A. Yeah.

Q. No, I cannot. But if -- you're free to read these and see if you can find it.

A. The only thing I remember is what's in footnote number 1.

Q. Okay. Do you want to take an opportunity to read through these documents? Now, we're going to go off the record if you're going to take some time to review them.

A. As I look at this now, I have no independent recollection of that being covered. I just --

Q. Okay.

A. Yeah.

Q. All right. Ready to go to the next question?

A. Sure.

Q. All right. The -- there's -- I want to drop down to Roman Numeral VI, Internal Communications with members of the Cook County State's Attorney's Office.

And specifically in the second paragraph discussing who the Working Group may

communicate with, it says: The Working Group may communicate with the CIU, the Lawyers' Committee, the lawyers for each claimant about its general practices, other claims involving the detectives, and the general status and progress of the investigation.
A. I see that language.
Q. Okay. I want to focus just on claims involving the detectives.
You read this as giving the Working Group the discretion to speak with members of the Lawyers' Committee or lawyers for the claimants about other claims involving the detectives.
A. All right.
Q. That's what it says, right?
A. Yeah.
Q. Okay. Are you aware of any language that gives the Lawyers' Committee -- I'm sorry. Are you aware of any language that gives the Working Group the discretion to speak with the detectives or attorneys for the detectives in any document you've reviewed as part of your work with the Working Group?
A. We did what?



Q. Were you -- are you aware of any written language given to the Working Group, similar to what we've just read, that gives the Working Group the option of speaking with the detectives or the lawyers for the detectives?
A. I think we previously went over this. Exceedingly rare, in my experience, that a police officer will speak with you about a case that they were involved with.
Q. No, I remember that. I'm more interested in whether you recall a document making it clear to the Working Group that speaking to a detective was an option.
A. Whatever is in the language of Exhibit Number 1 is what we followed.
Q. Okay. Let's take a look at Section VIII, Roman Numeral VIII, Review Procedures. I want to jump to subparagraph C.
A. Subparagraph B?
Q. C.
A. C. I have a hearing aid, so --
Q. I can tell. I'm trying to speak up. And you just let me know; if you can't hear me, I'll be happy to do better. I'm sorry if I'm not



talking loud enough.
Okay. Subparagraph C says: The Working Group will perform a case-by-case assessment of each case.
A. Yes.
Q. And a pattern assessment of all cases. And then the next sentence describes: The pattern assessment shall consider the history of misconduct of the detectives as well as any history of testifying falsely.
You see that language?
A. Yes.
Q. Was it your understanding that the Working Group had the option of assessing whether the allegations of misconduct in the past allegation or in the -- of the pattern assessment were true or false, as opposed to the Working Group having to consider the fact that those allegations are made?
A. The sentence says what the sentence says. There were individual disagreements among the three of us about how important pattern assessment was.
Q. Okay. I'm going to drop down to the



next section, paragraph D under Recommendations. And we talked about this earlier, the three categories that the Working Group could recommend?
A. Yes.
Q. Okay. Innocence -- I want you to take a look at that sentence for a moment, the first sentence under the Recommendation of Vacatur based on innocence. I'm going to ask you this question:
Do you agree with me that this recommendation has two distinct requirements? One, there must be new evidence; and, two, that evidence must rise to the level of a substantial probability that the convicted defendant was not the person who committed the offense.
A. That's what the language says.
Q. Okay. Do you agree that that is a high standard?
A. I don't know whether it's a high standard or not. It is what it says.
Q. Okay. How do you define a substantial probability that the convicted defendant was not the person who committed the crime?
A. All I can say is substantial probability says what it says. How you translate

that into guilt beyond a reasonable doubt, clear and convincing evidence, preponderance, I'm not quite certain.
Q. That -- how that is interpreted would have been up to the Working Group, right?
A. Yes.
Q. Are you aware of whether the Working Group ever did any research or came to any conclusions as to how to interpret this standard?
A. I do not recall. It was discussed all the time.
Q. Okay. The next, number 2, is Recommendation of Vacatur based on the Interests of Justice. Right?
A. Yes.
Q. Okay. And it states: Any credible information exists to cause a loss of conviction in the integrity of the conviction -- or loss of confidence in the integrity of the conviction, including any of the seven detectives' involvement in obtaining the statement from the defendant.
A. Yes, I see that sentence.
Q. Okay. Based on the sentence, the Working Group could reach a conclusion that because



one of the detectives was involved in obtaining the statement, that alone is enough to cause a loss of integrity.
A. That's what it says. And the three of us interpreted that as best we could based on who we were as an individual.
Q. Sure. Sure.
The next sentence says -- describes -- further describes what the determination will take into account, which is the overall patterns that emerge during your review, including what the Working Group learns from other cases involving any of these seven detectives and/or information in the specific case that results in a loss of confidence.
A. It says what it says. And then there might be differences among the three of us on how to apply that.
Q. Okay. Based on that sentence, was the Working Group free to disregard pattern assessment evidence, and only look at case-specific evidence in assessing the integrity of the conviction?
A. Again, there could be differences amongst the three of us.



Q. As to how to interpret that?
A. We -- I'm sorry. Ask your question again.
Q. So you see the conjunction is "and" slash "or"?
A. How far down?
Q. It's the top -- the fourth line up from the bottom on the right.
A. All right. I see "and/or."
Q. Okay. That would suggest that you can choose one or the other option; agreed?
A. That's what and/or -- and/or means.
Q. Okay. Based on the way this sentence is written, with that conjunction where it is, did the Working Group have the discretion to ignore pattern assessment evidence that may emerge during the review, and instead base its decision on the case-specific facts?
A. I can only talk about myself.
Q. Yeah.
A. And I took into account pattern instruction -- the pattern assessment, but I was much more concerned with the individual case and what the detectives were alleged to have done in



that specific case.
Q. Okay. Understood.
Okay. I want to focus on one more thing in that sentence, and it begins with, "Such a recommendation."
A. Okay.
Q. "Such a recommendation will not entail a finding that the defendant was innocent of the crime and may or may not include a finding of any wrongdoing by the detectives or other individuals associated with the case."
A. That's what it says.
Q. Okay. Let's just focus on the phrase related to innocence.
Did you read this, as a member of the Working Group, to mean that when you make a recommendation to vacate the conviction in the interest of justice, whether or not the individual is innocent of the crime is not part of your reasoning?
A. From my perspective, the interest of justice did not entail whether the person was actually innocent or not. To me, it focused on whatever the phrase "interest of justice" meant.

Case: 1:23-cv-14905 Document #: 135-28 Filed: 03/26/26 Page 31 of 60 PageID #:3630





Q. Okay. All right. I want to -- we're going to set that document aside for a second.
MR. KUBLY: Before we move on to the next document, we've been going for about an hour. Mind if we take a 5-minute break?
MR. MORAN: Any time you want to take a break is fine with me.
THE VIDEOGRAPHER: We are now going off the record at 1:56 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are now going back on the record at 2:03 p.m.
BY MR. MORAN:
Q. Okay, Mr. Kadish. We're going to talk about Exhibit 2 for a little bit.
And I can tell you yesterday we took the deposition of Risa Lanier, and she testified that this is the protocol document that was created by the Working Group that she eventually passed along to State's Attorney Foxx to approve.
Does that help you remember this document at all?
A. No.
Q. Okay. I'm just going to ask you a



couple questions about it. And I want to direct your attention to the second page at the top under Roman Numeral III entitled Scope of Review.
The first paragraph describes what we've read earlier about -- or what we discussed earlier about the fact that one of the seven detectives on the list must be part of the criminal investigation that led to the conviction. I'm paraphrasing, but that's essentially what it says. Would you agree?
A. That's what it says.
Q. The second paragraph says, after the Roman numeral -- or, I'm sorry -- yeah, after Roman Numeral V: The focus of the review will be the role and conduct of the detectives during the investigations and subsequent proceedings --
A. Wait. Where are you reading from?
Q. The second paragraph.
A. What page?
Q. The same page, under Scope of Review.
MS. NOLL: You mean Roman III.
MR. MORAN: Yes.
THE WITNESS: Oh, I'm sorry. I was looking at something else.



BY MR. MORAN:
Q. And this is the first line, about two-thirds of the way down: The focus of the review will be the role and conduct of the detectives during the investigations and subsequent proceedings.
You see that?
A. Yes.
Q. Okay. And the word "detectives" has the capital D because it's been defined to include those names we read off earlier. Remember that?
A. Okay.
Q. The -- let's talk about the next sentence: If claims are presented that exclusively allege misconduct of other members of the Chicago Police Department, or any other individuals, these cases will be handled through normal Cook County State's Attorney's Office and/or Conviction Integrity Unit channels.
You see that?
A. Yes.
Q. Okay. I want to give you -- or I want to ask you a question about that.
If the Working Group determines



that the misconduct did not involve one of the detectives on the list of seven, was it your understanding that the case then had to be sent back to the State's Attorney's Office?
A. That's what it says.
Q. Okay. In a situation where it is initially believed the misconduct was committed by one of the seven detectives, but the Working Group was either unable to show that that particular detective was involved in the misconduct, or it was somebody else, in that situation, would the Working Group send the case back to the State's Attorney?
A. I don't remember.
Q. Isn't -- this is more hypothetical.
A. I don't recall any other -- I don't remember any being sent back to the State's Attorney's Office or CIU.
Q. Okay.
THE VIDEOGRAPHER: You guys want to pause?
MR. MORAN: Sure. Let's go off the record.
(Discussion off the record.)
BY MR. MORAN:
Q. Okay. So now we're going to move on to another page further down. And this is on the,

let's see -- yes, the fourth page, and the very bottom -- or the bottom of the page where it says, in capital letters, C. Phase III: Investigation of Individual Claims.
Do you see where I'm at?
A. Yes.
Q. Okay. And on the next page under that heading are a list of bullet points. You see that?
A. Yes.
Q. Okay. And the introduction to those bullet points states: For the purpose of this review, the Working Group may ascertain information on the following for each case:
In the middle of the page is a bullet point that states: The existence of sufficient and credible evidence corroborating the involvement of the convicted person (persons) in the commission of the crime.
You see that?
A. Yes.
Q. Okay. That essentially would mean the Working Group can consider evidence of the claimant's guilt.
A. Yes.



