# Exhibit 30

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CORDELL WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>JAMES O'BRIEN, et al.,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br>No. 23-cv-14905<br>The Honorable Lindasy M. Jenkins<br>Magistrate Judge Kim |

**DEFENDANTS' SUPPLEMENTAL DISCLOSURES PURSUANT TO RULES 26(a)(1) and 26(2)(c) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Defendants, by their attorneys, make the following supplemental disclosures pursuant to Rule 26(a)(1) and 26(a)(2)(C) of the Federal Rules of Civil Procedure:

1. Marc Kadish, c/o his attorneys, Gregory Kubler and Amanda Hamilton, Akerman, LLP, 71 South Wacker Drive, 47th Floor Chicago, IL 60606. He may be called to testify consistent with his deposition in this case. He may be called to testify regarding his knowledge of the Working Group, its creation and the need for it, the Lawyers Committee, his communications with Kim Foxx, Risa Lanier, and other members of the Cook County State's Attorney's Office ("CCSAO"), members of the Working Group, Peter Neufeld, and other members of the Lawyers Committee regarding the Working Group, the cases the Working Group investigated and its recommendations, including the scope and substance of the investigation and recommendation regarding Plaintiff. He may be called to testify about his oral and written communications with the foregoing individuals, including emails, reports and any other documents or notes he authored, reviewed or edited, including any policies, procedures or protocols for the Working Group. He may be called to testify about his communications and interviews with witnesses. He may be

called to offer opinions on the law of accountability and how it applies to Plaintiff and the crimes for which he was convicted. He may be called to testify regarding the Working Group's investigation of Plaintiff's convictions and its recommendation to vacate Plaintiff's convictions and his concurring opinion, including any drafts. He may be called to testify about his recommendation that Plaintiff should not get a certificate of innocence. He may be called to testify about evidence the Working Group did or did not evaluate or consider in its recommendation. He may be called to testify about his communications with Risa Lanier and members of the Working Group about the Working Group's recommendation regarding Plaintiff. He may be called to testify about the role of the CCSAO and the role of its Conviction Integrity Unit ("CIU"). He may be asked to testify about the work of the Working Group compared to the work of the CIU. He may be called to testify, consistent with his deposition, that members of the Lawyers Committee and Working Group should not represent any claimants whose convictions were reversed pursuant to a recommendation by the Working Group because of a conflict of interest. He is expected to testify that this conflict of interest would exist if a member of the Lawyers Committee or Working Group had a financial incentive in the outcome of a case investigated by the Working Group or in the Working Group's recommendation to vacate the convictions. He is expected to testify about the affidavit of David Evans and whether the contents of this affidavit satisfies elements the State is required to prove to obtain a conviction based on an accountability theory, and that the State could have retried Plaintiff without Plaintiff's confession based on the contents of David Evans' affidavit and undisputed other evidence of guilt, including but not limited to Plaintiff's role as the driver of the getaway car, the false information Plaintiff provided to police regarding his use of the car, the temperature of the radiator of the car, indicating it had been recently been driven.

2. Maria Hawilo, c/o her attorneys, Gregory Kubler and Amanda Hamilton, Akerman, LLP, 71 South Wacker Drive, 47th Floor Chicago, IL 60606. She may be called to testify consistent with her deposition in this case. She may be called to testify regarding her knowledge of the Working Group, its creation and the need for it, the Lawyers Committee, her communications with Kim Foxx, Risa Lanier, and other members of the CCSAO, members of the Working Group, Peter Neufeld, and other members of the Lawyers Committee regarding the Working Group, the cases the Working Group investigated and its recommendations, including the scope and substance of the investigation and recommendation regarding Plaintiff. She may be called to testify about her oral and written communications with the foregoing individuals, including emails, reports and any other documents or notes she authored, reviewed or edited, including any policies, procedures or protocols for the Working Group. She may be called to testify about her communications and interviews with witnesses. She may be called to offer opinions on the law of accountability and how it applies to Plaintiff and the crimes for which he was convicted. She may be called to testify regarding the Working Group's investigation of Plaintiff's convictions and its recommendation to vacate Plaintiff's convictions and Mr. Kadish's concurring opinion, including any drafts. She may be called to testify about evidence the Working Group did or did not evaluate or consider in its recommendation. She may be called to testify about her communications with Risa Lanier and members of the Working Group about the Working Group's recommendation regarding Plaintiff. She may be called to testify about the role of the CCSAO and the role of its CIU. She may be asked to testify about the work of the Working Group compared to the work of the CIU. She may be called to testify, consistent with her deposition, that members of the Lawyers Committee and Working Group should not represent any claimants whose convictions were reversed pursuant to a recommendation by the Working Group because of a conflict of interest. She is expected to

