# Exhibit 37

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | No. 94 CR 15518 |
| | ) | |
| CORDELL WILLIAMS, | ) | Hon. Vincent M. Gaughan |
| | ) | |
| Defendant-Petitioner. | ) | |

**SUCCESSIVE POST-CONVICTION PETITION**

NOW COMES Petitioner CORDELL WILLIAMS, by and through his counsel, the Law Office of Steven W. Becker LLC, and petitions this Honorable Court to vacate the sentence imposed upon him and grant him a new sentencing hearing pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq.* and, in support of this request, states as follows:

INTRODUCTION

1. Cordell Williams brings this successive post-conviction petition seeking a new sentencing hearing on the ground that his mandatory natural life sentence violates the Illinois Constitution's proportionate penalties clause as applied to him because such sentence, which was statutorily mandated for all offenders convicted of the murder of more than one decedent, was imposed without consideration of his age, minimal involvement in the crime, lack of prior criminal history, and rehabilitative potential.

2. In support of his claim, Mr. Williams relies upon the landmark trilogy of United States Supreme Court decisions regarding juvenile sentencing culminating in *Miller v. Alabama*, 567 U.S. 460 (2012); *Miller's* progeny, including very-recent Illinois decisions confirming the meritorious nature of Mr. Williams' as-applied challenge; and new research in developmental psychology, neurobiology, and social science demonstrating that, like juveniles, the brains of emerging adults do not fully develop until their mid-20s.

3. Moreover, it is also pertinent to point out that David Evans, the actual shooter who committed the two homicides at issue and who was a 17-year-old juvenile at the time of the incident, has already been resentenced by this Court to two concurrent 60-year terms, which will result in his release from prison on parole in a little more than five years.

4. Based upon this claim, which is outlined below and fully presented in the accompanying memorandum of law, Mr. Williams' sentence should be vacated, and he should be entitled to a new sentencing hearing.

## PROCEDURAL HISTORY

5. Cordell Williams was charged by indictment with the first-degree murder of Billy Johnson and Myron Cochran on or about May 26, 1994. (T.C. 10-14)[1]

[1] The record on direct appeal, No. 1-95-2887, is cited as (T.C.), (T.S.C.), and (T.R.). The records on collateral review are as follows: motion for leave to file successive post-conviction petition regarding

6. Mr. Williams was found guilty of first-degree murder under an accountability theory by a jury and sentenced to natural life imprisonment. (T.C. 38-40, 46-47, 74)

7. On direct appeal, Mr. Williams raised the following issues: (1) the trial court erred in telling the jury that it should decide the meaning of the phrase "during the commission of the offense" in the accountability instructions; and (2) the court erred in failing to admonish the jury before sequestering them for the night. (P.C.2 17)

8. On March 26, 1999, Mr. Williams' convictions and sentence were affirmed on appeal. (P.C.2 17-24)

9. On March 16, 2000, Mr. Williams filed a post-conviction petition alleging that counsel on direct appeal was ineffective for (1) failing to argue that the State failed to prove him guilty beyond a reasonable doubt; and (2) failing to argue that the sentence was unconstitutional. (P.C.1 32-38)

10. On March 27, 2000, the trial court summarily dismissed Mr. Williams' petition. (P.C.1 59)

---

emerging-adult claim, No. 1-15-1373, is cited as (P.C.3) and (P.R.3); petition for relief from judgment, No. 1-12-0796, is cited as (P.R.J.C.) and (P.R.J.R.); habeas petition, No. 1-08-2409, is cited as (H.C.) and (H.R.); successive post-conviction petition, No. 1-03-0038, is cited as (P.C.2) and (P.R.2); and initial post-conviction petition, No. 1-00-1578, is cited as (P.C.1) and (P.R.1).