Q. Okay. Do you have a recollection of the Working Group receiving evidence of guilt and deciding to disregard it in any case?
A. Did -- I don't understand.
Q. How about -- let me ask it a different way because that's a ...
In any of the cases you reviewed as a member of the Working Group, do you recall a situation in which there was evidence of guilt that the Working Group reviewed but there was a decision made to give it less weight or no weight in the ultimate analysis?
A. No, I wouldn't do that.
Q. Okay. We're going to jump down to the next page now. And this is on the sixth page. And this is under bolded language. It says: Final recommendations on each case.
Do you see where I'm at?
A. Right.
Q. Okay. The nonbolded language states: In Phase IV, the Working Group will assess patterns of misconduct both alleged and documented, and apply these patterns to the individual cases under review. The Working Group will apply heightened



scrutiny to any cases impacted by said pattern and make appropriate recommendations for relief in the interests of justice, unless substantial evidence exists to overcome the impact of the detective's involvement.
Do you see that?
A. Yes.
Q. Okay. What do you understand that standard to mean?
A. I have no idea.
Q. Do you have any recollection of discussing this standard with your colleagues in the review of any case?
A. Again, there were differences among us as to how to interpret past misconduct.
Q. Uh-hmm.
According to the language that's written there -- and I want to ask you if you agree with this -- if -- and setting aside any disagreements that may have existed, just reading the language -- if the Working Group finds evidence of misconduct based on -- past evidence of misconduct based on -- whether it's alleged or documented, it shall apply those patterns to the



individual cases, apply a heightened scrutiny to the cases impacted by the pattern, and recommend relief in the interests of justice, unless there's substantial evidence to overcome the impact of the detective's involvement.
A. I guess I have to say again, I have no independent recollection of Exhibit Number 2. I would consult Exhibit Number 1 in going through an analysis of a case.
Q. The language we just read off under the bolded -- or in the middle of page 6 of Exhibit 2 --
A. Right.
Q. -- is this a standard, to your knowledge, that was ever applied to any of the cases the Working Group reviewed?
A. I do not remember, going by phase III phase IV.
Q. Given that this language incorporates pattern and practice evidence, is this the kind of language that would have been the subject of a disagreement between you and the other Working Group members?
A. Again, amongst the three of us, how much weight we gave to past involvement, past

pattern, et cetera, different amongst the three of us.
Q. Who among you gave the most weight to the pattern and practice evidence?
A. Vincent.
Q. I assume you gave --
A. Professor Southerland.
Q. That's okay. I knew who you meant.
Who among you gave the least weight to the pattern and practice evidence?
A. Me.
Q. Based on -- because of what you described earlier, based on your years of teaching evidence and your understanding of the --
A. My experience teaching and my experience as a criminal defense lawyer.
Q. Okay. We're going to look at a different exhibit now.
(Deposition Exhibit No. 3, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. Mr. Kadish, some of the exhibits I'm going to give you, I'm just going to give you



to see if it helps you remember anything, and this is one of them.
This is Exhibit Number 3, email from Risa Lanier to a group of people, including you, on June 8 of 2021, thanking you for agreeing to be a member of the Working Group. Is that correct?
A. I have no independent memory of receiving this --
Q. I understand.
A. -- document.
Q. The way I've described the exhibit, though, would you agree that that's what it is? The sender --
A. It appears to be an email from Risa Lanier.
Q. Okay. I just want to direct your attention to the first paragraph. And there's a reference to a Peter, and it states: Peter provided a great overview of how this group came to be, and the necessity of the work.
And I'll just stop there. You're welcome to read more, if that helps you, but my question is: Do you understand that to be a reference to Peter Neufeld?



A. Yes.
Q. Okay. Do you have any memory of Peter Neufeld providing the overview referred to by Ms. Lanier?
A. No.
Q. Does this help you remember any information Peter Neufeld gave you about the Working Group and why it was needed?
A. He may have had his opinion about why it was formed. I do not have any knowledge of that. I was not involved with Peter in the formation of the ideas.
Q. Understood. However, the email indicates that he gave a presentation, and it seems, from the email, that you were there for the presentation?
A. I do not remember that meeting.
Q. And as you sit here today, you can't remember any -- whether it's that meeting or any other meeting -- any details he gave you about the necessity of the Working Group.
A. Correct.
Q. All right. You can set that one aside, sir.



A. I'm sorry?
Q. You can set that one aside.
A. Okay.
(Discussion off the record.)
(Deposition Exhibit No. 4, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. We're looking at Exhibit Number 3 now --
MS. MEADOR: 4.
MR. MORAN: Oh, gosh. Exhibit Number 4 now.
MS. MEADOR: We don't have enough.
MR. MORAN: Yeah, I know. I'm sorry.
MS. MEADOR: That's okay.
MR. KUBLY: You can have this one, if you'd like.
MS. MEADOR: Thank you.
(Discussion off the record.)
BY MR. MORAN:
Q. This is an email dated, at the very top, November 23, 2021, and there's an email below it from you dated November 23, 2021 as well. The one at the top is from Maria Hawilo to you and

Vincent Southerland, and it looks like the one at the -- and she's responding to an email from -- that you had sent on November 23, 2021. Would you agree?
A. That's what it says.
Q. Okay. There's a discussion in the email you sent -- not a discussion -- but information in the email you sent indicating that you're going to forward to Bob a list of the cases and provide him a copy of the Procedures and Guidelines.
Is that a reference to Bob Milan?
A. Yes.
Q. Why were you giving Bob a list of the cases and the Procedures and Guidelines?
A. Because of his role as a special prosecutor.
Q. What about his role as a special prosecutor necessitated him having these documents?
A. I don't remember.
Q. Okay. And does this help you remember any of the discussions you had with Bob Milan about the Working Group?
A. I just remember we discussed things in



general. General procedures.
Q. Okay. Let me give you another exhibit. So you can set that one aside, sir.
(Deposition Exhibit No. 5, Witness Kadish, was marked for identification 10/30/2025.)
(Discussion off the record.)
BY MR. MORAN:
Q. Okay. This is Exhibit Number 5. And this is an email from Marc -- from you, sir, Marc Kadish, to Maria Hawilo and -- yes, just Maria Hawilo, it looks like. And the subject is Englewood Audit and Tyrone Delaney.
From reviewing this email, sir, do you have any recollection of it?
A. No.
Q. Okay. I want to direct your attention to the top of the page. You write: I spent about 45 minutes on the phone with Peter today. He wanted to know what I thought of the memo on the Englewood Four. We discussed the issue of Fabio's leaving the office.
I'm going to stop there.
Do you have any memory of the --



what's been described in those sentences?
A. No.
Q. Peter is a reference to Peter Neufeld?
A. Yes.
Q. Who is Fabio?
A. He was a State's Attorney.
Q. Is that Valentini?
A. I believe so.
Q. To your knowledge, was there an issue with Fabio Valentini leaving the State's Attorney's Office?
A. There was an issue. I did not know the parameters of it.
Q. Do you have any -- any details at all?
A. No.
Q. Did it have anything to do with the State's Attorney's Office handling of a case being reviewed by the Conviction Integrity Unit or a case being handled by the Post Conviction Division?
MS. MEADOR: Unit.
BY MR. MORAN:
Q. Unit.
A. I do not recall.
Q. I want to go to the next where -- after



where I stopped off. It states: When I told him about the conversation at CIU, he said that Adam and Nancy were wrong because they have never seen the FBI reports on the issue. I'm going to quietly check this out further. I have some ideas on who to talk to off the record.
Do you know what is being discussed in those sentences?
A. I think it was Mr. Fabio's leaving the State's Attorney's Office.
Q. Okay. This had something to do with Fabio Valentini leaving the State's Attorney?
A. Yeah.
Q. Do you know if Fabio Valentini was -- if he left on his own accord, or if he was terminated?
A. I don't know.
Q. Okay. Do you have any idea what the reference to FBI reports is about?
A. Those are the FBI 302s.
Q. With respect to which case?
A. I don't know.
Q. Okay. I'll give you another exhibit to look at.

(Deposition Exhibit No. 6,
Witness Kadish, was marked for
identification 10/30/2025.)

BY MR. MORAN:

Q. Okay. We're looking at Exhibit Number 6 now, and this is an email that is -- one second -- dated September 27, 2021, from you to Vincent Southerland and Maria Hawilo. And it's several paragraphs long.

Do you want to take a quick look and just tell me if you recognize this document.

A. I -- it says it's from me. I have no independent memory of --

Q. Okay.

A. -- of this.

Q. There's a couple things I want to ask you about in this document, and if you want to take a second to read through it to see if that helps at all, you're welcome to do that.

A. All right.

Q. Okay. There is, in the second paragraph -- I'm sorry, yes, the third paragraph -- states: As we delve into the cases and the whole controversy, I have no problem complaining about



our limitations. I just want to build our records so that we seem like we are doing a professional dispassionate review on what we were asked to do but then bring up our limitations.

Do you see that?

A. Yes.

Q. Okay. What are the limitations being referred to?

A. Didn't have subpoena power or an investigator, I believe.

Q. In other words, resources?

A. I can't remember.

Q. Did the State's Attorney's Office put any limitations on your ability to review cases? Other than what's been described in the procedures we looked at earlier today.

A. No. Once we -- once we were assigned a case, we attempted to do an independent, thorough -- to do an investigation of the case.

Q. Okay. I want to direct your attention to the last paragraph in the email you wrote on September 27, 2021.

It states: Regarding Bob Milan, he was a student at Kent in the clinic, but he was



assigned to another professor.

And then you provide more information about his background.

You see where I'm talking about?

A. Yes.

Q. Okay. You made a suggestion at the very end of that paragraph that you make contact with him upon your return.

Do you see that?

A. Yes.

Q. What was the reason for making contact with Bob Milan?

A. Well, as I said, we would have lunch periodically just to review our careers, and I wanted to know what his role was as the special prosecutor.

Our cases, to my knowledge, never overlapped. In other words, I don't recall a case that he was concerned with that we were working on.

Q. And were you like social friends with Bob Milan?

A. It's limited to an occasional lunch.

Q. All right. And I imagine in these lunches, you'd talk about other things besides your



career, like maybe kids or vacations and things of that nature?

A. On occasion.

Q. Okay. In this email, you're advising your colleagues on the Working Group of your suggestion that you make contact with Bob Milan, which seems that your suggestion is based on something related to the Working Group.

Were you proposing a meeting with Bob Milan and you in connection with Working Group business?

A. No.

Q. Okay. Did you ever have a discussion with Bob Milan about whether you should be on the Working Group?

A. No. Not that I recall.

Q. Did you ever have a discussion about his thoughts about -- or where his he shared his thoughts about the Working Group?

A. I'm sure we spoke about our work and his work. I do not remember specific context.

Q. Yeah, I'm speaking more about like when you were thinking about joining the Working Group, did you ever -- do you recall ever having a meeting

with Bob Milan where he gave you his feedback on whether you should join?
A. No. We -- that never happened, that I recall.
Q. Okay. You can set that one down.
(Deposition Exhibit No. 7, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. All right. We're looking at Exhibit Number 7. And this was sent as an email from you to Maria Hawilo and Vincent Southerland on August 2nd of 2022.
Do you see that, sir?
A. Yes.
Q. Okay. I want to -- take a quick look at that, and let me know after you've had a chance to just review it quickly.
A. I see it.
Q. Okay. There's -- under paragraph two, there is a reference to political ramifications. Do you see that?
A. Yes.
Q. Regarding resignations of supervisors



from the State's Attorney's Office.
What is that a reference to?
A. As I sit here now, I do not recall.
Q. Okay. Was there a time in 2022 where departures at the State's Attorney's Office had created media attention -- or gathered media attention, I should say?
A. I don't recall.
Q. Do you know whether that is a reference to Fabio Valentini?
A. I don't know. I don't remember. As I sit here now, remembering back in August '22, I do not remember.
Q. Okay. So let's talk about Cordell Williams, instead of emails that were sent around.
And I'm going to give you some documents to look at. Give me a second to find it.
While I'm digging that up, I want to come back to a question that I had asked earlier regarding David Wiener, the former attorney for Cordell Williams.
In the report regarding Cordell Williams, there's references to the fact that David Weiner was disbarred at some point.