testify that this conflict of interest would exist if a member of the Lawyers Committee or Working Group had a financial incentive in the outcome of a case investigated by the Working Group or in the Working Group's recommendation to vacate the convictions. She is expected to testify about the affidavit of David Evans and whether the contents of this affidavit satisfy elements the State is required to prove to obtain a conviction based on an accountability theory, and that the State could have retried Plaintiff without Plaintiff's confession based on the contents of David Evans' affidavit.

3. Vincent Southerland, c/o his attorneys, Gregory Kubler and Amanda Hamilton, Akerman, LLP, 71 South Wacker Drive, 47th Floor Chicago, IL 60606. He may be called to testify consistent with his deposition in this case. He may be called to testify regarding his knowledge of the Working Group, its creation and the need for it, the Lawyers Committee, his communications with Kim Foxx, Risa Lanier, and other members of the CCSAO, members of the Working Group, Peter Neufeld, and other members of the Lawyers Committee regarding the Working Group, the cases the Working Group investigated and its recommendations, including the scope and substance of the investigation and recommendation regarding Plaintiff. He may be called to testify about his oral and written communications with the foregoing individuals, including emails, reports and any other documents or notes he authored, reviewed or edited, including any policies, procedures or protocols for the Working Group. He may be called to testify about his communications and interviews with witnesses. He may be called to offer opinions on the law of accountability and how it applies to Plaintiff and the crimes for which he was convicted. He may be called to testify regarding the Working Group's investigation of Plaintiff's convictions and its recommendation to vacate Plaintiff's convictions and Mr. Kadish's concurring opinion, including any drafts. He may be called to testify about evidence the Working Group did or did not evaluate or consider in its

recommendation. He may be called to testify about his communications with Risa Lanier and members of the Working Group about the Working Group's recommendation regarding Plaintiff. He may be called to testify about the role of the CCSAO and the role of its CIU. He may be asked to testify about the work of the Working Group compared to the work of the CIU. He may be called to testify, consistent with his deposition, that members of the Lawyers Committee and Working Group should not represent any claimants whose convictions were reversed pursuant to a recommendation by the Working Group because of a conflict of interest. He is expected to testify that this conflict of interest would exist if a member of the Lawyers Committee or Working Group had a financial incentive in the outcome of a case investigated by the Working Group or in the Working Group's recommendation to vacate the convictions. He is expected to testify about the affidavit of David Evans and whether the contents of this affidavit satisfy elements the State is required to prove to obtain a conviction based on an accountability theory, and that State could have retried Plaintiff without Plaintiff's confession based on the contents of David Evans' affidavit

4. Carol Rogala, c/o her attorney, Elizabeth Ekl, Burns Noland LLP, 311 S. Wacker Drive, Suite 5200, Chicago, IL 60606, (312) 878-1297. Ms. Rogala is a former Assistant State's Attorney assigned to handle the State's response to Plaintiff's petitions for post-conviction relief. She may be called to testify about the allegations in Plaintiff's Complaint, including, but not limited to, any reports she authored or helped author, any oral, written, or court-reported statements taken, Plaintiff's prosecution for murder and Plaintiff's petitions for post-conviction relief. She may also be called to present certain evidence at trial under Federal Rules of Evidence 702, 703, or 705 regarding her role and the practices she followed as the prosecuting attorney, the procedures applicable to Plaintiffs' criminal cases, whether probable cause existed for the arrests and prosecution of Plaintiff, the circumstances under which the State would and should consider a

retrial of Plaintiff in the event his convictions had been vacated, as well as her opinions as to the sustainability of Plaintiff's conviction, whether the State should have vacated Plaintiff's conviction and/or retried him, and whether his petition for certificate of innocence was supported by the evidence.