11. On appeal, Mr. Williams argued that the statute under which he was sentenced was unconstitutional under the single-subject clause of the Illinois Constitution. (H.C. 13)

12. On September 6, 2002, the appellate court found that the statute was not unconstitutional and affirmed the judgment of the trial court. (H.C. 13-15)

13. On September 20, 2002, Mr. Williams filed a successive post-conviction petition raising a claim of actual innocence. (P.C.2 67-70)

14. On September 30, 2002, the trial court dismissed the petition. (P.C.2 95)

15. On appeal, after the Office of the Public Defender filed a motion to withdraw, the reviewing court granted the motion and affirmed the judgment of the trial court. (P.R.J.C. 35-36)

16. On April 22, 2008, Mr. Williams filed a petition for writ of habeas corpus alleging (1) that the charging instrument gave him insufficient notice of the State's accountability theory; (2) that the first-degree murder statute was unconstitutional as applied to him; and (3) that his sentence was unconstitutional. (H.C. 17-26)

17. On June 18, 2008, the trial court dismissed the habeas petition. (H.C. 71-74)

18. On December 15, 2009, after the Office of the Public Defender filed a motion to withdraw, the appellate court granted the motion and affirmed the judgment of the trial court. (P.R.J.C. 19-20)

19. On October 27, 2011, Mr. Williams filed a petition for relief from judgment asserting, *inter alia*, that his natural-life sentence was void because the sentencing statute was declared unconstitutional under the single-subject clause. (P.R.J.C. 22-28)

20. On January 27, 2012, the trial court dismissed the petition, finding that it was untimely and barred by *res judicata*. (P.R.J.C. 36-39)

21. On appeal, Mr. Williams argued that his mandatory sentence of natural life without parole was unconstitutional as applied to him under the federal and state constitutions and that he was entitled to additional sentence credit. (P.C.3 16)

22. On July 14, 2014, the appellate court affirmed the trial court judgment. (P.C.3 6, 14-15)

23. As to his sentencing challenges based on the United States Supreme Court's intervening decision in *Miller v. Alabama*, 567 U.S. 460 (2012), the appellate court found that Mr. Williams "used the wrong procedural vehicle to assert constitutional challenges to his sentence" and that the "appropriate method" for raising such a claim would be a new post-conviction petition. (P.C.3 15)

24. On December 19, 2014, Mr. Williams filed a motion for leave to file a successive post-conviction petition in which he alleged that his mandatory sentence of natural life without parole was unconstitutional as applied to

him, that he satisfied the "cause" and "prejudice" test, and that was entitled to proper sentencing credit upon resentencing. (P.C.3 18-20)

25. On March 25, 2015, the trial court denied Mr. Williams leave to file his successive post-conviction petition. (P.C.3 27) The trial court held that Mr. Williams may have been able to demonstrate cause but could not demonstrate prejudice. (P.C.3 26-27)

26. On May 11, 2018, the appellate court issued a published opinion reversing the trial court, vacating Mr. Williams' sentence, remanding the case for a new sentencing hearing, and instructing the circuit court to issue a corrected mittimus reflecting a sentencing credit of 441 days. *People v. Williams*, 2018 IL App (1st) 151373 ¶¶ 25, 30.

27. On November 28, 2018, the Illinois Supreme Court, under its supervisory power, vacated the appellate court's opinion and returned the case for reconsideration in light of *People v. Harris*, 2018 IL 121932, on the issue of whether Mr. Williams' sentence violated the proportionate penalties clause. *People v. Williams*, 2018 IL LEXIS 1153 (Nov. 28, 2018).

28. On March 27, 2019, the appellate court issued an order allowing Mr. Williams' agreed motion for summary disposition and remanding the case to the circuit court with instructions to allow Mr. Williams leave to file a successive post-conviction petition and to appoint counsel for second-stage proceedings.

## STATEMENT OF FACTS

29. Cordell Williams was born on August 1, 1974. (T.C. 48) 1975

30. Mr. Williams was charged by indictment with the first-degree murder of Billy Johnson and Myron Cochran on or about May 26, 1994. (T.C. 10-14)

31. Mr. Williams was 19 years old at the time of the offense. (T.C. 10-14, 48)

32. Mr. Williams had no prior criminal history and no prior juvenile adjudications. (T.C. 50)

33. At trial, the jury heard evidence that Mr. Williams told law enforcement after his arrest that on the evening of May 25, 1994, he, David Evans, and two others went to the hospital to visit a friend who had been shot. All five were members of the same street gang. Mr. Williams then drove Evans and the other two passengers home. Mr. Williams had seen Evans put a handgun in the trunk earlier that night. (T.R. G 8-10, 18, 109)