A. I believe so. I would have to look for the document.
Q. Yeah, yeah. I'm just -- before I dig it out.
In that he mishandled a few cases which caused him to be disbarred, failed to return money to a client, and also had an alcohol problem.
Does that ring a bell with you?
A. I re -- I mean, if it's in my memo, then that would be what I noted.
Q. Okay. The -- given your general position on propensity evidence, should allegations regarding misconduct or substance abuse by Dave Wiener that happened after his representation of Cordell Williams be a discussion point or a data point if there's no evidence that the misconduct or substance abuse had any role in his performance on behalf of Cordell Williams?
A. His past -- the past allegations are something that could be taken into account. The weight to be given it is something different.
Q. Okay. What I'm asking is whether the Working Group should include other allegations of misconduct or substance abuse against David Wiener



when there is no evidence that those events had any connection to his representation of Cordell Williams.
A. I don't know whether it did or didn't --
Q. Well, that's something --
A. -- during the case.
Q. That's something the Working Group would have looked into, right?
A. I suppose so.
Q. Generally speaking, do you know the law in Illinois on the --
A. Pardon?
Q. Generally speaking, do you know the law in Illinois on the admissibility of substance abuse in a criminal case? Like a criminal defendant's substance abuse?
A. Well, if they're caught with evidence of possession of an illegal substance, that could be the subject of a criminal case.
Q. How about someone commits an armed robbery, and the prosecutor wants to put in the fact -- and there's no drugs caught on the individual -- or found on the individual when the police arrest him, and the State wants to put in

evidence that the individual has a substance abuse problem.
MS. NOLL: Counsel, are you -- sorry. I didn't mean to speak over you.
MR. MORAN: That's okay.
MS. NOLL: Are you asking again for a legal opinion or an expert opinion?
MR. MORAN: I'm giving him a hypothetical.
MS. NOLL: The same objection stands. I want to understand the context of your question.
BY MR. MORAN:
Q. So what my question is, is it your understanding, based on your view of the law that you shared with us earlier, that the State can get that kind of evidence in without establishing a connection between the drug use or the substance abuse and the crime committed?
MR. BECKER: I'm going to object on legal grounds.
MS. NOLL: Same objection.
MR. KUBLY: Yeah, legal conclusion.
THE WITNESS: I'm not certain what you're getting at.



BY MR. MORAN:
Q. Well, it's simple. Is substance abuse or misconduct something that should be considered if you cannot establish that the substance abuse or misconduct had any connection at all to the events at issue?
MR. KUBLY: Same objection.
MR. BECKER: Same objection --
MS. NOLL: Same objection.
THE WITNESS: In the abstract, no. I don't -- again, I'm not sure what you're getting at specifically.
BY MR. MORAN:
Q. How about in the specific instance of David Wiener. Should the State's Attorney be told about drug abuse or alcohol -- I'm sorry -- alcohol abuse or events that led to him being disbarred if you cannot establish that those things had any connection whatsoever to his performance as Cordell Williams's attorney?
A. I took into account that Mr. Wiener had represented Mr. Williams. There were certain aspects of his representation that I was concerned with.



Q. I don't think that answers the question. What I'm asking is, should those specific things be considered?
A. At that time, as a means of understanding what had tooken place in that case, I may have taken it into account. I do not recall.
Q. Understood.
Now, understanding that you do not recall, the question is whether those things should be taken into account and included in the final report to the State's Attorney.
A. I don't recall what was in my final report as I sit here now.
Q. Okay. I seem to have forgotten to bring a printed exhibit. Can I email it to you?
MR. KUBLY: If you email it to me, I can get it printed for you.
MR. MORAN: I'll do that right now. You want to take a quick break?
(Discussion off the record.)
THE VIDEOGRAPHER: We are now going off the record at 2:42 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are now going back on



the record at 2:55 p.m.
BY MR. MORAN:
Q. Okay. Are you ready to get back started?
A. Yes.
Q. Okay. We talked a little bit about the accountability theory of criminal prosecutions. You remember that earlier?
A. Yes.
Q. Have you ever heard of the common design rule?
A. Yes.
Q. Can you tell us what that is?
A. It's another way of saying aiding and abetting. Being part of a group.
Q. Do you agree that under the common design, proof of the common design need not be supported by words of agreement but may be drawn from the circumstances surrounding the commission of the act --
MR. BECKER: I'm going to object.
MS. NOLL: Go ahead.
MR. BECKER: On the ground it calls for a legal conclusion.

MR. KUBLY: Same objection.
MS. NOLL: I join. He's not here as an expert.
MR. MORAN: That's okay.
Go ahead.
THE WITNESS: You can -- you don't need words alone to demonstrate that you're part of an ongoing criminal activity by more than one person.
BY MR. MORAN:
Q. Circumstances of the activity itself can be the evidence of the participation.
A. It's possible.
Q. Okay.
(Discussion off the record.)
(Deposition Exhibit No. 8, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. Exhibit Number 8 is entitled Affidavit, and you can see the name David Evans on the first page. And it is a two-page document with the Bates label W453 and W454.
You see that?
A. I see it.



Q. Okay. Have you ever seen this document before?
A. I do not remember.
Q. Okay. You want to take a moment and just review it, and let me know if you have -- after you've had a chance to take a quick look.
A. I don't remember the document.
Q. Okay.
A. I have no independent memory of it now as I sit here. I do not remember whether I reviewed it back in 2021.
Q. Okay. Fair enough.
You did have a chance to read through it real quick; is that --
A. I did.
Q. Okay. Very good.
Let's just take a look at a couple of the paragraphs.
Having read through the document, you can see that it was prepared or at least signed by David Evans; is that accurate?
A. Yes.
Q. Okay.
A. Yes, that's what it seems to be.



Q. And in -- specifically at the bottom of the page in paragraph 7, David Evans takes responsibility for having shot and killed two individuals in a restaurant.
A. I see what it says.
Q. Okay. Does the name David Evans ring a bell at all?
A. Only what's in here. No, I do not -- I know that there was -- I know that there was a shooter in this case.
Q. Right. And according to this document, exhibit Number 8, the shooter was David Evans.
A. That's what he says.
Q. Okay. Take a look at paragraph 2. It says: While at the party, I brandished my gun, so prior to letting me in his car, Cordell popped the trunk and told me I had to put my gun in the trunk, and I did.
You see that?
A. It says that.
Q. Okay. That would indicate that Cordell Williams had knowledge of the gun in the trunk. Would you agree?
A. It would seem so.



Q. Okay. Paragraph 3 -- I'm going to read paragraphs 3, 4, and 5.
As we were blocks away from my house, I thought I saw rival members in a restaurant who had been trying to shoot me.
I demanded Cordell to, quote, "pull over - pull over," end quote, and he did.
I told Cordell to, quote, "pop the trunk and wait right here, I want to see if that's these --" and then he uses the N word.
A. Right. All right.
Q. Close quote.
You see those three paragraphs?
A. Yes.
Q. Okay. Would you agree that according to these three paragraphs, Cordell Williams was instructed to pull over by David Evans?
A. That's what it says.
Q. And he was instructed to pop the trunk where the gun was located.
A. That's what it says.
Q. And he was told to wait right here so David Evans can go and see if it's the individuals he had thought were shooting at him.

A. Right.
Q. Okay. These paragraphs, are there circumstances here that you would agree indicate that Cordell Williams has participated in some way in the shooting deaths of the two individuals described in paragraph 7?
A. Yes.
MR. BECKER: Objection; calls for a legal conclusion.
BY MR. MORAN:
Q. And you can see the affidavit is dated 2017?
A. Yes.
Q. Would you agree with me that this affidavit was not available to the prosecutors who tried the case against Cordell Williams in 1995?
A. According to the dates, this was written in 2017. I don't know what was available to the prosecutors back then.
Q. And assume for a minute that David Evans is charged with the same crime, has not given a statement to police, and has exercised his right to remain silent. Back in 1995. That's not in here, I'm just giving that to you for purposes of



the question.
If David Evans is refusing to speak about what happened in the commission of this crime, would you agree then that the State -- he would not be a witness available to the State against Cordell Williams.
A. If David -- if David Evans confessed and named Cordell Williams as a participant or the driver of the car, then unless he testified, that his statements don't come in -- would not have come in.
Q. And if David Evans himself is refusing to testify, in other words, he's going to exercise his right to remain silent, is he available as a witness to the State in the case against Cordell Williams?
A. No.
Q. Okay. Would you agree with me if all those things are true, that David Evans' affidavit then is new evidence that is not available to the State -- was not available to the State in 1995?
A. If he -- we didn't study David Evans' case. I knew that there was a shooter, and we were asked to investigate Cordell Williams' involvement.



Q. Understood. I'm just asking, do you agree with me that David Evans -- the information provided -- he provided in his affidavit would not have been available as admissible evidence to the State in 1995 unless David Evans agrees to testify?
A. Yes.
Q. Okay. I'm going to show you another exhibit.
(Deposition Exhibit No. 9, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. We're looking at Exhibit Number 10, I believe.
COURT REPORTER: 9.
BY MR. MORAN:
Q. 9. This is the affidavit -- or, I'm sorry. This is an email from Steve Becker to yourself, Maria Hawilo, and --
A. Just seems to be to Maria and I.
Q. Yes, that is correct. Dated November 22nd of 2021.
Do you recognize this email?
A. No.



Q. Okay. I just want to show you -- there were attachments, and Mr. Becker identified the attachments in the body of the email.
Number 4 is the affidavit of David Evans dated August 2017 regarding the incident.
Do you see that?
A. I'm sorry. Yes, there appears to be attachments.
Q. Specifically -- so the reason I'm showing you this is that it indicates you received David Evans' affidavit on -- from Mr. Becker on November 22nd, 2021.
MS. NOLL: But you don't have the attachment to this email.
MR. MORAN: We just looked at it.
MS. NOLL: That's --
MR. MORAN: Correct, I don't have it with me.
MS. NOLL: It's not together here, but you're stating that was one of the attachments to Exhibit 9.
MR. MORAN: Number 4.
BY MR. MORAN:
Q. Do you see that, Mr. Kadish?
A. I see that.

Q. Okay. Do you have -- does this help you remember at all whether you received the affidavit and reviewed it?
A. As I sit here today, no.
Q. Okay.
A. Again, I looked at the date four years ago.
Q. No, I -- listen, I understand. You know, I got to give you some information to try and help you remember some things, and if it does, it does, and if it doesn't, it doesn't.
Do you have any reason to disagree with the fact that you received the affidavit from David Evans identified in the email from Steve Becker on November 22nd of 2021?
A. If that's what it says, that's what it says. I have no independent memory of it.
Q. I'm going to show you another exhibit.
(Deposition Exhibit No. 10, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. We're looking at Exhibit Number 10. And this is a string of emails. And



you can see the one, the email at the very bottom -- this is printed on both sides of the page -- but the originating email is the one we just looked at from Steven Becker.
A. Correct.
Q. Okay.
A. Who's seated in the room with us today.
Q. Exactly. He's seated in the room with us today.
There's an email from you to -- it doesn't say who it's to, but it would appear, from the email at the very top, that it was to Maria Hawilo and Vincent Southerland.
A. No, it's from -- it's not from me.
Q. No, I'm looking -- I'm sorry. In the middle of the page there's a line that says on November 22 of 2021, at 11:16 a.m., and then your name Kadish, Marc.
MR. KUBLY: (Indicating.)
THE WITNESS: I -- okay. Yes.
BY MR. MORAN:
Q. Okay. That looks like an email that you had sent to Maria Hawilo and Vincent Southerland.



A. That's what it says.
Q. Okay. And you reference the statement of David -- from David Evans. You write: The one item we had not seen before was the statement from David Evans.
Did I read that correctly?
A. Yes, that's what it says.
Q. Okay. And Maria Hawilo responded that same day, indicating "agreed" regarding the Evans statement. You see that? At the very top of the page.
A. At the very top -- oh, okay. I see the top of the page.
Q. She also writes: I'd like to discuss today.
Do you have any memory, from looking at this email, of having a discussion with Maria Hawilo and Vincent Southerland about David Evans' affidavit?
A. As I sit here today, no.
Q. Is there anything you think would help you refresh your memory about discussing the email -- or the affidavit of David Evans with Maria Hawilo and Vincent Southerland?