5. Catherine Malloy, c/o her attorney, Elizabeth Ekl, c/o her attorney, Elizabeth Ekl, Burns Noland LLP, 311 S. Wacker Drive, Suite 5200, Chicago, IL 60606, (312) 878-1297. Ms. Malloy is a former Assistant State's Attorney assigned to handle the State's response to Plaintiff's petitions for post-conviction relief. She may be called to testify about the allegations in Plaintiff's Complaint, including, but not limited to, any reports she authored or helped author, any oral, written, or court-reported statements taken, Plaintiff's prosecution for murder and Plaintiff's petitions for post-conviction relief. She may also be called to present certain evidence at trial under Federal Rules of Evidence 702, 703, or 705 regarding her role and the practices she followed as the prosecuting attorney, the procedures applicable to Plaintiffs' criminal cases, whether probable cause existed for the arrests and prosecutions of Plaintiffs and circumstances under which the State would and should consider a retrial of Plaintiff in the event his convictions had been vacated.

6. Robert Milan, Robert Milan Law, 1322 Cariann Lane, Glenview, IL 60025, (312) 881-1250. Mr. Milan is a former Assistant State's Attorney and federal prosecutor, who works as a special prosecutor with the CCSAO handling post-conviction cases and may be called to testify about his knowledge and experience in those roles as well as the proper legal and factual standards for reviewing post-conviction cases. Mr. Milan may be called to testify about his knowledge of the Working Group and Lawyers Committee, including but not limited to his written and oral communications with Peter Neufeld, Marc Kadish, Josh Tepfer and others about the CCSAO

Working Group and Lawyers Committee, the cases he was assigned as a special prosecutor, the cases assigned to him that Mr. Neufeld and Mr. Tepfer had asked him to relinquish to the Working Group, the conflicts of interest in the Lawyers Committee and Working Group conducting reviews of convictions and making recommendations to the State's Attorney. Mr. Milan may also be called to testify about the circumstances under which a conviction should be vacated and those under which the case should be retried against an individual whose convictions had been vacated. Mr. Milan's opinions are based on his extensive experience as a prosecutor and an investigator. Mr. Milan may also testify as to the following facts and opinions:

- He reviewed materials about the Working Group sent to him by Marc Kadish, including the Working Group Procedures and Guidelines and the lists of cases the Working Group was supposed to investigate. He met and spoke with Marc Kadish about Kadish serving as one of the Working Group investigators. He spoke with Peter Neufeld and Josh Tepfer about the Working Group, Lawyers Committee, and the request by Neufeld and Tepfer that he waive his authority as special prosecutor over certain cases.

- The Working Group was supposed to reinvestigate 16 cases that were originally investigated by one or more of seven Chicago Police detectives.

- Based on his review of the materials and his conversations with Kadish, Neufeld and Tepfer, Mr. Milan learned that: the Lawyers Committee established the parameters for what the Working Group would do; the members of the Working Group was selected mutually with then State's Attorney Kim Foxx and the Lawyers Committee; there was no explanation for why the "agreement" to form the Working Group and Lawyers Committee was not part of the written settlement for the Englewood 4 cases; the Lawyers Committee made presentations to members of the Working Group, including on Detectives Cassidy, Boudreau and those involved in the Englewood 4 case.

- Members of the Lawyers Committee were suing the City of Chicago and the same detectives on the list of seven detectives for wrongful convictions.

- Members of the Lawyers Committee would use the same cases dismissed by the Working Group as pattern and practice evidence in their civil lawsuits and benefit financially.

- The Lawyers Committee involvement in the creation of the Working Group, appointing its members and establishing its parameters created a conflict of interest tainting the Working Group's work and recommendations.

- The Working Group was designed to achieve the goal of vacating certain convictions regardless of whether those convictions should have been vacated.

In addition to the foregoing, Mr. Milan is expected to testify as to a prosecutor's ethical review of a conviction's integrity. Mr. Milan's anticipated testimony is described in the attached memo he created entitled "Call with Peter Neufeld: Thursday, February 3, 2022 (4:03 PM – 4:34 PM), attached as Exhibit A.