34. When they were on Halsted near 74th Street, Evans said he saw rival gang members in a restaurant and told Mr. Williams to stop the car and open the trunk. When Mr. Williams did, Evans got out, took the gun from the trunk, and walked into the restaurant across the street. Mr. Williams said he believed Evans was going to shoot someone, but never said there was a prior plan among the people in the car to commit a crime. (P.C.2 18; T.R. G 9-10, 34-37, 43-44, 110)

35. Evans shot and killed two people inside the restaurant; then he ran back to the car. (P.C.2 18; T.R. G 9-10, 111)

36. Evans was identified by two eyewitnesses, including a police officer driving on Halstead. (P.C.2 19; T.R. F 36-37, 57)

37. The officer saw Mr. Williams start to pull away as Evans ran to the car. Evans fell but eventually got in the car as Mr. Williams drove away. The officer chased the car and reported the license plate number, but Mr. Williams eluded the officer. (P.C.2 18; T.R. F 48-56, G 10-11, 111)

38. Mr. Williams told Evans to get out, dropped off the other two passengers, and then drove himself home, where he was arrested that night. (P.C.2 18; T.R. F 102-104, G 11, 111-112)

39. Mr. Williams was tried for the first-degree murders of Billy Johnson and Myron Cochran based on an accountability theory. (T.C. 38-40)

40. A jury found Mr. Williams guilty of two counts of first-degree murder. (T.C. 46-47)

41. On August 10, 1995, Mr. Williams waived his right to a jury at the death-penalty eligibility hearing. (T.C. 27; T.R. J 3-5)

42. The parties stipulated that Mr. Williams was born on August 1, 1974, was 19 years old at the time of the offense, and was found guilty of two counts of first-degree murder. (T.R. J 15)

43. The court found that Mr. Williams was eligible for the death penalty. (T.R. J. 16)

44. At sentencing, Odell Williams testified that his son, Cordell, graduated from high school in 1994 and had a job at the Chicago Board of Education at the time of his arrest. (T.R. J 18-19) Odell further testified that Cordell usually drove him to his frequent dialysis appointments. (T.R. J 19-20)

45. Brenda Williams, Cordell's mother, testified that Cordell never caused her any problems and often helped the older people and children who lived on the same block, including a handicapped child to travel to and from school. (T.R. J 21-22)

46. Defense counsel emphasized that Mr. Williams had no prior juvenile adjudications or adult convictions. (T.C. 48-51; T.R. 27)

47. The State noted that Mr. Williams had a pending charge of aggravated battery to a correctional officer following an incident on July 19, 1995. (T.R. J 23)

48. In imposing sentence, the trial court stated as follows:

> I have heard the evidence in this case as presented in the jury trial. I've reviewed the statutory factors in both aggravation and mitigation. I've heard the arguments of the attorney and the parents of Cordell Williams. I have powers, and I have limitations on those

> powers. I wish one of those powers I had was to bring back Myron Cochran and bring back Billie Johnson to his family, but I don't have that power. And I wish the other power that I had right now would stop the hurt that the families are experiencing at this time. But again, I'm limited and I don't have those powers either.
>
> I find that the defense has presented mitigating factors which would preclude the sentence of death, but I – but that is not to demean or depr[e]cate the loss of Myron Cochran nor the loss of Billie Johnson. And I'm sentencing Mr. Cordell Williams to natural life with no parole. (T.R. J 30)

49. The statute under which Mr. Williams was sentenced to natural life in prison without the possibility of parole mandated the imposition of such sentence where more than one decedent was murdered. *See* 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1994); 720 ILCS 5/9-1(h) (West 1994).