A. I -- I don't know. If you think there is something, then you can show it to me.
Q. Okay. I'm asking if you're aware of any documents that you think might help you. I'm not really in a position to say what will help you. I can guess. But if you know of something you'd prefer to look at to help refresh your recollection, I'm happy to try and find it.
A. I can't think of anything that ...
Q. Okay.
Okay. As part of the Working Group's work, it interviewed David Evans.
A. I have no independent memory of it now. I assume we did. Or I think we would have, if that's what the emails indicate.
Q. Okay. And I'm not going to ask you about that one anymore, so you can set that one aside, if you want.
In an interview with David Evans, would it be your expectation to discuss his affidavit and the contents of his affidavit with him?
A. Yes.
Q. And ask him questions about that

affidavit?
A. Yes.
Q. Cordell Williams was also interviewed.
A. Oh, I didn't see the T.
I have no independent recollection of it. I assume we did.
Q. And that would make sense, given that it's his conviction you're investigating, you'd almost have to interview him.
A. We would attempt to talk to every claimant who had made allegations.
Q. In the interview with Cordell Williams, would it be your expectation to discuss David Evans' affidavit with him?
A. I would assume so. I have no independent recollection of it.
Q. Sure. And would it be your expectation to ask him questions about the contents of David Evans' affidavit?
A. Yes.
Q. Okay.
A. Could I just add artificial --
MR. MORAN: You want to take a second to get --



(Discussion off the record.)
MR. MORAN: Here we go.
(Deposition Exhibit No. 11, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. You ready?
A. Ready.
Q. Okay. So we're looking at Exhibit Number 11.
And this is a document entitled People v Cordell Williams, dated May 10, 2022, Working Group Memorandum of Findings and Recommendations.
Do you want to take a quick look at that?
A. Okay.
Q. Okay. And if you want to turn to the last three pages of the document.
A. Three pages or two pages?
Q. Wherever your concurring opinion begins.
A. Pardon?
Q. Where your concurring opinion begins.
A. Okay. That's two pages.



Q. Yep. Okay. So you attached to the recommendations your concurring opinion.
A. Correct.
Q. Okay. In -- obviously, in the preparation of your concurring opinion, you would have had an opportunity to read the main recommendation that precedes it in the document.
A. I would have, yes, of course.
Q. Did you help write or edit the main document that precedes your concurring opinion?
A. I obviously -- I would have read -- this was written by -- if I remember correctly, it was written by Maria. There would have been discussions back and forth about factual assertions in the memo. Yes, we would have discussed it.
Q. Okay. And you can see under your concurring opinion, I think -- let's see. Well, I'm sorry. It does not make a reference to any adoption of the language in the main memo. Would you agree --
A. At this point, I don't remember. If you want me to take the time to read my opinion, I will.
Q. No, I -- you know what? I made a



mistake. I thought it was in there. I can tell you it doesn't appear that there's an adoption of any of the language in the main opinion -- or the majority opinion, I guess.
Anyway, let me ask you -- and I'll take a look at another document real quick.
(Deposition Exhibit No. 12, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Okay. This will be Exhibit Number 12. For some reason, I'm jumping ahead.
And as you can see, it's a draft of the document that we just looked at, the Memo of Recommendation by the Working Group, with handwritten edits.
A. Yes.
Q. Is that your handwriting?
A. Yes.
Q. Okay. Very good. So would you agree with me it appears that you did provide some editing and suggestions to the --
A. It appears that way. I did not remember, but, yes, that is my handwriting.

Q. Okay. Very good.
So I want to focus just on Exhibit Number 11 first.
A. Okay.
Q. Which is the final draft.
Okay. And the very top of the page on the first page, the Executive Summary describes what the recommendation will be and why.
A. So you're talking about the entire document, the, shall I say, majority opinion.
Q. Yeah. It's fair to call that the majority opinion?
A. Okay. That's fine if that's --
Q. Okay. In order to distinguish it from your concurring opinion.
A. Yes.
Q. Under Executive Summary, there's a brief summary of what the recommendation is and the reasons for the recommendation, right?
A. That's what it says, yes.
Q. Okay. The conviction is being -- or no, I'm sorry. The recommendation is to vacate the conviction in the interests of justice based on the totality of circumstances underlying the case,



including, but not limited to, facts learned during the investigation and the overarching pattern of misconduct, coercion, physical and psychological abuse, and bias exhibited by certain Area 1 detectives.
A. That's what it says.
Q. Okay. With the understanding that you submitted your own concurring opinion, do you agree with what's in the Executive Summary?
A. I would say, reading it now after over three years, the totality of the circumstances is more important to me.
Q. Than the pattern of the evidence that's described in there?
A. Yes.
Q. Okay. What do you understand totality of the circumstances to mean?
A. Taking everything that we learned during our independent investigation, understanding that we did not have subpoena power; and I don't even recall if we had an investigator at that point.
Q. Okay. Would you agree that totality of the circumstances includes the affidavit of David



Evans?
A. Yes. The weight to be accorded to his statement might differ depending on the individual.
Q. Sure.
In other words, what I'm getting at is, you wouldn't exclude David Evans' affidavit from the totality of the circumstances.
A. No. The -- the mere fact of it would have been taken into account. The weight to be accorded of it might be something different than the three of us would have, you know, attributed weight to.
Q. As you sit here today, do you remember any disagreement between any members of the Working Group as to the weight to be given to David Evans' affidavit?
A. Can you repeat that?
Q. Sure. Do you have any recollection of a disagreement among the Working Group members as to the weight to be given to David Evans' affidavit?
A. The question of recantations or new evidence involves a number of circumstances.
Q. Right. What I'm trying to find out is whether there was a disagreement among the Working



Group members as to how to --
A. I don't remember. I know how I regarded it.
Q. Oh, you do?
A. Yeah.
Q. How do you regard it?
A. Simply because a codefendant a number of years after a crime says the other guy wasn't involved, I look at it, but I have to assess how recently it came about, and the circumstances.
Q. Now, the language we just looked at, he's establishing that Cordell Williams was involved.
A. That's his interpretation.
Q. Okay.
A. That's Mr. Evans' interpretation.
Q. Now, specifically the language we looked at in paragraphs 2, 3, 4 and 5 were --
A. I would have to look at Mr. Evans' -- you're talking about his statement again?
Q. No. Let me back up a second.
And just to make sure that -- and I know you haven't reviewed these documents in a long time. David Evans did not give a statement to

police. He did not give police any information.
A. I'll take your word for it.
Q. Okay. And we'll come to the part where that's discussed in the final memo; okay?
David Evans' description of the events that we went over in the affidavit, where he indicates that Cordell Williams told him to put the gun in the trunk, he told Cordell Williams -- or he told Cordell Williams to pull over, pull over because he had thought he saw rival members who tried to shoot him. Cordell Williams did pull over. He told Cordell Williams to pop the trunk, where the gun was located. He did pop the trunk. And he told Cordell Williams to wait here, I want to see if that's these individuals.
Those are all facts, right?
A. Yes.
Q. They're not interpretations.
A. Yes.
Q. Okay. And this is the kind of evidence the State could use in a case against Cordell Williams under an accountability theory.
A. If they --
MS. BECKER: Object on the grounds it calls



for a legal conclusion.
BY MR. MORAN:
Q. Go ahead.
A. If this -- if the State had chosen to flip David Evans, and he agreed to testify, he could testify consistent with those facts.
Q. Okay. And those are the kind of facts that could be used by the State to build a case against Cordell Williams.
A. Yes.
Q. I think you've used the phrase before "brick by brick" in building a case?
A. That -- that is a famous quote from the advisory committee notes to the Federal Rules of Evidence made by, I forget if it was Wigmore or someone else. But good memory.
Q. David Evans' testimony, if he were to give it, would be one of those bricks; agreed?
A. Yes.
Q. Now, the State could choose to retry Cordell Williams, disregard the confession altogether, and just call David Evans as a witness, along with the other evidence that does not lack integrity; would you agree?



A. They could have chosen.
Q. If the State knew about the affidavit.
A. I -- you know, it's possible. I don't know if they knew. I assume they did. I don't know.
Q. Okay. Let's take a look at Exhibit Number 11 again.
And I want to drop down to midway through this document under the heading --
A. Do I identify the page?
Q. Yeah, I'm going to tell you the page in a second.
It's page 9, under the heading Roman Numeral VII, Summary of Interviews Conducted by the Working Group.
You see where we're at, Mr. Kadish?
A. Yes, I see.
Q. Okay.
A. Sorry. I was reading it.
Q. No, and you're welcome to read through the interviews, but I'm going to direct your attention to the interview of David Evans. You're welcome to read any of the interviews you want in order to create context for the questions I'm



asking.
A. I have no independent memory of interviewing him, but if this is what the memo says, then we did.
Q. Okay. Now, from this -- obviously under the section on David Evans, it's on page 10 under B., David Evans, right?
A. Yes.
Q. Okay. The very first line says: Marc Kadish, Maria Hawilo, and Vincent Southerland interviewed David Evans via Zoom. He is currently in prison, awaiting a release date in 2025.
Did I read that correctly?
A. Yes.
Q. Okay. If you had discussed the affidavit with David Evans and asked him questions about it, would you expect that to have been mentioned in the summary of the interview with David Evans?
A. I don't remember. My intent would have been to ask him about his memory of, you know, the totality of events.
Q. Uh-hmm. In the section regarding David Evans -- and you can see it goes on to the next

page, maybe -- slightly less than a page long.
A. Page 11?
Q. Yeah. It goes on to page 11, about a third of the way down.
Would you like an opportunity to read through this right now before I ask any questions?
A. All right.
I see what's here. I have no independent memory of any of this.
Q. Okay. Would you agree with me that almost the entirety of the summary of the interview with David Evans is about his experiences -- his experience being arrested and interviewed by the police for the murders at issue?
A. That would have made sense.
Q. Okay. You see that there's almost no description of the actual crime itself in the interview of David Evans.
A. Yes.
Q. Would you agree with me that there's no mention at all of David Evans' affidavit in the summary of the interview with David Evans?
A. Yeah, it doesn't say anything about the



affidavit.
Q. Okay. Let's jump down to page -- hang on a second, I skipped it -- page 14. There's a Section E entitled Affidavits?
A. Uh-hmm.
Q. You see that?
A. Excuse me?
Q. You want to take a moment to read that paragraph?
A. I see what's in the letter -- in that Section E.
Q. Okay. There is a reference to the affidavit in Section E; correct?
A. Yes.
Q. All right. And there's a description, a one-sentence description of what is in David Evans' affidavit; would you agree?
A. Could you point out the sentence?
Q. It's the last sentence of the paragraph.
A. That's what the sentence says.
Q. Do you agree that that is the only description, this one sentence, of the contents of David Evans' affidavit?