7. Risa Lanier, c/o her attorneys, Gregory Kubler and Amanda Hamilton, Akerman, LLP, 71 South Wacker Drive, 47th Floor Chicago, IL 60606. Ms. Ranier is a former Assistant State's Attorney and the former First Assistant to State's Attorney Kim Foxx. She may be called to testify consistent with her deposition in this case. She may be called to testify regarding her knowledge of the Working Group, its creation and the need for it, the Lawyers Committee, her communications with Kim Foxx, other members of the CCSAO, members of the Working Group, Peter Neufeld, and other members of the Lawyers Committee regarding the Working Group, the cases the Working Group investigated and its recommendations, including the scope and substance of the investigation and recommendation regarding Plaintiff. She may be called to testify about her oral and written communications with the foregoing individuals, including emails, reports and any other documents or notes she authored, reviewed or edited, including any policies, procedures or protocols for the Working Group. She may be called to offer opinions on the law of accountability and how it applies to Plaintiff and the crimes for which he was convicted. She may be called to testify regarding the Working Group's investigation of Plaintiff's convictions and its recommendation to vacate Plaintiff's convictions. She may be called to testify about evidence the Working Group did or did not evaluate or consider in its recommendation. She may be called to testify about her communications with Kim Foxx about the Working Group's recommendation regarding Plaintiff. She may be called to testify about the role of the CCSAO and the role of its

CIU. She may be called to testify as to the qualifications of the assistant state's attorneys hired to work in the CIU. She may be asked to testify about the work of the Working Group compared to the work of the CIU. She may be called to testify, consistent with her deposition, that members of the Lawyers Committee should not represent any claimants whose convictions were reversed pursuant to a recommendation by the Working Group because of a conflict of interest. She is expected to testify that this conflict of interest would exist if a member of the Lawyers Committee had a financial incentive in the outcome of a case investigated by the Working Group or in the Working Group's recommendation to vacate the convictions. She is also expected to testify about the affidavit of David Evans and whether the contents of this affidavit satisfy elements the State is required to prove to obtain a conviction based on an accountability theory.

8. Steven Becker, Plaintiff's attorney. He may be called to testify about his communications with members of the CCSAO and Working Group regarding Plaintiff, including but not limited to the documents he provided to members of the Working Group. He may also be called to testify about the post-conviction pleadings he filed for Plaintiff in the Circuit Court of Cook County.

Respectfully submitted.

/s/ Patrick R. Moran
Special Assistant Corporation Counsel
*One of the Attorneys for James O'Brien and Geri Yanow, as Independent Administrator for the Estate of William Foley*
Eileen Rosen
Patrick R. Moran
Andrew Grill
ROCK, FUSCO & CONNELLY, LLC
333 W. Wacker Drive, 19th Floor
Chicago, IL 60606

/s/ Lisa Meador
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*
James Sotos
Lisa Meador
Joseph M. Polick
THE SOTOS LAW FIRM
141 W. Jackson Blvd. #1240A
Chicago, IL 60604
(630) 735-3300

**CERTIFICATE OF SERVICE**

The undersigned verifies under penalty of perjury pursuant to 28 U.S.C. 1746 that he/she caused the forgoing Defendants' Supplemental Rule 26(a)(1) and (a)(2)(C) Disclosures to be served on the attorneys of record via email on December 29, 2025.

*s/ Patrick R. Moran*

# Exhibit A

**Call with Peter Neufeld: Thursday, February 3, 2022 (4:03 PM - 4:34 PM)**
*Document Completed at 7:19 PM on February 3, 2022*

In December 2021, Marc Kadish contacted me and asked if I would meet with him to discuss his appointment as a Special ASA in Cook County to reinvestigate approximately 16 old homicide cases that were originally investigated by seven Chicago Police detectives. Kadish sent me the Working Group Procedures and Guidelines, the list of 16 cases he would be reinvestigating, and a Claim Form that was sent to inmates in IDOC to inform them of the detectives involved and the process. Our first two meetings were postponed due to illness. Eventually, we met for lunch at The Gage on Michigan Ave. The meeting lasted approximately 90 minutes. I told Kadish that I thought he was being used. I explained that some of the lawyers on the Lawyers' Committee were suing the City of Chicago, claiming that these very same detectives wrongfully convicted individuals. I told Kadish that if he and his investigative team dismissed any cases, those same lawyers would use his exonerations as pattern and practice evidence in their civil suits and benefit financially. I told him that was unethical. Kadish said Peter Neufeld had told him all the cases should be dismissed because the detectives in question were all bad. Kadish responded that each case had to be investigated thoroughly and independently to determine whether they should be dismissed.