50. David Evans, the actual shooter in the case, who was 17 years old at the time of the two homicides, was resentenced by this Court in May 2019 under *Miller v. Alabama*, 567 U.S. 460 (2012), to two concurrent 60-year terms, which, according to the Illinois Department of Corrections' website, will result in his release from prison on parole in a little more than five years.[2]

---

[2] *See* IDOC Internet Status Page for David Evans, Reg. No. B75957, *available at* https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch/aspx (last visited June 28, 2020). *See People v.*

## CLAIM FOR RELIEF

Mr. Williams' claim for relief is set forth fully in the Argument section below in support of this Petition. The following provides a brief outline of this claim:

**The Sentence of Natural Life in Prison Without Parole Imposed upon Cordell Williams, who was 19 Years Old at the Time of the Offense, Violates the Illinois Constitution's Proportionate Penalties Clause as Applied to Him Because such Sentence, which was Statutorily Mandated for All Offenders Convicted of the Murder of More than One Decedent, was Imposed Without Consideration of his Age, Minimal Involvement in the Crime, Lack of Prior Criminal History, and Rehabilitative Potential.**

**A. Eighth Amendment and *Miller* Factors.**

**B. Proportionate Penalties Clause.**

**C. Illinois Case Law in Support of As-Applied Challenge.**

**D. Recent Scientific and Academic Literature Regarding Emerging Adults.**

**E. Actual Shooter Resentenced to 60-year Concurrent Prison Terms.**

## ARGUMENT

**The Sentence of Natural Life in Prison Without Parole Imposed upon Cordell Williams, who was 19 Years Old at the Time of the Offense, Violates the Illinois Constitution's Proportionate Penalties Clause as Applied to Him Because such Sentence, which was Statutorily Mandated for All Offenders Convicted of the Murder of More than One Decedent, was Imposed Without Consideration of his Age, Minimal Involvement in the Crime, Lack of Prior Criminal History, and Rehabilitative Potential.**

Cordell Williams, who was 19 years old at the time of the offense, was sentenced to natural life in prison without the possibility of parole. Mr. Williams

---

*Henderson*, 2011 Ill. App (1st) 090923, ¶ 8 (noting that courts make take judicial notice of IDOC website).

had no prior criminal history, no prior juvenile adjudications, and was convicted solely on the theory of accountability, although there is no evidence of a prior plan or that he ever handled the gun on the night that David Evans, a juvenile, shot the two victims. Mr. Williams' sentence resulted from the convergence of the accountability statute and the mandatory natural life sentencing provision. Because his sentence was mandated by statute on account of the fact that there was more than one decedent, the original sentencing court was barred from considering Mr. Williams' age, his lack of prior criminal history, and his rehabilitative potential. Furthermore, Mr. Williams' sentence is particularly disproportionate in light of the subsequent resentencing of David Evans under *Miller*, where Evans was resentenced to two concurrent 60-year terms.

Accordingly, because Mr. Williams' sentence is unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution, Mr. Williams is entitled to post-conviction relief, the vacation of his sentence, and to a new sentencing hearing under which these critical factors may be considered.

A. **Eighth Amendment and *Miller* Factors**

The Eighth Amendment prohibits, *inter alia*, the imposition of "cruel and unusual punishments" and applies to the States through the Fourteenth Amendment. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The Eighth Amendment's ban on excessive sanctions flows from the

basic principle that criminal punishment should be graduated and proportioned to both the offender and the offense. *Miller v. Alabama*, 567 U.S. 460, 469 (2012).

*Roper*, *Graham*, and *Miller* form a line of United States Supreme Court decisions that address how the Eighth Amendment's ban on "cruel and unusual punishments" applies to sentencing juveniles. As summarized by the Illinois Supreme Court in *People v. Davis*, 2014 IL 115595: "The [United States Supreme] Court recognized three general differences between juveniles under 18 and adults. First, juveniles have a lack of maturity and an underdeveloped sense of responsibility. Second, juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. Third, the character of a juvenile is not as well formed as that of an adult." *Davis*, 2014 IL 115595, ¶ 19.

In regard to these three factors, the United States Supreme Court emphasized that juveniles are therefore less deserving of the most-severe punishments, and their actions are less likely to be evidence of irretrievable depravity. *Miller*, 567 U.S. at 471. Thus, "just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in assessing his culpability." *Id.* at 476 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982)). Accordingly, the Court in *Miller* insisted that before a court can impose sentence on a juvenile, it must consider these "mitigating qualities of youth." *Id.*

More specifically, analogizing from the former individualized sentencing cases of *Roper* and *Graham*, the Supreme Court in *Miller* concluded that life

without parole could not be imposed on a juvenile for a homicide offense without an individualized consideration of the appropriateness of the sentence in light of the nature of the crime and the characteristics of the juvenile offender. *Id.* at 479.