A. I do not recall. I'll take your word for it.
Q. No, I mean in this paragraph. We're only looking at this one paragraph.
A. Right.
Q. That one sentence is the only description of the contents of David Evans' affidavit in the paragraph under Section E entitled Affidavits.
A. Yes.
Q. Okay. The sentence states: Evans stated that Cordell popped the trunk when Evans told him to do so, but that neither Cordell nor Evans had planned any shooting.
A. That's what that sentence says.
Q. You agree that information from the affidavit is not included such as the fact that Cordell had told David Evans to put the gun in the trunk.
A. The affidavit -- again, the affidavit states what it states. The weight to be accorded it or assumptions or views on credibility might be a different thing.
Q. And that would be addressed somewhere



in the memo itself, right?
A. I do not recall.
Q. Understood. But should it be addressed, the weight to be accorded the affidavit in --
A. Well, that's part of -- that's part of all of our investigations and discussions on weight to be accorded any information that we received.
Q. So when the State's Attorney gets this memo, the State's Attorney will be able to consider the weight the Working Group gave to the affidavit if that explanation is provided somewhere in this report.
A. All I can tell you is you have my concurring opinion about what I thought about the case.
Q. No, I understand that. We're only talking about the affidavit from David Evans; okay?
Paragraph E doesn't contain the fact that Cordell Williams told David Evans to put the gun in the trunk, that Cordell Williams pulled over at the direction of David Evans and popped the trunk -- or, I mean -- I'm sorry, that -- not that last part -- or that Cordell was told that -- to

wait here while David Evans goes in and sees if it's the individuals. Right?
A. I'm -- I'm -- what the language is in that sentence is what the language is in that sentence, yes.
Q. Okay. It's an incomplete description of the affidavit, right?
A. That's what this -- that's what Professor Hawilo put in this memo.
Q. I understand that.
But do you agree that this description is incomplete?
A. I don't know what you're getting at.
Q. What I'm getting at is that the description of David Evans' affidavit under -- in the paragraph entitled Affidavits does not contain the complete description of the affidavit.
A. I mean, evidently David Evans was interviewed. Evidently the affidavit would have been read, and what is in the affidavit is not completely covered by this sentence.
Q. Okay. If there's no other mention of David Evans' affidavit in this report, would you agree with me that the State's Attorney would not



know all of the other allegations in David Evans' affidavit?
A. I don't -- Ms. Lanier received the memo, she received my concurring opinion. What conclusion she determined was not up to us.
We did not participate in the court appearances. We never made a court appearance in any of our cases.
Q. I understand. My question is different, though.
Information in this affidavit that would support a charge of murder under an accountability theory that you agreed to earlier --
MR. BECKER: Objection. That mischaracterizes the testimony.
MR. MORAN: Let me finish. You can object all you want.
BY MR. MORAN:
Q. -- is not included in the report. Do you agree -- or, I mean, in the area -- the paragraph we just read.
A. I've said yes.
Q. All right.
A. The affidavit is different than what is



in here.
Q. Okay. So now my question is: The report goes to the State's Attorney. The State's Attorney reads the report, makes a decision based on the information provided by the Working Group in the report and in your concurring opinion, right?
A. Yes. And Ms. Lanier would be free to ask us or on her own say, I want to see all the documents in the case, I want to see police reports, et cetera.
Q. Of course.
A. I don't know what she -- I don't know how she or anyone in the office reached their opinion on what to do about Mr. Williams. We just made a recommendation.
Q. I understand that.
Now, if the report that Ms. Lanier and State's Attorney Foxx receives does not contain a complete description of the contents of the affidavit or a discussion about the weight to be given the affidavit, would you agree that Ms. Lanier and State's Attorney Foxx would not know then about the full contents of the affidavit from the report that has been submitted?



A. Again, I do not know how they reached their decision in the case, and I do not know what evidence they considered. There would be times when Ms. Lanier would say, I want to look at all the evidence in the case.
Q. You understand I'm not asking that question.
A. No, actually, I didn't.
Q. Okay. What I'm trying to find out is whether, in its simplest form, if the description of the affidavit is incomplete in the report, and there's no discussion of the weight to be given the affidavit in the report, then the State's Attorney and Ms. Lanier would not have the benefit of that knowledge in making decisions on whether to accept, reject, or modify the recommendations --
A. But that's a hypothetical. And if she wanted to ask for all the information in the case and looked at that, you know, she could have. I don't know what she did with -- I don't know how they reached -- "they" being Ms. Lanier and Ms. Foxx -- reached the conclusion on a case. That was beyond our purview. We couldn't say, "we disagree with you."

Q. I'm not asking that question. I'm not asking you to climb into their minds and figure out how they reached their conclusions; okay?
I'm -- it's very limited. You knew you were providing information to the State's Attorney, right? You as a member of the Working Group --
A. Yes.
Q. -- knew you were providing information to the State's Attorney. And you knew the State's Attorney would take that information and consider it in deciding what to do, right?
A. Yes.
Q. Okay. And if you don't give the State's Attorney information about the case, the State's Attorney doesn't have any way of knowing about it; agreed?
A. I -- I don't know if I can agree because I don't know -- again, I don't know what exactly she -- she could on her own say, get me the file, let me look at David Evans' statement.
Q. Did the State's Attorney or Ms. Lanier, in every case that you provided a report and a recommendation, ask for the complete file from the



Working Group?
A. Sometimes she did. Sometimes she would have independent ability to get it. Sometimes she would ask for a discussion of the facts.
Q. Okay. If they don't know the full contents of the affidavit, and the discussion in the report doesn't -- there's no discussion in the report about the weight of the affidavit, how would the State's Attorney or Ms. Lanier know to ask for more information about the affidavit?
A. I do not have independent memory of our discussions with Risa Lanier about Cordell Williams. I do not know myself what discussions they had within the office. I do not know if they took the Evans affidavit from 2017 into account.
Q. Well, I guess what I'm trying to find out is, how would they even know to consider it beyond what is described in the report?
A. I don't know because my decision on the case was my decision on the case, and I'm trying to remember what the basis of my -- you know --
Q. Okay.
A. -- four years later of why I reached -- you know -- I went -- I wrote what I wrote.



Q. That's fair. I'll tell you what; why don't you look at the concurring opinion on the last page or two right now. And take a moment to review it so you know your position -- what your position was.
A. Well, according to my opinion --
MS. NOLL: Wait for a question.
THE WITNESS: Oh, I'm sorry.
MR. MORAN: Give us one second. She's whispering.
BY MR. MORAN:
Q. Okay. Have you had a chance to look at your concurring opinion?
A. Yes.
Q. All right. And does your concurring opinion discuss the affidavit of David Evans at all?
A. No.
Q. Okay. Now, let's go over a couple things about your concurring opinion.
Your vote is to set aside the conviction based on the interests of justice.
A. Right.
Q. And you identify the grounds for your decision, right?



A. I hope so.
Q. Okay. And at the very outset of your opinion, you identify what the procedures and guidelines state about making a determination on -- in the interests of justice, right?
A. Right.
Q. So you're sort of setting forth the standard that you're going to apply to your analysis; is that true?
A. That's what it says. That's what I wrote back then.
Q. All right. The -- and there's a description of -- you write: The integrity of the conviction rests on statements Mr. Williams made to police and State's Attorney. Without these statements, the State's evidence consists of, and then you identify the evidence. Is that true?
A. Yeah. There was independent evidence which possibly could have led a trier of fact to conclude that Mr. Williams aided and abetted Mr. Evans in the murders.
Q. Okay. And in your view, that evidence, without Mr. Williams' court-reported statement, is not enough to meet the burden of proof for a

criminal conviction.
A. That's what I wrote at that point. As I sit here now, my memory of -- my memory of it was that there was independent -- there was some independent evidence and there was also a question of Mr. Williams' credibility.
Q. Why did you question his credibility?
A. I think that was Mr. Williams' admission that he was the last driver of the vehicle, but claimed he arrived home at 10:30, which was about an hour and a half before the incident, and the fact that at 1:30 the car's radiator was still warm.
Q. Now, if the State were to retry the case without the confession, it could rely on the fact that Mr. Williams made this misleading statement to police about what time he arrived home with the car.
A. Yes.
Q. And I think you've used the phrase that suggests guilty knowledge or something like that.
A. Yes.
Q. Okay. The State could also use the testimony from Officer Sanders, who saw the car



leaving the crime scene and speeding away.
A. Yes.
Q. All right.
A. All the things that I put in that paragraph could be taken -- could be taken into account by the State's Attorney's Office.
Q. And if the State's Attorney was considering a retrial of Mr. Williams without the confession, those are things that you pointed out could be used by the State.
A. Yes.
Q. Okay. The State could also use the affidavit of -- or the testimony of David Evans --
A. If he chose to testify.
Q. -- if he chose to testify. And we know from the affidavit that Mr. Evans provided to Cordell Williams that he is not remaining silent.
A. I'm sorry, what?
Q. We know from the affidavit that he provided to Cordell Williams that Mr. Evans is not, at least that the time, was not remaining silent.
A. No, not at -- in 2017, as opposed to when the conviction took place. But I can't remember the date of the conviction.



Q. 1995.
A. Pardon?
Q. 1995.
A. All right. So that is a statement made by a codefendant -- I can't even add -- between 1995 and 2017. A long time after the crime.
Q. Right. My question is specific to a retrial. So the State vacates the convictions, disregards the court-reported statement, and decides there's enough evidence here to retry the case. That's an option State's Attorney Foxx could have taken, right?
A. Could have.
Q. And if she knew about this affidavit, she would know that David Evans had at one point agreed to provide information that the State could use by calling him as a witness in a case against Cordell -- in a retrial against Cordell Williams.
A. From the language of the affidavit, he thought he was helping Cordell.
Q. By providing the affidavit?
A. Yes. Obviously that's why he gave it.
Q. But that doesn't change the fact that he provided facts the State could use to retry



Cordell Williams for the same crime.
A. Yes.
Q. Okay.
A. If he chose to testify, or forced to testify.
Q. But from your concurring opinion, State's Attorney Foxx would not know that information.
A. I don't know what -- again, I do not know the totality -- they were free to obtain any evidence that they wanted independently of us. We were not part of their internal discussions.
Q. Understood. Understood.
My question is simply that the State's Attorney would not know about the details in David Evans's affidavit --
A. I --
Q. -- from your own concurring opinion.
A. I don't know what she would know.
Q. Well, the details of David Evans' affidavit -- from David Evans' affidavit are not in your concurring opinion, right?
A. You're correct, there's nothing about David Evans' affidavit. I was focusing on

ineffective assistance of counsel, mentioning some of the evidence available, and then there was the issue of the emerging adult for sentencing -- resentencing.
Q. Yes, I do want to address that. Okay.
And you're -- so after the description of the evidence, for example, what Officer Sanders' testimony indicated, or the temperature of the -- or the fact that Mr. Williams had not been forthright about what time he came home with the car, you discuss in the rest of your report Mr. Wiener's decision to withdraw the motion to suppress.
A. Yes.
Q. Okay. And he actually quotes some of the transcript where the judge did not interrogate Cordell Williams about his understanding of the decision to withdraw the motion to suppress.
A. Yes.
Q. Okay. And that is what, in part, the decision to withdraw the motion to suppress and not getting -- allowing the judge -- or the judge's failure, I guess, to interrogate Mr. Williams is part of what you're relying on to conclude there



was ineffective assistance of counsel.
A. Yes.
Q. Okay. You provide an alternative recommendation in your concurring opinion, and that is -- I'm going to paraphrase -- but effectively if State's Attorney Foxx did not agree to vacate the conviction, there should be a new sentencing hearing because of his status as an emerging adult.
A. Yes.
Q. Okay. And that is the one alternative I think you mentioned earlier that you felt appropriate to give State's Attorney Foxx in a case like this.
A. I did.
Q. Okay. I'm going to come back up now.
MR. KUBLY: Pat, are you moving to a new document? And if so, can we take a break?
MR. MORAN: You can take a break.
MR. KUBLY: I just don't want to interrupt a line of questioning.
MR. MORAN: No, no, no, it's good. Go ahead.
THE VIDEOGRAPHER: We are now going off the record at 3:53 p.m.
(Recess taken.)