During the week of January 24-28, 2022, Josh Tepfer contacted me via phone and informed me that as part of the Englewood 4 settlement, Kim Foxx agreed to appoint a working group of special ASAs to investigate a number of homicide/sex cases originally investigated by seven detectives. Three cases (George Anderson, Clayborn Smith, and Jerry Gillespie) were special prosecutor cases assigned to me, so Foxx had no authority to allow the working group to investigate them. Tepfer summarized the process. I asked him to send me the Englewood Settlement agreement, the Working Group Protocol, and the claim form/application sent to inmates. He also emailed me the names of the attorneys for my cases: George Anderson (Russell Ainsworth and David Owens), Jerry Gillespie (Andrea Lyons), and Clayborn Smith (David Shapiro, Northwestern). Tepfer also sent the names of the working group (Kadish, Maria Hawilo, and Vincent Southerland).

On February 1, I called Kadish. I told him Tepfer had reached out and asked me to waive my authority over the Anderson, Smith, and Gillespie cases. I asked how these cases ended up on the list when they were not on the original list Kadish had sent me. Kadish was aware they were trying to add extra cases but did not know how these three ended up on the list. I informed him that Russell Ainsworth represented George Anderson against us. I explained that I had offered Anderson a plea deal, but Ainsworth rejected it because the case was before Judge Hooks. Ainsworth lost the case in front of Hooks, and Anderson is now serving a natural life sentence. I told Kadish that Ainsworth's involvement with the Lawyers' Committee likely put Anderson's case on the list, which I considered unethical. I told Kadish I would stay in touch.

On February 3, 2022, Peter Neufeld called me. The call lasted 31 minutes. Neufeld explained the history of the Englewood 4 case. Neufeld represented Saunders, Drizin represented another plaintiff, and Tara LKU represented another. Neufeld negotiated the settlement. April Perry handled the negotiation for the County. Foxx and Perry agreed to form the Lawyers' Committee and the Working Group because Foxx recognized the pattern of terrible conduct by these seven

detectives. Because Fabio Valentini had engaged in misconduct to prevent the exoneration, Foxx did not think her CIU could investigate these cases, so she agreed to form the Lawyers' Committee and the Working Group.

The Lawyers' Committee "established the parameters" for what the Working Group would do. The Working Group was selected "mutually by Foxx and the Lawyers' Committee." Neufeld could not explain why this agreement was not part of the written settlement for the Englewood 4. The Lawyers' Committee made presentations to the Working Group. Drizin presented about Jim Cassidy, Ainsworth about Boudreau, and Neufeld about the Englewood 4 case.

Neufeld stated the Lawyers' Committee sent the claim form/application to IDOC, which was distributed via closed-circuit video throughout IDOC. Inmates responded, and the Lawyers' Committee gave the list of respondents to Foxx's office. Neufeld said some of the respondents were brought forward by their outside lawyers, while others came from the Exoneration Project. Foxx's office did due diligence to determine if the cases met the qualifications and then turned them over to the Working Group.

Neufeld agreed to send me a list of all the cases being reviewed by the Working Group and the lawyers on the Lawyers' Committee. I told him I would review what he sent me, speak to my team, and give him an answer early next week.

On February 7, Neufeld sent me the names on the Lawyers' Committee. The list of 18 cases he sent did not match the original list Kadish had sent me. The new list included Johnny Plummer (a Special Prosecutor case) and John Hudson. However, it did not include the three cases he was asking me to waive my authority on (George Anderson, Jerry Gillespie, and Clayborn Smith).

On February 11, 2022, at 11 am, Milan and Myles O'Rourke had a call with Neufeld, Tepfer, and Neufeld's assistant Jahne Brown. I thanked them for giving us the heads-up on my three cases. I asked how, moving forward, the SP office would know if one of our cases ended up on the list. Neufeld apologized for the mistake and said the Lawyers' Committee had erroneously put Plummer on the list, and the CCSAO had removed him.