In sum, after the trilogy of juvenile sentencing cases from the United States Supreme Court, "it is clear that the Eighth Amendment prohibits the imposition of the death penalty for crimes committed by juvenile defendants, that life in prison without parole cannot be imposed on a juvenile nonhomicide offender, and that mandatory life without parole cannot be imposed on a juvenile offender who commits homicide without consideration of the mitigating characteristics of youth. All of these results rested on the notion that juveniles are constitutionally different from adults for purposes of the imposition of harsh punishments." *State v. Null*, 836 N.W.2d 41, 65-66 (Iowa 2013).

**B. Proportionate Penalties Clause**

Article I, section 11, of the Illinois Constitution provides, in relevant part, that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

The relevant language of article I, section 11, which is generally referred to as the proportionate penalties clause, prohibits a court from imposing a sentence that, although within a sentencing range set by the legislature, is nevertheless unconstitutionally disproportionate for an individual defendant. *See People v. Taylor*, 102 Ill. 2d 201, 206 (1984). "A defendant can raise a proportionate penalties

challenge on the basis that the penalty for a particular offense is too severe under the 'cruel and degrading' standard or that the penalty is harsher than the penalty for a different offense that contains identical elements." *People v. Williams*, 2015 IL 117470, ¶ 9 (citing *People v. Sharpe*, 216 Ill. 2d 481, 521 (2005)).

"While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (hereinafter *Leon Miller*) (internal quotation marks omitted).

In *Leon Miller*, the Illinois Supreme Court considered whether a mandatory sentence of natural life violated the proportionate penalties clause when applied to a juvenile found guilty under an accountability theory. *Id.* at 337. The *Leon Miller* court reviewed the question under the first theory, viz., whether the sentence shocked the moral sense of the community. *Id.* at 338-39. The court noted that the sentence was imposed based on the convergence of three statutes, the automatic transfer of juveniles 15 or 16 years old charged with murder to criminal court (705 ILCS 405/5-4(6)(a)) (West 1996), the accountability statute (720 ILCS 5/5-2(c)) (West 1996), and the mandatory natural life sentencing statute (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996). *Id.* at 340.

The *Leon Miller* court held that the defendant's sentence was unconstitutional as applied to him:

> Accordingly, we hold that the penalty mandated by the multiple-murder sentencing statute as applied to this defendant is particularly harsh and unconstitutionally disproportionate. We agree with defendant that a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole – the same sentence applicable to the actual shooter. Our decision does not imply that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate. It is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate. *Id.* at 341.

The supreme court further reasoned:

> However, the convergence of the Illinois transfer statute, the accountability statute, and the multiple-murder sentencing statute eliminates the court's ability to consider any mitigating factors such as age or degree of participation. A life sentence without the possibility of parole

implies that under any circumstances a juvenile defendant convicted solely by accountability is incorrigible and incapable of rehabilitation for the rest of his life. The trial judge in this case did not agree with such a blanket proposition. We also decline to find that the sentence mandated by the multiple-murder sentencing statute in this case satisfies the proportionate penalties clause of the Illinois Constitution. *Id.* at 342-43.

C. Illinois Case Law in Support of As-Applied Challenge

In *People v. House*, 2019 IL App (1st) 110580-B, *appeal granted*, 2020 IL LEXIS 19 (Jan. 29, 2020)[3], the First District, in a case virtually on all fours with Mr. Williams' case, ruled that the defendant's mandatory natural life sentence was unconstitutional as applied to the defendant, a 19-year-old young adult, under the Illinois Constitution's proportionate penalties clause.