THE VIDEOGRAPHER: We are now going back on the record at 4:07 p.m.
BY MR. MORAN:
Q. Okay. Mr. Kadish, we had just been talking about your concurring opinion, and I wanted to move up back into the main majority opinion to page 11.
And this is the description of the interview of Cordell Williams taken on November 30, 2021, by Maria Hawilo.
A. Correct.
Q. Okay. Now -- and, in fact, before I forget, would it be fair to say that your conclusion and your decision that you recommended -- or your recommendation, I should say, identified in your concurring opinion, you did not take into account the pattern and practice evidence?
A. I do not recall if -- I assume I -- I don't know what you mean "taken into account." I'm sure I considered it, and if it's not in my concurring opinion, that means it did not provide a factor in my decision.
Q. Okay. I think that answers the question.



Okay. So we're on page 11, and you can see there are -- going on to page 12, there's 16 paragraphs describing the information provided by Cordell Williams. You see that?
A. Yes, I see it.
Q. Okay. I want to direct your attention to paragraph 2, which states: Williams stayed at the party for two to three hours and then decided to drive home. He had to work the next day. He offered rides to anyone who wanted them. At some point before Williams himself got in the car, Evans asked for his keys. He gave him his keys. Williams believes Evans may have put the gun in the trunk at that time, but Williams did not see him do it, nor did they discuss it.
Did I --
A. That's what it says.
Q. That's what it says.
Is that information inconsistent with what David Evans put into his affidavit?
A. It appears so.
Q. Is that a factor to consider by the Working Group that Cordell Williams provided information that is inconsistent with what David

Evans put into his affidavit?
A. That would be things that I would have considered myself.
Q. Okay. I'm going to ask you some questions about Cordell Williams' allegations regarding his interview.
A. His interview with Professor Hawilo?
Q. Yes.
A. Not his interview with the police.
Q. I'm talking about with -- his interview -- what he told her about his experiences with the police.
A. Okay.
Q. Okay? I'm trying find it real quick.
According to Mr. -- or, actually, strike that. I'm going to come back to that in a little bit.
Mr. Williams alleges that Detective Foley is the individual who struck him during his interrogation. And you can see that. That is on page -- or paragraph 14.
A. Yes.
Q. Do you have any recollection that the Working Group was unable to confirm that Detective



Foley had -- was present on the day that Cordell Williams was interrogated?
A. Whether he was working that day?
Q. Yeah.
A. I do not recall. I have no independent recollection of that.
Q. The records that we received, and there is some mention of it later in this report, that the Working Group was unable to confirm that Detective Foley is the individual who struck, allegedly, Cordell Williams.
A. I don't remember, and, quite frankly, I don't even know if Foley was one of the seven detectives.
Q. I can tell you that he was.
A. He was?
Q. Yes. Now, let's assume for a minute that the Working Group is unable -- the Working Group gets information suggesting that Detective Foley was not there that day; okay? Should this case have gone back to the State's Attorney's Office given that Detective O'Brien and the other detectives identified were not on the list?
MR. BECKER: I'm going to object on



speculation.
THE WITNESS: Would you repeat your question?
MR. MORAN: Yeah, I'm going to actually ask her to read it back for you.
(Question read.)
THE WITNESS: Were not on the list?
BY MR. MORAN:
Q. The list of seven detectives.
A. I don't -- we were given the name of seven detectives to investigate. We were also assigned the cases to investigate. If, during the investigation, an allegation came up about a different police officer simply because they weren't one of the seven, we would not, shall we say, ignore it; we would not say, oh, he's not on the list of seven, we're not going to look at this at all.
Q. Okay. Would you alert the State's Attorney's Office that the case you're looking at now appears to not include any of the detectives on the list of seven?
A. I assume at some point we did, but there were other cases and other detectives.
Q. Okay. Let's jump down to paragraph --



I'm sorry. Page 14, under Roman Numeral VIII, Recommendation and Reasons. And this is under the heading: Circumstances surrounding Williams' detention and interrogation supports our recommendation of vacatur in the interests of justice. You see where I'm at?
A. I see that paragraph.
Q. Okay. And the first paragraph provides descriptions of what was -- Williams at least alleged was his experience with the detectives.
A. You mean in this paragraph.
Q. Yes.
A. Yes, that's what it says.
Q. And I want to focus on: He further alleged, both in writing and during opening statements at the motion to suppress, that he was interrogated throughout the night, refused food and bathroom facilities, was not permitted to call his father for several hours, despite multiple requests. You see that?
A. I see that.
Q. Okay. In this lawsuit -- you probably don't know this -- but Mr. Williams has testified already.

A. I have no idea. I -- since Mr. Becker is here, I assume there's a lawsuit pending. I know nothing about this whatsoever.
Q. Okay. You obviously -- you've seen the caption of the lawsuit on the subpoena that we sent you?
A. I suppose so. I assume so.
Q. Do you have any understanding about what the lawsuit is about?
A. Mr. Williams' claim is that he's actually innocent and that he was wrongfully convicted.
Q. That's a pretty good description. Okay. Mr. Williams testified at a deposition.
A. Okay, I'll take your word for it.
Q. And in his deposition testimony, he admitted that he was provided multiple cheese-burgers before he ever met Detective O'Brien, who, along with Detective Foley, he alleges were the people who abused him.
If that's true, that would be inconsistent with the information that's in paragraph 1. Would you agree with me?
A. I'll take your word for it.



Q. If Mr. Williams is telling the Working Group that he was denied food, but later on testifies that he actually was given food before he met the detectives he's accused of misconduct, is that a data point you would want to consider as a Working Group member in your analysis?
A. Well, what we knew in 2021 and what we know now is completely different.
Q. I understand. I'm asking, is that information you would want to consider in your analysis?
A. Yes.
Q. If Mr. Williams provides information that is inconsistent with his allegations -- strike that.
If in his lawsuit he testifies in a way that is inconsistent with the allegations he made to the Working Group, is that -- are those data points that you'd want to consider in the analysis?
A. If we had known it back in 2021, of course. But I -- you know, we would not know in 2021 that he's going to testify in 2025 or whenever --



Q. Sure. Of course.
And those inconsistencies would be a consideration because it affects his credibility.
A. Credibility was always key to what we investigated in all of our cases.
Q. And the more evidence you have of a credibility problem with Mr. Williams, would it be more likely that you question whether his allegations of abuse are true?
A. Inconsistencies in statements and testimony is always taken into account with respect to credibility.
Q. And that would be true in the Working Group's analysis.
A. It would be true in my analysis.
Q. Okay. Do you know whether your colleagues on the Working Group share that view, that you should take inconsistencies or credibility issues with the claimant into consideration?
A. We discussed credibility of witnesses and defendants throughout our -- the existence of the Working Group.
Q. Okay. Was it your understanding that Mr. Williams was interrogated for the duration of



his time at Area 1? In other words, he's brought there and the interrogation starts and there's no real stop.
A. I have no independent recollection of that.
Q. I'm going to drop down to the next page. This is on page 15. In the middle of the page, just before the next section, entitled Length of Detention, the paragraph starts with "We do not know." I'm going to read that paragraph.
We do not know, and cannot say which particular detective actually physically abused Mr. Williams, but do not believe Mr. Williams must provide proof of the name of the individual detective who abused him. As detailed below, the State's Attorney's file has hindered our investigation, and we have considered the missing file in reaching our conclusions.
Okay. There's two things I want to ask you about right there.
One, does that help you remember anything about whether the Working Group was able to identify the officer or the detective who allegedly struck Mr. Williams?

A. No, it does not.
Q. Two, is it appropriate for the Working Group to consider the fact that the State's Attorney can no longer locate a file in reaching its conclusion?
A. Having any and all files in a case, if we could get them, would have helped in our analysis. I have no independent recollection of whether the missing file, what happened to it, where it was, or anything.
Q. Okay. I want to come back to Cordell Williams' interview. And this is on --
A. Which interview?
Q. With Maria Hawilo.
A. Okay.
Q. On page 11 through 13. If you can just take a moment and go through these paragraphs numbered 1 through 16. I'm going to ask you if there's any information in these 16 paragraphs --
A. Let me read them.
Q. Well, I'm going to tell you what I'm going to ask you about so you know when you're reading them, you have that context in mind. I'm going to ask you whether you see any information in



those 16 paragraphs that suggests Mr. Williams was asked about David Evans' affidavit.
A. Well, paragraph 1, I see the name David Evans.
Q. Right.
A. Paragraph 4, I see David Evans mentioned. Likewise 5, 6, 7.
I see Evans' name in paragraph 16.
Q. Okay. So you just went through and you identified the paragraphs in which you spotted David Evans' name, right?
A. Yes.
Q. Did you spot any reference in those paragraphs to David Evans' affidavit?
A. Evidently not.
Q. Did you spot any information that leads you to believe that questions were asked about David Evans' affidavit?
A. You mean during Professor Hawilo's interview.
Q. Yes.
A. I don't know. If it's not in her report, I have no independent recollection of whether or not she may have asked them about that?



Q. Okay. Let's take a look at paragraph 5. You mentioned that you saw David Evans' affidavit in paragraph 5.
A. The one that says "when he heard Evans say 'pull over'"?
Q. "Pull over, some bricks." You see that?
A. Yes, I see that.
Q. Okay. Do you know what the reference to bricks is?
A. I think rival gang members.
Q. Is there any mention --
A. I could be wrong. I don't think it's about building a brick wall.
Q. No, no, your answer is fine.
Do you see any mention in paragraph 5 about the -- or strike that.
In paragraph 5, Williams agrees that he said, without thinking, I pulled over. Evans asked him to pop the trunk, and he popped the trunk using the key pad. That's what he says, right?
A. That's what it says.
Q. Okay. The next paragraph, paragraph 6, do you see any reference to the affidavit in paragraph 6, David Evans' affidavit?



A. Not the affidavit, no.
Q. Okay. In paragraph 6 it states "he," meaning Cordell Williams, believes Evans took the gun out of trunk, but isn't sure and wasn't sure back then.
Let's just stop there.
A. That's what it says.
Q. That's what it says. And that line would be inconsistent with the fact -- or with the allegation -- or I should say the averment in David Evans' affidavit that Cordell Williams told David Evans to put the gun in the trunk because he knew David Evans had a gun.
A. Yes, I remember what that says in David's affidavit.
Q. Okay. The next sentence says: Williams dozed off for a minute -- few minutes, heard gunshots, and started to pull off and drive away.
And that's Mr. Williams' description of his realization that there had been gunshots and he should drive away, right?
A. Yes, I see that.
Q. Okay. Is there any mention in

paragraph 6 of David Evans' affidavit?
A. No.
Q. Any mention in paragraph 6 that would lead you to believe Cordell Williams was asked about any allegations in David Evans' affidavit?
A. I have no knowledge because I can only read what's in here, and it was Professor Hawilo who conducted the interview.
Q. Got it. In paragraph 7, is there any mention of the affidavit by David Evans?
A. No.
Q. Is there any indication in paragraph 7 that Cordell Williams was asked about allegations in David Evans' affidavit?
A. There's nothing about David Evans' affidavit.
Q. Okay. And in paragraph 16, which you identified is another paragraph that mentions David Evans, do you agree with me that there's no mention in that paragraph regarding David Evans' affidavit?
A. Correct.
Q. Okay. Let me give you another exhibit.