I informed them that I would not relinquish my authority over Gillespie, Anderson, and Clayborn Smith to anyone, including their Working Group. Myles stated that he would not relinquish his authority over Plummer. Neufeld asked me why. I explained that Tepfer and others know that no one is more capable of investigating these cases and vetting them than me and my team, so there is no reason to allow their Working Group to review them. Neufeld asked Tepfer if he had anything to say. Tepfer hesitated and said, "No," then added, "I don't know what to say." He stated that he is a member of the Working Group and believes in it, but ultimately it is the prosecutor's decision to allow them to reinvestigate the cases. (I believe Tepfer meant to say he is a member of the Lawyers' Committee). Tepfer added that he was sure Milan had looked at these cases and given the decision much thought.

Neufeld explained that the seven detectives had a long history of lying and committing perjury, making them untrustworthy. He cited a Supreme Court case, *Napue v. Illinois,* stating that if evidence is false and material, the conviction can be vacated.

Neufeld expressed that he did not believe the CIU or SP Office had analyzed these cases with respect to the detectives' backgrounds, while the Working Group was doing so. He said Foxx had agreed the detectives committed perjury and lied, which is why she would allow the Working Group to investigate these cases per *Napue.* Neufeld also claimed that former ASA Valentini and another ASA committed bad acts on the Englewood Four, and that conduct was imputed to the entire CCSAO, thus creating a conflict of interest.

Neufeld further explained that the SP, like the CCSAO, could proceed on our cases but allow the Working Group to conduct a parallel investigation. At the end of their investigation, I would still retain authority over the final decision.

I thanked Neufeld for his explanation but reiterated that my position had not changed: I would not allow their Working Group to review my cases. Myles reaffirmed his stance. Neufeld asked if I knew who the detectives were on my cases. I confirmed that I did but refused to discuss our internal deliberations. The call ended.

# Exhibit A

**Call with Peter Neufeld: Thursday, February 3, 2022 (4:03 PM - 4:34 PM)**
*Document Completed at 7:19 PM on February 3, 2022*

In December 2021, Marc Kadish contacted me and asked if I would meet with him to discuss his appointment as a Special ASA in Cook County to reinvestigate approximately 16 old homicide cases that were originally investigated by seven Chicago Police detectives. Kadish sent me the Working Group Procedures and Guidelines, the list of 16 cases he would be reinvestigating, and a Claim Form that was sent to inmates in IDOC to inform them of the detectives involved and the process. Our first two meetings were postponed due to illness. Eventually, we met for lunch at The Gage on Michigan Ave. The meeting lasted approximately 90 minutes. I told Kadish that I thought he was being used. I explained that some of the lawyers on the Lawyers' Committee were suing the City of Chicago, claiming that these very same detectives wrongfully convicted individuals. I told Kadish that if he and his investigative team dismissed any cases, those same lawyers would use his exonerations as pattern and practice evidence in their civil suits and benefit financially. I told him that was unethical. Kadish said Peter Neufeld had told him all the cases should be dismissed because the detectives in question were all bad. Kadish responded that each case had to be investigated thoroughly and independently to determine whether they should be dismissed.

During the week of January 24-28, 2022, Josh Tepfer contacted me via phone and informed me that as part of the Englewood 4 settlement, Kim Foxx agreed to appoint a working group of special ASAs to investigate a number of homicide/sex cases originally investigated by seven detectives. Three cases (George Anderson, Clayborn Smith, and Jerry Gillespie) were special prosecutor cases assigned to me, so Foxx had no authority to allow the working group to investigate them. Tepfer summarized the process. I asked him to send me the Englewood Settlement agreement, the Working Group Protocol, and the claim form/application sent to inmates. He also emailed me the names of the attorneys for my cases: George Anderson (Russell Ainsworth and David Owens), Jerry Gillespie (Andrea Lyons), and Clayborn Smith (David Shapiro, Northwestern). Tepfer also sent the names of the working group (Kadish, Maria Hawilo, and Vincent Southerland).

On February 1, I called Kadish. I told him Tepfer had reached out and asked me to waive my authority over the Anderson, Smith, and Gillespie cases. I asked how these cases ended up on the list when they were not on the original list Kadish had sent me. Kadish was aware they were trying to add extra cases but did not know how these three ended up on the list. I informed him that Russell Ainsworth represented George Anderson against us. I explained that I had offered Anderson a plea deal, but Ainsworth rejected it because the case was before Judge Hooks. Ainsworth lost the case in front of Hooks, and Anderson is now serving a natural life sentence. I told Kadish that Ainsworth's involvement with the Lawyers' Committee likely put Anderson's case on the list, which I considered unethical. I told Kadish I would stay in touch.