In *House*, the defendant was 19 years old at the time of the commission of two murders, had no prior violent criminal history, was convicted under the theory of accountability because he acted as a lookout, and was sentenced to a mandatory natural life imprisonment sentence without the possibility of parole. *Id.* ¶¶ 32-33. With respect to his age, the court noted that although the defendant was 19 years old, he "was barely a legal adult and still a teenager when he committed these

[3] The State's petition appears to be principally directed at challenging the appellate court's ruling based on the procedural posture of the case in that the matter was not remanded for further post-conviction proceedings for development of the record in the trial court, rather than in opposing the underlying legal position that young adults, like juveniles, can maintain proportionate penalties challenges to their sentences. *People v. House*, Case No. 125124, Petition for Appeal as a Matter of Right or, Alternatively, for Leave to Appeal, at 6-8 (filed Oct 10, 2019).

offenses." *Id.* ¶ 63. Moreover, the court pointed out that his "youthfulness is relevant when considered alongside his participation in the actual shootings." *Id.* Next, the court highlighted that the defendant "did not have a criminal history of committing violent crimes" and that his presentence investigation report indicated only prior offenses for possession of a controlled substance with intent to deliver. *Id.*

With regard to the defendant's minimal culpability, the court remarked that "[b]ecause defendant acted as a lookout during the commission of the murders, he was found guilty under a theory of accountability" and was therefore subject to a mandatory natural life sentence pursuant to 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998). *Id.* ¶ 29. The court also emphasized that "defendant's conviction under the theory of accountability weighed heavily" in its conclusion. *Id.* ¶ 32.

As to the lack of consideration of rehabilitation, the court stated that although certain mitigating factors "were before the trial court when it declined to impose the death penalty, they were not available to be considered before imposing a mandatory natural life sentence. The court's ability to take any factors into consideration was negated by the mandatory nature of defendant's sentence. The trial court was precluded from considering the goal of rehabilitation in imposing the life sentence, which is especially relevant in defendant's case." *Id.* ¶ 64.

In addition, the First District considered pronouncements from the United States Supreme Court regarding continuing brain development in adolescents, scholarly articles, laws in European countries adjudicating young adults in juvenile

court, and judicial and legislative advancements in Illinois, including the Illinois Supreme Court's decision in *People v. Buffer*, 2019 IL 122327, which declared any sentence exceeding 40 years to be a *de facto* life imprisonment sentence, as well as the legislature raising the age for a delinquent minor, statutorily outlining the *Miller* factors for mitigation purposes, and granting parole review for persons under the age of 21 at the time of the commission of the offense. *Id.* ¶¶ 47-62. The court found that "[t]hese considerations are significant in the instant case and support defendant's argument that the mandatory natural life sentence is unconstitutional as applied to him." *Id.* ¶ 63.

In conclusion, the court stated that "[g]iven defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, we find that defendant's mandatory sentence of natural life shocks the moral sense of the community." *Id.* ¶ 64. "Accordingly, we hold that defendant's sentence violates the proportionate penalties clause of the constitution as applied to him." *Id.* ¶ 65. Finally, the panel noted that "we question the statutory requirement to impose a mandatory natural life sentence on a culpable lookout compared to the perpetrator who pulled the trigger and where a codefendant, although 17 years old, has been released from the penitentiary." *Id.* ¶ 66.

As mentioned above, the facts in *House* and in Mr. Williams' case are virtually indistinguishable, other than that Mr. Williams could be described as a

getaway driver as opposed to a lookout and Mr. Williams had no prior criminal history whatsoever.

Furthermore, several very-recent Illinois decisions have followed the rationale of *House* with respect to emerging adults in reversing denials of motions for leave to file successive post-conviction petitions challenging the propriety of the defendants' sentences. *See People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 34 (May 26, 2020); *People v. Johnson*, 2020 IL App (1st) 171362, ¶ 17 (May 26, 2020). *See also People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 114 (Mar. 31, 2020) (granting leave to file successive post-conviction petition by young adult).

**D. Recent Scientific and Academic Literature Regarding Emerging Adults**

In the United States Supreme Court's landmark trilogy of cases concerning juvenile sentencing, the Court relied heavily upon research in brain science and psychology in concluding that "those findings – of transient rashness, proclivity for risk, and inability to assess consequences – both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his '"deficiencies will be reformed."' *Miller*, 567 U.S. at 471-72 (quoting *Graham*, 560 U.S. at 68 (quoting Roper, 543 U.S. at 570)).