(Deposition Exhibit No. 13, Witness Kadish, was marked for identification 10/30/2025.)

BY MR. MORAN:
Q. Okay. Ready, Mr. Kadish?
A. Yes.
Q. All right. Exhibit 13, which has just been handed to you, is a document that doesn't have a title. It does have a Section A on the front page that says: Pattern and Practice evidence provides a separate, independent ground for vacatur in the interests of justice.
And I'll represent to you that at Risa Lanier's deposition yesterday, she agreed that this was the pattern and practice memo that was given to her alongside the memo regarding the case-specific memo that we just looked at.
A. I have no idea -- no independent recollection of this particular memo. I have no idea who wrote it or anything.
Q. Okay. Do you have any reason to believe that before today, you ever saw this document?
A. Where it talks about the protocol, you



know, I recognize that language.
Q. Okay. So you're welcome to page through it, but I will tell you that this is the document that contains the pattern assessment that we discussed earlier.
And I think you mentioned that the pattern assessment wasn't mentioned in your concurring opinion is not a factor in your decision.
A. That's correct; if it wasn't in my concurring opinion, then it's not something I took into consideration.
Q. In that instance, this particular Exhibit Number 13 would not have been relevant to your analysis.
A. As I said, I have no independent recollection of this document. The question of pattern and practice evidence was something that was always discussed and could be the subject of disagreement among the three of us.
Q. Got it. My question is just that if you don't -- you indicated if it's not mentioned in your concurring opinion, pattern and practice was not a factor. In light of that, this document



would not have been a factor in your analysis either.
A. Not in the Williams case, that I recall.
Q. Okay. All right. One more exhibit for you.
By the way, you provided billing statements to the State's Attorney's Office regarding your time?
A. Yes.
Q. Obviously you were charging, I think 185 an hour?
A. That's what we were told our rate was.
Q. Okay. The -- I assume that obviously all your billing statements would have been accurate, right?
A. I hope so.
Q. Yeah. There's no reason to doubt that --
A. Okay.
Q. -- as you sit here today.
A. Thank you.
Q. I'm not telling you. I'm asking you if you agree there's no reason to doubt it.
A. Yes. I kept -- I tried to keep daily

time records.
Q. Okay.
A. Of all my work -- all my working hours at Mayer Brown.
Q. Bear with me, I'm almost --
(Discussion off the record.)
(Deposition Exhibit No. 14, Witness Kadish, was marked for identification 10/30/2025.)
BY MR. MORAN:
Q. Here you go.
Okay. We're look at Exhibit Number 14. And this is entitled -- or to Maria Hawilo and Vincent Southerland from you, regarding Cordell Williams, and it's called Response to Maria's draft of 2/24 on Williams case.
You see that?
A. I have no independent recollection of having written it. I will say that I -- that's entirely possible.
Q. Okay. It looks like a draft of your concurring opinion.
A. Probably.
Q. Do you want to take a minute -- and



it's not long. You want to take a minute, it's a page and a half, just read through it real quick and tell me if you would agree with that characterization?
MS. NOLL: It's double-sided.
MR. MORAN: Yeah.
THE WITNESS: Okay. I've read it.
BY MR. MORAN:
Q. Okay. Do you agree that this appears to be a draft of the concurring opinion you provided in --
A. I don't know if I would call it a draft, but it was my thoughts in response to Maria's lengthy exposition.
Q. Okay. It begins by saying, under Conclusion: I am willing to recommend vacatur based on interests of justice because, and then there's --
A. Yeah.
Q. -- reasons identified below.
A. Yes.
Q. Okay. "I" would be a reference to you?
A. Pardon?
Q. "I" would be a reference to yourself?



A. Oh. Yes, yes.
Q. Okay.
A. I'm sorry. It's -- it's 4:30, you know. But that's okay, I'm fine.
Q. I promise you, we're almost done.
A. I'll take your word for it. I'm fine, though.
Q. This is written in the first person.
A. Yes.
Q. In other words, your perspective.
A. Yes, yes. I am the "I".
Q. Okay. And it starts off with the same standard that is in your file draft that's attached to the --
A. Yes.
Q. -- majority opinion, where you cite the Working Group Procedures and Guidelines as to what is required --
A. Right.
Q. -- to find a loss of confidence in the integrity of the conviction.
A. Yes.
Q. Okay. I want to direct your attention to a couple of things.



Under Number 4 you write: I do not believe that the number of interrogations over a 24-hour period are dispositive.
Is that a position that you stand by today?
A. I think I'm a bit more concerned about the length of interrogations based on the work, the research that we did.
Q. You mean as a member of the Working Group?
A. Yeah.
Q. And that was -- specifically are you referring to an article, draft, written I guess by -- Law Review article written by Steve Drizin and Richard Leo?
A. About the length -- I remember talking with Professor Drizin about the lengths of interrogation. I remember that we interviewed a professor. I do not remember his name. I believe it was the one -- it makes sense that it would have been the one that Steve introduced me to.
Q. Okay. And by length of interrogation, is that equated to total time in custody, or is it just the time of actual questioning?

A. Both.
Q. And how does -- total time in custody, how is that a factor in your mind?
A. I believe there's a -- should be a limited amount of time that a defendant should be questioned over a continuous series of hours or days.
Q. And does the questioning -- in the Cordell Williams' case, for example, he was -- the police showed up at his home. Officer Sanders saw the car getting away -- or driving away, took down the license plate; the license plate was connected to his parents; police showed up at his home roughly 30 minutes later and asked him questions about what he'd been doing that night.
A. Right.
Q. Are -- that limited period of time when those questions are being asked, is that, in your mind, the equivalent of an interrogation?
A. No.
Q. When the officers came out of the house with Cordell Williams and touched the radiator of the car to test how warm it was in order for them to determine when it was last driven, and asked him



questions about that, is that all an interrogation, in your mind?
A. Not from what I would consider interrogation in a police station by officers. This was just on-the-scene investigation.
Q. Okay. So one of the requirements for an interrogation would be that the individual is detained at the police station.
A. Or detained in a car and being questioned.
Q. Okay.
A. It's the question of detainment.
Q. That's the critical factor?
A. One of them, yes.
Q. What's another critical factor for you?
A. I think -- let me say detainment. You know, were they free to leave.
Q. Okay. Now, if Mr. Williams has testified that he was aware of his rights and he agreed to speak with the detectives when he was brought to Area 1 during the different times he was interrogated, would you have any concerns then about those interrogations at least being taken within the period of time he was at the station?



A. First of all, that doesn't take into account allegations of police misconduct or, you know, in other words, I gave this statement because I was beaten up. But if there's breaks in the questioning, I would take that into account.
Q. So, in other words, breaks in -- I'm not talking about other allegations of misconduct. We're only talking about the length of time -- the number of interrogations within a period of time.
In that period of time, if Mr. Williams agrees that he agreed to speak with the detectives, breaks are taken, he's allowed to use the restroom and he's fed, is your concern about the number of interrogations then still there, at least up to those -- that point?
A. Well, it would depend on how long the interrogations and over how -- period of time. If he's kept in custody continuously for, like, four days, even if there were breaks, I would take that into account.
Q. Sure. Mr. Williams says he was there for 27 hours, and he -- between the time he was brought there and the time he met Detective O'Brien sometime midday or in the afternoon, there were



multiple breaks given, he -- interrogations lasted roughly 20 minutes, and there was like one or two or maybe three, and he was fed.
Between the time he's brought to Area 1 and before he first is introduced to Detective O'Brien, do you have any concerns about the number of interrogations?
A. As I say in my first paragraph -- my first sentence in paragraph 4, I do not believe that the number of interrogations over a 24-hour period are dispositive.
Q. Okay. I want to talk about the next sentence.
You write: What corroborates his claims is the possibility that after he continuously denied involvement, a detective might have become frustrated and then slapped him and punched him in the stomach.
I'm going to stop there.
Do you agree that's speculation?
A. With respect to this case, it's speculation. I -- do I believe that on occasion Chicago police officers do such things? On occasion, yes.

Q. Yeah, my question is a little different.
The way you phrased it in this sentence was the possibility of certain things happening because an officer became frustrated corroborates his claims.
A. It could have, but they were never tested because the motion was withdrawn.
Q. Got it.
If -- I want to go back to the question I asked, though.
The events that you've described as corroborating type evidence, do you agree that it's speculation as to whether an officer became frustrated and decided to strike him?
A. I have no independent knowledge of whether the detective in this case actually, whoever the detective was, did become frustrated.
Q. Okay. You also write at the end of that paragraph that it's possible that Mr. Williams was led to believe he was a witness rather than a defendant because the detectives took him out of the police station to look for David Evans, the codefendant who shot the victims.



A. It is -- as I wrote, it is possible.
Q. That too would be speculation, though, right?
A. I don't know the difference between possibility and speculation, but that's what's in the paragraph.
Q. Okay. Certainly when you've tried cases, you've objected to speculation before?
A. Yes.
Q. So you know what speculation-type questions are.
A. Yes. I'm speculating what you're trying to get at, but, you know, that's part of the game.
Q. Apply that knowledge here. If you are saying this possibility could have occurred, that's speculation unless you have evidence that it did.
A. Yes.
Q. Okay. I want to direct your attention to the next page. And this is under a heading called section -- Roman Numeral II.
A. Wait, wait. What exhibit are you referring to now?
Q. This is the same exhibit, Exhibit 14.



A. Oh. All right.
Q. At the bottom of the first page, Roman Numeral II begins: I also take into account that Mr. Williams still has a pending Petition for Post-Conviction Relief.
And then on the next page you provide some information about that position.
I want to look at the paragraph c).
A. B)?
Q. C)?
A. C).
Q. You wrote: I do not find that Mr. Williams is entitled to a Certificate of Innocence. You see that?
A. Yes.
Q. What do you base that on?
A. If I thought that there was evidence that could have been considered by a trier of fact to determine whether he was or was not -- could be found guilty beyond a reasonable doubt.
Q. Okay. I want you to take a look at the final memo, Exhibit Number 11, and turn to your concurring opinion.
A. Yes.



Q. Okay. At the end of your -- well, anywhere in your concurring opinion, if you want to look at the whole thing, but it does not appear that there's a reference to your position on the certificate of innocence.
A. That's correct.
Q. Why did you take that out?
A. Well, it's one thing while we're talking internally about recommendations in a given case. The question of whether or not the State's Attorney's Office would decide whether to contest or agree with the Certificate of Innocence was beyond our project.
Q. Take a look at Exhibit No. 13 again.
A. Okay.
Q. In -- no, I'm sorry, it's 14. I apologize.
A. You're getting as tired as I am.
Q. Yes, I am.
A. Number 14.
Q. Okay. Again we're looking at the second page, which is the flip side, under a) and b) you point out -- the first thing you point out in those sections: It is not -- while our mandate

does not encompass pending court actions -- and then you describe your concern about the multiple different entities at the State's Attorney's Office that overlap.

And then in b), you write: Also, while outside our mandate, I have taken into account the co-defendant who shot two victims and had a natural life sentence reduced to 60 years because of his juvenile status at the time of the crime.

So you obviously recognized when you wrote this document that you were making recommendations outside of your mandate.

A. Over the course of four years, there's a number of things that evolved, shall we say, and I was trying, in my own way, to do what I thought was right.