On February 3, 2022, Peter Neufeld called me. The call lasted 31 minutes. Neufeld explained the history of the Englewood 4 case. Neufeld represented Saunders, Drizin represented another plaintiff, and Tara LKU represented another. Neufeld negotiated the settlement. April Perry handled the negotiation for the County. Foxx and Perry agreed to form the Lawyers' Committee and the Working Group because Foxx recognized the pattern of terrible conduct by these seven

detectives. Because Fabio Valentini had engaged in misconduct to prevent the exoneration, Foxx did not think her CIU could investigate these cases, so she agreed to form the Lawyers' Committee and the Working Group.

The Lawyers' Committee "established the parameters" for what the Working Group would do. The Working Group was selected "mutually by Foxx and the Lawyers' Committee." Neufeld could not explain why this agreement was not part of the written settlement for the Englewood 4. The Lawyers' Committee made presentations to the Working Group. Drizin presented about Jim Cassidy, Ainsworth about Boudreau, and Neufeld about the Englewood 4 case.

Neufeld stated the Lawyers' Committee sent the claim form/application to IDOC, which was distributed via closed-circuit video throughout IDOC. Inmates responded, and the Lawyers' Committee gave the list of respondents to Foxx's office. Neufeld said some of the respondents were brought forward by their outside lawyers, while others came from the Exoneration Project. Foxx's office did due diligence to determine if the cases met the qualifications and then turned them over to the Working Group.

Neufeld agreed to send me a list of all the cases being reviewed by the Working Group and the lawyers on the Lawyers' Committee. I told him I would review what he sent me, speak to my team, and give him an answer early next week.

On February 7, Neufeld sent me the names on the Lawyers' Committee. The list of 18 cases he sent did not match the original list Kadish had sent me. The new list included Johnny Plummer (a Special Prosecutor case) and John Hudson. However, it did not include the three cases he was asking me to waive my authority on (George Anderson, Jerry Gillespie, and Clayborn Smith).

On February 11, 2022, at 11 am, Milan and Myles O'Rourke had a call with Neufeld, Tepfer, and Neufeld's assistant Jahne Brown. I thanked them for giving us the heads-up on my three cases. I asked how, moving forward, the SP office would know if one of our cases ended up on the list. Neufeld apologized for the mistake and said the Lawyers' Committee had erroneously put Plummer on the list, and the CCSAO had removed him.

I informed them that I would not relinquish my authority over Gillespie, Anderson, and Clayborn Smith to anyone, including their Working Group. Myles stated that he would not relinquish his authority over Plummer. Neufeld asked me why. I explained that Tepfer and others know that no one is more capable of investigating these cases and vetting them than me and my team, so there is no reason to allow their Working Group to review them. Neufeld asked Tepfer if he had anything to say. Tepfer hesitated and said, "No," then added, "I don't know what to say." He stated that he is a member of the Working Group and believes in it, but ultimately it is the prosecutor's decision to allow them to reinvestigate the cases. (I believe Tepfer meant to say he is a member of the Lawyers' Committee). Tepfer added that he was sure Milan had looked at these cases and given the decision much thought.

Neufeld explained that the seven detectives had a long history of lying and committing perjury, making them untrustworthy. He cited a Supreme Court case, *Napue v. Illinois,* stating that if evidence is false and material, the conviction can be vacated.

Neufeld expressed that he did not believe the CIU or SP Office had analyzed these cases with respect to the detectives' backgrounds, while the Working Group was doing so. He said Foxx had agreed the detectives committed perjury and lied, which is why she would allow the Working Group to investigate these cases per *Napue.* Neufeld also claimed that former ASA Valentini and another ASA committed bad acts on the Englewood Four, and that conduct was imputed to the entire CCSAO, thus creating a conflict of interest.

Neufeld further explained that the SP, like the CCSAO, could proceed on our cases but allow the Working Group to conduct a parallel investigation. At the end of their investigation, I would still retain authority over the final decision.

I thanked Neufeld for his explanation but reiterated that my position had not changed: I would not allow their Working Group to review my cases. Myles reaffirmed his stance. Neufeld asked if I knew who the detectives were on my cases. I confirmed that I did but refused to discuss our internal deliberations. The call ended.