"Much of the same scientific research cited by the Court in *Roper*, *Graham*, and *Miller* for the proposition that juveniles are unique posits that brain development continues after age eighteen, rendering emerging adult brains similarly distinct from those of adults." Emily Graham, *Emerging Adults in the Federal System: A Case for Implementing the Federal Youth Corrections Act*, 11

HARV. L. & POL'Y REV. ONLINE 619, 623 (2017). It is also important to note that the Supreme Court "did not limit its holding to individuals under eighteen on neuroscientific grounds," *id.*; in fact, the Court in *Roper* declared that "[d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 543 U.S. at 574. This recognition led the *House* court to conclude that "[a]lthough the Court in *Roper* delineated the division between juvenile and adult at 18, we do not believe that this demarcation has created a bright line rule." *House*, 2019 IL App (1st) 110580-B, ¶ 54.

In *Roper*, the Court cited to the work of Professor Jeffrey Jensen Arnett. *Roper*, 543 at 569. Arnett, a psychology professor and expert in juvenile and young adult development, coined the term "emerging adulthood" in a groundbreaking article in 2000 to describe the period between adolescence and adulthood. Kevin J. Holt, Note, *The Inbetweeners: Standardizing Juvenileness and Recognizing Emerging Adulthood for Sentencing Purposes After* Miller, 92 WASH. U. L. REV. 1393, 1413 (2015). According to Arnett, "emerging adulthood" describes a period between the ages of eighteen and the mid-twenties. Jeffrey Jenson Arnett, *Emerging Adulthood, A Theory of Development from the Late Teens Through the Twenties*, 55 AM. PSYCHOLOGIST 469, 469 (2000). "Emerging adulthood has grown as a psychological and cognitive theory since its inception and continues to gain recognition." Holt, 92 WASH. U. L. REV. at 1413.

Focusing particularly on those emerging adults between the ages of eighteen and twenty, "recent behavioral, psychological, and neurological research confirms that eighteen- to twenty-year-olds are not fully mature adults. Rather, they are more likely to engage in reckless behavior than older adults and they are more vulnerable to peer pressure." Andrew Michaels, *A Decent Proposal: Exempting Eighteen- to Twenty-Year-Olds from the Death Penalty*, 40 N.Y.U. REV. L & SOC. CHANGE 139, 161 (2016).

With respect to behavioral and psychological research, studies demonstrate that "eighteen- to twenty-year-olds are behaviorally and psychologically different from older adults in several ways. They are less able to anticipate future consequences and they are less able to differentiate between positive and negative rewards. They score low on temperance and high on delinquency. Finally, they are more vulnerable to peer pressure than older adults. As a result of their behavioral predispositions, they are more likely to engage [in] reckless acts. The behavioral and psychological research indicates that eighteen- to twenty-year-olds are less than fully mature." *Id.* at 165.

Similarly, "[n]eurological research, which focuses on the anatomical structure of the brain, has illuminated the physiological basis for the behavioral differences of eighteen- to twenty-year-olds as compared to older adults." *Id.* In particular, the prefrontal cortex, which is the area of the brain responsible for behavior control, risk assessment, and impulse control, is particularly underdeveloped in eighteen- to twenty-year-olds. *Id.* First, the brain's grey matter, which assists in voluntarily

controlling behavior, does "not fully mature until after age twenty." *Id.* at 166. Second, the brain's white matter, which relates to self-regulation and peer pressure, likewise does not fully mature until after age twenty. *Id.* "In addition to affecting specific structures like the prefrontal cortex, the underdevelopment of gray matter and white matter has consequences for the brain's functional systems. The underdevelopment of the brain's reward system, which consists of various sub-components and their interaction with hormone pathways, also makes eighteen- to twenty-year-olds more vulnerable to peer pressure than older adults." *Id.* at 167.

Furthermore, "recent research shows that environmental factors can influence brain development beyond the age of eighteen. This is important because individuals of this age group are increasingly less likely to be part of healthy, stabilizing environments due to delayed marriage, decreased parental oversight, and greater access to negative peer influence." Graham, 11 HARV. L. & POL'Y REV. ONLINE at 624.