Q. Okay.

A. And so even though it was outside of our mandate, it was something that I wanted to be known as my position.

Q. So why not include the position on the Certificate of Innocence in the final draft given that you were taking a position on what you think



is right?

A. I did not think he was entitled to a Certificate of Innocence.

Q. Do you stand by that opinion today?

A. Yes.

Q. Do you know whether he got one?

A. Pardon?

Q. Do you know whether he got one?

I'm sorry. Do you know whether Cordell Williams was awarded a Certificate of Innocence?

A. I actually do not know. I assume he got one because he's got a pending civil case.

Q. Are you familiar with the statute, the Certificate of Innocence statute?

A. As I sit here today, no. I mean, I know that there is a Certificate of Innocence statute. I know that it is up to the State's Attorney's Office to decide whether or not to issue one -- not issue. It's up to a judge. But whether or not to oppose them.

Q. Okay. I'll ask you a question about the draft final memo with your handwritten edits on it.



A. All right.

Q. Actually, I'm going to ask you another question before I dive into that document.

Did Bob Milan ever warn you that he thought you were being used by the State's Attorney's Office as a member of the Working Group?

A. Not that I recall.

Q. Did he ever share his concerns that there was a huge conflict of interest involving the Lawyers' Committee, the lawyers on the Lawyers' Committee, and their role with the Working Group?

A. Bob had many opinions, some of which I agreed with, some of which I didn't agree with.

I do not believe we've spoken in several years. I even remember meeting him once at the botanical garden when Susan and I were there and he had taken a bike ride, but we just talked about our families. So I don't have any memory of Bob's positions, nor do I -- even if I disagree, we talk about disagreements in general.

Q. Okay. Turning back to that Certificate of Innocence language -- you don't have to look at it.

Were you instructed by anyone to



take that language out of your draft?

A. No.

Q. Did you discuss whether you were going to make a recommendation on the Certificate of Innocence with --

A. I thought that was beyond -- I did not want to venture into that area in a final recommendation. I did not think it was our role.

Q. Okay. Did you have any conversations with the State's Attorney's Office about making a recommendation on a Certificate of Innocence?

A. No.

Q. And is that true with all of the cases you reviewed, you never had that type of conversation?

A. I do not believe we did.

Q. Okay. So now we're looking at Exhibit Number 15 -- or no, not 15. What is this one again?

MR. BECKER: 12.

BY MR. MORAN:

Q. 12.

A. My concerns?

Q. No.

A. Oh, the draft.
Q. Exhibit Number 12, which you had confirmed for us contains your handwritten edits. I have a question about some of the edits on page 4.
In the right-hand margin, about a third of the way -- a third of the page down, there's the phrase "this doesn't help. Sounds like it was a plan."
A. Yeah, I see what I've written.
Q. Okay. And there's a line pointing to the sentence: "Mr. Williams had his headlights off."
A. Yes.
Q. Okay. As you sit here today, do you have any recollection as to why you included that comment?
A. All I can do is see what I've written. "This doesn't help. Sounds like it was a plan" meaning that it's part of aiding and abetting.
Q. Right. So, in other words, it could be construed as inculpatory evidence.
A. Yes.
Q. Okay. What was your concern about



help? When you wrote "this doesn't help."
A. Doesn't help his position.
Q. And was the Working Group advocating his position at this point?
A. Advocating his position?
Q. Yes.
A. That he was completely innocent?
Q. In any way, shape, or form.
A. These were discussions we had about Mr. Williams' involvement, whether he was actually innocent, or whether in the interests of justice. We discussed many things during four years and 20 cases.
Q. If your -- and was the comment here made to inform Ms. Hawilo, who had been the primary drafter, to delete that sentence?
A. No. No, I don't know if she deleted it or not. It was -- it was just a comment that having his headlights off was a fact that could be taken into account by the trier of fact and it could lead them to a position of that he aided and abetted.
Q. Is it important information for the State's Attorney to know that one of the facts,



under the totality of the circumstances, is that Mr. Williams had his headlights off, which you believed could be evidence used to support a conviction for aiding and abetting?
A. I think it is a fact that should -- that could be taken into account, yes.
Q. How is it impartial to write an edit into this document where you're saying "this doesn't help"?
A. This doesn't help his position of innocence. It was conversations between the three of us on how to reach a conclusion. It had nothing to do with impartiality.
Q. Okay.
A. It's part of the back and forth between the three of us over a four-year period.
Q. I guess I'm just trying to understand why that comment was introduced as "this doesn't help."
A. I have no independent recollection of that now. The words are what the words say.
Q. Okay. Was there an attempt by the Working Group at this point to help Mr. Williams?
A. No.



Q. At the top of the page it says: Do we know if -- do we know it was Evans' gun. If it was Evans' gun, didn't -- something -- see him.
And I think it's "Cordell."
Can you take a look that the comment and tell me -- and just translate it? I can't totally read all your handwriting.
A. I can't read it either.
I can tell you what I think it says.
Q. Sure.
A. "Do we know it was Evans' gun? If it was Evans' gun, didn't Cordell see him put it in the trunk."
Q. Okay. Do you think you wrote that comment in after you had a chance to review David Evans' affidavit?
A. I don't remember.
Q. That comment suggests you were aware of the claim in David Evans' affidavit that Cordell Williams told him to put it in the trunk and popped the trunk for him.
A. Would you -- the question -- the question of whether Williams knew that Evans had a gun which was put into the trunk and then the trunk

was open was something that I would have taken into account.

Q. Okay. Do you know if the final draft included the information identified in your comment?

A. I don't remember.

Q. Okay.

A. I don't know.

Q. Let me finish the question.

A. Pardon?

Q. Let me finish the question.

A. I'm sorry.

Q. For her.

Do you know if the final draft of the memo containing the Working Group's recommendation included what you're pointing out in this comment that Cordell Williams saw him put the gun in the trunk?

A. I have no independent recollection one way or another.

MR. MORAN: Okay. Give us couple minutes, I think we're coming up on the end.

THE VIDEOGRAPHER: We are now going off the record at 4:59 p.m.

(Discussion off the record.)



THE VIDEOGRAPHER: We are now going back on the record at 5:06 p.m.

BY MR. MORAN:

Q. Okay, Mr. Kadish. Question for you on some of the evidence you may have looked at in your investigation of the Cordell Williams case.

Would you have looked at photographs taken of Mr. Evans after he gave his court-reported statement?

A. Yes, we would have -- if there was photographs taken, we would always look at them.

Q. And one of the reasons to look at them, to see if there are injuries consistent with the type of physical abuse that Mr. Williams has alleged?

A. Yes.

Q. Okay. And if there were other factors you may want to look at, for example, the way his clothing looked, or whether there was blood on his clothing, or something like that, that might be consistent with his description of the injuries, that would be information you'd want to look at?

A. Yes.

Q. Okay. How about talking to the court



reporter who took his court-reported statement, is that a person you would have wanted to speak to to get an idea of what transpired?

A. If there was a transcript available. But given the fact that -- that would have happened in the initial bail hearings, which at that point were very, very brief, and my experience is that the court reporters would have no independent recollection of anything like that unless it was on the record.

Q. Okay. And same question with respect to the felony review state's attorney who took the court-reported statement. Would you have wanted to speak with that person regarding Cordell Williams' allegations?

A. If they were available and we could find them, I would try. There were many -- excuse me. There were many occasions where I reached out to former state's attorneys to ask them about their memory of cases.

Q. The person -- the name of the individual, the Felony Review attorney who took the court-reported statement of Cordell Williams is Greg Vaci. Do you know that name?



A. I remember the name.

Q. Okay. If Mr. Vaci is alive and well and living somewhere in the Chicago area, and you could have an investigator find him, would you have made an effort to speak with him?

A. Yes.

Q. Do you know if that was done, if an effort was made to locate him?

A. In every case where we had the state's attorney's name, I would try to reach out to them. I thought that they might respond to me better because I have been in the system locally for a long time.

I don't recall any state's attorney, any former state's attorney ever calling me back.

Q. Okay. If your investigation, as a member of the Working Group, or in the course of your investigation as a member of the Working Group you discovered new evidence, whether it's inculpatory or exculpatory, is that evidence you would want to make the State's Attorney aware of?

A. In the abstract, yes.

Q. Why do you say in the abstract?

A. Because I don't remember any specific

case where that occurred.
Q. Okay. So the phrase "inculpatory" means evidence of guilt, right?
A. Yeah, if -- if there was evidence of guilt, we would discuss it with them.
Q. Can you think of any situation in which you would not alert the State's Attorney to newly discovered evidence that wasn't available during the original criminal trial of guilt?
A. Would we point that out?
Q. No. Can you think of any situation in which you would not point that out, in which you wouldn't even reveal the evidence to the State's Attorney?
A. No, no. My position was all evidence that was relevant should be discussed amongst ourselves and, you know, if -- if relevant, then relevant to discuss it.
Q. Well, I mean, isn't evidence of guilt always relevant in your analysis as a member of the Working Group?
A. Yes. Yes, and I took that into account.
Q. Right. Understood. And therefore, at



least at far as your position is, that evidence of guilt, whatever it is, should always be disclosed to the State's Attorney.
A. Yes.
MR. MORAN: That is all I have right now.
THE WITNESS: Thank you.
MR. MORAN: Thank you.
MS. MEADOR: I have no questions. Thank you.
THE WITNESS: Thank you.
MR. BECKER: Mr. Kadish, I just have very few questions.

EXAMINATION

BY MR. BECKER:
Q. You were not responsible for making the ultimate decision as to whether to vacate Mr. Williams' convictions; is that correct?
A. No. It was the State's Attorney's obligation.
Q. And you did not make that ultimate decision in Mr. Williams' case; correct?
A. No. It was up to Ms. Foxx.
Q. And you were not responsible for making the decision as to whether to oppose Mr. Williams' Certificate of Innocence Petition; is that correct?



A. That's correct. We took no position, or I took no position, on Certificates of Innocence.
MR. BECKER: Thank you very much. No further questions.
THE WITNESS: Thank you, Steven.
MR. MORAN: You guys want to do signature or ...
MR. KUBLY: So, Mr. Kadish, at the end of the deposition, you have the option of requesting to be allowed to review your transcript. You get a copy of the transcript; you have 30 days to review the transcript. You're allowed to, like, spelling errors or places where you've been misquoted. Then you would sign off on any changes that you're making.
If you don't want to have to read the transcript, you can waive your signature.
THE WITNESS: I would leave that up to Ms. Noll and yourself.
MS. NOLL: Okay.
MR. KUBLY: I usually recommend waiving.
MS. NOLL: Okay. Yeah, that's fine here.
THE WITNESS: Okay.
MR. MORAN: All right. Thank you very much.



THE WITNESS: Thank you, Pat. It's a pleasure sitting here.
THE VIDEOGRAPHER: With that, we're going off the record at 5:13 p.m.
(The proceedings adjourned at 5:13 p.m.)

REPORTER'S CERTIFICATE

We, Kathleen Hillgard and Katie K. Elliott, do hereby certify that MARC R. KADISH was duly sworn to testify the whole truth, that the foregoing deposition was recorded stenographically by us and was reduced to computerized transcript under our direction, and that the said deposition constitutes a true record of the testimony given by said witness.

We further certify that the reading and signing of the deposition was waived by the deponent.

We further certify that we am not relatives or employees or attorneys or counsel of any of the parties, or relatives or employees of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, we have hereunto set our hands and affixed our seals of office at Chicago, Illinois, this 18th day of November 2025.

Illinois CSR No. 084-004093

Illinois CSR No. 084-004537