There is a plethora of new academic articles on the topic of emerging adults that analyze in depth the numerous psychological, neurological, and social science studies underlying the conclusions regarding emerging adults summarized above. *See, e.g.*, Clare Ryan, *The Law of Emerging Adults*, 97 WASH. U. L. REV. 1131, 1136-48 (2020); Zoe Jordan, Note, *The* Roper *Extension: A California Perspective*, 71 HASTINGS L.J. 197, 206-10 (2019); Elizabeth Scott et al., *Bringing Science to Law and Policy: Brain Development, Social Context, and Justice Policy*, 57 U. WASH. L.J. & POL'Y 13, 20-45 (2018); Christine E. Finch, Note, *Emerging Adulthood and the*

*Criminal Justice System: #BrainNotFullyCooked #Can'tAdultYet #Yolo*, 58 SANTA CLARA L. REV. 325, 331-33 (2018); Elizabeth Cauffman et al., *How Developmental Science Influences Juvenile Justice Reform*, 8 U.C. IRVINE L. REV. 21, 23-27 (2018); Josh Gupta-Kagan, *The Intersection Between Young Adult Sentencing and Mass Incarceration*, 18 WIS. L. REV. 669, 676-80 (2018); Emily Graham, *Emerging Adults in the Federal System: A Case for Implementing the Federal Youth Corrections Act*, 11 HARV. L. & POL'Y REV. ONLINE 619, 623-26 (2017); Carly Loomis-Gustafson, *Adjusting the Bright-line Age of Accountability within the Criminal Justice System: Raising the Age of Majority to Age 21 Based on the Conclusions of Scientific Studies Regarding Neurological Development and Culpability of Young-Adult Offenders*, 55 DUQ. L. REV. 221, 230-35 (2017); Andrew Michaels, *A Decent Proposal: Exempting Eighteen- to Twenty-Year-Olds from the Death Penalty*, 40 N.Y.U. REV. L & SOC. CHANGE 139, 161-67 (2016); Kevin J. Holt, Note, *The Inbetweeners: Standardizing Juvenileness and Recognizing Emerging Adulthood for Sentencing Purposes After* Miller, 92 WASH. U. L. REV. 1393, 1413-15 (2015).

Moreover, by way of international comparison, it is important to point out that "several European countries have already extended juvenile justice to include young adults": (1) "[i]n Germany, all young adults ages 18 to 21 are tried in juvenile court and the judges have an option to sentence them as juveniles"; (2) in Sweden, emerging adults may "be tried in juvenile court until their twenty-fifth birthday, and young adults receive different treatment than adults"; and (3) in The

Netherlands, there are "extended juvenile alternatives for young adults ages 18 to 21." *House*, 2019 IL App (1st) 110580-B, ¶ 56.

**E. Actual Shooter Resentenced to 60-year Concurrent Prison Terms**

In *House*, the appellate court noted that "[a]lthough, we do not generally make a specific recommendation to the trial court on remand as to an appropriate sentence, in this particular case . . . we question the statutory requirement to impose a mandatory natural life sentence on a culpable lookout compared to the perpetrator who pulled the trigger and where a codefendant although 17 years old, has been released from the penitentiary." *Id.* ¶ 66.

In the instant case, David Evans, the actual shooter who was 17 years old at the time of the two homicides, was resentenced by this Court in May 2019 to two concurrent 60-year terms, which, according to the Illinois Department of Corrections' website, will result in his release from prison on parole in a little more than five years.

As in *House*, Mr. Williams questions the proportionality of any sentence exceeding or equaling that of Mr. Evans given the very minimal role played by Mr. Williams as a driver. *Id.*

## CONCLUSION

For all of the foregoing reasons, Mr. Williams requests that the Court advance his petition to an evidentiary hearing, grant his petition, vacate his sentence, order a new sentencing hearing, and for such relief as the Court deems proper. Mr. Williams' verification is attached in support of the present petition.

Respectfully submitted,

Steven W. Becker

Steven W. Becker
Counsel for Petitioner
Law Office of Steven W. Becker LLC
205 N. Michigan Ave., Suite 810
Chicago, Illinois 60601
(312) 396-4116

STATE OF ILLINOIS )
) SS
COUNTY OF WILL )

**VERIFICATION**

I, Cordell Williams, being duly sworn under oath, state on information and belief that the facts stated in this petition are true and correct to the best of my knowledge.

Cordell Williams

CORDELL WILLIAMS

Subscribed and sworn to before me

this 11th day of March, 2020.

OFFICIAL SEAL
STEVEN W BECKER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/07/20

Steven W. Becker

NOTARY PUBLIC